**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION AT CINCINNATI**

| | | |
|---|---|---|
| **HEALTHY ADVICE NETWORKS,** | )( | |
| **LLC** | )( | |
| | )( | **Case No. 1:12-cv-610** |
| **Plaintiff,** | )( | |
| | )( | **Judge Dlott** |
| **v.** | )( | |
| | )( | |
| **CONTEXTMEDIA, INC.** | )( | |
| | )( | |
| **Defendant.** | )( | |

**<u>DEFENDANT CONTEXTMEDIA, INC.'S MEMORANDUM IN OPPOSITION TO
PLAINTIFF HEALTHY ADVICE NETWORK LLC'S MOTION FOR PRELIMINARY
INJUNCTION</u>**

I.    **INTRODUCTION**

Plaintiff Healthy Advice Networks, LLC ("HAN") and defendant ContextMedia, Inc. ("Context") are direct competitors in the business of providing video equipment with health-related content for use in physicians' waiting rooms.  HAN is by far the largest player in this business, claiming that more than 55,000 primary care and specialty doctors and more than 500 hospitals use HAN's services.  (Compl., Dkt. 1, ¶ 7).  Context is a newcomer, having entered the business only in 2006.  (Shah Decl., ¶ 15).[1]  But Context is growing, with its services currently being used by over 4,000 physicians.  (Shah Decl., ¶ 16-18).  Approximately 129 former HAN clients have chosen Context's services over HAN's.  (Shah Decl., ¶ 20).

Rather than respond in the marketplace, HAN sent a threatening letter on January 20, 2011 to Context making what proved to be a series of unfounded allegations, including some that are featured in HAN's current Complaint.  (Ex. C to Shah Decl).  An exchange between the parties ensued in February and March of 2011, with Context proposing reasonable conditions for both sides to follow when switching over a client from one company's services to the other's, and HAN claiming damages of $1,400 plus attorneys' fees.  (Exs. G and H to Shah Decl).  After March 4, 2011, not a word was heard from HAN until it filed this lawsuit on August 10, 2012. (Shah Decl., ¶ 50).

A preliminary injunction is of course an "an extraordinary remedy involving the exercise of a very far-reaching power."  *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir.2000).  Here, HAN's motion should be denied because it is unnecessary and unwarranted.  For starters, HAN has not submitted a shred of evidence to support its request for injunctive relief.  Its Complaint would seem to rest its request for injunctive relief on the following two allegations, both made

---

[1] Throughout this Memorandum, "Shah Decl." refers to the Declaration of Rishi Shah, filed concurrently with this memorandum.

on "information and belief": that "Context has falsely informed Healthy Advice Practices that the Practices have no contract with Healthy Advice and thus can switch to Context's services immediately" and that "Context has falsely informed numerous Healthy Advice Practices that Context is authorized to remove the Healthy Advice Property at their respective locations and replace it with Context's product." (Compl., ¶¶ 24-25). As shown by the evidence Context has submitted herewith, neither allegation is true. Context does not represent to clients that they have no contract with HAN, nor does Context tell clients that Context is authorized by HAN to remove its equipment. (Shah Decl., ¶ 34; Chestnut Aff., ¶¶ 7-8; McVay Aff., ¶¶7-8)[2]. At most, Context will assist clients in returning HAN's equipment to HAN when a client specifically requests and authorizes that assistance. (Shah Decl., ¶ 30; Ex. B to Shah Decl).

In other words, Context is not causing HAN any cognizable irreparable harm in need of the Court's extraordinary injunction powers. To the extent HAN is really seeking an injunction precluding Context from providing *any* assistance to a client in returning HAN's equipment when that client has chosen to switch to Context and to remove HAN's equipment from the client's own offices, Context submits that HAN has no legal right to such an injunction. Moreover, as demonstrated by Context's motion to dismiss, three of HAN's four causes of action—under the Lanham Act, the Ohio Deceptive Trade Practices Act, and the law of tortious interference —fail to state legally plausible claims. The fourth claim for conversion is factually bereft since Context does not possess any of HAN's equipment.[3]

---

[2] Throughout this memorandum, "Chestnut Aff." refers to the Affidavit of Dawn Chestnut from Cheyenne Medical Specialists, PC, filed concurrently with this memorandum.

[3] It is true that a HAN media player, which HAN claims was worth $765, was lost by FedEx during shipment to HAN. (Shah Decl., ¶ 41). That loss justifies neither a preliminary injunction nor, for that matter, a federal lawsuit.

