**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | | |
|---|---|---|
| **HEALTHY ADVICE NETWORKS, LLC,** | ) ) ) | **No. 1:12-cv-610** |
| **Plaintiff,** | ) ) | **(Chief Judge Susan J. Dlott)** |
| **v.** | ) ) ) | **CONTEXTMEDIA, INC.'S** |
| **CONTEXTMEDIA, INC.** | ) ) | **STATEMENT OF FACTS IN SUPPORT OF ITS MOTION FOR** |
| **Defendant.** | ) | **SUMMARY JUDGMENT** |

Pursuant to the Court's Standing Order on Civil Procedures Section I(E)(3)(a), Defendant ContextMedia, Inc. ("Context") submits the following statement of proposed undisputed facts in support of its motion for summary judgment against Plaintiff Healthy Advice Networks, LLC ("HAN"):

I.     **THE INDUSTRY**

1.     This case concerns the point-of-care patient education industry, in which companies provide patient education materials and information to physician practices free of charge, and receive revenue from sponsors, such as pharmaceutical companies or other medical product suppliers, who pay to advertise within those materials. (Ruschau Dep., Ex. 1, at 15:19-16:1, at 31:7-34:15, and at 78:3-82:20; Schnell Dep., Ex. 2, at 26:20-28:22; Merz Dep., Ex. 3, at 11:16-13:13 and at 24:18-25:23; PatientPoint website "About us," available at http://patientpoint.com/aboutus/who-is-patientpoint.aspx (accessed June 26, 2014).)

2.     One way of delivering patient education information in a physician's practice is through digital waiting room networks, in which the patient education programming is displayed

1

on television screens in the practice's waiting room. (*Id.*; Merz Dep., Ex. 3, at 16:17-21; Ruschau Dep., Ex. 1, at 29:13-21.)

## II.    THE PARTIES

### A.    HAN

3.    Founded in 1987, HAN has held itself out as the nation's largest health education provider. (Ex. 4, DX212 at HAN005855.)

4.    HAN's waiting-room programs are targeted toward five physician specialties: primary care, OB/GYN, rheumatology, cardiology and dermatology. (Merz Dep., Ex. 3, at 16:17-21.)

5.    HAN claims to serve more than 61,000 physicians in all of its programs, and to have approximately 14,000 to 15,000 physicians in its primary care waiting room network alone. (Ruschau Dep. Ex. 1, at 79:24-80:16.)

6.    HAN now goes by the name PatientPoint. (Merz Dep., Ex. 3, at 6:1-7; Ruschau Dep., Ex. 1, at 13:23-14:12.)

7.    A DVD containing a sample of HAN's programming from 2012 will be filed as Exhibit 5.

### B.    Context

8.    Context was founded in 2006. (Shah Dep., Ex. 6, at 10:6-8.)

9.    In the 2007 to 2008 time period, Context gained its first physician subscribers and its first advertisers. (Shah Dep., Ex. 6, at 11:18-12:4.)

10.    At first, Context offered exclusively diabetes-related programming and practices, under the program name Diabetes Health Network ("DHN"). (Shah Dep., Ex. 6, at 12:15-13:10 and at 15:7-17.)

11.     In late 2010, Context expanded into rheumatology for the first time, under the program name Rheumatoid Health Network ("RHN").  (Agarwal Dep., Ex. 7, at 62:1-5 and at 73:3-12.)

12.     As discussed in more detail below, Context's waiting room network programming was different from HAN's in 2010 – and remains quite different to this day.   Context's programming was primarily live-action video with sound, and also included a news ticker and streaming weather reports, among other things; HAN's programming lacked those features.  (*See, e.g.*, April 21 Finley Dep., Ex. 8, at 171:17-172:13 (video and sound); March 20 Finley Dep., Ex. 9, at 49:13-50:8, at 91:20-94:6, at 117:16-119:22 at 146:12-147:12, and at 184:1-186:6 (sound and features generally); Lawrence Dep., Ex. 10, at 87:19-89:4 and at 153:2-156:20 (video, news, weather and features generally); Lake Dep., Ex.11, at 125:24-126:18 and at 127:15-128:18 (video); Smith Dep., Ex. 12, at 45:19-23, at 45:5-8, and at 125:11-126:2  (sound, weather and video).)

13.     A DVD containing a sample of Context's programming from 2012 will be filed as Exhibit 13.

III.     **PROCEDURAL BACKGROUND**

      A.     **HAN's Allegations Of Unfair Competition**

14.     HAN filed its initial complaint for unfair competition under various legal theories on August 10, 2012.  (Compl., Dkt. 1.)

15.     HAN's allegations are that Context made false statements to physicians' practices to cause the practices to switch from HAN's waiting room system to Context's (the "Alleged Wrongful Statements").   The Alleged Wrongful Statements can be summarized as: (a) the practices do not have a contract with HAN or do not owe HAN certain contractual obligations; (b) Context's system is an "upgrade" over HAN's; (c) HAN's content is half advertising; (d)

3

HAN's content is essentially a PowerPoint slide presentation; (e) HAN's content is more general health information, as opposed to condition-specific (such as being focused on diabetes or arthritis); and (f) Context has switched out various numbers of HAN systems over various periods of time.  (Pl.'s 2nd Am. Compl., Dkt. 40, ¶¶ 24-37; Pl.'s Feb. 28, 2014 Suppl. Resp. to Interrog. 9, Ex. 14 at 4.)

16.

██████████████████████████████████████████████

**B.**     **HAN's Recently Added Trade Secret Claim**

17.     On November 15, 2013, HAN added a new claim for misappropriation of trade secrets.  (Pl.'s 2nd Am. Compl., Dkt. 40, ¶¶ 40-46, 90-101.)

