Deborah Schnell, 3/28/2014

1

```
 1            UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF OHIO
 2                   WESTERN DIVISION
 3     HEALTHY ADVICE           :
       NETWORKS, LLC,           :
 4                              :
            Plaintiff,          :
 5                              :
       vs.                      :   Case No. 1:12CV610
 6                              :
       CONTEXTMEDIA, INC.,      :
 7                              :
            Defendant.          :
 8
 9
10       Videotaped Deposition of DEBORAH SCHNELL,
11     a witness herein, taken by the defendant as
12     upon cross-examination, pursuant to the
13     Federal Rules of Civil Procedure and pursuant
14     to notice of counsel as to the time and place
15     and stipulations hereinafter set forth, at
16     the offices of Keating Muething & Klekamp,
17     PLL, One East Fourth Street, Suite 1400,
18     Cincinnati, Ohio 45202, at 1:00 p.m., Friday,
19     March 28, 2014, before KIRK McCRACKEN,
20     Videographer and ANN M. BELMONT, RPR, a
21     Registered Professional Reporter and Notary
22     Public within and for the State of Ohio.
23                          - - -
24
```

Electronically signed by Ann M. Belmont (201-234-827-3922)        b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

```
                                                             2
 1    APPEARANCES:

 2
      On behalf of Plaintiff:
 3
      JEANAH PARK, ESQ.
 4    Vedder Price, PC
      222 North Lasalle Street
 5    Chicago, Illinois  60601

 6    On behalf of Defendant:

 7    THOMAS F. HANKINSON, ESQ.
      Keating Muething & Klekamp, PLL
 8    One East Fourth Street
      Suite 1400
 9    Cincinnati, Ohio 45202

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Electronically signed by Ann M. Belmont (201-234-827-3922)                           b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

3

1              S T I P U L A T I O N S

2      It is stipulated by counsel for the

3    respective parties that the deposition of

4    DEBORAH SCHNELL, a witness herein, may be

5    taken at this time by the defendant as upon

6    cross-examination and pursuant to the Federal

7    Rules of Civil Procedure and notice to take

8    deposition, all other legal formalities being

9    waived by agreement; that the deposition may

10   be taken in stenotype by the Notary Public

11   Reporter and transcribed by her out of the

12   presence of the witness; that the transcribed

13   deposition was made available to the witness

14   for examination and signature and that

15   signature may be affixed outside the presence

16   of the Notary Public-Court Reporter.

17

18

19

20

21

22

23

24

Electronically signed by Ann M. Belmont (201-234-827-3922)                              b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

```
                                                                4
 1                          INDEX
 2    WITNESS          DIRECT  CROSS  RE-      RE-
                                     DIRECT   CROSS
 3
      DEBORAH SCHNELL
 4    BY MR. HANKINSON:            6          147
      BY MS. PARK:      141
 5
      EXHIBIT IDENTIFIED                      PAGE
 6
      Exhibit 97 e-mail chain                  51
 7    Exhibit 98 e-mail chain                  62
      Exhibit 99 e-mail chain                  73
 8    Exhibit 93 e-mail chain                  90
      Exhibit 95 e-mail chain                  95
 9    Exhibit 94 e-mail chain                 108
10    OBJECTIONS                     PAGE  LINE
11    MS. PARK:                      24     7
      MS. PARK:                      25    23
12    MS. PARK:                      26     9
      MS. PARK:                      29     4
13    MS. PARK:                      30    11
      MS. PARK:                      31    15
14    MS. PARK:                      32     7
      MS. PARK:                      32    14
15    MS. PARK:                      34    21
      MS. PARK:                      36     8
16    MS. PARK:                      36    13
      MS. PARK:                      39     9
17    MS. PARK:                      39    15
      MS. PARK:                      40    12
18    MS. PARK:                      41     4
      MS. PARK:                      41     7
19    MS. PARK:                      42    14
      MS. PARK:                      43     9
20    MS. PARK:                      44    14
      MS. PARK:                      45     2
21    MS. PARK:                      45    16
      MS. PARK:                      46     3
22    MS. PARK:                      46     5
      MS. PARK:                      46    14
23    MS. PARK:                      46    23
      MS. PARK:                      47     2
24    MS. PARK:                      47     8
```

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Deborah Schnell, 3/28/2014

5

```
 1    MS. PARK:                    48    19
      MS. PARK:                    49     8
 2    MS. PARK:                    49    22
      MS. PARK:                    50     9
 3    MS. PARK:                    50    20
      MS. PARK:                    51     1
 4    MS. PARK:                    51     6
      MS. PARK:                    51    10
 5    MS. PARK:                    56    19
      MS. PARK:                    57     4
 6    MS. PARK:                    57    12
      MS. PARK:                    57    21
 7    MS. PARK:                    58     3
      MS. PARK:                    58    17
 8    MS. PARK:                    59     3
      MS. PARK:                    60     1
 9    MS. PARK:                    60     6
      MS. PARK:                    61    17
10    MS. PARK:                    68    15
      MS. PARK:                    69     5
11    MS. PARK:                    69    13
      MS. PARK:                    69    21
12    MS. PARK:                    74    23
      MS. PARK:                    76    14
13    MS. PARK:                    78     9
      MS. PARK:                    80    21
14    MS. PARK:                    82     1
      MS. PARK:                    82    22
15    MS. PARK:                    87    19
      MS. PARK:                    94    13
16    MS. PARK:                    95     7
      MS. PARK:                   113     7
17    MS. PARK:                   113     9
      MS. PARK:                   114    18
18    MS. PARK:                   115    23
      MS. PARK:                   116    16
19    MS. PARK:                   127    10
      MS. PARK:                   129     1
20    MS. PARK:                   129    20
      MS. PARK:                   130    10
21    MS. PARK:                   139    12
      MS. PARK:                   152     5
22    MS. PARK:                   152    10
      MS. PARK:                   154    10
23    MS. PARK:                   154    20
      MS. PARK:                   155     4
24
```

Electronically signed by Ann M. Belmont (201-234-827-3922)                    b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

6

1              MR. McCKRACKEN: The time is 1:13

2     p.m., March 28, 2014.  We are on the video

3     record and the court reporter can swear the

4     witness.

5                  DEBORAH SCHNELL,

6          a witness herein, of lawful age, having

7     been first duly sworn as hereinafter

8     certified, was examined and testified as

9     follows:

10                CROSS-EXAMINATION

11    BY MR. HANKINSON:

12         Q.   Ms. Schnell, thank you for

13    coming in today.

14         A.   Em-hm.

15         Q.   My name is Tom Hankinson.  I

16    represent ContextMedia, which is the

17    defendant in this case. Do you know who the

18    plaintiff is in this case?

19         A.   PatientPoint.

01:14   20         Q.   And did PatientPoint at one

21    point have a different corporate name?

22         A.   Yes, Healthy Advice Networks.

23         Q.   Were you employed by Healthy

24    Advice Networks at one point?

Electronically signed by Ann M. Belmont (201-234-827-3922)                                    b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

7

1           A.      Yes, I was.

2           Q.      And up until what date?

3           A.      June 30, 2012.

4           Q.      Have you ever given a deposition

5    before?

6           A.      Yes, I have.

7           Q.      In what matter?

8           A.      Can you elucidate?  I'm not

9    sure.

01:15  10           Q.      Sure.  Was it in a court case?

11           A.      Yes.

12           Q.      And where was the court case

13   pending?

14           A.      I'm not sure, I think it was

15   either in Philadelphia or in New Jersey.

16           Q.      Where did you give the

17   deposition geographically?

18           A.      On the east coast.

19           Q.      Oh, the deposition was in the

01:15  20   same place --

21           A.      Yes.

22           Q.      -- where the court was pending?

23           A.      I think.

24           Q.      Either Philadelphia or New

Electronically signed by Ann M. Belmont (201-234-827-3922)

b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

8

1   Jersey?

2          A.    Yes, I don't remember

3   specifically which locale.

4          Q.    Do you remember what company or

5   person was the plaintiff?

6          A.    Yes, PDI.

7          Q.    And do you remember -- that was

8   just the only plaintiff?

9          A.    Yes.

01:15  10          Q.    And who was the defendant --

11          A.    Oh, excuse me.  Let me get this

12   straight. Oh, because the plaintiff is the

13   one that filed the suit?

14          Q.    Usually.

15          A.    Yes, okay.  So, oh, boy.  I

16   don't remember.

17          Q.    Do you know who the defendant

18   was?

19          A.    That would be PDI.

01:16  20          Q.    Oh, I see. Did you work for one

21   of the parties --

22          A.    I worked for PDI.

23          Q.    What company -- what does PDI

24   do?

Electronically signed by Ann M. Belmont (201-234-827-3922)   b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

9

1          A.    It's Professional Detailing,

2     Inc., and it's a contract sales force to the

3     pharmaceutical industry.

4          Q.    About when was that?

5          A.    It's at least over a decade ago.

6          Q.    Was that prior to your

7     employment at Healthy Advice?

8          A.    Yes.

9          Q.    Was it a state or a federal

01:16    10     matter, if you remember?

11          A.    I don't know.

12          Q.    Well, you may remember, but it's

13     been quite some time, maybe I'll go over some

14     of the basic guidelines, if that's okay with

15     you?

16          A.    That'll be fine.  Em-hm.

17          Q.    The court reporter is taking

18     down everything that is said, so it's helpful

19     during the course of the deposition if we

01:17    20     avoid talking over one another. I may make

21     that difficult because I tend to pause

22     sometimes, lose my train of thought and then

23     get back on it and try to finish my question.

24     But to the extent that you can, try to wait

Electronically signed by Ann M. Belmont (201-234-827-3922)    b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

10

1    until I'm completely finished and then give

2    your answer. Do you understand that?

3          A.    Yes.

4          Q.    And you're doing a great job of

5    this already, but always answer out loud

6    instead of shaking your head, you know, up

7    and down for yes or side to side for no and

8    try to say yes or no instead of uh-huh, which

9    can sometimes be ambiguous when you look back

01:17    10    at it, do you understand that?

11          A.    Yes, I do.

12          Q.    If you answer a question, I'm

13    going to assume that you understood it, are

14    you okay with that?

15          A.    Yes, I am.

16          Q.    If there's a point where you

17    don't understand one of my questions, please

18    ask me to repeat it or restate it or ask me

19    to clarify whatever part of it you don't

01:18    20    understand, okay?

21          A.    I will.

22          Q.    Appreciate that. Sometimes -- is

23    Mrs. Park representing you for this

24    deposition?

Electronically signed by Ann M. Belmont (201-234-827-3922)                                                        b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

11

1          A.    Yes, she is.

2                MR. HANKINSON: Do you want to

3     make an appearance?

4                MS. PARK: Sure. Jeanah Park on

5     behalf of the plaintiff, PatientPoint Network

6     Solutions, LLC.

7          Q.    At some point Ms. Park may

8     object to my questions, perhaps often. And

9     when that happens, please let her make her

01:18   10    full objection, and then if -- unless she

11    instructs you not to answer the question,

12    please then go ahead and answer it, okay --

13         A.    I'll do that.

14         Q.    If you ever need a break, let us

15    know, we'll ask that you answer any question

16    that's already been asked, but then after

17    that we can take a break.

18         A.    Okay, thank you.

19         Q.    About when did you become aware

01:19   20    of our case here?

21         A.    I believe when I got a -- early

22    to midFebruary, when I received a phone call.

23         Q.    That phone call was from an

24    attorney representing PatientPoint?

Electronically signed by Ann M. Belmont (201-234-827-3922)                    b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

12

1          A.    No, it was from someone else.

2          Q.    Who?

3          A.    Someone else.

4          Q.    Who, who was phone call from?

5          A.    Mike Collette.

6          Q.    Did he say at any point during

7    the phone call that he was conveying

8    information that he had received from an

9    attorney?

01:19    10          A.    Not that I recall.

11          Q.    What did he say to you on that

12    call?

13          A.    To the best of my recollection,

14    he said I wanted to let you know that you may

15    be -- that you have been named as someone

16    that will be deposed in a suit that we have

17    filed, and I wanted you to be aware because

18    you will probably get a call from the

19    attorney.

01:20    20          Q.    Did he say anything about what

21    the case was about?

22          A.    No, he did not.

23          Q.    Did you ask him?

24          A.    Well, yes.

Electronically signed by Ann M. Belmont (201-234-827-3922)                                        b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

13

1       Q.    And he just said he'd prefer not
2   to talk about it or what did he say?
3       A.    No.  He stated that it had to do
4   with some of the practices in physicians'
5   offices, and I knew what he meant from when I
6   worked there.
7       Q.    Interesting.  So is all he said
8   was it's about some of the practices in
9   physicians' offices?
01:20  10       A.    Well, I'm not sure those are the
11   exact words, but he was -- I knew that he was
12   referring to some of the situations that had
13   occurred when I worked there relative to our
14   rheumatology offices.
15       Q.    Which situations?
16       A.    The ones that are outlined in
17   the complaint.
18       Q.    And which -- what is the
19   complaint that you're referring to?
01:21  20       A.    That was filed by PatientPoint.
21       Q.    When did you -- have you seen
22   that complaint?
23       A.    Yes, I have.
24       Q.    When did you see that?

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Deborah Schnell, 3/28/2014

14

1          A.    Again, I don't remember the

2    exact date, but it was late -- mid to late

3    February.

4          Q.    How did you come to have that

5    complaint?

6          A.    I requested it.

7          Q.    From Mike on that call --

8          A.    No, from Jeanah.

9          Q.    So that was sometime after your

01:21  10    call with Mike?

11          A.    Yes.

12          Q.    On the phone call with Mr.

13    Collette, did he discuss with you whether you

14    ought to get an attorney or whether the

15    company was thinking about supplying one for

16    you?

17          A.    I don't recall.

18          Q.    What were the circumstances

19    under which you came to ask Ms. Park for the

01:22  20    complaint?

21          A.    At --

22                MS. PARK: Just, I would instruct

23    you, if there's anything that -- don't convey

24    anything that you and I discussed about, but

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                                                    b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

15

1    you can answer the question.

2           A.    She contacted me to tell me that

3    I had been requested to -- for a deposition.

4    And she had asked if I -- she said, by law,

5    I'm entitled to my own representation or she

6    could represent me, which did I want, and I

7    said I wasn't sure, I would contact -- I

8    would consult my attorney. And my attorney

9    suggested that I get a copy of the complaint,

01:22  10   which that's why I asked for one.

11           Q.    When did Ms. Park or her firm

12   begin to represent you?

13           A.    Well, I would guess the moment I

14   said, okay, I'll accept your representation.

15           Q.    That's what I'm asking about,

16   when was that?

17           A.    Again, late February.

18           Q.    Did you talk to anyone besides

19   attorneys about this case after your call

01:23  20   with Mr. Collette?

21           A.    Yes.

22           Q.    Who?

23           A.    My husband, my kids, a former

24   colleague of mine, and my -- the gentleman I

Electronically signed by Ann M. Belmont (201-234-827-3922)                    b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

16

1    currently work with.

2           Q.    What was the last one?

3           A.    The gentleman I currently work

4    with. One of my partners.

5           Q.    As to your husband and your

6    kids, did you discuss any of the facts about

7    the matter, or just the fact that the case

8    was happening and you might give a

9    deposition?

01:24   10           A.    I believe I talked also of the

11    facts as I'm aware.

12           Q.    With your business partner, did

13    you discuss the facts of the case with him?

14           A.    Yes, the facts as I'm aware.

15           Q.    What was the former colleague

16    that you spoke to?

17           A.    Blake O'Neal.

18           Q.    Is that a man or a woman?

19           A.    A man.

01:24   20           Q.    Did Mr. O'Neal work at Healthy

21    Advice at the same time as you?

22           A.    Yes, he did.

23           Q.    What was his position?

24           A.    Sales executive.

Electronically signed by Ann M. Belmont (201-234-827-3922)                    b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

17

1        Q.    Were you the head of sales at

2    the time that you worked with Mr. O'Neal?

3        A.    Yes, I was.

4        Q.    So was he an employee that you

5    supervised at that time?

6        A.    Yes, he was.

7        Q.    What did you discuss with Mr.

8    O'Neal?

9        A.    Basically, I told him that I had

01:25  10    been deposed and that it was regarding

11    ContextMedia and some of the things that,

12    again, that we were made aware of when I was

13    there.

14        Q.    What was the purpose of reaching

15    out to him about it?

16        A.    I didn't reach out to him about

17    that.  We were having a phone conversation.

18        Q.    Oh, you were talking about

19    things in general?

01:25  20        A.    Yes.

21        Q.    Do you maintain a friendship

22    with Mr. O'Neal?

23        A.    We do.

24        Q.    So the purpose of the call

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                                    b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

18

1   wasn't to talk about this case?

2          A.    Nope, I -- we work on other

3   opportunities together.

4          Q.    Mr. O'Neal works with you as

5   well?

6          A.    He has his own business, but he

7   has helped me get -- he's given me his

8   contacts of different places, it's mutually.

9          Q.    What company do you work for

01:26   10   now?

11          A.    Valore RX.

12          Q.    Can you spell that?

13          A.    V-A-L-O-R-E, R-X.

14          Q.    This is in the field of

15   pharmaceutical marketing?

16          A.    No.

17          Q.    What's the company do?

18          A.    They are PBM.

19          Q.    Which means?

01:26   20          A.    Pharmacy benefits management

21   company.

22          Q.    Healthcare plan type situation

23   for pharmaceuticals?

24          A.    PBMs typically process and pay

Electronically signed by Ann M. Belmont (201-234-827-3922)                                        b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

19

1    the RXs that are filled.

2         Q.    Is it a vendor to pharmaceutical

3    companies or to insurance plans?

4         A.    They negotiate with PhRMA --

5    they want to keep things on PhRMA, and

6    negotiate and contract rates at pharmacy

7    typically, so there are some plans, I

8    believe, that may also be a PBM.

9         Q.    Does this company have

01:27  10  customers?

11        A.    Yes.

12        Q.    Who are the customers of this

13   PBM?

14        A.    Well, anyone who would use their

15   discount savings card would, I assume, be

16   their customer, a patient for example.

17        Q.    Have you worked at Valore RX

18   since you left Healthy Advice?

19        A.    Not initially.

01:27  20        Q.    Did you have a job in between

21   the two?

