1

1              UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF OHIO
2                    WESTERN DIVISION
3      HEALTHY ADVICE          :
       NETWORKS, LLC,          :
4                              :
            Plaintiff,         :
5                              :
       vs.                     :   Case No. 1:12CV610
6                              :
       CONTEXTMEDIA, INC.,     :
7                              :
            Defendant.         :
8
9
10       Deposition of KATIE MERZ, a witness
11    herein, taken by the defendant as upon
12    cross-examination, pursuant to the Federal
13    Rules of Civil Procedure and pursuant to
14    notice of counsel as to the time and place
15    and stipulations hereinafter set forth, at
16    the offices of Keating Muething & Klekamp,
17    PLL, One East Fourth Street, Suite 1400,
18    Cincinnati, Ohio 45202, at 9:30 a.m.,
19    Tuesday, March 18, 2014, before ANN M.
20    BELMONT, RPR, a Registered Professional
21    Reporter and Notary Public within and for the
22    State of Ohio.
23                       - - -
24

Electronically signed by Ann M. Belmont (201-234-827-3922)                    789ed84f-7a0e-4fca-8040-b133f98c31d9

Katie Merz, 3/18/2014

2

```
 1    APPEARANCES:
 2
      On behalf of Plaintiff:
 3
      AARON M. BERNAY, ESQ.
 4    Frost Brown Todd, LLC
      301 East Fourth Street
 5    Suite 3300
      Cincinnati, Ohio 45202
 6
      On behalf of Defendant:
 7
      THOMAS F. HANKINSON, ESQ.
 8    Keating Muething & Klekamp, PLL
      One East Fourth Street
 9    Suite 1400
      Cincinnati, Ohio 45202
10
      RICHARD J. O'BRIEN, ESQ.
11    Sidley Austin, LLP
      One South Dearborn Street
12    Chicago, Illinois 60603
13
14
15
16
17
18
19
20
21
22
23
24
```

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Katie Merz, 3/18/2014

3

1                    S T I P U L A T I O N S

2        It is stipulated by counsel for the

3     respective parties that the deposition of

4     KATIE MERZ, a witness herein, may be taken at

5     this time by the defendant as upon

6     cross-examination and pursuant to the Federal

7     Rules of Civil Procedure and notice to take

8     deposition, all other legal formalities being

9     waived by agreement; that the deposition may

10    be taken in stenotype by the Notary Public

11    Reporter and transcribed by her out of the

12    presence of the witness; that the transcribed

13    deposition was made available to the witness

14    for examination and signature and that

15    signature may be affixed outside the presence

16    of the Notary Public-Court Reporter.

17

18

19

20

21

22

23

24

Electronically signed by Ann M. Belmont (201-234-827-3922)                    789ed84f-7a0e-4fca-8040-b133f98c31d9

Katie Merz, 3/18/2014

```
                                                    4

 1                      INDEX
 2    WITNESS        DIRECT  CROSS  RE-     RE-
                                   DIRECT  CROSS
 3
      KATIE MERZ
 4    BY MR. HANKINSON:           5
 5    EXHIBIT IDENTIFIED                    PAGE
 6    Exhibit 1 notice of deposition        10
      Exhibit 13 loop lineup documents      41
 7    Exhibit 14 ad ratio worksheets        65
      June 18, 2012                         68
 8    Exhibit 15 e-mail from Amy Finley     68
      dated June 18, 2012
 9    Exhibit 16 e-mail from Jill Brewer    81
      dated September 9, 2011
10
      OBJECTIONS                   PAGE LINE
11
      MR. BERNAY:                    17    5
12    MR. BERNAY:                    17   10
      MR. BERNAY:                    26    8
13    MR. BERNAY:                    33   24
      MR. BERNAY:                    39   10
14    MR. BERNAY:                    66    9
      MR. BERNAY:                    90   23
15    MR. BERNAY:                    95    9
      MR. BERNAY:                    99    2
16
17
18
19
20
21
22
23
24
```

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)    789ed84f-7a0e-4fca-8040-b133f98c31d9

Katie Merz, 3/18/2014

5

```
 1                    KATIE MERZ,
 2        a witness herein, of lawful age, having
 3   been first duly sworn as hereinafter
 4   certified, was examined and testified as
 5   follows:
 6                 CROSS-EXAMINATION
 7   BY MR. HANKINSON:
 8        Q.    Good morning.
 9        A.    Morning.
10        Q.    Would you please state your name
11   and spell your last name.
12        A.    Katie Merz, M-E-R-Z.
13        Q.    Merz?
14        A.    M-E-R-Z.
15        Q.    Very good.  Thank you for coming
16   in today.  As we established, but I'll say
17   again for the record, my name is Tom
18   Hankinson, I'm an attorney for ContextMedia,
19   which is the defendant in this action. Do you
20   understand what case you're here about today?
21        A.    Yes.
22        Q.    And do you understand that your
23   employer is the plaintiff in that case?
24        A.    Yes.
```

09:39 (line 10)

09:39 (line 20)

Electronically signed by Ann M. Belmont (201-234-827-3922)                    789ed84f-7a0e-4fca-8040-b133f98c31d9

Katie Merz, 3/18/2014

6

1          Q.    And who is your current

2     employer?

3          A.    PatientPoint.

4          Q.    And did they go by a different

5     name within the past couple of years?

6          A.    Healthy Advice Networks

7     formerly.

8          Q.    Do you know about when that name

9     change happened?

09:40    10          A.    I don't exactly recall. My guess

11     could be three, three or so, four years ago.

12          Q.    Some time ago?

13          A.    Yeah.

14          Q.    And it's the same company, it

15     just changed names?

16          A.    Yes.

17          Q.    Did your employer as a company

18     ever change over the last three or

19     four years?

09:40    20          A.    Did my employer?

21          Q.    Your paycheck's still coming

22     from the same place they always have?

23          A.    Yes, but the name has changed.

24          Q.    And do you understand that

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                          789ed84f-7a0e-4fca-8040-b133f98c31d9

Katie Merz, 3/18/2014

7

1    you're here -- have you heard the term

2    30(b)(6) before?

3           A.    No.

4           Q.    Okay. Do you understand that

5    you're here as a designee of your company on

6    a certain topic?

7           A.    Yes.

8           Q.    And what's your understanding of

9    that topic?

09:41   10           A.    The content of the loops.

11           Q.    And let me back up a step.  Have

12    you ever been deposed before?

13           A.    No.

14           Q.    Never been in a deposition?

15           A.    No.

16           Q.    Given testimony in court or

17    anything?

18           A.    No.

19           Q.    Okay. Your lawyer's probably

09:41   20    explained a lot of this stuff so I won't

21    spend a lot of time on it, but if you ever

22    need a break, please answer any pending

23    question and then just ask for the break, you

24    can have one.

Electronically signed by Ann M. Belmont (201-234-827-3922)                    789ed84f-7a0e-4fca-8040-b133f98c31d9

Katie Merz, 3/18/2014

8

1        A.    Okay.

2        Q.    If you need water or anything,

3    just let us know. If your attorney has an

4    objection to one of my questions, he'll state

5    that, you might want to give him a little

6    time to do so. And after that, unless he

7    instructs you not to answer, you go ahead and

8    answer. Usually those instructions not to

9    answer have to do with what we call

09:42  10    privilege, so he might say, objection,

11    privilege, then he'll give you an

12    instruction.  I don't want to get into

13    information that's actually privileged, so

14    we'll deal with that if and when it comes up.

15        A.    Okay.

16        Q.    Do you understand that?

17        A.    Yes.

18        Q.    And because we're taking all of

19    this down, we have to answer yes or no, some

09:42  20    kind of word and we'll try to avoid, and I'll

21    try to avoid saying things like uh-huh or

22    nodding or shaking my head, and I would

23    appreciate it if you would as well.

24        A.    Okay.

Electronically signed by Ann M. Belmont (201-234-827-3922)          789ed84f-7a0e-4fca-8040-b133f98c31d9

Katie Merz, 3/18/2014

9

1          Q.    Okay is a great example.

2          A.    Okay.

3          Q.    And we will try to not talk over

4    each other.  It's something that I have a

5    problem with. But we can only get down one

6    person's words at a time.  So even though I'm

7    longwinded and I might stop and start and

8    think in the middle of the question, to the

9    extent that you can understand what the heck

09:43   10    I'm doing, wait until I'm finished with the

11    question and then answer it. Are you okay

12    with that?

13          A.    Yes.

14          Q.    If you don't understand any

15    question, feel free to ask me to repeat it or

16    to ask me to rephrase it and I'll try to do

17    that or figure out why you don't understand

18    it and we'll get to the bottom of it, okay?

19          A.    Okay.

09:43   20          Q.    If you do answer, I'm going to

21    assume that you understood the question; is

22    that fair?

23          A.    Yes.

24          Q.    All right.  That sounded very

Electronically signed by Ann M. Belmont (201-234-827-3922)                                    789ed84f-7a0e-4fca-8040-b133f98c31d9

Katie Merz, 3/18/2014

10

1   official. I'm going to hand you what's been

2   marked already as Defendant's Exhibit 1.

3      (Exhibit 1 identified.)

4               MR. HANKINSON: Do you need a

5   copy?

6               MR. BERNAY: Yeah.

7               MR. HANKINSON: Maybe you should

8   take a copy and the witness can use this full

9   set of what was marked yesterday.

09:44  10               MR. BERNAY: Okay.

11      Q.   So what I've just put in front

12   of you is a full set of everything that was

13   marked yesterday at the deposition of Greg

14   Robinson. Do you know Greg?

15      A.   Yes.

16      Q.   Is he in your chain of command

17   or your silo at PatientPoint?

18      A.   He is my chief operation

19   officer, or COO.

09:44  20      Q.   And does the person that you

21   report up to report up the chain to him

22   ultimately?

23      A.   No. I report to the chief

24   medical information officer who reports to

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                              789ed84f-7a0e-4fca-8040-b133f98c31d9

Katie Merz, 3/18/2014

11

1     the CEO, Tom McGinness.

2          Q.     And who is the chief medical

3     information officer?

4          A.     Geeta Nayyar.

5          Q.     Could you spell that?

6          A.     G-E-E-T-A, N-A-Y-Y-A-R.

7          Q.     Thank you. Is that your direct

8     supervisor or manager?

9          A.     Yes.

09:45   10          Q.     Does she report directly to Tom

11    McGinness?

12          A.     Yes.

13          Q.     What's your title?

14          A.     Vice president editorial and

15    creative.

16          Q.     What are your job duties?

17          A.     I oversee the team of writers

18    and designers who create the content for both

19    our digital and print programs. I also

09:45   20    oversee the marketing execution team for the

21    sales port materials for the enterprise.

22          Q.     Part of your job deals with the

23    content that is displayed on PatientPoint

24    screens in doctor offices; is that accurate?

Electronically signed by Ann M. Belmont (201-234-827-3922)                    789ed84f-7a0e-4fca-8040-b133f98c31d9

Katie Merz, 3/18/2014

12

1        A.    Yes.

2        Q.    Part of your job deals with the
3    types of marketing materials that
4    PatientPoint uses in order to get those
5    screens placed in doctors' offices; is that
6    right?

7        A.    Yes, yes.

8        Q.    And another part of your job on
9    that side, the marketing side, would that
10   also entail the types of materials that
11   PatientPoint uses in order to get advisers
12   and sponsors to pay to have content placed on
13   PatientPoint's networks?

14       A.    Can you rephrase that, please?

15       Q.    Sure. The aspect of your job
16   that deals with marketing materials.

17       A.    Em-hm.

18       Q.    Do some of those marketing
19   materials go to advertisers and sponsors?

20       A.    Yes.

21       Q.    Is there another department that
22   deals with those marketing materials or it's
23   all in your wheelhouse?

24       A.    Yes, there is another

Electronically signed by Ann M. Belmont (201-234-827-3922)                              789ed84f-7a0e-4fca-8040-b133f98c31d9

Katie Merz, 3/18/2014

13

1    department.

2           Q.    What's the name of that?

3           A.    The strategy for the marketing

4    materials comes from the clients solutions

5    team for the pharmaceutical sponsors like you

6    just mentioned.  And the strategy for the

7    marketing materials to sell into doctors

8    offices comes from the providers sales

9    department.

09:47  10           Q.    The strategy comes in from those

11    two sources, and is your department in charge

12    of executing that strategy?

13           A.    Yes.

14           Q.    You said -- as vice president,

15    what was the word before creative?

16           A.    Editorial.

17           Q.    Editorial and creative.  You

18    said you oversee writers and who else?

19           A.    Designers.

09:48  20           Q.    Where would animators come in?

21           A.    Designers.

22           Q.    Are there other types of

23    designers?

