Joyce Lawrence, 3/19/2014

1

```
 1              UNITED STATES DISTRICT COURT
 2               SOUTHERN DISTRICT OF OHIO
 3                   WESTERN DIVISION
 4
 5     HEALTHY ADVICE              :
       NETWORKS, LLC,             :
 6                                 :
          Plaintiffs,             :
 7                                 :
        vs.                       : CASE NO. 1:12cv00610
 8                                 :
       CONTEXTMEDIA, INC.,        :
 9                                 :
          Defendants.             :
10
11        Deposition of JOYCE LAWRENCE, a witness
12     herein, taken by the defendants as upon
13     cross-examination, pursuant to the Federal
14     Rules of Civil Procedure and pursuant to
15     Notice of counsel as to the time and place
16     and stipulations hereinafter set forth, at
17     the offices of Thomas Hankinson, Esq.,
18     Keating Muething & Klekamp, One East Fourth
19     Street, Suite 1400, Cincinnati, Ohio, at 1:35
20     p.m., Wednesday, March 19, 2014, before
21     Valerie Jones Conn, a Registered Professional
22     Reporter, Certified Realtime Reporter, and
23     Notary Public within and for the State of
24     Ohio.
```

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Joyce Lawrence, 3/19/2014

2

```
 1    APPEARANCES

 2

 3     FOR THE PLAINTIFFS:   Aaron Bernay, Esq.
                             Frost Brown Todd
 4                           3300 Great American Tower
                             301 E. Fourth Street
 5                           Cincinnati, Ohio 45202
 6     FOR THE DEFENDANTS:   THOMAS HANKINSON, ESQ.
                             Keating Muething &
 7                           Klekamp
                             One East Fourth Street
 8                           Suite 1400
                             Cincinnati, Ohio 45202
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Electronically signed by Valerie Jones Conn (401-133-571-6952)          754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

3

1               S T I P U L A T I O N S

2      It is stipulated by counsel for the

3   respective parties that the deposition of

4   JOYCE LAWRENCE, a witness herein, may be

5   taken at this time by the defendants as upon

6   cross-examination and pursuant to the Federal

7   Rules of Civil Procedure and Notice of

8   counsel to take deposition, all other legal

9   formalities being waived by agreement; that

10   the deposition may be taken in stenotype by

11   the Notary Public Reporter and transcribed by

12   her out of the presence of the witness; that

13   the transcribed deposition was made available

14   to the witness for examination and signature

15   and that signature may be affixed out of the

16   presence of the Notary Public-Court Reporter.

17

18

19

20

21

22

23

24

Electronically signed by Valerie Jones Conn (401-133-571-6952)                    754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

```
                                                        4
 1                      INDEX
 2    WITNESS        DIRECT  CROSS  RE-      RE-
                                    DIRECT   CROSS
 3
      JOYCE LAWRENCE
 4    BY MR. HANKINSON:          5              168
      BY MR. BERNAY:    167
 5
      EXHIBIT IDENTIFIED                      PAGE
 6
      Exhibit 27 reason code comparison       120
 7    Exhibit 30 e-mail                        108
      Exhibit 31 competitor cancels           139
 8    Exhibit 32 log                           149
 9    OBJECTIONS                      PAGE  LINE
10    MR. BERNAY:                      42    16
      MR. BERNAY:                      48    17
11    MR. BERNAY:                      60     3
      MR. BERNAY:                      91    23
12    MR. BERNAY:                      92     5
      MR. BERNAY:                     106     7
13    MR. BERNAY:                     110    11
      MR. BERNAY:                     110    17
14    MR. BERNAY:                     121     4
      MR. BERNAY:                     157    22
15
16
17
18
19
20
21
22
23
24
```

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Valerie Jones Conn (401-133-571-6952)          754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

5

1                    JOYCE LAWRENCE,

2     a witness herein, of lawful age, having been

3     first duly sworn as hereinafter certified,

4     was examined and testified as follows:

5                    CROSS-EXAMINATION

6     BY MR. HANKINSON:

7              Q.    Good afternoon.

8              A.    Hi.

9              Q.    Ms. Lawrence?

10             A.    Yes.

11             Q.    I'm Tom Hankinson.  I'm a lawyer

12     for ContextMedia, which is the defendant in

13     this case.  Do you understand who the

14     plaintiff is in this case?

15             A.    Yes.

16             Q.    And is that your employer,

17     PatientPoint?

18             A.    Yes.

19             Q.    And PatientPoint was formerly

20     known as Healthy Advice Networks?

21             A.    Yes.

22             Q.    Have you ever been deposed

23     before?

24             A.    No.  First time.

01:35 (at line 10)

01:35 (at line 20)

Electronically signed by Valerie Jones Conn (401-133-571-6952)                    754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

6

        1         Q.    Ever given any testimony in
        2    court?
        3         A.    No.
        4         Q.    I'll just run over a few small,
        5    you can call them ground rules or guidelines.
        6    I'll be asking questions, you'll be
        7    responding.  Val is going to be taking down
        8    the questions and answers so it's helpful if
        9    we try not to talk over each other.  You've
01:36   10    done excellent at that so far.  Sometimes I
       11    stumble, pause, have long pauses in my
       12    questions as I'm thinking.  If you could work
       13    with me to make sure I'm finished with the
       14    question and I'll try to wait until you're
       15    completely finished with your answer before I
       16    ask the next question.  Another thing is that
       17    we need to give all responses out loud, so no
       18    -- we shouldn't shake, you know, head or say
       19    uh-huh because uh-huh can be ambiguous so we
01:36   20    try to say yes or no.  And I'll try to -- I
       21    tend to gesticulate like this.  If there's
       22    ever anything that you think I'm moving my
       23    hands around and it's part of the question
       24    that's not going to get down, remind me to

Electronically signed by Valerie Jones Conn (401-133-571-6952)                    754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

7

1   make sure that I'm saying everything out loud

2   and I'll try to remind you to answer out

3   loud, as well.

4          A.    Okay.

5          Q.    And I'll ask you to speak up a

6   little bit.  In these afternoon sessions a

7   lot of times we can kind of start to whisper.

8   I do that, too; I'll try to keep my volume

9   up, so do you understand that?

01:37   10          A.    Yes.

11          Q.    If you ever need a break, go

12   ahead and ask for one --

13          A.    Okay.

14          Q.    -- and that's fine.  If you need

15   water, a bathroom break or just to take a

16   break for any reason, let us know.

17          A.    Okay.

18          Q.    You'll have to answer the

19   pending question; if I've asked a question,

01:37   20   you'll have to answer it and then we'll take

21   a break.  Okay?

22          A.    Uh-huh.

23          Q.    Sometimes Aaron may object to a

24   question that I've asked.  He'll state his

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Valerie Jones Conn (401-133-571-6952)                    754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

8

1    objection and then, unless he instructs you

2    not to answer, you should go ahead and

3    answer.  If he wants you to not answer the

4    question he'll tell you I instruct you not to

5    answer.  Do you understand that?

6             A.    Uh-huh.  Yes.  I understand

7    that.  Sorry.

8             Q.    And then if you do answer a

9    question I'm going to assume that you

10   understood it.  Is that okay?

11            A.    Yes.

12            Q.    If there's ever any part of a

13   question that you don't understand, please

14   feel free to ask me to repeat it or rephrase

15   it.  Okay?

16            A.    Uh-huh.

17            Q.    Anything I've missed?  If you

18   think of something later, pipe up.

19            MR. BERNAY:  We're good to go.

20   Let's go.

21            Q.    All right.  Would you please

22   state your name and spell your last name?

23            A.    Yes.  Joyce Lawrence,

24   L-A-W-R-E-N-C-E.

01:38

01:38

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Valerie Jones Conn (401-133-571-6952)                    754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

9

1          Q.     What is your current job title?

2          A.     Well, I work at PatientPoint and

3     I'm a practice relations rep.

4          Q.     A practice relations

5     representative?

6          A.     Yes.

7          Q.     And what department or group is

8     that in?

9          A.     It's -- it's kind of like

01:39    10     customer service.

11          Q.     Who is the -- do you refer to it

12     as department or team or a group?

13          A.     We're a team.

14          Q.     A team.  And who's the head of

15     that team?

16          A.     Amy Finley and Heather McGovern.

17                 MR. BERNAY:  You may want to

18     speak up a little bit for the court

19     reporter --

01:39    20          A.     Okay.

21                 MR. BERNAY:  -- if possible.

22          Q.     If you need coffee --

23                 MR. BERNAY:  Or Mountain Dew.

24          Q.     Right.  Is your group sometimes

Electronically signed by Valerie Jones Conn (401-133-571-6952)                    754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

10

1    referred to as, like, customer relationship

2    management?

3              A.    Yes.

4              Q.    Is that the official title of

5    it?

6              A.    I would say yes.

7              Q.    Are Amy Finley and Heather

8    McGovern on the same level in terms of their

9    positions or does one report to the other?

01:40   10          A.    One reports to the other.  Amy

11   first and then Heather under her.

12             Q.    Are there other people that have

13   Heather's level of position with different

14   people reporting to them and then up to Amy

15   through them, or is Heather the only person

16   at that level in the chain of command?

17                   MR. BERNAY:  I'm going to object

18   to the form.  You can answer.

19             A.    Well, that's all that I know of

01:40   20   right now.  I mean, there's just -- just Amy

21   and then when I was hired it was Amy and then

22   Heather was made the next in line, I guess a

23   supervisor under her.

24             Q.    What is Heather's title?

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Joyce Lawrence, 3/19/2014

11

1          A.    Assistant supervisor.

2          Q.    And what is Amy's title?

3          A.    She's -- gosh, I don't know the

4     exact title for her -- relations manager.  I

5     don't know what she actually goes by but she

6     is who we report to.  She is our manager.

7          Q.    She's the head of the customer

8     relation management team?

9          A.    Uh-huh.  Yes.

01:41   10          Q.    Who else is a member of your

11     team?

12          A.    We have about 11 people now.  We

13     have Carrie Shank -- my mind's blank.

14          Q.    Is Lori Smith on your team?

15          A.    Yes, Lori Smith.

16          Q.    Did you ever work with Melissa

17     Lake?

18          A.    Yes, Melissa Lake.

19          Q.    Is she an employee or a former

01:42   20     employee?

21          A.    She is a former employee.

22          Q.    About when did she leave the

23     company, if you remember?

24          A.    I believe it was maybe

Electronically signed by Valerie Jones Conn (401-133-571-6952)          754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

12

1    September, September or October of 2013.

2         Q.    Do you recall any other members

3    of your team?

4         A.    Yes.  There is Gail -- trying to

5    think of her last name, she's kind of new --

6    and then we have Lucy Johnston.  Trying to

7    think.

8         Q.    I'm really sorry to have to

9    remind you but you need to speak up --

01:43   10         A.    Okay.

11         Q.    -- okay?  I'm sorry.  I'm having

12    trouble hearing you.

13         A.    There's Lucy Johnston and then

14    there's Suzanna Schmidt.

15         Q.    What are your job

16    responsibilities?

17         A.    I take incoming calls and then I

18    also call the customer to make sure

19    everything is working okay.  If a sales rep

01:43   20    goes out and updates information on their

21    displays I call to make sure everything is

22    working, that the representative did go out

23    and make updates to make sure they did fill

24    the displays.  If there's something broken on

Electronically signed by Valerie Jones Conn (401-133-571-6952)                    754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

13

1    a display I'll make sure it does get fixed.

2    I call and make the appointment to make sure

3    that they did -- I'll make the appointment to

4    make sure that a rep goes out and replaces a

5    display or I can send a part out to fix that

6    display.  We do periodically call and, well,

7    a lot -- make updates to the monitor's

8    messages.  We want to make sure that they do

9    every -- at least every three months make a

01:44    10    change to their messages.

11         Q.    When you say the monitor's

12    message, are you referring to the custom

13    messages that are provided by doctor's office

14    or practice?

15         A.    Yes.

16         Q.    And you're saying it's a goal of

17    your group to ensure that the practices

18    update their custom messages every so often?

19         A.    Yes, to keep them fresh for the

01:45    20    patients while they wait.

21         Q.    Is that important for patients?

22         A.    Yes.  We -- I feel it is so it

23    doesn't get repetitive.  Plus, we've changed

24    it a lot lately so that you can add pictures;

Electronically signed by Valerie Jones Conn (401-133-571-6952)                    754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

14

1    it can download pictures of the physicians,

2    kind of keep it fresh.  I don't feel that

3    they -- a lot of them do not know that, that

4    they can do that now.  They could add

5    pictures that they can download from their

6    computer, put up on a portal then put a

7    message up with them, put up new doctors,

8    welcome them to the practice in case the

9    patients don't know.  It's a lot of neat

01:45    10    things that they can do that they're not

11    aware of.  Only way they can know is if we

12    tell them.

13         Q.    And if a patient sees the same

14    content up on the screen over and over again

15    it can get repetitive and boring?

16         A.    I feel it does.  I know when I

17    go to my doctor's office I see that.

18         Q.    Do you know what system your

19    doctor has?

01:46    20         A.    It is PatientPoint.

21         Q.    Have you seen PatientPoint's

22    content outside of your own doctor's office?

23         A.    Just my doctor's office

24    actually.

Electronically signed by Valerie Jones Conn (401-133-571-6952)                                      754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

15

1          Q.    So none of your training at
2     PatientPoint involved watching the content?
3          A.    Of ours?  Yes.  I mean, I've
4     watched it in our office.  We have it in our
5     break room --
6          Q.    Oh.
7          A.    -- our meeting room.
8          Q.    Which network is in your break
9     room?
01:46  10          A.    Our PatientPoint information for
11     the primary care.
12          Q.    PCN, Primary Care Network?
13          A.    Yes.
14          Q.    And how long has that been up in
15     the break room?
16          A.    It's actually our meeting, like
17     our meeting room.  Since I've started.
18          Q.    When was that?
19          A.    2010, August.
01:47  20          Q.    Has the content that's displayed
21     on that network changed since 2010?
22          A.    Yes.
23          Q.    What types of changes have been
24     made?

Electronically signed by Valerie Jones Conn (401-133-571-6952)                    754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

16

1          A.    All the updates that they've

2     done with different content, the content's

3     always changing usually every month.  Every

4     time it does change, it changes on that

5     monitor, also.

6          Q.    Why do they change it so

7     frequently?

8          A.    Because the information, medical

9     information's always changing so they keep

01:47    10     that all updated.  Whatever they're changing

11     for PCN is being changed on that monitor so

12     that we're updated.

13          Q.    Is it just a matter of changing

14     the individual segments or does the style or

15     kind of how the information is conveyed, does

16     that change over time, as well?

17          A.    It does change over time.

18          Q.    And how has that changed since

19     2010?

01:47    20          A.    The pictures have changed.

21     They're not so cartoonish.  I know some

22     people call it Power Point but it's not Power

23     Point.  It's really up to date.

24          Q.    What did you mean by cartoonish?

Electronically signed by Valerie Jones Conn (401-133-571-6952)                    754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

17

1          A.    There are a lot of -- like it
2     looks like it used to be kind of cartoon, I
3     want to say more of a cartoon figure rather
4     than a real person in the picture.
5          Q.    And are those still photos that
6     you're referring to?
7          A.    Uh-huh.
8          Q.    Yes?
9          A.    Yes.  I'm sorry.  Yes.
01:48   10          Q.    So you're saying that since 2010
11     the still photos that have been on the PCN
12     network have appeared to you as going from
13     more cartoonish to being more like pictures
14     of actual people?
15          A.    Yes.  Uh-huh.
16          Q.    And has that been more engaging,
17     in your opinion?
18          A.    I feel, yes.
19          Q.    Has anybody told you that
01:49   20     PatientPoint has worked on improving its
21     content?
22          A.    They haven't told me.  I just
23     have noticed it myself.  We always have
24     someone upstairs in creative.  We send our

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Valerie Jones Conn (401-133-571-6952)                    754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

18

