Melissa Lake, 3/24/2014

1

1              UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF OHIO
2                    WESTERN DIVISION
3     HEALTH ADVICE          :
      NETWORKS, LLC,         :
4                            :
          Plaintiff,         :
5                            :   Case No.
      vs.                    :   1:12-CV-610
6                            :
      CONTEXT MEDIA,         :
7      INC.,                 :
                             :
8          Defendant.        :
9        Videotaped deposition of MELISSA LAKE, a
10    witness herein, taken by the defendant as
11    upon cross-examination, pursuant to the
12    Federal Rules of Civil Procedure and pursuant
13    to notice of counsel as to the time and place
14    and stipulations hereinafter set forth, at
15    the offices of Mr. Hankinson, Keating,
16    Muething & Klekamp, One East Fourth Street,
17    Suite 1400, Cincinnati, Ohio, at 9:30 a.m.,
18    Monday, March 24, 2014, before Deanne
19    Cartwright, a Notary Public within and for
20    the State of Ohio.
21                        - - -
22
23
24

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Electronically signed by Deanne L. Cartwright (501-202-620-8975)          132f775c-3e76-451d-ab6e-1c93ddabdb0f

Melissa Lake, 3/24/2014

2

```
 1                    APPEARANCES
 2
 3    FOR THE PLAINTIFF:   AARON M. BERNAY, ESQ.
                           Frost Brown Todd
 4                         301 East Fourth Street
                           3300 Great American Tower
 5                         Cincinnati, Ohio 45202
 6    FOR THE DEFENDANT:   THOMAS HANKINSON, ESQ.
                           Keating Muething &
 7                         Klekamp
                           One East Fourth Street
 8                         Cincinnati, Ohio 45202
 9    FOR THE DEFENDANT:   RICHARD J. O'BRIEN, ESQ.
                           Sidley Austin
10                         One South Dearborn
                           Chicago, IL 60603
11
12    ALSO PRESENT:  Kirk McCracken, videographer
13
14
15
16
17
18
19
20
21
22
23
24
```

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                                    132f775c-3e76-451d-ab6e-1c93ddabdb0f

Melissa Lake, 3/24/2014

3

1             S T I P U L A T I O N S

2        It is stipulated by counsel for the

3    respective parties that the deposition of

4    MELISSA LAKE, a witness herein, may be taken

5    at this time by the defendant as upon

6    cross-examination and pursuant to the Federal

7    Rules of Civil Procedure and notice to take

8    deposition, under notice all other legal

9    formalities being waived by agreement; that

10   the deposition may be taken in stenotype by

11   the Notary Public Reporter and transcribed by

12   her out of the presence of the witness; that

13   the transcribed deposition was made available

14   to the witness for examination and signature

15   and that signature may be affixed out of the

16   presence of the Notary Public-Court Reporter.

17

18

19

20

21

22

23

24

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    132f775c-3e76-451d-ab6e-1c93ddabdb0f

Melissa Lake, 3/24/2014

```
                                                                    4

  1                         INDEX
  2    WITNESS           DIRECT  CROSS   RE-      RE-
                                        DIRECT   CROSS
  3
       MELISSA LAKE
  4    BY MR. HANKINSON:           6
  5    EXHIBIT IDENTIFIED                          PAGE
  6    Exhibit 69                                   67
       Exhibit 70                                   98
  7    Exhibit 71                                  105
  8    OBJECTIONS                         PAGE   LINE
  9    MR. BERNAY:                         20     16
       MR. BERNAY:                         21     18
 10    MR. BERNAY:                         22      1
       MR. BERNAY:                         22     20
 11    MR. BERNAY:                         25     13
       MR. BERNAY:                         29      5
 12    MR. BERNAY:                         29     16
       MR. BERNAY:                         33     22
 13    MR. BERNAY:                         34      4
       MR. BERNAY:                         39      4
 14    MR. BERNAY:                         41     15
       MR. BERNAY:                         44     12
 15    MR. BERNAY:                         47      5
       MR. BERNAY:                         50      5
 16    MR. BERNAY:                         50     13
       MR. BERNAY:                         53      4
 17    MR. BERNAY:                         53     13
       MR. BERNAY:                         60      3
 18    MR. BERNAY:                         67      4
       MR. BERNAY:                         76      6
 19    MR. BERNAY:                         79     21
       MR. BERNAY:                         80      4
 20    MR. BERNAY:                         80     18
       MR. BERNAY:                         87      6
 21    MR. BERNAY:                         87     21
       MR. BERNAY:                         93     13
 22    MR. BERNAY:                         93     20
       MR. BERNAY:                         94     13
 23    MR. BERNAY:                        109     10
 24                         - - -
```

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                 132f775c-3e76-451d-ab6e-1c93ddabdb0f

Melissa Lake, 3/24/2014

5

1

                        INDEX CONTINUED

2

3      OBJECTIONS                           PAGE  LINE

4      MR. BERNAY:                          109   14

       MR. BERNAY:                          114    5

5      MR. BERNAY:                          115    5

       MR. BERNAY:                          115   23

6      MR. BERNAY:                          119    1

       MR. BERNAY:                          122    8

7      MR. BERNAY:                          123   24

       MR. BERNAY:                          126   16

8      MR. BERNAY:                          126   24

       MR. BERNAY:                          127   20

9      MR. BERNAY:                          129    7

       MR. BERNAY:                          132    4

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Melissa Lake, 3/24/2014

6

1                    VIDEOGRAPHER:  Okay.  The time

2      is 9:42 a.m.  March 24th, 2014.  We are on

3      the video record and the court reporter can

4      swear the witness.

5                    MELISSA LAKE,

6           a witness herein, of lawful age, having

7      been first duly sworn as hereinafter

8      certified, was examined and testified as

9      follows:

10                    CROSS-EXAMINATION

11     BY MR. HANKINSON:

12          Q.    Good morning.

13          A.    Morning.

14          Q.    Would you please state your name

15     and spell your last name?

16          A.    Melissa Lake, L-A-K-E.

17          Q.    Thank you for coming in today.

18     We really appreciate it.  My name's Tom

19     Hankinson.  I'm an attorney for Context Media

09:44   20     which is the defendant in this case.  Are

21     you -- do you know who the plaintiff in this

22     case is?

23          A.    Context Media.

24          Q.    Do you know who the plaintiff

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                          132f775c-3e76-451d-ab6e-1c93ddabdb0f

Melissa Lake, 3/24/2014

7

1     is?

2              A.     Oh, Healthy Advice Networks.

3     Sorry.

4              Q.     And you don't work there now,

5     correct?

6              A.     Correct.

7              Q.     About when did you leave?

8              A.     I left March 30 -- March 30th,

9     2013.  Could have been 31st.

09:44    10              Q.     Almost one year ago?

11              A.     Right.

12              Q.     And how long did you work for

13     Healthy Advice Networks?

14              A.     I started working there October

15     2009.

16              Q.     And what's your current job if

17     you have one?

18              A.     I'm in customer service for Raco

19     Wireless.

09:44    20              Q.     And is that the only employer

21     that you've had since you left Healthy Advice

22     Networks or have --

23              A.     No.

24              Q.     Could you take me through your

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    132f775c-3e76-451d-ab6e-1c93ddabdb0f

Melissa Lake, 3/24/2014

8

1    employment since you left Healthy Advice

2    Networks?

3          A.    Sure.  When I left Healthy

4    Advice I started the next day at a new job

5    selling for DDC, DNA Diagnostic Center.  I

6    was in sales for relationship testing.  I did

7    that the six months, and I got a great

8    opportunity to work for Raco Wireless so I

9    left there and I've been there since.

09:45   10          Q.    How do you spell Raco Wireless?

11          A.    R-A-C-O.

12          Q.    Are all of those companies

13    located in the Cincinnati region?

14          A.    Yes.  Well, DDC's in Fairfield.

15          Q.    What were the -- so you said you

16    started the next day at DDC.  You had that

17    lined up --

18          A.    The following Monday.  That --

19    that last Fri -- I worked there the last

09:46   20    Friday in March and then I started the

21    following Monday at DDC.

22          Q.    You had it lined up?

23          A.    Yes.

24          Q.    Did you choose to leave Healthy

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Melissa Lake, 3/24/2014

9

1    Advice Networks to go to that job?

2              A.    Yes.

3              Q.    Did you give them some notice

4    and --

5              A.    Yes.  Two weeks.

6              Q.    And would you mind -- actually,

7    I should backup a step and just kind of talk

8    to you a little bit about kind of the ground

9    rules and what we're doing here.  Have you

09:46  10    ever been deposed before?

11              A.    No.

12              Q.    Okay.  Sorry.  I kind of

13    launched into the jobs and everything.

14              A.    That's okay.

15              Q.    Let's talk generally.  As you

16    can see there is a court reporter taking down

17    what we're saying.  You're also videotaped.

18    And essentially there will be a transcript

19    made of this, so I will try not to talk over

09:47  20    you.  You should also try to -- not to talk

21    over me.

22              A.    Uh-huh.

23              Q.    Even though I sometimes am very

24    slow and I'll have pauses in the middle of my

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Melissa Lake, 3/24/2014

10

1    question as I'm thinking which makes it very

2    difficult --

3            A.    Uh-huh.

4            Q.    -- to the extent that you can

5    wait until I'm done, take a breath and then

6    answer, it will help everybody out.  Are you

7    okay with that?

8            A.    Yes.

9            Q.    And you're doing a great job so

09:47  10    far of answering out loud which is another

11    main thing.  Try to avoid shaking your head

12    no or up and down for yes or saying uh-huh

13    which is hard to take down in writing.

14            A.    Okay.

15            Q.    Appreciate it.  If you ever

16    don't understand a question that I ask, I

17    would like you to tell me that.  Ask me to

18    rephrase it or to repeat it if you just need

19    to hear it again.  Is that okay?

09:47  20            A.    That's fine.

21            Q.    If you do answer a question, I'm

22    gonna assume that you understood it.  Is that

23    okay?

24            A.    Yes.

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    132f775c-3e76-451d-ab6e-1c93ddabdb0f

Melissa Lake, 3/24/2014

11

1        Q.    There may be a question that I

2    ask that Mr. Bernay objects to in which case

3    right after I finish he'll say objection.

4    Unless he instructs you not to answer, then

5    you'll go ahead and answer the question that

6    I asked.  Do you understand that?

7        A.    Yes.

8        Q.    Is Mr. Bernay representing you

9    today?

09:48   10        A.    Yes.

11        Q.    And is he -- when did he start

12    representing you?

13        A.    I don't know the dates.

14        Q.    It was relatively recently?

15        A.    Yes.

16        Q.    Probably maybe a month ago or

17    less?

18        A.    Yes.

19        Q.    Was it specific to this

09:48   20    deposition that he became your attorney?

21        A.    Yes.

22        Q.    And does he represent you with

23    respect to any other matters?

24        A.    No.

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                          132f775c-3e76-451d-ab6e-1c93ddabdb0f

Melissa Lake, 3/24/2014

12

1       Q.   Does anyone else at his firm

2  represent you with respect to the litigation

3  in general?

4       A.   No.

5       Q.   If you ever need a break, just

6  let me know and we'll take a break but you

7  will have to answer any question that's

8  already pending and then we'll take the

9  break.  Is that okay?

09:49  10       A.   Yes.

11       Q.   If you need water or anything

12  let me know.  I don't have it yet but I will

13  soon.

14       A.   Okay.

15       Q.   Appreciate it.  Your patience.

16  Just trying to think if I left anything out

17  of the usual kind of instructions.  Do you

18  have any questions at this point about how

19  we're proceeding?

09:49  20       A.   No.

21       Q.   Would you please take me through

22  your education and employment after high

23  school through your job at Healthy Advice

24  Networks?

Electronically signed by Deanne L. Cartwright (501-202-620-8979)      132f775c-3e76-451d-ab6e-1c93ddabdb0f

Melissa Lake, 3/24/2014

13

1          A.    After high school I started

2     working right away.  Wasn't sure what I

3     wanted to do, so then I had a few different

4     jobs working at Kroger and things like that.

5     I worked at a day care.  But then I got a job

6     at radio station clear -- at the time it was

7     J Corp Communications and then it was bought

8     out and it was Clear Channel Communications

9     and I worked there for eight years and in

09:50    10     be -- while I was there I went to school.  I

11     went to school for interior design and I quit

12     that -- I quit going to school.  I -- I

13     went -- it wasn't for me.  I went there for

14     about a year and a half maybe and -- and then

15     I started working -- after I left Clear

16     Channel, I went to an advertising agency and

17     I worked there for about -- I worked at Clear

18     Channel, slash, J Corp for eight years and

19     then I went to Sunrise Advertising.  They

09:50    20     were Flynn Sabatino and Day then they became

21     Sunrise Advertising.  I worked there for

22     eight years.

23                And 2009 was a tough year so I

24     was laid off and that's when I got the job at

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                                    132f775c-3e76-451d-ab6e-1c93ddabdb0f

Melissa Lake, 3/24/2014

14

1    Healthy Advice in the fall.  I was laid off

2    in -- in the summer, June 2009.  And then

3    after Healthy Advice --

4            Q.    We've already been through --

5            A.    Okay.  Good.

6            Q.    Thank you.  Appreciate it.

7            A.    No problem.  And I went to

8    school in betw -- when I was working at

9    Sunrise Advertising, I went to Cincinnati

09:51   10    State for occupational therapy and it was too

11    much for me to go to school and take all

12    those classes and me to work full-time so I

13    took a break.  I'm not sure if I'm gonna go

14    back.

15            Q.    I'm renovating a room and I have

16    a son with occupational therapy so we should

17    talk.  All right.  That's just funny.  Well,

18    I appreciate that.  Thank you.  Did you enjoy

19    your time at Healthy Advice Networks?

09:52   20            A.    Yes.

21            Q.    What team or department were you

22    in?

23            A.    We were in the team it was

24    called the CET, customer experience team.

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    132f775c-3e76-451d-ab6e-1c93ddabdb0f

Melissa Lake, 3/24/2014

15

1          Q.    And do -- did you call that a
2    team?
3          A.    Yes.
4          Q.    About how many people were on
5    the team?
6          A.    About 15 give or take.
7    Including management.
8          Q.    And who was your direct
9    supervisor or manager?
10         A.    When I first started it was Amy
11   Finley and then my direct supervisor the last
12   year I was there was Heather McGauvran.
13         Q.    Is this the same team or a
14   different team from customer relationship
15   management?
16         A.    It's the same team.  They --
17   they use the customer experience team.  My
18   business card said customer or -- I'm sorry.
19   Practice relationship manager.
20         Q.    So you were on the same team as
21   Ms. Joyce Lawrence?
22         A.    Yes.  She sat right across from
23   me.
24         Q.    And that team also included Lori

09:52

09:53

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                                    132f775c-3e76-451d-ab6e-1c93ddabdb0f

Melissa Lake, 3/24/2014

16

1    Smith, right?

2          A.    Yes.

3          Q.    And Amy Finley remained in

4    management with oversight of that team when

5    Ms. McGauvran took on a supervisory role,

6    right?

7          A.    Yes.

8          Q.    And so did you report to

9    Ms. McGauvran then and then Ms. McGauvran

09:54  10   reported to Amy Finley?

11         A.    Yes.

12         Q.    For about the last year that you

13   were at Healthy Advice?

14         A.    I would say so.  It may have

15   been a little bit more but I would say it was

16   the last year.

17         Q.    And how do you call Healthy

18   Advice for short?  Do you say Healthy Advice

19   or HAN or --

09:54  20         A.    HAN or Healthy Advice, yes.

