Vida Albert, 4/11/2014

1

1           UNITED STATES DISTRICT COURT

2             SOUTHERN DISTRICT OF OHIO

3                WESTERN DIVISION

4

5    HEALTHY ADVICE,        :
                            :
6          Plaintiff,       :
                            :
7    vs.                    : CASE NO. 1:12-CV-610
                            :
8    CONTEXT MEDIA,         :
                            :
9          Defendant.       :

10

11      Deposition of VIDA ALBERT, a witness

12   herein, taken by the defendant as upon

13   cross-examination, pursuant to the Federal

14   Rules of Civil Procedure and pursuant to

15   agreement of counsel as to the time and place

16   and stipulations hereinafter set forth, at

17   the offices of Frost Brown Todd, 3300 Great

18   American Tower, 301 East Fourth Street,

19   Cincinnati, Ohio, at 9:30 a.m. on Friday,

20   April 11, 2014, before Vicky Marcon, a

21   Registered Professional Reporter and Notary

22   Public within and for the State of Ohio.

23                       - - -

24

Electronically signed by Vicky L. Marcon (101-175-031-5847)                    60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

2

1    APPEARANCES

2

3      FOR THE PLAINTIFF:    AARON M. BERNAY, ESQ.
                             Frost Brown Todd
4                            3300 Great American Tower
                             301 E. 4th Street
5                            Cincinnati, OH 45202

6

       FOR THE DEFENDANT:   THOMAS F. HANKINSON, ESQ.
7                            Keating, Muething &
                             Klekamp, PLL
8                            One East Fourth Street
                             Suite 1400
9                            Cincinnati, OH 45202

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Vida Albert, 4/11/2014

3

1              S T I P U L A T I O N S

2        It is stipulated by counsel for the

3    respective parties that the deposition of

4    VIDA ALBERT, a witness herein, may be taken

5    at this time by the defendant as upon

6    cross-examination and pursuant to the Federal

7    Rules of Civil Procedure and agreement of

8    counsel to take deposition, all other legal

9    formalities being waived by agreement; that

10   the deposition may be taken in stenotype by

11   the Notary Public Reporter and transcribed by

12   her out of the presence of the witness; that

13   the transcribed deposition was made available

14   to the witness for examination and signature

15   and that signature may be affixed out of the

16   presence of the Notary Public-Court Reporter.

17

18

19

20

21

22

23

24

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Electronically signed by Vicky L. Marcon (101-175-031-5847)                    60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

```
                                                              4
   1                        INDEX
   2   WITNESS          DIRECT  CROSS   RE-      RE-
                                        DIRECT   CROSS
   3
       VIDA ALBERT
   4   BY MR.
       HANKINSON:                  7
   5   BY MR. BERNAY:     84
   6
   7   EXHIBIT IDENTIFIED                        PAGE
   8   Exhibit 200 - Monitor Serial Number       28
       Matrix
   9   Exhibit 201 - CMS Document beginning      54
       with page HAN006141
  10   Exhibit 202 - Lenovo CPU Document        102
       starting with page HAN005056
  11   Exhibit 203 - Photos of Lenovo CPU       103
       Exhibit 204 - E-mail from Heather        106
  12   McGauvran to Lori Smith dated
       12/16/11
  13   Exhibit 205 - E-mail from Amy Finley     109
       to Vida Albert dated 3/8/12
  14   Exhibit 206 - E-mail of CMS Entry by     112
       Amy Finley June of 2012
  15   Exhibit 207 - E-mail from Vida Albert    114
       to Lori Smith dated 4/13/12
  16   Exhibit 31 - CMS Document starting       119
       with Location ID 3282775
  17   Exhibit 32 - CMS Document starting       131
       with Location ID 674426
  18
  19
  20
  21
  22
  23
  24
```

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Vida Albert, 4/11/2014

5

```
 1    OBJECTIONS                   PAGE LINE
 2    MR. BERNAY:                  17     5
      MR. BERNAY:                  18     8
 3    MR. BERNAY:                  19     1
      MR. BERNAY:                  19    19
 4    MR. BERNAY:                  20     6
      MR. BERNAY:                  20    11
 5    MR. BERNAY:                  20    22
      MR. BERNAY:                  21     2
 6    MR. BERNAY:                  22     3
      MR. BERNAY:                  22    15
 7    MR. BERNAY:                  23     5
      MR. BERNAY:                  25     3
 8    MR. BERNAY:                  25    14
      MR. BERNAY:                  32     3
 9    MR. BERNAY:                  37    10
      MR. BERNAY:                  37    17
10    MR. BERNAY:                  37    22
      MR. BERNAY:                  39    24
11    MR. BERNAY:                  40     3
      MR. BERNAY:                  41    19
12    MR. BERNAY:                  45     9
      MR. BERNAY:                  45    17
13    MR. BERNAY:                  46     5
      MR. BERNAY:                  47     1
14    MR. BERNAY:                  50    16
      MR. BERNAY:                  51     2
15    MR. BERNAY:                  51    13
      MR. BERNAY:                  51    23
16    MR. BERNAY:                  53     6
      MR. BERNAY:                  53    15
17    MR. BERNAY:                  63    15
      MR. BERNAY:                  69    19
18    MR. BERNAY:                  70    22
      MR. BERNAY:                  72    10
19    MR. BERNAY:                  78    18
      MR. BERNAY:                  80    24
20    MR. BERNAY:                  83    15
      MR. BERNAY:                  85     5
21    MR. BERNAY:                  88    13
      MR. BERNAY:                  91    23
22    MR. BERNAY:                  95    10
      MR. BERNAY:                  96    18
23    MR. BERNAY:                  97     4
      MR. BERNAY:                  98     6
24    MR. BERNAY:                  99    18
```

Electronically signed by Vicky L. Marcon (101-175-031-5847)

60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

```
                                                               6
 1     MR. BERNAY:                          101    19
       MR. BERNAY:                          103    18
 2     MR. BERNAY:                          105    14
       MR. BERNAY:                          108    22
 3     MR. BERNAY:                          109    15
       MR. BERNAY:                          115    19
 4     MR. BERNAY:                          122     4
       MR. BERNAY:                          122    15
 5     MR. BERNAY:                          124    20
       MR. BERNAY:                          125    24
 6     MR. BERNAY:                          129    16
       MR. BERNAY:                          134    20
 7     MR. BERNAY:                          143     9
       MR. BERNAY:                          147     2
 8     MR. BERNAY:                          148     3
       MR. BERNAY:                          148    12
 9     MR. BERNAY:                          153    22
       MR. BERNAY:                          154     4
10     MR. BERNAY:                          154    12
       MR. BERNAY:                          154    20
11     MR. BERNAY:                          155     4
       MR. BERNAY:                          155    23
12     MR. BERNAY:                          157    11
       MR. BERNAY:                          158     3
13     MR. BERNAY:                          158    10
       MR. BERNAY:                          158    18
14     MR. BERNAY:                          159     9
       MR. BERNAY:                          159    17
15
16
17
18
19
20
21
22
23
24
```

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Electronically signed by Vicky L. Marcon (101-175-031-5847)                    60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

7

1                    VIDA ALBERT,

2      A witness herein, of lawful age, having been

3      first duly sworn as hereinafter certified,

4      was examined and testified as follows:

5                    CROSS-EXAMINATION

6      BY MR. HANKINSON:

7              Q.    Good morning.  My name is Tom

8      Hankinson.  Thank you for coming in today.  I

9      represent the defendant in the lawsuit that

09:36   10     we're here about today, Context Media.

11             A.    Mm-hmm.

12             Q.    Are you aware of who the

13     plaintiff is in that case?

14             A.    Yes.

15             Q.    And who is that?

16             A.    That would be Patient Point.

17             Q.    And did Patient Point previously

18     go by the name Healthy Advice Network?

19             A.    Yes.  Networks.

09:36   20             Q.    Networks.  Thank you.  Would you

21     please state your name and spell your last

22     name?

23             A.    Vida Albert, A-L-B-E-R-T.

24             Q.    And maybe spell your first name,

Electronically signed by Vicky L. Marcon (101-175-031-5847)                    60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

8

1    as well.

2            A.    V as in Victor, I as in India, D

3    as in delta, A as in alpha.

4            Q.    Thank you.  Have you ever given

5    a deposition before?

6            A.    Yes.

7            Q.    And in what -- about how long

8    ago?

9            A.    About 30 years ago.

09:36 10         Q.    Did you say three or 30?

11           A.    Thirty.

12           Q.    Thirty years ago.  What kind of

13   matter was it, if you remember?

14           A.    It was in the military and it

15   had to do with sexual harassment.

16           Q.    Do you remember much about the

17   deposition process?

18           A.    Just that it was pretty

19   unpleasant at the time.

09:37 20         Q.    Sorry to hear that.  That's a

21   topic very much in the news lately.

22           A.    It wasn't much in the news back

23   then.

24           Q.    No.  Well, I'll go over a few of

Electronically signed by Vicky L. Marcon (101-175-031-5847)          60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

9

1    the sort of general, you can call them

2    guidelines or ground rules.  First of all,

3    and you're doing a great job so far, please

4    answer out loud and please wait until I'm

5    finished with a question before you answer

6    and I'll try to do the same.  I'll try to let

7    you finish your answer before I move on to

8    the next question.  Is that okay?

9           A.    Absolutely.

09:37  10           Q.    Also, while you're answering out

11    loud, please try to avoid going "mm-hmm" or

12    "uh-huh", because sometimes that can be

13    ambiguous as to whether you mean yes or no.

14    Okay?

15           A.    Absolutely.

16           Q.    If you ever don't understand one

17    of my questions, I would like you to tell me

18    that or ask me to repeat it, if that's what

19    you need, or ask me to rephrase it if that

09:38  20    would help.  Okay?

21           A.    Yes.

22           Q.    If you answer a question, I'm

23    going to assume that you understood it.  Is

24    that okay?

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Electronically signed by Vicky L. Marcon (101-175-031-5847)                                    60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

10

1        A.    Yes.

2        Q.    If you need a break, just let us

3    know.  We can take a break at any time, but

4    you'll be asked to answer any question that's

5    pending, that's already been asked, and then

6    we'll take a break.  Okay?

7        A.    That's fine.

8        Q.    Sometimes your attorney -- is

9    Mr. Bernay your attorney today?

09:38    10        A.    He is Patient Point's attorney,

11    yes.

12        Q.    Is he representing you for this

13    deposition?

14        A.    Yes.

15        Q.    Sometimes Mr. Bernay may object

16    to one of my questions.  If he does, let him

17    finish.  Unless he instructs you not to

18    answer, when he is done with his objection

19    you should go ahead and answer.  Okay?

09:39    20        A.    Yes.

21            MR. HANKINSON:  Anything else

22    before we kind of get started?

23            MR. BERNAY:  I think we're good.

24        Q.    Do you know an employee at

Electronically signed by Vicky L. Marcon (101-175-031-5847)                    60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

11

1     Patient Point named Joyce Lawrence?

2           A.    I do.

3           Q.    Were you aware of her giving a

4     deposition in this matter?

5           A.    Yes.

6           Q.    Were you aware before that

7     happened or did you find out about it

8     afterwards?

9           A.    I found out about it afterwards.

09:39  10         Q.    Do you work with Ms. Lawrence?

11          A.    In a very limited capacity.

12          Q.    Ms. Lawrence is in a team that's

13    sometimes referred to as the Customer

14    Relationship -- Practice Relationship

15    Management Team.  Is that accurate?

16          A.    That's correct.

17          Q.    And what group or team or

18    department are you in?

19          A.    I'm part of the Field Services.

09:40  20    Field Digital.  I'm sorry.

21          Q.    Field Digital?

22          A.    Field Services Digital.

23          Q.    Is there a nickname for that

24    that you use?

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Electronically signed by Vicky L. Marcon (101-175-031-5847)                    60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

12

1          A.     FSD.

2          Q.     What are your job

3     responsibilities?

4          A.     I code invoices and track

5     inventory.

6          Q.     Do you fulfill those roles

7     company wide or only for certain products and

8     services?

9          A.     Company wide.

09:41 10          Q.     Who do you report to?

11          A.     Kimberly Theiss.

12          Q.     What is your job title?

13          A.     Vendor Accounts Manager.

14          Q.     What is Ms. Theiss's job title,

15     if you remember it?

16          A.     I believe it's Executive Vice

17     President, Field Services.

18          Q.     Maybe like five years ago

19     everybody dropped the of's.  It's always like

09:42 20     a coma or a dash.  Executive Vice President,

21     Field Services.  I always get confused about

22     that.  And so is Ms. Theiss in charge of the

23     entire FSD?

24          A.     Yes.

Electronically signed by Vicky L. Marcon (101-175-031-5847)                    60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

13

1          Q.     And do you commonly refer to

2     that as a team or group, or how do you like

3     to --

4          A.     Team.

5          Q.     And who does Ms. Theiss report

6     to?

7          A.     To Tom McGinnis.

8          Q.     Mr. McGinnis is the CEO.

9     Correct?

09:42  10          A.     That's correct.

11          Q.     How long have you worked for

12     Patient Point and before that Healthy Advice

13     Networks?

14          A.     I'm going on my tenth year.

15          Q.     Your title is Vendor Accounts

16     Manager.  Who are the vendors that are being

17     referred to there?

18          A.     PCM, which was, used to be known

19     as Sarcom, Contingent, Integron,

09:43  20     I-N-T-E-G-R-O-N.  Oh, gosh.  I'm having a

21     brain freeze here.  ARS, also -- oh, Verizon,

22     AT&T, UPS, just about any vendor that crosses

23     our path, but those are the main ones.  I

24     code all of their invoicing.

Electronically signed by Vicky L. Marcon (101-175-031-5847)

60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

14

1          Q.     PCM that used to be Sarcom,

2     Contingent, Integron and ARS, are those

3     vendors related to installation or

4     deinstallation of systems in doctors' offices

5     waiting rooms?

6          A.     Yes, they are.

7          Q.     Do all four of them both install

8     and deinstall on behalf of Patient Point?

9          A.     Integron does not, but

09:44  10     Contingent, ARS and PCM do.

11          Q.     What is Integron limited to?

12          A.     Integron is warehousing.

13          Q.     Is that the only warehousing

14     vendor that Patient Point uses?

15          A.     No.  Contingent is a warehouse,

16     also, but they also install, deinstall and

17     service.

18          Q.     Does Patient Point have its own

19     technicians for service, installation or

09:45  20     deinstallation?

21          A.     No, we do not.

22          Q.     Do the vendors that you use have

23     certain regions or territories, or how is it

24     divided up?

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Electronically signed by Vicky L. Marcon (101-175-031-5847)                    60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

15

1          A.     It's divided up regionally.

2          Q.     And about where are they?  Like

3    which regions do each cover?  Hold on.  Let

4    me rephrase it.  Which region does each

5    cover?

6          A.     We -- it changes according to

7    availability of technicians plus according to

8    where we have salespeople available.  So I

9    couldn't give you that without looking,

09:46  10    without looking or checking with Amy Petrik.

11          Q.     The regions change over time?

12          A.     Mm-hmm.

13          Q.     What is -- could you spell Ms.

14    Petrik's last name?

15          A.     P-E-T-R-I-K.

16          Q.     What's her title?

17          A.     She is Director of Field

18    Services Digital.

19          Q.     Does she report to Ms. Theiss?

09:46  20          A.     Yes.

21          Q.     Would you please give me a sense

22    of your office or area and where it sits in

23    relation to the people who work in Practice

24    Relationship Management?

Electronically signed by Vicky L. Marcon (101-175-031-5847)                    60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

16

1        A.    I'm upstairs from them.

2        Q.    One flight?

3        A.    Yes.  I'm on the third floor.

4   They're on the second floor.

5        Q.    By what means do you communicate

6   with them, for instance, phone, in person,

7   e-mail, whatever else there might be?

8        A.    E-mail, phone and in person.

9        Q.    There's also database that

09:47   10   Patient Point uses called CMS.  Right?

11        A.    That's correct.

12        Q.    Do you sometimes enter

13   information in to CMS?

14        A.    Yes.

15        Q.    The Practice Relationship

16   Management Team, at least according to my

17   understanding, enters almost every

18   interaction that they have with a practice

19   into CMS.  Maybe that's not true.  Maybe it's

09:48   20   90 percent or whatever, but it seems like a

21   lot of what they do they enter into CMS.

22   Would you say that's similar to how you use

23   CMS or it's different?

24        A.    It's the same.

Electronically signed by Vicky L. Marcon (101-175-031-5847)        60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

17

1        Q.    What about when you do something

2    internally where you don't speak directly

3    with a practice, do you still enter it into

4    CMS?

5              MR. BERNAY:   Object to the form.

6    You can answer.

7        A.    I'm not sure I understand the

8    question.

9        Q.    When you -- do you authorize

09:49 10    invoices to be paid?

11        A.    Yes.

12        Q.    When you do that do you enter it

13    in the CMS?

14        A.    No, I don't.

15        Q.    Do you give instructions to

16    vendors about what actions to take at a

17    doctor's office?

18        A.    Yes, I do.

19        Q.    Whenever you do that, do you

09:49 20    enter it into CMS?

21        A.    Yes, I do.

22        Q.    Is it company policy to do so?

23        A.    Yes, it is.

24        Q.    Do you enter it into CMS at or

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Electronically signed by Vicky L. Marcon (101-175-031-5847)                                    60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

18

1    shortly after you give the instruction to the

2    vendor?

3         A.    Yes, I do.

4         Q.    In every case?

5         A.    Ninety-nine percent of the time.

6         Q.    And that's also according to

7    company policy.  Correct?

8              MR. BERNAY:  Object to the form.

9    You can answer.

09:50   10         A.    Yes.

11         Q.    Do you intend for your CMS

12    entries to be 100 percent accurate when you

13    write them?

14         A.    Yes.

15         Q.    If you discovered an error that

16    had been made in an entry in CMS, would you

17    take action to correct it?

18         A.    Yes.

19         Q.    Do you make entries into CMS in

09:50   20    the regular course of your job, then?

21         A.    Yes.

22         Q.    And are the entries, once

23    they're entered into CMS, kept by Patient

24    Point in the ordinary course of its business?

Electronically signed by Vicky L. Marcon (101-175-031-5847)

60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

19

1           MR. BERNAY:  Object to the form.

2     You can answer.

3           A.    Yes.

4           Q.    Do you use e-mails to

5     communicate with vendors?

6           A.    Yes, I do.

7           Q.    When you -- do your e-mails with

8     vendors sometimes include instructions about

9     actions to take at doctors' offices waiting

09:51  10     rooms?

11           A.    Yes, they do.

12           Q.    When you're writing that kind of

13     e-mail, are you doing it in the ordinary

14     course of your job?

15           A.    Yes.

16           Q.    If an e-mail is kept by Patient

17     Point is the company doing that in the

18     ordinary course of its business?

19           MR. BERNAY:  Object to the form.

09:52  20     You can answer.

21           A.    Yes.

22           Q.    Do you sometimes use saved

23     e-mails to check back what was said to a

24     vendor at a certain time?

Electronically signed by Vicky L. Marcon (101-175-031-5847)                    60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

20

1          A.     Yes.

2          Q.     Are you aware of any employees

3    either in FSD or in Practice Relationship

4    Management that you would describe in any way

5    as rogue employees?

6                 MR. BERNAY:  Object to the form.

7    You can answer.

8          A.     I'm not sure what you mean.

9          Q.     Have you heard the term "rogue

09:53 10   employee" at any time before this?

