Lori Smith, 3/18/2014

1

1              UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF OHIO
2                    WESTERN DIVISION
3    HEALTHY ADVICE         :
     NETWORKS, LLC,         :
4                           :
         Plaintiff,         :
5                           :
     vs.                    :   Case No. 1:12CV610
6                           :
     CONTEXTMEDIA, INC.,    :
7                           :
         Defendant.         :
8
9
10     Deposition of LORI SMITH, a witness
11   herein, taken by the defendant as upon
12   cross-examination, pursuant to the Federal
13   Rules of Civil Procedure and pursuant to
14   notice of counsel as to the time and place
15   and stipulations hereinafter set forth, at
16   the offices of Keating Muething & Klekamp,
17   PLL, One East Fourth Street, Suite 1400,
18   Cincinnati, Ohio 45202, at 12:23 p.m.,
19   Tuesday, March 18, 2014, before ANN M.
20   BELMONT, RPR, a Registered Professional
21   Reporter and Notary Public within and for the
22   State of Ohio.
23                          - - -
24

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Lori Smith, 3/18/2014

                                                                    2

```
 1    APPEARANCES:
 2
      On behalf of Plaintiff:
 3
      AARON M. BERNAY, ESQ.
 4    Frost Brown Todd, LLC
      301 East Fourth Street
 5    Suite 3300
      Cincinnati, Ohio 45202
 6
      On behalf of Defendant:
 7
      RICHARD J. O'BRIEN, ESQ.
 8    Sidley Austin, LLP
      One South Dearborn Street
 9    Chicago, Illinois 60603
10
      THOMAS F. HANKINSON, ESQ.
11    Keating Muething & Klekamp, PLL
      One East Fourth Street
12    Suite 1400
      Cincinnati, Ohio 45202
13
14
15
16
17
18
19
20
21
22
23
24
```

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Lori Smith, 3/18/2014

3

1          S T I P U L A T I O N S

2      It is stipulated by counsel for the

3  respective parties that the deposition of

4  LORI SMITH, a witness herein, may be taken at

5  this time by the defendant as upon

6  cross-examination and pursuant to the Federal

7  Rules of Civil Procedure and notice to take

8  deposition, all other legal formalities being

9  waived by agreement; that the deposition may

10  be taken in stenotype by the Notary Public

11  Reporter and transcribed by her out of the

12  presence of the witness; that the transcribed

13  deposition was made available to the witness

14  for examination and signature and that

15  signature may be affixed outside the presence

16  of the Notary Public-Court Reporter.

17

18

19

20

21

22

23

24

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Lori Smith, 3/18/2014

```
                                                              4
 1                        INDEX
 2     WITNESS          DIRECT  CROSS  RE-      RE-
                                      DIRECT  CROSS
 3
       LORI SMITH
 4     BY MR. O'BRIEN:            5          194
       BY MR. BERNAY:   183
 5
       EXHIBIT IDENTIFIED                     PAGE
 6
       Exhibit 1 notice of deposition          6
 7     Exhibit 17 spreadsheet                   8
       Exhibit 18 spreadsheet                  17
 8     Exhibit 19 e-mail exchange              80
       Exhibit 20 e-mail exchange             136
 9     Exhibit 21 e-mail exchange             145
       Exhibit 22 e-mail exchange             147
10     Exhibit 23 e-mail exchange             149
       Exhibit 24 e-mail exchange             151
11     Exhibit 25 e-mail exchange             157
       Exhibit 26 file on Rheumatoid Health   172
12     Network
       Exhibit 27 document that tracks        173
13     various reasons practices leave HAN
14     OBJECTIONS                     PAGE LINE
15     MR. BERNAY:                    43    13
       MR. BERNAY:                    82     5
16     MR. BERNAY:                    88    15
       MR. BERNAY:                   105    21
17     MR. BERNAY:                   125    17
       MR. BERNAY:                   155    23
18     MR. BERNAY:                   175    18
       MR. BERNAY:                   176     1
19     MR. BERNAY:                   196    21
       MR. BERNAY:                   197     6
20     MR. BERNAY:                   199     1
       MR. BERNAY:                   200    12
21     MR. BERNAY:                   201    21
22
23
24
```

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                          449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

5

1              LORI SMITH,

2        a witness herein, of lawful age, having

3    been first duly sworn as hereinafter

4    certified, was examined and testified as

5    follows:

6              CROSS-EXAMINATION

7    BY MR. O'BRIEN:

8        Q.    State your full name, please.

9        A.    Lori Ann Smith.

12:23  10        Q.    We just met. My name is Dick

11    O'Brien, I represent ContextMedia, a company

12    that's been sued by your employer, Healthy

13    Advice Networks, you understand that, right?

14        A.    Correct.

15        Q.    And your lawyer's told you I'll

16    be asking you a series of questions today,

17    right?

18        A.    Correct.

19        Q.    If at any point in time you

12:23  20    don't understand one of my questions or it's

21    not clear to you, let me know that and I'll

22    try to fix it, okay?

23        A.    Yes.

24        Q.    Otherwise, if you go ahead and

Electronically signed by Ann M. Belmont (201-234-827-3922)                    449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

6

1    answer, we're going leave the room at the end

2    of the deposition assuming you understood the

3    question; is that fair?

4          A.    Yes.

5       (Exhibit 1 identified.)

6          Q.    I'm going to show you what was

7    marked in an earlier deposition as

8    Defendant's Exhibit 1. Put that before you,

9    and you can look at whatever portions you

12:24  10   want to, but I'm going to turn your attention

11   to page 3, and there's a list of topics

12   there, do you see that?

13         A.    Yes.

14         Q.    And you've seen this before, I

15   take it?

16         A.    Yes.

17         Q.    And as I understand it, you are

18   here to testify on behalf of HAN, the

19   company, as to topics 2, 3, and 8, does that

12:24  20   square with your understanding?

21         A.    Yes.

22         Q.    And 2 is the following, "For

23   each HAN practice that HAN contends switched

24   from HAN to Context, the reasons why the HAN

Electronically signed by Ann M. Belmont (201-234-827-3922)                                    449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

7

1    practice did so," do you see that?

2              A.    Em-hm.

3              Q.    And you've agreed and are

4    prepared today to testify on behalf of the

5    company as to that topic, correct?

6              A.    Correct.

7              Q.    And with respect to 3, "For each

8    HAN practice that switched from HAN to a

9    competitor that is not Context, the reasons

12:25  10    why the HAN practice did so," do you see

11    that?

12              A.    Yes.

13              Q.    And you've agreed or are

14    appearing here today to give me knowledge of

15    the company on that topic, correct?

16              A.    Correct.

17              Q.    And lastly, and I won't read all

18    of it because it's kind of lengthy, but topic

19    8 has to do with HAN's practices and

12:25  20    procedures regarding removing, handling the

21    disposition of HAN's equipment, right?

22              A.    Correct.

23              Q.    And you've agreed to appear here

24    to provide the information within HAN's

Electronically signed by Ann M. Belmont (201-234-827-3922)                                    449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

8

1    knowledge on that topic, right?

2           A.    Correct.

3           Q.    So let's take these one at a

4    time going backwards. With respect to topic

5    2, Ms. Smith, tell us what you did to prepare

6    and conduct an investigation with respect to

7    HAN's knowledge on that topic.

8           A.    I went through our spreadsheet

9    of offices that have switched to Context just

12:26  10  to refresh my memory of those practices that

11    switched.

12           Q.    And anything else that you can

13    recall?

14           A.    That's -- no.

15           Q.    Did you look at any e-mails for

16    example?

17           A.    I did not look at any e-mails

18    on -- no.

19           Q.    Did you interview any HAN

12:26  20  employees?

21           A.    No.

22      (Exhibit 17 identified.)

23           Q.    Let's mark this as Exhibit 17.

24    I have now handed you and your counsel what's

Electronically signed by Ann M. Belmont (201-234-827-3922)                                        449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

9

1    marked as Defendant's Deposition Exhibit 17.

2    For the record, it's my understanding that,

3    while this bears no Bates stamp number, the

4    beginning Bates number assigned to it is HAN

5    3273. In the answer you gave a moment ago

6    about what you did to prepare for topic 2,

7    you referenced a spreadsheet.

8            A.    Yes.

9            Q.    Have I placed before you the

12:27   10    spreadsheet you mentioned?

11           A.    No.

12           Q.    Do you know what Exhibit 17 is?

13           A.    Yes.

14           Q.    What is Exhibit 17?

15           A.    I haven't seen this version of

16    this spreadsheet.

17           Q.    So, in fairness, you can't tell

18    me what Exhibit 17 is, right?

19           A.    Correct.

12:28   20           Q.    Was the spreadsheet that you

21    reviewed to give testimony today here on

22    topic 2, I'm probably going to get this

23    acronym wrong, derived from HAN's CMS or CMO?

24           A.    Excuse me?

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Lori Smith, 3/18/2014

10

1          Q.    What is the -- what do you call

2      the database?

3          A.    CMS.

4          Q.    The spreadsheet you reviewed,

5      was it derived from that database?

6          A.    It was -- yes, derived from. It

7      wasn't an automatic pull from the database,

8      but the data is all in -- the data from the

9      spreadsheet is all in the database.

12:28   10          Q.    Who put that spreadsheet

11      together?

12          A.    I did.

13          Q.    When did you do that?

14          A.    The course -- over the course

15      of -- since like January of 2011.

16          Q.    Do you know what fields are in

17      that database?

18          A.    They're similar to these fields.

19      The additional fields would be missing

12:29   20      equipment.

21          Q.    What other fields, that you can

22      recall, are missing?

23          A.    The date the office became

24      active, the date we were notified of our

Electronically signed by Ann M. Belmont (201-234-827-3922)                    449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

11

1    removal or cancel request, the program

2    that -- or, that's here. And that's all that

3    I can recall.

4         Q.    There might be more, but you

5    just can't recall right now?

6         A.    That's correct.

7         Q.    Do you happen to have that

8    spreadsheet with you today?

9         A.    No, I don't.

12:30    10         Q.    When you reviewed it in

11    preparation for your deposition, did you

12    review it with anybody or was that something

13    you did all on your own?

14         A.    On my own.

15              MR. O'BRIEN: Has that

16    spreadsheet been produced?

17              MR. BERNAY: For the record, I

18    believe Ms. Smith is referring to a

19    spreadsheet entitled RHN tracking, which we

12:30    20    have not produced.  It was a spreadsheet

21    created on the recommendation of counsel

22    early in this litigation. We've been over

23    this before. You've asked questions about the

24    spreadsheet.  I don't want to dismiss

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                    449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

12

1    previous answers, I want to be sure, do not

2    waive privilege to that spreadsheet, but we

3    have informed you that the spreadsheet is

4    simply a compilation of material that's

5    already been produced to you in the database.

6              MR. O'BRIEN: Well, our position

7    is two-fold.  One, we've maintained from the

8    beginning that we're entitled to that

9    database. And to the extent there would be

12:31  10    any room for argument on that, that's not

11    over, that's not been foreclosed because the

12    30(b)6 witness just testified that's the sole

13    document she used to prepared for her

14    testimony.

15              MR. BERNAY: I understand.

16              MR. O'BRIEN: So we would request

17    immediate production of that.

18         Q.    Is the spreadsheet we've been

19    talking about, which I don't have, something

12:31  20    that you've been using in the ordinary course

21    of your work at HAN?

22         A.    In relation to ContextMedia

23    removals.

24         Q.    Right.  Part of your job

Electronically signed by Ann M. Belmont (201-234-827-3922)                    449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

13

1    responsibilities -- we'll flush this out a

2    little bit more in a minute, is to monitor

3    and be knowledgeable about and gather as much

4    information as you can about practices that

5    move away from HAN, right?

6          A.    Yes.

7          Q.    And that could be to a

8    competitor like ContextMedia or some other

9    competitor, right?

12:32   10          A.    Correct.

11          Q.    It could be to cable TV?

12          A.    Correct.

13          Q.    Could be because the practice

14    closed?

15          A.    Correct.

16          Q.    Doctor retires, right?

17          A.    Em-hm.

18          Q.    There's a number of reasons,

19    right?

12:32   20          A.    Yes.

21          Q.    Have you also seen a document

22    that assigns codes to particular reasons that

23    HAN loses a practice and then tracks the

24    information that you gather in the ordinary

Electronically signed by Ann M. Belmont (201-234-827-3922)                    449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

14

1    course of business about why HAN loses a

2    practice and then assigns it to a particular

3    code?

4         A.    Correct, yes.

5         Q.    How many codes are there?  I

6    heard yesterday maybe 1 to 10, something like

7    that?

8         A.    1 to 10.

9         Q.    They include some of the things

12:32  10   I just referred to?

11        A.    Correct.

12        Q.    Are there others that I failed

13   to mentioned that you can recall are assigned

14   a code?

15        A.    If they change specialty.

16   That's all I can think.

17        Q.    What do you call that document?

18        A.    It -- I don't -- it doesn't

19   really have a name.

12:33  20        Q.    I heard it referred to yesterday

21   as a churn matrix, does this mean anything?

22        A.    That doesn't.

23        Q.    Are you the author of that

24   document?

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                     449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

15

1          A.     No.

2          Q.     Who's the author of that?

3          A.     I'm -- I don't know.

4          Q.     Do you use it for any reason?

5          A.     No.

6          Q.     When you gather information from

7     the field as to why a practice switched, do

8     you take some steps to see that that

9     information also gets to whoever is managing

12:33  10     this document that has the codes in it?

11          A.     No.

12          Q.     I have seen reference in these

13     spreadsheets that you personally, as part of

14     your job, make calls to practices and try as

15     best you can to understand why a practice has

16     made a decision to move away from HAN; is

17     that a fair representation?

18          A.     Yes.

19          Q.     How long has that been your job

12:34  20     responsibility?

21          A.     Since 2010.

22          Q.     A long time?

23          A.     Yeah.

24          Q.     What else do you do at HAN?

Electronically signed by Ann M. Belmont (201-234-827-3922)                                              449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

16

1          A.    I also provide --

2          Q.    I'm not suggesting that that's

3    not enough.

4          A.    No, no, that's fine. Provide

5    support for our network solution brochures,

6    digital screens, hospital screens, hospital

7    guides.  We take editorial changes for

8    hospital guides and send them to our

9    production team who sends them to design to

12:34    10    proof all of these changes to the guides.

11    We -- it's part of our job to keep practices

12    engaged and proactively reach out to them.

13          Q.    When you say engaged and reach

14    out to them, is that sort of ongoing customer

15    service, periodically talk to practices

16    trying to understand their concerns and

17    needs?

18          A.    Yes, correct.

19          Q.    That's something else you do?

12:35    20          A.    Correct.

21          Q.    What's your actual title?

22          A.    Senior relationship manager.

23          Q.    How long have you held that

24    title?

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                              449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

17

1          A.     Just -- the senior part just a

2     week.

3          Q.     Congratulations.

4          A.     Thank you.

5          Q.     Did a pay increase come with

6     that I hope?

7          A.     It did.

8          Q.     And your title before that, I

9     guess, was the same without the senior?

12:35  10          A.     Right.

11          Q.     How long did you hold that

12     title?

13          A.     Since August of 2010.

14          Q.     And how long have you been with

15     the company?

16          A.     Since August of 2010.

17        (Exhibit 18 identified.)

18          Q.     I've now handed to your counsel

19     and you, Ms. Smith, what's been marked as

12:36  20     Defendant's Deposition Exhibit No. 8, (sic)

21     which is another spreadsheet which I'm told

22     has a Bates number on the beginning of the

23     page of HAN 5190. Have you seen this

24     spreadsheet before?

Electronically signed by Ann M. Belmont (201-234-827-3922)          449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

18

1          A.     Yes.

2          Q.     Does this spreadsheet also come

3    from the CMR database?

4          A.     CMS.

5          Q.     I'll get it right at some point.

6    Is this a subset of the CMS database?

7          A.     I don't understand.

8          Q.     Let me -- I'm not trying to

9    trick you. It says at the bottom, PP CM

12:36    10    spreadsheet of competition switches non CM,

11    do you see that?

12          A.     Correct.

13          Q.     That's why I asked the question.

14    Is this a subset of a larger CMS database

15    that has things that relate to CM?

16          A.     I'm still not understanding the

17    question.

18          Q.     Okay.

19          A.     The database holds all of our

12:37    20    information.

21          Q.     For all the reasons practices

22    leave?

23          A.     Correct.

24          Q.     And that's why I asked the

Electronically signed by Ann M. Belmont (201-234-827-3922)          449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

19

1    question, if reading this down here suggests

2    to us, you and me, that this spreadsheet has

3    nothing in it about ContextMedia, nothing,

4    does that suggest to you that it's only a

5    subpart of the database?

6           A.    Yes.

7           Q.    Because the full database would

8    have information in it about ContextMedia?

9           A.    Correct.

12:37   10           Q.    And if you look at column E, do

11   you see it says stage, competitor cancels?

12           A.    Correct.

13           Q.    1, 2, 3, 4, 5, 6, 7 pages, plus

14   one other entry seem devoted to Accent

15   Health, right?

16           A.    Correct.

17           Q.    And then we have EMR Systems, do

18   you see that?

19           A.    Yes.

12:38   20           Q.    What's an EMR System?

21           A.    Electronic medical record.

22           Q.    I have no idea what that is.

23   Can you explain it to me?

24           A.    When you go to your physician's

Electronically signed by Ann M. Belmont (201-234-827-3922)                    449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

20

1    office and they're typing on an iPad that

2    record that they're keeping instead of on a

3    chart like they would ten years ago, that's

4    an electronic medical record.

5          Q.    Are EMR Systems competitors of

6    HAN?

7          A.    EMR Systems are more of a

8    competitor of our exam room brochure

9    displays, because the EMR System does carry

12:38   10    an educational component of it that can be

11    printed out.

12          Q.    I see.  Then after those EMR

13    Systems entries, of which there are three,

14    there's one for Everweld Networks, do you see

15    that?

16          A.    Yes.

17          Q.    Is that a competitor of HAN's?

18          A.    I'm not familiar with Everweld.

19          Q.    And then we pick up, after that,

12:39   20    with several pages of Health Monitor switch

21    outs?

22          A.    Yes.

23          Q.    Then we have Smart Health

24    Network, do you know what that is?

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                                    449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

21

1        A.    I'm not familiar with Smart

2    Health.

3        Q.    Then we have a lot of pages of

4    switch outs from HAN to television, right?

5        A.    Correct.

6        Q.    And if we had the complete set

7    of information from the CMS database, we'd

8    have a column in E for ContextMedia, I

9    suspect, as well?

12:39   10        A.    Correct.

11        Q.    Anybody else missing from this

12    that you can recall?

13        A.    Health Media Network, Kids Care

14    TV.

15        Q.    I take it, your position, you've

16    became quite familiar with HAN's competition,

17    correct?

18        A.    Correct.

19        Q.    Are there any others you can

12:39   20    name besides those last two?  You know what,

21    there's a rule for this process, and that is,

22    if at any point in time during the deposition

23    you want to go back to an answer and question

24    and change or modify however you want, you're

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                    449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

22

1   free to do that.

2         A.   Okay.

3         Q.   So if you think of something

4   later on, is my point, you can jump in.

5         A.   Okay.

6         Q.   I take it you've never seen at

7   HAN's business a version of the spreadsheet

8   just like what I handed to you, right?

9         A.   I've seen this spreadsheet.

12:40  10         Q.   You have?

11         A.   Yes.

12         Q.   With the ContextMedia stuff

13   backed out?

14         A.   Correct.

15         Q.   And what was the occasion for

16   your seeing this one?

17         A.   Just reviewing the cancelled

18   reasons for other programs.

19         Q.   Why did you have occasion to see

12:40  20   a spreadsheet like this that was incomplete

21   and didn't have the ContextMedia piece to it?

22         A.   The ContextMedia piece is just

23   something that I didn't feel like I had to --

24   I mean, this is the spreadsheet that I

Electronically signed by Ann M. Belmont (201-234-827-3922)                     449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

23

1    reviewed just because I'm very familiar with

2    ContextMedia.

3            Q.    You didn't feel the need to do

4    homework on them?

5            A.    No.

6            Q.    And when you did that, was it a

7    spreadsheet just like the one I have in front

8    of you, or, rather, was it a complete sheet

9    and you only needed to review the

12:41   10   nonContextMedia stuff?  Does my question make

11   sense to you?

12           A.    No.

13           Q.    So a spreadsheet we just were

14   talking about, that you looked at, was it

15   just like Exhibit 18, that is with all the

16   ContextMedia stuff backed out, or was it the

17   complete one with the ContextMedia stuff in

18   it and you only felt the need to look at the

19   entries for competitors other than

12:41   20   ContextMedia and skipped over the

21   ContextMedia ones?

22           A.    I'm not sure.

23           Q.    Okay, fair enough. We'll come

24   back to these spreadsheets in a minute. Back

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

24

1    to Exhibit 1, which is the topics.

2    Exhibit 3 -- or topic 3, and on page 3, is

3    for "Each HAN practice that switched from HAN

4    to a competitor that is not Context, the

5    reasons why that HAN practice did so."  What

6    did you do to investigate HAN's knowledge and

7    prepare to testify today on that subject?

8            A.    I reviewed this spreadsheet.

9            Q.    Exhibit 18?

12:42 10            A.    Exhibit 18.

11            Q.    Not knowing if it had the

12    ContextMedia stuff in it or not?

13            A.    Correct.

14            Q.    Anything else?

15            A.    Not that I can recall.

16            Q.    Did you interview anybody?

17            A.    No.

18            Q.    Didn't feel the need to, right?

19            A.    Correct.

12:42 20            Q.    And then, lastly, Exhibit 8,

21    what did you do to prepare yourself and

22    investigate the extent of HAN's knowledge on

23    this subject?

24            A.    I did not -- I did not do any

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                                              449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

25

1    further investigation on this topic.

2            Q.    I'll ask you the same question.

3    Did you interview anybody?

4            A.    No.

5            Q.    When you started at the company

6    in 2010, who did you report to?

7            A.    Heather McGauvran.

8            Q.    Did that ever change?

9            A.    No.

12:43  10        Q.    You still report to Heather?

11           A.    Correct.

12           Q.    Where, if anywhere, is Amy

13   Finley in that chain of command?

14           A.    Amy Finley is Heather's boss.

15           Q.    Who does Amy Finley report to,

16   if you know?

17           A.    Kimberly -- well, I'm not sure.

18           Q.    Okay. When you write things in

19   e-mails or on the CMS database or memos,

12:44  20   whenever you communicate in written form

21   within the company, I take it that you

22   endeavor to be as truthful as possible,

23   right?

