Amy Finley, 3/20/2014

```
                                                    1

 1               UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF OHIO
 2                    WESTERN DIVISION
 3    HEALTHY ADVICE          :
      NETWORKS, LLC,          :
 4                            :
           Plaintiff,         :
 5                            :
      vs.                     :   Case No. 1:12CV610
 6                            :
      CONTEXTMEDIA, INC.,     :
 7                            :
           Defendant.         :
 8
 9
10        Videotaped deposition of AMY FINLEY, a
11    witness herein, taken by the defendant as
12    upon cross-examination, pursuant to the
13    Federal Rules of Civil Procedure and pursuant
14    to notice of counsel as to the time and place
15    and stipulations hereinafter set forth, at
16    the offices of Keating Muething & Klekamp,
17    PLL, One East Fourth Street, Suite 1400,
18    Cincinnati, Ohio 45202, at 9:30 a.m.,
19    Thursday, March 20, 2014, before PAUL JAHN,
20    Videographer and ANN M. BELMONT, RPR, a
21    Registered Professional Reporter and Notary
22    Public within and for the State of Ohio.
23                        - - -
24
```

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Amy Finley, 3/20/2014

2

```
 1    APPEARANCES:
 2
      On behalf of Plaintiff:
 3
      AARON M. BERNAY, ESQ.
 4    Frost Brown Todd, LLC
      301 East Fourth Street
 5    Suite 3300
      Cincinnati, Ohio 45202
 6
      On behalf of Defendant:
 7
      RICHARD J. O'BRIEN, ESQ.
 8    Sidley Austin, LLP
      One South Dearborn Street
 9    Chicago, Illinois 60603
10
      THOMAS F. HANKINSON, ESQ.
11    Keating Muething & Klekamp, PLL
      One East Fourth Street
12    Suite 1400
      Cincinnati, Ohio 45202
13
14
15
16
17
18
19
20
21
22
23
24
```

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Amy Finley, 3/20/2014

3

```
 1                 S T I P U L A T I O N S
 2        It is stipulated by counsel for the
 3   respective parties that the deposition of AMY
 4   FINLEY, a witness herein, may be taken at
 5   this time by the defendant as upon
 6   cross-examination and pursuant to the Federal
 7   Rules of Civil Procedure and notice to take
 8   deposition, all other legal formalities being
 9   waived by agreement; that the deposition may
10   be taken in stenotype by the Notary Public
11   Reporter and transcribed by her out of the
12   presence of the witness; that the transcribed
13   deposition was made available to the witness
14   for examination and signature and that
15   signature may be affixed outside the presence
16   of the Notary Public-Court Reporter.
17
18
19
20
21
22
23
24
```

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Amy Finley, 3/20/2014

```
                                                        4

 1                          INDEX
 2     WITNESS           DIRECT  CROSS  RE-      RE-
                                        DIRECT  CROSS
 3
       AMY FINLEY
 4     BY MR. O'BRIEN:             6            211
       BY MR. BERNAY:   205              212
 5     BY MR. O'BRIEN:                          212
 6     EXHIBIT IDENTIFIED                       PAGE
 7     Exhibit 1 notice of deposition            7
       Exhibit 2 notice of deposition            7
 8     Exhibit 3 notice of deposition            7
       Exhibit 27 churn report                  34
 9     Exhibit 19 e-mail chain                  44
       Exhibit 22 e-mail chain                  48
10     Exhibit 23 e-mail chain                  54
       Exhibit 24 e-mail chain                  58
11     Exhibit 25 e-mail chain                  68
       Exhibit 33 e-mail chain                  74
12     Exhibit 34 e-mail exchange               77
       Exhibit 35 e-mail exchange               84
13     Exhibit 36 e-mail exchange               87
       Exhibit 37 e-mail exchange               94
14     Exhibit 38 e-mail exchange              100
       Exhibit 39 e-mail exchange              101
15     Exhibit 40 e-mail exchange              105
       Exhibit 41 e-mail exchange              107
16     Exhibit 42 e-mail exchange              109
       Exhibit 43 e-mail exchange              114
17     Exhibit 44 e-mail exchange              116
       Exhibit 45 e-mail exchange              120
18     Exhibit 46 e-mail exchange              122
       Exhibit 47 e-mail exchange              124
19     Exhibit 48 e-mail exchange              126
       Exhibit 49 e-mail exchange              130
20     Exhibit 50 e-mail exchange              131
       Exhibit 51 e-mail exchange              132
21     Exhibit 52 e-mail exchange              135
       Exhibit 53 e-mail exchange              137
22     Exhibit 55 e-mail exchange              140
       Exhibit 56 e-mail exchange              144
23     Exhibit 58 e-mail exchange              151
       Exhibit 59 e-mail exchange              153
24     Exhibit 60 e-mail exchange              157
```

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Amy Finley, 3/20/2014

```
                                                                    5

  1      Exhibit 62 e-mail exchange                     165
         Exhibit 63 e-mail exchange                     168
  2      Exhibit 64 e-mail exchange                     170
         Exhibit 65 e-mail exchange                     180
  3      Exhibit 66 e-mail exchange                     184
         Exhibit 67 e-mail exchange                     187
  4      Exhibit 68 e-mail exchange                     190
  5      OBJECTIONS                              PAGE  LINE
  6      MR. BERNAY:                             15     15
         MR. BERNAY:                             30     21
  7      MR. BERNAY:                             53      3
         MR. BERNAY:                             65     15
  8      MR. BERNAY:                             67     13
         MR. BERNAY:                             71     16
  9      MR. BERNAY:                             72     11
         MR. BERNAY:                             79      9
 10      MR. BERNAY:                             84     23
         MR. BERNAY:                             86     20
 11      MR. BERNAY:                             87      5
         MR. BERNAY:                             92     14
 12      MR. BERNAY:                             96      6
         MR. BERNAY:                             97     11
 13      MR. BERNAY:                            103     23
         MR. BERNAY:                            111      9
 14      MR. BERNAY:                            143     18
         MR. BERNAY:                            144      2
 15      MR. BERNAY:                            160      5
         MR. BERNAY:                            202     21
 16      MR. BERNAY:                            203     13
         MR. BERNAY:                            203     17
 17      MR. O'BRIEN:                           207      4
         MR. O'BRIEN:                           208      8
 18      MR. O'BRIEN:                           208     16
         MR. O'BRIEN:                           209     14
 19      MR. O'BRIEN:                           210      3
         MR. O'BRIEN:                           210      5
 20      MR. O'BRIEN:                           210     14
         MR. O'BRIEN:                           211      6
 21
 22
 23
 24
```

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Electronically signed by Ann M. Belmont (201-234-827-3922)                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

6

1          MR. JAHN: We are on the record.

2     Would the court reporter please swear in the

3     witness.

4                    AMY FINLEY,

5          a witness herein, of lawful age, having

6     been first duly sworn as hereinafter

7     certified, was examined and testified as

8     follows:

9          MR. O'BRIEN: We're ready? Oh,

09:33  10     okay. Different videographers do things

11     differently.

12                CROSS-EXAMINATION

13     BY MR. O'BRIEN:

14          Q.   Good morning, Ms. Finley, my

15     name is Dick O'Brien.  We just met, I

16     represent ContextMedia in the lawsuit brought

17     against it by Healthy Advice Networks.  As

18     you know, I'll be asking you a series of

19     questions today.  If at any point in time you

09:34  20     don't understand one of my questions, just

21     let me know that, okay?

22          A.   Okay.

23          Q.   And I'll try to fix it.

24     Otherwise, if you do go ahead and answer my

Electronically signed by Ann M. Belmont (201-234-827-3922)                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

7

1   question, we are all going to leave here

2   today assuming that you understood the

3   question; is that fair?

4          A.     Yes.

5          Q.     What's your full name?

6          A.     Amy Michelle Finley.

7          Q.     Have you ever been deposed

8   before?

9          A.     No.

09:34 10          Q.     Let me -- I put before you

11   what's been previously marked as Defendant's

12   Deposition Exhibits 1, 2 and 3.

13      (Exhibit 1 identified.)

14      (Exhibit 2 identified.)

15      (Exhibit 3 identified.)

16          A.     Okay.

17          Q.     And you understand that you're

18   appearing here today to give testimony on

19   behalf of the company Healthy Advice

09:34 20   Networks, right?

21          A.     Yes.

22          Q.     And you understand you're here

23   to give testimony on behalf of HAN as to

24   certain particular topics, right?

Electronically signed by Ann M. Belmont (201-234-827-3922)                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

8

1          A.    Yes.

2          Q.    And if you look at Defendant's

3    Deposition Exhibit 1, I think the topics

4    begin on page 3.

5          A.    Okay.

6          Q.    And I take it you've seen this

7    list of topics before?

8          A.    Yes.

9          Q.    And is it your understanding

09:35    10    you're here to testify today on behalf of HAN

11    as to topic 2?

12          A.    Yes.

13          Q.    And also as to topic 7?

14          A.    Yes.

15          Q.    And also on behalf -- excuse me,

16    also as to topic 10A?

17          A.    Yes.

18          Q.    And 10B?

19          A.    Yes.

09:35    20          Q.    And 11?

21          A.    Yes.

22          Q.    And then you can put that one to

23    the side and pick up Defendant's Deposition

24    Exhibit 2, and there the topics also begin on

Electronically signed by Ann M. Belmont (201-234-827-3922)          13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

9

1    page 3. And you've seen these topics before

2    as well, right?

3            A.    On page 3?

4            Q.    Yes, ma'am.

5            A.    Yes.

6            Q.    And you're here to testify on

7    behalf of HAN as to topics 15 and 16, right?

8            A.    Yes.  And what was the other

9    one?  I'm sorry, 15 and?

09:36   10            Q.    16.

11            A.    And 16, yes.

12            Q.    Now, you can put that one to the

13    side and pick up Defendant's Exhibit 3. Once,

14    again, the topics begin on page 3.

15            A.    Okay.

16            Q.    And you've seen those topics

17    before today, right?

18            A.    Yes.

19            Q.    And you're here to testify on

09:36   20    behalf of HAN as to topic 18, right?

21            A.    I believe so. I'm not really

22    sure on this one.

23                 MR. BERNAY: Dick, just to note

24    for the record, we've designated both Amy and

Electronically signed by Ann M. Belmont (201-234-827-3922)    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

10

1    Linda Ruschau on 18.

2              MR. O'BRIEN: Okay.

3              MR. BERNAY: Linda in terms of

4    advertisers and Amy as -- so far as 18 calls

5    for information concerning practices.

6              MR. O'BRIEN: Gotcha. Well,

7    thanks for that clarification.

8              THE WITNESS: Yes, thank you.

9         Q.    They gave you a lot of topics,

09:37   10    didn't they?

11         A.    They gave me a lot of topics.

12         Q.    Tell me what you did to prepare

13    yourself to be able to adequately testify on

14    behalf of HAN as to these topics.

15         A.    Well, I met with Aaron and I

16    also spoke with Mike Collette, Laura Buettgen

17    and Kelly Schulkers in regards to some of

18    these different topics that I know I'm

19    supposed to represent on.

09:37   20         Q.    And I didn't get all the names.

21    What were the two after Mike Collette?

22         A.    Kelly Schulkers.

23         Q.    Kelly Schulkers.

24         A.    And Laura Buettgen.

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Electronically signed by Ann M. Belmont (201-234-827-3922)          13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

11

1      Q.    Laura, what's her last name?

2      A.    Buettgen, it's B-O-G-G-E-T --

3  actually, don't even quote me how to spell

4  the last name.  It's in reference to one of

5  her e-mails, so.

6      Q.    Okay. Anything else besides talk

7  to those three people and your counsel?

8      A.    No, and our counsel.

9      Q.    Did you review any

09:38  10  documentation?

11      A.    No.  Well, I saw this -- one of

12  these forms, I don't remember which one, you

13  actually gave me of the whole thing, if it

14  was one, two or three, they all kind of look

15  the same to me.

16      Q.    They do look the same.  So

17  you're referencing the Deposition Exhibits 1,

18  2 and 3 that have the topics you're here to

19  testify to?

09:38  20      A.    Right.

21      Q.    What's Mr. Colette's position in

22  the company?

23      A.    He is no longer -- he was on the

24  board. He is no longer, actually, I guess an

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Electronically signed by Ann M. Belmont (201-234-827-3922)                                        13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

12

1    active employee of PatientPoint.

2              Q.    I see.

3              A.    He used to be the CEO.

4              Q.    What's he doing now?

5              A.    I'm not really sure actually.

6              Q.    But you spoke to him recently?

7              A.    I did, yes.

8              Q.    Is it a telephone conversation

9    or meeting?

09:39    10              A.    Yes.

11              Q.    And how long did that call last?

12              A.    Probably about ten minutes.

13              Q.    And what was the reason you

14    reached out to Mr. Collette?

15              A.    To get his information on what

16    the board's response was to attrition.

17              Q.    What did he tell you?

18              A.    And that they were basically

19    started from when we first sent our first

09:39    20    cease and desist, that the plan was to see if

21    ContextMedia would discontinue their actions,

22    and kind of weighed that out to see if they

23    would do that.  Obviously, that did not

24    happen, which is when they decided to pursue

Electronically signed by Ann M. Belmont (201-234-827-3922)                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

13

1    legal action.

2         Q.    I see. And he informed you that

3    what you just said in your answer was part of

4    a discussion at the board level?

5         A.    Yes.

6         Q.    And did he tell you when that

7    discussion occurred?

8         A.    No.

9         Q.    Did he tell you whether there

09:40  10   were any minutes to reflect that discussion?

11        A.    No.

12        Q.    Anything else that you discussed

13   with Mr. Collette?

14        A.    No.

15        Q.    Did you take any notes of your

16   conversation with him?

17        A.    No, I did not.

18        Q.    Are you a note taker by habit?

19        A.    No, I'm not.

09:40  20        Q.    What about Ms. Shulter, why did

21   you reach out to her?

22        A.    Ms. Schulkers, we had changed in

23   our agreements, our enrollment agreements the

24   terms of our cancellation policy of

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Amy Finley, 3/20/2014

14

1    notification 30 days to 60 days. I was just

2    verifying with her when we actually made that

3    switch, that's.

4            Q.    When did she tell you?

5            A.    January of 2011.

6            Q.    Anything else you discussed with

7    her?

8            A.    No.

9            Q.    So you switched from a 30-day

09:40  10    notice to a 60-day notice in January 2011?

11           A.    Yes.

12           Q.    Is it a 60-day notice now?

13           A.    No, it actually went back to

14    30 days.

15           Q.    And when did that happen?

16           A.    And actually I don't know the

17    date on that one, but it was last year.

18           Q.    2013?

19           A.    Yes.

09:41  20    Q.    Why did you go back to 30?

21           A.    Realized that 60 was probably

22    asking too much on the practice.

23           Q.    Did you go to 60 in the first

24    place -- why did you go to 60 in the first

Electronically signed by Ann M. Belmont (201-234-827-3922)                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

15

1    place?

2         A.    Because we actually -- we, on

3    our end, needed more, were wanting more time

4    to schedule technicians to be able to recruit

5    to replace that practice.

6         Q.    Because you were seeing an

7    increase in switch outs?

8         A.    At that time, actually, in

9    January, no. It was just we were wanting more

09:41  10   time, so.

11        Q.    Did the desire of HAN to have

12   more time to try to save practices who had

13   told HAN they wanted to switch out factor

14   into the 60-day notice?

15             MR. BERNAY: Object to the form.

16   You can answer.

17        A.    I'm sorry, I'm sorry, repeat.

18   Can you repeat the question?

19        Q.    Sure, I can ask it again. Fair

09:41  20   enough. Did the desire on behalf of HAN to

21   have more time to try to convince a practice

22   to stay with it after a practice initially

23   said we'd like to switch, did that desire on

24   behalf of HAN factor into HAN deciding to go

Electronically signed by Ann M. Belmont (201-234-827-3922)                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

16

1    from 30 to 60 days?

2         A.    I don't believe that the 60 day

3    was really more of a save tactic.  It was

4    more of, like I said, just giving us time to

5    have more time to recruit another practice in

6    replace of that, and for our technicians to

7    be able to schedule more time for us to be

8    able to find a technician to remove the

9    equipment.

09:42    10         Q.    Was having more time to try to

11    save a factor in going from 30 to 60 days?

12         A.    I'm sure it would, yes.

13         Q.    Anything else you discussed with

14    Ms. Shulter?

15         A.    No.

16         Q.    And I take it you took no notes

17    of that one?

18         A.    Huh?

19         Q.    You took no notes?

09:42    20         A.    I just wrote down the date, it

21    was January of 2011.

22         Q.    And I'm not going to attempt her

23    last name, Laura?

24         A.    Laura Buettgen.

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Electronically signed by Ann M. Belmont (201-234-827-3922)                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

17

1          Q.     Why did you reach out to her?

2          A.     Laura Buettgen I reached out to

3     because she had sent an e-mail that she had

4     recently cleaned out her inbox, and I was

5     verifying when she had did that and why she

6     did that, and that was my discussion.  So,

7     basically, she cleaned out her inbox because

8     she's -- as she put it, a pack rat, and her

9     inbox was full, she needed some space, she

09:43  10    cleaned out her inbox.  What I -- I don't

11    even know the timing after that, but shortly

12    after that was when she got notification that

13    we were actually going into a lawsuit and

14    that nobody was supposed to remove anything.

15    She did not feel like she really had

16    anything, but the one thing that she did

17    have, the e-mail that she did have she saved,

18    she actually did have and was able to produce

19    to me, but she was surprised that she had it

09:43  20    because she'd just recently cleaned her inbox

21    out prior to all that.

22         Q.     Gotcha.  Anything else you

23    discussed with her?

24         A.     No.

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Electronically signed by Ann M. Belmont (201-234-827-3922)                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

18

1        Q.   And she -- this cleaning out of

2   her inbox, it occurred after the lawsuit was

3   filed but before she got the notice?

4        A.   It was -- she said it was the

5   beginning of August.  She doesn't know

6   exactly which day, she just remembers it was

7   the beginning of August.

8        Q.   Whose decision was it for you to

9   reach out to Mr. Collette, was that yours?

10        A.   It was my counsel's.

11        MR. BERNAY: I would caution you

12   not to divulge the contents of your

13   conversation with counsel.

14        THE WITNESS: Okay.

15        Q.   Whose decision was it for you to

16   reach out to Ms. Shulter?

17        A.   Myself.

18        Q.   Yourself?

19        A.   Because I wanted to verify the

20   date.

21        Q.   How about Ms. Buettgen?

22        A.   Same thing, myself, just so I

23   knew.

24        Q.   What's your current position

09:44

09:44

Electronically signed by Ann M. Belmont (201-234-827-3922)    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

19

1    with the company?

2            A.    I'm the VP of provider services.

3            Q.    How long have you held that

4    position?

5            A.    For the last, was it

6    four-and-a-half years, I guess.

7            Q.    How long have you been with HAN?

8            A.    It's going on nine years.

9            Q.    And before your current

09:44  10    position, what position did you hold with

11    HAN?

12            A.    Providers -- wait, actually, it

13    was the director of practice relations.  And

14    then I was a senior manager of the field

15    sales support.

16            Q.    Senior manager?

17            A.    Field sales support.

18            Q.    As VP, your current position,

19    what are your duties and responsibilities?

09:45  20            A.    To oversee the relationship

21    management team and the installation team.

22            Q.    And the relationship management

23    team is managing relationships with member

24    practices, right?

Electronically signed by Ann M. Belmont (201-234-827-3922)                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

20

1          A.     Yes, correct.

2          Q.     Who do you report to in your

3     current position?

4          A.     Kimberly Theiss.

5          Q.     And as director of practice

6     relations, what were your duties and

7     responsibilities, excuse me?

8          A.     It was actually, at that time,

9     just managing the relationship management

09:45  10     team.

11          Q.     The folks interacting with the

12     practices?

13          A.     Correct.

14          Q.     Not on the sales side, but on

15     the relationship managing side?

16          A.     Correct.

17          Q.     And who did you report to then?

18          A.     Jill Brewer.

19          Q.     And Ms. Brewer is no longer with

09:45  20     the company, right?

21          A.     Correct.

22          Q.     Do you know why she left?

23          A.     It was, from my understanding, a

24     voluntary action when we were downsizing.

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Electronically signed by Ann M. Belmont (201-234-827-3922)                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

21

1          Q.     When did you downsize?

2          A.     In 2012 I believe.

3          Q.     And do you know what prompted

4     the company to downsize?

5          A.     No.

6          Q.     What did you do as senior

7     manager of field sales?

8          A.     Oversee the installation team

9     that processed the paperwork for new

09:46  10     enrollments.

11          Q.     So, again, you're working on the

12     side of the business that deals with

13     practices after they've been recruited?

14          A.     Yes, right.

15          Q.     Who did you report to in that

16     position?

17          A.     Jill Brewer.

18          Q.     Do you stay in touch with Ms.

19     Brewer?

09:46  20          A.     Rarely, yes.

21          Q.     Senior manager field sales, does

22     that mean you're not at the headquarters, but

23     you're out in the field in some sense, or

24     just a reference to the fact that you're

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Amy Finley, 3/20/2014

22

1    managing things that are going on in the

2    field?

3         A.    Correct.  I'm managing the team

4    inside that handles the processing of the

5    paperwork and scheduling of installation.

6         Q.    And where did you work before

7    HAN?

8         A.    Well, Exam Room Network, which

9    was a subsidiary of HAN.  It was a breakoff

09:47   10    company, actually, On Target Media.

11         Q.    It broke off from Target Media

12    and became a part of HAN?

13         A.    An independent company.  Exam

14    Room Network was the name of the company.

15         Q.    I see.  What was the business of

16    Exam Room Network?

17         A.    They were televisions in

18    physician office exam rooms.

19         Q.    Is Exam Room Network part of HAN

09:47   20    now?

21         A.    It was acquired by HAN nine

22    years ago, which is how I became --

23         Q.    I see.

24         A.    -- a member of it.

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Electronically signed by Ann M. Belmont (201-234-827-3922)                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

23

1        Q.    I get it now. So HAN acquired

2   Exam Room Network as part of its branching

3   out into providing services in the actual

4   exam rooms, right?

5        A.    Yes.

6        Q.    What did you do for Exam Room

7   Network?

8        A.    I was their broadcast

9   specialist, helped put together the sequence

09:48   10   of when the advertising and the actual

11   segments would play, scheduling.

12        Q.    So you worked on the content

13   side?

14        A.    I didn't actually create the

15   content.  It was more of the scheduling and

16   working with the company that broadcast the

17   content to make sure the ads were in the

18   place they were supposed to be, the content

19   was where it was supposed to be, coordinating

09:48   20   all of that.

21        Q.    Who was the company that was

22   broadcasting the content?

23        A.    You know what, I don't even

24   remember.

Electronically signed by Ann M. Belmont (201-234-827-3922)          13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

24

1        Q.      It was a third party?

2        A.      Yes, it was a third party.

3        Q.      How long were you with that

4    company?

5        A.      I believe it was three years.

6        Q.      What did you do before that?

7        A.      Worked at On Target Media.

8        Q.      Tell us what Target Media does.

9        A.      On Target Media.

09:48   10        Q.      On Target?

11        A.      On Target Media was actually

12   PatientPoint, it has undergone a couple of

13   name changes over the years.  So I started

14   with On Target Media, went with Exam Room

15   Network, and came back to Healthy Advice.

16        Q.      Can't get away from them?

17        A.      Can't get away from them.

18        Q.      What did you do at On Target

19   Media?

09:49   20        A.      I was then an administrative

21   assistant at that time.

22        Q.      To who?

23        A.      Multiple people within the

24   organization.

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Electronically signed by Ann M. Belmont (201-234-827-3922)                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

25

1          Q.     How long did you do that?

2          A.     Probably two years, I think,

3    before I switched over to the Exam Room

4    Network.

5          Q.     Before that you were in school?

6          A.     Before that I was in school.  I

7    work at Bethesda Tri Health, Bethesda concern

8    area.

9          Q.     Do you have a college degree?

09:49  10          A.     Yes.

11          Q.     Where from?

12          A.     Strayer University.

13          Q.     I'm sorry?

14          A.     Strayer University.

15          Q.     In what field?

16          A.     Marketing.

17          Q.     Have you ever been involved in a

18    lawsuit like this before?

19          A.     No.

09:49  20          Q.     Do you believe it's important

21    for you to be truthful in your communications

22    within the company?

23          A.     Yes.

24          Q.     Do you think that's crucial?

Electronically signed by Ann M. Belmont (201-234-827-3922)                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

26

1          A.     Yes.

2          Q.     And you believe is it crucial to

3    be accurate in your communications?

