Amy Finley, 4/21/2014

1

1                 UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF OHIO
2                      WESTERN DIVISION
3     HEALTHY ADVICE           :
      NETWORKS, LLC,           :
4                              :
           Plaintiff,          :
5                              :   Case No.
      vs.                      :   1:12-CV-610
6                              :
      CONTEXT MEDIA,           :
7      INC.,                   :
                               :
8          Defendant.          :
9        Videotaped deposition of AMY FINLEY, a
10    witness herein, taken by the defendant as
11    upon cross-examination, pursuant to the
12    Federal Rules of Civil Procedure and pursuant
13    to notice of counsel as to the time and place
14    and stipulations hereinafter set forth, at
15    the offices of Mr. Hankinson, Keating,
16    Muething & Klekamp, One East Fourth Street,
17    Suite 1400, Cincinnati, Ohio, at 9:30 a.m.,
18    Monday, April 21, 2014, before Deanne
19    Cartwright, a Notary Public within and for
20    the State of Ohio.
21                         - - -
22
23
24

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Amy Finley, 4/21/2014

2

```
 1                    APPEARANCES
 2
 3    FOR THE PLAINTIFF:   AARON M. BERNAY, ESQ.
                           Frost Brown Todd
 4                         301 East Fourth Street
                           3300 Great American Tower
 5                         Cincinnati, Ohio 45202
 6    FOR THE DEFENDANT:   THOMAS HANKINSON, ESQ.
                           Keating Muething &
 7                         Klekamp
                           One East Fourth Street
 8                         Cincinnati, Ohio 45202
 9    ALSO PRESENT:  Paul Jahn, videographer
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

3

1                    S T I P U L A T I O N S

2         It is stipulated by counsel for the

3    respective parties that the deposition of

4    AMY FINLEY, a witness herein, may be taken at

5    this time by the defendant as upon

6    cross-examination and pursuant to the Federal

7    Rules of Civil Procedure and notice to take

8    deposition, under notice all other legal

9    formalities being waived by agreement; that

10   the deposition may be taken in stenotype by

11   the Notary Public Reporter and transcribed by

12   her out of the presence of the witness; that

13   the transcribed deposition was made available

14   to the witness for examination and signature

15   and that signature may be affixed out of the

16   presence of the Notary Public-Court Reporter.

17

18

19

20

21

22

23

24

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

```
                                                        4

 1                       INDEX
 2    WITNESS          DIRECT  CROSS  RE-      RE-
                                      DIRECT   CROSS
 3
       AMY FINLEY
 4    BY MR. HANKINSON:          7             246
      BY MR. BERNAY:   245
 5
      EXHIBIT IDENTIFIED                       PAGE
 6
      Exhibit 208                               9
 7    Exhibit 209                              23
      Exhibit 210                              92
 8    Exhibit 211                              95
      Exhibit 212                             108
 9    Exhibit 213                             115
      Exhibit 214                             119
10    Exhibit 215                             123
      Exhibit 216                             126
11    Exhibit 217                             143
      Exhibit 218                             151
12    Exhibit 219                             176
      Exhibit 220                             177
13    Exhibit 221                             197
      Exhibit 222                             203
14    Exhibit 223                             211
15
      OBJECTIONS                       PAGELINE
16
      MR. BERNAY:                       10     2
17    MR. BERNAY:                       17     7
      MR. BERNAY:                       24     9
18    MR. BERNAY:                       34     3
      MR. BERNAY:                       36    13
19    MR. BERNAY:                       45    17
      MR. BERNAY:                       49    13
20    MR. BERNAY:                       51     1
      MR. BERNAY:                       53     9
21    MR. BERNAY:                       60     7
      MR. BERNAY:                       63     3
22    MR. BERNAY:                       64     5
      MR. BERNAY:                       65     2
23    MR. BERNAY:                       66    16
24                      -  -  -
```

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Amy Finley, 4/21/2014

5

1                          INDEX CONTINUED
2
      OBJECTIONS                      PAGE LINE
3
      MR. BERNAY:                      68    7
4     MR. BERNAY:                      68   13
      MR. BERNAY:                      70   11
5     MR. BERNAY:                      71   11
      MR. BERNAY:                      82   12
6     MR. BERNAY:                      83    2
      MR. BERNAY:                      87   11
7     MR. BERNAY:                      87   20
      MR. BERNAY:                     101   15
8     MR. BERNAY:                     108    1
      MR. BERNAY:                     118   12
9     MR. BERNAY:                     120   21
      MR. BERNAY:                     125   16
10    MR. BERNAY:                     134    4
      MR. BERNAY:                     135   11
11    MR. BERNAY:                     137   23
      MR. BERNAY:                     138    8
12    MR. BERNAY:                     148    9
      MR. BERNAY:                     152   19
13    MR. BERNAY:                     153    7
      MR. BERNAY:                     154   12
14    MR. BERNAY:                     155    5
      MR. BERNAY:                     156   15
15    MR. BERNAY:                     161   16
      MR. BERNAY:                     162    7
16    MR. BERNAY:                     172   19
      MR. BERNAY:                     175    3
17    MR. BERNAY:                     175    5
      MR. BERNAY:                     185   10
18    MR. BERNAY:                     185   18
      MR. BERNAY:                     186   11
19    MR. BERNAY:                     187   21
      MR. BERNAY:                     188    4
20    MR. BERNAY:                     188   22
      MR. BERNAY:                     191    1
21    MR. BERNAY:                     193    4
      MR. BERNAY:                     195   18
22    MR. BERNAY:                     196   20
      MR. BERNAY:                     208   14
23    MR. BERNAY:                     209    5
      MR. BERNAY:                     218    4
24

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

6

1                    INDEX CONTINUED

2

     OBJECTIONS                        PAGE LINE

3

     MR. BERNAY:                       218   15

4    MR. BERNAY:                       219   17

     MR. BERNAY:                       220   23

5    MR. BERNAY:                       237   17

     MR. HANKINSON:                    245   14

6    MR. HANKINSON:                    245   20

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

7

1              VIDEOGRAPHER:  We're on the

2      record.  Would the court reporter swear in

3      the witness, please?

4                    AMY FINLEY,

5          a witness herein, of lawful age, having

6      been first duly sworn as hereinafter

7      certified, was examined and testified as

8      follows:

9                  CROSS-EXAMINATION

09:37   10      BY MR. HANKINSON:

11          Q.    Good morning.

12          A.    Good morning.

13          Q.    Please state your name and spell

14      your last name.

15          A.    Amy Finley, F-I-N-L-E-Y.

16          Q.    Thank you for coming in again.

17      We appreciate your time.  My name is Tom

18      Hankinson.  I believe we met very briefly

19      previously but Mr. O'Brien, Richard O'Brien,

09:39   20      was asking you questions at the last --

21          A.    Correct.

22          Q.    -- deposition.  Do you remember

23      generally the guidelines and -- and ground

24      rules that he laid out before you started

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

8

1    that?

2           A.    Yes.

3           Q.    Those same ones will apply

4    today.  If you have any questions about that,

5    let me know.

6           A.    Okay.

7           Q.    If you answer a question, I'm

8    going to assume that you understood it.  Are

9    you okay with that?

09:39   10           A.    Yes.

11           Q.    And if you don't understand a

12    question please ask me to either rephrase it

13    or repeat it or ask me what I mean by

14    whatever is not being understood.  Okay?

15           A.    Okay.

16           Q.    At your previous deposition you

17    were a -- a representative or a designee of

18    your company, correct?

19           A.    Correct.

09:40   20           Q.    Are you familiar with the term

21    30(b)(6)?

22           A.    I've heard it but I don't recall

23    exactly what it means.

24           Q.    In any event, you're here to

Electronically signed by Deanne L. Cartwright (501-202-620-8979)        94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

9

1    testify today about certain topics, correct?

2          A.    Yes.

3          Q.    Were you provided with a notice

4    that told you what those topics were?

5          A.    Yes.

6       (Exhibit 208 identified.)

7                MR. HANKINSON:  I'd like to mark

8    an exhibit as 208.  Please take a moment to

9    look at Exhibit 208 and in particular topics

09:41  10    19 and 20 that start on page three.

11          A.    Okay.

12          Q.    Do you understand that

13    Defendant's Exhibit 208 which is titled

14    Defendant Context Media, Inc.'s Third

15    Supplemental Notice of Deposition of

16    Plaintiff Healthy Advice Networks, LLC

17    pursuant to Federal Rule of Civil Procedure

18    30(b)(6) is a notice that lists the topics

19    that you're here to testify today about?

09:41  20          A.    Yes.

21          Q.    Are you prepared to testify on

22    behalf of Patient Point formerly known as

23    Healthy Advice Networks as to the content of

24    these topics?

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

10

1          A.    Yes.

2                MR. BERNAY:  Obviously we have

3    lodged objections to these, Tom, as you know

4    and Amy is not here to testify about topic 19

5    B and she'll be testifying subject to our

6    objections.

7                MR. HANKINSON:  Did you review

8    the documents that have been produced by

9    Healthy Advice Networks on or after March

09:42   10    26th, 2014?

11          A.    Yes.

12          Q.    In addition to reviewing those

13    documents, how else, if at all, did you

14    prepare for your deposition today?

15          A.    I did investigate with a few

16    people inside Healthy Advice/Patient Point.

17          Q.    Who?

18          A.    Linda Gustin, Nicki Cloran,

19    Emily Hines, Rob Slater, Vida Albert and

09:43   20    Heather McGauvran.

21          Q.    Who is Linda, is it, Gozdin?

22          A.    Gustin.

23          Q.    Gustin.  Could you spell her

24    last name?

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Amy Finley, 4/21/2014

11

1          A.    G-U-S-T-I-N. She works in the IT

2     department.

3          Q.    What did you speak to Ms. Gustin

4     about?

5          A.    Just making sure I understood

6     the -- the database pulls, what software is

7     used, and things like that can.

8          Q.    You said database pulls

9     P-U-L-L-S?

09:44   10          A.    Pulls.  Yeah.  Sorry.

11          Q.    No.  That's great.  I just want

12     to make sure I understand.  When you say

13     database, are you referring to a system that

14     Patient Point maintains called CMS?

15          A.    Correct.

16          Q.    Does that stand for customer

17     management system?

18          A.    I believe so but I'm not 100

19     percent sure.

09:44   20          Q.    In any event, CMS.

21          A.    CMS is our database.

22          Q.    Are there any other databases or

23     sources of information that you were

24     referring to?

Electronically signed by Deanne L. Cartwright (501-202-620-8979)          94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

12

1          A.    No.

2          Q.    Who is Nicki Cloran?

3          A.    Nicki is in our research

4    department.

5          Q.    Could you spell her full name?

6          A.    If I recall how to -- it's

7    N-I-C-K-I and then her last name C-L-O-R-A-N

8    I believe.

9          Q.    What did you talk to Ms. Cloran

09:44    10    about?

11          A.    In regards to a webinar that was

12    conducted.

13          Q.    Are you referring to a

14    rheumatology webinar that had one attendant?

15          A.    Yes.

16          Q.    Who is Emily Hines?

17          A.    Emily Hines works in our

18    creative department and just spoke to her in

19    regards to the same thing.  The webinar.

09:45    20          Q.    Is her last name H-E-I-N-Z?

21          A.    H-I-N-E-S I believe.

22          Q.    Ah.  H-I-N-E-S.  Who is Rob

23    Slater?

24          A.    Rob Slater works in our field

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

13

1    service digital department.

2         Q.    What did you speak to Mr. Slater

3    about to prepare for your deposition today?

4         A.    In regards to an e-mail that he

5    produced.

6         Q.    Who is Ms. Vida Albert?

7         A.    Vida is our -- she's also in

8    field service digital.  Part of tracking

9    assets.

09:46    10         Q.    Some of the assets that

11    Ms. Albert tracks are monitors that are used

12    in Patient Point's in waiting room network

13    systems and CPUs that are also used in those

14    systems, correct?

15         A.    Correct.

16         Q.    And that's V-I-D-A A-L-B-E-R-T?

17    And who is Heather McGauvran?

18         A.    Heather McGauvran is the

19    director of the practice or relationship

09:46    20    managers.

21         Q.    M-C big G-A --

22         A.    U.

23         Q.    -- U-V-R-A-N?

24         A.    Correct.

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

14

1        Q.    Thank you.  What did you speak

2   to Ms. McGauvran about?

3        A.    In regards to a matrix.

4        Q.    Could you be more specific?

5        A.    A matrix that Vida apparently

6   had produced.

7        Q.    Does the matrix that you're

8   referring to list out serial numbers or

9   example serial numbers of various models of

10  monitors and CPUs?

11       A.    I believe so.

12       Q.    Was the purpose of Ms. Albert's

13  matrix that you spoke to Ms. McGauvran about

14  to have a list of which monitors and CPUs

15  were considered to still be in play in

16  Patient Point systems versus others that were

17  considered obsolete?

18       A.    I believe that what I asked

19  Ms. McGauvran about was actually she'd

20  received -- recalled receiving that matrix

21  from Vida, which she had, and if she had

22  distributed it to the team which she didn't

23  recall doing.

24       Q.    Didn't recall one way or the

09:47  (line 10)
09:47  (line 20)

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

                                                                    15

      1    other or she --
      2            A.    Didn't recall if she'd sent --
      3    sent it to the actual team, shared it with
      4    the team, or she just kept it for her own
      5    reference.
      6            Q.    Did Ms. McGauvran say I
      7    definitely did not send it to the team or did
      8    she say I don't remember one way or the
      9    other?
09:48 10            A.    I don't remember.
     11            Q.    Was that the only topic that you
     12    spoke with Ms. McGauvran about?
     13            A.    And then I asked her if we had a
     14    process regarding obsolete equipment.
     15            Q.    What did she say?
     16            A.    No.
     17            Q.    When you used the word we, were
     18    you referring to the customer relationship
     19    management team?
09:48 20            A.    The relationship management
     21    team.  Yes.
     22            Q.    Are you the head of the
     23    relationship management team?
     24            A.    I'm the VP of our provider

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

16

1    services.  Heather McGauvran reports to me.

2         Q.    Were you at one point the head

3    of the customer rela -- or excuse me -- the

4    relationship management team?

5         A.    The head point?  Yes.  And I

6    manage that team as well with Heather

7    McGauvran.  For a while she was the assistant

8    manager but from like a day-to-day workflow

9    providing people work on the team, making

09:49   10    sure that, you know, time off, things like

11    that, Heather managed like the day-to-day

12    activities of the team.

13         Q.    When did you become vice

14    president of provider services?

15         A.    2012 I believe.

16         Q.    Prior to that were you solely in

17    charge of managing the relationship

18    management team?

19         A.    No.  I was the director and

09:49   20    again Heather McGauvran was still working

21    with me.

22         Q.    And is relationship management

23    team how you commonly refer to your

24    department or group that manages the

Electronically signed by Deanne L. Cartwright (501-202-620-8979)          94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

17

1    relationships with providers that are in

2    Patient Point's various networks?

3         A.    Yes.  They used to be called

4    practice relations so there may be

5    terminology somewhere along the way that says

6    practice relations.

7              MR. BERNAY:  Just note these --

8    I believe these questions were asked and

9    answered the first time around.

09:50   10         Q.    Practice relations and then

11    relationship --

12         A.    Relationship management.

13         Q.    -- management.

14         A.    Relationship management team.

15    Their individuals are relationship managers.

16         Q.    Did you speak to Ms. Albert

17    about anything other than the matrix?

18         A.    I discussed with her her process

19    on what she recalled as far as obsolete

09:51   20    equipment.

21         Q.    How long was your conversation

22    with Ms. Albert?

23         A.    Maybe five, 10 minutes.

24         Q.    Do you have -- did that occur

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

18

1    before or after Ms. Albert was deposed in

2    this matter?

3          A.    I believe it was after.

4          Q.    And did you ask her if there was

5    anything that needed to be corrected or

6    changed in any way after her deposition?

7          A.    No, I did not.

8          Q.    Did she indicate to you that

9    there was any information that she was

09:51  10   providing you that was different in any way

11   from her answers to the questions of the

12   prior deposition?

13         A.    No.

14         Q.    Do you think that she would have

15   told you if there was something that she said

16   at that deposition that related to the matrix

17   and the process regarding obsolete equipment

18   that was in any way inaccurate?

19         A.    Repeat that again.  Make sure I

09:51  20   understand that right.

21         Q.    Sure.  Do you believe based on

22   your conversation with her --

23         A.    Uh-huh.

24         Q.    -- in preparation for your

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Deanne L. Cartwright (501-202-620-8979)          94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

19

1    deposition today that if there was anything

2    that she believed was inaccurate about the

3    answers that she gave in her deposition she

4    would have told you about them during your

5    conversation so that you could correct them?

6        A.    I don't know if she would have

7    told me that or not, knowing whether or not

8    that would be something she should do, so we

9    didn't go into that discussion.

10       Q.    In what way then did you talk

11   about her process regarding obsolete

12   equipment and the matrix?

13       A.    So asked her if she recalls who

14   she sent the matrix to.  She had said

15   Heather, and she also said that a few people

16   on my team she knows that she sent directly

17   to.  My team meaning the relationship

18   management team.  And then we discussed as

19   far as I reconfirmed with her in the fact

20   that she is not calling and canceling or

21   removing or scheduling removals of equipment,

22   that her process and what she handles is when

23   we actually have situations where the

24   equipment goes missing.  It's somewhat

09:52 (line 10)

09:52 (line 20)

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

20

1    un-retrievable.  They're having an issue

2    finding it at the practice.  Things like

3    that.  That that's when she gets involved and

4    would call the practice directly.  I was

5    trying to understand when she would actually

6    be speaking with the practices versus the

7    relationship managers who are the ones that

8    typically schedule the removals.

9         Q.    And the situation you just

10   described --

11        A.    Uh-huh.

12        Q.    -- is the situation in which

13   Ms. Albert would be speaking directly with

14   representatives of provider's offices.

15        A.    In situations like that she

16   could be, yes.

17        Q.    In all other situations it would

18   be expected that a member of the relationship

19   management team would be the person from

20   Patient Point to have direct contact with

21   provider's offices, right?

22        A.    Correct.  Vida was only called

23   in when there was a, you know, a need if --

24   that situation when equipment was missing.

09:53

09:53

Electronically signed by Deanne L. Cartwright (501-202-620-8979)          94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

21

1          Q.    When the practice relationship
2     managers were handling the communications
3     with the practices directly, they would still
4     nevertheless consult with Ms. Albert about
5     equipment that Ms. Albert was charged with
6     tracking, correct?
7          A.    They would consult with
8     Ms. Albert, yes.
9          Q.    Did you speak with Mr. Slater
09:54    10     about anything other than the e-mail that was
11     produced on or after March 26th in this case?
12          A.    No.
13          Q.    Did you speak with Ms. Hines or
14     Ms. Cloran about anything other than the
15     rheumatology webinar that we mentioned
16     earlier?
17          A.    No.
18          Q.    Did you speak with Ms. Gustin
19     about anything other than your understanding
09:55    20     of CMS and the pulls from that database?
21          A.    No.
22          Q.    Is Ms. Gustin the person at
23     Patient Point who has primary responsibility
24     for getting reports from CMS for special

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                              94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

22

1    projects or reports that aren't standardized?

2            A.    I don't know if she's the

3    primary person.  There's a multiple people in

4    the IT department.  Sorry.  I didn't realize.

5    She -- I know she is one of the people that

6    is used to pull special reports.

7            Q.    Have you worked with her before

8    to get special reports --

9            A.    Yes.

09:55    10            Q.    -- from CMS?

11            A.    I have.

12            Q.    Is she the person that you work

13    with most when you need a special report from

14    CMS?

15            A.    Yes.

16            Q.    Do you work with anyone else in

17    IT when you need a special report from CMS?

18            A.    Sometimes I work with John

19    Hummel.

09:55    20            Q.    But the vast majority of times

21    you work with Ms. Gustin?

22            A.    I work with Ms. Gustin, yes.

23            MR. HANKINSON:  I'd like to mark

24    an exhibit as Defendant's 209.

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Amy Finley, 4/21/2014

23

1        (Exhibit 209 identified.)

2            Q.    Ms. Finley, please take a moment

3    and read over what's been marked as

4    Defendant's Exhibit 209 and let me know when

5    you've familiarized yourself with it.

6            A.    Okay.

7            Q.    What is Defendant's Exhibit 209?

8            A.    This is the cancel process for

9    the relationship management team.

09:57  10            Q.    Who wrote this document?

11            A.    I believe this one was written

12    by Heather McGauvran.  I -- I initiated this

13    process originally.  I believe she had

14    updated it for this particular -- since then.

15    I was the original person like I said before.

16    She is -- she was my -- part of her being an

17    assistant manager was kind of keeping our

18    processes updated.

19            Q.    About how often was the WRN

09:58  20    cancel process updated during your time at

21    Patient Point?

22            A.    Not very often.  Not a lot's

23    changed with this process.

24            Q.    Are you aware of any updates

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Amy Finley, 4/21/2014

24

1    besides the one that is marked as Defendant's

2    209?

3            A.    Not that I'm aware of.  No.

4            Q.    Did you ever request that

5    someone update the WRN cancel process or did

6    you ever personally update it other than the

7    time that you initiated it and the time that

8    you asked Ms. McGauvran to update it?

9            MR. BERNAY:  Object to the form.

09:58   10    You can answer.

11           A.    Considering that I don't really

12    recall the timeframes, I would think that at

13    some point this was updated in some way

14    dependent upon orders that we use within the

15    database but for the most part this has

16    always been our process so --

17           Q.    Sometimes the workflow of the

18    way that orders in CMS are processed changes.

19    Is that what you're saying?

09:59   20           A.    It could.  Yes.

21           Q.    And when that happens you would

22    expect that the WRN cancel process document

23    would be updated to reflect the different

24    ways that CMS is being used?

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

25

1          A.    Correct.  But looking at the

2    orders that are actually in this process,

3    they're the same orders that we use today and

4    I don't recall these changing at all.

5          Q.    Do you believe this one to be

6    the most up-to-date version?

7          A.    Yes.

8          Q.    Do you know about when this

9    version was prepared?

09:59    10          A.    Actually, I can't say that

11    honestly knowing that I don't know -- recall

12    which version.  I believe this was in --

13               MR. BERNAY:  Take your time to

14    look at the document if you need to.

15               THE WITNESS:  Okay.  Again, I

16    think this was 2010, 2011 was when our

17    process was written.  Looking through here, I

18    don't believe that anything has changed from

19    this process looking at the reason codes.

10:00    20          Q.    Is your answer complete?

21          A.    Yes.  I think that this is still

22    our current process.

23          Q.    Your best understanding is that

24    this process was created in 2010 or 2011 and

Electronically signed by Deanne L. Cartwright (501-202-620-8979)          94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

26

1    that not much, if anything, has changed since

2    then?

3           A.    Correct.

4           Q.    And it is reflected in

5    Defendant's Exhibit 209?

6           A.    Yes.

7           Q.    When you referred to reason

8    codes, was that in reference to subparagraph

9    four and the bullets that are under it on the

10:01   10   page that's marked HAN 005789?

11          A.    Correct.  Under four, cancel

12   reasons, there's the list of reason codes

13   that we use.

14          Q.    What are those?

15          A.    Those are reason codes that we

16   use to track the cancels for each location in

17   our database.

18          Q.    Each location has a unique

19   identification number, right?

10:02   20          A.    Correct.

21          Q.    When a location informs Patient

22   Point that it would like to cancel Patient

23   Point service, a reason code is selected, is

24   that correct?

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Amy Finley, 4/21/2014

27

1          A.    Yes.  When we officially cancel

2     the -- the stage of the location in the

3     database it was canceled with a reason.

4          Q.    When you say the stage, is that

5     the network that's at the provider?

6          A.    The stage of the location.  So

7     if I have a location that has the waiting

8     room screen, they're active today because

9     it's up and running.  Once it's been removed

10:02   10    it is then canceled.

11         Q.    Stage refers to the field in CMS

12    that says whether a practice is active or

13    canceled?

14         A.    Correct.

15         Q.    Is it possible to update the

16    stage of a location to cancel without putting

17    in a reason?

18         A.    It was at one time.

19         Q.    And when did that become

10:03   20    impossible?

21         A.    I don't recall the date.  I

22    would say at least -- it's been that way at

23    least since 2011.

24         Q.    The whole year?

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

28

1          A.    I believe so.  Yes.

2          Q.    So at some point in 2010 or

3    before, the system was changed in some way so

4    that when a location was updated to canceled

5    in the stage field it was mandatory to enter

6    a reason.  Did I say that right?

7          A.    Yes.  Before the field was

8    available but then we made it a required

9    field because again it's a manual entry so we

10:04  10   wanted to make sure people remembered to put

11   it in.

12         Q.    Prior to the update in which the

13   reason code was made a mandatory entry for

14   all cancellations, was it already the policy

15   that a reason should be entered in every

16   situation where a practice canceled it?

17         A.    It should be, yes.

18         Q.    Do you have any impression of

19   how often a reason code was entered versus

10:04  20   not entered prior to that time?

21         A.    No, I don't.

22         Q.    Did a training at the time

23   include instructions to relationship managers

24   about how to get a reason for the

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

29

1    cancellation and how to enter it as a reason

2    code?

3              A.    So I am actually the one that

4    enters the reason co -- the official final

5    reason at that time in 2011 and 2012 so it

6    could have been my error that I did not enter

7    a reason code prior to -- prior to 2011 when

8    it was a manual.

9              Q.    I just don't understand.

10:05  10              A.    Okay.  We have a stage or

11   basically I -- the cancel order.  The

12   relationship manager creates a cancel

13   order --

14              Q.    Uh-huh.

15              A.    -- the cancel order then gets

16   reassigned to me when it's officially being

17   cancelled.  Then I officially take that stage

18   and move it from active to cancel and then

19   actually from there an ans -- enter the

10:05  20   reason code based on the comments.

21              Q.    Has that been the workflow for

22   cancel orders and reason codes since the time

23   that you started working at Patient Point?

24              A.    Not since the time I started

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

30

1    working at Patient Point because I haven't

2    done lots of different things at Patient

3    Point.  So when I took over the position of

4    working -- overseeing the relationship

5    management team, yes.

6            Q.    And that was prior to 2010?

7            A.    That was around 2009.

8            Q.    The whole time that you were in

9    your -- that position forward, the workflow

10   that you just described for cancels and

11   reason codes is what has been followed up to

12   today?

13           A.    That is -- yes, that is the

14   process now.  Not to say that I haven't had

15   somebody here and there help me out and do

16   some for me but majority of the time it was

17   my responsibility to change them from active

18   to canceled.

19           Q.    So when you changed the -- the

20   CMS system to make it mandatory, you were

21   essentially helping yourself remember?

22           A.    Correct.

23           Q.    Do you have a sense of how often

24   you were forgetting prior to that?

10:06

10:07

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

31

1          A.     No, I don't.

2          Q.     What was the source of your

3     information in entering reason codes?