II.    **FACTS**

    A.    **Industry for point-of-care health media platforms**

Context's co-Founder and current CEO, Rishi Shah, has knowledge of the facts set forth in this section and has offered a declaration that is being filed concurrently with this memorandum.  The business in which HAN and Context compete is referred to as "point-of-care health media."  (Shah Decl., ¶ 3).  Patients visiting doctors' offices are accustomed to seeing informative pamphlets and brochures about medical conditions in waiting rooms.  In recent years, those pamphlets and brochures have been supplemented with multimedia platforms featuring digital televisions that show sophisticated audio and video content.  (Shah Decl., ¶ 4). Context's content includes educational information and advice about medical health conditions, exercise and nutrition segments, patient stories, recipes, advertisements for pharmaceuticals and other health consumer brands, and health related public service announcements.  (Shah Decl., ¶ 5).

Health media platforms are in demand for several reasons.  They engage, educate, and inspire patients when and where the patients' health is at the top of their minds; they empower patients to ask physicians questions that the patients may not have otherwise asked; and they provide patients with information to make healthier lifestyle choices and positively impact health outcomes.  (Shah Decl., ¶ 7).  Besides HAN and Context, other competitors in this industry include Accent Health, Health Media Networks, Health Focus Media, Health Monitor Network, Everwell TV, and CARE Media.  (Shah Decl., ¶ 8).

    B.    **ContextMedia, Inc.**

Context was founded in 2006, focusing first on health media platforms for endocrinology (*i.e.*, diabetes) offices.  (Shah Decl., ¶ 15).  By 2010, about one fourth of all diabetes offices across all 50 states, representing almost 1 million patients, used Context's platform.  (Shah Decl.,

¶ 16).  Context has continued to grow, now offering services to rheumatology and cardiology practices.  (Shah Decl., ¶ 17).  Context earns revenue through advertising on its digital media platforms.  Advertisers include pharmaceutical and other health care consumer brands.  (Shah Decl., ¶ 22).

Offices choose Context's platforms over that of competitors for a variety of reasons.  By way of example, Context offers physicians the "Doctor's Choice Guarantee," which allows physicians to remove any content they do not like or approve.  (Shah Decl., ¶ 21).  Context is the first company to offer this choice. (*Id.*)  Context also offers a variety of content specifically targeted to conditions that its clients treat.  (*Id.*)  Context's content is provided through videos, rather than slideshows, and comes from respected sources including medical associations and trusted production companies.  (*Id.*)  Context offers its service free of charge to clients and provides clients with free, dedicated account management services.  (*Id.*)  And finally, physicians want to align with Context because of Context's mission of health education and Context's service-oriented approach.  (*Id.*)

C.     **Hardware equipment for health media platforms**

Context obtains content from licensing partners, trade associations, production houses, in-house production, sponsors, and other sources.  (Shah Decl., ¶ 6).  That content is distributed to clients' offices over the Internet.  Context provides and installs the necessary hardware equipment at the offices of physicians that have agreed to use Context's health media platform.  (Shah Decl., ¶¶ 29-30).  This hardware includes a computer media player for receiving and processing content and a flat-panel television for displaying the content.  (Shah Decl., ¶ 11).  In addition to these pieces of hardware, a typical installation makes use of certain other ancillary and commonplace components, such as cabling or television remote controls.  (Shah Decl., ¶ 12).

4

In some instances, client offices have preexisting equipment that needs to be taken down and replaced with the new equipment.  (Shah Decl., ¶¶ 13-14).  This legacy equipment could be an ordinary television that the client used for cable television, or it might be equipment from a competing health media platform provider that the client chose to replace, such as HAN.  (*Id.*)

        D.      **<u>Process for signing up and installing equipment for new customers</u>**

Context solicits prospective clients through a variety of means.  Many sales leads are generated from lists of physicians' practices purchased from third parties.  (Shah Decl., ¶ 24).  Other leads come from industry trade shows, conferences, and meetings.  (Shah Decl., ¶ 26).  Context does not limit its sales efforts to clients using HAN, and Context's sales personnel generally do not know whether a given prospective client is using HAN's services at the time Context reaches out to them.  (Shah Decl., ¶ 25).

If a client elects to use Context, Context obtains signatures from a client representative on two documents.  The first document is a "sign-up" form, which lays out certain rights and obligations as between Context and the client.  (Ex. A to Shah Decl.; Shah Decl., ¶ 28).  The second document is an "authorization form," which is used in instances where the office has legacy equipment from another company's health media platform.  (Ex. B to Shah Decl.; Shah Decl., ¶¶ 30-32; Chestnut Aff., ¶ 9; McVay Aff., ¶ 9).  Through the authorization form, a client confirms to Context that Context is authorized to remove the legacy equipment.  A representative authorization form reads as follows, where relevant names and addresses would be filled in:

> The Practice of [*name of client*] has agreed to replace its current waiting-room TV system provided by [*company providing legacy equipment*] with the ContextMedia:Health waiting-room TV service, at its facility located at [*address of client's practice*].
>
> Our Office has requested and authorized the technician responsible for installing the ContextMedia:Health waiting-room TV service, to also uninstall and remove the existing [*company providing legacy equipment*] system and to arrange to have all equipment removed to [*company providing legacy equipment*].