18.     HAN's purported trade secrets include various software on its in-waiting room network CPUs, and also its content "loops" stored on those CPUs.  (*Id.*; Pl.'s Feb. 7, 2014 Suppl. Resp. to Interrog. 14, Ex. 16.)

**C.**     **HAN's Collateral Litigation**

19.     On March 12, 2014, HAN (now going by the name PatientPoint) filed in this district another Complaint and a motion for a temporary restraining order alleging that it needed emergency relief against Context and one of Context's recently hired employees.  The suit initially included allegations of trade secret misappropriation and breach of the employee's non-compete agreement with PatientPoint, his former employer.  (*See PatientPoint Network Solutions, LLC v. ContextMedia, Inc. and Christopher Hayes*, No. 1:14-cv-226-TSB (S.D. Ohio Mar. 12, 2014) ("*Hayes* matter") at Dkt. 1 & 2.)

20.     On March 20, 2014, Judge Timothy S. Black held a telephonic hearing on PatientPoint's motion for emergency relief, and on March 21, 2014, the Court entered a 20-page decision denying the motion because, among other things, PatientPoint had not demonstrated a likelihood of success on any of its claims.  (*Hayes* matter at Dkt. 18.)

21.     PatientPoint later voluntarily dropped its non-compete claim.  (*Hayes* matter at Dkt. 24.)

## IV.   HAN CANNOT PROVE THAT THE ALLEGED WRONGFUL STATEMENTS CAUSED INJURY TO HAN.

22.     As discussed in detail below, the evidence shows that practices switched from HAN to Context exclusively for reasons *other than* the Alleged Wrongful Statements, such as Context's superior content, its video formatting, the availability of sound, technical problems with HAN's service, Context's news and weather reports, and more.  (*See supra* Section IV(C).)

### A.   HAN Carefully Gathers And Records The Reasons That Practices Cancel Their Waiting Room Network Services, And Relies On This Data In Its Business.

#### 1.   HAN Expends A Great Deal Of Effort To Find Out The Reasons That Practices Decide To Cancel Its Waiting Room Network Services.

23.     When a practice cancels HAN's waiting room network service, HAN requires its "Practice Relationship Management" personnel to ask the reason(s) that the practice decided to cancel.  (March 20 Finley Dep., Ex. 9, at 27:22-29:8; April 21 Finley Dep., Ex. 8, at 35:12-37:9; Smith Dep., Ex. 12, 15:12-21.)

24.     The manager of the Practice Relationship Management Team, Amy Finley, testified that her team members "are told to ask why [the practice is] canceling and to try to probe and understand why and to document that into the comment."  (April 21 Finley Dep., Ex. 8, at 35:18-20.)

25.



26.

27.     If practices switch to a competitor, HAN records the name of the competitor. (April 21 Finley Dep., Ex. 8, at 45:23-46:7 and at 50:10-18.)

28.     HAN provides scripts of suggested things to say to help the Practice Relationship Managers deal with cancellations and find out the reasons for practices' decisions to switch. (April 21 Finley Dep., Ex. 8, at 29:9-31:22; Lawrence Dep., Ex.10, at 114:2-7.)

29.     The Practice Relationship Managers also receive training to be effective in getting reasons from the cancelling practices.  (March 21 Finley Dep., Ex. 9, at 30:15-31:5; Lawrence Dep., Ex. 10, at 36:19-38:16 and at 65:17-70:13.)

30.

31.     Lori Smith, a member of the Practice Relationship Management team, is HAN's other 30(b)(6) designee on the reasons that practices leave HAN to switch to Context.  (*Id.*)  She testified that the members of her team ask practices for the reason(s) they are cancelling, the practices provide answers, and that it would be speculation to think that there are any other reasons: (Smith Dep., Ex. 12, at 200:18-201:23 ("Q: So to the best of your knowledge, they are responding to your questions and providing reasons, right? A: Correct. Q: And the notion that they're omitting information from you is rank speculation, right? [objection omitted] A: Yes.").)

2.     HAN Meticulously Records The Reasons That Practices Cancel In Its "CMS" Database, Which Is A Record of Regularly Conducted Activity.

32.     HAN Employees enter the reasons that practices switch into a database called "CMS."  (Lake Dep., Ex. 11, at 62:16-63:21 and at 66:19-67:9; Smith Dep., Ex. 12, at 201:24-202:20; April 21 Finley Dep., Ex 8, at 28:2-17 and at 31:2-32:5.)

33.     The HAN employees endeavor to be as complete as possible in their CMS entries and to include all information that may be important.  (Smith Dep., Ex. 12, at 25:18-26:7 and at 76:4-15; Lake Dep., Ex. 11, at 66:19-67:9.)

34.     HAN's instructions to its Practice Relationship Managers are to enter into a CMS "comment" all the information that the Practice Relationship Manager is able to obtain, and to get the very best information possible under the circumstances.  (April 21 Finley Dep., Ex. 8, at 47:16-48:3.)

---

[1] In response to a 30(b)(6) notice for the topic "For each HAN Practice that HAN contends switched from HAN to Context, the reasons why the HAN Practice did so," HAN designated two individuals, Amy Finley and Lori Smith.

35.     In accordance with instructions given by their supervisors, the Practice Relationship Managers record in CMS all the reasons for a practice's decision to switch during or shortly after each call with the practice. (Lawrence Dep., Ex. 10, at 65:17-70:13.)

36.     HAN's rules require that the Practice Relationship Managers inquire about the reasons for every switch to a competitor.  (*Id.*)  It is against HAN's rules for Practice Relationship Managers to input things into CMS that are false, or to leave out any reasons for a switch.  (*Id.*)

37.     HAN creates and maintains its CMS database in the ordinary course of business. (Smith Dep., Ex. 12, at 30:11-23, and at 32:2-6.)