22        A.    No.

23        Q.    When did you begin at Valore RX?

24        A.    I don't know.  The reason I say

Electronically signed by Ann M. Belmont (201-234-827-3922)                    b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

20

1    that is, I began just doing some work with
2    them, consulting, kind of helping out, and it
3    just turned into something.  That was the
4    fall of 2012.
5         Q.    What's the name of the business
6    partner with whom you discussed the facts of
7    this case?
8         A.    Tom Borzelleri.
9         Q.    Can you spell his last name?
10        A.    It's a pop up on my phone, but I
11   think it's B-O-R-Z-E-L-L-E-R-I.
12        Q.    What are the practices that you
13   think PatientPoint's lawsuit is about?
14        A.    Well, it's stipulated in the
15   complaint.
16        Q.    Right.  You said that you knew
17   what it was about even before you read the
18   complaint, so what did you know it was about
19   right away?
20        A.    People incenting different
21   practices to utilize Context's solution,
22   Context taking or having our product shipped
23   to their facility, and then, thirdly, going
24   into offices, making it seem like they worked

01:28 (line 10)
01:29 (line 20)

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                    b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

21

1    for us and taking equipment down.

2           Q.    The first one that you

3    mentioned, incenting different practices to

4    use ContextMedia's solution, what did that

5    entail?

6           A.    I'm not sure of any or all of

7    the methods, but I believe they offered them

8    different types of -- what do you call it?

9    Like monetary cards and things like that, and

01:30   10  lunches.

11          Q.    Who did they -- who's they?

12          A.    Context.

13          Q.    Sales representatives for

14   Context?

15          A.    I have no idea.

16          Q.    And who were they giving the

17   money or lunches to?

18          A.    I don't have the specific names

19   of the practices, if that's what you're

01:30   20  asking, but to offices that had our network,

21   rheumatology network installed.

22          Q.    And when you say our network,

23   you mean --

24          A.    Healthy Advice.

Electronically signed by Ann M. Belmont (201-234-827-3922)                    b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

22

1          Q.     Healthy Advice's ACN?

2          A.     Correct, Arthritis Care Network.

3          Q.     The monetary cards, were those

4     gift cards like from a major credit card

5     company?

6          A.     I don't know.

7          Q.     But in any event, it was a

8     direct transfer of cash in some form from

9     ContextMedia to a point of contact at a

01:31  10     doctor's office that you're talking about?

11          A.     I don't know if it was cash. As

12     I said, it may have been lunches and things

13     like that.

14          Q.     Did you know at the time and you

15     forget, or did you never know?

16          A.     I never knew.

17          Q.     At the time, what did you think

18     about the idea that ContextMedia would give

19     something of value, such as either cash or

01:32  20     lunches or another substantial gift to a

21     practice in order to give that practice an

22     incentive to select ContextMedia's service

23     over Healthy Advice's service?

24          A.     Could you -- I'm not

Electronically signed by Ann M. Belmont (201-234-827-3922)                              b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

23

1    understanding when you ask the question, what
2    did I think?
3            Q.    Yeah, what did you think about
4    that or how did you feel about it?
5            A.    I didn't think it was an
6    appropriate practice. I don't think it's an
7    appropriate practice.
8            Q.    Did you think that it made any
9    difference?
10            A.    I would have no way of knowing.
11    I wasn't out in the field, but it's
12    irrelevant whether it's right or wrong.
13            Q.    What's irrelevant?
14            A.    Whether it made a difference.
15            Q.    So it's -- it's inappropriate in
16    your eyes no matter whether it caused the
17    practices to change their behavior or if it
18    didn't?
19            A.    Yes.
20            Q.    And what's the source of the
21    rule or the, you know, the principle that
22    makes it inappropriate?
23            A.    The PhRMA guidelines, the PhRMA
24    code guidelines that the manufacturers all

01:32 (at line 10)
01:33 (at line 20)

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                                    b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

24

1    sign up for.

2           Q.    P-H-R-M-E?

3           A.    M-A.

4           Q.    M-A. Is that a code of ethical

5    guidelines that applies to the marketing of

6    pharmaceuticals?

7                 MS. PARK: Objection, form.  You

8    can answer.

9           A.    I'm not sure if it has to do

01:33   10    with pharmaceuticals or just in general the

11    way they approached the practices. I --

12          Q.    The way who approached the

13    practices?

14          A.    The PhRMA companies.

15          Q.    Who publishes the PhRMA

16    guidelines?

17          A.    I do not know.

18          Q.    Why do you think they're

19    important?

01:33   20          A.    Because it's the rules on which

21    have been established in terms of how to

22    ethically participate in physician practices.

23          Q.    But you don't know if it's a

24    government body, a non-profit, a

Electronically signed by Ann M. Belmont (201-234-827-3922)          b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

25

1    pharmaceutical company, a group of

2    pharmaceutical companies, or somebody else

3    who publishes it?

4            A.    To the best of my knowledge, it

5    is a group of the pharmaceutical companies.

6    It's the code of ethics that they established

7    to govern themselves.

8            Q.    Why would it apply to Healthy

9    Advice or Context?

01:34    10        A.    When -- because when you build a

11    network on behalf of someone else, you

12    represent them.

13           Q.    And do you think that's a major

14    part of the actions by Context that were

15    inappropriate at the time?

16           A.    It's certainly part.

17           Q.    At the time, isn't it true that

18    you were concerned that the incentives that

19    were being given to practices was having a

01:35    20    direct impact on the number of practices that

21    were switching from Healthy Advice to

22    ContextMedia?

23                 MS. PARK: Objection, form.

24           A.    I believe that that was what our

Electronically signed by Ann M. Belmont (201-234-827-3922)                                    b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

26

1    field sales folks thought, yes.

2           Q.    Are the field sales folks the

3    people who have the best information at

4    PatientPoint about what impact any particular

5    action or communication having to do with the

6    practice has on whether that practice chooses

7    to be in a digital screens network or to

8    switch between networks?

9                 MS. PARK: Objection, form.

01:35    10        A.    I believe that they are the ones

11    calling on the practice so they are closest

12    to it.

13           Q.    Is that the team that you relied

14    on when you were making decisions that had to

15    do with what the practices were doing and the

16    choices the practices were making at the

17    time?

18           A.    I don't think I understand the

19    question.

01:36    20        Q.    Well, your role was in sales of

21    advertising contracts to pharmaceutical

22    companies and the agencies that represented

23    them, right?

24           A.    Correct.

Electronically signed by Ann M. Belmont (201-234-827-3922)

b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

27

1        Q.    Sometimes those clients -- can I
2    call them clients?
3        A.    If you're speaking about the --
4    the ones who exchanged dollars with us for
5    advertising, yes.
6        Q.    Okay. And the ones who exchanged
7    dollars with you for advertising are the
8    decision makers in terms of whether
9    sponsorship contracts are entered into with
10   Healthy Advice, right?
11       A.    That would be correct.
12       Q.    So we can refer to them as
13   clients?
14       A.    Yes.
15       Q.    When you were communicating with
16   clients, did they sometimes have an interest
17   in the footprint of the network that they
18   were considering advertising on?
19       A.    That would be correct.
20       Q.    By the footprint, we mean the
21   size of it?
22       A.    That would be correct.
23       Q.    How many doctors' offices or,
24   you know, the waiting rooms of how many

01:37 (line 10)

01:37 (line 20)

Electronically signed by Ann M. Belmont (201-234-827-3922)                    b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

28

1    doctors the network was reaching?

2         A.    Yes.

3         Q.    That's what a footprint is?

4         A.    Yes.

5         Q.    Sometimes, were the clients

6    interested in how quickly or how reliably

7    Healthy Advice could expand the footprint of

8    a given network?

9         A.    Sometimes, not often.

01:37    10    Q.    And when they cared about that,

11    you and your team would be responsible for

12    communicating with them about it, right?

13         A.    Yes.

14         Q.    So in those circumstances when

15    you're communicating with a client about the

16    footprint or the rate of expansion of a

17    footprint in the field -- what was the team

18    that you mentioned earlier?

19         A.    You mean the ones for

01:38    20    physicians' offices? I don't know what they

21    formally called themselves, but we called

22    them field sales force.

23         Q.    Was the field sales force, in

24    those situations, the team that you relied on

Electronically signed by Ann M. Belmont (201-234-827-3922)     b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

29

1   for your -- the company's best information

2   about what practices were doing and what was

3   important to them?

4               MS. PARK: Objection, form.

5        A.    We certainly got information

6   from them, but much of it was delivered

7   through our COO.

8        Q.    Is your impression that your COO

9   had an independent source of information

10  other than the field sales team?

11       A.    I don't believe so.

12       Q.    Was the field sales team headed

13  up by Jill Brewer at the time that you were

14  employed by Healthy Advice?

15       A.    Yes.

16       Q.    Was Amy Finley in the management

17  of the field sales team?

18       A.    Yes.

19       Q.    Do you remember any other

20  managers in the field sales team?

21       A.    No, but if you said the names,

22  I'm sure I would recall them.

23       Q.    Heather McGauvran?

24       A.    I don't know.

01:38

01:39

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)   b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

30

1      Q.    Phyllis Timole, maybe she was a
2  field sales rep?
3      A.    Yes, I don't recognize that
4  name.
5      Q.    Not sure. It strikes me at some
6  point that you communicated to at least a
7  client, if not multiple clients, about the
8  footprint of ACN and some perceived slowness
9  in ramping up that footprint.  Do you
10 remember anything about that at this point?
11           MS. PARK: Objection, form.
12     A.    I did not communicate with any
13 client regarding a footprint size. I'm not
14 sure, I would imagine the salesperson that
15 had the network, I would imagine, I wasn't on
16 any of her calls, but I would imagine at some
17 point it's a possible subject that came up.
18     Q.    You weren't ever copied or
19 included in communications to clients about
20 the practices of ContextMedia or other
21 competitors in marketing digital screens to
22 providers?
23     A.    I'm sure I got copied on a lot
24 of things. Whether or not it was in my main

01:40

01:40

Electronically signed by Ann M. Belmont (201-234-827-3922)          b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

31

1    purview, whether or not I read through the

2    whole thing, you know, I don't know. I mean,

3    I'm sure I didn't, is what I'm saying.

4         Q.    So you don't remember that,

5    today, ever -- let me start again.

6              As of sitting here today, you

7    don't remember any occasions on which you

8    were directly interested in the communication

9    to clients about communications and actions

10   taken by competitors in the field who were

11   trying to sell digital screen networks for

12   the providers --

13        A.    I'm not sure what you're

14   asking --

15             MS. PARK: Objection, form.

16   Objection. It misstates prior testimony.

17        Q.    You don't understand the

18   question?

19        A.    No, I don't.

20        Q.    I think what I'm hearing you say

21   is that this -- maybe you were copied or

22   involved in communications, but it wasn't

23   something you cared about?

24        A.    Well, I care about the business,

01:41

01:41

Electronically signed by Ann M. Belmont (201-234-827-3922)                        b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

32

1    but there are other people that handle things

2    and you know it's going to -- you know.

3          Q.    And what I'm trying to ask you

4    now is, do you remember any occasions where

5    you were directly interested in those types

6    of communications to clients?

7                MS. PARK: Objection, form, vague

8    as to types of communications.

9          A.    I don't recall being involved in

10   the direct communication to a client or

11   asking to see how it was being conveyed.

12         Q.    Or even being interested in what

13   was being conveyed to the client about that?

14               MS. PARK: Objection, form.

15         A.    Well, of course I had an

16   interest.

17         Q.    And do you remember any

18   particular occasions on which you were

19   interested?

20         A.    I'm trying to think back.

21   Because of what we uncovered that was

22   happening in the -- out in the marketplace,

23   the individual that had the account, we would

24   have meetings to talk about making sure we

01:42 (lines 9-11)
01:42 (lines 20-24)

Electronically signed by Ann M. Belmont (201-234-827-3922)                    b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

33

1    maintained our numbers, and I'm talking about

2    ACN, in ACN, and how we could make sure that

3    we met our contract deliverables.  And so

4    during that conversation, they were certainly

5    talking about what was happening. Now, how

6    that was conveyed the client, I don't know.

7         Q.    ACN is the only network that you

8    remember taking an interest in these

9    communications?

01:43    10         A.    I'd say yes, to the best of my

11    knowledge.

12         Q.    And the brand at the time that

13    had exclusivity of advertising over ACN, was

14    that Humira?

15         A.    Yes, it was.

16         Q.    Was the individual you

17    mentioned, Linda Ruschau?

18         A.    Yes.

19         Q.    In those communications that you

01:44    20    were interested in, was there anybody else

21    involved?

22         A.    Well, help me out. When you say

23    "those communications," what are you talking

24    about, are you talking about dialogue?    Are

Electronically signed by Ann M. Belmont (201-234-827-3922)    b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

34

1    you talking about --

2              Q.    It seemed like you were

3    remembering something in particular.

4              A.    Not written communicates.  I'm

5    talking about internal meetings when we would

6    discuss what our strategy was.

7              Q.    Who was at those meetings?

8              A.    Sometimes it varied, but on --

9    by and large, it would have been Linda, Jill,

01:44    10    Tom Campbell, on occasion myself, and on

11    occasion, Mike McAllister, to the best of my

12    knowledge.

13             Q.    At those meetings, would Ms.

14    Brewer and Mr. Campbell be the people who

15    conveyed whatever information there was to be

16    conveyed about the side of the business that

17    was interacting with the doctors' offices?

18             A.    Typically, yes.

19             Q.    Were those formal meetings or

01:45    20    just kind of haphazard?

21                   MS. PARK: Objection, form.

22             A.    I think both.

23             Q.    Were there meeting invitations

24    sent out by e-mail or in an Outlook or

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Deborah Schnell, 3/28/2014

35

1    Eudora type of --

2          A.    I think so.

3          Q.    Were there agendas prepared?

4          A.    I don't -- if there was, I don't

5    recall, but that doesn't mean there wasn't.

6          Q.    Did anyone take notes at those

7    meetings?

8          A.    I don't know.

9          Q.    Did you take notes?

01:45   10          A.    I don't know.

11          Q.    You don't know whether you did

12    or didn't?

13          A.    This was three years ago, I

14    really don't.

15          Q.    What was the size of the

16    provider market for ACN?

17          A.    What do you mean, provider

18    market?

19          Q.    The number of doctors or the

01:46   20    number of doctors' offices that ACN's digital

21    screens could reach potentially.

22          A.    I have no idea.

23          Q.    What was the size of the

24    provider market for PCN?

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                    b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

36

1       A.    When you say size of provider,

2   let me make sure I understand. Do you mean

3   the footprint that they already had or how

4   many doctors were in the universe?

5       Q.    I would be interested in both,

6   but right now I'm asking about entire

7   universe.

8           MS. PARK: Objection, form.

9       A.    I have no way of knowing.

01:46  10       Q.    What about the second question?

11   How many doctors' offices or doctors PCN

12   actually had in its footprint?

13           MS. PARK: Objection, form, vague

14   as to time period.

15       A.    I don't remember.

16       Q.    Over the years, had Healthy

17   Advice had digital screens in the waiting

18   rooms of hundreds of thousands of doctors'

19   offices?

01:47  20       A.    Not that I'm aware of.

21       Q.    Over 100,000?

22       A.    No, not that I'm aware of. I

23   mean, I couldn't give -- that's why I said

24   before, I couldn't give you -- not that I

Electronically signed by Ann M. Belmont (201-234-827-3922)          b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

37

1    recollect, I couldn't give you specifics,

2    but, no to that.  I can tell you no.

3         Q.    Do you remember what the

4    footprint of ACN was at the time that you

5    were head of sales?

6         A.    I don't remember. I would say,

7    but I could be wrong, because you'll have to

8    go check, I would say it's anywhere between

9    1,000 to 2,000.

01:47    10         Q.    In the meetings that you

11    attended about the activities in the field

12    with respect to trying to place screens in

13    providers' offices, what were the activities

14    in the field that were discussed in terms of

15    impacting the footprint or how quickly the

16    footprint could expand for ACN?

17         A.    I'm not sure I understand the

18    question again.

19         Q.    You were discussing meetings

01:48    20    about the practices in the field --

21         A.    Em-hm.

22         Q.    -- that were occurring with

23    competitors, including ContextMedia in

24    marketing digital screen network services to

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                    b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

38

1    doctors' offices, right?

2         A.    Em-hm.

3         Q.    There were those meetings?

4         A.    Yes.

5         Q.    And some of them you attended?

6         A.    Yes.

7         Q.    And what I'm asking is, what

8    activities in the field were being discussed

9    at those meetings?

01:48    10         A.    Oh, I think I already told you

11    at the beginning.

12         Q.    So each of the activities that

13    you listed for me earlier were having an

14    impact on the footprint or the rate of

15    footprint expansion?

16         A.    Yes.

17         Q.    So just to recap them quickly,

18    at the time, giving direct incentives in

19    terms of money or other valuable items to

01:49    20    practices had an impact on the footprint or

21    the rate of footprint expansion, correct?

22         A.    Yes.

23         Q.    Correct?

24         A.    Yes, that was a belief.

Electronically signed by Ann M. Belmont (201-234-827-3922)

b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

39

1          Q.    And at the time the
2    understanding was that doctors' offices being
3    confused about whether a competitor was
4    actually Healthy Advice was also having an
5    impact on the footprint of ACN or the rate of
6    that footprint expansion?
7          A.    I'm not sure what that question
8    means or that statement meant.
9               MS. PARK: Objection.
01:49  10          Q.    One of the things that you
11    mentioned to me earlier was somebody going
12    into a doctor's office and giving the
13    impression that they were from Healthy
14    Advice --
15               MS. PARK: Objection, form.
16    Misstates prior testimony.
17          Q.    -- when they weren't actually?
18          A.    Yes.
19          Q.    That's what I'm referring to.
01:50  20          A.    Okay.
21          Q.    And I'm just recapping that. At
22    the time of these meetings that you
23    participated in, the understanding was that
24    that impersonation was having an impact on

Electronically signed by Ann M. Belmont (201-234-827-3922)                    b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

40

1    the footprint or the rate of expansion of the

2    footprint of ACN?

3         A.    Yes.

4         Q.    Now, the other activity that you

5    mentioned to me had to do with shipping a

6    piece of equipment to ContextMedia's office?