24           A.    Print and digital.

Electronically signed by Ann M. Belmont (201-234-827-3922)          789ed84f-7a0e-4fca-8040-b133f98c31d9

Katie Merz, 3/18/2014

14

1        Q.    How big is your department?

2        A.    Eighteen.

3        Q.    And they report to you?

4        A.    Not all directly.

5        Q.    Are you the head of the

6   department?

7        A.    Yes.

8        Q.    Are there any video designers or

9   editors on your team?

09:49   10        A.    The digital animators or the

11   digital designers, yes. There are several of

12   them.

13        Q.    Several video editors?

14        A.    I'm trying to think what your --

15   are you asking for the -- can you rephrase

16   the question?

17        Q.    Does anybody shoot videos at

18   PatientPoint?

19        A.    No.

09:49   20        Q.    Does anybody produce videos at

21   PatientPoint?

22        A.    No.

23        Q.    Does anyone at PatientPoint give

24   instructions to a vendor or some sort of

Electronically signed by Ann M. Belmont (201-234-827-3922)          789ed84f-7a0e-4fca-8040-b133f98c31d9

Katie Merz, 3/18/2014

15

1    video production company to make videos?

2            A.    Not in the past, we are just

3    about to pursue that.

4            Q.    In what way?

5            A.    We are concepting a new segment

6    that features our CMIO in the series of video

7    segments.

8            Q.    Ms. Nayyar?

9            A.    Yes.

09:50    10            Q.    Is that the only planned video

11    in the works?

12                  MR. BERNAY: Tom, to be clear,

13    are you asking across the entire company?

14                  MR. HANKINSON: Yes.

15            A.    If you mean video by production

16    by a video camera out in the field, then,

17    yes.

18            Q.    What other types?

19            A.    The output of our animated

09:51    20    segments can be converted into a video file.

21    So meaning a quick time file that would play

22    just like any other video. But those are done

23    not by a video production company.

24            Q.    Any other live action video

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                          789ed84f-7a0e-4fca-8040-b133f98c31d9

Katie Merz, 3/18/2014

16

1    besides the segments with Ms. Nayyar?

2         A.    No.

3         Q.    What led to the decision to

4    feature your CMIO in live action video

5    segments?

6         A.    The company wanted to add

7    credibility to our brand by bringing on a

8    certified doctor to serve as a medical expert

9    across all of our content, both print,

09:52 10   digital, check in all of our programs. That

11   was the impetus for bringing her on and

12   getting her face out there.

13        Q.    Where will that live action

14   video be seen?

15        A.    The starting plan is on the

16   waiting room programs.

17        Q.    What are the different waiting

18   room programs that PatientPoint provides?

19        A.    There are five specialties;

09:52 20   primary care, OB/GYN, rheumatology,

21   cardiology and dermatology.

22        Q.    Can you say them again for me?

23   Primary care?

24        A.    OB/GYN, which is women's health,

Electronically signed by Ann M. Belmont (201-234-827-3922)                    789ed84f-7a0e-4fca-8040-b133f98c31d9

Katie Merz, 3/18/2014

17

1    rheumatology, cardiology and dermatology.

2         Q.    What's the value of the

3    credibility of your CMIO and the credibility

4    of the brand that would stem from that?

5              MR. BERNAY: Object to the form,

6    but you can answer.

7         A.    Can you say it again?

8         Q.    Sure. What's the value of the

9    credibility of the brand under the CMIO?

09:53  10              MR. BERNAY: Same objection, but

11    you can answer.

12         A.    From a provider's perspective,

13    employing a doctor as an executive adviser

14    across our content goes to ensuring our

15    medical accuracy of all the content we put

16    inside their doctor offices.

17         Q.    When you say from a provider

18    standpoint, are you talking about the

19    doctor's offices in whose waiting rooms

09:55  20    PatientPoint's content is displayed?

21         A.    Yes.

22         Q.    And so the credibility of

23    PatientPoint as a brand and now the

24    credibility of your CMIO is one factor that a

Electronically signed by Ann M. Belmont (201-234-827-3922)                789ed84f-7a0e-4fca-8040-b133f98c31d9

Katie Merz, 3/18/2014

18

1    provider would think about in determining

2    whether to acquire or keep a PatientPoint

3    network in the waiting room; is that

4    accurate?

5            A.    I believe so.

6            Q.    And it's important enough to

7    embark on the production of a live video

8    sequence that will play on all five of the

9    different networks?

09:55  10            A.    Yes.

11            Q.    Do you think, then, that it's

12    calculated to make a material difference in

13    the decisions that the doctors and office

14    managers make about whether to acquire or

15    keep a PatientPoint system in their waiting

16    room? Let me put it differently.  You

17    wouldn't do it if you didn't think it would

18    matter, right?

19            A.    Perhaps I would say we are

09:56  20    testing the impact. We don't know yet.

21            Q.    How will you study the impact?

22            A.    We will gauge the impact like we

23    gauge the impact of feedback from all of our

24    networks, which is primarily through the

Electronically signed by Ann M. Belmont (201-234-827-3922)                    789ed84f-7a0e-4fca-8040-b133f98c31d9

Katie Merz, 3/18/2014

19

1    relationship management team who is assigned

2    to provider practices as the liaison and is

3    in communications about what they like and

4    don't like about the program.

5           Q.    And you said you get feedback

6    from them on a regular basis?

7           A.    Yes.

8           Q.    It's called the relationship

9    management team?

10          A.    Yes.

11          Q.    Who heads up that team?

12          A.    Amy Finley.

13          Q.    Is that the same team that

14   reaches out to practices who don't have a

15   waiting room system or have a waiting room

16   system from a competitor to try to place the

17   PatientPoint system?

18          A.    No.

19          Q.    What's the name of that team?

20          A.    Provider sales.

21          Q.    Who's the head of that?

22          A.    Lee Hambright.

23          Q.    How does the relationship

24   management team gather the information about

09:57 (line 10)

09:57 (line 20)

Electronically signed by Ann M. Belmont (201-234-827-3922)                    789ed84f-7a0e-4fca-8040-b133f98c31d9

Katie Merz, 3/18/2014

20

1    what matters to providers to give it to you?

2         A.    They, in any communication they

3    have with the practice, log the substance of

4    that communication in a content or customer

5    management system, and if -- I think that

6    answers the question.

7         Q.    What's the name of that system?

8         A.    Content -- customer management

9    system or CMS.

09:58    10         Q.    Do you usually rely on the

11   entries that the relationship management team

12   makes in the CMS in order to make decisions

13   about what matters to providers as you're

14   designing and changing content?

15        A.    In part.

16        Q.    What other factors?

17        A.    What other factors?

18        Q.    Let me back up actually. You

19   rely on it in part, that means that you rely

09:59    20   on it and you rely on other things, too?

21        A.    Correct.

22        Q.    Do you think it's reasonable in

23   your profession to rely on the feedback that

24   the relationship management team puts into

Electronically signed by Ann M. Belmont (201-234-827-3922)                    789ed84f-7a0e-4fca-8040-b133f98c31d9

Katie Merz, 3/18/2014

21

1    CMS in order to make decisions?

2         A.    Yes.

3         Q.    And what other things do you

4    rely on in making decisions about content?

5         A.    General research on the

6    specialties, what types of patients doctors

7    are seeing in the specialties, what's the

8    frequency of different conditions that are

9    being treated in those specialties.  We have

10:00  10   advisory positions that we'll poll for

11   information on what's important to them that

12   we educate on in those programs.

13        Q.    How does that polling work?

14        A.    Usually an e-mail.

15        Q.    To how many people?

16        A.    Depends on the program. But

17   each -- at a minimum, each specialty, digital

18   or print, has a key primary medical adviser

19   that we use as a sounding board.

10:00  20        Q.    Sometimes the poll might be just

21   an e-mail to that medical adviser?

22        A.    Right.

23        Q.    Does it sometimes go more

24   broadly?

Electronically signed by Ann M. Belmont (201-234-827-3922)                    789ed84f-7a0e-4fca-8040-b133f98c31d9

Katie Merz, 3/18/2014

22

1         A.    Yes.

2         Q.    And in the cases where it goes

3    more broadly, who is it going to, how many

4    people and of what type?

5         A.    We may do a focus group of

6    physicians.

7         Q.    Are the members of the focus

8    group drawn from people who already have a

9    PatientPoint system in their waiting room?

10:01   10         A.    Usually.

11         Q.    Are there exceptions?

12         A.    Perhaps.

13         Q.    You're not sure?

14         A.    I'm not sure.

15         Q.    The focus groups that you're

16    aware of, you've never come across someone

17    who didn't already have a PatientPoint or a

18    Healthy Advice system in the waiting room; is

19    that accurate?

10:01   20         A.    Yes, not that I'm aware of.

21         Q.    Is it just your common sense

22    impression that they are made up of people

23    who already have a PatientPoint system?

24         A.    Yes.

Electronically signed by Ann M. Belmont (201-234-827-3922)                    789ed84f-7a0e-4fca-8040-b133f98c31d9

Katie Merz, 3/18/2014

23

1          Q.     Who runs the focus groups?

2          A.     Our research department.

3          Q.     Who do they report to?

4          A.     Scott Nesbitt.

5                 Do you mind if I take a break to

6     get coffee?

7                 MR. HANKINSON: I would love to

8     take a break to get coffee. Go off the

9     record.

10                (Break taken.)

11         Q.     Does Scott Nesbitt report to

12    anybody who is in your chain of command at

13    any point?

14         A.     No.

15         Q.     Goes straight up to what, the

16    COO?

17         A.     Scott reports to Lee Hambright,

18    who is our chief commercialization officer.

19         Q.     Who does Lee Hambright report

20    to?

21         A.     I believe the CEO.

22         Q.     What's chief commercialization

23    officer mean?

24         A.     In general, I think he -- it's a

10:07

10:07

Electronically signed by Ann M. Belmont (201-234-827-3922)                                    789ed84f-7a0e-4fca-8040-b133f98c31d9

Katie Merz, 3/18/2014

24

1    role to look for business opportunities for

2    the enterprise at large.

3         Q.    Does the research department

4    also go out to various journal sources and

5    online sources to look for content, or is

6    that held within your group?

7         A.    Within my group.

8         Q.    Are there other types of

9    research that the research department does

10   other than content related focus groups and

11   communications with the medical advisers?

12        A.    They don't primarily access the

13   medical advisers, our team does. They do do

14   the focus groups like you mentioned, and

15   they -- while I'm not the expert to speak to

16   everything they do, I am aware that they do

17   ROI research for our sponsors.

18        Q.    What's ROI?

19        A.    Return on investment.

20        Q.    Does ROI research have an impact

21   on the content that gets displayed?

22        A.    No.

23        Q.    Who does that research go to?

24        A.    The ROI research is done on

10:08

10:09

Electronically signed by Ann M. Belmont (201-234-827-3922)        789ed84f-7a0e-4fca-8040-b133f98c31d9

Katie Merz, 3/18/2014

25

1    behalf of our paying sponsors to show that if

2    they place an advertisement in our programs,

3    that they will pay out. So the summary of

4    those findings are presented to the

5    advertisers after the contract term to get

6    them to renew or to say it did work, it

7    didn't work.

8           Q.    Does the quality of the content

9    impact the return on investment?

10          A.    I would think so.

11          Q.    For what reasons?

12          A.    It's important to create an

13   engaging and relevant program to get people

14   to watch, and when they watch, they see both

15   the content and the advertising.

16          Q.    So ROI is a measurement of how

17   much they're retaining the advertising part

18   of the programming?

19          A.    In part. ROI for the OTC or

20   over-the-counter or CPG, which is consumer

21   package goods, it would be recall. For

22   pharmaceutical sponsors, it would be

23   prescription list.

24          Q.    Those are ways of measuring how

Electronically signed by Ann M. Belmont (201-234-827-3922)          789ed84f-7a0e-4fca-8040-b133f98c31d9

Katie Merz, 3/18/2014

26

1    much engagement there was with the content

2    such that it impacted the patient's

3    decisionmaking or retention if they're being

4    polled?

5           A.    Can you say that one more time?

6           Q.    No.

7       (Record read by Reporter.)

8                 MR. BERNAY: I'll object to the

9    form, but you can answer.

10          A.    I'm not sure if it equates to a

11   measure of engagement, but indirectly there's

12   a correlation I guess.

13          Q.    If the content is so awful that

14   the patients all look away from it, then ROI

15   would go down?

16          A.    That's the assumption.

17          Q.    And if it's really great so

18   they're all looking at the screen the whole

19   time they're in the waiting room, including

20   the bits that are sponsored and that are

21   advertisements, the assumption is that the

22   ROI would go up?

23          A.    Yes.

24          Q.    Is part of your group's -- is

10:11 (line 10)

10:12 (line 20)

Electronically signed by Ann M. Belmont (201-234-827-3922)                    789ed84f-7a0e-4fca-8040-b133f98c31d9

Katie Merz, 3/18/2014

27

1    it -- do you refer to it as a team, a group,

2    a department?