```
 1    ideas up to them.  They're always open for
 2    ideas.  If -- if a practice wants to -- if
 3    they suggest something, we forward that on to
 4    creative also.  We're open for ideas so it
 5    starts with us.
 6         Q.    Do you think it's important that
 7    feedback from the practices about the content
 8    is passed along to creative and acted on?
 9         A.    Yes.
10         Q.    And why is that?
11         A.    Because we want to please the
12    customer.
13         Q.    If the customer's not pleased
14    then there's a risk that either television or
15    a competitor would come in and replace the
16    network, right?
17         A.    Sometimes.
18         Q.    Is that one of the main reasons
19    that it's important to get feedback from the
20    customer about the content?
21         A.    Yes.  I mean, there's always
22    something out there.  Lot of times TV --
23    well, we always offer that we can coexist but
24    we always want to keep the customer happy.
```

01:49 (line 10)

01:50 (line 20)

Electronically signed by Valerie Jones Conn (401-133-571-6952)                    754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

19

1          Q.    So when you say there's a lot of

2     things out there, sometimes TV, what are the

3     other things?

4          A.    There's always a competitor.

5          Q.    What competitors have you come

6     across?

7          A.    There's Accent Health and

8     ContextMedia.

9          Q.    Are there any other competitors

01:50    10     that you're familiar with?

11         A.    Those are the only two that I

12     can think of right now.  TV.

13         Q.    In your work have you ever come

14     across a company called Health Monitor?

15         A.    Yes, yes.

16         Q.    Is that another competitor?

17         A.    Yes.

18         Q.    Have you ever come across a

19     competitor called Health Media Networks?

01:51    20     A.    Yes.

21         Q.    What about --

22         A.    That's not the same as Health

23     Monitor.

24         Q.    Have you ever come across a

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Valerie Jones Conn (401-133-571-6952)                                    754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

20

1    competitor called Health Focus Media?

2         A.    I don't recall that.

3         Q.    What about Everwell TV?

4         A.    I have seen that one.

5         Q.    What about Care Media?

6         A.    I don't recall that one.

7         Q.    Is another competitor

8    Healthcasts Professional Television Network?

9         A.    I haven't ran into that one.

01:52    10         Q.    Have you come across Medlink

11    International in your work?

12         A.    I haven't seen that one.

13         Q.    What about Smart Health Network?

14         A.    I haven't ran into it but I have

15    seen those maybe on line or on the internet

16    but I haven't ran into it myself.

17         Q.    You're aware that Smart Health

18    Network is a competitor of PatientPoint?

19         A.    I think so, yeah.  I just

01:52    20    haven't used it.  I haven't had anybody come

21    in with that one yet.

22         Q.    Does your team share information

23    that you get from the calls that you receive

24    and make among the team?

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Joyce Lawrence, 3/19/2014

21

1          A.     Yes.

2          Q.     How often?

3          A.     We have a meeting once a week.

4     It doesn't always come up every week but we

5     have the chance to bring it up.

6          Q.     Bring what up?

7          A.     If there's something, like,

8     urgent or if there's a lot of competitor

9     information to be brought up, like if it

01:53   10     happens a lot we have the chance to bring it

11     up or talk about it on our weekly meetings

12     that we have every Friday.

13          Q.     Every Friday?

14          A.     Uh-huh.

15          Q.     Just to give me an example, what

16     did you talk about at your last team meeting?

17          A.     I missed half of it so --

18          Q.     Or the one before that.  I just

19     want to get a flavor.

01:53   20          A.     We usually talk about new things

21     that are coming up with our sales goals.

22     Well, not so much sales because we don't ever

23     sell, but our goals we have of trying to

24     close orders, walking people through, walking

Electronically signed by Valerie Jones Conn (401-133-571-6952)          754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

22

1    the customers through our practice, wire our

2    other monitor we have, walking them through

3    on how to update the messages.  We want to

4    get these closed because we're going to

5    have -- would have the reps going out to all

6    the different offices to update the displays

7    with new brochures, so that's coming up.

8    Well, that's already started this week so now

9    that's going to bring up more work service

01:54    10    orders because they're going to send that to

11    us.  Just these goals we have to get finished

12    before new work service.  Work is going to be

13    sent out from the reps that are going out to

14    update so we have certain goals we have to

15    get done before that starts up.

16          Q.    Part of the team meetings

17    involves feedback from the whole team about

18    trends that they're seeing and another part

19    of the team meeting has to do with management

01:54    20    communicating about goals and instructions

21    for the coming week; is that fair to say?

22          A.    Yes.

23          Q.    Are there any other parts of the

24    team meeting?

Electronically signed by Valerie Jones Conn (401-133-571-6952)                    754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

23

1          A.     Yeah.  We did have two people

2     who got promoted so that was kind of a --

3     kind of share that at the end of the meeting.

4          Q.     That's good.  Lori Smith was

5     one, right?

6          A.     She was.

7          Q.     I heard that yesterday.  That's

8     great.

9          A.     It was very nice.

01:55  10          Q.     Who else, just for --

11          A.     Laura Buegtten.

12          Q.     Thank you.

13          A.     I didn't -- I can say her name

14     but I can't spell it.

15          Q.     That's a new one, too.

16          A.     Sorry.

17          Q.     No worries.  Buegtten?

18          A.     Buegtten, B-U-E-G-T-T-E-N.

19          Q.     In your time at PatientPoint

01:55  20     have you discussed ContextMedia, including

21     any of its networks, at team meetings?

22          A.     Yes.

23          Q.     About how often?

24          A.     I'd say maybe, maybe once a

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Valerie Jones Conn (401-133-571-6952)          754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

24

1    month.

2         Q.    Since 2010?

3         A.    Gosh.  I couldn't give you an

4    accurate figure.  I don't know that.

5         Q.    But it's been regularly since

6    2010?

7         A.    Not every meeting.  I mean, when

8    it first -- I guess when they first started

9    being noticed maybe every two weeks in the

01:56   10    beginning.

11         Q.    Because a new competitor on the

12    scene was something remarkable and people

13    wanted to share information about them?

14         A.    And we were getting -- where I

15    sat in my office I would see things coming

16    back.  We were receiving monitors and they

17    were broken and they would sit near my desk

18    until UPS would come and pick them up and

19    take them back to the warehouse.

01:57   20         Q.    You're saying that's why they

21    were discussed at the team meetings?

22         A.    We were trying to get a handle

23    on it to find out why this was happening.  We

24    didn't realize that they were just being

Electronically signed by Valerie Jones Conn (401-133-571-6952)                    754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

25

1   taken down without our knowledge and so we

2   were trying to dig deep to find out, try to

3   find out if we can prevent this from

4   happening before it happened.  Of course,

5   it's kind of hard to do that but try to reach

6   out to all the certain accounts that we had

7   so -- to find out if we can stop it before it

8   happened so that -- just to let them know,

9   please, if you're going to do something, if

01:58   10   you're going to remove our monitor, we have

11   to know first.

12          Q.    And that became a regular part

13   of your calls with practices?

14          A.    Yes.

15          Q.    Would you say that you and your

16   team were successful in getting that message

17   out?

18          A.    Not all the time, no.

19          Q.    In general though?

01:58   20          A.    We tried.

21          Q.    It was a goal of yours?

22          A.    It was.

23          Q.    And you implemented it in the

24   way that you implement other business goals,

Electronically signed by Valerie Jones Conn (401-133-571-6952)          754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

26

1    right?

2            MR. BERNAY:  Object to the form.

3    You can answer.

4        A.    We tried to get in touch with

5    them if we could, let them know if we could,

6    before removing the monitor, let us know, one

7    of our technicians have to remove it.  Just

8    has to be one of our technicians before it is

9    removed.

01:59    10        Q.    And so you would say that on

11    calls with practices?

12        A.    Yes, or maybe we didn't call

13    each one to say before you remove that

14    monitor.  We didn't want them to remove it.

15    We did contact them to kind of make touch and

16    update their messages a little more often to

17    make sure that they were engaged in working

18    with the messages on the monitor and their

19    program so we kind of get a feel to make sure

01:59    20    that everything was okay.

21        Q.    At one point PatientPoint sent

22    out a letter to its practices about the fact

23    that PatientPoint wanted them to allow a

24    PatientPoint technician to take down monitors

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Valerie Jones Conn (401-133-571-6952)                    754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

27

1    in the case of a switch out; is that right?

2            A.    They did.

3            Q.    And did that letter go out to

4    all the practices in the networks that were

5    affected?

6            A.    I think it was more so the

7    rheumatology.

8            Q.    The rheumatology and others, or

9    just rheumatology?

02:00    10            A.    As far as I knew it was

11    rheumatology.  It could have been the others

12    but I'm not certain.

13            Q.    Did any practices call to follow

14    up on that letter?

15            A.    Yes.

16            Q.    About how many?

17            A.    I probably had about 10 that

18    were confused.  They didn't know what that

19    meant.  They thought that it -- they didn't

02:00    20    understand the letter.  They thought maybe

21    wasn't one of our technicians coming out to

22    remove the monitor so I would just explain to

23    them just make sure that they show their ID

24    before they would remove it or ask questions

Electronically signed by Valerie Jones Conn (401-133-571-6952)                          754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

28

1    first.

2         Q.    What was the distribution of the

3    letter?  About how many practices?

4         A.    I don't know.

5         Q.    It was in the hundreds, right?

6         A.    Could have been.  I don't have

7    an exact number.

8         Q.    Do you know how big the

9    rheumatology network is?

02:01    10         A.    I don't know how many.

11         Q.    Was it to the full network?

12         A.    Yes, but I don't know how many

13    we have total.

14         Q.    And there were about 10 calls to

15    follow up on it?

16         A.    That's how many came back to me.

17         Q.    To you?

18         A.    Yes, to my phone.

19         Q.    Do the members of your team have

02:01    20    a focus on any particular network or is it

21    shared the same among everyone?

22         A.    It's pretty much shared evenly.

23         Q.    In the break room when you're

24    watching or, excuse me, in your meeting room,

Electronically signed by Valerie Jones Conn (401-133-571-6952)                          754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

29

1    is that where you said the content is up?

2            A.    Uh-huh.

3            Q.    In the meeting room when you're

4    watching the primary care network do you see

5    the types of segments that convey information

6    to the patients?

7            A.    Yes.

8            Q.    Are some of them -- about how

9    long is each segment?

02:02  10            A.    Well, each -- each little

11    picture that runs is about 15 seconds for the

12    patient to read each article.

13            Q.    And when you say picture that

14    runs, there's kind of a background picture or

15    -- for each segment that remains the same as

16    the information is building until the next

17    one kind of comes up?

18            A.    Uh-huh.

19            Q.    And you said that's about a

02:03  20    couple minutes?

21            A.    Well, I'm always thinking of the

22    actual personal message they create because

23    we have -- of our segments we have 18 that

24    play every half hour, so 18 play within a

Electronically signed by Valerie Jones Conn (401-133-571-6952)                    754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

30

1    half hour, then 36 within the hour messages

2    so they're about 10 or 20 seconds, I guess,

3    within the -- each content.

4            Q.    Before the next background comes

5    up and a new segment starts?

6            A.    Uh-huh.

7            Q.    And, in the course of one

8    segment, would it be equivalent to about a

9    half a page of text if you just read it all

02:04    10    at once?

11            MR. BERNAY:  Object to the form.

12    You can answer.

13            A.    I'd say yeah.

14            Q.    But it doesn't all appear at

15    once, it appears sort of a few words at a

16    time over the course of the time that the

17    segment runs?

18            A.    Uh-huh.  Yes.

19            Q.    The message, when I've seen

02:04    20    them, there have been some that encourage

21    people to get early screenings for health

22    conditions.  Is that a type of segment that

23    runs?

24            A.    Yes.

Electronically signed by Valerie Jones Conn (401-133-571-6952)                    754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

31

1          Q.    I've seen -- for instance, have
2     you ever seen a spot with Danica Patrick in
3     it to encourage people to get mammograms?
4          A.    I don't remember with her.
5          Q.    No?  Have you seen any other
6     segments that encourage people to get
7     mammograms?
8          A.    There's -- there's a message on
9     the Women's Health Network.
02:05  10          Q.    What other types of preventive
11     screenings messaging have you seen?
12          A.    Like for high blood pressure,
13     get your blood pressure checked.  Prostate
14     cancer, be sure to get that checked.
15     Whatever -- I guess each month there's always
16     awareness so they always kind of put those
17     out there for each month.
18          Q.    Like a PSA?
19          A.    Uh-huh.  Yes.
02:05  20          Q.    And what are some other
21     examples?  I think I've seen lung, something
22     about lung awareness month or --
23          A.    Uh-huh.  Yes.
24          Q.    What's that?

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Joyce Lawrence, 3/19/2014

32

1          A.    Just to -- well, smoke out, if

2     you have -- the doctor's office will help you

3     with it if you want to quit smoking.  There's

4     a little segment on that if the doctor's

5     office will help, you know, if they offer

6     that.

7          Q.    So it doubles as kind of an ad

8     for the doctor's office because patients can

9     then get the service from the doctor's office

02:06    10    if they request it?

11          A.    Yes.

12               MR. BERNAY:  Object to the form.

13     You answered.

14          A.    And also if they -- if they

15     don't agree with any of that we also have

16     disclaimers we can put up also, so that's

17     another option, if they don't agree with some

18     of the content.

19          Q.    What other sorts of PSAs are

02:06    20    there?

21          A.    I'm trying to think.  There's --

22     I haven't really looked at this month's.

23     I've just been making the personal messages

24     for them.  I can't think of any off the top

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Valerie Jones Conn (401-133-571-6952)                    754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

33

1    of my head.  They were just in there

2    yesterday, too, but I can't think of

3    anything.

4           Q.    Are there some related to

5    aspirin?

6           A.    Yeah.  They do suggest, if it's

7    okay with the doctor, if you get on a regimen

8    of taking an aspirin but, again, if it's okay

9    with your doctor.

02:07   10           Q.    And you said they change each

11    month.  There are different awareness

12    campaigns?

13           A.    Yes.

14           Q.    What types of awareness

15    campaigns are included in the segments?

16           A.    Just kind of depends on from

17    month to month.  Like for, well, March, what

18    did I do for March?  February was heart.

19    There's like a cholesterol one.

02:08   20           Q.    When you said a cholesterol one,

21    what are you referring to?

22           A.    Cholesterol awareness; get your

23    numbers down for cholesterol, be sure to get

24    them checked, watch what you eat.  I forget

Electronically signed by Valerie Jones Conn (401-133-571-6952)                    754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

34

1    what I did for March but I try to update

2    them, and then also when I talk to the person

3    that we have in charge of updating their

4    messages because I do try to get them to walk

5    through and update them, too, because I can't

6    do every office.  I try to have them go to

7    the website to look up each month to do their

8    own awareness, but I know that we do have the

9    content that automatically updates for

02:08    10    themselves.  They don't have to -- I let them

11    know that we do have the content that will

12    change each month anyway but they have just

13    about unlimited messages that they can change

14    themselves and offer them to go to the

15    website that they can see each month that

16    they can kind of look and get an idea what

17    they want to change for the awareness.  They

18    can just follow that.

19           Q.    And each month the PatientPoint

02:09    20    content that's provided includes some sort of

21    awareness campaign?

22           A.    Usually.

23           Q.    The ability of the practice to

24    go in and create this custom messaging, is

Electronically signed by Valerie Jones Conn (401-133-571-6952)          754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

35

1    that an important feature to the customer?

2         A.    Yes.  It's a way to advertise

3    without having to pay to advertise.

4    Something that they might want to promote

5    themselves in their office.

6         Q.    And is that customization

7    feature something that you think would be a

8    factor in a doctor's decision about whether

9    to have a network or not in the waiting room?

02:09    10         A.    I think so, if they were to

11    purchase it.  It's very expensive.

12         Q.    Do you think that that ability

13    to customize is something that a doctor would

14    consider in choosing between two different

15    networks?

16         A.    I don't know.  I don't know if

17    that would or not.

18         Q.    Have you ever had somebody say

19    that it was important to them to have the

02:10    20    customization?

21         A.    No, but the way we've changed it

22    now I don't know if they -- that's why I try

23    to reach out to them.  I don't know that they

24    know all that they can do now since we've

Electronically signed by Valerie Jones Conn (401-133-571-6952)          754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

36

1    made such changes.

2           Q.    Do you think, when the word gets

3    out about the improvement in the customizable

4    messaging, that it will help to reduce churn?

5           A.    I think so.  It's pretty user

6    friendly.

7           Q.    It's a competitive advantage?

8           A.    I feel like it is.

9           Q.    About how many calls do you get

02:11   10    on with practices each day?

11           A.    Between 20 and 30 calls.

12           Q.    Is that every day?

13           A.    No, sometimes less.  I do a lot

14    of e-mails, too.

15           Q.    Okay.  And is your entire job

16    communicating with practices and sometime

17    passing along that information internally?

18           A.    Uh-huh.  Yes.

19           Q.    About how many practices do you

02:11   20    think you communicate with in any form each

21    week?

22           A.    About a hundred, 120.

23           Q.    And has that been the case since

24    you started in 2010?

Electronically signed by Valerie Jones Conn (401-133-571-6952)                                    754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

37

1          A.    Yes.

2          Q.    So you talk to these practices a

3    lot?

4          A.    I do.

5          Q.    Do you feel like you have a

6    pretty good feel by now for what's important

7    to them?

8          A.    Yes.

9          Q.    Is part of your job to find out

02:12    10    from the practices what is important to them

11    in making a decision about keeping

12    PatientPoint's network in their waiting room?

13          A.    Yes.

14          Q.    Is part of that figuring out, if

15    a practice wants to switch to a different

16    network, the reason that the practice wants

17    to switch?

18          A.    Yes.

19          Q.    Did you receive any training in

02:12    20    how to do that?

21          A.    Yes.

22          Q.    What kind of training?

23          A.    Well, they showed us all the

24    benefits of what PatientPoint has to offer

Electronically signed by Valerie Jones Conn (401-133-571-6952)                    754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

38

1    and then how to go about if someone did want

2    to switch, is that what you mean, if someone

3    wanted to -- somebody called up and wanted to

4    change out PatientPoint to something else?

5    Is that what you meant?

6          Q.    I think so.  Can you describe it

7    more?

8          A.    If someone wanted to cancel with

9    our service we would go ahead and ask why and

10   we would ask who.  Lot of times they don't

11   tell us who so then we would just go on the

12   pretense of just worrying about not so much

13   who but why, and then from there find out

14   what is it we're lacking and is there

15   something we can do to keep them, what is it

16   they're looking for.

17         Q.    Reminds me a little bit of a gym

18   membership that I had in Chicago and when I

19   moved to Cincinnati I had to cancel it and I

20   had to send a fax, then they call and say why

21   do you want to cancel.  It's an opportunity

22   to keep the membership going if you can kind

23   of respond to the problems that the

24   customer's raising.  Is that an accurate

02:13

02:14

Electronically signed by Valerie Jones Conn (401-133-571-6952)                    754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

39

1    analogy?

2           A.    Yeah, somewhat.

3           Q.    So you said somewhat.  What's

4    different about it?

5           A.    I was thinking of your gym.  You

6    can't take it with you, can you?  Need a

7    helicopter.  Yes, we wanted to try to cover

8    all bases to try to find out what we can do

9    to keep them.  If we really can't save them,

02:14  10   if there's nothing more that we can do, what

11   we try to do is find out what it is that they

12   want to change and if it's something -- if

13   they would just tell us what it is that

14   they're looking for.  Lot of times they don't

15   open up and tell us, they just say they want

16   to try something different.  We don't know

17   what that different is if they don't tell us,

18   so most of the time we end up losing them.

19          Q.    About how often after a practice

02:15  20   says it wants to switch are you able to keep

21   the system in the waiting room?

22          A.    We give them -- they have to

23   give us a 30 day notice, and that's usually

24   pretty much on the money.  I mean, 30 days is

Electronically signed by Valerie Jones Conn (401-133-571-6952)          754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

40

1    -- we have it out 28 to 30 days.  No longer

2    than that.

3          Q.    A technician out there to switch

4    them?

5          A.    To take out a monitor.

6          Q.    I guess my question was about

7    how often after somebody -- how often after

8    somebody says they want to switch do you

9    convince them, after all, to stay?

02:16    10          A.    Do I win?

11          Q.    How often do you win?

12          A.    Say 10 people call, maybe two I

13    might win out.  Eight I lose.

14          Q.    And has that been pretty steady

15    since 2010 or has it gone up and down?

16          A.    It was -- it's kind of died

17    down --

18          Q.    Which part?

19          A.    -- but it was very steady in

02:16    20    2010.

21          Q.    Which part of it was steady, the

22    request to switch, the wins, or both?

23          A.    The wins.  The losers were in

24    the beginning.  It's gotten a little bit

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Valerie Jones Conn (401-133-571-6952)                              754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

41

1    better now.  It's kind of tapered off now.

2    The requests have tapered off a little bit.

3           Q.    So setting aside how many calls

4    you're getting to switch has the percentage

5    that you've been able to win after they've

6    said they wanted to switch changed over time

7    or --

8           A.    No.

9           Q.    -- has it gone up and down?

02:17  10         A.    It's gone up and down.  It's

11    still kind of iffy.  One out of 10.

12           Q.    Would be the lowest that it's

13    been?

14           A.    (Nodding affirmatively.)

15           Q.    And then in a really great month

16    about how many out of 10 would you be able to

17    retain after they've said we're going to

18    switch?

19           A.    Two.

02:17  20               MR. BERNAY:  Tom, to clarify for

21    the record, are your questions geared to all

22    practices or just those switching to

23    ContextMedia?

24               MR. HANKINSON:  Is that an

Electronically signed by Valerie Jones Conn (401-133-571-6952)          754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

42

 1    objection?

 2              MR. BERNAY:  I'm just trying to

 3    clarify for the record.

 4              MR. HANKINSON:  I mean, my

 5    questions are what they are.  I don't

 6    remember what the phrasing of each one was.

 7              MR. BERNAY:  That's fine.

 8    That's fine.

 9         Q.    Do you find it easier or harder

02:18   10    to win back somebody who wants to switch

11    based on whether the switch is going to

12    television or to any one of the competitors

13    that you mentioned versus the others, or is

14    it always roughly the same one or two out of

15    10 you're able to win back?

16              MR. BERNAY:  Object to the form.

17    You can answer.

18         A.    It's about the same.

19         Q.    Is that 30 day time period in

02:19   20    the enrollment forms intended to give you a

21    chance to do what you do and win back the

22    practices?

23         A.    It is, but it's also time enough

24    to get a technician out there also for them

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Valerie Jones Conn (401-133-571-6952)                    754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

43

1    to schedule because we're kind of -- kind of
2    busy to where it is kind of hard to get
3    somebody to get out there between having the
4    technicians installing.  It's a little --
5    scheduling is tight, so between installing
6    and moving they kind of have to stagger it.
7         Q.    At any point while you've been
8    employed by PatientPoint has there been a 60
9    day period instead of a 30 day period?
10        A.    There used to be and then they
11   did change that to a 30 day.
12        Q.    Have you ever -- are you aware
13   of any time in which PatientPoint or Healthy
14   Advice have sued a doctor's office?
15        A.    I don't recall.
16        Q.    If a doctor's office takes down
17   the Healthy Advice or PatientPoint hardware,
18   itself, what happens?
19        A.    If they're going to send it back
20   to us or if they're going to keep it?
21        Q.    In either case what happens?
22   Let's take it first if they're going to send
23   it back to you.
24        A.    We usually try to find out,

02:20

02:21

Electronically signed by Valerie Jones Conn (401-133-571-6952)                    754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

44

1    well, find out, of course, why, because we

2    lost a signal, we're trying to find out.  If

3    they are sending it back to us, how they're

4    going to send it back.  We try to get a

5    technician out there actually to pick it up

6    if we can so it's not -- lot of times it's

7    not packaged correctly and by the time it

8    comes back it is broken, we're unable to use

9    it again, but the main thing is to get one of

02:21    10    our technicians out there to package it up.

11    That's the --

12              Q.    The equipment, if it's not

13    broken, get reused?

14              A.    Yes.

15              Q.    And about how often are you able

16    to reuse the equipment that comes back?

17              A.    If we have a -- if it's shipped

18    back correctly by one of our techs we usually

19    -- most of the time, hundred percent, as far

02:22    20    as I know, because I don't ever get to see

21    that end of it.

22              Q.    And then you asked me to clarify

23    if I was asking about instances where the

24    practice wants to keep the hardware.  What

Electronically signed by Valerie Jones Conn (401-133-571-6952)          754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

45

1    happens in that kind of circumstance?

2         A.    Depends if it's a 19 inch we

3    don't usually require that one back because

4    we don't use those anymore, but if it's one

5    we still use we, again, still try to get that

6    back.

7         Q.    Is the monitor the most

8    important part?

9         A.    There's something called a CPU.

02:22    10    We do usually have to get that back.

11        Q.    Usually or all the time?

12        A.    If it's one that hasn't, what do

13   I want to say, expired.  It's one we don't

14   use anymore then just depends on if we still

15   use it or not.

16        Q.    How do you know which CPUs are

17   being used still and which are not?

18        A.    There's someone upstairs named

19   Vida, she takes care of all that but she's

02:23    20   given us a list to tell us what we still use

21   and what we don't.

22        Q.    Vida?

23        A.    Vida.

24        Q.    V?

Electronically signed by Valerie Jones Conn (401-133-571-6952)                                                    754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

46