21   They did change names so --

22         Q.    Now it's called Patient Point?

23         A.    Correct.

24         Q.    Did that name change occur while

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    132f775c-3e76-451d-ab6e-1c93ddabdb0f

Melissa Lake, 3/24/2014

17

1    you were still working there?

2            A.    Yes.

3            Q.    If I use HAN or Healthy Advice,

4    for the purposes of the questions today will

5    you understand that I mean that same company

6    regardless of what its name was at the time?

7            A.    Yes.

8            Q.    And will you also understand if

9    I use Patient Point that I still mean the

09:55   10   same company?

11           A.    Yes.

12           Q.    Appreciate that.  Thank you.

13   Can we take a break?

14               VIDEOGRAPHER:  Okay.  We are

15   going off the video record at 9:54 a.m.

16      (Break taken.)

17               VIDEOGRAPHER:  Okay.  We are

18   back on the video record at 9:59 a.m.

19           Q.    When I'm talking about your

10:00   20   team, what are you most comfortable with me

21   using:  Customer experience team or practice

22   relationship management team?

23           A.    Practice relationship management

24   team.

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                132f775c-3e76-451d-ab6e-1c93ddabdb0f

Melissa Lake, 3/24/2014

18

1          Q.     Where did the customer
2     experience team term come from?
3          A.     It has -- the sales assistants
4     would be in it, management on our floor, and
5     also digital.
6          Q.     So it's a more general term?
7          A.     Uh-huh.
8          Q.     When you say digital, does that
9     refer to people who work on creating content
10:01  10    to run on HAN's network?
11         A.     No.
12         Q.     What is digital?
13         A.     It is the folks that schedule
14    the de-installs and the re -- they -- they
15    deal with the -- they deal with the techs
16    that go out to doctor's offices to
17    troubleshoot, de-install, reinstall new
18    customers.
19         Q.     Does Healthy Advice employ its
10:01  20    own techs or does it schedule techs that come
21    from a vendor?
22         A.     It comes from a vendor.
23         Q.     And are there various vendors
24    that they use throughout the country?

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Melissa Lake, 3/24/2014

19

1          A.    Yes.

2          Q.    And when we say techs it's

3    T-E-C-H-S?

4          A.    Yes.

5          Q.    Did you have any other

6    supervisors or managers during your time at

7    Healthy Advice other than Heather McGauvran

8    and Amy Finley?

9          A.    We had a head supervisor of the

10:02   10   whole CET team.  It was Jill Brewer.

11         Q.    Did she leave the company at

12   some point?

13         A.    Yes.

14         Q.    When was that?

15         A.    Right when we became Patient

16   Point.  Shortly after that.

17         Q.    Do you know what the

18   circumstances were of her leaving the

19   company?

10:02   20         A.    Not -- no.  I don't recall.  It

21   was on good terms.

22         Q.    She chose to leave?

23         A.    Yes.

24         Q.    Did it have anything to do with

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                              132f775c-3e76-451d-ab6e-1c93ddabdb0f

Melissa Lake, 3/24/2014

20

1    the name change or a merger having to do with

2    the name change?

3         A.    I don't know.

4         Q.    Did you ever have a conversation

5    with Ms. Brewer about the circumstances of

6    her departure?

7         A.    No.  Just well-wishes.

8         Q.    Did anyone else ever tell you

9    why she left?

10:03    10    A.    I mean, there was speculation

11    but I don't know exactly why.  I -- I'm not

12    real sure.  I don't remember.

13         Q.    Just if -- would you just tell

14    me every different reason that you heard from

15    any source and where you heard that from?

16              MR. BERNAY:  Object to the form.

17    You can answer the question.

18         A.    I think she wanted to save our

19    jobs so she was stepping down.  That was my

10:03    20    speculation.

21         Q.    And where did that come from?

22         A.    It was her choice so she didn't

23    want to see anybody else leave the company.

24    She decided to leave.

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    132f775c-3e76-451d-ab6e-1c93ddabdb0f

Melissa Lake, 3/24/2014

21

1          Q.    Where did you hear that?

2          A.    She told us.  She -- we had a

3     meeting and she told everybody.

4          Q.    Did she say why it was necessary

5     for her to leave in order to save other

6     people's jobs?

7          A.    No.  Not that I remember.

8          Q.    Did she connect it to the name

9     change to Patient Point or a merger during

10:04    10     that conversation?

11         A.    I don't remember.

12         Q.    Did she discuss any new

13    management coming in?

14         A.    No.

15         Q.    Did you have an understanding at

16    that time of why Mr. Brewer leaving would be

17    necessary to save other people's jobs?

18              MR. BERNAY:  Object to the form.

19    You can answer.

10:05    20         A.    Can you repeat that again?

21         Q.    Do you have -- did you have any

22    understanding at the time of why Ms. Brewer

23    would have to leave to save someone else's

24    job?

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Melissa Lake, 3/24/2014

22

1              MR. BERNAY:  Same objection.

2         A.    No.  I really -- I -- I really

3    didn't know.  I know that whenever companies

4    change and they get -- because I've been

5    through this with Clear Channel and J -- J

6    Corp and Clear Channel.  When -- when change

7    like that happens, there's a lot of people

8    that go their separate ways for whatever

9    reason and I figured that's, you know, what

10:05   10    she was doing.

11         Q.    Did the structure of the

12    practice relationship management team change

13    around the time of the name change to Patient

14    Point or did it stay the same?

15         A.    It stayed the same.

16         Q.    Did someone replace Ms. Brewer?

17         A.    No.

18         Q.    To whom do the customer

19    experience team members report now?

10:06   20              MR. BERNAY:  Objection.  You can

21    answer.

22         A.    Well, it's been a year but when

23    I -- I -- I've always reported to Amy or

24    Heather.  Heather first.  If Heather wasn't

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Melissa Lake, 3/24/2014

23

1    available, I would report to Amy Finley.

2           Q.    And that didn't change when

3    Ms. Brewer left the company?

4           A.    No.

5           Q.    Did Ms. Finley begin to report

6    to someone else besides Ms. Brewer?

7           A.    I don't think so.  I don't know.

8           Q.    At some point she had to have a

9    manager but you're not sure who it was?

10:06   10           A.    No.  It may have been Kimberly

11    Theiss.

12           Q.    What was Kimberly Theiss's role?

13           A.    She was in charge of the digital

14    department and I believe it was called field

15    service digital, FSD.

16           Q.    Her department?

17           A.    Yes.

18           Q.    What were your job duties on the

19    practice relationship management team?

10:07   20           A.    They were to engage the

21    customers, troubleshoot, follow up on any

22    non-connects.  We had proactive orders.  We

23    had a task list that we had to complete every

24    day.  So they had all kinds of orders.

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    132f775c-3e76-451d-ab6e-1c93ddabdb0f

Melissa Lake, 3/24/2014

24

1          Q.    What did you call them?  What

2     orders?

3          A.    Task -- a task list with orders.

4     They could be work generals, proactives.

5     It's been a while so --

6          Q.    You would receive a task list

7     each day?

8          A.    It would be -- yeah.  Every day

9     you would log on and your task list would be

10:08   10    there so if there's something that you needed

11    to follow up on or if you wanted to create a

12    proactive and check on a practice.

13         Q.    So the duties that you mentioned

14    were engage the customer, troubleshoot and I

15    guess troubleshooting included following up

16    on non-connects?

17         A.    Uh-huh.

18         Q.    Do I have that correct?

19         A.    Correct.

10:09   20         Q.    And the task list was a way each

21    day for each member of the team to see what

22    they should work on that day?  Is that --

23         A.    Yes.

24         Q.    Is that correct?

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    132f775c-3e76-451d-ab6e-1c93ddabdb0f

Melissa Lake, 3/24/2014

25

1          A.    Yes.

2          Q.    Who generated the task list?

3          A.    Heather gen -- Heather would

4    provide us proactives.  She would load those

5    in but if you had a non-connect it -- it

6    would automatically come to you if it was

7    your territory and then you would date out

8    whatever you're working on for whatever date

9    you want it to be to check on things if need

10   be.

11         Q.    Did the CMS generate the task

12   lists based on input that people put into it?

13              MR. BERNAY:  Object to the form.

14   You can answer.

15         A.    Yes, it did.  Trying to think of

16   how the non-connect -- I believe the

17   non-connects -- I don't know if that was

18   automatically generated or if somebody sent

19   them.  I can't remember.  It's been a while.

20         Q.    When you dated out items that

21   you were working on, did you do that by

22   entering them into CMS?

23         A.    Yes.

24         Q.    What does CMS stand for if you

10:09

10:10

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Melissa Lake, 3/24/2014

26

1    remember?

2            A.    Customer management system.

3            Q.    When -- do I understand you

4    correctly that you as an individual could

5    also create your own proactive item to work

6    on?

7            A.    Yes.

8            Q.    And is that what you meant when

9    you said if you create a proactive?

10:11    10            A.    Yeah.  You can create a

11    proactive to check on the customer, make sure

12    they're happy.  Can also create work generals

13    too.

14            Q.    What's the difference between a

15    work general and a proactive?

16            A.    The work generals were something

17    that absolutely need to be touched.  The

18    proactives if it was something you couldn't

19    get to that day, it's okay.  The work

10:11    20    generals were very important because they

21    were usually non-connects.  You needed to

22    find out what was going on with the practice.

23            Q.    What is a non-connect?

24            A.    When they are not connect --

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                                    132f775c-3e76-451d-ab6e-1c93ddabdb0f

Melissa Lake, 3/24/2014

27

1    when the flat screen in their waiting room is

2    not connecting with our system for the loop

3    that plays.

4         Q.    Have you heard the term

5    heartbeat?

6         A.    Yes.

7         Q.    When a system in a doctor's

8    office's waiting room is working properly,

9    Healthy Advice receives a heartbeat from that

10:12   10   CPU, correct?

11        A.    Correct.

12        Q.    When the heartbeat stops is that

13   what's referred to as a non-connect?

14        A.    Yes.

15        Q.    Is that an indication to Healthy

16   Advice that either someone has unplugged the

17   system or there's a technical problem with

18   the system?

19        A.    Yes.

10:12   20        Q.    Do you know of any other reasons

21   for non-connects?

22        A.    The system not being there

23   anymore.

24        Q.    Non-connects might occur based

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    132f775c-3e76-451d-ab6e-1c93ddabdb0f

Melissa Lake, 3/24/2014

28

1    on the system being unplugged, not being

2    there anymore, or malfunctioning?

3              A.    Correct.

4              Q.    How quickly would someone reach

5    out to a practice after the non-connect was

6    received by Healthy Advice?

7              A.    As soon as possible.

8              Q.    And generally how long would it

9    take?

10:13    10         A.    Well, if it's on a weekend it

11    would take the -- the -- the next working

12    business day for us to get that non-connect.

13    So Monday mornings there were some

14    non-connects to deal with and --

15              Q.    And the first action to be taken

16    would be to call the practice?

17              A.    Yes.

18              Q.    When you were dealing with a

19    non-connect, would you then ask the practice

10:14    20    whether the system was working or not?

21              A.    Yes.

22              Q.    Sometimes were there

23    connectivity issues?

24              A.    Yes.

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Melissa Lake, 3/24/2014

29

1      Q.    Did the connectivity issues that

2  the practices in your territory experienced

3  have more frequency at the beginning of your

4  time with Healthy Advice than later on?

5            MR. BERNAY:  Object to the form

6  of the question.  You can answer.

7      A.    It was pretty steady.

8      Q.    From 2009 to March of 2013 the

9  amount of connectivity issues that you

10  experienced in your territory remained

11  steady?

12      A.    Yes.

13      Q.    And were non-connects based on

14  connectivity issues a large part of the

15  non-connects?

16            MR. BERNAY:  Object to the form.

17  You can answer.

18      A.    There were all sorts of

19  different issues.

20      Q.    Lots of different technical

21  issues.

22      A.    Technical issues or a practice

23  just would close down.  They would close down

24  and then there were competitors that would

10:14

10:15

Electronically signed by Deanne L. Cartwright (501-202-620-8979)        132f775c-3e76-451d-ab6e-1c93ddabdb0f

Melissa Lake, 3/24/2014

30

1    come in.  There were -- there were technical

2    issues.  Sometimes their internet was down.

3    Sometimes -- sometimes we would call a

4    practice and the system wouldn't even be

5    there.  I mean, there's been all kinds of

6    issues from competitors to theft.

7              Q.    When you say technical issues,

8    what are the technical issues that arise with

9    the system?

10:16
10             A.    It could be that the flat screen

11    went out, it could be that the CPU needed to

12    be replaced, and it could be that the lines,

13    the tele -- analog lines are down or the

14    internet is down.

15             Q.    When you began working for

16    Healthy Advice, were the systems in doctor's

17    office's waiting rooms connected by fax?

18             A.    Some were.  Some we provided a

19    dedicated phone line as well.

10:17
20             Q.    About how many were fax versus

21    how many had a dedicated phone line?

22             A.    I -- I can't answer.  I don't

23    know.

24             Q.    At some point did Healthy Advice

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Melissa Lake, 3/24/2014

31

1    start to provide its content and programing

2    through the internet instead?

3         A.    Yes, they did.

4         Q.    Do you remember about when that

5    happened?

6         A.    I know it was going on when we

7    were Patient Point and I can't remember when

8    we started doing that.  I don't know if it

9    was when -- at the end of the being Healthy

10:17    10   Advice or Patient Point.  I can't remember.

11        Q.    2011?  2012?

12        A.    I -- I don't remember.

13        Q.    When Healthy Advice or Patient

14   Point started providing content to doctor's

15   offices over the internet, was it a gradual

16   process of replacing the fax lines with

17   internet-based service?

18        A.    We would just -- they would

19   schedule service for a tech to go out and run

10:18    20   a cat five cable and share their internet

21   into one of their ports and run that and then

22   plug it into the CPU.

23        Q.    They didn't just do it all in

24   one day though?

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                                        132f775c-3e76-451d-ab6e-1c93ddabdb0f

Melissa Lake, 3/24/2014

32

1         A.    Not all the territory.  No. No.

2         Q.    So --

3         A.    We would have to make sure it

4    was okay with the practice.

5         Q.    Over what period of time did

6    they phase in internet service?

7         A.    I don't -- not at the beginning

8    of working there.  Not in 2009.  But I can't

9    remember when it started.

10:19   10         Q.    I'm sorry.  I'm trying to ask

11   from the point --

12         A.    Oh.

13         Q.    -- when they started -- from the

14   point when they gave the first practice in

15   your territory internet connectivity instead

16   of fax or phone to the point when all the

17   practices were running based on the internet,

18   how long did that take?

19         A.    When I left they weren't all

10:19   20   hooked up to the internet at that point when

21   I left.  I mean, it was a process that they

22   were trying to get to.

23         Q.    And it had been going on for at

24   least a year, right?

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                                      132f775c-3e76-451d-ab6e-1c93ddabdb0f

Melissa Lake, 3/24/2014

33

1         A.    I would say so.  I don't know.

2         Q.    But about a year at least?

3         A.    Maybe six months.  I -- I --

4    my -- my -- I'm -- have a bad memory.

5         Q.    It wasn't complete when you left

6    in March of 2013, correct?

7         A.    Correct.

8         Q.    Do you have a sense for about

9    how many practices in your territory still

10   had fax or phone lines at that time?

11        A.    No.

12        Q.    As a percentage?

13        A.    No.  But I know they were

14   working hard at getting this done and I -- I

15   mean, we were -- we were doing well at

16   getting them done but it wasn't an overnight

17   thing to do.

18        Q.    Did practices who received their

19   content over a fax line have more

20   connectivity problems than practices who

21   received it over the internet?