11                MR. BERNAY:  Object to the form.

12   You can answer.

13         A.     No.

14         Q.     Are you aware of any employees

15   at Patient Point, in FSD or in Practice

16   Relationship Management who go against the

17   company's instructions or take joy rides, for

18   lack of a better term, do things on company

19   time that aren't allowed by the company?  Are

09:53 20   you aware of anyone who does that on a

21   regular basis?

22                MR. BERNAY:  Object to the form.

23   You can answer.

24         Q.     I'm not expecting that there is.

Electronically signed by Vicky L. Marcon (101-175-031-5847)

60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

21

1    I'm just asking.

2              MR. BERNAY:   Same objection.

3    You can answer.

4        A.     I don't even have the foggiest

5    idea what you're talking about.

6        Q.     Thank you for being honest with

7    me about the poor quality of my question.

8    Patient Point has policies about how

9    employees are supposed to communicate with

09:54  10    doctors offices.  Right?

11        A.     Yes.

12        Q.     There are trainings that the

13    company provides about interactions with

14    doctors offices.  Right?

15        A.     Yes.

16        Q.     And supervisors review comments

17    in CMS and hold meetings about interactions

18    with practices.  Correct?

19        A.     Yes.

09:55  20        Q.     Are you aware of anyone in FSD

21    or Practice Relationship Management who goes

22    against those policies and trainings?

23        A.     No.

24        Q.     Have you ever known Ms. Lawrence

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Vida Albert, 4/11/2014

22

1    to go against the policies, training and

2    instruction that she was given?

3           MR. BERNAY:  Object to the form.

4    You can answer.

5        A.    Absolutely not.

6        Q.    She's a high quality employee.

7    Correct?

8        A.    Absolutely.

9        Q.    She's knowledgeable about

09:55  10   company policy?

11       A.    Absolutely.

12       Q.    Do you go against Patient

13   Point's policies, instructions or training

14   when you're performing your job duties?

15           MR. BERNAY:  Object to the form.

16   You can answer.

17       A.    No.

18       Q.    If someone who was an employee

19   of Patient Point did go against the policies,

09:56  20   training and instruction of the company,

21   would you expect them to have some sort of

22   consequence such as a write-up or a

23   reprimand?

24       A.    Of course.

Electronically signed by Vicky L. Marcon (101-175-031-5847)                    60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

23

1       Q.    Have you ever been written up or

2   reprimanded for how you handled any piece of

3   equipment that was placed at a doctor's

4   office?

5             MR. BERNAY:  Object to the form.

6   You can answer.

7       A.    No.

8       Q.    Are you aware of anyone else

9   ever being reprimanded or written up for the

09:56  10   way that they handled a piece of equipment in

11   a doctor's office?

12       A.    No.

13       Q.    Part of your duties include

14   helping the other members of FSD and the

15   members of the Practice Relationship

16   Management Team make final decisions and

17   implement actions regarding the treatment of

18   equipment at doctors offices.  Right?

19       A.    Yes.

09:57  20       Q.    The equipment at the doctor's

21   office includes, among other things, a

22   monitor and a CPU.  Correct?

23       A.    Correct.

24       Q.    When you said that your job

Electronically signed by Vicky L. Marcon (101-175-031-5847)                    60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

24

1    duties included tracking inventory, are those

2    monitors and CPUs part of the inventory?

3          A.    That's correct.

4          Q.    How do you go about tracking

5    monitors and CPUs?

6          A.    I help facilitate the changes to

7    the Serial Number Reports kept by Integron

8    and Contingent, any changes that need to be

9    made.  I help track the inventory in the

09:58 10   field, help recover inventory from the field,

11   help recover inventory that is left in the

12   field by getting it recovered by UPS or

13   recovered from technicians in the field by

14   UPS, that sort of thing.  I make updates to

15   CMS.

16         Q.    Does anyone else fulfill the

17   same role as you at Patient Point?

18         A.    No.

19         Q.    So you have primary

09:59 20   responsibility for the duties that you just

21   described?

22         A.    That's correct.

23         Q.    If someone had been reprimanded,

24   then, for the handling of a piece of

Electronically signed by Vicky L. Marcon (101-175-031-5847)                    60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

25

1    equipment, you would be in the loop about

2    that.  Right?

3                MR. BERNAY:  Object to the form.

4    You can answer.

5           A.    Yes.

6           Q.    When members of the Practice

7    Relationship Management Team tell practices

8    what they should do with Patient Point's

9    monitors and CPUs, do they sometimes ask you

09:59  10   questions about what they should do?

11          A.    Yes, they do.

12          Q.    Is that part of Patient Point's

13   policies?

14               MR. BERNAY:  Object to the form.

15   You can answer.

16          A.    I'm not sure if it's part of the

17   policy, per se.

18          Q.    Not a written policy, but it's a

19   practice that's followed to keep you in the

10:00  20   loop on the handling of CPUs and monitors in

21   doctors offices?

22          A.    They -- they let me know what's

23   going on with the equipment that's there, if

24   something is lost or has been stolen or

Electronically signed by Vicky L. Marcon (101-175-031-5847)                    60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

26

1    something like that, yes.

2           Q.    Because they know you're

3    responsible for tracking it?

4           A.    That's correct.

5           Q.    Do you also keep track of what

6    equipment is considered obsolete?

7           A.    Absolutely.

8           Q.    Do monitors sometimes become

9    obsolete?

10:00  10           A.    Yes, they do.

11           Q.    Do CPUs sometimes become

12    obsolete?

13           A.    Yes, they do.

14           Q.    Do you make the decision what

15    equipment, kind of equipment is obsolete, or

16    does somebody tell you when it becomes

17    obsolete?

18           A.    Somebody tells me when it

19    becomes obsolete.

10:01  20           Q.    Ms. Theiss or somebody else?

21           A.    No one has told me anything is

22    obsolete since Mike McAllister left the

23    company.

24           Q.    About when was that?

Electronically signed by Vicky L. Marcon (101-175-031-5847)                    60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

27

1          A.    About a year ago.

2          Q.    Sometime in 2013?

3          A.    Yes.  I'm sorry.

4          Q.    No worries.  We'll remind you if

5     we notice.  How would Mr. McAllister tell you

6     when a piece of equipment was to be

7     considered obsolete?

8          A.    He would tell Kimberly and

9     Kimberly would tell me.

10 (10:01)         Q.    In person?

11         A.    That's right.

12         Q.    Would you write it down

13    somewhere?

14         A.    I keep a matrix of all our

15    equipment and I would notate there.

16         Q.    I don't know, but I may have

17    that.  We'll see.

18              MR. HANKINSON:  What exhibit did

19    we leave off at?

20 (10:02)         MR. BERNAY:  I wasn't in the

21    last one.

22         Q.    Please allow me to hand you what

23    we're going to mark as Defendant's

24    Exhibit 200.

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Electronically signed by Vicky L. Marcon (101-175-031-5847)                    60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

                                                            28

1              (Exhibit 200 was identified.)

2         Q.    Do you recognize what has been

3    marked as Defendant's Exhibit 200?

4         A.    Yes, I do.

5         Q.    Is this the matrix that you were

6    just describing?

7         A.    Yes, it is.

8         Q.    Does this matrix appear current

9    to you, or is it a copy of something --

10:05   10         A.    This is it.

11         Q.    On the first page there's a list

12   that's headed "All Monitor Models".  Correct?

13         A.    That's correct.

14         Q.    Under that there are subheadings

15   for 19-inch monitors, 26-inch monitors,

16   27-inch monitors, 32-inch monitors and that's

17   it.  Right?

18         A.    That's right.

19         Q.    The 19-inch models on this

10:05   20   exhibit -- the 19-inch monitors that are

21   listed on this exhibit are shaded orange and

22   have parentheses saying "obsolete".  Right?

23         A.    Right.

24         Q.    How long have all the 19-inch

Electronically signed by Vicky L. Marcon (101-175-031-5847)                    60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

29

1    monitors been considered obsolete?

2         A.    For about -- I want to say about

3    two years.

4         Q.    You're not quite sure, but you

5    think it's about that long?

6         A.    I think it's about that long.

7         Q.    Were some of them considered

8    obsolete earlier or were they all moved to

9    being obsolete at the same time?

10:06  10         A.    Some were considered obsolete

11   earlier.

12         Q.    Do you recall when the first

13   monitor started to be obsolete?

14         A.    No, because I wasn't really

15   tracking the serial numbers at that point.

16         Q.    This is the first time it had

17   happened?

18         A.    Right.

19         Q.    Was it more than five years ago,

10:06  20   do you think?

21         A.    Probably, yes.

22         Q.    On the second page there's a

23   main heading that says "All CPU Models".

24   Right?

Electronically signed by Vicky L. Marcon (101-175-031-5847)                    60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

30

1           A.      That's correct.

2           Q.      Underneath that there's a

3      subheading in yellow that says "Lenovo CPUs".

4      Right?

5           A.      That's correct.

6           Q.      There's another subheading in

7      yellow that says "Aopen", A-O-P-E-N, one

8      word --

9           A.      That's right.

10:07   10          Q.      -- "CPUs".  Right?

11          A.      Yes.

12          Q.      On the next page there's a main

13     heading called "All-in-one"?

14          A.      Yes.

15          Q.      What does "All-in-one" mean?

16          A.      They are the all-in-one units we

17     use for Practice Wire.

18          Q.      Is Practice Wire an exam room?

19          A.      No.  It's a back office.

10:07   20          Q.      "Back office" meaning those

21     appear in rooms that patients don't go to?

22          A.      That's correct.

23          Q.      Turning back to the second page

24     with the CPUs listed, there are five that are

Electronically signed by Vicky L. Marcon (101-175-031-5847)                          60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

31

1    shaded orange.  Right?

2          A.    Correct.

3          Q.    Are those also obsolete?

4          A.    Yes.

5          Q.    Do you remember, were they all

6    moved to being obsolete at the same time or

7    different times?

8          A.    They were used -- they were all

9    made obsolete at about the same time.

10:08   10          Q.    Do you remember when that was?

11          A.    I want to say about -- I want to

12    say about two or three years ago.  I'm not

13    spot on about the time.

14          Q.    Did Mike McAllister tell you

15    that these were to be considered obsolete?

16          A.    Mike McAllister is the one that

17    determined they were obsolete.

18          Q.    He told Ms. Theiss and Ms.

19    Theiss told you?

10:09   20          A.    That's correct.

21          Q.    At a certain point in time the

22    Practice Relationship Management Team, when

23    they encountered an old CPU, would get in

24    touch with you, you would figure out whether

Electronically signed by Vicky L. Marcon (101-175-031-5847)

60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

32

1    it was one that was considered obsolete and

2    then you'd tell them.  Right?

3              MR. BERNAY:  Object to the form.

4    You can answer.

5              A.    Yes.

6              Q.    And then at some point did you

7    give them this matrix list to look at so they

8    could tell themselves?

9              A.    That's correct.

10:09
10             Q.    Do you remember about when that

11   change was made?

12             A.    I don't have -- I don't remember

13   when I gave them the matrix.  It wasn't this

14   one.  It was an older version.

15             Q.    Were these five CPUs obsolete

16   already in the version that you gave them?

17             A.    Yes.

18             Q.    Do you remember if it was

19   definitely before 2013 or it might have been

10:10
20   after 2013?  Just trying to narrow it down.

21             A.    It would have been before 2013.

22             Q.    And sorry to be boring, but do

23   you remember if it was definitely before 2012

24   or if it might have been after 2012?

Electronically signed by Vicky L. Marcon (101-175-031-5847)                    60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

33

1           A.     I honestly don't remember.

2           Q.     So, first I'd like to talk to

3    you about the time period before you gave the

4    list to the members of the Practice

5    Relationship Management Team, whenever that

6    was before they had a matrix.

7           A.     Mm-hmm.

8           Q.     When a practice's system needed

9    service were there times when its CPU would

10:11  10   be replaced?

11          A.     Of course.

12          Q.     And would that be one instance

13   where the old CPU, if it was obsolete, would

14   be collected?

15          A.     Yes.

16          Q.     Other times a practice might

17   shut down and just cease operating.  Right?

18          A.     Correct.

19          Q.     And they would call to cancel

10:11  20   the service?

21          A.     That's right.

22          Q.     Is that another example of a

23   time when the old CPU would be collected?

24          A.     Yes.

Electronically signed by Vicky L. Marcon (101-175-031-5847)                    60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

34

1          Q.     And if the CPU was collected by

2    a vendor or shipped back by any means and it

3    was obsolete, would it then be destroyed?

4          A.     Yes.

5          Q.     Would those instructions usually

6    be done by the vendors?

7          A.     By Contingent, by the warehouse.

8          Q.     By the warehouse.  Who's Linda?

9    Is there a Linda R. who has something to do

10:12   10   with the destruction of obsolete CPUs,

11   Rassel or --

12         A.     Rassel, yes.

13         Q.     What is her position?

14         A.     She works on the installation

15   team.

16         Q.     Is she a Patient Point employee?

17         A.     Yes.

18         Q.     Does she interact with the

19   vendors?

10:12   20         A.     Yes.

21         Q.     Does she sometimes give them

22   instructions about what to do with CPUs?

23         A.     Sometimes.

24         Q.     At other times do you give

Electronically signed by Vicky L. Marcon (101-175-031-5847)                    60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

35

1    instructions to the vendors about what to do

2    with CPUs?

3           A.    Yes.

4           Q.    Does the Practice Relationship

5    Management Team ever interact directly with

6    the vendors?

7           A.    Honestly, at this point I don't

8    -- I don't know.

9           Q.    Could be but maybe they don't?

10:13  10           A.    Most likely not.

11           Q.    Does FSD ever communicate

12    directly with representatives of doctors

13    offices?

14           A.    Yes.

15           Q.    Do you communicate directly with

16    representatives of doctors offices sometimes?

17           A.    Yes.

18           Q.    What other members of FSD would

19    communicate directly with doctors offices?

10:13  20           A.    Any member of the team would.

21    They have to to troubleshoot.

22           Q.    FSD includes service and

23    troubleshooting of systems?

24           A.    That's correct.

Electronically signed by Vicky L. Marcon (101-175-031-5847)

60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

36

1       Q.    How large is the team?

2       A.    There are six members.  Well,

3  I'm sorry.  There's eight members.

4       Q.    Do those -- are some of them

5  technicians?

6       A.    That's correct.

7       Q.    Do the technicians visit the

8  doctors offices sometimes?

9       A.    Occasionally locally they do.

10:14  10       Q.    Usually, however, a vendor would

11  be used to physically go to a doctor's office

12  to troubleshoot.  Right?

13       A.    That's correct.

14       Q.    Over 90 percent of the time?

15       A.    Yes.

16       Q.    Still talking about the time

17  period before the Practice Relationship

18  Management Team was given a copy of the

19  matrix as it existed at that time, I'd like

10:15  20  to ask you a few more questions.  Was your

21  expectation that before they instructed a

22  representative of a doctor's office what to

23  do with obsolete equipment that they would

24  communicate with you?

Electronically signed by Vicky L. Marcon (101-175-031-5847)                                        60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

37

1          A.     Yes.

2          Q.     Will that normally happen by

3    e-mail?

4          A.     It would be an e-mail, a phone

5    call or sometimes they just stop by my desk,

6    yes.

7          Q.     About how many obsolete CPUs

8    were out there somewhere in the field at that

9    time?

10:16  10               MR. BERNAY:  Object to the form.

11   You can answer.

12         A.     At what time in particular?

13         Q.     At the time, say, the year

14   preceding when this matrix that's been marked

15   as Defendant's Exhibit 200 was provided to

16   the Practice Relationship Management Team.

17               MR. BERNAY:  Object to the form.

18   You can answer.

19         A.     How many were in the field?

10:16  20         Q.     Obsolete.

21         A.     Obsolete?

22               MR. BERNAY:  Same objection.

23         A.     I could -- I have no idea.

24         Q.     It would be over a thousand.

Electronically signed by Vicky L. Marcon (101-175-031-5847)                                      60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

38

1    Right?

2         A.    Several hundred.  We replace

3    them pretty quickly, but several hundred, at

4    least.

5         Q.    So, at that time, before the

6    matrix was provided to the Practice

7    Relationship Management Team, the process

8    was, if they had a question about how a CPU

9    at a practice should be handled, they would

10:17 10   get in touch with you in some way and you

11   would give them instructions and then they

12   would take that back to the practice.

13   Correct?

14        A.    Yes.

15        Q.    So, for instance, if Ms.

16   Lawrence found that a CPU at a practice that

17   was cancelling Healthy Advice's waiting room

18   service had an obsolete CPU, she would ask

19   you, maybe in writing but maybe in person,

10:17 20   what to do with the CPU.  Right?

21        A.    She would ask me if it was

22   obsolete.

23        Q.    And you would tell her whether

24   it was obsolete or not?

Electronically signed by Vicky L. Marcon (101-175-031-5847)                    60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

39

1          A.     That's correct.

2          Q.     And she would give her own

3     instructions to the Practice Relationship

4     Management, or excuse me, to the

5     representative of the practice about what to

6     do?

7          A.     She would ask me if it needed to

8     come back or not.

9          Q.     Okay.  So, if it was obsolete,

10:18   10    she would follow up and say, well, does it

11    need to come back or not, and she would ask

12    you that question?

13         A.     Yes.

14         Q.     And which ones would need to

15    come back and which ones would not?

16         A.     All of them needed to come back.

17         Q.     So what was the purpose of her

18    asking that question?

19         A.     If -- sometimes the practice

10:18   20    liked to keep them.

21         Q.     And sometimes the Practice

22    Relationship Management Team would make a

23    decision to allow that to happen.  Right?

24              MR. BERNAY:  Object to the form.

Electronically signed by Vicky L. Marcon (101-175-031-5847)                    60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

40

1        Q.    That had to go to Heather
2    McGauvran at the time?
3             MR. BERNAY:   Same objection.
4        A.    Sometimes a practice would like
5    to keep them because they would give -- they
6    would keep the old computers and they would
7    like to donate them to, for instance, a
8    school or something like that.  They knew we
9    weren't going to do anything with them.  So
10:19  10   they take them and they donate them to a
11   school, for instance.  Sometimes they keep
12   them for salvage.  Sometimes they just ask to
13   keep them and they keep them on the wall to
14   play programings.  For instance, if they were
15   cancelling out they'd keep them and they'd
16   play the programming, even though it couldn't
17   update, just to have something on the wall.
18   If they took responsibility for getting rid
19   of it or destroying it, we would allow them
10:20  20   to keep them.
21        Q.    When you said that sometimes --
22   well, first, did you talk to the practices
23   directly about these reasons that they wanted
24   to keep them or was that something that was

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Electronically signed by Vicky L. Marcon (101-175-031-5847)                                    60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

41

1    communicated to you by the member of the

2    Practice Relationship Management Team?

3          A.    Both.

4          Q.    Both in every case or sometimes

5    you would speak directly and sometimes they

6    would tell you?

7          A.    Sometimes I would, sometimes

8    they would.

9          Q.    So you've encountered personally

10:20   10   each of the reasons for keeping a CPU that

11   you just listed?

12         A.    That's correct, each.

13         Q.    Sometimes a practice would want

14   to keep the CPU for salvage, you said?

15         A.    Yes.  They just wanted it,

16   they --

17         Q.    To use as they needed to use it?

18         A.    Mm-hmm.

19              MR. BERNAY:  Object to the form.

10:21   20   Q.    It's essentially like an IBM

21   tower at the time?