24           A.    Correct.

Electronically signed by Ann M. Belmont (201-234-827-3922)                    449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

26

1        Q.      And as accurate?

2        A.      Yes.

3        Q.      Complete as complete?

4        A.      Yes, as far as my understanding.

5        Q.      You would never say things that

6    you didn't believe to be true, right?

7        A.      Correct.

8        Q.      Those are the easy questions. I

9    think I asked you this question, but I want

10   to make sure. The first spreadsheet I showed

11   you, Exhibit 17, you told me you'd never seen

12   this spreadsheet before?

13       A.      Correct.

14       Q.      Well, then, you do feel you're

15   familiar with Exhibit 18, either as part of a

16   larger document or by itself, right?

17       A.      Correct.

18       Q.      Why don't we look at -- and you

19   can help me understand, I hope, what the

20   various columns mean. So under column A, it

21   looks like location ID?

22       A.      Yes.

23       Q.      I'm guessing that is some sort

24   of unique number that HAN assigns to each

12:44 (line 10)

12:45 (line 20)

Electronically signed by Ann M. Belmont (201-234-827-3922)                    449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

27

1    practice?

2          A.    Correct.

3          Q.    And then location name, that's

4    the name of the practice, correct?

5          A.    Correct.

6          Q.    It looks like in here that, if

7    they have multiple screens or multiple

8    locations, they get two or more entries,

9    right?

12:45   10          A.    If they have multiple locations

11    they get more than one entry.

12          Q.    It doesn't matter the number of

13    screens, it's the matter of locations?

14          A.    Depending on how they're set up.

15          Q.    So, for example, after Mt.

16    Carmel, the very first one, the next two are

17    University Family Medicine, do you see that?

18          A.    Correct.

19          Q.    And it look like the comments

12:45   20    section is verbatim the same, right?

21          A.    Yes.

22          Q.    And then under program code,

23    that tells you which HAN network they're in,

24    right?

Electronically signed by Ann M. Belmont (201-234-827-3922)                                    449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

28

1          A.     Correct.

2          Q.     And then stage code, it says

3     cancelled -- well, strike that.

4                 What is stage code?

5          A.     Stage code would be how -- the

6     stage that they are in in our program.

7          Q.     What are the various stages

8     besides cancel?

9          A.     Active, installing, declined,

12:46   10    activated, pitched.

11         Q.     So if you had the full CMS

12    database, you'd see practices assigned those

13    various codes as well, right?

14         A.     Correct.

15         Q.     Who designed this database

16    originally, do you know?

17         A.     Created in-house.  I don't --

18         Q.     That was a bad question. When

19    did HAN first start using this database?

12:46   20         A.     I'm not sure.

21         Q.     It preexisted your coming to the

22    company?

23         A.     Correct.

24         Q.     But it's something you've worked

Electronically signed by Ann M. Belmont (201-234-827-3922)                                    449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

29

1    with constantly ever since you arrived?

2            A.    Correct.

3            Q.    Then under column E, it says

4    stage competitor cancels. And correct if I'm

5    wrong, that's a column that gets filled in

6    only if their stage code is cancelled and

7    they went to something you deem your

8    competition?

9            A.    Correct.

12:47    10            Q.    Stage date, what is that?

11            A.    That's the date that the --

12    that's the date that the change happened to

13    put them in whatever stage code they are

14    currently in.

15            Q.    Okay. And the next one is their

16    geographic location, right?

17            A.    Correct.

18            Q.    Same with stage, the first is

19    the city and the second is the state, right?

12:47    20            A.    Correct.

21            Q.    The last one is comment text,

22    that's where you find all the information

23    that you gather in the ordinary course of

24    your work about these various practices,

Electronically signed by Ann M. Belmont (201-234-827-3922)                                449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

30

1    right?

2          A.    Correct.

3          Q.    Has, to your knowledge -- well,

4    strike that.

5               It sounds like HAN has

6    maintained this spreadsheet in the ordinary

7    course of its business at least since 2010,

8    but maybe earlier than that, right?

9          A.    To my knowledge this spreadsheet

12:48  10    is pulled from the database.

11          Q.    Let me ask it differently.  That

12    database has been maintained in the ordinary

13    course of HAN's business at least since 2010,

14    maybe earlier, right?

15          A.    Correct.

16          Q.    It's something you work in every

17    day?

18          A.    Yes.

19          Q.    And then tell me some of the

12:48  20    kinds of things that you do to act on the

21    information that you're out there diligently

22    gathering. Does it impact ideas for content?

23          A.    Yes.

24          Q.    Does it impact ideas for

Electronically signed by Ann M. Belmont (201-234-827-3922)                    449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

31

1    marketing?

2          A.    I'm not sure.

3          Q.    In other words, you guys create

4    marketing collateral, correct?

5          A.    Right.

6          Q.    Are you aware of instances of

7    information that you were able to gather

8    information for the company that then

9    influenced a decision to change, modify,

10   improve marketing?

11         A.    I don't do marketing so I don't

12   know.

13         Q.    It sounds like you don't want

14   anything to do with it.  Is it important to

15   the salespeople?

16         A.    I'm not sure.

17         Q.    Are the salespeople interested

18   in why practices decide to move to another

19   choice?

20         A.    I don't know.

21         Q.    You have no connection with

22   sales either?

23         A.    I support sales when they're

24   calling in asking for information about our

12:49 (line 10)

12:49 (line 20)

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                    449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

32

1    existing customers.

2         Q.    So to your knowledge, what use
3    does HAN make of the information that you
4    collect day to day and input it in column I?

5         A.    We do improve our programs and
6    create resources for our practices.

7         Q.    And has it always been part of
8    your job that, when you call in to a practice
9    who has notified you that they want to move
12:50  10   away from HAN, to do the best you can to try
11    to get them to stay with HAN?

12        A.    Yes.

13        Q.    And, I mean, that's an important
14    part of your job, right?

15        A.    Right.

16        Q.    And sometimes you're successful
17    I take it?

18        A.    Yep.

19        Q.    And sometimes you're not?

12:50  20        A.    Correct.

21        Q.    Have you ever found an instance
22    where a practice was not being truthful with
23    you about the reasons it gave you that it
24    made a decision to switch?

Electronically signed by Ann M. Belmont (201-234-827-3922)                                    449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

33

1          A.    To my knowledge, there could be

2    lots of reasons and I just have a

3    couple-minute conversation with them.  So I'm

4    sure there's lots of information that's left

5    out.

6          Q.    Well, I didn't -- my question

7    wasn't is information left out, did you ever

8    feel or did you ever learn of a practice

9    simply not being truthful with you, Ms.

12:50  10  Smith?

11          A.    Most definitely.

12          Q.    Can you give me an example of

13   that?

14          A.    We had at least one location

15   that I can remember that cancelled due to a

16   move and our -- one of our sales

17   representatives went in to that office and

18   found a different program on the wall.

19          Q.    Do you know what the different

12:51  20  program was?

21          A.    I don't recall.

22          Q.    Can you recall -- it sounds like

23   that stands out in your mind?

24          A.    Yeah.

Electronically signed by Ann M. Belmont (201-234-827-3922)          449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

34

1          Q.     Because if you learn a practice

2     is being untruthful to you, that tends to

3     stand out in your mind?

4          A.     Right.

5          Q.     You don't appreciate it, right?

6          A.     Correct.

7          Q.     Can you think of any other

8     instances where you learned that a practice

9     had not been truthful to you in communicating

12:51  10     why it wanted to move away from the HAN

11     program?

12          A.     I can't think of any specific

13     instances, but I know that there's others

14     that I just can't recall.

15          Q.     Well, again, if you think of any

16     of them during the course of the deposition,

17     let me know.

18          A.     Okay.

19          Q.     I think you told me that's the

12:52  20     kind of thing that ought to stand out in your

21     mind, right?

22          A.     Right.

23          Q.     Can you in particular think of

24     any instance where a practice said it was

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                                    449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

35

1    switching to Accent Health and gave you a

2    reason and you later learned that they were

3    being untruthful about the reason?

4           A.    I can't think of a specific

5    instance.

6           Q.    How about Health and Monitor?

7           A.    I can't think of anything

8    specific.

9           Q.    How about ContextMedia?

10          A.    I can't think of a specific

11   instance.

12          Q.    If you later learn that a

13   practice has essentially lied to you about

14   the reasons it gave you for switching out to

15   a competitor, you'd probably make a note of

16   that somewhere, right?

17          A.    Correct.

18          Q.    Would you put it in the

19   database?

20          A.    Yes.

21          Q.    That's kind of the place to put

22   information about the practices?

23          A.    Correct.

24          Q.    That's kind of the gold

12:52 (line 10)

12:52 (line 20)

Electronically signed by Ann M. Belmont (201-234-827-3922)                    449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

36

1    standard, that's where everybody looks,

2    right?

3           A.    Yeah. I'm sure I could probably

4    go through this spreadsheet and find at least

5    a couple specific examples.

6           Q.    Examples of?

7           A.    Of a practice giving -- lying to

8    us.

9           Q.    You want to do that?

12:53  10           A.    Yeah.

11           Q.    Now, you're looking at

12    Exhibit 17, which is a spreadsheet you've

13    never seen before?

14           A.    Well, I'm looking at the --

15    these comments are pulled from our databases,

16    as far as I'm aware. I guess I would feel

17    more comfortable looking at the actual

18    database.

19           Q.    That's really the best source,

12:53  20    isn't it?

21           A.    Yeah.

22           Q.    Why don't we look at Exhibit 18

23    for now, because one of the topics,

24    obviously, that you were designated on was to

Electronically signed by Ann M. Belmont (201-234-827-3922)                    449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

37

1     testify as to why practices switch from HAN

2     to competitors other than ContextMedia.

3     Before I start doing that, let me ask you a

4     question. Do you feel like, as a result of

5     doing this for three-and-a-half years, you

6     have a good grasp of what factors are

7     important to practices in making POC

8     enrollment decisions?

9              A.    Yes.

12:54  10             Q.    And would that include things

11    like the quality of health-related

12    programming?

13             A.    I'm sorry?

14             Q.    Would one of those factors be

15    the quality of the programming?

16             A.    Yes.

17             Q.    And would one of those factors

18    be the quality of any entertainment-related

19    programming?

12:54  20             A.    Yes.

21             Q.    And health related, right?

22             A.    Correct.

23             Q.    Is the length of the program,

24    based upon your experience, a factor that

Electronically signed by Ann M. Belmont (201-234-827-3922)                    449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

38

1    practices take into account when making their

2    POC provider decisions?

3              A.    Yes.

4              Q.    How about the media format,

5    whether it's video or not; is that important?

6              A.    Yes.

7              Q.    And whether the program has

8    sound or not, is that an important factor?

9              A.    Yes.

12:55    10              Q.    Technical service, is that an

11    important factor?

12              A.    Yes.

13              Q.    The size and quality of the

14    hardware, is that another important factor?

15              A.    I'm not sure.

16              Q.    Cross that one off. Is the

17    ability to customize the programming an

18    important factor?

19              A.    Yes.

12:55    20              Q.    The ratio of content versus

21    advertising, is that another important

22    factor?

23              A.    Yes.

24              Q.    Customer service, is that an

Electronically signed by Ann M. Belmont (201-234-827-3922)                                   449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

39

1    important factor?

2          A.    Yes.

3          Q.    That's kind of near and dear to

4    your heart, right?

5          A.    Yes.

6          Q.    How about the sales

7    representatives and sales activities, is that

8    an important factor?

9          A.    Yes.

12:55  10        Q.    Did I miss any, based upon your

11    experience, that I should have included?

12          A.    Not that I can think of.

13          Q.    Same rule, if you want to jump

14    in at some point if you think of something

15    else.

16          A.    Okay.

17          Q.    In your mind, are you able to

18    sort of rank in order of importance those

19    things we just agreed were important factors?

12:56  20        A.    No.

21          Q.    If you were asked at a meeting

22    at work, and you're experienced, because

23    you're one that's closest to this, what's the

24    top three important factors, would you be

Electronically signed by Ann M. Belmont (201-234-827-3922)                    449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

40

1    able to provide an answer to that?

2            A.    Well, every office is different.

3            Q.    I see. So it's sort of unique to

4    the office?

5            A.    Correct.

6            Q.    That's a very good point.

7            A.    Correct.

8            Q.    It could vary widely from office

9    to office?

12:56    10            A.    (Witness nods head

11    affirmatively.)

12            Q.    Can you name one practice that,

13    based upon your interaction with the

14    practice, switched to ContextMedia because of

15    something false or misleading ContextMedia,

16    according to the practices, said to the

17    practice?

18            A.    I can go through our database

19    and find numerous instances where the

12:57    20    practice was misled or given false

21    information about our program or Context

22    program.

23            Q.    When you say that, what do you

24    have in mind?

Electronically signed by Ann M. Belmont (201-234-827-3922)                    449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

41

1          A.     The ratio of educational to

2     advertisement, the topic of our programs, the

3     quality of our educational segments.  Those

4     are the ones that I can think of off the top

5     of my head.

6          Q.     I think you said three, but I

7     only wrote two.  Ratio of ads, quality of

8     programming.  What other one did I miss, or

9     was there a third, maybe not?

12:58  10          A.     The topic of our programming.

11          Q.     Okay.  As to these three things,

12     ratio of ads, quality of programming, type of

13     programming, wouldn't you expect the practice

14     to know whatever the truth is as to those

15     three items by virtue of fact that the HAN

16     programming is running in their office every

17     single day?

18          A.     No.

19          Q.     So you wouldn't expect them to

12:59  20     know that?

21          A.     No.

22          Q.     Can you explain to me why you

23     say that?

24          A.     The office staff is the one

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                                    449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

42

1    that's seeing it, that might not be the

2    decision maker.  If the doctor's the decision

3    maker, they're not sitting in the waiting

4    room, they're seeing patients.

5         Q.    Back to build on the question

6    that got us started down this path, are you

7    aware of a single practice that told you they

8    switched because of a reason that you later

9    learned was a piece of false information

10   provided by ContextMedia?

11        A.    I'm sorry, can you say that

12   again?

13        Q.    Yeah, for example, did a

14   practice ever say -- tell you, I switched

15   because ContextMedia said to me that HAN's

16   content is 50 percent advertising?

17        A.    Yes.

18        Q.    And are you aware of any -- can

19   you name one practice?

20        A.    I can't give a specific example

21   without looking in the database.

22        Q.    Which I don't have here to show

23   you, right?

24        A.    Right.

12:59 (line 10)

01:00 (line 20)

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

43

1        Q.    Can you recall a single practice

2    that said, I switched solely because

3    Context -- solely because ContextMedia told

4    me something about the quality of your

5    practice which you knew to be untrue?

6        A.    I'm sorry, can you say that

7    again?

8        Q.    Can you think of a single

9    practice that told you, I switched solely

01:00   10    because of something that ContextMedia said

11    to me about the quality of HAN's programming

12    that you knew to be untrue?

13            MR. BERNAY: Object to the form.

14    You can answer.

15        A.    I can't think of an example, but

16    not a specific example.

17        Q.    Okay. Tell me what example

18    you're thinking of that you can't give me

19    specifics on?

01:01   20        A.    The office that I called and

21    spoke to, the man explained that he went to a

22    complete rheumatology loop and that our loop

23    was not completely rheumatology.

24        Q.    Was it in fact?

Electronically signed by Ann M. Belmont (201-234-827-3922)                    449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

44

1          A.    Yes.

2          Q.    But he could see for himself in

3    your waiting room, right?

4          A.    He was a back office manager so

5    he didn't have complete access to the program

6    in his day to day.

7          Q.    He had no access to the waiting

8    room?

9          A.    I mean, I'm sure he had access,

01:01    10    but he didn't have time to sit and watch the

11    programming.

12          Q.    Some practices told you they

13    switched to ContextMedia solely because they

14    wanted sound, right?

15          A.    Correct.

16          Q.    Some practices told you they

17    switched to ContextMedia solely because they

18    liked the greater length?

19          A.    Correct.

01:01    20          Q.    Some ContextMedia practices

21    switched because they told you -- they did so

22    solely because of a gift card?

23          A.    Correct.

24          Q.    Some practices switched from HAN

Electronically signed by Ann M. Belmont (201-234-827-3922)                    449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

45

1    to ContextMedia solely because they said they

2    liked the fact there were three parts to the

3    screen, right?

4          A.    Correct.

5          Q.    And some practices told you they

6    switched solely because there was a weather

7    information?

8          A.    Correct.

9          Q.    Some practices told you they

10   switched solely because they found the

11   programming more interesting?

12         A.    That's what they said.

13         Q.    Some perhaps told you they

14   switched because they had patients who often

15   waited longer than 30 minutes and the

16   30-minute loop was too repetitive?

17         A.    That's what they -- that's what

18   I was told.

19         Q.    And some practices told you they

20   switched because they had a lot of elderly

21   patients and they couldn't read the slides on

22   HAN's programming?

23         A.    Correct.

24         Q.    Do you believe any of those

01:02 (line 10)

01:02 (line 20)

Electronically signed by Ann M. Belmont (201-234-827-3922)

449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

46

1    practices that told any of those things were

2    lying?

3            A.    I -- I believe that they gave us

4    only partial, part of the story. We don't

5    trail, we don't trail practices when they

6    cancel.

7            Q.    Why would they only give you a

8    partial story?

9            A.    Because we don't bill them when

01:03   10    they cancel, so I don't.  We press, but we

11    don't press too far.

12            Q.    What would be their incentive to

13    not be truthful with you?

14            A.    To get off the phone so they can

15    get back to their job.

16            Q.    Do you think the same sort of

17    human interaction occurs when you talk to

18    practices switching from Accent Health, that

19    is, maybe they're not giving you all the

01:03   20    reasons?

21            A.    Yes.

22            Q.    So it's not special to

23    ContextMedia?

24            A.    Correct.

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                                        449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

47

1          Q.    Why don't we go back to

2     Exhibit 18, if you would. Believe me, we are

3     not going talk about all these.

4                 MR. BERNAY: I'm going to hold

5     you to seven hours.

6                 MR. O'BRIEN: We're not going to

7     use that, I guarantee that as well.

8          Q.    Let's just take a look at some

9     of these. The first page, line 5.  There, is

01:04  10  it not true, that the practice that was

11     moving to Accent Health said they preferred

12     Accent Health's programming?

13         A.    Correct.

14         Q.    They also said they had recent

15     service issues, right?

16         A.    Correct.

17         Q.    And that was a recurring theme

18     that I failed to mention, was it not?  That

19     it is, a lot of practices, when they

01:04  20  switch --

21         A.    I see this is the comment --

22     this is a situation where recent service

23     issues may have flagged our presence in their

24     waiting room. That's a -- that's not a quote

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                    449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

48

1    from the office. That's coming from whoever

2    wrote this comment.

3              Q.    Okay.  So that --

4              A.    So the office isn't the one that

5    said that.

6              Q.    The office didn't mention it,

7    but the person taking the comment knew that

8    had been an issue so they contributed?

9              A.    Yeah, that's a possibility.

01:05    10          Q.    That was a recurring problem

11    that HAN experienced in practices switching,

12    that this was a -- whatever reasons they gave

13    you, you knew that they also experienced

14    recurring service issues, right?

15             A.    On a select few of the cancels.

16             Q.    Isn't it true that a vast

17    majority of the practices that moved from a

18    competitor -- moved from HAN to a competitor

19    had had service issues of one sort or

01:06    20    another?

21             A.    No.

22             Q.    Who was responsible for fixing

23    the service issues?

24             A.    Can you rephrase that or --

Electronically signed by Ann M. Belmont (201-234-827-3922)                449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

49

1          Q.    Sure. To the extent there were

2     service issues that were plaguing HAN, who

3     was responsible for remedying that, that was

4     not your responsibility, was it?

5          A.    Correct.  That would be the team

6     that manages our vendors.

7          Q.    Third-party service vendors?

8          A.    Correct.

9          Q.    The very next entry says that

01:06    10     this practice, upon notifying of

11     cancellation, also had had service issues,

12     right?

13                MR. BERNAY: You're looking at

14     line 6, Dick?

15                MR. O'BRIEN: I am.

16          Q.    To be clear for the record,

17     thank you.  Line 6.

18          A.    Yes.

19          Q.    That is something the practice

01:07    20     spoke to you about, right?

21          A.    I'm not sure.

22          Q.    What does S/W mean?

23          A.    Spoke with.

24          Q.    So doesn't that say spoke with

Electronically signed by Ann M. Belmont (201-234-827-3922)                        449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

50

1    Linda Neece about the service issues?

2         A.    Yes.  And -- okay, I see, yes.

3    Yes.

4         Q.    And then the next page, page 18,

5    this is a practice telling you that they are

6    switching from you to Accent Health because

7    of the programming, right?

8         A.    Correct.

9         Q.    And then if we jump down to 21,

01:08    10    this is a practice that's telling you they're

11    switching from you to Accent Health because

12    they wanted the weather updated throughout

13    the day, right?

14         A.    Correct.

15         Q.    Go ahead and read to yourself

16    the rest of the comments there, and when

17    you're ready to answer my question, my

18    question is, isn't this -- doesn't it reflect

19    whoever was on this call from HAN trying very

01:08    20    hard to save the practice?

21         A.    I wouldn't call that trying very

22    hard. I mean, it was, to me, that sounds like

23    a pleasant conversation.

24         Q.    You would have put more effort

Electronically signed by Ann M. Belmont (201-234-827-3922)                    449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

51

1    into it?

2        A.    I mean, this comment does not

3    reflect what you're asking.

4        Q.    Okay. Let's look at the entry

5    for line 23 then. Here's the HAN personnel

6    speaking to the practice, right?  "They faxed

7    an Accent Health cancel notification over a

8    month ago to cancel all three offices. I have

9    been trying to save them but did not succeed

01:10    10    and could not recruit the help of the field

11    sales because Cynthia Mallicote has been on

12    medical leave so no one was available in

13    area. The decision has already been made and

14    they are insisting on removal or they will

15    dispose of our equipment," do you see that?

16        A.    Em-hm.

17        Q.    Don't you recall instances where

18    this happened, that is, HAN had received

19    notice to remove the equipment and had not

01:10    20    gotten out there timely while it tried to

21    save the practice, and the practice said just

22    what this practice said, if you don't come

23    out, I'm going to take it down?

24        A.    It's our policy to remove the

Electronically signed by Ann M. Belmont (201-234-827-3922)                    449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

52

1    equipment within 30 days. And that's -- I

2    mean, that's what we stand to.

3            Q.    Do you know how good HAN is

4    honoring that policy?

5            A.    We -- I don't have a percentage.

6            Q.    But isn't it true that in many

7    an instances HAN will -- and I'm not saying

8    there's anything wrong with this, delay the

9    removal of the equipment so they can buy time

01:11    10    to do the best they can to try to save the

11    practice?