4          A.     Yes.

5          Q.     To not be misleading?

6          A.     Yes.

7          Q.     And do you do your utmost best

8    to be truthful?

9          A.     Yes.

09:50  10          Q.     And accurate?

11          A.     Yes.

12          Q.     And not misleading?

13          A.     Yes.

14          Q.     You would never communicate on a

15    matter of HAN's business in a way that you

16    did not believe to be truthful, right?

17          A.     Correct.

18          Q.     And if you found out that

19    someone working for you is not being

09:50  20    truthful, accurate, or was being misleading,

21    you would take action?

22          A.     Correct.

23          Q.     How many folks report to you

24    right now?

Electronically signed by Ann M. Belmont (201-234-827-3922)                                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

27

1          A.      Thirty.

2          Q.      Wow!

3          A.      Oh, well, directly, I'll say

4     four.

5          Q.      Okay.  Who are those four?

6          A.      Heather McGauvran, Kelly

7     Schulkers, Dawn Haddison and Angel Culful.

8          Q.      The others that report up

9     through them to you, are -- do they include

09:50  10     the folks that actually call practices when

11     HAN learns that they want to switch and try

12     to understand why the practice wants to

13     switch?

14          A.      Yes.

15          Q.      So Lori Smith, for example?

16          A.      Yes.

17          Q.      And Ms. Lawrence for example?

18          A.      Yes.

19          Q.      Ms. Lake?

09:50  20          A.      Ms. Lake no longer works for the

21     company.

22          Q.      Okay. How many folks are

23     currently involved in that kind of activity?

24     That is, when HAN learns that a practice

Electronically signed by Ann M. Belmont (201-234-827-3922)                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

28

1    wants to move away from HAN for whatever

2    reason, they then reach out and try to

3    understand why?

4           A.    Twelve.

5           Q.    And it's important to your

6    business to do the very best you can to try

7    to understand why a practice is leaving HAN,

8    right?

9           A.    Yes.

09:51  10          Q.    And tell me some of the reasons

11   why that's important knowledge for HAN to

12   have?

13          A.    Well, it helps -- to understand

14   why they are leaving?

15          Q.    Em-hm.

16          A.    Why that's important?

17          Q.    Em-hm.

18          A.    Well, it helps us understand,

19   you know, more about our program and how we

09:51  20   can improve in our services or the

21   programming itself.

22          Q.    And the company -- the

23   information that your team gathers, HAN then

24   uses that information to the best it can,

Electronically signed by Ann M. Belmont (201-234-827-3922)                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

29

1    right?

2           A.    Yes.

3           Q.    And for the reasons you just

4    said?

5           A.    Correct.

6           Q.    And churn is an important issue

7    in a business like HAN's, right?

8           A.    Yes.

9           Q.    Do you have a note -- does your

09:52  10   team have a notebook that assists that team

11   in how to debrief practices when they call

12   regarding churn?

13          A.    No, I mean, a notebook.  We have

14   probably a document that just -- actually,

15   I'm not even sure if we have a training

16   manual, I'm sorry. We have a training manual,

17   I don't -- there may be some scripts on

18   here's some things that you can say to

19   reiterate the value of the program.

09:52  20          Q.    Em-hm.

21          A.    I'm not sure if that's what

22   you're getting at, but, I mean, I don't think

23   we have one for, like, here's exactly what to

24   say if a certain company calls in or anything

Electronically signed by Ann M. Belmont (201-234-827-3922)                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

30

1    like that.  It's here's what you say if they

2    are trying to say that they're moving or

3    something like that.

4            Q.    And you call those scripts?

5            A.    Yes.

6            Q.    I said notebook.  How do

7    those -- what do those scripts look like?

8            A.    It's just a piece of paper.

9            Q.    Okay.  And that's been true as

09:52   10   long as you've been involved in this?

11           A.    Yeah.

12           Q.    And there's training around

13   this, too?

14           A.    There's training on -- yes.

15           Q.    Is there training that your team

16   undergoes to make them as effective as they

17   can in trying to elicit from practices who

18   told HAN they want to leave the reasons for

19   why they want to leave?

09:53   20           A.    Right.

21                 MR. BERNAY: Object to the form.

22   You can answer.

23           A.    Yes.

24           Q.    Who conducts that training

Electronically signed by Ann M. Belmont (201-234-827-3922)                13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

31

1    today, do you know?

2         A.    Either myself or Heather

3    McGauvran.

4         Q.    Who conducted it back in 2011?

5         A.    That would be myself.

6              MR. JAHN: Pardon me, Counsel,

7    we're off the record.

8              (Break taken.)

9              MR. JAHN: We're on the record.

09:54  10         Q.    Are there written materials that

11   assist in this training that we've been

12   talking about?

13         A.    We have a manual that has how

14   to, really, to do different procedures and

15   processes. Like I said, as far as a training,

16   there really isn't.  We have a script, we

17   have a paper with some script on some things

18   that they can help, talking points, really,

19   is what it is. And that's really all that

09:55  20   exists as far as that.  Otherwise, it's more

21   verbal and just trying to role play with each

22   person practicing.

23         Q.    Okay. Are these scripts generic

24   to any reason that HAN might have been given

Electronically signed by Ann M. Belmont (201-234-827-3922)                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

32

1    as to why a practice is leaving?

2          A.    No -- I mean, okay.  Can you

3    repeat the question?  Sorry.

4          Q.    Yeah.  For example, do you have

5    one script when HAN has been told that the

6    practice is going to a competitor?

7          A.    No.

8          Q.    Another script when they say --

9          A.    No, that's not broken out like

09:55  10   that.  It's more talking points.

11         Q.    Okay. Did there ever come a time

12   when there was a special script for practices

13   that contacted HAN indicating they wanted to

14   switch to ContextMedia?

15         A.    No.

16         Q.    Was there a time when this team

17   was ever instructed that, if they received

18   notice that a practice wanted to switch to

19   ContextMedia, they should be sure to ask

09:56  20   particular things?

21         A.    Yes.

22         Q.    And how did that manifest

23   itself?  I mean, was that an e-mail

24   instruction, was it another script?

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Electronically signed by Ann M. Belmont (201-234-827-3922)                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

33

1        A.    I don't recall if it was e-mail

2    or if it was verbal, but it was one or the

3    other.

4        Q.    And who gave those instructions?

5        A.    Myself.

6        Q.    What were those instructions?

7        A.    If they were leaving to go to

8    ContextMedia, we were -- I instructed them to

9    find out if they were told or were offered

09:56   10    any incentive for switching, was also asking

11    them to find out if they -- you know, if they

12    were told they could remove the equipment on

13    their own, or any -- and just -- get any

14    other information as to why they're truly

15    switching it, to the best of your ability.

16        Q.    So they were instructed to

17    really try to drill down and find out why the

18    practice was leaving?

19        A.    To the best they could without

09:57   20    actually making them, you know, interrogating

21    the practice, basically.

22        Q.    They weren't going to, like,

23    shine bright lights on them?

24        A.    No.  Put a camera on them, no.

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Electronically signed by Ann M. Belmont (201-234-827-3922)          13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

34

1          Q.     No waterboarding?

2          A.     No.

3          Q.     And, again, you gave those

4     instructions because it was important to your

5     business to know as best you can the reason a

6     practice is leaving?

7          A.     Correct.

8          Q.     And it's the practice at HAN for

9     this team to then, once they've discerned the

09:57  10     reasons a practice is leaving, to put that

11     information in a database maintained in CMS,

12     right?

13          A.     Correct, that is the database.

14          Q.     That's been true as long as

15     you've been with the company?

16          A.     Correct.

17          Q.     That database is the best source

18     the company has for why a practice has

19     decided to leave, right?

09:58  20          A.     Correct.

21       (Exhibit 27 identified.)

22          Q.     Have you seen Exhibit 27 before,

23     Ms. Finley?

24          A.     Yes, I have.

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Electronically signed by Ann M. Belmont (201-234-827-3922)          13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

35

1        Q.    What's your understanding of

2  what this is?

3        A.    This is our churn report.

4        Q.    And how is this used in the

5  business?

6        A.    It is used to make the executive

7  members in the business aware of our reasons

8  for churn.

9        Q.    Is this a way to sort of, at a

10  high-level summary fashion, inform the

11  executive members of the reasons for churn

12  rather than having them go to the CMS

13  database and wade through that?

14        A.    Correct.

15        Q.    You're making it easier for the

16  senior folks?

17        A.    Yes.

18        Q.    And when you say the executive

19  team, who does that -- who did that include

20  in 2011?

21        A.    Oh, my goodness, I couldn't

22  repeat everybody at that time.

23        Q.    Who does it include now?

24        A.    The executive team members now,

09:59 (line 10)

09:59 (line 20)

Electronically signed by Ann M. Belmont (201-234-827-3922)      13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

36

1    just off the top of my head, would be

2    Kimberly Theiss, who I report to, Greg

3    Robinson, Chris Martini, Tom McGinness, Raj

4    Toleti, Kathy Gould, Scott Nesbit.  I'm sure

5    I'm forgetting others.  We have quite a large

6    executive team.

7            Q.    It sounds like that.  I didn't

8    appreciate it was that large.

9            A.    Em-hm.

10           Q.    Was it similarly that size in

11   2011-2012?

12           A.    I don't believe so.

13           Q.    Who do you recall being on the

14   team in 2011-2012?

15           A.    Jill Brewer, Mike Collette, Mike

16   McAllister, Kathy Gould, Scott Nesbit.

17           Q.    What is Kathy Gould's position

18   with the company?

19           A.    She is over our IT department.

20           Q.    And your boss, what's her

21   position?

22           A.    She is over field operations.

23           Q.    And Mr. Martini, what's his

24   position?

10:00 (line 10)

10:00 (line 20)

Electronically signed by Ann M. Belmont (201-234-827-3922)          13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

37

1          A.    He is our president of the

2    organization.

3          Q.    And he reports up to McGinness?

4          A.    Correct.

5          Q.    Now, is your team trained on how

6    to input information into whatever it is that

7    produces Exhibit 27?

8          A.    Yes.

9          Q.    And are they trained to do the

10:00  10   best they can to input what they believe to

11   be the main reason a practice switched?

12         A.    Correct.

13         Q.    So a practice may have given

14   multiple reasons, but they're trained to use

15   their judgment to determine the main reason?

16         A.    Correct.

17         Q.    And that training involves --

18   that training involves written materials as

19   well, right?

10:01  20        A.    It's really more verbal. I mean,

21   we have what each one of these reason codes

22   means. Which, for the most part, are pretty

23   obvious. And it's just that you pick one.

24   If -- depending upon if they are moving, say,

Electronically signed by Ann M. Belmont (201-234-827-3922)                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

38

1    for instance, and there is a -- they are

2    moving and they decided to go with a

3    competitor when they move, then competitor to

4    be selected because that's the main reason

5    why they are switching, not necessarily

6    because they're moving.

7        Q.    Is competition the main reason

8    for churn?

9        A.    It appears that way.

10       Q.    Is that your understanding based

11   on all the years you've worked for the

12   company?

13       A.    I would say it's usually high,

14   yes.

15       Q.    And does competition with

16   respect to Exhibit 27 include cable

17   television?

18       A.    Correct.

19       Q.    Is your CMS database also --

20   strike that.

21            Do your team members also, in

22   some fashion, input into the database when a

23   practice who's switching indicates, for

24   example, they wanted more sound?

10:01 (at line 10)

10:02 (at line 20)

Electronically signed by Ann M. Belmont (201-234-827-3922)                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

39

1          A.     Em-hm, yes.

2          Q.     That's sort of a separate

3    exercise, putting that in the database?

4          A.     There is an order that they will

5    place if there's a sound inquiry order.

6          Q.     What does that mean, sound

7    inquiry?

8          A.     It means the practice is

9    interested in sound.

10:02  10          Q.     Then there's a particular place

11   you put that in the database?

12          A.     It's an order that we put

13   underneath that location. We place a lot of

14   information -- or we use orders a lot in our

15   database to kind of use it to track and be

16   able to run reports.

17          Q.     I don't think I'm familiar with

18   the use of the word order in that context, so

19   why don't you unpack that for me a little bit

10:03  20   .

21          A.     Okay.  It's almost like a task,

22   I guess, that would be placed.  We have, I

23   guess, within our database, there's a section

24   for orders. We place an order for new

Electronically signed by Ann M. Belmont (201-234-827-3922)                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

40

1    brochures, say, for instance, there's an

2    order for sound inquiry, because we could

3    actually then run a report on those orders to

4    see how many locations requested sound.

5           Q.    Is there an order spot for

6    longer loop?

7           A.    No.

8           Q.    What are the other order

9    designations, if you will?

10:03 10           A.    We have lots of orders. As far

11    as inquiries, I would say sound was one. Did

12    we have another inquiry?  I'm sure there are

13    other ones, but we -- like I said, we have

14    lots of orders.

15           Q.    Is there one for video?

16           A.    There was one for video, yes.

17           Q.    Is there one for less ad

18    content?

19           A.    No.

10:04 20           Q.    Was there one with respect to a

21    practice's desire to have more control over

22    the content?

23           A.    I don't believe so.

24           Q.    If you were to leave here at the

Electronically signed by Ann M. Belmont (201-234-827-3922)                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

41

1    end of the day and try to figure out exactly

2    what all these order designations were, what

3    would you do?

4            A.    I would have to go back into --

5    look into the database to pull up all the

6    orders that are available.

7            Q.    You could put those on a screen

8    in front of you?

9            A.    I don't know if they would all

10:04  10   fit on a screen.  As I said, there are a lot

11   of orders.

12           Q.    But you scroll down on the

13   screen?

14           A.    Because everything we do is

15   based on orders, yes.

16           Q.    When you say everything you do

17   is based on orders, what do you mean?

18           A.    When we schedule a technician,

19   when we order brochures, when we are tasked

10:05  20   to call a practice, when it's time to service

21   the practice, I mean, just things like that.

22           Q.    All of those sound like action

23   items of some sort?

24           A.    Basically, yes.

Electronically signed by Ann M. Belmont (201-234-827-3922)          13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

42

1      Q.    But if a practice has told you

2   it's leaving, it's going away, one of the

3   reasons was they wanted more sound, why would

4   someone put in sound inquiry as an order?

5      A.    We're trying to gauge how many

6   people would actually -- really wanted sound

7   in their program.

8      Q.    And that you can obviously use

9   in managing your business?

10:05   10      A.    Correct.

11      Q.    Thinking about how you might

12   change your content and things like that?

13      A.    Correct.

14      Q.    Are there other order entries

15   that you can think of other than sound and

16   video that are put in there when a practice

17   is leaving to help you sort of make business

18   decisions down the road, other than an action

19   item, if you will?

10:06   20      A.    Oh, from an order standpoint?

21      Q.    Yes.

22      A.    No.

23      Q.    So, if you wanted to, you could

24   go into the database and print a report for

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Electronically signed by Ann M. Belmont (201-234-827-3922)                                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

43

1    every practice that left HAN for ContextMedia

2    that told HAN that one of the reasons it did

3    so was it wanted more sound?

4            A.    Not necessarily. I don't believe

5    that everybody put that order in when they

6    were doing that. A lot of times we use that

7    order for existing customers.  That wasn't

8    necessarily used for cancelled locations.

9            Q.    But it would certainly capture

10:06  10    some of those?

11            A.    Yes.  I mean, they were --

12    obviously, they were able to do that and some

13    of them chose to, which was fine.

14            Q.    So the only reason it wouldn't

15    capture all of them is someone didn't do what

16    they were told?

17            A.    Well, we didn't really make

18    putting a sound inquiry when they cancelled a

19    priority.  It was more if a current customer

10:07  20    had mentioned they wanted sound.

21            Q.    I see. I'm going to show you

22    some other documents.

23            A.    Okay.

24            MR. O'BRIEN: Did they give you

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Electronically signed by Ann M. Belmont (201-234-827-3922)                              13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

44

1    the stickers? The ones that were premarked?

2    They didn't give them to you?  Well, you have

3    some stickers, right?

4              MR. JAHN: We're off the record.

5              (Break taken.)

6              MR. JAHN: We're on the record.

7         Q.    I have handed to you, Ms.

8    Finley, what was previously marked in another

9    deposition as Defendant's Exhibit No. 19.

10:11  10  With this document, as with all of them, take

11   whatever time you want to look at it before

12   you answer any of my questions. When you are

13   ready to answer my question, the first one I

14   have for you, have you ever seen this before?

15     (Exhibit 19 identified.)

16        A.    Yes.

17        Q.    Okay. Did you see this recently?

18        A.    Yes.

19        Q.    And you saw this in preparation

10:11  20  for your deposition?

21        A.    Yes.

22        Q.    What I'm going to ask you about

23   is the e-mail from Ms. Brewer, it appears in

24   the first page, dated October 14, 2011. And

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Electronically signed by Ann M. Belmont (201-234-827-3922)                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

45

1    the e-mail chain has to do -- the subject of

2    the e-mail chain is practices switching from

3    HAN to ContextMedia, right?

4           A.    Right.

5           Q.    And Ms. Brewer was your boss at

6    the time, right?

7           A.    Correct.

8           Q.    And her e-mail is going to Tom

9    Campbell, what was his position at the time?

10:12   10           A.    Tom Campbell was -- I don't know

11   his official title, but he was on the

12   executive team.

13           Q.    Was Ms. Shattles on the

14   executive team?

15           A.    Yes.

16           Q.    And Mr. McAllister?

17           A.    Yes.

18           Q.    And Ms. Gould?

19           A.    Yes.

10:12   20           Q.    And Ms. Phillips?

21           A.    No, she reported to Tom

22   Campbell.

23           Q.    How about Ms. Theiss?

24           A.    Kimberly Theiss, she reported to

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Electronically signed by Ann M. Belmont (201-234-827-3922)                                      13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

46

1    Jill Brewer.

2         Q.    And Ms. Brewer writes that, in

3    the second paragraph, "With that said, they

4    are clearly --" they being ContextMedia,

5    right?

6         A.    Right.

7         Q.    "Clearly capitalizing on our

8    practice's service concerns, specifically our

9    connectivity issues. Almost all of the

10:12  10   offices they've been able to convert have a

11   record of one or more service issues.  This

12   is classic. You wait until your competitor

13   trips you up when you step in." Did I read

14   that correctly?

15        A.    That's the way that it reads,

16   yes.

17        Q.    Was HAN experiencing

18   connectivity service issues at this time

19   frame?

10:13  20   A.    No, not that I was aware of.

21        Q.    Do you think Ms. Brewer was

22   being truthful when she wrote that statement?

23        A.    I don't know what Ms. Brewer

24   was -- her intention was with that actually.

Electronically signed by Ann M. Belmont (201-234-827-3922)                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

47

1      Q.    Did you -- how long did you

2    report to her?

3      A.    Probably seven-and-a-half years.

4      Q.    Did you, based upon that

5    seven-and-a-half years of experience, believe

6    that she was truthful?

7      A.    Yes.

8      Q.    And that when she wrote e-mails

9    to the executive team, she would do the best

10:13  10    that she could to be truthful?

11     A.    I believe so, yes.

12     Q.    Do you know what she's referring

13    to when she says connectivity issues?

14     A.    I do know what connectivity

15    issues is. I know that that means that the

16    practice was not connecting to our home

17    office. We were -- to my knowledge, we were

18    not having a severe issue with connectivity

19    issues. Nor do I believe that the locations

10:14  20    that were leaving for ContextMedia all were

21    due to service.

22     Q.    So you wouldn't agree with her

23    statement, is what you're saying?

24     A.    Correct.

Electronically signed by Ann M. Belmont (201-234-827-3922)                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

48

1        Q.    Were some of the practices that

2    were leaving to Context leaving due to

3    service issues?

4        A.    There were a few.

5        Q.    Did you ever try to quantify

6    those?

7        A.    No, I did not.

8        Q.    If you wanted to quantify it,

9    the best you could do would be go into the

10:14   10   CMS database and see what was reported there,

11   right?

12       A.    Correct.

13     (Exhibit 22 identified.)

14       Q.    I'll hand you 22.

15            MR. BERNAY: I might have this

16   one.  Save you have a little -- yeah, I've

17   got it, Dick.

18       Q.    Thanks. I've now handed you, Ms.

19   Finley, what was previously marked as

10:15   20   Defendant's Deposition Exhibit 22, this is an

21   e-mail from Lori Smith to you and Heather

22   McGauvran, right?

23       A.    Yes.

24       Q.    Is this an e-mail you saw

Electronically signed by Ann M. Belmont (201-234-827-3922)                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

49

1    recently as part of your preparation?

2           A.    Yes.

3           Q.    This e-mail repeats an entry

4    from the CMS database regarding why this

5    practice switched, right?

6           A.    Em-hm.

7           Q.    You have to answer yes.

8           A.    Yes, I'm sorry.

9           Q.    That's all right.  It's more for

10   her benefit. And do you recall this practice

11   switching and the circumstances around it?

12          A.    No, I do not.

13          Q.    Do you recall practices who told

14   HAN when they were switching to ContextMedia

15   that they wanted to know if HAN could provide

16   more sound?

17          A.    If they wanted to know if we

18   could provide more sound?

19          Q.    Right.

20          A.    I believe we've had practices

21   ask us that, yes.

22          Q.    Were there instances where you

23   told the practice, at this point in time, you

24   can't give them more sound?

10:15 (at line 10)

10:16 (at line 20)

Electronically signed by Ann M. Belmont (201-234-827-3922)                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

50

1          A.     That would be correct.

2          Q.     And did practices switch to

3     ContextMedia on occasion because HAN didn't

4     have the ability at that point in time to

5     deliver more sound?

6          A.     From the information that was

7     provided to us, there were some that said

8     that, yes.

9          Q.     Do you have any reason to

10:16    10     believe that the practice was not being

11     truthful with HAN when it said that?

12          A.     I don't feel that -- I guess,

13     basically, with some of the practices, I do

14     think that they would just give us a reason.

15     We didn't push very hard either to really

16     drill down to find, because we didn't, again,

17     want to interrogate them, but we were trying

18     to get the best reason that we could.

19     Sometimes they would say that -- they would

10:17    20     put the information off to, you know, it was

21     somebody else in the office that made the

22     decision. You know, this is what they said,

23     not really wanting to say.  So do I think

24     that they probably always give us the real

Electronically signed by Ann M. Belmont (201-234-827-3922)          13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

51

1    reason or was that the main reason?  I don't

2    believe so, but, again, we only can go by

3    what they told us.

4         Q.    Right. Can you think of a

5    practice where you later learned had not been

6    truthful with you about the reason for

7    switching?

8         A.    I can't think of one off the top

9    of my head, no.

10:17    10         Q.    Can you think of a practice that

11    gave you a reason for switching and you later

12    learned that it wasn't the main reason?

13         A.    Yes -- oh, can I think of an

14    actual practice?

15         Q.    Right.

16         A.    I do recall that happening, but

17    I can't recall which practice.

18         Q.    If you left here today and

19    wanted to identify such a practice, what

10:18    20    would you do?

21         A.    I would have to do a lot of

22    digging.  Probably a lot of comment reading

23    to figure that out.

24         Q.    You think there are comments in

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Electronically signed by Ann M. Belmont (201-234-827-3922)                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

52

1    there that say that the practice told us the

2    reason was X and we later determined the real

3    reason was Y?

4         A.    Yes.  It could be that it was --

5    they told us at first it was because they

6    wanted to switch for the content, and then

7    the next we found out that they were provided

8    an incentive, for instance.

9         Q.    You later learned that the

10:18  10    incentive was the sole reason they switched?

11        A.    Yes.

12        Q.    And that would be reflected in

13   the database?

14        A.    I don't know if it would be

15   reflected in the database.  It should be,

16   yes.

17        Q.    It should be because the

18   database is supposed to capture everything

19   that is important?

10:18  20        A.    Right, everything. Correct.

21        Q.    You did, in fact, learn that

22   some practices -- strike that.

23             HAN did, in fact, learn that

24   some practices told HAN that the sole reason

Electronically signed by Ann M. Belmont (201-234-827-3922)                                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

53

1    they switched was because of incentive,

2    right?

3                 MR. BERNAY: Object to the form

4    of the question.  You can answer.

5         A.    I believe we had cases like

6    that, yes.

7         Q.    We may even see one in here that

8    said the sole reason was the incentive?

9         A.    It may, yes.

10:19  10         Q.    If that happened, it would be

11   duly noted in the database?

12         A.    It should be, yes.

13         Q.    Is there anything wrong, in your

14   view, with ContextMedia offering a practice

15   an incentive?

16         A.    My belief, yes.

17         Q.    Why do you say that?

18         A.    I feel like they're buying the

19   practice.

10:19  20         Q.    Does HAN ever give a practice

21   incentives?