4          A.     The comments.

5          Q.     What are the comments?

6          A.     The comments entered into the

7     database.

8          Q.     Who entered the comments on

9     which you based the reason codes that you

10:07  10    selected?

11         A.     The relationship management

12    team.

13         Q.     I'm sorry for being so basic.

14    Just trying to --

15         A.     Okay.

16         Q.     -- work through it.  Did anyone

17    else enter comments about the reasons that

18    practices canceled that you relied on in

19    entering reason codes?

10:08  20         A.     I don't believe so.  I typically

21    always looked at the relationship management

22    comments because they're the people that are

23    responsible for understanding why they

24    canceled.

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Amy Finley, 4/21/2014

32

1          Q.    Those comments reflected the

2    company's best information about why a

3    particular practice canceled Patient Point's

4    service, right?

5          A.    Correct.

6          Q.    Did you sometimes personally

7    interview the practice representative about

8    the reasons for the cancel?

9          A.    I may have.

10:08  10          Q.    You don't recall?

11          A.    I don't recall.

12          Q.    Do you recall ever doing that?

13          A.    I don't recall.  I mean, I'm not

14    going to guess --

15          Q.    Uh-huh.

16          A.    -- so --

17          Q.    If --

18          A.    I would like to think that if

19    there was one I was confused on that I would

10:08  20    ask the questions.  Yes.

21          Q.    If a CMS entry is notated to

22    have been created by you --

23          A.    Uh-huh.

24          Q.    -- and it includes a reason that

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

33

1    the practice decided to cancel, would that be

2    a comment that you used, written by yourself,

3    to pick the reason code?

4         A.    Yes.

5         Q.    Do you ever consider other

6    sources of information besides the CMS

7    comments when you're picking a reason code?

8         A.    No.

9         Q.    You never reach out to a member

10:09   10    of the team for further explanation or ask

11    them to call back?

12         A.    I may have.  Again, like I said

13    before, if there was something I was confused

14    about but then again if they called back or

15    that was a situation they would have entered

16    a comment into the database that they called

17    back the location.

18         Q.    Just to make sure I understand,

19    if you were confused in any way by a CMS

10:10   20    entry about the reason that a practice left

21    Patient Point's system, you would potentially

22    ask the relationship manager about that

23    reason and if they called and got more

24    information from the practice, that in itself

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

34

1     would become a new CMS entry that you then

2     would rely on to pick a reason code?

3               MR. BERNAY:  Object to the form.

4     You can answer.

5          A.    That sounds about right.  Yes.

6          Q.    What part of it is wrong?

7          A.    Well, I just don't -- I guess

8     I'm just not following.  I don't really

9     understand what this means.  I mean, what --

10    you know, I'm -- I'm -- basically I'm reading

11    the comments.  I'm selecting a reason code.

12    For the most part they're pretty

13    straightforward.  If -- I would think just

14    being a good manager that if for some reason

15    I was confused on something I would ask the

16    team or ask the person that originally spoke

17    with them more questions about it.  If they

18    pointed out to me -- to be clear, I guess

19    that would mean that I might not have got it

20    from a comment.  Maybe they did clarify.  I

21    just don't really recall many of those

22    situations which is why I'm having a hard

23    time with all of this --

24          Q.    Uh-huh.

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Deanne L. Cartwright (501-202-620-8979)          94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

35

1       A.    -- so, you know, that's what I
2   would believe that I would do.  Makes sense.
3   But, you know, again not having a lot of
4   recollection of doing that and I haven't been
5   doing it at all this year.  I've since passed
6   that baton on to someone else.  So, you know,
7   again it's just not something on the
8   forefront.
9       Q.    This year in 2014 at some point
10  someone else took that over?
11      A.    Correct.
12      Q.    I hear what you're saying.  To
13  maybe go about this in a different way, do
14  the relationship managers receive training in
15  how to get information from the practice
16  representatives about the reason that they're
17  canceling?
18      A.    They are told to ask why they're
19  canceling and to try to probe to understand
20  why and to document that into the comment.
21      Q.    And the intention is that
22  they'll do that so that the best information
23  the company has is in the field in CMS for
24  you to review?

10:11

10:12

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Amy Finley, 4/21/2014

36

1          A.    That is what we would like them
2    to do.  Yes.
3          Q.    So when you said earlier that
4    it's -- I forget if you said simple or
5    straightforward.  The process works is
6    essentially what you're saying.
7          A.    Correct.  Which is the reason
8    why we haven't really updated this process.
9          Q.    Patient Point takes the
10:12  10    information that's entered as a reason code
11    and uses it to make business decisions,
12    right?
13              MR. BERNAY:  Object to the form.
14    You can answer.
15          A.    Uses it to make business
16    decisions.  They use it for -- to review
17    reports to understand why practices are
18    leaving.
19          Q.    And presumably they do that for
10:13  20    a reason.
21          A.    Yes.
22          Q.    And so once they understand why
23    they think practices are leaving based on the
24    reason codes they use that information in

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Deanne L. Cartwright (501-202-620-8979)          94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

37

1    some way in Patient Point's business, right?

2        A.    I would believe they use it, you

3    know, strategies and ideas on how to improve

4    the business.

5        Q.    That's the purpose of --

6        A.    That's the purpose.

7        Q.    -- entering reason codes, right?

8        A.    Right.  So we can better

9    understand.

10:13  10        Q.    I know some of my questions are

11    basic.

12        A.    I'm sorry.  I don't mean to --

13        Q.    Looking back to Defendant's

14    Exhibit 209, is it the policy of Patient

15    Point that this WRN cancel process should be

16    used by the relationship managers and you or

17    the person who's appointed regarding reason

18    codes whenever a practice cancels a waiting

19    room network subscription?

10:14  20        A.    Yes.

21        Q.    Have you ever had to discipline

22    anyone for not following this practice?

23        A.    No.

24        Q.    It's been routinely and

Electronically signed by Deanne L. Cartwright (501-202-620-8979)        94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

38

1    universally followed to your knowledge as

2    their --

3              A.    To my knowledge.

4              Q.    -- manager?

5              A.    Yes.

6              Q.    I'd like to refer you to the

7    last major pointed bullet that start -- on

8    the first page of Defendant's Exhibit 209

9    where it says if RM is unable to save.  Is RM

10:15   10    relationship manager?

11             A.    Yes.

12             Q.    The last check box under that --

13   excuse me.  So if the relationship manager is

14   unable to, you know, save, does that mean

15   keep the practice from canceling?

16             A.    Yes.

17             Q.    So if the relationship manager

18   can't keep the practice from canceling, there

19   are steps under this bullet that the

10:15   20    relationship manager is supposed to follow,

21   correct?

22             A.    Correct.

23             Q.    The first step is to schedule

24   the removal of equipment, right?

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

39

1          A.     Correct.

2          Q.     The next two bullets have to do

3     with the removal of equipment and shipping it

4     back to Patient Point, right?

5          A.     Correct.

6          Q.     Then the fourth check box says

7     you must obtain a reason for canceling and

8     must is in all capital letters in bold type,

9     correct?

10:16   10          A.     Correct.

11          Q.     Did you put that boldface type

12     in when you drafted this originally?

13          A.     I don't remember if it was me

14     or -- but, you know, it was there obviously

15     to call attention to it.

16          Q.     That was the purpose of putting

17     must in all caps.

18          A.     Right.

19          Q.     The first sub-bullet under that

10:16   20     says, it is very important we capture the

21     true reason behind the cancel.  Did I read

22     that correctly?

23          A.     Yes.

24          Q.     Why is that very important?

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

40

1          A.     Because sometimes when a
2    practice will call in they'll just say
3    there's -- they're canceling because the
4    doctor decided he wanted to do something else
5    or he no longer wanted it for what -- it was
6    the doctor's decision and it's typically the
7    easy way for the office manager to just tell
8    us because, you know, they don't want to
9    really -- it's hard enough to say, oh, I'm
10   canceling your program.  So it's easier to
11   say, well, the -- it was the doctor's
12   decision so they don't have to actually tell
13   us anything.  So we try to ask more questions
14   or say could we speak to the doctor as really
15   the point behind that.  Not just settling for
16   I don't know, he just decided he no longer
17   wants it.  So it's try to find the real
18   reason why they no longer want it.
19          Q.     The importance of that point and
20   the way to go about pressing the office
21   manager --
22          A.     Uh-huh.
23          Q.     -- in getting the true reason,
24   is all of that conveyed to the relationship

10:17 (line 10)

10:17 (line 20)

Electronically signed by Deanne L. Cartwright (501-202-620-8979)          94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

41

 1    manager in their training and meetings?

 2          A.    It's -- well, it's kind of right

 3    here actually in this document.

 4          Q.    It's spelled out here and you

 5    would expect them to know it?

 6          A.    You would expect them to know.

 7    They should read through this prior to

 8    handling a cancel.

 9          Q.    I see.  It says here, probe to

10:17   10    get an answer; don't just accept that they

11    just don't want it, why don't they want it,

12    no sound, using something else.  That's the

13    second sub-bullet, right?

14          A.    Right.

15          Q.    No sound is an example of a

16    reason that some practices give for wanting

17    to cancel, correct?

18          A.    Correct.

19          Q.    Does that refer to the absence

10:18   20    or almost absence of sound in Patient Point's

21    content loops that get played on the screens

22    in doctor's offices?

23          A.    Correct.

24          Q.    Using something else, what does

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

42

1    that mean?

2           A.    Where are you at?

3           Q.    The second sub-bullet under the

4    last check box.

5           A.    Oh.  If they're using another

6    program, television, their own materials or

7    own programming.

8           Q.    The next sub-bullet says, ask

9    what they plan to use for patient education

10:19  10   in the future.  Is that a question that the

11   relationship managers are expected to ask, if

12   they can, in every instance?

13          A.    If they can, yes.  You know, I

14   don't expect them to every time.  You don't

15   want to press the customer if you don't

16   have -- you know, if they're -- if they seem

17   like they're -- it's all about reading the

18   customer really, so if they don't feel that

19   this is something they're gonna get out of

10:19  20   them, you know, they're not gonna ask the

21   question.  I wouldn't expect them to.

22          Q.    Uh-huh.  That one's a little bit

23   tougher.  You're really pressing them for --

24          A.    Right.

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

43

1        Q.    -- a commitment about their

2     future --

3        A.    Right.

4        Q.    -- action.

5        A.    Correct.

6        Q.    The next sub-bullet says, if you

7     are switching to TV ask why.  Will they let

8     the patients watch whatever they want.

9     Again, that's something that if the

10:19  10     relationship manager can you expect them to

11     ask it.

12        A.    Correct.  All of these that are

13     listed here are basically if you can.  It's

14     to give them suggestions, ideas on things

15     that they could ask to help find the reason.

16        Q.    In a sense coming under the very

17     first sub-bullet that it's important to find

18     the true reason.

19        A.    Right.  It probably isn't

10:20  20     outlined correctly.  Should probably be

21     another sub-bullet underneath there.

22        Q.    I'm not criticizing.

23        A.    That's okay.

24        Q.    The next sub-bullet is sort of a

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

44

1  point of emphasis.  Asking questions is the

2  only way we can improve our programs by truly

3  understanding why practices leave us.

4          A.    Correct.

5          Q.    Do you think that's a true

6  statement?

7          A.    Yes.

8          Q.    And it's included here to

9  motivate the relationship managers to help

10  the company by finding the true reason,

11  right?

12          A.    Yes.

13          Q.    Do you find that your

14  relationship managers are motivated to help

15  the company?

16          A.    Yes.

17          Q.    Switching to a competitor.  This

18  is the next sub-bullet.  Get the name of the

19  company, list the name in comments and note

20  field and update competitor info on the

21  general node.  What is it about their program

22  they like over ours?  Generally does that

23  describe questions to ask when the practice

24  lets the relationship manager know that a

10:20 (line 10)

10:21 (line 20)

Electronically signed by Deanne L. Cartwright (501-202-620-8979)          94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

45

1    competitor patient education system is being

2    installed?

3            A.    Correct.

4            Q.    What's the general node?

5            A.    It's just a field or a place

6    where information is stored in the database.

7            Q.    Is it just competitor info or --

8            A.    No.  Their address information

9    is there as well.  Phone number.  Fax.

10   Things like that.  General information.

11           Q.    Does each location ID number

12   only have one general node?

13           A.    Yes.

14           Q.    And it's written over or updated

15   rather than being stored as a series of

16   different entries?

17                 MR. BERNAY:  Object to the form.

18   You can answer.

19           A.    It's just -- it's basically

20   fields so, yes, they can be updated.  Address

21   information could be updated if they move or

22   fax.  So things like that.  Yes.

23           Q.    When you say update competitor

24   info on the general node, what information

10:21

10:22

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

46

1   about the competitor is updated there?

2          A.    It's just the name of the

3   competitor -- competitor at the office.

4          Q.    Any other information would be

5   in a normal --

6          A.    Comment.

7          Q.    -- CMS field?

8          A.    It would -- any -- like this

9   information what they liked about theirs over

10:22  10   ours would be in the comment.  All of the --

11   the only thing on the general node, that

12   field, is just the field name of the

13   competitor name.

14          Q.    Then the final sub-bullet on

15   this page, the first page of Defendant's

16   Exhibit 209, says, their feedback is

17   important so we can continue to improve our

18   programs.  Again, is that for emphasis and to

19   motivate the employees?

10:23  20          A.    Correct.

21          Q.    Once the relationship manager

22   obtains all the information that he or she

23   can about the reason for canceling pursuant

24   this check box and the sub-bullet

Electronically signed by Deanne L. Cartwright (501-202-620-8979)          94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

47

1    instructions here, are they instructed to

2    enter all of that information into CMS

3    comment fields?

4          A.    Yes.  They're supposed to enter

5    a comment summary of what took place so I

6    spoke to the practice, this is what I -- this

7    is what happened, this is what they told me,

8    and again it may be very vague in the sense

9    that they were not able to obtain all the,

10:23  10   you know, information to all of these.  It

11   comes back to reading the customer, probing

12   when you can without making them mad or upset

13   because you would like to think that these

14   customers could potentially be a customer

15   again in the future.

16          Q.    Patient Point's instructions are

17   to enter into a CMS comment field all the

18   information that the relationship manager was

19   able to obtain, correct?

10:24  20          A.    Correct.

21          Q.    And the instructions are to get

22   the best information possible under the

23   circumstances and understanding that practice

24   representatives are busy and might be annoyed

Electronically signed by Deanne L. Cartwright (501-202-620-8979)

94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

48

1    by the call but wanting to press and find the

2    true reason as much as possible, right?

3        A.    As much as possible, yes.

4        Q.    If you could look at the next

5    page of Defendant's Exhibit 209, the first

6    pointy bullet -- is that an arrow?  Should I

7    be calling that an arrow?

8        A.    Uh-huh.

9        Q.    The first arrow says, after all

10:24  10   cancel information is obtain proceed as

11   follows.  Are you with me?

12       A.    Yes.

13       Q.    The first subparagraph says RM

14   will create WR-cancel-request order and

15   reassign to Amy Finley.  Does that reflect

16   the workflow as it has been since you were

17   managing practice relations?

18       A.    Yes.

19       Q.    And it's what we discussed

10:25  20   earlier.

21       A.    Yes.

22       Q.    There's a sub-point here, a

23   little box bullet that says in italics, due

24   to competitor, question mark, add in the name

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

49

1    in the notes field.  Is that just a reminder

2    of some of the instructions from the prior

3    page?

4            A.    Yes.  To help me understand when

5    I put the competitor name with the cancel

6    reason code.

7            Q.    So in addition to the

8    relationship manager updating the general

9    node with the competitor name, you also if

10:26    10    you put competitor as one of the reasons

11    enter the competitor name in association with

12    the cancel code or the reason code?

13            MR. BERNAY:  Object to the form.

14    You can answer.

15            A.    The competitor name on the stage

16    nodes I don't believe is always updated

17    because it's a different place you have to go

18    in the database.  To remember to have to do

19    that was a little bit more difficult than to

10:26    20    put it in with the cancel order --

21            Q.    Uh-huh.

22            A.    -- that you're working where

23    your comments are.  So again from my

24    standpoint for -- for it to be easier for me

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

50

 1    to try to understand who the competitor was

 2    if they put it in this area I can locate it.

 3    It's -- they're more likely to remember it.

 4    Again, not always did they do that.  I would

 5    have to kind of read through the comments to

 6    understand.

 7         Q.    When you say stage nodes, is

 8    that another word for general node?

 9         A.    Yes.

10:27   10         Q.    Ideally, according to the WRN

11    cancel process, a relationship manager would

12    enter the name of the competitor in the

13    general node and would also add it in the

14    comments field and you would get it from both

15    those sources when you're picking a reason

16    code?

17         A.    I would get it from the

18    comments.  I didn't go to the general node.

19         Q.    When a -- stutter.  When a

10:27   20    practice gives as its reason that it is

21    switching to a competitor and also gives

22    information about why it is switching to a

23    competitor and the reason why is covered by a

24    different reason code, how do you pick one?

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

51

1          MR. BERNAY:  Object to the form.

2     You can answer if you understand the

3     question.

4          A.    I'm not really sure I understand

5     the question.

6          Q.    I'll march through the document

7     and then maybe I'll be able to ask it better.

8     Sorry for trying to speed up.

9          A.    Well -- no. I think that what

10:28   10    you're trying to say -- you can correct me --

11    is that sometimes a location may be moving

12    and they're also switching to a competitor,

13    so how do I determine if moving should be the

14    reason or competitor should be the reason.

15         Q.    Uh-huh.

16         A.    So the way that I look at it,

17    the practice relationship manager will

18    express both in the comment but I look at

19    that as, well, they moved but the real reason

10:29   20    why they're not going to reinstall us is

21    because of the competitor.  So if it's like

22    that, if I can really find out the real

23    reason on top of the move, then I'll put

24    that, but if I can't and it just comes down

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                              94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

52

1    to, well, they're moving and they really

2    won't tell us any more as to why they're

3    switching then I end up with moving.

4         Q.    Uh-huh.

5         A.    So it's -- you know, they could

6    be moving and they decide they don't want

7    advertising in their office or they're

8    remodeling and they no longer want any

9    advertising.  So I know that they don't want

10:29    10    advertising so I would put advertising versus

11    remodeling because I know the real reason why

12    they're canceling.

13         Q.    Because logically there's

14    nothing to keep them from reinstalling in the

15    new location or --

16         A.    Correct.

17         Q.    -- after the remodel.

18         A.    Correct.  And if there was then

19    that's when it would go to for cause which is

10:29    20    how we would label those because that -- if

21    there's something with the building or

22    whatnot that won't allow them to reinstall

23    the equipment then we would put that reason.

24         Q.    That's interesting.  So when

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

53

1   it's moving, renovation, remodeling -- I'm

2   sorry.  When it's moving or remodeling,

3   it's -- you're in essence saying that there's

4   probably a different reason and it's either

5   for cause if you can figure out that the move

6   or the remodel really does prevent it or

7   they're not telling you what the real reason

8   is.

9            MR. BERNAY:  Object to the form.

10:30   10   You can answer.

11        A.   For moving -- so moving decor,

12   for example, is typically because when they

13   move a lot of times they don't want to put

14   anything new or put anything on the walls

15   that are new.  Like buying a new house.

16   Don't want to hang that first picture so --

17        Q.   So that's a real reason.

18        A.   So it's really a real reason but

19   sometimes it's just we're moving and -- and

10:31   20   we have a new office and it really just

21   doesn't go with the aesthetics and so it can

22   really be the true reason.  But it's we're

23   moving but we're also gonna reinstall this

24   other program or we're just gonna go with a

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Deanne L. Cartwright (501-202-620-8979)          94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

54

1    television which would be a competitor --

2            Q.    Then --

3            A.    -- so --

4            Q.    -- it'll be coded to competitor.

5            A.    It would be coded to competitor

6    with the reas -- with the competitor name of

7    television.

8            Q.    And just to be clear.  We're

9    discussing the reason codes, some of them

10:31  10   that are listed as sub-bullets on the second

11   page of Defendant's Exhibit 209 under the

12   first arrow paragraph four, subparagraph A,

13   all the way down in the little box

14   sub-bullets, right?

15           A.    Yes.

16           Q.    When you know it's a competitor

17   and you also get information about content or

18   advertising being related to the reason for

19   the switch, how do you deal with that

10:32  20   situation?

21           A.    If it was content and

22   advertising?  Is that what you said?

23           Q.    Maybe I should take them one at

24   a time?

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

55

        1         A.    Can you repeat the question?

        2         Q.    Sure.  If you receive from the

        3   practice information that they are canceling

        4   because they're going with a competitor --

        5         A.    Uh-huh.

        6         Q.    -- and you also receive from

        7   that same practice information that they

        8   don't like Patient Point's content --

        9         A.    It would go to competitor.

10:32  10         Q.    What about -- does it ever

       11   happen when it's a competitor but the office

       12   also says that it's opposed to advertising?

       13         A.    Not necessarily because all of

       14   our competitors have advertising as well.

       15         Q.    Although sometimes practices

       16   have their own patient education system,

       17   right?

       18         A.    Right.  So that's where --

       19         Q.    So that could happen.

10:33  20         A.    That could happen but we would

       21   still choose the competitor as -- and

       22   programming if -- if they're new because

       23   that's one of the codes under competitor.

       24         Q.    Programming?

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

56

1          A.     Own programming.

2          Q.     Oh.

3          A.     If they make their own

4     programming internally.

5          Q.     That would be in place of the

6     competitor name?

7          A.     Correct.

8          Q.     When you select competitor as

9     the reason code, is it mandatory to put in a

10    name?

11         A.     It is now.

12         Q.     As of what time?

13         A.     I believe it was -- I -- I

14    believe it was at the beginning of 2011 --

15    2010-2011 when I had them switch to where it

16    was a mandatory field to where it would stop

17    me to enter a name.

18         Q.     The WRN cancel process document

19    on the second page appears to be set up for

20    the relationship manager to enter the reason

21    code but the practice and policy is for them

22    to provide that information to you in the

23    comments field and then for you to enter the

24    reason code?

10:33

10:34

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

57

1          A.    Correct.

2          Q.    Do you ever have conversations

3    with the practice -- let me start again.  Do

4    you ever have conversations with the

5    relationship manager when you find multiple

6    reasons in a comment field and you're trying

7    to prioritize which one should be cancel

8    reason number one?

9          A.    I typically can make that

10:35  10    decision myself if there's two.  Just kind

11    of -- like I said before, if it's -- usually

12    when there's two it's usually moving and

13    remodeling and something else.  They may, as

14    you just pointed out before, make a comment

15    about our content but also state that they're

16    going to a competitor, so I know that I'm

17    gonna put competitor in there versus content.

18    So at the end of the day I'm making that

19    decision.

10:35  20          Q.    Is there also a cancel reason

21    two?

22          A.    They have a spot -- at one point

23    they had a spot where they could actually put

24    this -- put both of these on here in the

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

58

1   database.  This isn't where the official

2   cancel code goes.  So it was somebody that

3   was at Patient Point prior to me started

4   that.  I don't really use it.  It is in here,

5   listed in here, but this isn't something

6   that's generally used or really required.  I

7   don't pay attention to it.

8              Again, I look at their comments

9   because I get more out of that than anything

10:36   10   because again if they're putting multiple

11   reasons I really want to understand why or

12   what they are.  So essentially you're

13   pointing out that I really need to update

14   this process.

15         Q.    That's not my intent.  So let me

16   make sure I understand.

17         A.    Uh-huh.

18         Q.    Under -- on the second page of

19   Defendant's Exhibit 209 under the first

10:37   20   arrow, subparagraph four, sub-subparagraph A,

21   cancel reason, there's a bullet that says

22   please list the final reason for the cancel

23   in the cancel reason one drop down box as the

24   reason may change as you learn more original

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

59

1   reason can go under cancel reason two.  Below

2   is the list of reason codes available.  Well,

3   first, did I read that correctly?

4           A.    You read that correctly.

5           Q.    And do I understand you

6   correctly that since you started being in

7   charge of this process in 2009 you have

8   entered one cancel reason as the reason code

9   and not put in a cancel reason two?

10:38   10           A.    Correct.  I haven't -- for the

11  official -- again, this field is still there.

12  This is still available within the database.

13  People can enter information in there.  It's

14  not to say that they can't.  But myself when

15  I officially cancel the site from a program I

16  put in they can -- switch the stage from

17  active to canceled with the reason and if the

18  reason is competitor then the name of the

19  competitor.

10:38   20           Q.    And if I understand you

21  correctly, the -- the reason given in this

22  sub-bullet doesn't apply because you wait

23  until the cancel is final and all the

24  information that's available is in the

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

60

1    comment field before you pick a reason one so

2    there's no reason to have a reason two.  Did

3    I --

4                    MR. BERNAY:  Object to the --

5            Q.    -- understand you correctly?

6            A.    I wouldn't --

7                    MR. BERNAY:  Object to the form.

8    You can answer.

9            A.    I wouldn't really necessarily

10:39   10   say that.  Again, I -- basically they enter

11   in a comment giving the information as to why

12   they canceled.  I review that comment and I

13   put in they moved from -- that they moved

14   from active to cancelled with the reason.

15   They may have more than one reason and they

16   may have put them in here under this field as

17   cancel reason one, cancel reason two

18   originally when they -- because that was the

19   way that it was set up before I started it

10:39   20   that way, I was finding that that cancel one,

21   cancel two was not necessarily the real

22   reason.  Like I said, I want to be the final

23   decision maker on which one should be over

24   top the other so therefore I would just

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Amy Finley, 4/21/2014

61

1    review the comments to determine the actual

2    reason code.

3         Q.    And you can put your final

4    decision in cancel reason one.

5         A.    No.  I would actually -- that --

6    again, that's what I mean.  This is a part of

7    the database that's like not really utilized.

8    That -- I put that under the stage code.  So

9    I change the stage code.  Underneath the

10:40  10   stage code you change it to cancelled.  When

11   you do that then the field popul -- or opens

12   up for me to allow me to answer the or enter

13   the reason why they cancelled.  Then if it's

14   a competitor then another field opens up that

15   allows me to enter the name of the competitor

16   which isn't on here because that's my process

17   and I don't really have my process

18   documented.

19        Q.    Are you aware of relationship

10:40  20   managers putting in information under the

21   fields that are shown as a little picture on

22   HAN 005789 that are labeled cancel reason one

23   and cancel reason two?

24        A.    I'm sure that they have.

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Amy Finley, 4/21/2014

62

1          Q.    And that's probably changed over

2     time?

3          A.    Yes.

4          Q.    Would that vary by the

5     individual relationship manager?

6          A.    Most likely.

7               MR. HANKINSON:  I feel like

8     you've been --

9               MR. BERNAY:  Yeah.  I've been

10:41   10     trying to get a break in here.  We've been

11     going about an hour so let's take a break.