5

(Ex. B to Shah Decl.; *see also* Chestnut Aff., ¶ 9; McVay Aff., ¶ 9).  For clients that had been using legacy equipment from HAN, Context does not tell clients that they "have no contract with Healthy Advice" and does not represent to offices that Context "is authorized to remove the Healthy Advice Property," as alleged in HAN's complaint. (Shah Decl., ¶ 34; Compl., ¶¶ 24, 25).

Having obtained signatures on the sign-up form and the authorization form, Context contracts technicians to assist the client in removing the legacy equipment if the client requests and authorizes Context to do so.  (Shah Decl., ¶ 30, 35; Ex. B to Shah Decl.; Chestnut Aff., ¶¶ 9-10; McVay Aff., ¶¶ 9-10).  The technician follows certain procedures to safeguard the equipment and ensure its proper delivery to its owner, including: photographing the equipment prior to removal; photographing the equipment on the floor after removal; packaging the equipment in boxes; taping and sealing the boxes; placing the equipment at a location specified by the client; and contacting a Context network operations engineer to confirm that the equipment is awaiting pickup by FedEx.  (Shah Decl., ¶ 35; *see also* Chestnut Aff. ¶ 11; McVay Aff. ¶ 11).  Usually within a period of days, FedEx picks up and delivers the competitor's equipment and ships it back directly to the competitor.  (Shah Decl., ¶ 37; Chestnut Aff. ¶ 12; McVay Aff. ¶ 12).  The equipment is not first sent to Context and Context does not "take[] possession of the Healthy Advice Property for an undetermined amount of time," as alleged in HAN's complaint.  (Shah Decl., ¶¶ 37-41; Compl., ¶ 30).[4]

---

[4] Context is aware of one past instance in which HAN equipment was first shipped to Context who then shipped it to HAN.  (Shah Decl., ¶ 39).  As of February 2011, Context has implemented procedures to ensure HAN equipment is shipped directly to HAN and is not sent to Context.  (*Id.*)  In the event that Context mistakenly receives HAN equipment, which has occurred fewer than five times in the past, Context's practice is to reject shipment, in which case the shipment would be sent back to the client.  (Shah Decl., ¶ 40).  Context would then have FedEx retrieve the shipment again from the client and deliver it to HAN.  (*Id.*)  For purposes of a preliminary injunction motion, isolated past incidents are not relevant.  *See, e.g.*, *Michigan Coalition v. Griepentrog*, 945 F. 2d 150, 154 (6th Cir. 1991) (irreparable harm requires "some evidence that the harm has occurred in the past ***and is likely to occur again***") (emphasis added).

6

Context is not aware of any missing or damaged HAN equipment aside from the one aforementioned media player from one physician's office.  (Shah Decl., ¶ 41).  Context believes that Federal Express lost this media player during shipment.  (*Id.*)  Context does not currently possess any equipment from HAN.  (Shah Decl., ¶ 42).

      E.      **Pre-suit correspondence and the present lawsuit**

On January 20, 2011, Context received correspondence from HAN complaining about Context's practices in switching clients from HAN's platform to Context's platform.  (Ex. C to Shah Decl.).  The parties continued to exchange letters and telephone correspondence until March 4, 2011.  (Shah Decl., ¶¶ 44-48, citing Exs. D-H to Shah Decl.).  HAN claimed damages of $1,425 that Context disputed and declined to pay.  (Exs. G and H to Shah Decl.).  Rather, Context proposed a set of procedures to govern future instances in which a client switches from Context to HAN:

- Once ContextMedia receives authorization from the physician to remove Healthy Advice's equipment and install its own, notice of termination will promptly be provided to Healthy Advice; and
- After receiving the notice of termination, Healthy Advice will have five (5) days to remove its equipment from the physician's office; and
- If Healthy Advice has not removed its equipment within five (5) days of receiving the notice of termination, ContextMedia will arrange to have the Healthy Advice equipment removed and returned, on behalf of the physician, by a contract service provider approved by Healthy Advice; and
- In addition, in any case where a physician has decided to replace ContextMedia's service with that of Healthy Advice, ContextMedia is willing to abide by the same arrangements

(Ex. H to Shah Decl.).

Context received no response from HAN to this proposal and heard nothing further from HAN until served with this lawsuit on August 20, 2012.  (Shah Decl., ¶ 50).