38.     CMS entries are made in the ordinary course of a Practice Relationship Manager's job, and kept by the CMS system in the ordinary course of business.  (Lawrence Dep., Ex. 10, at 108:20-110:22; Smith Dep., Ex.12, at 30:11-23, and at 32:2-6.)

39.     HAN uses and relies on the information in the CMS database, including the reasons that practices cancelled its service and switched to competitors, in its business. (April 21 Finley Dep., Ex. 8, at 35:12-37:9.)

40.     HAN uses CMS entries to judge why practices leave, and HAN relies on those CMS entries in figuring out how to improve its programming.  (Merz Dep., Ex. 3, at 85:13-87:12.)

41.     HAN gauges the effectiveness of changes to its programming through feedback from the Practice Relationship Management Team, and it does so through CMS entries.  HAN relies on CMS entries, in part, to make decisions about what matters to the practices.  Katie Merz, HAN's Vice President, Editorial and Creative (who was HAN's 30(b)(6) designee on the

8

content of HAN's "loops"), testified that the company's reliance on CMS is reasonable. (Merz Dep., Ex. 3, at 7:4-10, at 11:13-21, at 18:21-19:12, and at 19:23-21:2.)

42. CMS entries are the best source of information that HAN has about the reasons that practices have cancelled waiting room network services and the reasons that practices have switched from HAN to a competitor. (Smith Dep., Ex. 12, at 201:24-202:20; March 20 Finley Dep., Ex. 9, at 34:3-20; April 21 Finley Dep., Ex. 8, at 28:2-17, and at 31:2-32:5.)

43. Amy Finley, one of HAN's 30(b)(6) witnesses regarding the reasons that practices switched from HAN to Context, testified that if she were trying to find practices that switched because of something false and misleading that Context said, she would need to look at the CMS database, because "[t]hat is the best source of information." (March 20 Finley Dep., Ex. 9, at 194:13-195:2.)

## B. HAN Was Even More Meticulous In Investigating The Reasons That Practices Chose To Switch To Context.

44. In addition to its regular efforts, HAN assigned a particular member of the Practice Relationship Management team, Lori Smith, to track practices that switched from HAN to Context and to record the reasons for the those switches, among other things, in a separate "tracking spreadsheet." (March 20 Finley Dep., Ex. 9, at 60:15-64:7; April 21 Finley Dep., Ex. 8, at 158:18-160:10; Lori Smith's Tracking Spreadsheet, Ex. 20.)

45. Ms. Smith received special instructions pertaining to practices that switched to Context from HAN. She was instructed to find out if Context misled the practices or posed as HAN, and if she found any such information, she was instructed to put it in her comments. (April 21 Finley Dep., Ex. 8, at 173:19-175:15.)

46. Ms. Smith was instructed to really press for a reason when a practice switched from HAN to Context, to find out if an incentive was offered to induce the switch, and to find

out if the practices were told they could remove the equipment on their own.  (March 20 Finley Dep., Ex. 9, at 32:16-33:21.)

47.     When Ms. Smith spoke to a practice that was switching to Context, she tried to find out information about what Context did or said, and she put anything important into her comments.  (Smith Dep., Ex. 12, at 106:8-107:17.)

48. ███████████████████████████████████████

███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████

49.     Ms. Pater was instructed to find out if the practices had been offered an incentive to switch, and to gain any additional insight that she could about the reasons that the practice switched to Context.  (April 21 Finley Dep., Ex. 8, at 146:22-147:11, at 149:9-23.)

50. ███████████████████████████████████████

███████████████████████████████████████████
███████████████████████████████████████████

51.     Ms. Pater did not find any practices who were unhappy with Context.  (April 21 Finley Dep., Ex. 8, at 157:20-23.)

**C.     HAN's Own Investigation And Internal Business Documents Conclude That Practices Switched For Legitimate Reasons, Not The Alleged Wrongful Conduct.**

1.     HAN Admits That Practices Switched From HAN To Context Primarily Because Of The Content Of The Waiting Room Networks.

52. ███████████████████████████████████████

███████████████████████████████████████████
███████████████████████████████████████████



53.

54.

55.

56.     As to a practice known as Doctors Schnapp and Barth PA, Ms. Finley testified that HAN "truly did find out in this situation it was the content and it did not have anything to do with the video or the sound segments... It was strictly – strictly content."  (April 21 Finley Dep., Ex. 8, at 222:14-224:3).

57.     ████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

2.      <u>Practices Switched From HAN To Context Because They Experienced Connectivity Problems With HAN's System.</u>

58.     HAN's 30(b)(6) designee Amy Finley also admitted that some practices that switched from HAN to Context did so because they experienced connectivity issues (March 20 Finley Dep., Ex. 9, at 47:14-48:4.)

59.     ████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

60.     If a practice wants to switch to a competitor due to connectivity issues, there is almost nothing that HAN can do about it to remedy the situation.  (Lawrence Dep., Ex. 10, at 82:7-18, and at 83:17-86:19.)

61.     In 2010 HAN's subscribing practices experienced many connectivity problems, and HAN has been ramping up its efforts to connect via the internet (rather than fax lines) since 2011.  (*Id.*)

### 3. Practices Switched From HAN To Context Because Context's Programming Offered Live Action Video.

62.

63.     In the relevant time period, HAN heard from many practices that they wanted video, and Context offered it, but HAN did not.  (Smith Dep., Ex. 12, at 125:11-126:2; Lawrence Dep., Ex. 10, at 87:19-89:4.)

64.     In such instances, the desire for video was sufficient to cause a practice to switch, regardless of other factors.  (Lawrence Dep., Ex. 10, at 87:19-89:4; Lake Dep., Ex. 11, at 125:24-126:18 and at 127:15-128:18.)

65.

      4.    <u>Practices Switched From HAN To Context Because Context's Programming Offered Audio, While HAN's Was Virtually Silent.</u>

66.    HAN's 30(b)(6) designees also testified that some practices switched from HAN to Context because they wanted sound.  (Smith Dep., Ex. 12, at  44:12-15; March 20 Finley Dep., Ex. 9, at 204:10-17.)