7         A.    Yes.

8         Q.    Now, that wouldn't have an

9    impact on a provider entering into a network

10   or not, that must have been something

11   different?

12              MS. PARK: Objection, form.

13   Misstates prior testimony.

14         A.    I don't know.

15         Q.    You don't remember that coming

16   up at the meetings as something that was

17   decreasing retention of ACN practices within

18   the network or being a damper on new

19   practices coming into the network?

20         A.    No.

21         Q.    No, that didn't come up at the

22   meeting?

23         A.    No, I don't remember that it was

24   specifically stated that that would impact

01:50

01:51

Electronically signed by Ann M. Belmont (201-234-827-3922)                                      b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

41

1    new customers coming in.

2          Q.    It probably wouldn't because

3    it's shipping a piece of equipment, right?

4                MS. PARK: Objection, form.

5          Q.    I don't see how it could.  Can

6    you think of a way?

7                MS. PARK: Objection, form.

8          A.    I think it has more to do with

9    people trying to understand what we have to

01:51   10    improve their marketing capability, so, yes,

11    I do think it has a direct marketing impact.

12    And I think you do, too.

13          Q.    And you think what?

14          A.    I said I think you would too.

15          Q.    Well, if it never happened --

16    let me start over.

17                Let's assume that the piece of

18    equipment -- was it a CPU?

19          A.    I'm not sure. I believe so.

01:52   20          Q.    So whatever piece of equipment

21    we're talking about, you understood that

22    someone had shipped it to ContextMedia,

23    right?

24          A.    That was my understanding.

Electronically signed by Ann M. Belmont (201-234-827-3922)                    b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

42

1        Q.    And what you're saying is that

2    there's a way in which that equipment being

3    at ContextMedia could, through study or use

4    in some way, impact the size of ACN's

5    footprint?  ContextMedia's ability to compete

6    with ACN?

7            A.    Yes.

8        Q.    And if we assume that the

9    information on that piece of equipment was

01:53   10    made publicly available in some way, then any

11    impact on ContextMedia's marketing ability

12    would be legitimate instead of illegitimate,

13    right?

14            MS. PARK: Objection, form.

15        A.    Could you elucidate?  I don't

16    understand where you're going, or what you're

17    asking, I should say.

18        Q.    You're saying that there's

19    something on that equipment that may have

01:53   20    impacted ContextMedia's ability to compete in

21    recruiting rheumatology offices, right?

22        A.    Yes.

23        Q.    And I'm asking you, if that

24    information, whatever information was on that

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                                    b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

43

1    CPU, was actually publicly available, assume

2    it was publicly available, then --

3            A.    It's not.

4            Q.    I'm asking you to assume that it

5    was available in some public way, then

6    whatever impact that had on ContextMedia's

7    ability to market would then be okay, it

8    would be legitimate?

9            MS. PARK: Objection, form --

01:54    10        A.    Well, I can't answer that

11   because you said assume it was in the public

12   domain.  It is not in the public domain, so I

13   would have no way of knowing.

14           Q.    Well, you don't even remember

15   what the equipment was.

16           A.    Well, the reason I say that is

17   because there are different components, and

18   the -- when I -- I would get reports, for

19   example, I didn't really look what part it

01:54    20   is, rather that I would look at it as a very

21   high level in terms of trying to understand,

22   and as it was described to me by our experts

23   internally, that within and where it's

24   housed, I don't know, but within there is not

Electronically signed by Ann M. Belmont (201-234-827-3922)                    b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

44

1    just the context for the creative, but a lot

2    of microcoding -- and microcoding may not be

3    the correct word, but coding and different

4    things that allow our system to behave in

5    certain ways, of which I don't know what they

6    are, but that's how it was explained to me.

7         Q.    So it doesn't just include the

8    loop content?

9         A.    That was my understanding.

10         Q.    And if it did just include the

11    loop content, then there would be no problem

12    because that's available in the laws of 500

13    or 1,000 doctors' offices, right?

14              MS. PARK: Objection, form --

15         A.    I have no idea. I mean, I know

16    it's available, but I have no idea what

17    the assumptions would be.

18         Q.    I didn't understand your answer.

19         A.    When you said to assume, then

20    what would happen, I don't know, because

21    that's not the case.

22         Q.    Right.  But the loop content

23    wasn't considered secret at the time.  The

24    discussions were around the other things that

01:55  (at line 10)

01:55  (at line 20)

Electronically signed by Ann M. Belmont (201-234-827-3922)          b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

45

1    you thought were on the CPU?

2              MS. PARK: Objection, form.

3         A.    I think that it was two-pronged,

4    and when I say that, my understanding is that

5    there was a lot of history of information as

6    well, and so whatever is currently out there

7    that someone could see at one point in time,

8    that doesn't mean -- so there's a lot of

9    different content information, too, that was

01:56   10   quite valuable.

11         Q.    Who explained that to you at the

12   time?

13         A.    Mike McAllister.

14         Q.    And how did he come across that

15   information?

16              MS. PARK: Objection, foundation.

17         A.    I don't know.

18         Q.    What year was it?

19         A.    Again, this is going back, so I

01:56   20   don't know if it was -- I don't even know

21   when it started.  I don't know if it was

22   2011, I don't know if it was 2010, I don't

23   recall.  But somewhere in that general time

24   frame I think.

Electronically signed by Ann M. Belmont (201-234-827-3922)    b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

46

1        Q.    Did you know that Healthy Advice
2    abandoned CPUs in doctors' offices --
3              MS. PARK: Objection, form.
4        Q.    -- around that time?
5              MS. PARK: Sorry.  Objection,
6    form.
7        A.    No.
8        Q.    You weren't aware of that?
9        A.    To my knowledge, I don't believe
10   they did.
11       Q.    No one ever told you that they
12   did?
13       A.    No.
14             MS. PARK: Objection, form.
15       Q.    It would be quite different --
16   it would be a quite different situation from
17   what you were informed at the time if in fact
18   the information that was on that piece of
19   equipment was also on equipment that had been
20   left at practices with no nondisclosure
21   agreements and no ongoing relationship with
22   Healthy Advice, right?
23             MS. PARK: Objection, form.
24       A.    I don't know.

01:57 (line 10)

01:57 (line 20)

Electronically signed by Ann M. Belmont (201-234-827-3922)                    b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

47

1          Q.     Why don't you know that?

2                 MS. PARK: Objection.

3          A.     Why don't I know what?

4          Q.     It would be quite a different

5    situation if the same information was just

6    abandoned at a -- at several doctors' offices

7    at around the same time, right?

8                 MS. PARK: Objection, form.

9          A.     No. I don't understand what

01:57    10    you're trying to ask me, honestly.

11          Q.     You seemed to be quite concerned

12    that confidential information was on the

13    piece of equipment that you're saying you

14    understood was shipped to ContextMedia,

15    right?

16          A.     Correct.

17          Q.     If that same information was on

18    equipment that Healthy Advice freely let lie

19    at doctors' offices who had terminated their

01:58    20    relationship and had no nondisclosure

21    agreement, then wouldn't that be a different

22    situation?

23                 MS. PARK: Objection, form.

24          A.     First of all, I don't know

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                                                     b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

48

1    that -- I don't know that that is correct,

2    that they abandoned equipment at the office.

3            Secondarily, if something is

4    sitting there and those offices aren't

5    dissecting everything and aren't competitors,

6    that's a very different situation than

7    somebody purposefully taking something.

8            Q.    Would you have let a member of

9    your sales team give proprietary information

01:58    10    to a potential client without a nondisclosure

11    agreement in place?

12            A.    I think probably, based on the

13    relationship with the client.

14            Q.    So PatientPoint, at the time

15    that you were the head of sales, would not

16    necessarily require potential sponsors to

17    sign a nondisclosure agreement before seeing

18    proprietary information in the pitches?

19            MS. PARK: Objection, form.

01:59    20            A.    First of all, most of our

21    clients require NDAs upfront, because we

22    analyzed their data, so pretty much had NDAs

23    or CDAs in place.

24            Secondly, relative to the

Electronically signed by Ann M. Belmont (201-234-827-3922)                    b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

49

1    content, that stuff was just created on an

2    ongoing basis.

3         Q.    What content?

4         A.    That was on the digital screens,

5    the health education content.

6         Q.    I'm talking about proprietary

7    information.

8              MS. PARK: Objection, form,

9    vague.

02:00    10        A.    Yeah, I'm not -- I don't

11   understand.

12        Q.    Your sales team made pitches to

13   clients, right?

14        A.    Absolutely.

15        Q.    Did some of those pitches

16   include PatientPoint's proprietary

17   information?

18        A.    I don't believe so.

19        Q.    So the pitches that were made to

02:00    20   potential sponsors did not include

21   proprietary information of PatientPoint?

22             MS. PARK: Objection, form.

23        A.    Ask me again, because I want to

24   get this right, and I want to make sure I

Electronically signed by Ann M. Belmont (201-234-827-3922)                    b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

50

1    understand what you're asking me.

2            Q.    The pitches --

3            A.    Yes.

4            Q.    -- that your sales team made to

5    clients --

6            A.    Yes.

7            Q.    -- did not include

8    PatientPoint's proprietary information?

9                  MS. PARK: Objection, form, vague

02:01  10  as to the term proprietary information --

11           Q.    Is that a true statement?

12           A.    I don't believe so.

13           Q.    If something that a member of

14   your team was conveying to a client was

15   confidential and proprietary and it was

16   valuable to PatientPoint that it remain a

17   secret, assume that's the case, would you

18   require a nondisclosure agreement before that

19   piece of information was given to the client?

02:01  20                MS. PARK: Objection, form, vague

21   as to the term proprietary information.

22           A.    Yeah, I don't know.

23           Q.    You might not?

24           A.    Yeah.

Electronically signed by Ann M. Belmont (201-234-827-3922)                    b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

51

1            MS. PARK: Objection, form.

2        Q.    Because the relationships with

3    the clients are such that information would

4    just flow freely between PatientPoint and the

5    client?

6            MS. PARK: Objection, form.

7        A.    Em-hm.

8        Q.    Regardless of whether or not a

9    disclosure agreement was in place?

02:02  10            MS. PARK: Objection, form.

11        A.    Yes.

12      (Exhibit 97 identified.)

13        Q.    I'd like to hand you a document

14    that we're going to mark as Defendant's

15    Exhibit 97.

16        A.    Am I going to have to read

17    something?

18        Q.    Potentially.

19        A.    Okay.

02:02  20        Q.    Go ahead and take a look at it.

21    Thank you.  I guess I should have just said

22    yes. Is this an e-mail from you to Mike

23    Collette copying Tom McGinness, Tom Campbell,

24    Jill Brewer and Scott Nesbitt?

Electronically signed by Ann M. Belmont (201-234-827-3922)                                  b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

52

 1          A.    That's what it looks like.

 2          Q.    And it's dated February 27,

 3    2012?

 4          A.    Em-hm.

 5          Q.    Does it look like it replies to

 6    or forwards a prior e-mail from Mike

 7    Collette?

 8                MS. PARK: Could you give the

 9    witness a chance to read the document?  She's

02:03  10    still reading it.

11                MR. HANKINSON: Am I stopping

12    her?

13                MS. PARK: You're asking her a

14    question while she's still reading the

15    document.

16          A.    Okay.

17          Q.    Do you need to hear the question

18    again?

19          A.    Yes.

02:05  20          Q.    Does it look like you were

21    replying to or forwarding a prior e-mail from

22    Mike Collette?

23          A.    I am guessing that I am

24    responding to -- because I don't recall this

Electronically signed by Ann M. Belmont (201-234-827-3922)                    b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

53

1    e-mail, but I am guessing I'm responding to

2    the step in next steps, point one.  It sounds

3    like they have launched diabetes network in

4    addition to the arthritis, and that's why I

5    wanted to come back and tell him, actually,

6    that's their claim to fame, that's how they

7    started.  So I think that's what I was

8    responding to.

9              Q.    And how did you know that that

02:06  10   was their claim to fame and how they started?

11             A.    Because for quite a while it was

12   the only network they had.

13             Q.    Right.  How did you come to be

14   aware of it?

15             A.    Because you understand who's in

16   the marketplace.

17             Q.    How do you become aware of them?

18             A.    It's my job. You read.

19             Q.    Read what?

02:06  20             A.    Read the trades --

21             Q.    I'm sorry to be oversimplifying,

22   but --

23             A.    Well, read the trade magazines,

24   read the announcements, you know, so-and-so

Electronically signed by Ann M. Belmont (201-234-827-3922)                    b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

54

1    just launched.

2         Q.    So diabetes came first in terms

3    of network sponsor --

4         A.    That was --

5         Q.    -- that were put on by --

6         A.    Yes.

7               (Interruption by Reporter.)

8         Q.    -- ContextMedia? I'm sorry, if

9    we could avoid talking over each other, it'll

02:06    10    help.

11         A.    Okay.

12         Q.    So yes?

13         A.    Yes.

14         Q.    And then rheumatology followed?

15         A.    That's my understanding.

16         Q.    When did you first hear about

17    ContextMedia's rheumatology offering?

18         A.    I don't recall.

19         Q.    When did you first become

02:07    20    concerned about ContextMedia's competition in

21    the rheumatology space?

22         A.    I don't recall. Whenever, you

23    know, the field salespeople started bringing

24    it to our attention and the sales rep, Linda.

Electronically signed by Ann M. Belmont (201-234-827-3922)     b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

55

1    They would take it to her, I think, actually,

2    but then she would come to tell me.  I don't

3    remember if you're asking me the dates.

4            Q.    Your only concerns were the

5    concerns brought to your team by the field

6    salespeople?

7            A.    Yes, and then, as a subsequent

8    to that, by Linda Ruschau on behalf of the

9    client.

02:08    10            Q.    The same concerns being passed

11    from Linda Ruschau to you?

12            A.    Yes.

13            Q.    You weren't aware of other

14    things that ContextMedia was doing out in the

15    marketplace independent of what you're

16    receiving -- the information you were

17    receiving from the field sales team?

18            A.    I'm not understanding.

19            Q.    Were you aware of other

02:08    20    activities of ContextMedia in the marketplace

21    outside of the information --

22            A.    No.

23            Q.    -- that came to you from field

24    sales --

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                    b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

56

1        A.    Not that I recall.

2        Q.    -- through Linda Ruschau --

3        A.    Not that I recall.

4              MS. PARK: Let him finish the

5    question.

6        A.    My bad.

7        Q.    And I didn't mean to be mean

8    before when I was reminding you about that --

9        A.    That's okay.

02:08   10    Q.    -- I'm just trying to.

11             I'd like you to look at, in Mr.

12   Collette's e-mail, the fifth paragraph down

13   starting with "Said Agencies."

14       A.    Uh-huh.

15       Q.    "Said Agencies like their

16   product," their product refers to the product

17   of Health Focus Media, right?

18       A.    Em-hm.

19             MS. PARK: Objection, foundation.

02:09   20    Q.    Yes? You said em-hm.

21       A.    It appears, uh-huh. As I said,

22   it appears.

23       Q.    "Said Agencies like their

24   product but they struggle to get buys,"

Electronically signed by Ann M. Belmont (201-234-827-3922)          b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

57

1    B-U-Y-S, "due to their limited reach."

2    Limited reach would be the footprint of the

3    network, right?

4              MS. PARK: Objection, foundation.

5         A.    Correct.

6         Q.    "They said clients would rather

7    work with a Healthy Advice or and Accent," I

8    assume that means that that should be a

9    Healthy Advice or an Accent, referring to

10   Healthy Advice and Accent, which is a

11   competitor of Healthy Advice?

12             MS. PARK: Objection, foundation.

13        A.    I would assume.

14        Q.    So Mr. Collette's saying that

15   Health Focus Media, "said clients would

16   rather work with a Healthy Advice or and

17   Accent and do one buy than cobble together a

18   lot of smaller buys from smaller networks."

19   So one buy refers to one purchase of digital

20   screens network advertising, right?

21             MS. PARK: Objection,

22   foundation --

23        A.    I would assume.

24        Q.    Are you aware of any other

02:10

02:10

Electronically signed by Ann M. Belmont (201-234-827-3922)      b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

58

1    meaning that Mr. Collette could have in this

2    e-mail?

3                    MS. PARK: Objection foundation.

4            A.    I'm not.

5            Q.    Is that the meaning that you

6    take away from it based on your experience in

7    the industry?

8            A.    Yes, it is.

9            Q.    And Mr. Collette is contrasting

02:11    10    Healthy Advice or Accent who can put together

11    one large buy one, one buy, with a large

12    footprint with Health Focus, which would have

13    a smaller footprint, such that a client to

14    get the same amount of exposure would have

15    to, as he says, cobble together various

16    networks, right?

17                    MS. PARK: Objection, form,

18    foundation.

19            A.    Yes.

02:11    20            Q.    So the idea here is, it's quite

21    hard for someone with a very small network

22    footprint to make any impact in the market,

23    because a client would prefer to have a more

24    consolidated approach to their advertising

Electronically signed by Ann M. Belmont (201-234-827-3922)          b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

59

1    buys?

2         A.    No, not necessarily.

3              MS. PARK: Objection, form,

4    foundation.

5         Q.    So what would the situation be

6    that's the exception to that?

7         A.    It would, in my professional

8    opinion, be true for somebody who wanted to

9    reach a large broad-based primary care, and

02:12   10    if somebody is starting in that area, unless

11    you have -- that's where they may have to

12    cobble. There are other drugs brands that are

13    specifically targeting very small

14    specialties.  That's why you have an

15    arthritis care/rheumatology network, that's

16    why you have a gastroenterology network, they

17    are much smaller in scope and size.  It makes

18    business sense.

19         Q.    But there's some threshold of

02:12   20    footprint no matter what the specialty or

21    lack of specialty is where the number of

22    practices is so small that the digital screen

23    provider just couldn't get any headway,

24    right?

Electronically signed by Ann M. Belmont (201-234-827-3922)   b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

60

1          MS. PARK: Objection, form.

2          A.    No, I don't believe that's true.

3          Q.    If I had a single doctor, I

4   could approach Johnson & Johnson and sell

5   some advertising space?