3         A.    Team is fine.

4         Q.    Is part of your team's goal to

5    increase ROI?

6         A.    Our team's goal is not primarily

7    focused on that. However, on behalf of our

8    business, of course, we want to have a

9    program that leads to good ROI.

10:13  10         Q.    Because then the company gets

11   paid more?

12        A.    Exactly.

13        Q.    And the company would get paid

14   more, not just by attracting new sponsors and

15   advertisers, but, potentially, if you have

16   high ROI, you can charge higher prices; is

17   that right?

18        A.    I don't know that.

19        Q.    But somehow more money would

10:13  20   come in the door with increased ROI?

21        A.    I'm not sure if it's more money,

22   but it supports our business model to ensure

23   more longevity.

24        Q.    Keeps everybody from getting

Electronically signed by Ann M. Belmont (201-234-827-3922)                    789ed84f-7a0e-4fca-8040-b133f98c31d9

Katie Merz, 3/18/2014

28

1    fired?

2          A.    (Witness shrugs shoulders.)

3          Q.    Yes?

4          A.    I guess, yes.

5          Q.    Let me back up way back.  Could

6    you run through your education after high

7    school and then the jobs you've held since

8    then.

9          A.    Sure, yes. I went to Xavier

10:14    10    University for undergrad, F&W Publications,

11    now F&W Media as an editor for Writers Digest

12    Magazine, went back to Xavier for grad school

13    for a master's in education, freelanced as a

14    scientific editor for the Journal of the

15    School of Harvard.  Public Health Reports was

16    the name of the journal. I also freelanced at

17    Healthy Advice, and then came on full time at

18    Healthy Advice, now PatientPoint.

19          Q.    How long were you freelancing

10:15    20    with the Public Health Reports journal?

21          A.    Approximately a year and a half.

22          Q.    Were you freelancing at Healthy

23    Advice Networks during that time or after

24    that time?

Electronically signed by Ann M. Belmont (201-234-827-3922)                    789ed84f-7a0e-4fca-8040-b133f98c31d9

Katie Merz, 3/18/2014

29

1          A.     They overlapped.

2          Q.     When did you start working full

3      time at Healthy Advice?

4          A.     2006, I believe.

5          Q.     When would you say that you

6      started to work in -- well, do you consider

7      yourself to work in marketing or advertising?

8          A.     Not -- no.

9          Q.     Editorial, what would you

10:16   10   describe your job as at like a cocktail

11      party?  I am in?

12          A.     At this point I would describe

13      it as content development. Editorial, meaning

14      in terms of -- the term editorial means

15      creating content in a nonbiased way. So I

16      would describe what I do as researching

17      relevant topics for stated audiences and

18      applying an expertise to craft the lineup of

19      content or an approach to content that would

10:17   20   most meaningfully engage that -- those

21      audience members.

22          Q.     And the audience members are the

23      patients in the waiting rooms?

24          A.     In this case.

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                    789ed84f-7a0e-4fca-8040-b133f98c31d9

Katie Merz, 3/18/2014

30

1          Q.    Are you familiar with -- I mean,
2    what do you look in to to get content other
3    than what the sponsors provide?
4          A.    Do you mean content for the
5    waiting room program in particular?
6          Q.    Yes.
7          A.    We rely on research to the
8    specialty, primarily from government and
9    nonbiased resources, such as the CDC, NIH,
10   various associations or foundations that are
11   not for profit; Mayo Clinic, Cleveland
12   Clinic, those kinds of medically recognized
13   authorities.
14         Q.    And what types of output are
15   they giving that you're looking at?
16         A.    Mainly they're online public
17   domain web resources that they make available
18   to patients.
19         Q.    So it's not scientific journal
20   articles, but it's from these reputable
21   resources and it's web based.  Who are their
22   audiences?
23         A.    Patients, consumers.
24         Q.    Same as yours?

10:18

10:18

Electronically signed by Ann M. Belmont (201-234-827-3922)                    789ed84f-7a0e-4fca-8040-b133f98c31d9

Katie Merz, 3/18/2014

31

1          A.     Yes.

2          Q.     And some of it's kind of -- go

3    ahead.

4          A.     Sorry, I just want to clarify

5    that all of those organizations probably have

6    documents on their website that are for

7    patients and consumers as well as for

8    providers, but since we work for the audience

9    of patients, that's what we rely on.

10:19    10          Q.     And those types of

11   organizations; the CDC, that's Center for

12   Disease Control?

13          A.     And prevention.

14          Q.     And prevention. And the National

15   Institute of Health, that's NIH?

16          A.     Yes.

17          Q.     Those types of groups, do they

18   engage in public health advocacy?

19          A.     I don't know for sure.

10:20    20          Q.     Do they try to get patients to

21   do things that would make them be more

22   healthy?

23          A.     Yes.

24          Q.     Is that a lot of the content

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                                789ed84f-7a0e-4fca-8040-b133f98c31d9

Katie Merz, 3/18/2014

32

1    that PatientPoint gleans from those sources

2    and passes along?

3              A.    Yes.

4              Q.    Including -- I'm thinking of the

5    Ad Council, do you know the Ad Council?

6              A.    Yes.

7              Q.    Do you know if they do health?

8              A.    They do.

9              Q.    They do health-related things.

10:20   10    So I think of it as like Smokey the Bear.

11    What's the health related stuff that they do?

12              A.    Who?

13              Q.    The Ad Council.

14              A.    We don't use the Ad Council. I

15    wouldn't -- they're not a primary source for

16    us, so I wouldn't feel comfortable speaking

17    to it.

18              Q.    Okay.  Well, what are some of

19    the health-related public service

10:20   20    advertisements that the CDC would put out?

21              A.    The CDC may have created public

22    facing campaigns, perhaps, say, I know of one

23    that I'm familiar with is on autism

24    awareness, about speaking up and noticing

Electronically signed by Ann M. Belmont (201-234-827-3922)                    789ed84f-7a0e-4fca-8040-b133f98c31d9

Katie Merz, 3/18/2014

33

1    early signs.

2           Q.    Em-hm.

3           A.    But for the purposes of our

4    content generation, a lot of times we're just

5    reading their texts on how to treat COPD

6    versus relying on their CDC campaign on --

7    perhaps that they may have on COPD.

8           Q.    But it's all facing the patient,

9    right?  That's the audience?

10:22    10           A.    Yes.

11           Q.    And just in looking at some of

12    the content, it seems kind of like helpful,

13    like here's a tip to deal with this problem

14    that you have, and here's a list of five

15    things that help with symptoms of this other

16    thing.

17           A.    Are you talking about our

18    content?

19           Q.    Yeah. I'm just trying to get at

10:22    20    if that's coming from something like the NIH,

21    these are things that are geared toward

22    getting the public to act in more healthy

23    ways?

24                    MR. BERNAY: Object to the form.

Electronically signed by Ann M. Belmont (201-234-827-3922)                789ed84f-7a0e-4fca-8040-b133f98c31d9

Katie Merz, 3/18/2014

34

1          A.     Yes.

2          Q.     Like one of the things that I've

3    seen from a PatientPoint program would be

4    encouraging screening?

5          A.     (Witness nods head

6    affirmatively.)

7          Q.     Do you happen to know what type

8    of sources that information comes from?

9          A.     It would depend on what

10:23   10   screening it was.  So, say it was the

11   importance of diabetes screening, to research

12   that topic, we may go to -- probably wouldn't

13   rely on just one, but the American Diabetes

14   Association, we'd probably see what the FDA

15   said about that, the American Heart, Lung and

16   Blood Institute say.  So part of our content

17   process is a due diligence, scoping out of

18   what the key entities are saying about that

19   screening, and then taking our editorial

10:23   20   expertise to pull it together into a segment

21   that makes sense for our medium.  But we

22   usually primarily source the end of the

23   segment the main research that we relied on.

24         Q.     So some of the content helps get

Electronically signed by Ann M. Belmont (201-234-827-3922)                        789ed84f-7a0e-4fca-8040-b133f98c31d9

Katie Merz, 3/18/2014

35

1    the word out about things that the FDA or the

2    ADA may be trying to say about patients that,

3    you know, it has a positive health impact if

4    you get this early screening?

5          A.    Correct.

6          Q.    It reminds me, I used to be in

7    college radio, we used to do PSA, like, hey,

8    you should recycle, or you should do this.

9    Is it kind of like that?

10:24   10          A.    You could argue that our entire

11    program is a public service announcement,

12    because we're looking to underscore the

13    relevant health messaging that providers want

14    their patients to hear, and to drive

15    healthier behavior.

16          Q.    That's really interesting.  So

17    like the providers want their patients to do

18    these things because they'll feel better and

19    they'll be healthier, right?

10:25   20          A.    (Witness nods head

21    affirmatively.)

22          Q.    Yes?

23          A.    Yes.

24          Q.    And sort of the, some of the

Electronically signed by Ann M. Belmont (201-234-827-3922)                    789ed84f-7a0e-4fca-8040-b133f98c31d9

Katie Merz, 3/18/2014

36

1    sources that you're talking about, like the

2    CDC, the Mayo Clinic, the NIH, they also want

3    these patients to act in these healthy ways

4    and to get the word out about these programs;

5    is that right?

6        A.    To get the word out about these,

7    the importance of these healthy behaviors,

8    yes.

9        Q.    Thank you for that

10   clarification. Interesting to me, like as a

11   business for PatientPoint, you say you add

12   your expertise, so in a way you're helping

13   get that message out. How do you add

14   expertise that sort of makes that happen?

15       A.    Two thoughts come to mind. The

16   first is all of our medical writers are

17   certified through the American Medical

18   Writers Association, so we attend yearly

19   conferences and have applied for

20   certification. So that's one.

21            The second is bringing a

22   consumer-friendly approach to complicated

23   medical information.  So leveraging expertise

24   from how -- in particular, my experience in

10:25 (line 10)
10:26 (line 20)

Electronically signed by Ann M. Belmont (201-234-827-3922)          789ed84f-7a0e-4fca-8040-b133f98c31d9

Katie Merz, 3/18/2014

37

1  magazines is used to talk about topics that

2  are not so hard as medicine, and to take

3  those same tools and tricks, say, of the

4  trade, and apply them to health information

5  to help make that more digestible and easy to

6  understand.

7          Q.    And engaging?

8          A.    And engaging.

9          Q.    So that they act on it?

10         A.    Correct.

11         Q.    And as I'm looking at it, it

12  kind of -- there's some animation, there's

13  some words and maybe the words will kind

14  of -- there will be a sentence and then

15  something will kind of whiz in from the side

16  and knock a word around, and it's something

17  that's kind of -- it's words on a screen, but

18  there's some animation with it.  Is that kind

19  of one example how to make these things more

20  engaging?

21         A.    I would say the animation

22  technique or approach of how we build the

23  narrative throughout each segment is one way

24  to make things engaging.

10:26 (line 10)

10:27 (line 20)

Electronically signed by Ann M. Belmont (201-234-827-3922)          789ed84f-7a0e-4fca-8040-b133f98c31d9

Katie Merz, 3/18/2014

38

1          Q.     Which part of that is the
2     animation?
3          A.     Sometimes we refer to our
4     animation approach as building the narrative.
5     Meaning that you have a text, a script that
6     you could just put the words up on the screen
7     as a -- on a steady clip.
8          Q.     Em-hm.
9          A.     But that's not helping them to
10    read or follow along, so we'll take a more
11    intentional approach to bringing in the words
12    and transitioning the words on and off in a
13    way that would help keep -- attract and keep
14    people's eyes on the screen.
15         Q.     When I used to have to do -- you
16    know, like continuing legal education. Do you
17    do continuing education stuff?  I don't know.
18    There's like continuing education courses we
19    have to take as lawyers, and I used to have
20    to give some at my old firm and I would
21    always have a presentation of what you
22    described, the words were on the page. That
23    would be kind of the wrong way to do it,
24    right?  It's kind of boring.  It's okay to

10:28

10:28

Electronically signed by Ann M. Belmont (201-234-827-3922)                    789ed84f-7a0e-4fca-8040-b133f98c31d9

Katie Merz, 3/18/2014

39

1    insult me.

2         A.    So what are you asking me?  I'm

3    sorry.

4         Q.    I mean, could you apply your

5    methods of making things more engaging to,

6    you know, like words on a screen, like I'm

7    trying to convey a legal concept and it might

8    have five bullet points, there's a way to do

9    that that builds the narrative.