```
 1          A.    V-I-D-A.

 2          Q.    Do you remember her last name?

 3          A.    I don't remember names, no.

 4          Q.    And Vida retains a list of what

 5   equipment is being reused and what equipment

 6   is no longer, I guess, serviceable?

 7          A.    Right.

 8          Q.    And does that list change over

 9   time?
```

02:23
```
10          A.    It hasn't in a long time.  It's

11   pretty much the same.

12          Q.    And do you have an understanding

13   of what equipment, what CPUs are still

14   serviceable and which are not?

15          A.    Just from that list she's given

16   us.  We have it in our computer what they

17   have and what we have.

18          Q.    So you have the list?

19          A.    Uh-huh.
```

02:24
```
20          Q.    It's distributed from Vida to

21   the members of your team?

22          A.    Uh-huh.  Yes.

23          Q.    So when a practice calls and

24   says I want to switch, I've taken down your
```

Electronically signed by Valerie Jones Conn (401-133-571-6952)                    754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

47

1    system already, you can ask them what type of

2    CPU it is?

3            A.    We'll know.

4            Q.    You'll know from your notes?

5            A.    We'll know from the computer

6    screen at their office.

7            Q.    And if it's not one that's on

8    the list to be reused what happens to the

9    CPU?

02:24    10            A.    Make sure it's okay, I'll talk

11    to our manager and find out if we're going to

12    have somebody go out to get that.

13            Q.    So sometimes you go and get it

14    and sometimes you decide not to?

15            A.    We'll ask -- yes, we'll -- if

16    we're going to be able to still use it.  If

17    they've already taken it down we'll ask for

18    them, if they're okay with it, to dispose of

19    it or use it however they would like.

02:25    20            Q.    I didn't quite understand that.

21    It sounded like you said if we can still use

22    it we'll ask them to dispose of it.

23            A.    If it's one that we can use now,

24    if it's something that hasn't been considered

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Joyce Lawrence, 3/19/2014

48

1    old and non-usable, we'll ask for them, if

2    they want to, do whatever they would like

3    with it, or if it's something that we are

4    still using and could send a technician out

5    to go get, if it's one that's on that list of

6    not able to use again then we'll ask the

7    office if they're okay with doing whatever

8    they want with it, which is probably not

9    going to be putting it back up to use again

02:26    10    since they've already taken it down.

11         Q.   I see.  I was a little confused.

12    You're asking the office if it's okay with

13    them to do whatever they want with it.

14    You're concerned that leaving it there would

15    annoy them?

16         A.   Yes.  If they don't want --

17              MR. BERNAY:  Objection.  You can

18    answer.  You can answer.

19         A.   Okay.  If they don't want it

02:26    20    there we'll send a technician out to go get

21    it from them.

22         Q.   But if they're okay with it

23    being there and it's on the old list where

24    they're not reusing it anymore then they'll

---

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Valerie Jones Conn (401-133-571-6952)          754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

49

1    just keep it?

2            A.    Yes.

3            Q.    And has that happened multiple

4    times since 2010?

5            A.    Not usually.  They usually --

6    most of the time they usually have an up to

7    date -- it's a 32 inch monitor, usually has

8    an up to date CPU.

9            Q.    So it only happens some of the

02:26  10    time?

11            A.    Rarely, but yes.

12            Q.    About how many times a year?

13            A.    Just a ballpark figure, maybe

14    two or three times.  They might have a 19

15    inch monitor with an old CPU.

16            Q.    Usually if it's a 19 inch

17    monitor it also has the old CPU?

18            A.    Yes.

19            Q.    In every case?

02:27  20            A.    Most of the time.

21            Q.    And about two or three times a

22    year you've encountered this where the old

23    PCU and the monitor are left at the practice

24    after the practice cancels?

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Valerie Jones Conn (401-133-571-6952)                        754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

50

1          A.    Yes.

2          Q.    And that's just speaking for

3    yourself, personally, not your whole team,

4    correct?

5          A.    Correct.

6          Q.    Are you aware of this happening

7    with other members of your team?

8          A.    No, I've not heard; we've not

9    talked.

02:27    10          Q.    But everybody gets the list from

11    Vida that says what CPUs are still

12    serviceable and which you don't use anymore,

13    correct?

14          A.    It was sent to all of us.

15          Q.    Have you ever been instructed to

16    do this differently?

17          A.    No.

18          Q.    Is it your understanding that

19    everybody on your team has the same

02:28    20    instructions about what to do in these

21    circumstances?

22          A.    Yes.

23          Q.    The same network programming

24    runs on all the CPUs on the system, correct?

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Valerie Jones Conn (401-133-571-6952)                    754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

51

1              MR. BERNAY:  Object to the form.

2      You can answer.

3              A.    Yes.

4              Q.    Do the old CPUs and the new CPUs

5      offer the same features to the practices?

6              A.    As far as I know.

7              Q.    You've never been told that

8      there's any difference between the features

9      that are available if a practice has the old

02:29   10     CPU versus the features that are available if

11     the practice has the new CPU?

12             A.    I don't know the difference in

13     the technical part.

14             Q.    No one's ever told you that

15     there's a difference in the product offering

16     between the two, have they?

17             A.    No, we've never talked about --

18     I don't know the ins and outs of what they

19     do.

02:29   20             Q.    Your job, though, is to, in

21     part, at least, to explain the features that

22     are available to the practices so that they

23     feel engaged with the system and want to

24     retain it, right?

Electronically signed by Valerie Jones Conn (401-133-571-6952)                    754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

52

1          A.    Yes.

2          Q.    So if there was a certain list

3    of features that were only available to part

4    of the network you would expect to know that,

5    right?

6          A.    Yes.

7          Q.    So I think you can understand

8    what I'm trying to ask, and I'm sorry if I'm

9    not being clear, the same features are

02:30  10    offered to all the practices in the network?

11          A.    Yes, so one CPU couldn't do

12    another, yes.  I'm sure they both work

13    equally as opposed to old or new.  Just that

14    particular piece of equipment is something we

15    don't use anymore as opposed to the another

16    one we do use.

17          Q.    The software is the same, it's

18    the hardware that's different?

19          A.    Correct.

02:30  20          Q.    And Vida, how often does she put

21    out this list?

22          A.    It's only -- as far as I know

23    it's only been put out one time.

24          Q.    About when was that?

Electronically signed by Valerie Jones Conn (401-133-571-6952)                    754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

53

1          A.    About a year ago.

2          Q.    2013, sometime in early spring

3    or late winter?

4          A.    Yes.  It may have been available

5    out there before, just that's when I -- I've

6    always e-mailed her and said can we use this

7    one, you know, is this old or new.

8          Q.    So before the list came out you

9    would get in touch with Vida to find out if

02:31    10    the practice needed to send back the CPU or

11    not?

12          A.    Right.  I would just ask her.

13          Q.    Sometimes she would say yes, we

14    want that one back; sometimes she would say

15    no, they can keep it if they want?

16          A.    Correct.

17          Q.    Then you would convey that to

18    the practice?

19          A.    Yes.

02:31    20          Q.    And at least two or three times

21    a year the practice would keep it?

22          A.    Yes.

23          Q.    Did any practice ever tell you

24    what they intend to do with it?

Electronically signed by Valerie Jones Conn (401-133-571-6952)                    754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

                                                                54

     1          A.    Most of them said okay, they're
     2    fine with it.  If they didn't, I would send a
     3    tech out to pick it up.
     4          Q.    But it's really at the whim of
     5    the practice, it's whatever they want to do,
     6    customer service mentality, let the practice
     7    do what it wants?
     8              MR. BERNAY:  Object to form.
     9    You can answer.
02:31  10          A.    Yes.
    11              MR. BERNAY:  After that long
    12    pause why don't we take a break?
    13              MR. HANKINSON:  Was that a long
    14    pause?  Thank you.  A break sounds good.
    15              MR. BERNAY:  Relative.
    16      (Break taken.)
    17          Q.    You mentioned earlier, you said
    18    something like people say Power Point.  What
    19    did you mean by that?
02:43  20          A.    Said sometimes the actual
    21    showing reminds them of Power Point.
    22          Q.    How often have you heard that?
    23          A.    Just a few times.
    24          Q.    From whom?

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Valerie Jones Conn (401-133-571-6952)          754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

55

1        A.    Actually from my teammates

2    saying they've heard it before.

3        Q.    So a few times a member of your

4    team has indicated that a person from a

5    practice has said that it reminds them of

6    Power Point?

7        A.    Yes.

8        Q.    And "it" is the healthy advice

9    network system?

02:43   10        A.    Yes.

11        Q.    And you said that you disagree

12    with that?

13        A.    Yes.

14        Q.    Give me the reasons that you

15    disagree with that, if you would be kind

16    enough.

17        A.    Because some of the -- well,

18    when you look at the programming on Power

19    Point, there's so much you cannot do on that

02:44   20    monitor; when you look at it and see all the

21    different things that it can do there's no

22    way you can do that on a Power Point

23    presentation.

24        Q.    So what kind of things?

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Valerie Jones Conn (401-133-571-6952)                    754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

56

1        A.    Just -- some of the programming

2    on it is almost interactive, the way it

3    moves, and Power Point is pretty still so

4    it's -- they're just completely opposite.

5        Q.    So it's the movement of items on

6    the Healthy Advice screen that's the main

7    difference that you would note between that

8    and Power Point; is that fair?

9        A.    Yes.

02:44    10        Q.    What other differences do you

11    notice that would cause you to say they're

12    different?

13        A.    That and the color saturation.

14        Q.    What is color saturation?

15        A.    How much there is of -- the

16    different screens, I mean, there's just not

17    one specific color.  There's just a lot in

18    each picture.

19        Q.    So the Power Point presentations

02:45    20    that you're familiar with have a standard

21    background that is the same throughout the

22    whole presentation?

23        A.    What I've seen a long time ago.

24        Q.    Sure.  And is that what you're

Electronically signed by Valerie Jones Conn (401-133-571-6952)                    754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

57

1    contrasting to the color saturation of the

2    Healthy Advice Networks programming?

3            A.    Yes.

4            Q.    Are there any other differences

5    that are causing you to say that they are

6    different?

7            A.    No.  Just those.

8            Q.    Okay.  If Power Point came out

9    with a new program, like a -- Power Point

02:45  10    3.0, whatever they're up to, and there is the

11    capability to make the background of the

12    slide any color, different per slide, and

13    could be many colors, you could put a photo

14    in the background, you know what I mean?

15            A.    Uh-huh.

16            Q.    Would that be the kind of color

17    saturation that you're talking about?

18            MR. BERNAY:  Object to the form

19    but you can answer.

02:46  20            A.    Maybe.  I'd have to see it to be

21    able to say that but I would just have to

22    compare the two.

23            Q.    It's the kind of thing that

24    would be similar, maybe Healthy Advice would

Electronically signed by Valerie Jones Conn (401-133-571-6952)                    754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

58

1    be slightly more or better, but it's the kind

2    of color saturation that you're talking

3    about?

4            A.    Yes.  Just some of the pictures

5    I've seen the other day, I just can't compare

6    the two.

7            Q.    But if you could put a photo,

8    any photo you want, on a Power Point slide in

9    this new Power Point, then it would be the

02:46    10    same?

11            A.    No.

12            Q.    So what would the difference be?

13            A.    They're just -- some of it's

14    interactive and, I don't know, I'd have to --

15    I haven't seen Power Point recently where

16    it's interactive.

17            Q.    So that refers to the

18    interactivity, which you mentioned two

19    things.  One is the interactivity and one is

02:47    20    the color saturation, and those are the two

21    differences that you told me about.  So

22    setting aside the interactivity and just

23    talking about color saturation, if you could

24    put any photo you want, any color combination

Electronically signed by Valerie Jones Conn (401-133-571-6952)          754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

59

1    of colors on a Power Point slide, if you

2    could have every slide be different in that

3    regard, or five slides with the same sort of

4    very vivid, you know, high definition photo

5    and then five with a -- like a cartoon figure

6    in the background and, you know, anything

7    that you wanted, then it would be similar?

8              MR. BERNAY:  Object to the form.

9    You can answer.

02:47    10              Q.    Is that correct?

11              A.    I guess so.

12              Q.    On the color saturation side?

13              A.    Yes.

14              Q.    And then on interactivity, kind

15    of the same issue.  If we came out with a new

16    form of Power Point that would like, for

17    instance, you could have one word on and then

18    a different word would kind of seem like it

19    was coming from the side and it would knock

02:48    20    into the first word and maybe that would

21    bounce a little bit then they would settle

22    down, and then like a figure of a guy with an

23    idea light bulb over his head would come in

24    from the side, then the light bulb would

Electronically signed by Valerie Jones Conn (401-133-571-6952)                    754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

60

1    light up, if you could do that would that be

2    interactivity, in your mind?

3                MR. BERNAY:  Objection.  You can

4    answer.

5          A.    I guess, yes.

6          Q.    And that's the type of

7    interactivity that you're saying sets Healthy

8    Advice Networks's systems apart from Power

9    Point's capabilities?

02:48   10          A.    Yes.

11          Q.    Have you ever encountered

12   practices who say that they received money

13   from a network provider, a competitor of

14   PatientPoint?

15          A.    Gift cards; I've heard them get

16   gift cards.

17          Q.    What competitors have offered

18   gift cards?

19          A.    RHN, ContextMedia.

02:49   20          Q.    RHN, being a network that

21   ContextMedia puts out, or two different

22   things?

23          A.    I believe one in the same.

24          Q.    You believe they're the same?

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Valerie Jones Conn (401-133-571-6952)                                    754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

61

1          A.    One in the same, yes.

2          Q.    So are you aware of any other

3    competitors that have offered gift cards?

4          A.    No.

5          Q.    What about money for, like,

6    reimbursement for internet monthly fees?

7    Have you heard of a competitor offering that

8    to a practice?

9          A.    I did hear one of my other

02:50   10    teammates mention three months free of

11    internet.

12          Q.    Just once?

13          A.    Uh-huh.

14          Q.    Do you know what competitor that

15    referred to?

16          A.    It was ContextMedia.

17          Q.    Have you ever heard of Accent

18    Health offering any money or internet

19    reimbursement?

02:50   20          A.    I haven't, no.

21          Q.    Do you think it's an important

22    factor to the practice decisionmaker if

23    they're being offered a gift card or a

24    reimbursement for some sort of expense that

Electronically signed by Valerie Jones Conn (401-133-571-6952)                    754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

62

1    they have in deciding between two competing

2    systems?

3                MR. BERNAY:   Object to the form.

4    You can answer.

5            A.    Do I think it's important?

6            Q.    Yes.

7            A.    Yes; yes and no.  I mean, it's a

8    nice incentive but I don't think they should

9    make it their only incentive.  It shouldn't

02:51   10   make up their minds.

11           Q.    It shouldn't?

12           A.    I don't think it should make up

13   their minds, but that's just my thinking.

14           Q.    But sometimes it does?

15           A.    It does.

16           Q.    You encountered that where,

17   because of that gift card being offered,

18   that's it, that's the -- that's why the

19   practice is going to switch and there's no

02:52   20   changing their minds?

21           A.    True, yes.

22           Q.    Would you agree, though, that

23   the number one reason that practices switch

24   from one network to the other is the content

Electronically signed by Valerie Jones Conn (401-133-571-6952)                    754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

63

1    on the screens?

2           A.    I don't know because I have

3    never seen ContextMedia's content so I can't

4    tell you.  They've never told me.  A lot of

5    times -- well, I don't know.  They did say

6    they wanted a change.

7           Q.    They, meaning the practice?

8           A.    The practice said they wanted a

9    change.

02:52  10           Q.    And are you referring to a

11    specific conversation?

12           A.    Well, when they've called me and

13    want to cancel I ask them why, they say well,

14    we wanted something new and need a change.

15    Sometimes they'll say we might call back and

16    switch but they want to try something new.

17           Q.    New in terms of the content that

18    plays?

19           A.    Maybe just the new -- they may

02:53  20    be referring to that or just a new provider.

21           Q.    So there's a certain amount of

22    churn that's just generated by people wanting

23    to try new things, see if there's something

24    better, if the grass is greener; is that what

Electronically signed by Valerie Jones Conn (401-133-571-6952)                    754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

64

1    you're saying?

2             A.    Yes.

3             Q.    And a certain part of the

4    practices that switch from PatientPoint or

5    Healthy Advice to ContextMedia or Accent

6    Health would be due to circumstances beyond

7    anybody's control where they've had one

8    system for a while and they want to try one

9    that's new?

02:53    10             MR. BERNAY:   Object to the form.

11    You can answer.

12             Q.    Would you agree with that?

13             A.    I guess.

14             Q.    So yes?

15             A.    Yes.

16             Q.    I guessed that you would based

17    on what you said.

18             A.    Yes.

19             Q.    Have you encountered practices

02:54    20    who wanted a news ticker?

21             A.    Yes.

22             Q.    Have you encountered practices

23    who switched to ContextMedia because they

24    wanted a news ticker?

Electronically signed by Valerie Jones Conn (401-133-571-6952)          754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

65

1          A.    No.

2          Q.    To a different competitor?

3          A.    I don't think they've said that

4     that was the only reason but -- I can't

5     recall if that was the only reason but I have

6     -- I have heard people mention that they do

7     like that news ticker, or the doctor likes

8     that.

9          Q.    The news ticker on

02:55    10     ContextMedia's network?

11          A.    Uh-huh.   Yes.

12          Q.    So you can't remember if that

13     was the sole reason they switched or if that

14     was one factor among a couple of factors, or

15     a few, for the switch?

16          A.    Yes, correct.

17          Q.    If you -- you have a database

18     called a CMS?

19          A.    Yes.

02:55    20     Q.    That's where you input

21     information that you get from your calls and

22     e-mails with practices?

23          A.    Correct.

24          Q.    If you're aware of a reason for

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Valerie Jones Conn (401-133-571-6952)                    754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

66

1    a practice switching is it a policy or a

2    procedure that's part of your job for you to

3    put that reason into the CMS system?

4           A.    Correct.  Yes.

5           Q.    Have you been instructed to do

6    that?

7           A.    Yes.  Notate each account.

8           Q.    Have you been instructed to