22             MR. BERNAY:  Object to the form.

23   You can answer.

24        A.    I don't remember.

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Electronically signed by Deanne L. Cartwright (501-202-620-8979)          132f775c-3e76-451d-ab6e-1c93ddabdb0f

Melissa Lake, 3/24/2014

34

1          Q.    There were connectivity issues
2     even with practices that were receiving
3     content over the internet?
4                MR. BERNAY:  Again, object to
5     the form.  You can answer.
6          A.    I'm sure there was.  I'm not
7     sure of how many or why or what the reasons
8     were.
9          Q.    But over the course of your full
10:21  10     employment at Healthy Advice from around
11     October 2009 to March 2013, some significant
12     part of your day was spent calling practices
13     who had connectivity issues, correct?
14          A.    Yes.
15          Q.    And when I say connectivity
16     issues, I mean technical problems with the
17     connection.  Not just that someone had
18     actually chosen a different system or
19     unplugged the system.  Did you understand
10:21  20     that to be what I meant?
21          A.    Yes.  A lot of times FSD would
22     call when there wasn't a heartbeat and find
23     out what was going on and they would
24     troubleshoot first and when they would find

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    132f775c-3e76-451d-ab6e-1c93ddabdb0f

Melissa Lake, 3/24/2014

35

1    out that it was more than a connectivity

2    issue then it was a work general sent to me.

3         Q.    Sometimes for the technical

4    problem based on the heartbeat, FSD would

5    take care of it without you even being

6    involved, is that right?

7         A.    Yeah.  They would send us an

8    e-mail out of courte -- out of courteous --

9         Q.    As a courtesy?

10:22  10        A.    As a courtesy.

11        Q.    Very good.

12        A.    Yes.  Thank you.

13        Q.    So each time that field service

14    digital took care of a technical issue based

15    on the cutoff of the heartbeat, they would

16    send you or somebody else in your team an

17    e-mail saying that they had stepped in to do

18    that?

19        A.    Not every time.  No.  If it was

10:22  20    something they said they wanted to cancel, if

21    the practice said I want to cancel, or if the

22    practice said it's not here anymore, it would

23    go right to us.  They wouldn't do anything

24    else with it.

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                                        132f775c-3e76-451d-ab6e-1c93ddabdb0f

Melissa Lake, 3/24/2014

36

1          Q.    After field service digital
2     called to ask what was going on?  Yes?
3          A.    Yes.
4          Q.    Did -- what territory did you
5     have?
6          A.    I had -- when I left I had New
7     Jersey, Arizona and I can't remember the
8     rest.  Those were the two big ones I had.
9          Q.    There were some other states?
10         A.    Yeah.  My territory changed a
11    little bit before that and I had California
12    for a while.
13         Q.    Just California?
14         A.    I had a lot of the west coast.
15    California, Washington state.  Trying to
16    think if I had any east coast territory.  I
17    may have had a real small east coast
18    territory.  Nothing over -- nothing
19    overbearing or anything like that.
20    California was a big territory to take care
21    of.
22         Q.    In the fall of 2009 when you
23    started at Healthy Advice your territory was
24    California, Washington state and maybe

10:23 (line 10)
10:24 (line 20)

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                                    132f775c-3e76-451d-ab6e-1c93ddabdb0f

Melissa Lake, 3/24/2014

37

1     another smaller state?

2          A.    Actually, no.  I had Chicago and

3     some mid-Western states and I can't remember

4     which ones they were but I know Chicago was

5     the big one.

6          Q.    And then at some point your

7     territory changed to California,

8     Washington --

9          A.    Yes.

10:24   10         Q.    -- state and possibly another

11    smaller state?

12         A.    Yes.

13         Q.    After that it changed again to

14    New Jersey, Arizona and some others?

15         A.    Yes.

16         Q.    Did you notice a difference

17    between the regions in the issues that you

18    were dealing with?

19         A.    No.

10:25   20         Q.    Did part of your job include

21    fielding calls by practices who wanted to

22    join the system?

23         A.    Yes.

24         Q.    Did you ever have to turn away

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    132f775c-3e76-451d-ab6e-1c93ddabdb0f

Melissa Lake, 3/24/2014

38

1    practices because there wasn't room?

2           A.    Yes.

3           Q.    Why did that happen?

4           A.    Actually, can we back up?  Not

5    because there wasn't room.  You mean in

6    their -- in their lobby?  Do --

7           Q.    No.  Go ahead.

8           A.    Okay.

9           Q.    Why couldn't they join?

10:25    10           A.    If they didn't have the correct

11    specialty for what we were looking for for

12    that program.

13           Q.    Did you ever encounter

14    situations in which a practice had the

15    correct specialty but the network had enough

16    subscribers so that the practice was turned

17    away?

18           A.    Yes.

19           Q.    Which networks did that happen

10:26    20    with?

21           A.    I don't remember which ones.

22    They -- they would open and close enrollment

23    so I don't remember which ones but there were

24    times where it was closed.

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                                                                    132f775c-3e76-451d-ab6e-1c93ddabdb0f

Melissa Lake, 3/24/2014

39

1        Q.    Were there times when each of

2    Healthy Advice's five networks were closed or

3    did some of them stay open all the time?

4              MR. BERNAY:  Object to the form.

5    You can answer.

6        A.    From what I remember, I believe

7    PCN was always open.  I can't remember.

8        Q.    How did you receive the

9    information that a certain network was not

10:27   10    accepting new practices at a certain time?

11        A.    From our supervisor.

12        Q.    In what form?  An e-mail?

13        A.    We would have weekly meetings so

14    they would keep us updated on what was open

15    and what wasn't.

16        Q.    Was that recorded in writing at

17    any point?

18        A.    I don't remember.

19        Q.    If you turned a practice away

10:28   20    based on the network being at capacity

21    already, would you enter that information in

22    CMS?

23        A.    Yes.

24        Q.    So CMS includes practices who

Electronically signed by Deanne L. Cartwright (501-202-620-8979)        132f775c-3e76-451d-ab6e-1c93ddabdb0f

Melissa Lake, 3/24/2014

40

1    don't even have a relationship with Healthy

2    Advice, correct?

3           A.    Yes.

4           Q.    Did you encounter situations

5    where Healthy Advice turned away a practice

6    that had the correct specialty because there

7    were not techs available to go out and

8    install the system in that region?

9           A.    Can you repeat that again?

10          Q.    Did you ever have to turn a

11   practice away who wanted to join the system

12   and had the correct specialty because there

13   weren't techs available to go out and install

14   the system in that practice's geographic

15   region?

16          A.    No.

17          Q.    Were there any other reasons

18   that practices who had the correct specialty

19   and wanted to join a Healthy Advice Network

20   were turned away?

21          A.    No.

22          Q.    Do you know how it was

23   determined that a network was at capacity and

24   no longer accepting new practices?

10:28

10:29

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                                    132f775c-3e76-451d-ab6e-1c93ddabdb0f

Melissa Lake, 3/24/2014

41

1          A.    That all came from supervisors.

2          Q.    You didn't have any

3    understanding of why they chose to close or

4    open a network?

5          A.    No.

6          Q.    Going back to your task list

7    each day, it sounded to me -- and just

8    correct me if I'm wrong.  It sounded to me

9    like part of it might have been automatically

10:30  10   generated from past entries into CMS but then

11   part of it could be adjusted by Ms. Finley or

12   Ms. McGauvran or by the individual member of

13   the team by creating additional work generals

14   or proactives.  Do I have that correct?

15          MR. BERNAY:  Objection.  You can

16   answer.

17          A.    Yes.

18          Q.    And was that done on a daily

19   basis?

10:30  20          A.    Yes.

21          Q.    About how long is that task

22   list?

23          A.    It depends what was loaded the

24   night before.  If there was a lot of

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                                    132f775c-3e76-451d-ab6e-1c93ddabdb0f

Melissa Lake, 3/24/2014

42

1    proactives loaded the night before, then your

2    task list will be long but you just needed to

3    prioritize it.

4         Q.    Was it ever over five pages

5    long?

6         A.    No.

7         Q.    It would be a -- like a bullet

8    pointed list?  How did it look?

9         A.    It looked like -- almost like an

10:31 10   Excel spreadsheet almost and then you could

11   organize it under the type of orders.  You

12   could organize it by the dates.  So you could

13   organize it to what -- what was your --

14   whatever way you wanted to do it.

15        Q.    Did it pop up within CMS?

16        A.    My task list?

17        Q.    Yes.

18        A.    Yes.  It was in CMS.

19        Q.    Were you able to look at prior

10:31 20   week's task lists if you wanted to check

21   them?

22        A.    I don't believe so.  I believe

23   management might have been able to but once

24   you closed that task, it was off your list.

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Melissa Lake, 3/24/2014

43

1          Q.    Do you know if there was a
2     record of what was on each team member's list
3     each day that management could then check
4     back on later?
5          A.    I don't know what they could
6     look at and what they couldn't but they kept
7     track of your task list so I'm assuming so.
8     I don't know.
9          Q.    How -- how did they keep track
10    of it?  Like what -- how did they interact
11    with you about that?
12         A.    They would let you know how many
13    proactives you've closed, how many work
14    generals you've closed.  CM followups.
15    Cancels.
16         Q.    Were there ever any work
17    generals or proactives added in CMS specific
18    to Context Media?
19         A.    No.  They -- they're -- they
20    wouldn't say anything.  If it was, it would
21    be something in maybe a work general in the
22    notes field indicating competitor, something
23    like that, but, no, there wasn't any special
24    task list for Context Media.  Would either

10:32

10:33

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Melissa Lake, 3/24/2014

44

1    have been on a cancel request or work

2    general.

3            Q.    Do you recall any particular

4    efforts to speak to practices because of

5    anything that Context Media did or said?

6            A.    To speak with practices?  Can

7    you repeat that again?

8            Q.    Sure.  Do you recall any

9    particular efforts that were made to speak

10:34    10    with practices based on things that Context

11    Media was doing in the marketplace?

12                MR. BERNAY:  Object to the form.

13    You can answer.

14            A.    Yes.  We, first of all, would

15    find out what was going on and if FSD said

16    the equipment's not there or if they told us

17    the equipment was mailed to us, then we would

18    be able to see who it came from and ask them

19    why did you cancel, why -- why is it sent

10:34    20    back to us, and they would let us know.

21            Q.    That's something that would

22    happen in the case of any competitor switch

23    out?

24            A.    Yes.

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                                    132f775c-3e76-451d-ab6e-1c93ddabdb0f

Melissa Lake, 3/24/2014

45

1          Q.     That activity would be reflected

2     in the CMS comments field?

3          A.     Yes.  And probably in the notes

4     too.

5          Q.     Would there be any information

6     provided by the practice about the reason

7     that it was switching out -- let me start

8     that question over again.

9          A.     Okay.

10:35  10          Q.     When a practice either called or

11    e-mailed to say that it wanted to cancel its

12    Healthy Advice subscription --

13          A.     Uh-huh.

14          Q.     -- what would happen?

15          A.     We would find out why.  We --

16    that would be the first question.  And we

17    would want to know where the equipment is and

18    we would also tell them that they signed a

19    enrollment agreement which means that it is

10:35  20    either a 30- or 60-day notice for us to take

21    the equipment down and we would schedule it

22    out if we were sure that's what they wanted.

23    If they wanted to think about it, I wouldn't

24    schedule it out 60 days.  If I heard they are

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    132f775c-3e76-451d-ab6e-1c93ddabdb0f

Melissa Lake, 3/24/2014

46

1    canceling and this is why, I would schedule

2    it 30 to 60 days out.

3            Q.    Depending on the enrollment?

4            A.    Correct.

5            Q.    How would you get the word to

6    call that practice?

7            A.    From the non-connect or the

8    equipment mailed back to us.

9            Q.    Did practices also sometimes

10:36  10   call to cancel?

11           A.    Yes.

12           Q.    Did practices e-mail to cancel?

13           A.    Not as much.  I -- maybe I've

14    seen it maybe once or twice.

15           Q.    Were the activities that you

16    undertook different based on whether it was

17    Context Media or another competitor or a

18    regular television?

19           A.    Can you repeat that?

10:37  20           Q.    Did it make a difference to your

21    job and the communications that you were

22    supposed to undertake whether the practice

23    was cancelling in order to start with Context

24    Media or whether the practice was canceling

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                                                              132f775c-3e76-451d-ab6e-1c93ddabdb0f

Melissa Lake, 3/24/2014

47

1    to switch to a different competitor or

2    whether the practice was canceling to just go

3    with television instead of having an

4    in-waiting room information network?

5              MR. BERNAY:  Object to the form.

6    You can answer.

7         A.    There were many reasons why

8    practices cancel and -- I'm not sure what

9    your question is for that.  I'm not -- I'm

10:38    10   not sure what you're asking me.

11         Q.    What are the reasons that

12   practices cancel?

13         A.    There's a list of them.  Number

14   one could be a competitor.  Number two, maybe

15   they just didn't want anything in their

16   waiting room.  They were moving.  There --

17   there could be a list of them of different

18   reasons why.

19         Q.    And I don't want to bore you but

10:38    20   I -- I think I need to ask you to remember

21   all the different reasons that you can.

22         A.    Okay.  They weren't allowed to

23   have us connect to their internet -- that was

24   a big reason -- due to HIPAA reasons which

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    132f775c-3e76-451d-ab6e-1c93ddabdb0f

Melissa Lake, 3/24/2014

48

1    didn't seem like that -- we weren't getting

2    any other information but they were

3    instructed due to HIPAA.  Some people thought

4    that they -- thought that it just wasn't

5    enough for them, the patient education

6    system.  Moving.  It just didn't -- I didn't

7    work in their new waiting room.  And a lot of

8    times this was -- this was due just to space.

9    They just didn't have the wall space.

10:40    10            Q.    Can you think of any others?

11            A.    No.

12            Q.    Do you mind if I just kind of

13    rattle off some and see if -- I'm not trying

14    to put words in your mouth --

15            A.    Uh-huh.

16            Q.    -- so just tell me if they are a

17    reason --

18            A.    Uh-huh.

19            Q.    -- that a practice canceled in

10:40    20    your experience or if it's not tell me you --

21            A.    Okay.

22            Q.    -- don't remember it being one.

23            A.    Okay.

24            Q.    The -- well, first of all, when

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                                    132f775c-3e76-451d-ab6e-1c93ddabdb0f

Melissa Lake, 3/24/2014

49

1    you say sometimes it just wasn't enough for

2    them, the patient education system, what did

3    you mean by that?

4          A.    They just thought the patients

5    weren't engaged enough.

6          Q.    Did they say why?

7          A.    No.  Not that I remember.

8          Q.    Just that it wasn't interesting

9    enough for the patients to actually watch it?

10         A.    Yes.

11         Q.    Would it be fair to call that

12   the quality of the health-related

13   programming?

14         A.    No.  Because people really liked

15   the patient education that we provided.  I

16   think maybe it was maybe the location in the

17   waiting room.  It -- they just weren't --

18   there -- just had a lot of different reasons

19   why the patient wasn't watching it.  Maybe --

20   maybe there was -- just the chairs weren't

21   setup right in the office and the wall

22   space --

23         Q.    Uh-huh.

24         A.    -- it just wasn't engaging

10:41 (line 10)

10:41 (line 20)

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    132f775c-3e76-451d-ab6e-1c93ddabdb0f

Melissa Lake, 3/24/2014

50

1    enough.

2         Q.    If they're switching to a

3    competitor though, those factors would be the

4    same with the competitor, right?