22         A.    A Lenovo, yes.

23         Q.    A Lenovo is a type of PC?

24         A.    That's correct.

Electronically signed by Vicky L. Marcon (101-175-031-5847)       60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

42

1        Q.    So the practice could keep it

2    and run programs on it like you would a

3    personal computer?

4        A.    Well, not really, but they

5    thought that they could.

6        Q.    And sometimes a practice would

7    actually keep the CPU and play Healthy

8    Advice's programming on the wall but it just

9    wouldn't update?

10:21   10        A.    That's correct.

11        Q.    So, in that case, the

12    programming would be stuck on that CPU as it

13    existed at the time of the cancel and they

14    could only play it as it existed at that

15    time.  Right?

16        A.    That's right, until the computer

17    no longer worked.

18        Q.    The programming that's on those

19    CPUs is -- let me start over.  The loops --

10:22   20    are you familiar with the term "loop"?

21        A.    Yes.

22        Q.    The Healthy Advice system plays

23    loops of content that might last about a

24    half-an-hour or 45 minutes sometimes on the

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Electronically signed by Vicky L. Marcon (101-175-031-5847)                                          60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

43

1    screen in the waiting room of a doctor's

2    office.  Right?

3         A.    That's correct.

4         Q.    Those loops are stored on the

5    CPU.  Right?

6         A.    That's correct.

7         Q.    And those are what those doctors

8    offices who kept playing the loops, even

9    though they weren't updated, had on the CPU.

10:23  10   Right?

11        A.    That's correct.

12        Q.    Now, those loops are not like

13   typical Windows video files.  Right?  They're

14   some other type of file?

15        A.    That's correct.

16        Q.    The software that's on the CPU

17   is needed to play the Healthy Advice loops.

18   Right?

19        A.    That's correct.

10:23  20        Q.    So when the practice kept a

21   PC -- excuse me.  When a practice kept a CPU

22   because it wanted to play the same loop over

23   and over instead of getting updates each

24   month, the software and the loops that were

Electronically signed by Vicky L. Marcon (101-175-031-5847)

60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

44

1    on that PC, that CPU at the time of the

2    cancellation just stayed on the CPU.  Right?

3          A.    That's correct.

4          Q.    The relationship between that

5    practice and Healthy Advice as the network

6    provider ended at that time.  Right?

7          A.    That's correct.

8          Q.    Healthy Advice might down the

9    line try to resell that practice.  Right?

10:24  10          A.    That's correct.

11          Q.    But unless that practice was

12    resold, there was no relationship between the

13    practice and Patient Point or Healthy Advice.

14    Right?

15          A.    That's correct.

16          Q.    How many times did you

17    personally know of when a practice kept a CPU

18    for that purpose, for playing the loops?

19          A.    I honestly couldn't tell you

10:24  20    right now.  I've got 150 pickups out there

21    right now and cancellations.  I couldn't tell

22    you.  And we're talking about years, years

23    gone by.  I couldn't -- I honestly couldn't

24    tell you.

Electronically signed by Vicky L. Marcon (101-175-031-5847)

Vida Albert, 4/11/2014

45

1        Q.    Probably more than once or else

2   it wouldn't spring to mind.  Right?

3        A.    More than once.

4        Q.    And would the rate at which

5   practices wanted to keep CPUs stay the same

6   in your experience after this matrix was

7   provided to the members of the Practice

8   Relationship Management Team?

9              MR. BERNAY:  Object to the form.

10:25  10        A.    I can't answer that question.  I

11   don't know.

12        Q.    Is there a way that Healthy

13   Advice kept track of, for any given obsolete

14   CPU, whether a practice was allowed to keep

15   it or whether it was handled in some other

16   way?

17              MR. BERNAY:  Object to the form.

18   You can answer.

19        A.    I have no idea.

10:26  20        Q.    It was tracked in terms of

21   here's an obsolete CPU, we're writing it off.

22   Right?

23        A.    That's correct.

24        Q.    But a write-off could be of a

Electronically signed by Vicky L. Marcon (101-175-031-5847)                                                    60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

46

1    CPU that was destroyed or a write-off could

2    be a CPU that was lost or a write-off could

3    be a CPU that was obsolete and the practice

4    was allowed to keep it?

5             MR. BERNAY:  Object to the form.

6    You can answer.

7        A.    They were all written off as

8    either lost or damaged/disposed.  There was

9    no -- no other -- no other way to track it.

10       Q.    Sometimes, however, CMS would

11   include an entry that would record the

12   instructions that were given to the practice.

13   Right?

14       A.    Yes.

15       Q.    So just in those cases you could

16   tell from CMS what the practice had been told

17   or what the practice had asked to do with the

18   CPU.  Right?

19       A.    Possibly, yes.

20       Q.    That would be Healthy Advice's

21   best record for any given obsolete CPU about

22   whether the write-off was one that led to

23   destruction or one that led to the practice

24   keeping a CPU?

10:27 (line 10)

10:27 (line 20)

Electronically signed by Vicky L. Marcon (101-175-031-5847)

60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

47

1          MR. BERNAY:  Object to the form.

2     Q.     Is that correct?

3          MR. BERNAY:  You can answer.

4     A.     If the practice specifically

5    asked to keep it, to keep it on the wall, I

6    would say that the comment was put in there

7    that they asked that, yes.

8     Q.     And there's not some other

9    source of that information that would be

10:28 10    better.  Right?

11     A.     Not to my knowledge.

12     Q.     After the matrix that's been

13    marked as Defendant's Exhibit 200 was

14    provided to the Practice Relationship

15    Management Team, those team members would

16    look at the matrix to see if equipment was

17    obsolete.  Right?

18     A.     Most of the time.

19     Q.     So what would happen the other

10:28 20    time?

21     A.     "Vida, I lost my matrix."

22     Q.     Would be what the team member

23    says?

24     A.     (Witness nodding her head.)

Electronically signed by Vicky L. Marcon (101-175-031-5847)                                                  60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

48

1      Q.    And then it would operate like

2  it did before they had the matrix and you'd

3  give them an answer?

4      A.    That's correct.

5      Q.    But most of the time after they

6  had the matrix they would look at it and see

7  whether it was obsolete.  Right?

8      A.    Not really.

9      Q.    About what percentage of the

10:29  10  time would they make that determination

11  themselves in your experience?

12      A.    Maybe ten percent.

13      Q.    So you still got a lot of

14  stop-by business, calls and e-mails about

15  this?

16      A.    That's correct.

17      Q.    But, you know, there's some

18  portion of the time when a Practice

19  Relationship Management Team member would

10:29  20  look at the list, know it was obsolete and

21  then act on that information in some way?

22      A.    Yes.

23      Q.    And when they did that they

24  would then give instructions to the practice

Electronically signed by Vicky L. Marcon (101-175-031-5847)

60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

49

1    and sometimes the vendor about the handling

2    of that CPU.  Right?

3           A.    Normally in cases where the --

4    well, normally what I get from them is cases

5    where the site has moved or the site shut

6    down or the building has been demolished and,

7    "Oh, by the way, your equipment is still

8    there but they're tearing the building down

9    today", or "I'm standing outside the building

10:30    10    and it's burning down and, by the way, your

11    equipment is still in it."  Those kinds of

12    things -- those are the -- those are the ones

13    that I get from them.  Normally they just,

14    they send e-mails to me to let me know the

15    equipment is there and something has happened

16    to it.  They're not really letting me know

17    that obsolete equipment is there.  Normally I

18    get obsolete equipment notifications when

19    there's service being done and obsolete

10:31    20    equipment is being transferred out and new

21    equipment is being transferred in, or a site

22    cancels and obsolete equipment is being

23    transferred out and they're going to do away

24    with the obsolete equipment, all of the

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Vida Albert, 4/11/2014

50

1    obsolete equipment is being taken off site by

2    a technician and then being sent to the

3    warehouse.

4         Q.    When there is a service issue

5    and there's notification that there's

6    obsolete equipment, that's going to be the

7    time when almost always that obsolete CPU is

8    destroyed.  Right?

9         A.    That's correct.

10        Q.    It's these situations where it's

11   probably not a service issue but it's a

12   cancellation where sometimes circumstances

13   will lead to the CPU being left at the

14   physician's office?

15        A.    That's correct.

16             MR. BERNAY:  Object to the form.

17   You can answer.

18        A.    I'm sorry.

19        Q.    You said sometime in 2012 or

20   earlier there were hundreds of obsolete CPUs

21   in the field.  Right?

22        A.    That's correct.

23        Q.    Do you know how many are left

24   now in the field?

Electronically signed by Vicky L. Marcon (101-175-031-5847)                                    60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

51

1          A.     There --

2                 MR. BERNAY:  Object to the form.

3      You can answer.

4          A.     We are -- we're proactively

5      replacing them.  So there's -- there's just

6      no way for me to know now.  I'm so sorry.  I

7      just haven't kept up with it.

8          Q.     Would it be fair to say that

9      over the nine plus years that you've worked

10:33  10     at Healthy Advice and Patient Point there

11     have at least been over a hundred times where

12     the CPU wasn't collected?

13                MR. BERNAY:  Object to the form.

14     You can answer if you know.

15         A.     I would say that was a fair

16     assessment.

17         Q.     And, again, these are not

18     situations where a rogue employee is acting

19     contrary to instructions.  These are

10:33  20     situations where due to the circumstances a

21     decision is made by the company to allow that

22     CPU to remain at the practice.  Right?

23                MR. BERNAY:  Object to the form.

24     You can answer.

Electronically signed by Vicky L. Marcon (101-175-031-5847)                                    60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

52

1          A.     I don't understand rogue

2     employee, but someone decided to leave it,

3     yes.

4          Q.     It wasn't left at the practice

5     against instructions by the company.

6          A.     That's correct.

7          Q.     Correct?

8               MR. BERNAY:  We've been going

9     about an hour.  Why don't we take a break.

10:34    10               MR. HANKINSON:  Okay.

11               (Break taken.)

12          Q.     To follow up and try to tie off

13     what we were just talking about before I move

14     on, you had mentioned four situations where

15     CPUs had been allowed to remain at the

16     doctors offices.

17          A.     Mm-hmm.

18          Q.     When the doctor's office

19     cancelled.  Right?

10:50    20          A.     Yes.

21          Q.     And you had mentioned that the

22     CPUs have been generally handled in

23     accordance with company policy and practice.

24     Right?

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Electronically signed by Vicky L. Marcon (101-175-031-5847)                    60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

53

1        A.     Yes.

2        Q.     So when CPUs are kept by

3   practices to donate to schools, that has been

4   done in accordance with company policy and

5   practice.  Right?

6               MR. BERNAY:  Object to the form.

7        A.     Yes.

8        Q.     When CPUs have been kept by the

9   practices so that they can keep showing old

10:51  10   loops and play the loops that were on the CPU

11   at the time of the cancellation, even though

12   they're not updating, that has been handled

13   in accordance with company policy and

14   practice.  Right?

15               MR. BERNAY:  Same objection.

16        A.     I'm going to say I don't know if

17   that is necessarily company policy, but I

18   know that it was done with permission of

19   people higher than me.  It was done in

10:51  20   accordance with goodwill.

21        Q.     Because it's a service industry?

22        A.     That's right.

23        Q.     Similarly, when a practice has

24   asked to keep the computer for salvage, if

Electronically signed by Vicky L. Marcon (101-175-031-5847)                    60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

54

1    you or a customer or Practice Relationship

2    Management Team member has said, "That's an

3    old player", "We don't need it", "Go ahead

4    and hook it up to a computer, do whatever you

5    want with it", that was either done in

6    accordance with policy or with permission of

7    someone at Patient Point who was higher up.

8    Right?

9            A.    That's correct.

10:52  10            Q.    And when a practice kept a CPU

11    because it took responsibility for destroying

12    it in a fourth sort of situation, that too

13    was done in accordance with company policy or

14    at least with the permission of someone

15    higher up?

16            A.    Yes.

17            Q.    I'm going to hand you a document

18    marked Defendant's Exhibit 201.

19            (Exhibit 201 was identified.)

10:53  20            Q.    I'm going to recommend that and

21    ask you to take the clip off of Defendant's

22    Exhibit 201 and take the first two pages and

23    lay them out in front of you so that they're

24    side by side, and then take the second two

Electronically signed by Vicky L. Marcon (101-175-031-5847)                    60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

55

1    and sort of push -- I'm going to move your

2    water, if that's okay.  And sort of push

3    those up ahead of you and leave the bottom

4    two pages and spread those out side by side.

5    First we want the third page and then the

6    fourth page.

7              A.    Okay.

8              Q.    If you look to your right at the

9    far right-hand column of the second and

10:54  10   fourth page of Exhibit 201, does it appear

11   that CMS comment fields are listed out?

12             A.    That's correct.

13             Q.    You recognize this format and

14   style of comment as entries in CMS?

15             A.    Yes.

16             Q.    If we look on the left-hand side

17   but the far right column of those, the first

18   and third page, we see a comment created by a

19   column.  Do you see that?

10:54  20   A.    Yes.

21             Q.    And those all say "VAJ".  Does

22   that designate you in CMS?

23             A.    Yes, it does.

24             Q.    What's the J?

Electronically signed by Vicky L. Marcon (101-175-031-5847)                    60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

56

1          A.     That was my ex-husband's last

2     name, Johnson.

3          Q.     We need never speak of it again.

4          A.     Thank you.  He's dead now, by

5     the way.  He drank himself to death.

6          Q.     I don't know how to react.  The

7     far left column is "Location ID".  Correct?

8          A.     That's correct.

9          Q.     The numbers in the Location ID

10:55  10    column are the unique numbers that Patient

11    Point assigns to each doctor's office?

12         A.     That's correct.

13         Q.     And then the Location Name

14    column would list the names of those doctors

15    offices.  Right?

16         A.     That's correct.

17         Q.     In between those two, it says

18    "Program Code", and examples of program codes

19    are PCN, SCN, CCN and WHN.  Are those

10:55  20    different Patient Point networks?

21         A.     That's correct.

22         Q.     By network we're talking about a

23    group of subscribers to Patient Point's

24    content that sees slightly different loops

Electronically signed by Vicky L. Marcon (101-175-031-5847)                                              60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

57

1    because they're geared toward certain

2    practice specialties or primary care.  Right?

3           A.    That's correct.

4           Q.    PCN is Primary Care Network.

5    Right?

6           A.    That's correct.

7           Q.    Is CCN something to do with

8    cardiology?

9           A.    Cardiac Care Network.  WHN is

10:56  10   Women's Health Network and SCN is Skin Care

11   Network.

12          Q.    Looking at the comments on the

13   far right-hand side of Defendant's

14   Exhibit 201, do you recognize these as

15   comments that were in fact created by you?

16          A.    That's what it says.

17          Q.    If you could read them over, I'd

18   appreciate if you would confirm for me that

19   they're your comments in CMS.

10:57  20   A.    Yeah.  There's enough bad

21   grammar in here that I think it's mine.

22          Q.    So is that a yes?

23          A.    Yes.

24          Q.    Thank you.  I'd like to talk to

Electronically signed by Vicky L. Marcon (101-175-031-5847)                          60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

58

1    you a little bit about the vocabulary in the

2    comments.  If you look at the first row,

3    there's a -- at the very end of the comment

4    it says "Listed as lost."  What does "listed

5    as lost" mean?

6            A.    It means it was moved from the

7    -- there's different categories on -- that

8    the components are put in and this was moved

9    in this case from "install" to "lost".

10:58  10        Q.    Components are the type of

11    equipment that you track as inventory?

12           A.    That's correct.

13           Q.    Do those include anything other

14    than what was on that matrix we looked at

15    earlier?

16           A.    No.

17           Q.    And so there are different

18    categories in -- is it on the serial number

19    list or somewhere else?

10:59  20        A.    Yes.

21           Q.    So each warehouse vendor has a

22    serial number list?

23           A.    That's correct.

24           Q.    And "listed as lost" refers to

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Electronically signed by Vicky L. Marcon (101-175-031-5847)

Vida Albert, 4/11/2014

59

1    what a certain component would be categorized

2    as on a certain warehouse vendor's list of

3    inventory?

4         A.    That's correct.  In this case I

5    had them move it from "install" to "lost".

6         Q.    Installed is a description of

7    what?

8         A.    Where it is on the Serial Number

9    Report.

10:59  10         Q.    And the installed category is

11    intended to mean that the components are at a

12    doctor's office installed in an active

13    system.  Right?

14         A.    That's correct.

15         Q.    Does lost mean that the location

16    of the equipment is unknown?

17         A.    That's correct.

18         Q.    What different types of unknown

19    -- well, let me start over.  Would equipment

11:00  20    that has been stolen be listed as lost?

21         A.    Correct.  Lost/stolen, yes.

22         Q.    Is the category "lost/stolen"?

23         A.    Yes.

24         Q.    And so any equipment where the

Electronically signed by Vicky L. Marcon (101-175-031-5847)

60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

60

1     location is unknown would be listed on the

2     serial number lists at the vendors as

3     lost/stolen?

4          A.    That's correct.

5          Q.    And any case where it was stolen

6     it would be listed as lost/stolen, and in any

7     situation where it wasn't stolen but its

8     location is unknown it would be listed as

9     lost/stolen?

11:00  10          A.    Lost/stolen.

11          Q.    Yes?

12          A.    Yes.

13          Q.    If you look at the last row on

14     page one and three, going across the top half

15     of the papers as they're laid out in front of

16     you but the bottom row of that top half, it's

17     row 20, it starts with Location ID 3057214.

18          A.    Yes.

19          Q.    The last part of that

11:01  20     description says, "List the 19-inch monitor

21     as damaged/destroyed."  What is

22     "damaged/destroyed"?

23               MR. BERNAY:  Take your time to

24     read the whole comment.

Electronically signed by Vicky L. Marcon (101-175-031-5847)          60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

61

1          A.    That was a mistake.  I should

2     have listed it as lost/stolen instead of

3     damaged/destroyed, but because it was a

4     19-inch monitor I probably just keyed in and

5     listed it as damaged/destroyed instead of

6     lost/stolen.

7          Q.    And I'm not trying to play

8     gotcha.  I just --

9          A.    No.  I'm just --

11:02  10          Q.    If it was correct, what would

11     damage/destroyed mean?

12          A.    Damaged/destroyed would mean

13     that it was damaged, destroyed.  It was a

14     destroyed item.

15          Q.    Would the location of a

16     damaged/destroyed item possibly include both

17     equipment that was sent back to the warehouse

18     and found to be damaged and destroyed and

19     also equipment that was reported to be

11:02  20     damaged and destroyed at a physician's

21     office?

22          A.    Yes, it would.

23          Q.    If we look on what I'm calling

24     row 25, but basically if you march down from

Electronically signed by Vicky L. Marcon (101-175-031-5847)

60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

62

1    the row we were just looking at one, two,

2    three, four, five, six to location ID

3    3322415 --

4            A.    Yes.

5            Q.    -- the location name is

6    Dermatology and Advanced Skin Care.  Right?

7    Are we on the same row?

8            A.    Yes.  31 July '13.

9            Q.    I'm catching up with you.

11:03  10    July 31st, 2013 is the date when you entered

11    your comment.  Right?

12            A.    Yes.

13            Q.    Part of this entry says to mark

14    a certain CPU as damage/disposed.  Is that

15    the same as damage/destroyed?

16            A.    Yes, it is.

17            Q.    That's -- and which is the --

18    what's the name of the category on the

19    warehouse's list?