12            A.    If the person requesting the

13    equipment to be removed is willing to discuss

14    our -- discuss the removal, you know, it's

15    definitely a friendly conversation.  We would

16    never simply not show up.

17            Q.    Right.  But as long as they're

18    willing to have a dialogue, you're content

19    not to schedule the deinstallation, right?

01:11    20            A.    Correct.

21            Q.    That could be because practices

22    are busy, like you said, they could be

23    30 days, 60 days, 90 days, as long as you had

24    a shot, right?

Electronically signed by Ann M. Belmont (201-234-827-3922)                                   449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

53

1          A.    Right.

2          Q.    I'm still struggling how to

3    figure out how to read this thing because,

4    under column F, which is stage date, that

5    would be the date of the cancellation, right?

6          A.    Correct.

7          Q.    And then it says in here that we

8    scheduled the cancellation for 11/2/2010. And

9    I was trying to figure out how to make sense

01:12   10    of those two dates since one is before the

11    other.

12          A.    Then the comment, when it says,

13    Remove Wednesday, 11/3/2010," that's when the

14    technician is going out to remove the

15    equipment. And the stage date of 11/8/10 is

16    when we've verified that the heartbeat is no

17    longer current, received the equipment back

18    and actually cancelled the location in our

19    database.

01:12   20          Q.    In your system -- and do you

21    have any involvement at HAN on the sponsor

22    side?  By sponsor, do you know I'm referring

23    to advertisers, right?

24          A.    Correct.

Electronically signed by Ann M. Belmont (201-234-827-3922)                    449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

54

1          Q.    The people that provide your

2    revenue?

3          A.    Correct.

4          Q.    Do you have any involvement on

5    that side?

6          A.    No.

7          Q.    Are you aware of any instances

8    where -- well, strike that.

9                Do you know when HAN has to

01:13    10    report to advertisers the practice is no

11    longer in the network?  And by that I mean,

12    do you know if it's when the cancellation

13    letter comes in, when the equipment is

14    deinstalled; when folks get around to closing

15    out the system or none of the above?

16          A.    I don't know.

17          Q.    Okay.

18                MR. BERNAY: Whenever you've got

19    an -- we've almost been going for an hour, so

01:13    20    I think it would be a good time to break for

21    lunch.

22                MR. O'BRIEN: I'm hungry.

23                MR. BERNAY: You're hungry? We're

24    all hungry.

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                              449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

55

1          (Lunch break taken.)

2              MR. BERNAY: In the interest of

3     the full record, Lori wanted to add two

4     things to her prior testimony before we

5     start.

6              MR. O'BRIEN: Sure, absolutely.

7        A.    When reviewing information for

8     the case, we did -- I did go over some

9     e-mails from the past. Also, the spreadsheet

02:04    10     that I started keeping was after the first

11     practice on the spreadsheet was from January

12     2011, but I didn't start keeping that

13     spreadsheet until April 2011.

14          Q.    Which spreadsheet?

15          A.    The one that I was referring to.

16          Q.    That you reviewed in preparation

17     for your deposition?

18          A.    Correct.

19          Q.    Okay.  The one that I don't

02:04    20     have?

21          A.    Right.

22              MR. BERNAY: Well, Dick, let's

23     just be clear.  The spreadsheet contains

24     information which is here, because it's the

Electronically signed by Ann M. Belmont (201-234-827-3922)          449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

56

1    spreadsheet pulled from the database.  So the

2    cancel codes on that spreadsheet are here,

3    it's a selection of the cancel codes that are

4    here. So it is -- I think you would -- it is

5    the main cancel code for each.

6              MR. O'BRIEN: My problem is you

7    don't get to make that selection process.

8    And until today you consistently maintained

9    the reason I'm not getting it is it's work

02:05 10    product.  We contested that and also argued

11    that work product can be overcome if there's

12    a substantial need. But my point about that

13    argument's over now.  Under the law, the fact

14    that that's what she referred to in

15    preparation for her deposition means I have

16    to have it.

17              MR. BERNAY: I understand.  We'll

18    revisit the issue after the deposition.

19              MR. O'BRIEN: I thought it no

02:05 20    longer becomes an issue by virtue of their

21    testimony.  It's the same thing if someone

22    says I reviewed something to refresh my

23    recollection.  Anyway, I'm not going to waste

24    Ms. Smith's time.  Was there something else

Electronically signed by Ann M. Belmont (201-234-827-3922)                    449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

57

1    you wanted to do?

2            A.    That's it.

3            Q.    So the first point was, when I

4    asked you to tell me everything you reviewed,

5    you've now remembered that, in addition to

6    what you told me, there was some e-mails,

7    too?

8            A.    Correct.

9            Q.    Do you have an independent

02:06   10    memory of what those e-mails were as you sit

11    here today?

12            A.    I'm not -- I don't have one

13    specific instance.

14            Q.    It would kind of surprise me if

15    you did.

16            A.    Yeah.

17            Q.    How many?

18            A.    Probably in the nature of

19    between one and 20.

02:06   20            Q.    Well, thank you, Ms. Smith.

21    Thank you, Counsel.

22                Let's go back to Exhibit 18,

23    please. Line 26, this is a practice telling

24    you they're switching to Accent Health

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                                449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

58

 1   because the practice did not like HAN's small

 2   screens, soundless, uninteresting programs

 3   and they found -- didn't find your

 4   programming helpful to our patients; is that

 5   right?

 6           A.    Correct.

 7           Q.    Which then there was an offer

 8   made to update their screen, do you know what

 9   that means?

02:07  10           A.    Upgrade their screens. They

11   had -- they mostly likely had small, older

12   equipment.

13           Q.    At this point you were offering

14   larger screens?

15           A.    Yes.

16           Q.    But that didn't cause the

17   practice to be saved, right?

18           A.    Correct.

19           Q.    On the next one -- excuse me,

02:08  20   not the next one. 28, it looks like the offer

21   was made with a large 32-inch, A-open with no

22   rack, do you know what that is?

23           A.    A 32 would be a 32-inch screen.

24   A-open is the computer that's mounted to the

Electronically signed by Ann M. Belmont (201-234-827-3922)                                    449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

59

1    back of the screen, and no rack would be we

2    would not install a brochure display that

3    traditionally goes along with those screens.

4            Q.    Those offers were made to try to

5    satisfy the practice's need, correct?

6            A.    Correct.

7            Q.    Again, it didn't work, did it?

8            A.    Correct.

9            Q.    Then on the next page, 31,

02:09   10   here's a practice that tells you that several

11   months ago they sent a cancellation request

12   from the practice -- or am I reading that

13   wrong?

14           A.    Well, this is regarding -- I'm

15   not sure if that cancellation request is

16   referring to the other, the related office.

17           Q.    Well, does it appear that's what

18   happened here, is that a practice had sent a

19   cancellation notice several months before

02:10   20   this particular phone call and the equipment

21   still had not been removed?

22           A.    It looks like they -- they had

23   sent in a cancellation request and this says

24   that the equipment was still there.

Electronically signed by Ann M. Belmont (201-234-827-3922)                    449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

60

1          Q.     So more than 30 days had passed

2     since the cancellation notice, right?

3          A.     According to this.

4          Q.     And then, nonetheless, you were

5     able to save one of the locations, right?

6          A.     It looks like they were able to

7     save the exam room program.

8          Q.     But it looks like the practice

9     had already taken down some of your equipment

02:11  10     and installed Accent Health, right?

11          A.     Correct.

12          Q.     On the next page, line 38, it

13     says, "Vanessa called in connectivity issues,

14     working with POC onsite, suggested installing

15     a dedicated line to resolve the issues," do

16     you see that?

17          A.     Yes.

18          Q.     That's another instance where

19     there was some connectivity issues?

02:12  20          A.     Correct.

21          Q.     It says, "She explained to me

22     the changes in the office and they wanted to

23     provide uniform patient education.  She

24     mentioned Lisa," do you think that's Lisa

Electronically signed by Ann M. Belmont (201-234-827-3922)                    449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

61

1    Grippo?

2          A.    It looks like it.

3          Q.    "Had given a presentation months

4    ago and HAN lost.  They decided to go with

5    another competitor, Accent Health," do you

6    see that?

7          A.    Em-hm.

8          Q.    My question for you about this

9    one is, this looks like it was a head-to-head

02:12    10    competition for a practice, Accent Health

11    versus HAN, and Accent Health won.  And if

12    that part of what I just said is true, why

13    would they be in the switch out chart? Does

14    my question make any sense to you?

15          A.    No.

16          Q.    Let's say there's Aaron Bernay,

17    M.D., practice, and he doesn't have anything,

18    and you pitched the practice and Accent

19    Health pitched the practice, you with me so

02:13    20    far?

21          A.    Em-hm.

22          Q.    You have to answer out loud.

23          A.    Oh, yes, sorry.

24          Q.    That actually happens a lot,

Electronically signed by Ann M. Belmont (201-234-827-3922)                                    449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

62

1    right?

2            A.    Correct.

3            Q.    It's not a switch out situation,

4    you're both competing for new business,

5    right?

6            A.    Correct.

7            Q.    Is there a spreadsheet that

8    records the results of that activity?

9            A.    No, not that I'm aware of.

02:13  10            Q.    That's not captured?

11            A.    Not that I'm aware of.

12            Q.    You said earlier today that if

13    you had the full CMS, there was, under D, an

14    entry that could be made for pitched, did I

15    hear that right?

16            A.    Yes.

17            Q.    In my scenario, it wouldn't be

18    captured there?

19            A.    It would be -- no, it -- no

02:14  20    longer would it be captured there.

21            Q.    So once you lose the pitch, it

22    gets jettisoned somehow out of the database?

23            A.    No, that's not the case.  That's

24    not exactly what pitched means.

Electronically signed by Ann M. Belmont (201-234-827-3922)                    449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

63

1        Q.    Okay. What does pitch mean then?

2        A.    Pitched means that the sales rep

3   was going after an office that we're already

4   aware, due to a request of a client that they

5   want the program in that office.

6        Q.    They're on some sort of target

7   list?

8        A.    Target, yes.

9        Q.    So if I wanted to know how many

02:14   10   times in 2010 to 2014 Accent Health and HAN

11   have gone head-to-head for a practice that's

12   never had a POC provider in there, and

13   determine which practices those were and what

14   the outcome of that activity was, is there

15   any way to determine that to your knowledge?

16       A.    No.

17       Q.    No, you know there's no way, or,

18   no, there's none to your knowledge?

19       A.    None to my knowledge.

02:15   20       Q.    And back to 38, the comments go

21   on to say -- provide the reasons why the

22   practice chose Accent Health over HAN after

23   each side made a presentation, right?

24       A.    Can you ask that question again?

Electronically signed by Ann M. Belmont (201-234-827-3922)                    449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

64

1          Q.     Sure. Do the rest of these

2     comments in here describe the input from the

3     practice as to why it ultimately chose Accent

4     Health over HAN?

5          A.     Yes.

6          Q.     And among those were, "the

7     practice didn't think that HAN's presentation

8     could keep the patient's interest"?

9          A.     That's what it says here.

02:16   10          Q.     It also says, "the overall

11     presentation by Lisa did not sell this

12     product," right?

13          A.     That's what it says.

14          Q.     It also said, "they didn't like

15     the HAN product because it shows the same

16     thing every 30 minutes and we have patients

17     waiting longer," right?

18          A.     Correct.

19          Q.     And they didn't like the fact

02:16   20     that you didn't have sound, right?

21          A.     That's what it says, yeah.

22          Q.     Is it information like that that

23     we just discussed that the folks in the

24     content side could look at and figure out if

Electronically signed by Ann M. Belmont (201-234-827-3922)                    449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

65

1    they wanted to do something to address that?

2          A.    I'm sorry, could you ask?

3          Q.    Yeah.  You testified this

4    morning that one of the uses made of this

5    information that you gathered from the field

6    is that the people that are responsible for

7    the HAN content might look at it and figure

8    out if they need to respond in the

9    marketplace in some competitive way, for

02:17   10   example, no sound?

11          A.    Yes.

12          Q.    If HAN got a cancellation

13   notice -- let's take Dr. Bernay again, got a

14   cancellation notice from Dr. Bernay, and you

15   were able to save the practice, would Dr.

16   Bernay's practice appear in this spreadsheet,

17   Exhibit 8, or would that only be found in a

18   larger CMS database or does Exhibit 8 only

19   have to do with switch outs?

02:17   20          A.    I -- I don't know. I don't know

21   who put this spreadsheet.

22          Q.    But all the practices are in the

23   database, right?

24          A.    Correct.

Electronically signed by Ann M. Belmont (201-234-827-3922)                                    449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

66

1          Q.     Information about all the

2     practices are in the database, right?

3          A.     Yes.

4          Q.     What we have here in Exhibit 8

5     is only information about practices that

6     ultimately switched out and couldn't be

7     saved, right?

8          A.     These are all cancelled

9     locations.

02:18  10          Q.     So if I wanted to know if a

11     practice had sent in a cancellation notice

12     and you were able to save it, I would have to

13     go to the notes in the larger database,

14     right?

15          A.     Correct.

16          Q.     Look at item 60, if you would,

17     please. The HAN employee here spoke with Lisa

18     Fini, F-I-N-I, who said that she had been OM

19     for two months and the monitors never worked.

02:19  20     What does OM mean?

21          A.     Office manager.

22          Q.     And there were a number of

23     instances where practices reported that their

24     system had not been working for some period

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                                   449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

67

1    of time, right?

2          A.    I'm not sure.

3          Q.    You don't have a recollection of

4    that?

5          A.    I mean, there are a couple of

6    them in here.

7          Q.    You think there's just a couple?

8          A.    I -- there's -- I mean, there's

9    a handful.

02:19    10          Q.    The HAN equipment installed in

11    the offices that switched out to

12    ContextMedia, that wasn't any different or

13    higher quality equipment than HAN installed

14    in the Accent Health office's, right?

15          A.    I'd have to have the complete

16    database to see what was installed then.

17          Q.    But at any given time, wasn't

18    HAN basically installing the same equipment

19    in each practice?

02:20    20          A.    Throughout the course of our

21    company, we've upgraded and had different

22    equipment.

23          Q.    But there wasn't a point in

24    time, let's say, January 2012, where you were

Electronically signed by Ann M. Belmont (201-234-827-3922)          449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

68

1    getting better equipment to some practices,

2    inferior equipment to other practices, that

3    was never your practice, was it?

4         A.    Well, I mean, there was a point

5    in time when we were still installing 27-inch

6    monitors and we were also installing 32-inch

7    monitors.

8         Q.    Sort of a transition period?

9         A.    Yes.

02:21    10         Q.    But other than those transition

11    periods, you tried to be consistent in the

12    product you were offering, right?

13         A.    Correct.

14         Q.    Look at the entry for 70,

15    please.

16         A.    Let me -- let me go back to that

17    point. At one point, we were installing a

18    different type of equipment in smaller

19    offices than bigger offices.

02:21    20         Q.    Okay.

21         A.    So there was a time that we were

22    installing different equipment in different

23    offices.  It wasn't just that one transition

24    period.

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                    449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

69

1          Q.    Am I correct in saying that
2    was -- that differentiation was driven by the
3    space available?  In other words, a larger
4    waiting room?
5          A.    There are multiple factors.
6          Q.    Okay. Thanks for that
7    clarification. Item 70, the HAN reporter
8    wrote, "Dan called in and asked about the
9    decision to switch programs. He said we're
02:22  10  going with you. And I said, that's great that
11   you decided to keep us, and he said, wait,
12   where did you say you were calling from?  He
13   asked are you the ones with the PowerPoint?
14   I said we're currently in his office, we have
15   an exclusive contact and provide unlimited
16   messages your office can use to promote
17   whatever and even upload photos.  He said
18   he's been with us for roughly four years and
19   they're looking for a change, wanted to go to
02:22  20  Accent Health because it's more like a news
21   broadcast." Goes on to say, "I asked about
22   coexisting, he doesn't think they have room."
23   Did you have practices that switched from you
24   to Accent Health that characterized your

Electronically signed by Ann M. Belmont (201-234-827-3922)                    449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

70

1    content as PowerPoint like on occasion?

2           A.    That's what -- that's what

3    this -- that's what this guy is saying.

4           Q.    Is that the only time you heard

5    that characterization?

6           A.    I'm not sure.

7           Q.    And this is someone that had

8    been with you for four years, right?

9           A.    That's what it says.

02:23  10           Q.    Then down at 73, there's the

11    note made that "the site has had ongoing

12    service issues," do you see that?

13           A.    Em-hm.

14           Q.    And I take it, you don't know,

15    as you sit here today, if that was something

16    the practice said to the HAN employee, or

17    something the HAN employee put in there

18    because he or she knew it?

19           A.    Correct. I don't know where

02:24  20    that's coming from.

21           Q.    Goes on to say, "I'm going to

22    send flowers but I do not think we will be

23    able to save these two locations," do you see

24    that?

Electronically signed by Ann M. Belmont (201-234-827-3922)                    449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

71

1          A.     Yes.

2          Q.     Did HAN occasionally send

3     practices gifts in order to try to save a

4     practice?

5          A.     We did send flowers.

6          Q.     Do you have any idea how many

7     times you did it?

8          A.     It was a rare occasion.

9          Q.     Do you know the value of the

02:24  10     flowers?

11          A.     No.

12          Q.     84, by the way, several of these

13     I notice a Sue called.  Do you know who Sue

14     is?  Is she somebody on your staff or do you

15     think that's someone at the practice?

16          A.     From this comment, it leads me

17     to believe that's someone at the practice.

18          Q.     Okay. And here it's indicated

19     the practice is switching to Health Monitor

02:25  20     because the doctor was a member of a

21     rheumatology society, right?

22          A.     That's what it says.

23          Q.     And you tried -- or not you, HAN

24     tried to schedule a deinstallation and the

Electronically signed by Ann M. Belmont (201-234-827-3922)                                    449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

72

1    practice said they wanted it removed sooner

2    than 30 days, right?

3            A.    Correct.

4            Q.    Did HAN try to accommodate a

5    practice when it wanted the equipment removed

6    sooner than 30 days?

7            A.    That's what it shows here.

8            Q.    You know that happened from time

9    to time?

02:26   10            A.    Yeah.

11            Q.    Page 89, second line there, it

12    says, "Health Monitor had removed the

13    equipment and taken it off the site," do you

14    see that?

15            A.    Yes.

16            Q.    Did Health Monitor do that with

17    some frequency, to your knowledge?

18            A.    Very small handful.

19            Q.    How about Accent Health?

02:26   20            A.    No.

21            Q.    Never?

22            A.    No, not to my knowledge.

23            Q.    Did HAN ever take down a

24    competitor's equipment?

Electronically signed by Ann M. Belmont (201-234-827-3922)                                449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

73

1          A.    No, not to my knowledge. If

2     there is a situation out there like that, it

3     was purely an accident.

4          Q.    Never on purpose?

5          A.    No, never on purpose.

6          Q.    You didn't see any e-mails that

7     showed otherwise?

8          A.    No.

9          Q.    Let's look at 95, please. This

02:27   10    is a practice switching from HAN's product to

11    television, right?

12         A.    Yes.

13         Q.    And here again the practice is

14    saying they've had connectivity problems all

15    along, right?

16         A.    She said that we always have

17    techs out there.

18         Q.    Well, the first sentence says,

19    "They have had connectivity problems all

02:28   20    along," right?

21         A.    That looks like -- that looks

22    like an opinion from whoever wrote the

23    comment.

24         Q.    That's another internal

Electronically signed by Ann M. Belmont (201-234-827-3922)                                    449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

74

1   contribution?

2          A.    I believe, yeah.

3          Q.    It looks like she's being told

4   she would have considered, but our program

5   has never worked right, is that --

6          A.    Correct.

7          Q.    -- how you interpret this?

8          A.    I'm sorry, can you ask that

9   again?

02:29   10          Q.    It looks like she's saying she

11   would have considered HAN, but our program

12   has never worked right?

13              MR. BERNAY: What's the question?

14          Q.    Is that how she interprets that?

15          A.    Yes.

16          Q.    And it's reported, as you said a

17   moment ago, they always have techs out there,

18   right?

19          A.    Correct.

02:29   20          Q.    And one monitor's been out for

21   weeks, right?

22          A.    That's what it says.

23          Q.    You don't doubt that she's being

24   truthful with HAN, do you?

Electronically signed by Ann M. Belmont (201-234-827-3922)          449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

75

1          A.     Excuse me?

2          Q.     You don't doubt that she's being

3     untruthful with -- or you don't doubt that

4     she's being truthful with HAN?

5          A.     It's hard to say.

6          Q.     In your experience in doing this

7     for four years, is it the case that you feel

8     practices are often untruthful with HAN?

9          A.     I feel like we get a portion of

02:30    10     the story quite often.

11          Q.     But the portion you get, do you

12     think they're lies?

13          A.     There's embellishments.

14          Q.     And how do you know that?

15          A.     When -- oftentimes, if I'm

16     looking in the database and I'm seeing that a

17     office manager is reporting the screen hasn't

18     worked for four weeks, but I can see that a

19     tech just went out two weeks ago.  Or vice

02:30    20     versa, if she's saying that we've been out

21     there ten times in the last two months, I can

22     look at our database and see the last time we

23     were out there was in 2012.

24          Q.     And if you were to do something

Electronically signed by Ann M. Belmont (201-234-827-3922)          449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

76

1    like what you just described, would you make

2    a note in the database to that effect?

3            A.    It's possible.

4            Q.    Wouldn't it be a good practice

5    to do that?

6            A.    I would -- I would say that kind

7    of -- all of the information is there in the

8    database.

9            Q.    You endeavor to make the

02:31   10    database as complete as possible, right?

11            A.    Correct.

12            Q.    And by complete as possible,

13    that would include anything that's important,

14    right?

15            A.    To the most extent.

16            Q.    Do you have a different database

17    where you keep other important stuff?

18            A.    No.

19            Q.    Do you know what percentage of

02:31   20    practices HAN loses to television as opposed

21    to other competitors?

22            A.    No, I don't.

23            Q.    Have you ever seen someone try

24    to do that calculation?

Electronically signed by Ann M. Belmont (201-234-827-3922)                    449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

77

1         A.    That's a report that can be

2    pulled.

3         Q.    Have you seen a report like that

4    before?

5         A.    No.

6         Q.    How would you go about pulling

7    it?

8         A.    Through Answers, our database.

9         Q.    What's Answers?

02:32  10         A.    It goes into the database and

11    pulls the information.

12         Q.    So it's a software product where

13    you can --

14         A.    It just kind of matches up the

15    database, pulls the information.

16         Q.    Entry 177, there it's reported

17    that, "Called office, tried to save --"

18         A.    And just to go -- just to go

19    back. I have seen -- like, I've seen

02:33  20    presentations from other people's, the way

21    that they pull CMS and match up competitors

22    or different cancel reasons, but I've never

23    pulled that data myself.