22         A.    For -- no.

23         Q.    HAN never sends flowers?

24         A.    To current customers, not to try

Electronically signed by Ann M. Belmont (201-234-827-3922)                13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

54

1     to recruit them.

2            Q.     Sends flowers to current

3     customers trying to save them?

4            A.     We may, or to -- we would send

5     flowers if there was a service issue, that,

6     basically, we were apologizing for the

7     inconvenience to their office.

8            Q.     Sends practices cookies?

9            A.     For the same reason, sorry to

10:20  10    inconvenience your office.

11           Q.     Any other things of value that

12    HAN sends to practices?

13           A.     Those would be the only two that

14    I'm aware of.

15           Q.     I'm not going to ask you to get

16    inside somebody's head, but --

17           A.     Thank you.

18           Q.     -- on Exhibit 22, do you have

19    any idea what Ms. Smith is referring to when

10:20  20    she says "on a roll"?

21           A.     No.

22        (Exhibit 23 identified.)

23           Q.     23 is another e-mail concerning

24    a practice that was telling HAN that it was

Electronically signed by Ann M. Belmont (201-234-827-3922)                                          13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

55

1    leaving HAN to go to ContextMedia, right?

2           A.    It appears, yes.

3           Q.    Is this a document you saw very

4    recently in connection with your preparation

5    as well?

6           A.    No.

7           Q.    It doesn't look like you are on

8    this.  Have you ever seen this before?

9           A.    I'm trying to recall. I feel

10:21  10   like I may have seen this comment before.  I

11   don't know if I've seen it in this context of

12   the e-mail.

13          Q.    Do you believe you may have seen

14   the comment before because it would have

15   stuck in your mind if a practice said that a

16   tech had to come out seven times in six

17   months?

18          A.    Yes.

19          Q.    This, based upon the comment

10:21  20   here, is a practice that is very frustrated

21   with connectivity issues, right?

22          A.    It appears, yes.

23          Q.    HAN ultimately decided that it

24   was in its best business interest to switch

Electronically signed by Ann M. Belmont (201-234-827-3922)                                13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

56

1    from fax-based service to Internet-based

2    service, right?

3         A.    Yes.

4         Q.    And it's in the process of doing

5    that, right?

6         A.    Have been, yes.

7         Q.    When did that process start, do

8    you know?

9         A.    I believe in 2012.

10:22    10        Q.    And any idea when it's going to

11    be completed?

12        A.    No.

13        Q.    That's not under your

14    responsibilities?

15        A.    My team contributes to,

16    obviously, doing that switch over, but it's

17    not a goal that I have on my goal sheet, I

18    guess you could say.

19        Q.    Do you have a set of goals?

10:22    20        A.    It's not on my targets, I guess.

21        Q.    What are your targets?

22        A.    Oh, well, just trying to retain

23    practices.

24        Q.    Right. Is that -- that's really

Electronically signed by Ann M. Belmont (201-234-827-3922)    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

57

1    the principal responsibility of your team,

2    right, to do whatever it can to keep the

3    business?

4            A.    And to keep them engaged in the

5    products and to keep reiterating the value of

6    the programs.

7            Q.    And as to that piece, to keep

8    them engaged, do you make it your business to

9    periodically reach out to practices and see

10:23   10   how they're doing, that kind of thing?

11           A.    Correct.

12           Q.    Is there a time table for that?

13   Once a month, every two weeks?

14           A.    With the amount of practices

15   that we have, no.  There was really no time

16   table.  It's, you know, basically when we

17   have a time that there's not many tasks to

18   follow up on, we will proactively reach out

19   to certain practices.

10:23   20           Q.    So if you had to assign the main

21   objectives of your team, it's try to save

22   practices who's told them they want to leave,

23   and before that happens, trying to make sure

24   they're happy and pleased with the service?

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Electronically signed by Ann M. Belmont (201-234-827-3922)          13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

58

1          A.    Trying to engage them in the

2    programs.  All of our programs.

3               MR. JAHN: Pardon me, Counsel,

4    we're off the record.

5               (Break taken.)

6               MR. JAHN:  We're on the record.

7          Q.    Okay.  We're done with that one.

8    Let me find 24. I've now placed before you

9    what was previously marked, Ms. Finley, as

10   Deposition Exhibit 24. This is an e-mail

11   chain between you and Lori Smith, and Heather

12   McGauvran's involved at one point. Is this a

13   document you saw recently as part of your

14   preparation?

15      (Exhibit 24 identified.)

16         A.    No.

17         Q.    This comment in the database

18   indicates the practice switched because the

19   new program is more engaging, offering sound

20   and a news ticker.

21         A.    Em-hm.

22         Q.    The practice felt the new

23   program provides more for the patient to look

24   at, do you see that?

10:24 (line 10)

10:25 (line 20)

Electronically signed by Ann M. Belmont (201-234-827-3922)          13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

59

1          A.    Yes, I see that.

2          Q.    And the practice that -- excuse

3    me.  In this instance, the practice was

4    switching to ContextMedia, right?

5          A.    Correct.

6          Q.    And HAN was also informed that

7    the practice characterized the HAN product as

8    the same slides over and over again.  Do you

9    see that?

10:25    10          A.    Yes, same slides over and over,

11    yes.

12          Q.    And these are each things that

13    HAN had learned from practices from time to

14    time, right?

15          A.    These are things that were

16    stated, yes.

17          Q.    And HAN was told these things by

18    the practices when it was telling HAN that it

19    was switching to ContextMedia, right?

10:26    20          A.    Right.

21          Q.    And have you ever seen the

22    ContextMedia loop?

23          A.    Not the entire loop.  I've seen

24    pieces of it from the website.

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Amy Finley, 3/20/2014

60

1        Q.    And you understand that it has

2    always offered sound, right?

3        A.    Correct.

4        Q.    And it has always been longer

5    than HAN's product, right?

6        A.    I believe so, yes.

7        Q.    And it's always had a news

8    ticker, right?

9        A.    Yes.

10:26    10        Q.    Now, this e-mail ends, at least

11    the middle one there -- or the comments,

12    excuse me, is placing sound inquiry.  That's

13    what we just talked about, right?

14        A.    Right.

15        Q.    And in the last e-mail from Ms.

16    Smith to you says, "The spreadsheet is

17    updated with the exception of cancel reasons

18    from two locations." The spreadsheet she's

19    referring to, do you think that's the

10:26    20    database or something else?

21        A.    That is the spreadsheet.

22        Q.    That's something other than the

23    database?

24        A.    The database, correct.

Electronically signed by Ann M. Belmont (201-234-827-3922)                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

61

1        Q.    What spreadsheet is she talking

2    about?

3        A.    It was a spreadsheet that we had

4    kept of the locations that ContextMedia had

5    removed our equipment.

6        Q.    I see. And when did you start

7    maintaining that spreadsheet?

8        A.    I believe right away when we

9    had -- after our first experience of

10:27
10   equipment being removed from an office.

11       Q.    Late 2010?

12       A.    No, it would be in 2011.

13       Q.    And whose decision was it to

14   create that spreadsheet?

15       A.    I was told to create that

16   spreadsheet by Jill Brewer.

17       Q.    And you did what Ms. Brewer told

18   you to, right?

19       A.    Correct.

10:27
20       Q.    And then you instructed your

21   team to help you keep this spreadsheet

22   current, right?

23       A.    Correct.  I pinpointed Lori to

24   be the person to keep the spreadsheet up to

Electronically signed by Ann M. Belmont (201-234-827-3922)                                        13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

62

1  date.

2      Q.    I see.  So how would she get

3  information from the other members of the

4  team that would keep the spreadsheet up to

5  date?

6      A.    They would send her an e-mail or

7  let her know that this location.

8      Q.    So was there an e-mail that went

9  out from you to your team indicating Lori's

10:28  10  going to be in charge of this activity and be

11  sure to give her any information you put in

12  the database about a switch to ContextMedia

13  to her as well so she can put it in the

14  spreadsheet?

15      A.    I instructed them to notify her.

16  I -- quite honestly, what we did was really,

17  if we heard of anything like this happening

18  or that there was a switch or the equipment

19  just showed up on our door, Lori was the

10:28  20  point person to handle it.  So really,

21  primarily, she was the one that took the

22  majority of the calls and took care of the

23  issues herself, just to have that one person

24  really handle the situation.

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Electronically signed by Ann M. Belmont (201-234-827-3922)                                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

63

1          Q.     I see.

2          A.     Not to say there wasn't other

3     times where other people would, but if they

4     did, they would have to inform Lori so she

5     could be aware.

6          Q.     So Lori was the point person if

7     you guys got wind of the fact that a practice

8     was switching to ContextMedia, she had the

9     role of making that call and finding out why?

10:29    10          A.     Right.

11          Q.     So is it fair to say that Lori

12     Smith, perhaps, better than anyone else at

13     HAN knows why practices switched from HAN to

14     ContextMedia?

15          A.     I don't know if it would be to

16     say, but she got a lot of information, yes.

17          Q.     She was on a lot more of those

18     calls than you?

19          A.     Correct.

10:29    20          Q.     Or anybody else in the team?

21          A.     Yes.

22          Q.     Maybe more than all the rest of

23     the team members combined?

24          A.     Maybe, yes.

Electronically signed by Ann M. Belmont (201-234-827-3922)                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

64

1        Q.    How did the other team
2    members -- well, how did Lori know she was
3    supposed to do this?
4        A.    That she was supposed to be the
5    point person?
6        Q.    And create the spreadsheet.
7        A.    I told her to.
8        Q.    And was that in a communication
9    like we're having now or was it an e-mail or
10:29 10    both?
11        A.    I don't recall if it was one or
12    the other.
13        Q.    If it was an e-mail, you would
14    still have it, right?
15        A.    I would think so.
16        Q.    And then how did the other team
17    members know they were supposed to funnel
18    this to Lori?
19        A.    That would have been
10:30 20    communicated either in a meeting or in an
21    e-mail.
22        Q.    And if it was e-mail, it would
23    still exist, right?
24        A.    Right.

Electronically signed by Ann M. Belmont (201-234-827-3922)                13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

65

1        Q.    I mean, isn't that something you

2    would likely put in an e-mail to make it

3    clear rather than rely --

4        A.    I would think so, yeah.

5        Q.    That would be you practice,

6    right?

7        A.    That would be make sense, yes.

8        Q.    Whether it was an e-mail or in a

9    meeting, can you provide a little more detail

10:30  10    for me as to the nature of the communication,

11    any more information around it, why you were

12    doing it, how it was to be done, what

13    information was to be collected, anything

14    like that?

15            MR. BERNAY: Object to the form

16    of the question. You can answer.

17        A.    The communication would be that,

18    you know, we had experienced locations where

19    the equipment was removed without our

10:30  20    authorization and we are trying to track

21    that, and so any -- any notice that you get,

22    anything that makes you aware of that, then

23    you need to make sure that Lori is aware of

24    that information so she can put it on the

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Electronically signed by Ann M. Belmont (201-234-827-3922)                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

66

1    spreadsheet.

2         Q.    Okay.

3         A.    I mean, it was really, it was

4    nothing, it was basic.

5         Q.    Okay. When's the last time you

6    looked at this spreadsheet?

7         A.    Oh, God, I don't know.  It's

8    been a while.

9         Q.    Who's the -- what's the format

10:31 10    of it?  Does it just exist electronically, or

11    is there hard copies you've seen?

12              MR. BERNAY: I'm just going to

13    note for the record that we have claimed

14    privilege to the spreadsheet.  And I would

15    advise you not divulge the content of the

16    spreadsheets.  And we've been over this

17    before, Dick, and we told you that you have

18    the information contained within the

19    spreadsheet in other forms. Again, I would

10:31 20    advise you not to divulge the contents of the

21    spreadsheet.

22         A.    The information --

23              MR. O'BRIEN: Actually, I don't

24    think you asserted privilege, you asserted

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Amy Finley, 3/20/2014

67

1    work product.

2              MR. BERNAY: Work product, sorry.

3    Thanks for correcting me.

4         A.    The information in the

5    spreadsheet is also in the database.  It's

6    just a format.

7         Q.    So if the same information is in

8    the database, I guess the spreadsheet was

9    just created, and the information was put

10:32   10   there so you'd have a ready -- one source for

11   all this stuff regarding ContextMedia, right?

12        A.    Right.

13             MR. BERNAY: Objection.  You can

14   answer.

15        A.    Correct.

16        Q.    Rather than having to hunt and

17   peck through the database?

18        A.    Yes.

19        Q.    If you wanted to look at sort of

10:32   20   the landscape of reasons why practices

21   switched from HAN to ContextMedia, the most

22   user friendly way to do that is the

23   spreadsheet, right?

24        A.    I don't -- no, I would think you

Electronically signed by Ann M. Belmont (201-234-827-3922)                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

68

1    would still need to go through comments in

2    the database.

3            Q.    Because the spreadsheet didn't

4    capture everything?

5            A.    Correct.

6            Q.    I see. Were there things in the

7    spreadsheet that weren't in the database?

8                  MR. BERNAY: Again, I would

9    advise you not to divulge the contents.

10                 THE WITNESS: Okay.

11                 MR. BERNAY: Of the spreadsheet.

12           A.    Right. I don't believe so.

13           Q.    Okay. You'd have to look at it

14   to confirm?

15           A.    I would -- yes, and I have not

16   looked at it in a while.

17      (Exhibit 25 identified.)

18           Q.    Let's find Exhibit 25. I've

19   handed -- let's wait for counsel. I've handed

20   to you, Ms. Finley, what was previously

21   marked as Defendant's Deposition Exhibit 25.

22   This is another e-mail exchange -- excuse me,

23   regarding the Context switch out to

24   ContextMedia, right?

10:33 (line 10)

10:33 (line 20)

Electronically signed by Ann M. Belmont (201-234-827-3922)                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

69

1        A.    Yes.

2        Q.    Is this something you looked at

3   recently?

4        A.    Yes.

5        Q.    In a meeting with your lawyer?

6        A.    Yes.

7        Q.    Let's go to the first e-mail in

8   this chain, which is on page 4 of the

9   document. And that's an e-mail from Lori

10:34  10  Smith, dated February 15, 2013, to you, Ms.

11  Schulkers, Ms. Grippo, Jennifer Hartfiel and

12  Allison Griffin, right?

13       A.    Em-hm.

14       Q.    And it concerns a practice

15  that's referred to as Lakeside, right?

16       A.    Yes.

17       Q.    This was a practice that was

18  very important to HAN because they had quite

19  a few locations, right?

10:34  20       A.    Yes.

21       Q.    What was the position of Ms.

22  Hartfiel at the time?

23       A.    Jennifer Hartfiel?

24       Q.    Yes.

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Electronically signed by Ann M. Belmont (201-234-827-3922)                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

70

1          A.     Jennifer Hartfiel is one of the

2   installation coordinators processing new

3   enrollments.

4          Q.     She reports to you, right?

5          A.     She reports directly to Kelly

6   Schulkers.

7          Q.     What was Ms. Griffin's position

8   at the time?

9          A.     Allison Griffin is a sales rep.

10:35  10          Q.     And this is a lengthy e-mail,

11   but I'd like to direct your attention to the

12   second paragraph that begins, "Pam was

13   remorseful."

14          A.     On the second page?

15          Q.     It's page numbered 4 at the

16   bottom.

17          A.     Okay.

18          Q.     Do you have it?

19          A.     Em-hm.

10:35  20          Q.     Second paragraph, about, I don't

21   know, three, four, sentences in, there's a

22   sentence that reads as follows, "Pam said

23   that the decision has already been made and

24   contracts were signed."

Electronically signed by Ann M. Belmont (201-234-827-3922)                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

71

1              MR. BERNAY: Are you there?

2         A.    Three or four sentences in?

3              MR. BERNAY:  Start there.

4         A.    Okay, yeah.  I see it now.

5         Q.    Then it goes on to say, "I

6    explained that often in our business the

7    contracts are not always binding.  I just

8    want to make sure the decision makers know

9    about our suite of products before we begin

10:36  10   removing monitors," do you see that?

11        A.    Em-hm.

12        Q.    You didn't disapprove of Ms.

13   Smith telling the practice that, often in our

14   business the contracts are not always

15   binding, did you?

16              MR. BERNAY: Object to the form.

17   You can answer.

18        A.    No, I don't believe so.

19        Q.    And, in fact, you write, do you

10:36  20   not, at the top?

21        A.    Oh, yes, good job.

22        Q.    "Great job, Lori!"

23        A.    Em-hm.

24        Q.    "Thank you for contacting her,"

Electronically signed by Ann M. Belmont (201-234-827-3922)                                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

72

1    right?

2          A.    Yes.

3          Q.    And you wrote great job, Lori,

4    because you read this e-mail, which, as I

5    said, was long?

6          A.    Em-hm.

7          Q.    And you felt that Ms. Smith was

8    doing her level best to save a practice,

9    right?

10:37    10          A.    Yes.

11          MR. BERNAY: Object to the form.

12    You can answer.

13          A.    Yes.

14          Q.    And to save it from going to

15    ContextMedia, right?

16          A.    Yes.

17          Q.    And you read her e-mail before

18    you said that, right?  Obviously?

19          A.    Yes.

10:37    20          Q.    And, ultimately, her efforts

21    paid off, didn't they?

22          A.    Yes.

23          Q.    Are they still with you?

24          A.    Yes.

Electronically signed by Ann M. Belmont (201-234-827-3922)                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

73

1          Q.    In your experience, as part of

2    HAN's effort to save a practice, has HAN ever

3    delayed scheduling the removal of the

4    equipment to give it more time to do the best

5    it could to convince the practice of the

6    merits of HAN's product?

7          A.    We would schedule it when our

8    technician's availability.

9          Q.    But did you ever not schedule it

10:38  10   as soon as a technician was available to give

11   you time to work with the practice, because

12   you thought you might be able to reach a

13   decision --

14         A.    If they felt that they could

15   have the opportunity to, to talk to them and

16   engage them in the program to save them, yes.

17         Q.    And that's something the members

18   of your team knew to do, right?

19         A.    Yes, if they were working the

10:38  20   location.

21         Q.    How are members of your team

22   paid?  Compensated?

23         A.    They are paid salary.

24         Q.    Straight salary?

Electronically signed by Ann M. Belmont (201-234-827-3922)                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

74

1          A.     Em-hm.

2          Q.     Is there any financial benefit

3    to them if they save a practice?

4          A.     No.

5          Q.     Is there -- is it straight

6    salary and no bonus at any point in time of

7    the year?

8          A.     No, they're on a straight

9    salary.  If it's a bonus, it's a corporate

10:39  10   bonus, not for individual saves.

11         Q.     Bonus turns on how well the

12   company did that year?

13         A.     Correct.

14      (Exhibit 33 identified.)

15         Q.     Let's mark this.  I've handed

16   you what's been marked as Exhibit 32.

17              MR. BERNAY: No, it should be 33.

18         Q.     33, thanks. This is another

19   e-mail exchange concerning a practice wanting

10:40  20   to leave HAN for ContextMedia, right?

21         A.     Em-hm, yes.

22         Q.     And it starts with an e-mail to

23   you from Chris Martini, right?

24         A.     Yes, it starts there.

Electronically signed by Ann M. Belmont (201-234-827-3922)                                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

75

1        Q.    I just noticed, Mr. Martini's

2    title here is president hospital solutions

3    and enterprise sales strategy, do you see

4    that?

5        A.    Yes.

6        Q.    Does -- at this point, you're

7    PatientPoint; is that right?

8        A.    Yes.

9        Q.    And by the way, if I use

10:40   10   PatientPoint and I use HAN and I use Healthy

11   Advice today, you'll understand they are all

12   the same for purposes of this exercise?

13       A.    Correct.

14       Q.    Does PatientPoint have multiple

15   presidents or just one?

16       A.    It does have multiple

17   presidents, yes. We have two currently.

18       Q.    But for your business, the

19   president is Mr. Martini?

10:41   20       A.    Correct.

21       Q.    And then with an e-mail that

22   starts on the first page, dated February 20,

23   2013, at 7:52 a.m., you write to Mr. Martini,

24   and then actual content's on the next page.

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Electronically signed by Ann M. Belmont (201-234-827-3922)                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

76

1    And you write, "Yes, this happened when we

2    called. It shouldn't be a clause, this

3    program is in the exam room, not the waiting

4    room. Their agreement," and you're referring

5    to ContextMedia, right?

6            A.    Em-hm.

7            Q.    "Like ours, states that no one

8    else can be in the waiting room area," but,

9    again, these are not binding contracts,

10:41  10    right?

11           A.    Yes.

12           Q.    You're writing that after you've

13   worked at the company for eight years?

14           A.    Yes.

15           Q.    And you're writing that to the

16   president of the company?

17           A.    Huh?  Yes.

18           Q.    Has, in your experience, HAN

19   ever sued a practice to attempt to enforce

10:42  20    its enrollment agreement?

21           A.    No.

22           Q.    Has it ever threatened to sue

23   one?

24           A.    No.

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Amy Finley, 3/20/2014

77

1    Q.    You look like I said something

2    dumb.

3    A.    No, I just.  Sorry.

4    Q.    That's all right. You're

5    entitled to react, it's your deposition. Ever

6    send a demand letter to a practice saying

7    we're going to come after you for breaching

8    our agreement?

9    A.    No.

10:42   10    (Exhibit 34 identified.)

11    Q.    I need to get organized here.

12    This is an e-mail exchange involving you, Ms.

13    Grippo, Ms. Brewer and Amanda Devlin, at the

14    top, but beneath it is an e-mail from Mr.

15    Jordan Zmick at ContextMedia, do you see

16    that?

17    A.    Yes.

18    Q.    Is this an e-mail you saw

19    recently?

10:43   20    A.    I haven't seen this particular

21    e-mail chain, no.

22    Q.    Did you see an e-mail recently,

23    if not this chain, involving the issue of Ms.

24    Devlin falsely telling someone at

Electronically signed by Ann M. Belmont (201-234-827-3922)                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

78

1    ContextMedia that she was a representative of

2    a practice interested in their service?

3         A.    Yes, it was in the previous one

4    with Jill Brewer.

5         Q.    Whose idea was it for Ms. Devlin

6    to do that?

7         A.    I don't know.

8         Q.    No idea?

9         A.    I don't know if it was -- it was

10   obviously her idea.  I did not tell her to do

11   that.

12        Q.    Who did she report to at the

13   time?

14        A.    Jill Brewer.

15        Q.    You don't know if it was Jill

16   Brewer's idea?

17        A.    No, I don't.

18        Q.    Was Ms. Devlin ever reprimanded

19   for doing that?

20        A.    I don't know.

21        Q.    In fact, weren't her actions

22   applauded by the company?

23        A.    I can't say by the company.

24        Q.    Applauded by you?

10:44 (line 10)

10:44 (line 20)

Electronically signed by Ann M. Belmont (201-234-827-3922)                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

79

1          A.    I did say great job to her, not

2    necessarily condoning her -- how she got

3    information, but her -- the fact that she was

4    able to get some factual information.

5          Q.    On how many occasions, to your

6    knowledge, has HAN done that, instructed an

7    employee to act as an imposter to obtain

8    information from a competitor?

9               MR. BERNAY: Object to the form.

10:44   10   You can answer.

11          A.    I don't believe anybody has ever

12   been instructed.

13          Q.    Do you disagree with me that she

14   did act as an imposter?

15          A.    No, I don't disagree with you.

16          Q.    Do you think that what Ms.

17   Devlin did was unethical?

18          A.    Yes.

19          Q.    Did you ever tell her that?

10:45   20          A.    No.

21          Q.    To your knowledge, did Ms.

22   Brewer ever tell her that?

23          A.    Not to my knowledge.

24          Q.    To your knowledge, did Mr.

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Electronically signed by Ann M. Belmont (201-234-827-3922)                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

80

1   Martini ever tell her that?

2          A.    Not to my knowledge.

3          Q.    Is she still with the company?

4          A.    Yes.

5          Q.    In what position?  Is she still

6   part of your team?

7          A.    No, she's not on my team.

8          Q.    Was she part of your team then?

9          A.    No.

10:45  10          Q.    Whose team was she on then?

11          A.    At this time, she was on Jill

12   Brewer's.  She reported to Jill Brewer, the

13   sales team.

14          Q.    You did too, right?

15          A.    I did.

16          Q.    But different?

17          A.    Right.  She's in the sales side.

18   I'm not in sales, she's in sales.

19          Q.    I see. Sales to practices?

10:45  20          A.    Yes.

21          Q.    Not sales to advertisers?

22          A.    Correct.

23          Q.    So what was Ms. Brewer's

24   position at this time?

Electronically signed by Ann M. Belmont (201-234-827-3922)          13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

81

1          A.    She was the EVP of -- I want to

2    say operation and sales, sales and

3    operations.