12               THE WITNESS:  I would rather

13     finish this, this document.

14               MR. BERNAY:  I just -- I need --

15     I need to --

16               THE WITNESS:  Okay.

17               VIDEOGRAPHER:  We're off the

18     record.

19        (Break taken.)

10:47   20               VIDEOGRAPHER:  We're on the

21     record.

22               MR. HANKINSON:  Have you ever

23     seen a report of the data that is in CMS for

24     the cancel reason one and cancel reason two

Electronically signed by Deanne L. Cartwright (501-202-620-8979)          94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

63

1    that are shown in the little picture on HAN

2    005789?

3            MR. BERNAY:  Object to the form.

4    You can answer.

5            A.   No, I don't recall seeing a

6    report --

7            Q.   Is there --

8            A.   -- on those two reasons.

9            Q.   If you asked Ms. Gustin to

10   create a report, could she do that?

11           A.   Yes.

12           Q.   Could she create a report that

13   has as one column the location ID number, as

14   another column the location name, as another

15   column the date on which the cancel reasons

16   were created and then as another column

17   cancel reason one and another column cancel

18   reason two?

19           A.   I believe so.  Sounds logical.

20           Q.   Based on your understanding of

21   CMS and the reports that you've asked to be

22   run and reviewed in your work you believe

23   that that's possible?

24           A.   Yes.

10:48 (line 10)

10:48 (line 20)

Electronically signed by Deanne L. Cartwright (501-202-620-8979)          94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

64

1          Q.    Would the information in those

2    cancel reason one and cancel reason two

3    fields be duplicated in other fields

4    automatically?

5                MR. BERNAY:  Object to the form.

6    You can answer.

7          A.    In cancel reason one and cancel

8    reason two would they be duplicated

9    somewhere?

10:49   10          Q.    For instance in the comments

11    field or any other field or would they exist

12    in that particular field alone?

13          A.    Well, this is just a drop down

14    field of the reason codes I believe.

15          Q.    Uh-huh.

16          A.    So if any -- if this information

17    was duplicated in the comment it would be

18    manually keyed.

19          Q.    Uh-huh.  And there's no reason

10:49   20    to believe that that happened?

21          A.    What?

22          Q.    That somebody manually keyed a

23    duplicate of each and every reason code given

24    in cancel reason one and cancel reason two

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

65

1     into a common field.

2                    MR. BERNAY:  Object to the form.

3          A.    They could have manually keyed

4     in the reason code?  Or the -- I mean, they

5     could type in the reason code technical or

6     advertising or competitor, canceling due to

7     whatever, however they put it in the comment,

8     so that same word could be duplicated?  I'm

9     not sure if I understand what you're --

10:50   10          Q.    Well, you're saying --

11          A.    -- meaning by duplicate.

12          Q.    You're saying it could be.  I'm

13     saying -- I'm asking you is it always?

14          A.    Oh, I would say no because I

15     don't know that they always even fill out

16     cancel reason one and cancel reason two.

17          Q.    They're not instructed to put a

18     cancel reason that they have selected from

19     these drop-down menus in their comment

10:50   20     fields, right?

21          A.    Right.

22          Q.    So if somebody did that it would

23     be of their own idea?

24          A.    They're instructed to put the

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

66

1    summary --

2            Q.    Uh-huh.

3            A.    -- with the cancel reason so in

4    that case then, yes, they would -- if they're

5    putting the correct summary, if they're

6    summarizing their comment properly, then

7    they're putting in the reason which that

8    reason would also potentially be in this

9    reason one or reason two if they completed

10:51    10    that portion in the database.

11            Q.    There could be a one to one

12    relationship between these cancel reason one

13    and cancel reason two drop downs and the

14    reasons listed in the summary but there could

15    be differences between those two, right?

16                MR. BERNAY:  Objection.

17            Q.    We just don't know.

18            A.    There could be differences.

19    There could be lots of things.  Like I said,

10:51    20    I don't really recall how many people

21    utilized this particular fields in the

22    database.

23            Q.    Whenever there's a competitor

24    that is replacing Patient Point's system in a

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

67

1    practice's waiting room, does competitor

2    trump whatever other reasons there may be for

3    the cancel such that competitor is what you

4    enter as the reason code?

5         A.    I look at each one individually

6    and depending on what the reasons are

7    determine which one trumps the other.

8    Typically, yes, competitor will trump moving

9    or content, remodeling.

10:52   10        Q.    Can you think of an instance in

11    which a competitor has switched out Patient

12    Point's waiting room system but you selected

13    something other than competitor as the reason

14    code?

15         A.    I do not recall.  No.

16         Q.    Do you suspect that you've done

17    that a lot or would that be pretty rare?

18         A.    They would be pretty rare

19    looking at the reason codes.

10:53   20        Q.    If a practice told the

21    relationship manager that Patient Point's

22    content was simple to the point of being

23    demeaning to the patients and told the

24    relationship manager that they were switching

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

68

1    to Health Monitor and those comments were

2    reflected in the summary that the

3    relationship manager put into CMS, which

4    reason code would you pick:  Content or

5    competitor?

6              A.    Competitor.

7              MR. BERNAY:  Objection.

8              Q.    Can you picture a comment about

9    Patient Point's content that would trump

10   competitor as the reason code ever or if it's

11   content and competitor the reason code is

12   competitor?

13             MR. BERNAY:  Object to the form.

14   You can answer.

15        A.    If I know it's competitor I'm

16   going to pick competitor because

17   understanding that they switched to a

18   competitor I believe is more valuable than

19   noting the content comment.

20        Q.    What about service issue?  Would

21   the same be true if a practice gave

22   information that they had a negative

23   experience due to service but also indicated

24   that they were switching to a competitor?

10:54 (line 10)

10:54 (line 20)

Electronically signed by Deanne L. Cartwright (501-202-620-8979)          94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

69

         1          A.    You would switch competitor or

         2    would -- I'd choose competitor knowing that I

         3    had the service comment in there.  The same

         4    thing would be content.  I still have that

         5    information about that practice --

         6          Q.    Right.

         7          A.    -- in the comment.

         8          Q.    And what about technical issue,

         9    if a practice had experienced a negative

10:55   10    circumstance due to equipment failure and

        11    also indicated that it was switching to a

        12    competitor, would you in every case choose

        13    competitor as the cancel reason?

        14          A.    I would switch -- I would choose

        15    competitor.

        16          Q.    As you pointed out though, the

        17    other information is in the comment field

        18    that you're basing your reason code decision

        19    on, right?

10:55   20          A.    Right.

        21          Q.    So in a sense you are selecting

        22    the number one reason in your mind in terms

        23    of the importance for reason code tracking to

        24    get the reports to the executive level but

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

70

 1    there's, you know, a more nuanced version of

 2    the reasons that a practice leaves in the

 3    comments field.

 4              A.    Correct.

 5              Q.    Do you have an opinion based on

 6    your experience and Patient Point's policies

 7    about which is the better information about

 8    why a practice left between the reason code

 9    that you've selected and the comments field

10:56   10    that people have entered?

11              MR. BERNAY:  Objection.  Object

12    to the form.  You can answer.

13              A.    Not sure I understand.  I

14    don't -- I don't really quite understand what

15    you're asking so --

16              Q.    Sure.

17              A.    -- repeat that again.

18              Q.    Do you report to Kimberly

19    Theiss?

10:57   20              A.    Correct.

21              Q.    If Ms. Theiss came to you and

22    said I would like to know the best

23    information that the company has about why

24    practice XYZ in Chicago decided to cancel.

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

71

1    Do you follow my --

2            A.    Yes.

3            Q.    -- hypothetical so far?

4            A.    Yes.

5            Q.    Do you have an opinion about

6    whether the reason code that you've selected

7    from the drop-down list or the information

8    that's entered into the CMS comment fields

9    would be better suited to what Ms. Theiss was

10:57  10    asking?

11            MR. BERNAY:  Objection.  You can

12    answer.

13            A.    I think that you could get value

14    from both.  You know, we look at the reason

15    codes as ways to understand why practices may

16    leave.  If you wanted to drill down further

17    one step further as to why say, for instance,

18    they said competitor to try to look at the

19    comment to understand more as to why they

10:58  20    chose that competitor, was it because of the

21    content, was it because they were having

22    service issues, was it because of that, you

23    could drill down -- if the relationship

24    manager was able to get that information, you

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

72

1    know, you could get that from the comment but
2    just trying to do a straightforward here's
3    why someone cancelled, the reason code one is
4    what I would use.
5            Q.    The reason code that you enter
6    is recorded as some sub part of what you
7    called the stage code, is that right?
8            A.    Correct.
9            Q.    If you asked Ms. Gustin to
10   create a report by practice location number,
11   practice location name, and then reason code,
12   would she be able to run that report for you?
13           A.    Yes.
14           Q.    Going back to Defendant's
15   Exhibit 209 on the second page which is
16   marked HAN 005789 under sub sub-paragraph
17   four it says the RM manager is required to
18   fill in the following fields, and cancel
19   reason is subparagraph A, the first thing
20   that they're supposed to enter, right?
21           A.    That's what it says.
22           Q.    And we've already discussed what
23   the actual practice is.  Looking to the other
24   sub-subparagraphs B, C and D it says that

10:58

10:59

Electronically signed by Deanne L. Cartwright (501-202-620-8979)    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

73

1    they are also to enter the save strategy,

2    used to track how the location is being

3    saved; the requestor name, name of person

4    requesting to cancel the program; and the

5    requestor title, name of person requesting to

6    cancel the program's title.  Are those pieces

7    of information things that the relationship

8    managers are supposed to enter in the

9    comments field?

11:00    10       A.    They should enter in their

11    comments what they did to try to save the

12    location, who they spoke with.  All of that

13    again, yes, would be captured in the

14    comments.

15       Q.    Are any of those things that you

16    would then reenter or would the comments

17    field be the source of that information?

18       A.    The comments field would be the

19    source.

11:00    20       Q.    Is the picture that comes just

21    before paragraph five on HAN 005789 a screen

22    shot of some sort of CMS?

23       A.    Yes.

24       Q.    Is this whole picture a part of

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

74

1    the system that's not used as a matter of

2    policy but may be used on an individual

3    basis?

4         A.    This pending save tab, yes.

5         Q.    When a relationship manager is

6    logged into CMS, do they see a screen with

7    these five tabs available:  Targeting,

8    enrolling, installing, active, and pending

9    save?

11:01  10         A.    There is a part in the database,

11    yes, that they can go to to see that

12    information.

13         Q.    Are any of these tabs used as a

14    matter of policy and instruction or are they

15    all more informal than that?

16         A.    The targeting is informal.

17    Enrolling, installing is act -- is actual

18    process.  Active isn't.  There's nothing

19    entered on the active.  It's just a flow to

11:02  20    show that it starts from targeting to

21    enrolling, installing, active.

22         Q.    Meaning if you click on active

23    there's no information to enter underneath

24    it?

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Amy Finley, 4/21/2014

75

1          A.    There's information there.  I
2     don't think there's anything to enter under
3     that stage.
4          Q.    Does pending save refer to the
5     status of a practice after it has told
6     Patient Point that it would like to cancel
7     but before the cancel has actually happened?
8          A.    Yes.
9          Q.    Looking at subparagraph five it
11:03 10    says, do not click the cancel program radio
11    button on the right-hand side of the save
12    tab.  Is that a button that you click when
13    it's final or is that just something that's
14    not used?
15         A.    I do not click that.  I believe
16    that if -- you probably can -- you click that
17    it must do something that we don't want it to
18    do which is why it's stated there.
19         Q.    Okay.
11:03 20         A.    But, no, my field is located on
21    a different portion of the database to where
22    you're --
23         Q.    And by my field you mean the
24    field that's visible when you enter the

Electronically signed by Deanne L. Cartwright (501-202-620-8979)          94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

76

1     cancel reason -- the cancel -- the reason

2     code?

3              A.    Right.  When I switch it from

4     active to cancel with entering the reason and

5     then the competitor reason.

6              Q.    That's a different part of the

7     database?

8              A.    It's gonna -- above is -- it's

9     in the stage node.  Kind of hard to describe.

11:04  10             Q.    Is this series of five tabs a

11     different node?

12             A.    No.  It's under the same stage

13     node.

14             Q.    When this WRN cancel process was

15     first communicated to the relationship

16     managers, was there training to go along with

17     it?

18             A.    I think they just read through

19     the process.

11:04  20             Q.    Is it discussed at a team

21     meeting?

22             A.    When it was originally probably

23     presented, yes, but as new people come on

24     board it's more of just training people and

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

77

1    they just shadow existing relationship

2    managers.

3              Q.    Uh-huh.  It's part of their

4    on-the-job training?

5              A.    Right.  They're -- right.

6    They -- they have a manual.  They use this as

7    a reference.

8              Q.    When the WRN cancel process was

9    first communicated to relationship managers,

11:05   10    did they have an opportunity to ask any

11    questions that they had about it?

12             A.    I'm sure they did.  Yes.

13             Q.    And if they had asked questions

14    it would have been clarified to them?

15             A.    Correct.

16             Q.    If you flip to the fourth page

17    that's marked HAN 005791, there's some

18    handwriting at the top that says save talking

19    points.  Do you see that?

11:06   20             A.    Yes.

21             Q.    Is that your handwriting?

22             A.    Yes.

23             Q.    Was this version of the WRN

24    cancel process collected from you?

Electronically signed by Deanne L. Cartwright (501-202-620-8979)          94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

78

1          A.     Yes.

2          Q.     And when it was collected from

3     you was HAN 005791 and the pages that follow

4     it attached in some way to the WRN cancel

5     process document that's three pages long?

6          A.     They were in the same manual.

7          Q.     Do they appear after one another

8     in the manual or is there something in

9     between them?

11:06    10          A.     I don't recall the order.  I

11     provided them because we say that -- in the

12     beginning that we use save talking points.

13     These were the documents that we use for save

14     talking points.

15          Q.     On the first page of Defendant's

16     Exhibit 209 in the first arrow it says

17     relationship manager attempts to save the

18     location by referencing save talking points

19     in their manual, and that refers to the save

11:07    20     talking points that are on page HAN 005791.

21     Do I have that right?

22          A.     Correct.

23          Q.     Are there different save talking

24     points depending on which competitor or if

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                              94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

79

1    there's no competitor?

2          A.    No.  These -- these are the only

3    saves that -- close to competitor specific

4    would be these fact sheets that we have.

5          Q.    Uh-huh.

6          A.    Otherwise it's more information

7    about our content and speaking to, you know,

8    how our programs developed and, you know,

9    what's provided and things like that.

11:07  10          Q.    So after a practice said that it

11    would like to cancel but before the

12    cancellation becomes final the talking points

13    on pages HAN 005791, 92, and 93 --

14          A.    93.

15          Q.    -- are consulted as part of the

16    WRN cancel process, right?

17          A.    Or even 94 and 95.  Right.

18          Q.    94 and 95 which are titled

19    handling objections.

11:08  20          A.    Right.

21          Q.    Those five pages are the save

22    talking points.

23          A.    Correct.  Well, actually the

24    e-mail is -- we utilize the e-mail sample as

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

80

1    well as a taking point.

2            Q.    On --

3            A.    Everything from this point where

4    it says save talking points on is -- can be

5    utilized as a resource.

6            Q.    For the save talking points?

7            A.    For the save talking points.

8            Q.    All the way through HAN 005797?

9            A.    Yes.

11:09  10            Q.    Looking at HAN 005791, the first

11    page of the saved talking points, it

12    references rheumatology waiting room, right?

13            A.    Yes.

14            Q.    The far left column is kind of a

15    category of information column, right?

16            A.    Yes.

17            Q.    And then the middle column

18    Healthy Advice rheumatology.

19            A.    Yes.

11:09  20            Q.    And so that fills in what the

21    information is for Patient Point's own system

22    for the type of information that's being

23    listed?

24            A.    Correct.

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

81

1          Q.     Then the column on the far

2     right, is that specific to the Rheumatoid

3     Health Network?

4          A.     Yes.

5          Q.     And that's put out by Context

6     Media, right?

7          A.     Correct.

8          Q.     Under the row accountable for

9     content in the Healthy Advice column it says

10    yes and in the Rheumatoid Health Network

11    column it says no.  What does that mean?

12               MR. BERNAY:  Hold on.  I'm just

13    gonna note that HAN 5791 and 5792 were

14    previously produced on, I believe, as HAN 002

15    and HAN 0 -- and HAN 0024 and Mr. O'Brien did

16    ask questions of Ms. Finley of at least one

17    of these two documents at her deposition, so

18    again, I'll let Ms. Finley answer this

19    question but -- although this was produced

20    after March 26th, this is a document that

21    actually did appear previously in production.

22          A.     The accountable for content

23    because Healthy Advice actually produces and

24    writes their content where Context Media

11:10

11:11

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

82

1    content is purchased.

2         Q.    What is Patient Point's basis

3    for saying that RHN is not accountable for

4    content that it has purchased?

5         A.    If their content is purchased

6    they're not necessarily liable for the

7    content.  The person that produced it is

8    accountable for that content.

9         Q.    It's a legal opinion about who

11:12   10   would be liable if someone was --

11        A.    No.

12             MR. BERNAY:  Object to the form.

13        A.    I'm not saying that.  I'm not

14   saying that.  Basically what we were trying

15   to produce -- state here is that we take --

16   we're fully accountable for our content.  It

17   was more so about ours and saying no for

18   rheumatology, we don't know 100 percent if

19   they are or not.

11:12   20        Q.    Did anyone ask RHN or Context

21   Media if they consider themselves fully

22   accountable before no was put in this column?

23        A.    We reviewed their website.

24        Q.    Is that the full basis for this

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                     94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

83

1    fact --

2              MR. BERNAY:  All right.  I'm

3    gonna -- I'm gonna instruct Ms. Finley not to

4    answer any more questions related to 5791 and

5    5792 simply because they were produced prior.

6    This is her second deposition.  It goes to

7    documents that were produced after

8    March 26th.  These are simply included for --

9    as part of what was provided to counsel for

11:13    10    production.  Mr. O'Brien did ask Ms. Finley

11   questions about this document and again given

12   our understanding of what -- what was gonna

13   happen here today, I don't -- I don't want to

14   labor over a document that has already

15   been -- has been previously produced.

16              MR. HANKINSON:  Is that a

17   forward going instruction?  She answered this

18   question.

19              MR. BERNAY:  Correct.

11:13    20              MR. HANKINSON:  And did you get

21   the answer to that question?

22              THE REPORTER:  (Nodded

23   affirmatively.)

24              MR. HANKINSON:  Would you please

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Amy Finley, 4/21/2014

84

1    refer to HAN 005794 and 95?  What's the

2    purpose of this document titled handling

3    objections?

4         A.    This document was originally

5    created for the sales team and was basically

6    reutilized for the relationship management

7    team.

8         Q.    By putting it in their manual?

9         A.    Correct.

11:14  10         Q.    And what is it used for by

11    relationship managers?

12         A.    As another resource for save

13    talking points or talking points in general.

14         Q.    Please take a look under the

15    heading probing that may help at the third

16    bullet from the bottom where it states, we

17    know that you're all about compliance and so

18    are we.  Our patient education outweighs

19    sponsoring far more than any other PE

11:15  20    programs.  Is that statement made as a

21    suggestion for what a relationship manager

22    might say in their save talking points to a

23    practice representative?

24         A.    This is again just here as a

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

85

1    resource not necessarily what they would

2    state.

3            Q.    It's phrased informally as a we

4    know that you are all about compliance.  Is

5    that essentially like a script statement

6    that's there for them as a resource if they

7    want to use it?

8            A.    Again, this was originally

9    scripted for the sales team that we just

11:16  10    repurposed for the relationship management

11    team, so I wouldn't state that this was

12    something that we wanted them to say

13    necessarily and quite frankly I'm not even

14    familiar with this phrase.  I mean, I -- oh,

15    sorry.  I mean, I'm -- I'm trying to

16    understand really myself what the meaning

17    behind this phrase was.

18            Q.    Uh-huh.  Well, that is what I

19    was gonna ask you.

11:16  20            A.    Well, I -- I don't have the

21    answer for this.  I did not write this

22    document.

23            Q.    Do you know who originally wrote

24    it?

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Amy Finley, 4/21/2014

86

1          A.    It's been so long I -- the

2     person that wrote it I'm gonna say could be

3     Jill Brewer but -- because she was over the

4     sales team.

5          Q.    Do you know about when this

6     document began being used by the sales team?

7          A.    No, I don't.

8          Q.    Do you know about when this

9     document began to be repurposed as part of

11:17   10   the save talking points?

11         A.    We've probably had this in our

12    manual since 2010 at least.

13         Q.    Who made the decision to include

14    it in the save talking points in the manual

15    for the WRN cancel process?

16         A.    I did.

17         Q.    I understand that you're saying

18    it was put in there as a resource.  Am I

19    correct in understanding that to mean that it

11:18   20   is there as something that a relationship

21    manager can read and understand and use to

22    the extent that they see fit in talking with

23    a practice representative?

24         A.    Yes.

Electronically signed by Deanne L. Cartwright (501-202-620-8979)          94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

87

1          Q.    Do you know what compliance

2     means in the bullet point that I read

3     earlier?

4          A.    Compliance.  Not in this case,

5     no.

6          Q.    Just brainstorming.  Something

7     to do with like health regulatory compliance

8     in trying to develop some camaraderie.  Does

9     that ring any bells?

11:19  10          A.    I --

11               MR. BERNAY:  Objection to the

12     form.

13          A.    I don't want to make any

14     assumptions.

15          Q.    As Patient Point's designee to

16     give testimony about this document, the

17     company's best information at this time is

18     that it does not know what compliance means.

19     Do I have that correct?

11:19  20               MR. BERNAY:  Object to the form.

21          A.    In this -- in this document

22     here, no.

23          Q.    The handling objections document

24     that is two pages long is currently a part of

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

88

1    Patient Point's WRN cancel process in that

2    the relationship managers are to reference it

3    as a resource for their save talking points

4    under that process, right?

5         A.    They can utilize this as a

6    resource.

7         Q.    And the rest of my question was

8    correct as well?

9         A.    What was the rest of your

10   question?  I apologize.

11        Q.    Sure.  The handling objections

12   document that's on HAN 005794 and 95, is

13   currently a part of Patient Point's save

14   talking points that are referred to in the

15   WRN cancel process, correct?

16        A.    Correct.

17        Q.    Looking further at the third

18   bullet from the bottom of the HAN 005794 the

19   second sentence says, our patient education

20   outweighs sponsoring far more than any other

21   PE programs.  PE is patient education, right?

22        A.    Correct.

23        Q.    Do you know what it means to say

24   that Patient Point's patient education

11:19 (line 10)

11:20 (line 20)

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

89

1    outweighs sponsoring more than another

2    program?

3              A.    I believe what that statement is

4    made -- and only because I've used this in

5    other references -- that the fact that the

6    program is sponsored the value of the patient

7    education should mean more to the practice

8    than the advertising sponsors.

9              Q.    When you said you've used this

11:21  10   in other references, what were you referring

11   to?

12             A.    In cases where we've had

13   practices state that they love the program

14   but they don't like the advertising.

15             Q.    There's a distinction in this

16   bullet point between advertising and

17   sponsorship?

18             A.    Sponsorship, advertisers to me

19   are the same.

11:22  20   Q.    Okay.

21             A.    The advertising -- they're the

22   sponsors of the program the advertisers.  So

23   there's -- sponsor's advertisement is in the

24   program so that's the sponsorship.

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

90

1          Q.     Uh-huh.  When you say that
2     because the patient education system is
3     sponsored, the value of the patient education
4     system to the patients would be more than
5     other advertising, I didn't quite understand
6     that.
7          A.     No.  To the -- to the practice.
8     So if a practice is liking our program but
9     yet wants to cancel or doesn't like the --
11:22    10     doesn't like the advertising portion of the
11     program, we try to reiterate the fact that
12     the value of the patient education that
13     they're receiving for free should outweigh
14     the fact that they have sponsors.
15          Q.     More than competitors?
16          A.     More than competitors.
17          Q.     Just finishing the bullet point
18     that the value of Patient Point's system to
19     the practice that it gets for free outweighs
11:23    20     the sponsoring -- you know, the fact that
21     it's sponsored, the advertisements, far more
22     than any other PE programs.  I was assuming
23     that that was a reference to competitors.
24          A.     No.  There's patient education

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

91

1    programs that people can buy and purchase

2    content.  I don't believe that was a direct

3    to competitors.

4         Q.    Are they all sponsored?

5         A.    There was points where there was

6    people that could buy patient education and

7    can buy things online.  You can buy

8    brochures.  Things like that.  So the fact

9    that you're getting this free program that's

10   sponsored, you know, we're trying to say it

11   was outweighing the fact that -- that it

12   should outweigh -- the sponsorship should

13   outweigh that more so than other patient

14   education programs I would believe in this

15   case because sometimes you have to purchase

16   patient education which can be costly.  We're

17   providing it to you for free.  There's

18   sponsorship that comes along with it but

19   that's how we're able to provide it for free,

20   so you should be able to see the benefit of

21   that over having to purchase content.  I

22   believe this was more towards purchasing

23   patient education than competitor.

24              MR. HANKINSON:  I'd like to mark

11:24  (line 10)

11:24  (line 20)

Electronically signed by Deanne L. Cartwright (501-202-620-8979)        94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

92

1    this as Defendant's Exhibit 210.

2       (Exhibit 210 identified.)

3          Q.    Please take a moment and

4    familiarize yourself with this and let me

5    know when you're ready.

6          A.    Okay.  I'm ready.

7          Q.    What is Defendant's Exhibit 210?

8          A.    This is the cancel process.

9          Q.    Do you know whether this version

11:26  10   of the cancel process was from before or

11   after the one that is Defendant's

12   Exhibit 209?

13         A.    These are the same process.

14         Q.    Did you review these two

15   versions of the document prior to the

16   deposition?

17         A.    Yes.

18         Q.    And you confirmed that they're

19   word for word?

11:26  20         A.    I did not confirm they were word

21   for word but they're --

22         Q.    If you could flip to the third

23   page.

24         A.    Uh-huh.

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

93

1          Q.    The last line of text says
2     updated November 4th, 2010 and if you look at
3     the third page of Defendant's Exhibit 209
4     that same line says updated March 24th, 2014.
5          A.    Correct.
6          Q.    Does this confirm your
7     recollection that this cancel process was not
8     substantively updated between 2010 and the
9     current day?

11:27   10          A.    Correct.  This printed -- this
11    one with the updated 3/24/2014 was printed
12    out from the manual.  The 11/4/2010 was taken
13    directly from a printed version of the
14    manual.
15          Q.    There's an electronic version of
16    the manual?