III.  **ARGUMENT**

A.  **Legal Standard**

"A preliminary injunction is an extraordinary remedy which should be granted only if the movant carries [its] burden of proving that the circumstances clearly demand it."  *Overstreet v. Lexington-Fayette Urban Cty.*, 305 F.3d 566, 573 (6th Cir. 2002).  "There is no power the exercise of which requires greater caution, deliberation, and sound discretion, or more dangers in a doubtful case, than the issuance of an injunction."  *Roghan v. Block*, 590 F. Supp. 150, 153 (W. D. Mich. 1984), *aff'd* 790 F.2d 540 (6th Cir. 1986).  It is "an extraordinary remedy involving the exercise of a very far-reaching power."  *Leary*, 228 F.3d at 739 (6th Cir. 2000).

In ruling on a preliminary injunction, the Court should consider and balance four factors:

> (1) whether Plaintiff has a strong likelihood of success on the merits;
>
> (2) whether Plaintiff would suffer irreparable injury without the injunction;
>
> (3) whether issuance of the injunction would cause substantial harm to Context; and
>
> (4) whether the public interest would be served by the issuance of the injunction.

*Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007); *Abney v. Amgen, Inc.*, 443 F.3d 540, 546 (6th Cir. 2006).  The Sixth Circuit uses a balancing test:  "[T]he precise wording of the standard for the likelihood of success on the merits is not as important as a realistic appraisal of all of the traditional factors weighed by a court of equity.  A balancing is required … ."  *Roth v. Bank of the Commonwealth*, 583 F.2d 527, 537-38 (6th Cir. 1978); *In re DeLorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 1985).

A preliminary injunction "should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet*, 305 F.3d at 573. HAN has not and cannot make the required showing in this case.

B. **HAN's Failure of Proof Requires Denial of its Motion, While Context's Evidence Shows That HAN's Allegations Of Harm Are Untrue**

Petitioning a federal court to enter an injunction is of course a serious matter that should not be undertaken lightly. *See Hanson Trust PLC v. SCM Corp.*, 774 F.2d 47, 60 (2d Cir. 1985) (A preliminary injunction is "one of the most drastic tools in the arsenal of judicial remedies."). Accordingly, "[t]he party seeking a preliminary injunction bears the burden of producing evidence… ." *ECRI v. McGraw-Hill, Inc.*, 809 F.2d 223, 226 (3d Cir. 1987). *Evidence* is required, not conclusory allegations. *Michigan Coalition of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 154 (6th Cir. 1991) ("In order to substantiate a claim that irreparable injury is likely to occur, a movant must provide some *evidence* that the harm has occurred in the past and is likely to occur again") (emphasis added); *Dyer v. Hardwick*, 2012 WL 2131340, *9 (E. D. Mich. 2012)(conclusory allegations deemed "short of what is required" for an injunction) (citing *Leary*, 228 F.3d at 739 (6th Cir. 2000)).

Here, HAN is seeking an injunction on the strength of nothing more than two "information and belief" allegations: (1) that Context tells prospective clients that they have no contract with HAN and (2) that Context tells prospective clients that it is authorized to remove HAN's equipment. (Compl., ¶¶24-25). HAN never identifies a single customer to which Context supposedly has made these statements, nor identifies the date or place of, or participants in, any such alleged communications. Putting aside the palpable implausibility of these allegations, HAN has not submitted a single piece of *evidence* to support them. For that reason alone, HAN's motion should be denied.

9

Moreover, HAN's threadbare allegations are untrue as demonstrated by the evidence Context has put before the Court. This evidence includes a declaration and affidavits from Context's CEO and from clients showing what Context's true practices are in switching clients from HAN to Context. (Shah Decl., ¶¶ 23-42; Chestnut Aff.; McVay Aff.). This evidence shows that Context does <u>not</u> tell clients they have no contract with HAN. (Shah Decl., ¶ 34; Chestnut Aff., ¶¶ 7-8; McVay Aff., ¶¶ 7-8). Likewise, Context does not tell clients that Context is authorized to remove HAN's equipment. (*Id.*) Rather, Context's practice is to <u>obtain</u> authorization from its clients. (Shah Decl., ¶ 30-32; Chestnut Aff., ¶ 9; McVay Aff., ¶9). And this evidence shows that Context is not in possession of any of HAN's equipment, with the only arguable conversion being FedEx's loss of a $765 video player. (Shah Decl., ¶¶ 41-42). This evidence by itself is another sufficient ground to deny HAN's motion in its entirety. Context is not making the statements HAN wants to enjoin and Context has nothing belonging to HAN that it can be compelled to return.