70.

71.     HAN's Practice Relationship Manager Joyce Lawrence confirmed that HAN did not begin offering content "loops" with about 50% audio until 2013, and prior to that time the lack of sound was a sufficient reason by itself for practices to switch.  (Lawrence Dep., Ex. 10, at 89:5-91:8.  HAN added sound to be more competitive.  (*Id.*; *see also* Lake Dep., Ex. 11, at 128:19-129:9 (testifying that the lack of sound can be an independent reason for practices' decisions to switch away from HAN.)

72.

73.

74.

75. 

76.

77.

78.

5.   Practices Switched From HAN To Context Because Context's
     Programming Was More Customizable.

79.

16

[REDACTED]

80.     Ms. Finley admitted that this increased customizability feature was a "fair differentiator." (*Id.* at 164:24-165:11.)

81.     One practice switched from HAN to Context because Context's programming was more customizable (they could "create the entire thing") and does not repeat for days, with the same "flexibility and custom messaging" that HAN offered. (Smith Dep., Ex. 12, at 109:11-111:5.)

82.     [REDACTED]

[REDACTED]

6.     <u>Practices Switched From HAN To Context Because Of The Context Program's News Ticker And Weather Reports.</u>

83.     HAN's 30(b)(6) designee Amy Finley also testified that during one period within the relevant timeframe, HAN's sales team was frustrated that HAN's programming lacked an "RSS feed," which could provide scrolling news and weather "tickers" and more sophisticated custom message options, and that HAN ultimately implemented changes to try to add more video, weather, and more customization options. (March 20 Finley Dep., Ex. 9, at 91:20-94:6.)

84.     Some practices decided to switch from HAN to Context because of the Context program's news and weather. (Smith Dep., Ex. 12, at 123:17-125:3; Lawrence Dep., Ex. 10, at 153:2-156:20.)

85.     HAN's 30(b)(6) designee Lori Smith testified that some practices switched from HAN to Context solely due to Context's weather reports. (Smith Dep., Ex. 12, at 45:5-8.)

86. 

87.

### 7. Practices Switched From HAN To Context Because Of Other Superior Features And Efforts.

88. Many practices switched from HAN to Context because Context's DHN program was more specific to diabetes than HAN's (HAN does not offer a diabetes-specific network). (March 20 Finley Dep., Ex. 9, at 113:16-20 and at 115:22-116:21; Smith Dep., Ex. 12, at 115:19-116:16, at 127:19-22, and at 145:4-146:21; April 21 Finley Dep., Ex. 8, at 169:15 - 170:9.)

[2]

89.



90.     Another practice switched from HAN to Context because Context's programming was more specialty-specific and because Context's "loop" was longer.  (Lawrence Dep., Ex. 10, at 112:24-116:16.)

91.



92.     Yet other practices decided to switch from HAN to Context because Context's programming offered health-related recipes, while HAN's did not at the time.  (Smith Dep., Ex. 12, at 128:6-15.)

93.     Other practices switched from HAN to Context because Context's programming had a longer "loop" length, and some practices reported that their patients often had wait times longer than HAN's roughly 30-minute "loop," making HAN's content too repetitive.  (Smith Dep., Ex. 12, at 44:16-19 and at 45:13-18; Lawrence Dep., Ex. 10, at 168:9-16.)

94.     Another practice switched from HAN to Context because the screen offered by Context was bigger, Context's programming was less repetitive, and Context offered a gift card. (Smith Dep., Ex. 12, at 96:12-97:21.)

95.     HAN's 30(b)(6) designee Lori Smith testified that some practices reported switching from HAN to Context because they liked the three different parts of Context's screen into which the programming was divided.  (Smith Dep., Ex. 12, at 44:24-45:4.)



96.

97.

98.     HAN encountered situations at a number of practices where the doctors met someone from Context at a conference and decided to switch after meeting with them.  (Smith Dep., Ex. 12, at 116:17-117:23.)

99.     HAN's 30(b)(6) designee Amy Finley testified that HAN recognized this issue and started trying to participate in more physicians' conferences.  (March 20 Finley Dep., Ex. 9, at 169:7-170:2.)

100. Ms. Finley testified that there is nothing wrong with Context selling itself at a conference: "No, there's nothing wrong with that." (*Id.* at 170:3-11.)

101. Ms. Finley specifically admitted that Context did not do anything wrong with respect to convincing the practice of Drs. Burhan Chinikhanwala and Okey Oparanaku to switch from HAN to Context through efforts at a conference. (March 20 Finley Dep., Ex. 9, at 168:11-170:11; Jan 25, 2012 Email from Smith, Ex. 39 ("Lori explained that the doctor went to a Rheumatology ACR symposium in Chicago and RHN won him over there. She said he came back and was excited to switch after his first day back.")

> 8. Practices Also Switched From HAN To Context Because Of Incentives Such As Gift Cards.

102. HAN's 30(b)(6) designees Ms. Finley and Ms. Smith also testified that some practices switched from HAN to Context solely due to incentives, such as gift cards, that Context gave to the practices. (March 20 Finley Dep., Ex. 9, at 52:23-53:6; Smith Dep., Ex. 12, at 44:20-23.)

103. 

104. HAN's Practice Relationship Manager Joyce Lawrence likewise confirmed that practices sometimes switch solely because of an incentive. (Lawrence Dep., Ex. 10, at 60:11-62:21.)

105. Indeed, Ms. Finley testified that the incentive was the sole, overriding reason that a practice switched in *every* case where the incentive was offered. (April 21 Finley Dep., Ex. 8, at 147:20-148:15 and at 158:10-17.)