6          MS. PARK: Objection, form.

7          A.    Okay.  Let me redirect. Yes,

8   but, again, it depends.  It could be 500, it

9   could be -- but no one would do it for one,

02:13   10   you're probably correct.  I don't believe

11   anyone would do it for one.

12          Q.    But once you get up in the range

13   of four or five hundred, then that's big

14   enough within a specialty to be a

15   considerable part of that market?

16          A.    Yes, for that client. If it's a

17   small speciality niche.

18          Q.    So in a small speciality.  Would

19   you consider rheumatology a small speciality?

02:13   20   A.    I do.

21          Q.    Once you're up to about 400

22   offices, that is a substantial segment of the

23   market where a client might be interested in

24   that number of practices?

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                                                              b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

61

1         A.    I don't think I'd use the word
2    substantial. I think that it would -- it
3    could get their attention, but there are some
4    clients who may want to reach more.
5         Q.    So you wouldn't use the word
6    substantial segment until it's higher than
7    400 practices?
8         A.    No, that's -- that is what I
9    said in this case. But you'd have to do an
02:13  10    analysis on each of the specialties, you may
11    look at something totally different in
12    oncology, in neurology, and I don't have the
13    data in front of me to make that
14    determination.
15         Q.    You're just answering as far as
16    rheumatology goes?
17              MS. PARK: Objection, form.
18         A.    Yes, I'm sorry.
19         Q.    So and -- and I'm sorry if I'm
02:14  20    slow to put it all together, but in the field
21    of rheumatology, in digital screen networks
22    that go in rheumatology practices, a
23    substantial segment of the market would be
24    somewhere more than 400 screens?

Electronically signed by Ann M. Belmont (201-234-827-3922)                          b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

62

1        A.    Okay.  Again, I would not use

2    the word substantial, but it would be enough

3    to get a client's attention.

4        Q.    So at what point would it become

5    a substantial segment of the market?

6        A.    I don't know, because I don't

7    have the data in front of me for all that.

8        Q.    But it would be more than 400?

9        A.    Likely.

02:15    10        Q.    And what you're saying earlier

11    is something like primary care where there

12    are tens of thousands, possibly even more

13    than 100,000 doctors' offices, what would

14    constitute a substantial segment of that

15    market would be a lot higher?

16        A.    Yes, that would be correct.

17      (Exhibit 98 identified.)

18        Q.    I'm handing you what we are

19    marking as Defendant's Exhibit 98.

02:16    20        A.    Thank you.

21        Q.    And I guess you should always

22    feel free to read an entire document that I

23    put before you. My general practice is that

24    I'll ask questions, and if you feel the need

Electronically signed by Ann M. Belmont (201-234-827-3922)                    b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

63

1    to read the document, then you'll read it

2    before you answer.

3         A.    Okay.

4         Q.    Are you okay with operating like

5    that?

6         A.    I can refer back to this if I

7    need to?

8         Q.    As much as you want.

9         A.    Okay.

02:16    10    Q.    Who is Jamie -- is it Kozma?

11        A.    I don't know how --

12        Q.    You don't know how to pronounce

13    it?

14        A.    No, I don't.

15        Q.    Do you know who he is?

16        A.    I'm not -- I do not know what

17    his title is, but I do know he works for J3.

18        Q.    What's J3?

19        A.    It's an agency.

02:16    20    Q.    In 2011, was J3 the agency --

21    well, what clients were they handling for

22    Healthy Advice?

23        A.    I don't know.

24        Q.    It wasn't Humira?

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                                      b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

64

1          A.     No, definitely not.

2          Q.     Because that was Target Health?

3          A.     I believe that would be correct.

4          Q.     And then, subsequent to that,

5     Spark?

6          A.     I have no idea. I don't.

7          Q.     In any event, this e-mail chain,

8     top one in the chain is dated October 31,

9     2011.

02:17   10          A.     Em-hm, yes.

11          Q.     And that's from Mr. Kozma,

12     that's, K-O-Z-M-A, to you, and it copies Kim

13     Coar?

14          A.     That's correct.

15          Q.     Who is Kim Coar?

16          A.     Kim was another one of the sales

17     executives that reported to me.

18          Q.     What was her territory?

19          A.     I don't recall everything

02:17   20     necessarily, but the majority of it would

21     have been Merck and Pfizer.

22          Q.     M-E-R-C-K, the pharmaceutical

23     company?

24          A.     Yes, yes.  And she may have had

Electronically signed by Ann M. Belmont (201-234-827-3922)          b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

65

1    one or two smaller accounts, but that

2    constituted the large majority of her.

3         Q.    Territory?

4         A.    Business, em-hm.

5         Q.    I'd like to refer you to the

6    second e-mail down in the chain, which is

7    from you, correct?

8         A.    Yes.

9         Q.    That e-mail is to Mr. Kozma at

02:18   10    J3, and it cc's Kim Coar, right?

11        A.    Correct.

12        Q.    And the subject line of that is,

13   forward more edits.

14        A.    Was that a question?

15        Q.    Correct.

16        A.    Oh, I'm sorry.

17        Q.    No, that's my fault.

18        A.    Oh, yes. The subject is more

19   edits.

02:19   20        Q.    I meant to put the question in

21   my voice, but I didn't, so that's totally my

22   fault.

23        A.    Sorry.

24        Q.    In the second paragraph of your

Electronically signed by Ann M. Belmont (201-234-827-3922)                    b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

66

1    e-mail to Mr. Kozma, you say, "Secondly, we

2    appreciate the very candid feedback you

3    provided after your discussions with

4    ContextMedia. Jamie, having been in business

5    for over 23 years and recruited," and then

6    there's a number, it's 100,000, "physician's

7    (including replacement/churn) we are keenly

8    aware that practices do in fact ask who the

9    brand sponsors will be; they want to know

02:19  10   what will be running in their practice, it

11   simply makes good business sense."  Do you

12   know whether that number was intended to be

13   100,000 or 10,000 or something else?

14          A.    This is a guess, but I would

15   guess that it means 100,000. And I don't have

16   the data and statistics, but I did at the

17   time relative to what the churn is, because

18   you're constantly losing X-amount due to

19   practices that are consolidating, closing

02:20  20   down, going out of business, those types of

21   things.  I would guess that's what it means.

22          Q.    And over all of Healthy Advice's

23   Networks and including all replacement churn,

24   10,000 would actually be quite low for

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                                      b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

67

1    stating the number of practices that Healthy

2    Advice's screens had been in, right?

3              A.    No, that's not true. Practices

4    are different than physicians because you

5    could have, you know, you might not have a

6    network with five or 6,000 physicians, but

7    only having, you know, 30-some thousand

8    physicians, 6,000 -- 5,000 practices, okay?

9              Q.    But then you have more

02:20   10    physicians than that, or less?

11              A.    No.

12              Q.    Less?

13              A.    Well, I don't understand the

14    question.

15              Q.    Are there more doctors than

16    offices or more offices than doctor?

17              A.    There are more doctors than

18    there are offices.

19              Q.    So that's my mistake. In

02:21   20    considering all of Healthy Advice's digital

21    screens networks at the time, 10,000

22    physicians would have been quite low in terms

23    of describing how many physicians those

24    networks have been placed with?

Electronically signed by Ann M. Belmont (201-234-827-3922)                                    b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

68

1          A.    I don't know that it would be
2     quite low to say 10,000 physicians in digital
3     screens.  But you have to understand, when I
4     used the term relative to physician
5     recruitment, we look across our enterprise
6     and our exam room program, and primary care
7     is actually -- now, I don't know if it is
8     today, but it was actually larger than the
9     network in digital screens primary care.
02:21  10          Q.    The exam room program was big?
11          A.    It was substantial, yes.
12          Q.    At the time in 2011 and 2012,
13     ContextMedia did not have an exam room
14     program, correct?
15               MS. PARK: Objection, foundation.
16          A.    I have no idea.  Not to my
17     knowledge.
18          Q.    You were not aware of an exam
19     room program being offered by ContextMedia?
02:22  20          A.    I am not aware of the exam room
21     program.
22          Q.    So when you received information
23     about ContextMedia supposedly going into
24     practices and impersonating Healthy Advice?

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                                        b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

69

1        A.     Yes.

2        Q.     That was in the context of

3   digital screen networks, right?

4        A.     From my perspective --

5               MS. PARK: Objection, form.

6        Q.     You weren't aware of that ever

7   being conveyed to you with respect to an exam

8   room program, right?

9        A.     Correct.

02:22   10        Q.     ContextMedia wasn't even

11   competing with Healthy Advice at the time in

12   exam room programs?

13               MS. PARK: Objection, form.

14        Q.     Right?

15        A.     To the best of my knowledge.

16        Q.     The impact of ContextMedia's

17   marketing to practices at that time on

18   Healthy Advice's Network footprint was

19   limited, then, to digital screen networks,

02:23   20   right?

21               MS. PARK: Objection, form.

22        A.     As to what I'm aware.

23        Q.     J3, after talking to both

24   Healthy Advice and ContextMedia, told Healthy

Electronically signed by Ann M. Belmont (201-234-827-3922)                                    b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

70

1    Advice that the practice of giving incentives

2    to healthcare providers in relation to

3    recruiting them into digital screen networks

4    could continue?

5           A.    I don't know.

6           Q.    Go ahead and review the rest of

7    the e-mail and see if it refreshes your

8    recollection.

9           A.    Okay.

02:26   10           Q.    Did you finish reviewing?

11           A.    I got to the part where I think

12   I can answer your question, if I remember

13   what the question was. I vaguely.

14           Q.    Did -- after J3 had communicated

15   with both ContextMedia and Healthy Advice --

16           A.    Yes.

17           Q.    -- about the incentives that

18   were given to providers to influence their

19   decisions about entering into a digital

02:26   20   screens network for ContextMedia, did J3

21   communicate to Healthy Advice that, as far as

22   J3 was concerned, the incentives could

23   continue?

24           A.    That's not what I read here.

Electronically signed by Ann M. Belmont (201-234-827-3922)    b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

71

1     Rather, it sounds to me like what they said

2     that ContextMedia gave them an explanation as

3     to why they were able to.

4           Q.    And J3 wasn't going to take

5     action to stop it, correct?

6           A.    I don't believe they were.

7           Q.    They told you they weren't going

8     to take action to stop it, right?

9           A.    I don't know that they said it

02:27   10    in those terms, but, you know, it states

11    here, if that's really what they're doing,

12    then they were going to be comfortable with

13    it. And if their explanation was accurate,

14    then they were going to accept that, is the

15    way I read it.

16          Q.    Do you remember at the time

17    there being a concern that aggressive sales

18    techniques including multiple telemarketing

19    calls to the same healthcare provider were

02:27   20    contributing to an unwillingness by the

21    healthcare providers to listen and allow

22    opportunities when Healthy Advice salespeople

23    tried to offer them the ACN digital screens

24    program?

Electronically signed by Ann M. Belmont (201-234-827-3922)     b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

72

1          A.    I'm not sure how information was

2     necessarily conveyed. I do recall, because

3     that wasn't my main purview, so, you know,

4     you listen in on meetings when people are

5     giving an update to know a specific area, but

6     I do recall them saying that the practices

7     were complaining that they were just getting

8     bombarded over and over and over with the

9     same thing, and just -- yes, I do recall

02:28    10    that.  But in what way the information was

11    being delivered, I don't know.

12          Q.    When you say what way the

13    information was delivered, are you talking

14    about what methods of marketing to the

15    providers were being employed or the way the

16    information was being delivered to you about

17    that?

18          A.    The way the information was

19    being delivered to the providers.

02:29    20          Q.    So you're not sure if it was

21    telemarketing or in-person or faxes or

22    e-mails --

23          A.    Or combinations of, I don't

24    know.

Electronically signed by Ann M. Belmont (201-234-827-3922)                                    b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

73

1          Q.    But you remember there was a

2    concern that, in a sense, a saturation of

3    marketing about digital screens was making it

4    more difficult than anticipated to expand the

5    footprint of the ACN?

6          A.    Yes.

7       (Exhibit 99 identified.)

8          Q.    I'm handing you a document that

9    we are marking as Defendant's Exhibit 99.

02:30    10          A.    Thank you.

11          Q.    I'd like you to go ahead and

12    review this one all the way through and let

13    me know when you're done.

14          A.    Okay.

15          Q.    Do you have any memory of this

16    e-mail or the events surrounding it?

17          A.    Vaguely. I don't know that I've

18    ever seen this e-mail before, but I do

19    remember a concern from the sales executive

02:31    20    where -- and, again, I don't know how it

21    transpired how it was, but saying that

22    Humira's content was playing in the

23    ContextMedia and they had some concerns, I do

24    recall that.

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                    b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

74

1        Q.    Do you remember the outcome of

2    any -- whether there was a further

3    investigation about this?

4        A.    I don't know.

5        Q.    So you don't remember any

6    additional information coming in the door

7    either after --

8        A.    I don't.

9        Q.    It strikes me as bizarre, and I

02:31   10    just wonder if you remember anything about

11    comments at the time or explanations of

12    how -- of how or why an ad that was, you

13    know, that Humira was paying Healthy Advice

14    to put on the ACN?

15        A.    Correct.

16        Q.    Would be played on someone

17    else's screen?

18        A.    I've never seen that happen

19    before either, and I don't know. And I did

02:32   20    not see it on the screen, I just heard.

21        Q.    Did you ever hear this debunked

22    in any way?

23            MS. PARK: Objection, form.

24        A.    I did not.

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                                    b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

75

1          Q.    Do you remember any impact that

2     the Humira ad being played on this screen in

3     New York had on the business in any way?

4          A.    No.

5          Q.    Could you look at the third

6     e-mail down in the chain. It's on the second

7     page from Kim Coar, this page is marked --

8          A.    Is this the same one we were

9     looking at?

02:33  10          Q.    Yes. The page is marked

11     HAN00805.

12          A.    Yes.

13          Q.    This is an e-mail from Kim Coar,

14     dated October 11, 2011, right?

15          A.    Yes.

16          Q.    The to line lists Lee, Bruce.

17     Who is Lee, Bruce?

18          A.    I believe -- I don't -- I

19     believe he is part of J3, I don't -- I don't

02:34  20     know him.

21          MS. PARK: I think his name is

22     Bruce Lee, Counsel, just to.

23          A.    Oh.

24          Q.    Thank you. Lee, Bruce?

Electronically signed by Ann M. Belmont (201-234-827-3922)                    b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

76

1        A.    Yes.

2        Q.    He's got an (NYC-JJJ) there, is

3    that --

4        A.    Yes, I would think he's with J3.

5        Q.    And Kim Coar is e-mailing him

6    and copying you and Mike McAllister, right?

7        A.    Yes.

8        Q.    About the relationship with J3?

9        A.    Well, I'm reading, so I'm

02:34   10    checking.  Okay.  I'm sorry, what was your

11    question now?

12        Q.    This e-mail is about the

13    relationship with J3?

14            MS. PARK: Objection, form,

15    foundation.

16        A.    I'm not sure.

17        Q.    Just at the practical level, I'm

18    trying to think, since you don't remember who

19    Bruce Lee was, but you think it's J3, can you

02:35   20    read this e-mail and confirm that he was at

21    J3?

22        A.    Oh, yes, I can.  I believe he's

23    at J3, absolutely.

24        Q.    Kim Coar had responsibility for

Electronically signed by Ann M. Belmont (201-234-827-3922)                b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

77

1    the account with -- of the client who was

2    advertising through J3 as an agency, right?

3            A.    Again, I don't remember, but I

4    do not, to the best of my knowledge, no, I

5    don't think she had responsibility for J3.  I

6    think she had a relationship with J3 before

7    when she had J&J.

8            Q.    So sometimes, even though a

9    agency was not making decisions for a brand

02:36   10    that was in a particular salesperson's

11    territory, if that salesperson had a

12    relationship with someone at the agency, they

13    might step in and help out?

14            A.    That would be correct.

15            Q.    And that's the situation that

16    was happening here --

17            A.    As I remember it correctly, and

18    I say, again, because timelines are a little

19    bit hard for me to remember three years back,

02:36   20    because she did at one time have J&J, and

21    when I gave you her a major clients

22    beforehand and I said Merck and Pfizer, I

23    believe at this particular point in time J&J

24    was no longer part of hers.

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)   b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

78

1          Q.     Are those relationships with
2     personnel at clients in marketing departments
3     and at marketing and advertising agencies
4     important in your business?
5          A.     I believe they are.
6          Q.     Do they contribute to the
7     success of the sales organization of Healthy
8     Advice?
9                 MS. PARK: Objection, form.
02:37  10          A.     I believe they do, but I don't
11     believe that's all of it. It's part of the
12     product, a part of a lot of different things
13     and brand needs.
14          Q.     Let's break that down. So what
15     factors contribute to the success of Healthy
16     Advice's client sales organizations?  We've
17     got relationships, we've got the product. And
18     when you say product, are you talking about
19     the --
02:37  20          A.     I don't really mean product, I
21     mean the solution. How's that?
22          Q.     The solution?
23          A.     Yeah.
24          Q.     Which would be a combination of,

Electronically signed by Ann M. Belmont (201-234-827-3922)                    b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

79

1    potentially, digital screen programs, exam

2    room programs, and then the other advertising

3    programs that the client might be interested

4    in?

5          A.    True, yes.

6          Q.    What other factors contribute to

7    the successful sales wing --

8          A.    Result.  And I'd probably put

9    that first.

02:38    10          Q.    What's result?

11          A.    For every dollar I spend, how

12    many do I get back?  What's my return on

13    investment?  I can have a great relationship

14    with you and you can have a product that I

15    like, but if it doesn't deliver money,

16    sayonara.

17          Q.    And might I refer to that as

18    ROI?

19          A.    Yes, you might.

02:38    20          Q.    What's the difference between

21    that ROI and the solution?

22          A.    I'm not sure I answered your

23    question -- or I understand your question.

24          Q.    Well, you listed them as two

Electronically signed by Ann M. Belmont (201-234-827-3922)                                  b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

80

1   factors.

2          A.     Em-hm.

3          Q.     Is there a part of the solution

4   that a client's going to be interested in

5   independently of straight up giving my dollar

6   figure ROI?