10:29   10         MR. BERNAY: Object to the form.

11   You can answer.

12         A.    I guess I'm struggling to answer

13   it because I feel like they're two separate

14   teaching tools.  I mean, it sounds like the

15   thing you're referring to is like a

16   presentation or a PowerPoint versus what we

17   do is just building After Effects or Flash

18   animation.  So I'm not sure if the tools and

19   tricks of the Flash animation could be

10:30   20   translated exactly into that other medium, I

21   don't know.

22         Q.    You're not familiar with, like,

23   presentations software?

24         A.    Not as -- I'm not as an expert

Electronically signed by Ann M. Belmont (201-234-827-3922)        789ed84f-7a0e-4fca-8040-b133f98c31d9

Katie Merz, 3/18/2014

40

1    of that as I wish I was.

2          Q.    Right, because it's helpful,

3    right?

4          A.    Yeah.

5          Q.    So this is what I always

6    struggled with, is I know that there are ways

7    to animate text and to add pictures in, for

8    instance, PowerPoint presentations, right?

9          A.    Yes.

10:30   10          Q.    And it sounds like what you're

11   saying is you use Flash?

12          A.    Right.

13          Q.    And some other tools?

14          A.    Correct.

15          Q.    But not live action video except

16   for this thing that's starting with Ms.

17   Nayyar?

18          A.    However, we have -- stock video

19   is available, so we haven't purchased stock

10:31   20   video that we've used in segments before.

21          Q.    The video would run in the

22   background, there would be some text from you

23   guys in the foreground?

24          A.    In essence, yes.

Electronically signed by Ann M. Belmont (201-234-827-3922)                    789ed84f-7a0e-4fca-8040-b133f98c31d9

Katie Merz, 3/18/2014

41

1          Q.     What's Flash?

2          A.     Flash is a program we use that

3     is an animatics program so it allows the

4     designers to design in a digital space. I

5     would prefer if my design team would explain

6     it.  I don't personally work in it

7     day-to-day.

8          Q.     But things on the screen move

9     around based on what they program it to

10:32  10    Flash?

11          A.     Right, but as I mentioned, Flash

12    is only one of the programs they work in.

13    After Effects is another main tool.

14          Q.     What is that?

15          A.     It's another type of creative

16    suite program for digital design that allows

17    for more robust timelines and insertion of

18    video and photography, and with a more robust

19    suite of tools for transitions and layers.

10:32  20    Layers, meaning how you build a segment so

21    that it includes video imagery, etc.

22       (Exhibit 13 identified.)

23          Q.     I'm going to hand you a new

24    document.  Flip through that if you would,

Electronically signed by Ann M. Belmont (201-234-827-3922)                    789ed84f-7a0e-4fca-8040-b133f98c31d9

Katie Merz, 3/18/2014

42

1   it's double-sided.  What's been marked as

2   Defendant's Exhibit 13 is a combination of

3   many documents. Each has loop lineup at the

4   start of it. Are you familiar with these loop

5   lineup documents?

6          A.    Yes.

7          Q.    Do you use them in your work?

8          A.    Not in my current role daily.

9          Q.    What did you do to prepare for

10  testifying about the content and the duration

11  of content in advertisements in

12  PatientPoint's content loops today?

13         A.    My current role, I'm not as

14  daily -- the daily overseer of this, so I

15  just tried to refresh my memory on the

16  general content, generation flow.

17         Q.    You used to be more directly

18  engaged with that?

19         A.    Yes.

20         Q.    And so what did you do to

21  refresh your recollection?

22         A.    Mainly, it was a mental exercise

23  of just recalling, okay, this is how --

24  taking the approach of how a bill becomes a

10:34  (at line 10)

10:35  (at line 20)

Electronically signed by Ann M. Belmont (201-234-827-3922)                    789ed84f-7a0e-4fca-8040-b133f98c31d9

Katie Merz, 3/18/2014

43

1   law. Oh, yes, this starts with this, it goes

2   to that, starts with this, you know.

3          Q.    I'm only a loop.

4          A.    Right, so.

5          Q.    Did you talk to whoever's in

6   charge of it now?

7          A.    No.

8          Q.    Did you review any documents to

9   help refamiliarize yourself with it?

10:36  10          A.    Yes.

11          Q.    Which?

12          A.    I had a folder from when Aaron,

13   when I was --

14          MR. BERNAY: I would advise you

15   not to disclose the content of conversation

16   with counsel.  You can state what documents

17   you reviewed, but not disclose anything that

18   we discussed at any point in time.

19          A.    Okay. I think the documents were

10:36  20   the ad editorial ratio document was the main

21   one. And you, or Context Health, had at some

22   point asked for certain loops, and I had

23   printouts of those and I glanced at those to

24   see which ones you asked for.

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)        789ed84f-7a0e-4fca-8040-b133f98c31d9

Katie Merz, 3/18/2014

44

        1         Q.    The printouts of the loops?

        2         A.    Em-hm.

        3         Q.    Were those loop lineup

        4    documents?

        5         A.    Not loop lineup documents, no.

        6    It was the story boards.

        7         Q.    What are the story boards?

        8         A.    Story boards are this translated

        9    into thumbnails.

10:37   10         Q.    Is that done for all loops?

       11         A.    Yes.

       12         Q.    And thumbnails have, like, a

       13    little graphic depiction of what each file

       14    is?

       15         A.    Yes.

       16         Q.    Where are those stored?

       17         A.    Hard copy. They may have a

       18    digital storage as well. I'm not 100 percent

       19    sure.

10:37   20         Q.    So how does a bill become a law?

       21    How does a nascent loop go into becoming a

       22    final loop?

       23         A.    I'm going to try to summarize

       24    this. It begins in general with the concept

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Katie Merz, 3/18/2014

45

1    that a loop is primarily going to be 25 to

2    30 minutes long. That loop is composed of

3    content, custom messages from the doctor, and

4    sponsor messages. So there's a working

5    editorial lineup of content that is a portion

6    of that loop. However, the loop link is not a

7    finite thing.  It is something that expands

8    or contracts based on the number of

9    advertisers that come in. Because the main

10:38  10   thing we subscribe to is this 30:70 ad to

11   editorial ratio. The 30 percent is sponsor

12   messages, the 70 percent is composed of

13   content plus the personalized messages from

14   the doctor.

15            So, every month our program

16   management team, who is the team that

17   liaisons with the client sales group to bring

18   in the sponsor content, provides us an output

19   of how many seconds of sponsor content will

10:39  20   be in that loop's lineup. We then put it into

21   this Excel document that calculates, given

22   the number of seconds of advertising that

23   will happen, the fixed amount of personalized

24   message time that will happen, how much

Electronically signed by Ann M. Belmont (201-234-827-3922)                    789ed84f-7a0e-4fca-8040-b133f98c31d9

Katie Merz, 3/18/2014

46

1    editorial time do we need to maintain the

2    30:70 ad/edit ratio.  Then we will go in and

3    either -- we often don't subtract content if

4    it's a little extra, but if we're low on the

5    editorial, we will add additional segments

6    until that amount of time of editorial gets

7    us to a comfortable 30:70 ratio.

8            Q.    What's included in the editorial

9    time?

10:40    10            A.    The individual content segments.

11    The personalized messages from the doctor, of

12    which 270 seconds worth appear each loop. And

13    what we call a network identification. So,

14    you're watching PatientPoint.

15            Q.    How much of that is played per

16    loop?

17            A.    Usually appears twice and it's

18    about 10 to 15 seconds.

19            Q.    Would you be surprised if -- as

10:41    20    I'm watching it, it's 30 seconds long each

21    time?

22            A.    The network ID?

23            Q.    Yeah.

24            A.    It would depend on what network

Electronically signed by Ann M. Belmont (201-234-827-3922)    789ed84f-7a0e-4fca-8040-b133f98c31d9

Katie Merz, 3/18/2014

47

1    you're watching.  We've revised it, so

2    perhaps if you're referring to one that

3    was -- actually, I have no idea. If -- no, it

4    would not surprise me. We changed it, though,

5    so it could be a longer version or a shorter

6    version.

7          Q.    And you don't know exactly how

8    long it is at any one point in time or on any

9    particular network?

10         A.    They're the same across the

11   networks. So I know at one point we had a

12   longer version that appeared once and then

13   midway through we had a shorter version.  I

14   think -- I believe that now we're playing the

15   same one in both instances in the loop, and

16   that it's about 15 seconds.

17         Q.    If you add other editorial

18   content so that the nonsponsored editorial

19   time is like 45 minutes, would you add an

20   additional network identification?

21         A.    Please repeat that.

22         Q.    Generally, it starts out with a

23   skeleton of about 25 to 30 minutes of

24   editorial time?

10:41 (at line 10)

10:42 (at line 20)

Electronically signed by Ann M. Belmont (201-234-827-3922)          789ed84f-7a0e-4fca-8040-b133f98c31d9

Katie Merz, 3/18/2014

48

1          A.     Total loop time.

2          Q.     Oh, total loop time.  If you add

3     10 or 15 minutes of editorial time because

4     you got a lot of sponsored material there,

5     would you typically add a network

6     identification slot?

7          A.     No.

8          Q.     So there would be two?

9          A.     Correct.

10:42     10          Q.     And has that been the case for

11    the last three, four years?

12         A.     I believe so.

13         Q.     But the duration of those

14    network identifications changed at some

15    point?

16         A.     Correct.

17         Q.     The 230 seconds of personalized

18    messages from the practices, is that the same

19    regardless of what the practice gives you?

10:43     20              MR. BERNAY: I believe she said

21    it was 270 seconds.

22         A.     Each personalized message is

23    15 seconds in length and there are nine sets

24    of them, they appear in pairs of 30 seconds.

Electronically signed by Ann M. Belmont (201-234-827-3922)                    789ed84f-7a0e-4fca-8040-b133f98c31d9

Katie Merz, 3/18/2014

49

1    So there's each -- they appear back to back,

2    so if my math is correct, it should be 30

3    times nine, which is 270.

4            Q.    270 seconds?

5            A.    Em-hm.

6            Q.    And that's always the same?

7            A.    Yes. If the practice is just

8    utilizing our off-the-shelf practice

9    personalized message option, they have those

10   18 opportunities to play a personalized

11   message of 15-second length.  However, a few

12   practices are interested in playing their

13   videos, their own practice videos, and we

14   have a mechanism in place for them to do

15   that.

16           Q.    That varies by practice?

17           A.    What varies by practice?

18           Q.    The videos that the practices

19   play.

20           A.    Yes. And they -- that -- the

21   business model for that is, if they want to

22   play their videos, they have two

23   opportunities in the loop to play those

24   videos. And they can be no longer than three

10:44 (at line 10)

10:44 (at line 20)

Electronically signed by Ann M. Belmont (201-234-827-3922)                    789ed84f-7a0e-4fca-8040-b133f98c31d9

Katie Merz, 3/18/2014

50

1    minutes in length. Those are definitely the

2    exception, but those segments count toward

3    editorial time.

4         Q.   Would you look at what's been

5    marked as Defendant's Exhibit 13, the first

6    page, which in the lower right there's an HAN

7    0002707, we call those Bates numbers, I might

8    refer to them here today.  They're added

9    usually by counsel when they're providing

10   documents to the other side so that we have a

11   uniform system of page numbering. So if you

12   could look at the page 2707. Do you see the

13   column?  It's the second column from the

14   left, it says Seq. Order?

15        A.   Yes.

16        Q.   Are you familiar with what that

17   means?

18        A.   Yes.

19        Q.   What does it mean?

20        A.   It's the abbreviation, means

21   sequence order. That column is used to denote

22   a functionality in our loop where we can

23   stack content. Meaning that, say there were

24   three pieces of editorial playing in a row,

10:45 (line 10)

10:46 (line 20)

Electronically signed by Ann M. Belmont (201-234-827-3922)                    789ed84f-7a0e-4fca-8040-b133f98c31d9

Katie Merz, 3/18/2014

51

1    A, B, and C.  A would be the file, the

2    technology displays the file verbatim.  B

3    would be a sequence container where we have a

4    variety of editorials stacked in there.  And

5    C would be a normal play. Every time the loop

6    would cycle through, when it would get to B,

7    it would play the first time through, the

8    first editorial piece of that slot, the

9    second time through, the second editorial

10:47  10    piece in that slot, the third time through,

11    in this case, back to the first, because

12    there's only two stacked in there.

13           Q.    What does the 0 mean?

14           A.    That's just -- 0 is the name of

15    the slot file that pulls the -- that is the

16    sequence container itself, so it's a shell

17    with the code inside of it to say play one,

18    play two.