9    notate each account with every reason that

02:56   10    the practice gives you for a switch?

11           A.    Yes.

12           Q.    You're not supposed to leave any

13    out?

14           A.    Try not to.  Try to put

15    everything in there.

16           Q.    What did you call, notate -- I

17    know I repeated it but now I forget -- notate

18    the account?

19           A.    Right.  Yes.

02:56   20           Q.    Is that what you -- is that the

21    term for entering information into the CMS

22    database with respect to a particular

23    practice?

24           A.    Yes.

Electronically signed by Valerie Jones Conn (401-133-571-6952)                    754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

67

1          Q.    So the account is the practice?

2          A.    Correct.  Yes.

3          Q.    And the notate is kind of

4      entering text into a computer?

5          A.    Yes.

6          Q.    Do you notate the account at the

7      time of the call or shortly after it?

8          A.    At the time of the call.

9          Q.    Right at the time of the call?

02:57  10          A.    Yes.  Yes.

11          Q.    Within seconds, within minutes?

12          A.    Within minutes of the call.

13          Q.    When you still remember and it's

14      fresh in your mind?

15          A.    Yes.

16          Q.    And is the policy and procedure

17      in your -- of your team to do that?

18          A.    Yes.  Usually while we're

19      scheduling; if we're scheduling the removal

02:57  20      or while we're talking to them.

21          Q.    Did you say while or why?

22          A.    While, while we're talking to

23      them.

24          Q.    It's the policy or the

Electronically signed by Valerie Jones Conn (401-133-571-6952)          754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

68

1    procedure -- is it a policy or a procedure?

2            A.    It's a procedure.

3            Q.    It's a procedure?

4            A.    Yeah.

5            Q.    You've been instructed by your

6    supervisors to do it?

7            A.    Right.  Yeah.  Correct.

8            Q.    And is there training about how

9    to do it?

02:57    10            A.    Yes.

11            Q.    This is the information you

12   should ask for, this is how we want it

13   entered into CMS?

14            A.    Yes.

15            Q.    So those are the types of things

16   that your supervisors have instructed you

17   about?

18            A.    Correct.

19            Q.    About how often do they instruct

02:58    20   you about that?

21            A.    We have a -- well, once a year

22   we get a training.

23            Q.    Has it been pretty much the same

24   training on the CMS account notations since

Electronically signed by Valerie Jones Conn (401-133-571-6952)                          754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

69

1    you started in 2010 or does it change?

2         A.   It's about -- well, every day we

3    know we have to notate the account.  It's

4    just the only way you're going to know

5    something.  I'd say every six months we're

6    reminded don't forget to notate the account.

7         Q.   During your call or within

8    seconds after?

9         A.   Correct, yes.

02:58  10        Q.   Is it against the rules to put

11   things in CMS that are false?

12        A.   Yes.

13        Q.   Is it against the rules to leave

14   things out of CMS when the practice is

15   telling you that that's the reason that they

16   switched to a competitor?

17             MR. BERNAY:  Object to the form.

18   You can answer.

19        A.   Yes.

02:59  20        Q.   And is it a rule that you're

21   supposed to inquire in every case where a

22   practice wants to switch to a competitor who

23   the competitor is and why the practice is

24   switching?

Electronically signed by Valerie Jones Conn (401-133-571-6952)                    754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

70

1       A.   Yes, we do want to put that in
2    there.  We do ask.  If they don't tell us
3    then we just put whatever, whatever they tell
4    us, put whatever we -- whatever they tell us
5    to the best of our knowledge to what they're
6    telling us, we try to put as much in as
7    they're telling us.  If we don't have all the
8    information then that's what we -- we have to
9    put a work order request in to cancel then we
02:59  10   send that to Amy.  Sometimes she doesn't --
11   she's not happy if we don't know who the
12   competitor is but that's what we have to send
13   her.
14       Q.   Amy Finley?
15       A.   Amy Finley.
16       Q.   Is there any written document
17   for the training or the instructions about
18   entering or notating accounts?
19       A.   Yes.
03:00  20       Q.   What form is that?
21       A.   We have a book that -- it's a
22   manual that we go by.
23       Q.   And how often is that manual put
24   out?

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Valerie Jones Conn (401-133-571-6952)                    754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

71

1          A.   It's -- well, it's our manual

2     that we get as we start from day one and

3     periodically it's updated.  Don't know

4     exactly how often but there's always updates

5     when anything new is changed.

6          Q.   Is it separate from the HR type

7     employment manual, it's something specific

8     for your team?

9          A.   It's -- well, when a new person

03:00   10     starts you get a book that has your -- your

11     criteria that you start with and then that

12     book you keep at your desk and you refer back

13     to as you're putting in orders or creating

14     something.

15          Q.   Do you know what I mean by like

16     an employee manual?

17          A.   Yes, and that's separate from --

18          Q.   Okay.  This is more of a

19     training or an instructions manual?

03:01   20          A.   Uh-huh.  Yes.

21          Q.   And is it specific to customer

22     relationship management?

23          A.   Yes.

24          Q.   Just your team?

Electronically signed by Valerie Jones Conn (401-133-571-6952)                    754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

72

1          A.     Yes.

2          Q.     How big is it?  How many pages?

3          A.     I'd say it's about 50 to 75

4     pages.

5          Q.     Do you get it in printout or do

6     they e-mail it to you?

7          A.     It's printed.

8          Q.     Is it like a binder?

9          A.     Yes.

03:01  10          Q.     I like binders.  Is it in color?

11          A.     Each -- we have three binders

12     and they're different colors.

13          Q.     Okay.  What are the three

14     binders?

15          A.     One is for exam room program,

16     one is the monitor program and then the other

17     one is just your -- the company, all about

18     the company program.

19          Q.     All about PatientPoint?

03:02  20          A.     PatientPoint, yes.

21          Q.     And the monitor program you're

22     talking about, the PCN, ACN, the care

23     networks where the content is put into the

24     waiting rooms of practices?

Electronically signed by Valerie Jones Conn (401-133-571-6952)                    754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

73

1          A.    Yes.

2          Q.    So what color is that binder?

3          A.    Orange.

4          Q.    Do you call it the orange

5    binder?

6          A.    No, I call it the WRN binder.

7          Q.    The WRN binder?

8          A.    Waiting Room Network.

9          Q.    Waiting Room Network.  Very

03:02  10    good.

11          A.    It encompasses all of it.

12          Q.    Are there sample scripts in

13    there for phone calls?

14          A.    Yeah, yes.

15          Q.    And are some of those sample

16    scripts related to calls where a practice

17    says they want to terminate?

18          A.    More so if they want the service

19    and we can't fulfill it.  Sometimes we aren't

03:02  20    in every area to expand or we're overexpanded

21    and we don't have enough monitors.  There's a

22    little script in there to let them know we'll

23    put them on a waiting list.

24          Q.    So there's --

Electronically signed by Valerie Jones Conn (401-133-571-6952)                    754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

74

1          A.    There's a script for that.

2          Q.    There's more demand for

3    PatientPoint's network services than

4    PatientPoint is able to meet?

5          A.    Correct.

6          Q.    And is that across all networks

7    or particular to one or two networks?

8          A.    There might be one or two

9    networks we can't expand in.

03:03   10          Q.    Which ones?

11          A.    They change from time to time.

12          Q.    How do you find out when any

13   particular network is too full?

14          A.    We're updated from month to

15   month or maybe every three months it might

16   change.  They just kind of send a list out.

17          Q.    And is that countrywide or are

18   there regions where you're not going to

19   expand?

03:03   20          A.    Countrywide.

21          Q.    So each month there's a list no

22   more PCN but we can still add screens to the

23   other four, then the next month it might be

24   we're full of ACN but we can still add

Electronically signed by Valerie Jones Conn (401-133-571-6952)                    754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

75

1    screens to the other ones?

2          A.    It changes about every three

3    months.

4          Q.    Every three months.  Have there

5    been times since 2010 when you started that

6    PCN was oversubscribed?

7          A.    Yes.

8          Q.    Have there been times since you

9    started in 2010 when ACN was oversubscribed?

03:04    10          A.    No.

11          Q.    ACN, is that Arthritis Care

12    Network?

13          A.    Yes.

14          Q.    Have there been times since 2010

15    when CCN has been oversubscribed?

16          A.    Yes.

17          Q.    Do you have any sense for how

18    often PCN or CCN have been oversubscribed or

19    full?

03:04    20          A.    No, I don't know how long or how

21    often.

22          Q.    Do you have any sense for the

23    numbers of practices that have had to be put

24    on a wait list or turned away?

Electronically signed by Valerie Jones Conn (401-133-571-6952)                    754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

76

1        A.    No, because we don't see that

2    end of it.

3        Q.    It would be in CMS if a practice

4    was turned away?

5        A.    I don't get to see that if it

6    is.  I don't see the numbers or anything.

7        Q.    But you input it into CMS?

8        A.    Yes.

9        Q.    And there's a script for how to

03:05   10   deal with that situation in the WRN binder?

11       A.    Yes, and after a while we just

12   kind of let them know, we send the

13   information out there and that they're

14   interested in the service, just kind of --

15   and when someone does -- someone new does

16   call in we do -- we have a gentleman that we

17   send that new information to and he kind of

18   will kind of put it in there and he might

19   know a little bit better than we do if

03:05   20   something more is available.  If there is a

21   new practice that we are expanding in we send

22   it to this gentleman and he'll kind of let

23   them know if there's something available,

24   he'll send it to the sales rep and get things

Electronically signed by Valerie Jones Conn (401-133-571-6952)                    754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

77

1    going.

2         Q.    Do you know what the limiting

3    factor is?  Like you just run out of

4    monitors?

5         A.    Well, just depends on, I

6    guess -- it depends on, I guess, the area,

7    the sales team, the sales reps in that area.

8         Q.    Geographically?

9         A.    Uh-huh.

03:06   10         Q.    I don't get it.  I'm sorry.  The

11    sales reps have, like, quotas that they're

12    not allowed to go beyond?

13         A.    Because I deal with Colorado

14    sometimes there's not reps in that area in

15    some of the districts, some of the outlying

16    areas, and sometimes they don't have somebody

17    to go in that area to even offer that

18    information, offer the program to them so

19    they don't have anybody to even report to

03:06   20    them to say, hey, I can show you the program

21    and this is what we have, so they don't have

22    anybody to even sell it to them.

23         Q.    So a lack of an available sales

24    rep would be a total bar to putting a network

Electronically signed by Valerie Jones Conn (401-133-571-6952)                    754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

78

1    into a new waiting room?

2         A.    Right.

3         Q.    Do sales reps act on behalf of

4    all the networks or only particular networks?

5         A.    They work on all the networks.

6         Q.    Within a particular geographical

7    region?

8         A.    Uh-huh.  Yes.

9         Q.    So even though ACN, to your

03:07  10    memory, hasn't appeared on the list of

11    oversubscribed networks there are certain

12    areas where sales reps may not be available

13    to put in new systems?

14         A.    Correct.

15         Q.    And that would be an independent

16    reason that, even though somebody wants a

17    screen up, PatientPoint would just not be

18    able to provide the screen?

19         A.    If they weren't in that

03:08  20    geographical area there's not somebody to

21    offer it.

22         Q.    Then the answer to my question

23    would be yes?

24         A.    Yes.

Electronically signed by Valerie Jones Conn (401-133-571-6952)                    754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

79

1          Q.     So when I asked whether, in the
2    WRN binder, there was a script about how to
3    deal with somebody who called to terminate,
4    you said more so turning people away, but are
5    there scripts that deal with termination
6    calls?
7          A.     I would -- well, I'm trying to
8    think if I even -- yes, because we do -- I
9    would say yes.  I just have it in my mind to
03:09    10    always ask the main things as why, what can
11    we do to show you the value of our product
12    and what can we do to keep you.
13          Q.     Those are the main questions to
14    ask?
15          A.     Uh-huh.
16          Q.     You're having trouble
17    remembering if that's in the book, in
18    particular?
19          A.     Yeah, because I don't flip it
03:09    20    over to even look.  We do, yes, I mean, there
21    is a little tab I have that says save but I
22    just know those are the questions that I have
23    that I actually have a little thing on my --
24    my wall that I stuck up there to say these

Electronically signed by Valerie Jones Conn (401-133-571-6952)                    754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

80

1   are my questions I like to ask, but I

2   actually don't flip open my book to look for

3   that but, yes, there is an article in there.

4           Q.    Did you say an article?

5           A.    There is a script.

6           Q.    Are there other instructions

7   about that situation aside from a sample

8   script?

9           A.    Yes.

03:09   10          Q.    What kind of other instructions?

11          A.    If we're not able to save them,

12  the next step is what to do, how to go about

13  scheduling removal and how to get the

14  equipment back, how many days to schedule it

15  out.

16          Q.    And does it say to always

17  schedule it close to the end of the 30 days?

18          A.    Twenty-eight to 30; no longer

19  than 30 days.

03:10   20          Q.    But no sooner than 28 days?

21          A.    Whatever is going to work for

22  the site, make sure it's -- but it is in the

23  agreement to have it out within 30 days.

24          Q.    So if PatientPoint did not

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Valerie Jones Conn (401-133-571-6952)                    754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

81

1  de-install a system within 30 days after

2  being notified to do so it would not be

3  complying with what it tells the practices it

4  will do?

5          A.    True.  Yes.

6          Q.    And is there an instruction that

7  if the practice is okay with it to make the

8  installation 28 to 30 days out specifically?

9          A.    I don't believe it states

03:11  10  exactly like that.

11          Q.    Well, you said 28 to 30 days.

12  I'm just wondering where that came from.

13          A.    I like to try to make sure in

14  case the technician is late or something or

15  misses the call, if we shoot for 28 it gives

16  a day.  If he misses that 28th day and he

17  says I'm stuck in traffic, not going to make

18  it, something terrible happens, he can make

19  it the next day, at least we're still going

03:11  20  to be out within that 30 days.

21          Q.    But why not next week?

22          A.    Well, again, we like to shoot

23  for -- well, we have to do our 30 day

24  agreement because that's what's in the

Electronically signed by Valerie Jones Conn (401-133-571-6952)          754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

82

1    enrollment agreement and we like to be able

2    to make sure we have a technician going to be

3    in that area and we have other technicians

4    that are installing and we just want to be

5    able to make sure that they have a technician

6    that's going to be able to do that.

7              Q.    Have you dealt with practices

8    who have connectivity issues with a network?

9              A.    We have had.

10             Q.    Meaning that their screens go

11   blank periodically and they're annoyed with

12   it?

13             A.    We have had that.  It used to be

14   more prevalent when I first started.

15             Q.    About when?

16             A.    In 2010 when we were hooked up

17   to the fax line, but now it's not so much an

18   issue.

19             Q.    And when did that change?

20             A.    We connect with the internet.

21             Q.    And when was that change made?

22             A.    It was a progression since 2010

23   'til now.

24             Q.    More and more people or, excuse

Electronically signed by Valerie Jones Conn (401-133-571-6952)                    754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

83

1    me, new installations were made internet

2    connective sometime after 2010?

3            A.    And we actually went out and

4    upgraded a lot of offices to internet

5    connection.

6            Q.    When did that process start?

7            A.    About 2011 and on, 2012.

8            Q.    So before -- wait, 2011 and on?

9            A.    Uh-huh.

03:13    10            Q.    You said 2012.  Did you just

11    mean including 2012?

12            A.    Well, right, 2011 and on up.

13            Q.    Beginning of 2011?

14            A.    Somewhere in the middle.

15            Q.    Somewhere in the middle of 2011

16    new initiative started -- let me start over.

17    Somewhere around the middle of 2011 a new

18    initiative started to make new installations

19    connect via the internet instead of fax and

03:13    20    also replace some of the existing practices,

21    fax connections with new internet

22    connections?

23            A.    Correct.

24            Q.    Before the middle of 2011 it was

Electronically signed by Valerie Jones Conn (401-133-571-6952)                    754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

84

1    all fax connective?

2            A.    Yes.

3            Q.    And that was the period during

4    which there were more reported connectivity

5    issues; is that correct?

6            A.    Yes.

7            Q.    Is it hard to save a practice

8    when it has experienced connectivity issues?

9            A.    It's harder to save.

03:14    10          Q.    So if you're saving a practice

11    that wants to cancel one or two times out of

12    10, in general, are you saving a practice

13    with connectivity issues something on the

14    order of one out of 50 or a hundred times?

15            A.    You mean out of those, say, 50 I

16    can save one, is that what you mean?

17            Q.    Yeah.

18            A.    Probably, yeah.  It's hard to

19    save them when there are connectivity issues.

03:15    20          Q.    It's an overriding issue if the

21    practice experiences a problem where the

22    screen goes dark, it's just -- almost never

23    will they stay with PatientPoint during that

24    time period; is that correct?

Electronically signed by Valerie Jones Conn (401-133-571-6952)                    754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

85

1          MR. BERNAY:  Object to the form.

2     You can answer.

3          A.    I wouldn't say never.  I mean,

4     they may give us another chance.  It's

5     possible to save them.

6          Q.    But that one reason is enough

7     for 49 out of 50 who want to cancel for that

8     reason; is that correct?

9          MR. BERNAY:  Object to the form.

03:15  10     You can answer.

11          A.    Correct.

12          Q.    You can't save a practice with

13     great content if the screen is dark a lot,

14     right?

15          A.    True, yes.

16          Q.    And so in the 2010 to early 2011

17     time period, when all the connectivity was

18     through faxes, if practices were switching to

19     ContextMedia and those practices had had

03:16  20     connectivity issues, almost all the time

21     PatientPoint was going to lose that practice

22     anyway and it just depends whether the

23     practice goes to television, nothing or

24     another competitor; would that be accurate?

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Valerie Jones Conn (401-133-571-6952)                    754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

86

1                    MR. BERNAY:  Objection.  Form.

2        You can answer.

3              A.    They may or may not have decided

4        to switch because of that.

5              Q.    If they've decided to switch and

6        they report that connectivity issues were the

7        reason, it would be very difficult to save

8        that practice, right?

9              A.    Yes.

03:17   10              Q.    Because of the connectivity

11        issues?

12              A.    If that's what they've reported,

13        yes.

14              Q.    And so that practice, except

15        for, you know, the rare one that could be

16        saved, were going to cancel PatientPoint

17        anyway, there's nothing you could do about

18        it, right?

19              A.    I'd say yes.

03:17   20              Q.    And then whether the practice

21        goes to television, ContextMedia, Accent