5              MR. BERNAY:  Object to the form.

6    You can answer.

7         A.    Yeah.  Yeah.  Definitely.

8         Q.    So if somebody was switching to

9    a competitor and they -- the reason they gave

10:42  10   was that the system wasn't engaging enough,

11   that would have to do with the quality of the

12   content, right?

13             MR. BERNAY:  Objection.  You can

14   answer.

15        A.    It could have to do with that

16   and where the flat screen is located.

17        Q.    How would that change with the

18   competitor?

19        A.    Maybe they were able to put it

10:42  20   in a -- in a different spot for them.

21             MR. BERNAY:  We've been going

22   about an hour.  Why don't we take a break?

23             MR. HANKINSON:  Okay.

24             VIDEOGRAPHER:  Okay.  We are

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Melissa Lake, 3/24/2014

51

1    going off the video record at 10:41 a.m.

2       (Break taken.)

3            VIDEOGRAPHER:  Okay.  We are

4    back on the video record at 10:51 a.m.

5            MR. HANKINSON:  I'd like focus

6    on the reasons that a practice would switch

7    to a competitor or to cable television or

8    other television in the waiting room.  So set

9    aside the factors that would cause a practice

10   to just completely have no screen in their

11   waiting room and let's talk about the reasons

12   that practices would switch to a competitor

13   or to television.  Is that okay?

14           A.    Yes.

15           Q.    One of the reasons that you

16   mentioned was a practice not being allowed to

17   connect a waiting room system to the

18   internet.  I assume they could have done it

19   by fax or dedicated phone line but there was

20   something about the switch to the internet

21   that caused them to cancel.  Is that right?

22           A.    Yes.

23           Q.    And if a competitor was able to

24   connect via the phone line or the fax line

10:52 (at line 10)

10:53 (at line 20)

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                132f775c-3e76-451d-ab6e-1c93ddabdb0f

Melissa Lake, 3/24/2014

52

1    then they could go with that competitor, is

2    that right?

3         A.    I don't remember a scenario like

4    that coming up.

5         Q.    In every case that you remember,

6    that practice just cancelled and didn't

7    switch to a competitor?

8         A.    Oh, yes, they switched to

9    competitor but I don't remember if -- the way

10:53  10   the competitor connected.  I don't know if

11   they were able to go through the internet or

12   an analog phone line.

13        Q.    The practice was telling you

14   that they were canceling the service because

15   they couldn't connect through the internet,

16   right?

17        A.    Sometimes.

18        Q.    And are you saying sometimes a

19   practice like that would still switch to a

10:54  20   competitor?

21        A.    Yes.

22        Q.    But you just don't know how the

23   competitor was providing the content.

24        A.    Yes.

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    132f775c-3e76-451d-ab6e-1c93ddabdb0f

Melissa Lake, 3/24/2014

53

1          Q.     That's an independent reason

2     that standing alone a practice just couldn't

3     use a Healthy Advice system, right?

4                 MR. BERNAY:   Object to the form

5     of the question.   You can answer.

6          A.     Can you repeat that?

7          Q.     Standing alone if a practice is

8     not able to connect their system through the

9     internet, if their -- if their policy is that

10:54  10     they can't do that, that is a sufficient

11     reason by itself that that practice would

12     cancel Healthy Advice, right?

13                MR. BERNAY:   Same objection.

14     You can answer.

15          A.     No.   There were some cases where

16     if we couldn't connect to the internet we

17     still let them connect through an analog line

18     when I was there.

19          Q.     But in other cases the practice

10:55  20     wasn't important enough to do that or --

21          A.     To switch to an internet?   To

22     the --

23          Q.     Or switch to a -- to a phone or

24     fax line.

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                          132f775c-3e76-451d-ab6e-1c93ddabdb0f

Melissa Lake, 3/24/2014

54

1        A.    To switch from internet back to
2    a phone line?
3        Q.    Or I'm sorry.  To give them a
4    dedicated internet line.  Is that what you're
5    saying?
6        A.    Oh, we didn't -- I don't
7    remember providing a dedicated internet line.
8    I don't remember providing that.
9        Q.    If a practice says I can't
10   connect my system through the internet, was
11   there a solution to that?
12       A.    I believe they would still
13   connect the old way with an analog line.
14       Q.    With an analog line which is fax
15   or phone, right?
16       A.    Yes.
17       Q.    And you said sometimes they
18   would do that.  So I was just asking but
19   other times they wouldn't?
20       A.    I think they were very motivated
21   to switch to an internet line but I don't
22   remember what the out -- I -- I don't -- I
23   don't remember the outcome of it.  This was
24   new before I left, switching the internet, so

10:55 (line 10)
10:56 (line 20)

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    132f775c-3e76-451d-ab6e-1c93ddabdb0f

Melissa Lake, 3/24/2014

55

1    I didn't have a lot of interaction with it.

2    So FSD had a lot, so I can't really answer

3    that question correctly.

4         Q.    Thank you.  So setting aside

5    that internet prohibition --

6         A.    Uh-huh.

7         Q.    -- if a practice was switching

8    to a competitor or to television, is one

9    reason that they gave for doing that that the

10:56  10    quality of the content was not engaging

11    enough to the patients?

12        A.    Yes.  That could be.

13        Q.    That could be one reason?

14        A.    Uh-huh.

15        Q.    Another reason could be that

16    Healthy Advice's system was in a part of the

17    waiting room that wasn't working out and the

18    competitor or television could be in a

19    different part of the waiting room?  I think

10:57  20    that's what you told me.

21        A.    Yes.  We -- we always said that

22    we could coexist with any competitor out

23    there.

24        Q.    And then sometimes a practice

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Melissa Lake, 3/24/2014

56

1    would let you coexist and other times the

2    practice would say, no, I only want one

3    screen or patient education system.

4          A.    Yes.

5          Q.    So at least in that subset of

6    practices one reason that they would switch

7    to a competitor or to a TV is that it could

8    be in a different spot in the waiting room

9    that Healthy Advice couldn't accommodate?

10:58   10        A.    I would say no because if -- if

11   a competitor could put it somewhere else then

12   we could.  We would make sure -- we did not

13   want to lose business so we made sure we

14   could definitely move it in a different area.

15   Whether they would let us or not, that was up

16   to them.

17        Q.    Some competitors have a -- do

18   you know what loop means?

19        A.    Yes.

10:58   20        Q.    Loop is -- what's your

21   understanding of loop?

22        A.    Usually what we had was a

23   30-minute loop for the CPU and -- and that

24   loop, that would get updated.  That's what we

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    132f775c-3e76-451d-ab6e-1c93ddabdb0f

Melissa Lake, 3/24/2014

57

1    called a loop.

2           Q.    It's the content that gets shown

3    on the screens, correct?

4           A.    Correct.

5           Q.    And it repeats after a certain

6    amount of time?

7           A.    Correct.

8           Q.    And the loop is one -- one way

9    through the content before it repeats, right?

10:59  10           A.    Right.  But -- go ahead.

11           Q.    No.  Please.

12           A.    Oh, but the loop can -- there --

13    the loop -- the 30-minute loop, the next 30

14    minutes that it would change to the next

15    loop, different things would be on -- it

16    would be updated with different -- it

17    wouldn't look exactly the same.

18           Q.    Some of the content would repeat

19    in the second loop --

10:59  20           A.    Yes.

21           Q.    -- and some of it would be

22    slightly different --

23           A.    Yes.

24           Q.    -- based on segments where --

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Melissa Lake, 3/24/2014

58

1    certain segments would repeat exactly as they

2    were on the first loop.  Other segments would

3    kind of be substituted in in the second or

4    maybe even the third loop.  Correct?

5        A.    Right.  There were things like

6    they had quizzes and different things like

7    that.  I can't remember what they were all

8    called but just to make it more entertaining.

9    Quizzes and things like that.

11:00  10        Q.    So Healthy Advice had as part of

11   its content that it relied on quizzes and

12   trivia that the patients would see, right?

13       A.    There were portions of it, yes.

14       Q.    And that was one way that they

15   implemented their patient education.

16       A.    Yes.

17       Q.    And the quizzes would

18   essentially operate by one slide showing the

19   question and then some other content coming

11:00  20   in and then another slide showing the answer

21   later?

22       A.    Yeah.  I can't remember if the

23   answer was the next slide or not.

24       Q.    One I saw with the amount of

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Melissa Lake, 3/24/2014

59

1    fiber in raspberries, it looked like it

2    waited maybe until the end of the loop or

3    maybe even the next loop to show the answer.

4    Does that ring any bells?

5            A.    No.

6            Q.    Did you know raspberries have

7    more fiber than a potato?

8            A.    No.

9            Q.    I didn't either.

10           A.    But I know you should keep

11    berries in your diet.

12           Q.    But regardless the question and

13    the answer were on different slides --

14           A.    Uh-huh.

15           Q.    -- and there would be, you know,

16    one would display and then the other --

17           A.    Yes.

18           Q.    -- and then if there was other

19    content in that loop, it would be on slides

20    with different sorts of backgrounds.

21           A.    Yes.

22           Q.    And there might be like a photo

23    on one slide and some words that would appear

24    and then it would move on to another slide

11:01 (line 10)

11:01 (line 20)

Electronically signed by Deanne L. Cartwright (501-202-620-8979)          132f775c-3e76-451d-ab6e-1c93ddabdb0f

Melissa Lake, 3/24/2014

60

1    with a different topic?

2          A.     And then there were --

3                 MR. BERNAY:   Object to the form.

4    You can answer.

5          A.     Yes.  And then they would

6    personalized messages also --

7          Q.     Uh-huh.

8          A.      -- for the practice to update

9    and customize any way they wanted to for the

11:01  10    patients.

11          Q.     And a lot of times those

12    personalized messages from the practices

13    would be a -- a different background of slide

14    with some text on it that the practice had

15    supplied to Healthy Advice for them to

16    display on the screen, right?

17          A.     Yes.  But they could do it

18    themselves as well.

19          Q.     They could choose what messages

11:02  20    to display online?

21          A.     They could pick whatever

22    message -- whatever they wanted to

23    communicate to the patient.  If they weren't

24    able to do it, we could do it for them or

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                                    132f775c-3e76-451d-ab6e-1c93ddabdb0f

Melissa Lake, 3/24/2014

61

1    walk them through.

2          Q.    That was part of your job was to

3    help people customize that part of the loop,

4    right?

5          A.    Yes.

6          Q.    Did people like that feature?

7          A.    Yes.

8          Q.    Was that an important reason to

9    keep a Healthy Advice screen as opposed to a

11:02    10    competitor that could not customize?

11          A.    Yes.

12          Q.    Did anyone ever cancel in your

13    territory because they wanted sound and

14    Healthy Advice at the time did not provide

15    sound?

16          A.    I can't remember.

17          Q.    Maybe, maybe not?

18          A.    Yeah.

19          Q.    Did anyone ever cancel in your

11:03    20    territory because they wanted more

21    live-action video and Healthy Advice at the

22    time did not provide live-action video as

23    part of their content?

24          A.    It's been a while.  I'm trying

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Melissa Lake, 3/24/2014

62

1    to think.  I don't know.

2           Q.    You just don't remember one way

3    or the other?

4           A.    I don't remember.

5           Q.    What about the connectivity

6    problems that we were discussing earlier, did

7    you encounter practices who canceled their

8    Healthy Advice subscription because they had

9    connectivity issues?

11:04  10           A.    I don't know.  I don't think so.

11    I -- I don't know.

12           Q.    You don't remember now?

13           A.    I don't remember.

14           Q.    At the time -- and this isn't a

15    pop quiz.  You know don't worry.  You

16    remember what you remember.  So at the time

17    though one of your duties was to ask the

18    practice why they chose to cancel, right?

19           A.    Yes.

11:04  20           Q.    And if they were switching to a

21    competitor, was one of your duties also to

22    ask the practice why they were switching to

23    the competitor?

24           A.    Yes.

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                                    132f775c-3e76-451d-ab6e-1c93ddabdb0f

Melissa Lake, 3/24/2014

63

1          Q.    And you also asked which

2     competitor it was, right?

3          A.    Yes.

4          Q.    At that time, was it your job to

5     then put that information into CMS?

6          A.    Yes.

7          Q.    Your duty was to put all the

8     information about reasons for a switch into

9     CMS, right?

11:05    10          A.    Whenever there's a cancel.  Yes.

11          Q.    You weren't supposed to leave

12     parts of it out.  You were supposed to

13     provide all the reasons that the practice

14     gave for switching, right?

15          A.    If they provided it, yes.

16          Q.    And generally -- let me start

17     again.  You didn't leave things out, right?

18          A.    I hope not.

19          Q.    Your intent was to put all the

11:05    20     reasons for the switch in the CMS?

21          A.    Yes.

22          Q.    For practices in your territory

23     that were assigned to you to do this

24     questioning, did anyone else in the company

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                                        132f775c-3e76-451d-ab6e-1c93ddabdb0f

Melissa Lake, 3/24/2014

64

1    know better than you why the practice

2    switched?

3              A.    Yes.

4              Q.    Who?

5              A.    We had a few people that were

6    checking every day on non-connects which was

7    FSD and also Lori Smith also kept track for a

8    little while as well.

9              Q.    If -- would FSD put a CMS entry

11:06  10   in for any reasons that it knew?

11             A.    Yes.

12             Q.    And would Lori Smith make a CMS

13   entry for each reason that she knew that a

14   practice was switching?

15             A.    Yes.

16             Q.    If there is no other CMS entry

17   giving reasons for a practice to switch other

18   than one of yours, would you then be the

19   person at the company who had the most

11:07  20   knowledge about why that practice switched?

21             A.    Yes.

22             Q.    And if for some reason someone

23   in upper management or an advertiser on

24   Healthy Advice's networks wanted to know why

Electronically signed by Deanne L. Cartwright (501-202-620-8979)          132f775c-3e76-451d-ab6e-1c93ddabdb0f

Melissa Lake, 3/24/2014

65

1    a particular practice in Arizona at the time

2    that you were covering Arizona switched, they

3    would go to your CMS entries to get that

4    information, right?

5         A.    I don't know.  I never dealt

6    with the advertisers at all.

7         Q.    But you're not aware of a better

8    source of information about the switches

9    other than the CMS entries from the employees

11:08   10   who spoke to the practice?

11        A.    If a tech went out there they

12   would let us know also if they saw, you know,

13   whatever it was in their lobby.  If they were

14   taking down our equipment.  They would --

15   they would let us know also.

16        Q.    Uh-huh.  And how would they let

17   you know?

18        A.    They would communicate with FSD

19   when their job is complete.

11:08   20        Q.    And would FSD put that

21   information in CMS?

22        A.    Yes.

23        Q.    So again it's the company's best

24   knowledge that's reflected in the -- let me

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    132f775c-3e76-451d-ab6e-1c93ddabdb0f

Melissa Lake, 3/24/2014

66

1    start that again.  Again, if the company has

2    knowledge for a switch -- just not firing

3    right.

4          A.    It's Monday.

5          Q.    Yeah.  If Healthy Advice has any

6    information about why a practice would switch

7    to a competitor, it would be in the CMS

8    entries, right?

9          A.    In my department for sure, yes.

11:09  10    Sometimes we would just get it in the mail.

11    We would just get the equipment in the mail

12    and would know.

13          Q.    But that's when you don't know

14    the reason, right?

15          A.    Well, we would know if our

16    equipment came back from Context -- Context

17    Media, we would know that they went to a

18    competitor.

19          Q.    Right.  If you found out the

11:09  20    reason for the switch, whoever found out the

21    reason for the switch would put it in CMS,

22    correct?