11:04  20            A.    Damaged/destroyed.  Do you know

21    how many of these things I type a day?

22            Q.    Yeah.  So the official term is

23    damaged/destroyed?

24            A.    Yes.

Electronically signed by Vicky L. Marcon (101-175-031-5847)      60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

63

1          Q.     So looking back up to the third

2     row from the top, Location 3124112; Location

3     Name, Doctors H. Goldstein and E. Ordorica,

4     do you see that row?

5          A.     Yes.

6          Q.     Following that row across,

7     there's the reference to "SN change request

8     dated", and then there's a date.  What is "SN

9     change request"?

11:04   10          A.     Serial number change request.

11          Q.     Is that a request that is made

12     to the warehouse vendor to change the

13     category in which it lists a piece of

14     equipment on the vendor's serial number list?

15               MR. BERNAY:  Object to the form.

16     You can answer.

17          A.     It's -- I send the report twice

18     a month to the warehouse and it's just a

19     collection of items that are moved from one

11:05   20     category to another.  And I try to note them

21     in CMS that this is what has happened to this

22     piece of equipment, so that people don't try,

23     you know, don't go looking for it.

24          Q.     So, when you say "SN change

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Electronically signed by Vicky L. Marcon (101-175-031-5847)                                        60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

64

1    request dated February 27th, 2012", that

2    means that --

3             A.    It's on that request.  I'm

4    sorry.

5             Q.    -- you made a report like you

6    just described to the warehouse on

7    February 27th, 2012 listing this piece of

8    equipment and others potentially?

9             A.    That's correct.

11:06  10         Q.    Would "added to SN change list",

11    if it's in a CMS entry authored by you, mean

12    that you have put this on that report that

13    you then later intend to send to the vendor?

14             A.    That's correct.

15             Q.    If you say in a CMS entry "Moved

16    to damaged/disposed" or "moved to lost",

17    would that indicate that on your draft report

18    that you're later going to send to the vendor

19    you have changed the category of that piece

11:07  20    of equipment?

21             A.    We started doing that report in

22    2000 -- I want to say 2011.  So there may not

23    be any before then.

24             Q.    Was it done on an individual

Electronically signed by Vicky L. Marcon (101-175-031-5847)

60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

65

1    equipment basis before then?

2          A.    Individual comment basis.  I

3    would type the comment and then forward it to

4    accounting and to the warehouse.

5          Q.    The comment would go into CMS?

6          A.    And then I would e-mail it.

7          Q.    There's an option where you can

8    take a comment that you've put in CMS and

9    make it into an e-mail?

11:07  10          A.    That's correct.

11          Q.    And then that e-mail, you said,

12    would go to accounting and to the vendor who

13    is responsible for the equipment?

14          A.    That's correct.

15          Q.    And the accounting needs to know

16    about these categorizations because they keep

17    track of these pieces of inventory for tax

18    purposes.  Right?

19          A.    That's correct.

11:08  20          Q.    If a CMS entry says write off a

21    piece of equipment, would that be tax related

22    or is that a more general term?

23          A.    That's tax related.

24          Q.    Well, let's look at the second

Electronically signed by Vicky L. Marcon (101-175-031-5847)                                                    60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

66

1    to last row, Location Name, or excuse me,

2    Location Number 3310251; name, Women's Health

3    and Breast Pavilion.  Do you see that row?

4        A.    Yes.

5        Q.    Following that across, the last

6    sentence in the entry is, "If no response to

7    e-mail I am going to write off obsolete CPU

8    and close order."  Do you see that?

9        A.    Yes, I do.

11:09  10        Q.    What did that mean you were

11    going to do?

12        A.    That meant that if I got no

13    response to the call I was going to write off

14    the equipment because it was obsolete, spend

15    no more resources to try and track it down or

16    call this person.  Sometimes we will call

17    five or six times trying to reach someone who

18    doesn't want to talk to you.  Well, have you

19    ever done that?

11:09  20        Q.    Yes, I have.

21        A.    Trying to reach someone who

22    doesn't want to talk to you, especially with

23    these doctors offices, it can eat up a lot of

24    goodwill.  So, I'll put a comment in there

Electronically signed by Vicky L. Marcon (101-175-031-5847)    60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

67

1    just to remind myself that, okay, I've tried

2    all I'm going to try, and the next time I go

3    to this pickup order to try and get the

4    equipment, that reminds me that I'm not going

5    to try anymore, and then I will put it on

6    this Serial Number Change Report.

7            Q.    And so when you say "write off"

8    in this entry, you're talking about putting

9    the obsolete CPU on the change order list?

11:10    10          A.    And I will put it in the

11   appropriate category.

12           Q.    So "write off" could include

13   lost/stolen and it could include

14   damage/disposed -- excuse me.  Let me start

15   over.  The term "write off" could mean that

16   you are going to move the component to the

17   category "lost/stolen" or it could mean that

18   you are going to move the component to the

19   category "damaged/destroyed", depending on

11:11    20   the circumstances?

21           A.    That's correct.

22           Q.    What does "closed the order"

23   mean in a CMS entry authored by you?

24           A.    That means that I would close

Electronically signed by Vicky L. Marcon (101-175-031-5847)

60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

68

1    the order.  The order would no longer be open

2    and there would be no more calls made on that

3    order.

4         Q.    What's the order?

5         A.    The order would be a pickup

6    order.  That's an order open in CMS that

7    let's me know that, hey, we're trying to get

8    this piece of equipment picked up.

9         Q.    Do the vendors see the CMS

11:11  10   entry?

11        A.    Yes.

12        Q.    Does it pop up as a work order

13   for the vendor's technician, then, when

14   there's an order open?

15        A.    This is an order at the

16   warehouse.  They have issued a UPS label to

17   try and pick up the equipment.  For whatever

18   reason, UPS has not been able to retrieve the

19   equipment.  So my job is then to try and find

11:12  20   out why the equipment cannot be retrieved.  I

21   call the doctor's office sometimes

22   repeatedly, and sometimes you just -- there's

23   nothing you can do.  There -- you can't --

24   you can't retrieve the equipment.

Electronically signed by Vicky L. Marcon (101-175-031-5847)

60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

69

1          Q.    And that's when you would close

2     the order?

3          A.    If I cannot retrieve the

4     equipment.  Sometimes it's a screen,

5     sometimes it's a computer.  Sometimes it is

6     -- sometimes it's cables and mounting

7     hardware.  In this case, it was an obsolete

8     computer.

9          Q.    And when you decide to finally

11:13 10    close the order, you select something in CMS

11    and it let's the warehouse know that, even

12    though it has issued a UPS tag, it can go

13    ahead and stop trying to fulfill that?

14          A.    That's correct.

15          Q.    What's your record for the

16    number of times that you've called a practice

17    on the phone before going ahead and closing

18    an order?

19               MR. BERNAY:  Object to the form.

11:13 20         A.    I don't know how to answer that.

21    I have no idea.

22          Q.    Do you think you've ever called

23    the same practice more than ten times to try

24    to pick up an obsolete CPU?

Electronically signed by Vicky L. Marcon (101-175-031-5847)                    60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

70

1          A.    Yes.

2          Q.    But sometimes, as you mentioned

3    earlier, five or six calls would be enough to

4    get the impression that the order ought to be

5    closed?

6          A.    Yes.

7          Q.    If the practice seems

8    particularly nonresponsive, meaning that the

9    person who picks up doesn't want to talk to

11:14    10    you and expresses that to you, would you

11    perhaps close the order after two or three

12    calls?

13          A.    I always make at least four

14    calls.

15          Q.    So you would always make at

16    least four calls regarding an obsolete CPU

17    and then you would decide whether you have a

18    feeling that more calls would be helpful or

19    whether your feeling is that further calls

11:15    20    aren't going to do any good and then you

21    would decide to close the order?

22                MR. BERNAY:  Object to the form.

23          A.    Pretty much you get a feel as to

24    whether they're going to be helpful or not

Electronically signed by Vicky L. Marcon (101-175-031-5847)

60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

71

1    and that -- yes.

2          Q.    I mean, you've done this for

3    nine years.  I bet you have a feel.  Right?

4          A.    Yes.

5          Q.    The -- sometimes you e-mail the

6    physician's office?

7          A.    Yes.

8          Q.    When would you e-mail as opposed

9    to call?

11:15   10          A.    The doctors offices are really

11    busy.  Sometimes you can get someone to

12    answer an e-mail at the end of the day as

13    opposed to taking a call any time of day.

14          Q.    Are the e-mail addresses

15    typically listed in CMS?

16          A.    Yes, they are.

17          Q.    Do you have the option in your

18    discretion, as a Patient Point's employee, to

19    choose whether to call or e-mail or both?

11:16   20          A.    Yes.

21          Q.    Do you always e-mail a practice

22    about obsolete CPUs?

23          A.    You betcha.

24          Q.    How many times minimum would you

Electronically signed by Vicky L. Marcon (101-175-031-5847)                                    60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

72

1    e-mail a practice about an obsolete CPU?

2          A.    I'm sorry.  Are you asking me

3    how many times would I send an e-mail or how

4    many times would I e-mail as opposed to call?

5          Q.    You always e-mail a practice

6    when it has cancelled and its CPU is obsolete

7    but has not been able to be retrieved, and I

8    am asking do you always e-mail multiple times

9    and, if so, how many do you always send?

11:17    10          MR. BERNAY:  Object to the form.

11    You can answer if you understand.

12          A.    I call four times and I e-mail

13    twice.  Does that answer your question?

14          Q.    The postman always e-mails

15    twice?

16          A.    Twice.  So does the grumpy

17    Patient Point lady.

18          Q.    Do you treat it the same way as

19    phone calls, in that with every obsolete CPU

11:18    20    that's left at a practice you e-mail at least

21    twice and then you make a decision about

22    whether more e-mails would help or not?

23          A.    If they don't answer you after

24    two e-mails, they are not going to answer

Electronically signed by Vicky L. Marcon (101-175-031-5847)                    60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

73

1    you.

2           Q.    So that's the maximum number

3    that you would send?

4           A.    You -- you don't want to piss

5    them off.  Other people have to work with

6    them.

7           Q.    So the answer is yes?

8           A.    Yes.

9           Q.    Is each e-mail and call entered

11:19  10   separately into CMS or not?

11          A.    Sometimes.  It depends on what

12   kind of time crunch.  Sometimes -- sometimes

13   I have so many of these to make that I don't

14   always get all of them in.  I try to enter

15   every single one.

16          Q.    Now I'd like to go to certain

17   rows here and get a little more detailed

18   about what happened in each instance.  If you

19   could look at row, the first row, Location

11:20  20   3443727; Location Name, Access Community

21   Health Network.  Do you see?

22          A.    Yes.

23          Q.    The CMS comment from you

24   regarding that practice says, "Equipment at

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Electronically signed by Vicky L. Marcon (101-175-031-5847)

Vida Albert, 4/11/2014

74

1    this location is a 19-inch monitor", and then

2    it lists a serial number.  Right?

3            A.    Yes.

4            Q.    And an M-51 CPU, and then it

5    lists another serial number.  Right?

6            A.    Yes.

7            Q.    The comment goes on, "Both

8    pieces of equipment are obsolete.  There is

9    no reason to retrieve them from the site.

11:20  10  Sending to Sarcom and accounting to have them

11    listed as lost."  Right?

12            A.    Yes.

13            Q.    Now, this was in 2010.  Right?

14    So this was a time when you were creating a

15    CMS entry and then e-mailing that entry to

16    accounting and Sarcom.  Right?

17            A.    That's correct.

18            Q.    The CPU that -- oh, and this is

19    -- this practice, Access Community Health

11:21  20  Network, had cancelled its service to use its

21    own patient education programming.  Right?

22            A.    That's what it looks like, yes.

23            Q.    The CPU that was at that

24    practice could not be retrieved.  Right?

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Electronically signed by Vicky L. Marcon (101-175-031-5847)                                        60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

75

1      A.    That's what it looks like, yes.

2      Q.    So then it was listed as lost

3 and the order would have been cancelled or

4 closed.  Correct?

5      A.    Right.

6      Q.    Sarcom would then know that,

7 even if it had issued a UPS tag, it should

8 stop trying to retrieve this equipment at

9 that point.  Right?

11:22  10      A.    Yes.

11      Q.    I'd like you to look two rows

12 down from there at Location ID 3124112;

13 Location Name, Doctors H. Goldstein and E.

14 Ordorica.  Do you see that row?

15      A.    Yes.

16      Q.    Following that across, we can

17 see that the practice had cancelled the

18 service and the reason that's listed is that

19 it was moving or redecorating.  Right?

11:22  20      A.    Yes.

21      Q.    In February --

22      A.    Wait a minute.  3124112?

23      Q.    Yes.

24      A.    They were under -- no.  You're

Electronically signed by Vicky L. Marcon (101-175-031-5847)                    60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

76

1    right.  I'm sorry.

2         Q.    No worries.  It's small.

3    Following that across, you entered a comment

4    in February of 2012.  Right?

5         A.    Yes.

6         Q.    That comment says "CPU" and then

7    it lists a serial number and -- and then it

8    lists another serial number, "Have been moved

9    to damaged/destroyed on SN change request

11:23  10  dated February 27th, 2012.  This is obsolete

11   equipment that will not be removed from the

12   site."  Is that the CMS entry you wrote?

13        A.    That's what it looks like, yes.

14        Q.    Are both of the serial numbers

15   that are listed in this entry the serial

16   numbers of CPUs?

17        A.    The 1S81833 number is a CPU.

18   The other is an obsolete 19-inch monitor.

19        Q.    And here is an example of what

11:24  20  we were talking about earlier where you had

21   switched to providing a report to the

22   warehouse vendors twice a month and the CPU

23   and the 19-inch monitor that were at this

24   cancelling practice were listed on that

Electronically signed by Vicky L. Marcon (101-175-031-5847)

60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

77

1    report to be changed from installed to

2    damaged/destroyed.  Right?

3            A.    That's correct.

4            Q.    And you further noted that it

5    would not be picked up from the site.  Right?

6            A.    That's correct.

7            Q.    That was a couple of years ago

8    and you do hundreds of these, but I'll just

9    ask, do you happen to remember the

11:25  10    circumstances of this one?

11            A.    I do not.

12            Q.    Further down, it's about the

13    tenth row in the middle of the page -- I'll

14    give you the Location ID.  Or, excuse me,

15    I'll give you the name.  Loveland Family

16    Practice, Inc.  There's two rows that have

17    that practice name.

18            A.    Yes.

19            Q.    And this is Location ID 3160991.

11:25  20            A.    Yes.

21            Q.    I'd like to look at the second

22    row that is about that location.  This is a

23    practice that cancelled and the reason given

24    was "moving and hassle factor".  Correct?

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Electronically signed by Vicky L. Marcon (101-175-031-5847)

Vida Albert, 4/11/2014

78

1          A.     Yes.

2          Q.     Following across you entered a

3     CMS comment in April of 2012.  Right?

4          A.     Yes.

5          Q.     Your CMS entry about the

6     Loveland Family Practice, Inc. location says

7     that, "A 19-inch monitor and Lenovo CPU", and

8     it lists the serial numbers of both pieces of

9     equipment, "have been listed on SN Change

11:26   10    Report dated April 23rd, 2012.  Monitor is

11    damaged/disposed.  CPU damaged/disposed.

12    19-inch monitor is obsolete, and the decision

13    was made by management not to retrieve the

14    CPU due to cost involved."  Is that correct?

15         A.     That's what it says.  Yes.

16         Q.     Was this Lenovo CPU obsolete at

17    the time?

18              MR. BERNAY:  Object to the form.

19         Q.     If it helps you, you can refer

11:27   20    to Defendant's Exhibit 200.

21         A.     No, it was not obsolete.

22         Q.     But there's a certain cost

23    involved in retrieving equipment.  Correct?

24         A.     Yes, there is.

Electronically signed by Vicky L. Marcon (101-175-031-5847)                    60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

79

1      Q.    And in certain situations,
2  depending on the circumstances, a manager at
3  Patient Point might choose, even if a CPU was
4  not obsolete, to not retrieve it from the
5  practice.  Correct?
6      A.    If the practice will take
7  responsibility for disposing of it, yes.  We
8  had a long relationship with this particular
9  practice, so I'm sure that -- I believe her
11:28  10  name is Peggy.  Loveland Family Practice, I
11  think her name was Peggy, would have agreed
12  to dispose of it.
13      Q.    Do you remember Peggy's last
14  name?
15      A.    I think her name is Peggy, but I
16  don't remember her last name.
17      Q.    Would she have signed something?
18      A.    No.  We never had anybody sign
19  anything.  We just put the comment in CMS.
11:29  20      Q.    Your best recollection is that
21  someone who may have been named Peggy, and if
22  it was Peggy you're not sure of the last
23  name, you think would have said that she
24  would dispose of the CPU before this entry

Electronically signed by Vicky L. Marcon (101-175-031-5847)                    60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

80

1      would have been made.  Right?

2           A.    Yes.

3           Q.    And that decision was made by

4      management?

5           A.    Yes.

6           Q.    Do you remember who was the

7      manager who made that decision?

8           A.    Honestly, no, I don't.

9           Q.    It would have been either Amy

11:29  10     Finley or Heather McGauvran.  Right?

11          A.    I honestly can't say.  I

12     honestly do not know.

13          Q.    Would that manager have been

14     from FSD or from Practice Relationship

15     Management?

16          A.    For all I know it could have

17     been me.  I do not know.  I do not have a

18     memory like that.  I wish I did.

19          Q.    Would it have been one of those

11:30  20     three sources of management, either you or

21     someone else in FSD or someone in Practice

22     Relationship Management?  Are there any other

23     managers who would have made that decision?

24                MR. BERNAY:  Object to the form.

Electronically signed by Vicky L. Marcon (101-175-031-5847)                                    60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

81

1    You can answer.

2         A.    I honestly -- I don't -- I just

3    don't know.

4         Q.    Tom McGinnis never stepped in

5    and said "Leave the CPU"?

6         A.    I don't think so.  No.

7         Q.    Do you recall anyone outside of

8    FSD or Practice Relationship Management ever

9    telling you what to do with a CPU in a

11:30  10  particular practice?

11        A.    No.

12        Q.    Do you remember anyone ever

13   following up with the person at Loveland

14   Family Practice, whether it was Peggy or

15   someone else, to verify that the CPU had been

16   disposed?

17        A.    No, I don't.

18        Q.    Disposed could have included

19   throwing the CPU out or giving it to someone

11:31  20  else or donate it to a school.  Right?

21        A.    I would have no idea what they

22   would have done with it.

23        Q.    If you would look at the bottom

24   set of pages, let's count up from the bottom,

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Electronically signed by Vicky L. Marcon (101-175-031-5847)                        60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

82

1  one, two, three, four, five, six, seven,

2  eight up from the bottom, there's a Location

3  NCH Medical Group and a Location Number

4  3534284.  Do you see that?

5          A.    Yes.

6          Q.    The NCH Medical Group had

7  cancelled the Patient Point service, and the

8  reason listed is "remodeling/redecoration".

9  Right?

11:32   10          A.    Yes.

11          Q.    Following that row across, you

12  entered a CMS comment in November of 2013.