24         Q.    So you've seen someone else

Electronically signed by Ann M. Belmont (201-234-827-3922)                    449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

78

1    prepare a report that says, in this quarter

2    of 2010, in terms of our churn, it's

3    X-percentage ContextMedia, X-percentage

4    changed it out, X-percentage television, that

5    kind of thing?

6              A.    And different -- the other --

7    all the cancel reasons.

8              Q.    192. It appears the office is

9    reporting to HAN that, "The patients do not

02:34   10    like the program and do not watch it," right?

11              A.    I'm sorry, can you ask that

12    again?

13              Q.    She's reporting that the

14    patients do not like the program and do not

15    watch it.

16              A.    That's what it says.

17              Q.    And, "They watch TV and watch to

18    be entertained," right?

19              A.    Yes.

02:34   20              Q.    Is it fair, perhaps,

21    unfortunate, that one thing POC providers

22    have to compete with is soap operas and talk

23    shows?

24              A.    I'm sorry, what was your

Electronically signed by Ann M. Belmont (201-234-827-3922)                    449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

79

1    question?

2         Q.   I said, is it fair but

3    unfortunate that one of the things POC

4    providers have to compete with is soap operas

5    and talk shows?

6         A.   That's fair.

7         Q.   She also goes on to say that,

8    "the program hasn't worked in a month," do

9    you see that?

02:34  10         A.   Yes.

11         Q.   That's not an instance where you

12   went into some records and found that she was

13   being untruthful, was it?

14         A.   I'm sorry?

15         Q.   This isn't an instance where you

16   went into the records you referred to earlier

17   and determined that she was not being

18   truthful with you?

19         A.   I'd have to look at the

02:35  20   database. It looks like that's a quote from

21   her, which may or may not be truthful.

22         Q.   Now, look at 203. It looks like

23   this practice is leaving HAN because they

24   came up with their own patient education

Electronically signed by Ann M. Belmont (201-234-827-3922)                    449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

80

1     program, do you see that?

2            A.    Yes.

3            Q.    And that's another reason

4     practices sometimes leave the POC provider?

5            A.    Correct.

6            Q.    And then 220, here's a practice

7     telling you -- not you, I'm sorry, HAN, that,

8     "they want to switch away from the HAN

9     product because they had spoken to their

02:36   10    patients," right?

11           A.    Correct.

12           Q.    "And the patients had told the

13    practice they are not engaged in watching the

14    HAN information"?

15           A.    That's what it says.

16           Q.    And the last one I'll ask you

17    about is 227. Here, again, the practice is

18    telling HAN they don't want the HAN program,

19    right?

02:36   20           A.    That's what it says.

21           Q.    She says it hasn't worked in

22    some time?

23           A.    That's what she said.

24       (Exhibit 19 identified.)

Electronically signed by Ann M. Belmont (201-234-827-3922)                449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

81

1          Q.    Take whatever time you'd like,
2    Ms. Smith, to look this over. But when you're
3    ready to answer, my first question for you,
4    do you recall this e-mail?
5          A.    I don't recall this e-mail.
6          Q.    I don't think you're on it, but
7    the reason I asked you is, it has to do with
8    the subject of why practices switch away from
9    HAN.  And I was wondering if this is one of
02:38  10    the e-mails you looked at as part of your
11    investigation or preparation to give
12    testimony for the company today?
13          A.    No.
14          Q.    When you agreed to serve as the
15    company's witness for the testimony of the
16    switch outs, did you ask to see all the
17    e-mails HAN had on the subject of why
18    practices switched?
19          A.    I did not ask to see all the
02:38  20    e-mails.
21          Q.    There's a reference, this starts
22    out with an e-mail from Amanda Devlin, do you
23    know Amanda Devlin?
24          A.    I know of Amanda Devlin.

Electronically signed by Ann M. Belmont (201-234-827-3922)                    449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

82

1          Q.    Did you know part of her job at

2     HAN was to pose as a practice to gain

3     competitive information from other POC

4     providers?

5               MR. BERNAY: Object to the form

6     of the question.  You can answer.

7          A.    I don't know. I don't -- I don't

8     know of that being part of her job.

9          Q.    Do you know that she did that?

02:39  10         A.    No.

11          Q.    Do you know of others at HAN who

12     falsely posed as a practice interested in a

13     competitor's product in order to get

14     information about the competitor?

15         A.    No.

16          Q.    You've never heard of that

17     happening before?

18         A.    No.

19          Q.    Is that something that you

02:39  20     approve of?

21         A.    No.

22          Q.    Do you think that's an ethical

23     business practice?

24         A.    No.

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                    449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

83

1          Q.    I take it you've never done it?

2          A.    No.

3          Q.    If someone asked you to do it,

4     you wouldn't, right?

5          A.    Correct.

6          Q.    So Ms. Devlin gives her report

7     on her obtaining information from

8     ContextMedia, and that's reported up,

9     ultimately, to it looks like Jill Brewer, Tom

02:40  10    Campbell, Sabrina Shaddles, Mike McAllister,

11    Kathy Gould, Liz Phillips, and Kimberly

12    Theiss, do you see that?

13         A.    Yes.

14         Q.    And in October 2011, who was

15    Jill Brewer, if you know?

16         A.    I don't know what her official

17    title was.

18         Q.    Did you know Ms. Brewer back

19    then?

02:40  20         A.    I've met her.

21         Q.    Did you ever work on the same

22    team as her?

23         A.    She was in some way part of our

24    department. She was -- I'm not sure how she

Electronically signed by Ann M. Belmont (201-234-827-3922)                    449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

84

1    related to me personally.

2           Q.    What's the name of your

3    department?

4           A.    The relationship management

5    team.

6           Q.    What are the various departments

7    within HAN, if you can tell me?

8           A.    All of HAN? Or just the customer

9    experience team?

02:41  10           Q.    Okay.

11           A.    There's the field services

12    digital, field services print, relationship

13    management team.

14           Q.    What was the first one?

15           A.    Field services digital.

16           Q.    And field services print.  I

17    thought you said one before that?

18           A.    The customer experience team.

19           Q.    That was it. Any others?

02:41  20           A.    I'm the customer experience

21    team, that's the three.

22           Q.    Oh, those are all within

23    customer?

24           A.    Yes.

Electronically signed by Ann M. Belmont (201-234-827-3922)          449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

85

1          Q.     And you are within customer

2     service?

3          A.     Yes.

4          Q.     Which one of those are you on?

5          A.     Relationship management.

6          Q.     And there are probably other

7     groups and departments at HAN that recruit

8     practices, right?

9          A.     That?

02:42  10          Q.     Go out and try to acquire

11     practices?

12          A.     Right.

13          Q.     That's a different group?

14          A.     Correct.

15          Q.     You're servicing the practices

16     after they've been acquired?

17          A.     Correct.

18          Q.     There's probably another group

19     that's out trying to get sponsors and

02:42  20     advertisers, correct?

21          A.     Correct.

22          Q.     Do you know why Ms. Brewer left

23     HAN?

24          A.     No.

Electronically signed by Ann M. Belmont (201-234-827-3922)                    449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

86

1          Q.    In October 2011, who was Tom
2     Campbell?
3          A.    I'm -- I'm not 100 percent sure
4     what Tom's position was.
5          Q.    Was he the CEO?
6          A.    No.
7          Q.    How about Sabrina Shaddles?
8          A.    She was the head of the creative
9     department.
02:42 10          Q.    They're involved with content?
11          A.    Correct.
12          Q.    Ms. Merz works in that group?
13          A.    Yes.
14          Q.    Then Mike McAllister, who is he?
15          A.    Mike -- I believe Mike
16     McAllister was the CEO at that time.
17          Q.    Since you've been there, tell
18     me -- I'm having a hard time keeping track.
19     Who was the CEO?
02:43 20          A.    I believe it was Mike
21     McAllister.
22          Q.    Who was the next CEO?
23          A.    Tom McGuinness.
24          Q.    He's the CEO now, right?

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                    449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

87

1        A.     Correct.

2        Q.     And who was Kathy Gould?

3        A.     She's the CIO, chief information

4    officer.

5        Q.     How about Liz Phillips?

6        A.     She's in program management.

7        Q.     How about Kimberly Theiss or

8    Theiss?

9        A.     At that time, I'm not sure what

02:43    10   Kimberly's position was at that time.

11        Q.     Do you consider all these

12   people, as of 2011, to be part of the senior

13   management?

14        A.     I can't say that all of them.

15        Q.     How about one by one, how about

16   Ms. Brewer?

17        A.     Yes.

18        Q.     How about Mr. Campbell?

19        A.     Yes.

02:44    20        Q.     How about Ms. Shaddles?

21        A.     I'm unsure.

22        Q.     Certainly Mr. McAllister?

23        A.     Yes.

24        Q.     How about Ms. Gould?

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                    449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

88

1          A.    I'm sure -- I am unsure

2      October 2011.

3          Q.    How about Ms. Phillips?

4          A.    Again, I'm unsure.

5          Q.    How about Ms. Theiss?

6          A.    Unsure.

7          Q.    Were all these people senior to

8      you?

9          A.    Yes.

02:44  10          Q.    Given the fact that all these

11      senior people are being told that someone at

12      HAN is engaging in what you characterize as

13      unethical conduct, wouldn't you expect them

14      to have something to say about that?

15              MR. BERNAY: Object to the form.

16      You can answer.

17          A.    I don't. I don't have any

18      knowledge that they didn't, you know, address

19      what happened.

02:45  20          Q.    Well, look at Ms. Brewer's

21      e-mail to this group. She starts off by

22      saying, "Below is an e-mail trail whereby RHN

23      responded to Berne Devlin (aka Amanda Devlin)

24      who contacted them and expressed interest in

Electronically signed by Ann M. Belmont (201-234-827-3922)                                    449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

89

1    their network. In addition, attached are a

2    couple pieces of collateral they use to

3    compare our services when attempting to

4    convert an office.  Share with whom you feel

5    is relevant. Funny, RHN," you understand

6    that's ContextMedia, right?

7         A.    Correct.

8         Q.    "Tells Berne," which is Amanda's

9    pseudonym, "that we are 'has been's from the

02:45   10   '80's," do you see that?

11        A.    Yes.

12        Q.    It doesn't look like senior

13   management is being disapproving of Ms.

14   Devlin's conduct, does it?

15        A.    From this comment it doesn't

16   look like that.

17        Q.    In fact, they're all sort of

18   considering it and saying pass it on to

19   others, correct?

02:46   20        A.    Correct.

21        Q.    And then Ms. Brewer goes on to

22   write, and this is, frankly, the reason I

23   want to show you this document. "With that

24   said, they," you understand they is

Electronically signed by Ann M. Belmont (201-234-827-3922)                     449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

90

1    ContextMedia?

2            A.    Correct.

3            Q.    "Are clearly capitalizing on our

4    practice services concerns, specifically our

5    connectivity issues. Almost all the offices

6    they've been able to convert have a record of

7    one or more service issues. This is classic,

8    you wait until your competitor trips up, then

9    you stepped in. With that said, we must

02:46   10    explore more modern options not only because

11    this is increasing our competitive risks, but

12    also because I believe practices are

13    beginning to feel more comfortable sharing

14    their internet connection as well as the

15    mounting costs around our fax-share model,"

16    do you see that?

17            A.    Yes.

18            Q.    And read as much as you like,

19    but then the next paragraph also says, "We

02:47   20    have hard copies of ContextMedia's

21    installation instructions which includes an

22    inventory of the items they ship," do you see

23    that?

24            A.    Yes.

Electronically signed by Ann M. Belmont (201-234-827-3922)                                                449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

91

1          Q.    Do you approve of HAN having

2    those documents?

3          A.    Not necessarily.

4          Q.    Back in this period, 2011, the

5    HAN practice was being delivered over a fax

6    line, right?

7          A.    Correct.

8          Q.    Who paid the fax charges?

9          A.    I'm not sure.

02:48   10          Q.    You don't know if it was the

11    practice or HAN?

12          A.    We have two different setups. We

13    have a dedicated line setup and we have an

14    analog sharing setup. But I'm not -- I -- to

15    my knowledge, it's just a matter of who

16    supported the line.  Is that what you're

17    asking?

18          Q.    I'm was wondering who had to pay

19    for it?

02:48   20          A.    The line itself?

21          Q.    Yeah.

22          A.    It -- depending on their

23    setup -- we could share their fax machine, or

24    we would have a dedicated line.

Electronically signed by Ann M. Belmont (201-234-827-3922)                    449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

92

1          Q.    If you had a dedicated line, you
2     would absorb the cost?
3          A.    Correct.
4          Q.    Around this point in time, was
5     it becoming clear to HAN that the fax-based
6     model versus internet model was putting HAN
7     at a competitive disadvantage?
8          A.    I'm not -- it wasn't aware to
9     us.
02:49    10          Q.    Did it ever become apparent to
11     you?
12          A.    It -- from a cost -- from a cost
13     standpoint.
14          Q.    And is HAN now Internet based?
15          A.    We're getting there.
16          Q.    The aspiration is to get there?
17          A.    Em-hm, yes.
18          Q.    Do you know when you expect to
19     get there?
02:49    20          A.    No.
21          Q.    Do any practices have it yet?
22          A.    Oh, yes.
23          Q.    So you're rolling them out?
24          A.    Yes.

Electronically signed by Ann M. Belmont (201-234-827-3922)                    449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

93

1          Q.    With the objective to get them

2    all there eventually?

3          A.    Correct.

4          Q.    You don't know if that's going

5    to be this quarter, next quarter or 2015?

6          A.    I don't know.

7          Q.    Do you know what percentage of

8    the practices have it?

9          A.    No.

02:49    10          Q.    And it's going to help HAN if

11    they can -- once they get them all on

12    Internet, right?

13          A.    Correct.

14          Q.    Now, Ms. Brewer says or I'd read

15    this part to you. I'm repeating it now, a

16    sentence from the bottom paragraph of the

17    first page, "Almost all of the offices

18    they've been able to convert have a record of

19    one or more service issues." Do you disagree

02:50    20    with Ms. Brewer's statement there?

21          A.    I couldn't say.

22          Q.    Let's look at Exhibit 17, that's

23    the long one. Now, I think you told me this

24    morning that you don't believe you've ever

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                                    449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

94

1    seen it in this particular format, right?

2        A.    Correct.

3        Q.    But do you have any reason to

4    doubt that the information in the comment

5    side in the right column comes from your CMS

6    database?

7        A.    I'm sorry, can you say that

8    again?

9        Q.    Sure.  Do you have any reason to

02:50   10    doubt that the information in the right-hand

11    side column, in the notes column, come from

12    the CMS database?

13        A.    No, I don't doubt that this

14    information comes from CMS.

15        Q.    So it's fair for me to ask you

16    questions about this?

17        A.    Yes.

18        Q.    This is not going to be foreign

19    to you?

02:51   20        A.    No.

21        Q.    Now, these are paginated, you

22    see at the bottom it'll say like 1 of 55 and

23    so on and so on?  Oh, yours isn't paginated

24    that way.

Electronically signed by Ann M. Belmont (201-234-827-3922)                    449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

95

1                    MR. BERNAY: No, it's not.

2                    MR. O'BRIEN: Okay.

3                    MR. BERNAY: Why don't you call

4       out location ID at the bottom of the page on

5       the first column.

6            Q.    I see, okay. Well, yeah, this

7       one is printed -- that's the darn thing with

8       these spreadsheets. Counsel's suggestion is,

9       of course, a good one.

02:51   10                   MR. BERNAY: Well, did the two

11      marry each other?  Is your pagination

12      different than mine?

13                   MR. O'BRIEN: No, what happened

14      was someone printed it this way, and then I

15      worked on it, and then someone alerted me to

16      the fact that, I guess, they hadn't opened up

17      all the fields, so some of the fields here, I

18      wanted to give you a full and complete

19      version.

02:52   20                   MR. BERNAY: This was produced in

21      native format to you.

22                   MR. O'BRIEN: I don't even know

23      what that means.

24                   MR. BERNAY: It was produced as

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                                    449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

96

1    an Excel file, not as a pdf.

2              MR. O'BRIEN: Native, I think of

3    American Indian.  We'll work our way through.

4    I think what you suggested is a good idea.

5         Q.    Can you find location 3002214,

6    which is Orange County?  On my copy it's five

7    pages in.

8              MR. BERNAY: 3002214.

9              THE WITNESS: It's on the bottom?

02:53   10              MR. BERNAY: It's in the middle

11    of the page.

12         Q.    And there are -- actually,

13    there's a bunch of entries for Orange County.

14    I see there are different days.  Let's look

15    at the one that is for April 18, 2012, do you

16    see that?

17              MR. BERNAY: It's the one that

18    starts with the comment "called office"?

19              MR. O'BRIEN: Yes.

02:53   20         A.    Okay.

21         Q.    And this is an entry you made,

22    right?

23         A.    Correct.

24         Q.    And it says, "The office

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                    449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

97

1    switched to DHN," that's ContextMedia, right?

2        A.    Correct.

3        Q.    "Because they offered a bigger

4    screen and their program does not play the

5    same thing over and over again," do you see

6    that?

7        A.    Yes.

8        Q.    "The rep visited the office in

9    person and called the office to sell the

02:54  10    project. Melissa said they did receive a

11    gift card for switching," she asked you why

12    you wanted to know, you said, "I explained

13    that there is a code of ethics because our

14    clients are Pharma companies and there are

15    laws restricting gifts." Why were you saying

16    that to the practice?

17        A.    At that -- I was under the

18    impression that the -- I believe it's the

19    Sunshine Act restricts Pharma companies from

02:54  20    providing gifts to physicians' offices to

21    provide their products.

22        Q.    Were you telling this practice

23    that you thought ContextMedia was behaving

24    unethically?

Electronically signed by Ann M. Belmont (201-234-827-3922)    449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

98

1          A.    I don't -- I didn't tell her
2     that they were behaving unethically.
3          Q.    Is that what you were trying to
4     communicate?
5          A.    The code of ethics, that it was
6     more of a get to the bottom and find more
7     information versus putting down ContextMedia
8     saying they were being unethical.
9          Q.    Did you ever try to put down
10    ContextMedia?
11         A.    No.
12         Q.    Were you saying this to the
13    practice to try to save it?
14         A.    No.
15         Q.    Now, I'm going into several
16    pages to -- and these are really in no
17    numbered order, are they?  3432121, it's Dr.
18    Jagdeo.
19              MR. BERNAY: Say that again,
20    3432121?
21              MR. O'BRIEN: Yeah, I apologize.
22    I thought I had this figured out.
23         Q.    And there are several entries
24    for this practice on November 30, 2012, and

02:55 (at line 10)
02:56 (at line 20)

Electronically signed by Ann M. Belmont (201-234-827-3922)                    449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

99

1    I'd like to ask you about the very last of

2    those. Oh, you know what? That's the stage

3    date so that doesn't tell you when the call

4    was, does it? Okay. Well, anyway, I want to

5    ask you about the last entry concerning that

6    practice.

7              MR. BERNAY: It's the next page.

8         Q.    "Called office and spoke with

9    Lorna," I appreciate your guys patience on

02:57  10    this.  "She explained that they will be

11    keeping HAF," what is HAF?

12         A.    Healthy Advice for your family,

13    it's a brochure program.

14         Q.    It's what again?

15         A.    Brochure program.

16         Q.    Oh, program. "The doctor just

17    decided to go with a program that offered a

18    flat screen TV in the waiting.  She explained

19    that this TV has sound and segments more like

02:58  20    the news so it was not just a slideshow of

21    information. She said the screen was playing

22    information on rheumatology right now.  The

23    sound and video along with the size and

24    updated look of the equipment were the sole

Electronically signed by Ann M. Belmont (201-234-827-3922)          449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

100

1    reasons for switch. Lorna explained that she

2    called us two months ago to tell us about the

3    switch, but there was no record of such

4    contact. I asked Lorna if she knew what

5    number she called but she could not tell me.

6    Lorna explained the other company did not say

7    anything about us and that the office

8    actually shipped the equipment back. Return

9    labels had DHN info on them --"

02:59    10         MR. BERNAY: Sorry, Dick. For the

11   record, we missed that part in this

12   spreadsheet.

13         MR. O'BRIEN: Oh, really?

14         MR. BERNAY: Yes.

15         MR. O'BRIEN: Where do you guys

16   stop?

17         MR. BERNAY: We stop at return.

18   It looks like it got clipped by the printout.

19         MR. O'BRIEN: Oh, the word return

02:59    20   is the last one you have?

21         MR. BERNAY: In this cell.

22      Q.    Well, mine said, to finish that,

23   "Return labels had DHN info on them,

24   reassigned order to Amy F."  I take it, if

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                    449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

101

1   you want to assume with me for the moment

2   that I read that correctly and it is on here,

3   the return labels had DHN info on them,

4   you're probably noting that to make the point

5   that ContextMedia probably gave them to ship

6   the materials, right?

7          A.    Correct.

8          Q.    Did you ever learn that, with

9   respect to this practice, what they

03:00   10   identified as the sole reasons for the switch

11   was not an accurate statement?

12          A.    I'm sorry, can you ask that

13   again?

14          Q.    They say here that those were

15   the sole reasons for the switch, right?

16          A.    That's what it says.

17          Q.    Did you ever learn that not to

18   be true?

19          A.    I never learned -- no, I never

03:00   20   learned that not to be true.

21          Q.    You believe that some practices

22   were switched by ContextMedia from HAN for

23   things that ContextMedia did improper, right?

24          A.    Correct.

Electronically signed by Ann M. Belmont (201-234-827-3922)                449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

102

1          Q.    Will you concede that some

2      practices, just some practices, switched from

3      HAN to ContextMedia for reasons other than

4      any improper conduct?

5          A.    Yes.

6          Q.    Are you able to tell me how many

7      are in which camp?

8          A.    No.

9          Q.    No way for you to do that,

03:01  10      right?

11          A.    Correct, we have --

12          Q.    It could be a lot in one camp

13      and a little in another or vice versa, it

14      could be split?

15          A.    Right.  We've since learned a

16      lot about the misrepresentations, so it's

17      hard to say which offices received

18      misrepresentations and which did not.

19          Q.    But you're not going to dispute

03:01  20      that some offices just switched due to fair

21      competition?

22          A.    Correct.

23          Q.    Then I jump down two entries to

24      3437501, Drs. Gnana and Darshi -- I bet you

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                    449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

103

1      encounter some names, don't you?

2           A.    Yes.

3           Q.    They're a little more

4      complicated than Lori Smith.  That's not a

5      question. "I asked Monshuan to confirm that

6      and also asked why they chose DHN over HA?

7      She said the doc is a diabetic doc and it

8      made sense to go with the DHN as PCN with not

9      applicable to their specialty," do you see

03:02    10    that?