4          Q.    So she was pretty senior?

5          A.    Yes.

6          Q.    Who did she report to at the

7    time, the president?

8          A.    I believe Mike McAllister.

9          Q.    The CEO?

10:46 10          A.    The COO.

11          Q.    Oh, okay. McAllister was the

12    COO, and Collette was the CEO?

13          A.    Correct.

14          Q.    Now, this e-mail includes Mr.

15    Zmick's information to Ms. Devlin, Mr. Zmick

16    being from ContextMedia?

17          A.    Em-hm.

18          Q.    Because he believes that she's a

19    representative of a practice he's trying to

10:46 20    sell her, right?

21          A.    Em-hm.

22          Q.    And he's touting what he

23    believes the merits of ContextMedia's

24    product, right?

Electronically signed by Ann M. Belmont (201-234-827-3922)                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

82

1          A.    Yes.

2          Q.    And he sends some links to allow

3    her to view the portions of the content,

4    right?

5          A.    Yes.

6          Q.    For example, he gives her a link

7    as to some content where the ContextMedia

8    content gives a personal story example?

9          A.    Em-hm.

10:47  10          Q.    And then another link for a

11    recipe, right?

12          A.    Em-hm, yes.

13          Q.    Another one for physical

14    activity, right?

15          A.    Yes.

16          Q.    And these are things that, if

17    you didn't know before, you knew about them

18    then were included in ContextMedia content,

19    right?

10:47  20          A.    Yes, but I knew before they had

21    these.

22          Q.    And it was reported back to you

23    from time to time that one of the reasons

24    that a practice switched from HAN to

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Electronically signed by Ann M. Belmont (201-234-827-3922)                                      13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

83

1    ContextMedia was that the practice liked the

2    recipes?

3            A.    Yes.

4            Q.    And another reason it was given

5    was they liked the video on exercises and

6    things like that?

7            A.    It could be. I don't recall that

8    one.

9            Q.    That one doesn't stand out for

10:47   10    you?

11           A.    That does not stand out to me.

12           Q.    And do you see anything in here

13    in Mr. Zmick's e-mail that you believe to

14    have been false or misleading?

15           A.    In the e-mail to Ms. Devlin?

16           Q.    Yes.

17           A.    No.

18           Q.    And as to equipment, he tells

19    her that -- because she said she was from

10:48   20    Accent Health, another competitor in the

21    market, right?

22           A.    Em-hm, yes.

23           Q.    She -- he tells her that, "We

24    will, upon your having Accent Health remove

Electronically signed by Ann M. Belmont (201-234-827-3922)                                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

84

1    the equipment, will coordinate installation

2    of ours," right?

3         A.    That's what it says.

4      (Exhibit 35 identified.)

5         Q.    Let's mark this as 35. This is

6    another exchange involving Ms. Devlin's

7    interactions with Jordan Zmick of

8    ContextMedia, right?

9         A.    Yes.

10:49  10         Q.    Is this one you saw recently?

11         A.    No.

12         Q.    She -- in addition to falsely

13    stating that she was from a practice, she

14    also gave a false name, right?

15         A.    It's not her name, no.

16         Q.    Berne is not her name?

17         A.    No.

18         Q.    And she is now trying to get

19    more information from him about content and

10:50  20    wanted to know if they have any silent

21    content, and he forwards some examples of

22    ContextMedia silent content, right?

23              MR. BERNAY: Object to the form

24    of the question.  You can answer.

Electronically signed by Ann M. Belmont (201-234-827-3922)                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

85

1          A.    It appears after he

2    approached -- reapproached her to reengage

3    with her to try to see if she was still

4    interested, yes.  She tells him that she was

5    going to silent, is what it says, and that he

6    says that they have a silent loop.

7          Q.    And he says that it's longer and

8    much more thorough than the Healthy Advice

9    that you were interested in --

10:50   10         A.    Assuming, yeah.

11         Q.    And you know why he made that

12    assumption that it was Healthy Advice, right?

13         A.    No.

14         Q.    Well, wasn't Healthy Advice the

15    only competitor in the field, then, that was

16    offering only silent content?

17         A.    Oh, yes, okay.

18         Q.    So she said she wants -- she's

19    looking at someone else, a competitor who

10:51   20    provides silent, it stands to reason, if

21    you're in the business and in the know, that

22    it's your company, right?

23         A.    Correct.

24         Q.    Do you think it was -- he said

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Electronically signed by Ann M. Belmont (201-234-827-3922)                                          13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

86

1    anything false and misleading in her -- in

2    his interaction with her once he thought she

3    was considering Healthy Advice?

4           A.    No, not at this time.

5           Q.    Does HAN, to your knowledge,

6    consider its content to be a trade secret?

7           A.    Yes.

8           Q.    If you consider your content to

9    be a trade secret, wouldn't it stand to

10:51  10   reason that ContextMedia would -- might

11   consider its content to be a trade secret?

12          A.    I -- they purchase their

13   equipment -- their content, I know that, so

14   it's different than where our -- our content

15   is actually developed in-house through our

16   creative department, so.

17          Q.    So you think that might be a

18   reason that HAN's content is a trade secret

19   but ContextMedia's isn't?

10:52  20          MR. BERNAY: Object to the form

21   of the question. You can answer.

22          A.    It could be, but I've honestly

23   never thought about it.

24          Q.    You didn't think about it when

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Electronically signed by Ann M. Belmont (201-234-827-3922)                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

87

1    Ms. Devlin was -- by falsely impersonating

2    herself causing ContextMedia to send HAN, a

3    competitor, example after example of its

4    content?

5              MR. BERNAY: Objection.  You can

6    answer.

7         A.    No, I did not.  They were demos,

8    sales demos is the way I viewed them.

9         Q.    Do patients in member practices

10   of HAN's have to sign nondisclosure

11   agreements before they can step into the

12   waiting room?

13        A.    No.

14     (Exhibit 36 identified.)

15        Q.    Let's mark this as 36.

16   Exhibit 36 starts with an the exchange

17   between Mr. Zmick and Ms. Devlin, and then

18   you forwarded it up to Mike Collette, and

19   then Mike Collette writes to Kathy Gould, and

20   I don't know if you were included there or

21   not, it doesn't -- I can't tell.

22        A.    No.

23        Q.    In any event, what you -- Mr.

24   Collette -- I just asked you this question,

10:52

10:53

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Electronically signed by Ann M. Belmont (201-234-827-3922)                                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

88

1    now I forgot.  COO or CEO?

2          A.    Mike Collette is the CEO.

3          Q.    Okay.  Maybe I'll get it right

4    by the end of the day. So you're forwarding

5    this information where Ms. Devlin is acting

6    as an imposter for ContextMedia.  You forward

7    that up to the president of the company,

8    right?

9          A.    Yes.

10:54  10          Q.    And you write, "Mike, this is

11    the information we received from RHN towards

12    the end of the year," right?

13          A.    Yes.

14          Q.    And so you're writing on

15    April 2012, you're sending him something that

16    you got back in October of 2011?

17          A.    Em-hm.

18          Q.    What provoked you to do that?

19    What inquiry or -- I'll stop, let me back up.

10:54  20    What provoked you to do that?  And I'll stop

21    there.

22          A.    I believe he asked me if I had

23    any information on RHN in there and their

24    program.

Electronically signed by Ann M. Belmont (201-234-827-3922)                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

89

1          Q.    Okay. And besides this, do you

2    recall whatever -- do you recall whether you

3    sent him anything else in response to his

4    inquiry?

5          A.    I don't recall.

6          Q.    You might have, you just can't

7    remember as you sit here two years later?

8          A.    Exactly.

9          Q.    And then he writes to Ms. Gould,

10:55 10    "Part of the frustration PRG," who is PRG?

11          A.    The physician recruitment group,

12    the sales team.

13          Q.    Reporting up to Ms. Brewer?

14          A.    Yes.

15          Q.    Is experience -- let me start

16    over.  "Part of the frustration PRG is

17    experiencing is the competitors are already

18    offering more sophisticated custom message

19    options, RSS feeds, etc., so they can't

10:55 20    understand why we can't do the same. Note the

21    RSS feeds issue is obviously a different

22    story as it requires a broadband connection,"

23    do you see that?

24          A.    Yes.

Electronically signed by Ann M. Belmont (201-234-827-3922)                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

90

1          Q.    And then he concludes, "By the

2      way, Berne is Amanda," and I'm told, but you

3      don't have to take my word for it, that the J

4      is a smiley face, that's the way it gets

5      reproduced, but. Do you know how Mr. Collette

6      knew that Berne was Amanda Devlin, because

7      you don't tell him that, at least not in this

8      e-mail.

9          A.    No, I don't know how. I don't

10     know.  I don't recall if I told him or if he

11     just made that assumption knowing that he

12     knew Ms. Devlin.

13         Q.    Because that's the kind of thing

14     Ms. Devlin does all the time?

15         A.    No, her last name is -- it says

16     Devlin, so that's the only reason. I don't

17     know.

18         Q.    And Devlin, though, is a very

19     common name?

20         A.    Huh?

21         Q.    Devlin is a common name.

22         A.    It is?

23         Q.    Must not be Irish.

24         A.    I only know one Devlin.

10:56  (line 10)
10:57  (line 20)

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Electronically signed by Ann M. Belmont (201-234-827-3922)                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

91

1      Q.   Okay. So he either figured it

2  out all by himself or someone had to tell

3  him, right?

4      A.   Right.

5      Q.   Did you have any other action

6  with Mr. Collette with respect to the

7  activities of Amanda Devlin, aka, Berne

8  Devlin?

9      A.   No, not that I recall.

10:57 10      Q.   Yeah, I was going to say --

11      A.   Yeah, I don't believe so.

12      Q.   Okay. What is RSS?

13      A.   The RSS feeds?

14      Q.   Right.

15      A.   That's where you get the weather

16  and the news ticker.

17      Q.   Okay. I've never heard that.

18  Why is it called RSS, do you have any idea?

19      A.   No, I don't.

10:57 20      Q.   Do you agree with his statement

21  there that, "Part of the frustration PRG is

22  experiencing is the competitors are already

23  offering more sophisticated custom message

24  options, RSS feeds, etc."?

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Electronically signed by Ann M. Belmont (201-234-827-3922)        13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

92

1        A.    Yes, I do agree that they were

2    experiencing frustration.

3        Q.    Because that's what your team

4    was learning, right?

5        A.    This was the sales team that

6    we're trying to sell new programs, yes.

7        Q.    Right.  But on your side of the

8    business, when you're interacting with

9    practices who are telling you they're going

10:58  10   to switch to ContextMedia, they're telling

11   you things like they want more sophisticated

12   custom message options and they want RSS

13   feeds, right?

14        MR. BERNAY: Object to the form

15   of the question. You can answer.

16        A.    What they would say, from my

17   side of the team, would say they wanted

18   video, they didn't use that terminology. Or

19   that they would like news or weather tickers.

10:58  20        Q.    And that's the kind of

21   information your team would gather as part of

22   its objective to understood why practices

23   switched to share with the sales team, right?

24        A.    Right.  Or the sales team, also,

Electronically signed by Ann M. Belmont (201-234-827-3922)                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

93

1    in turn would get that information while

2    being out in the field trying to, maybe, not

3    even if it was another company, but just what

4    some practices may tell them that they want.

5          Q.    They'd confront the same issue?

6          A.    Correct.

7          Q.    And do you know if Mr. Collette

8    was correct when he said that RSS feeds

9    really can't be provided without a broadband

10:59  10    connection?

11          A.    That is correct. You need a

12    broadband to be able to do that.

13          Q.    And was it about this time that

14    HAN made it a business objective to improve

15    its product offering to offer things like RSS

16    feeds?

17          A.    I -- we still don't offer RSS

18    feeds, we offer weather.

19          Q.    I see.

10:59  20          A.    It's not an RSS feed. That's all

21    I really.

22          Q.    Did HAN ever make it a business

23    objective to offer more sophisticated custom

24    message options?

Electronically signed by Ann M. Belmont (201-234-827-3922)          13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

94

1          A.     Yes.

2          Q.     And are you doing that now?

3          A.     Yes. I don't recall when that

4     started, though.  If it was prior to this, it

5     was something I know we were in the works of

6     trying to create to offer more video.

7          Q.     To your knowledge, did the

8     president of the company, Mr. Collette, ever,

9     in any way, shape or form, suggest that Ms.

11:00  10  Devlin be reprimanded for her conduct?

11          A.     Not to my knowledge.

12               MR. BERNAY: Hey, Dick, it's

13     eleven o'clock, let's take a break.

14               MR. JAHN: We're off the record.

15               (Break taken.)

16               MR. JAHN: We're on the record.

17       (Exhibit 37 identified.)

18          Q.     I've handed to you and your

19     counsel what's been marked as Defendant's

11:08  20  Deposition Exhibit 37. This is Ms. Buettgen

21     forwarding to you and some others a comment

22     that she's put in the CMS regarding the

23     practice switching to ContextMedia and then

24     some e-mail exchanges with you and Ms.

Electronically signed by Ann M. Belmont (201-234-827-3922)                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

95

1    McGauvran?

2         A.    McGauvran.

3         Q.    McGauvran. Do you agree with

4    what I just said?

5         A.    This is an e-mail exchange

6    between --

7         Q.    Right.

8         A.    Yes.

9         Q.    The comment indicates that, "The

11:09  10   practice called to see if someone was going

11   to come pick up the equipment, could they buy

12   out the equipment." Did, on occasion, HAN

13   sell its equipment to practices?

14        A.    No.

15        Q.    And Ms. Buettgen told him,

16   "There's no need to get our equipment back.

17   The site cancelled to go with RHN," you know

18   RHN is ContextMedia, right?

19        A.    Yes.

11:09  20        Q.    She goes on to write, "It looks

21   like we had a date set and had to cancel

22   because we didn't have a tech in the area,"

23   do you see that?

24        A.    Yes.

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Electronically signed by Ann M. Belmont (201-234-827-3922)                                      13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

96

1          Q.    First, are you aware of

2     instances where the practice contacted HAN to

3     arrange for the return of HAN's equipment and

4     HAN said, no need to do that, you can just

5     keep it?

6                MR. BERNAY: Object to the form

7     of the question. You can answer.

8          A.    Obviously, I was aware.

9          Q.    Right.

11:10  10          A.    I don't really recall this that

11     much. The equipment being left with the

12     practice was a rare instance. And typically

13     would happen, if it was, either due to

14     somebody not being able to go to get the

15     equipment or the office was closing their

16     doors and we weren't able to retrieve in a

17     timely manner to retrieve the equipment.

18          Q.    Have you done any investigation

19     to determine how often HAN told the practice

11:10  20     to keep the equipment over the last several

21     years?

22          A.    No.

23          Q.    How would you determine that if

24     you wanted to?

Electronically signed by Ann M. Belmont (201-234-827-3922)                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

97

1          A.    I'm not really sure off the top

2    of my head.  Quite honestly, I'd have to

3    think about that.

4          Q.    Might not be able to?

5          A.    Might not be able to, right.

6          Q.    And if I'm reading this comment

7    correctly, it looks like arrangements had

8    been made for HAN to remove the equipment,

9    and then it didn't show up when it was

11:11  10   supposed to, right?

11          MR. BERNAY: Object to the form.

12    You can answer, and take your time looking at

13    the document.

14          A.    Okay.  I'm sorry, could you

15    repeat the question?

16          Q.    Sure.

17          MR. O'BRIEN: Could you read it

18    back, please.

19      (Record read by Reporter.)

11:11  20          A.    It looks like we had a date set,

21    yes, to have a technician come to the area --

22    or come to the site.

23          Q.    And then it didn't happen,

24    right?

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Electronically signed by Ann M. Belmont (201-234-827-3922)                                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

98

1          A.     It didn't happen.

2          Q.     And then at the end you write to

3    Ms. McGauvran, "If you don't mind, if RHN

4    removed our equipment, explain that we are in

5    litigation with them, and since they were not

6    authorized to handle our equipment, the

7    practice is now liable for getting the

8    equipment back to us," do you see that?

9          A.     Yes.

11:12   10          Q.     "Advise they may want to contact

11    RHN since they forced them to breach their

12    contract, yada, yada," do you see that?

13          A.     Yes.

14          Q.     "If you prefer I do it, that is

15    fine," I guess you wrote to, but I think you

16    meant so, "so I will call tomorrow," do you

17    see that?

18          A.     Yes.

19          Q.     You're instructing Ms. McGauvran

11:12   20    to call the practice back and tell the

21    practice that HAN's in litigation with

22    ContextMedia, right?

23          A.     Yes, that's what it says.

24          Q.     And that's a false statement, is

Electronically signed by Ann M. Belmont (201-234-827-3922)                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

99

1    it not?

2            A.    Yes, I know that now.

3            Q.    Well, in March of 2011, did you

4    believe that HAN and ContextMedia were in

5    litigation?

6            A.    I, obviously, used the wrong

7    terminology.  I know we sent a cease and

8    desist letter to ContextMedia, so I'm not

9    really sure where I came up with the term

11:13 10   litigation, if it was something that was told

11   to me, that is where I came up with it. I

12   will be honest, I don't recall.

13           Q.    Okay.

14           A.    But I know that it was not the

15   correct term.

16           Q.    Was it your --

17           A.    Now I do.

18           Q.    Was it your thought to make sure

19   that someone said to the practice something

11:13 20   negative about ContextMedia?

21           A.    No.

22           Q.    By saying that you're in

23   litigation suggests, does it not, that

24   ContextMedia had done something wrong?

Electronically signed by Ann M. Belmont (201-234-827-3922)                13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

100

1          A.     Yes.

2          Q.     And when you said -- advised

3     them they may want to contact RHN since they

4     forced them to breach their contract, yada,

5     yada, what do you mean by yada, yada?

6          A.     Forced them to breach their

7     contract, our contract, by basically not

8     following the 30-day notice policy that we

9     have, and the notice that only PatientPoint

11:14   10    or Healthy Advice was authorized to service

11     and remove the equipment.

12          Q.     That's what yada, yada means?

13          A.     I believe that's what I meant at

14     the time.

15          Q.     Is that --

16          A.     But obviously I can't recall

17     100 percent since that was a couple of years

18     ago.

19          Q.     Isn't saying yada, yada like

11:14   20    saying blah, blah, blah?

21          A.     Sure.

22       (Exhibit 38 identified.)

23          Q.     This is another e-mail exchange

24     involving the same practice. And now the note

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Electronically signed by Ann M. Belmont (201-234-827-3922)                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

101

1    says, "Josh," that's the practice, right?

2         A.    Yes.

3         Q.    "Called in, person from HAN

4    explained that HAN is currently in litigation

5    with RHN," right?

6         A.    Yes, that's what it says.

7         Q.    And that was a false statement,

8    right?

9         A.    Correct.

11:15  10         Q.    And your response is, "Great

11    job, Heather!", right?

12         A.    Yes.

13      (Exhibit 39 identified.)

14         Q.    This is 39. This is an e-mail

15    exchange involving you early on and then

16    later on some others in the company, right?

17         A.    Yes, it appears.

18         Q.    And it begins with a comment

19    from the practice or where it indicates that

11:16  20    "The practice switched to ContextMedia

21    because of a $100 AmEx card," right?

22         A.    Yes.

23         Q.    In other words, she told you --

24    told HAN she really didn't care about the

Electronically signed by Ann M. Belmont (201-234-827-3922)                                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

102

1    content or anything else, right?

2         A.    Yes, that's what it appears

3    she's --

4         Q.    It goes on to repeat that she

5    was fine with switching strictly because of a

6    $100 gift card, right?

7         A.    Yes.

8         Q.    And then you write up to Brewer

9    and McAllister, who is the COO, right?

11:17   10      A.    Correct, got it right.

11        Q.    "Isn't there someone we can

12   report them to?  They are basically buying

13   their locations."

14        A.    Correct.

15        Q.    And later Ms. Schnell writes to

16   Linda Ruschau, who is Linda Ruschau?

17        A.    Linda Ruschau is one of the

18   salespeople for the -- that sells to the

19   pharmaceutical companies.

11:17   20      Q.    On the sponsor side?

21        A.    Sponsor side.

22        Q.    Is she part of the executive

23   team?

24        A.    Yes, she is.

Electronically signed by Ann M. Belmont (201-234-827-3922)          13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

103

1        Q.    And she's writing -- Linda

2    Ruschau, Mike McAllister, Ms. Schnell --

3    who's Ms. Schnell?

4        A.    Debbie Schnell was the EVP over

5    the client sales team sponsors, the sales

6    reps had sold into the sponsors.

7        Q.    So she's on the executive team,

8    too?

9        A.    She's on the executive team. Was

10   on the executive team. She's no longer with.

11       Q.    Do you know why she is no longer

12   with the company?

13       A.    No, I do not.

14       Q.    And Ms. Schnell writes, "What

15   they are doing is not illegal according to

16   the court of the law. Only the PhRMA code

17   guidelines and FDA."  Did someone ever tell

18   you that?

19       A.    What, that?

20       Q.    I guess there's many pieces

21   there, let me break it down.  Did someone

22   ever tell you that it was not illegal?

23            MR. BERNAY: Object to the form

24   of the question.

Electronically signed by Ann M. Belmont (201-234-827-3922)            13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

104

1          A.    Well, I would say yes because I

2     received this e-mail.

3          Q.    Well, I'm not sure you did.

4          A.    Yes, I did.

5          Q.    Oh, yes, you did, I'm sorry.

6          A.    Yes.

7          Q.    I'm sorry, your name is at the

8     top, I apologize.

9          A.    Yes, it is.

11:18  10          Q.    Okay.  So someone did tell you

11     it was not illegal?

12          A.    They did tell me it was not

13     illegal.

14          Q.    But you also were told, at least

15     at this point in time, that they were

16     violating some PhRMA code guidelines in the

17     FDA, right?

18          A.    I was told that, yes.

19          Q.    And you later learned that

11:18  20     wasn't true either, right?

21          A.    Honestly, no, I've never really

22     confirmed that that was not necessarily true.

23          Q.    And there's a reference in here

24     to J3.  Do you know who J3 is?

Electronically signed by Ann M. Belmont (201-234-827-3922)          13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

105

1      A.    I do not.  I know it's an

2   organization that Pharma works with, but I

3   don't know really know what they do.

4      Q.    Did you understand when you got

5   this at the time that HAN was planning to

6   approach a sponsor or potential sponsor to

7   suggest that ContextMedia was engaged in some

8   sort of wrongful conduct?

9      A.    I don't know what their -- I

11:19  10   didn't know what their intention was with it,

11   honestly.

12      Q.    You never interact with

13   sponsors, right?

14      A.    I don't. That's the one side of

15   the business I'm really not privy to.

16      (Exhibit 40 identified.)

17      Q.    Let's mark this as 40. I've

18   handed to you and your counsel what's been

19   marked as Defendant's Deposition Exhibit 40.

11:20  20   This is another comment being put in CMS,

21   October 11, 2011.  And it looks like it is

22   sent from Ms. Brewer to you and Mr.

23   McAllister, right?

24      A.    Yes.

Electronically signed by Ann M. Belmont (201-234-827-3922)                              13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

106

1    Q.   And you're right, there's stuff

2    on the back, it looks like -- it doesn't

3    actually begin with the forwarding of a

4    comment, I stand corrected. It starts off

5    with Kim Coar, who's Kim Coar, do you know?

6    A.   Kim Coar is a sales rep on the

7    sponsor side.

8    Q.   And it goes to Bruce Lee, and

9    don't tell me he's a martial artist.

11:20  10   A.   I don't know who Bruce Lee is. I

11   know who that Bruce Lee is, but I don't know

12   this Bruce Lee.

13   Q.   And copy to Debbie Schnell and

14   Mike McAllister, and then Mike forwards it to

15   you, right?

16   A.   Em-hm.

17   Q.   And then it looks like forwards

18   it to you and Ms. Brewer, and then Ms. Brewer

19   forwards the comment up to Mr. McAlister and

11:21  20   you.

21   A.   Em-hm.

22   Q.   And in the e-mail that starts

23   this all off, Mr. Lee writes, "Context --" in

24   the middle there, "ContextMedia has blatantly

Electronically signed by Ann M. Belmont (201-234-827-3922)   13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

107

1    defied the FDA and Pharma code guidelines,"

2    do you see that?

3         A.    Yes.

4         Q.    I think you -- from your prior

5    answer, you never learned that that was

6    false, did you?

7         A.    No.

8         Q.    Okay.  Nothing else on that.

9         A.    Okay.

11:22  10    (Exhibit 41 identified.)

11         Q.    Marking Exhibit 41, here's

12    another e-mail exchange concerning the loss

13    of a practice by HAN to ContextMedia, right?