17          A.    Well, every document is saved
18    electronically.  So I originally printed it
19    and then was then -- it was then also

11:28   20    provided or pulled directly from the manual.
21          Q.    Uh-huh.  Now, if you flip to the
22    next page HAN 005860 in Defendant's
23    Exhibit 210 that page and following one
24    ending in 61 are a different brochure of some

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

94

1    sort, correct?

2            A.    Correct.

3            Q.    What -- can you explain?

4            A.    So this was a sales piece that

5    was used back in 2010 and I believe 2009 that

6    we put in the manual to use as a saved

7    talking point at that time.

8            Q.    Do you know when the other save

9    talking points from Defense Exhibit 209 were

11:29   10    used instead of this one?

11            A.    I don't know the exact date when

12    these were added.  The rheumatology facts

13    sheets would have been added in 2011.  That's

14    when they were produced.  I don't think we

15    could -- any of us could recall exactly when

16    this was put into the manual.  It was

17    whenever we come across documents that we

18    felt would be utilized by this sale -- by the

19    relationship managers as a resource we would

11:30   20    add them to the manual, hence the reason for

21    they've kind of grown a little bit since the

22    last time --

23            Q.    Uh-huh.

24            A.    -- it was originally developed.

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

95

1          Q.    The brochure that's at the end

2     of Defense Exhibit 210 uses the term

3     rheumatology network.  Patient Point no

4     longer uses that term for its network, right?

5          A.    We with still use the

6     rheumatology.

7          Q.    Does that refer to ACN?

8          A.    Or -- arthritis care.  Yes.

9     You're right.  Sorry.

11:30   10          Q.    So not to belabor the point but

11     that network was once called rheumatology

12     network and is now called arthritis care

13     network?

14          A.    It's called arthritis care

15     network.  It's also referred to internally as

16     rheumatology network.  I think that's what my

17     confusion came.  A lot of times we will refer

18     to programs by the specialty internally.

19          Q.    But this as a -- as an example

11:31   20     of sales collateral this would be out of

21     date?

22          A.    Yes.  This is out of date.

23        (Exhibit 211 identified.)

24          Q.    I'm handing you what we're

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

96

1    marking as Defendant's Exhibit 211.  Have you

2    seen this document before?

3            A.    Yes.

4            Q.    Is this a fax that was drafted

5    to send to particular practices that

6    subscribe to Healthy Advice's networks?

7            A.    This is not a fax.  This is a

8    team agenda topics that we were to discuss

9    and in reviewing this we talked about a fax

11:32  10    and e-mail that was going out to practices

11    and that gave them basically talking points

12    to reference if they were to get inbound

13    calls regarding the e-mail and fax.

14            Q.    The second and third page of

15    Defense Exhibit 211 are a script, right?

16            A.    Yes.

17            Q.    The team that was meeting is

18    that practice relations and field sales?

19            A.    Field sales support.

11:33  20            Q.    Was that a -- sort of a joint

21    team meeting?

22            A.    It's -- yes.

23            Q.    Do they always meet together?

24            A.    No.  I don't -- No, they don't

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

97

1    always meet together.  Actually, I think that

2    was my title header.  The teammates that were

3    invited was just PR.

4            Q.    Uh-huh.

5            A.    So that's the practice relations

6    team which is now known as the relationship

7    managers or relationship management team.

8            Q.    The fax and e-mail that this

9    refers to did not mention Context Media by

11:34   10    name, right?

11           A.    Correct.

12           Q.    But they were sent out as a

13   response to what Patient Point thought it was

14   seeing from Context Media in the field,

15   right?

16           A.    It was sent out in response to

17   that, yes.

18           Q.    The script that's part of

19   Defendant's Exhibit 211 is a training piece

11:34   20   to prepare the relationship managers to field

21   questions about that fax and e-mail, right?

22           A.    Correct.

23           Q.    The expectation of Patient Point

24   was that a certain number of representatives

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

98

1    from practices would call in, ask about the

2    e-mail and fax and -- right?

3         A.   Yes.  Whenever you send anything

4    to a practice you're typically going to get

5    at least one phone call.

6         Q.   Was the expectation that the

7    practices who called -- let me start again.

8    To which selected practices was the fax and

9    e-mail sent?

11:35  10         A.   The fax and e-mail were sent to

11    the locations that were active in our

12    arthritis care network and our primary care

13    network.  Says it right there actually.  Just

14    never read that.

15         Q.   It was generally known by the

16    practice managers that this was in response

17    to Context Media, right?

18         A.   I wouldn't say that.

19         Q.   Well, the agenda says that it's

11:36  20    correspondence to all ACN and PNC

21    locations --

22         A.   This is for --

23         Q.   -- regarding --

24         A.   -- relationship managers --

Electronically signed by Deanne L. Cartwright (501-202-620-8979)        94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

99

1    relationship management team.

2         Q.    Uh-huh.

3         A.    To them this was in response to

4    what was going on with Context Media.  This

5    is not what was stated to the practices.

6         Q.    Uh-huh.

7         A.    They knew what was going on

8    because they were the ones receiving the

9    phone calls in from practices stating that

10   Context was stating they had permission to

11   remove our equipment.

12        Q.    Were the relationship management

13   team members instructed about whether or not

14   to mention Context Media by name in

15   discussing the e-mail and fax with

16   representatives of practices?

17        A.    I don't believe I made the -- I

18   don't know if for 100 percent if I actually

19   stated that but I have always stated in the

20   past don't talk or mention a competitor's

21   name when you're speaking with a practice

22   unless they're actually referencing it then

23   you can speak to it but you should not

24   initiate that.

11:36

11:37

Electronically signed by Deanne L. Cartwright (501-202-620-8979)          94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

100

1          Q.    Did Patient Point document how

2     many calls of this nature it received?

3          A.    If they received calls a comment

4     would have been entered but I don't believe

5     there would be a way to track it.

6          Q.    There wasn't an instruction to

7     use a certain code or a certain word in the

8     field if the practice was asking questions

9     about the e-mail or the fax?

11:37   10          A.    Well, I did state here that I

11     told them to send the comments to me.

12          Q.    That arrive by e-mail?

13          A.    Yes.

14          Q.    Do you recall how many e-mails

15     you received that included a CMS comment

16     about a practice asking about the fax or

17     e-mail that related to Context Media?

18          A.    What I recall is receiving

19     e-mail comments about practices stating they

11:38   20     were receiving calls from another company

21     that was calling them all the time, that they

22     received calls from another company that said

23     that they did have permission to remove our

24     equipment.  We received calls from people

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

101

1    that actually called to just verify they had

2    a service appointment and wanted to make sure

3    that it was truly with us.

4         Q.    Those comments would be

5    reflected in e-mails that you saved in your

6    inbox or some part of your e-mail system,

7    right?

8         A.    Yes.

9         Q.    Did you have a policy to keep

11:39  10   those?

11        A.    We had a policy to keep e-mails.

12   I -- I -- it's in my e-mails.  Yeah.

13        Q.    There wouldn't be additional

14   comments that were not in your e-mails?

15             MR. BERNAY:  Object to the form.

16   You can answer.

17        A.    Additional comments where?  I

18   mean --

19        Q.    Well, I mean --

11:39  20        A.    -- I don't --

21        Q.    -- you've -- you've -- you've

22   said that there wasn't a way of tracking it

23   but they were supposed to send you an e-mail.

24   So I'm trying to think, well, if I counted up

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                              94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

102

1    the e-mails --

2            A.    I wasn't tracking it.

3            Q.    Uh-huh.

4            A.    So bas -- basically I was asking

5    them to send me an e-mail so I could be aware

6    of what kind of comments they would receive.

7    Wasn't for me to take and then track all

8    those e-mails and count them up and see how

9    many we got.  I wasn't doing that.

11:40   10            Q.    Uh-huh.

11            A.    It was just more of just for my

12   knowledge.  If people did call in and say

13   something regarding it, I wanted to be able

14   to see what they were stating.

15            Q.    I don't have any issue with your

16   process and your goal for business purposes.

17   I'm approaching this from a different

18   angle --

19            A.    Uh-huh.

11:40   20            Q.    -- which is after the fact I

21   would be interested in how many calls and how

22   many were actual confusion, if there were any

23   as you're stating, and comparing that to any

24   that were kind of false alarms and I know

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                          94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

103

1    that that wasn't what your process was but

2    I'm trying to figure out if that can be

3    recreated now.  Does that make sense?

4           A.    Yeah.

5           Q.    So when I asked about did you

6    keep all the e-mails --

7           A.    Uh-huh.

8           Q.    -- that related to practice's

9    comments about the e-mail or fax, what's the

11:41   10    answer to that question?

11          A.    I -- I don't know.  I mean,

12   depending on what the comment was, I mean, I

13   don't know if I deleted it or not.  I don't

14   generally delete comments unless I'm trying

15   to make space for my inbox so I would like to

16   think that I have them but I don't even know

17   what I would search on to try to find those

18   comments.  Because again it would have been

19   entered in the database as a comment.  That

11:41   20    comment would have been forwarded over to me

21   through the database in an e-mail.  What or

22   how that would have been tracked -- probably

23   should have found a better way to track it

24   but obviously did not so --

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

104

1                    VIDEOGRAPHER:  Pardon me,
2       counsel.  We're off the record.
3          (Break taken.)
4                    VIDEOGRAPHER:  We're on the
5       record with DVD number two.
6                    MR. HANKINSON:  I want to try to
7       run through to make sure I understand how
8       records, whether in CMS or by e-mail, of
9       practice's calls about the Context Media
11:50   10      response fax and e-mail were kept, so I'm
11      gonna just run through my understanding and
12      let me know if I'm right or wrong.
13                   Referring to Defendant's
14      Exhibit 211, when a practice called in and
15      asked about the fax or e-mail that was sent
16      about Context Media's alleged activities in
17      the marketplace, the practice manager was
18      supposed to talk to them about it according
19      to the suggested script, right?
11:50   20          A.    If they called in, yes.
21          Q.    Right.  They were supposed to
22      enter an entry about that conversation, a
23      summary of it, in CMS, right?
24          A.    Yes.

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

105

1          Q.    And they were supposed to e-mail

2     you that CMS entry.

3          A.    Correct.

4          Q.    So at that point it existed in

5     CMS and it exists in your e-mail inbox,

6     right?

7          A.    Right.

8          Q.    That CMS entry is still there.

9     Those have not been --

11:51   10          A.    Correct.

11          Q.    -- deleted, right?

12          A.    Correct.

13          Q.    However, they would not always

14     have the term Context, Context Media, RHN or

15     rheumatology health network in them, right?

16          A.    That's correct.

17          Q.    And particularly if the practice

18     called in and was asking about the e-mail or

19     fax but it turned out that what they were

11:51   20     asking about had nothing to do with Context

21     Media, that CMS entry and the e-mail would

22     not say Context Media or RHN, right?

23          A.    Correct.

24          Q.    Then the e-mail version of the

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Amy Finley, 4/21/2014

106

1    CMS entry may or may not still be in your

2    inbox, right?

3          A.    Correct.

4          Q.    Some of them were deleted but

5    some were saved in your inbox.

6          A.    Could be.  Yes.

7          Q.    Is there any special file where

8    they're all put?

9          A.    No.

11:52  10          Q.    And you clean out your inbox

11   periodically?

12          A.    I -- on e-mails that don't

13   pertain to this I try to.  Now, again, when

14   this occurred 2012 so I would say that these

15   should be in there but again if they didn't

16   say Context Media or RHN could have been

17   deleted --

18          Q.    Uh-huh.

19          A.    -- but not intentionally.  Let's

11:52  20   put it that way.

21          Q.    Because they didn't say RHN or

22   Context Media even if they were in response

23   on the practice's part to the letter to the

24   fax or the e-mail about Context Media, they

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

107

1   might not have said that in the body and

2   therefore it might be out of your e-mail at

3   this point.

4           A.    It might be --

5           Q.    And --

6           A.    -- or it might still be there.

7           Q.    Could go either way.

8           A.    Could go either way.

9           Q.    Either way, those are not in a

11:53  10   collection of, you know, e-mails related to

11   the Context Media fax and e-mail blast?

12           A.    Correct.

13           Q.    And likewise the CMS entries are

14   kept according to their normal fields so if

15   they don't say RHN, Context Media or another

16   word like that, they can't be searched in a

17   way that gathers up all the calls that were

18   about the Context Media fax and e-mail blast.

19           A.    Correct.

11:53  20           Q.    At the time that the fax and

21   e-mail blast went out Patient Point knew that

22   it was considering suing Context Media,

23   right?

24           A.    That's 2012 --

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

108

1                    MR. BERNAY:  Objection.  You can

2       answer.

3               A.    I don't recall the exact date of

4       when the decision was made --

5               Q.    Do you remem --

6               A.    -- and I'm not -- I'm not the

7       person that makes that decision either.

8          (Exhibit 212 identified.)

9               Q.    I'd like to hand you what we're

11:54   10      marking as Defendant's Exhibit 212.  Just

11      glance through this to familiarize yourself

12      with it but I'm only gonna ask you about one

13      particular sentence on it.  When you're ready

14      flip to HAN 005854.

15              A.    Okay.

16              Q.    There's a sentence on here that

17      says at the bottom, act now, enrollment is

18      limited and only available for select

19      offices.  Defendant's Exhibit 212 is a

11:55   20      marketing piece for Healthy Advice's in

21      waiting room networks, right?

22              A.    Correct.

23              Q.    De --

24              A.    Sales collateral.

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                                                94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

109

1          Q.    Meaning this type of thing would

2     be sent to or dropped off at practices?

3          A.    Could be, yes.

4          Q.    The intent is that it would be,

5     right?

6          A.    That it would be left behind

7     after a sales rep was there, yes.

8          Q.    So is this particular to a

9     par -- to a specialty or could this be any

11:56   10     particular network?

11          A.    This is a folder with tabs

12     inside and each -- there is a tab for

13     specialty at the top.

14          Q.    So it looks like we're looking

15     at a primary care section.

16          A.    Right.  Which they're pretty

17     similar.  It -- really the only difference is

18     probably the content at the top and the

19     messages.  More custom as to -- regarding

11:56   20     rheumatology.

21          Q.    If this was adjusted for ACN?

22          A.    Or women's health if it was

23     adjusted for OB-GYN.

24          Q.    Do you believe that the sentence

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

110

1   at the bottom of HAN 005854 is on both ACN

2   and PCN sales collateral?

3          A.    This is part of the folder part,

4   so this is the flap on the inside.  So this

5   is the folder which would mean -- yes, this

6   would be utilized for all the waiting room

7   programs.

8          Q.    Is the whole folder left behind

9   at the practice including all the tabs for

10  all the networks?

11         A.    No.

12         Q.    But the sales rep is supposed to

13  put in the information that applies to that

14  practice and leave the folder?

15         A.    Correct.

16         Q.    So this sentence would be left

17  with the practice as part of a folder if this

18  was a PCN advertisement and if this was a A

19  CN advertisement?

20         A.    This folder would be -- could

21  be, yes.

22         Q.    Among other things.

23         A.    Could be.

24         Q.    The intent is that it would be,

11:57   (line 10)

11:57   (line 20)

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

111

1    right?

2          A.    They are supposed to -- yes,

3    they would -- the idea is to have a folder to

4    make it easy for them to leave whatever they

5    wanted to leave behind, but typically we

6    instruct our sales reps not to leave things

7    behind because you didn't want to leave your

8    materials.  It was more of a reason for a

9    practice to say, yeah, we looked over it but

11:58  10    we don't -- we're not interested.  So

11    typically they would tell people to hold your

12    materials, bring it with you to show and use

13    as your presentation and talk and go over

14    things but if you could not to leave it

15    behind because it's sort of leaving your

16    goods behind if you do that.

17          Q.    So the intent is that the

18    practice representatives and decision makers

19    would see the folder and the sales

11:58  20    collateral, right?

21          A.    Yes, they would see it.

22          Q.    And it's addressed to them,

23    right?

24          A.    Yes.

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

112

1        Q.    What does the sentence

2    enrollment is limited and only available for

3    select offices mean?

4        A.    I believe it was used as a call

5    of sense of urgency.  Put a sense of urgency.

6        Q.    Is enrollment limited?

7        A.    Yes.

8        Q.    So there's a cap on the number

9    of subscribers to ACN?

11:59  10        A.    There -- at particular times

11    there may have been.

12        Q.    Is there a cap to the number of

13    subscribers in PCN?

14        A.    I don't believe we've ever had a

15    cap for primary care.

16        Q.    So this sentence would be

17    accurate for ACN and possibly some of the

18    other networks but it would not be accurate

19    for PCN?

11:59  20        A.    It's only available for select

21    offices.  Meaning you have to be a primary

22    care specialty in order to receive it or you

23    have to be -- for select offices meaning you

24    have to be of that specialty to receive the

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

113

1    program so you're sort of limiting who gets

2    the program based on that.  Based on the

3    specialty.

4           Q.    Uh-huh.  So enrollment is

5    limited.  You referred to a cap on the number

6    of subscribers in a network, right?

7           A.    There could be, yes.

8           Q.    At various times there may have

9    been.

12:00  10          A.    In the past.  Yes.

11          Q.    But not as to PCN?

12          A.    Correct.

13          Q.    And then available for select

14   offices, you must be a rheumatologist or

15   something of the like to get ACN in your

16   waiting room, right?

17          A.    Correct.

18          Q.    And then you must be a primary

19   care physician to get PCN in your network,

12:00  20   right?

21          A.    Correct.

22          Q.    How would you find out when caps

23   were in place on the number of subscribers in

24   ACN?

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

114

1          A.    Well, basically the cap is more

2     of an expansion so maybe we're only gonna

3     grow this network or something by 300 more

4     physicians.  So if we're only expanding to a

5     certain number of physicians -- physicians at

6     that particular time span, that's what --

7     that's what enrollment is limited mean --

8     really means.

9          Q.    Are you aware of a practice

12:01  10  being turned away?

11          A.    Of being turned away?  Yes.

12          Q.    And that's when the expansion

13     has been reached?

14          A.    It could be for that or it could

15     be because of their specialty.  We have lots

16     of leads in from different specialties that

17     want our waiting room screens that are not of

18     the specialty we have a program for them.

19          Q.    They're siphoned off into a

12:01  20  different program?

21          A.    If we have a program available

22     for them.  Sometimes we get leads in for

23     osteo -- orthopedics a lot and we don't have

24     an orthopedics program.

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

115

1          Q.    Uh-huh.

2     (Exhibit 213 identified.)

3          Q.    I'm handing you what we're

4     marking as Defendant's Exhibit 213.  Sorry

5     about that.  Is Defendant's Exhibit 213 a

6     list of what is referred to as sound

7     inquiries?

8          A.    It appears, yes.

9          Q.    WRN-CN-INQRY-sound under

12:03  10     inventory item appears in all of the rows,

11     right?

12          A.    Yes.  But there's also the sound

13     complaint.

14          Q.    Ah, yes.  Two of these have that

15     and then complaint after a period, right?

16          A.    Correct.

17          Q.    Is -- are those codes in the

18     column inventory item codes that CMS uses to

19     track practice comments about sound?

12:03  20          A.    They are orders that are created

21     to track practices inquiring about sound.

22          Q.    They're separate from a comments

23     field.

24          A.    Well, the com -- the comment

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

116

1  would probably be tied to it but there would

2  be -- and there would be a comment in the

3  database for it but inventory item is the

4  actual order that you can use to run a report

5  like this.

6          Q.    When a practice tells a

7  relationship manager I want sound in my loop,

8  is the policy or instruction to the

9  relationship manager to code that in the

12:04  10  database as sound inquiry?

11          A.    They should inquire -- they

12  should notify them of the sound that we

13  currently have in the program and make sure

14  that their volume is obviously adjusted.

15  Sometimes our practices just have their

16  volume down all the way.  But, yes, if

17  they're interested in wanting more sound then

18  we would have them enter a sound inquiry

19  order.

12:04  20          Q.    When did that start?

21          A.    For as long as I can remember

22  we've done that.

23          Q.    Have there been sound inquiries

24  prior to 2011?

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                              94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

117

1          A.    There could be.

2          Q.    You're not sure one way or the

3    other?

4          A.    I would have to run the report

5    to see.

6          Q.    But you recall that sound

7    inquiries were tracked prior to 2011?

8          A.    Again, that I recall.  I don't

9    know exactly when we created this order in

10   the database.

11         Q.    If Ms. Theiss came to you and

12   said I'd like you to work with Ms. Gustin, or

13   whoever you can get in IT, and give me a list

14   of practices who told Patient Point that they

15   wanted more sound than Patient Point had to

16   offer, what steps would you take?

17         A.    If they requested they wanted

18   more sound.  If I wanted to see how many

19   locations, I would pull a report on this

20   inventory item WRN CM inquiry sound to get my

21   list.

22         Q.    You believe that that would be

23   at least slightly under inclusive because

24   it's possible that a practice relationship

12:05 (line 10)

12:06 (line 20)

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                              94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

118

1   manager would enter the sound inquiry in the

2   CMS field but not make a sound inquiry work

3   order, right?

4           A.    You mean it could be possible

5   that they stated it in the comment but not

6   created this order?

7           Q.    Yes.

8           A.    That could be possible.  Yes.

9           Q.    How complete do you think your

12:06   10   list for Ms. Theiss would be if you based it

11   just on the sound inquiry order report?

12           MR. BERNAY:  Object to the form.

13   You can answer.

14           A.    I feel it would be fairly

15   complete.

16           Q.    And have you seen Defendant's

17   Exhibit 213 in your preparation for this

18   deposition?

19           A.    I've seen this sound inquiry

12:07   20   report, yes.

21           Q.    Do you believe this to be a

22   complete list of all sound inquiry reports

23   between July 2010 and March 2013?

24           A.    Yes.

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Amy Finley, 4/21/2014

119

1                    MR. BERNAY:  That's fine.

2                    MR. HANKINSON:  No.  Go ahead.

3                    MR. BERNAY:  No. No.  That's

4        fine.

5                    MR. HANKINSON:  I'm going to

6        hand you -- I'm going to hand you what we're

7        marking as Defendant's Exhibit 214.

8          (Exhibit 214 identified.)

9               Q.    Did you see this document in

12:08  10        your preparation for your deposition?

11                    MR. BERNAY:  Take a minute to

12        look at the document.

13               A.    It's hard for me to tell exactly

14        which document this is.

15               Q.    What I've been told about this

16        document is that it is a report of the

17        cancels -- of canceled orders but it was

18        inadvertently incomplete.  Does that match

19        your understanding?

12:08  20               A.    Inadvertently canceled orders so

21        basically the saves.

22               Q.    It was intended to be saves --

23               A.    Saves.

24               Q.    -- but it might not be complete?

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

120

 1          A.    Correct.

 2          Q.    Do you have an understanding of

 3    what caused this report to not have other

 4    cancels of cancels or saves in it?

 5          A.    Well, because this report --

 6    actually, if you notice, this stage code says

 7    canceled so these are the saves that then

 8    after the fact canceled.  We saved them

 9    basically once but then later then they

12:09   10    canceled.  What was not produced on here,

11    which should have been, is the ones that were

12    still active.

13          Q.    So these were temporarily saved.

14          A.    Correct.

15          Q.    Is there a way to tell from

16    Defendant's Exhibit 214 for what period of

17    time the practice subscribed after they

18    requested to be canceled for the first time

19    until they were actually canceled after the

12:09   20    second request or thereafter?

21              MR. BERNAY:  Object to the form.

22    You can answer.

23          A.    If you look at the column that

24    says order status date, it's the fourth one

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

121

1    in from the -- yes.  The order status date

2    was the date that the order was canceled

3    which means that's when it was saved.

4            Q.    Okay.

5            A.    So if you take that column and

6    look at the stage date which is seven columns

7    or seven rows in -- columns in, that would

8    kind of give you your time span.

9            Q.    The column titled stage date is

12:10  10   the ultimate cancellation date?

11           A.    Correct.

12           Q.    The column titled order status

13   date is when the initial request to cancel

14   was recorded.

15           A.    It was when the initial request

16   to cancel --

17           Q.    Oh.  When the --

18           A.    -- order was canceled.

19           Q.    That's the save date.

12:10  20           A.    Which, yes, is ultimately the

21   save date.

22           Q.    Is there a comment field

23   associated with a cancel of a cancel order?

24           A.    It would be the same order that

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

122

1    was -- or same comment that's produced with

2    the cancel.  Cancel comments.  They're the

3    same.  The only difference is whether -- the

4    difference between it is whether or not we

5    canceled the order or closed the order.

6          Q.    The order meaning the cancel

7    order?

8          A.    Correct.

9          Q.    And if you close the cancel

12:11  10    order it means that you actually fulfilled

11    the order meaning you canceled the practice's

12    subscription?

13          A.    Correct.

14          Q.    If you cancel the cancel order

15    it means the practice was saved.  This report

16    could be run with a comments field, correct?

17          A.    Yes, you could add a comments

18    field.

19          Q.    And it would be the comment that

12:11  20    accompanied, if any, the ultimate cancel or

21    could you get the comment that accompanied

22    the save?

23          A.    Well, when you pull the comments

24    for the cancels that pertain to the cancels

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

123

1   you're basically gonna get both.  If that

2   makes sense.

3          Q.    Because even if there's a

4   status -- huh.  Well --

5          A.    There's not a comment that's

6   tied to stage code.

7          Q.    Okay.  There's a comment tied

8   to --

9          A.    Your cancel comments.

12:12  10          Q.    Order status code.

11          A.    Inventory item.

12          Q.    That would comment on why the

13   cancellation was requested, right?

14          A.    Right.

15          Q.    Is there a comment on how it was

16   saved?

17          A.    If it would, it would still be

18   within that same comment.

19          Q.    Because the cancel order would

12:13  20   be open and all the comments would be

21   associated with it?

22          A.    It should be all associated

23   together.

24      (Exhibit 215 identified.)

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

124

1          Q.     I'm handing you what we're

2     marking as Defendant's Exhibit 215.  If

3     Mr. Bernay doesn't object, I suggest that you

4     break the staple.

5               MR. BERNAY:  No objection.

6               MR. HANKINSON:  Did you review

7     Defendant's Exhibit 215 in your preparation

8     for this deposition?

9          A.     Yes.

12:13   10          Q.     What's your understanding of

11     what this document shows?

12          A.     So these are the actual saves

13     that were saved.

14          Q.     Permanently saved?

15          A.     They're still active today, yes.

16          Q.     And you're seeing that in the

17     stage code column still saying active.

18          A.     Correct.

19          Q.     But the order status code says

12:14   20     canceled just like in Defendant's

21     Exhibit 214 --

22          A.     Correct.

23          Q.     -- because the cancel was

24     canceled.