C.     <u>**HAN Has Not Established a Strong Likelihood of Success on the Merits as to Any of its Causes of Action.**</u>

HAN asserts the following four causes of action: unfair competition under the Lanham Act (Count I); violation of the Ohio Deceptive Trade Practices Act (Count II); tortious interference with contract (Count III); and conversion (Count IV). The degree to which a plaintiff must establish likelihood of success depends on its strength as to the other three equitable factors. *In re DeLorean Motor Co.*, 755 F.2d at 1229. As will be shown below, all of the other three equitable factors weigh against HAN. HAN must therefore make a very strong showing on likelihood of success on at least one of its four claims, but has failed to come close. Indeed, all but the state law conversion claim fail to even state a plausible claim for relief within the meaning of Rule 12(b)(6), as demonstrated by Context's motion to dismiss, being filed

concurrently with this Memorandum.  Context's motion to dismiss is incorporated herein by reference and its arguments will not be repeated here.

        1.      **Lanham Act and the Ohio Deceptive Trade Practices Act (Counts I and II)[5]**

Section 1125(a)(1) of the Lanham Act sets forth two types of prohibited conduct: false designation under § 1125(a)(1)(A) and false advertising under § 1125(a)(1)(B).  HAN's Complaint does not specify the subsection under which its Lanham Act claim falls.  (Compl., ¶¶43-51).  HAN's Motion lists "false advertising" and recites legal elements associated with false advertising, (HAN Motion, Dkt. 3, at 7), suggesting HAN bases its claim under § 1125(a)(1)(B).  But regardless, Context's allegedly misleading statements do not fall within the categories of conduct that the Lanham Act prohibits.

        a.      **HAN Will Not Succeed In Establishing False Advertising.**

The Lanham Act's false advertising provision prohibits misstatements about goods or services.  17 U.S.C. § 1125(a)(1)(B); *White Mule Co. v. ATC Leasing Co. LLC*, 540 F. Supp. 2d 869, 896 (N.D. Ohio 2008) ("[Section 1125(a)(1)(B)] usually applies to advertising.  In the rare cases that do not involve traditional advertising, courts in this circuit have still applied false advertising precedents.").  HAN's motion correctly recites the five essential elements for a false advertising claim, (HAN Motion, Dkt. 3, at 7), but misapplies them.  Under a proper interpretation, HAN cannot establish at least four of the essential elements.

The first essential element of a false advertising claim is "the defendant has made false or misleading statements of fact concerning his own product or another's."  *White Mule*, 540 F. Supp. 2d at 896-897.  The statement must be one of fact, not opinion.  *White Mule*, 540 F. Supp.

---

[5] Courts apply the same legal standards to the Ohio Deceptive Trade Practices Act ("ODTPA") as they do for the Lanham Act.  *Procter and Gamble Co. v. Georgia-Pacific Consumer Products* (S. D. Ohio, August 3, 2009); *Allied Erecting v. Genesis Equip. & Mfg.*, 649 F. Supp. 2d 702, 725 (N. D. Ohio 2009)).

2d at 896; *Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725, 731 (9th Cir.

1999) ("Statements of opinion are not generally actionable under the Lanham Act") (citing 15

U.S.C. § 1125(a); *Groden V. Random House, Inc.*, 61 F.3d 1045, 1051 (2d Cir. 1995));

*Incompass IT, Inc. v. Dell, Inc.*, No. 11-CV-0629, 2012 WL 383960, at *3 (D. Minn. Feb. 6,

2012).  Had Context ever told a client that it has no enforceable contract with HAN, that would

be a statement of opinion, not fact.  *See McDavid Knee Guard, Inc. v. Nike USA, Inc.*, No. 08 CV

6584, 2010 WL 3000178, at *3 (N.D. Ill. July 28, 2010) ("[A] layman's statements expressing an

interpretation of a contractual agreement are opinions which are not actionable under the

Lanham Act"); *see also Coastal Abstract*, 173 F.3d at 731 (laypersons interpretation of

regulation or statute are opinion).

  HAN also has no proof of the essential element that the allegedly made misleading

statements "actually or tend[] to deceive a substantial portion of the intended audience."  *White

Mule*, 540 F. Supp. 2d at 896-897 (N. D. Ohio 2008).  In fact, the notion that Context could

deceive a client under contract with HAN that the client had no such contract is implausible on

its face.  The client would know about the contract and would not accept, at face value, a naked

representation by a third party salesperson that such a contract does not exist.  As to Context's

alleged misrepresentation that Context was authorized by HAN to remove equipment, the

evidence is to the contrary.  The authorization form on which Context obtains a signature from

clients makes plain that HAN and Context are separate entities and seeks authorization from

clients to remove equipment, rather than representing that Context already has authorization.