21

106.    Later in her deposition, Ms. Finley attempted to recant this testimony, but even then she testified that some practices switch solely due to an incentive, while others switched due to content or product features.  (*Id.* at 246:13-247:5.)

9.      Practices Also Switched From HAN To Context For Circumstances Beyond Either Company's Control.

107.    ███████████████████████████████████████████████████

10.     HAN Cannot Provide Evidence That Any Practice Switched From HAN to Context Because Of The Alleged Wrongful Statements.

108.    HAN's 30(b)(6) witnesses, after conducting the amount of investigation and preparation that HAN felt appropriate for its 30(b)(6) designees, could not identify a single specific practice that switched to Context due to the Alleged Wrongful Statements.  (*See* Smith Dep., Ex. 12, at 102:1-22; March 20 Finley Dep., Ex. 9, at 194:5-22; April 21 Finley Dep., Ex. 8, at 246:13-247:9.)

109.    Lori Smith admitted that some of the switches were due to fair competition, and testified that there is no way to determine how many were based on the alleged misconduct and how many were fair.  (Smith Dep., Ex. 12, at 102:1-22.)  Amy Finley stated that sometimes the reason was an incentive, sometimes content, sometimes the "bells and whistles" of Context's system – and that the reasons were always subjective to each practice and would need to be evaluated individually.  (April 21 Finley Dep., Ex. 8, at 246:13-247:9.)

110.    HAN's designees both deferred to the company's records and testified that HAN's CMS database houses the company's best information about the reasons that practices switch.  (March 20 Finley Dep., Ex. 9, at 34:3-20; Smith Dep., Ex. 12, at 201:24-202:20.)

111. 

112.     Ms. Finley testified that the records from CMS that are reported in this spreadsheet were made and kept in the ordinary course of HAN's business, and were recorded by people with knowledge at or near the time that they had the interactions and conversations reflected in the data.  (April 21 Finley Dep., Ex. 8, at 212:6-214:4.)

113.     Ms. Finley also testified that HAN relies on the information in the CMS database to make important business decisions.  (*Id.* at 213:15-22.)

114.     Ms. Finley testified that HAN's instructions to its Practice Relationship Managers are to enter in a CMS comment all the information that the Practice Relationship Manager is able to obtain, and to get the best information possible under the circumstances.  (March 20 Finley Dep., Ex. 9, at  47:16-48:12.)

115.

116.

---

<sup>3</sup> Exhibit 41 is a demonstrative visual aid that is intended as an aid to argument, not as record evidence.  The red font is a change made by counsel based on their review of the spreadsheet, not part of the source document.

HAN's CMS Entries Re Practices That Switched to Context, Ex. 24; for demonstrative purposes, *see* Demonstrative Exhibit 41, at red passages.)

117.    As to 30 of the practices that switched, Context posed Requests for Admission, asking HAN to admit that the practices had switched for various product- and service-related reasons stated in HAN's documents.  (*See* HAN's Am. Resps. to Reqs. for Adm. 10-39, Ex. 42,) HAN admitted that the practices reported the various product- and service-related reasons for their decisions to switch.  (*Id.*)

118.



119.

120.    Ms. Smith reviewed her tracking spreadsheet to prepare herself to testify as a 30(b)(6) witness for HAN regarding the reasons that practices switched from HAN to Context. (Smith Dep., Ex. 12, at 8:3-14, at 10:1-13:5.)   Ms. Smith felt she was familiar enough with practices that switched from HAN to Context that she did not need to review other sources in order to testify as HAN's 30(b)(6) witness on the topic.  (*Id.* at 22:22-23:5.)

121.

122. [redacted]

## V.    HAN'S EMPLOYEES AND DOCUMENTS ADMIT THAT HAN DOES NOT HAVE BINDING CONTRACTS WITH PRACTICES.

123. [redacted]

124.    Ms. Finley testified that HAN has never sued, threatened, or written to a practice to seek to enforce HAN's enrollment form.  (March 20 Finley Dep., Ex. 9, at  76:18 – 77:9.)

125.    Ms. Finley testified that HAN's "general policy" is that they have no penalties against practices, never try to charge practices penalty fees of any kind, and would inform any practice of that policy whenever it comes up.  (April 21 Finley Dep., Ex. 8, at 236:17-238:10.)

126. [redacted]

127.    Ms. Smith testified in her deposition that she told a practice that contracts in HAN's industry are not always binding; that she is not aware of any efforts by HAN to enforce any contracts against practices at any time; that her supervisors approved of her saying this to a

practice; and that no one ever admonished her not to say this.  (Smith Dep., Ex. 12, at 157:17-158:9, at 160:21-163:16, and at 166:12-168:3.)

128.     Former HAN Practice Relationship Manager Melissa Lake testified that HAN never took action against a practice or charged them money for taking equipment down; that to do so would be contrary to HAN's business model and offensive to the practices; that she never encountered such a thing happening in the hundreds of practices that she dealt with every month for HAN; and that she would have known about such a situation if it had ever arisen in her territory.  (Lake Dep., Ex. 11, at  95:16-97:11.)

129.     Ms. Lake also testified that she was instructed by HAN to tell customers that HAN could co-exist with a competitor's system in the waiting room; that she was never instructed to check the competitor's enrollment form before saying this to a practice; and that she never thought to check the competitor's enrollment form because the practice would not normally be held responsible for anything in that kind of situation.  (*Id.* at 114:12-116:24.)

## VI.     HAN ABANDONS ITS CPUS, INCLUDING ALL CONTENT AND PROGRAMMING, TO CANCELLING PRACTICES, WITH NO RESTRICTIONS OR FOLLOW-UP.

130.     In its trade secret claim, HAN accuses Context of misappropriating a CPU, including the software and the "loop" content that was on the CPU at the time.  (*See* Pl.'s Feb. 7, 2014 Suppl. Resp. to Interrog. 14, Ex. 16.)