7          A.     I'm not -- what do you mean?

8          Q.     They're different?

9          A.     The product is different than

02:38   10   the result, yes.  But I'm not understanding

11   what you're asking me.

12          Q.     What's different about them?

13          A.     The one is how I'm conveying

14   their brand messages, etc., or education or

15   whatever it is I'm being asked to do, and the

16   other one is, did it move the needle on my

17   business.

18          Q.     So the style of how the solution

19   is reaching patients is important

02:39   20   independently of the ROI hard data?

21          MS. PARK: Objection, form.

22          A.     It's a contributor, but style

23   isn't all of it.  It has to do not with only

24   the method in which something is delivered,

Electronically signed by Ann M. Belmont (201-234-827-3922)                    b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

81

1    i.e., whether it's print based, whether it's

2    digital, what's my content, do I have really

3    good creators who can change behaviors,

4    influence behaviors, etc.?  It also has to do

5    with quality of the physicians recruited,

6    significantly so, in addition to your

7    content.  They all play a very important

8    part.

9         Q.    So subparts under the factor of

02:40  10   the solution are the product --

11        A.    Em-hm.

12        Q.    -- include the style in which

13   the marketing message is being conveyed, the

14   medium or media, the creditors who are behind

15   that, and whether those creators are the type

16   of people who can make stuff consistently

17   that changes behaviors and the quality of the

18   physicians within the network?

19        A.    Yes. And I don't know if that's

02:40  20   exhaustive, but off the top of my head those

21   would be key elements.

22        Q.    Are there -- and those are

23   factors that -- are those factors that the

24   clients are interested in?

Electronically signed by Ann M. Belmont (201-234-827-3922)                    b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

82

1          MS. PARK: Objection, foundation.

2          A.    I think at the end of the day

3    they're interested in results. Really, they

4    are. And if you can show them how your

5    solutions will get those, then they'll like

6    your solution.

7          Q.    We can, I guess, to a certain

8    extent, a client would be interested in the

9    solution if there was something

02:41   10    counterproductive or additionally productive

11    in the solution that wouldn't necessarily

12    come out in a hard data ROI study such as,

13    for example, if while the advertising on the

14    digital network in terms of hard data created

15    more prescriptions?

16          A.    Yeah.

17          Q.    And more dollar value, there was

18    something about the solution that was

19    distasteful so that they would be

02:42   20    anticipating, and in the long run, it might

21    damaged the brand?

22          MS. PARK: Objection, form.

23          A.    No, I -- well, I can't imagine

24    what would be distasteful to someone, I mean.

Electronically signed by Ann M. Belmont (201-234-827-3922)                                                    b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

83

1        Q.    Or what if the solution was

2    really cool and independent of the hard data

3    of the ROI, they anticipated that, in the

4    long run, this partnership with this

5    particular solution was going to be good for

6    the brand, would that be -- would the client

7    be interested in that?

8        A.    Let me ask you, I want to make

9    sure I understand what you're asking me. I

02:42   10   don't necessarily think it's going to create

11   the ROI I'm looking for, but I think this is

12   a really cool solution.  Would I be inclined

13   to utilize that, is that the question?

14       Q.    Yeah.

15       A.    No, I would not say that. And

16   the reason that I wouldn't say that is

17   because the brand manager's job is a

18   revolving door, they're in and out, they've

19   got X-amount of time to make a decision and

02:43   20   your next job, your promotion is based upon

21   what did I deliver.  They're keenly focused

22   on that.

23       Q.    What if the ROI is generally

24   within the same range as a competitor, but

Electronically signed by Ann M. Belmont (201-234-827-3922)                                      b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

84

1    the competitor has a slightly higher ROI,

2    could the nature of the solution impact the

3    decision that the client makes?

4           A.    Oh, I think probably for sure,

5    but so can, you know, the relationship that I

6    have and the history and all kinds of other

7    things.  There's not one single thing in my

8    almost 37 years experience in sales, it's a

9    variety of different things that contribute.

02:43    10           Q.    And so far we've talked about

11    relationship, solution, ROI, and I think you

12    mentioned history?

13           A.    Em-hm.

14           Q.    What's history independent of

15    relationships?

16           A.    Has a company utilized a

17    solution for a really long time and

18    consistently brand over brand, year over

19    year.  It's a company that delivers, it's a

02:44    20    company that services their account, it's a

21    company that respects, it's a company with

22    ethics, honor, integrity, all those things.

23           Q.    Consistency, service, ethics and

24    reputation?

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                                    b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

85

1          A.    Yes, and a proven ability to

2     deliver.

3          Q.    Can you think of other factors

4     that influence client decisions in this

5     industry?

6          A.    I'm sure there are others, but,

7     as I said, those are things -- I do this, you

8     know, I'm in sales, those are the big things

9     that come to mind.

02:44    10          Q.    Now, ROI isn't always going to

11     be important to every client, right?

12          A.    No.

13          Q.    So sometimes that's not even a

14     factor?

15          A.    In the first year launch,

16     you're -- nothing pays out for anybody, not

17     TV, not anything, because you've got such an

18     investment in it and you have to grow your

19     brand, but other than that, yes.

02:45    20          Q.    So that the stage, the market

21     stage, can influence how important one factor

22     is over another in the client's decision

23     making?

24          A.    Just in launch, yes.  After

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                    b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

86

1    that, you've got to pay out.

2           Q.    After that every client is going

3    to be interested in ROI?

4           A.    I have not met one to date that

5    hadn't been.

6           Q.    But the degree to which the

7    other factors play into the decision making

8    would change with respect to each client

9    potentially, right?

02:45   10           A.    Yes, I would think so.

11           Q.    And even each contract for the

12    same client, right?

13           A.    Potentially.

14           Q.    Is there any way to generalize

15    about how important relationships, solution,

16    ROI and history are relative to one another?

17           A.    I don't -- I mean, I can't do

18    it, maybe there is somebody who can, because,

19    as I said, ROI is always a big deal.  Some

02:46   20    people who may be new to an organization that

21    has a long-term relationship, it may not be

22    as relevant to that, it's each -- I couldn't

23    really say.

24           Q.    And the client decisions that

Electronically signed by Ann M. Belmont (201-234-827-3922)                                    b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

87

1    these things are implementing ultimately

2    impact the bottom line of the business,

3    right?

4         A.    Are you asking bottom line of

5    the client's business?

6         Q.    I'm talking about Healthy

7    Advice's business.

8         A.    Certainly.

9         Q.    Or its competitors' business?

02:46  10    A.    I would guess, yes.

11        Q.    Within the industry?

12        A.    I would guess.

13        Q.    These factors would be the same

14   for a competitor as they would for

15   PatientPoint, right?

16        A.    I would assume so, but I don't

17   know, I don't -- I never worked for any of

18   them.

19             MS. PARK: Objection.

02:46  20    Q.    Well, you've had 20 -- 37 years

21   experience in the healthcare --

22        A.    No, not healthcare.

23        Q.    Not in healthcare --

24        A.    Sales.

Electronically signed by Ann M. Belmont (201-234-827-3922)                                    b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

88

1          Q.     In sales. Is there some reason

2     that you're hesitant to say that these

3     factors are the same for a competitor?

4          A.     No, but I'm giving you my

5     opinion, what I know, what I'm aware and

6     somebody else might say something totally

7     different.

8          Q.     Your opinion is that --

9          A.     Correct.

02:47    10          Q.     -- these factors would be a --

11     would be the same for a competitor of

12     PatientPoint?

13          A.     I would think.

14          Q.     And ultimately they -- because

15     they influence client decisions, they have an

16     impact on revenue for PatientPoint?

17          A.     Sure, yes.

18          Q.     And that can be through

19     decisions that the clients make whether to

02:47    20     purchase a contract and also the price that

21     they pay for each contract, correct?

22          A.     Yes.

23              MS. PARK: Tom, we've been going

24     about an hour and a half, can we take a quick

Electronically signed by Ann M. Belmont (201-234-827-3922)                                    b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

89

1    break?

2                    MR. HANKINSON: Sure.

3                    MR. McCRACKEN: We're going off

4    the video record at 2:46 p.m.

5                    (Break taken.)

6                    MR. McCKRACKEN: We're back on

7    the video record at 2:56 p.m.

8         Q.    Do you remember an Alexis

9    Schnell who worked at Healthy Advice?

02:57  10         A.    Yes, I do.

11         Q.    Is that you or a relation?

12         A.    No, it's my daughter.

13         Q.    Oh, okay.  Was she on the sales

14    team?

15         A.    Yes, she was.

16         Q.    What was her role?

17         A.    Which month?  I say that, they

18    changed it a lot, so when do you want to

19    know?

02:57  20         Q.    2012, beginning of the year.

21         A.    Again, you're going to have to

22    check, but I believe that was around the time

23    they moved her as a junior partner on the

24    Chicago business, Takeda and Abbott, so I

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                                    b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

90

1    believe that's about the time, but you'd have

2    to check that.

3         Q.    Is junior partner a position

4    that works with the person who has primary

5    responsibility for a territory?

6         A.    Yes, that's correct.

7      (Exhibit 93 identified.)

8         Q.    I'm going to hand you what's

9    been previously marked as Defendant's

02:58  10    Exhibit 93. If you would like, you can glance

11    it over to become familiar with the date and

12    time frame. I can tell you, I'll be asking

13    you about the second e-mail in the chain that

14    goes from the first page to the second page.

15    So let me know when you're ready to proceed.

16         A.    May I ask a question?

17         Q.    Yes.

18         A.    Is this -- because I don't want

19    to waste everybody's time.  Is this response

03:01  20    from Jamie the same one that was attached to

21    a previous e-mail or should I read the entire

22    response?

23         Q.    I would have to check. I'm not

24    going to ask you about that portion.

Electronically signed by Ann M. Belmont (201-234-827-3922)                                    b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

91

1       A.   Oh, okay, then that's fine if

2  you're not.

3       Q.   But you should look it over to

4  the extent that would make you feel

5  comfortable answering questions about the

6  second e-mail in the chain. And let me know

7  when you're done. Yes, it is the same e-mail

8  that was part of a prior e-mail chain that we

9  discussed.

03:02  10       A.   Well, may I ask a question then?

11       Q.   Yes.

12       A.   Because I guess I'm not

13  following.  In this context and it certainly

14  wasn't in the previous one, as they talk

15  about the fact that they have a CD, but it

16  doesn't include any of the client sponsor, it

17  then says, "This is not true, we have copies

18  of their sales collateral including a CD that

19  they," oh, Jill Brewer put that in.  I'm

03:03  20  sorry.  She's interspersed her comments,

21  okay.  My apologies.

22       Q.   There you go.  Yes, it says {JB}

23  in brackets as she's inserting things, so I

24  guess it was the same e-mail, but there were

Electronically signed by Ann M. Belmont (201-234-827-3922)      b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

92

1    some insertions from Jill Brewer in this.

2           A.    Okay, just -- okay, I got it.

3    Got it, okay.

4           Q.    Looking at the e-mail from Jill

5    Brewer starting on the first page of this

6    document and going to the second page.

7           A.    Yes.

8           Q.    The date of that e-mail is

9    October 28, 2011, right?

03:03   10           A.    Yes, it is.

11           Q.    And you are one of the

12    recipients?

13           A.    Yes, that is correct.

14           Q.    I'd like to direct your

15    attention to the third paragraph of the

16    e-mail, the second paragraph on page

17    HAN000768.

18           A.    Em-hm.

19           Q.    Ms. Brewer says, "With regard to

03:04   20    churn, what we've heard is that many offices

21    are just trying something new or that there

22    is a new manager so they don't know us or the

23    product well. Unfortunately, because this

24    market is so small (SKA reports around 4,000

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                                                    b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

93

1    Rheums with only 2,700 docs being

2    office-based or our audience) they have

3    hounded these rheums to death via

4    telemarketing.  Honestly, they call

5    repeatedly month over month, even after

6    they've been told no. What this means is, to

7    us is that as we work to replace our losses,

8    we are running into the crap they've left at

9    the front door." Do you see that part of this

03:05    10    e-mail?

11          A.    Yes, I do.

12          Q.    Do you remember around the fall

13    of 2011 the concern that aggressive and

14    repeated marketing to practices was slowing

15    down the growth of ACN?

16          A.    I already answered that earlier.

17          Q.    What was the answer?  Remind me.

18          A.    She's got it.

19          Q.    Yes, was it more complicated

03:05    20    than that?

21          A.    No.

22          Q.    So the answer was yes?

23          A.    Yes.

24          Q.    Does reviewing this e-mail

Electronically signed by Ann M. Belmont (201-234-827-3922)                    b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

94

1    refresh your independent recollection at all

2    of the nature of the marketing activities?

3         A.    No.

4         Q.    At the time, did PatientPoint

5    rely on Ms. Brewer and her team to provide

6    its best information about what was happening

7    in the marketing of digital screen networks

8    to providers?

9         A.    Yes, I believe that is correct.

10        Q.    Do you think it was reasonable

11   to rely on her and her team to make business

12   decisions?

13             MS. PARK: Objection, form.

14        A.    She didn't report to me, so I

15   don't know if she made all the decisions.  I

16   do know that, you know, people make

17   recommendations, as you can see through some

18   of this e-mail document, as well as the fact

19   that, in my opinion, they were the frontline,

20   out in the -- in the practices to know what

21   was going on better than others.

22        Q.    The phenomenon of what she calls

23   death via telemarketing, but might be

24   referred to as the over marketing or market

03:06 (next to line 10)

03:06 (next to line 20)

Electronically signed by Ann M. Belmont (201-234-827-3922)                     b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

95

1    saturation of providers, that phenomenon is

2    an independent factor even over above

3    incentives and over and above any

4    impersonation of Healthy Advice in the

5    difficulty that Healthy Advice was

6    encountering in expanding ACN, right?

7              MS. PARK: Objection, form.

8         A.   I believe that, yes, she has --

9    what's the word I'm looking for?  Expressed

03:07  10    that this was a factor, but I think, much

11    like the sales to the clients for money, it

12    is not one thing, it is the combination of

13    all those things that will exacerbate a

14    situation and define the outcome.

15         Q.   So each of those things that I

16    listed is a factor?

17         A.   As it has been brought to my

18    attention.  I don't deal with it, but.

19         Q.   And are you aware of a way to

03:08  20    rank or compare how important each of those

21    factors is?

22         A.   I don't think I'm in a position

23    to do that.

24      (Exhibit 95 identified.)

Electronically signed by Ann M. Belmont (201-234-827-3922)                                    b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

96

1          Q.    I'm handing you what has been

2     previously marked as Defendant's Exhibit 95.

3     This is one where I think it would make sense

4     for you to review the whole e-mail chain and

5     then let me know when you're ready to

6     proceed.

7                MR. McCKRACKEN: While she's

8     reviewing, I'm going to change discs.

9                MR. HANKINSON: Is that okay with

03:09   10     you?

11               MS. PARK: That's fine.

12               MR. McCKRACKEN: Going off the

13     video record at 3:08 p.m.

14               (Break taken.)

15               MR. McCKRACKEN: Okay.  We are

16     back on the video record at 3:10 p.m.,

17     starting with DVD disc No. 2.

18          Q.    Are you ready to proceed in

19     talking about Defendant's Exhibit 95?

03:11   20          A.    Yes.

21          Q.    In this e-mail chain, personnel

22     on the side of Healthy Advice's business that

23     deals with providers report up the chain

24     about $100 AmEx cards given as an incentive

Electronically signed by Ann M. Belmont (201-234-827-3922)                                    b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

97

1    to a practice, correct?

2           A.    Yes.

3           Q.    Was the concern that these types

4    of incentives would be a major factor in some

5    provider's decisions about whether to switch

6    from a Healthy Advice screen to a

7    ContextMedia screen?

8           A.    I believe so.

9           Q.    And, in fact, the note here --

03:12    10    are you familiar with CMS at Healthy Advice?

11    Customer Management System?

12           A.    Oh, yes.  I was saying I know

13    that, yes.

14           Q.    Does the note at the bottom of

15    this e-mail chain look like a CMS entry

16    that's been embedded in the e-mail? You

17    haven't --

18           A.    No, I didn't. I have no idea.

19           Q.    In any event, Amy Petrik is

03:12    20    reporting to Amy Finley and others about this

21    incentive, correct?

22           A.    That is correct.

23           Q.    And it says that this point of

24    contact explained that, "she made the

Electronically signed by Ann M. Belmont (201-234-827-3922)                    b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

98

1   decision to switch to RHN because they

2   offered her a $100 AmEx card, other than

3   that, she didn't really care about content,

4   etc., provided she didn't have to pay and

5   arrange anything, she was fine with switching

6   strictly because of $100 gift card." Did I

7   read that correctly?

8          A.    I think you did.

9          Q.    Does that refresh at all your

03:12   10   independent recollection of what types of

11   incentives were being offered by

12   ContextMedia?

13          A.    No, as I mentioned earlier, I

14   was not involved in the day-to-day side of

15   that business. I do recall, as I said, there

16   were gift cards, other times I heard of, you

17   know, maybe dinners -- or not dinner, but

18   food or lunch, I don't know.

19          Q.    You do remember that there were

03:13   20   gift cards at some point?

21          A.    I do.

22          Q.    And you actually are on an

23   e-mail further up this chain?

24          A.    Yes, I am.

Electronically signed by Ann M. Belmont (201-234-827-3922)          b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

99

1          Q.    Does this refresh your
2     independent recollection at all of whether
3     the incentives were considered to be a factor
4     that, in and of themselves, might drive the
5     decisions of some practices to switch from
6     Healthy Advice to ContextMedia?
7          A.    Yes.
8          Q.    And what do you remember about
9     that?
10         A.    What it says here, the office
11    said, I would have stayed, I wasn't going to
12    make a switch, but for $100, I'm going.
13         Q.    Do you remember that it being a
14    more general concern at the time at Healthy
15    Advice, apart from this one particular
16    office?
17         A.    Do I -- I was not nodding that I
18    understood where you were going, but I'm not
19    sure now where you went.  What's your -- what
20    are you asking me is, basically, what I'm
21    saying.