19           Q.    If I look at the row that has

10:47  20    the 0 in it, it has a slot that's called

21    arth-other II. It has an ID, 2038, that's

22    different from the ID in the row that has a 1

23    and a 2 beneath it. It has a file name that's

24    different. And then the SWF time is 55. Is

Electronically signed by Ann M. Belmont (201-234-827-3922)                    789ed84f-7a0e-4fca-8040-b133f98c31d9

Katie Merz, 3/18/2014

52

1    that a file or not?

2         A.    Are you referring to the time 55

3    for the 2038?

4         Q.    Yeah.

5         A.    Okay. In trying to calculate the

6    time, the editorial time, the slot is where

7    we would put the time we're counting for the

8    master editorial count, so usually it's an

9    average of whatever files are in that

10:48    10    container.

11         Q.    And how do I tell what files are

12    in the slot?

13         A.    So they're all -- if you look in

14    the slot, all things that are marked

15    arth-other II are part of that sequence

16    container, and if you look over to where --

17    this is the key thing.  On the far right

18    where there's an exclusion, you see how the

19    arth-other II slot is not filled in?

10:49    20         Q.    Em-hm.

21         A.    Whereas, the files underneath it

22    are?  That's the way we do that, is so that

23    it's an exclusion, meaning we're only

24    counting that time once, I guess is what I

Electronically signed by Ann M. Belmont (201-234-827-3922)                    789ed84f-7a0e-4fca-8040-b133f98c31d9

Katie Merz, 3/18/2014

53

1    was trying to say. So those files are

2    excluded, meaning they are part of that play

3    code that will say when it's playing and when

4    it's directed to. So this document here is

5    used to help calculate editorial time, so we

6    don't want to count the 55, the 57 and the

7    55, we don't want to overcount that, so we

8    take an average usually and we just assign it

9    to the slot itself and not count the

10:50  10    individual time segments inside that slot so

11    we don't overcalculate. Does that make sense?

12          Q.    No. What are the exclusions

13    excluded from?

14          A.    The exclusions is a technical

15    term.  It's a technical term for -- that's

16    tied into the slot loader technology. So

17    meaning we push those files out, but they're

18    excluded until they're told to play.

19          Q.    I thought you said that the

10:50  20    exclusion comment had to do with how the

21    editorial time was calculated?

22          A.    It does too.

23          Q.    So how does it play into that,

24    and I know you already tried to say it, but I

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                                                    789ed84f-7a0e-4fca-8040-b133f98c31d9

Katie Merz, 3/18/2014

54

1    apologize, I couldn't follow it.

2           A.    I understand, okay. So give me a

3    second. I'm trying to think of the best way

4    to illustrate this for you. So, if you turn

5    to like 0002885, just randomly picked.

6           Q.    Okay.

7           A.    You can see that this document

8    in general shows editorial content which

9    starts on page 1, and then on the backside,

10:52  10    you'll see there's a summary bar, that says

11    editorial. It also includes a network section

12    which those files denote are network IDs, as

13    well as placeholders for custom messages and

14    then ads. So if you look at this document in

15    general, you can see that, for every file

16    that comes in, there's a swift time allocated

17    to it. This file maker file has logic in it

18    that helps automate that summary of the swift

19    time.  So, for example, with PCNA here, you

10:53  20    have one, two, three, four different segments

21    that are going to be cycling through in that

22    slot.  So those calculations or those files

23    have the dots filled in on exclusion, so that

24    when the automated timing of this report is

Electronically signed by Ann M. Belmont (201-234-827-3922)                    789ed84f-7a0e-4fca-8040-b133f98c31d9

Katie Merz, 3/18/2014

55

1    pulled, it won't count all those extra

2    editorial times.  It's only going to count

3    the ones that have the 0s or the exclusion

4    circles not filled in.  So for PCNA, we were

5    averaging a 55 second time for that.

6        Q.    So for any given time that a

7    loop plays, the amount of editorial time

8    could be somewhat less or somewhat more,

9    depending on which one of those four is

10   playing?

11       A.    Correct.

12       Q.    And that would be the case for

13   any files that have a sequence order number

14   and a 0 in that sequence order column?

15       A.    Correct.

16       Q.    When there's a blank SWF time,

17   what does that mean?

18       A.    Well, PCN is our trickiest loop

19   because there's more than one -- at this

20   time, there was more than one PCN loop

21   pushed. So what we would do is build, for

22   example -- again, it all comes down to how

23   many sponsors are in and where they're going.

24   So, say a sponsor only bought a subset of

10:54 (line 10)

10:55 (line 20)

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                    789ed84f-7a0e-4fca-8040-b133f98c31d9

Katie Merz, 3/18/2014

56

1    PCN, they wouldn't buy the whole universe,

2    they wouldn't need to push that file, or we

3    wouldn't want that file to play everywhere

4    because they didn't buy those other locations

5    to play. So we would have to, though, account

6    for that ad time regardless to build our

7    editorial lineup, because at the time we

8    didn't have a way to differentiate that, we

9    could only build one editorial loop to rule

10:56    10    them all, so to speak, so we would have to

11    build it off the most -- the largest sponsor

12    amount number.

13           Q.    So what does it mean when

14    there's a blank in a SWF time?

15           A.    So for this -- if there's a

16    blank here, which I think you mean this 0 for

17    the PCNB, it means that -- never will a slot

18    PCNA and PCNB, would ever play in the same

19    loop. They're either going to play A or B, so

10:56    20    from an accounting perspective, we don't want

21    to count the B.

22           Q.    You would only count the A?

23           A.    Right.

24           Q.    And if B has a -- some of the

Electronically signed by Ann M. Belmont (201-234-827-3922)                              789ed84f-7a0e-4fca-8040-b133f98c31d9

Katie Merz, 3/18/2014

57

1    slots in B have a different length, they

2    would just be accounted for, nevertheless, by

3    counting what you're putting in slot A?

4          A.    Correct.

5          Q.    Now, that's a very -- thank you

6    for telling me that.  I was actually asking

7    what about when there's a blank SWF time, not

8    a 0.

9                MR. BERNAY: Do you have an

10:57   10   example, Tom?

11         Q.    Do you know the answer to my

12   question?

13         A.    I don't offhand.

14         Q.    Would you look at the page

15   that's marked HAN002723.  Do you see that

16   some of those SWF times are blank?

17         A.    Yes.

18         Q.    What is the reason for that?

19         A.    Okay. The reason for the 1331

10:58   20   through 1335 files, why there's only a time

21   for the first one is because, again, it has

22   to do with this sequence exclusion

23   technology.  That 1331 file is a designation

24   of our custom messages. And during that time

Electronically signed by Ann M. Belmont (201-234-827-3922)                    789ed84f-7a0e-4fca-8040-b133f98c31d9

Katie Merz, 3/18/2014

58

1    we pulled in different video backgrounds for

2    each time it played, so those variances of

3    the background one, background two, that's

4    what BG stands for, background four,

5    background five, that's really just a

6    denotion of the file that we're pushing, that

7    gets called in a different video background

8    each time. So it's not counted as extra time

9    each time because the one master, so to

10:59   10    speak, of the BG1 is the time.

11           Q.    Would you look at the next page,

12    HAN002724.

13           A.    Okay.

14           Q.    Here there are four ads that

15    have a blank SWF time. It doesn't appear to

16    me that the explanation you just gave for the

17    custom applies to this. How do you explain

18    what these blank SWF times mean?

19           A.    The explanation I just gave you

11:00   20    I do not believe applies to this. I would

21    probably say that this is a result of someone

22    on our team not backfilling this data entry

23    here. We get the sponsor counts in a separate

24    Excel file, that's where we get the read out

Electronically signed by Ann M. Belmont (201-234-827-3922)                    789ed84f-7a0e-4fca-8040-b133f98c31d9

Katie Merz, 3/18/2014

59

1    of how many advertisers here, and then we use

2    that file to pull it into this document.  And

3    I would say that she just did not go back in

4    and fill those in. That's my best explanation

5    for that.

6         Q.    Would that be the same

7    explanation for HAN002726 where we see

8    MedCenter and Quest with the blank SWF times?

9              MR. BERNAY: Right there.

11:02  10         A.    I don't -- I don't know.

11         Q.    Do you have another explanation?

12    It seems like the same phenomenon.

13         A.    Probably.

14         Q.    Would you flip to HAN002919. I

15    suggest you treat it like a book.

16         A.    Okay.

17         Q.    And then it'll be good.

18         A.    So don't unclip?

19         Q.    Well, you can unclip it, but

11:03  20    flip it right to left like you're flipping a

21    book's pages, then they'll stay in order.

22         A.    Okay.  2919?

23         Q.    Yes.

24         A.    Okay.

Electronically signed by Ann M. Belmont (201-234-827-3922)                    789ed84f-7a0e-4fca-8040-b133f98c31d9

Katie Merz, 3/18/2014

60

1      Q.    Is each loop lineup particular

2    to a network and a month?

3          A.    Correct.

4          Q.    And so is the loop lineup that

5    starts at 2919 for PCN, that's primary care

6    network in November 2012?

7          A.    Right.

8          Q.    And I can make that conclusion

9    by reading the title and the date in the

11:03  10    little strip that's just underneath where it

11    says loop lineup?

12          A.    Right.

13          Q.    Is that going to be true for all

14    examples of loop lineup documents?  That's

15    where the network and the date will appear?

16          A.    Right.

17          Q.    And the files under slot and

18    file name are kind of the movie files or

19    other files that are playing when the content

11:04  20    is displaying in the waiting rooms?

21          A.    Yes.

22          Q.    So if we go down, like, file

23    name and title, we can kind of see that --

24    you used the word thumbnails before, but just

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                    789ed84f-7a0e-4fca-8040-b133f98c31d9

Katie Merz, 3/18/2014

61

1    basically get an idea of what these slots

2    have to do with, for instance, pharmacy pick

3    up, shake your salt habit, cold and flu tips.

4    Is that basically a title for what file is

5    going to play?

6         A.    Correct.

7         Q.    So for cold and flu tips, it

8    would kind of be like one of those public

9    service announcements that we discussed

10   before where there's little tips about how to

11   avoid cold and flu, wash your hands for 30

12   seconds, sing happy birthday while you do it,

13   that kind of thing?

14        A.    Yes.

15        Q.    If you flip to the next page,

16   marked 2920, there's one for meningitis

17   vaccine and one for immunization generally

18   that looks like they play just one place per

19   loop; is that right?

20        A.    One place per loop cycle.

21        Q.    Right. And those would be

22   related to, for instance, encouraging people

23   to get those vaccines and to be immunized?

24        A.    Correct.

11:04 (line 10)

11:05 (line 20)

Electronically signed by Ann M. Belmont (201-234-827-3922)                    789ed84f-7a0e-4fca-8040-b133f98c31d9

Katie Merz, 3/18/2014

62

1          Q.    Then if we go down, there's one

2     that says NHO: American, November is lung and

3     National Alzheimer's, are those slots related

4     to, like, lung cancer awareness month or

5     Alzheimer's awareness day, things like that?

6          A.    Correct.

7          Q.    So trying to get the word out to

8     the public about those occasions?

9          A.    Yes.

11:06  10          Q.    Then if we move down, there's

11    something that says "daily aspirin," and it

12    actually appears a few times. ID 2471 says,

13    "daily aspirin and," oh, it's over and over

14    again, I'm sorry.  It's all ID 2471, but it

15    appears four times; is that right?

16          A.    It appears four times on this

17    page.

18          Q.    But it's broken out because

19    you're pushing different things to PCNA

11:06  20    versus PCNB?

21          A.    Exactly.

22          Q.    That's some sort of daily

23    aspirin, like you can take a daily aspirin to

24    control your blood pressure?

Electronically signed by Ann M. Belmont (201-234-827-3922)                    789ed84f-7a0e-4fca-8040-b133f98c31d9

Katie Merz, 3/18/2014

63

         1          A.    Right.  It's a message about
         2    whether or not you should ask your doctor
         3    about whether daily aspirin could help you.
         4          Q.    And that's all under -- well, I
         5    guess, it's over the bar that says
         6    "editorial," but, basically, everything that
         7    comes above the bar that says "editorial" on
         8    2921 is considered editorial content?
         9          A.    Right.
11:07   10          Q.    Then between that bar that says
        11    "editorial" and the bar that says "other"
        12    that's custom network and network
        13    identification?
        14          A.    Right.
        15          Q.    That's considered editorial time
        16    in your ratios?
        17          A.    Yes.
        18          Q.    And then below that where it
        19    says "ads" and then there's a bar that says
11:07   20    "ads" you call it a summary bar?
        21          A.    Right.
        22          Q.    That's where it's sponsor
        23    content, correct?
        24          A.    Yes.