22        Health, Health Monitor, that's a separate

23        issue of, you know, somebody who's offering

24        something, or if they want cable TV they're

Electronically signed by Valerie Jones Conn (401-133-571-6952)                    754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

87

1    going to go to something or nothing, that's a

2    separate issue from cancelling due to the

3    connectivity issues, right?

4         A.    Yes.

5         Q.    Have you encountered practices

6    where the doctors just did not like some of

7    the content that Healthy Advice had up on its

8    screens?

9         A.    Maybe once or twice.  Not too

10   often.  Maybe they didn't like advertising.

11   We offer a disclaimer for that but it hasn't

12   been a regular thing, just a -- maybe two or

13   three times at the most since I've been here

14   and once or twice I did save them by giving

15   them the little disclaimer and putting up

16   disclaimers and then the person at the front

17   desk was able to say this is okay, the doctor

18   is all right now.

19        Q.    The content that you've seen in

20   your meeting room from the primary care

21   network, does it include live video, like

22   live action video?

23        A.    No.  It's still the -- it's not

24   really -- it's not like a TV per se.

Electronically signed by Valerie Jones Conn (401-133-571-6952)                    754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

88

1          Q.    There's not actual people

2     walking around talking captured in video,

3     right?

4          A.    Right.

5          Q.    Have you encountered -- and

6     that's been the same since 2010, right?

7          A.    Right.

8          Q.    Have you encountered practices

9     who have given the feedback that they prefer

03:19  10   video to the content that Healthy Advice or

11    PatientPoint is providing to them?

12         A.    Yes.

13         Q.    And when you get that feedback

14    there's no video option to give them from a

15    PatientPoint network, correct?

16         A.    Correct.

17         Q.    So there's not a lot that you

18    can do to save that practice either, right?

19         A.    Correct.

03:20  20        Q.    If a practice wants video then

21    that alone would be a sufficient reason for

22    them to switch to a competitor or to

23    television, right?

24         A.    Yes.

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Valerie Jones Conn (401-133-571-6952)          754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

89

1          Q.    And if they don't give you

2     another reason you would assume that that's

3     the reason that they're switching, right?

4          A.    Yes.

5          Q.    Have you encountered practices

6     -- PatientPoint Network's content doesn't

7     have much sound, right?

8          A.    It didn't back in 2010.  It does

9     now.

03:20    10          Q.    I've heard it described as

11     virtually silent.  Has that changed?

12          A.    Uh-huh.  Yes.

13          Q.    When did that change?

14          A.    In the past year.

15          Q.    In 2014?

16          A.    And '13; 2013 to '14.

17          Q.    So how much sound is there now?

18          A.    It's over 50 percent.  I'd say

19     60 percent sound now.

03:21    20          Q.    People talking?

21          A.    Uh-huh.  Yes.

22          Q.    Music?

23          A.    No music but talking.

24          Q.    Are people shown on the screen

Electronically signed by Valerie Jones Conn (401-133-571-6952)                                        754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

90

1    when they're talking?

2         A.    Yes.  Well, the segments.

3         Q.    Photos of them?

4         A.    Yes.

5         Q.    Not videos of them?

6         A.    No, not video.  Lot of the

7    segments have them.

8         Q.    Was the sound added because

9    feedback came from your team that practices

03:21  10    like sound and engaged the patients more?

11         A.    Yes.

12         Q.    That was important enough to the

13    practices that sometimes they would switch to

14    a competitor that had sound just for that

15    reason, right?

16         A.    Yes.

17         Q.    And if a practice representative

18    told you that the reason they are switching

19    to a competitor was because they wanted sound

03:22  20    and they didn't give you any other reason,

21    then you would conclude that that was the

22    sole reason that they were switching, right?

23         A.    Yes.

24         Q.    And when you were in that

Electronically signed by Valerie Jones Conn (401-133-571-6952)                    754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

91

1    situation prior to midway through 2013, when

2    the sound was ramped up to about 50 percent

3    on PatientPoint's network, there wasn't much

4    you could do, correct?

5           A.    Correct.

6           Q.    But then this feature was added

7    in order to more effectively compete, right?

8           A.    Yes.

9           Q.    PatientPoint ramped up their

03:22  10    content so about half of it had sound and

11    since that time PatientPoint's been able to

12    compete more effectively with competitors

13    that have sound, right?

14           A.    Yes.

15           Q.    And have you found it more easy

16    to deal with practices who want sound since

17    that time?

18           A.    Yes.

19           Q.    Has that come up with

03:22  20    competitors -- with practices who want to

21    switch to ContextMedia?

22           A.    I haven't come --

23                 MR. BERNAY:  Object to the form

24    -- I'm sorry -- object to the form.  You can

Electronically signed by Valerie Jones Conn (401-133-571-6952)          754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

92

1    answer.

2           A.    I haven't come up with that yet.

3    Haven't dealt with it.

4           Q.    Since the change in 2013?

5                 MR. BERNAY:  Same objection.

6    You can answer.

7           A.    Correct.

8           Q.    Did you say correct?

9           A.    Correct.

03:23   10        Q.    Prior to the change in 2013

11    where PatientPoint added more sound you did

12    deal with people, practices who wanted to

13    switch to the ContextMedia because it had

14    sound, right?

15           A.    Not so much ContextMedia.  I had

16    actually dealt with it with Accent Health.

17           Q.    Accent Health had sound --

18           A.    Sound.

19           Q.    -- in its content?

03:23   20        A.    Yes.

21           Q.    And it was a driving factor for

22    customers to change, practices to change to

23    Accent Health?

24           A.    Yes.

Electronically signed by Valerie Jones Conn (401-133-571-6952)                    754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

93

1          Q.    Have you encountered practices

2     who gave you feedback about the size and

3     quality of the hardware, the monitors?

4          A.    For PatientPoint's monitor?

5          Q.    Yes.

6          A.    I have, yes, on occasion and

7     offered upgrades to a larger monitor.

8          Q.    So PatientPoint's monitors used

9     to all be 19 inches?

03:24    10          A.    They did, yes.

11          Q.    Then at some point they offered

12     -- what's the new size?

13          A.    There's 26 and 32.

14          Q.    When did they start offering

15     those?

16          A.    Gosh, well, since -- when I --

17     19 was well before I started.  When I started

18     it was 27 -- 27 inch was popular and 32, and

19     then 26 came on board, gosh, I guess about

03:25    20     2012, and now 2012, 2013 26 and 32 is now all

21     we do offer.

22          Q.    No more 27?

23          A.    Correct.

24          Q.    Have you encountered practices

Electronically signed by Valerie Jones Conn (401-133-571-6952)          754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

94

1    who were offered a larger screen or a better

2    screen by a competitor?

3            A.    I haven't heard.  Not that I

4    know of.

5            Q.    Have you encountered practices

6    that have any other problem with the

7    hardware, that it's obtrusive or heavy or in

8    the way or anything like that?

9            A.    No.

03:25    10            Q.    Have you encountered practices

11    who say it's important that they have some

12    ability to customize the content?

13            A.    I've had a few that like that,

14    to be able to customize it.

15            Q.    I think we were saying earlier

16    that putting in the custom messages is really

17    important, right?

18            A.    Yes.

19            Q.    That's a big part of what you do

03:26    20    to kind of retain practices is engage them

21    with the custom messages?

22            A.    Yes.

23            Q.    So when I say have you

24    encountered any where customization is

Electronically signed by Valerie Jones Conn (401-133-571-6952)                    754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

95

1    important, are you thinking of customizing

2    the other segments when you say it's only a

3    few?

4              MR. BERNAY:  Object to the form.

5    You can answer.

6              A.    You mean --

7              Q.    The confusion is probably mine.

8    So I'm asking have you encountered practices

9    to whom it's important to be able to

03:26   10   customize the message, and you said a few and

11   I just --

12             A.    You mean if they were wanting

13   to -- I was thinking if they were wanting to

14   cancel and didn't know about the

15   customization or --

16             Q.    I see.

17             A.    But usually when -- if somebody

18   were calling to cancel I always bring that

19   up, but I'm kind of confused, too.

03:27   20        Q.    So only a few times have

21   people -- have practices given you the

22   feedback that I'm switching because you can't

23   customize my network and a competitor can;

24   that's happened sometimes but rarely?

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Valerie Jones Conn (401-133-571-6952)                    754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

96

1          A.    Yeah.  It doesn't happen too

2     often.

3          Q.    Because you can customize?

4          A.    Yes, you can.  Yes.

5          Q.    So if that happened you'd say

6     well, actually, you can customize.  Let me

7     explain how.

8          A.    Yes.

9          Q.    And that's something that -- you

03:27    10     say you contact a hundred customers in a

11     given week.  About how many of those have to

12     do with putting in custom messages?

13          A.    Gosh, over 60 of them --

14          Q.    Over -- okay.  So over time more

15     than half of the e-mails and calls that you

16     have with customers have to do with

17     customized messages?

18          A.    Yes.

19          Q.    Do you think that's an important

03:28    20     tool in retaining those practices as members

21     of the PatientPoint network?

22          A.    Yes.

23          Q.    And that's why you focus on that

24     so much?

Electronically signed by Valerie Jones Conn (401-133-571-6952)                    754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

97

1          A.    Yes.

2          Q.    It's a nice feature?

3          A.    It is.

4          Q.    If you didn't have it you would

5     then expect that some portion of those would

6     be less interested in PatientPoint's network?

7          A.    Yes.

8          Q.    And some portion of them would

9     cancel because of it?

03:28    10          A.    Yes.

11          Q.    Do you think customer service is

12     important to retaining members of

13     PatientPoint's networks?

14          A.    Yes.

15          Q.    Do you think that -- have you

16     encountered practices that switch because of

17     poor customer service?

18          A.    Yes.

19          Q.    Have you encountered practices

03:29    20     where that was the only reason for the

21     switch?

22          A.    I haven't encountered any

23     because of that.

24          Q.    So it's just one part of the

Electronically signed by Valerie Jones Conn (401-133-571-6952)                    754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

98

1    feedback that they give is they didn't like

2    the customer service they received?  You said

3    sometimes you get feedback about poor

4    customer service, right?  What am I saying

5    wrong?  I'm sorry.

6         A.   I think it's most -- it's very

7    important.  I haven't received any bad

8    feedback on it but I think that's most

9    important.  I haven't had anybody cancel

03:29    10    because they have had bad feedback from

11    another competitor or anything, but I feel

12    like that's the most important thing for

13    anyone to stay with us.

14         Q.   They're not cancelling because

15    you give good customer service?

16         A.   Correct.

17         Q.   That's why it doesn't come up?

18         A.   Correct.

19         Q.   Now I understand why you're

03:30    20    confused.  So you've received feedback from

21    customers that they like your customer

22    service?

23         A.   Correct.

24         Q.   The PatientPoint's customer

Electronically signed by Valerie Jones Conn (401-133-571-6952)                                    754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

99

1    service?

2            A.    Yes.

3            Q.    And you said that that's one of

4    the most important things in terms of

5    retaining practices in a network?

6            A.    Yes.

7            Q.    And then you're in customer

8    relationship management so you're dealing

9    with people who have already signed up,

03:30   10   correct?

11           A.    Yes.

12           Q.    There's another team that is

13   made up of sales representatives, right?

14           A.    Yes.

15           Q.    And they are important to

16   recruiting practices who have not been in a

17   PatientPoint network before, correct?

18           A.    Yes.

19           Q.    And competitors also have teams

03:31   20   of sales reps, right?

21           A.    Yes.

22           Q.    And whether a practice comes

23   into PatientPoint's network or whether a

24   practice goes to a competitor's network would

Electronically signed by Valerie Jones Conn (401-133-571-6952)                    754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

100

1    also presumably have something to do with

2    those sales reps, right --

3              A.    Yes.

4              Q.    -- what the sales reps are

5    saying and doing?

6              A.    Yes.

7              Q.    So one factor with a new

8    practice why they might come into

9    PatientPoint's network or go with a

03:31    10    competitor's network would be the quality of

11    those sales reps and what they say and do,

12    right?

13              A.    Yes.

14              Q.    Otherwise, they wouldn't be

15    adding any value because you'd have your

16    product and sells itself, right?

17              A.    Correct.

18              Q.    So there's some portion of a

19    practice's decision makings that are based on

03:31    20    all the other factors that we talked about

21    that are great for PatientPoint or maybe

22    where it struggled in the past or may

23    continue to struggle, then sales reps is

24    another factor and these are all part of a

Electronically signed by Valerie Jones Conn (401-133-571-6952)                    754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

101

1    decision making process, potentially?

2              A.    Yes.

3              Q.    And, as we've been going through

4    them, you've sort of described that this is

5    what I think is the most important customer

6    service, this I think is -- you know, this

7    has only come up a little bit.  This is one

8    of the more important factors.  I think what

9    I'd like to do is go back through the list

03:32    10    and try to just get a gauge of how important

11    each one is based on your experience.  So I

12    like numbers, I think we've already done like

13    a one out of 10 kind of thing.

14              A.    Okay.

15              Q.    Let's do one out of a hundred.

16              A.    Okay.

17              Q.    And first I'm going to list all

18    the things that I -- that we just talked

19    about as factors so that you kind of have

03:32    20    them in your mind, and if you want to write

21    them down you can, and then I'm just going to

22    go through and say how important is that one

23    out of a hundred --

24              A.    Okay.

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Valerie Jones Conn (401-133-571-6952)                    754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

102

1          Q.    -- based on your four years of a
2     hundred calls a week.  You understand what
3     I'm saying?
4          A.    Okay.
5          Q.    And you don't have to make them
6     add up to a hundred.  You know, if they're
7     all 80, they're all 80, you know what I mean?
8          A.    Okay.
9          Q.    But, you know, 10, 25, 72,
03:33  10     whatever you want to rate for each one.
11          A.    Okay.
12          Q.    So the factors that I have are
13     the content that's shown on the screens, the
14     video versus non-video.  Remember we talked
15     about that?
16          A.    Uh-huh.  Yes.
17          Q.    The sound versus no sound,
18     connectivity issues.  Remember these can be
19     both bad and good --
03:34  20     A.    Okay.
21          Q.    -- it's just how important is
22     it.  It seemed to me like you didn't think
23     that the hardware was a factor?
24          A.    No.

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Valerie Jones Conn (401-133-571-6952)          754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

103

1          Q.    Customizability, custom

2    messaging?

3          A.    Yes.

4          Q.    Customer service and the sales

5    representatives, their activities and words?

6          A.    Yes.

7          Q.    So are there any other factors

8    that you were thinking of that I left out?

9          A.    What about the -- no, that's

03:35  10    good.

11          Q.    And if you think of one later,

12    let me know.

13          A.    Okay.

14          Q.    So, one out of a hundred, how

15    important would you rate the content that's

16    shown on the screen?

17              MR. BERNAY:  Object to the form

18    of the following questions.  I think this is

19    an arbitrary exercise, getting her to answer

03:35  20    on a scale.  You've already asked her whether

21    this is important or not.  I'll let her

22    answer but note my objection for the record.

23    You can answer.

24          A.    Content is 95 percent.

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Valerie Jones Conn (401-133-571-6952)                    754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

104

1          Q.    And when you say percent, you

2      mean 95 out of a hundred it's very important?

3          A.    Yes.

4          Q.    What about having video versus

5      not having video?

6                MR. BERNAY:  Just note a

7      continuing objection to this line of

8      questioning.

9          A.    Ninety.

03:36   10          Q.    Okay.  Sound versus no sound?

11          A.    Fifty.

12          Q.    Connectivity issues?

13          A.    One hundred.

14          Q.    Customized messaging?

15          A.    Ninety.

16          Q.    Customer service?

17          A.    A hundred.

18          Q.    Take pride in your work?

19          A.    I do.

03:36   20          Q.    And the activities of sales

21      representatives?

22          A.    One hundred because if they

23      don't do their job I'm not going to have one.

24          Q.    And then I understand that you

Electronically signed by Valerie Jones Conn (401-133-571-6952)                    754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

105

1   don't always rate these things one out of a

2   hundred, but as we were going through you

3   were noting some that were more important and

4   less important, right?

5       A.   Yes.

6       Q.   Can you think of a better way

7   than rating them one out of a hundred to

8   figure out how much more important or how

9   much less important?

10          MR. BERNAY:  Object to the form.

11  You can answer.

12          A.   Well, all along we've always

13  gotten along without sound because people

14  usually can read the segments and now we're

15  introducing sound and you can go either way

16  because if you wanted to have a TV in there

17  you could, so you can still do that.  You can

18  turn it down and we can coexist, so that's

19  why I went 50/50 on that.

20      Q.   Because that could or could not

21  make a difference?

22      A.   Correct.

23      Q.   But the ones that are more up

24  near a hundred are much more likely to make a

03:37

03:37

Electronically signed by Valerie Jones Conn (401-133-571-6952)                    754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

106

1    complete difference.  It's like if you don't

2    have it, it's not going to work; if you do

3    have it, that's awesome?

4         A.    Right.

5         Q.    Can you think of a better way to

6    convey that than numbering out of a hundred?

7              MR. BERNAY:  Objection.

8         Q.    I'm willing to kind of go

9    through the list again in a different way, if

10   you like.

11             MR. BERNAY:  Same objection.

12   You can answer.

13        A.    Do you mean like one of the

14   other ones?  The one I didn't go a hundred

15   on?

16        Q.    No, no.  I just mean if you want

17   to go through the whole list and compare them

18   in a different way I could.  This was kind of

19   the best way that I could think of to gauge

20   their relative importance.  We could give

21   them rotten tomatoes.  I'm happy with this

22   but I wanted to ask you if there's a

23   different way in your mind that you rate the

24   relative importance of these various factors.

03:38 (line 10)

03:38 (line 20)

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Valerie Jones Conn (401-133-571-6952)          754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

107

1          A.    Customer service, I think, is,

2     of course, number one.  I mean, that's --

3          Q.    So you want to maybe rank them?

4          A.    One, two, three, four, like

5     that?

6          Q.    You want to?  Do you think that

7     would be a better way, just a different way?

8          A.    I mean, they're all important to

9     the -- in order to have a good company to

03:39   10     make everything work.

11          Q.    If you were ranking them, then

12     the ones that, you know, had -- you gave the

13     highest score out of a hundred would be at

14     the top of the list and then there would be