23          A.    Yes.

24          Q.    There's no other source of

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                                    132f775c-3e76-451d-ab6e-1c93ddabdb0f

Melissa Lake, 3/24/2014

67

1    information at Healthy Advice that's better

2    than CMS for the reasons practices switch to

3    a competitor.

4              MR. BERNAY:  Object to the form.

5    You can answer.

6         A.    Correct.

7         Q.    Including switches to Context

8    Media and other competitors as well?

9         A.    Correct.

11:10  10       Q.    I'm going to hand you a document

11    that we're marking as Defendant's Exhibit 69.

12       (Exhibit 69 identified.)

13        Q.    Do you know who Liz Phillips is?

14        A.    She was in charge -- yes.

15        Q.    Who was she?  Thank you.

16    Appreciate that exactness.  Who was Liz

17    Phillips?

18        A.    She was in charge of the --

19    trying to think of the term.  She was in

11:11  20    charge of the management of the content that

21    was on the flat screen.  I think everything

22    from the advertiser to -- she overseen the

23    contact -- the -- she was an overseer.  I --

24    I don't exactly know what -- what all her job

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Melissa Lake, 3/24/2014

68

1    entailed but --

2           Q.    She was pretty high up --

3           A.    Yes.

4           Q.    -- and it had to do with what

5    was shown on the screens in the waiting

6    rooms?

7           A.    Yes.

8           Q.    Did you know Linda, is it,

9    Ruschau?  Ruschau?

11:11    10           A.    No.  But I knew her name.

11           Q.    Can you tell me how to pronounce

12    it?

13           A.    Ruschau.

14           Q.    Ruschau?

15           A.    Ruschau.

16           Q.    Do you know what her position

17    was at the company?

18           A.    She -- I believe she came on

19    during Patient Point and she came on when

11:12    20    I -- I'd say the last couple months that I

21    worked there from what I remember and I never

22    had a contact with her that I remember.  So I

23    don't remember what her --

24           Q.    Do you know who Alexis Schnell

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    132f775c-3e76-451d-ab6e-1c93ddabdb0f

Melissa Lake, 3/24/2014

69

1    is?

2            A.    Yes.

3            Q.    Who's that?

4            A.    She was in sales.

5            Q.    Sales is separate from customer

6    relationship management, right?

7            A.    Yes.  She was in sales for

8    the -- for the clients.  Not the customers.

9            Q.    For advertisers and sponsors?

11:12  10            A.    Yes.

11            Q.    Who's Tom Campbell if you know?

12            A.    He was -- I don't know what his

13    position was but he was in management

14    position.

15            Q.    Pretty high up?

16            A.    Yes.

17            Q.    Was he higher up in the chain of

18    command than Linda Ruschau?  It's okay if

19    you're not sure.

11:13  20            A.    I don't know.

21            Q.    What's ACN?

22            A.    That's the arthritis network.

23            Q.    Is that smaller than the others?

24            A.    Yes.

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    132f775c-3e76-451d-ab6e-1c93ddabdb0f

Melissa Lake, 3/24/2014

70

1          Q.    There's fewer doctors in that
2     specialty, right?
3          A.    Yes.
4          Q.    Primary care can be any primary
5     care physician, right?
6          A.    Yes.
7          Q.    Whereas arthritis care is
8     limited to people who are in that field:
9     Rheumatology, arthritis and associated
11:13 10     disorders?
11          A.    Yes.  That specialty.  Correct.
12          Q.    Have you heard the word churn
13     before?
14          A.    Yes.
15          Q.    What's churn?
16          A.    They expect cancels.
17          Q.    And who's they?
18          A.    Management.
19          Q.    And what do you mean by expect
11:14 20     cancels?
21          A.    Any time you're in sales there's
22     a churn.
23          Q.    It's not even unique to -- in
24     waiting room systems.  It's just in sales

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                                        132f775c-3e76-451d-ab6e-1c93ddabdb0f

Melissa Lake, 3/24/2014

71

1    there's an expected churn?

2          A.    Yes.

3          Q.    And here in Healthy Advice's

4    industry there's an expected churn of

5    practices, right?

6          A.    From what I understand.

7          Q.    And you understand that from

8    meetings with your supervisors and the team

9    and your training at Healthy Advice?

11:14    10          A.    We really didn't talk about the

11    churn too much but I was aware of it.

12          Q.    Are you familiar with the term

13    save?

14          A.    Yes.

15          Q.    What does that mean?

16          A.    It's when a practice decides

17    they want to cancel and we convince them not

18    to cancel.  They allow -- usually my -- I --

19    I don't remember what I was gonna say.

11:15    20          Q.    Okay.  Usually when a practice

21    calls to cancel, were you gonna say --

22          A.    When they call to cancel and I

23    convince them not to cancel, you cancel the

24    cancel request as a save and that's what we

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    132f775c-3e76-451d-ab6e-1c93ddabdb0f

Melissa Lake, 3/24/2014

72

1    call it.

2           Q.    The cancel of the cancel --

3           A.    Right.

4           Q.    -- is the save?

5           A.    Right.  The cancel of the cancel

6    is the save.

7           Q.    Is that reflected in CMS?

8           A.    Yes.

9           Q.    Is there a separate field that's

11:15  10  like cancel and then cancel the cancel?

11          A.    When you're -- when you have

12   that order, you either -- with a cancel you

13   either send it on to management or you save

14   it, so you cancel the cancel with a save, and

15   you would just put in a save and put how you

16   saved them and --

17          Q.    So there's a separate save

18   field?

19          A.    Only if it's a cancel you'll see

11:16  20  where -- from what I remember, you would see

21   where you could either send it on or cancel

22   that cancel and the re -- and it'll -- and

23   you just click on something the reason you

24   canceled it was a save.  Is best I can

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                                    132f775c-3e76-451d-ab6e-1c93ddabdb0f

Melissa Lake, 3/24/2014

73

1    explain it I guess without looking at it.

2         Q.    There's -- there's a choice --

3    after you click to cancel the cancel, there's

4    a choice of, you know, why you're doing it or

5    what you're -- is there an opportunity to

6    comment --

7         A.    Yeah.

8         Q.    -- or is -- or is it a pick list

9    or both?

11:16    10         A.    There's always a place for you

11   to put a comment in.

12         Q.    Is there also a list of choices

13   to click?

14         A.    I can't remember.

15         Q.    Okay.

16         A.    I'd have to look at it.

17         Q.    So anyway, when there's a cancel

18   and then you order in CMS it would pop up on

19   your task list.  Right?

11:17    20         A.    And you would work that order.

21         Q.    And you'd work the order by

22   calling the contact at the practice?

23         A.    Uh-huh.

24         Q.    You'd talk to them about it.

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                                    132f775c-3e76-451d-ab6e-1c93ddabdb0f

Melissa Lake, 3/24/2014

74

1    You'd do your best to understand why they're

2    canceling, right?

3         A.    Yes.

4         Q.    And if they chose to continue

5    the cancel, to actually go through with it,

6    you'd schedule the cancel and you put your

7    best information in CMS for why they were

8    switching?

9         A.    Yes.

11:17    10         Q.    If they chose after talking to

11    you to keep the system in the waiting room,

12    to keep Healthy Advice --

13         A.    Uh-huh.

14         Q.    -- going, then you would click

15    something to cancel the cancel, right?

16         A.    Right.

17         Q.    And at that point a new screen

18    or like little window would pop up, correct?

19         A.    I can't remember what pops up.

11:17    20         Q.    Uh-huh.

21         A.    I just remember that --

22         Q.    But something pops up, right?

23         A.    Something would come up in the

24    cancel request where you can pick --

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    132f775c-3e76-451d-ab6e-1c93ddabdb0f

Melissa Lake, 3/24/2014

75

1          Q.     Save.

2          A.     -- save I believe.  Yeah.  From

3      what I remember.  It's been a while.  From

4      what I remember.  Those were my favorite

5      orders.

6          Q.     Because then you feel like

7      you're winning, right?

8          A.     Right.  Well, I like sales so --

9          Q.     Oh, very good.  Now, there's a

11:18  10      separate department that's sales at Healthy

11      Advice, right?

12          A.     Yes.

13          Q.     And would you consider their

14      work important in terms of getting practices

15      to sign onto Healthy Advice's networks?

16          A.     Very important.

17          Q.     And would you also consider the

18      customer relationship management team's

19      efforts to keep the practices engaged to be

11:18  20      important to retaining practices in the

21      networks?

22          A.     Yes.

23          Q.     Is one of those more important

24      than the other?

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    132f775c-3e76-451d-ab6e-1c93ddabdb0f

Melissa Lake, 3/24/2014

76

1          A.    They're both very important.

2          Q.    Is there any basis to think one

3    is more important to the total number of

4    practices that Healthy Advice is able to have

5    in any particular network?

6               MR. BERNAY:  Object to the form.

7    You can answer.

8          A.    While it's important to sell it,

9    it's very important to manage it to keep them

11:19  10    happy and engaged.

11          Q.    So there's really not a way to

12    compare the two.  They're just both very

13    important?

14          A.    Right.

15          Q.    And that's the sales team and

16    the customer relationship team and all the

17    activities they undertake.  Separately from

18    that there's the product, right?

19          A.    Yes.

11:19  20          Q.    And if what Healthy Advice was

21    selling was just like a screen that displayed

22    puce walls, no matter how good the sales team

23    and the customer relationship team were, they

24    couldn't sell that product, right?  The

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    132f775c-3e76-451d-ab6e-1c93ddabdb0f

Melissa Lake, 3/24/2014

77

1    product's important is what I'm trying to

2    say.

3         A.    The product is important.  Yes.

4         Q.    And the product's quality is

5    separate from what the sales activities are

6    and what customer relationship management's

7    activities are?

8         A.    Can you repeat the first part of

9    the question?

11:20    10         Q.    Sure.  The product which we

11    agree is important to the practices --

12         A.    Uh-huh.

13         Q.    -- is separate from -- it's a

14    separate kind of thing from the activities of

15    the salespeople and the activities of the

16    customer relationship management team.

17         A.    Yes.

18         Q.    And each of those three could

19    potentially be why a particular practice is

11:20    20    in a network, correct?

21         A.    Yes.

22         Q.    Exceptional sales could be a

23    reason that a practice is in a Healthy Advice

24    Network, correct?

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                                                                132f775c-3e76-451d-ab6e-1c93ddabdb0f

Melissa Lake, 3/24/2014

78

1          A.     Yes.

2          Q.     And exceptional customer

3   relationship activities could be a reason

4   that that practice is in that network at a

5   particular time, right?

6          A.     Yes.

7          Q.     And good quality programming

8   could also be a reason that a particular

9   practice is in a network at a particular

11:21  10   time, right?

11         A.     Yes.

12         Q.     On the flip side, if the sales

13  team does a poor job of selling, that could

14  be a reason that they missed a practice, that

15  a practice is not in a Healthy Advice Network

16  at a particular time, right?

17         A.     Yes.

18         Q.     And if somebody on your team,

19  the customer relationship management team,

11:21  20   did a poor job of engaging the practice for

21  whatever reason, that could be a reason that

22  a practice got lost, cancelled, and therefore

23  is not in that network at a particular time,

24  right?

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    132f775c-3e76-451d-ab6e-1c93ddabdb0f

Melissa Lake, 3/24/2014

79

1          A.    Yes.

2          Q.    And if the content in the view

3     of the practice is no good, for whatever

4     reason, that could be a reason independent of

5     the other two that that practice is not in a

6     Healthy Advice Network at a particular time,

7     right?

8          A.    Yes.

9          Q.    Now, separately from those three

11:22  10    there's also the technical issues, right?

11    Because you've got your product which has a

12    certain quality --

13         A.    Uh-huh.

14         Q.    -- but if the practice -- if the

15    practice's patients can't see it because the

16    screen goes bank or it's fizzy or whatever

17    the technical issues might be, that's yet a

18    fourth independent reason that any particular

19    practice might be in or out of a network at a

11:22  20    particular time, right?

21              MR. BERNAY:  Object to the form.

22    You can answer.

23         A.    Yes.

24         Q.    The -- and a bad experience in

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Melissa Lake, 3/24/2014

80

1    any one of those four for any particular
2    practice could cause a cancel by itself,
3    right?
4                MR. BERNAY:  Objection.  You can
5    answer.
6          A.    Yes.
7          Q.    And in your experience that's
8    probably happened where a practice has one of
9    those that really was an overriding factor
11:23   10   and you couldn't save it because one of those
11   four was lacking in the past, right?
12         A.    Yes.
13         Q.    Would you have any way to
14   compare or rate which of those four factors
15   are more or less important than the other in
16   having a practice in a network at a
17   particular time?
18                MR. BERNAY:  Objection.  You can
19   answer.
11:23   20        A.    They're all important.  I can't
21   remember like --
22         Q.    What can't you remember?
23         A.    The -- one of the four reasons
24   why --

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    132f775c-3e76-451d-ab6e-1c93ddabdb0f

Melissa Lake, 3/24/2014

81

1        Q.    Oh, sure.

2        A.    -- they would cancel.

3        Q.    We were just talking about the
4    sales activities; the customer relationship
5    management team activities; the programming,
6    the product; and then technical issues
7    whether it works flawlessly or whether there
8    are problems with connectivity that make it
9    not work properly.

11:24   10        A.    You know, there -- there were
11    all sorts of different reasons and there
12    wasn't one particular reason each time.  I
13    didn't see a trend of it.  It was --

14        Q.    Any particular cancel could be
15    any one of those or a combination?

16        A.    Or a competitor coming in.

17        Q.    Uh-huh.

18        A.    Yes.

19        Q.    And so a competitor coming in
11:24   20    you're thinking is sort of a fifth category,
21    right?

22        A.    Yes.

23        Q.    And if a competitor comes in and
24    has sales activities that are very effective

Electronically signed by Deanne L. Cartwright (501-202-620-8979)          132f775c-3e76-451d-ab6e-1c93ddabdb0f

Melissa Lake, 3/24/2014

82

1    that could be yet a fifth reason that a

2    practice is either in or not in a Healthy

3    Advice Network at a particular time, right?

4           A.    Yes.

5           Q.    Did you receive scripts as part

6    of your training or instructions?

7           A.    Not -- we were coached but I

8    can't -- I can't remember if there was an

9    exact script.  We didn't -- if there was, we

10   didn't have to like follow it word by word or

11   anything like that.

12          Q.    Did you have a binder?

13          A.    Yes.

14          Q.    Was there a binder -- did you

15   have three binders?

16          A.    One -- yes.

17          Q.    Was one related to in waiting

18   room systems?

19          A.    Yes.

20          Q.    Did that binder have

21   instructions in it about interactions with

22   practices?

23          A.    I don't remember.

24          Q.    Do you remember if there were

11:25

11:26

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    132f775c-3e76-451d-ab6e-1c93ddabdb0f

Melissa Lake, 3/24/2014

83

1    scripts in there?

2            A.    I want to say yes but --

3            Q.    You want to say it because you

4    think so?

5            A.    I think so.

6            Q.    But you're not sure?

7            A.    I think so.  But I'm not 100

8    percent sure.

9            Q.    Uh-huh.

11:26   10       A.    It was a very well made binder.

11           Q.    It covered a lot of the issues

12   that came up in your job?

13           A.    Yes.

14           Q.    Would you refer to that binder

15   if you were having an issue and you weren't

16   sure exactly how to handle it with the

17   practice?

18           A.    Yes.

19           Q.    Do you remember anything else

11:26   20   about the binder, what was in it?