13  Right?

14          A.    Yes.

15          Q.    This CMS entry states "CPU" and

16  then it gives a serial number, "and 26-inch

17  monitor", and then it gives a serial number

18  again, "being destroyed by office and have

19  been moved to damaged/destroyed on SNR

11:32   20  because of timeline.  Office has stated that

21  they are demolishing and remodeling office on

22  Monday and will pitch equipment if we are not

23  there in time to remove.  There is no time to

24  cost effectively dispatch technician to pick

Electronically signed by Vicky L. Marcon (101-175-031-5847)                                          60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

83

1    up equipment.  Lenovo is obsolete and monitor

2    is one of our older 26-inch monitors."  Did I

3    read that correctly?

4            A.    That's what it says.

5            Q.    The office essentially gave you

6    a rude ultimatum.  Right?

7            A.    That's correct.

8            Q.    And it was something that would

9    have required measures that are not cost

11:33  10    effective to go and retrieve the CPU.  Right?

11           A.    That's correct.

12           Q.    It would have been -- it's much

13   more expensive to send somebody on a rush

14   basis to a particular location.  Right?

15               MR. BERNAY:  Object to the form.

16   You can answer.

17           A.    It would be very expensive to

18   get one of our vendors to send a technician

19   out there to pick up that equipment.

11:34  20           Q.    How much does that cost?

21           A.    It would be probably about two

22   times -- probably about -- probably right

23   around $600 to get someone to go out there.

24           Q.    So that's, you said, nearly two

Electronically signed by Vicky L. Marcon (101-175-031-5847)                 60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

84

1    times or maybe over two times what you would

2    normally pay?

3            A.    Yes.

4            Q.    So a typical pickup would be

5    more like $300?

6            A.    It would -- a normal pickup

7    would be about $220, so one-and-a-half to two

8    times what we would normally pay.  That's

9    what we call an expedited removal depending

11:35  10    on who we send.

11            Q.    Patient Point would not pay for

12    an expedited removal of an obsolete CPU.

13    Right?

14            A.    Not normally.

15            Q.    And in this case they decided

16    not to.  Right?

17            A.    That's correct.

18            Q.    This was in November of last

19    year.  Do you remember this occasion at all?

11:35  20            A.    Vaguely.

21            Q.    Do you remember who you spoke to

22    at the practice?

23            A.    I do not remember who I spoke to

24    at the practice.

Electronically signed by Vicky L. Marcon (101-175-031-5847)

60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

85

1       Q.     A man or a woman?

2       A.     I don't remember.

3       Q.     Do you remember their tone in

4   giving you the ultimatum?

5              MR. BERNAY:  Object to the form.

6   You can answer.

7       A.     I don't remember.  I just -- I

8   just vaguely remember the conversation.

9       Q.     Any other details that are not

11:36   10  in this CMS entry that are in your mind?

11      A.     Just that I -- just that it was

12  more expedient to just let them --

13      Q.     Because the CPU and the monitor

14  was obsolete and the monitor was old?

15      A.     Yes.

16      Q.     They -- the practice wanted --

17  pardon me.  The practice was offering an

18  opportunity to pick up the equipment but

19  didn't care whether you did or not, just

11:36   20  wanted to make sure that as of a certain date

21  you knew they were going to be gone or the

22  equipment would be gone?

23      A.     Yes.  We've gotten calls as

24  people were demolishing their buildings, "By

Electronically signed by Vicky L. Marcon (101-175-031-5847)

60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

86

1    the way, we're tearing the building down and

2    your equipment is still in it."

3          Q.    And this comment was made on the

4    same day that the practice told you about

5    this situation.  Right?

6          A.    That's correct.

7          Q.    So, if I looked at a calendar

8    for 2013 and looked up when the next Monday

9    was, the time in between November 8th, 2013

11:37  10    and that Monday would be the amount of time

11    that the practice had given Patient Point an

12    opportunity to pick up the equipment.  Right?

13          A.    That's correct.

14          Q.    Look back to the second row of

15    Defendant's Exhibit 201, Pocahontas Medical

16    Clinic, Location ID 3302235.  Are you with

17    me?

18          A.    Yes.

19          Q.    Pocahontas Medical Clinic

11:38  20    actually remained active and you wrote a CMS

21    entry about it on January 11th -- excuse

22    me -- January 31st, 2011.  Right?

23          A.    That's what it says, yes.

24          Q.    Would you go ahead and -- this

Electronically signed by Vicky L. Marcon (101-175-031-5847)                                           60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

87

1    was kind of a long one.  Would you go ahead

2    and read it and let me know when you're done?

3          A.     Okay.

4          Q.     Can you tell whether this is

5    about a monitor or a CPU?

6          A.     It is about a CPU, an M-42.

7          Q.     Is that an obsolete CPU?

8          A.     Yes, it is.

9          Q.     Do you remember what the Office

11:39   10   Depot was trying to -- how they were

11   involved?

12         A.     Somebody had dropped it off at

13   an Office Depot, which sometimes -- some

14   Office Depots take UPS equipment.  The

15   tracking number provided by the Office Depot

16   in Jonesboro, Arkansas, I guess it is, none

17   of the tracking numbers seem to be the items

18   that we were trying to find is exactly what

19   it says.

11:39   20         Q.     So a member from -- somebody

21   from the practice had said that they dropped

22   this CPU off at this Office Depot, but none

23   of the pickups from that Office Depot were

24   matching the tracking number that you had

Electronically signed by Vicky L. Marcon (101-175-031-5847)                                    60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

88

1    been given?

2         A.    Actually, since it refers to

3    Christina, it was a Sarcom employee, or a PCM

4    employee.

5         Q.    Who dropped it at the Office

6    Depot?

7         A.    That's correct.

8         Q.    And the reasonable effort here

9    is contacting UPS to see if any of the

11:40  10  pickups from that location were the one that

11   you were looking for?

12        A.    That's correct.

13             MR. BERNAY:  Object to the form.

14        A.    I'm sorry.

15        Q.    Does "reasonable effort" refer

16   to any other actions?

17        A.    Yes.  We put a trace on it with

18   UPS, which would be normal.

19        Q.    You had the tracking number and

11:41  20  you asked UPS to trace it?

21        A.    To trace it.

22        Q.    And that didn't turn up any

23   results?

24        A.    That's correct.  They then

Electronically signed by Vicky L. Marcon (101-175-031-5847)                    60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

89

1    checked their lost and found.  That turned up

2    no results.

3              Q.    UPS did?

4              A.    Yes.  And pretty much that's all

5    they can do.  If you can't find it, you can't

6    find it.

7              Q.    Move down to -- it's a little

8    bit below the midline of the first set of

9    pages, Maryland Healthcare Associates,

11:41   10   Location Number 3117580.  Do you see that?

11    The first set of pages.  So if you look at

12    the top set of pages --

13              A.    3117580.  Yes.

14              Q.    Maryland Healthcare Associates

15    was still an active subscriber to the network

16    when you --

17              A.    Yes.

18              Q.    And you made your comment on

19    June 7th, 2012.  Right?  Excuse me.  You made

11:42   20   your comment on June 29th, 2012.  Right?

21              A.    Yes.

22              Q.    This comment indicates that you

23    called the site but no one knew anything

24    about the CPU that was supposed to be

Electronically signed by Vicky L. Marcon (101-175-031-5847)                                    60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

90

1  returned.  Correct?

2          A.     That's what it says, yes.

3          Q.     Then it indicates that you were

4  sent to someone else's voicemail at the

5  practice but you didn't understand the name.

6  You left a message.  And then it says if the

7  call is not returned that you suggest closing

8  the call and listing the obsolete CPU on an

9  SN Change Report, meaning listing it as lost.

11:43  10  Right?

11          A.     Yes.

12          Q.     These comments appear to be

13  comments that use the word "obsolete".  There

14  would be other calls or e-mails potentially

15  that record your interactions with these

16  practices.  Right?

17          A.     Yes.

18          Q.     In any event, after this

19  voicemail your feeling was that reasonable

11:44  20  efforts had been exhausted and this CPU

21  should be abandoned at the Maryland

22  Healthcare Associates in 2012?

23          A.     Well, that it wasn't going to be

24  able to be picked up, yes.

Electronically signed by Vicky L. Marcon (101-175-031-5847)                    60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

91

1        Q.    And that efforts to do so should

2   be stopped.  Right?

3        A.    Yes.

4        Q.    Does Patient Point ever just

5   send someone to a practice to retrieve an

6   obsolete CPU without setting it up with the

7   practice in advance?

8        A.    I'm not sure I understand what

9   you mean.

11:45  10        Q.    We were discussing earlier that

11  you would make a certain number of calls and

12  a certain number of e-mails, and at some

13  point you would make a decision that efforts

14  should stop in terms of retrieving an

15  obsolete CPU.  Right?  Yes?

16        A.    Yes.

17        Q.    My question is are there any

18  times when Patient Point or Healthy Advice

19  has gone to the physician's office anyway,

11:45  20  even if you're not getting a call back or an

21  e-mail back, and picked up the CPU when it's

22  obsolete?

23           MR. BERNAY:  Object to the form.

24  You can answer.

Electronically signed by Vicky L. Marcon (101-175-031-5847)        60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

92

1          A.      Absolutely.

2          Q.      They have?

3          A.      They have, yes.

4          Q.      Do you have any sense for how

5     often that happens versus leaving it there in

6     cases of obsolete CPUs when you haven't been

7     able to set up an appointment?

8          A.      If there is a technician in the

9     vicinity we will send someone there, keeping

11:46   10   in mind that we're trying to keep costs under

11    control.  If someone is in the vicinity we'll

12    say, "Can you go by and see if you can find

13    it?"  A lot of times the reason that UPS

14    can't pick it up is that the practice doesn't

15    know where it is.  At the same time, I'll

16    call five times to a practice and say, "Do

17    you know where this is?"  And they'll say,

18    "No.  We don't have it.  We haven't seen it.

19    We don't know what you're talking about."

11:46   20   And then six months from now I'll get a call

21    that says, "This CPU has been here for six

22    months.  Why haven't you come to pick it up?"

23    And I'll send UPS and they'll pick it up.  So

24    it's been written off as lost or damaged,

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Vida Albert, 4/11/2014

93

1    disposed, and six months later we pick it up.

2         Q.    If the practice gets back in

3    touch?

4         A.    If the practice gets back in

5    touch with us.  So saying it's written off as

6    damaged, disposed or lost isn't always the

7    final word.  Sometimes it miraculously

8    appears because someone trips over it and

9    says, "Oh."

11:47   10         Q.    But it is the final word in

11    terms of Patient Point expending time and

12    money to try to get the CPU back.  Right?

13         A.    Most of the time, yes.

14         Q.    All of the time unless the

15    practice gets back in touch.  Right?

16         A.    Yes.

17         Q.    When you say that sometimes even

18    without an appointment an obsolete CPU will

19    have a tech dispatched to try to pick it up

11:47   20    if the tech is in the vicinity, how close

21    does the tech have to be?  Are we talking the

22    same city, the same state?

23         A.    Generally the same building.

24         Q.    And is that something that you

Electronically signed by Vicky L. Marcon (101-175-031-5847)                    60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

94

1    or someone at the vendor notices?  I guess my

2    question is how would you know, how would you

3    notice that a tech was going to be in the

4    same building?

5         A.    We have a lot of related

6    practices, a lot of practices that will have

7    multiple locations within a same building.

8         Q.    Is that the only time when

9    Patient Point or its vendors would notice

11:48  10   that a tech is being dispatched to the same

11   building as a place where there's an obsolete

12   CPU that is having trouble being retrieved?

13        A.    That would be the most -- that

14   would be the case most often.

15        Q.    Can you think of a different

16   circumstance where it's been noticed that a

17   tech is going to be in the vicinity?

18        A.    Related locations would be most

19   often.  That's -- that's the -- that would be

11:49  20   the best case for me.

21        Q.    I'm just asking if in your nine

22   years you've encountered a different scenario

23   where that happened?

24        A.    I have not.

Electronically signed by Vicky L. Marcon (101-175-031-5847)                                      60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

95

1         Q.    The technician would still

2    charge money to go to a different room in the

3    same building.  Right?

4         A.    To pick up a piece of equipment,

5    no.

6         Q.    So, if it's essentially free,

7    that's when a tech would be sent after a CPU

8    even if the doctor's office was nonresponsive

9    to calls and e-mails?

11:49   10         MR. BERNAY:  Object to the form.

11    You can answer.

12         A.    He would charge to take it off

13    site to ship it back to UPS, but he wouldn't

14    charge to pick it up, if that makes sense.

15         Q.    Mm-hmm.  Yes.  The situation in

16    which, even when the doctor's office is not

17    responding to your calls and e-mails, a tech

18    still picks up an obsolete CPU only occurs

19    when the pickup would be free, but there

11:50   20    would be a charge after the pickup for

21    processing the CPU.  Do I have that right?

22         A.    That's not exactly right.  There

23    are times when in frustration I will call the

24    warehouse and tell Liz, "We've got to get it.

Electronically signed by Vicky L. Marcon (101-175-031-5847)                                    60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

96

1    Go ahead and send somebody."  She'll send

2    them under a minimum charge and they will go

3    and pick up equipment.  And they'll pick up

4    all of the equipment that's there.  And, in

5    all honesty, it'll be that there's a 26-inch

6    monitor as well as the obsolete CPU but I

7    have them pick up everything.

8         Q.    As long as they're there, they

9    might as well pick up everything?

11:51   10         A.    Mm-hmm.

11         Q.    So that situation, again, would

12    be one in which the pickup of the obsolete

13    CPU isn't causing any more cost over and

14    above just the processing of it after it's

15    being picked up, because the cost is going to

16    be incurred anyway to pick up that monitor

17    that's not obsolete?

18              MR. BERNAY:  Object to the form.

19    You can answer.

11:51   20         Q.    Right?

21         A.    Correct.

22         Q.    All I'm trying to get at is

23    Patient Point doesn't send techs to go pick

24    up obsolete CPUs when it's going to cost

Electronically signed by Vicky L. Marcon (101-175-031-5847)

60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

97

1      money, right, other than just the processing?

2      When the pickup is going to cost money that

3      seems to be where the line is drawn?

4                  MR. BERNAY:  Objection.  You can

5      answer.

6            A.    Correct.

7            Q.    Would you look at, it's row 16,

8      but look for North Shore Cardiology

9      Consultants.

11:52  10           A.    What's the Location ID, please?

11           Q.    3654722.

12           A.    All right.

13           Q.    This location is North Shore

14      Cardiology Consultants.  It's listed as an

15      active location and your comment in CMS was

16      made on April 10th, 2013.  Right?

17           A.    Yes.

18           Q.    Would you review your comment

19      and tell me when you're done and I'll ask

11:53  20      some questions about it.

21           A.    All right.  I'm done.

22           Q.    Thank you.  This comment is

23      about a CPU.  Right?

24           A.    Yes.

Electronically signed by Vicky L. Marcon (101-175-031-5847)                    60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

98

1          Q.    Your best information about what

2    happened to this CPU is that it was probably

3    picked up by a UPS driver without a label on

4    it, right, because there's no tracking from

5    the practice to the UPS warehouse?

6               MR. BERNAY:  Object to the form.

7    You can answer.

8          A.    Yes.

9          Q.    That was your conclusion based

11:54  10    on your experience with UPS.  Right?

11          A.    That's right.

12          Q.    Then you say, "Since this is

13    obsolete equipment, I am asking that the

14    pickup order be closed and the CPU moved to

15    damage/disposed."  Right?

16          A.    That's right.

17          Q.    And you had already said that

18    this probably should have been lost, there's

19    just an error.  Right?

11:54  20    A.    Yes.

21          Q.    Setting that aside, you said

22    that you were making this decision since this

23    is obsolete equipment.  Is there something

24    that is done to look for equipment at UPS if

Electronically signed by Vicky L. Marcon (101-175-031-5847)

60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

99

1    it's not obsolete when it's been picked up

2    without a call tag?

3        A.   If equipment has been picked up

4    without a call tag and you call obsolete, or

5    -- call obsolete -- you call UPS and you say

6    equipment was picked up without a call tag.

7    They say, "We're very sorry, but since

8    there's no evidence that it was picked up at

9    all, we can't put a trace on it.  We can't

11:55  10    look in lost and found.  We can't do anything

11    else.  So, sorry, but you're on your own."

12    So, since it was picked up without a call tag

13    and since I've been doing this for as long as

14    I've been doing it, I knew that they wouldn't

15    look any further.

16        Q.   Was there a time where you were

17    young and naive and thought UPS might look?

18           MR. BERNAY:  Object to the form.

19        A.   Yes, there was a time when I was

11:55  20    -- there was a time when I was young, but --

21    and there was a time when I thought that I

22    could force them to look, but no, they won't

23    do that.  If there's no call tag, no

24    tracking, they won't look.

Electronically signed by Vicky L. Marcon (101-175-031-5847)               60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

100

1          Q.    And maybe the last one before we

2     take a break.  If you look at the second to

3     last row of Location Number 3310251, the

4     location Women's Health and Breast Pavilion.

5     Are you with me?

6          A.    Yes.

7          Q.    This practice is also listed as

8     active and your comment was entered

9     February 21st, 2014.  Right?

11:56  10          A.    Yes.

11          Q.    Your comment says, "I sent an

12     e-mail to Beth Jasper regarding old CPU left

13     at site for UPS pickup.  No response to call.

14     If no response to e-mail, I am going to write

15     off obsolete CPU and close order."  Did I

16     read that correctly?

17          A.    That's correct.

18          Q.    Do you remember if there was a

19     response to this call or not or to the

11:57  20     e-mail?

21          A.    I do not remember.

22          Q.    Your intent, if there was no

23     response, was to close the order.  Right?

24          A.    That's correct.

Electronically signed by Vicky L. Marcon (101-175-031-5847)                    60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

101

1          Q.    And if that happened, Patient

2    Point's efforts to recover this CPU would

3    stop.  Right?

4          A.    That's correct.

5          Q.    Was Beth Jasper the contact at

6    Women's Health and Breast Pavilion?

7          A.    Yes.

8          Q.    And she apparently had already

9    not responded to your phone call.  Right?

11:57  10       A.    That's correct.

11          Q.    Since this practice is active,

12    there was probably a new CPU that was

13    providing the loops.  Right?

14          A.    That's correct.

15          Q.    And this CPU was left to be

16    picked up by UPS, or at least that's what you

17    were told but that just never made it back.

18    Right?

19                MR. BERNAY:  Object to the form.

11:58  20   You can answer.

21          A.    That's correct.

22                MR. HANKINSON:  Do you want to

23    take a break?

24                MR. BERNAY:  Yeah.  It's getting

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Electronically signed by Vicky L. Marcon (101-175-031-5847)                    60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

102

1    close to 12:00.  Let's take a break.

2         (Lunch break taken from 12:00 p.m. to

3    1:00 p.m.)

4         Q.    Thank you for coming back this

5    afternoon.  I appreciate your time.  I'm

6    sorry we're going a little bit later than

7    originally anticipated, but thank you.  I'd

8    like to hand you what we are marking as

9    Defendant's Exhibit 202.  Are you familiar

01:04  10    with the type of document that is Defendant's

11    Exhibit 202?

12         (Exhibit 202 was identified.)

13         MR. BERNAY:  Take a look -- have

14    a look at the entire document.

15         (There was a brief pause.)

16         A.    No.  Actually, I'm not.

17         Q.    If you look at the first page,

18    row seven, there's a reference of -- there's

19    a reference to a Lenovo CPU.  It looks like

01:06  20    maybe there's a partial serial number.  Do

21    you see the row I'm speaking of?

22         A.    Yes.

23         Q.    Do you have any idea who would

24    have created this document?