11          A.    How does this entry start?

12          Q.    Called and spoke to Monshuan.

13          A.    Okay, yes.

14          Q.    PCN is a reference to your

15     primary care network product, right?

16          A.    Correct.

17          Q.    And that has a lot of

18     educational material on it other than that

19     specific to the condition of diabetes, right?

03:02    20         A.    It's a wide range of conditions

21     that could or could not be affected by

22     diabetes.

23          Q.    But it's conditions other than

24     diabetes, too, right?

Electronically signed by Ann M. Belmont (201-234-827-3922)                    449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

104

1        A.    Correct.

2        Q.    I mean, do you know all the

3    conditions that are referenced in that

4    product?

5        A.    It changes from time to time,

6    but when you're talking about high blood

7    pressure, that's relevant to a diabetes

8    patient.  Eating right and exercising also is

9    relevant to a diabetes patient.

03:03   10        Q.    But you wouldn't dispute the

11    fact that a product that is exclusively

12    related to diabetes is going to be different

13    than the PCN one?

14        A.    Correct.

15        Q.    At least for me it's turning to

16    the next page, and I want to talk about one

17    of the entries for Clinical Associates,

18    3437969, maybe it's on your same page, I

19    don't know.

03:03   20            MR. BERNAY: What's the entry

21    date?

22            MR. O'BRIEN: For all these it

23    looks like November 30, 2012.

24            MR. BERNAY: I'm sorry, I'm

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                    449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

105

1    looking at the column that's -- you may not

2    have it, I don't know.  The column that's

3    closer to the comment section.

4                MR. O'BRIEN:  October 23, 2012.

5                MR. BERNAY: Starts, "Called the

6    office to follow up"?

7                MR. O'BRIEN: Yes, exactly.

8        Q.    This is, again, you recording

9    the information, right?

03:04  10        A.    Correct.

11        Q.    And Maria from this practice

12    explains to you she faxed two letters to

13    notify us the equipment was to be removed,

14    right?

15        A.    Correct.

16        Q.    Were there instances where the

17    practices thought they had given you notice

18    and either they sent it to the wrong fax or

19    left a voice mail, for whatever reason, it

03:04  20    didn't get returned, mixups like that?

21                MR. BERNAY: Object to the form.

22    You can answer.

23        A.    There were instances where

24    practices felt like they had given us --

Electronically signed by Ann M. Belmont (201-234-827-3922)                    449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

106

1    alerted us to a cancel but we didn't get it.

2         Q.    Now, she goes on to say, "she

3    did not get this number from the other

4    company and explained the other company had

5    not said anything to her about our

6    equipment," do you see that?

7         A.    Yes.

8         Q.    At this point in time,

9    October 23, 2012, when you were calling in to

03:05   10    practices that wanted to switch to

11    ContextMedia, you were routinely asking

12    questions like, did they misrepresent

13    themselves to be HAN, did they say they were

14    authorized to remove our equipment, did they

15    say anything about -- things like that,

16    right?

17         A.    I was asked -- I was asking with

18    some routine, every practice doesn't get

19    every question.

03:05   20    Q.    Right.  But that was because of

21    some things you found out about in the field

22    regarding ContextMedia.  When you got a call

23    about a switch out from ContextMedia, you

24    were trying to gather information along those

Electronically signed by Ann M. Belmont (201-234-827-3922)                    449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

107

1    lines each time, right?

2            A.    Correct.

3            Q.    And then when you did, as you

4    did here, you put it down if there was

5    anything noteworthy or important, right?

6            A.    I'm sorry?

7            Q.    And when you did that and you

8    got the information that was noteworthy or

9    important, you endeavored to put it in here

03:06   10    so others could see it and use it, right?

11            A.    For the most part.  This is a

12    summary of the conversation.

13            Q.    But your practice in doing a

14    summary is to put in the important stuff, and

15    if you leave anything out, you leave out the

16    unimportant stuff, right?

17            A.    Correct.

18            Q.    It's kind of the nature of a

19    summary?

03:06   20            A.    Right.

21            Q.    And so it goes on to say that,

22    "she requested the equipment be removed in

23    August and September," that's two and one

24    months earlier, "so she figured it would not

Electronically signed by Ann M. Belmont (201-234-827-3922)                    449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

108

1    be an issue when the company installed. Our

2    system has not worked since March," do you

3    see that?

4          A.    Yes.

5          Q.    Did you determine that she was

6    being inaccurate when she said the HAN system

7    did not work since March?

8          A.    The -- she is saying that the

9    system has not worked since March.

03:07  10          Q.    Do you know if she was lying?

11          A.    They had a heartbeat at this

12    time, so I don't know.  I don't know that --

13    whether she was being truthful or not.

14          Q.    That's an interesting term in

15    this context. So they were still alive, as

16    far as you knew?

17          A.    Yeah.

18          Q.    In other words, as far as you

19    could tell on your end, the system seemed to

03:07  20    be running?

21          A.    They were connecting, yes.

22          Q.    But you knew of instances where

23    you would get, as you put it, a heartbeat and

24    techs would go out and it was a problem?

Electronically signed by Ann M. Belmont (201-234-827-3922)                              449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

109

1        A.    I'm sorry?

2        Q.    You knew of instances where you

3   were getting a heartbeat and techs would go

4   out, and techs, technicians, would go out and

5   it was in fact a problem, right?

6        A.    Correct.

7        Q.    Blue screens?

8        A.    The blue screen is kind of a

9   simple fix, but different, black screen or

03:08   10   something along those lines.

11        Q.    Let's go to my next page the

12   practice is Prime Health Network, and the

13   call date is February 26, 2013. Now, there's

14   actually multiple ones of those. And on mine

15   it says, next to that date, phone in and the

16   comment begins, "Received call from Shayna."

17        A.    Okay.

18        Q.    And the initials of the person

19   reporting here for HAN is LWB, who is that,

03:08   20   do you know?

21        A.    Liz Billmann.

22        Q.    How long did Ms. Billmann work

23   for the company?

24        A.    She was there prior to my start

Electronically signed by Ann M. Belmont (201-234-827-3922)                                    449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

110

1    date.

2           Q.    So you don't know when she

3    started?

4           A.    No.

5           Q.    Is she still there?

6           A.    No.

7           Q.    Do you know when she left

8    approximately?

9           A.    Approximately October, November

03:09  10    of 2013.

11           Q.    These comments show notes, "the

12    docs prefer the loop because they can create

13    the entire thing, it doesn't repeat for days

14    and they have the same flexblity and custom

15    messaging," do you see that?

16           A.    Yes.

17           Q.    That's a comment you heard

18    before, right?

19           A.    I can't say that I've heard this

03:09  20    comment -- specific comment over and over.

21           Q.    I guess I'll rephrase my

22    question.  You heard before that doctors

23    preferred content that they can customize?

24           A.    Correct.

Electronically signed by Ann M. Belmont (201-234-827-3922)                    449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

111

1          Q.    And you heard before that

2     doctors switch because they found a

3     competitor's product less repetitive than

4     HAN's?

5          A.    Correct.

6          Q.    And the comments go on to say

7     that you had a discussion with the practice

8     where you told her that only HAN can remove

9     the equipment, right?

03:10    10          A.    Liz had that conversation.

11          Q.    I'm sorry, thank you. The

12    reporter, Liz, reports here that she

13    discussed with the practice removal of the

14    equipment, right?

15          A.    Yes.

16          Q.    And the practice was told that

17    only HAN can remove it, right?

18          A.    Correct.

19          Q.    And I think an agreement was

03:10    20    made for a deinstallation date, right?

21          A.    Well, this comment is cut off,

22    but I can -- I only have up until, "Not the

23    office staff and --"

24          Q.    So you don't have the comment

Electronically signed by Ann M. Belmont (201-234-827-3922)                    449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

112

1    she said she understood?

2                    MR. BERNAY: No, not on this.

3            Q.    All right. Well, are you aware

4    of instances in a ContextMedia switch out

5    where the practice notified HAN they were

6    switching to ContextMedia and HAN then went

7    and deinstalled the equipment?

8            A.    Can you say that again, please?

9            Q.    Are you aware of instances where

03:11   10    the practice notified HAN that it had made

11    the decision to switch to ContextMedia, and

12    then HAN and the practice arranged for HAN to

13    remove the equipment?

14           A.    Yes.

15           Q.    And that happened more than

16    once, right?

17           A.    Correct.

18           Q.    There are other instances where

19    ContextMedia took the equipment down itself,

03:11   20    right?

21           A.    Correct.

22           Q.    Do you know how many -- what

23    percentage of the switch outs HAN removed the

24    equipment versus ContextMedia?

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                    449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

113

1          A.    I don't.

2                MR. BERNAY: Dick, we've been

3    going for about an hour.

4                MR. O'BRIEN: Yeah.

5                MR. BERNAY:  Is this a good time

6    to take a break?

7                MR. O'BRIEN: Yeah, let's take a

8    break.  Whatever you want.

9                (Break taken.)

03:26   10          Q.    A couple more questions about

11    this spreadsheet. Now I'm at 3441380, which

12    is Leyla Daneshdoost.  It's a few items

13    beneath the one we just talked about, and

14    March 23, 2012. It starts, "Called office to

15    follow up on cancel reasons," do you see?

16          A.    Em-hm.

17          Q.    Take whatever time you want to

18    read it, Ms. Smith, but when you're ready to

19    answer, my question is, this is one of those

03:27   20    examples where the practice needed sound

21    because the patients were older and had a

22    hard time reading the screen.

23                MR. BERNAY: Dick, I'm just going

24    to note for the record, ours cuts off again

Electronically signed by Ann M. Belmont (201-234-827-3922)          449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

114

1    at, "Janice was in a hurry, I thanked her

2    for --" and that's the last.

3         Q.    The last is "partnering with

4    us."

5             MR. O'BRIEN: I don't know what

6    we're going to do about this after the fact.

7    I mean, I think we have to use the exhibit as

8    it is with the recognition that some things

9    are cut off, and the ability to argue about

03:27  10  it or not.  I haven't seen anything that

11   would be material, but you may have a

12   different view.

13        Q.    Anyway, do you remember my

14   question any more?

15        A.    No, go ahead.

16        Q.    This is one of those examples

17   where the practice said they needed sound

18   because their patients were elderly and

19   couldn't read the small screen, right?

03:28  20        A.    They had a hard time reading the

21   small screen, they had the 19-inch is what it

22   says.

23        Q.    As HAN's ongoing effort to try

24   to save practices who said they wanted to

Electronically signed by Ann M. Belmont (201-234-827-3922)                    449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

115

1    switch, HAN would offer to co-exist with

2    television, correct?

3           A.    Correct.

4           Q.    And on some occasions they

5    offered to co-exist with competitors,

6    correct?

7           A.    Correct.

8           Q.    Were you aware -- have you ever

9    seen ContextMedia's enrollment form?

03:28    10           A.    I'm sure I have, but.

11           Q.    Did you know that it asks that a

12   practice not have another product in the

13   waiting room?

14           A.    I don't remember that.

15           Q.    Do you recall knowing that when

16   suggesting that practices consider

17   coexisting?

18           A.    No.

19           Q.    Let's go to Long Island

03:29    20   Diabetes, which is 345945, the entry for

21   April 4, 2012. And it begins, "Called office

22   to follow up on cancel request."

23           A.    Yes.

24           Q.    And, "Spoke with Barbara.  She

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                    449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

116

1    explained that they switched programs because

2    the new program focuses on diabetes.  She

3    liked our program and it worked fine for

4    them, the biggest problem with the program

5    was that the PCN," that's you guys, correct?

6         A.    Correct.

7         Q.    "Program advertised many drugs

8    that they do not prescribe since they deal

9    only with diabetes.  She mentioned Spiriva."

03:30  10  Do you recall other instances where that was

11   a reason a practice switched, because your

12   practice was advertising from pharmaceutical

13   products that weren't relevant to the

14   practice?

15        A.    This is the only -- I don't

16   recall any other off the top of my head, no.

17        Q.    Jump down to a couple lines, a

18   couple entries later for the Arthritis

19   Connective something or other, the May 30,

03:31  20  2012 entry. Do you see that?

21        A.    Yes.

22        Q.    It said, "Called office and

23   spoke with Nicole.  She explained the doctor

24   saw RHN at the ACR conference and decided he

Electronically signed by Ann M. Belmont (201-234-827-3922)                    449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

117

1    would like to try something new. RHN did not

2    approach the office to interview their

3    patients and at no time did they present

4    themselves as HAN," do you see that?

5         A.    Yes.

6         Q.    There were a number of instances

7    that you recall where you were told the

8    practice was switching because they'd seen a

9    presentation made by ContextMedia at an

03:31   10   industry conference, right?

11        A.    Correct.

12        Q.    During that time period, did HAN

13   participate in these industry conferences?

14        A.    I'm not sure.

15        Q.    Do you recall a point in time

16   where HAN decided that, for strategic and

17   competitive reasons, it needed to start doing

18   that?

19        A.    I'm aware that we are doing

03:32   20   that.

21        Q.    That's probably not your end of

22   the business?

23        A.    Correct.

24        Q.    You know, grab Exhibit 18 again

Electronically signed by Ann M. Belmont (201-234-827-3922)                    449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

118

1    for a moment, and stay where you are on

2    Exhibit 17, and I was just struck by

3    something. For Exhibit 17, the format within

4    any particular practice seems like you keep a

5    running chronological list of comments for

6    the particular practice, right?

7           A.    Correct.

8           Q.    So you can look -- you go on the

9    database, at least the part that's reflected

03:32  10   by 17, and just get a blow by blow of the

11   interaction of the practice from start to

12   finish, right?

13          A.    Correct.  For the -- in the

14   database it's going to have every comment.

15          Q.    Right.  But they're organized by

16   context, right?  And the date?

17          A.    They can be organized a number

18   of ways.

19          Q.    Okay. How are you most familiar

03:33  20   with it?  In the format that we're looking at

21   now where you can sort of track the progress

22   or series of comments over time with the

23   practice?

24          A.    In this type of format, it's

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)          449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

119

1    going to depend on how you pull the report,

2    how you filter the database information.

3         Q.    There sounds like a lot of

4    different ways to present this database

5    information.

6         A.    Correct.

7         Q.    The only reason I raise this is,

8    I was struck by the fact just now that the

9    one we're looking at seems to have these

03:34   10    chronological entries in it, and 18 doesn't

11    do that. And I'm wondering if what 18 does,

12    but you tell me, does 18 just pull out the

13    comment field for the cancellation activity

14    and none of the previous activity?

15         A.    I don't know.

16         Q.    For example, you look at the

17    first page, the first entry, Mt. Carmel

18    Medical Group, we've got an entry of the

19    reasons for the cancellation, right?

03:34   20    A.    Correct.

21         Q.    But now I'm believing that

22    there's probably a whole slew of entries from

23    Mt. Carmel that precede that, right?

24         A.    Correct.

Electronically signed by Ann M. Belmont (201-234-827-3922)                449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

120

1          Q.     You guys were reaching out

2     periodically to see how the practice was

3     doing?

4          A.     Right.

5          Q.     So this all gets a snapshot of

6     the cancellation, right?

7          A.     I can't say. I don't know how

8     this report was pulled.

9          Q.     Going back to 17, you go to the

03:35   10    next page, or my next page, practice 3486088,

11    Osteoporosis and Rheumatology, the entry for

12    May 14, 2012, starts, "Cancel, going with

13    RHN."

14         A.     Okay.

15         Q.     And the reporter here is KSK,

16    who is KSK?

17         A.     Karen Kline.

18         Q.     Is she still with the company?

19         A.     No.

03:35   20         Q.     And these comments for this

21    practice about in the middle, it's reported,

22    after she's being told there's a 60 day

23    notice, "She asked if there was any way to

24    remove it sooner because it has not worked

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)          449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

121

1    for so long already and she did not want her

2    patients to have to see a blue screen for

3    another two months. I checked with Heather

4    and, since we hope to sell them HAR too, we

5    can schedule the removal for after 6/6." HAR

6    is the brochure stuff?

7            A.    Correct.

8            Q.    And it looks like here with the

9    practice did ask that you remove the

03:36  10   equipment sooner than 60 days, you

11   accommodated the practice, right?

12           A.    Correct.

13           Q.    Now I go forward a number of

14   pages to 3552912, Family Medical Health.

15           MR. BERNAY: I'm sorry, Dick,

16   what is the number again?

17           Q.    I'm sorry, 35529212, the

18   November 6, 2012, entry that begins, "Called

19   office and spoke with Janice. She explained

03:37  20   that the equipment was not working and she

21   called in to have us come fix it. No one ever

22   came so she decided to switch to

23   ContextMedia," do you see that?

24           A.    Yes.

Electronically signed by Ann M. Belmont (201-234-827-3922)                                    449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

122

1          Q.     There were instances where, due
2     to HAN's failure to respond to service
3     complaints, that the practice became
4     frustrated and went to a competitor, right?
5          A.     Can you say that again?
6          Q.     There were instances where a
7     practice became frustrated with the service
8     experience with HAN and, because of that,
9     switched to a competitor?
03:38    10          A.     From what -- there are instances
11     where the practice felt like they were
12     reaching out and were reaching out to someone
13     else, or we didn't -- don't have a record of
14     a call.  Like what happened in this case, it
15     looks like there's -- there's no record of a
16     call in, so, again, it's unclear if she, you
17     know, was reaching out or.
18          Q.     Do you recall the e-mail I
19     showed you from Ms. Brewer?
03:38    20          A.     Yes.
21          Q.     Where she said that virtually
22     all the practices that had switched from HAN
23     to ContextMedia were ones where there was a
24     history of service problems?

Electronically signed by Ann M. Belmont (201-234-827-3922)                    449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

123

1          A.    That -- yes.

2          Q.    This would be one example of

3     that, right?

4          A.    I wouldn't consider this an

5     example because the comment that they're

6     having service issues is coming from the

7     office and not from what we're seeing in our

8     database.  So it's unclear if this is a

9     perceived need for service or an actual need

03:39    10     for service. So if they were not connecting,

11     we would know about it within seven days.

12          Q.    I'm getting the sense that, in

13     your four years of doing this, you've come to

14     the conclusion that offices aren't

15     trustworthy?

16          A.    No.

17          Q.    Well, go in about another four

18     pages to 3655328, the Greenville Healthcare,

19     and the call is July 1, 2013. And who is J.

03:40    20     Lawrence?

21          A.    Joyce Lawrence.

22          Q.    She was on your staff at the

23     time?

24          A.    Correct.

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                                    449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

124

1          Q.     All these people making these
2     calls, were they reporting to you at the
3     time?
4          A.     No, no, they were my peers.
5          Q.     Oh, okay. So you all were
6     reporting up to Ms. McGauvran?
7          A.     McGauvran.
8          Q.     I forgot, is she still with the
9     company?
03:40  10          A.     Yes.
11          Q.     And the entry here is -- well,
12     if they're your peers, how did you get picked
13     to do this?  That's not necessary.
14               The entry here is, "Dee had
15     called in to have a monitor removed since
16     their office doctors had decided to go with
17     ContextMedia.  I asked her why as their
18     office has been with us since 2006. She said
19     ContextMedia has scrolling news,
03:41  20     weather/educational stories, and they were
21     looking for something different. I explained
22     we will have the weather info on our monitor
23     screen soon," do you see that?
24          A.     Yes.

Electronically signed by Ann M. Belmont (201-234-827-3922)                                    449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

125

1          Q.    Yet the practice went ahead and

2     cancelled, right?

3          A.    Correct.

4          Q.    Did you find with respect to

5     ContextMedia you were sort of playing

6     technology catch up at times?

7          A.    I don't know if it would be

8     technology catch up, but I think we were

9     keeping up with what practices were asking

03:42  10     for.

11          Q.    Well, during the 2011, '12, '13

12     time period, were you finding that Context's

13     product offerings more often than not was

14     meeting the practice's needs more than HAN's

15     product offering?

16          A.    No.

17                MR. BERNAY: Object to form, but,

18     sorry, were you finished?

19          Q.    You were hearing a lot of

03:42  20     practices wanted video, right?

21          A.    Correct.

22          Q.    ContextMedia had that, right?

23          A.    Correct.

24          Q.    And HAN didn't at the time,

Electronically signed by Ann M. Belmont (201-234-827-3922)                    449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

126

1   right?

2         A.    Correct.

3         Q.    You were hearing a lot that

4   ContextMedia had sound, right?

5         A.    Yes.

6         Q.    And HAN didn't at the time,

7   right?

8         A.    Correct.

9         Q.    And you were hearing a lot that

03:42   10   ContextMedia was preferred because it was

11   Internet based, right?

12         A.    I don't feel that that's a

13   reason that I heard very often.

14         Q.    You were hearing in certain

15   instances where the practices were condition

16   specific that they preferred ContextMedia

17   product because its product was condition

18   specific, right?

19         A.    I'm sorry?

03:43   20         Q.    We've seen examples where the

21   practices tell you that they preferred

22   ContextMedia because ContextMedia's offering

23   was condition specific?

24         A.    Correct.

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)          449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

127

1          Q.    And whereas HAN's was not,

2     right?

3          A.    Our arthritis program was, but

4     practices were under the impression that it

5     was not.

6          Q.    And rheumatology it was not,

7     right?

8          A.    For rheumatology it was

9     condition specific.

03:43    10          Q.    It was?

11          A.    Yes.

12          Q.    What about for arthritis?

13          A.    That's the same thing.

14          Q.    Same thing?

15          A.    Yeah.

16          Q.    Just shows you how ignorant I

17     am. Diabetes?

18          A.    Diabetes was the primary care.

19          Q.    And so you heard that some

03:43    20     practices preferred ContextMedia's diabetes

21     offer because it was condition specific?

22          A.    Correct.

23          Q.    Here's an example where

24     ContextMedia's product was preferred by the

Electronically signed by Ann M. Belmont (201-234-827-3922)                449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

128

1      practice because they had weather info on the

2      screen, right?

3              A.     Correct.

4              Q.     And HAN didn't have that?

5              A.     Correct.

6              Q.     Did you ever hear that a

7      practice preferred ContextMedia's product

8      because it had health-related recipes?

9              A.     Yes.

03:44   10              Q.     And at the time, HAN didn't,

11      right?

12              A.     Correct.

13              Q.     Does HAN have all those things

14      now?

15              A.     We still don't have -- no.

16              Q.     Do you have weather now?

17              A.     On some programs.

18              Q.     Do you have recipes?

19              A.     We have -- we have recipes in a

03:44   20      completely different way.  We don't have a

21      video recipe that a patient can see in the

22      waiting room.

23              Q.     Seeing someone playing Julia

24      Child?

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                    449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

129

1          A.     Right.

2          Q.     Cooking something?

3          A.     Right.

4          Q.     Have you seen ContextMedia's

5   loop?