14              MR. BERNAY: Take your time to

15    review the document.

16         Q.    Oh, please.

17         A.    Yeah, this is a long one. Okay.

18         Q.    The question that was pending

19    was something like this, doesn't this e-mail

11:24  20    exchange involve another situation where HAN

21    is being informed of a practice switching out

22    to ContextMedia?

23         A.    Yes.

24         Q.    And in this situation, HAN was

Electronically signed by Ann M. Belmont (201-234-827-3922)                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

108

1    notified that the practice was switching,

2    right?

3         A.    Correct.

4         Q.    And HAN was given the

5    opportunity to go out and pick up its

6    equipment, right?

7         A.    Yes.

8         Q.    And then HAN didn't do it -- at

9    least, didn't do it on a timely basis, right?

11:25 10       A.    Yeah. I can't tell from this if

11   we removed the equipment or if the equipment

12   was already removed and we were just going to

13   pick it up.

14        Q.    Okay.  One or the other?

15        A.    One or the other.

16        Q.    And then on the first page you

17   ultimately write to your -- was Kim Theiss

18   your boss at this time, June 2012?

19        A.    I believe so.

11:25 20       Q.    And you wrote, "I know Nicole

21   was handling this, but this does not make us

22   look good in the eyes the practice or the

23   competitor," do you see that?

24        A.    Yes, I do see that.

Electronically signed by Ann M. Belmont (201-234-827-3922)                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

109

1        Q.    What did you mean by that?

2        A.    Meaning that if a technician

3  doesn't show up when they're supposed to,

4  obviously, we don't look good.

5        Q.    I can understand that that would

6  not make you look good with the practice, but

7  why did you also feel it doesn't make you

8  look good with ContextMedia?

9        A.    Well, because if they were aware

11:26  10  of that situation, which being that they were

11  switching to ContextMedia, then they would

12  also then state that they believe that we

13  have an issue with our service or something

14  of that sort.

15        Q.    All right. You understand, do

16  you not, that ContextMedia didn't always take

17  down the HAN equipment, did it?

18        A.    No, it did not always.

19   (Exhibit 42 identified.)

11:27  20        Q.    I have handed to you and your

21  counsel what's been marked as Defendant's

22  Exhibit 42. You're not on this.

23        A.    No.

24        Q.    Do you recall ever seeing this

Electronically signed by Ann M. Belmont (201-234-827-3922)    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

110

1    before today?

2         A.    No.

3         Q.    Take whatever time you read

4    it -- want to read it, but when you're done

5    doing that, the question I want you to

6    answer, if you could, does this involve a

7    practice switching from HAN to ContextMedia?

8         A.    Okay.  Yes, it appears that they

9    were switching from Healthy Advice to

11:28    10    Context.

11         Q.    And the reason I ask that is,

12    the comment starts off, "Hey, we're going

13    with us, and then doc went to conference

14    decided to go with RHN," so when I read that

15    it wasn't clear to me if they already had HAN

16    installed or rather instead they signed up

17    your agreements and then the guy decided to

18    go with ContextMedia instead.

19         A.    Not being able to see all of the

11:29    20    details on the location, it's hard for me to

21    explain, but it could be they moved and we

22    were trying to reinstall in a new location.

23         Q.    Gotcha.

24         A.    And, therefore, she was trying

Electronically signed by Ann M. Belmont (201-234-827-3922)                              13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

111

1    to schedule the reinstallation.

2         Q.    Let me ask a different question.

3    This CMS database, does it simply include

4    practices that have signed up with HAN and

5    then installed, or does it also include

6    instances where competitors are in a

7    head-to-head contest for a practice that

8    doesn't have anything at that point in time?

9              MR. BERNAY: Object to the form.

11:29   10    You can answer.

11         Q.    Do you understand my question?

12         A.    That, basically, that we've

13    pitched?

14         Q.    Right.

15         A.    We both have pitched. At one

16    point it did capture pitched locations. I

17    don't recall if it was -- if they really put

18    in there if they were up against someone.

19    They just used it as a way to say when they

11:30   20    pitched a location versus to when it was

21    actually sold.

22         Q.    You said at one point in time.

23    Did you stop doing that at some point in

24    time?

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Electronically signed by Ann M. Belmont (201-234-827-3922)          13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

112

1        A.    Yes.

2        Q.    Kind of clutters up the

3   database, doesn't it?

4        A.    Yes, it does.

5        Q.    What was Ms. Grippo's position

6   at the time, if you know?

7        A.    I believe at this point Lisa was

8   the manager over the -- what would it be, the

9   northeast side of the region. She was a sales

11:30  10   manager.

11        Q.    Sales to practices?

12        A.    Sales to practices.

13        Q.    I understand she lives in New

14   York; is that your understanding?

15        A.    Yes.

16        Q.    Does this part of HAN's

17   business, is it divided into geographic

18   regions?

19        A.    Yes.

11:30  20        Q.    Are people out in the regions

21   working?

22        A.    Yes.

23        Q.    I see. And are they working from

24   their home or do you have offices in the

Electronically signed by Ann M. Belmont (201-234-827-3922)                13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

113

1    regions?

2           A.    Well, they work from home, but

3    they're out in the field visiting practices.

4           Q.    Do you recall hearing from time

5    to time that practices had decided to go with

6    ContextMedia over HAN because the doctor had

7    seen something about ContextMedia at a

8    conference?

9           A.    I don't -- I do recall them

11:31  10  seeing them at a conference, yes, I do.

11   Actually, I do remember that.

12          Q.    Do you also recall practices

13   going with ContextMedia over HAN because

14   ContextMedia had some bilingual content?

15          A.    No, I do not.

16          Q.    Do you recall the number of

17   practices going with ContextMedia over HAN

18   because ContextMedia's offering in the

19   diabetes area was content specific?

11:31  20         A.    Yes.

21          Q.    And do you read this comment to

22   say that Ms. Mallicote?

23          A.    Ms. Mallicote.

24          Q.    Ms. Mallicote tried hard to keep

Electronically signed by Ann M. Belmont (201-234-827-3922)          13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

114

1    this practice or save this practice?

2          A.    It also appears she was still

3    trying.

4          Q.    Okay.

5          A.    Is the way I read this, and was

6    asking for suggestions.

7          Q.    And in response to that, Ms.

8    Grippo said she's, "got a ton of supporting

9    information for choosing HAN over

11:32   10   ContextMedia," right?

11         A.    That what it says, yes.

12         Q.    Do you know what she's referring

13   to?

14         A.    Could be just our sales

15   collateral of what our program entails, the

16   value of our program.

17         Q.    And, "This physician says he's

18   looked at the content that both companies and

19   likes ContextMedia hands down better," right?

11:32   20         A.    That's what it says.

21      (Exhibit 43 identified.)

22         Q.    You told me a moment ago that

23   you don't feel like you've ever seen an

24   entire ContextMedia loop, but just pieces of

Electronically signed by Ann M. Belmont (201-234-827-3922)                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

115

1    it from time to time?

2            A.    Yes.

3            Q.    This question has nothing to

4    with it, it just popped in my head.

5            A.    Oh, sorry.

6            Q.    Back in 2011 or 2012, did you

7    have a personal opinion as to which content

8    was superior, ContextMedia versus HAN, or did

9    you feel you weren't in a position to judge

11:33  10    having not seen an entire loop?

11            A.    I would say that I believe that

12    our content was superior.  I mean, I

13    definitely believe in our products and what

14    we offer and the patient education we

15    provide. I believe we have a great creative

16    department.  They believe in what they do.

17    We have medical advisory boards that are

18    reviewing our content.  So I do believe that

19    our content, you know, is valuable.

11:34  20            Q.    Kind of expected that answer.

21            A.    Okay. Good.

22            Q.    I have now shown you and your

23    counsel what's been marked as Defendant's

24    Exhibit 43. This is another e-mail exchange,

Electronically signed by Ann M. Belmont (201-234-827-3922)                                                          13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

116

1   again, one that you're not on, but take your

2   time to read it, and my question for you when

3   you're ready, is this another comment in the

4   database explaining why a practice is

5   switching from HAN to ContextMedia?

6          A.    Yes.

7          Q.    Here the practice is telling HAN

8   that they've done their research, right?

9          A.    Yes.

11:34  10          Q.    And they decided to go with

11   ContextMedia's diabetes product because it's

12   programming specifically for diabetes, right?

13          A.    Yes.

14          Q.    And at that point in time, HAN

15   didn't have a truly competitive product, did

16   it?  By that, I mean, it didn't have a

17   product that was diabetes specific?

18          A.    That was diabetes specific, no.

19          Q.    Does it have one now that's

11:35  20   diabetes specific?

21          A.    No.

22     (Exhibit 44 identified.)

23          Q.    Let's mark this as 44. This is

24   another exchange that you do not appear to be

Electronically signed by Ann M. Belmont (201-234-827-3922)                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

117

1    on, but same kind of questions. Take whatever

2    time you want to look at it. I'm asking you

3    if this is another internal HAN exchange

4    describing why a practice is switching from

5    HAN to ContextMedia?

6            A.    Yeah, okay.  Yes, this is an

7    exchange between Collette and Amanda.

8            Q.    Is this a document you saw as

9    part of your preparation for your deposition?

11:37  10        A.    No.

11           Q.    Pardon me if I already asked you

12   this.  Did you review the CMS database

13   entries as part of your deposition

14   preparation?

15           A.    No.

16           Q.    With respect to this exhibit,

17   Exhibit 44, the longer e-mail that is on the

18   first page of the document comes from

19   Collette Brady, do you know who Collette

11:37  20   Brady is?

21           A.    She was a sales rep on the

22   physician side, physician office side.

23           Q.    Someone that reported up to you?

24           A.    She reported to Amanda.

Electronically signed by Ann M. Belmont (201-234-827-3922)                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

118

1          Q.     And Amanda reported to you?

2          A.     Amanda reported to Jill Brewer.

3          Q.     Okay. You told me this before --

4          A.     Yes.

5          Q.     -- this is on the sales side,

6     and you're on the sort of the --

7          A.     The sales side.

8          Q.     -- care taking?

9          A.     More of the operation side.

11:37  10          Q.     Right.

11          A.     Yes.

12          Q.     And here it's being reported

13     that the physician told HAN it looked at both

14     the HAN program and the ContextMedia program

15     and decided to go with ContextMedia because

16     the program has sound, right?

17          A.     Yes.

18          Q.     And this is something you heard

19     more than once, right?

11:38  20          A.     I have heard it more than once,

21     yes.

22          Q.     And Ms. Brady writes, "In the

23     context of trying to save the practice,

24     there's not really much I can do at this

Electronically signed by Ann M. Belmont (201-234-827-3922)                                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

119

1    point since that's not something we can

2    change," right?

3              A.    That's what she says, yes.

4              Q.    Well, that was true, was it not?

5    I mean, you couldn't provide more sound at

6    that point in time, right?

7              A.    I wouldn't say that that wasn't

8    true, we probably could, but.

9              Q.    As much as ContextMedia

11:38  10  provided?

11             A.    I believe that anything was

12   possible, but it wasn't my decision to make

13   that, you know.

14             Q.    Right.  It wasn't happening

15   then, was it?

16             A.    It wasn't happening then, no.

17             Q.    When did it start happening that

18   you increased significantly the amount of

19   sound --

11:38  20           A.    I would say last year.

21             Q.    2013?

22             A.    2013.

23             Q.    What, can you tell me which

24   quarter?

Electronically signed by Ann M. Belmont (201-234-827-3922)                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

120

1          A.     No, I can't.

2                 MR. JAHN: Pardon me, Counsel,

3      we're off the record.

4                 (Break taken.)

5                 MR. JAHN: We're on the record

6      with DVD No. 2.

7          (Exhibit 45 identified.)

8          Q.     Same deal, take what time you

9      want to look at it, then when you're ready to

11:41   10     answer, my question for you, is this another

11     e-mail exchange involving a practice

12     switching from HAN to ContextMedia?

13         A.     Okay.

14         Q.     Now, this involves a situation

15     where, according to this e-mail, HAN

16     removed -- excuse me, ContextMedia removed

17     HAN's equipment without telling HAN, right?

18         A.     I missed that part. Yes.

19         Q.     And that's something you had an

11:42   20     issue with, right?

21         A.     Yes.

22         Q.     And you felt that, to the extent

23     ContextMedia communicated to a practice that

24     they were authorized by HAN to remove the

Electronically signed by Ann M. Belmont (201-234-827-3922)          13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

121

1    equipment, that was a false statement?

2            A.    That was a false statement.

3            Q.    But the comment goes on to

4    disclose the reasons the practice, in fact,

5    switched from HAN to ContextMedia, does it

6    not?

7            A.    Yes.

8            Q.    And one of the reasons was

9    sound, right?

11:42  10            A.    Em-hm, yes.

11            Q.    And another reason was cooking

12    segments that focused on foods that are good

13    for people suffering from RA, right?

14            A.    That's what it states, yes.

15            Q.    And how to cook when you suffer

16    from RA, right?

17            A.    Yes.

18            Q.    Did you know back then that

19    among the offerings in ContextMedia's content

11:42  20    were actual cooking instructions?  That is,

21    someone live, kind of Julia Child's like?

22            A.    Yes.

23            Q.    And that's something HAN didn't

24    provide at the time, right?

Electronically signed by Ann M. Belmont (201-234-827-3922)                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

122

1      A.      Right.

2      Q.      And another reason the practice

3  switched was that Con's loop was an hour and

4  a half, right?

5      A.      Yes, that's what it states.

6      Q.      And at this point in time, HAN's

7  loop was 30 minutes, right?

8      A.      Yes.

9      Q.      And another reason the practice

11:43  10  switched was the patients were complaining to

11  the practice, right?

12      A.      Again, yes, that's what it

13  states.

14      Q.      And they were complaining that

15  HAN's offering had no sound and it was

16  boring, right?

17      A.      Yes.

18      (Exhibit 46 identified.)

19      Q.      I've handed you and your counsel

11:44  20  what's been marked as Exhibit 46. This is

21  Tina.  I don't see the last name. What's

22  Tina's last name?

23      A.      Grieshop.

24      Q.      Tina Grieshop forwarding up to

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Electronically signed by Ann M. Belmont (201-234-827-3922)                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

123

1    you another comment about a practice, the

2    practice's reasons for switching from HAN to

3    ContextMedia, right?

4         A.    Yes.

5         Q.    And this is another situation

6    where apparently ContextMedia told the

7    practice that ContextMedia could remove the

8    equipment and return it to HAN, right?

9         A.    Yes.

11:45   10         Q.    And, again, that's something you

11    had a problem with, right?

12         A.    Correct.

13         Q.    The practice went on to advise

14    ContextMedia of the reason it was switching,

15    right?

16         A.    The practice advised

17    ContextMedia?

18         Q.    I'm sorry.  I get -- it happens

19    eventually.  The practice advised HAN as to

11:45   20    why they were switching, right?

21         A.    I'm not seeing that.

22         Q.    Look toward the end of the

23    comment.

24         A.    More informative, okay.  Yes, I

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Electronically signed by Ann M. Belmont (201-234-827-3922)                                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

124

1    see that.

2           Q.    It's reported that Tina asked

3    the practice what was the doctor's reasons

4    for going with --

5           A.    Right.

6           Q.    -- ContextMedia, right?

7           A.    Yes.

8           Q.    And then --

9           A.    As we always do.

11:45  10           Q.    And the reason was the doctor

11    felt ContextMedia was more informative,

12    right?

13           A.    That's what they said, yes.

14      (Exhibit 47 identified.)

15           Q.    Now, this is a February 28,

16    2011, exchange between you and the

17    president -- oh, you and the CEO of the

18    company, right?

19           A.    COO.

11:46  20           Q.    Thank you.

21           A.    Yes.

22           Q.    Pardon me if I already asked you

23    this too.  Is Mr. McAllister still with the

24    company?

Electronically signed by Ann M. Belmont (201-234-827-3922)                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

125

1          A.    No.

2          Q.    Do you know why he left?

3          A.    No.

4          Q.    Do you know when he left, in a

5    year?

6          A.    I think so.  I believe it was --

7    I don't know the date for sure, so.

8          Q.    And the COO of the company is

9    asking you, with the subject being RHN?

11:47  10          A.    Yes.

11          Q.    "Do offices who took this say

12    why they liked their versus ours," right?

13          A.    Yes.

14          Q.    And, again, you're going to do

15    the best you can to be truthful and

16    forthright and accurate with the COO, right?

17          A.    Yes.

18          Q.    And you report, "We are hearing

19    sound, cooking segments and recipes," right?

11:47  20          A.    Yes.

21          Q.    And you go on to say, "Some have

22    just said the doctors like the overall

23    content better than ours."

24          A.    Right. They were more vague.

Electronically signed by Ann M. Belmont (201-234-827-3922)                              13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

126

1         Q.    More vague?

2         A.    The practices were more vague.

3         Q.    Because overall content isn't as

4  specific as sound, cooking segments and

5  recipes?

6         A.    Right, correct.

7    (Exhibit 48 identified.)

8         Q.    Here we have another e-mail

9  exchange internal to HAN discussing why a

10  practice was switching from HAN to

11  ContextMedia, right?

12        A.    Yes.

13        Q.    And you write to the practice

14  relations team on March 2, 2011, and that's

15  the whole team that interacts with the

16  practices?

17        A.    Yes.

18        Q.    First you congratulate Lori for

19  doing an excellent job, and then you go on to

20  say, "As you all know, ContextMedia has been

21  trying to push us out the door. They finally

22  understand they cannot remove our equipment

23  so they're pushing the offices to call and

24  get it removed under the 30 days," do you see

11:48 (line 10)

11:48 (line 20)

Electronically signed by Ann M. Belmont (201-234-827-3922)        13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

127

1    that?

2            A.     Yes.

3            Q.     And when you said, trying to

4    push us out the door, what did you mean?

5            A.     That they were trying to switch

6    out their program with ours.

7            Q.     And that's okay, right?

8            A.     Yes, if they go through the

9    proper methods of doing it, yes.

11:49  10            Q.     You're not opposed to

11   competition, right?

12            A.     I'm not opposed to competition,

13   just opposed to handling the equipment that

14   they're not authorized to handle.

15            Q.     Okay.  And about this point in

16   time, were you noticing that ContextMedia was

17   allowing the practices to notify HAN to

18   remove the equipment, but at the same time

19   pushing the practices to try to get you to

11:49  20   take the equipment out sooner than 30 days,

21   right?

22            A.     Yes, that's what it states.  And

23   this would be about the time we sent the

24   cease and desist, I believe.

Electronically signed by Ann M. Belmont (201-234-827-3922)                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

128

1          Q.    Was that your experience going

2     forward then, the balance of 2011?

3          A.    I don't recall the actual

4     balance, but I know it continued of them

5     removing the equipment without our

6     authorization after this, so.

7          Q.    That ContextMedia continued or

8     that --

9          A.    That ContextMedia continued to

11:50  10   remove our equipment without authorization

11    from PatientPoint.

12         Q.    And then Liz Billmann concludes

13    the chain by writing to you on March 3.  Liz

14    Billmann.

15         A.    Liz Billmann.

16         Q.    Who is Liz Billmann?

17         A.    Liz Billmann was a relationship

18    manager on my team.

19         Q.    I see.  So you wrote to the full

11:50  20   team, that's how she gets it, right?

21         A.    Correct, and then she responded

22    back to myself and the team.

23         Q.    And she tells yourself and the

24    team, "This is interesting feedback because I

Electronically signed by Ann M. Belmont (201-234-827-3922)          13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

129

1    spoke with a rheumatologist yesterday who

2    felt our information was 'silly and

3    demeaning'", do you see that?

4         A.    Yes.

5         Q.    And then he -- according to Ms.

6    Billmann gives -- the doctor gives an example

7    or an example of -- two examples as to why he

8    thinks that, right?

9         A.    Yes, that's what it states.

11:51  10         Q.    And do you recall at the time

11    that part of your content included

12    grandparents playing with their

13    grandchildren?

14         A.    I could not recall what our

15    content included at that time in 2011.

16         Q.    And you also don't recall the

17    peppermint segment?

18         A.    I don't recall that, no.

19         Q.    And Ms. Billmann writes "(I have

11:51  20    had other complaints about)," right?

21         A.    That's what she rights, yes.

22         Q.    But that's not something you

23    would remember?

24         A.    The complaints about the

Electronically signed by Ann M. Belmont (201-234-827-3922)                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

130

1    segments?

2            Q.    Yeah, practices complaining

3    about the segments.

4            A.    No, I do not.

5            Q.    I'm kind of curious, with no

6    video in your content in March of 2011, how

7    would your content have information about --

8    well, strike that.  I guess it's possible.

9    Never mind.

11:52  10    (Exhibit 49 identified.)

11           Q.    This is another comment being

12   reported up to you about the reason a

13   practice was switching from HAN to

14   ContextMedia, right?

15           A.    Yes.

16           Q.    Let me know when you finish

17   reading the content.

18           A.    Okay.

19           Q.    Is this a situation where, after

11:53  20    the practice has decided to go with

21   ContextMedia, the practice then gave HAN the

22   30 days notice to remove the equipment?

23           A.    That's what it appears as, yes.

24           Q.    And HAN then did its best to try

Electronically signed by Ann M. Belmont (201-234-827-3922)          13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

131

1    to save the practice, right?

2           A.      Right.

3           Q.      And HAN was unsuccessful, right?

4           A.      It appears that way.

5           Q.      And one of the things that this

6    person did to try to save the practice was,

7    in response to hearing the practice comment

8    on ContextMedia's content, told the practice

9    that HAN was going to have some new features

11:54  10  as well, right?

11          A.      Yes.

12          Q.      But that they wouldn't be

13   available until later in the summer, right?

14          A.      That's correct.

15          Q.      And then it's reported that's

16   the real reason they're cancelling, right?

17          A.      I believe so. That's what they

18   stated to us.

19      (Exhibit 50 identified.)

11:54  20        Q.      Let me show what's been marked

21   as Defendant's Exhibit Exhibit 50. This is

22   Lori Smith reporting to you about the reasons

23   the practice switched from HAN to

24   ContextMedia in April of 2011, right?

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Electronically signed by Ann M. Belmont (201-234-827-3922)                                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

132

1          A.    Yes.

2          Q.    And one of the reasons was the
3     practice felt like the ContextMedia was more
4     like TV than the HAN product, right?

5          A.    Yes.

6          Q.    And less like a slide show,
7     right?

8          A.    That's what they stated, yes.

9          Q.    I think we saw an e-mail earlier
11:55  10     today, if you recall, about the practice
11     characterizing the HAN content as slide after
12     slide after slide, do you remember that?

13          A.    I believe so, yes.

14          Q.    And these weren't isolated
15     instances, were they?  That a practice
16     characterized the HAN content as like a
17     PowerPoint or a slide show?

18          A.    We never heard this before prior
19     to this actual competition with ContextMedia.
11:56  20     It's not something that we heard prior to
21     that as reasons to being cancelled as a slide
22     show.  This was new for us.

23      (Exhibit 51 identified.)

24          Q.    Let me hand you what's been

Electronically signed by Ann M. Belmont (201-234-827-3922)                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

133

1  marked as Defendant's Deposition Exhibit 51.

2  This is another practice commenting on the

3  reasons it's switching from HAN to

4  ContextMedia, right?  Strike that, I think I

5  mischaracterized it.

6         A.    That's what I'm seeing, they are

7  saying RHN was rather annoying, I'm seeing

8  that.

9         Q.    Right, you're right.  It looks

11:57  10  like it's a practice commenting about some

11  complaints it had about your service, right?

12         A.    "He told me the monitor had not

13  been playing for a long time. They had their

14  IT department look into it, he said he would

15  like it fixed. He also asked me if I knew we

16  had competition, I told him I did. He said he

17  almost went with them since he hadn't heard

18  from us. He asked if we had the same

19  material, I told him how our program was

11:57  20  different and what we had to offer, and then

21  he said that -- he said they were rather

22  annoying.  I told him we would be out to fix

23  the CPU and also let him know if he had any

24  issues in the future to call." So this was a

Electronically signed by Ann M. Belmont (201-234-827-3922)                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

134

1    site that was being approached by RHN, but it

2    doesn't appear that they had made the switch

3    at this time.

4         Q.    I stand corrected, you're

5    absolutely right. He's also telling you that

6    your monitor had been not been playing for a

7    long time?

8         A.    The practice stated that, yes.

9    Which we -- if the office does not call to

11:58  10    tell us the screen is black, we don't know

11    that the office -- the monitor is not working

12    because the CPU could still be connecting to

13    the home office.  So, therefore, in our eyes,

14    we believe that the system is still up and

15    running.  If the system is not, or it's on a

16    different channel, the practice needs to call

17    us to tell us that, or when we go out to

18    service a couple times a year, we'll pick it

19    up at that point.  But in between then, it's

11:58  20    really -- we rely on the practice to let us

21    know if the system is not up and running.