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                              94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

125

1          A.    Correct.

2          Q.    All right.  If we added both

3    Defendant's Exhibit 214 and Defendant's

4    Exhibit 215, would that be a complete list of

5    saves for the period of July 2010 to

6    March 2013?

7          A.    For that period, yes.

8          Q.    Do you know approximately how

9    many cancel orders happened during that time

12:14  10   period?

11          A.    No, I do not.  That's a lot of

12    data.

13          Q.    Would you expect the saves to be

14    about one-tenth or less of the total cancel

15    orders based on your experience?

16          MR. BERNAY:  Object to the form.

17          A.    I couldn't say.  I haven't

18    looked at it that way.

19          Q.    Saves are relatively rare after

12:15  20   a cancelation order, correct?

21          A.    No.  I just don't do my reports

22    that way.

23          Q.    Well, I'm asking you like --

24          A.    Oh.

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

126

1          Q.    -- aren't they relatively rare?

2          A.    Oh.  No.  I mean, no, I don't

3     think that they're relatively rare but, you

4     know, I think it just depends on the

5     situation and where they are in -- in the

6     process of the cancel and when we actually

7     get notified of it.  So depends on sooner we

8     can -- we hear about it the more likely we

9     are to be able to save it.  Later in the fact

12:15  10    we are less likely.  Your chance of -- your

11    chances go down or decrease.

12         Q.    Later in the sales cycle?

13         A.    Later in -- when they want to

14    cancel.  So if we're notified later in the

15    process they're canceling, we're not able to

16    get wind beforehand, it's harder to save it

17    after they've already made up their mind

18    about something versus when they're thinking.

19      (Exhibit 216 identified.)

12:16  20         Q.    I'm handing you what we're

21    marking as Defendant's Exhibit 216.  Is

22    Defendant's Exhibit 216 the agenda for the

23    rheumatologist webinar that you mentioned

24    near the beginning of this deposition?

Electronically signed by Deanne L. Cartwright (501-202-620-8979)          94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

127

1        A.    Yes.

2        Q.    How many attendees were there at

3    webinar?

4        A.    One.

5        Q.    The targeted number of

6    attendees, three?

7        A.    Yes.

8        Q.    Did any followup with other

9    rheumatologist practices occur along the same

12:17   10    lines as this agenda?

11        A.    No.

12        Q.    Did you believe that Patient

13    Point got useful information from the

14    webinar?

15        A.    No.

16        Q.    Why not?

17        A.    Because it was unsuccessful.

18        Q.    And what's that?

19        A.    We were not able to -- the

12:17   20    participant was having computer issues and we

21    were not able to really proceed with the

22    webinar in the fashion that we wanted to be

23    able to proceed.

24        Q.    The participant couldn't see the

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

128

1    program?

2         A.    Right.  They couldn't see

3    anything or get into basically a go-to

4    webinar meeting with us.  So it was more of

5    just questions.

6         Q.    So did you conduct the webinar?

7         A.    I did not.

8         Q.    Who conducted it?

9         A.    Would be Nicki Cloran.

12:18    10         Q.    And that's who you spoke to

11    about this prior to the deposition?

12         A.    Correct.

13         Q.    Is the handwriting on here

14    Nicki's handwriting?

15         A.    Yes.

16         Q.    Tell me her last name again.

17         A.    It's -- I believe it's Cloran,

18    C-L-O-R-A-N.  I don't know if that's exact

19    pronunciation or not.

12:18    20         Q.    Initially was the idea that the

21    participants in the webinar would be paid for

22    their participation?

23         A.    Yes.

24         Q.    Is it true that this participant

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

129

1    was not actually paid?

2           A.    Correct.

3           Q.    Was that decision made before or

4    after the webinar?

5           A.    I believe it was made after when

6    the webinar was unsuccessful.

7           Q.    The participant was told that

8    they would receive compensation for the

9    webinar?

12:19  10           A.    Prior to.

11           Q.    And then because it didn't --

12    the participant wasn't able to connect to see

13    the presentation of the webinar then the

14    compensation was not given?

15           A.    Correct.

16           Q.    Was that the only reason that

17    the compensation was not given?

18           A.    Correct.

19           Q.    The document that is Defendant's

12:20  20    Exhibit 216 is an internal Patient Point

21    document, right?

22           A.    Yes.

23           Q.    This was not shown to the

24    webinar participant?

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

130

1          A.     Correct.

2          Q.     And was not intended to be

3     shown?

4          A.     No.

5          Q.     Rather the numbered paragraphs

6     and then the subparagraphs under them are

7     comments and questions that were gonna be

8     asked as an accompaniment to whatever the

9     presentation through the webinar was gonna be

12:20  10    shown on the screen?

11         A.     Correct.

12                MR. HANKINSON:  I'm sorry.

13    Are -- are you good to go?  Okay.  I don't

14    want to go too fast.  Thank you.

15         Q.     To whom was the rheumatologist

16    webinar agenda circulated?

17         A.     Myself, Liz Phillips, Nicki,

18    Emily Hines and I believe that's it.

19         Q.     Who wrote it?

12:21  20         A.     Nicki wrote it and then

21    circulated it for edits.

22         Q.     Did anyone comment?

23         A.      I'm sure people made comments to

24    get it to where it ended.  This was the final

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

131

1   version.

2        Q.    Did you make any edits to the

3   initial draft?

4        A.    I don't recall if I made any --

5   any edits to this.

6        Q.    You could have, you just don't

7   remember?

8        A.    I don't remember.

9        Q.    The -- is what I'm looking at

12:21  10  the final version?

11       A.    Yes.

12       Q.    So its -- was it approved by all

13   four of you:  Liz Phillips, Nicki Cloran, and

14   Emily Hines?

15       A.    Yes.

16       Q.    The primary issue that's listed

17   at the top of the agenda states majority of

18   the practices who leave ACN for RHN do so

19   because of content.  ACN is arthritis care

12:22  20  network?

21       A.    Correct.

22       Q.    Is that a program in the waiting

23   rooms of physicians that is provided by

24   Patient Point?

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

132

1        A.    Yes, it is.

2        Q.    RHN is rheumatoid health

3    network?

4        A.    Correct.

5        Q.    Is that a program in the waiting

6    rooms of physicians that's provided by

7    Context Media?

8        A.    Yes.

9        Q.    Do you believe that the comment

12:22   10    in this rheumatology webinar is correct that

11    the majority of practices who leave ACN for

12    RHN do so because of content?

13        A.    That's what we have been told --

14        Q.    By the practices?

15        A.    -- on the comments -- based on

16    comments that we reviewed, yes.

17        Q.    The comments that you reviewed

18    were in CMS, correct?

19        A.    Correct.

12:23   20    Q.    Those are the same comments that

21    you use to pick a reason code in association

22    with cancels of practices who subscribe to

23    networks, right?

24        A.    Right.

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

133

1          Q.    Is it an ordinary practice for

2    Patient Point to host webinars or conference

3    calls to get feedback about its programming?

4          A.    We do conduct focus groups, yes,

5    on our programming.

6          Q.    This rheumatologist webinar

7    agenda isn't the only document of its kind?

8          A.    There's other focus group

9    agendas, I'm sure, out there.  Yes.

12:24    10          Q.    And this is prepared in the same

11    way that other focus group agendas are

12    generally prepared?

13          A.    I don't know if this was

14    prepared -- I don't conduct the focus groups.

15    Our research department does --

16          Q.    Uh-huh.

17          A.    -- so I don't know exactly how

18    they conduct each focus group.  I'm sure it's

19    similar.

12:24    20          Q.    As Patient Point's designee

21    today as to questions about this document,

22    it's the company's best knowledge that the

23    rheumatologist webinar agenda that is

24    Defendant's Exhibit 216 is prepared in a

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

134

1    similar way to the agendas of Patient Point's

2    other focus groups conducted by the research

3    department, right?

4              MR. BERNAY:  Objection.  I

5    object to the -- the extent that she's the

6    designee on the document.  She's the designee

7    as to the topics described in 19 and 20 of

8    the notice.  You can answer.

9              A.    Yes.  I mean, again, I -- I know

12:25  10   that this was a document that was used for

11   this webinar.  I did not review or -- all of

12   the other focus group agendas and -- and how

13   they were conducted or, you know, in the past

14   to know if this was exactly the same way it's

15   done every time they do a focus group, so I

16   can't enter or answer 100 percent that this

17   is exactly the same way we always do them,

18   but, you know, this is the research

19   department that did create the -- the webinar

12:25  20   or generated it.

21             Q.    Is it your impression that they

22   created it in the ordinary course of their

23   work doing research for Patient Point?

24             A.    This was a request actually.  I

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

135

1    believe I actually initiated the request to

2    get some feedback on -- from practices for

3    this.

4           Q.    Do you recall who drafted the

5    sentence that comes after primary issue?

6           A.    I would believe that would be

7    Nicki created the document.

8           Q.    Did all four of the people that

9    this was circulated to sign off on the final

12:26  10   version that includes that sentence?

11                MR. BERNAY:  Object to the form.

12          A.    You asked me this question

13   already.  Yes.

14          Q.    This document was created as

15   part of yours, Liz Phillips, Nicki Cloran's

16   and Emily Hines' work for Patient Point,

17   right?

18          A.    Right.

19          Q.    It was within your duties.

12:26  20          A.    It -- however -- I'm not really

21   sure how to take that but, yes, we did create

22   this together and signed off on this

23   document.

24          Q.    The objective, desired outcome,

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

136

1    and secondary headings and the sentences and

2    questions that come after them were also

3    prepared in the course of your duties and

4    approved by all four of the people that we

5    talked about, right?

6        A.    Yes.

7        Q.    And the goal of this document

8    was to acquire information that Patient Point

9    could use in its business, right?

12:27   10        A.    Yes.

11        Q.    You said that you requested this

12    one, right?

13        A.    I put in a request to find a way

14    to do some research, get feedback basically,

15    from practices on our content.

16        Q.    What was the -- why did you

17    submit that request?

18        A.    Because I wanted to understand

19    better whether or not it was truly our

12:28   20    content that practices didn't like or if it

21    was something else.  I viewed the comparison

22    of RHN's content to our content as more of

23    they were looking at RHN's features that --

24    you know, the extras like the weather and the

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

137

1    news and not necessarily the content.  So I

2    was trying to really understand is it just

3    the news and the weather that they're liking

4    better about the program or is it truly the

5    actual educational content.

6            Q.    Have you reached a conclusion on

7    that?

8            A.    No, I have not.

9            Q.    Is there additional research

12:29  10  that has been done?

11           A.    No, there hasn't been.

12           Q.    In any event, the question that

13   you were seeking to ask in -- or to explore

14   in making the request was whether the

15   perceived difference in content between ACN

16   and RHN on the part of practices was based on

17   the patient education component primarily or

18   whether it was influenced by other aspects of

19   RHN's program that were not patient

12:29  20  education --

21           A.    Correct.

22           Q.    -- right?

23                 MR. BERNAY:  Object to the form.

24           A.    Correct.

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                                94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

138

1          Q.    Regardless, when a practice was

2    reporting that content was the reason that

3    they switched to a competitor, whether they

4    were referring to patient education content

5    or other aspects of content like a news

6    ticker or weather reports, the switch would

7    still be based on what's in the loops, right?

8              MR. BERNAY:  Object to the form.

9    You can answer.

12:30   10          A.    The switch -- I -- we -- they

11    switched based on what they told us.  So if

12    they stated we like their content better, we

13    would note that but again was it really the

14    content or was it really the extras?

15          Q.    The bells and whistles?

16          A.    The bells and whistles.

17          Q.    And that's what your request to

18    do research on this topic was intended to

19    explore.

12:30   20          A.    Correct.

21              MR. BERNAY:  It's 12:30.

22              MR. HANKINSON:  Is it really?

23              MR. BERNAY:  So you'd better

24    call.  Yes.  Time flies when you're having

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                              94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

139

1    fun.

2              MR. HANKINSON:  Go off the

3    record.

4              VIDEOGRAPHER:  We're off the

5    record.

6       (Lunch break taken.)

7              VIDEOGRAPHER:  We're on the

8    record.

9              MR. BERNAY:  I think we did want

01:12   10   to correct a couple things before we resumed

11   questioning on -- on the record, so Amy.

12             THE WITNESS:  Okay.

13             MR. BERNAY:  I think it's this

14   one and it's in relation first to you had

15   asked a question earlier about Exhibit 215.

16             THE WITNESS:  Yes.  And are

17   you --

18             MR. HANKINSON:  Oh, no.  No.

19        A.    In regards to this I believe I

01:12   20   was asked if this was all of the -- these are

21   two different.

22             MR. BERNAY:  They go together.

23             THE WITNESS:  Oh, do they?

24   Okay.  In regards to all of the cancels

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

140

1    for -- that -- that were saved and the aspect

2    of that, it was actually the ones that were

3    just canceling with the intent to go to a

4    competitor.  We obviously have other reasons

5    why people may cancel that we would save a

6    practice from.  That was correction on that.

7                    MR. HANKINSON:  I'll let you

8    finish making whatever statements you want to

9    make and then I'll resume questioning.

01:13   10                    MR. BERNAY:  Sure.

11                    THE WITNESS:  Okay.  I don't

12    remember what I stated on this one.

13                    MR. BERNAY:  I don't -- that --

14    that's fine.

15                    THE WITNESS:  This is the one

16    that I remember.

17                    MR. BERNAY:  Yes.  That's fine.

18                    THE WITNESS:  Okay.

19                    MR. BERNAY:  I don't --

01:13   20                    THE WITNESS:  I mean --

21                    MR. BERNAY:  -- usually do this

22    so just to correct the record.  In terms of

23    who you spoke with --

24                    THE WITNESS:  Yes.

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

141

1              MR. BERNAY:  -- in 30(b)(6).

2              THE WITNESS:  In who I spoke

3     with, I left off Kimberly Theiss.  I forgot

4     that I did speak to Kimberly in regards to

5     the processes that she has with her vendors.

6              MR. BERNAY:  That's that.

7              MR. HANKINSON:  All set?

8              THE WITNESS:  Yes.

9              MR. HANKINSON:  Thank you.

01:14   10              THE WITNESS:  It is.

11              MR. HANKINSON:  I appreciate it.

12     With respect to your conversation with

13     Ms. Theiss did that have to do with warehouse

14     and installation or deinstallation vendors?

15          A.    The deinstallation vendors, yes.

16          Q.    Was there any other aspect to

17     your conversation with Ms. Theiss in

18     preparation for this deposition?

19          A.    No.

01:14   20          Q.    With respect to Defendant's

21     Exhibit 215, your clarification is that the

22     permanent saves or at least the saves that

23     are still active in Patient Point's networks

24     to today's date that are listed in

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

142

1   Defendant's Exhibit 215 are the subset of

2   such saves where the reason for the cancel

3   that was provided by the practice was that a

4   competitor was going to switch out the

5   system?

6          A.    Okay.  Not quite sure I

7   understand how you phrased that.

8          Q.    Let me -- let me try again --

9          A.    Okay.

01:15   10          Q.    -- because I'm just trying to

11   speed up --

12          A.    Yeah.

13          Q.    -- rather than slow down.

14          A.    No.

15          Q.    So Defendant's Exhibit 215 is a

16   list of saves that are currently active in a

17   Patient Point network, right?

18          A.    Correct.

19          Q.    Your clarification is that there

01:15   20   are additional saves of practices that are

21   currently active in a Patient Point network.

22   The ones that are listed in Defendant's

23   Exhibit 215 are those where the reason for

24   the initial cancel order before the save had

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

143

1    to do with a competitor.

2            A.    Correct.

3            Q.    Your conversation with

4    Ms. Theiss in preparation for the deposition

5    today specifically was that about the

6    handling of equipment, including obsolete

7    equipment, in interacting with Patient

8    Point's vendors for installation?

9            A.    My conversation with Ms. Theiss

01:17  10   was actually confirming the documents

11   provided the process with the vendor were

12   still current today.

13           Q.    So the documents that have been

14   produced related to deinstallation vendors

15   and agreements with those vendors and

16   instructions given to those vendors are

17   current as of today?

18           A.    Yes.

19                 MR. HANKINSON:  What's the next

01:17  20   exhibit?

21                 THE REPORTER:  217.

22                 MR. HANKINSON:  I'd like to mark

23   Exhibit 217.

24       (Exhibit 217 identified.)

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

144

1          Q.    Ms. Finley, have you seen

2     Defendant's Exhibit 217 before?

3          A.    Yes.

4          Q.    What is it?

5          A.    Just want to make sure I -- let

6     me read it real fast to make --

7          Q.    Uh-huh.

8          A.     -- sure I have the right one.

9     Yes.  This document was used as a -- a guide

01:18   10    to make calls to previous Healthy

11    Advice/Patient Point customers.

12          Q.    Who made the inquiries?

13          A.    Who made the phone calls?

14          Q.    Yes.

15          A.    Pam Pater.

16          Q.    Who drafted this document?

17          A.    I did.

18          Q.    And about when did you do that?

19          A.    When -- I believe it was in

01:19   20    summer of 2012.

21          Q.    Was there any particular

22    competitor that this document was used with

23    respect to?

24          A.    Yes.  It was in regards to the

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

145

1    locations that had canceled to go to Context

2    Media.

3            Q.    And specifically this document

4    is targeted at ACN practices, correct?

5            A.    Correct.

6            Q.    And those ACN practices who

7    cancel and switched to Context's RHN program,

8    right?

9            A.    Correct.

01:20   10            Q.    When approximately after the

11    drafting of this document did Ms. Pater begin

12    making the phone calls?

13            A.    Oh, I would say probably within

14    a week or so after.

15            Q.    Did anyone else have input into

16    the content of this document besides you?

17            A.    Looks like someone else wrote on

18    this and so I don't recall if this was my --

19    mine or Pam's suggestion back.

01:20   20            Q.    Are you referring to words that

21    are written in a slightly lighter or gray

22    font?

23            A.    Right.  Yes.  That leads me to

24    believe there's -- someone else edited

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

146

1    this -- this particular document but not

2    seeing everything around this, I -- I don't

3    recall who.

4         Q.    I don't know.  Do you remember

5    which part of this you drafted?

6         A.    I would have probably been the

7    original person.  I reported to Jill Brewer

8    at the time so maybe she had some input but

9    again not 100 percent confident.

01:21  10         Q.    Is there anyone besides

11   Ms. Brewer or Ms. Pater who might have given

12   input on this document?

13         A.    Not that I recall.

14         Q.    Are you aware of a final version

15   of this document that's different from this

16   one?

17         A.    There could be.  I'm guessing

18   that I would have kept the suggestions that

19   were here.  This was more of a sort of script

01:21  20   to like talking points.  We don't necessarily

21   go off of a script or read verbatim.

22         Q.    What were Ms. Pater's

23   instructions in contacting members of ACN's

24   network who had cancelled and started

Amy Finley, 4/21/2014

147

1    receiving Context Media's RHN network?

2         A.    Her instructions were to just --

3    in that contact the location to see if they

4    were still interest -- or still satisfied

5    with their selection and if they could

6    mention -- you know, to find out if there was

7    any incentive that was involved she was able

8    to get that.  That was basically what we were

9    looking for because we had discovered that

01:22  10   practices were actually being incented to

11   switch to Context Media.

12        Q.    They were being given money?  Is

13   that what incentive --

14        A.    They were being given an

15   American Express -- a hundred dollar American

16   Express gift card.

17        Q.    And that's what you mean by

18   incented?

19        A.    Yes.

01:22  20        Q.    Do you mean to suggest that the

21   practice may have -- that some practices may

22   have switched from ACN to RHN because of the

23   incentive that was provided?

24        A.    Yes.

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

148

1          Q.    It's an important enough
2   incentive that you think it could influence
3   the decision that a practice makes
4   independently of all the other factors
5   involved?
6          A.    Yes.
7          Q.    How often do you think that
8   could possibly happen?
9                MR. BERNAY:  Object to the form.
01:23   10          A.    I believe as many times as it
11  was offered.
12          Q.    If an incentive was offered then
13  your opinion would be that it was the reason
14  that the practice switched to RHN?
15          A.    Yes.
16          Q.    How were the results of this --
17  well, this document is a list of questions or
18  suggestions for a conversation.  Was this
19  project implemented?
01:24   20          A.    Yes.
21          Q.    Was Ms. Pater the only one who
22  made the calls?
23          A.    Yes.
24          Q.    And what form did she record her

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

149

1    results?

2          A.    In the CMS database in her

3    comments.

4          Q.    What field of CMS?

5          A.    The actual comments field.  I

6    don't believe these were tied to an order.

7    They were added to a spreadsheet.  The

8    comment.

9          Q.    Was the determination of whether

01:24  10    a gift card had been offered or received the

11    primary purpose of these follow-up

12    interviews?

13          A.    Yes.

14          Q.    Were there secondary purposes

15    that you were also trying to achieve?

16          A.    Well, if we could gain any more

17    insight as to why they switched obviously

18    that would have been beneficial.  Knowing

19    that these practices were not going to -- the

01:25  20    intent was not to get them to switch back

21    because to put a practice through a

22    de-install, reinstall, de-install, reinstall

23    would have been too much.

24          Q.    Did Ms. Pater report on or

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

150

1    summarize her results to anyone?

2         A.    Again, the comments were put

3    into the spreadsheet and for me to review.

4         Q.    A separate spreadsheet from CMS?

5         A.    A separate spreadsheet from CMS,

6    yes.

7         Q.    How often?

8         A.    All of her calls that she

9    made -- I don't believe she made that many,

01:25  10  but her comment summary of that call was

11   added as a comment in the database and that

12   comment was copied over to the spreadsheet.

13        Q.    How often?  Just one spreadsheet

14   or did she work on --

15        A.    Just one spreadsheet.

16        Q.    About how long did it take her

17   to complete the calls she made?

18        A.    I believe she was able to finish

19   up.  I think it was only like a week or two

01:26  20  that she worked on that project.

21        Q.    About how many calls did she

22   make?

23        A.    I don't know the exact number.

24        Q.    How long was the spreadsheet?

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

151

1          A.    It was added to our spreadsheet

2     of cancels but it -- I know it was not all of

3     them.  It was, I don't know, maybe a third.

4          Q.    All right.

5        (Exhibit 218 identified.)

6          Q.    I've just handed you what we

7     have marked as Defendant's Exhibit 218.  Is

8     this the spreadsheet of cancels that you were

9     referring to?  Where were Ms. Pater's results

10    recorded in this spreadsheet?

11         A.    Column M discussion feedback --

12              MR. BERNAY:  Column?

13              THE WITNESS:  M. I believe it's

14    M.  Discussion feedback --

15              MR. HANKINSON:  Look really

16    close at that M.

17              THE WITNESS:  Oh, it's not M.

18    Oh, double A.  Oh, I need to get classes.

19              MR. HANKINSON:  No, not at all.

20    It's very small.  So column --

21         A.    Double A.

22         Q.    Double A is the --

23         A.    Discussion feedback.

24         Q.    Was the intent to put all of

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Deanne L. Cartwright (501-202-620-8979)          94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

152

1    Ms. Pater's result into this column?

2            A.    Yes.

3            Q.    Do you have any reason to

4    believe that there are any comments given by

5    practices to Ms. Pater that are not in here?

6            A.    No.

7            Q.    So if we count them up --

8            A.    Yeah.

9            Q.    -- we would know the number of

01:27    10    at least calls that Ms. Pater made where she

11    got some sort of information.

12            A.    Correct.

13            Q.    Regardless of the time when the

14    practice had originally canceled, Ms. Pater's

15    calls were all made as part of a sort of

16    separate standalone project within about a

17    two-week period in the summer of 2012?

18            A.    Yes.

19            MR. BERNAY:  I would just note

01:28    20    for the record that Exhibit 218 is one that

21    we've produced over objection as -- as a

22    spreadsheet that was prepared for counsel and

23    contains work product in that sense.  Just

24    noting that for the record.

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

153

1            MR. HANKINSON:  Is there 100

2    percent overlap between the comments pasted

3    into column double A of the spreadsheet that

4    is Defendant's Exhibit 218 and Ms. Pater's

5    comments that were entered into CMS as she

6    conducted this research project?

7            MR. BERNAY:  Object to the form.

8    You can answer.

9        A.    As long as she didn't miss one

01:29  10   in manual error, yes, it should be 100

11   percent.

12       Q.    How did Patient Point act on the

13   information that Ms. Pater was able to gather

14   if at all?

15       A.    We did not act on this

16   information.

17       Q.    Was there an intent to act on

18   the information when the project was

19   undertaken?

01:30  20       A.    I think it was dependent upon

21   the results.  We were really trying to see if

22   anybody would actually state that they were

23   given an incentive.

24       Q.    You believed that the practice's

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

154

1    representatives might be reticent to say that

2    they had been offered and had accepted a gift

3    card for switching?

4            A.    We had -- I -- I -- I know and I

5    recall a practice being offended that -- that

6    they would have done something of the sort.

7    Being defensive I guess.

8            Q.    So, if anything, you believed

9    that Ms. Pater's results would be

01:30    10    under-inclusive of the practices that

11    switched because of the incentive?

12                MR. BERNAY:    Object to the form.

13            A.    I -- I believe that she did

14    not -- she was not able to determine what we

15    were hoping that she would be able to

16    determine:    Whether or not they were offered

17    an incentive.

18            Q.    Did any practices confirm that

19    had they had been offered an incentive?

01:31    20            A.    Not from her calls but we have

21    confirmation from other practices that they

22    had been.

23            Q.    And your impression is that

24    there are additional ones who just were not

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

155

1    willing to say that they had accepted an --

2           A.    Correct.

3           Q.    -- incentive.  And what is that

4    based on?

5                 MR. BERNAY:  Object to the form.

6           A.    It's based on a comment that we

7    received from a vendor that was told that the

8    practice was switching due to an AMX gift

9    card that was provided to the office where we

01:32  10   did not -- the office manager did not state

11   that to us directly.  She told our vendor.

12          Q.    A deinstallation vendor?

13          A.    Yes.

14          Q.    How was that vendor's story

15   reported to you?

16          A.    I believe that story was

17   provided via phone to either the relationship

18   manager -- actually I believe it was the

19   relationship manager.  Could have been

01:32  20   somebody from our field service department

21   though too.  One or the other that had access

22   to CMS and they put the comment in CMS.

23          Q.    Do you remember who the

24   relationship manager was?

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

156

1          A.     No.

2          Q.     Were Ms. Pater's instructions to

3    record all the responses to her questions or

4    to focus on the incentives?

5          A.     For every person that she calls

6    she has to put a comment into the database if

7    she reached out to them via phone so

8    regardless of the -- of what she found out

9    she was instructed to put -- enter a comment.