(Ex. B to Shah Decl.; Shah Decl., ¶¶ 30-32; Chestnut Aff., ¶ 9; McVay Aff., ¶ 9).

  HAN's claims will likewise fail under two other essential elements – that the misleading

statement is "material in that it will likely influence the deceived consumer's purchasing

decisions" and that "there is some causal link between the challenged statements and harm to the plaintiff." *White Mule*, 540 F. Supp. 2d at 896-897 (N. D. Ohio 2008). HAN contends clients would be less likely to switch to Context if clients knew that "doing so would place them in breach of contract." (HAN Motion, Dkt. 3, at 9). But clients select Context because of the substance and quality of Context's offering, not because of the alleged misleading statements alleged in HAN's complaint. Specifically, clients are attracted to Context's "Doctor's Choice Guarantee," which allows physicians to remove any content they do not like or approve – a choice not previously offered by other competitors. (Shah Decl., ¶ 21). Moreover, Context offers a variety of content specifically targeted to the conditions that its clients treat, provides its content through videos rather than slideshows, and obtains its content from respected and well-known sources. (*Id.*) Context's alleged misleading statements related to a client's contract with HAN are unlikely to sway a client's purchasing decision, at least because HAN's contract does not even prohibit its clients from doing business with Context. (Compl., Ex. A) ("respectfully request[ing]" but not requiring that clients not use other services). HAN will be unlikely to show that Context's alleged statements drove clients to switch to Context's services.

b. **HAN Will Not Succeed In Establishing False Designation.**[6]

False designation claims are limited, by statutory language, to conduct that affects consumers' perception of the plaintiff's "goods, services, or commercial activities." 17 U.S.C § 1125(a)(1)(A). The law of false designation prohibits conduct that causes confusion in the marketplace as to the source of goods or services "in order to … protect the ability of consumers to distinguish among competing producers." *Blue Leather, LLC v. Markowicz*, No. 3:07CV-458-

---

[6] Although HAN's motion suggests HAN is basing its claim on Section 1125(a)(1)(B) and not Section 1125(a)(1)(A), its motion does not affirmatively take this position and its Complaint is completely ambiguous. As such, Context addresses Section 1125(a)(1)(A).

13

S, 2009 WL 2835785, at *1 (W.D. Ky. Aug. 31, 2009) (citations omitted).  An essential element of false designation is a "likelihood of confusion."  *Johnson v. Jones*, 149 F. 3d 494, 502 (6th Circuit 1998).

To the extent HAN pursues a false designation claim, its cause of action fails under the "likelihood of confusion" element.  Context telling clients that clients have no contract with HAN cannot cause a likelihood of confusion as between HAN and Context.  If anything, statements by Context sharing opinions regarding the clients' contractual obligations with HAN would confirm to a client that Context and HAN are separate entities.  Moreover, if the client was somehow confused into thinking that Context was affiliated with HAN, it would serve no purpose and not make sense for Context to say that the client has no contract with HAN.

Context telling clients that Context is authorized to remove HAN's equipment cannot be a basis for this claim, as Context requires clients to sign an authorization form that specifically identifies the company providing the legacy equipment as a separate entity.  No client, looking at this authorization form, could possibly be confused as to which set of equipment belongs to which corporate entity:

> The Practice of _____ has agreed to replace its current waiting-room TV system provided by _____ with the ContextMedia:Health waiting-room TV service, at its facility located at _____ _____.
>
> Our practice has requested and authorized the technician responsible for installing the ContextMedia:Health waiting-room TV service, to also uninstall and remove the existing _____ system and to arrange to have all equipment returned to _____.

(Ex. B to Shah Decl.).

### 2.     Tortious Interference with Contract (Count III)

In addition to the legal defects of this claim shown in Context's motion to dismiss and the evidence described above that defeats this claim, HAN will not succeed on this claim for the

14

additional reason that Context is privileged to interfere with at-will contracts of its competitors. This privilege is separate and distinct from another privilege described and analyzed in Context's motion to dismiss, and will provide yet another basis of defeating HAN's tortious interference claim. Specifically, Ohio has adopted Restatement (Torts) 2nd § 768, which provides:

> One who intentionally causes a third person not to enter into a prospective contractual relation with another who is his competitor or not to continue an existing contract terminable at will does not interfere improperly with the other's relation if: (a) the relation concerns a matter involved in the competition between the actor and the other and; (b) the actor does not employ wrongful means and; (c) his action does not create or continue an unlawful restraint of trade and; (d) his purpose is at least in part to advance his interest in competing with the other.