131.     But HAN has decided not to recover its waiting room network system's CPU from a cancelling practice more than 100 times.  (*See, e.g.*, Albert Dep., Ex. 46, at 51:8-52:6 and at 52:12-54:16.)

132.     Each of the CPUs that were left at cancelling practices contained the same software and "loop" content as the rest of HAN's CPUs in the relevant network as it existed at

that time.  (*See* Albert Dep., Ex. 46, at 41:13-42:17 and at 43:20-44:15*; Lawrence Dep., Ex. 10, at 50:23-52:19.)

133.    In each case where HAN left its CPU at a cancelling practice, there were no restrictions, no contractual obligations, no ongoing relationship, and no follow-up.  (Albert Dep., Ex. 46, at 122:7-16, at 158:6-12 and at 159:6-20.)

**A.**    **HAN's General Abandonment of Aging CPUs And Lack Of Restrictions On Its Content "Loops"**

1.    HAN Routinely And Purposefully Abandons CPUs Containing The Same Information That HAN Claims Is A Trade Secret.

134.    A few years ago, HAN designated the hardware of certain models of CPUs as "obsolete," and the list of obsolete CPUs was communicated to HAN's Practice Relationship Management Team.  (Albert Dep., Ex. 46, at  30:23-32:9.)

135.    According to HAN's practices, if a physician's office was cancelling HAN's service, but nevertheless wanted to keep the "obsolete" CPU, HAN would not insist on retrieving it.  (Lawrence Dep., Ex. 10, at 44:22-45:21, at 47:20-50:5, and at 53:8-22.)

136.    In fact, Practice Relationship Manager Joyce Lawrence testified that if a cancelling practice was okay with keeping an "obsolete" CPU and using it however they would like, HAN just leaves the CPU there; Ms. Lawrence herself has handled CPUs this way two to three times per year.  (*Id.*)

137.    In such circumstances, it was at the whim of the practice what to do with the CPU.  (*Id.* at 54:4-10.)

138.    The Practice Relationship Management team does not have a standardized process regarding the handling of obsolete equipment.  (April 21 Finley Dep., Ex. 8, at  15:13-16.)

139.    In 2011 or 2012, there were several hundred CPUs in the field that were designated "obsolete" hardware by HAN.  (Albert Dep., Ex. 46, at 37:7-38:4 and at 50:19-22.)

140. CPUs were left at cancelling practices for several different purposes. Sometimes the practices would keep the CPUs to "salvage" them for some unspecified use. (*Id.* at 41:13-42:17, at 52:12-54:16, and at 157:5-13.)

141. Sometimes the cancelling practices kept the CPUs to play the same loop on the wall over and over again, while severing their relationship with HAN and not receiving updated content "loop" each month. (*Id.* at 41:13-42:17, at 43:20-45:3, at 52:12-54:16 and at 156:15-22.) In such cases, HAN knew that the practice would retain HAN's software and content "loop" information on the CPU, knew that the information was going to be used by the practice, and knew that the practice had no ongoing relationship with HAN. (*Id.* at 43:20-44:15, at 156:15-22, at 158:6-12 and at 159:6-20.)

142. Some CPUs that HAN stopped trying to retrieve were left at practices that decided to have their own patient education program, which HAN considers to be a competitive situation. (*Id.* at 156:3-14.)

143. Other CPUs that HAN stopped trying to retrieve were left at practices that were switching to direct competitors. (*Id.* at 156:3-14.)

144. Yet other CPUs that HAN stopped trying to retrieve were left at practices that wanted to donate them to schools or somewhere else locally. (*Id.* at 156:23-157:4.)

145. There is no way for HAN to say how many of the CPUs with "obsolete" hardware are in each category described above. (*Id.* at 157:14-17; *see also id.* at 45:12-47:11 ("Q: Is there a way that Healthy Advice kept track of, for any given obsolete CPU, whether a practice was allowed to keep it or whether it was handled in some other way? A: I have no idea.")

146. HAN does not keep any list of abandoned CPUs, and Vida Albert, the manager in charge of tracking CPUs for HAN (among other inventory), testified:

Q: If [your supervisor] Ms. Theiss came to you and said try to make your best list possible of the CPUs that Patient Point has decided over the years not to try to retrieve anymore from practices, how would you go about that?

A: I've never been directed to do that and I – there's never been – nobody has ever said anything exactly like that, and I wouldn't know how to make a list like that.

Q: No one has ever asked you to keep track of that?

A: No.

Q: And no one has ever asked you to keep track of the reasons that obsolete CPUs have been left with practices as opposed to retrieved and destroyed?

A: No.

(*Id.* at 154:16-155:16.)

147. As to each of the CPUs abandoned in the circumstances described above, the handling of the CPU was in accordance with HAN policy and practice or occurred with permission HAN supervisors.  (*Id.* at 52:12- 54:16.)

148. No practice ever signed anything promising to handle HAN's CPU in any specified way:

Q: Was there any instance in any of the situations that I just listed out where the practice signed something promising to handle the CPU in that way? [Objection omitted]

**A:** *There was no time that anyone signed anything, no.*

...

Q: A cancelling practice ceases its relationship with Patient Point under the enrollment form. Correct? [Objection omitted]

A: Yes.

Q: ...Is there any policy in place that requires a Patient Point employee to get a contract from the practice before deciding to allow the practice to keep an obsolete CPU? [Objection omitted]

A: No.

(*Id.* at 158:6-12 and 159:6-20 (emphasis added); *see also id.* at 130:3-131:8.)

149.     Cancelling practices cease any relationship with HAN under the enrollment form, and there is no HAN policy requiring its employees to get a new contract from the practice before deciding to allow the practice to keep an obsolete CPU.  (*Id.* at 122:7-16, at 159:6-20 and at 162:1-15.)