22         Q.    Well, you're saying that this
23    refreshed your independent recollection, and
24    you pointed to the comment about this

03:13

03:14

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Deborah Schnell, 3/28/2014

100

1    particular practice?

2        A.    Right.

3        Q.    And I'm asking, do you remember

4    it being a more general concern over and

5    above just one practice?

6        A.    Yes, I do.

7        Q.    A significant enough concern --

8    let me start that again.

9            If we look further up this

03:14    10    e-mail chain, Ms. Ruschau says, "Can we ask

11    Neil his perspective and report them or sue

12    them??" Do you see that?

13        A.    I do.

14        Q.    And she sends that e-mail to

15    Mike McAllister and you, right?

16        A.    Yes.

17        Q.    You answer that e-mail, correct?

18        A.    I did.

19        Q.    About 12 minutes later?

03:15    20    A.    Okay.

21        Q.    Yes?

22        A.    Yes.

23        Q.    And you say, "What they are

24    doing is not 'illegal' --"

Electronically signed by Ann M. Belmont (201-234-827-3922)                    b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

101

1          A.    Not quote/unquote.

2          Q.    "Not 'illegal' according to the

3    court of law, only the Pharma code

4    guidelines, and FDA." When you refer to what

5    they are doing, are you referring to

6    ContextMedia?

7          A.    Yes, I am.

8          Q.    And when you refer to the PhRMA

9    code guidelines, is that --

03:15    10          A.    PhRMA.

11          Q.    PhRMA?

12          A.    (Witness nods head

13    affirmatively.)

14          Q.    Do you remember what, if

15    anything, you meant separately about the FDA

16    here?

17          A.    To the best of my recollection,

18    they are -- according to the FDA, they're not

19    allowed to, again, incent, give things to

03:16    20    practices.

21          Q.    Is the basis of your

22    interpretation of those guidelines that

23    direct incentives to physicians or their

24    offices are not permissible under those

Electronically signed by Ann M. Belmont (201-234-827-3922)                    b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

102

1    guidelines in marketing pharmaceuticals?

2         A.    In anything to the practices is

3    my understanding, whether it's a -- an iPad,

4    things like that, you can't give them things.

5         Q.    Was your understanding at the

6    time?

7         A.    Yes.  It still is.

8         Q.    You go on in your e-mail to say,

9    "I have asked Kim to contact J3 and inform

03:17  10    them that out of respect for them will are

11    giving them notice that if they do not have

12    ContextMedia --"

13         A.    Excuse me, it should be we.

14    Obviously, I have a typo.

15         Q.    I was going to get to that.  I

16    just didn't want to misread it.

17         A.    I apologize for interrupting.

18         Q.    No, no, that's fine.  "I have

19    asked Kim to contact J3 and inform them that

03:17  20    out of respect for them we are giving them

21    notice that if they do not have ContextMedia

22    cease and desist, we are going directly to

23    the president of Centicor, reporting the

24    ethics violation." Who was the president of

Electronically signed by Ann M. Belmont (201-234-827-3922)                    b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

103

1    Centicor?

2          A.    I don't know.

3          Q.    But what is that title, what's

4    Centicor?

5          A.    Centicor is the division of J&J

6    that was contracted through J3 to have

7    ContextMedia build this network for them.

8          Q.    Healthy Advice?

9          A.    No, to have ContextMedia build

03:17  10   RHN, is that what they call it?

11          Q.    Oh, okay. And how did you know

12   that?

13          A.    To the best of my recollection,

14   they actually came to Healthy Advice first.

15   J3 was contacted as an agency by Centicor for

16   Simponi, because they wanted to build a

17   network.  They actually, based on their

18   experience with us, our delivering results,

19   our ethics, our integrity and they way we

03:18  20   work as a company, they approached us to

21   build the network for them, we turned it

22   down. We said that the network, that the

23   size, the scope, we already had a proprietary

24   network for a competitor and that, basically,

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                    b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

104

1    we would be cannibalizing, because their

2    space simply wasn't big enough to deliver and

3    we turned it down.

4            Q.    Rheumatology?

5            A.    Yes. So that's how we knew,

6    because they had gone to -- this is, again,

7    according to my recollection, I don't get

8    involved everyday on all the calls, but Kim

9    Coar worked for me, and she had had J&J

03:18  10   before, I told you, she did not, to the best

11   of my knowledge, at this time, but they went

12   to her and she came to us, and we said no we

13   cannot do this, okay?  So that's how I knew.

14           Q.    Do you remember reporting about

15   these activities to the president of

16   Centicor?

17           A.    Yes, I remember.  I did not.

18           Q.    Why not?

19           A.    At the end of the day and,

03:19  20   again, this is best of my recollection,

21   because you're trying to remember where you

22   are at that moment in time.  We actually --

23   when you say, you know, when you call your

24   bluff in cards or something, but I don't know

Electronically signed by Ann M. Belmont (201-234-827-3922)                                                    b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

105

1    that I was really going to go, but we

2    thought, if we said that, we could get some

3    action, but at the end of the day, I did not

4    go.

5         Q.    So the plan was Kim Coar would

6    say this to J3, that if they didn't do

7    something about it, Healthy Advice would talk

8    to the president of Centicor, and the idea

9    was that J3 would then do something about it.

03:19  10   When J3 didn't do something about it, no one

11   at Healthy Advice actually went to the

12   president of Centicor?

13        A.    That would be correct.  That

14   would be correct. Now, when I said that would

15   be correct, it is correct that no one went.

16   I am not sure what conversation Kim had with

17   J3, whether she said we were going to, I

18   don't know whether she said that to them.

19        Q.    You asked her to though?

03:20  20        A.    No, I did not ask her to, I

21   told -- that's what I said we would do, but I

22   didn't say specifically tell them we will do

23   this. I mean, she had a good enough

24   relationship --

Electronically signed by Ann M. Belmont (201-234-827-3922)          b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

106

1        Q.    So this e-mail is inaccurate?

2        A.    No, it is accurate.  I said we

3   will do, you know, what did I -- tell them,

4   you know, out of respect, okay?  Yeah, I

5   don't know that she actually did that,

6   though, I guess is what I'm saying.  Let me

7   go back and refresh.  She may have said that

8   to them.  I don't know if she did or if she

9   said, based on her relationship, that she

03:20   10   said, hey, look, we've got some things going

11   on relative to, whatever, can you speak with

12   us.  But I was -- didn't -- I was not privy

13   to the actual conversation and how she got

14   the meeting.

15        Q.    At the time of October 11,

16   2011 --

17        A.    Yes.

18        Q.    -- you had asked Kim to say that

19   to J3?

03:21   20        A.    Yes.

21        Q.    She reported to you, correct?

22        A.    Yes, she did.

23        Q.    And then, above that, Mike

24   McAllister e-mails Amy Finley and Jill Brewer

Electronically signed by Ann M. Belmont (201-234-827-3922)                    b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

107

1   and says, "As info - I will need some names

2   for J3 - this got their attention." Do you

3   see that?

4       A.    I do.

5       Q.    Does that in any way refresh

6   your independent recollection of whether this

7   message that you had asked Kim to convey to

8   J3 had actually been conveyed?

9       A.    No.  Again, I have no idea if

03:21   10   she stated it that way.  I do know that, as a

11   result of her calling them, I did have a call

12   with them.

13      Q.    And what was the contents of

14   that call?

15      A.    Basically, I thanked them for

16   their time, I told them that we've worked

17   together for quite a while and I was calling

18   them out of respect, that they had a great

19   reputation in the industry as well and that

03:22   20   they were contracted with by a company to

21   deliver X, and as a result, anything that was

22   improprietary would be a reflection on them,

23   and I gave them some examples of some things

24   that we had noticed through our practices and

Electronically signed by Ann M. Belmont (201-234-827-3922)          b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

108

1   I said -- I do remember saying, I could have
2   gone directly to their president, I said, but
3   I didn't, I came to you, and they thanked me
4   very much for that, and they said we will
5   look into it, I said thank you.  That was it.
6          Q.    Was your intent to influence
7   J3's behavior?
8          A.    No.
9      (Exhibit 94 identified.)
03:22  10          Q.    I'd like to hand you what's been
11   previously marked as Defendant's Exhibit 94.
12   This is a different e-mail chain, so I think
13   you should take whatever time you need to
14   become familiar with it --
15          A.    Okay.
16          Q.    -- and then let me know when
17   you're ready.
18          A.    Thank you. Okay.
19          Q.    In the e-mail chain that is
03:24  20   Defendant's Exhibit 94, a different comment,
21   this one from Phyllis Timole, is reported to
22   Kelly Schulkers and Amanda Devlin about an
23   incentive given to a practice to convince the
24   practice to go with ContextMedia's digital

Electronically signed by Ann M. Belmont (201-234-827-3922)                    b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

109

1    screen network instead of Healthy Advice's,

2    correct?

3            A.    Yes.

4            Q.    Amy Finley forwards it to Mike

5    McAllister, and then Mike McAllister forwards

6    it to you, right?

7            A.    Going back trying to -- yes.

8            Q.    And then you forward it to Kim

9    Coar, and say to her, "ContextMedia offered

10   another American Express card.  They said, if

11   we offered the same thing, they would stay

12   with us.  Feel free to send to J3," right?

13           A.    Yes.

14           Q.    So this is an independent

15   incident that you are reporting to Kim Coar

16   and saying, feel free to send it to J3,

17   right?

18           A.    Correct.

19           Q.    But it's the same phenomenon of

20   giving an incentive card directly to a

21   practice?

22           A.    That is correct.

23           Q.    Then Kim Coar forwards the

24   e-mail to Jamie Kozma and Eric Solomon who

03:25

03:26

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                    b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

110

1    are personnel at J3, correct?

2          A.    Okay.  Let me follow here. I

3    just want to make sure I have the right --

4    yes.

5          Q.    And she says -- and you're

6    copied on this e-mail, right?

7          A.    Yes.

8          Q.    And she says, "Hi Jamie, FYI,

9    here is another example, Kim," correct?

03:26    10          A.    Yes.

11          Q.    Does this refresh your

12    independent recollection that, not only this

13    incident, but another incident was, in fact,

14    reported to J3?

15          A.    Yes.

16          Q.    And it was?

17          A.    Well, as I said, when you -- let

18    me clarify, when you asked does this refresh.

19    I don't remember, but I'm looking at it here

03:27    20    and it appears as though, yes.

21          Q.    You can't think of another

22    explanation for this e-mail other --

23          A.    No, I can't.

24          Q.    -- than that?  Then later that

Electronically signed by Ann M. Belmont (201-234-827-3922)    b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

111

1    morning Jamie Kozma from J3 responds to Kim

2    Coar and copies Eric Solomon at J3 and you --

3              A.    Yes.

4              Q.    -- at Healthy Advice, correct?

5              A.    That is correct.

6              Q.    And he says -- informs you that

7    J3 actually sat down with ContextMedia to

8    discuss this issue, correct?

9              A.    That is correct.

03:27    10              Q.    Then Kim Coar sends Jamie

11    Kozma's e-mail to Linda Ruschau and Mike

12    McAllister and copies you, right?

13              A.    Em-hm.  Yes.

14              Q.    She just says, "Interesting"?

15              A.    Yes, that's correct.

16              Q.    And the -- you know, the outcome

17    of the conversation with Jamie Kozma was that

18    J3 wasn't going to intercede in this

19    situation, right?

03:28    20              A.    I think that is correct.

21              Q.    So Kim calls that interesting

22    and then Linda Ruschau e-mails back and says,

23    "So what is the truth?"  Do you see that?

24              A.    I do.

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)        b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

112

1         Q.    And you were copied on that

2    e-mail?

3         A.    Yes.

4         Q.    The next e-mail is a reply from

5    Kim Coar back to Linda's question, copying

6    you and Mike McAllister, and Kim Coar says,

7    "Sounds like they found a loophole to me."

8    Do you see that?

9         A.    I do.

03:29    10        Q.    If you had a different opinion

11    from Kim Coar, who was your subordinate at

12    this time, would you have expressed that in

13    this e-mail chain?

14        A.    No, not necessarily.

15        Q.    Would you have followed up in

16    some way or just let this stand?

17        A.    I don't know. I don't -- I

18    believe, but I can't -- I believe I had

19    conversations with them.

03:29    20        Q.    With whom?

21        A.    Kim.  And potentially Linda, I

22    don't recall.

23        Q.    But you don't remember?

24        A.    Not 100 percent, but I believe I

Electronically signed by Ann M. Belmont (201-234-827-3922)                                           b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

113

1    did.

2           Q.    Were those conversations similar

3    to your response in a different e-mail chain

4    about it not being illegal in a court of law

5    but that the pharmaceutical guidelines had

6    something to say about it?

7                MS. PARK: Objection, form.

8           Q.    Or a different conversation?

9                MS. PARK: Same objection.

03:30   10           A.    The -- we are hired, as I said,

11    by clients, and so when you represent them,

12    you have to abide by those rules, that's what

13    I said, to the best of my recollection.

14           Q.    Do you remember giving any

15    response to the theory that there was a

16    loophole?

17           A.    No, I don't.

18           Q.    You don't know if you agreed

19    that there was a loophole, disagreed that

03:30   20    there was a loophole or just didn't comment?

21           A.    That would be correct. I -- as

22    I'm looking at it here, because I don't

23    remember.  I know I don't agree.

24           Q.    So today you don't agree?

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)        b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

114

1        A.    Right.

2        Q.    You don't remember if you had a

3   conversation with anyone at the time --

4        A.    No, I don't remember seeing

5   this, but, obviously, I did.  It's one of my

6   e-mails, but I see lots of them and sometimes

7   you get one, and salespeople just talk

8   amongst themselves a lot, they're not going

9   to make decisions.  But as I said, I don't

03:31   10   recall 100 percent, but I do believe I spoke

11   and said, no, we wouldn't do that, here's why

12   you don't do that ethically, you represent,

13   you have to live by their standards of the

14   client you represent.

15        Q.    If it wasn't unethical, then

16   would you agree with the suggestion that

17   Healthy Advice should do it too?

18             MS. PARK: Objection, form.

19        A.    I don't know, I have no idea of

03:31   20   knowing.  I mean, if I didn't have to pay my

21   people money to take my stuff, why would I?

22   That would be dumb business, so I have no

23   idea whether I would or would not have if it

24   wasn't unethical.

Electronically signed by Ann M. Belmont (201-234-827-3922)                    b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

115

1          Q.    Because there might not be a

2     need on Healthy Advice's part to use direct

3     incentives to compete?

4          A.    Your product's your incentive,

5     your service is your incentive to those

6     practices, your service.

7          Q.    So the answer to my question is

8     yes?

9          A.    Yes what?

03:32  10          Q.    Well, I asked, I think, if I'm

11     remembering it right, that you wouldn't

12     necessarily agree with the suggestion that

13     Healthy Advice do the same thing, give direct

14     incentives, even if it were ethical?

15          A.    That would be correct.

16          Q.    The reason is, Healthy Advice

17     may not need to because it has other sales

18     points?

19          A.    That's correct.

03:32  20          Q.    If a competitor needs to in

21     order to recruit or retain practices, then

22     that would be a separate issue?

23               MS. PARK: Objection, form,

24     vague.

Electronically signed by Ann M. Belmont (201-234-827-3922)                              b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

116

1          A.    This is a situation where they

2    are building out a network for a specific

3    client, one client, and I don't believe it's

4    ethical.

5          Q.    And not what?

6          A.    It's not ethical.  They have to

7    live by the guidelines of that sole

8    manufacturer that they represent because they

9    were building it for them, so, no.

03:32    10          Q.    And the reason behind those

11    ethics is precisely because, in your opinion,

12    it would influence, potentially, doctors'

13    decisions in terms of the prescriptions that

14    they wrote?  Isn't that the reason for these

15    ethical guidelines?

16              MS. PARK: Objection, form --

17          A.    That is, I believe, I'm not part

18    of the PhRMA code, but I believe that is, you

19    know, the premise for it.  In this case,

03:33    20    however, they are not incenting them to write

21    prescriptions, they're incenting them to take

22    their particular product, which will house

23    only that client's information.

24          Q.    The idea being, then, because

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Deborah Schnell, 3/28/2014

117

1    incentives can be effective in influencing

2    the practices at doctors' offices, that's why

3    there are guidelines about whether or not

4    they can be used, right?

5          A.    I believe that's true.  Again,

6    I'm not part of the PhRMA code -- or PhRMA

7    ethics committee, but all the PhRMA companies

8    signed it.

9          Q.    What is your -- in 2011 to 2012,

03:33   10  could you describe for me your prior work

11   history in the industry or in any related

12   aspect of sales?

13         A.    From when to when?

14         Q.    From the time that you began any

15   sales experience that you would consider

16   relevant to PatientPoint's Healthy Advice's

17   business up through 2011 to 2012.

18         A.    Well, I want to make sure I get

19   it right, so. In January of 1996 was my first

03:34   20  move into the healthcare space specifically.

21   I had -- well, I worked for IBM for almost 20

22   years, and I had a short stint in hospitals

23   selling hardware, but most of it was

24   technology in lots of different industrial

Electronically signed by Ann M. Belmont (201-234-827-3922)                                    b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

118

1    verticals, but in January 1996 I made a full

2    jump over into the healthcare space.  And so,

3    there you go, until Healthy Advice.

4            Q.    And in 1996, was that at Healthy

5    Advice?

6            A.    No, I worked for a company that

7    was On Target Media, and they were launching

8    a brand-new start up called ProtoCall.

9            Q.    What did ProtoCall do?

03:35   10            A.    We provided a different type, a

11    niche type of contract sale service to the

12    PhRMA industry.  It was really much more

13    along the sampling line than actually full

14    detail.

15            Q.    And I apologize, I didn't

16    understand that.

17            A.    Pharmaceutical reps that go in

18    and have to fully detail a product to

19    understand the biokinetics and everything

03:35   20    about it and patient profiles and stuff.