Electronically signed by Ann M. Belmont (201-234-827-3922)                    789ed84f-7a0e-4fca-8040-b133f98c31d9

Katie Merz, 3/18/2014

64

1        Q.    And in the calculating, what you

2    say is the 30:70 ad to content ratio, what

3    you consider ads are what's in this ad

4    section, the things that actually companies

5    pay for, correct?

6        A.    Right.

7        Q.    You're not including in the ad

8    time when you do that 70:30 calculation

9    public service announcements about aspirin or

11:08   10    flu vaccines or meningitis vaccines?

11        A.    No.

12        Q.    No, you're not counting them or

13    my question was wrong?

14        A.    No, you're not counting them.

15    We're not counting them.

16        Q.    Those would nevertheless be part

17    of the 70 percent that you're shooting for?

18        A.    Right.

19        Q.    I'm going to hand you --

11:09   20        MR. BERNAY: We've been going

21    about an hour. Do you want to take a break?

22        MR. HANKINSON: Sure.

23        (Break taken.)

24        Q.    I saw a piece with Danica

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                    789ed84f-7a0e-4fca-8040-b133f98c31d9

Katie Merz, 3/18/2014

65

1    Patrick in it when I was viewing content, it

2    had to do with mammograms. Does that ring any

3    bells?

4           A.    With who?

5           Q.    With Danica Patrick, the race

6    car driver.

7           A.    No.

8           Q.    I'm just curious. Very quickly,

9    I'm handing you a document that we're going

11:15   10    to mark as Exhibit 14.  Is this one of those

11    ad ratio worksheets that you mentioned

12    earlier?

13      (Exhibit 14 identified.)

14           A.    Correct.

15           Q.    Do they all look essentially

16    like this?

17           A.    In essence, yes.

18           Q.    And the input where you get the

19    seconds comes from the loop lineup documents

11:15   20    that we were just looking at?

21           A.    They come from two sources. The

22    ad seconds come from a Excel spreadsheet

23    provided to us by the program management

24    team. The editorial seconds are calculated

Electronically signed by Ann M. Belmont (201-234-827-3922)                    789ed84f-7a0e-4fca-8040-b133f98c31d9

Katie Merz, 3/18/2014

66

1    from the loop lineups that we just reviewed.

2         Q.   So from just looking at the loop

3    lineups, and knowing that it looks like there

4    wasn't a complete meshing back with the Excel

5    spreadsheets from the program management

6    team, I couldn't look at those loop lineups

7    and see all the backup for the seconds that

8    are on this ad ratio worksheet, right?

9              MR. BERNAY: Object to the form.

11:16  10    You can answer.

11         A.   Not in total, you would need

12    both documents.

13         Q.   What's underneath this redacted

14    part?  Do you know what redacted means?

15         A.   No.

16         Q.   Redacted is something that

17    attorneys put on -- a piece of paper when

18    they're covering over something that's in it.

19    Are you familiar with ad ratio worksheets?

11:16  20         A.   Yes.

21         Q.   Can you describe for me what's

22    underneath the redaction of the section of

23    the document?

24              A.   Are you saying there was text or

Electronically signed by Ann M. Belmont (201-234-827-3922)                    789ed84f-7a0e-4fca-8040-b133f98c31d9

Katie Merz, 3/18/2014

67

1    something underneath here?

2          Q.    Yes.

3          A.    I do not recall.

4          Q.    Is there any information --

5          A.    Oh --

6          Q.    -- that's usually in an ad

7    ratio?

8          A.    I answered too early. Yes, I

9    know what was under there. It just took me a

11:17  10    minute. This document is used to calculate

11    the -- and test the 30:70 ad ratio across all

12    of our networks, and your team had only asked

13    for information on ACNP and PCNB, so what is

14    under here is the same worksheet work for WHN

15    and SCN.

16          Q.    Setting aside what my team asked

17    for, what's underneath there is for the other

18    two networks?

19          A.    Correct.

11:17  20          Q.    Anything else that would be

21    underneath there?

22          A.    Not that I recall.

23          Q.    I'm going to hand you what we

24    are going to mark as Defendant's Exhibit 15.

Electronically signed by Ann M. Belmont (201-234-827-3922)                    789ed84f-7a0e-4fca-8040-b133f98c31d9

Katie Merz, 3/18/2014

68

```
 1    Is this an e-mail from Amy Finley to Liz
 2    Phillips and you dated June 18, 2012?
 3       (Exhibit 15 identified.)
 4          A.    Yes.
 5          Q.    Does it forward an e-mail from
 6    Deborah K. Adams to Lori Smith?
 7          A.    Yes.
 8          Q.    Who is Deborah Adams?
 9          A.    I don't recall.
10          Q.    Who is Lori Smith?
11          A.    I believe she's a member of the
12    relationship management team.
13          Q.    And you mentioned previously
14    that Amy Finley heads up that team?
15          A.    Correct.
16          Q.    Is this an example of the
17    relationship management team passing along
18    information of -- excuse me, let me start
19    again.
20             Is Defendant's Exhibit 15 an
21    example of the relationship management team
22    passing along feedback about PatientPoint
23    content to your team?
24          A.    Yes.
```

11:19 (at line 10)

11:19 (at line 20)

Electronically signed by Ann M. Belmont (201-234-827-3922)          789ed84f-7a0e-4fca-8040-b133f98c31d9

Katie Merz, 3/18/2014

69

1        Q.    Can we conclude from this that
2    Deborah Adams is a member of the relationship
3    management team?
4        A.    I would assume.
5        Q.    You can't think of anyone else
6    who would be passing along this type of
7    information; is that correct?
8        A.    Correct.
9        Q.    Does --
10       A.    Oh --
11       Q.    -- this paragraph here have --
12   look like a CMS entry that's being put into
13   an e-mail?
14       A.    I would just want to clarify
15   that in response to my last question. Because
16   I don't recall who this person is perhaps
17   it's a provider sales team member. I don't
18   know.
19       Q.    Are you more closely familiar
20   with the relationship management team?
21       A.    Correct.
22       Q.    Both the relationship management
23   team and the provider sales team have
24   conversations with doctors offices?

11:21 (line 10)

11:21 (line 20)

Electronically signed by Ann M. Belmont (201-234-827-3922)                    789ed84f-7a0e-4fca-8040-b133f98c31d9

Katie Merz, 3/18/2014

70

1          A.     Correct.

2          Q.     Please look at the sentence or

3     the words in this paragraph -- let me start

4     again. Are entries into CMS often phrased as

5     summaries of calls with providers?

6          A.     I believe so.

7          Q.     Does this appear to be a summary

8     of a call with a provider?

9          A.     Yes.

11:22  10          Q.     And it begins the comment,

11     "Called and spoke to Tara," is that right?

12          A.     That's what it says here.

13          Q.     And is this the type of

14     description in CMS or passed along by e-mail

15     that your team would use to understand the

16     feedback about content that's coming from --

17     usually, the relationship management team,

18     sometimes the provider sales team?

19          A.     It is an example.

11:23  20          Q.     And that sort of feedback would

21     be used by your team in designing

22     PatientPoint's content for waiting room

23     systems?

24          A.     Not necessarily. We receive, as

Electronically signed by Ann M. Belmont (201-234-827-3922)                    789ed84f-7a0e-4fca-8040-b133f98c31d9

Katie Merz, 3/18/2014

71

1    a matter of course of business, there's a

2    sort of a general feedback e-mail

3    distribution list where this kind of comment

4    from customers are just sent along, which we

5    may or may not respond to.

6          Q.    You sometimes respond?

7          A.    Sometimes, yes.

8          Q.    And you sometimes respond in the

9    way that you design content?

11:23  10          A.    It's a factor perhaps.

11          Q.    Well, it's certainly a factor.

12          A.    Right.

13          Q.    This particular comment says,

14    "Said that they liked the monitor better,

15    90-minute loop, they have cooking segments

16    and sound." Is that the portion of this

17    comment that would be relevant to your team?

18          A.    Yes.

19          Q.    And have you heard -- and this

11:24  20    is talking, actually, when they say they,

21    they're talking about RHN.  Do you know what

22    RHN means?

23          A.    I believe it stands for

24    Rheumatology Health Network.

Electronically signed by Ann M. Belmont (201-234-827-3922)                    789ed84f-7a0e-4fca-8040-b133f98c31d9

Katie Merz, 3/18/2014

72

1      Q.    Is that a competitor of
2    PatientPoint?
3      A.    Correct.
4      Q.    So this comment's being passed
5    along to you.  It's actually about the
6    content that a competitor has in a waiting
7    room system?
8      A.    Right.
9      Q.    Is that something -- why do you
11:25  10    care about what competitors have?
11      A.    Isn't that -- to me,
12    understanding your marketplace and
13    competition is just a commonsense approach to
14    being -- building a product, so.
15      Q.    It's so obvious that it's
16    important to your design that you're having
17    trouble articulating why it's important?
18      A.    Exactly.
19      Q.    The cooking segments. Have you
11:25  20    heard feedback about competitors having
21    cooking segments aside from just this e-mail?
22      A.    Probably.
23      Q.    Have you heard feedback about
24    competitors having sound aside from just in

Electronically signed by Ann M. Belmont (201-234-827-3922)  789ed84f-7a0e-4fca-8040-b133f98c31d9

Katie Merz, 3/18/2014

73

1    this e-mail?

2          A.    Yes.

3          Q.    And is this standing out to the

4    person taking the comments because

5    PatientPoint, at this point, did not have

6    cooking segments or sound?

7          A.    I don't know why its standing

8    out to them, but we have had minimal sound,

9    and I'm not sure if we were including recipe

11:26    10    segments at this time or not.

11          Q.    At some point PatientPoint began

12    including recipe segments?

13          A.    The recipe segment I'm referring

14    to doesn't actually show recipes on the

15    screen, it's a QR code to download them on

16    your mobile phone.  So it's not necessarily a

17    recipe segment, but -- I can't remember if

18    that answered your question.

19          Q.    I was just trying not to cut you

11:27    20    off. I think so, basically, those QR --

21          A.    QR codes.

22          Q.    Those QR codes to download a

23    recipe, they weren't part of the content at

24    one point, then you started putting them in

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                                    789ed84f-7a0e-4fca-8040-b133f98c31d9

Katie Merz, 3/18/2014

74

1    later on?

2          A.    Sure, yes.

3          Q.    Was that in response to feedback

4    like this?

5          A.    I don't recall exactly, but

6    probably in part.

7          Q.    Why does PatientPoint change the

8    type of content that it offers over time?

9          A.    I think any type of content

11:27  10    program evolves over time.  We want to

11    introduce new segments to keep it fresh, you

12    know, for the patients, yes, but also for the

13    provider experience, that they can see that

14    they didn't just purchase something that's up

15    and is never changing, but it's evolving over

16    time, that responds to requests that they

17    have, that is continually trying to push

18    itself to provide innovative, engaging

19    segments.

11:28  20          So, for example, with the one I

21    just mentioned, you know, the idea of using a

22    QR code was more in response to the mobile

23    insurgence of usage and we were experimenting

24    with could we up engagement with our

Electronically signed by Ann M. Belmont (201-234-827-3922)                    789ed84f-7a0e-4fca-8040-b133f98c31d9

Katie Merz, 3/18/2014

75

1    programming by offering more mobile segments.

2    So the QR code for recipes was one technique.

3    We had a quiz, a poll with where you could

4    SMS text responses, and those are the two I

5    recall right now that were couched in a

6    mobile engagement experiment on our end.

7           Q.    So increasing engagement with

8    the patient in the waiting room can help

9    please the provider because they like how the

11:29  10  patients are interacting with the network,

11   and it can also help in terms of retention by

12   the patients and potentially ROI?

13          A.    Yes.

14          Q.    And why do you care as a company

15   about whether the provider likes or dislikes

16   what's on the system?

17          A.    Well, I'll speak from my

18   perspective. I think it's -- this is

19   something I say often, we take the

11:29  20  responsibility of being invited into the

21   doctor's space very seriously.  We understand

22   that we are not the CDC, we are PatientPoint

23   and we need to make sure that they can trust

24   us to give them reliable health information

Electronically signed by Ann M. Belmont (201-234-827-3922)          789ed84f-7a0e-4fca-8040-b133f98c31d9

Katie Merz, 3/18/2014

76

1    that comes from nonbiased sources, that we

2    maintain our editorial integrity, that we're

3    not going to be pushing health messaging that

4    doesn't align with what they subscribe to or

5    believe, but, in fact, are a reinforcing tool

6    for them. They only have a limited amount of

7    time with their patients each day, so if we

8    can hit on some topics like general

9    lifestyle, messaging, compliance education,

11:30   10   that they can glean in that few minutes that

11   they are in the waiting room and perhaps

12   hopefully make a better health decision based

13   off of that, that's where -- that's our goal.