15     some that are tied if you gave them the same

16     number and you kind of marched down the list,

17     right?

18          A.    Yes.

19          Q.    Okay.  Let me know if you think

03:39   20     of a different way to kind of get at which

21     ones are more important and less important if

22     you think of one later.  Okay?

23          A.    Okay.

24          Q.    I'm going to hand you what we're

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Valerie Jones Conn (401-133-571-6952)          754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

108

1    going to mark as Exhibit 30.

2       (Exhibit 30 was marked.)

3          Q.    Is this an e-mail from you to

4    Lori Smith dated March 10, 2011?

5          A.    Yes.

6          Q.    The information that's in the

7    bottom of the e-mail, is that a CMS entry?

8             MR. BERNAY:  Take your time to

9    review the e-mail.

03:40   10          A.    I'm sorry, what was your

11    question?

12          Q.    Is this an e-mail from you to

13    Lori Smith dated March 10th, 2011?

14          A.    Yes.

15          Q.    And, I'm sorry, that wasn't my

16    last question.  My last question was is that

17    information at the bottom of the e-mail a CMS

18    entry?

19          A.    Yes.

03:41   20          Q.    Do you make an entry like this

21    each time that you have a call or an e-mail

22    with a practice?

23          A.    Yes.

24          Q.    Do you make it according to

Electronically signed by Valerie Jones Conn (401-133-571-6952)          754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

109

1    policies and procedures that are given to you

2    by PatientPoint?

3          A.    Yes.

4          Q.    And, as you've said previously,

5    you make a CMS entry like this during or very

6    shortly after the call or the e-mail,

7    correct?

8          A.    Very shortly after, yes.

9          Q.    At a time when it's very clear

03:41   10   in your mind, right?

11         A.    Yes.

12         Q.    And this type of CMS entry, all

13   CMS entries are made in the ordinary course

14   of your job, correct?

15         A.    Yes.

16         Q.    And they're kept by the CMS

17   system in the ordinary course of your job,

18   right?

19         A.    Yes.

03:42   20         Q.    And you have direct knowledge of

21   everything that I've just asked you, right?

22         A.    Correct, yes.

23         Q.    Which you got through your job?

24         A.    Yes.

Electronically signed by Valerie Jones Conn (401-133-571-6952)          754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

110

1        Q.    I don't mean to be too
2    rudimentary, I'm just running through this
3    list.  And is it, the other 10 members of
4    your team and other members of your team who
5    have come and gone since 2010, it's part of
6    their jobs to make entries like this, right?
7        A.    Correct.
8        Q.    And they also make them in the
9    ordinary course of their jobs, correct?
10        A.    Yes.
11        MR. BERNAY:  Object to the form.
12    You can answer.
13        Q.    And the CMS entries that they
14    make are also kept in the ordinary course of
15    business, right?
16        A.    Yes.
17        MR. BERNAY:  Objection.  You can
18    answer.
19        Q.    And you have knowledge of all
20    the questions that I just asked you, right,
21    from your job?
22        A.    Yes.
23        Q.    When a practice representative
24    speaks to you or e-mails you about a

03:42 (line 10)

03:42 (line 20)

Electronically signed by Valerie Jones Conn (401-133-571-6952)                    754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

111

1    termination, part of your job is asking them

2    what reason in their mind is causing them to

3    switch, right?

4           A.    Yes.

5           Q.    And then they give you that

6    information, right?

7           A.    Yes.

8           Q.    Sometimes?

9           A.    Correct.  Yes.

03:43   10    Q.    And if they give it to you, your

11    instructions are to make sure it goes in the

12    CMS entry, correct?

13          A.    Yes.

14          Q.    And that's notating the account?

15          A.    Yes.

16          Q.    Do you happen to remember Joani

17    Lesser?

18          A.    To this day, no, until reading

19    this e-mail.

03:44   20    Q.    But does this jog your memory

21    and you kind of remember her now?

22          A.    Yes.

23          Q.    So you'd forgotten about her but

24    it's bringing back pleasant memories?

Electronically signed by Valerie Jones Conn (401-133-571-6952)                    754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

112

1          A.    It's an okay memory.  It's part
2    of the job.
3          Q.    Is she related to James Lesser?
4          A.    It sounds like it, yes.
5          Q.    Do you remember that?
6          A.    I don't.  I -- just by reading
7    this.  I mean, it's been so long.
8          Q.    But you do have a memory of
9    speaking with Joani?
03:44  10          A.    Yes.
11          Q.    Was she a pleasant person?
12          A.    Yes, it was a nice practice.
13    Hated to lose them.
14          Q.    Do you remember speaking with
15    Joani on multiple occasions then?
16          A.    You know, I can't remember.  I
17    must have because, you know --
18          Q.    You have a general impression of
19    her?
03:44  20          A.    Yes.
21          Q.    Which must have come from
22    multiple conversations; is that right?
23          A.    Yes.  Yes.
24          Q.    This e-mail that's been marked

Electronically signed by Valerie Jones Conn (401-133-571-6952)                    754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

113

1    as defense Exhibit 30 is a request to cancel,

2    right?

3            A.    Yes.

4            Q.    Or, excuse me, I said e-mail.

5    This e-mail reflects a phone call that was a

6    request to cancel, right?

7            A.    Yes.

8            Q.    Do you write this type of e-mail

9    in the ordinary course of your job?

03:45  10            A.    Yes.

11            Q.    It's a regular practice to put

12    the CMS entry at the bottom of an e-mail and

13    maybe a short comment and send it to somebody

14    who would be interested in it?

15            A.    Yes.  Like I have scheduled

16    removal for April.  This is what's usually

17    going to go to Amy, a reason why and when

18    it's going to be removed.

19            Q.    So there's a regular practice

03:45  20    and procedure in your job of sending e-mails

21    like this?

22            A.    Yes.

23            Q.    And keeping them in the ordinary

24    course?

Electronically signed by Valerie Jones Conn (401-133-571-6952)          754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

114

1          A.    Yes.

2          Q.    When Joani called you to cancel

3     did you go through the script about asking

4     why?

5          A.    Yes.

6          Q.    And did she give you a reason?

7          A.    Yes.

8          Q.    What was the reason?

9          A.    She wanted -- well, her daughter

03:46    10     was an endocrinologist and because of that

11     she found that the other office she was going

12     to go with, competitor, their information was

13     a little more along the line of what dealt

14     with a little more closer than what we had,

15     the product that we had, so it was -- it had

16     more information that dealt with what they

17     were going to be dealing with.  Ours kind of

18     encompasses a little bit of everything where

19     hers -- theirs is -- narrows down to more

03:46    20     rheumatology.

21          Q.    And this was RHN, which is put

22     out by ContextMedia?

23          A.    Yes.

24          Q.    That's the competitor that

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Valerie Jones Conn (401-133-571-6952)                    754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

115

1    replaced PatientPoint system?

2         A.    Yes.

3         Q.    And that was the reason that

4    Joani gave you for the switch?

5         A.    Yes.

6         Q.    Did Joani also mention that

7    ContextMedia had a longer loop?

8         A.    Yes.

9         Q.    Did she specify how much longer?

03:47   10         A.    No.

11         Q.    Do you understand what loop

12    means?

13         A.    Just how long -- yes, the

14    program, itself, is going to be longer.

15         Q.    The programming repeat after a

16    certain amount of time?

17         A.    Yes.

18         Q.    And PatientPoint system at the

19    time probably was repeating every half hour;

03:47   20    is that correct?

21         A.    Yes.

22         Q.    Sometimes maybe up to 40, 45

23    minutes?

24         A.    Yes.

Electronically signed by Valerie Jones Conn (401-133-571-6952)                    754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

116

1          Q.     Do you know how long RHN's loop

2     was at the time?

3          A.     No.

4          Q.     But that was important to Joani,

5     right?

6          A.     Yes.

7          Q.     Joani notes that they did very

8     much like your program before RHN came to

9     compete with it, correct?

03:48  10          A.     Yes.

11          Q.     So these competitive advantages,

12     the more focused rheumatology information and

13     the longer loop, were the reason for her

14     switch.  It wasn't that she was dissatisfied

15     with PatientPoint before that, correct?

16          A.     Correct.

17          Q.     There was no confusion on

18     Joani's part, she knew that RHN was a

19     competitor of PatientPoint and she was

03:48  20     choosing them over PatientPoint, correct?

21          A.     Correct.

22          Q.     And she said that RHN offered to

23     take it down, correct?

24          A.     Yes.

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Valerie Jones Conn (401-133-571-6952)                    754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

117

1        Q.    But you told her that they're

2   not allowed to do that, right?

3        A.    Correct.

4        Q.    You think she understood you?

5        A.    Yes.

6        Q.    You have no reason to believe

7   that, when you tell a practice that a

8   competitor is not allowed to touch the

9   equipment, that they somehow don't

03:49  10   understand, right?

11        A.    Right.

12        Q.    And you, you know, it's part of

13   your job to communicate effectively with

14   practices, right?

15        A.    Yes.

16        Q.    So you can kind of get a feel if

17   your point is getting across or if they're

18   confused in any way?

19        A.    Yes.

03:49  20        Q.    And if they were confused would

21   you follow up and make sure that they

22   understood you?

23        A.    Yes.

24              MR. BERNAY:  We've been going

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Valerie Jones Conn (401-133-571-6952)                    754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

118

1    for a while.  Let's take a break.

2                MR. HANKINSON:  Okay.

3        (Break taken.)

4            Q.    Ms. Lawrence, have you heard of

5    churn?  I think we mentioned it earlier

6    today.

7            A.    Yes.

8            Q.    Have you heard of churn during

9    your work?

04:05   10            A.    Yes.

11            Q.    What does that refer to

12    specifically at PatientPoint?

13            A.    The ins and outs.  What I think

14    of is somebody -- one going in, one going

15    out.

16            Q.    One what?

17            A.    One service, one company going

18    in, one company going out.  I think of it

19    like that.

04:05   20            Q.    One provider of waiting room

21    network services going into a practice while

22    the other competitor goes out?

23            A.    Correct.  Yes.  One going out,

24    one going in.

Electronically signed by Valerie Jones Conn (401-133-571-6952)                    754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

119

1        Q.    Is churn something that

2    PatientPoint tracks?

3        A.    Yes.

4        Q.    How do they do that?

5        A.    I don't actually know exactly

6    how it goes about doing it.  I'm sure we have

7    reports that run but I don't see that end of

8    it but I'm sure that there are reports that

9    run.

04:06   10        Q.    You don't see that end of it.

11    Are you on the side of it where you're

12    inputting information in some way?

13        A.    No.

14        Q.    No?

15        A.    No.  I mean, I don't get to see

16    that.  I mean, I do -- I put my notes in and

17    I'm sure there's some type of report that

18    runs but I don't get to -- I don't see that

19    side of it.

04:06   20        Q.    What type of report?

21        A.    Well, if the company runs

22    reports, that type of thing.  I don't see

23    that side of it or know the outcome.

24        Q.    Let me show you a document that

Electronically signed by Valerie Jones Conn (401-133-571-6952)                    754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

120

1    we marked yesterday.  Handing the exhibit,

2    Defendant's Exhibit -- I'm handing the

3    witness Defendant's Exhibit 27.  Do you

4    recognize that document at all?

5                MR. BERNAY:  Take a minute and

6    look through the document.

7       (Exhibit 27 was marked.)

8             A.    I don't.  I don't -- no.

9             Q.    Do you recognize any of the

04:07   10    words in it or numbers, headings, anything?

11                MR. BERNAY:  Objection to the

12    form.  You can answer the question.

13            A.    I mean, I know some of the,

14    like, competitor, brochures, advertising.

15            Q.    Did you ever receive training or

16    instructions about picking just one reason

17    for a switch to a competitor or to

18    television?

19            A.    Yes, yes.  If there's -- like

04:08   20    some of these are a reason code.

21            Q.    What's a reason code?

22            A.    A reason for an office to choose

23    to leave, to move, to leave our company.

24            Q.    A reason that a practice gives

Electronically signed by Valerie Jones Conn (401-133-571-6952)                    754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

121

1    to terminate PatientPoint's waiting room

2    network service has a code that's assigned to

3    it; is that right?

4            MR. BERNAY:  Object to the form.

5    You can answer.

6            A.    Yes.

7            Q.    Is there a long list of those

8    reasons they each have a code?

9            A.    Just the ones mentioned here.

04:09   10            Q.    Just the ones that are listed on

11    the first page of Defendant's Exhibit 27?

12            A.    Yes.

13            Q.    Did you receive training in what

14    those codes correspond to or how to pick a

15    particular code?

16            A.    It's not so much training but it

17    just comes up on our screen.  Yes, I guess it

18    is training.  Comes up on our screen, on our

19    monitor.

04:09   20            Q.    When does it come up on your

21    monitor?

22            A.    When they click a little button

23    to choose when they're cancelling.

24            Q.    So somebody calls or e-mails you

Electronically signed by Valerie Jones Conn (401-133-571-6952)          754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

122

1    from a practice and says I want to cancel,

2    you talk to them in the way that we've

3    discussed earlier today.  At some point you

4    click a button.  Is this connected to the CMS

5    system?

6            A.    Correct.

7            Q.    So you click a button in the CMS

8    software and -- that indicates the practice

9    wants to cancel, right?

04:10   10            A.    Yes.

11            Q.    And then after that at some

12   point there's an option given to you that

13   says -- that you're supposed to input a

14   reason code?

15            A.    It will be a little drop down

16   and these little reasons will come down and

17   you just choose which one, why they're

18   leaving.

19            Q.    And is it limited by the system

04:10   20   so that you can only choose one reason code?

21            A.    Actually you can -- I think

22   there's two.  You can choose two reason codes

23   why they're leaving.

24            Q.    No more than two?

Electronically signed by Valerie Jones Conn (401-133-571-6952)          754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

123

1       A.    Yes.

2       Q.    Did you ever receive training or

3    instruction about how to select just one or

4    two reasons if a practice gives you more than

5    that?

6       A.    We can put it in the notes.

7       Q.    And you do put it in the notes,

8    right?

9       A.    Correct.

04:11   10       Q.    I'm just asking did anybody ever

11    tell you, if the practice gives you three

12    reasons or five reasons, how to pick the ones

13    to put in as reason codes?

14       A.    We'll choose from this list and

15    pull the ones that actually relate to that

16    office, what they're saying.

17       Q.    And were you instructed to use

18    your best judgment in doing this?

19       A.    Yes.

04:11   20       Q.    And were you instructed what the

21    different reason codes meant?

22       A.    Yes.

23       Q.    Was that during a weekly meeting

24    or in a separate session?

Electronically signed by Valerie Jones Conn (401-133-571-6952)                    754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

124

1      A.    When we first talked when we are

2    hired, go through our training.

3      Q.    And it's been the same since you

4    started in 2010?

5      A.    Yes.

6      Q.    Have the reason codes changed or

7    has it stayed the same since then?

8      A.    I think it's pretty much stayed

9    the same.

04:12    10      Q.    Were you trained at that time

11    how to get the practice to tell you the

12    reasons?

13      A.    We just asked.  I mean, we just

14    asked what the reason was.

15      Q.    You were provided with the

16    binder about -- the WRN binder, correct?

17      A.    Yes.

18      Q.    And that had some instructions

19    about how to get that information from the

04:12    20    practice, right?

21      A.    It had suggestions.

22      Q.    Were you told to follow the

23    suggestions?

24      A.    Yes.

Electronically signed by Valerie Jones Conn (401-133-571-6952)                    754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

125

1          Q.    Did that include asking

2     follow-up questions if at first the practice

3     didn't give you a real answer?

4          A.    Well, we'd ask why and then we'd

5     ask if there was anything else we can do to

6     save, save you, is there something else that

7     you're looking for.  We would just lead with

8     that.

9          Q.    And the idea was that if you ask

04:12  10    if there's anything else you can do and the

11    practice says some things, then that's

12    probably the reason that they're switching?

13         A.    Correct.

14         Q.    Were there other leading

15    questions like that, that were intended to

16    get a reason from the practice representative

17    who was trying to cancel?

18         A.    I don't know of any offhand

19    right now but --

04:13  20         Q.    It was part of the binder and

21    the training?

22         A.    Correct.

23         Q.    The reason codes are entered

24    into the system every time a practice

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Valerie Jones Conn (401-133-571-6952)                    754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

126

1    cancels, correct?

2         A.    Yes.  You can't go to another

3    screen unless you complete that screen.

4         Q.    And those reason codes are

5    entered as a part of the ordinary course of

6    business, right?

7         A.    Yes.

8         Q.    And they're kept in the CMS as a

9    part of the ordinary course of business,

04:13    10    correct?

11         A.    Yes.

12         Q.    And the person who's entering

13    the reason code is the person who just

14    interacted with the practice about what that

15    reason was, correct?

16         A.    Correct.

17         Q.    And do they enter that reason

18    code at or right after the call or e-mail

19    exchange with the practice?

04:14    20         A.    Right.  Yes.

21         Q.    In every case?

22         A.    When they're cancelling.

23         Q.    In every case that's true?

24         A.    Yes.

Electronically signed by Valerie Jones Conn (401-133-571-6952)                    754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

127

1          Q.    Is a reason that this is a very

2     specific process so that PatientPoint can

3     look back at that data at some point?

4          A.    Yes, so we know why.

5          Q.    And then some analysis can be

6     done based on actual numbers about the

7     reasons that practices switch to a

8     competitor, correct?

9          A.    Correct.

04:14  10          Q.    And does the CMS also track

11     which competitor practices switch to when the

12     practice tells you?

13          A.    That I don't know.  I don't have

14     something that I click on to say which

15     competitor because I don't --

16          Q.    That's just entered into the

17     notes?

18          A.    Right.  Sometimes we don't know

19     who.

04:15  20          Q.    Right.  You always ask, correct?

21          A.    Correct.

22          Q.    And if the practice tells you

23     then you always enter it into CMS, correct?

24          A.    Correct.

Electronically signed by Valerie Jones Conn (401-133-571-6952)                    754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

128

1        Q.    Do you usually ask a follow-up

2    question if the practice doesn't tell you at

3    first?

4        A.    I do.

5        Q.    Do you do your best --

6        A.    Well, I can't always -- yeah, I

7    do my best to find out and if they don't, I

8    don't keep asking.

9        Q.    You apply your customer service

04:15   10    expertise to get the answer as best you can?

11        A.    Yes.  I don't want to make them

12    mad.

13        Q.    You're trained in customer

14    service, correct?

15        A.    Yes.

16        Q.    How much training do you have?

17        A.    About 30 years.

18        Q.    Thirty years of continuous

19    training?

04:15   20    A.    Of being in customer service.

21        Q.    Including at various companies?

22        A.    Yes.

23        Q.    And did those various companies

24    give you periodic trainings throughout those

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Valerie Jones Conn (401-133-571-6952)                    754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

129

1    years?

2         A.    Yes.

3         Q.    Both specific to the practices