21           A.    I -- I remember trouble --

22   different ways to troubleshoot if you were on

23   the phone with a practice for -- we had

24   different sized flat screens so --

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                                        132f775c-3e76-451d-ab6e-1c93ddabdb0f

Melissa Lake, 3/24/2014

84

1          Q.    Uh-huh.

2          A.    -- there were different ways to

3    troubleshoot for each flat screen.

4          Q.    That's an interesting point.

5    The size of the TV is important to some

6    practices, right?

7          A.    Uh-huh.

8          Q.    And the CPU -- do you think the

9    CPU kind of being in the way or the size or

11:27   10    placement of it is important or should we

11    just ignore that?

12          A.    Ignore that because it's -- it's

13    behind the --

14          Q.    It's hidden in the wall?

15          A.    It -- it's actually connected to

16    the back of the flat screen.  It's very

17    small.

18          Q.    Well, the new CPU is very small,

19    right?

11:27   20    A.    Yeah.

21          Q.    There was an old one that was

22    larger?

23          A.    I -- I remember we -- we were

24    phasing those out and providing new ones from

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                                132f775c-3e76-451d-ab6e-1c93ddabdb0f

Melissa Lake, 3/24/2014

85

1   what I remember.

2           Q.    During the time from the fall of

3   2009 to March of 2013 were you phasing out

4   old CPUs that whole time?

5           A.    Yes.

6           Q.    As it came up?

7           A.    Yes.

8           Q.    If the practice had an old CPU,

9   it might be replaced?

11:28   10           A.    Especially if it wasn't working

11   correctly, yes.

12           Q.    Was there an employee at Healthy

13   Advice called -- named Vida Albert?

14           A.    Yes.

15           Q.    Albert or Alberts?

16           A.    Albert.

17           Q.    Albert.  Vida Albert?

18           A.    Yes.

19           Q.    Did she have something to do

11:28   20   with the replacement of CPUs?

21           A.    Yes.

22           Q.    What was her role in that?

23           A.    She would -- she would order

24   them --

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    132f775c-3e76-451d-ab6e-1c93ddabdb0f

Melissa Lake, 3/24/2014

86

1          Q.     Uh-huh.

2          A.     -- if it needs to be replaced.

3          Q.     And what happens to the old

4    CPUs?

5          A.     They get -- well, usually they

6    would be -- they would be sent back to us.

7          Q.     In every case?

8          A.     I'm not in the field digital

9    department but from what I understand they

11:29  10    were sent back to us.

11         Q.     It just sounds like -- did you

12   ever have a experience where the old CPU was

13   left with the practice or was that somebody

14   else's job?

15         A.     If it was left it was an

16   accident.

17         Q.     Why do you say that?

18         A.     I don't think they wanted to

19   leave that equipment there.

11:29  20         Q.     The old CPUs -- at one point

21   didn't Vida send out a list of what kind of

22   equipment was needed back from a practice and

23   what kind of equipment could be left with a

24   practice?

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                                         132f775c-3e76-451d-ab6e-1c93ddabdb0f

Melissa Lake, 3/24/2014

87

1          A.    Possibly.  I don't remember.

2          Q.    If Ms. Joyce Lawrence told me

3     that there was a list like that, would you

4     have any reason to disagree with her?

5          A.    No.

6               MR. BERNAY:  Objection.  You can

7     answer.

8          A.    No.  I would have no reason to

9     disagree with her.

11:30   10          Q.    Was she -- you said you sat

11     right across from her?

12          A.    For a while.  Yeah.

13          Q.    Was she good at her job?

14          A.    Yes.

15          Q.    Was she knowledgeable of Healthy

16     Advice's policies and procedures?

17          A.    Yes.

18          Q.    It looks like you want to say

19     she was very knowledgeable.  Can you tell me

11:30   20     a little bit about Ms. Lawrence and her work?

21               MR. BERNAY:  Objection.  You can

22     answer.

23          A.    She never got up from her desk.

24     I would make her go to lunch.  She worked

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    132f775c-3e76-451d-ab6e-1c93ddabdb0f

Melissa Lake, 3/24/2014

88

1   very hard.  She was a very -- she's a very

2   good employee.  I would make her get up.  Did

3   you eat?  Did you drink something today?

4   Please get up from your desk.  Let's walk

5   somewhere.

6           Q.    Extremely dedicated.

7           A.    Very much.

8           Q.    If you had a question about what

9   to do with a particular situation that was

11:30   10   arising, would you sometimes ask

11   Ms. Lawrence?

12           A.    Yes.

13           Q.    She was a good resource for that

14   type of information?

15           A.    Yes.  But I could ask my

16   supervisor first.

17           Q.    Uh-huh.

18           A.    If she wasn't around, I would

19   ask her.

11:30   20           Q.    And would you trust the

21   information that Ms. Lawrence gave you about

22   Healthy Advice's practices and procedures?

23           A.    Yes.

24           Q.    Did you ever have a situation

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    132f775c-3e76-451d-ab6e-1c93ddabdb0f

Melissa Lake, 3/24/2014

89

1    where she was wrong in any sort of important

2    way?

3            A.    Not that I know of.

4            Q.    Very dedicated, very

5    knowledgeable employee?

6            A.    Yes.

7            Q.    As far as CPUs of the old

8    variety and whether or not they were left at

9    a practice in certain situations, you don't

11:31  10   have direct knowledge after that, correct?

11           A.    No.

12           Q.    You're saying that decisions

13   about that were made by digital and Vida

14   Alberts, right?

15           A.    Yes.

16           Q.    And if they made decisions about

17   that, it would be reflected in a CMS entry,

18   correct?

19           A.    Yes.

11:31  20       Q.    So there's no reason for me to

21   pop quiz you about it, right?

22           A.    I think so.

23           Q.    So going back to the size of the

24   TV screens, was that important to some

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    132f775c-3e76-451d-ab6e-1c93ddabdb0f

Melissa Lake, 3/24/2014

90

1    practices?

2           A.    Yes.

3           Q.    Healthy Advice had screens that

4    were available in certain sizes at certain

5    times, right?

6           A.    Yes.

7           Q.    And sometimes would a practice

8    want a larger screen?

9           A.    Yes.

11:32  10           Q.    Would certain practices switch

11   to a competitor and say that the reason was

12   to get a larger screen?

13           A.    I have a hard time answering

14   that because if a practice was requesting a

15   flat screen, a larger flat screen, I would

16   make sure I was able to provide that.

17           Q.    Oh, there are two sizes and

18   sometimes they had the small and wanted the

19   large?

11:32  20           A.    Right.  And if they wanted -- if

21   they wanted a larger screen I would find out

22   if we were able to provide that.

23           Q.    Uh-huh.  And you don't remember

24   the result of any particular situation where

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                                    132f775c-3e76-451d-ab6e-1c93ddabdb0f

Melissa Lake, 3/24/2014

91

1    that arose?

2           A.    I have never -- I never had a

3    practice that I remember canceling because of

4    the size of the flat screen, meaning we

5    weren't able to upgrade them if they needed

6    to.  We were -- that's all I know about

7    the --

8           Q.    Uh-huh.

9           A.    We did upgrade if they were

11:33  10   requesting.

11          Q.    Could you look at paragraph --

12   the numbered paragraph two in Defendant's

13   Exhibit 69?

14          A.    Uh-huh.

15          Q.    The last part of that paragraph

16   says, in addition, reps will be equipped with

17   a script that explains that there's a

18   competitor in the marketplace that is

19   misrepresenting themselves and that no

11:34  20   authorization has been given to any other

21   company to remove HAN equipment.  Do you

22   remember any such script?

23          A.    I do remember this.

24          Q.    What was it?

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    132f775c-3e76-451d-ab6e-1c93ddabdb0f

Melissa Lake, 3/24/2014

92

1        A.    I don't remember the exact

2   script but I do remember if we had -- if we

3   had a practice deciding they wanted to cancel

4   and they told us that it's already been taken

5   down by a competitor, they have a -- they

6   were provided a -- thinking of the word.

7   They had a contract when they joined us.

8        Q.    Enrollment?

9        A.    Enrollment agreement.  And in

11:35   10   the enrollment agreement it said that only

11   Healthy Advice was permitted -- was allowed

12   to take down the equipment meaning our techs

13   and nobody else was required to do that and

14   we needed a 30- or 60-day notice and we

15   would -- we would take it down and cancel

16   them within that 30 or -- to 60-day notice

17   depending on their enrollment.

18        Q.    And every time that situation

19   arose you would inform the practice of that,

11:35   20   correct?

21        A.    When they wanted to cancel, yes.

22        Q.    And do you have any reason to

23   believe that the practice was confused about

24   that after you spoke to them?

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    132f775c-3e76-451d-ab6e-1c93ddabdb0f

Melissa Lake, 3/24/2014

93

1          A.    No.

2          Q.    And if you -- if they did seem

3    confused you would have followed up and

4    explained it further, right?

5          A.    Yes.

6          Q.    So by the time you were done you

7    had conveyed that full message to each

8    practice.

9          A.    Yes.

11:36   10          Q.    Was that according to the script

11    and instructions that you were given?

12          A.    Yes.

13              MR. BERNAY:  Objection.  You can

14    answer.

15          A.    Yes.

16          Q.    And that's -- those -- that

17    script and those instructions were given to

18    the whole customer relationship management

19    team, right?

11:36   20              MR. BERNAY:  Objection.  You can

21    answer.

22          A.    Yes.

23          Q.    Look at paragraph three.  It

24    says, in addition to this personal outreach,

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    132f775c-3e76-451d-ab6e-1c93ddabdb0f

Melissa Lake, 3/24/2014

94

1    we are sending a formal letter to all ACN

2    practices with similar language around

3    misrepresentation and authorization.  Do you

4    have any memory of that letter?

5            A.    I don't.

6            Q.    Do you have any memory of

7    speaking with a practice at any point that

8    mentioned that letter at all?

9            A.    I don't remember.

11:36   10        Q.    In the script about a company in

11    the marketplace misrepresenting themselves

12    what specifically was said about that?

13            MR. BERNAY:  Object to the form.

14    You can answer.

15            A.    I think that they told them it

16    was okay for them to take the equipment down

17    and they would take care of it and ship it

18    out to us and I think that was a

19    misrepresentation -- that was misrepresenting

11:37   20    what our enrollment agreement said.

21            Q.    That was what the script said?

22            A.    I don't remember the script.  I

23    remember there was one but I don't remember

24    what it said.

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                                    132f775c-3e76-451d-ab6e-1c93ddabdb0f

Melissa Lake, 3/24/2014

95

1          Q.    You remember generally that the
2     issue had to do with taking down the
3     equipment and whether someone was authorized
4     to do that?
5          A.    Correct.
6          Q.    Do you know if that was specific
7     to Context Media or if it was other
8     competitors as well?
9          A.    I don't remember another
10    competitor doing that, sending it back to us.
11:38
11    I only remember Context Media doing that.
12    The diabetic network and the arthritis
13    network they had.
14         Q.    Rheumatology?
15         A.    Rheumatology.  Yes.
16         Q.    Did Healthy Advice ever take any
17    action against a practice for taking the
18    equipment down itself?
19         A.    No.  Not that I know of.
11:38
20         Q.    That would have been contrary to
21    its customer service model, right?
22         A.    I would say so.
23         Q.    It would be offensive to the
24    practice?

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                                    132f775c-3e76-451d-ab6e-1c93ddabdb0f

Melissa Lake, 3/24/2014

96

1          A.     Yes.

2          Q.     And so in a situation where the

3     name of the game is getting screens up in

4     doctor's offices, Healthy Advice would not

5     want it to become known that it ever sued a

6     practice, right?

7          A.     I don't think so.

8          Q.     That would be bad.

9          A.     I just -- I don't think that's a

11:39  10     good place to talk about -- doctor's offices

11     about suing with all the malpractices out

12     there, I don't --

13          Q.     Doctors can be touchy about

14     lawsuits, right?

15          A.     I'm sure.  Yes.

16          Q.     And so although there was an

17     enrollment form that talked about practice

18     switch outs, doctor's offices didn't have

19     that enforced against them, correct?

11:39  20          A.     I don't know.

21          Q.     You never encountered one that

22     was enforced against a practice, right?

23          A.     That a lawsuit was enforced

24     against a practice?  No.

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    132f775c-3e76-451d-ab6e-1c93ddabdb0f

Melissa Lake, 3/24/2014

97

1          Q.    Or that a practice was charged

2     money for the equipment being taken down.

3          A.    No.

4          Q.    And you dealt with hundreds of

5     practices every month during your time at

6     Healthy Advice, right?

7          A.    Yes.

8          Q.    And if it was in your territory

9     you would have known if that kind of

11:40    10     situation arose, right?

11         A.    Yes.

12         Q.    The policy of Healthy Advice was

13    to tell the practice that it needed to make

14    sure that the equipment got sent back and was

15    appropriately packed, right?

16         A.    If they told us it was taken

17    down by a competitor?

18         Q.    Yes.

19         A.    I can't remember having that

11:40    20    conversation of making sure it was packed up

21    correctly.  If I did, I -- I would say that

22    but I can't remember.

23         Q.    Do you ever remember getting

24    instructions about that situation about what

Electronically signed by Deanne L. Cartwright (501-202-620-8979)          132f775c-3e76-451d-ab6e-1c93ddabdb0f

Melissa Lake, 3/24/2014

98

1    to say?

2          A.    No.  I can't remember that.

3          Q.    Did you ever deal with -- did

4    the script about -- that's referenced in

5    number two of Defendant's Exhibit 69 refer to

6    a specific competitor?

7          A.    I don't know.  I -- I know that

8    there was only one competitor that I was

9    aware of that was sending it back.

11:41   10          Q.    Did you -- did a practice that

11    you spoke to ever get angry at the competitor

12    after you spoke to them about these issues?

13          A.    Not that I know of.  I don't

14    remember.

15          Q.    I'd like to hand you what we are

16    marking as Defendant's Exhibit 70.

17       (Exhibit 70 identified.)

18          Q.    Is this an e-mail from Lori

19    Smith to Kelly Schulkers, you and Heather

11:42   20    McGauvran dated September 23rd, 2011?

21          A.    I'm sorry.  Did you want me to

22    read this?

23          Q.    Sure.

24          A.    Okay.

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    132f775c-3e76-451d-ab6e-1c93ddabdb0f

Melissa Lake, 3/24/2014

99

1          MR. BERNAY:  Take your time go

2     through the document.

3          A.   Okay.  It's 2011 so I'm trying

4     to remember this.  Okay.  I remember Phyllis.

5          VIDEOGRAPHER:  While she's

6     reviewing, I'm gonna take the opportunity to

7     change DVDs.  Going off the video record at

8     11:42 a.m.

9       (Off the record discussion.)

11:44  10          VIDEOGRAPHER:  Okay.  We are

11     back on the record at 11:44 a.m.

12          Q.   I'll ask the question again.  Is

13     this an e-mail from Lori Smith to Kelly

14     Schulkers, you, and Heather McGauvran dated

15     September 23rd, 2011?

16          A.   Yes.

17          Q.   Lori Smith is a member of the

18     customer relationship management team, right?

19          A.   Yes.

11:45  20          Q.   And at this time so was Heather

21     McGauvran?

22          A.   Yes.

23          Q.   And you were a member of that

24     team, right?

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                                      132f775c-3e76-451d-ab6e-1c93ddabdb0f

Melissa Lake, 3/24/2014

100

1          A.     Yes.

2          Q.     Who's Kelly Schulkers?

3          A.     She was in FSS, field sales

4     service.

5          Q.     Is that the sales team that we

6     were discussing previously?

7          A.     Yes.

8          Q.     And who's Phyllis?

9          A.     She was an -- she was an FS as

11:46  10     well out in California.

11          Q.     Did Phyllis go out to practices

12     in person?