Electronically signed by Vicky L. Marcon (101-175-031-5847)                    60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

103

1         A.    No.

2         Q.    It's not something that you use

3    in your business?

4         A.    Not me personally, no.

5         Q.    Can you tell if the information

6    that's in this row seven is accurate, whether

7    that Lenovo CPU is indeed obsolete?

8         A.    Yes, it is.

9         Q.    You can tell that and it is

01:06  10    obsolete?

11         A.    It is obsolete.

12         Q.    I'm going to hand you what we

13    are marking as Defendant's Exhibit 203.  Do

14    you know if you have ever seen this CPU that

15    is depicted in the photos that are

16    Defendant's Exhibit 203?

17              (Exhibit 203 was identified.)

18              MR. BERNAY:  Object to the form.

19    You can answer.

01:07  20         A.    I don't know off the top of my

21    head, no.

22         Q.    Do you see the CPUs in the

23    ordinary course of your duties?

24         A.    I see different ones.  I don't

Electronically signed by Vicky L. Marcon (101-175-031-5847)                    60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

104

1    see -- I wouldn't know specifically unless I

2    labeled them myself or something.

3         Q.    Right.  You see the different

4    types of CPUs come through?

5         A.    Yes.

6         Q.    So, ignoring whether this is a

7    particular serial number or from a particular

8    location, do you know what type of CPU this

9    is, just looking at the picture itself, not

01:08  10   the Post-It note?

11         A.    This is a Lenovo.

12         Q.    Can you tell if it is obsolete

13    or not?

14         A.    This is an obsolete Lenovo, yes.

15         Q.    You can determine that from the

16    photo?  You're not using the serial number.

17    Correct?

18         A.    From the shape and the size of

19    it, the outside case, it would appear to be

01:08  20    an obsolete Lenovo, yes.

21         Q.    Since the time that Mike

22    McAllister first told you that certain Lenovo

23    CPUs were going to be considered obsolete, if

24    an obsolete CPU like this came back to

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Vida Albert, 4/11/2014

105

1    Patient Point, the practice would be to

2    destroy it.  Correct?

3         A.    That is correct.

4         Q.    Is there a cost that's

5    associated with destroying a CPU like that?

6         A.    Yes.

7         Q.    An obsolete CPU like this would

8    not be reused.  Correct?

9         A.    No, it would not.

01:09   10         Q.    So it actually costs Patient

11    Point money to get one of these obsolete CPUs

12    in the door because then it's disposed.

13    Correct?

14              MR. BERNAY:  Object to the form.

15    You can answer.

16         A.    It costs in that it is handled

17    by our warehouse.  They then -- they then

18    send it out to be destroyed or they destroy

19    it there.  I'm not a hundred percent clear on

01:10   20    the process.

21         Q.    In any event, Patient Point pays

22    to have this destroyed rather than finding

23    this to be something valuable that it can use

24    going forward?

Electronically signed by Vicky L. Marcon (101-175-031-5847)                    60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

106

1          A.    That's correct.

2               MR. BERNAY:   I just note for the

3    record these are the photos that you took

4    when you were at the office about a year ago.

5    Is that correct?

6               MR. HANKINSON:   I don't remember

7    when it was, but yes.  I believe I was in a

8    conference room over there.  That's when we

9    first met.  Good times.

01:11  10          Q.    I would like to hand you what we

11   are marking as Defendant's Exhibit 204.

12   Please take a minute and review this whole

13   e-mail chain and let me know when you're

14   done.

15               (Exhibit 204 was identified.)

16               (There was a brief pause.)

17          A.    All right.

18          Q.    Does this e-mail chain appear to

19   be an example of what you described earlier

01:13  20   where a CMS comment can be clicked or

21   selected in some way to make it into an

22   e-mail?

23          A.    Yes.

24          Q.    This is how the CMS comments

Electronically signed by Vicky L. Marcon (101-175-031-5847)                    60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

107

1    look when they're made into an e-mail and

2    sent internally at Patient Point.  Right?

3          A.    Yes.

4          Q.    What is an EA as referred to in

5    this e-mail chain?

6          A.    Enrollment Agreement.

7          Q.    Are you aware that at a certain

8    point in Healthy Advice's history EAs were

9    not kept electronically and then after that

01:14  10   time they were kept electronically?

11         A.    Yes.

12         Q.    Do you know about when that time

13   was?

14         A.    I believe that they were

15   converted in 2000 -- I believe that they were

16   converted in 2009.

17         Q.    And sometimes there are EAs that

18   when that was converted were not put into the

19   electronic storage for whatever reason?

01:15  20         A.    Some were not scanned in.

21         Q.    The CPU that is discussed in

22   this e-mail chain is an obsolete one.

23   Correct?

24         A.    I would say from the date that

Electronically signed by Vicky L. Marcon (101-175-031-5847)    60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

108

1   that's what they have indicated here.

2           Q.    It's a Lenovo.  Right?

3           A.    Yes.

4           Q.    Lori Smith and Heather McGauvran

5   are in the Practice Relationship Management

6   Team.  Right?

7           A.    That's correct.

8           Q.    Ms. Smith writes to Ms.

9   McGauvran that because there's not an EA on

01:16  10   file it seems silly to push the issue.  Do

11   you see that?

12           A.    Yes.

13           Q.    The issue that she is discussing

14   is getting the CPU that is obsolete returned

15   to Healthy Advice.  Right?

16           A.    The way I read it, yes.

17           Q.    Does this refresh your memory at

18   all about whether the matrix had been

19   provided to the Practice Relationship

01:16  20   Management Team at some point before December

21   of 2011?

22                MR. BERNAY:  Object to the form.

23           A.    It doesn't indicate to me

24   whether it had or had not.

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Electronically signed by Vicky L. Marcon (101-175-031-5847)

60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

109

1          Q.    It's possible that Ms. Smith or

2    Ms. McGauvran spoke to you about the CPU, but

3    it's also possible that they made this

4    decision looking at the matrix on their own?

5          A.    It's possible.

6          Q.    Either one of those is possible?

7          A.    Yes.

8          Q.    Would you disagree with their

9    handling of this CPU if you had been on this

10   e-mail chain?

11         A.    I don't think so, no.

12         Q.    In part they're basing their

13   conclusion based on the lack of an Enrollment

14   Agreement.  Right?

15              MR. BERNAY:  Object to the form.

16         A.    Exactly.

17         Q.    Now I would like to hand you

18   what we are marking as Defendant's

19   Exhibit 205.  Please take a moment to read

20   this all the way through and let me know when

21   you're done.

22              (Exhibit 205 was identified.)

23              (There was a brief pause.)

24         A.    All right.

01:17

01:18

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Electronically signed by Vicky L. Marcon (101-175-031-5847)                    60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

110

1        Q.    This appears to be a CMS entry

2    by Amy Finley that was turned into an e-mail

3    to you on March 8th, 2012.  Do I have that

4    correct?

5        A.    Yes.

6        Q.    It discusses the location

7    Physicians Affiliated Care, Location Number

8    3416535.  Correct?

9        A.    Yes.

01:19  10        Q.    In her CMS entry, which she

11    forwards to you, Ms. Finley states that she

12    told someone from Physicians Affiliated Care

13    that since Healthy Advice is unable to

14    schedule a technician by the time that

15    Physicians Affiliated Care wanted the

16    technician to be scheduled, "We are granting

17    you permission to remove the equipment from

18    the wall."  Is that accurate?

19        A.    That's what it states.

01:20  20        Q.    You rely on CMS entries from

21    members of the Practice Relationship

22    Management group in making decisions in your

23    ordinary business.  Right?

24        A.    Yes.

Electronically signed by Vicky L. Marcon (101-175-031-5847)                    60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

111

1      Q.    Do you generally find them to be

2  reliable enough to make those decisions for

3  purposes of business?

4      A.    Yes.

5      Q.    Then Ms. Finley indicates in her

6  CMS entry that she has told the practice, "We

7  will be in touch next week to arrange the

8  retrieval of the equipment."  Right?

9      A.    Yes.

01:20  10      Q.    Now, at that point it looks like

11  Ms. Finley leaves off of her summary what she

12  told the practice and indicates some next

13  steps.  She says, "Next steps."  Does "F/U"

14  mean follow up?

15      A.    Yes.

16      Q.     "Next steps.  Follow up with

17  Vida to see if we can write off the equipment

18  and then contact Jennifer next week to let

19  her know what to do with the equipment."  Is

01:21  20  that in line with your expectation of how

21  someone in Practice Relationship Management

22  would handle this type of situation?

23      A.    Yes.

24      Q.    There's nothing out of the

Electronically signed by Vicky L. Marcon (101-175-031-5847)

60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

112

1    ordinary here?

2           A.    No.

3           Q.    Then Ms. Finley forwards her CMS

4    entry to you and asks you, "Should we just

5    write this equipment off versus sending

6    someone to retrieve it?  Just let me know.

7    Thanks, Amy."  Right?

8           A.    Right.

9           Q.    So either the equipment that is

01:21  10    at Physicians Affiliated Care will be written

11    off and no one will retrieve it or Patient

12    Point will arrange to send somebody to

13    retrieve it.  Right?

14           A.    Right.

15           Q.    I'd like to hand you what we're

16    going to mark as Defendant's Exhibit 206.

17    Please go ahead and read this all the way

18    through and then let me know when you're

19    done.

01:22  20           (Exhibit 206 was identified.)

21           (There was a brief pause.)

22           A.    All right.

23           Q.    The e-mail that is Defendant's

24    Exhibit 206 is also a CMS entry by Amy

Electronically signed by Vicky L. Marcon (101-175-031-5847)                    60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

113

1    Finley.  Correct?

2        A.    Yes.

3        Q.    This is also about Physicians

4    Affiliated Care, Location Number 3416535.

5    Correct?

6        A.    Yes.

7        Q.    This CMS entry is from

8    June 2012, a few months after the March 2012

9    e-mail that we just discussed in Defendant's

01:24  10    Exhibit 205.  Right?

11        A.    Yes.

12        Q.    In the June 2012 CMS entry, Ms.

13    Finley indicates that she gave the practice,

14    Physicians Affiliated Care, permission to

15    remove the equipment from its office.  Right?

16        A.    Yes.

17        Q.    Ms. Finley told Physicians

18    Affiliated Care that it is not liable for the

19    equipment being removed and they do not need

01:25  20    to return the equipment to Healthy Advice.

21    Right?

22        A.    Yes.

23        Q.    And that's after hearing from

24    Jennifer at Physicians Affiliated Care that

Electronically signed by Vicky L. Marcon (101-175-031-5847)

60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

114

1    the practice can't use the old PCM equipment.

2    Correct?

3        A.    Yes.

4        Q.    Physicians Affiliated Care was

5    cancelling the program in order to go with

6    Diabetes Health Network.  Correct?

7        A.    Yes.

8        Q.    I'd like to hand you what we're

9    marking as Defendant's Exhibit 207.  Please

01:26  10    take whatever time you need to review this.

11    I will say that my impression is the bottom

12    CMU entry is the same as Exhibit 205 but then

13    it gets different from there on out.

14            (Exhibit 207 was identified.)

15            (There was a brief pause.)

16        A.    All right.

17        Q.    The e-mail chain that is

18    Defendant's Exhibit 207 happened in between

19    the e-mail at Defendant's Exhibit 205 and the

01:27  20    CMS entry from Ms. Finley that is Defendant's

21    Exhibit 206.  Right?

22        A.    It appears that way.

23        Q.    This e-mail chain that is

24    Defendant's Exhibit 207 was in April in

Electronically signed by Vicky L. Marcon (101-175-031-5847)        60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

115

1     between the March and the June entries that

2     we just discussed.  Right?

3          A.    That's the way it looks, yes.

4          Q.    In the e-mail chain that is

5     Defendant's Exhibit 207, Ms. Smith, Lori

6     Smith, essentially confirmed with you that

7     you were aware of the equipment at Physicians

8     Affiliated Care and Amy Finley's intent to

9     follow up with you.  Right?

01:28    10          A.    Yes.

11          Q.    So, between the time in March of

12     2012 when Ms. Finley stated that she intended

13     to follow up with you and the time in June

14     when she told the practice that it could

15     remove the CPU from the wall and that it

16     wasn't liable for it, the decision was made

17     to go ahead and write that CPU off and not

18     retrieve it.  Right?

19               MR. BERNAY:  Object to the form.

01:28    20     You can answer.

21          A.    It would appear so, yes.

22          Q.    Do you have any independent

23     recollection of this particular CPU?

24          A.    No, I don't.

Electronically signed by Vicky L. Marcon (101-175-031-5847)                    60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

116

1      Q.    Can you picture any scenario in

2  Patient Point's business where there would be

3  a different explanation for these three

4  documents than what we just discussed?

5      A.    No, not really.

6      Q.    So we're pretty sure that's what

7  happened --

8      A.    Yes.

9      Q.    -- that Physicians Affiliated

01:29  10  Care switched to Diabetes Health Network.

11  Right?

12      A.    That's what it says here.

13      Q.    Are there occasions when

14  practices inform Patient Point that the CPU

15  that Patient Point has put in their waiting

16  room has been stolen?

17      A.    Yes.

18      Q.    About how often does that

19  happen?

01:30  20      A.    Probably once every two,

21  three months, more often around Christmas.

22      Q.    That's very sad.  What happens

23  -- what do you do when you're informed by a

24  practice that a CPU has been stolen?

Electronically signed by Vicky L. Marcon (101-175-031-5847)                    60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

117

1      A.    Usually it's stolen in

2  conjunction with the monitor.  It used to

3  happen more often before, you know, the

4  larger monitors came out, but normally it's

5  stolen in conjunction with a 32-inch monitor.

6  We ask for a police report.  We provide

7  information requested by the police,

8  generally the serial numbers and the model

9  types and the color.  We put the police

01:31  10  report in CMS, attach it in CMS, and at that

11  time we decide whether or not it's worth the

12  risk to go ahead and reinstall it at that

13  location or not.

14      Q.    What sorts of factors play into

15  the decision about whether it's worth the

16  risk?

17      A.    Well, in general, has more than

18  one been stolen from this location or not.

19  Sometimes, if it's a high crime area, we

01:32  20  decide not to install there again.  Sometimes

21  the practices will say, "Okay.  We've had one

22  stolen.  We don't want anything out in the

23  waiting area that's going to attract more

24  trouble.  So don't install it here again."

Electronically signed by Vicky L. Marcon (101-175-031-5847)                    60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

118

1    So things like that.

2         Q.    Does Patient Point ask for any

3    additional security measures to be taken in

4    instances where it decides to go ahead and

5    reinstall a CPU?

6         A.    We can't ask that of a practice.

7         Q.    Why do you say that?

8         A.    That's not their business.  That

9    is not what they do.  They take -- they're a

01:33   10   doctor's office.  They have certain measures

11   that they take to be safe to begin with.

12   We're putting this in their waiting area and

13   we have to trust that they're doing

14   everything to keep safe that they can.  They

15   get it stolen twice, generally we realize

16   it's, you know, it's not a safe place for it

17   to be, but we're not asking them to do

18   anything else to be safe.  Most of them have

19   some type of security system.  Doctors

01:33   20   offices as a rule do have, especially if

21   they're one that has drug samples and that

22   sort of thing on hand.  So we're not asking

23   them to do anything special, no.

24        Q.    I'm handing you what's been

Electronically signed by Vicky L. Marcon (101-175-031-5847)                                              60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

119

1  previously marked as Defendant's Exhibit 31.

2  Flip through it.  I'm not going to ask you

3  about everything on here.  Actually, could I

4  impose on you to hand me back those copies?

5  It looks like something additional was copied

6  at the end of each one.  Sorry about that.

7  Oh.  No.  Yours are clean.  Just mine.  Sorry

8  about that.  So, as I was saying, please go

9  ahead and flip through this just so you kind

01:35  10  of generally get a sense of it, but don't

11  read it all at this point.

12          (Exhibit 31 was identified.)

13          MR. BERNAY:  Maybe it would be

14  easier if you direct her to a particular

15  comment that you want.  It's a long document.

16          Q.    Sure.  I just wanted to give her

17  a minute.  The rows and columns in

18  Defendant's Exhibit 31 are pieces of

19  information that were taken from CMS and

01:35  20  produced to us by Patient Point's attorneys.

21  Do you understand what I'm saying?

22          A.    Yes.

23          Q.    I'm going to ask you to look at

24  certain rows.  Unfortunately, I don't think

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Electronically signed by Vicky L. Marcon (101-175-031-5847)                                          60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

120

1   that these rows are in location number order.

2   So we'll do the best we can.  If you would,

3   I'd like you to flip to the 15th page.

4              MR. BERNAY:  If you give us the

5   competitor and the stage, the cancel date or

6   the stage date, that might be the best way to

7   find it.

8        Q.    Health Monitor, date

9   August 10th, 2011.  Ms. Albert, do you see a

01:37  10   row that begins with Location Number 3555656

11   and has Location Name BFCC Urban Strategies?

12              MR. BERNAY:  Hold on.

13        A.    What's the location?

14              MR. BERNAY:  Right there, I

15   think.

16        A.    Okay.

17        Q.    3555656.

18        A.    656.

19        Q.    Okay.  Take a look at the

01:38  20   comment on this row.

21        A.    All right.

22        Q.    The CPU at the practice BFCC

23   Urban Strategies which had cancelled to

24   switch to Health Monitor was written off in

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Electronically signed by Vicky L. Marcon (101-175-031-5847)

60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

121

1    this instance.  Correct?

2         A.    That is what it says.

3         Q.    This is an example, then, of

4    Patient Point deciding not to retrieve a CPU

5    that has been misplaced.  Is that right?

6         A.    It says they could not find it,

7    that the equipment was misplaced, yes.  It

8    says they believe it was disposed of.

9         Q.    When you say "they believe",

01:39  10   you're talking about the person who wrote

11   this CMS entry?

12        A.    Yes.

13        Q.    The practice did not -- this

14   entry does not say that the practice told

15   them that.  It says that "they" believe that.

16   Right?

17        A.    Yeah.  Whoever wrote this

18   believed it was disposed of.

19        Q.    But the practice simply said

01:39  20   they cannot find it, correct, Ruth Richmond

21   at the practice?

22        A.    That's correct.

23        Q.    Is there any policy or practice

24   in place, once a representative of a practice

Electronically signed by Vicky L. Marcon (101-175-031-5847)                    60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

122

1   says that they cannot find a CPU, to take any

2   extra step to locate it, or is that pretty

3   much the end of it?

4                    MR. BERNAY:  Object to the form.

5           A.    We're not going to go into a

6   practice and accuse them of lying, no.

7           Q.    And when a practice cancels the

8   service, it ends its relationship with

9   Healthy Advice.  Right?

01:40  10          A.    That's correct.

11          Q.    From that point on the

12  practice's obligation towards Healthy Advice

13  stops?

14          A.    That's correct.

15                    MR. BERNAY:  Object to the form.

16          A.    I'm sorry.  That's correct.

17          Q.    I'm going to ask you to flip

18  pretty deep into this, and I'll try to use

19  the approach that Mr. Bernay identified.  So

01:41  20  quite some ways into this document there will

21  be a row where the competitor in the middle

22  is listed as "Television", and the date of

23  the -- the stage date will be November 30th,

24  2012.  Let me know when you find it.

Electronically signed by Vicky L. Marcon (101-175-031-5847)        60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

123

1        A.    Okay.  What's the location

2    number?