6          A.     I haven't.  I've seen the --

7   some segments from their website.

8          Q.     You've never gone in to an

9   office and looked at it?

03:45   10          A.     No.

11          Q.     But you've got a flavor for it

12   from the snippets that are on the website,

13   right?

14          A.     Correct.

15          Q.     Did any of those snippets show

16   you that ContextMedia's content also would

17   have, like, sort of round table discussions

18   and people talking about health-related

19   topics?

03:45   20          A.     Yes.

21          Q.     And HAN doesn't have that

22   either, correct?

23          A.     Correct.

24          Q.     Now, I've jumped ahead a bunch

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                                   449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

130

1    to 3736202, the entry dated September 19,

2    2012.

3            A.    What's the practice name?

4            Q.    I'm sorry, Thomas Lafferty.

5            A.    What was the date?

6            Q.    September 19, 2012. Did you find

7    it?

8            A.    Yes.

9            Q.    It says, "Cancel.  Try to save.

03:46  10   I have learned from Lesley's comment that

11   this office plans to cancel us and replace

12   with ContextMedia. We have an open WR-SVC

13   followup order for broken rack? and a

14   proactive order for PM walkthru," do you see

15   that?

16           A.    Yes.

17           Q.    What does WR-SVC followup order

18   mean?

19           A.    To have -- the service

03:47  20   representative has gone out to update the

21   brochures in the brochure display and is

22   reporting that the office needs to be

23   followed, there's some type of follow-up

24   that's needed.

Electronically signed by Ann M. Belmont (201-234-827-3922)                    449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

131

1          Q.     Does WR mean waiting room?

2          A.     No, that's work, work service

3    follow up.

4          Q.     I see. And that was for a broken

5    rack or a malfunctioning screen?

6          A.     It looks like for a broken rack

7    from this comment.

8          Q.     And what's a proactive order for

9    PM walkthru?

03:47    10          A.     We proactively call offices to

11   walk them through the website and show them

12   how to update their personalized messages on

13   the screen.  So that would be an order that

14   was loaded prior to the comment.

15         Q.     Tell me again who KSK is.

16         A.     Karen Kline.

17         Q.     And she is the one you told me

18   she's gone, right?

19         A.     Correct.

03:48    20         Q.     "I will need to try to save and

21   address all issues if possible. If it becomes

22   necessary, will try to schedule removal for

23   November and stress how we are the only one

24   to remove our equipment.  Require 30-day

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                                        449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

132

1    written notice, etc." Do you see that?

2            A.    Yes.

3            Q.    Now, this call is occurring on

4    September 19, 2012, right?

5            A.    Correct.

6            Q.    Don't you read this comment to

7    be saying I'm going to delay the removal for

8    more than 30 days to try to save the

9    practice?

03:48    10            A.    No.

11            Q.    What about the part that says,

12    "If it becomes necessary, will try to

13    schedule a removal for November," let's just

14    take that part.  That's more than 30 days

15    after September?

16            A.    Correct.

17            Q.    And then it goes on to say, "and

18    stress how we are the only ones to remove our

19    equipment," right?

03:49    20            A.    Correct.

21            Q.    So before this November

22    deinstallation, no one else can touch it,

23    right?

24            A.    Correct.

Electronically signed by Ann M. Belmont (201-234-827-3922)                                        449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

133

         1          Q.    And she also says, "In the
         2    meantime, I'm going to try to save it,"
         3    right?
         4          A.    Correct.
         5          Q.    And putting that together, you
         6    don't interpret that to be saying, I'm going
         7    to delay the deinstallation beyond 30 days to
         8    try to save it?
         9          A.    I see that she's scheduling the
03:49   10    removal.  At one point our enrollment
        11    agreement said 60 days and the --
        12          Q.    But not at this point, right?
        13          A.    I can't say.
        14          Q.    But she says require a 30-day
        15    notice?
        16          A.    Right.  I can't, I --
        17          Q.    All right. Then I go to, at
        18    least on mine, the second to last page, and
        19    the practice is Capital Arthritis
03:50   20    Rheumatology, the number is 3736413. And the
        21    entry date is January 16, 2012. And this is a
        22    comment from you?
        23          A.    Okay.
        24          Q.    It says, "Called site to follow

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                                    449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

134

1    up on ACN non connect." I don't remember

2    seeing non connect before, what does that

3    mean?

4         A.    That means that they lost

5    heartbeat.

6         Q.    Okay.

7         A.    So the call may be calling for

8    updates.

9         Q.    And the last heartbeat was six

03:50  10   days earlier, right?

11        A.    Correct.

12        Q.    And then she tells you they

13   cancelled the program but the equipment was

14   shipped back on Friday, right?

15        A.    Correct.

16        Q.    And she told you, "There was

17   nothing we could have improved in our

18   program," right?

19        A.    Correct.

03:51  20        Q.    That's because, "They decided to

21   switch because the ContextMedia program is

22   specifically geared toward RA," right?

23        A.    That's what it says.

24        Q.    Do you recall there were any

Electronically signed by Ann M. Belmont (201-234-827-3922)          449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

135

1    number of instances where you guys did your

2    best to save the practice and the practice

3    was candid with you and said, there's really

4    nothing you can do to save the practice?

5            A.    Yes.

6            Q.    They said they enjoyed working

7    with you, but, given this other competitive

8    offering, there was nothing you could do at

9    this point, correct?

03:51   10            A.    Correct.

11            Q.    I'm sorry, I do have one more.

12    It's Dr. Barry Shibuya, 3742102. It's you

13    reporting again on June 13, 2012. And the

14    comment begins, "Per Phyllis Timole."

15            A.    Okay.

16            Q.    And Victor at this practice

17    reports to you that the doctor, in the middle

18    of the comment, "had a few issues with our

19    program, the screen is always going blue and

03:52   20    they have to use the remote to get it back on

21    channel quite often.  Our program is stagnant

22    and not very engaging and we keep sending

23    Humira and Uloric brochures, which they have

24    hundreds of. I thanked him for giving us the

Electronically signed by Ann M. Belmont (201-234-827-3922)                    449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

136

1   opportunity to remove our own equipment." And

2   so, in this instance, do you recall if, in

3   fact, HAN removed its own equipment?

4          A.    I don't recall.

5          Q.    That's what this sounds like,

6   right?

7          A.    That's what it sounds like the

8   plan was, it doesn't mean that's what

9   happened.

03:53   10          Q.    Fair enough. Okay, just a few

11   more.

12      (Exhibit 20 identified.)

13          Q.    This is a September 7, 2011,

14   e-mail from you to Catherine -- you're going

15   to have to help me with the name, Goertzen?

16          A.    Goertzen.

17          Q.    Goertzen.  Take whatever time

18   you want to read it and let me know when

19   you're ready.

03:54   20          A.    Okay.

21          Q.    What was Ms. Goertzen's position

22   at the time?

23          A.    She was relationship manager.

24          Q.    Is that something different than

Electronically signed by Ann M. Belmont (201-234-827-3922)                    449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

137

1    you?

2          A.    Not what I was at this time, no.

3          Q.    And this chain is about a

4    comment that someone has forwarded to you

5    from the CMS after entering it, or what's

6    being forwarded to you?

7          A.    This is me forwarding a comment

8    to Catherine.

9          Q.    So it may be a comment that you

03:55  10    put in?

11          A.    Correct.

12          Q.    Now, you're pulling it out of

13    the database and sending it on.  You have the

14    capability to do that?

15          A.    Correct.

16          Q.    I've seen -- I'm not sure I'm

17    going to find one, but I've seen a bunch of

18    e-mails where someone is commenting on an

19    entry they made, and then there are some

03:55  20    instructions to immediately delete.  Does

21    that ring any bells with you?

22          A.    Oh, deleting comments?

23          Q.    Yeah.

24          A.    If there's error or duplication,

Electronically signed by Ann M. Belmont (201-234-827-3922)                                    449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

138

1    that's a very rare instance, but that's

2    simply if there's an error.

3            Q.    It wasn't some practice where

4    you recorded the comment in one format and

5    then put it in the database and deleted the

6    original format?

7            A.    No.

8            Q.    Okay.

9            A.    All of the comments would be

03:56   10   going in the same database and the same

11   format.

12           Q.    I'll ask somebody else about

13   that. Why were you bringing this one to Ms.

14   Goertzen's attention?

15           A.    This was in her territory.

16           Q.    I see, okay. And you're asking

17   her, if you get a call from this location

18   that switched to ContextMedia, you would like

19   a reason for the cancellation?

03:56   20           A.    Correct.

21           Q.    It sounds like you weren't able

22   to capture one on your call?

23           A.    I --

24           Q.    -- you never called?

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                    449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

139

1          A.    I didn't speak with anyone at
2    the office.  I simply left a voice message.
3          Q.    You tell Ms. Goertzen that she
4    should ask the reason for cancel, and you
5    tell her I'm sure the reason will be
6    specialty, right?
7          A.    Yes.
8          Q.    You said that because you've
9    heard that many times from practices, right?
03:57 10          A.    I said that since this is a
11   diabetes clinic.
12          Q.    And you've heard that many times
13   from diabetes clinics?
14          A.    I heard that in the past.
15          Q.    That was true as of September 7,
16   2011?
17          A.    I -- yes.
18          Q.    And you also share with her that
19   you've also heard that they will give us
03:57 20   reasons that they prefer sound or a news
21   ticker, right?
22          A.    Correct.
23          Q.    That's something you've heard
24   before, right?

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                              449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

140

1        A.      Correct.

2        Q.      But not as often as you've heard

3    the specialty reason, right?

4        A.      It's hard to say.

5        Q.      Well, at least in the diabetes

6    practices, wasn't that what the predominant

7    reason was?

8        A.      I'm not sure what the

9    predominant reason was at that time.

03:57   10        Q.      Then you say you, "usually

11    record the conversations in case they have a

12    lot to say," do you see that?

13        A.      Yes.

14        Q.      Did your company have the

15    ability to record conversations with the

16    practices back then?

17        A.      They did.

18        Q.      And do you still do that?

19        A.      No.

03:57   20        Q.      And for some period of time, did

21    you regularly do it?

22        A.      No, not regularly.

23        Q.      You say usually?

24        A.      I don't know that I usually or

Electronically signed by Ann M. Belmont (201-234-827-3922)                    449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

141

1    regularly did that. That's what this says,

2    but there were -- there were instances where

3    I recorded calls.

4             Q.    During what time period, do you

5    know?

6             A.    In 2011, I'm not sure when it

7    stopped.

8             Q.    And who put that procedure in

9    place, do you know?

03:58   10             A.    I don't know.

11             Q.    It was available to you and all

12    of your peers, correct?

13             A.    Correct.

14             Q.    And did you let the practice

15    know that you were recording a conversation?

16             A.    No.

17             Q.    To your knowledge, you never

18    did?

19             A.    On occasion.

03:58   20             Q.    But the practice was not?

21             A.    The -- on occasion we may have

22    let them know.

23             Q.    But usually you didn't?

24             A.    Right.

Electronically signed by Ann M. Belmont (201-234-827-3922)                    449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

142

1        Q.    Then what happened to those

2    recordings?

3        A.    They're somewhere in an e-mail

4    or they may have been just deleted after,

5    basically, the point of recording the

6    conversation was just to be able to take good

7    notes.

8        Q.    I see.  Do you recall ever

9    listening to a recorded conversation after

03:59   10    you made good notes?

11        A.    After, no.

12        Q.    And I think I understand. The

13    recording is more reliable than your memory

14    or your handwritten notes in most cases,

15    right?

16        A.    Right.

17        Q.    So to get in the database the

18    most accurate complete information you could,

19    you would record?

03:59   20        A.    Yes.

21        Q.    And I take it that included

22    practices that switched from HAN to

23    ContextMedia, correct?

24        A.    Correct.

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                    449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

143

1        Q.    Do you know why HAN stopped

2   doing it?

3        A.    I'm not sure.

4        Q.    No one ever told you?

5        A.    I'm not sure.

6        Q.    No one ever told you --

7        A.    I can't recall.

8        Q.    No one ever told you that there

9   was concerns over the fact that it might be

04:00   10   illegal to do that?

11        A.    Right.  And I'm not sure, I was

12   just told to stop doing it.

13        Q.    But you said right when I said

14   illegal.  Did you hear that too?

15        A.    I have heard that, but I'm not

16   -- that decision didn't come from me.

17        Q.    Right.

18        A.    I'm not sure.

19        Q.    Does HAN have practices in the

04:00   20   state of Illinois?

21        A.    Yes.

22        Q.    State of Washington?

23        A.    Yes.

24        Q.    State of Massachusetts?

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                    449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

144

1       A.      Yes.

2       Q.      State of Pennsylvania?

3       A.      Yes.

4       Q.      Do you know if any of those

5    recorded calls still exist?

6       A.      Yes, they should, just --

7       Q.      Go on, I didn't mean to cut you

8    off.

9       A.      There should be just what --

04:01   10   what we've -- I think this was like three or

11   so.

12      Q.      There's three left?

13      A.      Yeah, there was just a handful

14   that came through, that you should have as

15   far as I'm aware.

16      Q.      Did those handful exist by

17   accident?

18      A.      No.

19      Q.      I mean, was there some concerted

04:01   20   effort to destroy all the others?

21      A.      No.

22      Q.      To your knowledge, has there

23   been any sort of the law enforcement or

24   governmental inquiry or investigation of HAN

Electronically signed by Ann M. Belmont (201-234-827-3922)                449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

145

1    for the recording of phone calls?

2              A.    Not to my knowledge.

3          (Exhibit 21 identified.)

4              Q.    I think we are done with that

5    one. Exhibit 21 is a February 3, 2012, e-mail

6    exchange, first between you and Deborah Adams

7    and Lori Smith, you are Lori Smith, excuse

8    me, and you -- it's been a long day, and your

9    boss, Heather McGauvran, right?

04:02    10              A.    Correct.

11              Q.    This is an example of a practice

12    telling you they were switching because of

13    specialty, right?

14              A.    I'm sorry, can you ask that

15    again?

16              Q.    If you look at the comments at

17    the bottom, this is an instance of a practice

18    telling you they were switching because of a

19    specialty reason?

04:03    20              A.    Correct.

21              Q.    And when you then write --

22              A.    And this comment is from Deborah

23    Adams saying that the diabetic doctor --

24              Q.    I see, you're right.  I stand

Electronically signed by Ann M. Belmont (201-234-827-3922)                                    449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

146

1    corrected.  And then you pass it on to your

2    boss, right?

3            A.    Yes.

4            Q.    And whatever I was going to ask

5    you about here, I'm curious.  The last line

6    of your statement to your boss says, "I feel

7    like with DHN the reason for the switch is a

8    little more obvious," do you see that?

9            A.    Correct.

04:03    10            Q.    Do you have any idea what you

11    meant there?

12            A.    Since this is a diabetes

13    practice, they were looking for a diabetes --

14    according to Debbie's notes here, the doc was

15    a diabetes doc.

16            Q.    Back in February 2012, were you

17    aware of anybody in the marketplace, any of

18    your competitors that had a diabetes

19    condition specific product beside

04:04    20    ContextMedia?

21            A.    Not that I can recall.

22            Q.    And you understood that was

23    their first product, right?

24            A.    Correct.

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                    449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

147

1       (Exhibit 22 identified.)

2           Q.    This is an e-mail from you to

3   Ms. Finley, your boss, on Valentine's day

4   2012, right?

5           A.    Yes.

6           Q.    And did you field this call from

7   the practice?

8           A.    I called the practice.

9           Q.    You called the practice, that's

04:05   10   what I meant.

11          A.    Yes.

12          Q.    They told you that the practice

13   wanted additional sound on the program?

14          A.    That's what it says.

15          Q.    And they wanted to know if you

16   could provide additional sound, right?

17          A.    It says that she had inquired in

18   the past on sound.

19          Q.    And that she was told that the

04:05   20   sound you currently provide is all that's

21   available right now?

22          A.    That's what it says.

23          Q.    And then you write, "There are

24   no notes in CMS about a sound inquiry,"

Electronically signed by Ann M. Belmont (201-234-827-3922)          449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

148

1    questioning whether that really happened,

2    right?

3              A.    Correct.

4              Q.    But what were the facts at that

5    point in time, that is Valentine's day, 2012,

6    did HAN offer additional sound than what she

7    was getting?

8              A.    It's hard to say if she had her

9    volume up on her screen. A lot of times

04:06  10   practices don't realize that their volume

11   button is on their screen.

12             Q.    But did you have sound then?

13             A.    We had some sound.

14             Q.    Some sound?

15             A.    Yeah.

16             Q.    But not as much as ContextMedia?

17             A.    No.

18             Q.    But you're saying they're all

19   sound, correct?

04:06  20             A.    Correct.

21             Q.    And then, again, I'm curious

22   about your opening comment, "On a roll L..."

23   what do you mean by that?

24             A.    I have no idea.  Maybe that's a

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                    449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

149

1    typo.

2            Q.     Pardon?

3            A.     Maybe that's a typo.

4            Q.     On a roll is a typo?

5            A.     Oh, the L...

6            Q.     Oh, okay.  I thought that was

7    you to Lori. What do you mean --

8            A.     Well, that's from me, so.

9            Q.     What do you mean by on a roll?

04:06   10            A.     This is probably a week that we

11    received plenty of equipment from RHN or

12    Context.

13            Q.     And it was also a week when

14    plenty of the practices told you they decided

15    to switch?

16            A.     I can't say.

17        (Exhibit 23 identified.)

18            Q.     This is 23. This is a call you

19    had with the practice, right?  On June 9,

04:07   20    2011?

21            A.     Correct.

22            Q.     You write, "Site was serviced

23    June 1 and lost connection June 3.  Very

24    frustrated with connection issues." You say,

Electronically signed by Ann M. Belmont (201-234-827-3922)                    449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

150

1    "The office is under the impression that they

2    are under contract until October so they have

3    not made the switch." She goes on to say --

4    you go on to say, "After reviewing comments

5    this office had a tech on site 7 times since

6    January," right?

7         A.    That's what it says.

8         Q.    So this is not a practice

9    exaggerating to you about the service issues,

04:08   10   this is you going into your database and

11   finding out that they had a tech on site

12   seven times in the last six months, right?

13        A.    Correct.

14        Q.    "Jackie agreed to plug us back

15   in, but I do not see us staying plugged in,"

16   do you see that?

17        A.    Yes.

18        Q.    Is what you're trying to

19   communicate there is, the practice had, for a

04:08   20   moment, agreed to stay with you, but you were

21   pessimistic that you could save it?

22        A.    Can you ask that again?

23        Q.    Pardon?

24        A.    Can you say that again?

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                                        449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

151

 1        Q.    Are what you're communicating

 2    there is that, for now the practice has

 3    agreed to stay with you, but you're

 4    pessimistic you're going to be able to keep

 5    them for the long term?

 6        A.    Yes.

 7        Q.    And do you know if this practice

 8    ever, in fact, switched?  You probably don't

 9    know off the top of your head, do you?

 04:09  10        A.    I don't know off the top of my

 11    head.

 12        Q.    But that could be confirmed,

 13    right?

 14        A.    Yes.

 15      (Exhibit 24 identified.)

 16        Q.    This is 24. This is, first, a --

 17    anyway, you can look at whatever you want on

 18    this, but in the middle near the top, you're

 19    forwarding a comment on a conversation you

 04:10  20    had with a practice to Amy Finley, right?

 21        A.    Yes.

 22        Q.    And you report what the practice

 23    said to you about that. And then you conclude

 24    the comment by saying, "Placing Sound inquiry

Electronically signed by Ann M. Belmont (201-234-827-3922)                    449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

152

1    and fielding cancel request to Amy F."  Do

2    you see that?

3              A.    Yes.

4              Q.    What does that mean, placing

5    sound inquiry?

6              A.    Noting that the practice was

7    requesting sound.

8              Q.    What was the purpose of doing

9    that?

04:10    10              A.    To determine the needs of our

11    customers.

12              Q.    So you're sort of keeping track

13    of, as you said, the needs of your customers

14    so that others in the company can look at

15    that and figure out what to do?

16              A.    Correct.

17              Q.    At this point, you're not

18    providing sound, right?

19              A.    Correct.

04:11    20              Q.    Was there some sort of -- tell

21    me how you physically place a sound inquiry.

22    Is that in the database you put something in?

23              A.    Yes, and just to backup.

24              Q.    Sure.

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                                      449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

153

1          A.    We did offer some sound, but not

2     full sound. The placing of sound inquiry is

3     an order that we place in our database.

4          Q.    In the same database as CMS?

5          A.    Em-hm.

6          Q.    But that's a different field?

7          A.    It's a -- it's a order, I don't

8     know. It's not a comment, it's an order that

9     can be tracked.

04:11  10          Q.    Is it a column on Exhibit 17?

11          A.    No, no.  This would be -- this

12     would be not specific to the location

13     information, but more like the -- we

14     encountered one other order, the WR service

15     order that you asked about. That's that same

16     type of tracking information.

17          Q.    So if you were going to the

18     database and tried to determine every

19     practice for which a sound inquiry had been

04:12  20     placed by you or one of your peers, what

21     would come up on the screen?

22          A.    It depends on how you pull the

23     report. What you want to come up on the

24     screen.

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                    449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

154

1          Q.    Can you pull up a report --
2     well, can you pull up a report like I just
3     said, if you do the right inquiries, which
4     said, list all the practices for which you
5     made sound inquiries?
6          A.    Yes.
7          Q.    It sounds like a very robust
8     database.
9          A.    Yes.
04:13    10          Q.    Could you pull up a list of
11    practices who said they wanted longer loops?
12          A.    No.
13          Q.    What other kinds of lists could
14    you pull up where you're tabulating feedback
15    of the client's needs?
16          A.    There would be no sound,
17    additional languages, additional programs,
18    additional displays, video.  I believe that's
19    all of them.
04:14    20          Q.    When you said -- I think I
21    understood all of those except one;
22    additional displays, what does that mean?
23          A.    For the exam room, if they
24    wanted more displays but we weren't able to

Electronically signed by Ann M. Belmont (201-234-827-3922)          449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

155

1    provide them.

2         Q.    More than one, for example?

3         A.    Correct.

4         Q.    Why were you not able to provide

5    more than one?

6         A.    Just the restraints of the

7    program, not being able to incur the cost of

8    the displays.

9         Q.    Okay.

04:14  10         A.    Or have the display, we might

11   not have the displays on hand, you know,

12   enough inventory.

13        Q.    Were you ever able to

14   accommodate the request for additional

15   displays?

16        A.    In some cases.

17        Q.    But most you weren't?

18        A.    Right.

19        Q.    Because the initial display

04:14  20   might mean that you don't have -- for one

21   practice might mean you don't have one at all

22   for another?