22         Q.    I see.  So that -- I think I've

23    learned after participating in enough of

24    these depositions, your testimony is a

Electronically signed by Ann M. Belmont (201-234-827-3922)                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

                                                            135

1    heartbeat?

2           A.    Correct.

3           Q.    So the CPU could be sending a

4    heartbeat while the screen is black?

5           A.    Yes.

6           Q.    I see.

7           A.    A lot of times it could be that

8    the power was off on the monitor, but the CPU

9    was still up and running and playing.

11:59  10    (Exhibit 52 identified.)

11          Q.    Handing you what's been marked

12   as Defendant's Exhibit 52. I think it -- I

13   think I have it right this time, that this is

14   an exchange about a practice switching from

15   HAN to ContextMedia, but take your time to

16   look at that and tell me whether you agree.

17          A.    Okay.

18          Q.    I might be wrong again.  Maybe

19   this is just a practice telling you they're

12:00  20   thinking about switching, but you look at it

21   and you tell me.

22          A.    Yeah, it looks like it actually

23   might still be with us. We were just working

24   on a service issue with the CPU, and then

Electronically signed by Ann M. Belmont (201-234-827-3922)                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

136

1    possibly offering them an upgrade, but the

2    office did see RHN at a conference.  And I'm

3    not really seeing whether or not for sure if

4    they actually switched or not. At left we

5    were -- it looks like we reached out to our

6    sales rep, Lisa Grippo, for assistance on

7    talking to the practice.

8         Q.    Ms. Grippo comments on the first

9    page that -- excuse me, "They have had one

12:01  10    service issue after the other," do you see

11   that?

12         A.    Yes.

13              MR. O'BRIEN: What do you guys

14   want to do about lunch? When do you want to

15   break for that?  What's your pleasure?

16              THE WITNESS: What time is it

17   now?

18              MR. BERNAY: It's just past noon.

19              THE WITNESS: If we could go to

12:01  20   like 12:30.

21              MR. O'BRIEN: Okay.

22              MR. BERNAY: Do you want to keep

23   going?

24              THE WITNESS: Is that okay?

Electronically signed by Ann M. Belmont (201-234-827-3922)                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

                                                                137

1              MR. O'BRIEN: Yeah, that's fine.

2              THE WITNESS: Get it done.

3              MR. O'BRIEN: If I can figure out

4    what's going on with my throat.

5        (Exhibit 53 identified.)

6        Q.    Is Exhibit 53 a document

7    commenting on why a practice is changing from

8    HAN to ContextMedia?

9        A.    It doesn't really clearly state

12:02    10   whether or not they actually switched, but it

11   appears that they obviously were interested

12   in ContextMedia.

13       Q.    And it indicates that "the

14   doctor's interested because he likes

15   ContextMedia's program better," right?

16       A.    Yes, that's what it states.

17       Q.    "Finds it more interactive,"

18   right?

19       A.    They told -- yes, that's what

12:03    20   they told them.

21       Q.    And it's noted after "more

22   interactive (different vignettes) with

23   physicians and PAs discussing various

24   conditions," do you see that?

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Electronically signed by Ann M. Belmont (201-234-827-3922)                13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

138

1          A.    Yes.

2          Q.    And you understand that's a

3    description of some of the video content of

4    ContextMedia's content, right?

5          A.    Different vignettes, yes.

6          Q.    And then, "The practice also

7    prefers the fact that ContextMedia has three

8    different sections to its screen," right?

9          A.    Yes.

12:03   10          Q.    And that's not something HAN

11    offered at the time, right?

12          A.    Not in rheumatology, no.

13       (Exhibit 54 identified.)

14          Q.    This is Deposition Exhibit 54.

15    Now, in this July 12, 2011, e-mail, Ms. Smith

16    sends a comment out of the database to create

17    a feedback, do you see that?

18          A.    Yes.

19          Q.    And do you know what that is,

12:04   20    create a feedback?

21          A.    It's an e-mail distribution with

22    our creative team that receives the e-mails

23    on feedback that we receive on our programs.

24          Q.    So this is an instance where HAN

Electronically signed by Ann M. Belmont (201-234-827-3922)          13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

139

1    is using information it learns from practices

2    about how it judges HAN's content versus a

3    competitor's to get it to the creative people

4    to enable them, as they see fit, to respond

5    and make adjustments, that type of thing?

6         A.    Correct.

7         Q.    It's important information for

8    them to have to see if they want to do

9    anything in reaction to their content?

12:05  10        A.    Right.  Our job is to make sure

11   the people know what we're hearing from

12   practices.

13        Q.    She writes, she did, "did not

14   mention their technical issues at all."  Do

15   you know what she means by that, Ms. Smith?

16        A.    I don't know what -- I would

17   believe that she means that, if they had

18   technical issues, she -- they did not mention

19   that or see that as an issue.

12:05  20        Q.    This indicates that the decision

21   to go with ContextMedia was actually made,

22   right?

23        A.    Yes.

24        Q.    And sound was one factor, right?

Electronically signed by Ann M. Belmont (201-234-827-3922)                              13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

140

1          A.     I believe it said that.  Yes,

2     yes.

3          Q.     And then Ms. Smith, as we've

4     seen before, hearing that, places the sound

5     inquiry?

6          A.     Correct.

7          Q.     It's also noted that, "many of

8     the patients in this practice are elderly and

9     are slow readers," right?

12:06  10          A.     That's what it says.

11          Q.     And to benefit from HAN's

12     content in July of 2011, you had to read the

13     content, right?

14          A.     Yes.

15       (Exhibit 55 identified.)

16          Q.     This is now Defendant's

17     Exhibit 55, and this is another e-mail

18     exchange regarding the reasons a practice is

19     switching from HAN to ContextMedia, right?

12:06  20          A.     Yes.

21          Q.     And Lisa tells -- is this a

22     comment you're receiving or --

23          A.     This is me. This looks like it's

24     mine. It's from me.

Electronically signed by Ann M. Belmont (201-234-827-3922)                                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

141

1          Q.    You roll your sleeves up here.

2          A.    Yes, it was coming in by Amy

3    Finley, so, yes, it was me.  I actually --

4          Q.    It is you, right?

5          A.    Yes.

6          Q.    By the way, it seems like a lot

7    of these comments, after they're put in, are

8    then kicked up to you. Was that part of the

9    protocol, then, as well, that you, sort of as

12:07  10    the boss, wanted to know when we got

11    information as to why a practice switched to

12    ContextMedia in particular?

13          A.    Yes, to keep me informed or --

14    of any type of situation where they would

15    hear something that they think that I should

16    be aware of that to -- for me to then, maybe,

17    inform the creative team or the executive

18    team or whatnot.

19          Q.    What I'm getting at is, you told

12:08  20    me earlier that once ContextMedia came on the

21    competitive landscape, or I think your words

22    were actually sort of "touching our

23    equipment," you instructed Lori to be sort of

24    the point of contact to do the database for

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Electronically signed by Ann M. Belmont (201-234-827-3922)                                        13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

142

1    her to try to take those calls if possible.

2    And I'm wondering if part of that same

3    protocol was also kick up to me, Amy Finley,

4    any comments about switches to ContextMedia?

5          A.    I don't know if I requested to

6    have every comment switched -- or kicked up

7    to me.  But a lot of times, especially even

8    Lori would just send them to me to keep me in

9    the know.

12:08  10          Q.    Okay.

11          A.    Obviously, this situation, it's

12    my comment. I'm giving it to Lori, reverse

13    roles.

14          Q.    There's that TV show where the

15    boss is a worker or something?

16          A.    Yeah, Undercover Boss.

17          Q.    Okay.  So the doctor tells you

18    that -- his view, the content is not

19    engaging, right?  Or, no, he feels their

12:09  20    content is more engaging?

21          A.    Correct.

22          Q.    And "the doctor preferred

23    ContextMedia's ratio of content to

24    advertising," right?

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Electronically signed by Ann M. Belmont (201-234-827-3922)                                                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

143

1          A.    That's what they stated, yes.

2          Q.    And you told the practice that

3    ContextMedia can't remove the equipment,

4    right?

5          A.    Yes.

6          Q.    And she said fine, and you

7    scheduled a removal date, right?

8          A.    Correct.

9          Q.    Any reason to believe that

12:09    10    didn't go down as planned?

11          A.    No, no reason to believe that,

12    no. This would be the proper channels of --

13    the proper process of handling a cancel.

14          Q.    So from your perspective, this

15    was an example of fair competition versus

16    unfair?

17          A.    Correct.

18          MR. BERNAY: Object to the form.

19    You can answer.

12:10    20    A.    Correct.

21          Q.    During the 2010-2013, early 2013

22    time frame, do you have a way of determining

23    which of the ContextMedia switch outs in your

24    view were the results of fair competition and

Electronically signed by Ann M. Belmont (201-234-827-3922)          13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

144

1    the result of unfair competition?

2              MR. BERNAY: Object to the form.

3    You can answer.

4         A.    I don't -- I don't know.

5       (Exhibit 56 identified.)

6         Q.    Another example, is it not, of a

7    practice switching from HAN to ContextMedia?

8         A.    Yes.

9         Q.    And the comment from Melissa

12:11  10  Lake is, "I tried to save this location,"

11   right?

12        A.    Yes.

13        Q.    "But the practice said the

14   doctor's already decided to go with

15   ContextMedia," right?

16        A.    That's what it states, yes.

17        Q.    And so Melissa asked the

18   practice why, right?

19        A.    Yes.

12:11  20  Q.    The response was, "The practice

21   felt that the ContextMedia product was geared

22   more for arthritis," right?

23        A.    Yes.

24        Q.    Did, in 2011, HAN have a

Electronically signed by Ann M. Belmont (201-234-827-3922)                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

145

1    arthritis specific product?

2         A.    Yes.

3         Q.    But it was not video, right?

4         A.    Not video, it was media, yeah.

5         Q.    Okay.

6         A.    It was on a media player.  It

7    was not a slide show.

8         Q.    But it wasn't --

9         A.    It wasn't like a TV --

12:12  10      Q.    Right.

11        A.    -- segment, no.

12        Q.    Vignettes and things like that?

13        A.    Correct.  But our content was

14   geared toward arthritis.

15        Q.    Okay. And then Melissa is

16   congratulated for trying to save the site and

17   for understanding why, and then Lawrence

18   says, "Good job, Melissa," and then Melissa

19   writes back, "Ah, thanks, but they're going

12:12  20   to cancel," right?

21        A.    Yes.

22        Q.    That, and Ms. Lawrence writes,

23   "I know, but, but," right?

24        A.    That's what it -- that's what it

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Electronically signed by Ann M. Belmont (201-234-827-3922)                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

146

1    states, yes.

2         Q.    I mean, was your group getting a

3    little discouraged in this time frame with

4    the frequency of practices switching and the

5    inability to respond?

6         A.    There would be sometimes, yes,

7    where it would happen in spurts.  I wouldn't

8    say it was all the time, but you would get a

9    peak moment where you would tend to see some

12:13  10   that were switching or being removed at

11   different times.

12        Q.    But when practices are telling

13   you about all these things they preferred

14   about ContextMedia's content, and in many

15   instances they were things you guys couldn't

16   provide just yet?

17        A.    Just yet, correct.

18        Q.    Was that sort of hard on the

19   morale of your group?

12:13  20        A.    Well, that's where that was my

21   job and Heather's job to continue to

22   reiterate and remind them the value of our

23   program and what we have to offer.  So, you

24   know, we just had to keep continuing to do

Electronically signed by Ann M. Belmont (201-234-827-3922)                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

147

1    that so that they understood.  And a lot of

2    them did.  I mean, they knew and really do

3    believe in our program and our products, so.

4         Q.    You agree that, at this point in

5    time, the content of ContextMedia's product

6    and the content of HAN's product was

7    different, right?

8         A.    Yes.

9         Q.    And it was quite different in

12:14  10   certain respects, right?

11        A.    The format in which it was

12   delivered, yes.

13        Q.    So if I hear you correctly, even

14   though they were quite different, you still

15   believe your product, while different, was

16   superior?

17        A.    Yes.

18      (Exhibit 57 identified.)

19        Q.    This is Exhibit 57. And it is,

12:14  20   again, I believe, a internal HAN document

21   discussing the reasons a practice is

22   switching from HAN to ContextMedia, right?

23        A.    Hold on, I'd like to read it

24   first.

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Electronically signed by Ann M. Belmont (201-234-827-3922)                                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

148

1        Q.    Sure, sure. It's not a speed

2    test.

3        A.    Okay.

4        Q.    Was my characterization accurate

5    this time?

6        A.    Oh, repeat that question.

7            MR. O'BRIEN: Go ahead, read it

8    back.

9      (Record read by Reporter.)

12:16  10        A.    Correct.

11        Q.    Here Phyllis Timole is making

12    the call, right?

13        A.    Yes.

14        Q.    Was she a member of your team?

15        A.    She's a sales rep out in the

16    field.

17        Q.    Oh. Any idea why she's calling

18    on the practice?

19        A.    She could have been reaching out

12:16  20    to the practice just as a proactive measure.

21    2011, yes.

22        Q.    Okay.

23        A.    To try to help with just

24    touching base, seeing if the practices were

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Electronically signed by Ann M. Belmont (201-234-827-3922)                13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

149

1    engaged.

2           Q.    Gotcha.

3           A.    We would from time to time have

4    the sales rep.

5           Q.    In addition to you all?

6           A.    In addition to us, yes.

7           Q.    And "The practice is switching

8    because it feels the ContextMedia product is

9    more specialty specific," right?

12:17  10          A.    I'm not sure I'm seeing where.

11          Q.    The back page.

12          A.    Oh, okay, I see at the top.  "No

13   longer interested in our program and got --

14   and more speciality specific." That's what it

15   states, yes.

16          Q.    And also, "The practice felt

17   that ContextMedia offered better timely

18   correspondence and better customer service,"

19   right?

12:17  20          A.    That's what it states, which I

21   believe is rare on our end.

22          Q.    She said, "Our communication is

23   not connected and she seemed pretty

24   frustrated with us.  One example being that,

Electronically signed by Ann M. Belmont (201-234-827-3922)                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

150

1    when the office had moved, it took us three

2    tries to come and pick up the equipment and

3    it didn't get done until after they had

4    moved," do you see that?

5         A.    Yes, and I see in the top where

6    I'm explaining that it was due to UPS, which

7    is something we have limited control over,

8    not necessarily something we can do, but.

9         Q.    Okay. But Ms. Timole writes,

12:18    10    "Unfortunately, it looks like HAN dropped the

11    ball on this one," right?

12         A.    That's the way it's perceived by

13    the practice.

14         Q.    "And really nothing I could do

15    to save it," she writes, right?

16         A.    That's what she writes, yes.

17    But I pride ourselves on anything, it would

18    be our service, because I do think we are

19    great about corresponding.  Sometimes you

12:18    20    can't control third parties to the extent

21    that you want them to, but we are usually

22    very responsive.

23         Q.    And the last e-mail is yours and

24    you're actually encouraging everyone to sort

Electronically signed by Ann M. Belmont (201-234-827-3922)                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

151

1    of to buck up their service, right?

2          A.    Of course.

3          Q.    Because you write, "Everyone

4    needs to take time today to review their list

5    of tasks due today and make sure you're

6    making timely calls," right?

7          A.    Correct.

8          Q.    Now, you write that only to

9    Heather McGauvran and not the group e-mail,

12:19   10   is that because --

11          A.    Right, because Heather runs the

12    team on the daily basis, so she manages their

13    daily work.

14       (Exhibit 58 identified.)

15          Q.    This is a document we marked as

16    Defendant's Exhibit 58, and appears to be

17    another internal HAN e-mail exchange

18    regarding a practice leaving HAN for

19    ContextMedia?

12:20   20          A.    Yes.

21          Q.    And Ms. McGauvran is trying to

22    save the practice, right?

23          A.    Correct.

24          Q.    And after she sends the e-mail,

Electronically signed by Ann M. Belmont (201-234-827-3922)                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

152

1    the long e-mail to the practice trying to

2    save it and telling the practice that,

3    "ContextMedia has been removing our equipment

4    without authorization, thousands of dollars

5    worth of equipment has gone missing," she

6    then forwards that on to Ms. Grippo, right?

7           A.    Correct.

8           Q.    And she writes, "After I sent

9    Sovana the office manager this e-mail she

10   called me back within the hour, at first she

11   was quite upset, but the conversation ended

12   on amicable terms," you're not on this, so --

13          A.    No, I'm not.

14          Q.    -- I think I probably know the

15   answer to this question, but I'll ask it

16   anyway. Do you have any idea why the practice

17   was so upset?

18          A.    I believe that the practice was

19   upset because they -- the company,

20   ContextMedia, removed the equipment without

21   our authorization.  And -- or that they

22   were -- no, wait, hold on.  Or that maybe

23   they were misled.  Honestly, I don't know,

24   but now I realize that this -- I don't know

Electronically signed by Ann M. Belmont (201-234-827-3922)                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

153

1    where this stemmed from.

2       (Exhibit 59 identified.)

3       Q.    This is 59. Again, this is

4    another internal HAN communication discussing

5    the reasons a practice is leaving it for

6    ContextMedia, right?

7       A.    Yes.

8       Q.    And the practice informed HAN

9    that they preferred ContextMedia because they

12:22  10    had sound, right?

11       A.    Yes.

12       Q.    And the loop was longer?

13       A.    I don't believe this -- I don't

14    know if this was an active customer or if

15    this was a target customer.

16       Q.    I kind of have the same question

17    of whether this --

18       A.    Dawn is a sales rep, and it says

19    that she declined our program and went with

12:22  20    RHN, so I'm not sure if.

21       Q.    So this may have been one of

22    those examples of a head-to-head competition?

23       A.    That could have been a

24    head-to-head.

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Amy Finley, 3/20/2014

154

1          Q.    And it's on December 2, 2011.

2    At that point in time, were you still logging

3    what we've referred to pitches in the

4    database?

5          A.    I don't recall.

6          Q.    But you're looking at this, your

7    best judgment it's a head-to-head, right?

8          A.    Yeah, it appears that way. I

9    can't tell.  Again, just because of the

12:23  10  people involved.

11          Q.    And you -- as you also pointed

12   out, though, it says declined our program,

13   not cancelled, right?

14          A.    Right.

15          Q.    And then Lisa writes to you at

16   the end, "Sorry to be spreading bad news on a

17   yucky Monday.  I thought I would share the

18   feedback.  This is a six doc practice," the

19   more doctors, the more attractive to HAN,

12:23  20  right?

21          A.    Correct.

22          Q.    And she writes, "This is a six

23   doc practice that we desperately needed to

24   win!"  Some sort of symbol, I don't know what

Electronically signed by Ann M. Belmont (201-234-827-3922)                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

155

1    these things are.  And then it says, "So

2    frustrating," right?

3            A.    That's what it says, yes.

4            Q.    Do you know why she said this is

5    one we desperately needed to win?

6            A.    No, I don't. Again, not knowing

7    the full context of this, it could be an

8    active customer that we were trying to save

9    and reinstall from a move, it could be a

12:24  10  brand-new location, it could be one that does

11   have the equipment up and we're continuing to

12   just try to save from moving on to someone

13   else.  It's really hard to tell based on

14   what's -- what's on this document.

15           Q.    Which side of the business is

16   Ms. Grippo on, you told me before but --

17           A.    She's on the sales side.  But

18   the other thing is we do -- like I said,

19   before, from time to time, and still the

12:24  20  reps, too, help with current customers to

21   retain them.

22           Q.    Okay.

23           A.    So it could be either situation

24   in this case.

Electronically signed by Ann M. Belmont (201-234-827-3922)                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

156

1          Q.    Yeah, but, you know, the use of

2     the words "declined our program and needed to

3     win," sounds more like a head-to-head,

4     doesn't it?

5          A.    It would sound that way, yes,

6     but, again, I don't know for sure.

7          Q.    Are you aware of instances over

8     the period from 2010 to 2013 where

9     ContextMedia and HAN went head-to-head for a

12:25  10     practice that didn't have anything and HAN

11     won?

12          A.    I believe there are, yes.

13          Q.    And on the other side of the

14     coin, are you aware of practices of where

15     they went head-to-head and ContextMedia won?

16          A.    Yes. And I'm also aware of there

17     are some practices where ContextMedia was

18     also removed.

19          Q.    By HAN?

12:25  20          A.    By HAN in the proper format and

21     procedure.

22          Q.    During the 2010-2013 time?

23          A.    I can't recall which. It was

24     obviously within the last few year's time

Electronically signed by Ann M. Belmont (201-234-827-3922)                                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

157

1    span.

2         Q.    How do you track that

3    information internally?

4         A.    That's a little bit harder to

5    track because, again, they weren't a current

6    customer and so, when we're putting them in,

7    there's really not something that we use to

8    flag or track that this was one that we

9    removed.

12:26   10         Q.    There's not some big board on

11   the wall?

12         A.    Right, right, there was not a

13   big board on the wall.

14     (Exhibit 60 identified.)

15         Q.    I'm handing you what's been

16   marked Defendant's Deposition Exhibit 60. Is

17   this not another comment from the database

18   describing why a practice has changed from

19   HAN to ContextMedia?

12:26   20         A.    Yes.

21         Q.    And here the caller is Lori

22   Smith, right?

23         A.    Yes.

24         Q.    And she's calling and she says

Electronically signed by Ann M. Belmont (201-234-827-3922)          13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

158

1      "to find out the reason for the cancel,"

2      right?

3              A.     Right.

4              Q.     And she was informed that

5      "Technology is advancing rapidly and our

6      program is still in the exact same as it was

7      when they first signed up," do you see that?

8              A.     Yes.

9              Q.     Was that true at the time, that

12:27  10    there had not been, as of December 2011, any

11     significant technological changes or

12     improvements in HAN's content for some time?

13             A.     I don't really know what they

14     mean by the technology, because, I mean, as

15     far as the content goes, we are always

16     updating and adding new graphics and designs

17     and things to our content.

18             I think that, again, this is one

19     where we would sort of believe that they were

12:27  20    told this information, because most practices

21     really don't know the difference between

22     whether or not we're using an analog line or

23     a broadband line, but somebody could state to

24     them, if they're on analog, oh, well,

Electronically signed by Ann M. Belmont (201-234-827-3922)                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

159

1   they're, you know, they're using old

2   technology where everybody uses broadband

3   today. That's what I believe they're

4   referring to here, but I don't know if the

5   practice really understands that. And, again,

6   in this situation, if I recall, for the ones

7   that Lori would call, this was probably a

8   location as well that ContextMedia must have

9   removed the equipment without our

12:28   10   authorization and then -- because when that

11   happened, we still had Lori call to follow up

12   to find out why they switched.

13           Q.    Sure.

14           A.    Where which -- at that point,

15   I'm not sure what -- how much they were going

16   to tell us and what we were going to get from

17   them, but it was already done, the equipment

18   was already up on the wall. It's not like we

19   were thinking that we were going to be able

12:28   20   to switch them back at that point, but we

21   wanted to at least get some information and

22   understand a little bit more as to why.

23           Q.    But having a content loop that

24   has human beings interacting and doing round

Electronically signed by Ann M. Belmont (201-234-827-3922)                13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

160

1    tables and providing cooking lessons and

2    stuff like that, couldn't that fairly be

3    viewed as more technologically advanced than

4    a presentation that was static?

5              MR. BERNAY: Object to the form.

6    You can answer.

7         A.    Honestly, I think it's really

8    just viewed as TV. It appears to be more like

9    TV, which TV has been around a long time.  So

10   I don't feel that's really more technology

11   advanced than our media player that's showing

12   the graphics and design that we have on it.

13        Q.    What about the ability to -- for

14   the practice to customize the content?

15        A.    The ability for them to pick and

16   choose content?

17        Q.    Yeah, or also to put their own

18   information up there and that kind of thing.

19        A.    Well, they could do the same

20   thing on ours.

21        Q.    They could?

22        A.    Yes.

23        Q.    Would you believe that having

24   sound is more technologically advanced than

Electronically signed by Ann M. Belmont (201-234-827-3922)                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

161

1    not having sound?

2         A.    No.

3              MR. BERNAY: It's 12:30 now, do

4    you want to break now or do you want to --

5              THE WITNESS: I can finish this

6    last one if you want and then go, that's

7    fine.

8              MR. BERNAY: Okay. One more

9    exhibit, then we'll --

12:30    10        MR. O'BRIEN: One more, okay.