01:33  10          Q.     Do you know if -- well, was she

11   instructed to record all the comments they

12   received about the sound that's available

13   through RHN's content loops?

14          A.     So in reference --

15                 MR. BERNAY:  Object -- object to

16   the form.

17          A.     In reference to this document,

18   again these are suggested questions for her

19   to ask and whatever she was able to gather

01:34  20   she would summarize into a comment.

21          Q.     She was instructed to do that?

22          A.     She was instructed to put into a

23   comment.

24          Q.     But she was not instructed to

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                              94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

157

1    necessarily hit all of these questions on

2    every call?

3         A.    Correct.

4         Q.    Did you ever have a conversation

5    with Ms. Pater about how she carried out her

6    instructions?

7         A.    No.  I don't believe.  I mean --

8    what do you mean?

9         Q.    I'm just picturing something

01:34  10    like after the fact where you might have

11    discussed with her, well, how many questions

12    did you typically ask or -- you know what I

13    mean?  Like any kind of debrief?

14         A.    My debrief went as far as were

15    you able to find anything out or anybody that

16    was not happy or anybody that was -- was

17    incented that told you that.  That was the

18    in -- I mean, that was pretty much the gist

19    of the debrief.

01:34  20         Q.    The results of the project were

21    that Ms. Pater did not find anyone who was

22    unhappy with RHN, correct?

23         A.    Correct.

24         Q.    And further Ms. Pater was unable

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

158

1     to confirm any practice saying that they had

2     switched because of a gift card?

3          A.    Correct.  Out of the calls that

4     she made.

5          Q.    But that didn't surprise you

6     because you thought the practices would

7     hesitate to admit that.

8          A.    I did -- I did believe there was

9     hesitation to admit that.

01:35    10          Q.    It didn't cause you to change

11    your opinion that those incentives were

12    enough to cause a not insignificant number of

13    switches in and of themselves?

14          A.    I still believed that -- that

15    the source of the switch was due to the

16    incentive not necessarily because of the

17    program.

18          Q.    Looking at Defendant's

19    Exhibit 218, who is responsible for creating

01:36    20    this spreadsheet?

21          A.    I initially started this

22    spreadsheet with the column headers and I

23    believe like the first two Chicago locations

24    and then Lori Smith maintained it from that

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

159

1    point forward.

2           Q.    How did you select the column

3    headers?

4           MR. BERNAY:  Again, I want to

5    caution Ms. Finley not to reveal any of her

6    discussions with counsel and not -- not to

7    reveal any -- any thought processes or

8    anything that would veer over the line of

9    work product in relation to the document.  We

10   still maintain it's privileged despite the

11   fact we have produced it again over

12   objection.

13          A.    What's the question again?

14          Q.    How did you select the column

15   headings?

16          A.    Oh.  Basically just kind of went

17   through what I felt would be necessary

18   information that I would want to look at in a

19   glance.

20          Q.    Regarding cancellations of

21   Patient Point's systems in favor of Context

22   Media coming in as a competitor?

23          A.    Correct.

24          Q.    Were those the instructions you

01:37

01:37

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Amy Finley, 4/21/2014

160

1    gave to Lori Smith in preparing this?

2            A.    Yes.

3            Q.    Part of the project involved

4    tracking whether the equipment came back,

5    correct?

6            A.    Correct.

7            Q.    And another part of the project

8    involved collecting comments about the reason

9    for the cancellation, right?

01:38    10            A.    Yes.

11            Q.    And then subsequently

12    Ms. Pater's comments were put in column AA?

13            A.    Correct.

14            Q.    What are the comments in Z that

15    are in the red here mostly?

16            A.    These were comments that were

17    highlighted and this was for counsel to --

18                    MR. BERNAY:  I would instruct

19    you not to say anything more than that.

01:39    20                    THE WITNESS:  Okay.

21                    MR. HANKINSON:  The comments in

22    Z taken -- they're excerpts from other

23    comments.

24            A.    Correct.

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

161

1      Q.    Was it your intent in creating

2   this document and assigning to Lori Smith the

3   ongoing project to provide the best

4   information that you could or, excuse me, to

5   gather the best information that you could

6   about cancelations of practices who were

7   switching to Context Media?

8      A.    I was instructed to create this

9   spreadsheet by my boss at the time Jill

01:39   10   Brewer.  From there, again, selected the

11   appropriate fields that I felt was -- we felt

12   was necessary to maintain in the spreadsheet.

13      Q.    Was it your goal to provide

14   complete information about reasons for

15   switches?

16            MR. BERNAY:  Object to the form.

17      A.    This was more for tracking

18   equipment in locations that Context Media

19   removed our equipment.

01:40   20      Q.    On the seventh row in the

21   comment summary the first sentence says Josh

22   called in explained HAN is currently in

23   litigation with RHN.

24      A.    Correct.

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

162

1          Q.     That comment was made by Heather

2     McGauvran, right?

3          A.     Yes.

4          Q.     Did you have an understanding of

5     whether HAN was in litigation with RHN at the

6     time that comment was made?

7                 MR. BERNAY:   I -- I just want to

8     note again for expediency purposes that this

9     comment was produced previously.  I said I --

01:41   10   you know, if there -- if there's new

11    information contained in these documents that

12    I don't object to you asking her about it but

13    this was a comment that I believe may have

14    been asked about as part of an e-mail even in

15    an earlier deposition.  So again for

16    expediency purposes I'm going to instruct

17    Ms. Finley not to answer.

18                MR. HANKINSON:  It's a big

19    project for me to know what's in here that

01:42   20   would be new versus what's in here that's not

21    new and I'm not trying to create work.  I'm

22    just saying like I've got my questions --

23                MR. BERNAY:  Uh-huh.

24                MR. HANKINSON:  -- I want to be

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

163

1    expedient too.

2              MR. BERNAY:  Right.

3              MR. HANKINSON:  This one I'll

4    let go but that instruction I disagree with

5    and I kind of want to figure out a way that

6    we can get through today real nicely.

7              MR. BERNAY:  Understood.

8    Understood.  I -- you know, I take particular

9    exception to this one because I believe --

01:42  10    again I've been through a lot of these --

11              MR. HANKINSON:  Skip this one.

12              MR. BERNAY:  Sure.

13              MR. HANKINSON:  Moving forward

14    let me just try to be expedient --

15              MR. BERNAY:  Okay.

16              MR. HANKINSON:  -- and then --

17              MR. BERNAY:  And I've let you --

18    I think there -- there's been previous

19    questions which could have easily been asked

01:42  20    in prior depositions.  I've let that go.  I'm

21    not -- I'm not gonna hold you to only the

22    text of the document and only what hadn't

23    been produced before but I'm just -- again, I

24    think this one was actually an exhibit in an

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

                                                          164

1    earlier deposition.  That's all.

2                   MR. HANKINSON:  That e-mail that

3    you're referring to?

4                   MR. BERNAY:  Yeah.  I believe

5    so.  I -- again, I've been through a lot of

6    these so --

7                   MR. HANKINSON:  Yeah and it's

8    just hard --

9                   MR. BERNAY:  I don't disagree

01:43  10    with you, Tom, on that one.

11                   MR. HANKINSON:  All right.

12                   THE WITNESS:  Am I allowed to

13    say I believe so too?

14                   MR. HANKINSON:  Yeah.

15                   THE WITNESS:  Because I do

16    believe -- I do recall discussing that.

17    Yeah.

18                   MR. BERNAY:  I believe you were

19    asked about that.  Yeah.

01:43  20                   MR. HANKINSON:  Fair enough.

21    Looking at row six in column double A

22    Ms. Pater reports from her ACN follow-up

23    interviews that the representative of the

24    practice is happy with Context Media's

Electronically signed by Deanne L. Cartwright (501-202-620-8979)            94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

165

1    program and the sound is okay, correct?

2         A.    Yes.

3         Q.    Ms. Pater was conducting that

4    interview process in the course of her duties

5    for Patient Point, right?

6         A.    Yes.

7         Q.    At your instruction?

8         A.    Yes.

9         Q.    And your answer would be the

01:44  10    same if I asked that question as to any

11    comment in column double A, correct?

12         A.    Yes.

13         Q.    The next row down, row seven,

14    Ms. Pater reports that the practice

15    representative said that they are happy with

16    the new system, they think their patients are

17    benefiting, correct?

18         A.    Correct.

19         Q.    Looking down in row eight,

01:44  20    Ms. Pater reported as part of her ACN

21    follow-up interviews that the practice

22    representatives were very happy with the new

23    program, they have had no service issues,

24    that the female patients especially like the

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

166

1    programing.  They like the recipes and the

2    sound and that it's more entertaining.

3    Correct?

4          A.    That's what it states.  Yes.

5          Q.    Do you believe that even though

6    Mrs. Pater was primarily focused on finding

7    out about incentives that she was

8    nevertheless trying to be truthful and

9    complete in reporting summaries of her

01:45   10    conversations with the practices in column

11    double A?

12          A.    Yes, I believe she was being

13    truthful.

14          Q.    And also complete as to whatever

15    questions she managed to get answers to,

16    right?

17          A.    Yes.  And complete to whatever

18    she was able to discuss.

19          Q.    In column 27 or, excuse me, row

01:45   20    27, it's at the top of the page, in column

21    double A, Ms. Pater reported that the

22    practice representative Mila feels the older

23    patients are more attracted to the sound

24    program than to reading the intro off the

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

167

1    screen.  Do you see that?

2           A.    Yes.

3           Q.    Has it come to your attention in

4    following up about comparisons between RHN's

5    content and Patient Point's content that

6    rheumatology is an area where just

7    demographically the patients are more likely

8    to be a little bit older?

9           A.    You could -- could say that.

01:46   10           Q.    You've seen comments indicating

11   that patients in rheumatology offices have a

12   little more trouble reading words off a

13   screen as opposed to hearing dialog with

14   sound that's played at a -- at a audible

15   volume?

16           A.    I've heard both.  I've even

17   heard the sound -- they can't always hear the

18   sound either depending on the patient.  So I

19   think it goes sort of both ways.  And the

01:47   20   font that is used on our screen is pretty

21   visible.

22           Q.    But there have --

23           A.    Larger font with that -- knowing

24   that, you could have a variety of -- I don't

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

168

1    know what the right word is -- variety of

2    different ages and age spectrum in the

3    office.

4          Q.    Is the font in ACN larger than

5    the font in primary care network for that

6    reason?

7          A.    That I don't know.  I can't

8    speak to that.

9          Q.    Are you aware of any feedback

01:47  10    about the lack of sound in the ACN program

11    related to older patients being given to the

12    research department?

13          A.    Being given to our research

14    department?

15          Q.    Maybe that's a bad question.

16          A.    No.  No.

17          Q.    Being given to the department --

18          A.    Maybe the creative --

19          Q.    -- that created --

01:48  20          A.    -- department?  The creative

21    department.  I'm sure if they received

22    comments like that they would be shared to

23    our creative department.

24          Q.    And are you aware of any changes

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

169

1    in Patient Point's content that were made

2    because of such comments?

3            A.    I know that we have made changes

4    to content.  I can't say that it was in

5    respect to those comments or how those

6    changes were developed.

7            Q.    Were Ms. Pater's comments shared

8    with anyone outside of the relationship

9    management team?

01:48   10           A.    I don't recall if I circulated

11   her comments or not.

12           Q.    You may have or you may not

13   have?

14           A.    Correct.

15           Q.    If you could look at row 38.  In

16   the course of her ACM follow-up interviews

17   Ms. Pater reported that the Arthritis and

18   Pain Associates Practice, number 3433172

19   stated again to her that the switch was due

01:49   20   to content, correct?

21           A.    Yes.  That's what it states.

22           Q.    If you could look at row 55,

23   this concerns a switch from a primary care

24   network location, correct?

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

170

1          A.     In row 55, yes.

2          Q.     Dr. David Leonard was the

3    primary care physician?

4          A.     Yes.

5          Q.     And the comment field states

6    that the doctor decided to change the program

7    because the new program is specifically for

8    diabetes, right?

9          A.     Yes.

01:50    10          Q.     Have you seen other comments

11    like that in the course of your work --

12          A.     Yes.

13          Q.     -- about diabetes?

14          A.     Yes.

15          Q.     Does Patient Point have a

16    network that is geared specifically toward

17    offices that primarily deal with patients who

18    have diabetes or related illnesses?

19          A.     They did at one time and then

01:50    20    those -- that program was merged into the

21    primary care network.

22          Q.     Do you know about when that

23    happened?

24          A.     That would pro -- that was --

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

171

1      I'm gonna say like early 2005, four.  I mean,

2      a long time ago.

3           Q.    So at the time that Context

4      Media got on your radar as a competitor, that

5      switch had happened long in the past?

6           A.    It happened prior to that, yes.

7           Q.    So if I was a doctor who had

8      Patient Point's diabetes focused program

9      originally and was I still a subscriber

01:51  10     whenever that switch happened, approximately

11     2005, my content would have changed from that

12     focus to a primary care focus, right?

13          A.    To a primary care focus but

14     there was diabetes content still in the

15     primary and still is today in that primary

16     care network.

17          Q.    If you could look at row 63, the

18     comment as to location 3747002 Doctors Akther

19     and Purushotham indicates that the practice

01:52  20     contact explained that Patient Point's

21     program is very boring and they have patients

22     who visit the office for multiple times in

23     one week for infusions and treatments.  Did I

24     read that correctly?

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

172

1           A.    That's what it states.  Yes.

2           Q.    And it states that the practice

3    contact indicated that Context's programming

4    was more engaging, kept the patients

5    interested throughout their visit, and the

6    contact specifically mentioned video recipes

7    and segments with sound, correct?

8           A.    That's what it states.

9           Q.    And then it states, she was very

01:53   10   adamant that our programing was boring and

11   not very educational, right?

12          A.    Again, yes, that's what it

13   states.

14          Q.    It's fairly common in the

15   comment fields to find that a practice that

16   switched to Context Media liked that RHN was

17   focused on rheumatology or that DHN was

18   focused on diabetes.  Is that fair to say?

19                MR. BERNAY:  Object to form.

01:54   20          A.    The comments that were -- are

21   stated or put in here are basically what the

22   practice had stated to us.  I'm not sure I

23   under -- our content for rheumatology is

24   focused on rheumatology.  The primary care,

Electronically signed by Deanne L. Cartwright (501-202-620-8979)          94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

173

1    yes, there's diabetes segments in there so it

2    would be fair to say that Context Media may

3    have more diabetes segments than us but I

4    don't even know that for a fact because I

5    have not seen their loop compared to our --

6    their diabetes loop compared to our primary

7    care loop.

8         Q.    But the practices on this list

9    report that that's the case.

01:54    10         A.    That's what they believe, yes.

11         Q.    In row 74 the comment field for

12    a practice 3655964 the North Dayton

13    Rheumatology indicates, among other things,

14    that the contact is not sure if an incentive

15    was offered and does not think that RHN

16    mislead or pretended to be HAN at any point.

17    Do you see that?

18         A.    Yes.

19         Q.    Were -- was Lori Smith the

01:55    20    person who was fielding most of the calls

21    when Context Media was identified as the

22    competitor at issue?

23         A.    Yes, she was.

24         Q.    Were part of her instructions to

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

174

1    ask about whether Context Media was posing or

2    misleading that they were affiliated with

3    HAN?

4          A.    Again, I believe I covered all

5    this in my last deposition but, yes, part of

6    her instructions at one point were to ask

7    that.  When we heard a practice tell us that

8    they felt they were -- that they were

9    misrepresented -- another company, Context

10   Media, had misrepresented us by stating that

11   they had permission to remove our equipment,

12   when we found out that that was happening, we

13   wanted to make sure that when we learned of

14   another location removing equipment, if that

15   was the case in their situation as well.

16         Q.    And I don't want to take up a

17   lot of time.  I just -- if Ms. Smith found

18   that out you -- her instructions were that it

19   would be in her comments, right?

20         A.    It would be in her comments.

21         Q.    So if I'm looking at this

22   spreadsheet and some of them say they did not

23   mislead and others are silent as to whether

24   they misled or not, I can't assume that the

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

175

1    others were misled.  She would have stated it

2    affirmatively if they told her that, right?

3                MR. BERNAY:  Objection.

4         Q.    According to her instructions.

5                MR. BERNAY:  Same objection.

6    You can answer.

7         A.    Again, this is a manual entry.

8    I can't state that she put verbatim

9    everything that she was told.  She should.

01:57   10    It would be -- you know, she should put that

11    in her comments for obvious reasons.  It's --

12    you know, it's something that we would want

13    to know but I can't say, oh, yeah, 100

14    percent of the time she did that because

15    everybody makes mistakes.

16         Q.    And that's why column double A

17    stops eventually is because that ACM followup

18    happened at a particular time in the summer

19    of 2012 so the comments that were added to

01:59   20    the spreadsheet after that would not have

21    anything in column double A.

22         A.    Right.  And she didn't even call

23    every single practice so --

24                MR. HANKINSON:  I'd like to mark

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

176

1    this as 219.

2       (Exhibit 219 identified.)

3         Q.    Do you recognize what's been

4    marked as Defendant's 219?

5         A.    This appears to be a counsel

6    request.

7               MR. BERNAY:   Huh?

8         Q.    The date of this request is

9    September 8th, 2012?

02:00    10         A.    That's what it states.

11         Q.    And the offices is Rheumatology

12    Associates in Bettendorf, Louisiana, correct?

13         A.    Yes.

14         Q.    It's signed by the office

15    manager Nancy Brimeyer?

16         A.    Yes.

17         Q.    Do you know whose notes appear

18    in handwriting on the right margin?

19         A.    That's my handwriting.

02:01    20         Q.    Your note of October 7th does

21    that reflect the date on which you spoke to

22    the office manager?

23         A.    I don't recall what that date

24    is.

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

177

1        Q.    Do you have a common practice
2    when you take notes about calls with
3    canceling practices?
4        A.    No, I don't.  I don't typically
5    deal with the practices on a day-to-day
6    basis.  Looking at this, you know, October
7    7th, 8 a.m., tells me maybe it was an
8    appointment of some time -- of some type.
9    Considering the timeframe from the letter and
02:01   10    that I would probably conclude that that was
11    the date of de-installing the equipment.
12        Q.    And then the word content
13    underneath there, does that refer to the
14    reason for the cancel?
15        A.    That could be the -- yes.
16        Q.    Would that be your best
17    understanding of your own notes?
18        A.    Yes.
19        MR. HANKINSON:  I'd like to mark
02:02   20    Exhibit 220.
21      (Exhibit 220 identified.)
22        Q.    Ms. Finley, do you know what
23    Defendant's Exhibit 220 is?
24        A.    Yes.

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Amy Finley, 4/21/2014

178

1          Q.     What is it?

2          A.     It's a churn report.

3          Q.     Are these reports made in the

4     course of Patient Point's business?

5          A.     I create this report.

6          Q.     How often?

7          A.     Once a quarter.

8          Q.     How do you create it?

9          A.     I pull the data from the

02:03   10    database using the cancel reason codes.

11          Q.     Do you do that yourself or with

12    someone from IT?

13          A.     I do that myself actually.

14          Q.     And by database you mean CMS?

15          A.     Correct.

16          Q.     So these are reports that

17    utilize the reason codes that you enter with

18    every cancellation at least since the time

19    you made that mandatory.

02:03   20          A.     Yes.

21          Q.     And before that it was your best

22    effort to --

23          A.     Sure.

24          Q.     -- record those reason codes?

Electronically signed by Deanne L. Cartwright (501-202-620-8979)          94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

179

1          A.     The reason code for cancel was
2    always entered.  The competitor name was what
3    was not always 100 percent.  That wasn't
4    the -- the cancel reason code was always
5    mandatory.  I'm sorry if I didn't make that
6    clear before.  Cancel reason code was always
7    mandatory.  It was the competitor name that
8    wasn't always mandatory.
9          Q.     That was not my understanding
02:04  10   before but that's --
11         A.     Sorry.
12         Q.     -- that's what it is?
13         A.     That is what it is, yes.
14         Q.     Okay.
15         A.     The can -- when you cancel a
16   location you have to give the reason.
17         Q.     And that's always been the --
18         A.     That's always been the case.
19         Q.     -- case at least since 2009?
02:04  20         A.     Correct.
21         Q.     For what quarter was this churn
22   report created?
23         A.     This is for the entire year of
24   2013.

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

180

1    Q.    Was it the one that you made for

2    the fourth quarter?

3    A.    This would have been the end of

4    the year, yes.  I tried to run them

5    quarter -- I tried to be religious about

6    running them each quarter.

7    Q.    Who are they distributed to?

8    A.    I would pass then on to

9    executive team members.

02:05    10            MR. BERNAY:  I do want to state

11    she's testified about the previous churn

12    reports in 2000 -- from 2011, 2012 so this --

13    these kind of general questioning has already

14    been asked on the record.  If you have

15    questions specific to the 2013 document, I

16    would -- I would ask them.

17            MR. HANKINSON:  Who did you send

18    this one to?

19    A.    I -- who did I send this one to.

02:05    20    I sent this to my boss Kimberly Theiss.  I

21    also believe I sent this to Greg Robinson,

22    and Chris Martini.

23    Q.    What is the expected churn of

24    30 percent in ACN come from?

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

181

1           A.    Reviewing the -- reviewing the
2      previous year's report and just kind of
3      estimating on top of that what we anticipate
4      could be the churn.
5           Q.    It's not a -- the 30 percent is
6      not an exact report of a statistic from the
7      database.
8           A.    No.
9           Q.    It's a projection?
02:06  10           A.    Yes.
11           Q.    And are you responsible for
12      making this 30 percent projection?
13           A.    I am.
14           Q.    And the same for all the
15      expected churn numbers in this document?
16           A.    Yes.
17           Q.    The other one?
18           A.    Yes.
19           Q.    When was the 30 percent ACN and
02:06  20      12 percent PCN expected churn picked by you
21      that then ended up in this report?
22           A.    It would have been in
23      January 2013 -- January/February of 2013.
24      That timeframe.

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

182

1          Q.    And actual churn for 2013 ended

2    up to be lower than that?

3          A.    Correct.

4          Q.    The comparison of 2011 to 2012

5    that included in the same report made in the

6    fourth quarter of 2013?

7          A.    Yes.

8          Q.    Is there usually sort of a

9    backward looking report that's at the same

02:07    10    time?

11          A.    This was actually an error on

12    the top header.  If it's in the header field,

13    it's not viewable unless it's printed so I

14    did not update that top information.  As you

15    can see, 12 months 2013, 12 months 2012,

16    that's really what you're comparing here.

17    Actually just realized that recently that I

18    never updated that header because you don't

19    see it when you look on it electronically.

02:08    20    You only see it when you print it.

21          Q.    Is this spit out by CMS or some

22    program in between?

23          A.    This is an Excel document.

24          Q.    What year are the notes in the

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

183

1    status comments column applicable to?

2           A.    2013.

3           Q.    So in -- if I'm reading this

4    correctly, in 2013, 96 practice locations

5    switched from Patient Point's waiting room

6    network system to a television to the best of

7    Patient Point's information?

8           A.    Correct.  But I'd also like to

9    note that this is all of our WRN programs not

02:09  10    just primary care and arthritis care.

11           Q.    Do you have a regular report

12    that breaks it down by waiting room network?

13           A.    The -- you mean by each

14    individual program?

15           Q.    Uh-huh.

16           A.    I could run that report but do I

17    run that typically?  No.

18           Q.    PWR is --

19           A.    Practice wire.

02:10  20           Q.    Is that like brochures?  No.

21    That's the back office one, right?

22           A.    Yes.

23           Q.    What is the note health system

24    acquisitions mean on HAN 006137?

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                      94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

184

1          A.    Health system acquisitions

2     refers to large health systems, for instance,

3     like in Cincinnati Catholic Health Partners

4     buying up more hospitals and physician

5     offices under their ownership.

6          Q.    And there's a reason code for

7     new management.

8          A.    Correct.

9          Q.    So when there's a large scale

02:11   10   acquisitions that would potentially affect

11    the level of churn for practices that were

12    within that acquisition.

13         A.    Yes.  So with -- yes.  Health

14    care systems was the reason -- main reason

15    for new management.  Practices switching

16    because of new ownership.

17         Q.    That comment is your attempt to

18    add some color to the numbers?

19         A.    Correct.

02:11   20        Q.    Was does the comment offices

21    closing doors mean?

22         A.    Offices permanently closed.

23    Those offices closing their doors, so offices

24    actually closing their practice.

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Deanne L. Cartwright (501-202-620-8979)          94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

185

1          Q.    That one doesn't really explain

2     anything new it's just an explanation --

3          A.    Right.

4          Q.    -- of that code.

5          A.    Right.

6          Q.    Did your expected churn for 2013

7     include churn that you expected due to

8     competitors practices that you believe are

9     part of this lawsuit?

02:12  10          MR. BERNAY:  Object to the form.

11     You can answer.

12          A.    My expected churn number for

13     rheumatology was anticipating the removal of

14     our equipment by Context Media without our

15     knowledge.

16          Q.    Why do you think that that

17     impacts churn?

18          MR. BERNAY:  Object to the form.

19          A.    Oh.  Well, because they take

02:13  20     down our equipment without us knowing it, we

21     don't have a -- we don't have time or a

22     chance to actually convince the practice

23     otherwise because the equipment's already

24     down and off the wall and their equipment is

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

186

1    up.

2              Q.    You're referring to saves?

3              A.    Yes.

4              Q.    Do you have any reason that you

5    believe that the save rate for practices that

6    switch to Context Media would be any better

7    than the save rate for practices that switch

8    to another competitor or to television if the

9    same period of time was given to Patient

02:14   10    Point to make the save?

11              MR. BERNAY:  Object to the form.

12              A.    I believe that if the practice

13    had time -- that we had more time to talk to

14    the practice to make sure that they

15    understand.  Because a lot of times office

16    managers change so the person that we

17    originally sold our program into may not be

18    fully aware of everything that's available on

19    the program or the content that's even on the

02:14   20    program unless they sat in the waiting room

21    and watched it which is very unlikely for a

22    practice manager to do.  So for us not to be

23    able to have the chance to explain to them

24    what they already have, yes, I do believe

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

187

1    that, you know, if we had more time to do

2    that we could have saved more practices.

3    It's hard to -- to do that and explain to

4    them what they have when it's already been

5    removed off the wall.

6           Q.    There's a certain amount of

7    churn no matter what the competitors are

8    doing, right?

9           A.    There's always expected churn.

02:15  10           Q.    And then what you're describing

11    is your view that part of this 30 percent is

12    you've added some component of this

13    30 percent for the anticipation that Context

14    Media is going to switch out the equipment

15    without waiting the 30 or the 60 days, right?