*See Fred Siegel Co., LPA v. Arter & Hadden*, 85 Ohio St. 3d 171, 178-180 (1999). Factors (a) – (d) are all satisfied by Context. As to (a), Context's conduct with prospective clients currently using HAN's services directly deals with a matter related to competition between Context and HAN. As to (b), Context does not employ any wrongful means. (*See, generally*, Shah Decl.; Chestnut Aff.; McVay Aff.). Rather, Context engages in routine competition and, if successful, switches out HAN's equipment only after receiving written authorization from the client. (*Id.*) As to (c), nothing about Context's conduct creates any restraints of trade. And as for (d), Context's motivation is to advance its own interests in competing with HAN for certain common prospective clients.

All that remains is the threshold showing that the contracts between HAN and the clients were terminable at will. The contract appended to HAN's Complaint includes "Terms and Conditions" with contradictory provisions. It recites an initial 24 month period with automatic 12 month renewals on the one hand, but recites an initial 6 month term followed by termination at-will upon 60 days written notice on the other hand. (Compl. at Ex. A). The Seventh Circuit addressed a similar contract (reciting a year-to-year renewal while also providing for termination

15

upon thirty days notice) and concluded that "the usual approach" would be to consult extrinsic evidence to resolve the ambiguity. *R.S. & V. Co. v. Atlas Van Lines, Inc.*, 917 F. 2d 348, 351 (7th Cir. 1990). *See also Kelly v. Medical Life Ins. Co.*, 31 Ohio St. 3d 130, 132 (1987) (courts should consult extrinsic evidence where contract language is unclear or ambiguous).

Here, the Court will likely find this contract to be "at will" after the initial 6-month period. HAN's own pleadings and Motion confirm that the at-will termination subject to 60-days notice controls this contract, and not the 24 month initial period with automatic 12-month renewals. (*See, e.g.*, Compl., ¶ 13; HAN Motion, Dkt. 3, at 4).[7] Context therefore has a privilege as to all clients that were with HAN for at least 6 months before switching to Context. There will be few, if any, clients that do not fit this category.

### 3.    Conversion (Count IV)

HAN has not shown a likelihood of success on the merits of its conversion claim. A conversion claim requires that the defendant withhold property or prevent a plaintiff from having possession of property. *NPF IV, INC. v. Transitional Health Services*, 922 F. Supp. 77, 80-81 (S. D. Ohio 1996). To reiterate, Context does not currently possess any HAN property. (Shah Decl., ¶ 42). And the evidence provides no basis for finding that Context will in the future convert HAN's property. *See, e.g.*, *Mich. Coalition*, 945 F. 2d at 154 (irreparable harm requires "some evidence that the harm has occurred in the past *and is likely to occur again*") (emphasis added). As explained, Context assists clients in removing, packaging, and returning HAN's equipment back to HAN with all due care. (Shah Decl., ¶¶ 29-36; Chestnut Aff., ¶ 11; McVay Aff., ¶ 11). The equipment is shipped directly from client offices to HAN. (Shah Decl., ¶ 38;

---

[7] Notice of termination periods, such as the 60-day notice period in this contract, do not alter the contract's status as "terminable at will." Ohio courts view notice periods of this type as consistent with "terminable at will" contracts. *See, e.g.*, *Doe v. Lodi Community Hosp.*, 2000 WL 1825095 Ohio App. 9 Dist. 2000 ("Doe's contract with SOE is an at-will contract, it permits either Doe or SOE to terminate the agreement 'with or without cause, upon thirty (30) days written notice.'"

Chestnut Aff., ¶ 12; McVay Aff., ¶ 12).  Context is neither withholding HAN's equipment nor preventing HAN from possessing HAN's own equipment.  HAN will therefore not succeed in its claim for conversion.

Any claim of past conversion, even if it had any merit, is fully compensable by money damages.  So there is no role for an injunction here.

D.      **HAN Has Not Shown That It Will Suffer Irreparable Injury.**

Courts routinely reject a movant's assertion of irreparable injury where the movant delayed in filing its motion for preliminary injunction.  *Wells Fargo v. WhenU.com, Inc.*, 293 F.Supp.2d 734, 771 (E.D. Mich. 2003) (finding nine-month delay "undermines [plaintiffs'] allegation of irreparable harm"); *McDonald's Corp. v. Burger King, Corp.*, 87 F. Supp. 2d 722, 725 (E.D. Mich. 1999) (failure to act in a related proceeding within about 6 months "belies a claim of irreparable harm"); *Quince Orchard Valley Citizens Ass'n, Inc. v. Hodel*, 872 F.2d 75, 79-80 (six-month delay in seeking injunctive relief indicated "an absence of the kind of irreparable harm required to support the preliminary injunction"); *Southtec Orthopedics, Inc. v. Dingus*, 428 F. Supp. 2d 410, 420-21 (E.D.N.C. 2006) (denying plaintiff's motion in part because of its six- to nine-week delay in filing suit); *John Lemmon Films, Inc. v. Atl. Releasing Corp.*, 617 F. Supp. 992, 996 (W.D.N.C. 1985) (plaintiff's seven-month delay in filing suit after receiving an "unsatisfactory response" to correspondence with defendant was "telling of the absence of convincing proof that the Plaintiff would suffer irreparable harm").