150.     HAN does not follow up in any way to confirm how the practice handles or uses the CPU that it is allowed to keep.  (*Id.* at 130:3-131:8.)

151.     There have been, at a minimum, more than 100 occasions when a HAN CPU was not collected from a practice, and in each case, someone from HAN made the decision to leave the CPU there; it was not against the company's instructions.  (*Id.* at 51:8 - 52:6 and at 155:18-156:2.)

      2.     <u>Even Before A Practice Cancels, HAN's Disclosure Of Information To The Practices And Patients Are Public And Without Any Restriction.</u>

152.     HAN's Enrollment Form does not include any non-disclosure request or provision.  (*See* Compl., Dkt. 1, at Ex. A (PAGEID #15-16).)

153.     Patients at practices that subscribe to HAN's networks do not sign non-disclosure agreements before stepping into the waiting room.  (March 20 Finley Dep., Ex. 9, at 87:9-13.)

**B.**    <u>**Specific Examples of HAN's Decisions To Abandon CPUs In Competitive Situations**</u>

      1.     <u>HAN Purposefully, And Without Any Restrictions, Abandoned A CPU To A Practice That HAN Knew Was Switching To Context.</u>

154.

155.    HAN granted Physicians Affiliated Care permission to remove HAN's equipment from the wall.  (*Id.*)

156.    Physicians Affiliated Care told HAN that "the practice can't use the old [HAN system] equipment."   In response, Ms. Finley told Physicians Affiliated Care that it need not return the equipment to Healthy Advice and that the practice is not liable for the equipment being removed.  (*Id.*).

157.    Ms. Finley made the decision to allow Physicians Affiliated Care to keep HAN's CPU and other equipment – with an assurance of no liability – at a time when HAN *knew* that Physicians Affiliated Care was switching to Context.  (*Id.*; see also March 20 Finley Dep., Ex. 9, at 94:18-96:22.)

158.    ████████████████████████████████████████

159.    At her deposition, Ms. Albert reviewed CMS entries associated with the abandonment of the CPU to Physicians Health Care, and testified that the handling was appropriate according to HAN's policies and practices: "I don't see anything that would raise any red flags, no."  (Albert Dep., Ex. 46, at 133:13-134:23.)

> 2.    HAN Gave Up Looking For A CPU At A Practice That Was Switching To HAN's Competitor Health Monitor.

160.    HAN also decided to give up trying to recover a CPU from a practice that switched to HAN's competitor Health Monitor.  (Albert Dep., Ex. 46, at 119:16-122:6.)  The practice reported that it could not find the CPU, and HAN has no policy or practice to locate its CPU if the Practice says it is lost.  (*Id.*)

161.    HAN knew that Health Monitor had taken down HAN's equipment, but decided that it should be "written off," meaning that HAN was going to cease trying to locate it.  (April 21 Finley Dep., Ex. 8, at 210:9-211:2.)

### 3.    HAN Purposefully Abandoned A CPU To Practices That Were Implementing Their Own Competitive Patient Education System.

162.    A practice called ETSU Family Medicine associates cancelled HAN's service with plans to implement its own patient education program.  (Albert Dep., Ex. 46, at 123:5-126:14.)

163.    HAN considers practices' development of their own patient education systems to be a competitive situation.  (*Id.* at 124:11-22)  Nevertheless, HAN permitted ETSU Family Medicine to retain HAN's CPU and other equipment after cancellation.  (*Id.* at 123:5-126:14.)

164.    Vida Albert, HAN's manager in charge of tracking inventory and making decisions about the handling of CPUs and other equipment, reviewed the CMS entries associated with the handling of this CPU, and testified that nothing in those records would indicate that something went wrong or needs to be corrected.  (*Id.*)

165.    HAN likewise chose to allow a practice called Access Community Health, which was also implementing its own patient education program, keep the HAN system's CPU.  (*Id.* at 73:16-75:10.)

### C.    Specific Examples of HAN's Decisions to Abandon CPUs Without Restrictions Or Any Continuing Relationship.

166.    HAN chose to allow Drs. H. Goldstein and E. Ordorica to keep HAN's CPU when they cancelled HAN's service for the purpose of moving or redecorating.  (Albert Dep., Ex. 46, at 75:11-77:6.)

167.    HAN also chose to allow a cancelling practice called Loveland Family Practice, Inc., to keep the HAN system's CPU.  (*Id.* at 77:12-80:5.)  The CPU that HAN chose to abandon at Loveland Family Practice, Inc. was not even considered "obsolete" hardware.  (*Id.*)

168.    Loveland Family Practice, Inc. was not required to sign anything prior to being permitted to keep the CPU, and no one ever followed up to verify whether the CPU was disposed of.  (*Id.* at 77:12-80:5 and at 81:12-22.)  Vida Albert, HAN's relevant manager, testified about the CPU that was left with Loveland Family Practice, Inc.: "I would have no idea what they would have done with it."  (*Id.* at 77:12-81:22.)

169.    In another example, HAN's Practice Relationship Managers decided to allow a cancelling practice to keep HAN's CPU without pushing the issue, in part because they could not find the practice's enrollment form.  (*Id.* at 106:10-109:16.)  Ms. Albert, HAN's relevant manager for deciding about and tracking CPU treatment, testified that she does not disagree with the handling of this CPU.  (*Id.*)

**D.    The Abandonment Of CPUs Is In Accordance With HAN Policy.**

170.    Vida Albert is HAN's Vendor Accounts Manager and is responsible for tracking HAN's inventory.  (Albert Dep., Ex. 46, at 12:2-16.)  Ms. Albert reports to an executive vice president who is in charge of the entire department, Field Services.  (*Id.*)

171.    Ms. Albert's boss reports directly to HAN's CEO.  (*Id.* at 13:5-10.)

172.    Ms. Albert has worked at HAN for approximately 10 years.  (*Id.* at 13:11-14.)

173.    Ms. Albert testified that she does not violate HAN's policies and she has never been reprimanded for how she handled any piece of equipment at a physician's office.  (*Id.* at 22:12-23:12.)