21    This was a different niche, so that we could

22    take mature products where they'd already

23    established the relevance of the product and

24    what it was for and how doctors -- for

Electronically signed by Ann M. Belmont (201-234-827-3922)                                    b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

119

1    example, nobody knew what Lipitor is for, so

2    why pay for a high price person?  These

3    people will go in, say the brand name, make

4    it top of line, drop off samples for you,

5    okay?

6           Q.    It's a marketing protocol --

7           A.    It's promoting brand drugs for

8    pharmaceutical companies. They would hire us

9    rather than hire incremental salespeople.

03:36  10           Q.    And promoting them directly to

11    doctors' offices?

12           A.    Correct.

13           Q.    So it's relevant experience as

14    you bridged into your role at Healthy Advice?

15           A.    Sure.

16           Q.    And was ProtoCall a separate

17    company or just part of target media -- On

18    Target Media?

19           A.    You know, you'd have to go back

03:36  20    and look at the structure.  I don't really

21    remember exactly how we structured

22    everything. When I started there, I had

23    equity on the other side, and then I said, I

24    don't want it any more, I'll just take it all

Electronically signed by Ann M. Belmont (201-234-827-3922)                          b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

120

1   in ProtoCall, because that's where I was

2   spending 100 percent of my time.

3          Q.    Had some sort of separate stock

4   incentive program?

5          A.    I don't even know if they issued

6   stock.  It was so long ago.

7          Q.    When you say equity, though,

8   this was some kind of bonus program?

9          A.    If the company was sold.

03:36   10          Q.    And when did you leave

11   ProtoCall?

12          A.    We sold the company to a

13   publicly traded company, which I mentioned to

14   you before, PDI.  I continued on as president

15   of ProtoCall for, again, I can't tell you how

16   long, I don't remember the dates.  If I had

17   my resumé here I could, but, and then at some

18   point along the line, the folks at PDI asked

19   me to make the move to the east coast and

03:37   20   head up all of their business development

21   efforts, which I did.

22          Q.    What was the business of PDI?

23          A.    Contract sales to the

24   pharmaceutical industry.

Electronically signed by Ann M. Belmont (201-234-827-3922)   b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

121

1          Q.    Same industry as ProtoCall which

2     it had acquired?

3          A.    Yes.

4          Q.    And did you work continuously

5     from 1996 through the time that you -- that

6     ProtoCall was sold to PDI?

7          A.    Yes.

8          Q.    And what was your next position

9     after you worked for PDI?

03:38    10          A.    I worked at PDI till February of

11     2005 or '06. And then in May of whatever year

12     that was, '05 or '06, I started with Healthy

13     Advice.

14          Q.    So apart from five or

15     six months, you worked continuously from 1996

16     to the time that you joined Healthy Advice?

17          A.    Correct.

18          Q.    In the industry of marketing to

19     doctors' offices?  Or how would you describe

03:38    20     it?

21          A.    Well, they are really two

22     different -- we look at them as two different

23     fields for whatever.  So one is professional

24     marketing when you're calling on doctors, the

Electronically signed by Ann M. Belmont (201-234-827-3922)                    b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

122

1   other one is direct to the consumer because

2   that's who you're trying to reach.

3        Q.   Was PDI direct to consumer?

4        A.   No.  Healthy Advice was direct

5   to consumer, or PatientPoint.

6        Q.   I see.  But the program still

7   needed to be marketed on behalf of the

8   company itself to the doctors' offices?

9        A.   That would be correct.  That's

03:39  10  what Jill's group did.

11       Q.   And so that experience in the

12  professional -- did you call it professional

13  marketing?

14       A.   Yes.

15       Q.   In the professional marketing

16  industry gave you insight and experience in

17  understanding that part of PatientPoint's

18  business, even though you were on the client

19  side, correct?

03:39  20       A.   Somewhat, yes.  I would believe

21  that's true.

22       Q.   I mean, you had almost 20 years

23  of experience marketing --

24       A.   No.

Electronically signed by Ann M. Belmont (201-234-827-3922)                b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

123

1          Q.     No?

2          A.     If you go from '96.

3          Q.     Ten years, almost ten years

4     experience --

5          A.     That's okay.  I like your math

6     though.

7          Q.     Not my strong suit.

8          A.     Mine either.

9          Q.     But in any sense, you had almost

03:40    10     a decade of experience in professional

11     marketing in, specifically, the field of

12     marketing to doctors' offices before you

13     joined Healthy Advice?

14          A.     Yes and no.  The reason I say

15     that, I wasn't one whoever went out to the

16     offices, I didn't call on the practices.

17     Again, I called on the professional -- the

18     different people in marketing in PhRMA,

19     people who control the direct to consumer

03:40    20     advertising budgets, and they come out of two

21     separate buckets, so even the context that

22     you have are very different when you switch

23     over. So the people that worked under me

24     managed the teams that were out in the field

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                                    b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

124

1    calling on the offices.  I did not go out to

2    the offices.

3              Q.    But you were an executive --

4              A.    Yes.

5              Q.    -- for that whole ten years?

6              A.    Yes. That would be true.

7              Q.    And those people who went out to

8    the offices reported to you?

9              A.    Indirectly.

03:40  10              Q.    And I assume you gained valuable

11    insight during that time?

12              A.    I think so.

13              Q.    And you applied that insight as

14    you progressed in your career?

15              A.    Hopefully.

16              Q.    So then you started work at

17    Healthy Advice either in 2005 or 2006, did

18    you work there continuously through 2012?

19              A.    '12, I did. I was there for

03:41  20    seven years, so you can back into it if you

21    want, if your math is better than mine, if I

22    try to count backwards.

23              Q.    And during that time you gained

24    even more experience being an executive, this

Electronically signed by Ann M. Belmont (201-234-827-3922)                          b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

125

1   time in the industry of direct to consumer

2   marketing of pharmaceuticals?

3       A.   Yes.

4       Q.   When you were making business

5   decisions at Healthy Advice, you were

6   applying that experience, correct?

7       A.   I would guess.  I don't know

8   what the circumstances are -- were. I think

9   that, as you grow through business, you use

03:41  10   your personal life, you use things from IBM,

11   you use -- hopefully people use all kinds of

12   things to make good business decisions.

13       Q.   And you had very significant

14   experience at that point?

15       A.   I think so.

16       Q.   Earlier we discussed the concern

17   that Healthy Advice had about a piece of

18   equipment being shipped to ContextMedia, do

19   you remember that?

03:42  20       A.   I do.

21       Q.   Your impression at that time was

22   that it was important to keep the information

23   on that piece of equipment secret inside the

24   company, correct?

Electronically signed by Ann M. Belmont (201-234-827-3922)            b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

126

1           A.     That's what I was told. That's

2    what the executives who were responsible for

3    that area of the business believed, and so

4    any opinion I have is a direct reflection of

5    peers that I trust their judgment.

6           Q.     You said you were not aware of

7    anyone at Healthy Advice purposefully

8    abandoning a similar piece of equipment at a

9    doctor's office that was not continuing its

03:43 10   relationship with Healthy Advice, right?

11          A.     That is correct.

12          Q.     If someone at that time had told

13   you that that was something that happened not

14   once but multiple times intentionally, would

15   that have been inconsistent with what you

16   were being told about that piece of equipment

17   by the people that you trusted at the time?

18          A.     I don't understand the question.

19          Q.     They were telling you at the

03:43 20   time, the people that you trusted --

21          A.     Yes.

22          Q.     -- for this type of information

23   that it was very important to keep the

24   information on that equipment secret, right?

Electronically signed by Ann M. Belmont (201-234-827-3922)                    b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

127

1          A.      Correct.

2          Q.      Would it have been consistent

3    with what they are telling -- they were

4    telling you or inconsistent with what they

5    were telling you if someone else had told you

6    that Healthy Advice had intentionally left

7    the same type of equipment with the same type

8    of information --

9          A.      I can't comment on that --

03:44  10          MS. PARK: Objection, form,

11   vague --

12          A.      -- I have never heard that,

13   never.

14                MS. PARK: -- compound.

15          A.      I have no idea what you're

16   talking about. None. And I can't believe

17   they would've -- I don't think they did that,

18   I don't know.  But I've never heard that.

19          Q.      Right, but you were there at the

03:44  20   time and you were making decisions and

21   forming understandings of Healthy Advice's

22   concerns at the time that you remembered,

23   even to this day, when you first got a call

24   about this case, right?

Electronically signed by Ann M. Belmont (201-234-827-3922)                    b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

128

1         A.     Yes.

2         Q.     And that understanding and those

3    decisions were based on what, you're telling

4    me, you were told by the people that you

5    trusted for this type of information --

6         A.     Correct.

7         Q.     -- right?  So I understand that

8    you're saying you were never informed of the

9    type of inconsistent information that I'm

03:44  10   describing, but what I'm asking you is, let's

11   assume that someone else from the company

12   came into your office and said, you know, I

13   know what they said.

14        A.     Okay.

15        Q.     I want to make you aware of

16   something. Actually, that type of equipment

17   with that type of information we sometimes

18   intentionally leave it at physicians' offices

19   who are cancelling our program, because the

03:45  20   hardware's outdated even though the

21   software's the same.  That would've been --

22   and all I'm asking you is, that would have

23   been inconsistent with the other information

24   you were getting, correct?

Electronically signed by Ann M. Belmont (201-234-827-3922)                    b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

129

1           MS. PARK: Objection, form,

2      compound --

3           A.    Not necessarily --

4           MS. PARK: -- vague.

5           A.    -- if someone -- and, again, I'm

6      not aware of it, but if someone made a

7      business decision to do that because they

8      thought it was more costly to go out, pick it

9      up, or whatever you just said, bring it back.

03:45  10  The likelihood that a practice is going to

11     tear it apart and have any ability to even

12     understand what is in there, and the coding,

13     is something unknown, and on the likelihood

14     that that practice is going to go out and

15     start a business to compete with us is slim

16     to none, so, no.

17          Q.    The practice can choose to do

18     what it wants with something that's abandoned

19     though, correct?

03:46  20          MS. PARK: Objection, form,

21     foundation --

22          A.    I have no idea.

23          Q.    And what it sounds like you're

24     saying is that the risk that this piece of

Electronically signed by Ann M. Belmont (201-234-827-3922)                     b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

130

1    equipment that was left at a practice,

2    theoretically, assume that it was, so the

3    risk that that would fall into the hands of a

4    competitor was of such little concern that

5    you think it would be reasonable for Healthy

6    Advice to not even pay for shipping costs to

7    get it back?

8           A.    No, that is not what I said at

9    all --

03:46    10           MS. PARK: Objection, form --

11           A.    -- that's not what I said at

12    all. I don't -- I don't know of that

13    happening.  You asked me to say can you

14    imagine a situation where it would, and I

15    said I don't know, because I don't have the

16    facts in front of me, and what you had

17    implied, you actually said, to the best of my

18    recollection, what if they thought from a

19    business perspective it was cheaper, can you

03:46    20    ever -- I said, I don't know.  What might

21    have been going through their head, maybe it

22    was a -- those were not my decisions, I

23    didn't even know it was ever done, so I have

24    no clue, none.  I would never make a business

Electronically signed by Ann M. Belmont (201-234-827-3922)                    b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

131

1    judgment now, I would tell you that, I don't

2    know.

3            Q.    Members of your team did not use

4    the customer management system; is that

5    accurate?

6            A.    That is correct.  You mean

7    putting -- inputting all that data?  No.

8            Q.    Did you ever receive reports

9    from -- of data coming out of customer

03:47   10   management system?

11           A.    Well, certainly I got the

12   e-mail, you know, with excerpts out of it.  I

13   don't believe I did.  Now, what I will tell

14   you, and I don't know, because I'm not

15   familiar with the system itself, and don't

16   really know.  From time to time on a going --

17   on every single program, we got report in our

18   senior executive teams, we're tracking here

19   with this many, you know, or we're having

03:48   20   this kind of -- so you would see a number in

21   handouts that somebody gave you at a meeting.

22   So, yes, I did see some things like that.

23           Q.    Aggregated data, not individual

24   entries?

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                                    b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

132

1          A.    That's correct.

2          Q.    Were you familiar at all with

3    churn --

4          A.    Sure.

5          Q.    -- data?

6          A.    Well, I don't know if I know

7    it's churn data, but I know what churn means

8    and when -- yes.  And on those reports

9    sometimes they would stipulate by network,

03:48   10   you know, what the percent was.

11         Q.    Did you ever engage with a

12   client in a discussion that involved churn

13   data?

14         A.    Not to my knowledge.

15              MR. HANKINSON: Can we take a

16   break?

17              MS. PARK: Sure.

18              MR. McCKRACKEN: We're going off

19   the video record at 3:48 p.m.

03:56   20          (Break taken.)

21              MR. McCKRACKEN: We're back on

22   the video record at 3:55 P.M.

23         Q.    Ms. Schnell, you mentioned

24   earlier that you did some consulting work for

Electronically signed by Ann M. Belmont (201-234-827-3922)                    b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

133

1    PDI prior to becoming an employee?

2           A.    No.

3           Q.    No.  What was the consulting

4    work you mentioned?

5           A.    When I left Healthy Advice.

6           Q.    When you left Healthy Advice and

7    went to?

8           A.    Valore.

9           Q.    Valore, that's right, pardon me.

03:56  10    Who were your consulting clients,

11    just Valore?

12           A.    Valore.

13           Q.    Have you ever done any other

14    consulting?

15           A.    No.

16           Q.    And what was the nature of the

17    projects that they had you consulting on?

18           A.    Well, it wasn't really a

19    project.  They wanted me to help them

03:56  20    position their product and, you know, get

21    into certain clients to form partnerships

22    with in the healthcare.

23           Q.    Did you feel qualified based on

24    your experience to provide them with

Electronically signed by Ann M. Belmont (201-234-827-3922)                    b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

134

1    strategies and opinions on that goal?

2            A.    Yes and no. It's a new area, the

3    PBM space was a totally -- and they knew

4    that.  It's a totally new area for me, so

5    part of it was rather relationships and

6    things like that, rather than having all the

7    product expertise, or solution I should say,

8    expertise.

9            Q.    Do you serve on any boards?

03:57   10            A.    No.

11            Q.    Have you spoken at conferences

12    in the past?

13            A.    Yes.

14            Q.    Could you describe for me your

15    experience speaking at conferences up through

16    2012?

17            A.    I was good.

18            Q.    What's that?

19            A.    I was good.

03:57   20            Q.    About how often would you be

21    asked to speak?

22            A.    I don't know, once or twice a

23    year.

24            Q.    Once or twice a year starting

Electronically signed by Ann M. Belmont (201-234-827-3922)                    b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

135

1    in?

2         A.    Oh, I don't remember, no.

3         Q.    2000 or earlier?

4         A.    No, not earlier.  But maybe even

5    2003-ish.

6         Q.    What sorts of topics were you

7    invited to speak on?

8         A.    It depended because they varied

9    when I was at PDI the type of things you have

03:58  10    to talk about and the panels you sit on when

11    you're talking about physicians versus the

12    direct to consumer.  The last conference that

13    I chaired where I had to, you know, introduce

14    everybody and be the questioner and also

15    speak was the conference in Philadelphia on

16    customer centricity and trying to get

17    pharmaceutical companies to be closer to

18    their customers.

19         Q.    And were the other topics that

03:58  20    you were invited to speak on similar to that,

21    topics within the industry?

22         A.    Always within the industry,

23    sure.

24         Q.    Could you give me just a couple

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                                      b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

136

1    more examples.

2            A.    Gosh, one of them was a -- it

3    wasn't necessarily -- it was a portion of

4    speaking, but it was more a conference that

5    the professional side was hosting trying to

6    understand how to better connect with

7    doctors, and so I hosted a panel of

8    physicians across our networks to talk about

9    what was important to them, the type of

03:59  10  things that they would like.

11           Q.    What's one more example?

12           A.    I honestly don't remember.

13           Q.    It's been a little bit of time?

14           A.    Yeah.

15           Q.    But other topics related to your

16   industry and field?

17           A.    I don't understand the question.

18           Q.    Your other speaking engagements,

19   the topics were always related to your

03:59  20  industry and field?

21           A.    Yes.

22                 MR. McCKRACKEN: Would you mind

23   if we pause and go off the record for just a

24   second.

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                    b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

137

1           MR. HANKINSON: Sure.

2           (Break taken.)

3           MR. McCRACKEN: We're back on the

4    video record at 3:59 p.m.

5           Q.    Is there any other relevant

6    information or experience that would be on

7    your CV for a job or another opportunity to

8    consult or speak in your industry that I

9    haven't already asked about?

04:01   10           A.    None that I can think of. I

11   mean, I don't know what you're looking for me

12   to say or, you know, what information you

13   want, so I don't.

14           Q.    Just anything else that you

15   would include on a CV.

16           A.    I don't think so.

17           Q.    We pretty much covered it?

18           A.    (Witness nods head

19   affirmatively.)

04:01   20           Q.    Do you remember problems in the

21   2011 to 2012 time frame that Healthy Advice

22   had in building out the footprint of ACN?

23           A.    Above and beyond what we have

24   spoken about here?

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)          b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

138

1          Q.     Yes. Any other recollection?

2          A.     No, I don't.

3          Q.     Linda Ruschau was closer to that

4     issue than you, correct?

5          A.     Closer to what issue?

6          Q.     Dealing with the build out of

7     ACN and interfacing with Humira --

8          A.     Yes, that would be true.

9          Q.     -- on that issue? Was there a

04:02  10     high amount of competition in 2011 to 2012 on

11     the sponsorship side in the field of digital

12     screens networks?

13          A.     I think that's fair to say,

14     there's always competition in the

15     marketplace.

16          Q.     So there's been a healthy amount

17     of competition since 2010 and before?

18          A.     Yes, I think there's -- again,

19     it's a field that, you know, just one or two

04:03  20     don't own, so there's competition.  Yes, I

21     would think that's correct to say.

22          Q.     It's possible to compete with

23     Healthy Advice in a way that is ethical and

24     appropriate, correct?