14        Q.    And screening actually goes up

15   when you have messaging related to that,

16   right?

17        A.    We hope.  And we did do research

18   on the impact of our screening segments and

19   whether they actually netted out in a higher

11:31   20   incidence of screenings before, which was

21   favorable research, but I would really defer

22   to someone in the research department to

23   speak to the numbers in particular.

24        Q.    But it's an example of where you

Electronically signed by Ann M. Belmont (201-234-827-3922)                          789ed84f-7a0e-4fca-8040-b133f98c31d9

Katie Merz, 3/18/2014

77

1    added content related to trying to get the

2    patients to do something and then you looked

3    at whether they actually did it and got a

4    favorable result?

5         A.    Yes.

6         Q.    Oh, and if the doctors don't

7    feel comfortable with your content and don't

8    like it, there's competition in this

9    industry, right?

11:31  10         A.    Yes.  But, also, we can respond.

11   Say, for example, a certain customer -- and

12   this is another reason why we have the

13   relationship management team in place. If a

14   customer does not like a certain segment, we

15   have this often with birth control segments

16   in practices that are Catholic or have the

17   certain religious affinity, we, from a

18   technological perspective, can exclude that

19   segment from playing there.

11:32  20         Q.    Is that a feature that practices

21   like?

22         A.    I don't know. It's not something

23   we broadly solicit, it's just a tool we have

24   to respond to when it happens.

Electronically signed by Ann M. Belmont (201-234-827-3922)                    789ed84f-7a0e-4fca-8040-b133f98c31d9

Katie Merz, 3/18/2014

78

1      Q.    Do you think that PatientPoint

2   content has improved over time?

3      A.    Yes.

4      Q.    Is that in response to

5   competition in the marketplace in part?

6      A.    I don't think so.

7      Q.    How many competitors are you

8   aware of?

9      A.    Several. I know our biggest are

11:33   10   Context Health and Accent Health, but I think

11   Catalina Health is a player, and maybe a few

12   other minor ones. Health Monitor.

13      Q.    Would you say it's a highly

14   competitive field?

15      A.    Yeah.

16      Q.    Do you get feedback from

17   executives about the need to compete

18   effectively with PatientPoint competitors?

19      A.    Are you speaking now or at

11:33   20   that -- just in general since my whole time

21   being there?

22      Q.    Yeah, if it's changed over time,

23   I'd like to hear how.

24      A.    Well, I'm on the executive team

Electronically signed by Ann M. Belmont (201-234-827-3922)                    789ed84f-7a0e-4fca-8040-b133f98c31d9

Katie Merz, 3/18/2014

79

1   now so I have more interface with the

2   executives now about that kind of feedback,

3   so, yes.

4        Q.    And can you describe it?

5        A.    Describe, say that again.  I'm

6   sorry, like?

7        Q.    Well, you said you get feedback

8   from the executive team about the importance

9   of content to competing with the competitors

11:34  10   in the field.  And you said you got feedback

11   about that now more that you're on that team

12   and I'd like you to describe that feedback.

13        A.    Just, you know, I would say,

14   given the changing health industry, meaning

15   meaningful use, to the importance of health

16   IT, the importance of making our content fire

17   on all cylinders, especially in light of the

18   new industry, that there's a lot more talk

19   about, you know, how can our content be used

11:35  20   as a tool for providers for meaningful use,

21   too.  That's more of the feedback that's

22   coming to me right now in our content. Can we

23   certify our content or put it into our

24   technology in a way that would help make it

Electronically signed by Ann M. Belmont (201-234-827-3922)       789ed84f-7a0e-4fca-8040-b133f98c31d9

Katie Merz, 3/18/2014

80

1    tie into meaningful use, too, which is like a

2    big issue with providers right now. I think

3    that, from a market perspective, that all

4    patient engagement companies are probably

5    faced with that same turning of the tides and

6    trying to figure out how to convert what they

7    do to be meaningful in that way.

8         Q.    And if you don't adapt in this

9    marketplace, then the subscriptions by

11:36   10   providers would go down?

11        A.    Perhaps.

12        Q.    And indeed some providers change

13   to just regular television, right?

14        A.    Some providers do opt for

15   television as a reason for leaving us.

16        Q.    And that's presumably related to

17   the content shown on television versus the

18   content that's shown on your network?

19        A.    My understanding is that those

11:36   20   providers don't value, think it's valuable to

21   educate in the waiting room, they just want

22   to entertain their patients and not stress

23   them out.

24        Q.    And they make decisions on that

Electronically signed by Ann M. Belmont (201-234-827-3922)                    789ed84f-7a0e-4fca-8040-b133f98c31d9

Katie Merz, 3/18/2014

81

1    basis about whether to keep the waiting room

2    system in the waiting room or switch to TV?

3         A.    Yes.

4         Q.    And the providers who do care

5    about engaging their patients in the waiting

6    room are going to be seeking the best way to

7    do that, right?

8         A.    I would think so, yes.

9         Q.    And so it might include looking

11:37  10  at competitors if they think the competitor's

11   doing a better job, they would go with that

12   service, right?

13        A.    Right.

14        Q.    So one factor why your content

15   would improve over time is to keep that level

16   of trust and positive feedback going with the

17   subscribers so that you can keep the

18   subscription numbers up?

19        A.    Right.

11:37  20     (Exhibit 16 identified.)

21        Q.    I'm going to show you what we're

22   marking as Defendant's Exhibit 16.  I'm going

23   to ask you to look at page HAN 00145,

24   beginning midway down.  Do you see an e-mail

Electronically signed by Ann M. Belmont (201-234-827-3922)                          789ed84f-7a0e-4fca-8040-b133f98c31d9

Katie Merz, 3/18/2014

82

1    from Jill Brewer dated September 9, 2011,

2    where you and Liz Phillips are cc'd and some

3    other people are the on to line?

4            A.    Yes.

5            Q.    The title of this forward is

6    RHN?

7            A.    Correct.

8            Q.    And that is, you said,

9    Rheumatology Health Network?

11:38  10            A.    Yes.

11            Q.    Do you understand that's the

12    defendant in this case, Context's network --

13            A.    Yes.

14            Q.    -- at the time? Jill Brewer

15    says, "As you guys know, we are battling it

16    out with RHN and Health Monitor on a daily

17    basis now," do you see that?

18            A.    Yes.

19            Q.    Were you aware of that at the

11:38  20    time?

21            A.    Probably via this e-mail.

22            Q.    Jill Brewer is forwarding an

23    e-mail from Diane Feyrer, F-E-Y-R-E-R.  Do

24    you know who that is?

Electronically signed by Ann M. Belmont (201-234-827-3922)          789ed84f-7a0e-4fca-8040-b133f98c31d9

Katie Merz, 3/18/2014

83

1          A.    I do not.

2          Q.    Do you know any of the people on

3    the to line?

4          A.    I know Lisa Grippo to be, I

5    believe, a former member of the provider

6    sales team.

7          Q.    And Amy Finley, who's on the cc

8    line, is the head of the relationship

9    management team?

11:39   10          A.    Right.

11          Q.    Do you happen to recall reading

12    this e-mail?

13          A.    No, I don't recall reading it. I

14    don't recall receiving this e-mail in the

15    past.

16          Q.    If you could look at Ms.

17    Feyrer's first numbered point on page 146.

18          A.    Yes.

19          Q.    "RHN - Sound VS. HA - No sound.

11:41   20    ACN is designed to be virtually silent. No

21    distractions, TV or other program can be

22    utilized," do you see that?

23          A.    Yes.

24          Q.    That's true, right?  You said

Electronically signed by Ann M. Belmont (201-234-827-3922)                    789ed84f-7a0e-4fca-8040-b133f98c31d9

Katie Merz, 3/18/2014

84

1    that Healthy Advice's content has -- I think

2    you said essentially no sound?

3            A.    Virtually silent is the term.

4            Q.    Virtually silent.  And that's

5    actually used to differentiate Healthy

6    Advice's content from a competitor's content?

7            A.    At this time, yeah.

8            Q.    Is that changing?

9            A.    Right.  We're considering

11:41   10    offering a sound and no sound option to

11    customers.

12            Q.    To please the ones who would

13    like sound but keep customers who would

14    prefer no sound?

15            A.    Correct.

16            Q.    Presumably, if you're thinking

17    about offering that option, it's something

18    that matters to the practices?

19            A.    Right.

11:42   20            Q.    It's something that could cause

21    them to decide to go with one system or

22    another?

23            A.    Yes.

24            Q.    Do you have any way to judge how

Electronically signed by Ann M. Belmont (201-234-827-3922)                          789ed84f-7a0e-4fca-8040-b133f98c31d9

Katie Merz, 3/18/2014

85

1   important that factor is, sounds versus no

2   sound to all the other things that could go

3   into that the decision, like certified

4   content and the quality of the animation and

5   the engagement of the customers, how

6   important that sound versus nonsound is

7   versus all the other factors?

8          A.    Do I have a way to judge?

9          Q.    Yeah.

11:43  10          A.    Not that I can -- I don't know

11   of a way to weigh, from the practice's

12   perspective, which would be more important.

13          Q.    So there's no basis to decide

14   whether that's more or less important than

15   some of the other factors that I mentioned in

16   a decision about whether to keep a network

17   system in the waiting room?

18          A.    The only way to gauge would be

19   when we do lose customers, we keep track of,

11:43  20   like, reasons why they're moving to other

21   practices, so you could pull that data and

22   look at the reasons that they stated and

23   perhaps run some math to see, you know, how

24   many left for the reason of sound versus they

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                    789ed84f-7a0e-4fca-8040-b133f98c31d9

Katie Merz, 3/18/2014

86

1    thought this content was more legitimate

2    versus they thought this content was -- they

3    just wanted television for entertainment.

4           Q.    And those entries are in the

5    CMS?

6           A.    Correct.

7           Q.    Is that something that your

8    group does?

9           A.    Yes, we care very much why we

11:44  10   lose customers.

11          Q.    So you look at the CMS data to

12   make conclusions?

13          A.    I am not in CMS on a daily

14   basis.  I would say maybe annually we look at

15   it.

16          Q.    Who looks at it when you do?

17          A.    Well, Amy Finley owns that data

18   and the relationship.  So, like I mentioned,

19   we have a steady stream of e-mails which we

11:44  20   are copied on as a way to get a read of what

21   people like and don't like. We also get

22   e-mails about what people like. And then, you

23   know, there's reports that can be pulled from

24   CMS on data about what, you know, why people

Electronically signed by Ann M. Belmont (201-234-827-3922)          789ed84f-7a0e-4fca-8040-b133f98c31d9

Katie Merz, 3/18/2014

87

1    are choosing us, why people are not choosing

2    us, etc.

3          Q.    That's what your group would

4    rely on when you're taking that feedback into

5    account in order to figure out how to change

6    or keep PatientPoint programming?

7          A.    It would be -- right, one factor

8    along with, I mentioned, you know, maybe

9    focus groups with patients and/or providers,

11:45  10    general creative bills based on maybe what

11    other people are doing in other media or

12    television, mobile, that kind of thing.

13          Q.    And that's the one -- the focus

14    groups and the CMS database are the two

15    sources of ideas that actually take feedback

16    from providers and give that feedback to your

17    team in terms of generating and choosing to

18    retain types of content?

19          A.    Yes.

11:46  20          Q.    Does PatientPoint's content

21    include, like, quizzes?  I saw one about the

22    fiber and raspberries.

23          A.    Yes.

24          Q.    Is that something that generally

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                    789ed84f-7a0e-4fca-8040-b133f98c31d9

Katie Merz, 3/18/2014

88

1    there could be a quiz as part of the

2    editorial time?

3            A.    Right.

4            Q.    Like quizzes about, like, trivia

5    that's related to health probably?

6            A.    Right.

7            Q.    When did PatientPoint add the

8    ability for a provider to opt out of a

9    certain segment of content?

11:46   10        A.    I don't recall exactly.

11            Q.    Did it get added at a certain

12    time while you were with the company?

13            A.    I believe that technology was --

14    that capability was always there during my

15    entire time there.

16            Q.    But it's not something that's

17    advertised to the customers, it's just

18    something that you use in reaction when

19    somebody complains about a segment?

11:47   20        A.    Right.

21            Q.    In general, the service that you

22    offer of customization refers exclusively to

23    adding nine 30-second slots or 18 50-second

24    slots of customized provider provided

Electronically signed by Ann M. Belmont (201-234-827-3922)                    789ed84f-7a0e-4fca-8040-b133f98c31d9

Katie Merz, 3/18/2014

89

1    messages?

2           A.    Right.

3           Q.    Are you familiar at all with the

4    enrollment forms that PatientPoint uses?

5           A.    Not particularly.

6                 MR. HANKINSON: Can we take a

7    break?