4    at that company and also just general

5    customer service principles?

6         A.    Yes.

7         Q.    Have you received specific

8    training in how to elicit information from a

9    customer?

04:16  10         A.    Not so much that.

11         Q.    What kinds of things?

12         A.    I mean, I haven't been told

13    exactly how to go about pulling information

14    from a customer, no.

15         Q.    What kind of things have you

16    received training in?

17         A.    Just about how to -- well, phone

18    training and just how to speak to a customer,

19    how to work with practices.

04:16  20         Q.    In what sense did you get

21    trained in how to work with practices?

22         A.    How to -- just what not to ask,

23    what to ask.  I don't know how much --

24         Q.    I'd like all the detail.

Electronically signed by Valerie Jones Conn (401-133-571-6952)                    754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

130

1         A.    I don't know.  I just have a

2    phone etiquette.

3         Q.    What do you mean by what to ask

4    and what not to ask?

5         A.    I mean, there's -- I don't

6    usually cross the -- I'm not going to go

7    overboard and ask -- I'm not going to make a

8    customer mad.  If they don't want to talk

9    about something or -- I'm not going to call

04:17  10    them too many times.  If somebody in another

11    department just called, I'm supposed to call

12    them in a few days, I stop.  I don't call and

13    bug them again.  Little things like that.

14         Q.    When you're on calls or e-mail

15    exchanges with practices are you applying all

16    your experience in 30 years and all the

17    training that you've gotten --

18         A.    I try to.

19         Q.    -- to do the best job you can,

04:17  20    right?

21         A.    I do.

22         Q.    Do you think you're, at this

23    point, pretty good at your job?

24         A.    I feel I am.

Electronically signed by Valerie Jones Conn (401-133-571-6952)                    754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

131

1          Q.    Do you feel you're an expert in

2    customer service?

3          A.    I feel I am.

4          Q.    Do you feel that, based on your

5    experience, you can get a good understanding

6    from most practices about the information

7    that you're trying to get from them?

8          A.    Yes.

9          Q.    Do you feel that, from your

04:18   10    experience and training, you can tell if

11    you're not getting all the information?

12          A.    Sometimes.

13          Q.    You get a feeling?

14          A.    Yes.

15          Q.    Where you feel like you're not

16    getting the whole story do you enter

17    something in CMS to indicate that?

18          A.    No, I would never do that.

19          Q.    You would just give the best

04:18   20    information that you're able to give and put

21    that into CMS, correct?

22          A.    Correct.

23          Q.    And if the practice won't give

24    you the information you would put that into

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Valerie Jones Conn (401-133-571-6952)                    754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

132

1    CMS?

2           A.    Right.  If they won't tell me

3    who then I just put they would not divulge

4    who.

5           Q.    Or why if they won't tell you

6    why?

7           A.    Correct.

8           Q.    How often do you enter a reason

9    but you think that the practice was not being

04:19  10    honest with you?

11               MR. BERNAY:  Object to the form

12    of the question.  You can answer.

13           A.    Depending on how they --

14    whatever they said.  If --

15           Q.    I'm just asking how often.

16           A.    How often?

17           Q.    It's not something that comes up

18    a lot, correct?

19           A.    Correct.

04:19  20           Q.    People are generally honest with

21    you?

22           A.    They are.

23           Q.    Ninety-nine times out of a

24    hundred or more --

Electronically signed by Valerie Jones Conn (401-133-571-6952)          754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

133

1          A.    Yes.

2          Q.    -- your feeling is that the

3     practice representative is being honest with

4     you?

5               MR. BERNAY:  Object to the form.

6     You can answer.

7          A.    I feel they are.

8          Q.    It's very rare that you would

9     get the feeling that they're not being

04:20  10    honest?

11         A.    Most of the time.

12         Q.    Most of the time it's very rare?

13         A.    Correct.

14         Q.    The other times it's just rare?

15         A.    Yes.

16         Q.    Could you tell me what companies

17    you've worked for in customer service and

18    about what time frames?

19         A.    Central Hardware, '79 to --

04:20  20    well, 15 years ago -- to '83, '85.  I worked

21    at Time Warner Cable.  I'm kind of jumping

22    around.  I work at Fifth Third Bank and I

23    worked at -- I worked at Fifth Third Bank for

24    a year and a half in the '80s.  I worked at

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Valerie Jones Conn (401-133-571-6952)                    754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

134

1    Time Warner Cable, and that was until 2009

2    for seven years, so 2002.  And it was all

3    pretty much customer service in those

4    departments, and then 2010 until now, so I

5    was a little scrambled there.

6         Q.    That's okay.  1979 for about,

7    let's see, until about the mid 1980s you

8    worked at Central Hardware?

9         A.    Yes.

04:21  10         Q.    And that was in customer

11    service?

12         A.    Yes.

13         Q.    Did they give you training

14    throughout that time?

15         A.    Uh-huh.  Yes.

16         Q.    Was there a database that you

17    entered information into?

18         A.    Well, I worked -- yes, there

19    was.  I worked in a computer.  I worked -- I

04:22  20    did payroll.

21         Q.    It was pretty cutting edge at

22    that point?

23         A.    I was.  I worked at a register,

24    I was a supervisor.

Electronically signed by Valerie Jones Conn (401-133-571-6952)                    754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

135

1          Q.    And there was data entry where

2     you were trying to get information and then

3     pass it into a system?

4          A.    Yes.

5          Q.    And then after that at some

6     point you worked for Fifth Third Bank just

7     for a brief period?

8          A.    For about a year and a half.

9          Q.    Year and a half.  Was that in

04:22  10    customer service?

11         A.    Yes.

12         Q.    Was there entry of information

13    that you got from customers into a database

14    there?

15         A.    Yes.

16         Q.    Did you receive training in how

17    to do that?

18         A.    Yes.

19         Q.    And then where did you work

04:22  20    from, if at all, from sort of the late 1980s

21    to 2002?

22         A.    I think that was Rumpke.

23         Q.    Rumpke or Remke?

24         A.    Rumpke trash service, customer

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Joyce Lawrence, 3/19/2014

136

1    service.

2         Q.    Was that also, yes, you said,

3    customer service?

4         A.    Yeah.  Yes.

5         Q.    And did that job involve

6    eliciting information from customers and

7    putting it into a database?

8         A.    It did.

9         Q.    And did you receive training

04:23   10    throughout your time at Rumpke in how to

11    effectively do that?

12         A.    Yes.

13         Q.    Then from 2002 to 2009,

14    approximately, you worked at Time Warner

15    Cable; is that right?

16         A.    Yes.

17         Q.    And there, as well, it was in

18    customer service?

19         A.    Yes, for a year in customer

04:23   20    service and then I did sales.

21         Q.    Okay.  When you were in customer

22    service did you get information from

23    customers and put it in the database?

24         A.    I did.

Electronically signed by Valerie Jones Conn (401-133-571-6952)                    754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

137

1          Q.    And did you receive training in
2     how to do that effectively?
3          A.    Yes.
4          Q.    When you were in sales at Time
5     Warner Cable did you also still engage with
6     customers and potential customers?
7          A.    Yes.
8          Q.    And did that involve taking
9     information from those customers and putting
04:24  10     it into a database?
11          A.    Yes.
12          Q.    Did you receive training from
13     Time Warner Cable in how to effectively do
14     that?
15          A.    Yes.
16          Q.    After that you moved to
17     PatientPoint from 2010 to present, correct?
18          A.    Correct.
19          Q.    Do you think there's anyone at
04:24  20     PatientPoint for a practice -- let me start
21     over.
22               When a practice cancels and you
23     are the person who takes the cancellation
24     call or e-mail is there anyone at

Electronically signed by Valerie Jones Conn (401-133-571-6952)          754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

138

1    PatientPoint who would know more than you

2    about the reasons that that practice is

3    cancelling?

4          A.    There may be.  I don't know.

5          Q.    You're not aware of someone else

6    who would?

7          A.    Correct.

8          Q.    And if there was someone else

9    who knew more they would be entering

04:25   10    information in CMS, correct?

11          A.    Correct.

12          Q.    Therefore, the information in

13    CMS entered by you would be the best

14    information that PatientPoint has about the

15    reasons for a customer to switch to a

16    competitor unless there's another CMS entry

17    about that practice by someone else --

18                MR. BERNAY:  Object to the form.

19          Q.    -- is that correct?

04:25   20                MR. BERNAY:  You can answer.

21          A.    Can you say that again?

22          Q.    Sure.  If there's no other entry

23    in CMS about the practice switching and the

24    reasons that the practice is switching to a

Electronically signed by Valerie Jones Conn (401-133-571-6952)                    754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

139

1    competitor, only your entry --

2             A.    Okay.

3             Q.    -- then you are the person with

4    the most knowledge about the reason for the

5    switch at PatientPoint, correct?

6             MR. BERNAY:  Same objection.

7    You can answer.

8             A.    Correct.

9             Q.    We talked about it a lot.  I'm

04:26  10    going to hand you what we are marking as

11    Defendant's Exhibit 31.

12       (Exhibit 31 was marked.)

13             Q.    This is a document that was

14    produced, meaning given to us, by

15    PatientPoint's attorneys and they've called

16    it HAN 001590.  That doesn't appear on the

17    face of this document because it was produced

18    in a form that didn't have a label on it and

19    that's when I printed it out, but this is

04:27  20    that document, the one that you produced to

21    me by e-mail, Aaron.

22             MR. BERNAY:  Just, for the

23    record, I think it's HAN 005190.

24             MR. HANKINSON:  Pardon me.

Electronically signed by Valerie Jones Conn (401-133-571-6952)                    754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

140

1          MR. BERNAY:  And this was -- I

2    believe this was entered as an exhibit

3    yesterday as Exhibit 18.

4          MR. HANKINSON:  But there were

5    some cutoffs.

6          MR. BERNAY:  There was some

7    cutoffs so this is a version of the same

8    document with full entries.

9          MR. HANKINSON:  With no cutoffs.

04:27    10   Thank you for that.  So HAN 005190.

11        Q.    Ms. Lawrence, do you recognize

12   the fields, the columns that you can see in

13   this exhibit as fields in the CMS?

14        A.    Yes.

15        Q.    The column that's labeled

16   comment text, do those appear to you to be

17   CMS entries?

18        A.    Yes.

19        Q.    The location ID column, does

04:28    20   that appear to you to have the numbers that

21   are assigned to practices?

22        A.    Yes.

23        Q.    Does each practice get a unique

24   location ID?

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Valerie Jones Conn (401-133-571-6952)                    754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

141

1          A.    Yes.

2          Q.    The next column after location

3    ID is location name.  In the CMS database do

4    these location names appear this way?

5          A.    Yes.

6          Q.    The column after that is program

7    code and the programs say things like PCN,

8    ACN.  I'm not seeing a CCN but there might be

9    one.  Are those the different networks that

04:29  10    would be associated with that practice in

11    CMS?

12          A.    Yes.

13          Q.    What is stage code?

14          A.    What stage they're in now,

15    whether they're active or cancelled.

16          Q.    So active is part of the

17    network, cancelled is what would be in CMS

18    after the practice has terminated HAN's or,

19    excuse me, Healthy Advice's or PatientPoint's

04:29  20    network?

21          A.    Correct.

22          Q.    Is stage competitor a field

23    where, if the competitor that the practice

24    moves to is known, it's entered into CMS.

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Valerie Jones Conn (401-133-571-6952)          754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

142

1          A.    Yes.

2          Q.    So where I see Accent Health in

3     this column, in Defendant's Exhibit 31, that

4     would be PatientPoint's best knowledge of

5     which competitor the practice switched to,

6     correct?

7          A.    Correct.

8          Q.    And if it says television then

9     PatientPoint's best knowledge is that the

04:30  10     practice cancelled PatientPoint and uses a

11     television instead, right?

12          A.    Yes.

13          Q.    What does stage date mean?

14          A.    I've not really heard of that

15     but I'm guessing that was the date that we

16     removed it.

17          Q.    Do you enter a date of removal

18     in CMS?

19          A.    Yes.

04:30  20          Q.    And the text that you would

21     enter in the CMS would appear like these

22     entries under the column comment text,

23     correct?

24          A.    Yes.

Electronically signed by Valerie Jones Conn (401-133-571-6952)                    754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

143

1          Q.    In fact, in this spreadsheet
2     there's not a column for the person who
3     entered any of the information, correct?
4          A.    There is not.
5          Q.    In the CMS any entry in, you
6     know, text comment would be associated with
7     the person who entered it, yes?
8          A.    Usually, yes.
9          Q.    So if I wanted to look up all
04:31   10     the comments about practices that Ms.
11     Lawrence, you, had made there would be a way
12     to pull up all those comments?
13          A.    I would think.  I don't -- I
14     don't know the --
15          Q.    Sure.
16          A.    -- I don't know how it's done.
17          Q.    But when you enter it the system
18     retains the information that you entered it?
19          A.    I would think because it's done
04:32   20     under state so -- by state.  I don't know how
21     they do it.  I know my states back then -- I
22     have my certain territories.
23          Q.    Oh, interesting.
24          A.    We all have territories.  I was

Electronically signed by Valerie Jones Conn (401-133-571-6952)          754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

144

1    Michigan back in 2010.

2            Q.     Really?  I did not know that.

3            A.     Yeah.  Now I'm not Michigan

4    anymore.

5            Q.     Where are you now?

6            A.     I'm the lower, Oklahoma,

7    Texas --

8            Q.     And how long have you --

9            A.     -- Arizona.

04:32 10          Q.     -- how long have you had that

11    territory?

12           A.     Since May of 2013.

13           Q.     And were you just Michigan up

14    until then?

15           A.     Uh-huh.

16           Q.     So if I went through here and

17    found Michigan entries they would most likely

18    be yours unless they were after 2013, mid

19    2013?

04:33 20          A.     Yes.

21           Q.     So if you could flip to the

22    sixth page.

23                  MR. BERNAY:  Give us the

24    location ID on the --

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Valerie Jones Conn (401-133-571-6952)                    754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

                                                                    145

     1              MR. HANKINSON:  I'm going to.

     2              MR. BERNAY:  -- just so we know

     3     we're at the right page.

     4         Q.    So if you're on the sixth page

     5     go to the second row, it should be location

     6     ID 3585994.  Are you with me?

     7         A.    Yes.

     8         Q.    And that location name is Family

     9     Practice Center of Livonia, L-I-V-O-N-I-A,

04:33  10     right?

    11         A.    Yes.

    12         Q.    Do you remember the Family

    13     Practice Center of Livonia in Michigan in

    14     2010?

    15         A.    Let me read here.

    16         Q.    Sure.

    17         A.    Okay.  Just by reading the notes

    18     I can't say I remember remember (sic), but

    19     yes.

04:34  20         Q.    Looks like the practice wanted

    21     sound?

    22         A.    Yes.

    23         Q.    And gave that as the reason for

    24     the switch?

Electronically signed by Valerie Jones Conn (401-133-571-6952)                    754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

146

1          A.    Yes.

2          Q.    This entry appears as Accent

3    Health in the stage competitor field.  Do you

4    see that?

5          A.    Yes.

6          Q.    The comments say, Bonnie was not

7    sure who competitor was.  Thinks it is Accent

8    Health.  Is that right?

9          A.    Yes.

04:35   10          Q.    Where -- if you weren't sure

11    from the practice who the competitor was but

12    you thought it was likely a particular

13    competitor would you, as part of your job,

14    still enter that competitor's name into CMS?

15          A.    She thought it was Accent

16    Health.  That's why I put it as Accent

17    Health.

18          Q.    It was your best information

19    about who the competitor was?

04:35   20          A.    Correct.

21          Q.    So you put it in the CMS, right?

22          A.    Yes.

23          Q.    The good news is you didn't lose

24    very many.

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Valerie Jones Conn (401-133-571-6952)                    754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

147

1          A.    No.

2          Q.    Trying to think of the best way

3    to do this.  These location IDs appear to be

4    at least roughly -- no, they're not in order.

5    That's okay.  Would you turn to page number

6    three?  The third page.  They're not

7    numbered.  This first row of the third page

8    there's a location ID 3683483.  Are you with

9    me?

04:37    10          A.    Yeah.

11          Q.    Yes?

12          A.    Yes.

13          Q.    I see a location name Baptist

14    Primary Care, Lane Avenue, correct?

15          A.    Yes.

16          Q.    This would not be one of yours.

17    This is in Florida, it looks like, right?

18          A.    Yes.

19          Q.    But a member of the team would

04:38    20    have entered this into CMS at the time,

21    right?

22          A.    Yes.

23          Q.    This looks like it was one of

24    those connectivity issues, right?  Says,

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Valerie Jones Conn (401-133-571-6952)                    754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

148

1    since the one monitor always has problems

2    working.

3              A.    Yes.

4              Q.    Then it says they may end up

5    also cancelling HAF.   What's HAF?

6              A.    That's our exam room program.

7              Q.    And is there revenue that goes

8    to PatientPoint from the exam room program as

9    well as from the screen networks in the

04:38   10    waiting rooms?

11              A.    Yes.

12              Q.    Those programs are separate and

13    -- right?

14              A.    Yes, they are separate.

15              Q.    This practice, for instance, is

16    considering keeping the exam room program but

17    getting rid of PatientPoint and the waiting

18    room network, correct?

19              A.    Yes.

04:39   20              Q.    Is it true that PatientPoint is

21    happy to coexist with a competitor in a

22    waiting room?

23              A.    Yes.

24              Q.    Is that something that you

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Valerie Jones Conn (401-133-571-6952)                    754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

149

1    routinely tell practices when they want to

2    cancel or switch to a competitor?

3          A.    Yes.

4                MR. HANKINSON:  Aaron, may I ask

5    you to share with the witness on this one?

6                MR. BERNAY:  We can share.

7          Q.    I would like to hand you what

8    we're marking as Defendant's Exhibit 32.

9       (Exhibit 32 was marked.)

04:40  10          Q.    This is a document that was

11    produced to us, given to us by PatientPoint's

12    attorneys with a number HAN 003273.  Do the

13    column headings in Defendant's Exhibit 32

14    appear to be fields from CMS?

15          A.    Yes.

16          Q.    The location ID means the same

17    as in Defendant's Exhibit 31, right?

18          A.    Yes.

19          Q.    And the location name would mean

04:41  20    the same thing as in Defendant's Exhibit 31,

21    correct?

22          A.    Yes.

23          Q.    The program code would also mean

24    the same thing?

Electronically signed by Valerie Jones Conn (401-133-571-6952)                    754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

150

1           A.    Yes.

2           Q.    The stage code, whether active

3    or cancelled, that would also be the same as

4    in -- the same meaning as in Defendant's

5    Exhibit 31?

6           A.    Correct.

7           Q.    The stage date, you weren't sure

8    about but you thought probably was when it

9    was de-installed, correct?

04:41    10           A.    Correct.

11           Q.    The created by is a column

12   that's not in Defendant's Exhibit 31 but is