13          A.     Yes.

14          Q.     Were there specialized members

15     of FSS that did that and then there were

16     others who worked the phones?

17          A.     FSS was field service sales so

18     they were out in the field and I was in the

19     office answering phones, trying to save them,

11:46  20     but it helped out a lot if they went and

21     visited a practice.

22          Q.     Is there a separate sales team

23     or department that operated mostly by phone?

24          A.     I don't know how they operated.

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                                    132f775c-3e76-451d-ab6e-1c93ddabdb0f

Melissa Lake, 3/24/2014

101

1    If they would just -- they -- they -- they're

2    instructed to visit a practice.

3            Q.    And this is in California?

4            A.    Uh-huh.

5            Q.    Right?  Do you remember Dr.

6    Sandler?

7            A.    No, I don't.

8            Q.    The part of this e-mail that

9    appears below comment type, is that a CMS

11:47   10    entry?

11            A.    I believe so only because the --

12    it says comment type here so it is because

13    that was one of the comments that went in

14    under an order that was at this location

15    3744754.  So, yes, it was in CMS.

16            Q.    That number that you just said

17    is a unique location ID number and every

18    practice has its own, right?

19            A.    Yes.

11:48   20            Q.    And that number's used by CMS to

21    track all the different practices, right?

22            A.    Yes.

23            Q.    And there must have been some

24    sort of option for you to be able to send an

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Melissa Lake, 3/24/2014

102

1    e-mail that had a CMS field entry in it

2    because that's what we're looking at, right?

3            A.    Yes.  Yes.

4            Q.    Would you start that in CMS and

5    then click something to e-mail the entry?

6            A.    Yes.

7            Q.    So when we see a CMS entry or an

8    e-mail that has one that looks like this --

9            A.    Uh-huh.

11:48   10            Q.    -- those are documents that are

11    generated in the ordinary course of your job,

12    right?

13            A.    Yes.

14            Q.    And they're kept by Healthy

15    Advice in its ordinary business, correct?

16            A.    Yes.

17            Q.    It appears from the CMS entry

18    that the practice had some connection issues?

19            A.    Yes.

11:49   20            Q.    When you wrote a CMS entry --

21    pardon me.  It appears that this CMS entry

22    was -- was entered by Lori Smith, right?

23            A.    Yes.

24            Q.    Do you know why that was even

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Melissa Lake, 3/24/2014

103

1   though it was in your territory?

2           A.     Lori ended up taking over the

3   California location, so I'm not sure if this

4   was -- we were still in -- in transition of

5   switching territories because she got it

6   after me or if this was the time she was

7   checking on everything with the ACN

8   locations.  I -- I don't know.

9           Q.     What's that second time that

11:50  10  you're referring to when she was checking on

11  everything with the ACN location?

12          A.     Lori would keep track of

13  non-connects for ACNs as well as digital had

14  it but just for our -- just so everyone was

15  in the know about the ACN non-connects.

16          Q.     Whenever there was a non-connect

17  in the ACN network Lori Smith would call the

18  practice?

19          A.     She would not necessarily call

11:50  20  them.  It would be handled -- from what I

21  remember, it would be -- she would just be

22  keeping track of it but we were working it,

23  so -- sometimes it -- she would call if it

24  was her -- if it was something she was

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                                                                  132f775c-3e76-451d-ab6e-1c93ddabdb0f

Melissa Lake, 3/24/2014

104

1    working on, yes, but I really can't remember

2    if she called on the ACNs.  I don't remember.

3          Q.    She spoke to this one.

4          A.    And I don't know if it was

5    because it was her territory at the time --

6          Q.    Well, the -- up above it says --

7          A.    -- and I was still involved in

8    it.  Okay.

9          Q.    You'll see it says Melissa just

11:51  10   an FYI --

11         A.    Okay.

12         Q.    -- since this is in your

13   territory.

14         A.    Okay.  Okay.  That's right.

15         Q.    So she wouldn't have said that

16   if it was the transition issue, right?

17         A.    No.  I just can't remember if we

18   held onto a few orders until it was over

19   but --

11:51  20         Q.    Uh.

21         A.    -- but she kept track of the

22   ACNs definitely.  Non-connects.  She had a

23   spreadsheet I think.

24         Q.    If Lori Smith was entering

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                132f775c-3e76-451d-ab6e-1c93ddabdb0f

Melissa Lake, 3/24/2014

105

1    information about the reason that a practice

2    switched, then she's the person who was in

3    communication with the practice about those

4    issues, right?

5         A.    I believe so.  With this issue

6    here, from what I'm looking at, they just

7    went ahead and sent a field sales -- field

8    sales department or field sales

9    representative to that location for a

11:52    10    followup.

11         Q.    I'd like to hand you what we are

12    marking at Defendant's Exhibit 71.

13      (Exhibit 71 identified.)

14         Q.    This has a front and a back if

15    you would look it over, please.

16             MR. BERNAY:  This may have been

17    introduced already, Tom.  I just -- I just

18    don't remember.

19             MR. HANKINSON:  In which case I

11:53    20    just marked it twice.  Sorry.

21             MR. BERNAY:  That's fine.

22             MR. HANKINSON:  Let me know when

23    you've had a chance to look it over.

24         A.    Okay.

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Melissa Lake, 3/24/2014

106

1          Q.    The very bottom of this e-mail

2     chain --

3          A.    Uh-huh.

4          Q.    -- is there an e-mail from you

5     to Lori Smith and Heather McGauvran?

6          A.    Yes.

7          Q.    That's dated September 20th,

8     2011, right?

9          A.    Yes.

11:55   10          Q.    And it's about Dr. Lorilee

11     Sutter in Modesto, California?

12          A.    Yes.

13          Q.    Do you remember Ms Sutter's --

14     Dr. Sutter's office?

15          A.    No.

16          Q.    Do you remember who Kari is?

17          A.    No.  I believe she's the POC.

18          Q.    What's POC?

19          A.    Point of contact.

11:55   20          Q.    Each practice has a primary

21     point of contact?

22          A.    Yes.

23          Q.    That information is reflected in

24     CMS?

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    132f775c-3e76-451d-ab6e-1c93ddabdb0f

Melissa Lake, 3/24/2014

107

1          A.     Yes.

2          Q.     Did you have a chance to look

3    over the CMS entry that's at the bottom of

4    Defendant's Exhibit 71?

5          A.     Yes.

6          Q.     Is this an entry that you wrote?

7          A.     Yes.

8          Q.     The point of contact at this

9    doctor's office gives a couple different

11:56    10    reasons for switching to RHN, correct?

11          A.     Yes.

12          Q.     RHN is one of the networks made

13    by Context Media, right?

14          A.     Yes.

15          Q.     According to this entry that you

16    made, the point of contact at this practice

17    felt that RHN was more geared toward

18    arthritis, right?

19          A.     Yes.

11:56    20          Q.     And it also says here that the

21    point of contact said that RHN has more

22    video, right?

23          A.     Yes.

24          Q.     And in September of 2011,

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    132f775c-3e76-451d-ab6e-1c93ddabdb0f

Melissa Lake, 3/24/2014

108

1   Healthy Advice had essentially no live-action
2   video in its content, correct?
3           A.   I don't remember the dates.  I
4   know when I left they had live video.  I -- I
5   can't remember the dates when they started
6   getting live video.
7           Q.   In any event, the point of
8   contact for this practice said that RHN had
9   more video, correct?
11:57  10           A.   Yes.
11           Q.   Or rather that it is more video.
12   It's more video.  Right?
13           A.   Yes.
14           Q.   Oh, and it says that you
15   informed her of the upcoming changes we will
16   have.  Does that refresh your memory at all
17   about the timing of this and whether Healthy
18   Advice had video at that time or was just
19   planning to?
11:57  20           A.   If I told her that we were
21   having video then, yes, we were having video
22   at that time.
23           Q.   Do you remember if that's what
24   the upcoming changes refers to?

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                                    132f775c-3e76-451d-ab6e-1c93ddabdb0f

Melissa Lake, 3/24/2014

109

1          A.    Yes.

2          Q.    So if you said this, your

3    conclusion was -- if you -- so you did say

4    this, right?

5          A.    Yes.

6          Q.    And what you're saying is that

7    leads you to conclude that Healthy Advice did

8    not have video at that time but was planning

9    to, right?

11:58    10               MR. BERNAY:   Objection.  You can

11   answer.

12         Q.    If you said this, it was at a

13   time when you were planning to have video.

14               MR. BERNAY:   Objection.  You can

15   answer.

16         A.    Yes, it was -- it had to be.

17   Yes.

18         Q.    You told this point of contact

19   at the practice to go ahead and compare

11:58    20   Healthy Advice's programming with RHN, if --

21   if RHN's screen was up before Healthy

22   Advice's was de-installed, right?

23         A.    Correct.

24         Q.    And you mentioned earlier that

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    132f775c-3e76-451d-ab6e-1c93ddabdb0f

Melissa Lake, 3/24/2014

110

1    are you always informed practices that were

2    switching to competitors that Healthy Advice

3    was happy to coexist with a competitor,

4    right?

5            A.    Correct.

6            Q.    And that's because Healthy

7    Advice stands behind its programming, right?

8            A.    Correct.

9            Q.    And feels that if the

11:59  10    competitor's programming and its programming

11    are viewed side by side that would result in

12    at least some practices keeping Healthy

13    Advice over a competitor or at least

14    alongside a competitor, right?

15            A.    Yes.

16            Q.    And the people in the doctor's

17    offices that make these decisions have a

18    Healthy Advice screen already, right?

19            A.    Yes.

11:59  20            Q.    They're familiar with the

21    content?

22            A.    Yes.

23            Q.    They know what the loops are.

24            A.    If they are -- a lot of times --

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    132f775c-3e76-451d-ab6e-1c93ddabdb0f

Melissa Lake, 3/24/2014

111

1     I don't know how much they're in the waiting

2     area to watch them but they should know

3     what's out there.  It's up to them to make

4     sure they know.

5          Q.    In any event they can go check

6     if they have a question about what the

7     content is.

8          A.    Yes.

9          Q.    And at least a fair number of

12:00  10    them give you feedback about the content so

11    you know that those have viewed it, right?

12         A.    Yes.

13         Q.    It appears from this entry that

14    the point of contact at this practice knew

15    that RHN was a competitor of Healthy Advice,

16    right?

17         A.    Yes.

18         Q.    There wasn't any confusion about

19    who RHN was and whether it was some sort of

12:00  20    subsidiary or it was related to Healthy

21    Advice.  They knew it was a separate

22    competitor?

23         A.    Yes.

24         Q.    And that was the case with all

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                                    132f775c-3e76-451d-ab6e-1c93ddabdb0f

Melissa Lake, 3/24/2014

112

1     the practices that you dealt with.  They --
2     if they were switching to a competitor, they
3     didn't think it was some sort of upgrade,
4     right?  They knew it was a different system?
5          A.    From what I understand, yes.
6          Q.    And it says that you informed
7     this practice that they're not allowed to
8     touch the system, correct?
9          A.    Uh-huh.
10         Q.    Do you have any reason to
11    believe that that is not clear when you tell
12    a practice that?
13         A.    No.
14         Q.    You think, you know, if the
15    system hasn't been taken down yet and you
16    tell the practice they're not allowed to
17    touch it or let RHN touch it, that that
18    clears up the situation?
19         A.    Unless they're not listening to
20    me or looking at the enrollment agreement.  I
21    know they have a million things going on in
22    their office besides what's going on in their
23    lobby.
24         Q.    But as you're telling them that,

12:01  (line 10)
12:01  (line 20)

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    132f775c-3e76-451d-ab6e-1c93ddabdb0f

Melissa Lake, 3/24/2014

113

1     your intention is to be understood, right?

2             A.    Yes.

3             Q.    And if you weren't understood

4     you would have followed up to make sure that

5     you were understood, correct?

6             A.    Yes.

7             Q.    And you experience hundreds of

8     calls with practices every month, right?

9             A.    Yes.

12:02   10            Q.    And you think that you have a

11    good feel for whether you're being understood

12    or whether you need to clarify some more

13    before you hang up?

14            A.    No.

15            Q.    Not necessarily?

16            A.    I don't feel like they -- I feel

17    like they under -- I repeated it.  I feel

18    like they understood that they're not allowed

19    to take it down.

12:02   20            Q.    And my question was a little bit

21    different.

22            A.    Oh, okay.

23            Q.    I was asking in all those calls

24    in all the experience that you've had, do you

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Melissa Lake, 3/24/2014

114

1    feel like you've developed a good

2    understanding of when a practice understands

3    you versus when you need to follow up a

4    little bit more to make your point?

5            MR. BERNAY:  Object to the form.

6    You can answer.

7        A.    It's hard for me to say if -- if

8    I know if they understood what I said or if

9    they were listening to me.  I hope they did.

12:03   10        Q.    And that was your intent.

11        A.    Yes.

12        Q.    Did you know in 2011 whether or

13    not RHN's enrollment form permitted it to

14    coexist with a competitor or not?

15        A.    I don't.

16        Q.    Did you think to check whether

17    there was any promise in that enrollment form

18    not to have RHN up with another competitor's

19    screen?

12:04   20        A.    No.

21        Q.    And that's because the practice

22    wouldn't normally be held responsible for

23    that kind of situation, correct?

24        A.    Correct.

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                                    132f775c-3e76-451d-ab6e-1c93ddabdb0f

Melissa Lake, 3/24/2014

115

1          Q.    Because in this field the

2     enrollment forms aren't really enforced

3     against the practice whether they're Context

4     Media's or Healthy Advice's, right?

5                MR. BERNAY:  Object to the form.

6     You can answer.

7          A.    I don't know what Context Media

8     enrollments forms were at all.  I don't know

9     if they were allowed to have competitors.  I

12:04  10    know we were and that's all I was worried

11     about.

12          Q.    You weren't worried about what

13     was in the competitor's enrollment form,

14     correct?

15          A.    Not since we were there first.

16          Q.    You were never instructed to

17     look at RHN's enrollment form, right?

18          A.    No.

19          Q.    Your supervisors were okay with

12:05  20    you making statements about coexisting

21     without looking at competitor's enrollment

22     forms, right?

23                MR. BERNAY:  Object to the form.

24     You can answer.

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    132f775c-3e76-451d-ab6e-1c93ddabdb0f

Melissa Lake, 3/24/2014

116

1          A.    I don't know.  I don't remember.
2     Let's see.  I don't remember.  I -- I'm
3     sorry.
4          Q.    In any individual case when
5     you're talking to a practice, you didn't know
6     what the competitor's enrollment forms said,
7     right?
8          A.    Right.
9          Q.    And you wouldn't -- your -- you
12:05 10    weren't expected to know that, correct?
11          A.    No.
12          Q.    Your supervisors didn't expect,
13    you know, you to go look up the competitor's
14    enrollment forms?
15          A.    No.
16          Q.    And the competitor's enrollment
17    forms weren't distributed to you, correct?
18          A.    I don't remember.
19          Q.    You never remember seeing one?
12:06 20          A.    No.
21          Q.    But you were instructed to tell
22    practices that Healthy Advice can coexist
23    with a competitor's screen, right?
24          A.    Yes.

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    132f775c-3e76-451d-ab6e-1c93ddabdb0f

Melissa Lake, 3/24/2014

117

1          Q.    And that was based on Healthy

2     Advice's policies?

3          A.    Yes.

4          Q.    Did a -- did a practice ever

5     describe Healthy Advice's content as slides

6     to you?