3              MR. BERNAY:  Sorry.

4    November 2012?

5        Q.    So the location name when you

6    get there will be ETSU Family Medicine

7    Associates.

8              MR. BERNAY:  What's the date

9    again?

01:42   10         MR. HANKINSON:  November 30th,

11    2012.  It's only five pages from the back of

12    the document.

13              MR. BERNAY:  Okay.  I found it.

14    Hold on.  Let's see.  There are a lot of them

15    that are cancelled on the 30th.  There we go.

16        A.    What's the name of it?  I'm

17    sorry.

18        Q.    ETSU Family Medicine Associates.

19        A.    Okay.

01:42   20        Q.    Practice Location Number

21    3236627.  Do you see that row?

22        A.    I do.

23        Q.    This practice cancelled in favor

24    of using television in its waiting room.

Electronically signed by Vicky L. Marcon (101-175-031-5847)

60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

124

1    Correct?

2         A.    Yes.

3         Q.    Go ahead and read the complete

4    comment entry and let me know when you're

5    finished.

6         A.    All right.

7         Q.    Now, the comment says that the

8    office came up with their own patient

9    education program.  Right?

01:43  10         A.    Yes.

11         Q.    Offices sometimes do that, they

12    go ahead and come up with their own content

13    to show on loops in their own waiting rooms?

14         A.    Yes.

15         Q.    And that's, in a sense,

16    considered a competitor of Healthy Advice

17    because the office then doesn't become part

18    of the circulation numbers of Healthy

19    Advice's network.  Right?

01:43  20              MR. BERNAY:  Object to the form.

21    You can answer.

22         A.    Yes.

23         Q.    This CMS entry indicates that

24    the cancel is being fielded to Amy Finley,

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Electronically signed by Vicky L. Marcon (101-175-031-5847)                    60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

125

1    and the person who wrote it let the practice

2    know that they may keep the 19-inch monitor

3    and do whatever they would like with the

4    equipment.  Right?

5         A.    Yes.

6         Q.    And then it says, "Sent info to

7    Vida to write off equipment."  Right?

8         A.    Yes.

9         Q.    This would be an occasion when

01:44  10    the Practice Relationship Management Team

11    member made the decision about what the

12    practice could do with the CPU and then

13    informed you about it.  Right?

14         A.    Well, not knowing who wrote the

15    comment, I don't know if it was a member of

16    the Relationship Management Team, but they

17    received the information from the FSD office,

18    and whoever did, yes, they fielded it to Amy

19    Finley and they let me know that the

01:45  20    equipment was being written off.

21         Q.    In November 2012 was this in

22    accordance with Patient Point's policies and

23    practices about obsolete CPUs?

24              MR. BERNAY:  Object to the form.

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Electronically signed by Vicky L. Marcon (101-175-031-5847)                    60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

126

1    You can answer.

2          A.    This is what happened in this

3    particular instance.  I can't speak to the

4    particular policy.  Yes.

5          Q.    Is there anything in this CMS

6    entry that would lead you to go back after we

7    leave today and tell somebody that the person

8    who did this should be reprimanded or

9    disciplined in any way?

01:45    10          A.    No.

11          Q.    There's nothing in here that

12    would indicate that something went wrong here

13    such that it needs to be corrected?

14          A.    No.

15          Q.    Look three rows down from there

16    at the location First Medical Center 3556762.

17    Are you there?

18          A.    Yes.

19          Q.    Go ahead and read the complete

01:46    20    comment entry and then let me know when

21    you're done.

22              (There was a brief pause.)

23          A.    All right.

24          Q.    In this cancelled First Medical

Electronically signed by Vicky L. Marcon (101-175-031-5847)          60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

127

1    Center practice there would have been a full

2    set of equipment to pick up, potentially.

3    Right?

4         A.    Yes.

5         Q.    So in the last sentence where

6    the person who wrote this entry says, "Since

7    we are not going to get anywhere here and

8    this might not be a DHN removal, e-mail Vida

9    to determine if the monitor is worth picking

01:48    10    up."  When they refer to "monitor" is that

11    essentially because the CPU was assumed to

12    have no value, or do they just kind of mean

13    generally equipment?

14         A.    I would have no way of knowing

15    what this person meant.  To me it looks like

16    they were all around the bend with these

17    people and probably very frustrated.  I

18    actually don't -- I actually don't have any

19    idea what the intent of this statement is.

01:48    20    They wanted me to do something, but

21    probably -- I would say that there was

22    probably a couple of follow-up phone calls

23    made after I got the e-mail.

24         Q.    All right.  Flip two pages and

Electronically signed by Vicky L. Marcon (101-175-031-5847)                                          60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

128

1    look at the top row.  It should be Piedmont

2    Physicians Group, Location 3146462.  Are you

3    there?

4         A.    Yes.

5         Q.    Read through that entry and let

6    me know when you've finished.

7              (There was a brief pause.)

8         A.    All right.

9         Q.    Is this cancellation by the

01:50  10   Piedmont Physicians Group another example of

11   a member of the Practice Relationship

12   Management Team deciding not to retrieve a

13   CPU from a cancelling practice?

14        A.    It says a 19-inch monitor.  It

15   doesn't say anything about the CPU.

16        Q.    It does say they may do with the

17   equipment as they please.  Right?

18        A.    It says, "E-Mail Vida the

19   equipment."

01:50  20        Q.    Just a couple of sentences

21   before that.

22        A.    It mentions the 19-inch monitor

23   several times, but it doesn't specifically

24   say the CPU.  I don't want to assume

Electronically signed by Vicky L. Marcon (101-175-031-5847)

60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

129

1    anything, but it appears to be an instance

2    where they kept the 19-inch monitor.  I can't

3    speak to the CPU.  I would have to look at my

4    records to know for sure.

5         Q.    If you assume that by

6    "equipment" they meant CPU and that when you

7    check your records you find, you found that

8    the CPU is obsolete and the decision was made

9    not to retrieve it -- do you understand those

01:52    10    assumptions?

11         A.    Yes.

12         Q.    If those assumptions are true,

13    would the handling that is described in this

14    entry be appropriate under Patient Point's

15    practices and policies at the time?

16              MR. BERNAY:  Object to the form

17    of the question.  You can answer.

18         A.    The way that it's phrased isn't

19    exactly the way that I would like to see it

01:52    20    or the way that we would have liked this

21    person, whoever it is, to put it in there.

22    Normally we would ask them to take

23    responsibility for the equipment, not to do

24    with it as they please, but to take

Electronically signed by Vicky L. Marcon (101-175-031-5847)

60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

130

1    responsibility for the equipment, not do with

2    it as they please.

3         Q.    You say ordinarily but then

4    there would be certain times where this would

5    be okay but ordinarily it wouldn't?

6         A.    Normally we ask them to take --

7    we would ask them to take responsibility for

8    the equipment and that's the way it should be

9    phrased.  If they say that they will take

01:53   10   responsibility for the equipment, then they

11   can have it, meaning that they would properly

12   dispose of it.

13        Q.    Or continue to use it.  Right?

14        A.    Mm-hmm.  Yes.  Sorry.

15        Q.    And if this CMS entry indicated

16   that the practice had agreed to keep the

17   equipment and possibly reuse it, then that

18   would be in accordance with the policy and

19   procedure at the time?

01:54   20   A.    Yes.

21        Q.    And, again, the practice

22   wouldn't be required to sign anything

23   promising that.  Correct?

24        A.    No.

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Electronically signed by Vicky L. Marcon (101-175-031-5847)

Vida Albert, 4/11/2014

131

1        Q.    It would -- my question is --
2   pardon me.  Bad question.  Would the practice
3   be required to sign anything?
4        A.    No.
5        Q.    Would there be any follow-up
6   done to verify how the practice was using the
7   CPU later on?
8        A.    No.
9        Q.     If you can flip one more page.
01:55   10  Skip that one.  All right.  You can set aside
11   the Exhibit 31.  I'm handing you what's been
12   previously marked as Exhibit 32.  These are
13   additional comments and other fields from CMS
14   that were provided by Patient Point's
15   attorneys.  Okay?
16        A.    Mm-hmm.  Yes.
17             (Exhibit 32 was identified.)
18             MR. HANKINSON:  Aaron, any good
19   ideas about the best way to direct looking
01:56   20  through this document?
21             MR. BERNAY:  It looks like these
22   are arranged by Location ID, so I'd use that.
23             MR. HANKINSON:  Okay.  Although
24   they start at six and then maybe jump

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Vida Albert, 4/11/2014

132

1    backwards.  We'll try it.

2                MR. BERNAY:  It's a six-digit

3    and then it goes to a seven-digit Location

4    ID.

5                MR. HANKINSON:  Oh.  Okay.

6    Good.

7         Q.    Ms. Albert, would you please

8    turn to the row with the Location ID 3000813?

9         A.    Is this a test to see if I can

01:57  10    count?

11                MR. BERNAY:  3000813.

12         A.    3000813.

13         Q.    So that's at the bottom of the

14    page.  Please turn to the next page where

15    there's a row at the top that's still 300813.

16    The practice location name is the Endocrine

17    Medical Group.  Are you with me?

18         A.    Yes, I am.

19         Q.    All right.  Take a look at that

01:57  20    comment and let me know when you're done

21    reading it.

22         A.    All right.  I am.

23         Q.    Is this an example of the

24    Practice Relationship Management Team member

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Electronically signed by Vicky L. Marcon (101-175-031-5847)

Vida Albert, 4/11/2014

133

1    noting that the CPU had not been received and

2    asking you to write it off?

3         A.    Yes.

4         Q.    And when you write the CPU off,

5    that means that Patient Point ceases trying

6    to retrieve it.  Correct?

7         A.    That's correct.

8         Q.    Please flip down to Location

9    3416535.

01:59  10         A.    There's several comments for

11    that location.  Which comment are we looking

12    at?

13         Q.    Please flip to the second page

14    of that location, and the second row on that

15    page should be -- it says, "Phone in", and it

16    lists a contact of Jennifer Boreman, and the

17    comment starts, "Sent the following e-mail".

18    Are you with me?

19         A.    Yes.

02:00  20         Q.    This is actually Physicians

21    Affiliated Care that we looked at e-mails

22    about earlier.  Correct?

23         A.    It looks like it, yes.

24         Q.    And the entry that we find in

Electronically signed by Vicky L. Marcon (101-175-031-5847)                                    60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

134

1    CMS is the one we looked at earlier where the

2    next step is to follow up with you to see if

3    the equipment could be written off.  Correct?

4        A.    Yes.

5        Q.    And then if you look at the next

6    page we see the entry talking about the

7    conversation with Jennifer and then granting

8    the written authority to remove the equipment

9    and the statement that Physicians Affiliated

02:01    10    Care is not liable for the equipment.  Right?

11        A.    Yes.

12        Q.    Now, did you see anything in the

13    CMS entry about the Endocrine Medical Group

14    that we looked at first, where the equipment

15    was requested to be written off, or this

16    Physicians Affiliated Care handling of the

17    obsolete equipment that leads you to believe

18    that any policies or practices were violated

19    and would need to be corrected?

02:01    20            MR. BERNAY:  Object to the form.

21    You may answer.

22        A.    I don't see anything that would

23    raise any red flags, no.

24        Q.    Would you look at the practice

Electronically signed by Vicky L. Marcon (101-175-031-5847)    60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

135

1    number 3487896?  It should be Rheumatology

2    Center, Inc.

3           A.    Yes.

4           Q.    All right.  There's a lot of

5    these entries.  Please flip to the page where

6    it changes from Rheumatology Center, Inc. to

7    the next practice.  The next practice is

8    James B. Lesser and then John A. Goldman.

9    It's maybe the sixth page of these entries.

02:03  10    Please take a look at the third to last entry

11    for Location 3487896, the Rheumatology

12    Center, Inc.  It's got a "Data Created Date"

13    of February 28th, 2012, and it says,

14    "Phone-in" in the next column over.  Are you

15    with me?

16           A.    Yes.

17           Q.    And it says Kelly Schulkers is

18    the person who created the comment?

19           A.    Yes.

02:04  20           Q.    Or, excuse me, Kelly Schulkers

21    is the person who was spoken to.  The comment

22    says, "Per conversation with Kelly, Equipment

23    Node and Serial Number tab have been updated.

24    Asked Vida to mark CPU lost on SNR since tech

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Electronically signed by Vicky L. Marcon (101-175-031-5847)                    60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

136

1      wasn't able to retrieve it.  Only monitor is

2      being returned."  Did I read that correctly?

3            A.    Yes.

4            Q.    This comment doesn't provide a

5      reason that the tech wasn't able to retrieve

6      it, does it?

7            A.    No, it doesn't.

8            Q.    Nevertheless, the person who

9      entered this is asking you to mark the CPU

02:04  10     lost.  Correct?

11           A.    Yes.  If you look above there it

12     says, "Cancelling" -- all right.  Yes.

13     "Removed our equipment prior to our return

14     visit."

15           Q.    And then returned it to

16     Contingent?

17           A.    "Equipment has been removed by

18     RHN and returned to Contingent."

19           Q.    Did you have anything else to

02:05  20     say about that?

21           A.    Some of these computers were

22     returned after the fact.  We received them

23     through the mail directly to our office.

24                 MR. BERNAY:  Let's take a break.

Electronically signed by Vicky L. Marcon (101-175-031-5847)                    60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

137

1                    (Break taken.)

2          Q.    Earlier you mentioned

3    communicating by e-mail in the course of your

4    duties.  Right?

5          A.    Yes.

6          Q.    And I remember you mentioning

7    that you always e-mail doctors offices at

8    least twice if there's an obsolete CPU that

9    has not been retrieved.  Right?

02:14  10          A.    It's not always -- it's not only

11    obsolete.  It's any CPU monitor, whatever the

12    equipment is.

13          Q.    Including obsolete CPUs but also

14    including other things?

15          A.    Yes.

16          Q.    And you also sometimes e-mail

17    instructions to vendors regarding how they

18    should treat equipment in offices.  Right?

19          A.    Yes.

02:14  20          Q.    And those e-mails would

21    sometimes include instructions about obsolete

22    CPUs.  Right?

23          A.    Yes.

24          Q.    You also have internal e-mails,

Electronically signed by Vicky L. Marcon (101-175-031-5847)                                         60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

138

1     e-mails with other Patient Point employees

2     regarding whether or not a CPU is obsolete

3     sometimes.  Right?

4           A.    Yes.

5           Q.    In fact, you mentioned that

6     since the time you started working in this

7     role at Patient Point up through even today,

8     even though you've provided them with the

9     matrix already, members of the Practice

02:15  10   Relationship Management Team pretty often

11    e-mail you to ask whether a CPU is obsolete

12    or not.  Right?

13          A.    That's correct.

14          Q.    And some subset of those e-mails

15    also ask you what you think ought to be done

16    about it.  Right?

17          A.    That's right.

18          Q.    Do you have a practice that you

19    use to store your e-mails or file them away?

02:16  20         A.    Not really, no.

21          Q.    They come in -- is it Outlook?

22          A.    Outlook, yes.

23          Q.    They come into your inbox.  Do

24    you have folders where you store any, or do

Electronically signed by Vicky L. Marcon (101-175-031-5847)                    60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

139

1    you operate wholly out of your inbox?

2            A.    Out of my inbox.

3            Q.    Do you have a sent e-mail file

4    that you can look into?  It might be you

5    click on it over to the left when Outlook is

6    open.

7            A.    I have one, yes.

8            Q.    Do you ever look in that sent

9    e-mail file to see something that you sent to

02:16   10   somebody a while back?

11           A.    Not usually.

12           Q.    But there are old e-mails in

13   there?

14           A.    Sometimes, yes.

15           Q.    And do you have a deleted folder

16   when you open Outlook?

17           A.    Yes.

18           Q.    Do you ever look in the deleted

19   folder and look at e-mails that you've

02:17   20   clicked to be deleted but you know they're in

21   that deleted folder?

22           A.    Sometimes.

23           Q.    Are there -- is your e-mail

24   system set up so that the e-mails in your

Electronically signed by Vicky L. Marcon (101-175-031-5847)                                    60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

140

1    deleted folder disappear periodically, like

2    up through a certain date?

3         A.   I get so many spread sheets in

4    my delete, in my e-mail that I can't keep any

5    for very long, because it blows up.  I do so

6    many reports and everything that I just -- I

7    can't.  It yells at me.

8         Q.   There's a space problem?

9         A.   Yes.

02:17  10        Q.   So how -- do you go into your

11   deleted folder and then --

12        A.   Delete everything.

13        Q.   Have you heard of that called

14   the hard deleting?

15        A.   No.

16        Q.   Anyway, you go into the delete

17   folder, you select "all" and then you delete

18   it all?

19        A.   Delete it.

02:18  20        Q.   How often do you do that?

21        A.   Whenever it starts yelling at

22   me.

23        Q.   And does that happen monthly?

24        A.   Oh, probably once a week.  No.

Electronically signed by Vicky L. Marcon (101-175-031-5847)                                          60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

141

1    Probably once a month.

2          Q.    Once a month.  And has that been

3    true for say the last three years?

4          A.    At least.

5          Q.    Now, what about your sent file,

6    does the same thing apply, or is that handled

7    differently?

8          A.    The same thing applies to -- I

9    have such a small amount of space that I can

02:18  10  keep, and these spread sheets that I send

11    back and forth are enormous.

12          Q.    So about once a month for the

13    past three years, approximately, you've gone

14    into your sent e-mail folder and deleted

15    everything?

16          A.    Close to everything, yes.

17          Q.    What, if anything, do you keep?

18          A.    I keep very little.  I really

19    don't have any reason.  We have comments in

02:19  20  CMS.  The only thing that I really go back

21    and look for is to see if someone sends me

22    something and I check by Location ID to see

23    if I got something, and that's probably to

24    look a week back.

Electronically signed by Vicky L. Marcon (101-175-031-5847)                60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

142

1          Q.    So there's nothing in your sent

2    folder that you've kept for more than a month

3    or so?

4          A.    Probably not.

5          Q.    And then your inbox, is there a

6    size limitation on that?

7          A.    I have a size limitation on

8    everything.

9          Q.    So how do you deal with e-mails

02:19   10    in your inbox that need to be deleted?

11          A.    I delete them as soon as I can.

12          Q.    And do the old e-mails kind of

13    pile up at the bottom?

14          A.    Yes.

15          Q.    Is there an automated process

16    that gets rid of those, or do you have to go

17    in and delete them?

18          A.    I have to go in and delete them.

19          Q.    Do you handle that about the

02:20   20    same as your deleted folder and your sent

21    folder?

22          A.    It's a little bit slower, but

23    yes.

24          Q.    So maybe -- anything that's over

Electronically signed by Vicky L. Marcon (101-175-031-5847)                    60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

143

1    two months old in your inbox is most likely

2    deleted?

3          A.    Most likely.

4          Q.    And you go in and kind of pare

5    that down every month to two months?

6          A.    Something like that, yes.

7          Q.    Are the practices' e-mails back

8    to you copied and pasted anywhere?

9                MR. BERNAY:  Object to the form.

02:20  10   You can answer.

11         A.    I don't copy and paste any

12   e-mails from the practices anywhere.

13         Q.    The CMS entries that you make,

14   are they a one to one ratio with the e-mails

15   that you receive from a practice, or do you

16   kind of summarize your correspondence

17   somehow?

18         A.    I generally summarize.  "I

19   received an e-mail from Jane at" such and

02:21  20   such a practice "who stated that the CPU is

21   in the hall closet beside the x-ray room",

22   blah, blah, blah.