23             MR. BERNAY: Objection to the

24   form.

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                    449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

156

1         Q.    It's a confusing question. Did

2    you understand it?

3         A.    No.

4         Q.    Okay. Meaning that if you, in

5    these instances, provided an additional

6    display to a single practice, you might be

7    sacrificing the ability to provide a display

8    to a new practice?

9         A.    I --

04:15   10         Q.    Don't let me put words in your

11   mouth, okay?

12         A.    No, I -- is there a -- can you

13   ask it in a different way?

14         Q.    I guess I'm trying to understand

15   the constraints of -- aside from additional

16   inventory, maybe that's just it and you have

17   nothing else to say.

18         A.    There are restraints, but more

19   than what you mentioned.

04:15   20         Q.    Tell me what those are.

21         A.    One restraint would be not being

22   able -- not having the inventory, another

23   would be not having the ability to incur the

24   cost of additional displays, and then

Electronically signed by Ann M. Belmont (201-234-827-3922)                    449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

157

1    servicing those displays as a result going

2    forward.

3            Q.    Okay. Was it rare you were able

4    to accommodate a request for additional

5    displays given all these restraints?

6            A.    It has changed throughout my

7    tenure.

8            Q.    How about in 2011?

9            A.    At that time, we were able to

04:16   10   accommodate more displays than --

11           Q.    In 2012 was less?

12           A.    -- 2012.

13           Q.    2012 was less?

14           A.    Yes.

15           Q.    How about 2013?

16           A.    I'd say less than 2011.

17       (Exhibit 25 identified.)

18           Q.    This is a somewhat lengthy

19   e-mail exchange, last e-mail being February

04:17   20   19, it looks like the first e-mail was one

21   from you on page 4 of this document, dated

22   February 15, 2013. I'd like to work from that

23   first e-mail forward.

24           A.    Okay.

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                              449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

158

1          Q.    Is this an e-mail you saw

2     recently?

3          A.    No.

4          Q.    The first e-mail, Friday,

5     February 15, 2013, you're writing Amy Finley,

6     Kelly Schulkers and Lisa Grippo, copying

7     Jennifer Hartfiel and Allison Griffith,

8     right?

9          A.    Yes.

04:18  10          Q.    We know who Amy Finley was.

11     I've seen Lisa Grippo's name a lot, but I

12     haven't asked you, what was her position?

13          A.    She was in some type of sale

14     position.

15          Q.    Not in your group?

16          A.    Not on my team, correct.

17          Q.    Kelly Schulkers, did I ask you

18     about her before?

19          A.    Kelly Schulkers is over the

04:18  20     field sales support, so her team handles any

21     kind of installations and new practices.

22          Q.    How about Jennifer Hartfiel?

23          A.    Jennifer Hartfiel is part of the

24     field sales team.

Electronically signed by Ann M. Belmont (201-234-827-3922)                    449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

159

1          Q.    And Allison Griffith?

2          A.    Allison is part of sales as

3     well.

4          Q.    This is about a practice that

5     you refer to as Lakeside, right?

6          A.    Correct.

7          Q.    Talked to them, they wanted to

8     go to another program. I'm in the first

9     paragraph down towards the end of it, "The

04:19  10     group has acquired 11 new offices and we

11     could not promise programs for these 11, plus

12     the CCN office, and our competitor could," do

13     you see that?

14          A.    Yes.

15          Q.    Is this an example of being

16     handicapped by the inability to provide

17     additional displays?

18          A.    No.

19          Q.    What is this then?  Why couldn't

04:19  20     you accommodate the request for 11 new

21     offices?

22          A.    Some of those offices were

23     specialities outside of our programs.

24          Q.    I see. Dictated by the

Electronically signed by Ann M. Belmont (201-234-827-3922)                              449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

160

1    advertisers?

2          A.    Correct.

3          Q.    Eleven offices is a lot, right?

4          A.    Right.

5          Q.    I mean, that's an attractive

6    practice, right?

7          A.    Right.

8          Q.    And at the end of that paragraph

9    you write, "To my dismay, I learned that the

04:20  10   competitor was ContextMedia," do you see

11   that?

12         A.    Yes.

13         Q.    Why were you dismayed?

14         A.    Just it's -- I guess that's just

15   how I was feeling that day.

16         Q.    If you don't remember, you don't

17   have to make stuff up.

18         A.    Yeah.

19         Q.    It's a long time ago.

04:20  20         A.    I'm not sure, yeah.

21         Q.    In the next paragraph it looks

22   like you're trying to save her, you can read

23   as much as you want, but get down to the

24   middle, "Pam said that the decision has

Electronically signed by Ann M. Belmont (201-234-827-3922)                                                        449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

161

1    already been made and contracts were signed,"

2    do you see that?

3              A.    Yes.

4              Q.    And then you write, "I explained

5    to her that often, in our business, the

6    contracts are not always binding and I just

7    want to make sure that the decision makers

8    know about our suite of products before we

9    begin removing the monitors," do you see

04:21   10    that?

11              A.    Yes.

12              Q.    So you were suggesting to her

13    that whatever she had signed with

14    ContextMedia may not be binding?

15              A.    That's what it says.

16              Q.    And you're asking for the

17    opportunity to talk to the decision makers to

18    try to save the practice even though she's

19    just told you she signed contracts with

04:21   20    ContextMedia?

21              A.    Correct.

22              Q.    And at this point in time,

23    February 2013, you've been in the industry

24    for about three years, right?

Electronically signed by Ann M. Belmont (201-234-827-3922)                    449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

162

1         A.    Yes.

2         Q.    Fair amount of experience,

3    right?

4         A.    Yes.

5         Q.    Fair amount of an understanding

6    about the contract offering your competitor

7    is offering?

8         A.    Not an understanding about the

9    competitor's contracts.

04:21   10         Q.    But you reached a view after

11   three years that contracts aren't always

12   binding in the industry, right?

13        A.    That this -- the -- that's what

14   I was told.

15        Q.    Who told you?

16        A.    I don't recall.

17        Q.    Somebody at HAN, right?

18        A.    Yes.

19        Q.    It wasn't somebody at

04:22   20   ContextMedia?

21        A.    No.

22        Q.    Have you ever talked to anybody

23   from ContextMedia?

24        A.    Not that I can recall.

Electronically signed by Ann M. Belmont (201-234-827-3922)          449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

163

1          Q.    Okay. To your knowledge, did HAN
2    ever enforce its enrollment agreements? You
3    know what I mean by enforce, right?
4          A.    Yes.
5          Q.    Did they ever threaten to sue a
6    practice?
7          A.    Not to my knowledge.
8          Q.    Did it ever sue a practice?
9          A.    Not to my knowledge.
04:22   10          Q.    Do you know what a cease and
11    demand letter is?
12          A.    Now I do.
13          Q.    To your knowledge, did HAN ever
14    send a practice a cease and demand letter,
15    stop what you're doing, you can't do that?
16          A.    Not to my knowledge.
17          Q.    And then this is a long e-mail
18    you wrote. Flipping on over to the next page,
19    first paragraph, last sentence, you say, "I
04:23   20    explained coexisting and told her that we
21    would never tell her how to run a practice or
22    organization in that manner, and I am shocked
23    that they do." This is in part an explanation
24    of your pitch to this practice in order to

Electronically signed by Ann M. Belmont (201-234-827-3922)                                        449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

164

1    try to save it that the HAN product, you

2    would allow the HAN product to coexist with

3    the ContextMedia product, right?

4          A.    Correct.

5          Q.    Do you know if HAN was able to

6    count with advertisers in the same way if the

7    practice only had HAN product, if it had

8    coexisting with ContextMedia product?

9          A.    I don't know that information.

04:24   10          Q.    "I asked her to please give us

11    the chance to remove our equipment," and she

12    allowed you to do that, right?  She agreed?

13          A.    Correct.

14          Q.    And you said, "I explained that

15    we would love to partner with them and

16    coexisting would give her the chance to try

17    both programs," right?

18          A.    Yes.

19          Q.    And then she noted, apparently

04:25   20    based on what you told her, "This is not an

21    option," right?

22          A.    Yes.

23          Q.    Did you know it was contrary to

24    the enrollment terms of the agreement that

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                          449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

165

1    she'd just signed with ContextMedia for you

2    to coexist?

3            A.    I'm sorry?

4            Q.    Did you know it was a violation

5    of the terms of the enrollment agreement,

6    which she had just signed with ContextMedia

7    for HAN to coexist with the ContextMedia

8    offering?

9            A.    No.

04:25    10            Q.    And then you, last paragraph,

11    second to last sentence, write,

12    "Unfortunately, I think overlooking the CCN

13    office and not guaranteeing that we can

14    accommodate expanding into all of their newly

15    acquired offices was our shortfall," right?

16            A.    Correct.

17            Q.    That was your assessment of why

18    you were not able to save her, right?

19            A.    Yes.

04:26    20            Q.    But you're not going to give up,

21    right?  You say lastly, "Personally, I'm not

22    ready to throw in the towel here, but it will

23    be a struggle to get the decision maker to

24    reverse this decision," right?

Electronically signed by Ann M. Belmont (201-234-827-3922)                449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

166

1          A.     Yes.

2          Q.     But you were never able to do

3    so, right?

4          A.     We were.

5          Q.     You were?

6          A.     Yes.

7          Q.     So you saved this practice?

8          A.     Yes.

9          Q.     Okay.

04:26     10          A.     I didn't personally, but I

11    believe Chris Martini did.

12          Q.     And so the HAN equipment was

13    never taken down?

14          A.     Correct.

15          Q.     And the ContextMedia equipment

16    was never put up?

17          A.     Correct.

18          Q.     And that happened after you told

19    them that contracts were not always binding

04:27     20    right?

21          A.     That's what this says.

22          Q.     And Amy Finley writes back,

23    "Great job Lori!  Thank you for contacting

24    her," right?  It's at the top of page 4.

Electronically signed by Ann M. Belmont (201-234-827-3922)                    449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

167

1          A.    Yes.

2          Q.    And at this point in time, since

3    it's four minutes after your e-mail, the

4    practice hasn't been saved yet, has it?

5          A.    Correct.

6          Q.    Who is -- you say Chris Martini?

7          A.    Correct.

8          Q.    Who is he or she?

9          A.    He is in sales.

04:27    10          Q.    In sales. Do you know how he was

11    able to save these 11 locations?

12          A.    I'm not sure.

13          Q.    And Ms. Finley, when she writes

14    back to you and says, "Great job Lori," she

15    copies Kelly Schulkers, Lisa Grippo, Jennifer

16    Hartfiel, Allison Griffith and Chris Martini,

17    the same group you sent, but adding Mr.

18    Martini, right?

19          A.    Correct.

04:28    20          Q.    And she doesn't say to you in

21    this e-mail that you should not be saying to

22    practices that contracts are not always

23    binding, does she?

24          A.    No, she does not.

Electronically signed by Ann M. Belmont (201-234-827-3922)                    449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

168

1          Q.    Did anyone ever admonish you not

2     to say that?

3          A.    No.

4          Q.    And going along, proceeding

5     forward in the e-mail chain -- actually, go

6     to the last page. You respond February 18,

7     2013, at 9:33 a.m. after some more e-mails,

8     you can look at it. You've been asked --

9     you've been asked whether you scheduled the

04:29   10   removals yet, right?

11         A.    I'm sorry, oh, I see here.

12    Correct.

13         Q.    And then you -- actually, that's

14    what you said, "Correct, I did not schedule

15    any removals.  When I spoke with her on

16    Friday, I set the expectation that we would

17    follow up this week." "Lisa, since you were

18    out this week, either Chris or I will reach

19    out to her," that is Lisa's not responding --

04:30   20   I'm sorry.  Amy is responding, "Lisa, since

21    you are out this week, either Chris or I will

22    reach out to her this week and we will go

23    from there."  That's kind of where it gets

24    left, right?

Electronically signed by Ann M. Belmont (201-234-827-3922)                    449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

169

1          A.    Yes.

2          Q.    Do you know what period of time

3    after this e-mail exchange it took Mr.

4    Martini to get out to the practices?

5          A.    I'm not 100 percent certain.

6          Q.    Do you know how long it took for

7    him to -- actually, for the practice to

8    change its mind?

9          A.    I'm not 100 percent certain.

04:30    10          Q.    When you say you're not

11    100 percent certain, that tells me you know

12    something.

13          A.    I know it was pretty quickly.

14          Q.    Very quickly?

15          A.    It was -- I want to say within

16    the week.

17          Q.    Do you know how he was able to

18    do that?

19          A.    I'm not sure.

04:30    20          Q.    Do you know if he offered any

21    incentives to the practice?

22          A.    I believe he discussed the CCS

23    program with our -- with Pam.

24          Q.    Let's mark one more.

Electronically signed by Ann M. Belmont (201-234-827-3922)                    449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

170

1          MR. BERNAY: Dick, can we take a

2     break?

3          MR. O'BRIEN: Sure.

4          (Break taken.)

5          Q.    Before I mark this next one. I

6     guess I should ask you about your background.

7     You've been with ContextMedia since 2010,

8     right?

9          A.    PatientPoint.

04:39    10          Q.    Would you like a job?  Sorry.

11     You've been with -- that was a trick

12     question, double agent.

13          You've been with HAN since 2010,

14     and before that, what did you do?

15          A.    I was a manager at Hobby Lobby.

16          Q.    What's Hobby Lobby?

17          A.    It's a craft store.

18          Q.    Here in Cincinnati?

19          A.    Yes.

04:40    20          Q.    How long did you do that?

21          A.    Eight years.

22          Q.    And then did you have employment

23     before that?

24          A.    That was my first job.

Electronically signed by Ann M. Belmont (201-234-827-3922)                    449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

171

1          Q.    First job?

2          A.    Well, I mean, aside from when I

3    was a minor working at Arby's and McDonald's.

4          Q.    Did you go to high school here

5    in Cincinnati?

6          A.    Yes.

7          Q.    Do you have any schooling after

8    that?

9          A.    Ohio State.

04:40  10          Q.    Ohio State. Did you complete a

11   degree of program there?

12          A.    No.

13          Q.    How many years did you study

14   there?

15          A.    Three.

16          Q.    Thinking about going back some

17   day?

18          A.    Maybe.

19          Q.    What was your area of focus when

04:40  20   you were there?

21          A.    Consumer affairs.

22          Q.    Any sort of additional training,

23   specialized courses, things like that?

24          A.    No.

Electronically signed by Ann M. Belmont (201-234-827-3922)          449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

172

1      Q.   Any professional certificates or

2  anything like that?

3      A.   No.

4  (Exhibit 26 identified.)

5      Q.   Are you aware of a folder or

6  file HAN maintains on each of its

7  competitors?

8      A.   No.

9      Q.   Flip through --

04:41  10      A.   I know in the past we had

11  information on Accent Health, but it wasn't a

12  folder. It was just kind of what their

13  program is.

14      Q.   How was that maintained?

15      A.   It wasn't. That information

16  is -- was just dumped, and to my knowledge,

17  it wasn't -- it was never maintained.

18      Q.   Dumped on a drive somewhere or a

19  server?

04:42  20      A.   Yes.

21      Q.   But it wasn't -- you had some

22  stuff on that particular competitor, but to

23  your knowledge, there wasn't some organized

24  effort to gather information on all

Electronically signed by Ann M. Belmont (201-234-827-3922)           449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

173

1    competitors?

2         A.    Correct.

3         Q.    I take it this particular file

4    I've just given you, you have not seen

5    before?

6         A.    Correct.

7         Q.    All right. I don't have any

8    questions.

9       (Exhibit 27 identified.)

04:42    10            I'll represent to you this was

11    produced by Tom a couple hours ago. And I'm

12    led to believe that this is the document that

13    tracks various reasons practices leave HAN.

14    Have you seen a report in this format before?

15         A.    Yes.

16         Q.    And is the thing you told me

17    about earlier today?

18         A.    Yes.

19         Q.    Let's look at the first page,

04:43    20    and it says, "WRN only" that means waiting

21    room products only, correct?

22         A.    Correct.

23         Q.    Can you interpret this graph for

24    me?  What it means to be on the green and

Electronically signed by Ann M. Belmont (201-234-827-3922)                    449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

174

1    what it means to be on the red? I mean, I can

2    read what it means, but, for example,

3    advertising, it looks like it's nearly

4    negative 4 percent.  Do you know what that

5    means?  Can you translate that for me?

6            A.    I don't know. Aside from

7    reading.  Aside from reading here what you

8    can read.

9            Q.    Do you know what -- do you know

04:43   10   what it means to say a practice churned due

11   to advertising?

12           A.    Yes.

13           Q.    What does that mean?

14           A.    That means that they elected to

15   cancel the program due to advertising.

16           Q.    Due to the fact that you had

17   advertising in the program?

18           A.    Yes.

19           Q.    Would that also capture

04:44   20   cancellation due to the amount of advertising

21   in relation to the amount of content?

22           A.    That would -- do you mean -- can

23   you ask that again?

24           Q.    Yeah, it sounds like when you

Electronically signed by Ann M. Belmont (201-234-827-3922)          449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

175

1    just told me, this intends to capture

2    practices who left HAN because they didn't

3    want advertising in the waiting room?

4            A.    Correct.

5            Q.    Does it also capture practices

6    who left HAN because they didn't like the

7    ratio of advertising to content in HAN's

8    products?

9            A.    As long as that was the only

04:44    10    clear cancellation reason.

11           Q.    And in your experience, that has

12    been a reason from time to time, correct?

13           A.    Correct.

14           Q.    Is that what this is meant to

15    do, building on something you just told me,

16    try to capture the reasons for churn when you

17    see a single, clear reason?

18           MR. BERNAY: Object to the form.

19    You can answer.

04:45    20           A.    When -- can you ask that again?

21           Q.    Yeah. Does this document intend

22    to record as reasons for churn only occasions

23    where a reason is the sole reason given?

24           A.    This --

Electronically signed by Ann M. Belmont (201-234-827-3922)                    449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

176

                    MR. BERNAY: Same objection.  You
1
2    can answer.
3            A.    This document would record the
4    reason code, which would be applied -- well,
5    I'm not sure.
6            Q.    So, for example, if a practice
7    said I'm leaving because I don't like the
8    ratio of HAN's advertising to its contend,
9    and I'm also leaving because I like the
04:46  10   competitor's product better, would that --
11   how would that fall on this chart?
12           A.    Depending on -- depending on
13   how -- how the relationship manager
14   interprets the comments from the practice,
15   whatever their main reason is for leaving.
16           Q.    So judgment is exercised as to
17   what the main reason is and then you assign
18   that to this chart?
19           A.    Correct.
04:46  20           Q.    And who does that?  Do multiple
21   people make those choices?
22           A.    Yes.
23           Q.    Are you one of them?
24           A.    Yes.

Electronically signed by Ann M. Belmont (201-234-827-3922)                                    449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

177

1          Q.     Who else?

2          A.     All of the relationship

3     managers.

4          Q.     Okay. All your peers?

5          A.     Em-hm.

6          Q.     How does your judgment that,

7     say, a practice switched from HAN or left HAN

8     because it didn't like the advertising ratio,

9     how do you get that judgment into this

04:47  10     program?

11          A.    I mean, this is just a snapshot.

12     Your judgment would come from the database

13     and the comments in the database.

14          Q.    I guess what I'm trying to ask

15     if however unartful fashion as I am, how does

16     something get from comments in the database

17     to appearing as a statistical item on this?

18          A.    As a practice cancels, we have

19     to collect a reason.

04:47  20          Q.    I see. So, for example, all of

21     the practices on Exhibit 17, or Exhibit 18 --

22     strike that.

23               All of the cancellations from

24     HAN, as reflected on Exhibit 17 or Exhibit

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                    449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

178

1    18, would have a reason selected by you or

2    your team for input into this document?

3          A.    Correct.

4          Q.    And what use is made of this

5    document by HAN?

6          A.    Knowing where we stand as far as

7    where our churn points are.

8          Q.    Do you receive any training, you

9    and your team, as to how to exercise your

04:48  10   judgment to pick the main reason, or are you

11   just sort of left to your common sense?

12         A.    It's -- we receive training.

13         Q.    On this subject?

14         A.    On -- I mean, it's not an

15   ongoing training.

16         Q.    But you received training at

17   some point --

18         A.    Yes.

19         Q.    -- that told you how you should

04:48  20   conduct yourself and make judgments in order

21   to input main reasons for cancellation into

22   Exhibit 27?

23         A.    Correct.

24         Q.    Were there written materials

Electronically signed by Ann M. Belmont (201-234-827-3922)                    449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

179

1    around that training?

2           A.    Yes.

3           Q.    When did that training for you

4    take place?

5           A.    In 2010.

6           Q.    Was that like a classroom

7    setting with you and others?

8           A.    Myself and one other.

9           Q.    And is it your understanding

04:49  10    that, as people have been added to your team

11    over time, they have been similarly trained?

12           A.    Yes.

13           Q.    Do you recall what those

14    training materials look like?  Not look like,

15    that's a bad question.  Do you recall the

16    content of them?

17           A.    Just specifically related to

18    this?

19           Q.    Yes.

04:49  20           A.    It would, basically, walk

21    through the cancel process and the steps of

22    the cancel.

23           Q.    And these training materials

24    helped you understand how to do this?

Electronically signed by Ann M. Belmont (201-234-827-3922)                                                    449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

180

1        A.    Yes.

2        Q.    One of the codes is advertising,

3   we talked about that. Another one is

4   brochures, what does that mean?

5        A.    If an office feels like the

6   brochures are cluttering their office or

7   becoming a distraction to patients, that's

8   when brochures would be selected.

9        Q.    And competitor, is that all

04:50   10   switches to competitors, or just ones where

11   someone made the judgment that a competitor's

12   offering was better?

13        A.    That would be that the practice

14   is cancelling and the number one reason is

15   because of a competitor.

16        Q.    Could there be cancellations

17   where a HAN practice went to a competitor but

18   nonetheless that cancellation was assigned

19   one of these different reasons?

04:51   20        A.    It's not likely, but it's

21   possible.

22        Q.    In other words, they could say

23   I'm going to a competitor, but my real reason

24   was I didn't like the brochures cluttering my

Electronically signed by Ann M. Belmont (201-234-827-3922)                    449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

181

1    office or something like that?

2           A.    Yes.

3           Q.    But it's your belief that, in

4    most cases, if there was a cancellation

5    because the practice was going to a

6    competitor, they would go into that field?

7           A.    Most of the time.

8           Q.    Back on the first page, I

9    don't -- and maybe tell me if you've already

04:52   10    answered this. I don't understand -- well, I

11    did ask you this.  You don't understand the

12    green versus red, how something could be a

13    negative percent?