11             THE WITNESS: It doesn't matter

12   to me.

13             MR. O'BRIEN: Well, actually,

14   you're the boss here, so what do you want to

15   do?

16             THE WITNESS: Oh, let's finish

17   this last one.  One less we have to do when

18   we come back.

19             MR. O'BRIEN: This stack is

12:30    20   getting much smaller. I see you watching it.

21             THE WITNESS: I am watching it.

22             MR. O'BRIEN: And there's not

23   another one.

24             MR. BERNAY: I was going to say,

Electronically signed by Ann M. Belmont (201-234-827-3922)                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

162

1    just wait until he brings back another stack.

2              MR. O'BRIEN: I've seen lawyers

3    do that, no.

4              THE WITNESS: That's what I was

5    waiting for, is there another stack coming.

6              MR. O'BRIEN: No, there's not.

7              THE WITNESS: Or the after lunch

8    stack.

9    (Exhibit 61 identified.)

12:30    10        Q.    I've handed you what's been

11   marked as Deposition Exhibit 61. Again, I

12   believe, but you can correct me if I'm wrong,

13   this is an internal HAN comment about why a

14   practice is switching from HAN to

15   ContextMedia, right?

16             A.    Yes.

17             Q.    And this is rheumatology, right?

18             A.    That is correct, yes.

19             Q.    And the practice felt that

12:31    20   ContextMedia's rheumatology offering was more

21   specific to their practice than HAN's

22   rheumatology offering, right?

23             A.    It appears that -- it says that

24   the sound -- well, it does select their

Electronically signed by Ann M. Belmont (201-234-827-3922)                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

163

1    content.  They did like the sound, but it was

2    not the deciding factor. They -- because one

3    of their monitors, they actually -- it looks

4    like they were going to leave the sound off

5    on.

6            Q.    Well, the first part, doesn't it

7    say, "The site felt the programming on RHN

8    was more specific to their practice"?

9            A.    That's what they said to us,

10   yes.

11           Q.    And that they liked the

12   functionality of the ContextMedia program and

13   enjoyed the fact that it was customizable, do

14   you see that?

15           A.    Yes, I do see that.

16           Q.    Now, based on the answer you

17   just gave me, is it your position that HAN's

18   content was -- had equal or equivalent

19   functionality?

20           A.    Well, I believe what it is, is

21   they were allowed to select their content,

22   pick and choose the educational segments that

23   they were playing, that's what they are

24   stating here.  And at that time, they could

Electronically signed by Ann M. Belmont (201-234-827-3922)                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

12:31

12:32

Amy Finley, 3/20/2014

164

1    not pick and choose content with us.

2         Q.    Okay.  So a moment ago when you

3    gave the answer that I understood to be that

4    they could do that?

5         A.    Okay.

6         Q.    What did I get wrong in that?

7         A.    That they could -- when you said

8    they could put up their own messages, they

9    can actually create their own messages to put

12:32    10    on the program. What their ContextMedia, I

11    believe, is stating here is that they could

12    choose the purchase segments that

13    ContextMedia has, they could pick and choose

14    from those, versus with ours, which is

15    content that is created and developed by our

16    people internally, they could not pick and

17    choose which segments played for the

18    educational portion of it.

19         Q.    Gotcha.

12:33    20    A.    But both are customizable.  They

21    can put -- both of them could put their --

22    their practices could put their own messages

23    up on both programs.

24         Q.    Right, but the educational

Electronically signed by Ann M. Belmont (201-234-827-3922)                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

165

1    content --

2          A.    Was a differentiator.

3          Q.    Because on HAN you couldn't pick

4    and choose the educational content, but with

5    ContextMedia you believe you could?

6          A.    That's what they state they

7    could.  I don't know if that's actually

8    correct or not, but that's what they stated.

9          Q.    Well, if it were correct, do you

10   think that's a fair differentiator?

11         A.    Yes.

12               MR. O'BRIEN: All right.  Why

13   don't we take our lunch break.

14               MR. JAHN: We're off the record.

15               (Lunch break taken.)

16               MR. JAHN: We're back on the

17   record.

18         (Exhibit 62 identified.)

19         Q.    I'm going to hand to you, Ms.

20   Finley, and your counsel what's been marked

21   as Exhibit 62, is a January 12, 2012, e-mail

22   from you to Lori Smith reporting to you the

23   reasons why the other practice switched from

24   HAN to ContextMedia, right?

12:33 (line 10)
01:27 (line 20)

Electronically signed by Ann M. Belmont (201-234-827-3922)                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

166

1          A.    Yes.

2          Q.    And down toward the bottom it

3   was reported to Ms. Smith that the practice

4   did not think that ContextMedia misled her,

5   right?

6          A.    Yes, that's what it states.

7          Q.    Or pretended to be HAN at any

8   point, right?

9          A.    Correct.

01:28   10          Q.    Was that part of the script for

11   ContextMedia at some point, to ask the

12   practice if they felt ContextMedia had misled

13   you?

14          A.    We were asking if they were --

15   yes, if they were receiving information, you

16   know, based on the permission to remove the

17   equipment that they -- if they were -- let me

18   say this clear.

19          Q.    Sure.

01:28   20          A.    Basically, when we found out

21   that there were locations that the practices

22   were telling us that ContextMedia stated

23   you -- we were authorized by Healthy Advice

24   to remove your equipment, they give us

Electronically signed by Ann M. Belmont (201-234-827-3922)                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

167

1    permission or they do -- we do this all the

2    time and they're okay with this. When we

3    started hearing that was when we started

4    asking and probing the question with the

5    practices when we were learning that they

6    were leaving us for any reason to just

7    confirm whether or not that was being stated

8    to that particular practice.

9           Q.    Okay.

01:29   10          A.    So.

11          Q.    Was it also part of the practice

12   to ask the practice whether or not

13   ContextMedia had pretended to be HAN at any

14   point?

15          A.    Yes.

16          Q.    And here it's reported back that

17   they didn't pretend to be HAN?

18          A.    That's correct.

19          Q.    Now, this -- pardon me if we

01:29   20   already covered this.  This instruction to

21   ask these particular questions about

22   ContextMedia, I think you can't recall if

23   that was conveyed orally or in an e-mail?

24          A.    Right. I feel like it was a

Electronically signed by Ann M. Belmont (201-234-827-3922)                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

168

1    discussion, especially, like I said with,

2    Lori being the pinpoint person, that her and

3    I had, just try to probe, understand if they

4    were being miss -- if they misrepresented us

5    in any way or were offered any type of

6    incentive.

7         Q.    And Lori was expected to put

8    that in the database, right?

9         A.    Right.

01:30  10    (Exhibit 63 identified.)

11         Q.    Now, this is another practice

12    switching from HAN to ContextMedia and Ms.

13    Smith is reporting on -- reporting it up to

14    you, correct?

15         A.    Correct.

16         Q.    This is January 25, 2012?

17         A.    Em-hm.

18         Q.    And, "She reports to --" she

19    being the practice, "reports to Ms. Smith

01:30  20    that the person she was speaking to, Lori,

21    really liked the HAN program, but she does

22    not get to watch it very often.  Lori, in the

23    practice, explained that the doctor went to a

24    rheumatology ACR symposium in Chicago and

Electronically signed by Ann M. Belmont (201-234-827-3922)

13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

169

1  ContextMedia won him over there. She said he

2  came back and was excited to switch after his

3  first day back. He really liked the fact the

4  program has sound and is more of a video

5  format," do you see that?

6       A.    Yes, I see that.

7       Q.    This is another one of those

8  examples where ContextMedia was able to have

9  a practice switch based on some presentation

10 at a conference, right?

11      A.    Right.

12      Q.    And Lori reacts to that, makes a

13 recommendation, right?

14      A.    Yes.

15      Q.    She says that, "We need to be

16 actively seeking out these conventions and

17 attending each one. I got the feel that many

18 practices learned about RHN after the

19 convention we went to in Florida," do you see

20 that?

21      A.    Yes, I see that.

22      Q.    Going forward, did your company

23 try to be more involved and participatory --

24      A.    Yes.

01:31

01:31

Electronically signed by Ann M. Belmont (201-234-827-3922)

13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

170

1          Q.      -- in conventions?

2          A.      Yes, they did.

3          Q.      Looking at this, do you see

4    anything here that suggests that ContextMedia

5    did anything wrong?

6          A.      In this situation, no.

7          Q.      And there's nothing wrong with

8    ContextMedia just selling itself at a

9    conference?

01:32  10          A.      No, there's nothing wrong with

11   that.

12      (Exhibit 64 identified.)

13          Q.      We'll mark this as 64. This is,

14   Ms. Finley, a couple months later reporting

15   to you that another practice is switching to

16   ContextMedia because of something they saw at

17   a convention, right?

18          A.      Yes.

19          Q.      By the way, have you ever talked

01:32  20   to anyone from ContextMedia?

21          A.      Have I ever talked to anyone

22   from ContextMedia?

23          Q.      Yeah.

24          A.      One of their employees

Electronically signed by Ann M. Belmont (201-234-827-3922)                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

171

1    approached me at a conference, the ACR

2    conference in Washington, I guess, it was

3    about two years ago, maybe, but it was a

4    brief con -- he just introduced himself, he

5    was a sales rep, from what I understood.  It

6    really wasn't much of a conversation about

7    our products, he just said, oh, I just

8    thought I'd come introduce myself, I'm sure

9    we'll be running into each other, so it

01:33  10    wasn't --

11            Q.    I'm sorry, go on.

12            A.    No, that's it.

13            Q.    Did it ever occur to you that

14    what ought to happen here when you were

15    having these issues with them on this

16    equipment, the two parties just ought to get

17    together and try to work out an arrangement

18    for switching each other's equipment out when

19    that happened?

01:33  20            A.    It didn't really occur to me. I

21    just was doing my part in trying to give this

22    information up to the executive team level. I

23    felt that was my job to make them aware.

24    What they did with it from there.

Electronically signed by Ann M. Belmont (201-234-827-3922)    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

172

1        Q.    That's their business?

2        A.    That was up to them. I can only

3   make my recommendations and what I thought.

4        Q.    Now, I'd like to show you

5   Exhibit 4, which was previously marked.  I

6   thought I put it in the pile I set in front

7   of you at the very beginning this morning,

8   but I could be wrong.

9        A.    This is all this morning.

01:34   10   Q.    There wasn't an Exhibit 4?

11       A.    No.

12            MR. BERNAY:  Is this it here,

13   Dick?  4?

14            MR. O'BRIEN: Yeah. And here's

15   another copy for one of you.

16            MR. BERNAY: I'll take that.

17            THE WITNESS: What number is it?

18   Is it 4?

19            MR. BERNAY: 4.

01:34   20   Q.    4, this was marked at an earlier

21   deposition, that's why it's got a lower

22   number. And this is an e-mail you've seen

23   recently, right?

24       A.    Yes.

Electronically signed by Ann M. Belmont (201-234-827-3922)                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

173

1          Q.    Your lawyer showed this to you

2     in the meeting, right?

3          A.    Yes.

4          Q.    And this is a discussion with

5     some senior executives about how to come up

6     with a plan to combat ContextMedia in the

7     marketplace, right?

8          A.    Correct.

9          Q.    In the May 18, 2012, e-mail that

01:35  10     you write to Mr. Campbell, copying Greg

11     Robinson, Kimberly Theiss, Tom McGinness, you

12     write, "Tom, we are eager to come up with a

13     plan to combat ContextMedia since they are

14     impacting not only ACN but PCN churn as well.

15     We have a couple of ideas to get the ball

16     rolling," and you write, No. 1, "Since

17     content is the number one reason for the

18     switch, we are going to survey our ACN

19     advisory board members on our program

01:35  20     content," do you see that?

21          A.    Yes, I see that.

22          Q.    Did you, in fact, survey your

23     ACN advisory board members?

24          A.    Yes, we did.

Electronically signed by Ann M. Belmont (201-234-827-3922)          13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

174

1          Q.     Who are your ACN advisory board

2     members?

3          A.     We had in -- what year is this?

4     In 2011 we created an advisory board of

5     office managers from our current customers

6     to, basically, serve as a panel to provide

7     feedback to us.

8          Q.     And did they give you feedback?

9          A.     Yes, they did.

01:35    10          Q.     What was it?

11          A.     I can't recall everything that

12    was provided, but I -- off the top of my

13    head, nothing was alarming.

14          Q.     Are you the person that

15    interacted with them?

16          A.     With the board?

17          Q.     Yeah.

18          A.     It wasn't a, I guess, a formal.

19    It was more of a informal board panel, where

01:36    20    we would send an electronic survey to them.

21          Q.     I see.

22          A.     So.

23          Q.     So you sent a survey to them

24    about ideas on how to --

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Electronically signed by Ann M. Belmont (201-234-827-3922)                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

175

1        A.    Just asking for feedback on

2    their -- on the program itself.

3        Q.    Okay. In comparison to

4    ContextMedia or --

5        A.    Or just on the content in

6    general. What do you like, what don't you

7    like, do you want sound, do you not want

8    sound type things.

9        Q.    So then each one of those board

01:36  10    members got a survey to fill out and turned

11    it back in?

12        A.    Correct.

13        Q.    Were you the point person for

14    getting those back?

15        A.    No, I was not.

16        Q.    Do you know who was?

17        A.    I believe they came back to

18    Niki, I don't remember what her maiden name

19    is, but Niki from our research department.

01:36  20    I'd try to pronounce her last name, but.

21        Q.    It's not easy like Finley or

22    O'Brien?

23        A.    No, it's not.

24        Q.    Did you ever see the survey

Electronically signed by Ann M. Belmont (201-234-827-3922)                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

176

1    results?

2          A.    Yes, I did.

3          Q.    How many board members are there

4    approximately?

5          A.    There was -- I believe we had

6    about 20 that were -- that we had as a panel

7    that were, again, there to provide feedback.

8          Q.    Then you say action No. 2 is

9    "Next week we will begin to reach out to

01:37    10    customers who have canceled our program to

11    see why they canceled and possibly to see if

12    any will admit to accepting a monitory gift

13    for enrollment," do you see that?

14          A.    Yes, I do see that.

15          Q.    Was that done?

16          A.    Yes, that was.

17          Q.    Who did that?

18          A.    I had one of the girls on my

19    team, Pam Pater, reach out to those

01:37    20    practices.

21          Q.    So she reached out to each and

22    every one?

23          A.    She tried to, attempted to, yes.

24          Q.    And so what was -- what work

Electronically signed by Ann M. Belmont (201-234-827-3922)        13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

177

1    product did she generate as a result of that

2    effort?

3           A.     What do you mean by that? Work

4    product?

5           Q.     A report or an e-mail, a

6    survey --

7           A.     Her information was put into,

8    when she made the phone call, her comments

9    were put into the database.

01:38   10           Q.     That's separately recognized in

11    some way so that you could sort of see what

12    had been gathered in response to No. 2?

13           A.     I believe the comment was also

14    transferred over to our spreadsheet.

15           Q.     Okay. And is there a separate

16    column in the spreadsheet for that?

17           A.     I believe so, but I've not seen

18    it in a while.

19           Q.     My point is you thought it was

01:38   20    an important item to follow up on, right?

21           A.     I wanted to try to -- yes, see

22    if that was the reason they were switching

23    and if they were -- how many offices were

24    really receiving some sort of an incentive to

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Electronically signed by Ann M. Belmont (201-234-827-3922)                                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

178

1    entice them to switch.

2        Q.    What I was leading up to was, I

3    mean, you've listed three things here, 1, 2

4    and 3, right?

5        A.    Em-hm.

6        Q.    And what I was just trying to

7    understand was if you, and you're in a

8    position of responsibility, thought it was

9    important to gather this information, I was

01:39  10    just trying to understand it.  It came back

11    to you and then what did you do?  You asked

12    for it, you obviously want the answers?

13        A.    Well, yes, I wanted the answers.

14    Really, what I was looking for is, if that

15    was the case, and I don't believe that we

16    really found anybody, any alarming -- anybody

17    actually saying anything, which I can't

18    really expect it.  I didn't expect anybody to

19    really come back and say, oh, you know, we're

01:39  20    not happy, we want to switch, because for a

21    practice to go through removing our

22    equipment, installing their equipment and

23    then removing it again to put ours back in,

24    it's a free program on both sides.  At the

Electronically signed by Ann M. Belmont (201-234-827-3922)                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

179

1    end of the day, the practices don't have a

2    lot of time for this.  So I wasn't really

3    expecting, you know, anything alarming, but I

4    just thought it was worth a try to see if,

5    you know, they were still happy or if they

6    were able to tell us, again, at this time is

7    where I still believed that receiving an

8    incentive was not correct.

9            Q.    And then your third item in

01:39  10    order of importance was, "One of our field

11    sales reps is currently reaching out to a

12    rheumatologist they know to see if they can

13    help us gain more knowledge on RHN's

14    tactics," do you see that?

15            A.    Yes, I see that.

16            Q.    Was that done?

17            A.    I believe she attempted to, but

18    she was not able to get any information.

19            Q.    And then you conclude, "We'll

01:40  20    get you updated on the status of these

21    items," right?

22            A.    Yes.

23            Q.    And you're addressing this to

24    Mr. Campbell. And did you get back to them

Electronically signed by Ann M. Belmont (201-234-827-3922)                13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

180

1    all?

2          A.    Honestly, I don't recall

3    actually following up on this with them.

4          Q.    And then you're not on this but

5    Greg Robinson writes to McGinness, "Let's add

6    this to the list, I've been pushing TC and

7    Amy to put together a ContextMedia response

8    plan and it looks like she's making

9    progress."  That's you, right?

01:40    10          A.    Right.

11          Q.    May 2012, given the job you had,

12    did you feel like you had a pretty good grasp

13    on why practices were switching from HAN to

14    ContextMedia?

15          A.    If they were finding -- if --

16    yes, if we knew the reason or they told us,

17    yes.

18          Q.    And you were kind of making it

19    your business to find out, right?

01:41    20          A.    Yes, right, I was.

21          Q.    It seemed like you put a lot of

22    effort and energy into it?

23          A.    Yes.

24       (Exhibit 65 identified.)

Electronically signed by Ann M. Belmont (201-234-827-3922)                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

181

1      Q.    This is an e-mail exchange.  The

2  last one is June 13, 2012, from Lori Smith to

3  Phyllis Timole and you and cc'd some others.

4  This involves another practice that decided

5  to switch from HAN to ContextMedia, right?

6      A.    Em-hm, yes.

7      Q.    And this one, one of the reasons

8  the practice switched was the doctor, again,

9  had seen ContextMedia at a convention, right?

01:42  10      A.    Just a second, I'm reading

11  through it.

12      Q.    It's down at the bottom.

13      A.    Oh, is it on the first page?

14      Q.    Yes, on the first page, the last

15  e-mail exchange.

16      A.    "Cancel due to RHN," yeah.

17  "Doctor saw RHN at a convention."

18      Q.    And it's indicated, "they've

19  been considering switching for about six

01:42  20  months," right?

21      A.    That's what it states, yes.

22      Q.    And going back up, working

23  backwards, the doctor had a few issues with

24  HAN's program, right?

Electronically signed by Ann M. Belmont (201-234-827-3922)                                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

182

1        A.    Patient -- yes, the blue.  This

2    is a blue screen, which, again, is another

3    one of those -- that's a channel station,

4    where if they changed the station, unless

5    we're notified it's hard for us to know that

6    there's something wrong.

7        Q.    Have you done something since to

8    address that problem?  By that I mean, is --

9    as far as the practice knows, the thing's not

01:43   10    working, but you don't know that?

11        A.    Right.

12        Q.    Have you done something on the

13    technology side to address that, so that the

14    channel can't change, for example, or?

15        A.    Sometime we lock the screen, the

16    monitor down, but if we do that, then they

17    can't adjust the volume of the monitor.

18        Q.    I see.

19        A.    So we don't really like to do

01:44   20    that, but what we have done is try to reach

21    out more periodically with faxes, asking them

22    is everything working okay, kind of giving

23    them -- proactively reaching out to them to

24    say, give them an opportunity to say, oh,

Electronically signed by Ann M. Belmont (201-234-827-3922)                13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

183

1    yeah, it is -- it isn't working, where --

2    because we understand that a lot of times

3    they may see the blue screen or the black

4    screen, but they don't have time to stop and

5    call and we get that.

6         Q.    And that is -- what you just

7    said has its problems too, because you'd

8    probably hear people say stop sending me

9    those darn faxes?

01:44   10         A.    You could, yes, but.

11         Q.    And this doctor was also not

12    happy with the fact that, I guess, you guys

13    were sending him a lot of Humira and Uloric

14    brochures?

15         A.    Yes, it states that.  That we

16    were, which is part of the program.

17         Q.    Part of the program if you have

18    the racks in, right?

19         A.    It's the brochure rack that goes

01:45   20    underneath the screen, yes.

21         Q.    Does it go in automatically?

22         A.    Yes.

23         Q.    Can the doctor opt out of that?

24         A.    Yes.

Electronically signed by Ann M. Belmont (201-234-827-3922)                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

184

1       (Exhibit 66 identified.)

2           Q.    This is another practice that's

3    indicating why it's switching from HAN to

4    Context, right?

5           A.    Yes.

6                 MR. BERNAY: Take your time to

7    review it.

8           A.    Okay.

9           Q.    Is this another switch from HAN

10   to Context?

11          A.    I believe it -- yes, it is. I'm

12   just taken back because Elaine isn't usually

13   somebody that would work on a practice, so

14   I'm trying to recall if she actually pulled

15   this from the database and was just providing

16   me with this information or she actually

17   spoke to the practice. Based on this e-mail,

18   it's hard to tell.

19          Q.    Notice the subject line, too.

20          A.    Conference question, yes.

21   Because -- and that was the thing, a lot

22   of -- pretty much the whole trail of this

23   e-mail is about us attending a conference

24   that was in California. Because I do recall

Electronically signed by Ann M. Belmont (201-234-827-3922)                                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

185

1    Devin being a person that was somebody we

2    worked with for setting up a conference.

3         Q.    Em-hm.

4         A.    So I'm not sure how it jumped

5    from there to this conference question with

6    her comment about this one particular office.

7    So I feel like she was just pulling in

8    data -- oh, well, actually, now I see it.

9    ACN cancelled in December of 2011 and this

01:48    10    was 2012, so she was referring to an older

11    cancel.

12         Q.    Why would she do that?

13         A.    She must have been looking back

14    as to -- this was a cancelled site of

15    somebody that was going to be attending the

16    conference.  To be honest, I'm not sure.

17         Q.    Okay.

18         A.    That's just based.

19         Q.    Well, on the note that she

01:48    20    pulled from the database, it's indicated that

21    the practice is switching because of sound,

22    recipes and exercises, right?

23         A.    Correct.

24         Q.    But the practice actually tells

Electronically signed by Ann M. Belmont (201-234-827-3922)                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

186

1    you what the biggest reason for the switch

2    was, doesn't it?

3         A.    Yes, about the not being able --

4    or the practices not being -- "RHN so the

5    patients do not have to read everything on

6    the screen."

7         Q.    Right. And then in the end down

8    there, there's a comment, "Added RHN as

9    competitor," do you see that?

01:49   10         A.    Em-hm, yes.

11         Q.    What is that?

12         A.    So in the database, they could,

13    again, put as the cancelled reason code.  At

14    one time we just would put cancelled

15    competitor. And then I don't recall at what

16    point in the life of our database we added

17    another field that said which competitor.

18         Q.    I see.

19         A.    So I'm going to take it that she

01:49   20    probably saw this one as a cancelled, she

21    went back and added what competitor it was in

22    our database.

23         Q.    As of May 2012, and given what

24    your job responsibilities were and the people

Electronically signed by Ann M. Belmont (201-234-827-3922)                                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

187

1    you had working for you and reporting to you,

2    wouldn't you expect that you had a better

3    firsthand understanding of why practices

4    switched from HAN to ContextMedia than Mr.

5    McGinness?

6            A.    Yes.

7            Q.    Or Greg Robinson?

8            A.    Yes.

9            Q.    Or Tom Campbell?

01:50 10         A.    Yes.  Although, Tom should also

11   be well aware because I kept him informed

12   throughout the whole time.

13           Q.    But he's not getting all the

14   information, you are?

15           A.    No, he doesn't get it.

16           Q.    You're in the trenches?

17           A.    I'm more on the front line.

18      (Exhibit 67 identified.)

19           Q.    This is No. 67. Really getting

01:50 20   close to the end.

21           A.    I was wondering if that other

22   folder was another stack you pulled.

23           Q.    No, I promise.

24                 MR. BERNAY:  Maybe.

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Electronically signed by Ann M. Belmont (201-234-827-3922)                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

188

1          A.     Maybe.

2          Q.     This appears to be, does it not,

3     another report of a practice deciding to

4     switch from HAN to ContextMedia, right?