16           A.    Right.

17           Q.    How much of that expected churn

18    is that versus --

19           A.    I --

02:15  20           Q.    -- other?

21           MR. BERNAY:  Objection.  You can

22    answer.

23           A.    I don't know.  I -- I -- I don't

24    know.

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

188

1          Q.    You can't say what this number

2    would be absent the Context Media switch out

3    practice that you're describing?

4                MR. BERNAY:  Same objection.

5    You can answer.

6          A.    I can't -- no, I can't.  I

7    can't -- especially right here right now

8    trying to think in my head what was our churn

9    rate the year before.  What wasn't factored.

02:16    10    What -- was it increased at a certain point

11    towards the end of the year.  And you can't

12    get that from these others because this is

13    all the WRN together and not just one

14    particular program.

15          Q.    It's frustrating and I don't

16    mean to hammer on it.  I just -- you're

17    telling me that a part of this number is due

18    specifically to how you say Context Media

19    takes equipment off of walls and the timing

02:16    20    of it but you can't tell me what part of this

21    number.

22                MR. BERNAY:  Object to the form.

23    Asked and answered.

24          A.    I don't know -- so for the --

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

189

1    for instance, when Context Media was going at

2    the rate that they were with removing

3    equipment off the wall, if they would have

4    continued at that rate without us trying to

5    put a stop to it and having them follow the

6    proper protocol, we could have continued at a

7    higher rate and that's what this number was

8    anticipating.  I don't recall what the number

9    was for 2012 to say did I look at this and

02:17  10    say, okay, was it the last six months of the

11    year that I analyzed and said, okay, based on

12    that it's gonna continue that, I'm gonna add

13    ten percent.  I -- I don't know.  I'd have to

14    go back and kind of look at everything again

15    and figure out where I came up with that

16    number exactly but -- you know.  So that's as

17    much information right now that I can give

18    you.

19         Q.    Ms. Lawrence testified, if I'm

02:17  20    remembering correctly -- and I'm just using

21    this as an example -- that she thought that

22    of the practices that she received

23    cancellations from --

24         A.    Uh-huh.

Electronically signed by Deanne L. Cartwright (501-202-620-8979)    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

190

1      Q.     -- she probably only then would

2    be able to save, would be able to cancel the

3    cancel, in about one of ten, sometimes up to

4    two of ten, times.

5      A.     Okay.

6      Q.     Now, you've said you don't know

7    what that rate is normally.  Is that correct?

8      A.     I don't handle every cancel

9    request that comes in.

02:18   10      Q.     Right.

11      A.     And nor does she.

12      Q.     Right.  But there's a certain

13    number of cancellations that then get

14    cancelled, that get saved, right?

15      A.     Uh-huh.

16      Q.     And that number -- you know, in

17    theory there would be saves, you know, and

18    then it's out of a total number of cancel

19    orders and that would be the save rate,

02:18   20    correct?

21      A.     Sounds -- that calculation seems

22    right.

23      Q.     And that's not 100 percent.

24    It's nowhere near 100 percent, right?

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

191

1            MR. BERNAY:  Object to the form.

2        A.    I -- I don't understand what

3    you're --

4        Q.    You don't save every cancel

5    order.

6        A.    No, we don't save every cancel

7    order.

8        Q.    Or nearly every cancel order.

9        A.    We do not save every cancel

02:19   10   order.  No.

11        Q.    And that's -- so let's take out

12   Context Media and say all other

13   competitors --

14        A.    Uh-huh.

15        Q.    -- and television which you

16   include as a competitor, right?

17        A.    Correct.

18        Q.    There's a certain save rate that

19   would be a component of churn, right?

02:19   20        A.    There would be a certain save

21   rate.  I don't look at the save rate.  I

22   guess that's where -- I have not looked at

23   that, so I'm sorry that I don't have those

24   answers.

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

192

1          Q.    I'm not looking for apology or
2    even judging any of your work.  It's just I
3    have new questions here today.  You know --
4          A.    No.
5          Q.    -- what I mean.
6          A.    I understand.
7          Q.    So there's a save rate that
8    would be essentially normal or at least it
9    would be aggregated across all other
02:19  10    competitors other than Context and you're
11    saying that because of the timing of Context
12    taking equipment off of walls, that save
13    rate --
14          A.    Uh-huh.
15          Q.    -- is going lower, right?
16          A.    That save rate is lowering, yes.
17          Q.    If that save rate, let's say, is
18    only one out of every five -- like let's say
19    when a practice cancels -- you know, when
02:20  20    five practices cancel, excludeing Context,
21    only one out of those five is gonna get
22    saved.  Make that assumption.  Then if that
23    save rate decreases from there to one out of
24    ten --

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Amy Finley, 4/21/2014

193

1          A.     Uh-huh.

2          Q.     -- it's not like that timing,

3     you know, lets you save everybody, right?

4               MR. BERNAY:  Object to the form.

5     Object to the hypothetical nature of the

6     question.  You can answer.

7               A.     Well, here's the thing too --

8     and just as you're talking about this more,

9     the other piece of this, making me think this

02:21    10     is -- where this is coming from as far as

11     them removing the equipment and the timing,

12     the other aspect of this is the fact that

13     when Context was making it easy for the

14     practice and they didn't have to do anything,

15     they didn't have to call us to tell us that

16     they wanted to cancel, they just basically

17     let Context handle everything and thought

18     they had permission to handle everything,

19     then it took the burden off of the practice

02:21    20     which I also believe played a factor into the

21     fact of why they wanted to switch, so

22     therefore if now by following the proper

23     protocol that slows that process down because

24     now you're actually asking the practice to

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

194

1    call us and tell us that they not longer want

2    the program.  We had practices say I like

3    your programing, I'm happy with your

4    programming but we're gonna try something

5    different.  That's why we switched.  Well,

6    again, because the prac -- the decision was

7    already made and it was made easy for them

8    that, I believe, also im -- or had a factor

9    into why things were happening, churn was

02:22    10    happening faster and higher because, one --

11   it all just boiled down to the fact that they

12   were taking the equipment down and it would

13   show up on our doorstep.  So the practice

14   didn't have to do anything.  We didn't have a

15   time to even call -- a chance to even call

16   them to try to convince them to stay.  It

17   just happened.

18         Q.    But it's not that the -- the

19   save rate would become 100 percent if Context

02:22    20   suddenly --

21         A.    No, it would not --

22         Q.    -- gave 30 or 6 --

23         A.    -- be 100 percent.

24         Q.    It would probably be in line

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

195

1    with the rest of the save rate for all

2    competitors and television, right?

3            A.    It -- I would believe it to be,

4    yes.

5            Q.    So when you're calculating this

6    30 percent churn rate, it's not that the 74

7    locations that switched to Context Media --

8    now, I know that's for all networks.  But I

9    mean it's gonna be only PCN and A CN, right?

02:22  10            A.    Yes.

11            Q.    So 74 locations switch to

12    Context Media, you're not saying that you

13    expected that churn to be, you know, 74

14    instead of zero because of a delay.  The save

15    rate for all competitors and television would

16    only be something like one out of ten or one

17    out of five.

18            MR. BERNAY:  Object to the form.

19            A.    Okay.

02:23  20            Q.    So if you're talking about 74

21    practices in one year, we're only talking

22    about maybe seven practices that would be

23    saved if the 30 to 60 days were allowed?

24            MR. BERNAY:  I think she's asked

Electronically signed by Deanne L. Cartwright (501-202-620-8979)          94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

196

1    and answered the -- you've asked and she's

2    answered this question about ten times

3    already.

4         A.    I -- I don't really understand

5    what you're asking me.  Again, I'm not a math

6    person, so asking me figure out percentages

7    and numbers and all that, it's not my strong

8    suit so I'm sorry I'm not following with you

9    directly.  Trying to do my best.

02:24    10         Q.    I'm not a math person either so

11    it's probably my fault too.

12         A.    But I'm trying to -- I mean, I

13    do get what you're saying.  Yes, I do think

14    that if the proper protocol was followed --

15    of course we're not going to save every

16    practice.  It's not gonna happen.

17         Q.    You would expect the save rate

18    to be in line with the rest of the

19    competitors and television?

02:24    20         MR. BERNAY:  Objection.  Asked

21    and answered.  You can answer one more time.

22         A.    I would expect it to be lower,

23    yes.

24         MR. BERNAY:  Why don't we take a

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

197

1    short break?

2                THE WITNESS:  Yeah.  My foot's

3    falling asleep.  Sorry.

4                VIDEOGRAPHER:  We're off the

5    record.

6      (Break taken.)

7                VIDEOGRAPHER:  We're on the

8    record with DVD number three.

9      (Exhibit 221 identified.)

02:34    10                MR. HANKINSON:  Ms. Finley, I'd

11    like to direct your attention to what's been

12    marked as Defendant's Exhibit 221 and this

13    also bears a footer that says HAN 002706.  Do

14    you see that?

15          A.    Yes.

16          Q.    Are you familiar with HAN 002706

17    as one of the spreadsheets that was produced

18    in this litigation by Patient Point's counsel

19    that lists certain comments from CMS?

02:35    20          A.    Yes.

21          Q.    And this particular one, 2706

22    that's now Defendant's Exhibit 221, was

23    produced relatively early in the litigation,

24    correct?

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                                        94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

198

1          A.    Yes.

2          Q.    Are you familiar with the intent

3    of Defendant's Exhibit 221 to list practices

4    that switched to Context Media from Patient

5    Point?

6          A.    Yes.

7          Q.    Please flip to page four of 66

8    and look at the comments listed for 3001256

9    Dr. David Leonard.

02:36    10          A.    Okay.

11          Q.    If you could read the third

12    comment in the comment fields column?

13          A.    The one that starts out with per

14    Rob?

15          Q.    Yes.

16          A.    Well, there's two actually.

17    Second one that starts off with per Rob.

18          Q.    Uh-huh.

19               MR. BERNAY:  You're asking her

02:36    20    about the longer per Rob comment?

21               MR. HANKINSON:  Yes.

22               MR. BERNAY:  Okay.

23          A.    Okay.

24               MR. HANKINSON:  Rob's the name

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                                        94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

199

1    of the practice contact, correct?

2         A.    I believe so.

3         Q.    That would be the context of

4    this comment, right?

5         A.    Yes.

6         Q.    And --

7         A.    Oh, wait.  No.  No.  See per

8    Rob.  Per Rob, we also have a Rob employee

9    and based on what I'm -- per Rob, we just

02:37   10    received the -- we just received the

11    equipment from this office.

12         Q.    And then it switches to the

13    office contact.

14         A.    Then it switches to they field

15    this order to Heather and Kari which is on

16    the relationship management team.  We have

17    received all major equipment back and is

18    gonna go into this --

19         Q.    Then it says --

02:37   20    A.    -- comment.

21         Q.    -- office confirmed today.

22         A.    Right.  So which -- which leads

23    me to believe Kari spoke with the office

24    contact.

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Amy Finley, 4/21/2014

200

1        Q.    Okay.  And --

2        A.    But it doesn't have the office

3   contact name.

4        Q.    So the office contact of

5   Dr. David Leonard's office --

6        A.    Right.

7        Q.    -- indicated that they didn't

8   have issues with Patient Point's program but

9   the doctor decided to change because the new

02:37   10   program is specifically for diabetes, right?

11        A.    That's what it states.  Yes.

12        Q.    That would be an example of what

13   we spoke about earlier in terms of comments

14   indicating that practices were switching to

15   DHN because it was specific to diabetes,

16   correct?

17        A.    Correct.

18        Q.    If you turn to the next page,

19   the top comment, the first three words are

02:38   20   during audit call.  What is an audit call?

21        A.    The audit calls -- so our field

22   service department when we send a third party

23   to go out to update brochure racks, they will

24   audit the vendor to make sure that they

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

201

1    actually updated the brochure rack.

2            Q.    So that's a visit to a practice?

3            A.    The visit is.  The audit call is

4    an actual call to follow up to make sure that

5    the visit took place.

6            Q.    Thank you.  If you could flip to

7    page eight of 66, the top comment has to do

8    with practice 3002620 Endocrine Associates of

9    South Jersey, correct?

02:39    10            A.    Yes.  Appears --

11            Q.    And it summarizes a conversation

12    with Mary from Endocrine Associates?

13            A.    Yes.

14            Q.    In switching to Context Media,

15    Mary explained that the switch was made

16    because the new program deals only with

17    diabetes and our program is not specialized

18    for their office, right?

19            A.    That's what it states.  Yes.

02:39    20            Q.    Is that another example?

21            A.    Another example of?

22            Q.    Of what we spoke about earlier

23    in terms a Patient Point's primary care

24    network not being as geared specifically to

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

202

1    diabetes as Context's network as of at least

2    the time period after 2005 when Patient

3    Point's diabetes specific network was

4    converted into the primary care network?

5           A.    Yes.

6           Q.    I'd like to direct you to page

7    ten of 66.  The third comment down.  Does

8    that relate to practice 3297726 Internal

9    Medicine Clinic?

02:40   10           A.    Okay.  It says starting with

11   called site?

12           Q.    Yes.

13           A.    Okay.

14           Q.    Does the practice representative

15   indicate to Patient Point that the switch was

16   made because the new program is more engaging

17   offering sound and a news ticker?

18           A.    That -- yes.  That's what it

19   states.

02:41   20           Q.    Would this be an example of what

21   you referenced earlier that you wondered

22   whether some of the switches weren't due to

23   this patient education on Context's loop

24   specifically but might rather be related to

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

203

1    the bells and whistles like sound and a news

2    ticker?

3             A.    Yes.

4             Q.    If you would look at the bottom

5    comment on this page, it ends in redacted.

6             A.    It ends in -- oh, yes.  Okay.

7             Q.    Do you know what that is?

8             A.    I do not know what that is.

9             Q.    Do comments in CMS sometimes

02:41  10   reflect conversations with attorneys?

11            A.    I don't recall.  I don't know.

12            Q.    Okay.

13            A.    It's -- I don't know --

14            Q.    I don't need to --

15            A.    -- what that means.

16            Q.    I don't need to you ask you

17   anymore.  I just wanted to --

18            A.    I don't know what that means.

19   Yeah.

02:42  20            Q.    Okay.  All right.  Set that one

21   aside.

22       (Exhibit 222 identified.)

23            Q.    Look at what's been marked as

24   Defendant's Exhibit 222.  I will represent to

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

204

1    you that this was produced as a file that had

2    the number HAN 005882.  Would you mind

3    writing that at the bottom, HAN 005882?

4    Thank you.  Sorry to impose.

5              A.    That's okay.

6              Q.    Are you aware that counsel for

7    Patient Point also tried to produce some

8    spreadsheets from CMS that have comments

9    about reasons given for switches to

02:43   10   competitors other than Context?

11             A.    Yes.

12             Q.    Are you aware that Defendant's

13   Exhibit 222 that was marked with HAN 005882

14   is one of those spreadsheets?

15             A.    Yes.

16             Q.    Was the intent in creating

17   the -- and this spreadsheet lists data taken

18   from CMS, correct?

19             A.    Correct.  This was just a data

02:43   20   pull.

21             Q.    And the CMS data was entered

22   into CMS by Context -- or excuse me -- by

23   Patient Point employees, correct?

24             A.    Yes.  By Patient Point employee.

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

205

1          Q.    They did that in the ordinary
2     course of their duties, correct?
3          A.    Correct.
4          Q.    And the CMS database including
5     all the information in this spreadsheet is
6     kept in Patient Point's ordinary course of
7     business, correct?
8          A.    Correct.
9          Q.    The comment fields are entered
02:44  10    by employees at or shortly after the time
11    that the conversations reflected in the
12    comments occurred, right?
13         A.    Yes.
14         Q.    Would you please look at -- I
15    hope these are in order, Aaron -- practice ID
16    3429893?
17              MR. BERNAY:  3429893?
18              MR. HANKINSON:  Yeah.  It is a
19    balance --
02:44  20             MR. BERNAY:  Miguel Cima?
21              MR. HANKINSON:  Yes.
22         A.    I can't believe I found it.
23         Q.    So there's quite a few.  I'm
24    looking at the -- there's two at the bottom

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

206

1    of the page and then I'm looking at the full

2    page of Cima -- Miguel Cima comments --

3              A.    Okay.

4              Q.    -- at the bottom comment.  Is

5    this a CMS entry related to practice 3429893

6    practice name Miguel A. Cima, MD?

7              A.    This is the practice -- yes.

8              Q.    And this comment has to do with

9    a practice that switched away from the ACN

02:45   10   network, correct?

11             A.    Yes.

12             Q.    The competitor to which that

13   practice switched was Health Monitor,

14   correct?

15             A.    Correct.

16             Q.    Lori Smith entered this CMS

17   information?

18             A.    Yes.

19             Q.    And she received that

02:45   20   information from Gloria Cima, correct?

21             A.    Correct.

22             Q.    I'll just go ahead and read the

23   comment quickly.  Reassigning cancel order to

24   Amy F.  That's you, correct?

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

207

1        A.    Yes.

2        Q.    Health monitor removed our

3    equipment 7/9.  Do you believe that to mean

4    July 9th?

5        A.    Yes.

6        Q.    After Heather specifically told

7    the office that another company was

8    misrepresenting themselves claiming that they

9    were authorized to remove our equipment.  I

02:46    10    was able to -- is SW speak with?

11        A.    Yes.

12        Q.    I was able to speak with Gloria

13    once and she refused to call -- do you

14    believe Health Monitor is what is meant by

15    HM -- she refused to call Health Monitor to

16    find out what happened to our equipment.

17    I've been unable to get her on the phone

18    since.  Notifying Vida that the monitor and

19    CPU for this office should be written off.

02:46    20    Did I read that correctly?

21        A.    Yes.

22        Q.    The specific notification from

23    Heather -- that would be Heather McGauvran,

24    right?

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

208

1          A.    Yes.

2          Q.    The specific notification that

3    another company was misrepresenting

4    themselves claiming they are authorized to

5    remove our equipment, do you know what that

6    refers to?

7          A.    I -- I would believe that

8    would -- refers to Heather notifying of

9    this -- notifying them of this but --

02:47   10          Q.    Do you think that that -- she

11    intended to notify them about a practice that

12    Heather thought Context Media was following

13    in the marketplace?

14                MR. BERNAY:  Object to the form.

15          A.    I don't believe that she was

16    stating a specific company.  It's just the

17    fact that nobody else is allowed to remove

18    our equipment stating that fact and then

19    after the fact that they still removed the

02:47   20    equipment.

21          Q.    Are you aware of any statements

22    to practices about a company being in the

23    marketplace misrepresenting themselves

24    claiming that they're authorized to remove

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

209

1    our equipment other than the e-mail and fax

2    and any calls from the practices about the

3    e-mail and fax that related to Context Media

4    that we discussed earlier?

5              MR. BERNAY:  Object to the form.

6         A.    Those would be the primary

7    reasons for that conversation to take place.

8    It's not to say that there couldn't have been

9    a conversation where there was notification

02:48    10    that a practice was being can -- that was

11    canceling or that somebody got wind that that

12    was happening and they stated, oh, they're

13    going to remove it, you don't have to worry

14    about it, to where they were saying they

15    would reiterate that fact or bring up that

16    point from that e-mail/fax at that time.

17         Q.    So we don't --

18         A.    I would hope that they would

19    reiterate that fact.

02:48    20         Q.    We don't know whether

21    Ms. McGauvran was telling this to the

22    practice because of that Context Media fax

23    and e-mail or whether it's some independent

24    reason that she's telling this to the

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

210

1    practice, correct?

2          A.    Yes.  I don't -- I don't know if

3    this was in reference to the e-mail or if

4    this was just -- this is what we knew was

5    happening and she was stating that we know

6    this is happening and that is not true, only

7    Patient Point/Healthy Advice can remove the

8    programming.

9          Q.    So what was known is that Health

02:49   10   Monitor had removed the equipment already,

11   right?

12         A.    That's what it sounds like in

13   this -- what I'm seeing from here.

14         Q.    Uh-huh.  And then the comment

15   ends notifying Vida that the monitor and CPU

16   for this office should be written off, right?

17         A.    Right.

18         Q.    Written off mean -- sorry.  You

19   were talking.

02:49   20         A.    No.  It's okay.  I was just

21   gonna say that it looks -- it appears the

22   equipment is missing.

23         Q.    And so written off means that

24   Patient Point is going to cease efforts to

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

211

1    locate the equipment?

2           A.    Yes.

3        (Exhibit 223 identified.)

4           Q.    Please direct your attention to

5    what's been marked as Defendant's 223.

6    Please try to find practice number 3488738.

7    It's Board Certified Rheumatology.  348 --

8           A.    348 --

9           Q.    -- 8738.

02:50   10           A.    348 -- 3488 --

11           Q.    738.  The page begins with

12    Lesser then Goldman and then Board Certified

13    Rheumatology is the one I'm talking about.

14           A.    89.  88.  Oh, okay.  I'm sorry.

15    It was underneath the clip.

16           Q.    Probably the page before that.

17           A.    The page before this one?

18                 MR. BERNAY:  738.  There it is.

19                 THE WITNESS:  Says James -- oh,

02:51   20    okay.  Down here.

21                 MR. BERNAY:  Yeah.

22                 THE WITNESS:  Okay.

23                 MR. HANKINSON:  If you could

24    turn your attention to the bottom comment,

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

212

1    this comment relates to a practice -- oh,

2    excuse me.  I should have started -- keep --

3    Keep that.  Don't lose that for goodness

4    sake.  Here, you want to put that on it?

5           A.    That would be great.  Thank you.

6           Q.    Thank you.  Defendant's

7    Exhibit 223 was produced with a number.  It

8    was HAN 00 I believe it's 6 -- yeah -- 6145.

9    Would you write that, HAN 006145?

02:52    10           A.    HAN 00 --

11           Q.    6145.  Are you aware of a

12    attempted final update of the spreadsheet of

13    data from CMS that gives the database's

14    information about practices that switched

15    from Patient Point to Context Media?

16           A.    Yes.

17           Q.    And the attempted final update

18    that includes the comments about the reasons

19    for those practices' switch is HAN 006145,

02:52    20    right?

21           A.    Yes.

22           Q.    And that's Defense Exhibit 223

23    now.  Please, go ahead and -- well, generally

24    I should say, is the information in this

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

213

1    spreadsheet taken from CMS?

2            A.    Yes.

3            Q.    And are all the questions that I

4    asked about -- well, let's just run through

5    it again.  Was the information entered into

6    CMS by employee's of Patient Point?

7            A.    Yes.

8            Q.    Did they enter that information

9    in the course of their duties as employees of

02:53   10   Patient Point?

11           A.    Yes.

12           Q.    Did they do that in the ordinary

13   course of their duties?

14           A.    Yes.

15           Q.    Does Patient Point keep the CMS

16   database in the ordinary course of its

17   business?

18           A.    Yes.

19           Q.    And it relies on the information

02:53   20   in the CMS database to make important

21   business decisions, right?

22           A.    Yes.

23           Q.    The comments in the CMS database

24   are entered by employees at or shortly after

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

214

1    the time that they have the interactions and

2    conversations reflected in the comments,

3    right?

4         A.    Yes.

5         Q.    Okay.  Please direct your

6    attention to practice number 3488738 Board

7    Certified Rheumatology.

8         A.    Okay.

9         Q.    Is this a comment about a

02:54    10    cancelation of a practice in the ACN network?

11         A.    You're looking at the final

12    comment on this page?

13         Q.    Yes.

14         A.    Yes.

15         Q.    The final comment dated November

16    29th of 2011.

17         A.    Yes.

18         Q.    This comment indicates that no

19    incentive was offered to the practice for the

02:54    20    switch, correct?

21         A.    Correct.

22         Q.    And it says that the practice

23    went with RHN because they felt it was more

24    customizable than our program.

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

215

1        A.    Correct.

2        Q.    And it also says and that was

3    it.  Does that mean that that was the only

4    reason given?

5        A.    I don't know if that was exactly

6    her intent behind that comment but it sounds

7    like it.  And I know this sort of goes

8    back to -- I mean, obviously there are

9    situations where I believe the incentive was

02:55  10    the trigger for the switch.  Obviously there

11    are other reasons besides that but there are

12    times where I believe the incentive was an

13    issue.  Sometimes I believe there was the

14    news ticker and the bells and whistles, as

15    you put it earlier, was the reason --

16        Q.    Uh-huh.

17        A.    -- or in this case they believed

18    that their program was more customizable than

19    ours.

02:55  20        Q.    And there's an issue where you

21    think that there are practices that switched

22    because of the gift card that wouldn't say

23    that to a Patient Point employee, right?

24        A.    I do believe that there is cases

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

216

1    where they would not tell us that, yes.

2           Q.    And in a sense, that is a reason

3    that would be off the page -- if that's true,

4    it wouldn't necessarily be in these CMS

5    comments.

6           A.    No.  Because it wouldn't have

7    been something that was discussed if that was

8    the case.

9           Q.    And let's say that there are --

02:56  10    you know, it's possible that there are

11    reasons that are not reflected in CMS for one

12    reason or another, right?

13           A.    I would say that if they're

14    getting -- like that with the assumption in

15    this situation.  She obviously discussed the

16    incentive which is why she put in the comment

17    no incentive offered.  If there was no

18    discussion about incentive, then she wouldn't

19    have put any comment about incentive in there

02:56  20    or it could have been something -- because

21    I've seen that -- where they say no incentive

22    mentioned as well.  So, again, I think that

23    it's kind of -- I don't think there's one

24    true reason for a cancel.

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

217

1          Q.    Uh-huh.

2          A.    I think that there's

3    different -- you can have -- come up with

4    different reasons why a practice would cancel

5    in any competitor -- any situation, but I do

6    believe sometimes it was because of the

7    incentive, sometimes I believe it was because

8    they felt the bells and whistles were what

9    they wanted and -- and sometimes I believe

02:57   10    they felt like they thought that the program

11    had certain content.

12              Like I said, some of them you've

13    read here to me, some of them had

14    rheumatology content.  We have rheumatology

15    content.  So it's not that we don't have it

16    and they do.  It's just that's what the

17    practice thought.  So it kind of varies --

18          Q.    Uh-huh.

19          A.    -- across.

02:57   20          Q.    If the CMS entry is -- gives

21    some other reason besides the incentive --

22          A.    Right.

23          Q.    -- you would say -- there's no

24    way to prove that that particular practice

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

218

1    really changed for that reason.  They could

2    have changed because of the gift card.

3              A.    I don't know how to --

4              MR. BERNAY:  Object to the form.

5              A.    -- prove that.

6              Q.    And what's that?

7              A.    What -- I mean, what are you

8    saying?

9              Q.    You're saying that regardless of

02:58  10    what it says in CMS, there could be the

11    reason of the gift card and that could be

12    the -- the full and total reason for the

13    switch and there's no way to prove whether

14    that's the case or not.