Here, HAN first complained about the conduct it alleges in its lawsuit on January 20, 2011 and then sat on its hands from March 1, 2011 until August 10, 2012.  The total amount of delay in filing suit was approximately 19 months.  (Shah Decl., ¶¶ 43-50).  There is no justifiable excuse for HAN's delay.  The very notion that HAN has been enduring irreparable harm for nearly two years while doing nothing is simply not credible.

17

HAN's motion relies on a "presumption" of irreparable harm that supposedly attaches to this case on the basis that HAN alleges a violation of the Lanham Act. (HAN Motion, Dkt. 3, at 13). HAN cites cases that are pre-*ebay, Inc. v. Mercexchange, LLC*, 547 U.S. 388 (2006), where the Supreme Court rejected a presumption for patent cases. Courts have indicated that this holding should extend to Lanham Act cases. *See, e.g.*, *North American Medical Corp. v. Axiom Worldwide*, 522 F. 3d 1211, 1227-1228 (11th Cir. 2008) (finding that "a strong case can be made that *eBay's* holding necessarily extends to the grant of preliminary injunctions under the Lanham Act" but declining to decide the issue). While the Sixth Circuit has not squarely addressed this issue, other courts that decline to decide the issue affirmatively rejected any notion of a presumption where there are other shortcomings in the plaintiff's case. *See Voice of The Arab World v. MDTV Medical News Now*, 645 F.3d 26, 31 (1st Cir. 2011) (affirming that presumption inapplicable where plaintiff delays in filing suit); *KFC Corp. v. JRN, Inc.*, 2012 WL 170196, *6 (W.D. Ky. 2012) (affirming that presumption is inapplicable where plaintiff cannot show likelihood of success). As explained earlier in this memorandum, HAN delayed in filing its suit and cannot establish a likelihood of success as to its Lanham Act claims. Therefore, no presumption applies.

      E.      **<u>A Preliminary Injunction Would Cause Substantial Harm to Others.</u>**

A preliminary injunction would cause substantial harm to Context, to physicians' offices, to advertisers that display content using Context's services, and to patients at those offices. Context will be harmed because an injunction will limit its ability to obtain new clients and, thereby, limit its ability to attract advertisers. *Wells Fargo & Co.*, 293 F. Supp. 2d at 772 (E. D. Mich. 2003) (recognizing disruption to business relationships and ability to obtain new advertisers as "substantial harm" weighing against injunction). Similarly, physicians' offices will be harmed by losing the ability to display Context's content in offices, and advertisers will

be harmed by losing viewers.  *Id.* (recognizing harm to advertisers as weighing against injunction).  Finally, patients will lose the ability to view Context's informative and important medical information in waiting rooms.  All of these harms to others far outweigh the harm that HAN alleges in its Complaint.

       F.       **A Preliminary Injunction Would Not Serve the Public Interest.**

Avoiding unnecessary restraints on competition is an important public policy weighing against an injunction. "Granting an injunction to protect plaintiffs from the rigors of competition also threatens the integrity of the competitive process."  *Wells Fargo & Co.*, 293 F. Supp. 2d at 772 (E. D. Mich. 2003).  "Federal policy has long favored such comparative advertising."  *Id.*

**IV.**    **CONCLUSION**

For the reasons above, the Court should deny to HAN's Motion for Preliminary Injunction.

Respectfully submitted,


/s/ *Thomas F. Hankinson*
James E. Burke (0032731)
Thomas F. Hankinson (0088367)
KEATING MUETHING & KLEKAMP PLL
One East Fourth St.
Suite 1400
Cincinnati, Ohio 45202
Phone: (513) 579-6428
Fax: (513) 579-6457
jburke@kmklaw.com
thankinson@kmklaw.com

Richard J. O'Brien (*pro hac vice*)
Shubham Mukherjee (*pro hac vice*)
Sidley Austin LLP
One South Dearborn St.
Chicago, IL 60603
Phone: (312) 853-7000
Fax: (312) 853-7036
robrien@sidley.com
smukherjee@sidley.com
*Attorneys for Defendant ContextMedia, Inc.*


## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was filed electronically on October 3, 2012.

Parties may access this pleading through the Court's electronic docketing system.


/s/ *Thomas F. Hankinson*
Thomas F. Hankinson (0088367)