174.    Ms. Albert testified that she is not aware of anyone at HAN being reprimanded for how he or she handled any piece of equipment at a physician's office.  (*Id.*)  Ms. Albert has

primary responsibility at HAN for tracking and recovering inventory in the field including CPUs, and would be informed or involved if anyone had been reprimanded for how they handled a piece of equipment. (*Id.* at 23:13-25:5.)

175.    Ms. Albert also testified that she is not aware of anyone at HAN who goes against HAN's policies. (*Id.* at 21:8-22:11.)

176.    Ms. Albert testified that allowing cancelling practices to keep HAN's CPUs to donate them to schools, play the old loop over and over, or salvage it for an unknown use are all within HAN's policy or practice or were done with permission of HAN executives superior to her. (*Id.* at 52:12- 54:16.)

177.    Joyce Lawrence, one of HAN's Practice Relationship Managers, confirmed that if a cancelling practice wants to keep an "obsolete" CPU, HAN does not require the CPU to be retrieved. (Lawrence Dep., Ex. 10, at 44:22-45:21, at 47:20-50:5, and at 53:8-22.) If the Practice is okay with keeping the CPU and using it however they would like, and it is on the "obsolete" list, Ms. Lawrence testifies that the practice will just keep the CPU. (*Id.*)

178.    Ms. Lawrence testified that she has never been instructed to handle HAN's CPUs differently, and she understands her whole team to have the same instructions. (*Id.* at 50:15-22.)

179.    Ms. Albert testified that Ms. Lawrence is a high quality employee who has "absolutely not" gone against HAN policies, and who is "absolutely" knowledgeable about those policies. (Albert Dep., Ex. 46, at 21:8-22:11.) Ms. Albert is not aware of anyone who has gone against HAN's policies in this regard. (*Id.*)

**E.    Ensuring The Return Of A CPU Is Not Even Worth A Few Hundred Extra Dollars To HAN.**

180.    One practice that was cancelling HAN's service, NCH Medical Group, told HAN that it must pick up its CPU and other equipment by the following Monday or the practice would "pitch" it.  (Albert Dep., Ex. 46, at 82:2-84:17.)

181.    HAN decided not to attempt to retrieve the CPU because "rush" pick-up of equipment could cost twice as much as a regular de-installation, up to $600.  (*Id.*)  The CPU that HAN had placed at NCH Medical Group was written off instead.  (*Id.*).

182.    Vida Albert testified that this was according to HAN's ordinary practice: "Q: [HAN] would not pay for an expedited removal of an obsolete CPU.  Right?  A: Not normally." (*Id.*)

183.    As a general matter, HAN does not pick up an obsolete CPU where it is going to cost money over and above normal processing.  (*Id.* at 96:22-97:6.)

**VII.    HAN VALUES ITS CONVERSION CLAIM AT A MAXIMUM OF $24,589.**

184.    HAN's conversion claim rests on the allegation that Context has damaged or lost HAN equipment in some instances when installing Context's equipment at the request of a physician practice.  HAN responded to an interrogatory related to its conversion claim by referencing a letter from counsel that attached charts listing out the equipment that HAN alleges is missing or damaged, and totaling up the replacement cost of that equipment.  (Pl.'s Feb. 28, 2014 Suppl. Resp. to Interrog. 3, Ex. 14 (last paragraph, incorporating letter and charts; last page of exhibits, showing chart of total alleged replacement costs.)

185.    HAN's total alleged replacement cost of the equipment that is claimed to be missing or damaged is $24,589.  (*Id.*)

Respectfully submitted,

 /s/ *Thomas F. Hankinson*
James E. Burke (0032731)
Thomas F. Hankinson (0088367)
KEATING MUETHING & KLEKAMP PLL
One East Fourth St.
Suite 1400
Cincinnati, Ohio 45202
Phone: (513) 579-6428
Fax: (513) 579-6457
jburke@kmklaw.com
thankinson@kmklaw.com

Richard J. O'Brien (*pro hac vice*)
Jessica Johnson (*pro hac vice*)
Sidley Austin LLP
One South Dearborn St.
Chicago, IL 60603
Phone: (312) 853-7000
Fax: (312) 853-7036
robrien@sidley.com
jessica.johnson@sidley.com
*Attorneys for Defendant ContextMedia, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that I caused a redacted version of the foregoing, with all non-sealed exhibits, to be filed electronically on July 10, 2014.  Parties may access this pleading through the Court's electronic docketing system.  I further certify that I caused a complete, non-redacted copy of the foregoing, with all exhibits thereto (both sealed and unsealed), to be served via hand delivery to:

Grant Cowan (0029667)
Aaron M. Bernay (0086495)
FROST BROWN TODD, LLC
3300 Great American Tower
301 E. Fourth Street
Cincinnati, OH 45202
Phone: (513) 651-6164
Fax: (513) 651-6981
Email: gcowan@fbtlaw.com
        abernay@fbtlaw.com

I further certify that I caused a complete, non-redacted copy of the foregoing, with copies of all sealed exhibits, to be sent via email to the attorneys listed above and to:

Thomas R. Dee (*pro hac vice*)
Jeanah Park (*pro hac vice*)
VEDDER PRICE P.C.
222 North LaSalle Street
Suite 2600
Chicago, IL 60601-1003
Phone: (312) 609-7500
Email: tdee@vedderprice.com
        jpark@vedderprice.com

　　　　　　　　　　　　　　　 */s/ Thomas F. Hankinson*　　　　　
　　　　　　　　　　　　　　　 Thomas F. Hankinson (0088367)

5522449.3

37