Electronically signed by Ann M. Belmont (201-234-827-3922)                    b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

139

1          A.     Absolutely.

2          Q.     And it's possible to convince

3     providers' offices to switch from Healthy

4     Advice's programming to a competitor's

5     programming for legitimate reasons, correct?

6          A.     I think so.

7          Q.     So some amount of switches is

8     caused by legitimate factors, and then in

9     your opinion, some amount of switches might

04:03   10    have been influenced by illegitimate factors,

11    correct?

12              MS. PARK: Objection, form,

13    foundation.

14         A.     You know, again, I'm not out

15    there, so I don't know. But I would assume it

16    can be a combination of.  But unless I'm out

17    there talking to the doctors, why did you do

18    this, what was your understanding, I would

19    have no way of knowing that.

04:04   20         Q.     As to the solution factor that

21    we talked about in the factors that

22    contribute to clients' decisions?

23         A.     Right, yes.

24         Q.     Is part of what clients care

Electronically signed by Ann M. Belmont (201-234-827-3922)                    b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

140

 1    about the content that's displayed on digital

 2    screen networks in the loops?

 3           A.    I think it's going to depend

 4    upon, you know, your individual buyers.  But

 5    in -- because, you know, everybody is coming

 6    from a different perspective, but I think in

 7    some instances, content would be important to

 8    them as you're educating on a particular

 9    disease state, others simply will not be as

10    relevant all the time because it's something

11    that people are highly aware of and so it's

12    just really going to depend.

13           Q.    Healthy Advice's contents in its

14    loops improved over the time frame from 2010

15    to 2012, correct?

16           A.    I think from the day I got there

17    until the day I left it consistently

18    improved.

19           Q.    That's something that --

20           A.    And I don't mean because I did

21    it, I'm not that -- I just meant I noticed

22    it.

23           Q.    And that's something that's done

24    to help Healthy Advice compete in that

04:04 (at line 10)

04:05 (at line 20)

Electronically signed by Ann M. Belmont (201-234-827-3922)                    b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

141

1   marketplace, correct?

2          A.    I would -- yes, that is always

3   true, but it's also done because your job as

4   a marketer is to get someone to take -- make

5   a call to action to do something.  And your

6   ability to do that has to continually be

7   refined.

8          Q.    Do you have any answers that

9   you've given today as you think back over the

04:06   10   course of the deposition that you want to

11   explain further, expound upon, change in any

12   way? I just want to give you that

13   opportunity.

14          A.    Yeah, thank you. I appreciate

15   that. I don't think so.

16          MR. HANKINSON: Okay. I don't

17   have any further questions.

18                DIRECT EXAMINATION

19   BY MS. PARK:

04:06   20          Q.    I have a few questions.  I'll

21   try to keep this as brief as we can. Ms.

22   Schnell, my name is Jeanah Park, I represent

23   PatientPoint and you for purposes of this

24   deposition. I just have a few questions for

Electronically signed by Ann M. Belmont (201-234-827-3922)                    b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

142

1    you, but you do understand that you're still

2    under oath.

3              A.    I do.

4              Q.    Okay.

5              A.    I do now.

6              Q.    I'm talking about the 2000 --

7    you know -- well, let's talk about the time

8    that you worked for Healthy Advice beginning

9    in, I believe, 2005.  Who would you say are

04:06   10   Healthy Advice's competitors?

11             A.    Well, those changed over time.

12   The largest competitor, to the best of my

13   knowledge, was Accent Health, and then over

14   the course of the years, other smaller

15   vendors actually probably came and went in

16   the digital space.  Some of them, because

17   they went, I can't name them to you, but

18   later on, much later, was the advent of

19   Context. Companies like Care Media Holdings,

04:07   20   which has Kids Care and OB/GYN Network. But

21   those were the bigger ones I believe.

22             Q.    What, in your opinion,

23   distinguishes or distinguished Healthy Advice

24   from its competitors?

Electronically signed by Ann M. Belmont (201-234-827-3922)

b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

143

1           A.    Well, as I said earlier, I think
2     it's always a combination of things, but the
3     one thing that Healthy Advice did uniquely
4     and clients consistently told us, was our
5     research, our metrics, our ability to measure
6     by doc what did I get. And we did that
7     consistently.
8                 In fact, before we took a
9     client, our research was so good, so
04:07  10     proprietary that -- and I mentioned earlier
11     that we always signed CDAs because we're all
12     about delivering results and having satisfied
13     clients.  Before we took a contract, as we
14     were calling on a client, we asked them for
15     particular data, and I don't remember the
16     fields anymore and I didn't analyze the data,
17     but we did specific ROI projections, if you
18     spend this with us, based on our confidence
19     in our product, the quality of our doctors,
04:08  20     and our ability to change behaviors, this is
21     the projected ROI for you.  And we were so
22     confident of that, we actually guaranteed,
23     when necessary, those ROIs.
24           Q.    And Healthy Advice did a lot of

Electronically signed by Ann M. Belmont (201-234-827-3922)                                                                b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

144

1   work and a lot of research to come up with

2   those ROIs, it was a complex formula?

3         A.    Yes, it was.

4         Q.    Do you -- was Healthy Advise

5   able to deliver on its ROIs to the sponsors

6   that you worked with during the time you were

7   there?

8         A.    Yes, we were, consistently.

9         Q.    And typically how long were

04:08   10   pharmaceutical sponsor contracts with Healthy

11   Advice?

12         A.    Well, having come from, you

13   know, the IT space, I certainly tried to get

14   them the long-term contracts, but it's tough

15   to do in the PhRMA industry, they were

16   typically annual contracts.  I will say based

17   on my time there, you'd have to go back and

18   check the records, I don't recall a client

19   ever, once they got in on the pharmaceutical

04:09   20   side, ever leaving until their product went

21   off patent.  So some of them were there for

22   seven years, the entire time I was there. And

23   when the brand went off patent, then they

24   would leave, but I don't remember anybody,

Electronically signed by Ann M. Belmont (201-234-827-3922)          b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

145

1   but, again, you could check with somebody, I

2   may have missed one, but by and large, I

3   don't remember anybody leaving once they got

4   in.

5          Q.     Thank you. And why do you think

6   that brands stayed with Healthy Advice once

7   they started subscribing to the medium with

8   Healthy Advice?

9          A.     Because we did return

04:09   10   consistently such high ROIs.  We had brands

11   like an Ambien, for example, that was in our

12   -- started in our exam room network, expanded

13   into our digital screens and stayed for the

14   duration until they went off patent.  You

15   have brands like, you know, Actos for

16   diabetes, they did the same thing.  You have

17   brands like Lantus, did the same thing.  They

18   bought up every space, it was seven, $8

19   million, they bought up everything they could

04:10   20   get and they did that because of the

21   consistent results they received year over

22   year over year.

23          Q.     Thank you. Just wanted to ask

24   you some questions about content.  Were you

Electronically signed by Ann M. Belmont (201-234-827-3922)                    b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

146

1    familiar with the content that Healthy Advice

2    displayed in its offices --

3              A.    Of course, yes.

4              Q.    In the time that you were there,

5    Healthy Advice typically displayed soundless

6    loops on its digital screens --

7              A.    That's correct.

8              Q.    -- do you recall that? Do you

9    know why?

04:10    10              A.    Yes.  Actually, that was done by

11    design.  We were founded by P&Gers and if you

12    guys -- well, you all are from Cincinnati,

13    Procter & Gamble, they don't do anything

14    without research.  What's this?  If I do

15    this, what's it going to do?  And typically

16    what they found from researching out in

17    offices -- because when we entered that

18    waiting room space, we were not the first one

19    out there, Accent Health was out there first.

04:10    20    And so you say, am I going to enter as a me

21    too, or am I going to make a better

22    mousetrap, or what am I going to do?  So they

23    went out and actually interviewed offices,

24    and they said what do you like about what you

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                                                    b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

147

1   have and what would you change?  And

2   consistently it was get rid of that sound.

3   Because what happens is, if I'm sitting there

4   and I'm in an office practice and that loop

5   over and over and over, and so what we found

6   was they would oftentimes turn it down, and

7   then when your brands are relying on talking

8   heads with nothing coming out, you don't get

9   much.

04:11   10          Q.    And in your experience as head

11   of sales at Healthy Advice, were sponsors

12   receptive to the soundless medium in the

13   digital screens in waiting rooms?

14          A.    Yes.  That's why we had every

15   major brand.

16                MS. PARK: And -- actually,

17   that's all I have.

18                THE WITNESS: Okay.

19                RECROSS-EXAMINATION

04:11   20   BY MR. HANKINSON:

21          Q.    I'll just follow up briefly.

22   During your time at Healthy Advice, which

23   extended through what part of 2012?

24          A.    June 30, 2012.

Electronically signed by Ann M. Belmont (201-234-827-3922)                    b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

148

1          Q.   June 30, 2012, you are not aware

2     of any brands that, once it started working

3     with Healthy Advice, stopped during the

4     period of 2010 to 2012?

5          A.   Oh, gosh.  Our brand -- I'm not,

6     again, but you got to go back and check,

7     because we had tons of brands, and we had so

8     many different networks, I could -- that's

9     three years -- or two-and-a-half, whatever it

10    is, I could be forgetting one, but I don't.

11         Q.   At the same revenue levels?

12         A.   No, not necessarily at the same

13    revenue levels.

14         Q.   Sometimes the revenue level

15    would go down or go up over the years?

16         A.   Yes.

17         Q.   Would that be influenced by many

18    different factors?

19         A.   Yes.

20         Q.   Would it be possible to

21    generalize about the rank or relative

22    importance of the various factors that would

23    cause the brands to decrease or increase the

24    amount of money that they were paying Healthy

04:12 (line 10)
04:12 (line 20)

Electronically signed by Ann M. Belmont (201-234-827-3922)                    b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

149

1    Advice for their advertising, or is it

2    impossible to say across the board how much

3    each of those factors was weighing into that?

4           A.    I don't think it's possible, and

5    not all of them are determined by the brand.

6    For example, if you're familiar, and I don't

7    expect you to be as familiar with the

8    pharmaceutical space.  They had a real patent

9    cliff where a lot of big, major blockbusters

04:13    10    went off patent.  And so, as I mentioned

11    earlier, we are all about results, that's all

12    it is, deliver. And so when we would look and

13    do an analysis, your function of your ROI is

14    a direct function of what's my cost and what

15    are my -- so as the smaller brands were

16    entering the marketplace, it may not have --

17    particularly in the primary care audience's

18    broad appeal, then if you -- to do business

19    with them, you may have to adjust your

04:14    20    pricing to deliver an ROI that works for

21    them.

22           Q.    It would vary by individual

23    sponsor?

24           A.    Well, yes and no.  That's not --

Electronically signed by Ann M. Belmont (201-234-827-3922)                                    b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

150

1   we have a rate card and typically that's what

2   it was.  But if there was -- if a practice

3   wanted -- we surveyed our practices.  I told

4   you, we were heavy in research, what do you

5   want?  Because that's how you keep programs

6   in their offices, too, you got to bring them

7   education and drugs that they want. If there

8   was a drug that they wanted or a disease

9   state and we had to go after it, and we

04:14  10   knew it, you know, then we'd have to say it's

11   important to our practices, here's what we'll

12   do and adjust that so that it became a good

13   opportunity for our sponsor, a good

14   opportunity for the practices and a good

15   opportunity for the patient to be educated.

16   But by and large, we had a rate card.

17        Q.    So sometimes the pricing of a

18   sponsor contract would be discounted, or in

19   any sense, go down because the practices

04:14  20   wanted that drug and disease state to be part

21   of the content loop?

22        A.    And the brand itself, and based

23   on the amount of scrips or where it was

24   couldn't support that, or we thought it was

Electronically signed by Ann M. Belmont (201-234-827-3922)        b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

151

1    important.

2           Q.    And that would be an independent

3    factor in the pricing?

4           A.    Correct.  But by and large, we

5    had rate cards for most all of them, and we

6    stuck with that rate card.

7           Q.    In response to Ms. Park's

8    questioning, I think at one point you said

9    something about having testified earlier that

04:15  10    you always had CDAs.  Did you mean to say

11    that?

12           A.    I'm not sure I said we always

13    had CDAs. I think you asked the question, did

14    we have CDAs with our clients, and I said by

15    and large, to the best of my recollection, we

16    did.  And the reason being is because our

17    market approach is the fact that we do a

18    pre-analysis so we can know who's going to

19    win and who's not going to win, and for them

04:16  20    to release their data to us, they would say,

21    I'm not giving you that stuff until we have a

22    CDA.

23           Q.    PatientPoint -- or excuse me,

24    Healthy Advice would enter into a CDA

Electronically signed by Ann M. Belmont (201-234-827-3922)                    b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

152

1    promising not to reveal the sponsor's

2    information to anybody prior to taking that

3    information from the sponsor.  Is that what

4    you're saying?

5           MS. PARK: Objection, form.

6      A.    I'm not sure what the question

7    is.

8      Q.    The CDA protected the client's

9    information.

04:16    10           MS. PARK: Objection, form.

11      A.    If it was -- we might say --

12    yes, the -- basically, yes.

13      Q.    As revenue might go up or down

14    with a specific brand, prior to the time that

15    the drug at issue goes off patent, are there

16    a variety of factors that influence the level

17    of revenue?

18      A.    It depends on the company, but,

19    yes.

04:17    20      Q.    What are those factors?

21      A.    The lifecycle management of the

22    drug, a launch product.  And, again, this is

23    changing today I think from some articles I

24    read, but during the launch phase, they may

Electronically signed by Ann M. Belmont (201-234-827-3922)                                              b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

153

1    have X-amount of dollars to spend, versus,

2    you know, in later lifecycle management.

3    Also, you have to look at their portfolio, is

4    it -- do they -- does the organization itself

5    deem it a growth driver for them, all of

6    those things come into play relative to the

7    budget and things like that that the brands

8    will have.

9            Q.    What other factors?

10           A.    I don't -- I can't think of any.

11           Q.    There may be others, but you

12   don't remember them?

13           A.    Or there may not be any, and I

14   remembered them all.

15           Q.    So there are factors including

16   the two that you just mentioned that

17   influence the amount of revenue that comes in

18   the door for a drug that aren't necessarily

19   controlled by the patent life?

20           A.    Well, sure.  I mean, some part

21   of it is, and I think everybody faces it,

22   there's X-amount of budget dollars.  And in

23   today's environment, I might want to spend it

24   on social media, I might want to spend it on

04:18

04:18

Electronically signed by Ann M. Belmont (201-234-827-3922)                    b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

154

1    digital, I might want to spend it on mass

2    DTC, and it's your job to convince them to

3    take if from this bucket to this bucket if

4    there's not enough.  And we were pretty good

5    at that.  Actually, let me correct that, we

6    were very good at that.

7          Q.    That's a major -- the sales

8    activity of PatientPoint on the client's side

9    is an important driver of that?

04:19    10                MS. PARK: Objection, form.

11          A.    In terms of revenue, I think

12    they play a significant role in terms of

13    revenue.

14          Q.    And because there are multiple

15    factors that go into that, the revenue level

16    at which a particular brand is participating

17    in the networks, cannot necessarily be

18    predicted to stay exactly the same year over

19    year over year, correct?

04:19    20                MS. PARK: Objection, form,

21    foundation.  Misstates prior testimony.

22          A.    We had pretty good visibility,

23    we had very good visibility on our clients

24    and their renewal rates, very good.

Electronically signed by Ann M. Belmont (201-234-827-3922)                                    b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

155

1          Q.    But many factors would influence

2     it, and it went up and down over the years,

3     correct?

4               MS. PARK: Objection, form.

5          Q.    That's what you said earlier?

6          A.    No, I don't think I did.  But if

7     I did, let me re -- I stated that when brands

8     came into our network, they stayed in, okay?

9     When you asked as we were acquiring new

04:20  10    clients how that might happen, we might have

11    to vary, but brands tended to stay in, the

12    prices stayed consistent, etc., etc. and that

13    would be correct.  Accurate and correct.

14         Q.    The revenue coming in from each

15    brand, didn't you say that varied by year?

16         A.    No, I didn't. I said that it

17    could vary by brand, not necessarily for the

18    same brand every year. There's a distinction

19    there.

04:20  20         Q.    I see. And in any event, that

21    revenue would be affected by the factors that

22    you listed earlier?

23         A.    Yes, I'm sorry.  I'm just

24    shaking my head.

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)          b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

156

1              MR. HANKINSON: Okay.  That's all

2    for me.

3              MS. PARK: I have no further

4    questions.  We'll reserve signature.

5              MR. McCRACKEN: We're going off

6    the video record at 4:20 p.m.

7

8

9

10

11

12                        _____

                         DEBORAH SCHNELL

13

14

15

16                        *  *  *

17         (DEPOSITION CONCLUDED AT 4:20 p.m.)

18                        *  *  *

19

20

21

22

23

24

Electronically signed by Ann M. Belmont (201-234-827-3922)                    b4951d34-4796-40cc-8ac4-5ef9f8f6efb3

Deborah Schnell, 3/28/2014

157

1               C E R T I F I C A T E

2

STATE   OF   OHIO
3            :   SS
COUNTY OF CLERMONT

4

5          I, ANN M. BELMONT, RPR, the
undersigned, a duly qualified notary public
6    within and for the State of Ohio, do hereby
certify that DEBORAH SCHNELL was by me first
7    duly sworn to depose the truth and nothing
but the truth; foregoing is the deposition
8    given at said time and place by said witness;
deposition was taken pursuant to stipulations
9    hereinbefore set forth; deposition was taken
by me in stenotype and transcribed by me by
10   means of computer; deposition was provided to
witness for examination and signature outside
11   the presence of the Notary Public. I am
neither a relative of any of the parties or
12   any of their counsel; I am not, nor is the
court reporting firm with which I am
13   affiliated, under a contract as defined in
Civil Rule 28(D) and have no financial
14   interest in the result of this action.

15          IN WITNESS WHEREOF, I have hereunto set
my hand and official seal of office at
16   Cincinnati, Ohio this 27th day of April,
2014.

17

18

19   My commission expires:  ANN M. BELMONT, RPR
December 4, 2015  Notary Public - State of Ohio

20

21

22

23

24

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990