8                 THE WITNESS: Sure.

9                 (Break taken.)

11:54   10          Q.    What was the other tool that you

11   mentioned besides Flash earlier for

12   animation?

13          A.    After Effects.

14          Q.    After Effects.  Who puts that

15   out?

16          A.    You mean who is the maker of it?

17          Q.    Yeah.

18          A.    I don't know.

19          Q.    It's a suite of animation tools?

11:54   20          A.    Yes, it's a software.

21          Q.    Looking at the loops that were

22   provided, what I see are like a -- it's kind

23   of like -- it's text that could fit on half a

24   page, but it kind of folds out over time.

Electronically signed by Ann M. Belmont (201-234-827-3922)                    789ed84f-7a0e-4fca-8040-b133f98c31d9

Katie Merz, 3/18/2014

90

1          A.     Em-hm.

2          Q.     Is that what you mean by

3     building the narrative?

4          A.     Yes.

5          Q.     So it might be something like

6     there's five ways to lower your blood

7     pressure, but it takes, like, a little bit,

8     there's five ways up in the upper left, and

9     then there might be, like, some orange shapes

11:55  10   moving in the background, that kind of look

11    like people, and then in from the right

12    flies, like, to lower your blood pressure,

13    and then it might change background and a

14    word appears that's, like, listen to our

15    favorite song, it shows a picture of like a

16    record player.

17         A.     Em-hm.

18         Q.     You're with me so far?

19         A.     Yes.

11:55  20   Q.     Is that, which tool, Flash or

21    Back Up Effects or both are providing those

22    kinds of features?

23              MR. BERNAY: I'll object to the

24    form, but you can answer.

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                    789ed84f-7a0e-4fca-8040-b133f98c31d9

Katie Merz, 3/18/2014

91

1              MR. HANKINSON: What's wrong with

2    that question?

3              MR. BERNAY: It's the greatest

4    question.

5         A.    I believe either tool could do

6    that.

7         Q.    It's Adobe, Adobe Flash?

8         A.    Yes.

9         Q.    Anyway, it's Flash?

11:56  10         A.    Right.

11         Q.    That could do it or this other

12    tool, Back Up Effects?

13         A.    After Effects.

14         Q.    After Effects could do that as

15    well?

16         A.    Em-hm.

17         Q.    You start with a script?

18         A.    Yes.

19         Q.    And is the script usually less

11:56  20    than a page?

21         A.    Yes.

22         Q.    And then to build the narrative

23    you kind of divvy up the script, right?

24         A.    Right.

Electronically signed by Ann M. Belmont (201-234-827-3922)                    789ed84f-7a0e-4fca-8040-b133f98c31d9

Katie Merz, 3/18/2014

92

1      Q.    You kind of choose words that
2    are going to appear first, words that will be
3    added with the same background, then at some
4    point you might change the background?
5      A.    Yes. Go ahead.
6      Q.    So over the course of the
7    segment that might be 30 seconds to two
8    minutes long, all the words in the script
9    will get put on the screen, but it's just
11:57 10    some at a time and it kind of builds; is that
11    fair to say?
12      A.    Yes.
13      Q.    The animation consists sometimes
14    of the background shapes moving around,
15    right?
16      A.    Yes.
17      Q.    And then other times it might
18    be -- I'm trying to think how to describe it.
19    It's not quite a cartoon, it's not like there
11:57 20    are characters that are walking around and
21    saying things in speech bubbles, but
22    sometimes there's human forms or putting
23    their -- like hand under their chin in the
24    background.  Do you know what I'm talking

Electronically signed by Ann M. Belmont (201-234-827-3922)                    789ed84f-7a0e-4fca-8040-b133f98c31d9

Katie Merz, 3/18/2014

93

1    about?

2            A.    I am not sure. I mean.

3            Q.    Do you have a word that you use

4    for the kind of animation that you do?

5            A.    The kind of animation?

6    Animation.

7            Q.    Fair enough.  So shapes moving

8    around?

9            A.    No. I would say after a script

11:58  10    is written and it's passed off to design, the

11    designer can pull in photography, stock

12    photography, stock video, can do information

13    graphics, can -- may just play with text and

14    words, there's a variety of ways to, for lack

15    of a better word, illustrate visually that

16    script concept.

17            Q.    Em-hm.

18            A.    So usually the editor and writer

19    try to pick a design approach that's

11:59  20    appropriate for the substance of the segment.

21            Q.    Okay. And are those all the

22    sources from which that designer can pull

23    from the animation part?

24            A.    You mean sources for visuals?

Electronically signed by Ann M. Belmont (201-234-827-3922)                    789ed84f-7a0e-4fca-8040-b133f98c31d9

Katie Merz, 3/18/2014

94

1        Q.      Yes.

2        A.      I believe so.

3        Q.      Stock photos and original design

4    designs there that are kind of stock designs,

5    what else?

6        A.      Well, we rely on stock

7    photography houses for images, stock video

8    houses for video clips.  We might borrow

9    illustrative or borrow -- use illustrative

11:59  10  icons from stock houses as well. Or our

11    designers inhouse may, in some cases, they

12    have shot their own homegrown video or

13    illustrate them custom themselves.

14        Q.      Okay. Now, when I do a

15    presentation, I can pull a photo.  I've done

16    this, I shouldn't admit this as a former IT

17    litigator, but I've gone to Google Images and

18    I've copied a photograph that appears there

19    and I've put it on a PowerPoint slide.

12:00  20  That's something a PowerPoint could do,

21    right?

22        A.      Yes. I believe PowerPoint can

23    insert photography, yes.

24        Q.      Now, it's easier to manage with

Electronically signed by Ann M. Belmont (201-234-827-3922)                    789ed84f-7a0e-4fca-8040-b133f98c31d9

Katie Merz, 3/18/2014

95

1   these tools?

2       A.   Easier to manage what?  I'm --

3       Q.   With Flash and with After

4   Effects, you're managing a whole kind of

5   narrative build. You use something like that

6   because it's -- you can manage it along with

7   all these other elements that we're going to

8   go through?

9       MR. BERNAY: Object to the form.

12:01  10  You can answer.

11       A.   I'm sorry, I'm just confused by

12   the term "manage it."

13       Q.   Okay.

14       A.   So can you rephrase perhaps?

15       Q.   Maybe I'll go through them.  So

16   then video, you can insert a video into a

17   PowerPoint slide as well and then play it

18   during the presentation, right?

19       A.   Yes.

12:01  20       Q.   And then you can display words

21   on the same slide as a photo or a video,

22   right?

23       A.   In PowerPoint?

24       Q.   Yeah, in PowerPoint.

Electronically signed by Ann M. Belmont (201-234-827-3922)       789ed84f-7a0e-4fca-8040-b133f98c31d9

Katie Merz, 3/18/2014

96

1          A.      Yes.

2          Q.      The same is true for icons,

3    which in a sense, are just similar to photo

4    files, you can put icons on a PowerPoint

5    slide, right?

6          A.      Correct.

7          Q.      And PowerPoint actually,

8    amazingly to me, has animation features where

9    icons can move around on the screen, right?

12:01  10          A.      Yes.

11          Q.      And you can also in PowerPoint

12    make the words that are on the screen fly in

13    or fly off or fade in or fade out, right?

14          A.      In PowerPoint?

15          Q.      Right.

16          A.      Yes.

17          Q.      And if I make an original design

18    using some other program, maybe I draw it, as

19    long as I put it in a format that PowerPoint

12:02  20    can import, I can put that on a slide in

21    PowerPoint, correct?

22          A.      I would assume.

23          Q.      And if I shoot homemade video,

24    again, as long as I have it in a format that

Electronically signed by Ann M. Belmont (201-234-827-3922)                    789ed84f-7a0e-4fca-8040-b133f98c31d9

Katie Merz, 3/18/2014

97

1   PowerPoint can import, I can put that in a

2   PowerPoint presentation?

3        A.    Right.

4        Q.    So when I'm talking about

5   management, I'm just saying it looks like

6   what Flash and After Effects do is better

7   manage all of those feature so that you can

8   do it a little better in terms of making your

9   content?

12:03  10        A.    To me, they are totally

11   different tools for usage, so it's hard for

12   me to respond I guess. I would think of it in

13   terms of what we do is more of, say, for

14   example, you're watching TV and there's an ad

15   for a truck that relies on graphic animation,

16   and there's not a human in it, perhaps, on

17   this commercial, but they're using, you know,

18   key words that pounded with, you know, images

19   that come in and interact with the text, and

12:03  20   I'm thinking of what we do is more akin to

21   that, than in terms of as a tool for

22   communicating to people in a digital signage

23   manner versus PowerPoint.

24        Q.    It's different software?

Electronically signed by Ann M. Belmont (201-234-827-3922)       789ed84f-7a0e-4fca-8040-b133f98c31d9

Katie Merz, 3/18/2014

98

1          A.    It is different software.

2          Q.    The features that I mentioned

3    can be accomplished in PowerPoint, right?

4          A.    Yeah.

5          Q.    Aside from managing it or, you

6    know, designing it from the ground up in a

7    way that is customary to production of

8    advertisements, is there a difference in kind

9    that I'm missing between Flash and After

12:04  10   Effects and PowerPoint?

11          A.    Can you say that again?

12          Q.    Well, if the features are

13   available in PowerPoint, all I'm hearing is

14   that After Effects and Flash are kind of

15   looked at differently, they have a different

16   way of building it from the ground up.  And

17   I'm asking you if there's a difference in

18   kind, or if it's just a difference in speed

19   and ease?

12:05  20          A.    Difference in kind. That's

21   what's confusing me.  I don't know what you

22   mean by difference in kind.

23          Q.    You're not aware of a difference

24   in kind between PowerPoint and Flash and

Electronically signed by Ann M. Belmont (201-234-827-3922)                    789ed84f-7a0e-4fca-8040-b133f98c31d9

Katie Merz, 3/18/2014

99

1    After Effects?

2              MR. BERNAY: Object to the form.

3    You can answer.

4         A.    The programs that we work in,

5    After Effects and Flash, have a capability of

6    a timeline and layers, so there's a

7    substantive difference between the software

8    mechanism of those programs versus

9    PowerPoint.

12:05  10         Q.    If I took a PowerPoint

11    presentation and I added enough slides and I

12    made it into a flip book, it would be

13    analogous to what you're doing, right?

14         A.    No, because it's missing the

15    layers and timing features. Layers means

16    that -- PowerPoint does not have the

17    capability of putting things into a

18    three-dimensional space unless you were to

19    insert a three-dimensional video inside of

12:06  20    it, correct? So After Effects allows you to

21    put layers, on one layer you could have the

22    video be playing while the text is on top of

23    it.  While the color background -- it just

24    allows for the creation of a

Electronically signed by Ann M. Belmont (201-234-827-3922)                          789ed84f-7a0e-4fca-8040-b133f98c31d9

Katie Merz, 3/18/2014

100

1    three-dimensional space, so to speak.

2           Q.    The title would go up above the

3    video on a PowerPoint slide?

4           A.    It's more one-dimensional in my

5    mind.

6                 MR. HANKINSON: I think that's

7    all I have.

8                 MR. BERNAY: No questions for me.

9    We'll reserve signature.

10

11

12

13

14

15                              _____

                                KATIE MERZ

16

17

18

19                       *  *  *

20          (DEPOSITION CONCLUDED AT 12:06 p.m.)

21                       *  *  *

22

23

24

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                           789ed84f-7a0e-4fca-8040-b133f98c31d9

Katie Merz, 3/18/2014

101

1                    C E R T I F I C A T E
2

    STATE   OF   OHIO
3             :   SS
    COUNTY OF CLERMONT

4

5            I, ANN M. BELMONT, RPR, the
    undersigned, a duly qualified notary public
6    within and for the State of Ohio, do hereby
    certify that KATIE MERZ was by me first duly
7    sworn to depose the truth and nothing but the
    truth; foregoing is the deposition given at
8    said time and place by said witness;
    deposition was taken pursuant to stipulations
9    hereinbefore set forth; deposition was taken
    by me in stenotype and transcribed by me by
10    means of computer; deposition was provided to
    witness for examination and signature outside
11    the presence of the Notary Public. I am
    neither a relative of any of the parties or
12    any of their counsel; I am not, nor is the
    court reporting firm with which I am
13    affiliated, under a contract as defined in
    Civil Rule 28(D) and have no financial
14    interest in the result of this action.
15            IN WITNESS WHEREOF, I have hereunto set
    my hand and official seal of office at
16    Cincinnati, Ohio this 2nd day of April, 2014.
17
18            _____
19    My commission expires:  ANN M. BELMONT, RPR
    December 4, 2015  Notary Public - State of Ohio
20
21
22
23
24

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990