13   here in Defendant's Exhibit 32, correct?

14           A.    Yes.

15           Q.    Do you recognize, for example,

16   TPittman, which is the entry in the third

17   row?

18           A.    I don't know who that person is

19   but I do know the other two.

04:42    20           Q.    Who are the other to?

21           A.    Amy Petrick is the top one and

22   Missy Reno is the second one.

23           Q.    So in the created by column the

24   initials AP mean Amy --

Electronically signed by Valerie Jones Conn (401-133-571-6952)                    754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

151

1          A.     Petrick.

2          Q.     -- Petrick?

3          A.     She's in IT department.

4          Q.     How do you spell that?

5          A.     P-E-T-R-I-C-K.

6          Q.     Was it Melissa Reno?

7          A.     Missy, M-I-S-S-Y, and Reno,

8     R-E-N-O.

9          Q.     Is the meaning of MReno, all one

04:42  10     word, in the second row of the created by

11     column, right?

12         A.     Yes.

13         Q.     Is this a field in CMS that

14     states who wrote the comments text in CMS?

15         A.     Yes.

16         Q.     So if you wrote the comment text

17     in CMS some version of your name would appear

18     in created by, correct?

19         A.     Correct.

04:43  20     Q.     Created date, is that a field in

21     CMS that relates to the date that the comment

22     text was created?

23         A.     I believe so.

24         Q.     Do you know what CMT underscore

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Valerie Jones Conn (401-133-571-6952)                    754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

152

1    source means as a column heading?

2         A.    I don't.

3         Q.    This is going to be a little bit

4    cumbersome to navigate around in, so what I

5    would like you to do is hand me back the

6    exhibit and I'm going to find for you the

7    place where I am and then hand it back to

8    you.

9              MR. BERNAY:  I'll say this

04:43  10    appears to be just a repaginated version of

11    Exhibit 17.

12              MR. HANKINSON:  I'm not sure

13    what the number is but this was marked

14    yesterday.

15              MR. BERNAY:  Yes.

16              MR. HANKINSON:  And, again, I

17    believe there may have been cutoff issues.

18              MR. BERNAY:  Right.  So I

19    believe location ID runs sequentially in this

04:44  20    one so if you want to just give us a location

21    ID that could make for a better finding tool.

22              MR. HANKINSON:  Apparently with

23    some exceptions.  Oh, it switches digit

24    counts.  Okay.

Electronically signed by Valerie Jones Conn (401-133-571-6952)                    754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

153

1          MR. BERNAY:  Right.

2      Q.    Location ID 3655328 is the row

3  that I would like you to turn to, Ms.

4  Lawrence.  Thank you very much.

5          MR. BERNAY:  What's the -- the

6  easiest way to find it, Tom, is there are two

7  dates.  What's the, I guess, the second date

8  as you're going left to right in the column

9  that you want to ask about?

04:44   10          MR. HANKINSON:  Actually it's

11  the third page of 3655328.

12          MR. BERNAY:  Okay.

13          MR. HANKINSON:  And it is the

14  top two rows where JLawrence is in the

15  created by column.  The date would be -- the

16  second date would be 28th of May '13.

17          MR. BERNAY:  Okay.

18      Q.    There you are.  Correct?

19      A.    Yes.

04:45   20      Q.    Very good.  So in the top two

21  rows with a created date of May 28th, 2013

22  appear comment text entries that you entered

23  into CMS, correct?

24      A.    Yes.

Electronically signed by Valerie Jones Conn (401-133-571-6952)                    754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

154

1       Q.    These comments have to do with
2   Greenville Healthcare Associates, correct?
3       A.    Yes.
4       Q.    That's the practice that's at
5   issue?
6       A.    Yes.
7       Q.    Your contact there appears to be
8   Dee Ayad, the office manager; is that right?
9       A.    Correct.
04:46  10       Q.    This would have been less than a
11   year ago.  Do you happen to remember your
12   interaction with Dee?
13       A.    Vaguely.  Yes.  Somewhat.
14       Q.    Did this practice want to cancel
15   its subscription to PCN?
16       A.    Yes.
17       Q.    And did this practice want to
18   switch to ContextMedia?
19       A.    Yes.
04:46  20       Q.    The reason that Dee Ayad gave
21   you for switching was ContextMedia has
22   scrolling news, weather, educational stories
23   and also that she was looking for something
24   different, correct?

Electronically signed by Valerie Jones Conn (401-133-571-6952)                    754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

155

1          A.    Correct.

2          Q.    If you had gotten any other

3     reasons from Diad you would have entered them

4     into CMS, right?

5          A.    Yes.

6          Q.    And if someone else at

7     PatientPoint had more knowledge about this,

8     they would have entered something in CMS

9     about it, correct?

04:47    10          A.    Correct.

11          Q.    So if I don't see another entry

12    that contradicts this I would be reasonable

13    to assume that PatientPoint's best

14    information about the reason for the switch

15    appears in that comment section, correct?

16              MR. BERNAY:  Object to the form.

17    You can answer.

18          A.    Correct.

19          Q.    For business purposes if someone

04:47    20    asks PatientPoint why did Diad of the

21    Greenville Health Associates switch, this CMS

22    entry is where PatientPoint would go to find

23    the answer to that, correct?

24              MR. BERNAY:  Object to the form.

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Valerie Jones Conn (401-133-571-6952)                    754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

156

1    You can answer.

2            A.    Yes.

3            Q.    For instance, and I don't know

4    why they would be interested, but if like a

5    sponsor said it looks like you lost

6    Greenville Healthcare Associates, tell me

7    why, then PatientPoint would go to this CMS

8    if they wanted to provide an answer, correct?

9            MR. BERNAY:   Object to the form.

04:48  10    You can answer.

11           A.    Yes.

12           Q.    And that's the reason that you

13   make these entries is to rely on them for

14   business purposes, right?

15           A.    Correct.

16           Q.    That's why PatientPoint trains

17   you to look at how to interact with customers

18   on the phone and then input the relevant

19   information into CMS, right?

04:48  20           A.    Correct.

21           Q.    If you look at the second row

22   this is also an entry that was entered by

23   you, correct?

24           A.    Yes.

Electronically signed by Valerie Jones Conn (401-133-571-6952)          754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

157

1          Q.    And it says that you let Dee

2    know that only our technician can take down

3    our equipment, right?

4          A.    Yes.

5          Q.    Do you remember that

6    conversation?

7          A.    Not to the T but since I wrote

8    it here.  I don't remember speaking it but

9    I'm sure I did if I wrote it here.

04:49   10          Q.    You got the impression that Diad

11    was confused at all about -- let me start

12    over.

13                Diad was not confused about who

14    ContextMedia was, correct?

15          A.    I don't think she was.

16          Q.    It was pretty clear it was a

17    different company, and that Greenville Health

18    Care Associates wanted to go with that

19    different company instead of PatientPoint,

04:49   20    correct?

21          A.    Yes.

22                MR. BERNAY:  Object to the form.

23          A.    I would think so.

24          Q.    And do you have any reason to

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Valerie Jones Conn (401-133-571-6952)                    754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

158

1    believe that Diad didn't understand you when

2    you said that only your technician should

3    take down the equipment?

4         A.    I don't think she misunderstood.

5         Q.    In the WRN binder are there any

6    instructions or scripts or any other material

7    that's particular to a competitor as opposed

8    to other competitors?

9         A.    No.

04:50    10         Q.    Is there any information in that

11   WRN binder that's particular to ContextMedia?

12        A.    No.

13        Q.    Have you received instructions

14   informally at any point about asking

15   particular questions when a practice is

16   switching to ContextMedia as opposed to

17   another competitor?

18        A.    No.

19        Q.    Have you ever received

04:51    20   instructions that when the competitor is

21   ContextMedia, a different member of the team

22   or a member of another team should deal with

23   the switchout or callback to make inquiries

24   of the customer?

Electronically signed by Valerie Jones Conn (401-133-571-6952)                    754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

159

1          A.    No.  No, it just -- no matter

2     who it is, we really take the same -- take

3     the same steps.  We make sure that everybody

4     knows only PatientPoint can remove the

5     equipment.  We're responsible for it.  We

6     don't want them to be responsible if

7     something would happen to it.

8          Q.    If something happens to the

9     equipment then you instruct the practice that

04:51  10    they could be liable for that equipment?

11          A.    Right, if something were to

12    happen.

13          Q.    Are you aware of any instances

14    where a practice has had to pay any money to

15    PatientPoint for any reason?

16          A.    I -- personally I don't know of

17    anybody.

18          Q.    And there are times when the

19    equipment is written off, correct?

04:52  20          A.    Yes.  I think.  I don't see that

21    end of it but --

22          Q.    Are there times when you enter

23    instructions in CMS to write off equipment?

24          A.    No, I don't.  I don't get to see

Electronically signed by Valerie Jones Conn (401-133-571-6952)                    754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

160

1    that.  I don't do that.  I don't take care of

2    that.

3          Q.    Are there times when you ask

4    someone if equipment should be written off?

5          A.    No.

6          Q.    How should I say this when we're

7    talking about the list from Vida?

8          A.    Vida.

9          Q.    Vida.  You're engaging with her

04:52  10    in some way about whether to leave the

11    equipment there.  What's the kind of entry

12    that would go into CMS for that?

13          A.    I would send the information to

14    her and she would take care of whatever was

15    going to be done.  If that's something that

16    was going to be done she would enter the

17    information into CMS.

18          Q.    So Vida also has access to CMS?

19          A.    Correct.

04:53  20          Q.    And her instructions are to

21    record her actions with respect to a practice

22    into CMS?

23          A.    Yes.

24          Q.    If she determines that a

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Valerie Jones Conn (401-133-571-6952)                    754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

161

1    practice should be allowed to keep hardware

2    then that would be reflected in CMS, correct?

3           A.    Correct.

4           Q.    Do you know if it's a separate

5    field?

6           A.    I don't know.  I don't believe

7    so.

8           Q.    You said you don't believe so?

9           A.    Correct.  I don't think it is.

04:53  10    I think we're all in the same system.

11           Q.    Comment field?

12           A.    Correct.

13           Q.    There could be a lot of

14    different comments for each location?

15           A.    Yes.

16           Q.    And they'd be parcelled out by

17    who made them and on what date?

18           A.    Yes.

19           Q.    Did Lori Smith, at some point,

04:54  20    take on extra responsibilities for switchouts

21    related to ContextMedia?

22           A.    Yes.

23           Q.    What were those

24    responsibilities?

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Valerie Jones Conn (401-133-571-6952)                    754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

162

1          A.     If someone from -- if somebody

2     was switching over to ContextMedia she would

3     take care of those accounts.  We would send

4     the information on to her.

5          Q.     So does that refresh your memory

6     that you did receive instructions at some

7     point where, if the competitor was

8     ContextMedia, that it should be directed to

9     someone else on your team?

04:54    10          A.     Yes.

11          Q.     When did that happen?

12          A.     Maybe 2012, somewhere around

13    there, since it was happening a lot, and then

14    we would just let her know so she can keep

15    track of how things were happening.

16          Q.     And she would ask particularized

17    questions as to ContextMedia, right?

18          A.     Correct.

19          Q.     That was one reason to direct

04:55    20    them to her because had access to what

21    questions were supposed to be asked?

22          A.     Yes.  She would call the

23    practice to remind them to please don't have

24    the equipment taken down, let us take the

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Joyce Lawrence, 3/19/2014

163

1    equipment down.  Don't let the other

2    competitor take it down, we'll take care of

3    that for you.

4         Q.    Part of her duties were to, even

5    more than you normally did, remind the

6    practice not to take the equipment down,

7    itself, or let anybody else, correct?

8         A.    Correct.

9         Q.    And Lori Smith also had certain

04:55   10   additional questions that she was supposed to

11   ask the practice about the switch to

12   ContextMedia, right?

13        A.    I think.  I never knew what she

14   did.  I didn't know what all her

15   responsibilities were.  I just knew we would

16   copy her on the e-mail and send that

17   information to her.  I don't know -- I didn't

18   know all her responsibilities though.

19        Q.    Did she ever discuss practices

04:55   20   who switched to ContextMedia at the weekly

21   meetings?

22        A.    No.

23        Q.    Did you ever discuss it with her

24   informally in any way?

Electronically signed by Valerie Jones Conn (401-133-571-6952)                                                    754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

164

1          A.    No.  I would just send the
2    information to her and knew that she was
3    ContextMedia's person to send all that
4    information to.
5          Q.    In what way were you told to do
6    that?  By e-mail or live or on the phone?
7          A.    We may have had a meeting.  I'm
8    not sure.  I don't remember.  It was a while
9    ago.
04:56   10          Q.    But you said it wasn't at a team
11    meeting on a Friday, it was a special
12    meeting?
13          A.    It may have been or by e-mail.
14    I don't recall how Amy told us to do it, but
15    I just knew Lori was that person to send that
16    information to.
17          Q.    Would there normally be an
18    e-mail if an instruction like that was given?
19          A.    I can't recall.  I can't recall.
04:56   20    I don't know if it was done that way or by a
21    meeting.
22          Q.    Has anyone at PatientPoint ever
23    spoken to you about the importance of the 30
24    day termination period to efforts to resell

Electronically signed by Valerie Jones Conn (401-133-571-6952)                    754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

165

1    or save the practice?

2         A.    Yes.  I mean, within that 30 day

3    period then we had that time, we were like

4    within like a two week period after that, go

5    ahead and give them a call back to try to,

6    you know, save them if we were able to but,

7    you know, we still had that 30 day window.  I

8    always would call like in two weeks to see if

9    anything has changed or if they've noticed

04:58    10    anything different on the monitor.  I always

11    tried to put a new message up to see if that

12    enticed them or not.  Again, that rate wasn't

13    too high but --

14         Q.    If the practice didn't object

15    would PatientPoint try to take as long as

16    possible to take down the screen in order to

17    give more time to save the practice?

18              MR. BERNAY:  Objection to the

19    form.  You can answer.

04:58    20         A.    If they had to have it done

21    sooner, if they insisted, we obliged.

22         Q.    If they were okay with 60

23    days --

24         A.    No, we wouldn't go that long.

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Valerie Jones Conn (401-133-571-6952)                                        754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

166

1          Q.    You wouldn't go that long?

2          A.    No.  It's -- they took a form of

3     the document and go by the enrollment form.

4          Q.    But within the first two weeks

5     of the 30 days you would, as a matter of

6     practice and procedure, make efforts to save

7     the practice, correct?

8          A.    That was always my rule of thumb

9     but maybe somebody was a little bit different

04:59  10     but I always gave them two weeks so I

11     wouldn't bombard them, but we were given that

12     so we could try to save them in that time

13     frame.

14          Q.    The hardware, upon cancellation,

15     either would be left with the practice or

16     destroyed on the one hand, or shipped back

17     for reuse, correct?

18          A.    Correct.

19          Q.    Is there any third option for

04:59  20     hardware where it's shipped back if something

21     else happens to it?

22          A.    Not that I know of.

23               MR. HANKINSON:  I think that's

24     all I have.

Electronically signed by Valerie Jones Conn (401-133-571-6952)                    754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

167

1              MR. BERNAY:  All right.  I just

2      have one quick question for you.

3                      DIRECT EXAMINATION

4      BY MR. BERNAY:

5              Q.   I'd like to clarify the record.

6      Going back to the beginning of this

7      deposition you were asked about practice

8      messaging and the importance of refreshing

9      and updating practice specific content so

05:00  10     that it -- so that it does not go stale.  I

11     want to be sure that I understood your

12     testimony correctly.  Is it your opinion that

13     Healthy Advice's content loop as a whole is

14     boring and repetitive?

15             A.   No.

16             Q.   So when you testified before, if

17     I understand correctly, you were saying that

18     if a practice doesn't refresh its messages

19     they can become boring and repetitive, its

05:01  20     particular practice content?

21             A.   No, the content is not boring

22     and repetitive.  That's updated every month.

23     That's always changed.  I just like to update

24     their personal messages because that's always

Electronically signed by Valerie Jones Conn (401-133-571-6952)                          754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

168

1    playing in between the content.  That's
2    always updated every month so that's --
3    that's never the same.
4            Q.    That's what I have.
5                  RECROSS-EXAMINATION
6    BY MR. HANKINSON:
7            Q.    Brief follow up, Ms. Lawrence.
8            A.    Uh-huh.
9            Q.    Practices sometimes tell you
05:01  10    that they're switching to a competitor
11    because the competitor's loop of content is
12    longer, right?
13            A.    Yes.
14            Q.    And a longer loop repeats less
15    often, correct?
16            A.    Correct.
17            Q.    Do practices sometimes report
18    that they are cancelling because
19    PatientPoint's content is boring or
05:02  20    repetitive?
21            A.    It may be to them.  Not a
22    hundred percent sure.
23            Q.    They've indicated that it may be
24    in certain instances?

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Valerie Jones Conn (401-133-571-6952)                    754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

169

1      A.    In the one e-mail, yes.

2      Q.    I don't have anything else.

3            MR. BERNAY:  I'm done, as well.

4            MR. HANKINSON:  Thank you very

5    much for coming in.

6

                    _____

7                    JOYCE LAWRENCE

8

9

10

                    *  *  *

11

        (DEPOSITION CONCLUDED AT 5:01 P.M.)

12

                    *  *  *

13

14

15

16

17

18

19

20

21

22

23

24

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Valerie Jones Conn (401-133-571-6952)                    754875e6-c293-4372-acf0-ea2ec7faaf5b

Joyce Lawrence, 3/19/2014

                                                          170

1                    C E R T I F I C A T E
2
         STATE  OF  OHIO
3                   :  SS
         COUNTY OF HAMILTON
4
              I, Valerie Jones Conn, RPR, CRR, the
5        undersigned, a duly qualified notary public
         within and for the State of Ohio, do hereby
6        certify that JOYCE LAWRENCE was by me first
         duly sworn to depose the truth and nothing
7        but the truth; foregoing is the deposition
         given at said time and place by said witness;
8        deposition was taken pursuant to stipulations
         hereinbefore set forth; deposition was taken
9        by me in stenotype and transcribed by me by
         means of computer; that the transcribed
10       deposition was made available to the witness
         for examination and signature and that
11       signature may be affixed out of the presence
         of the Notary Public-Court Reporter.  I am
12       neither a relative of any of the parties or
         any of their counsel; I am not, nor is the
13       court reporting firm with which I am
         affiliated, under a contract as defined in
14       Civil Rule 28(D) and have no financial
         interest in the result of this action.
15            IN WITNESS WHEREOF, I have hereunto set my
         hand and official seal of office at
16       Cincinnati, Ohio this 24th day of March,
         2014.
17
18
19                   _____
20   My commission expires:  Valerie Jones Conn, RPR, CRR
         September 4, 2017  Notary Public - State of Ohio
21
22
23
24

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990