7          A.    I think in the personalized

8     message slides, yes, because there were 26

9     slides, I believe.  The number could have

12:07  10   changed or been a little bit different but

11    there were -- there were several slides that

12    we slide -- you know, so when we were helping

13    them with their messages --

14          Q.    Uh-huh.

15          A.    -- we would indicate which slide

16    for which message.

17          Q.    Did the points of contact for

18    practices ever describe Healthy Advice's

19    content as boring?

12:07  20   A.    I'm sure I had that before.

21    Yes.

22          Q.    Did they ever describe a

23    competitor's offering as somehow more

24    engaging or more exciting?

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    132f775c-3e76-451d-ab6e-1c93ddabdb0f

Melissa Lake, 3/24/2014

118

1        A.    Yes.

2        Q.    Did the practices that you spoke

3    to ever describe Healthy Advice's content as

4    essentially like a Power Point?

5        A.    I didn't come across it much but

6    every once in a great while, yes.

7        Q.    A practice would say that the

8    Healthy Advice waiting room content looked

9    like a Power Point presentation every once in

12:08    10   a while?

11       A.    Very --

12       Q.    Every once in a great while.

13       A.    Very rarely but yes.

14       Q.    Do you understand why they might

15   say that?

16       A.    Because it wasn't video.

17       Q.    And so when you put text on

18   backgrounds it -- to -- it resembled -- let

19   me start again.  So when Healthy Advice put

12:08    20   text onto backgrounds as the main form of

21   content that it was providing to practices,

22   you can understand why someone would describe

23   that as essentially a Power Point

24   presentation?

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    132f775c-3e76-451d-ab6e-1c93ddabdb0f

Melissa Lake, 3/24/2014

119

1              MR. BERNAY:  Objection.  You can

2      answer.

3              A.    Yes.

4              Q.    Was the content of the primary

5      care network displayed in your team meeting

6      room during your employment at Healthy

7      Advice?

8              A.    Yes.

9              Q.    Did you see a large amount of

12:09  10     Healthy Advice's content through that?

11             A.    Yes.

12             Q.    Did you ever watch Healthy

13     Advice's content at different setting?

14             A.    My doctor's office.

15             Q.    What network did your doctor

16     have?

17             A.    PCN.

18             Q.    Did you ever see ACN content?

19             A.    No.  Well, I believe it was at

12:09  20     the office.  I can't remember.  Sorry.

21             Q.    Do you think as part of training

22     at some point you saw some of the ACN

23     content?

24             A.    Yes.

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Melissa Lake, 3/24/2014

120

1          Q.    In the -- in your meeting room

2    for your team was it always the primary care

3    network or was it sometimes a different

4    network?

5          A.    Trying to think of all the flat

6    screens we had.  We had several different

7    networks and trying to think of which ones

8    they were.  I know PCN for sure.

9          Q.    ACN, CCN, and two others, right?

12:10  10          A.    Yeah.  There was one for

11    OB-GYNs.  I remember seeing that one.  That

12    was to the right.  That was in the center.  I

13    believe -- I -- I can't answer if that was

14    ACN or not.  I can't remember.

15                MR. BERNAY:  We've been going

16    well over an hour, can we take a break?

17                MR. HANKINSON:  I was gonna try

18    to just press through --

19                MR. BERNAY:  Okay.

12:10  20                MR. HANKINSON: -- to finish but

21    I'm happy to if that's how you'd like to do

22    it.

23                MR. BERNAY:  How much -- how

24    much more do you -- I just need a -- need a

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                                    132f775c-3e76-451d-ab6e-1c93ddabdb0f

Melissa Lake, 3/24/2014

                                                      121

1    break.  That's all.

2                MR. HANKINSON:  Ten to 15

3    minutes probably.

4                MR. BERNAY:  Yeah.  Let's take a

5    quick break.

6                MR. HANKINSON:  Okay.

7                VIDEOGRAPHER:  We are going off

8    the video record at 12:09 p.m.

9      (Break taken.)

12:17  10              VIDEOGRAPHER:  Okay.  We are

11   back on the video record at 12:17 p.m.

12               MR. HANKINSON:  When we were

13   talking previously about Power Point, I just

14   want to make sure, you're familiar with Power

15   Point the program, right?

16         A.    Yes.

17         Q.    And you know what it looks like?

18         A.    Yes.

19         Q.    You've seen Power Point

12:19  20   presentations before?

21         A.    Yes.

22         Q.    Many times?

23         A.    Yes.

24         Q.    When you were discussing the

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    132f775c-3e76-451d-ab6e-1c93ddabdb0f

Melissa Lake, 3/24/2014

122

1    reasons that a practice had decided to switch

2    to a competitor, did the practice ever say

3    anything to you about the competitor

4    posturing about how many screens it had

5    switched out in the past month or year,

6    anything of that nature?

7              A.    No.

8                    MR. BERNAY:  Objection.  You can

9    answer.

12:19  10          A.    No.  I don't remember that.

11             Q.    So as you were following your

12   instructions to find out all the reasons that

13   the practice switched, that reason never came

14   up?

15             A.    The reason that they were

16   switching all -- Healthy Advice's to Context

17   Media?  Is that the question?

18             Q.    Yes.

19             A.    No, I haven't.  I don't remember

12:20  20   coming across a practice that indicated that,

21   that they were switching all their flat

22   screens to Context Media.

23             Q.    Do you remember a practice ever

24   saying that it was important to them or that

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                                    132f775c-3e76-451d-ab6e-1c93ddabdb0f

Melissa Lake, 3/24/2014

123

1    they were switching to Context Media because

2    their impression was that a lot of practices

3    were switching from Healthy Advice to Context

4    Media?

5            A.    I don't remember that.

6            Q.    It's not something that a

7    practice ever said was important to them?

8            A.    That they wanted everything to

9    be the same?

10           Q.    No.

11           A.    That they wanted the --

12           Q.    That's not the nature of my

13   question.

14           A.    Okay.  Okay.

15           Q.    Just that they wanted to fit in

16   or, you know, like rats abandoning a sinking

17   ship, you know, like that they felt like the

18   competitor was telling them, oh, I switch out

19   X number of screens just last month or over

20   the course of a year from Healthy Advice to

21   Context Media.  Did -- did a practice ever

22   give you a reason of that nature for its

23   switch?

24                 MR. BERNAY:  Object to the form.

12:20

12:21

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                           132f775c-3e76-451d-ab6e-1c93ddabdb0f

Melissa Lake, 3/24/2014

124

1    You can answer.

2          A.    Don't remember that.

3          Q.    It never came up?

4          A.    Don't remember it coming up.

5          Q.    If it did come up, you would put

6    that in your CMS entry, correct?

7          A.    Yes.

8          Q.    Do you recall a practice ever

9    informing you that the reason it was

12:21    10    switching to a competitor, whether it's

11    Context Media or a different competitor, was

12    for the quality of the hardware, the TVs?

13          A.    No.

14          Q.    So you don't recall that ever

15    making a difference to a practice in your

16    experience?

17          A.    No.

18          Q.    Earlier you mentioned that you

19    felt it was important to practices that they

12:22    20    be able to customize part of the content for

21    their own purposes, correct?

22          A.    Yes.

23          Q.    Do you think that that is a

24    feature that would cause a practice to choose

Electronically signed by Deanne L. Cartwright (501-202-620-8979)        132f775c-3e76-451d-ab6e-1c93ddabdb0f

Melissa Lake, 3/24/2014

125

1    to keep Healthy Advice in its waiting room

2    it's that important?

3              A.    Yes.

4              Q.    You received a lot of positive

5    feedback about the ability to customize those

6    parts of the content, right?

7              A.    The personalized messages, yes.

8              Q.    And part of your job, setting

9    aside switches, was to check up on practices

12:23  10   and make sure they were engaged with the

11   customization program, right?

12             A.    Correct.

13             Q.    Healthy Advice saw that as a way

14   to keep the practices feeling engaged with

15   its service so that they were more inclined

16   to keep the screen in the waiting room,

17   right?

18             A.    Yes.

19             Q.    Healthy Advice wouldn't devote

12:23  20   all that time to it unless they thought that

21   it was effective in retaining practices,

22   correct?

23             A.    Correct.

24             Q.    At the practice that we looked

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                                        132f775c-3e76-451d-ab6e-1c93ddabdb0f

Melissa Lake, 3/24/2014

126

1      at the e-mail earlier where they said that

2      Context RHN network it's more video, did you

3      encounter that feedback with other practices

4      who were canceling Healthy Advice's network?

5             A.    Yes.

6             Q.    Certainly that wasn't the only

7      time that came up.

8             A.    Right.

9             Q.    And, in fact, Healthy Advice

12:24  10     rolled out more video during the latter part

11     of your time working there, right?

12            A.    Yes.

13            Q.    In response to feedback about

14     competitors having video and Healthy Advice

15     not, right?

16                  MR. BERNAY:  Objection.  You can

17     answer.

18            A.    Yes.

19            Q.    Because it's important to

12:24  20     practices that there be some sort of video

21     content, if that's available, to engage the

22     patients in the waiting room more than the

23     slides, right?

24                  MR. BERNAY:  Objection.  You can

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                                                132f775c-3e76-451d-ab6e-1c93ddabdb0f

Melissa Lake, 3/24/2014

127

1    answer.

2           A.    Yes.  They did have a little bit

3    of video though before they added more.

4    There wasn't a lot but there was some video.

5    Not a lot.

6           Q.    Would it be fair to say

7    essentially no video?  Virtually no video?

8           A.    No.  Because there was video

9    with like spin to wins and things like that.

12:25   10           Q.    You're referring to pictures

11    moving around on the screen.

12           A.    Yes.

13           Q.    Not live-action video.

14           A.    Right.

15           Q.    And Healthy Advice's content was

16    stationary enough, enough resembling slides

17    rather than video, that they needed to make a

18    change to it to respond to competitors who

19    had live-action video, right?

12:25   20           MR. BERNAY:  Object to the form.

21    You can answer.

22           A.    Yes.

23           Q.    If a practice wanted live-action

24    video in the content that it was putting up

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    132f775c-3e76-451d-ab6e-1c93ddabdb0f

Melissa Lake, 3/24/2014

128

1    in its waiting room, before Healthy Advice

2    began its program to put more video in

3    Healthy Advice's programming, that practice

4    would not be able to fulfill that need with

5    Healthy Advice, right?

6            A.    At -- it depends on the timing.

7            Q.    Right.  But before Healthy

8    Advice had the video added in, that practice

9    would have to go elsewhere if they wanted

12:26   10    video, right?

11           A.    Yes.

12           Q.    And so that could be an

13   independent reason that a practice switched.

14           A.    Yes.

15           Q.    And it's not solvable by

16   anything other than Healthy Advice adding

17   video which is why it did so, correct?

18           A.    Yes.

19           Q.    That's similar to the situation

12:26   20    with sound.  When a practice wanted sound

21   before the time that Healthy Advice had sound

22   in its programming, the practice would have

23   to go to a competitor because Healthy Advice

24   didn't have that offering, right?

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    132f775c-3e76-451d-ab6e-1c93ddabdb0f

Melissa Lake, 3/24/2014

129

1          A.    Yes.

2          Q.    And where the sound was

3   important to the practice to engage its

4   patients, they might do so on that basis

5   alone, setting aside how good quality Healthy

6   Advice's slides were, right?

7               MR. BERNAY:  Objection.  You can

8   answer.

9          A.    Yes.

12:27   10          Q.    We were talking earlier about

11  you being familiar with Healthy Advice's

12  content from it being displayed in the team

13  meeting room at the office --

14          A.    Uh-huh.

15          Q.    -- and from watching the network

16  and your own physician's office, right?

17          A.    Uh-huh.  Yes.

18          Q.    In -- and part -- partially it

19  relies on quizzes and trivia, right?

12:27   20          A.    Uh-huh.  Yes.

21          Q.    Part of it is advertising the

22  sort of National Health Awareness type months

23  that are happening each month, right?

24          A.    Yes.

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    132f775c-3e76-451d-ab6e-1c93ddabdb0f

Melissa Lake, 3/24/2014

130

1          Q.    Something I could refer to as

2    like public service advertising?

3          A.    Yes.

4          Q.    And part of it would be talking

5    about messages that the National Institute of

6    Health or the Center for Disease Control were

7    trying to get out to the public, right?

8          A.    Yes.

9          Q.    Things about watching your hands

12:28  10    while singing the happy birthday song for

11    instance?

12         A.    Yes.

13         Q.    To make sure that you wash them

14    long enough, right?

15         A.    Yes.

16         Q.    And every month in every network

17    there's content geared toward that kind of

18    public service messaging, right?

19         A.    Yes.

12:28  20         Q.    And that's in addition to the

21    advertising that's sponsored by drug

22    companies or health product companies,

23    correct?

24         A.    Yes.

Electronically signed by Deanne L. Cartwright (501-202-620-8979)          132f775c-3e76-451d-ab6e-1c93ddabdb0f

Melissa Lake, 3/24/2014

131

1        Q.    And every month there are these

2    sorts of public service advertisements geared

3    toward whatever health month awareness it is,

4    correct?

5        A.    Yes.

6        Q.    And there are other

7    advertisements that are public service nature

8    about being on a program of daily Asprin to

9    control heart related issues, correct?

12:29   10        A.    Yes.

11        Q.    There are also other

12    advertisements in Healthy Advice's content

13    each month that encourage patients to get

14    increased levels of preventative screening,

15    right?

16        A.    Yes.

17        Q.    Like mammograms other

18    preventative screenings?

19        A.    Yes.

12:29   20        Q.    And that's another type of

21    content that's in the loops each month,

22    correct?

23        A.    Yes.

24        Q.    And all of those taken together

Electronically signed by Deanne L. Cartwright (501-202-620-8979)        132f775c-3e76-451d-ab6e-1c93ddabdb0f

Melissa Lake, 3/24/2014

132

1    along with the custom messages add up to the

2    Healthy Advice loop, right?

3           A.     Yes.

4                  MR. BERNAY:  Objection.

5                  MR. HANKINSON:  I think that's

6    all I have.

7                  MR. BERNAY:  All right.  I have

8    no further questions so we'll reserve

9    signature and we're done.

12:30  10              VIDEOGRAPHER:  Okay.  We are

11   going off video record at 12:28 p.m.

12

13

14          _____

                 MELISSA LAKE

15

16

17

18                   * * *

19      (DEPOSITION CONCLUDED AT 12:28 p.m.)

20                   * * *

21

22

23

24

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Melissa Lake, 3/24/2014

133

1              C E R T I F I C A T E
2

STATE  OF  OHIO
3            :  SS
COUNTY OF CLERMONT

4
5          I, Deanne Cartwright, the undersigned,
a duly qualified notary public within and for
6   the State of Ohio, do hereby certify that
MELISSA LAKE was by me first duly sworn to
7   depose the truth and nothing but the truth;
foregoing is the deposition given at said
8   time and place by said witness; deposition
was taken pursuant to stipulations
9   hereinbefore set forth; deposition was taken
by me in stenotype and transcribed by me by
10  means of computer; that the transcribed
deposition was submitted to the witness for
11  examination and signature and that signature
may be affixed out of the presence of the
12  Notary Public-Court Reporter. I am neither a
relative of any of the parties or any of
13  their counsel; I am not, nor is the court
reporting firm with which I am affiliated,
14  under a contract as defined in Civil Rule
28(D) and have no financial interest in the
15  result of this action.
16         IN WITNESS WHEREOF, I have hereunto set
my hand and official seal of office at
17  Cincinnati, Ohio this 11th day of April,
2014.
18
19                              _____
20  My commission expires:  Deanne Cartwright
August 4, 2018    Notary Public - State of Ohio
21
22
23
24

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)