23         Q.    And that might summarize a

24   couple of different e-mails if you've been

Electronically signed by Vicky L. Marcon (101-175-031-5847)                    60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

144

1    going back and forth?

2        A.    Yes.

3        Q.    There's other information in the

4    e-mail that doesn't make it into CMS. It's

5    just a summary. Right?

6        A.    That's correct.

7        Q.    What about your e-mails with

8    members of the Practice Relationship

9    Management Team, do those get entered into --

02:22  10    do you summarize those in CMS?

11        A.    Those are a little bit

12    different, because when we send those back

13    and forth we're usually using CMS to respond

14    to one another. I type something in CMS and

15    send it to someone and they in turn type

16    something in CMS and send it back to me. So

17    those usually are all in CMS.

18        Q.    When you make a decision to

19    write off an obsolete CPU, that decision is

02:22  20    sometimes conveyed to Practice Relationship

21    Management Team either in phone or in person.

22    Right?

23        A.    That may be, yes.

24        Q.    And then they don't always

Electronically signed by Vicky L. Marcon (101-175-031-5847)

60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

145

1    record that conversation in CMS.  Right?

2         A.    That's correct, but it would go

3    on a report.

4         Q.    The Serial Number Change Report?

5         A.    That's correct.

6         Q.    But that report would just

7    reflect "Change this serial number to this

8    category."  It wouldn't talk about the

9    reasons that that decision was made.  Right?

02:23  10         A.    Not necessarily, no.

11         Q.    The -- does the Serial Number

12    Change Report have any comment area in it?

13         A.    It does.  It lists things like

14    the item was lost.  In the case of obsolete

15    equipment I'm afraid it only says it was

16    obsolete.  In the case of lost equipment, it

17    tells how it was lost.  In the case of stolen

18    equipment, it states that the site was

19    burglarized or something like that.  It gives

02:24  20    a little bit of information but not a lot.

21         Q.    And when you say it gives a

22    little information, you put a little

23    information into it?

24         A.    Yes.

Electronically signed by Vicky L. Marcon (101-175-031-5847)                          60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

146

1          Q.    But that report would not

2    describe the circumstances that led you or

3    the Practice Relationship Management Team

4    member to allow an obsolete CPU to stay at a

5    practice, would it?

6          A.    No, it would not.

7          Q.    The Practice Relationship

8    Management Team member would make a CMS entry

9    for what they told the practice.  Right?

02:24   10          A.    That's correct.

11          Q.    But there wouldn't be a separate

12    entry just for the conversation that they had

13    with you.  Right?

14          A.    Not necessarily.

15          Q.    There might be one but there

16    might not be?

17          A.    There might not be.

18          Q.    And the same is true when you

19    make that decision or give that information

02:25   20    by e-mail.  Right?

21          A.    That's possible, yes.

22          Q.    So there may be a CMS entry

23    about your e-mail exchange with the member of

24    the Practice Relationship Management Team

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Electronically signed by Vicky L. Marcon (101-175-031-5847)                                    60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

147

1    internally or there may not be?

2              MR. BERNAY:  Object to the form.

3    You can answer.

4         A.    That's possible.

5         Q.    Either one of those is possible?

6         A.    That's right.

7         Q.    At any point in the last four

8    years has anyone asked you to change how you

9    handle your e-mails and the deletion of your

02:26   10   e-mails?

11        A.    No one has ever said anything

12   except IT.

13        Q.    And has IT ever asked you to

14   keep e-mails in another place or not delete

15   them on the schedule that you have been?

16        A.    No.

17        Q.    And no one else has given you

18   any instructions about not deleting certain

19   e-mails?

02:26   20        A.    No.

21        Q.    When you make a CMS entry about

22   obsolete equipment, do you always use the

23   word "obsolete" or do you sometimes make

24   entries that would just say "write off CPU"

Electronically signed by Vicky L. Marcon (101-175-031-5847)                    60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

148

1    or "change to damage/destroyed" without using

2    the word "obsolete"?

3              MR. BERNAY:  Object to the form.

4    You can answer.

5         A.    I honestly don't know.  Most of

6    the time I use obsolete, but I couldn't say I

7    use it 100 percent of the time.  I just don't

8    know.

9         Q.    There have been hundreds of

02:27  10    situations where you're dealing with obsolete

11    CPUs.  Right?

12              MR. BERNAY:  Object to the form

13    and mischaracterization of prior testimony.

14         A.    There have been a lot.

15         Q.    Hundreds.  Right?

16         A.    A lot, yes.

17         Q.    More than that?

18         A.    There's been a lot.  I -- I

19    couldn't give you a number.  I'm sorry.

02:27  20    There have been a lot.

21         Q.    Well, you said that there were

22    several hundred in the field in 2012 and

23    before.  Right?

24         A.    Yes.

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Electronically signed by Vicky L. Marcon (101-175-031-5847)                    60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

149

1          Q.     And we're not sure if that

2     number is over a thousand?

3          A.     No.

4          Q.     We just don't know?

5          A.     Don't know.

6          Q.     There's a way to find that out.

7     Right?  I'm just thinking every CPU has a

8     serial number that Patient Point keeps track

9     of.  Right?

02:28   10          A.     That's correct.

11          Q.     And from the serial number you

12     can determine whether the CPU is obsolete or

13     not.  Right?

14          A.     That's correct.

15          Q.     And each warehouses serial

16     number list -- let me start that over.  How

17     would we make a complete list of all CPUs?

18     Where would that information be?  They're all

19     listed out somewhere?

02:28   20          A.     They are listed on the Serial

21     Number Report.

22          Q.     The Serial Number Report, not

23     the Serial Number Change Report?

24          A.     That's correct.

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Vida Albert, 4/11/2014

150

1      Q.     And is that a single report for

2  the whole company or is it divided per

3  warehouse?

4      A.     We have two warehouses.  One

5  warehouse deals with our Practice Wire

6  equipment.  The other warehouse deals with

7  all of the WRN equipment.  Contingent is that

8  warehouse.  That warehouse has nothing but

9  WRN equipment in it, and that Serial Number

02:29  10  Report would have all of the obsolete

11  equipment on it.

12      Q.     Even lost, damaged, destroyed

13  ones would still be on the list, their

14  category would just be listed as lost,

15  damaged, destroyed?

16      A.     That's correct.

17      Q.     Does that Serial Number Report

18  also include the installed CPUs?

19      A.     Yes, it does.

02:29  20      Q.     So, if I had the Serial Number

21  Report from Contingent in front of me -- have

22  you seen that report before?

23      A.     Every day.

24      Q.     That's one of the spread sheets

Electronically signed by Vicky L. Marcon (101-175-031-5847)

60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

151

1    you get?

2           A.     Yes.

3           Q.     Are the rows numbered?

4           A.     Yes.

5           Q.     Do you know how many rows there

6    are?

7           A.     Off the top of my head, no.  It

8    changes daily.

9           Q.     Thousands and thousands?

02:30  10           A.     There's, I believe -- the last

11    time I counted there were 10,000 installed

12    CPUs.

13           Q.     Do the installed ones appear at

14    the top of the list?

15           A.     No.  They just -- they are

16    broken down by the type of CPU that they are.

17           Q.     So all of the Lenovos would be

18    in a row?

19           A.     On their own spread sheet.  It's

02:31  20    a workbook, Excel workbook.

21           Q.     And there's some Lenovos that

22    are obsolete and some that are not.  Right?

23           A.     That is correct.

24           Q.     So that tab, that, you know,

Electronically signed by Vicky L. Marcon (101-175-031-5847)

60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

152

1    spread sheet in the workbook that is the

2    Serial Number Report would list all of the

3    obsolete CPUs and then some other CPUs that

4    are not obsolete?

5         A.    That's correct.

6         Q.    Would the ones that are obsolete

7    all be in a row because their model numbers

8    and serial numbers are kind of in that order?

9         A.    If you sorted by them, yes.

02:31  10         Q.    And do you know how many serial

11    numbers are on the Lenovo tab?

12         A.    No, I don't.

13         Q.    So, since about 2012, when there

14    were hundreds of obsolete CPUs in the field,

15    there's been a consistent effort to upgrade

16    those CPUs when there are service calls, to

17    sometimes upgrade them when there's no

18    service call just to get the upgrade done,

19    and also to retire them when there are

02:33  20    cancellations rather than reuse them.  Right?

21         A.    That's correct.

22         Q.    Do you have any sense for

23    whether that process is almost complete or

24    not or if there are still hundreds left?

Electronically signed by Vicky L. Marcon (101-175-031-5847)          60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

153

1          A.    We don't have -- well, the --

2    the ones that they were most anxious to get

3    out of the field were the older ones, the

4    M-41s and the M-42s, and I know that we have

5    very, very few of those out there.  I think

6    there were two M-41s left and maybe ten M-42s

7    left.  Those were the ones that we needed to

8    get out of the field, because those are the

9    ones that are shutting down when they convert

02:34   10   to the Internet.  The others I couldn't be

11   certain how many of those are out.  The M-41s

12   and the M-42s are the ones they asked me

13   about most often.

14          Q.    Do you know about how many M-41s

15   and M-42s there were when they became

16   obsolete?

17          A.    I want to say about 50 of each.

18   I can't be certain.  We're going back a

19   couple of years and I just don't remember.

02:34   20          Q.    And how many other types of

21   obsolete CPUs are there?

22              MR. BERNAY:  Object to the form.

23   You can answer.

24          A.    There were three other types,

Electronically signed by Vicky L. Marcon (101-175-031-5847)                                        60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

154

1    M-50s, M-51s and M-52s.

2          Q.    Do you know about how many of

3    each of those that exist?

4                MR. BERNAY:  Object to the form.

5          A.    I honestly just don't remember.

6          Q.    Do you know if it's more than

7    the M-41s and M-42s?

8          A.    There are more than the M-41s

9    and M-42s.

02:35  10          Q.    Each has more than 50 or all

11    combined?

12                MR. BERNAY:  Object to the form.

13          A.    Each has -- I would say each

14    have more than 50, but I honestly don't know

15    the number.

16          Q.    There's no list of the CPUs that

17    -- let me start again.  Is there a list of

18    the CPUs that Patient Point has decided to

19    stop trying to retrieve from practices?

02:36  20                MR. BERNAY:  Object to the form.

21    You can answer.

22          A.    No.

23          Q.    If Ms. Theiss came to you and

24    said try to make your best list possible of

Electronically signed by Vicky L. Marcon (101-175-031-5847)                    60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

155

1   the CPUs that Patient Point has decided over

2   the years not to try to retrieve anymore from

3   practices, how would you go about that?

4             MR. BERNAY:  Object to the form.

5        A.    I've never been directed to do

6   that and I -- there's never been -- nobody

7   has ever said anything exactly like that, and

8   I wouldn't know how to make a list like that.

9        Q.    No one has ever asked you to

02:37   10   keep track of that?

11        A.    No.

12        Q.    And no one has ever asked you to

13   keep track of the reasons that obsolete CPUs

14   have been left with practices as opposed to

15   retrieved and destroyed?

16        A.    No.

17        Q.    And that's why -- never mind.

18   So the best information we have is an

19   estimate that somewhere north of 100 obsolete

02:37   20   CPUs have probably had the decision made to

21   not try to retrieve them anymore and we're

22   not sure if the number is higher than that?

23             MR. BERNAY:  Object to the form.

24   You can answer.

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Vida Albert, 4/11/2014

156

1          A.      For a varied number of reasons,

2      yes.

3          Q.      As we saw in the exhibits that

4      we've looked at today, some of the obsolete

5      CPUs for which Patient Point has decided to

6      stop trying to retrieve them were left at

7      practices that decided to have their own

8      patient education program.  Correct?

9          A.      Yes.

02:38    10          Q.      And some of the obsolete CPUs

11      that Patient Point decided to stop trying to

12      retrieve were left at practices that switched

13      to competitors.  Correct?

14          A.      Yes.

15          Q.      Some of the obsolete CPUs that

16      Patient Point decided not to try to retrieve

17      anymore were left at practices that desired

18      to play Patient Point's loops but just over

19      and over again as they were at the time of

02:39    20      the cancellation instead of getting updates.

21      Right?

22          A.      That's correct.

23          Q.      Some of the CPUs that Patient

24      Point decided to stop trying to retrieve were

Electronically signed by Vicky L. Marcon (101-175-031-5847)

60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

157

1   left at practices who desired to donate them

2   to schools or somewhere else locally.

3   Correct?

4            A.    That's correct.

5            Q.    Some of the CPUs that were

6   obsolete and that Patient Point decided to

7   stop trying to retrieve were left at

8   practices who wanted to salvage them for

9   other uses in some way that was unspecified.

02:40  10   Correct?

11                 MR. BERNAY:  Object to the form.

12   You can answer.

13            A.    That's correct.

14            Q.    There is no way to say right now

15   how many obsolete CPUs fit into each of the

16   categories that I just listed.  Correct?

17            A.    No, there isn't.

18            Q.    But in no case did a practice

19   sign a new contract or promise that what they

02:40  20   said they were going to do with the CPU --

21   let me start again.  In no case did a

22   practice that was taking responsibility for

23   an obsolete CPU sign something promising to

24   handle it in the way that they were telling

Electronically signed by Vicky L. Marcon (101-175-031-5847)                           60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

158

1    Patient Point it was going to be handled.

2    Right?

3              MR. BERNAY:  Object to the form.

4    You can answer.

5         A.    Would you restate that?

6         Q.    Sure.  Was there any instance in

7    any of the situations that I just listed out

8    where the practice signed something promising

9    to handle the CPU in that way?

02:41  10              MR. BERNAY:  Object to the form.

11         A.    There was no time that anyone

12    signed anything, no.

13         Q.    And in all of the cases where

14    the practice was cancelling at the time that

15    Patient Point decided not to retrieve the CPU

16    there was no longer a relationship based on

17    the enrollment form.  Correct?

18              MR. BERNAY:  Object to the form.

19         A.    No.

02:41  20         Q.    No, there was no longer a

21    relationship?  My question was correct.

22    Right?

23         A.    That's --

24              MR. BERNAY:  Could you read back

Electronically signed by Vicky L. Marcon (101-175-031-5847)

60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

159

1    that question?

2                    (Record read by Reporter.)

3                    MR. HANKINSON:  Let me just ask

4    a different question, if that's okay.

5                    MR. BERNAY:  All right.

6           Q.    A cancelling practice ceases its

7    relationship with Patient Point under the

8    enrollment form.  Correct?

9                    MR. BERNAY:  Object to the form.

02:42   10         A.    Yes.

11          Q.    There's no policy in place that

12   requires -- let me start again.  Is there any

13   policy in place that requires a Patient Point

14   employee to get a contract from the practice

15   before deciding to allow the practice to keep

16   an obsolete CPU?

17                   MR. BERNAY:  Object to the form.

18   You can answer if you understand the

19   question.

02:43   20         A.    No.

21          Q.    Thinking back over the course of

22   the day, is there any answer that you'd like

23   to add to or change?  I'd just like to give

24   you an opportunity now.  I'm not saying that

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Electronically signed by Vicky L. Marcon (101-175-031-5847)                    60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

160

1  there should or shouldn't be.  Just if

2  anything has sprung to mind in the meantime

3  I'd like to give you an opportunity to let me

4  know about it.  Is there anything that you'd

5  want to add, change, subtract about what

6  you've said today?

7        A.    One thing that I would like to

8  point out about leaving equipment at a site

9  that has cancelled, in particular ones that

02:44 10  want to keep the equipment on the wall,

11  sometimes it's a choice because they don't

12  want the holes to show, but other times it's

13  a good business decision because they look up

14  there and they see the loop playing, and

15  maybe it's the decision of a doctor that's in

16  the practice right now that they don't want

17  us, they do not want to continue with us.  We

18  leave the equipment up there and another

19  doctor joins the practice and they see it up

02:44 20  there and they see what -- they see what's up

21  there and they look at it and wonder if

22  they've got something new now, and it sparks

23  a call.  They call in, they find out a little

24  bit more about us, or they check, they look

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Electronically signed by Vicky L. Marcon (101-175-031-5847)                60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

161

1    at us on the web and they call in, they find

2    out more about us.  They find out that we

3    don't just have this little 19-inch screen

4    anymore.  We've got a 32-inch screen or a

5    42-inch screen or a new program that they can

6    find.  It's good business to leave those up

7    there sometimes.  So there's a lot more that

8    goes into it than just saving a dollar.

9    Sometimes it's just good business.

02:45   10          Q.    There's other costs and benefits

11   that play into Patient Point's decision about

12   whether to leave a CPU at a practice.  Cost

13   is just one of them?

14          A.    Yes.

15              MR. HANKINSON:  Okay.  I think

16   I'm done.

17              MR. BERNAY:  Okay.  I just have

18   a few very short questions before we -- and

19   then we'll be done.

02:46   20                DIRECT EXAMINATION

21   BY MR. BERNAY:

22          Q.    So, Ms. Albert, you're not an

23   attorney, are you?

24          A.    Nope.

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Electronically signed by Vicky L. Marcon (101-175-031-5847)                    60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

162

1       Q.     You're generally familiar with

2   the Enrollment Agreements between Healthy

3   Advice and its practices.  Is that fair?

4       A.     Yes.

5       Q.     And there are obligations on the

6   practice in those agreements.  Is that right?

7       A.     That's right.

8       Q.     And do you know the exact point

9   in time when a cancellation is effective and

02:46   10   ends a contract?

11       A.     When the site has -- when the

12   equipment is removed, when they say that they

13   no longer want our equipment in their office

14   and they no longer want to do business with

15   us.

16              MR. BERNAY:  I have no further

17   questions.

18              MR. HANKINSON:  I think we're

19   done.  Appreciate your time.  Thank you.

20

21

22

23

24

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Vida Albert, 4/11/2014

163

1

2

3

4                                          _____

                                              VIDA ALBERT

5

6

7

8                              *  *  *

9              (DEPOSITION CONCLUDED AT 2:47 P.M.)

10                             *  *  *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Electronically signed by Vicky L. Marcon (101-175-031-5847)                    60355967-60b5-44e8-ad72-1070fbb014b8

Vida Albert, 4/11/2014

164

1                    C E R T I F I C A T E
2

     STATE   OF   OHIO
3              :   SS
     COUNTY OF HAMILTON
4
5           I, Vicky Marcon, the undersigned, a
     duly qualified notary public within and for
6    the State of Ohio, do hereby certify that
     VIDA ALBERT was by me first duly sworn to
7    depose the truth and nothing but the truth;
     foregoing is the deposition given at said
8    time and place by said witness; deposition
     was taken pursuant to stipulations
9    hereinbefore set forth; deposition was taken
     by me in stenotype and transcribed by me by
10   means of computer; deposition was made
     available to the witness for examination and
11   signature; I am neither a relative of any of
     the parties or any of their counsel; I am
12   not, nor is the court reporting firm with
     which I am affiliated, under a contract as
13   defined in Civil Rule 28(D) and have no
     financial interest in the result of this
14   action.
15          IN WITNESS WHEREOF, I have hereunto set
     my hand and official seal of office at
16   Cincinnati, Ohio this 16th day of April,
     2014.
17
18                    _____
19    My commission expires:  Vicky Marcon, RPR
      March 17, 2019    Notary Public - State of Ohio
20
21
22
23
24

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Electronically signed by Vicky L. Marcon (101-175-031-5847)                              60355967-60b5-44e8-ad72-1070fbb014b8