14           A.    Correct.

15           Q.    I don't think we see that later,

16    it's only that one page. Can I turn your

17    attention now -- I'm wrong, there's some

18    more.  Turn your attention to 5746, that's

19    the number down in the lower right-hand

04:53   20    corner. Here's another one where we've got

21    some negatives.  Again, this doesn't help you

22    explain to me why that's so?

23           A.    No.

24           Q.    If you were to --

Electronically signed by Ann M. Belmont (201-234-827-3922)                                    449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

182

1          A.    Wait a minute.  It's a

2    comparison, but.

3          Q.    A comparison to what?

4          A.    The 2010 versus 2011.

5          Q.    Ah.

6          A.    For reasons code competitor, the

7    short green bar left of the center axis

8    indicates.

9          Q.    I see. If you were -- at the end

04:53    10    of the deposition today, if you were to go

11    back to your office and wanted to know more

12    about this document and what it means and how

13    it's maintained, who would you ask first?

14          A.    Heather or Amy.

15          Q.    Amy Finley?

16          A.    Em-hm.

17          Q.    Again, on 5746, it breaks out,

18    and I think you said earlier today this could

19    be done, the various elements of competitor

04:54    20    cancellations that year, right?

21          A.    Correct.

22          Q.    And it looks like, at least

23    during this time period, your biggest

24    competitor was television, right?

Electronically signed by Ann M. Belmont (201-234-827-3922)                                        449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

183

1          A.     Yes.

2          Q.     What is "39 lost to practice on

3    PGM"?

4          A.     Program.

5          Q.     What does that mean?

6          A.     It's a system or a doctor's

7    office decides to create their own

8    educational program for the waiting room, or

9    that could also apply to -- oh, this is WRN

10   only, yeah.

04:54

11              MR. O'BRIEN: All right. Can I

12   have a few minutes to look over my notes, and

13   I think I'm done.

14              MR. BERNAY: Sure.  We can take a

15   quick break for a few minutes.

16              (Break taken.)

17              MR. BERNAY: Anything else?

18              MR. O'BRIEN: I have no further

19   questions.  Thank you for your time today.

04:59

20                 DIRECT EXAMINATION

21   BY MR. BERNAY:

22          Q.     I just have a few questions,

23   follow up on a few things you said this

24   afternoon. You testified earlier that

Electronically signed by Ann M. Belmont (201-234-827-3922)                449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

184

1    practices have -- you said that PatientPoint

2    believes could switch from them for a number

3    of reasons.  Is it your understanding that

4    the reason proffered in a lot of these

5    comments, it's just one of many reasons that

6    a practice switches?

7              A.    Yes.

8              Q.    And so is it not so much that

9    the practice is being untruthful when they

04:59   10   call in, but that the practice is being

11   incomplete?

12             A.    Yes.

13             Q.    And that they omit information

14   that may be responsive to the questions that

15   you're asking?

16             A.    Correct.

17             Q.    And when the practice calls,

18   you're not looking for a complete and full

19   explanation of the reasoning behind the

05:00   20   switch out?

21             A.    Correct.

22             Q.    And it's not often the case that

23   you ask follow-up questions to get at other

24   motives or reasons for the switch out?

Electronically signed by Ann M. Belmont (201-234-827-3922)                449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

185

1          A.    Only the questions that are in

2     that first conversation.

3          Q.    Okay. And you're not --

4     especially early on in, let's say 2011, you

5     are not asking what a practice was told by

6     the competitor; is that right?

7          A.    Correct.

8          Q.    And one of the things we haven't

9     mentioned today, were you often told by

05:00  10    PatientPoint practices that switched to

11    Healthy Advice -- I'm sorry, switched to

12    ContextMedia, that they were -- ContextMedia

13    told those practices that Context was

14    authorized to remove PatientPoint's

15    equipment?

16         A.    Yes, correct.

17         Q.    And do you know, does

18    PatientPoint authorize Context to remove its

19    equipment?

05:01  20         A.    No.

21         Q.    You said earlier that you heard

22    that from a number of practices?

23         A.    Yes.

24         Q.    Do you believe that all or

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                    449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

186

1    almost all of the practices that switched

2    were told that Context had authorization to

3    remove?

4         A.    Yes.

5         Q.    You said earlier that -- and I'm

6    paraphrasing, that sometimes if you were in a

7    dialogue with a conversation during a switch

8    out, that you would wait more than 30 days to

9    schedule a removal?

10        A.    I'm sorry?

11        Q.    You said earlier, and I'm

12   paraphrasing your testimony, that if you were

13   in a dialogue with a practice over their

14   cancellation or switch out, you would wait

15   more than 30 days to schedule a removal?

16        A.    We would wait until they

17   wanted -- yes, till they wanted the equipment

18   removed.

19        Q.    So if a practice called and said

20   we want this out and there was no indication

21   that you'd be able to save the practice, you

22   would schedule the removal?

23        A.    Yes.

24        Q.    And is it true that, often, the

Electronically signed by Ann M. Belmont (201-234-827-3922)                    449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

187

1    fact that the practice would call ahead was

2    something of a luxury, there was a period of

3    time that you found out about a switch out

4    because the equipment showed up at your

5    offices?

6            A.    Yes.

7            Q.    And then you would have to call

8    the practice to find out what happened?

9            A.    Yes.

05:03   10        Q.    And I'm referring to

11   ContextMedia to be sure.

12           A.    Correct.

13           Q.    So sometimes when a competitor

14   switched to ContextMedia, the equipment would

15   simply show up at the office without a

16   courtesy phone call or anything else?

17           A.    Yes, when a practice switched to

18   ContextMedia, the equipment would sometimes

19   just ship.

05:03   20        Q.    You mentioned very early on this

21   afternoon in looking at the practices shown

22   in column E on Exhibit 18, you noticed that

23   there were two that were not there, I think

24   you said they were Health Media Network and

Electronically signed by Ann M. Belmont (201-234-827-3922)                    449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

188

1    Kids Care TV?

2         A.    Yes.

3         Q.    Is that right?

4         A.    Yes.

5         Q.    And do you have -- are they

6    competitors of ACN or PCN?

7         A.    The Health Media Network has an

8    arthritis program, so, yes.

9         Q.    What about Kids Care TV?

05:04  10         A.    And Kids Care is a pediatric

11    program, so not directly.

12         Q.    And is Health Media Network a

13    newer competitor?

14         A.    Yes.

15         Q.    And do you have any reason to

16    believe that any Healthy Advice practice

17    switched to Health Media Network or Kids Care

18    TV during the dates that this spreadsheet

19    represents?  And I'll tell you that I believe

05:04  20    the date range is July 2010 through March 20,

21    2013.

22         A.    No.

23         Q.    So as far as you know, this

24    spreadsheet is a complete list of all

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                    449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

189

1    practices that switched to competitors

2    besides ContextMedia for that date range?

3         A.    As far as I'm aware, yes.

4         Q.    If you look now that we're in

5    Exhibit 18, Mr. O'Brien referenced a comment

6    with you, and one was at 38.  So if you go to

7    row 38. And I believe you were asked a

8    question that if this practice was saved, why

9    was it inputted with the cancellation code?

05:05    10         A.    Yes.

11         Q.    And if you look at the comment

12    itself, I'm going to start -- I think I'm

13    going to pick up where Mr. O'Brien left off.

14    You said, "They are removing all WRN and ERN;

15    only keeping PWR," can you explain what that

16    sentence means?

17         A.    So this office is cancelling the

18    waiting room and exam room program, but

19    keeping the practice wire back office screen.

05:06    20         Q.    So that office did have Healthy

21    Advice at the time of cancellation in 2011?

22         A.    Yes.

23         Q.    So even though they were keeping

24    the practice wire screen, this was still a

Electronically signed by Ann M. Belmont (201-234-827-3922)                    449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

190

1    cancellation?

2         A.    Correct.  They were cancelling

3    the PRM program.

4         Q.    If you look at No. 60, same

5    exhibit. You were asked about this entry from

6    Prime Health Network. It says, "Spoke with

7    Lisa Fini who said that she has been OM for

8    two months and the monitor has never worked.

9    She does not want to have two monitors that

05:07    10    are playing in the waiting room." If a

11    monitor does not work, it would stop sending

12    a heartbeat; is that correct?

13         A.    Correct.

14         Q.    And so you would have -- Healthy

15    Advice would have noticed that the monitor

16    was not working?

17         A.    Correct.

18         Q.    Is there a procedure in place

19    when a monitor fails to register a heartbeat?

05:07    20         A.    Yes.

21         Q.    What is that procedure?

22         A.    The field services digital team

23    will call if the screen has not connected for

24    seven days. At which time, they'll

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                                                          449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

191

1    troubleshoot and possibly send service if

2    needed.

3            Q.    Is it your experience that

4    sometimes practices believe that the machine

5    is broken when sometimes the issue is

6    something as simple as changing the channel

7    to get it correct?

8            A.    Yes.

9            Q.    Input on?

05:07    10            A.    Em-hm.

11            Q.    So it's possible that practice

12    thinks something is broken when it's not?

13            A.    Correct.

14            Q.    And that Healthy Advice or

15    PatientPoint now would have no notice of

16    that?  Meaning that the heartbeat would still

17    register?

18            A.    Yes, if it's simply a off

19    channel or a monitor issue.

05:08    20            Q.    If you look at Exhibit 19. You

21    were -- if you go to the second page.

22                    MR. O'BRIEN: Give me a second.

23                    MR. BERNAY: Sorry, I'll wait.

24            Q.    Is the e-mail --

Electronically signed by Ann M. Belmont (201-234-827-3922)                    449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

192

1           MR. O'BRIEN:  Let me see that,

2    what it looks like.

3           MR. BERNAY: Scott Landon.

4           MR. O'BRIEN: Oh, okay. Got it.

5        Q.    And on the second page, you'll

6    notice that I think Mr. O'Brien asked you

7    about a sentence that reads, "We have hard

8    copies of ContextMedia's installation

9    instructions which includes inventory of the

05:09   10    items they ship," do you remember that?

11        A.    Yes.

12        Q.    And if you turn to Exhibit 26

13    which is the competitor info folder. And if

14    you -- I'll direct you to a certain page,

15    it's page 3182. This is a document that looks

16    like the 2011 operations manual; is that

17    right?

18        A.    For?

19        Q.    For ContextMedia.

05:10   20        A.    Yes.

21        Q.    Do you know if there's a note on

22    top of that, it looks like it's a marginalia

23    or a sticky that says "Returned with our

24    equipment."

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                                    449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

193

1          A.    Yes.

2          Q.    Is it your understanding that

3    this training manual was returned in the same

4    box as Healthy Advice's equipment in 2011?

5          A.    Yes.

6          Q.    And that's how Healthy Advice

7    came in possession of installation

8    instructions?

9          A.    Yes.

05:10    10          Q.    And then, finally, you said at

11    one point this afternoon that it would be

12    fair to say that -- I don't know exactly what

13    you said, but that practices -- some

14    practices left for reasons of fair

15    competition and some practices switched from

16    Healthy Advice to ContextMedia for reasons of

17    unfair competition.

18          A.    Correct.

19          Q.    Is there any way to quantify

05:11    20    actually how many practices you think

21    switched on the basis of fair competition?

22          A.    I don't have a number, but I

23    would imagine that the number that switched

24    due to fair competition was very low.

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                    449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

194

1           MR. BERNAY: I have no further

2     questions.

3           MR. O'BRIEN: I've got a lot.

4           RECROSS-EXAMINATION

5     BY MR. O'BRIEN:

6           Q.    Ms. Smith, you just gave a

7     series of answers and responses to a series

8     of questions from your lawyer, right?

9           A.    Correct.

05:11   10           Q.    Those are questions and answers

11     that the two of you just discussed and

12     rehearsed in the hallway, right?

13           A.    No.

14           Q.    You didn't discuss --

15           A.    We discussed, we didn't

16     rehearse.

17           Q.    So I got part of it wrong. You

18     discussed what questions he was going to ask

19     you, right?

05:12   20           A.    We just -- yes.

21           Q.    He understood what answers you

22     were going to give, right?

23           A.    (Witness nods head

24     affirmatively.)

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                                    449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

195

1          Q.    And the last one was that, with

2     respect to the percentage of practices that

3     switched from ContextMedia to HAN due to fair

4     competition, you said, "I would imagine that

5     the percentage would be very low," right?

6          A.    Yes.

7          Q.    Do you recall testimony just an

8     hour or so ago in response to a question of

9     mine where you said you had no way of

05:12    10   allocating the number of practices that

11    switched due to fair competition versus the

12    number of practices that switched due to what

13    you believed was improper conduct?

14         A.    Correct.

15         Q.    And that was truthful testimony,

16    wasn't it?

17         A.    Yes.

18         Q.    And when you say you imagine it

19    was very low, that's all you're doing is

05:12    20   imagining, right?

21         A.    No.

22         Q.    Well, those were your words,

23    that you imagined, right?

24         A.    I don't imagine that they're

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                                            449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

196

1   very low, they are --

2          Q.    That's what you just said,

3   right?

4          A.    They are -- well, the numbers

5   are low.

6          Q.    How do you know that?

7          A.    Through our documents, through

8   our spreadsheet, speaking with practices and

9   hearing the same themes over and over.

05:13   10          Q.    When you say your spreadsheets,

11   the spreadsheets we looked at today?

12          A.    The tracking spreadsheet with --

13   that I keep.

14          Q.    Did you know there's not a

15   single instance, not a single instance in

16   those spreadsheets where you report, or any

17   of your peers, that a practice switched from

18   ContextMedia -- ContextMedia to HAN (sic)

19   because of anything false or misleading that

05:13   20   ContextMedia said to the practice?

21              MR. BERNAY: Object.  You can

22   answer.

23          A.    Those words aren't in our

24   comments.

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                                    449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

197

1          Q.    But your comments don't say the

2     practice said it switched because

3     ContextMedia said blank and blank was false

4     or misleading, those comments don't say that,

5     do they?

6              MR. BERNAY: Objection.  You can

7     answer.

8          A.    The comments say what the

9     practice told us, which was inaccurate

05:14   10     information that they received from

11     ContextMedia.

12          Q.    Like that HAN doesn't have

13     sound, was that inaccurate information?

14          A.    Yes.

15          Q.    That HAN does not have video,

16     that was inaccurate?

17          A.    At the time that was not

18     inaccurate.

19          Q.    That HAN's loop was shorter than

05:14   20     ContextMedia, that was inaccurate?

21          A.    That was not inaccurate.

22          Q.    That HAN didn't have recipes,

23     was that inaccurate?

24          A.    That was not inaccurate.

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                                    449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

198

1       Q.    In fact, your comments report

2   practices telling you lots and lots of

3   reasons that they switched from ContextMedia

4   to HAN (sic) that were not inaccurate

5   information, right?

6       A.    There are reasons.

7       Q.    And, in fact, if you took all of

8   the comments in there as to why practices

9   switched from ContexMedia to HAN (sic) and

05:14  10   put on one side those reasons that were

11   legitimate, fair competition reasons and on

12   the other side reasons where you believe

13   ContextMedia said something false and

14   misleading to HAN, you know there would be a

15   lot more reasons on the first side than the

16   other?

17       A.    I'm sorry?

18       Q.    Never mind. Exhibit 26, your

19   counsel asked you what that Post-it note

05:15  20   said, that, "Returned with our equipment," do

21   you see that?

22       A.    Yes.

23       Q.    You have no earthly idea what

24   that means, do you?

Electronically signed by Ann M. Belmont (201-234-827-3922)      449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

199

1              MR. BERNAY: Objection.  You can

2     answer.

3              A.    There's a comment in CMS

4     regarding this, this paperwork that came.

5              Q.    Had you seen this comment,

6     returned with the equipment, before today?

7              A.    I hadn't seen the comment, but

8     I've seen this document as it came back in a

9     box.

05:15   10              Q.    Do you know for a fact that, as

11     you sit here, that this was, in fact,

12     returned with HAN's equipment?

13              A.    Yes.

14              Q.    Because you opened the box and

15     saw the HAN equipment and then pulled this

16     out of the box, you personally?

17              A.    I did not personally.

18              Q.    Did you see anybody else do it?

19              A.    No.

05:16   20              Q.    You weren't standing there?

21              A.    Hm-mm.

22              Q.    You started off in response to

23     some of your counsel's questions agreeing

24     with him that the comments recorded in your

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                                      449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

200

1    spreadsheets were one of many reasons and

2    that they were incomplete and that practices

3    omit information, do you recall that

4    testimony?

5          A.    (Witness nods head

6    affirmatively.)

7          Q.    The only reasons that you know

8    about as to why Context -- why practices

9    switched from ContextMedia -- from HAN to

05:16   10  ContextMedia are the ones that you and your

11   peers recorded in the comments box, right?

12          MR. BERNAY: Objection. I know

13   it's getting late, but getting a little

14   argumentative here.

15          Q.    Do you understand the question?

16          A.    Can you ask the question again,

17   I guess.

18          Q.    Yeah.  The reasons you and your

19   peers know as to why practices tell you they

05:17   20  switched from HAN to ContextMedia are the

21   reasons you report in the notes and the CMS

22   database, right?

23          A.    Those are some of the reasons,

24   but we don't have -- we don't have the

Electronically signed by Ann M. Belmont (201-234-827-3922)                    449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

201

1    opportunity to have a long conversation with

2    these office managers.

3         Q.    But based upon the conversations

4    you have, they give you certain reasons,

5    right?

6         A.    They give us some of the

7    reasons, yes.

8         Q.    Well, do they ever tell you, Ms.

9    Smith, I'm going to give you some of the

05:17  10   reasons, but I'm not going to tell you the

11   others?  Have you ever had a conversation

12   like that?

13        A.    No.

14        Q.    So to the best of your

15   knowledge, they are responding to your

16   questions and providing reasons, right?

17        A.    Correct.

18        Q.    And the notion that they're

19   omitting information from you is rank

05:17  20   speculation, right?

21             MR. BERNAY: Objection.  You can

22   answer.

23        A.    Yes.

24        Q.    The best knowledge HAN

Electronically signed by Ann M. Belmont (201-234-827-3922)                    449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

202

1    possesses, the very best knowledge, the most

2    accurate, complete knowledge that HAN

3    possesses as to why practices switch from HAN

4    to ContextMedia is included by you and your

5    peers in these databases, right?

6          A.    Yes.

7          Q.    And I think you told me earlier

8    today, you take pride in your job in making

9    sure that you write down and record in the

05:18    10    database things that are of importance,

11    right?

12          A.    Correct.

13          Q.    Things that are of significance,

14    right?

15          A.    Correct.

16          Q.    It wouldn't be consistent with

17    your job responsibilities to purposely omit

18    things that were important or significant,

19    would it?

05:18    20          A.    Correct.

21          Q.    Now, in response to one of your

22    counsel's questions, you also indicated that,

23    during this conversation, you're not asking

24    the practices what they were told by

Electronically signed by Ann M. Belmont (201-234-827-3922)                    449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

203

1    ContextMedia?

2          A.    I'm sorry, say that again.

3          Q.    I heard you say -- agree with

4    one of your counsel's questions that during

5    these conversations you don't ask the

6    practice what ContextMedia said to the

7    practice?

8          A.    No.

9                MR. BERNAY: I'm not sure if

05:19  10    that's exactly what I asked, but.

11          A.    That's --

12          Q.    Well, let's go at it

13    differently.  Your notes, and we can go back

14    to them if you want to --

15          A.    Early on we did not ask those

16    questions.

17          Q.    But at some point you started

18    routinely asking, did they represent

19    themselves to be HAN, did they say they were

05:19  20    authorized to remove the equipment, what else

21    did they say about HAN, right?

22          A.    Correct.

23          Q.    You said, and agreed with

24    another one of your counsel's questions, that

Electronically signed by Ann M. Belmont (201-234-827-3922)                    449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

204

1    you believe that all practices that switched

2    had been told by ContextMedia that

3    ContextMedia had the authorization to remove

4    the equipment, do you recall that?

5          A.    I'm sorry, can you say that

6    again?

7          Q.    You testified and agreeing to

8    one of your counsel's questions that you

9    believe all of the practices that switched

05:20    10    from HAN to ContextMedia had been told by

11    ContextMedia that ContextMedia had the

12    authority to remove HAN's equipment?

13          A.    Some of the practices.

14          Q.    Some were, right?

15          A.    Right.

16          Q.    And, in fact, you recorded that

17    when that happened, didn't you?

18          A.    Yes.

19          Q.    You said when the heartbeat

05:20    20    ceases to exist, that it's your policy to

21    wait seven days and then make a call, right?

22          A.    Correct.

23          Q.    Can you imagine a practice being

24    frustrated that the screen was dark for seven

Electronically signed by Ann M. Belmont (201-234-827-3922)                                        449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

205

1    days before hearing a peep?

2            A.    Just because they lost a

3    heartbeat doesn't mean their program is

4    black.

5            Q.    There's one way to find out,

6    though, right?

7            A.    I mean, typically it's not, and

8    that's why we wait seven days.

9            Q.    What do you expect to happen in

05:20  10    that seven days?

11            A.    The computer to connect again.

12            Q.    I see.

13            A.    Could have been a fax issue or a

14    number of other things.

15            MR. O'BRIEN: I have nothing

16    further.

17            MR. BERNAY: I have nothing

18    further.

19

20                            _____

                                      LORI SMITH

21

                                * * *

22

            (DEPOSITION CONCLUDED AT 5:20 p.m.)

23

                                * * *

24

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                    449b7acd-12fe-4b67-bd20-49367b4fe4b3

Lori Smith, 3/18/2014

206

1              C E R T I F I C A T E
2

     STATE   OF   OHIO
3              :  SS
     COUNTY OF CLERMONT
4
5          I, ANN M. BELMONT, RPR, the
     undersigned, a duly qualified notary public
6    within and for the State of Ohio, do hereby
     certify that LORI SMITH was by me first duly
7    sworn to depose the truth and nothing but the
     truth; foregoing is the deposition given at
8    said time and place by said witness;
     deposition was taken pursuant to stipulations
9    hereinbefore set forth; deposition was taken
     by me in stenotype and transcribed by me by
10   means of computer; deposition was provided to
     witness for examination and signature outside
11   the presence of the Notary Public. I am
     neither a relative of any of the parties or
12   any of their counsel; I am not, nor is the
     court reporting firm with which I am
13   affiliated, under a contract as defined in
     Civil Rule 28(D) and have no financial
14   interest in the result of this action.
15          IN WITNESS WHEREOF, I have hereunto set
     my hand and official seal of office at
16   Cincinnati, Ohio this 24th day of March,
     2014.
17
18
19   My commission expires:  ANN M. BELMONT, RPR
     December 4, 2015  Notary Public - State of Ohio
20
21
22
23
24

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                    449b7acd-12fe-4b67-bd20-49367b4fe4b3