5          A.     Yes, it appears that they were

6     wanting to switch.  It looks like we were

7     trying to save them.

8          Q.     Yes, I agree. Although, whether

9     I agree or not doesn't matter, it's your

01:51  10     testimony that matters. But it's reported

11     that the practice has actually been turning

12     you off because patients have been

13     complaining that it's boring and repetitive;

14     is that right?

15          A.     That's what we were told, yes.

16          Q.     So it sounds like -- does that

17     mean, at this point, you have sound?

18          A.     When is this?

19          Q.     Well, it's --

01:51  20          A.     It's 2013, we do have sound,

21     yes.

22          Q.     It gets loud so she turns it

23     off.

24          A.     We've always had some sound in

Electronically signed by Ann M. Belmont (201-234-827-3922)                                                     13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

189

1    our practice.

2         Q.    I see.

3         A.    We've increased the sound over

4    the last year.

5         Q.    Before that, was it -- what was

6    the sound, music?

7         A.    More music that would show up

8    with the practice's custom message.

9         Q.    I see. And now you've got

01:52 10    actually spoken words?

11         A.    We do have some voiceover, yes.

12         Q.    And when did that start?

13         A.    I can't recall the exact date,

14    but I believe it was in 2013 at some point.

15         Q.    Has that been helpful?

16         A.    I wouldn't say that it's made a

17    huge impact, because, again, at the end of

18    the day, I still don't know if the sound -- I

19    think it could go both ways.

01:52 20         Q.    No, I don't disagree, but I'm

21    just -- I mean, again, you're getting all

22    this information --

23         A.    Right, --

24         Q.    -- every day.

Electronically signed by Ann M. Belmont (201-234-827-3922)                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

190

1          A.    Yes, I think it -- I do think,

2     of course, any time you add or enhance your

3     program in any way it's helpful.

4          (Exhibit 68 identified.)

5          Q.    This is a longer e-mail

6     exchange. But, by my reading of it, and

7     correct me if you disagree, again, involves

8     the situation of a practice deciding to

9     switch from HAN to ContextMedia?

01:53  10          A.    Yes.

11          Q.    And this is John Hopkins?

12          A.    Yes.

13          Q.    If you turn to the very first

14     e-mail in the chain, it looks like Ms.

15     Billmann is speaking to a Jonathan Rivera at

16     John Hopkins; is that right?

17          A.    Yeah, that's what it appears

18     she's speaking to.

19          Q.    And it looks like they've

01:53  20     already got ContextMedia in some of their

21     offices and now they're deciding, based upon

22     that experience, to add it to other offices.

23     Is that the way you read this?

24          A.    Yes, so then -- yes.

Electronically signed by Ann M. Belmont (201-234-827-3922)                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

191

1          Q.    And he's telling you that they

2    got it in the other offices and they like it?

3          A.    Yes.

4          Q.    And based upon that, they want

5    to put it in the offices that don't have it?

6          A.    Correct.

7          Q.    And the reason he says they like

8    it is more information, not repetitive, and

9    they like the streaming weather, right?

01:54  10          A.    Yes.

11          Q.    And they're trying to save it,

12    HAN is, and the HAN person says, Ms.

13    Billmann, I explained that we have streaming

14    weather, too.  I take it that was true as of

15    March 2013?

16          A.    Correct, we did have weather.

17    We do have weather in our ACM program.

18          Q.    "He described our system as

19    repetitive and a very basic slide show," do

01:55  20    you see that?

21          A.    Yes, I see that.  Again with the

22    slide show.

23          Q.    Is it -- you have no problem

24    with, do you, with a practice having the

Electronically signed by Ann M. Belmont (201-234-827-3922)                                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

192

1    ContextMedia product in an office and liking

2    the experience and deciding, therefore, to

3    put it in another office, do you?

4          A.    Right, no, I have no problem

5    with that, if that's what they choose, yes.

6    As long as we had a fair opportunity to and

7    it was being presented, you know, correctly,

8    I guess you could say.  And I'm not saying in

9    this -- I'm not trying to lead in this

01:55  10    instance that I feel like they are saying

11    this was incorrect.  I'm just kind of stating

12    that, with the slide show, this is something

13    we never heard.  I mean, we've been doing

14    this for a long time and over the years with

15    churn and practices cancel, never were we

16    ever told slide show, used that terminology.

17    And so I just felt that that was something

18    that somebody was presenting that to these

19    practices that way, which then they were

01:56  20    using that back to us as, oh, it's a slide

21    show.

22          Q.    But here, the practice has you

23    in some offices and ContextMedia in the

24    other, right?

Electronically signed by Ann M. Belmont (201-234-827-3922)                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

193

1          A.     That's what -- yes.

2          Q.     And so he's in a pretty good

3     position to --

4          A.     He is in a good position, yes.

5          Q.     And haven't you seen internal

6     e-mails to HAN that refer to your product as

7     PowerPoint like?

8          A.     Internal e-mails?

9          Q.     Right, at HAN.

01:56   10          A.     To us?  Between each --

11          Q.     You talking amongst yourselves

12     as referring to it as PowerPoint like?

13          A.     We've -- no, we said that that's

14     what patients may have said or practices may

15     have said, again, through this whole

16     ContextMedia.

17          Q.     Well, would you agree with me

18     that this John Hopkins situation at least is

19     an instance of fair competition?

01:57   20          A.     Yes.

21          Q.     And then it looks like Liz

22     Billmann, look at page 3 of the document, is

23     writing up to you and Chris Martini and

24     others.

Electronically signed by Ann M. Belmont (201-234-827-3922)          13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

194

1          A.     Yes.

2          Q.     And she's basically playing back

3     for you what this practice told her, right?

4          A.     Correct.

5          Q.     Can you, as you sit here today,

6     identify a single practice that switched from

7     HAN to Context because of something false or

8     misleading that ContextMedia said to the

9     practice?

01:58   10          A.     That switched from HAN -- from

11     PatientPoint HAN to --

12          Q.     Let me start that question over.

13     Can you identify a single practice as you sit

14     here that switched from HAN to ContextMedia

15     because of something false and misleading

16     ContextMedia said to the practice?

17          A.     I don't know if I can identify

18     an actual practice off the top of my head, I

19     would have to look through data to do that.

01:58   20          Q.     And what you would do is look

21     through the database, right?

22          A.     Right.

23          Q.     Because that's the best source

24     of information?

Electronically signed by Ann M. Belmont (201-234-827-3922)                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

195

1          A.     That is the best source of

2     information.

3          Q.     Would you agree with me that,

4     given how long and consistently you've been

5     doing this, that you have a pretty good feel

6     for what factors practices feel are important

7     in choosing a point of care provider?

8          A.     Yes and -- yes and no, I guess.

9          Q.     Can you think of anybody in the

01:59   10    company that would have a better sense of

11    that?

12         A.     I'm sorry?

13         Q.     Can you think of anybody in the

14    company that would have a better sense of

15    that than Ms. Finley?

16         A.     Salespeople.

17         Q.     Okay, fair point. They might

18    have a better sense, but you've got a pretty

19    good sense?

01:59   20         A.     I've got a pretty good sense.

21         Q.     Who heads up the sales side?

22         A.     Today -- as of today, it would

23    be Lee Hamwright.

24         Q.     Back in this time period we've

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Electronically signed by Ann M. Belmont (201-234-827-3922)                                13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

196

1    been dwelling on, 2011, '12, '13?

2         A.    Jill Brewer, and then from Jill

3    Brewer to Chris Martini.

4         Q.    Okay. Well, at least based upon

5    your several years of experience, is it your

6    understanding the quality of the health

7    related programming is an important factor?

8         A.    Yes.

9         Q.    Is the quality of the

02:00  10    entertainment related program an important

11    factor?

12         A.    Yes.

13         Q.    How about the length of the

14    program, is that an important factor?

15         A.    I wouldn't say it's a -- I

16    wouldn't say that's a focus, I mean,

17    obviously, we have some practices that do

18    state that they wanted a certain amount, but

19    considering that the program plays continuing

02:00  20    over, I don't think -- no, I don't think that

21    loop length is.

22         Q.    How about the media format?

23         A.    No, I don't think that.

24         Q.    How about whether or not the

Electronically signed by Ann M. Belmont (201-234-827-3922)                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

197

1    program has sound?

2            A.     I think that varies.

3            Q.     How about the quality of the

4    technical service?

5            A.     I think that's important.

6            Q.     How about the size and quality

7    of the hardware?

8            A.     It varies.

9            Q.     How about the practice's ability

02:01  10    to control the educational content?

11            A.     I don't believe that's really

12    been a factor.  We've heard that in -- not a

13    handful of practices that wanted that.

14            Q.     How about the ratio of content

15    versus advertisement, is that an important

16    thing?

17            A.     Yes, that's important.

18            Q.     How about the practice's

19    experience with customer service?

02:01  20            A.     That's important.

21            Q.     How about the practice's

22    experience with sales representatives?

23            A.     That's important.

24            Q.     Would you -- all these factors

Electronically signed by Ann M. Belmont (201-234-827-3922)                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

198

1    that we ticked off to the extent you thought

2    they were important and some of them you said

3    you didn't think so.

4         A.    Em-hm.

5         Q.    Would you be able to rank them

6    or order them in order of importance from

7    your experience?

8         A.    You know, it varies with

9    practices, but I would like to say that the

02:01  10   patient education is the number one.

11        Q.    The content?

12        A.    The content, which -- where

13   that's where I think it gets a little tricky

14   because, you know, our content, a lot of

15   these reasons for practices switching, you

16   know, you'll see that there's a lot, it's

17   just sound, news, weather, which isn't really

18   their content.

19        Q.    Right.

02:02  20        A.    And so that, you know, in saying

21   that, whether their content is better than

22   ours, I don't really feel like we're being

23   compared content to content. The news, the

24   weather, that's features, which we could add

Electronically signed by Ann M. Belmont (201-234-827-3922)                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

199

1    those features, that's not the same thing as

2    what our content, our patient educational

3    content is verus compared to their patient

4    education content.

5         Q.    Well, and news and weather is a

6    patient educated content, isn't it?

7         A.    No, it's not.

8         Q.    Okay.  So you think the

9    educational content would be the most

02:02   10    important factor.  What do you think would be

11    the second most important factor?

12         A.    The news.

13         Q.    Pardon me?

14         A.    The news and weather.

15         Q.    Then after that?

16         A.    It would be hard to rank.

17         Q.    Okay. This isn't a quiz.

18         A.    I'm just guessing.  At this

19    point, I would be guessing and I don't want

02:02   20    to guess.

21         Q.    Right. We're not going to go

22    beyond those, okay?

23         A.    Okay.

24         Q.    And these factors that are

Electronically signed by Ann M. Belmont (201-234-827-3922)                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

200

1    important, people in the market that you're

2    in, competitors try to differentiate

3    themselves, right?

4          A.    Em-hm, correct.

5          Q.    You try to differentiate

6    yourself from the competition and you expect

7    others to do the same?

8          A.    Yes.

9          Q.    We touched on, a moment ago, the

02:03  10    fact that your folks were instructed to try

11    to find out if ContextMedia misrepresented

12    itself as HAN in any way, right?

13          A.    Yes.

14          Q.    Did you ever find any instance

15    where that, in fact, happened?

16          A.    Well, that was the whole reason

17    why we started asking the question, because

18    we had a practice and maybe -- and I do

19    believe there was more than one, that

02:04  20    actually said, you know, they came to the

21    office, we thought they were you, they never

22    represented themselves as some completely

23    different company, they were here to service

24    and change the equipment.  So when we started

Electronically signed by Ann M. Belmont (201-234-827-3922)                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

201

1    getting comments like that from practices,

2    that's when we were starting to get concerned

3    that we -- they were being misled and

4    misrepresenting us as Healthy Advice.

5         Q.    I think I saw an e-mail along

6    those lines, and isn't it a fact you never

7    determined if that was ContextMedia?

8         A.    I don't know.

9         Q.    I mean, wouldn't it --

02:04   10         A.    Considering that they switched

11   to ContextMedia, that's what would lead me to

12   believe it was ContextMedia.

13         Q.    It just -- does that make any

14   sense to you for ContextMedia to portray

15   itself as HAN when its whole selling approach

16   was to try to say we're so different?

17         A.    So, no, the approach was, I'm

18   here to upgrade your equipment, that's what

19   it was. I'm here to upgrade your equipment,

02:04   20   and so I'm just going to take that down and

21   put this up and, you know, send the other

22   equipment back.  And not really stating that

23   this was PatientPoint or Healthy Advice's

24   equipment, I'm taking this down and sending

Electronically signed by Ann M. Belmont (201-234-827-3922)    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

202

1    this back, they would -- or they would call

2    and say, I'm calling to schedule an

3    appointment or coming to -- I want to upgrade

4    your equipment and they would use the upgrade

5    of the equipment as their tactic to -- versus

6    really truly selling it, it was, I'm coming

7    to upgrade your equipment, and that was where

8    it was misleading and we had practices call

9    back and call us and say, didn't I just talk

02:05   10   to you, you just talked to me about an

11   upgrade and we're confused.

12          Q.    And is all of that that you just

13   said that, the answer you just gave me, that

14   should be reflected in that database?

15          A.    It should be somewhere in that

16   database, yes.

17          Q.    Have you looked recently?

18          A.    No, not for that particular.

19          Q.    And if it's not in there, maybe

02:05   20   it didn't happen, right?

21              MR. BERNAY: Objection. You can

22   answer.

23          A.    I would like to say no, it did

24   happen. Whether -- it should have been

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Electronically signed by Ann M. Belmont (201-234-827-3922)              13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

203

1    documented, but we wouldn't have made that

2    up. It wouldn't have come out of nowhere, it

3    happened somewhere along the line. I would

4    hope that it was documented in the database.

5         Q.    But we've gone through a lot of

6    documents today, right?

7         A.    Yes, we have.

8         Q.    And doesn't it appear that

9    ContextMedia's modus operandi is to try to

02:06  10   convince practices that it's different and

11   better, and isn't that -- isn't that their

12   sales pitch?

13            MR. BERNAY:  Object to the form.

14   You can answer.

15        Q.    Whether that's right or wrong,

16   isn't that their pitch?

17            MR. BERNAY: Same objection.

18        A.    It's every salesperson's pitch,

19   yes.

02:06  20        Q.    That's why I said it doesn't

21   make any sense, but that's all right.

22        A.    Right, but it was, again,

23   perceived as an upgrade.  Let's make it easy.

24   Again, the practices are -- they don't want

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Electronically signed by Ann M. Belmont (201-234-827-3922)          13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

204

1    to be inconvenienced, and so at the end of

2    the day, you're going to put a patient

3    education program in my waiting room and make

4    it easy for me, okay, great.  And that's

5    pretty much what they were trying to do, is

6    make it as easy and painless as possible for

7    the practice by saying we'll take care of

8    everything for you, even by removing the

9    equipment.

02:06   10         Q.    But wouldn't you agree that some

11   practices switched to ContextMedia because

12   they thought the quality of the content was

13   better?

14         A.    Based on the comments we

15   received, yes.

16         Q.    And whether or not the program

17   had sound, right?

18         A.    Right.

19         Q.    And the ability of the practice

02:07   20   to choose its educational content?

21         A.    I wouldn't say that that was a

22   primary reason, but.

23         Q.    It was a factor from time to

24   time?

Electronically signed by Ann M. Belmont (201-234-827-3922)                                   13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

205

1          A.    But it was mentioned in one of

2     the cancels, yes.

3               MR. O'BRIEN: Let's take a break.

4               MR. BERNAY: Okay.

5               MR. O'BRIEN: I really may be

6     done.

7               MR. JAHN: We're off the record.

8               (Break taken.)

9               MR. JAHN: We're on the record.

02:13  10               MR. O'BRIEN: I have no further

11     questions.  Thank you very much for your

12     time, Ms. Finley.

13               THE WITNESS: Really?

14               MR. BERNAY: I have.

15               THE WITNESS: Okay.

16               MR. O'BRIEN: Be careful.

17                DIRECT EXAMINATION

18     BY MR. BERNAY:

19          Q.    I do know you want to get out of

02:14  20     here.  I'm just going to ask you a few, a few

21     questions before you can go out the door.

22          A.    Okay.

23          Q.    But you'll be out of here very

24     shortly, okay. So you've been asked a lot of

Electronically signed by Ann M. Belmont (201-234-827-3922)                                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

206

1    questions today and you've been shown a lot

2    of e-mails about practice correspondence; is

3    that right?

4         A.    That's correct.

5         Q.    And you generally have a good

6    handle on what practices that are switching

7    out from Healthy Advice or PatientPoint list

8    as the reasons why they're switching out?

9         A.    Correct.

02:14    10         Q.    Yeah.  And do you believe that

11   when they -- when they tell PatientPoint,

12   they give you a reason or reasons, is that a

13   complete -- do you feel that's a complete

14   picture of why the practice is leaving?

15        A.    I don't believe in every

16   instance that was the case, no.

17        Q.    And if I told you that -- and

18   you know that a lot of practices switched to

19   ContextMedia over the last few years?

02:15    20        A.    Correct.

21        Q.    If I told you that ContextMedia

22   was telling Healthy Advice practices that

23   half of the Healthy Advice loop was

24   advertising, is that a true statement?

Electronically signed by Ann M. Belmont (201-234-827-3922)                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

207

1          A.    No, it's not.

2          Q.    So it's false. If I told you

3    that Context --

4              MR. O'BRIEN: I'll object to

5    counsel testifying.

6              MR. BERNAY: Well, I was kind of

7    framing that as a question, but, okay.  So

8    it's false?

9          A.    Oh?

02:15  10          Q.    That's false?

11          A.     It is false, it is not

12    50 percent.

13          Q.    And if I told you that

14    ContextMedia represented to practices that

15    they had switched out 350 Healthy Advice

16    monitors in the last year, when that figure

17    was actually a sixth of that, is that a --

18    would that be -- would that be a true

19    statement?

02:16  20          A.     It was not a true statement for

21    them to say that there was over 350 switch

22    outs, no.

23          Q.    Even to this point, have there

24    been --

Electronically signed by Ann M. Belmont (201-234-827-3922)                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

208

1          A.    To this day, there still has not

2     been 350 switch outs.

3          Q.    And do you think if your --

4     you're involved with practice communications

5     all the time.  If you were a practice and you

6     heard a statement like that, would that be an

7     important statement?

8                MR. O'BRIEN: Object to the form

9     of the question.  You can answer.

02:16    10          A.    I do believe that would -- that

11     would have some influence on my decision,

12     yes.

13          Q.    And if ContextMedia told a

14     practice they didn't have a contract with

15     Healthy Advice, is that a true statement?

16                MR. O'BRIEN: Same objection.

17          A.    We heard that statement, that

18     they were telling practices that they did not

19     have a contract.

02:17    20          Q.    Is that a false statement?

21          A.    Okay.  I need to repeat the

22     question, I'm lost.

23          Q.    Sorry, I'll repeat it again. If

24     ContextMedia represented to a Healthy Advice

Electronically signed by Ann M. Belmont (201-234-827-3922)                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

209

1    practice --

2           A.    Okay.

3           Q.    That they did not have a

4    contract with Healthy Advice?

5           A.    Oh, okay.

6           Q.    Is that true?  Is that a true

7    statement?

8           A.    No, they do have a contract with

9    Healthy Advice.

02:17  10           Q.    And from your perspective, if

11    you heard that as a practice, would that

12    information be important to your decision to

13    switch?

14               MR. O'BRIEN: Object to the form

15    of the question.

16           A.    Again, I think it could

17    influence their decision, yes.

18           Q.    And if ContextMedia represented

19    to a practice that Healthy Advice's content

02:18  20    amounted to a PowerPoint slide -- first, is

21    that -- is it true that Healthy Advice's

22    content is a PowerPoint slide?

23           A.    That is not true.

24           Q.    And if you heard that as a

Electronically signed by Ann M. Belmont (201-234-827-3922)                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

210

1    practice, in your opinion, would that piece

2    of information be a factor in your decision?

3                MR. O'BRIEN: Object to the form.

4         Q.    To switch to ContextMedia?

5                MR. O'BRIEN: Object to the form.

6         A.    Again, I do believe it could

7    influence their decision.

8         Q.    And if you as a practice were

9    told by someone at ContextMedia that they

02:18  10   were -- they were calling to upgrade your

11   equipment, again, based on your experience,

12   would you believe that they were calling from

13   Healthy Advice?

14               MR. O'BRIEN:  Object to the form

15   of the question.

16        A.    Yes, I would if they -- if I

17   didn't identify another company name.

18        Q.    And if you were told by a

19   practice -- scratch that -- strike that.

02:18  20               If ContextMedia told a practice,

21   a Healthy Advice practice, that they were

22   authorized, they meaning ContextMedia, were

23   authorized to remove Healthy Advice's

24   equipment, would that be a true statement?

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)

Electronically signed by Ann M. Belmont (201-234-827-3922)                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

211

1          A.     That is not true.

2          Q.     And if you were a practice and

3    you heard that statement, would that piece of

4    information be an important factor in your

5    decision to switch to ContextMedia?

6                 MR. O'BRIEN: Objection to the

7    form.

8          A.     Again, I think that it would

9    influence their decision, making it seem that

02:19  10    it was an easy process for them.

11                MR. BERNAY: Those are my

12   questions. I have nothing further.

13                RECROSS-EXAMINATION

14   BY MR. O'BRIEN:

15         Q.     During the break, did you and

16   counsel go over the questions he was going to

17   ask you?

18         A.     No, he did not.  No, I did not.

19         Q.     And a lot of those questions

02:19  20   were asking you to speculate about

21   hypothetical questions and how a practice

22   would react, right?

23         A.     Like I said, I think it could

24   influence their decision.  I wasn't stating

Electronically signed by Ann M. Belmont (201-234-827-3922)                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

                                                            212

1    that it did or it did not.  Do I think it

2    could influence their decision?  Yes, my

3    belief is that, yes, it could.

4           Q.    All kind of things?

5           A.    All things -- kind of things

6    could, yeah, right.

7                 MR. O'BRIEN: I have nothing

8    further.

9                 REDIRECT EXAMINATION

10   BY MR. BERNAY:

11          Q.    Sitting here today, do you have

12   knowledge that all of the statements I made

13   in my questioning to you were actually made

14   to Healthy Advice practices?

15          A.    Yes.

16                MR. BERNAY: I have no further

17   questions.

18   BY MR. O'BRIEN:

19          Q.    Is that because you heard

20   ContextMedia make these statements to

21   practices?

22          A.    I did not hear ContextMedia make

23   those statements.  This was information that

24   was given to us from practices.

Electronically signed by Ann M. Belmont (201-234-827-3922)                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

213

1        Q.    Right.  And when that happened,

2   it would be put in the database, right?

3        A.    It should be put in the

4   database.

5              MR. O'BRIEN: Nothing further.

6              MR. BERNAY: Nothing further.

7              MR. JAHN:  We're off the record

8   at 2:19:29.

9

10

11                    _____

                           AMY FINLEY

12

13

14

15                    *  *  *

16        (DEPOSITION CONCLUDED AT 2:19 p.m.)

17                    *  *  *

18

19

20

21

22

23

24

Electronically signed by Ann M. Belmont (201-234-827-3922)                    13e3b12f-27ae-44c9-9b47-e9c875d04a76

Amy Finley, 3/20/2014

                                                    214

1            C E R T I F I C A T E
2

    STATE   OF   OHIO
3              :  SS
    COUNTY OF CLERMONT
4
5            I, ANN M. BELMONT, RPR, the
    undersigned, a duly qualified notary public
6    within and for the State of Ohio, do hereby
    certify that AMY FINLEY was by me first duly
7    sworn to depose the truth and nothing but the
    truth; foregoing is the deposition given at
8    said time and place by said witness;
    deposition was taken pursuant to stipulations
9    hereinbefore set forth; deposition was taken
    by me in stenotype and transcribed by me by
10   means of computer; deposition was provided to
    witness for examination and signature outside
11   the presence of the Notary Public. I am
    neither a relative of any of the parties or
12   any of their counsel; I am not, nor is the
    court reporting firm with which I am
13   affiliated, under a contract as defined in
    Civil Rule 28(D) and have no financial
14   interest in the result of this action.
15           IN WITNESS WHEREOF, I have hereunto set
    my hand and official seal of office at
16   Cincinnati, Ohio this 23rd day of March,
    2014.
17
18
                          _____
19   My commission expires:  ANN M. BELMONT, RPR
    December 4, 2015  Notary Public - State of Ohio
20
21
22
23
24

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513-241-5605) / Dayton, Ohio (937-224-1990)