15              MR. BERNAY:  Object to the form.

16    You can answer.

17              A.    It could be.  Yes.  There could

18    be the -- the incentive could have been the

19    reason and the reason I state that is

02:58  20    because, like I said earlier, we did see a

21    case where the practice told us that but yet

22    we later found out that the incentive gift

23    card was why they switched.  But again it's

24    not every practice.  As you know -- notice

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

219

1    here, I don't think that that incentive was

2    offered everywhere and I don't know what

3    point Context Media started doing that and I

4    can't say that that was always the reason.  I

5    shouldn't say that's always the reason

6    because obviously there's other reasons as

7    you're stating and pointing out to me here.

8    Does that make sense?

9           Q.    I think so.  Although I think

02:59  10   what you said earlier is that in any given

11   situation it's possible that the incentive

12   caused the switch.

13          A.    I do believe -- yes.

14          Q.    Even if a different reason is

15   given.

16          A.    I believe that --

17          MR. BERNAY:  Object to the form

18   with prior -- characterization of prior

19   testimony but you can answer.

02:59  20          A.    Okay.  Yeah.  I'm not really

21   sure what you're getting at but -- now I've

22   kind of lost my train of thought.  I believe

23   the incentive could have been the reason for

24   a cancel.  I do believe that there would be

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

220

1    instances where the practice may not have

2    told us that was why they switched and they

3    may have given us a different reason.  I also

4    do believe though there are practices that

5    just switched because of the bells and

6    whistles maybe not the incentive.  It was the

7    news and the ticker.  And I believe that

8    there is locations that switched because of

9    the content.  They thought theirs was more

02:59    10    diabetes specific versus -- I believe there

11    are all of those cases.  I don't believe it's

12    just one.

13         Q.    Uh-huh.

14         A.    Does that make sense?

15         Q.    I think so.

16         A.    Okay.

17         Q.    I guess my question is in any

18    particular instance, knowing that all of

19    those are possible and knowing that there

03:00    20    could be reasons that are not in CMS, would

21    there be a way to, you know, prove that the

22    incentive wasn't the reason?

23              MR. BERNAY:  Objection.

24         A.    I don't know.

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

221

1          Q.    Would you please flip to the

2     comment it's practice number 3547293.  I

3     don't want to be presumptuous but maybe I

4     should flip and hand it back and forth?

5          A.    What is this --

6               MR. BERNAY:  Yeah.  Three --

7     3547293.

8               MR. HANKINSON:  3547293.  I

9     don't want to cause a distraction.  I'm just

03:01  10    trying to think of the fastest way to do it.

11               MR. BERNAY:  Yeah.

12          A.    That's all right.  3547293.

13     There it is.

14          Q.    Dr. Schnapp and Barth PA?  Yes?

15          A.    Yes.

16          Q.    And I am looking at a comment

17     dated January 12th, 2010.

18          A.    January 12th?

19          Q.    It's the second one from the top

03:01  20    of the page and it's probably the last page

21     of Dr. Schnapp and Barth.

22               MR. BERNAY:  January 10, 2012?

23          A.    Okay.  I see.

24               MR. HANKINSON:  It's the second.

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

222

1          A.    Valerie?

2                MR. HANKINSON:  Valerie Kallina

3    would be --

4          A.    Is that what you're talking

5    about?

6          Q.    -- the practice contact and Lori

7    Smith would be the commenter?

8          A.    The comment starts with Valerie

9    called --

03:01  10          Q.    Yes.

11          A.    -- in to return my call?

12          Q.    Yes.

13          A.    Okay.

14          Q.    Take a moment to review it.  For

15    practice 3547293 with the name of the

16    practice being Drs. Schnapp and Barth PA, the

17    practice contact, Valerie Kallina, reported

18    that the reason the office decided to switch

19    to Context was that the doctors wanted to

03:02  20    offer an RA based program.  Does that mean

21    rheumatoid arthritis?

22          A.    Yes.

23          Q.    The characteristics or the

24    program -- of the program probably is what

Electronically signed by Deanne L. Cartwright (501-202-620-8979)          94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

223

1    was meant.  Sound and video segments did not

2    play a role in the decision.  It was strictly

3    the topic of the content RA versus primary

4    care, right?

5           A.    Right.

6           Q.    So here's an example regardless

7    of whether it's your opinion or someone

8    else's opinion that ACN is just as focused on

9    rheumatology as RHN, the practice was

03:02    10    reporting that it found RHN to be more

11    focused and that's why they were switching,

12    right?

13          A.    This particular office had our

14    primary care network which is why the content

15    was not geared towards rheumatology and

16    that's why you see in parentheses her

17    comments of RA versus primary care so in this

18    particular case -- but again this kind of

19    also goes back to my point before where I was

03:03    20    stating, you know, they -- she did truly find

21    out in this situation it was the content and

22    it did not have anything to do with the video

23    or the sound segments.

24          Q.    It was --

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

224

1          A.    And I would believe that there

2    was probably no incentive in this situation.

3    It was strictly -- strictly content.

4          Q.    And specifically the focus on

5    rheumatoid arthritis as opposed to primary

6    care?

7          A.    Right.

8          Q.    All right.  Please flip to

9    practice 3663355.

03:03   10          A.    No, I did not just flip to --

11    South Plainfield?

12          Q.    Yeah.  The very bottom comment

13    on the first --

14          A.    That's amazing.

15          Q.    -- first page -- that's what

16    qualifies for good at this point in the day,

17    huh?

18          A.    I guess.

19          Q.    That's terrible.  Creating all

03:04   20    this --

21               MR. BERNAY:  Great moment in

22    deposition history --

23               MR. HANKINSON:  Right.

24               MR. BERNAY:  -- volume 235.

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Deanne L. Cartwright (501-202-620-8979)          94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

225

1              MR. HANKINSON:  All right.

2         A.    Please mark that.

3         Q.    We're discussing South

4    Plainfield Primary Care which switched from

5    the PCN, correct?

6         A.    Correct.  And we're looking at

7    the last comment?

8         Q.    Yeah.  The last comment on the

9    page from Dr. Madhu Goyal.

03:04    10         A.    Okay.

11         Q.    The CMS entry indicates that

12    Dr. Goyal called wanting to cancel in favor

13    of diabetes network.  Do you understand that

14    to mean DHN from Context?

15         A.    Yes.

16         Q.    And then it asked for feedback.

17    Said likes the content more and program

18    provide medical news.  Very interactive.  Has

19    recipe on diabetes medical related info and

03:05    20    audio and video.  Sent cancel survey.  Those

21    are the reasons given in CMS for this switch,

22    correct?

23         A.    Correct.

24         Q.    What is the cancel survey?

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

226

1          A.     There is a survey that we would

2     send to practices after they cancelled to try

3     to provide more feedback.

4          Q.     During what time period was that

5     survey sent to practices who canceled?

6          A.     This was a manually sent survey,

7     so when the relationship manager -- was more

8     of a judgment call -- felt that they could

9     send this to possibly get some feedback.

03:05 10    Sometimes they would just do it just to do

11    it.  There was really no protocol as to when.

12    I mean, ideally you obviously send it after

13    they cancel but it was never a process as to

14    you had to send it to every single practice.

15         Q.     It was left to the relationship

16    manager's discretion?

17         A.     Correct.

18         Q.     Is it -- is it a survey that's

19    general as to whether the cancellation is to

03:06 20   a competitor or to TV or in favor of nothing?

21         A.     I don't believe it's

22    that specific.  I think it's just more about

23    our content and the services that we provide.

24    It --

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

227

1          Q.    Do you know if the cancel survey

2    asks for reasons for a switch?

3          A.    Yes.  I believe it does.

4          Q.    Where are the results sent?

5          A.    It's sent to our research

6    department.

7          Q.    And do you know where the

8    results are stored by the research

9    department?

03:06    10          A.    I don't know where they store

11    them.

12          Q.    And have you seen results of any

13    of those surveys in your job?

14          A.    They have shared me -- shared

15    results with me.  I believe would do that

16    like once a quarter depending on how many

17    responses they have.  We have not had a lot

18    of responses to the survey.

19          Q.    If the -- is the survey like

03:06    20    whether one was received back with answers

21    entered into CMS?

22          A.    The answers that received?  No.

23    That -- it goes into -- I don't know if --

24    what electronic survey.  It's a link.  It's

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

228

1    an electronic survey that is sent back to our
2    research department.  I'm not sure I know the
3    name of the actual software they use to
4    gather the results back in.  They would
5    pretty much quantify them and provide the
6    results to me.
7            Q.    Do you know if the cancel survey
8    asks what competitor was switched to if it
9    was a competitor switch out?
03:07    10            A.    I don't recall.
11            Q.    Would you please flip to
12    location 3668954?  Adriana Pop-Moody?
13            A.    Yes.
14            Q.    Look at the comment dated
15    February 27th, 2012.
16            A.    It's two of them.
17            Q.    There's two of them.  Please
18    look at the bottom one on the page starting
19    with received a fax from Kathy.  Are you with
03:08    20    me?
21            A.    Yes.
22            Q.    Kathy Rock as the practice
23    contact from the Adriana Pop-Moody location
24    explained that a doctor saw RHN at a

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

229

1    conference and decided to switch, correct?

2           A.    Correct.

3           Q.    And the reason they liked RHN,

4    according to Kathy Rock, is that they liked

5    the sound and interviews on the new program,

6    right?

7           A.    That's what it states.  Yes.

8           Q.    She further explained that the

9    patients have been asking for something more

03:09  10    interesting and with sound and RHN fills that

11    request, right?

12           A.    Yes.  That's what it states.

13           Q.    Could you please flip to

14    location 3736209?

15           A.    Brian McKnight?

16           Q.    Yes.  Comment date January 11th,

17    2012.  Second from the bottom.  Lisa McKnight

18    is the contact for the provider's office,

19    correct?

03:10  20           A.    Correct.

21           Q.    She said that they switched to

22    RHN because she likes the fact that the

23    program has dialogue and not just pictures.

24    She explained that their segments are a

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

230

1    little bit longer and are newer which is good

2    when their patients have longer wait times.

3    Many patients visit the office a couple times

4    a month and it seemed to be less repetitive.

5    Did I read that right?

6            A.    Yes.

7            Q.    So the reason given here,

8    although it may be subjective, is based on

9    the content being longer and less repetitive

03:10    10    for their patients who come a lot to the

11    office?

12            A.    Based on this comment here, yes.

13            Q.    If there's no contrary comment

14    in CMS then this would be the -- Patient

15    Point's best information about the reason for

16    the switch, right?

17            A.    To the best of our knowledge,

18    yes, this would be the reason.

19            Q.    Please switch -- flip to

03:11    20    location 3736283.

21            A.    Next page?

22            Q.    Very good.  North Jersey

23    Rheumatology Associates.  Look at the comment

24    dated May 20th, 2011.  It's at the top.  Is

Electronically signed by Deanne L. Cartwright (501-202-620-8979)          94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

231

1    Hilary Sugar the practice comment -- the

2    practice contact that this comment relates

3    to.

4           A.    Uhm.  Received e-mail from

5    doctor -- looks like they received an e-mail

6    in from the doctor.

7           Q.    So it maybe that --

8           A.    Just --

9           Q.    -- that Ms. Sugar --

03:11   10           THE REPORTER:  I can't hear you,

11    ma'am.

12           THE WITNESS:  Oh, sorry.  I was

13    reading the comment.  Just want to make you

14    aware, we sent yesterday saying that we were

15    going to be canceling our subscription to

16    your service.  It's a bit limited, needs more

17    sound and there are some better systems out

18    there.  Haven't heard anything back so

19    consider this our official cancellation.

03:12   20    Added e-mail and attachment.  Tried calling

21    office but it rolled to an answering service

22    and said they would follow up on Monday to

23    understand the reasons more.  Is this due to

24    RHN pressuring them to switch?  And point out

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

232

1    that HAN benefits.

2           Q.    Who's HRM?  Heather McGauvran?

3           A.    HRM?  Yes.  Heather McGauvran.

4           Q.    So this comment's from

5    Ms. McGauvran?

6           A.    Yes.

7           Q.    And she intended to follow up to

8    see if RHN pressure had something to do with

9    the switch, right?

03:12   10           A.    Yes.

11           Q.    But the e-mail from Dr. Guma

12   indicated that Patient Point's ACN network

13   was a bit limited, needs more sound and that

14   there's better systems, right?

15           A.    Correct.

16           Q.    And if there's no contrary

17   statement to that in CMS, this is Patient

18   Point's best information about the reasons

19   for that switch, correct?

03:13   20           A.    That's the best information.

21   Yes.

22           Q.    All right.  Please flip to

23   location 3742237.

24           A.    374 -- I'm sorry.  What was the

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

233

1   rest?

2          Q.     3742237.  Comment dated

3   January 24th, 2011.  It's about the middle of

4   the page.  Related to Veena Nayak, MD, right?

5          A.    Yes.

6          Q.    And this practice switched from

7   ACN, correct?

8          A.    They switched from ACN.

9          Q.    Now, this comment indicates

03:14  10   that -- well, who is MMM from Patient Point?

11          A.    I'm trying to reme -- recall.

12          Q.    It seems from the comment that

13   they met in person.

14          A.    Margie Moore maybe.

15          Q.    In any event, why you don't you

16   read over the comment and --

17          A.    It was in Chicago.  Okay.

18          Q.    Illinois.  Yeah.  Let me know

19   when you -- when you're ready.

03:15  20          A.    Okay.

21          Q.    This is a pretty detailed

22   meeting with both Dr. Nayak and the office

23   manager Uma Reddy, right?

24          A.    Yes.

Electronically signed by Deanne L. Cartwright (501-202-620-8979)          94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

234

1          Q.    And were you able to confirm

2    there's it's Margie Moore who made this

3    entry?

4          A.    I'm almost positive it's Margie

5    Moore.  I can't think of anybody else with

6    the initials MM that worked for us.

7          Q.    The reason that the --

8          A.    I take that back.  I just

9    realized there was -- internally but there

03:15  10    was a Michelle Mullins -- or, no, not

11    Michelle.  Michelle.  I don't recall her last

12    name but I believe it began with an M and she

13    was a sales rep in Chicago, so that leads me

14    to believe that she was probably the person

15    that met with them and -- since Margie Moore

16    was here in Cincinnati, that's why when I

17    said --

18          Q.    Uh-huh.

19          A.    -- Chicago earlier I was having

03:16  20    a hard time picturing her being in Chicago

21    just to meet with a practice.  It's possible.

22    But we did have a sales rep that worked in

23    Chicago.

24          Q.    Michelle Mullins --

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

235

1          A.    Yeah.

2          Q.    -- or some last name?

3          A.    Something.  I can't remember her

4    last name exactly.  I'd have to --

5          Q.    In any event a Patient Point

6    employee met with Dr. Nayak and Uma Reddy and

7    made this entry, correct?

8          A.    Correct.  Only a Patient Point

9    employee could enter into the database.

03:16   10          Q.    Dr. Nayak's reason for switching

11    to RHN is because she thinks RHN is more

12    engaging and she said instead of short

13    snip-its like yours, they have longer

14    dialogue between actual people.  She also

15    said that she likes that RHN has a 90-minute

16    loop to hopefully cover wait time.  Do you

17    see that portion of the entry?

18          A.    Yes.

19          Q.    Then further down it says,

03:17   20    Dr. Nayak said RHN offers some messaging.

21    Your messaging is wonderful for offices that

22    have massage therapy and tai chi and other

23    services they want to promote but my office

24    is more conservative and I'm not really

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

236

1    interested in that.

2         A.    That's referring to our

3    customization feature.

4         Q.    Which is a sales point for

5    Patient Point, right?

6         A.    Correct.

7         Q.    It's a -- considered a

8    competitive advantage.

9         A.    Correct.

03:17  10         Q.    And Dr. Nayak's simply

11    responding that she is not as interested in

12    that as perhaps other practices?

13         A.    She does -- it appears she

14    doesn't need to promote any services at her

15    office.

16         Q.    At the bottom this comment says,

17    I told Dr. Nayak that we have no penalties

18    and that she should really look through her

19    contract with them.  I tried once more to see

03:18  20    if she would allow our screen to stay as it

21    was virtually silent and would not interfere

22    with other program but she said no as she

23    already has a TV and does not want three

24    screens.  That's Michelle or whoever the

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

237

1    sales representative who met with --

2          A.    Right.

3          Q.    -- Dr. Nayak was responding to

4    Dr. Nayak's comment that she felt bad about

5    not dealing with your company directly but

6    time is precious and RHN said that they would

7    take that off my shoulders, take down the

8    equipment, and send to you and would pay any

9    penalties that might be accrued.  So in

03:18    10    response to that a Patient Point employee

11    says that we have no penalties.  Is that

12    accurate?

13          A.    We don't charge the practice

14    anything.  No.

15          Q.    And that's a general policy.

16          A.    Correct.

17                MR. BERNAY:  Object to the form.

18    You can answer.

19          A.    Correct.  We do not charge

03:19    20    our -- our practices.

21          Q.    And if that issue ever comes up

22    where a practice is concerned that they'll be

23    charged a penalty, Patient Point would inform

24    the practice that they won't be charged a

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

238

1    penalty, right?

2           A.    If that were to come up.

3           Q.    As it did here.

4           A.    It did here, yes.  This seems

5    very rare to me but --

6           Q.    It's not a secret.

7           A.    No, it's not a secret.  We don't

8    charge a -- we don't charge a fee.

9           Q.    Or a penalty?

03:19  10           A.    Or a penalty fee.

11           Q.    Please switch to location

12    3744754.  3744754.  Oh, it's the next page.

13    To a comment dated October 10th, 2011.  Might

14    be the following page.  Midway down.  Does

15    this comment apply to location 3744754 Joseph

16    I. Sandler, MD?

17           A.    The comment that starts with

18    spoke to Jackie?

19           Q.    Yes.  And is it a switch from

03:20  20    the ACN?

21           A.    Switch from ACN.

22           Q.    Here -- who is PMB from Patient

23    Point?

24           A.    That was Pam Brown.

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

239

1          Q.    Here Ms. Brown reports that the
2    practice mentioned that the competition has
3    sounds and programming in English and
4    Spanish, correct?
5          A.    That's what it states.  Yes.
6          Q.    Does Patient Point offer content
7    in Spanish?
8          A.    No, not on our waiting room
9    screen.
03:21  10          Q.    Please flip to location 3747517.
11    Olga N. Popel.
12          A.    Okay.
13          Q.    Please head to the comment dated
14    December 13th, 2011.
15          A.    Which one?  There's two of them.
16          Q.    The second one --
17          A.    Okay.
18          Q.    -- from Lori Smith regarding a
19    cancellation of ACN, correct?
03:22  20          A.    Correct.
21          Q.    The practice contact here is
22    Joanna Mejia, correct?
23          A.    Yes.
24          Q.    Johanna explained that her

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

240

1    physician is a rheumatologist and the RHN

2    content was a better fit for their office,

3    right?

4              A.    Yes.

5              Q.    And that's even though it's a

6    switch from ACN, correct?

7              A.    That's what it states.  Yes.

8              Q.    And this comment indicates that

9    there's nothing really necessarily wrong in

03:23  10    Ms. Mejia's mind with Patient Point's

11    programing.  She just decided to make a

12    change and she'd go back to Patient Point if

13    it comes up.

14              A.    That's what it states.  Yes.

15              Q.    Please look at location 3737565.

16              MR. BERNAY:  373 --

17              THE WITNESS:  373?  So we're

18    going backwards?

19              MR. HANKINSON:  Yeah.

03:23  20              A.    Okay.  737375?

21              Q.    Yeah.

22              A.    75 --

23              Q.    65.

24              A.    VW?

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

241

1          Q.    Yes.  If you could review the

2     comment and confirm that the CMS entry here

3     indicates that the practice switched due to

4     the focus on rheumatoid arthritis.

5          A.    Which comment are we looking at?

6          Q.    I'll have to look it up.

7          A.    I see it.  It's the comment

8     August 2nd.  The phone out -- phone in/out.

9     Are you referring to received message from

03:24    10   Dr. Dalai?

11          Q.    Yes.  The doctor from this

12     practice indicated the content of Patient

13     Point was not specific enough for arthritis

14     patients, correct?

15          A.    That's what it states here.

16     Yes.

17          Q.    Also it says that the new

18     program has speaking.  Do you understand that

19     to mean like sound and voiceover?

03:25    20   A.    Yes.

21          Q.    And those are the reasons that

22     are given for the switch, correct?

23          A.    Correct.

24          Q.    Please look at -- this will go

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

242

1    backwards again -- 3723759.

2           A.    Rheumatology Associates of South

3    Florida?

4           Q.    Yes.  Are there a lot of them?

5           A.    There's a few.

6           Q.    All right.  Yeah.  Look at the

7    one that's the second to last on this page

8    dated November 30th, 2012 with Annette

9    DeLuca.  Starting with the Annette called in

03:26    10    and LM left message.

11          A.    LM left message.  It looks like

12   we received their -- our -- our equipment

13   from the practice that was removed by

14   Context.

15          Q.    Ms. DeLuca was unaware of her

16   contract with Patient Point and the alleged

17   enrollment agreement, is that right?

18              MR. BERNAY:  Take your time to

19   read the comment.

03:27    20          A.    Okay.  Can you repeat the

21   question?

22          Q.    Sure.  And I'll actually ask a

23   new question.  Lori Smith asked Annette

24   DeLuca at the Rheumatology Associates of

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

243

1   South Florida if Context said anything about

2   our contract and Ms. DeLuca said no, and then

3   said we did not have a contract, did we.

4   Right?

5          A.    It says we did not have a

6   contact, did we, but I believe that was

7   probably meant to be contract.

8          Q.    And that's what Ms. DeLuca

9   responded?

03:27    10          A.    That's the way she responded to

11   Lori, yes.

12          Q.    And the reason given for the

13   switch to Context is that the docs were ready

14   for a change and they liked the audio on the

15   program, right?

16          A.    Yes.  That's what it states.

17          Q.    All right.  Please flip to

18   3691607.

19          A.    369 --

03:28    20          Q.    Uh-huh.  3691607.

21          A.    Linden Medical Group.

22          Q.    Yes.  If you could review the

23   comment on April 23rd, 2012.  Did Ms. Bialy

24   from the Linden Medical Group indicate that

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

244

1    the doctor liked the new program from Context

2    Media because it could be personalized more?

3           A.    That's what it states.  Yes.

4           Q.    And she also said that the

5    company DHN did not present themselves as

6    HAN, correct?

7           A.    Correct.

8           Q.    And that she knew it was a

9    different company --

03:29  10           A.    Yes.

11           Q.    -- and switched anyway.

12           A.    Correct.

13           Q.    I only have about two more hours

14    so I'll stop here.

15           A.    You only have two more hours?

16           Q.    I'm just joking.

17           A.    Oh.

18           Q.    Sorry.  That wasn't fair.

19                 VIDEOGRAPHER:  No further

03:29  20    questions?

21                 MR. HANKINSON:  From me.

22                 MR. BERNAY:  From Tom.

23

24

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

245

1                    DIRECT EXAMINATION

2    BY MR. BERNAY:

3         Q.    I'm just gonna ask two or three

4    real quick questions, Amy, because I know

5    you -- we appreciate your time.

6         A.    No.  That's fine.

7         Q.    I don't want to take up too much

8    time.  I just want to clarify some of your

9    testimony on the record and thinking back to

03:29  10    your first deposition as well.

11              Practices switch from Healthy

12   Advice to Context Media for a host of

13   reasons, is that right?

14              MR. HANKINSON:  Objection to the

15   form.

16         A.    Correct.

17         Q.    And some of those reasons

18   involve misrepresentations made by Context

19   Media to the practice.

03:30  20              MR. HANKINSON:  Objection.

21   Leading.

22         A.    Correct.

23         Q.    And you -- you testified earlier

24   to the extent that an incentive could play a

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

246

1    role in a practice's decision to switch, is

2    that right?

3              A.    Yes.  It could play a role.

4              Q.    Do you think that an incentive

5    alone would have been the sole reason that a

6    practice switched?

7              A.    Maybe in some cases.  Not in all

8    cases.

9              MR. BERNAY:  That's all I've

03:30   10    got.

11              RECROSS-EXAMINATION

12    BY MR. HANKINSON:

13              Q.    Earlier you did say that you

14    thought that in every case when an incentive

15    was offered that that was the reason for the

16    switch, didn't you?

17              A.    I did state that.  Yes.

18              Q.    And did you change your mind

19    over the course of today or --

03:31   20              A.    Well, I think that I -- just

21    being a little flustered with all of this I

22    think but I do believe that, like I was

23    stating earlier, there are some cases where

24    it is due to content.  I think there's some

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573

Amy Finley, 4/21/2014

247

1   cases where it's due to bells and whistles

2   and I do think that there's some cases where

3   it was due to incentive.  Again, I think it's

4   all subjective to the practice and what was

5   offered or provided or told to them.

6          Q.    Each case would have to be

7   evaluated individually to know the cause of

8   the switch.

9          A.    That would be fair.  Yes.

03:31   10          Q.    Okay.  No further questions.

11          MR. BERNAY:  No further

12   questions.

13          VIDEOGRAPHER:  We're off the

14   record at 3:30:07.

15

16

17                   _____

                         AMY FINLEY

18

19

20

21                         *  *  *

22       (DEPOSITION CONCLUDED AT 3:30 p.m.)

23                         *  *  *

24

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Amy Finley, 4/21/2014

248

1              C E R T I F I C A T E
2

STATE  OF  OHIO
3              :  SS
COUNTY OF CLERMONT

4
5          I, Deanne Cartwright, the undersigned,
   a duly qualified notary public within and for
6  the State of Ohio, do hereby certify that
   AMY FINLEY was by me first duly sworn to
7  depose the truth and nothing but the truth;
   foregoing is the deposition given at said
8  time and place by said witness; deposition
   was taken pursuant to stipulations
9  hereinbefore set forth; deposition was taken
   by me in stenotype and transcribed by me by
10 means of computer; that the transcribed
   deposition was submitted to the witness for
11 examination and signature and that signature
   may be affixed out of the presence of the
12 Notary Public-Court Reporter. I am neither a
   relative of any of the parties or any of
13 their counsel; I am not, nor is the court
   reporting firm with which I am affiliated,
14 under a contract as defined in Civil Rule
   28(D) and have no financial interest in the
15 result of this action.
16         IN WITNESS WHEREOF, I have hereunto set
   my hand and official seal of office at
17 Cincinnati, Ohio this 6th day of May, 2014
18
19         _____
    My commission expires:  Deanne Cartwright
20  August 4, 2018    Notary Public - State of Ohio
21
22
23
24

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Deanne L. Cartwright (501-202-620-8979)                    94d97799-8dab-4e92-a971-9d65edb86573