```
 1              UNITED STATES DISTRICT COURT
                 SOUTHERN DISTRICT OF OHIO
 2                   WESTERN DIVISION

 3

 4   HEALTHY ADVICE NETWORKS, LLC, )
                                   )
 5              Plaintiff,         )
                                   )
 6       -vs-                      ) No. 1:12 CV 00610
                                   )
 7   CONTEXTMEDIA, INC.,           )
                                   )
 8              Defendant.         )

 9

10       The deposition of PATRICK CAVANNA, taken

11   before Lydia B. Pinkawa, CSR and Notary Public,

12   pursuant to the Federal Rules of Civil Procedure for

13   the United States Courts pertaining to the taking of

14   depositions, at 25th Floor, 222 North LaSalle Street,

15   Chicago, Illinois, commencing at 1:22 p.m., on the

16   5th day of March, 2014.

17

18

19

20

21

22

23

24
```

Patrick Cavanna   March 5, 2014

```
 1   PRESENT:

 2        FROST BROWN TODD, LLC
          By MR. AARON M. BERNAY
 3        3300 Great American Tower
          301 East Fourth Street
 4        Cincinnati, Ohio  45202
          (513) 651-6831
 5        abernay@fbtlaw.com

 6          appeared on behalf of plaintiff,

 7        SIDLEY AUSTIN, LLC
          By MR. RICHARD J. O'BRIEN and
 8           MS. JESSICA JOHNSON
          One South Dearborn Street
 9        Chicago, Illinois  60603
          (312) 853-7283
10        robrien@sidley.com

11          appeared on behalf of defendant.

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Patrick Cavanna   March 5, 2014

```
 1                   I N D E X
 2   WITNESS
 3     Patrick Cavanna
 4   EXAMINED BY                        PAGE
 5     Mr. Bernay                         4
 6   EXHIBITS MARKED                    PAGE
 7     Exhibit 18 (sign up form)         34
 8     Exhibit 19 (8-16-11 e-mail)       56
 9     Exhibit 20 (9-8-11 fax to Andrea) 58
10     Exhibit 21 (8-10-11 e-mail)       60
11     Exhibit 22 (Oct. '11 e-mail)      62
12     Exhibit 23 (9-1-11 e-mail to Dr. M.)  66
13     Exhibit 24 (11-9-11 e-mail to Valerie)  69
14     Exhibit 25 (5-16-12 e-mail to Evelina)  73
15     Exh. 26 (1-11-12 e-mail from S. Velazquez)75
16     Exhibit 27 (4-4-12 e-mail to Laurie)  81
17     Exhibit 28 (e-mail to M. Garms)   82
18     Exhibit 29 (5-8-12 e-mail to Renata)  85
19
20
21
22
23
24
```

4

Patrick Cavanna    March 5, 2014

```
 1                    PATRICK CAVANNA,
 2   having been first duly sworn, was examined and
 3   testified as follows:
 4                    DIRECT EXAMINATION
 5   BY MR. BERNAY:
 6       Q    Good afternoon.
 7       A    Hello.
 8       Q    Do you go by Patrick or Pat?
 9       A    Any one you want.  Patrick, Pat is fine with
10   me.
11       Q    I'm Aaron Bernay.  I represent Patient Point,
12   formerly known as Healthy Advice Networks in this
13   lawsuit.  We met a few minutes ago and commiserated
14   about Tony Romo off the record.  But I want to start
15   by asking you this afternoon, have you ever been
16   deposed before?
17       A    I have not.
18       Q    Ever given prior testimony in court?
19       A    I have not.
20       Q    Or any other forum?
21       A    No.
22       Q    So before we begin, I just want to go over a
23   few ground rules.
24       A    Sure.
```

Patrick Cavanna    March 5, 2014

 1     Q    I'm going to be asking you a bunch of
 2  questions this afternoon.  I'm going to assume that
 3  you understand the question that I've asked and that
 4  your answer is responsive to my question.  If at any
 5  time you don't understand the question, please stop
 6  and let me know and I can rephrase it.
 7     A    Okay.
 8     Q    Can we agree to that?
 9     A    Yes.
10     Q    It's important that we don't talk over each
11  other so that the court reporter can take an accurate
12  record.  So I just ask that you wait to answer my
13  question until I'm done asking it.
14     A    Okay.
15     Q    In addition, the court reporter can only
16  capture verbal responses.  So no head shakes,
17  "mm hmm", none of that, all right?
18     A    Got you.
19     Q    And if you need a break at any point, please
20  let me know.  I would ask that you just finish
21  answering the question pending before we break.
22     A    Okay.
23     Q    Any other questions about the process?
24     A    No.

6

Patrick Cavanna    March 5, 2014

```
 1      Q    Are you on any medications today that would
 2  affect your ability to give full, complete and
 3  accurate testimony?
 4      A    No, sir.
 5      Q    And are you presently under a doctor's care
 6  for any reason?
 7      A    No.
 8      Q    Can you state your full name for the record?
 9      A    Patrick Justin Cavanna.
10      Q    And what's your current address?
11      A    1950 North Lincoln Avenue.
12      Q    And that's here in Chicago?
13      A    Chicago, Illinois, yes, 60614.
14      Q    And let's talk about education.  Did you
15  finish high school?
16      A    I did.
17      Q    And where was that?
18      A    Coppell High School.
19      Q    And where is Coppell High School?
20      A    It's in Texas.
21      Q    And where did you attend college?
22      A    Franciscan University of Steubenville in
23  Ohio.
24      Q    And when did you -- did you complete a degree
```

Patrick Cavanna    March 5, 2014

1    there?

2        A    I did.

3        Q    And what's that degree?

4        A    Business.

5        Q    BS in business?

6        A    Mm hmm.

7        Q    And what year was that?

8        A    2003.

9        Q    Any other degrees?

10       A    No.

11       Q    Advanced degrees?  A few additional

12   background questions.  Have you ever been convicted

13   of a crime?

14       A    I have not.

15       Q    Have you ever sued anyone?

16       A    I have not.

17       Q    Have you ever been sued yourself?

18       A    I have not.

19       Q    So you're here today because of your

20   background at ContextMedia.  When were you hired by

21   ContextMedia?

22       A    I was hired in August of 2011.

23       Q    And what were you doing before you came to

24   Context?

Patrick Cavanna    March 5, 2014

1      A    I was actually doing sales in Dallas.

2  Actually, I'm sorry.  Sales in Washington, D.C. for a

3  company called Corporate Executive Board.

4      Q    And how long were you in that job?

5      A    I would say probably about seven months.

6      Q    And what were you doing there?

7      A    Doing sales for them.

8      Q    Just cold calling?

9      A    Yes, prospecting, you know, following up on

10  leads, trying to close deals.

11      Q    What did you do before then?

12      A    Before then, I was in Dallas doing sales for

13  a software company called SimCrest.

14      Q    And how long were you there for?

15      A    Eight months.

16      Q    Again the same type of responsibilities

17  and --

18      A    Yes.

19      Q    And before SimCrest?

20      A    Back in Washington, D.C., I was doing account

21  management for a company called ICREO.

22      Q    And how long there?

23      A    Two years.

24      Q    And in terms of account management, what were

Patrick Cavanna    March 5, 2014

1    you doing?

2       A    I was in charge of, you know, handling

3    accounts, making sure they understood the software,

4    how to use it, that sort of thing.

5       Q    And how did you happen to come to

6    ContextMedia?

7       A    Well, I moved out to Chicago July of 2011.

8    I applied to two jobs, this one and Groupon, and I

9    got the offer from ContextMedia.

10      Q    Why Chicago?

11      A    You know what?  It's because I hated D.C.

12   and I've always wanted to come out here, so I packed

13   my bags and came on out.

14      Q    Where did you find that listing?

15      A    I believe I found it on Indeed, if my memory

16   serves me correctly.  It was either indeed.com or,

17   you know, one of the other, Monster or something like

18   that.

19      Q    And when you joined the company, what was

20   your title?

21      A    Member outreach executive.

22      Q    And is that still your title today?

23      A    Yes.

24      Q    What did you do to prepare for today's

Patrick Cavanna    March 5, 2014

1  deposition?

2      A   I met with, you know, these two guys.  That's

3  about it.

4      Q   Apart from your counsel, did you speak with

5  anyone else about your deposition?

6      A   No.

7      Q   Did you review documents ahead of today's

8  deposition?

9      A   Yes, I looked over a few e-mails.

10     Q   Mostly e-mails?

11     A   Yes.

12     Q   Anything else besides correspondence?

13     A   No.

14     Q   So your title is member outreach executive.

15  What were you hired to do?

16     A   To make sales.

17     Q   And what were you selling?

18     A   Our product, which is a waiting room

19  educational television.

20     Q   And for ContextMedia do you sell anything

21  else besides the waiting room product?

22     A   Now, currently?

23     Q   Currently, now.

24     A   Yes, we have another product that we're

Patrick Cavanna    March 5, 2014

 1   allowed to sell, too, or sell with.

 2       Q    And what's that product?

 3       A    It's the tablets in the exam rooms.

 4       Q    And how long have you been selling that

 5   product?

 6       A    I would say probably October of last year.

 7       Q    And is that sold as kind of a package with

 8   the waiting room TV?

 9       A    Yes, currently, you know, they can't get the

10   tablets unless they have the television.  There are

11   some one off instances where we allow that, but it's

12   very rare.

13       Q    And when you were hired, were you selling

14   primarily across two networks called RHN and DHN?

15       A    Yes.

16       Q    Anything else besides those two networks?

17       A    No, not at that time when I first started.

18       Q    And RHN is the Rheumatoid Health Network?

19       A    Rheumatoid Health Network, correct.

20       Q    And DHN is the Diabetes Health Network?

21       A    Yes.

22       Q    And as a member outreach executive, you were

23   charged with making sales, but what were your

24   day-to-day responsibilities?

Patrick Cavanna    March 5, 2014

```
1        A    Calling clinics in my territory and selling
2    them.
3        Q    And have you always had a specific territory?
4        A    It's changed.  I mean, I can't remember
5    what -- I think it started out in California, I'd
6    sell that more.  But it's changed.
7        Q    And that territory is geographic?
8        A    Yes, obviously.  I mean, by state.  Actually,
9    by ZIP code, sorry.
10       Q    I wonder if you can kind of walk me through
11   your day as a member outreach executive.  How much of
12   your day do you spend on the phone?
13       A    Probably about 100 percent of the day.
14       Q    Do you have one of those headsets?
15       A    Yes.
16       Q    Do you have a set number of calls that you're
17   supposed to make in a day?
18       A    Not, I mean it's not, you know, written in
19   any rules that we have to make, you know, this number
20   of calls or anything like that, but yes, we tend to
21   target around 60 to 80 phone calls a day.  That's a
22   pretty good day.
23       Q    And are those, when you say 60 to 80, are
24   those completed calls where someone is answering on
```

Patrick Cavanna    March 5, 2014

1   the other line?

2       A    Sometimes.  I mean, that would be a great day

3   if that happened.  Sometimes they are, a lot of times

4   it's voice mails.  It's a combination of those

5   things.

6       Q    And besides calling, do you also have other

7   sales activities that you do, e-mailing, for example?

8       A    Yes, I mean yes, communication, e-mails, fax.

9   That's the only thing I can think of off the top of

10  my head.

11      Q    The same question here, do you have a set

12  number of e-mails you're supposed to send in a day?

13      A    No.

14      Q    Besides those three, e-mail, fax and phone,

15  are there other ways that you contact practices?  Do

16  you go in person, for example?

17      A    We don't -- well, conferences are one way.

18  And then if we're out at a conference and, you know,

19  I happen to call, that conference is in my territory,

20  I happen to call someone and I say I'm going to be in

21  town, then I would meet them at their office.  But

22  other than that, no, we don't fly out and just go,

23  you know, to clinics door to door or anything like

24  that, no.

Patrick Cavanna    March 5, 2014

```
1        Q    You have gone on clinic visits before?
2        A    Yes.
3        Q    How often do you go on clinic visits?
4        A    Not -- I mean, I can only remember like two
5   or three times.
6        Q    That's over the last --
7        A    Two and a half years.
8        Q    -- two and a half years?
9        A    Yes.
10       Q    So how do you know who to contact?
11       A    It's in our, we use this CRM called Sales
12  Force and they're automatically uploaded into that,
13  into our database.  And there are reports built out,
14  you know, under our names.  You go into that report,
15  a whole list of people to call.
16       Q    Do you use Quickbase as well?
17       A    We did use Quickbase, yes, sorry.  Now we use
18  Sales Force.
19       Q    So Sales Force is a successor to Quickbase?
20       A    Right.
21       Q    When did that switch happen?
22       A    I don't remember 100 percent.  I would say
23  probably September, August, maybe, of last year,
24  2013.  I'm not 100 percent on that.
```

Patrick Cavanna   March 5, 2014

1      Q    And I understand that at some point RHN and
2  DHN became essentially ContextMedia Health, is that
3  right?
4      A    Yes.
5      Q    Before that happened, you were selling both
6  RHN and DHN, I assume?
7      A    Correct.
8      Q    Was there, I mean, were you selling more of
9  one than another?  I mean, were you making more calls
10 for one than another?
11     A    Well, when I first started it was days,
12 right.  So Monday, Wednesday, Friday we would do DHN.
13 Tuesday and Thursday would be RHN.  And then the next
14 week it would change, RHN Monday, Wednesday, Friday.
15 So it was like that.  When I first started I would
16 say, I mean, 50/50.
17     Q    And who determined the schedules?
18     A    It was just kind of best practices from my
19 boss, Matt Garms.  It wasn't really a set schedule.
20 Obviously if we had to do one call, we were allowed
21 to deviate.
22     Q    And has Matt been your boss for the entire
23 time you've been at Context?
24     A    My direct boss, yes.

Patrick Cavanna    March 5, 2014

1    Q    And he's also part of the sales team?

2    A    Yes, he is.

3    Q    Are you aware where these -- you're provided

4    with a list of practices.  Do you know where that

5    list comes from?

6    A    No.  I know that they're coming from our

7    sponsors, but I don't know what sponsor is providing

8    those lists.  I don't think I've ever really asked.

9    Q    Just so I understand, because I've never seen

10   Sales Force's software, although I think their

11   building is across the river, so you're sitting in

12   front of a screen and you've got a list of, maybe

13   like a spreadsheet to open of practices you need to

14   call?

15   A    No, it's in the CRM, so you can run reports,

16   you can filter out by different, you know.

17   Q    And you're allotted a number of practices to

18   call each day, it just kind of trickles down to your

19   screen?

20   A    Well, you determine that by, you know, for

21   instance, they all start out as open accounts, pull

22   from that account and based on the conversation, you

23   set an activity out for tomorrow so when you go in

24   tomorrow, you pull out your activities for today and

Patrick Cavanna    March 5, 2014

 1   that account's in there now.
 2      Q    Got you.  Okay.  So until someone claims
 3   them, these accounts are just kind of open, their
 4   status is open and then you follow up and make the
 5   calls on a claim?
 6      A    Well, no.  The open accounts are in each --
 7      Q    They're in your names to begin with?
 8      A    Yes.  It's not just everybody can take
 9   whatever.
10      Q    When you call a practice, do you have a
11   script?
12      A    No, I usually just, you know, go through
13   conversation.  I don't have a script in front of me
14   that I'm reading off and that sort of thing.  So no,
15   I don't have a script in front of me.
16      Q    Did you ever have a script in front of you?
17      A    No.
18      Q    Even when you started?
19      A    No, absolutely not, yes.
20      Q    Does anyone use scripts?
21      A    I think some of the new guys will create
22   their own just so they can feel comfortable.  But I
23   mean, that usually, you know, after they get the hang
24   of it, I don't really see anybody sitting in front of

Patrick Cavanna    March 5, 2014

1  their computer with a script there.

2      Q    So your experience is that when member

3  outreach executives come through, they will sometimes

4  make their own script?

5      A    I mean, I guess more of a guide for what to,

6  you know, how to approach and say hi to somebody and

7  how to find their way through the correct point of

8  contact.

9      Q    I understand everything's been merged into

10  ContextMedia Health now, but do you still know if the

11  practice is more, let's say, diabetes focused or more

12  rheumatoid focused before you even pick up the phone?

13  Do you know what the practice specialty is?

14      A    Yes, yes.  It would say that in the Sales

15  Force.

16      Q    That information is contained?

17      A    Yes.

18      Q    And despite the merger, are you still

19  primarily calling on diabetes and rheumatology

20  practices?

21      A    Actually, no.  I'm actually more focused on

22  primary care physicians now.

23      Q    And that's a result of the kind of, I'm

24  calling it, it's not really just a merger, it's a

Patrick Cavanna    March 5, 2014

```
 1   consolidation of the two brands?
 2       A   I wouldn't say it was the result of that.
 3   I think we just started, we must get a list and we
 4   opened up, you know, a primary care network.
 5       Q   You've noticed a lot more primary care
 6   clinics coming through?
 7       A   Yes.
 8       Q   So beyond that info -- so you'll know what
 9   the practice specialty is.  What else do you know
10   about the practice before you pick up the phone?
11       A   I mean, you're talking about a cold --
12       Q   A cold call.
13       A   Cold call?  Really, that's it.
14       Q   So do you know if they have a competitor
15   product?
16       A   No, no.  You're talking about a cold call,
17   right?
18       Q   A cold call, right.
19       A   No, I wouldn't know.
20       Q   When would you know if they had a competitor
21   product?
22       A   If I talked to them and asked them or they
23   tell me.
24       Q   Or if someone else in the organization had
```

Patrick Cavanna    March 5, 2014

1  called before you as part of the notes?

2      A   I didn't really come across that too many

3  times.  I was one of the first sales guys there, so

4  there wasn't a lot of notes to look through.

5      Q   So when you cold call a practice, what do you

6  say to get their attention?

7      A   Well, I firstly, you know, introduce myself

8  and say I'm Patrick Cavanna from ContextMedia Health

9  and describe our service, we do the free flat panel

10  televisions and the conversation just kind of

11  naturally goes from there.

12      Q   And if a practice says no, I'm not

13  interested, take me off your list, for example, what

14  happens then?

15      A   I would try to keep the conversation going

16  and ask them why they're not interested.

17      Q   And if you have situations where a practice

18  says we have a competitor and we're just simply not

19  interested, please take us off your list, for

20  example, do you remove the competitor from your CRM

21  database?

22          MR. O'BRIEN:  Object to the form.  You mean

23      remove the practice?

24

Patrick Cavanna    March 5, 2014

```
 1   BY MR. BERNAY:
 2       Q   To remove the -- I don't want to speak to two
 3   meanings here, so I'll be clear.  If a practice tells
 4   you please take us off your list, do you take them
 5   off the list and stop calling them?
 6       A   It depends.  If I feel like I could talk to
 7   them later, then I would just push them out for a
 8   really long time.
 9       Q   What happens if a competitor tells you --
10   sorry, if a practice tells you they have a competitor
11   product?  What do you do then?
12       A   I say, oh, who are you going with?
13       Q   And if they, let's say, tell you that they
14   have Healthy Advice or Patient Point, what do you say
15   next?
16       A   I say tell me your thoughts on it.
17       Q   And if the practice tells you we're happy
18   with the product, what do you say then?
19       A   I would ask them have you sat down in front
20   of the screen and taken a look at it?
21       Q   And if they respond yes and we're happy with
22   the product, do you continue to try to sell at that
23   point?
24       A   To be honest with you, the majority of the
```

Patrick Cavanna    March 5, 2014

```
 1   times they say no, they haven't taken a look at it.
 2       Q    And you're saying that's true of Healthy
 3   Advice or Patient Point?
 4       A    What's true?
 5       Q    That the practices haven't really looked at
 6   the system that's in their office?
 7       A    I wouldn't say that for, you know, for all
 8   the practices I've talked to that have Healthy
 9   Advice.  But the majority of the ones that I can
10   remember, yes, I mean, the office manager is so busy
11   that they don't have time to really look at the
12   screen.
13       Q    Does Context have a list of practices that it
14   will not call back for any reason?
15       A    I wouldn't say it was a new, you know, a
16   separate list.  For instance, if we call a doctor and
17   they're deceased or retired, obviously we're not
18   going to call them back.
19       Q    Right.  Do you still use tags in the database
20   like unqualified?
21       A    Do we still use them today?
22       Q    Yes.
23       A    Yes.
24       Q    And what does unqualified mean?
```

Patrick Cavanna    March 5, 2014

1     A    They don't fit our, you know, criteria of

2  whatever it is that they qualify for the free

3  television.  So for instance, doctor's deceased, he's

4  retired, you know, if that's the only doctor at the

5  practice, unqualified.

6     Q    And if a practice has a competitor installed

7  and doesn't want to switch at that moment, is that

8  practice also unqualified?

9     A    No.

10    Q    What would you label that practice as?

11    A    Objection.

12    Q    And what's the procedure with objection

13  practices?

14    A    I mean, there's no procedure.

15    Q    Do you try to call them back later on?

16    A    Yes, it depends.  It depends.  Sometimes we

17  don't.

18    Q    And let's say that you get confirmation on a

19  sale, a practice wants to go with ContextMedia.  What

20  happens next?

21    A    Are you talking about to date, right now?

22    Q    Well, has the policy or has the procedure

23  changed over time?

24    A    I mean, there's a lot of things that's

Patrick Cavanna    March 5, 2014

1   changed over time.

2      Q   Let's go back, then, and start with when you

3   started with the company in August 2011.

4      A   Okay.

5      Q   Let's say a competitor, I'm sorry, a practice

6   tells you that they want to take you up on your offer

7   for a screen.  What do you do next?

8      A   So back in 2011 I would fax them or e-mail

9   them the sign up form and I would walk through it

10  with them.

11     Q   So you'd have them on the phone --

12     A   Mm hmm.

13     Q   And you'd help them fill out the demographic

14  information?

15     A   Mm hmm.  Yes.

16     Q   And we'll look at the form in a little while

17  and I'll ask you some questions about it then.

18     A   Okay.

19     Q   If you were switching out a competitor

20  product, what would you do?

21     A   This is back in 2011?

22     Q   2011.

23     A   I would have them actually fill out a switch

24  out form.

Patrick Cavanna   March 5, 2014

1      Q    And what is a switch out form?

2      A    The switch out form is essentially saying

3  that their practice can -- allows us to switch out

4  the, whatever competitor is in that waiting area.

5      Q    And is the switch out form required?

6      A    If they had a competitor in there, when I

7  first started in 2011, yes.

8      Q    And is that not the case today?

9      A    Well, we don't, no, we wouldn't use a switch

10  out form now.  That's not the -- there's a different

11  process.

12      Q    So what's the process with competitors today?

13      A    Today the clinic has to actually call whoever

14  that competitor is and have them take down the

15  television.

16      Q    And when did that change come into effect?

17      A    You know what?  That I don't remember, I have

18  not the slightest clue when that took effect as far

19  as specific date-wise.

20      Q    So you no longer use switch out forms?

21      A    No.

22      Q    And these forms were part of a switch out

23  package, is that right?

24      A    What do you mean by switch out package?

Patrick Cavanna    March 5, 2014

1      Q    Well, I think I'll start by asking are you
2   familiar with the term switch out package?
3      A    No.
4      Q    So these -- a switch out form is essentially
5   like an authorization form, is that right?
6      A    (Nodding.)
7      Q    And what was your understanding of that form
8   when you started?  What was the purpose of that form?
9      A    For the clinic to allow us to switch the
10  television.
11     Q    Did that form give ContextMedia the legal
12  right to come in and switch out a competitor product?
13         MR. O'BRIEN:  Object to the form.  You can
14     answer.
15     A    I mean, I don't know as far as legal right.
16  I mean, to the best of my understanding it was a form
17  that allowed, that said that the clinic was allowed
18  to switch out the television.
19  BY MR. BERNAY:
20     Q    Have you ever sold a practice by e-mail
21  alone?
22     A    I don't recall.
23     Q    It always starts with a cold call?
24     A    Of course, yes.

Patrick Cavanna    March 5, 2014

```
 1      Q    Were your calls recorded?

 2      A    No.

 3      Q    Were anyone else's calls ever recorded?

 4      A    No.

 5      Q    Was your productivity monitored in any way?

 6      A    What do you mean by monitored?

 7      Q    Was someone keeping tabs on the member

 8  outreach executives in terms of how many phone calls

 9  they were making a day, sales they were closing, et

10  cetera?

11      A    We would have software that would record how

12  many calls we have.  And we have a board up that says

13  how many sales, you know, we have or we've made up

14  till today.  But I don't think, if it was being

15  monitored, I wouldn't necessarily use that term.

16      Q    Who's looking at those numbers?

17      A    Everyone, I would speculate.  I mean, I

18  couldn't give you specific people, but it's out there

19  for anybody to see.

20      Q    Is someone looking at those numbers with a

21  critical eye in terms of how much people are selling

22  or not selling?

23      A    What do you mean by critical eye?

24      Q    I guess I'm asking for more, kind of an
```

Patrick Cavanna    March 5, 2014

1    oversight position.  Like you report to Matt Garms,

2    you told me that, right?

3         A    Mm hmm.  Yes.

4         Q    So is he looking at, you know, the day in,

5    day out numbers from the sales team?

6         A    I don't know what he's looking for, but I

7    wouldn't have an insight as to what exactly he's

8    looking for.  But I assume if it's a bad sales month,

9    it's pretty obvious to everyone.

10        Q    I'm going to switch gears a little bit.  I

11   want to ask you about your training.

12        A    Sure.

13        Q    What kind of training did you receive when

14   you joined Context?

15        A    I don't recall specifically.  It was, you

16   know, I know I was on the phone within day four.  But

17   he would go over what to, you know, our product,

18   obviously, how to use Quickbase at the time, that

19   sort of thing.

20        Q    When you say he would go over, who's he?

21        A    Matt Garms.

22        Q    And when you joined in August 2011, who else

23   was on the sales team with you?

24        A    So Deven Tatum, Brok Vandersteen, Patrick

Patrick Cavanna    March 5, 2014

```
 1   Gerrity, Jordan Zmick.  I believe that's it.
 2       Q    And Patrick and Jordan are no longer with the
 3   company, is that right?
 4       A    Yes, correct.
 5       Q    Why did Patrick leave?
 6       A    I think he had another opportunity.
 7       Q    And Jordan?
 8       A    Jordan had another opportunity as well.
 9       Q    So what did you do to get up to speed on the
10   product that you were selling?
11       A    Really, I mean, I listened to kind of what
12   Matt told me about the product, I checked out, you
13   know, our DVD loop, I guess, and kind of took it from
14   there.
15       Q    And did you do some research on competitor
16   systems as well?
17       A    Back when I started?
18       Q    Mm hmm.
19       A    No.
20       Q    Was there a point in time when you did
21   research on competitor systems?
22       A    No.
23       Q    Did you know anything about the competitor
24   systems before you started selling?
```

Patrick Cavanna    March 5, 2014

```
 1      A    Yes.
 2      Q    And how did you gain that information?
 3      A    Well, you know, we were provided with
 4   marketing material.
 5      Q    Marketing material that Context produced?
 6      A    Yes.
 7      Q    And would those materials include side by
 8   side comparisons?
 9      A    Yes.
10      Q    And besides the marketing material, what else
11   did you consult, if anything, to learn about
12   competitor products?
13      A    You know, by talking to people on the phone
14   that had the competitors up.
15      Q    Did anyone, when you started did anyone tell
16   you anything about Healthy Advice's products?
17      A    I don't recall.  Maybe, yes.
18      Q    Who would have?
19      A    It would have been Matt.
20      Q    Anyone else besides Matt?
21      A    Maybe, you know, some of the other sales guys
22   that were on the phone.  I don't really remember.
23      Q    Besides the -- do you remember learning about
24   other competitors besides Healthy Advice?
```

Patrick Cavanna    March 5, 2014

```
1        A    Yes.
2        Q    From the marketing materials?
3        A    From that and from also, you know, talking to
4    clinics on the phone.  You know, we're on the front
5    lines.  We're talking about people who are sitting
6    right in front of the TV, so a lot of the times
7    that's where I would get, you know, a lot of the
8    stuff about these clinics and the other TV systems
9    that they had.
10       Q    Besides the marketing materials that
11   ContextMedia produced, did you do anything, did you
12   review any other documents related to Healthy Advice
13   when you started or thereafter?
14       A    I might have jumped on their web site.
15       Q    And at any point in time did you watch a
16   video, did you watch a Healthy Advice loop?
17       A    No.
18       Q    Are you familiar with the competitor
19   intelligence folder that marketing maintained?
20       A    I know that there was one.  I wouldn't say I
21   was familiar with it.
22       Q    Did you ever look at it?
23       A    I don't think I did, to be honest with you.
24       Q    From time to time were there lunch and learns
```

Patrick Cavanna    March 5, 2014

1    organized at Context?

2        A    There were a few, yes.

3        Q    And what was the purpose of a lunch and

4    learn?

5        A    I mean, really to talk about anything, you

6    know, how the day's going, how we're structuring our

7    day, you know, we would talk about competitors.  I

8    remember going to three of them.  I don't know if

9    there were any more than that.

10       Q    All right, I'm going to show you a document

11   which I will mark as Exhibit 1, Plaintiff's Exhibit

12   1.

13           MR. O'BRIEN:  Do what you want, but I would

14       recommend numbering the exhibits consecutively.

15           MR. BERNAY:  Okay.  Are you saying for the

16       next two weeks you want to number them

17       consecutively?

18           MR. O'BRIEN:  If we go to trial, that might

19       be easier.

20           MR. BERNAY:  Okay.

21           MR. O'BRIEN:  What number?

22           MR. BERNAY:  What number was that one?  5.

23       Q    I would set aside the top e-mail.  Do you

24   recognize this document?

Patrick Cavanna   March 5, 2014

1      A   I mean, looking at it now, yes, it looks
2  familiar.
3      Q   Is this essentially what you received as a
4  new employee when you started?
5      A   I don't remember if this was exactly it.  To
6  be honest with you, I don't really remember.
7      Q   Set aside that this is the exact version of
8  the same document.  Did you receive a training manual
9  when you started?
10      A   I believe I did.  But like I said, I don't
11  really remember if I did or not.
12      Q   If you turn -- there are some numbers on the
13  lower right-hand corner of these pages which we call
14  a production number.  And if you'd turn to page 645A,
15  which corresponds to page 1, is the schedule that's
16  here similar to what your training when you started
17  at ContextMedia?
18      A   I don't really remember the schedule for my
19  training.  I mean, that was so long ago.  This looks
20  like something I might have received.
21      Q   But it's similar, you would agree, to what
22  you described earlier.  There is a review of
23  Quickbase, is that right?
24      A   I believe, yes, I believe Quickbase was on

Patrick Cavanna    March 5, 2014

1   there.  Yes, it says review Quickbase on this.

2       Q    And was part of your day spent, at least if

3   you can recall, reviewing this manual?

4       A    You know what?

5       Q    Or a very similar version?

6       A    Majority of the day was really spent in time

7   with Matt.

8       Q    Did you listen in on sales calls with Matt?

9       A    Not with Matt but, you know, other sales

10  guys, yes.

11      Q    And when you listened in on sales calls, were

12  you actually listening in to the line and were you

13  just standing there in conference?

14      A    Yes, I was listening in to the line.

15      Q    If you turn to page 12 or 6469, is half that

16  page cut off on yours?

17      A    Yes, I'm only seeing -- this is what I'm

18  seeing here (indicating).

19      Q    We'll discuss the summation later.  Then I'm

20  going to mark this as 18.

21          (Documents marked as Plaintiff's Group

22           Exhibit 18 for identification.)

23      Q    I'm giving you the same thing, just a

24  different copy.  It's just a clean copy of it.

Patrick Cavanna    March 5, 2014

```
 1      A    Got you.
 2      Q    So is this the sign up form that you would
 3   send to a practice when you first started after you
 4   had landed the sale?
 5      A    Not after I'd landed the sale.
 6      Q    Would the practice -- well, the practice
 7   agreed to go with ContextMedia and that's why you
 8   were sending the form?
 9      A    No.
10      Q    So you sent this form as a matter of course
11   before the --
12      A    Yes, if they wanted more information.
13      Q    You'd send them the sign up form?
14      A    And along with other --
15      Q    Materials?
16      A    Yes.
17      Q    And after they had indicated a willingness to
18   go with ContextMedia, then you'd walk them through
19   this form?
20      A    Correct.
21      Q    And if you notice down at bracket D, there
22   are, I guess seven sentences set apart with check
23   boxes.  As part of that process walking through,
24   walking the practice through this form, did the
```

Patrick Cavanna    March 5, 2014

1  practice have to sign off on each of these individual

2  statements?

3      A    You mean check them?

4      Q    Check them, yes.

5      A    Yes.

6      Q    And did you ever have a practice that refused

7  to sign one or more of those statements?

8      A    No.  Have I ever had a clinic refuse to sign

9  this if they wanted to sign up?  Or check this, I'm

10 sorry.

11     Q    No, I'm asking have you ever had a clinic

12 that has told you I don't want to sign, for example,

13 the monthly patient traffic estimate, let's say?

14     A    You know, there's only been rare instances

15 that that's happened.  And the rare instances that I

16 recall, you know, they would just sign it, you know,

17 sign their initial.

18     Q    But they were supposed to sign all of these,

19 is that right, or put checks in all of these?

20     A    Essentially, yes.

21     Q    Was the form acceptable if they did not?

22     A    I've had some instances where maybe there was

23 a check box that wasn't signed or checked and we went

24 ahead and did it anyways.

Patrick Cavanna    March 5, 2014

1      Q    If you turn to page 15 and 16, what are these
2  two pages?
3      A    It looks like a list of competitors.
4      Q    And do you recall seeing a comparison chart
5  like this when you started?
6      A    Yes, I remember seeing this.
7      Q    And did you have something like this sheet at
8  your work space in case you called and needed to
9  reference it?
10     A    No.  I mean, I don't remember, you know,
11  taping this up or anything like that.
12     Q    Did you ever refer to something like this or
13  one of the comparison charts when you were calling a
14  practice if you knew they had a competitor?
15     A    What do you mean by that?
16     Q    Well, if a practice indicated that it had a
17  competitor, in order to discuss what features that
18  competitor had and how they compared to Context, did
19  you have a reference like this?
20     A    I mean, we were provided this, you know, when
21  we started.
22     Q    But if that came up in conversation, you
23  wouldn't use something like this, you would just --
24     A    They would just, you know, give us --

Merrill Corporation - Chicago
(312) 386-2000                    www.merrillcorp.com/law

Patrick Cavanna    March 5, 2014

1     Q    Free flowing conversation?

2     A    Exactly, right.

3     Q    And if you look on the Healthy -- I'm looking

4  at page 15 now.

5     A    Okay.

6     Q    If you look at, for example, the Healthy

7  Advice call, it says that their network is known as

8  Arthritis Care Network.  You've certainly run into,

9  I'm sure, a lot of practices that have that network,

10  is that right?

11    A    You know, I don't recall ever hearing of

12  Arthritis Care Network, no.

13    Q    Did the practice tell you, they would say

14  that they have Healthy Advice?

15    A    They would say that they had probably Healthy

16  Advice, yes.

17    Q    And if you notice in the third column, it

18  says cancellation can occur after the system has been

19  installed for six months, requires two weeks' written

20  notice.  What do you take that to mean?

21    A    I mean, what do you mean by that, what do I

22  mean?

23    Q    When you called and the practice told you

24  that they had Healthy Advice, did you ask them, did

Patrick Cavanna    March 5, 2014

1    you ever ask how long they had had the system for?

2        A    Yes.

3        Q    Every time?

4        A    I don't recall every -- I'm not sure if I

5    said that every time.  It depends on, I guess, how

6    the conversation was going.

7        Q    Did you tell the practice that they needed to

8    provide written authorization to Healthy Advice to

9    switch out?

10           MR. O'BRIEN:  At what point in time are we --

11   BY MR. BERNAY:

12       Q    When you started.  I'll ask that question

13   again, actually.  Around the time you started, did

14   you tell practices that they needed to provide two

15   week written notice to Healthy Advice?

16       A    I didn't mention that.  It was just like a,

17   like I said, the switch out form is really what I

18   sent them.

19       Q    If you look at the final row there on this

20   column, in 30 minutes of programming, nine minutes is

21   dedicated to sponsor messaging.  Did you ever

22   communicate to a practice that half of Healthy

23   Advice's loop was advertising?

24       A    Based on what I heard from other clinics that

Patrick Cavanna   March 5, 2014

1    had Healthy Advice, yes.

2        Q    So other clinics told you that half of

3    Healthy Advice's loop was advertising?

4        A    I mean, the ones that I remember, you know,

5    they said yeah, it's all ads.

6        Q    Did you ever go to anyone within ContextMedia

7    and say, hey, actually this is wrong, it's got to be

8    at least half?

9        A    I don't recall saying that.

10       Q    And if you go to page 27, and this concerns

11   the competitor switch out process.

12       A    Mm hmm.

13       Q    It's hard to see this form, it's even a

14   little blurrier on this page, but do you recognize

15   this as the installation authorization that you would

16   send to practices?

17       A    This is what it looks like, but again, I

18   can't read what it says.

19       Q    I'm not going to make you read it.  And

20   again, this is required for every time you switched

21   out a competitor?

22       A    Correct, at that time.

23       Q    At the time, right.  If you turn the page to

24   page 28, there's a different procedure in place at

Patrick Cavanna    March 5, 2014

```
 1    the top of the page depending on whether the practice
 2    is an Accent Health practice or not.  Do you recall
 3    there being a different procedure in place?
 4         A    With other competitors?
 5         Q    Mm hmm.
 6         A    You know what, I don't remember.  Not to my
 7    knowledge.  I mean, from what I can recall, at that
 8    time I believe it was, you know, all the same.
 9         Q    And today is there only one procedure?
10         A    Yes, the procedure is, you know, have the
11    clinic call whoever that competitor is and get them
12    to take the television out.
13         Q    So you don't recall going through a different
14    procedure with Accent Health?
15         A    I don't remember that.
16         Q    Do you know why there was a different
17    procedure?
18              MR. O'BRIEN:  Object to the form.  You can
19         answer.
20         A    I wasn't aware that there was a different
21    procedure.
22    BY MR. BERNAY:
23         Q    All right, how were you compensated as a
24    member outreach executive?
```

Patrick Cavanna    March 5, 2014

```
 1      A    I have a salary and then I also get
 2   commissions.
 3      Q    And what is the nature of that commission?
 4      A    What do you mean by that?
 5      Q    So you have a base salary and then how is
 6   your commission calculated?
 7      A    The exact numbers or, I mean --
 8      Q    Are you compensated based on the number of
 9   practices that you close?
10      A    It's not contingent on -- I mean, we get a
11   commission on, you know, each sale that we bring in.
12      Q    And what is that commission?
13      A    I mean, it's changed.  It depends on how
14   many, you know, qualified doctors there are.  It
15   depends on a lot of things.
16      Q    Okay.  Besides qualified doctors, what does
17   your commission hinge on?
18      A    What do you mean by that?
19      Q    Well, you said it depends on a lot of things.
20   So what are some of those things?
21      A    For instance, if a practice has more than one
22   waiting room, you know, we get more commission.  Like
23   I said, if there's more qualified doctors, we get
24   more commission.  But the commission structure has
```

Patrick Cavanna   March 5, 2014

1   changed, you know, since I've started numerous times,
2   so I can't really tell you specifics.
3        Q    How has the commission structure changed?
4        A    Like I said, I mean, it's changed a lot.
5   I can't recall all the changes that's been made with
6   commissions.
7        Q    Beyond commissions, are there other
8   incentives that are offered from time to time?
9        A    Yes.  For instance, if we're having, whoever
10  is having a good month, they get like movie tickets
11  or something like that, you know, sales contacts,
12  stuff like that.
13       Q    Did your commission, would the amount of your
14  commission depend on if the sale was a competitor
15  switch out?
16       A    I don't recall.  I don't really recall.
17       Q    Anything else that would factor?
18       A    Off the top of my head I can't, I really, I
19  can't really say anything more about that.
20       Q    I asked before if you had seen a Healthy
21  Advice loop.  Have you seen Healthy Advice's contract
22  with its practices?
23       A    No, I don't recall ever seeing a, you know, I
24  wasn't even aware that they had a contract with other

Patrick Cavanna    March 5, 2014

1    practices.

2        Q    Just to be clear, when I say contract, I'm

3    talking about an enrollment agreement.  Have you ever

4    seen an enrollment agreement with, a Healthy Advice

5    enrollment agreement with one of its practices?

6        A    I don't recall ever seeing one.

7        Q    Did anyone ever tell you that the sales team

8    needed to focus on switching out competitors?

9        A    I wouldn't exactly use those terms.

10        Q    What would you say?

11        A    I would say there were some times where,

12    you know, we would, I guess, try to switch out

13    competitors if we came across them.  I mean, I don't

14    think those words have ever, you know, Matt's never

15    came to me and said I want you just focusing on a

16    specific competitor or competitors.  I mean, it

17    was --

18            MR. BERNAY:  This would be a fine time to

19        take a break if you want to take one now.

20            MR. O'BRIEN:  Okay.

21            (A recess was taken, after which the

22        following proceedings were had:)

23    BY MR. BERNAY:

24        Q    Before the break, we looked at the

Patrick Cavanna    March 5, 2014

1    authorization form in this manual.  And you don't

2    have to turn back.  And you said you would use this

3    authorization form with switch outs.  Did you use

4    that form with every competitor?

5        A    When I started, to my recollection, yes.

6        Q    Regardless if it was Healthy Advice or Accent

7    Health or Health Monitor, you'd always make sure you

8    had that form?

9        A    I did.

10       Q    Did you, besides Matt Garms, did you have

11   discussions about the competitor switch out process

12   with anyone else at ContextMedia?

13       A    I don't recall.

14       Q    Any discussions with Jeana Loewe?

15       A    Yes, she had -- I don't exactly remember what

16   those discussions were, but I remember her correcting

17   me.

18       Q    Correcting you about what?

19       A    Not really -- just if she heard something

20   that, you know, maybe wasn't true, she would kind of

21   correct me.

22       Q    And you mean she would overhear you saying

23   something that wasn't true?

24       A    Maybe it was incorrect.

Patrick Cavanna    March 5, 2014

```
1        Q    But you can't remember what that was?

2        A    No, I can't.

3        Q    Did she approach you about it more than once?

4        A    I don't recall the exact number, I mean how

5   many times she did.

6        Q    Again referring to the competitor switch out

7   process, did you have any conversations with Jim

8   Demas about that process?

9        A    Was this when I first started?

10       Q    Yes, from the time you started onward.

11       A    Till now?

12       Q    Mm hmm.

13       A    Yes.

14       Q    What did you talk about?

15       A    I don't, I mean, I don't recall specifics.

16       Q    Was it directed to any competitor in

17   particular?

18       A    What do you mean by directed?

19       Q    Well, you were talking about switching out

20   Patient Point or Healthy Advice practices?

21       A    I don't remember, you know, specifically.

22       Q    Same question for Rishi Shah.  Did you have

23   any conversations with Rishi about competitor switch

24   outs?
```

Patrick Cavanna    March 5, 2014

```
 1      A    What kind of conversations?
 2      Q    Well, did Rishi ever tell you anything about
 3   what you should be doing with a competitor switch out
 4   or we're going to change our procedure, anything like
 5   that?
 6      A    I guess I'm just not kind of understanding
 7   the question.  What exactly, could you kind of
 8   explain more?
 9      Q    I mean, have you ever been part of any
10   discussion with Rishi Shah about competitor switch
11   outs?
12      A    Yes.
13      Q    And do you recall what that discussion was
14   about?
15      A    Yes, I do.
16      Q    What was it about?
17      A    Well, I recall one instance where, you know,
18   Rishi had actually, you know, the procedure had
19   changed.  I recall that conversation.
20      Q    So he told you the procedure had changed?
21      A    He would -- yeah.
22      Q    And why was he telling you that?
23      A    He told us that, you know, he just kind of
24   explained that now the correct procedure is to, you
```

Patrick Cavanna    March 5, 2014

1    know, have the clinic reach out to Healthy Advice.

2        Q    And was that in a meeting he told you this?

3        A    I don't recall if it was a meeting.

4        Q    Did he tell it to you personally or to others

5    as well?

6        A    He told it to pretty much everyone that was

7    on the sales team.

8        Q    Okay.  And did he tell you why the procedure

9    had changed?

10       A    I don't recall the exact reason why.

11       Q    You don't remember?

12       A    I remember that conversation being a long

13   time ago.  There was a reason why but I was, you

14   know, really focused on the procedure has changed.

15       Q    Did anyone on the sales team ask why suddenly

16   the procedure was changing?

17       A    I don't know if anybody else did.

18       Q    Is that the only conversation you can recall

19   with Rishi about competitor switch outs?

20       A    I'm sure I've talked to Rishi about, you

21   know, competitor switch outs, but I don't recall that

22   being the only conversation.

23       Q    Did you have any conversations with Shradha

24   Agarwal about the same topic, competitor switch outs?

Patrick Cavanna    March 5, 2014

1       A    Yes.

2       Q    And what did you discuss with Shradha?

3       A    That the authorization form is, you know,

4   it's a different process now.

5       Q    Before the protocol where the process

6   changed, did you have any conversations with those

7   folks, you know, about how the company was going

8   about switching competitors?

9       A    You know, to my recollection, I can't

10  remember.

11      Q    There are certain things that you, as a

12  member outreach executive, should not say about

13  competitors in the sales pitch, is that right?

14      A    In the actual sales pitch?

15      Q    During a call.  Were there things you were

16  not supposed to say to competitors?

17      A    If they were --

18      Q    I'm sorry, about competitors.

19      A    Yes, obviously if they were untrue, we're not

20  allowed to say those things.

21      Q    What were those things?

22      A    I mean, you know, for instance, I wasn't

23  allowed to say, you know, you'll get a million

24  dollars if you switch out with us.  That's obviously

Patrick Cavanna    March 5, 2014

1    absurd.  So yes, absurdly false things I was not

2    allowed to say, yes.

3        Q    Do you recall any specific statements that

4    you were told not to make?

5        A    Yes.

6        Q    And what were those specific statements?

7        A    This time frame was when I originally

8    started?

9        Q    From the time you joined through --

10       A    Yes, if they were, if someone had heard me

11   say that, for instance, you know, if it was all

12   advertising, don't say that.  It's not true.

13       Q    Did you say that at one point?

14       A    I don't recall.

15       Q    Do you recall someone told you not to say

16   that specifically?

17       A    Yes.

18       Q    And did they raise that issue with you

19   because they had heard you say it?

20       A    If they raised that issue with me, then yes,

21   it was because I said an untrue statement.  It wasn't

22   exactly that statement of, you know it's 100 percent

23   ads.

24       Q    Did you ever tell a practice that if the

Patrick Cavanna    March 5, 2014

1    practice signed an authorization form, that
2    ContextMedia would be authorized to remove the
3    competitor equipment?
4        A    I wouldn't necessarily put it in those words.
5        Q    What would you say?
6        A    Here's the switch out form, sign it.
7        Q    And how would you explain the switch out form
8    to the practice?  Just sign this?
9        A    I would just, you know, fax it to them and
10   somebody will be in contact with you.  That's it.
11   Here's the switch out form, here's the sign up form.
12       Q    You wouldn't explain why they had to sign the
13   switch out form?
14       A    I would, you know, I recall there were some
15   instances where I would say this is allowing you to
16   give us authorization to, you know, switch their
17   practice, or switch the television.
18       Q    And is that a true statement?
19       A    What do you mean by that?
20       Q    Well, did that form provide ContextMedia with
21   authorization to remove?
22       A    To the best, I mean, to the best of my
23   knowledge, yes.
24       Q    Shortly after you began working at Context,

Patrick Cavanna    March 5, 2014

1    did you tell a practice that you switch out Healthy

2    Advice every day, meaning you personally?

3        A    I don't recall saying me personally.

4        Q    Did you switch out Healthy Advice every day?

5        A    It seemed like we did.

6        Q    But were you?

7        A    Me, personally?  No.

8        Q    Do you know if anyone else made similar

9    statements about switching out Healthy Advice every

10   day?

11       A    I don't know.

12       Q    Around the time that you started, did you

13   tell practices that you had switched out hundreds of

14   Healthy Advice screens?

15       A    I don't know if I used one hundred or

16   hundreds.

17       Q    But a large number?

18       A    I don't recall.

19       Q    Had you switched out hundreds of Healthy

20   Advice screens around the time that you started?

21       A    Me, personally?  I don't recall me doing that

22   when I first started.

23       Q    So no?

24       A    Yeah, no.

Patrick Cavanna    March 5, 2014

1     Q    Have you told practices that half or
2  50 percent of Healthy Advice's loop is advertising?
3     A    I recall saying that.
4     Q    Is that a true statement?
5     A    Based on what other clinics were telling me,
6  I found that to be true based on the information I
7  was given from other clinics.
8     Q    When you made the statement that half of the
9  loop is advertising, did you tell people either on
10 the phone or in e-mail that you had heard that was
11 the case?
12    A    That sounds like something I would say I
13 heard.
14    Q    And is that a true statement?
15    A    Based, like I said, based on what they would
16 tell me, I would assume that that was a true
17 statement.
18    Q    Did you ever tell a practice that Context's
19 sign up sheet is not a contract?
20    A    Yes.
21    Q    Is that true?
22    A    To my knowledge, we don't have contracts.
23    Q    Will you allow a practice to become a member
24 without signing a sign up form?

Patrick Cavanna    March 5, 2014

```
 1     A    No.
 2     Q    Did you ever tell a practice that they were
 3   not legally obligated to do something or did you
 4   ever -- let's stop there.  Did you ever tell a
 5   practice that they were not legally obligated to do
 6   something?
 7     A    What do you mean, not legally obligated to do
 8   something?  Can you clarify what something was?
 9     Q    Well, did you ever tell a practice they
10   didn't have a contract with a competitor?
11     A    Based on what I have heard from that
12   particular, from a particular clinic, you know, in
13   the past, yes, I mean, that sounds like something I
14   have said.
15     Q    Did you ever tell a practice that you wanted
16   to upgrade their system?
17     A    Yes.
18     Q    Without identifying yourself as being from
19   ContextMedia?
20     A    Well, I always start out the call saying I'm
21   Patrick from ContextMedia Health.
22     Q    And do you tell the practice that you want to
23   upgrade their system?
24     A    Yes.
```

Patrick Cavanna    March 5, 2014

1      Q    Did you ever tell a practice that during the
2  switch out process there was no need to notify
3  Healthy Advice?
4      A    I might have recalled saying that back in,
5  you know, when I first started in 2011, yes.
6      Q    Prior to the change?
7      A    Prior to the change, yes.
8      Q    Did you ever tell a practice that had a
9  competitor's system that they could switch to
10  ContextMedia immediately?
11      A    I never said those words.
12      Q    Did you ever tell a practice that
13  ContextMedia switches four or five Healthy Advice
14  screens a week?
15      A    Yes, I recall saying that.
16      Q    Is that true?
17      A    It seems, I mean back then, yes, it seems
18  like we did a lot.  It seemed like we did four or
19  five screens.
20      Q    Did you ever tell a practice that
21  ContextMedia and Healthy Advice had a relationship
22  that meant the practice didn't have to contact
23  Healthy Advice about the switch out?
24      A    I don't recall ever saying that.

Patrick Cavanna    March 5, 2014

1      Q    Did you ever tell a practice that Healthy

2  Advice and ContextMedia had an agreement?

3      A    I don't recall saying that.

4      Q    All right, we're back into documents.  And

5  I'm going to first mark this first one as Exhibit 19.

6           (Document marked as Plaintiff's Exhibit 19

7            for identification.)

8      Q    Just take a minute and read through this

9  e-mail.

10     A    Sure.

11     Q    So let me ask you, this is an e-mail to, I

12 assume a practice contact, right?  And would this

13 August 16, 2011, would that have been pretty close to

14 your start date?

15     A    Yes.

16     Q    And is this typical of the kind of follow-up

17 e-mails that you would send to a -- actually, I

18 think, is this a fax?

19     A    Yes, I believe it is because it's the

20 21818.776, so I think it's a fax, yes.

21     Q    This is actually a fax sent via e-mail?

22     A    Yes.

23     Q    And so is this typical of the followup you

24 would do of a practice?

Patrick Cavanna    March 5, 2014

1        A    I mean, what do you mean by typical?

2        Q    Well, after you, let's say, made an initial

3    call to the practice, would you as a matter of course

4    follow up with an e-mail attaching more information?

5        A    After I talk to them, if they wanted

6    information, I would send more information.

7        Q    And if we look at the body of the e-mail, it

8    says, "Hi, Joanna.  Hope all is well.  Here is the

9    sign out and switch out form.  It's not a contract,

10    so you can fill out the sign up sheet and switch out

11    form and fax it back to me.  Remember, it's

12    100 percent free, no contracts, no obligations."

13            So the authorization form or the sign up

14    form does place obligations on the practice, isn't

15    that right?

16        A    To my knowledge, there's no obligation to --

17    are you talking about keeping the system for -- what

18    do you mean by obligation?

19        Q    Well, the practice has to sign monthly

20    traffic affidavits, is that right?

21        A    To the best of my knowledge, yes.  I don't

22    really deal with members, you know, that whole --

23        Q    That's member services?

24        A    That world, yes.

Patrick Cavanna    March 5, 2014

1      Q    So what do you mean the language no

2  contracts, no obligations?  What do you take that

3  language to mean?

4      A    That means it's not a contract.  There's no

5  obligations.  They don't have to -- they can pretty

6  much cancel whenever they want without a penalty.

7      Q    So if a practice cancels with Context,

8  Context will come out and take its screen and that's

9  that, no questions asked?

10     A    If they request it, to the best of my

11 knowledge, yes, that's what we do is we'll come out

12 and take it down.  But like I said, I don't really

13 deal with that day to day, so I can't really speak on

14 exact, you know, what happens if they do do that.

15     Q    Let me put this aside and I'll mark the

16 following exhibit as 20.

17         (Document marked as Plaintiff's Exhibit 20

18          for identification.)

19     Q    Take a minute to familiarize yourself with

20 this document.

21     A    Okay.

22     Q    So looking at the first paragraph, again this

23 is a blast fax, right?  Or not a blast fax, but a

24 fax?

Patrick Cavanna    March 5, 2014

```
 1      A    It's a fax to Andrea, nobody else.  It
 2  definitely wasn't a blast fax.
 3      Q    Right, on September 8, 2011.  And you say,
 4  "Hi, Andrea.  Here's the sign up sheet and switch out
 5  form for the Rheumatoid Health Network.  Remember,
 6  legally you are not actually tied to a contract with
 7  Healthy Advice."  What do you mean by that?
 8      A    From what I recall up until this point, the
 9  clinics who I talked to, you know, prior to this
10  e-mail had mentioned to me that they don't have a
11  contract with Healthy Advice.  So that's kind of what
12  I meant by that.
13      Q    So you assume that this practice didn't have
14  a contract with Healthy Advice?
15      A    Correct.
16      Q    Or if they did, they weren't legally bound to
17  it?
18      A    I assume that they didn't have a contract
19  with Healthy Advice.
20      Q    But you actually had no knowledge of whether
21  or not they had one?
22      A    I assumed based on the fact that I was told,
23  you know, by another clinic that they didn't have a
24  contract with Healthy Advice.
```

Patrick Cavanna    March 5, 2014

1      Q    And if you look at the next sentence, "I have
2    personally switched out about 35 screens in the
3    California area alone from Healthy Advice."  Is that
4    true?  Was that true at the time?
5      A    You know, it seemed like it at the time.
6      Q    But it wasn't true?
7      A    I'm not sure.  I'd have to go look back at
8    the numbers.
9      Q    You'd only, I guess, been at Healthy Advice
10    for four to five weeks.  Do you think it's possible
11    you could have switched out 35 screens in California
12    alone during that time?
13      A    For four to five weeks, I mean, no.
14      Q    How many do you think you may have switched
15    out in that time?
16      A    I have no idea.
17      Q    Could it have been less than five?
18      A    It could have been less than five, it could
19    have been 20.  Like I said, I would have to go back
20    and look at the numbers.  It could have been 35.
21      Q    All right, I'll ask you about another
22    document.  We'll mark this as 21.
23          (Document marked as Plaintiff's Exhibit 21
24            for identification.)

Patrick Cavanna    March 5, 2014

1      Q    And again, just take a minute to look at this

2    e-mail.  I'm going to focus your attention on the

3    second paragraph here.  First, again this is a fax to

4    a practice, I assume again very close to your start

5    date.  This is August 10, 2011.

6      A    Mm hmm.

7      Q    And the second paragraph says, "Again for

8    this to take place, we do have sponsors from diabetes

9    advocacy organizations to make this 100 percent

10   free."  So is it true that, this is pertaining to the

11   DHN, is DHN solely supported by diabetes advocacy

12   organizations?

13     A    Not solely supported.

14     Q    There are pharmaceutical sponsors as well?

15     A    Right.

16     Q    Did you ever have practices ask you who your

17   sponsors were?

18     A    Yes.

19     Q    And what do you say?

20     A    I tell them all the sponsors that come off

21   the top of my head.

22     Q    And for DHN who are those sponsors, I guess

23   around the time you started?

24     A    I mean, I remember Levemir, saying Levemir,

Patrick Cavanna   March 5, 2014

1   American Diabetes Association.  Those are the only

2   two I can recall off the top of my head at this

3   period.  Kemper foot balm I recall.

4       Q    Kemper foot balm?  Based on your experience

5   did practices, you know, for the first year or so you

6   were at Context, did they want to know who Context's

7   sponsors were?

8       A    You're talking about all the people that I

9   called in the year?

10      Q    Mm hmm.

11      A    I couldn't tell you all the people that I

12  spoke with in a year, everyone wanted to know.

13      Q    I'm just asking generally.  I mean, was it a

14  common question?  It didn't have to be asked every

15  time, but was it a common question?

16      A    What do you mean by common?

17      Q    Do you recall several instances of practices

18  asking you who Context's sponsors were?

19      A    In the first year, yes.

20      Q    I know I'm moving through a lot of documents.

21  I'm going to show you what I've marked as Exhibit 22.

22          (Document marked as Plaintiff's Exhibit 22

23           for identification.)

24      Q    Just again take a quick look at this.  This

Patrick Cavanna     March 5, 2014

```
 1   is actually an e-mail, not a fax.
 2       A    Right.  Okay.
 3       Q    If you look at the second paragraph, it says,
 4   "We have over a thousand hours of content of the same
 5   type of segments that we update on a monthly basis
 6   for you."  Was it your understanding that Context had
 7   thousands of hours of content in October 2011?
 8       A    Yes, I mean -- yes.
 9       Q    And that's true?
10       A    To the best of my knowledge, if I wrote this
11   in October 2011, then I obviously assumed that that
12   was true.
13       Q    And looking further down this e-mail, you say
14   I've got a $100 American Express gift card with your
15   name on it, too, right in time for the holidays if
16   you switch us out.  If you are hesitant to switch us
17   both out, try just switching one out, at least
18   Healthy Advice, and see which one you like better."
19   First, I guess, any reason why you picked Healthy
20   Advice over Accent Health as the one switch out?
21       A    Well, you know, I found it easier to switch
22   out Healthy Advice.
23       Q    And why was that?
24       A    Why was it easier to switch out Healthy
```

Patrick Cavanna    March 5, 2014

1    Advice?

2        Q    Mm hmm.

3        A    Because I've heard clinics complain about

4    customer service, you know, their loop is very

5    repetitive, they had a lot of ads, a slew of other

6    reasons.  If you compare, in my opinion if you

7    compare the two televisions, you know, it's kind of a

8    no brainer.

9        Q    Was it easier to switch Healthy Advice than

10   Accent Health because Context would do it itself?

11       A    I wouldn't say that that's the reason why it

12   was easier.

13       Q    But it was a reason?

14       A    No, I wouldn't say that that was a reason.

15       Q    I want to turn back to the gift card.  How

16   did gift cards work as part of the sales strategy?

17       A    Back then we were allowed to give anyone a

18   hundred dollar gift card.

19       Q    Any practice that expressed interest in

20   switching?

21       A    That signs up.

22       Q    That signs up, right, regardless of --

23       A    It doesn't have to be a switch out, yes.

24       Q    And when you say back then, were there

Patrick Cavanna    March 5, 2014

1    periods of time when you didn't give out gift cards?

2        A    Yes.  You mean for clinics who signed up?

3        Q    Yes.

4        A    Yes.

5        Q    So it was a promotion from time to time?

6        A    It was just kind of an incentive that we

7    could offer.

8        Q    And sometimes you would give less, sometimes

9    you'd give more?

10       A    Yes, to my recollection, sometimes they were

11   $50, sometimes they were $100.

12       Q    Or 200?

13       A    You know, I think I did 200 once and I got in

14   a lot of trouble with it and that's the last time I

15   ever did that.  Actually, I had to pay that out of my

16   pocket.

17       Q    So it was otherwise contained?

18       A    Yes.

19       Q    Do you still do gift cards?

20       A    Yes.

21       Q    And is that a pretty constant thing or are

22   there some months you do it and some months you

23   don't?

24       A    If they have a competitor, we're allowed to

Patrick Cavanna    March 5, 2014

1    offer them a hundred dollar gift card, if they have

2    regular cable TV we're allowed to offer them a

3    hundred dollar gift card in some instances.

4        Q    If they have regular cable TV, would you

5    switch out that TV?

6        A    It depends.

7        Q    And how long has it been the case that you

8    just incentivize competitor and cable switch outs?

9        A    I don't recall the exact date.

10       Q    But loosely?

11       A    Loosely, maybe a year ago.

12           (Documents marked as Plaintiff's Group

13            Exhibit 23 for identification.)

14       Q    Take a look at this e-mail.  I'll direct your

15   attention to a few parts of this e-mail.  This is an

16   e-mail to a Dr. Manoukian in California on

17   September 1, 2011.  And if you look at the end of the

18   first paragraph, it looks like he's got Healthy

19   Advice.  You say, "This does not surprise me in any

20   way as I have personally removed over 50 screens in

21   the California area from Healthy Advice who, like

22   you, were also turned away by the service,

23   professionalism and overall customer satisfaction

24   from this organization."  Again here you're telling

Patrick Cavanna    March 5, 2014

1   this practice that you've removed over 50 screens in
2   the California area alone from Healthy Advice.  Is
3   that true?
4       A    I would assume that that was true if I would
5   have wrote it.
6       Q    Now, if you recall, earlier we looked at an
7   e-mail that was dated September 8, 2011, and you told
8   that practice that you had switched, so it's a week
9   later, you had told that practice you had switched
10  out 35 screens in California.
11      A    Mm hmm.
12      Q    So that's 15 less than you had represented
13  you had switched out a week earlier.  So again your
14  testimony is that you had switched out 50 screens
15  from Healthy Advice customers who were turned away
16  from the company by, I guess it's lack of service,
17  professionalism and customer satisfaction?
18      A    Yes, I mean, I guess I was under the
19  impression that that's how many I did.
20      Q    And you say, looking at the second paragraph,
21  reading in the middle, "We pride ourselves in
22  customer satisfaction to the utmost" --
23      A    Where?  Okay, I've got you.
24      Q    Second paragraph.  "We pride ourselves in

Patrick Cavanna   March 5, 2014

1   customer satisfaction to the utmost extent.  We don't

2   just treat you like a customer and show you the

3   door."  What do you mean by that?

4       A    You know, I meant that we take care, we would

5   take care of you and that we wouldn't just not

6   contact you and leave you hanging.

7       Q    And the implication there is that Healthy

8   Advice does show you the door?

9       A    I don't think I was implicating that, you

10   know, in this sentence.  I was just saying in

11   generalities we don't, you know, we wouldn't just

12   show you the door.

13       Q    If you look at the third paragraph, looking

14   in the middle, you're comparing Healthy Advice and

15   Context and you say, "Our ads, which are all from

16   diabetes advocacy organizations, have the least

17   amount of air time in the industry."  So is it true

18   that every ad on DHN was from a diabetes advocacy

19   organization?

20       A    I believe what I meant by that in September,

21   I was under the impression that, you know,

22   pharmaceutical companies fell under that, I guess

23   category.  I was under the impression that our ads

24   were for diabetes, therefore they would advocate, you

Patrick Cavanna    March 5, 2014

1    know, being treated for diabetes.  That's what I

2    meant by that statement.

3        Q    So your understanding a month after you

4    started the job is that the pharmaceutical companies

5    that sponsored DHN were really advocacy

6    organizations?

7        A    I guess I misunderstood what advocacy meant

8    at the time.  But yes, I mean, I was under the

9    impression that we were for treating diabetes.

10            (Documents marked as Plaintiff's Group

11             Exhibit 24 for identification.)

12       Q    So let me show you another document.  This is

13   marked as 24.  Take a minute to look at this one.

14   And again this is an e-mail to a practice, the date

15   is November 9, 2011, and this is a longer e-mail

16   string.  It looks like the first e-mail is, if you

17   look on the second page, it's just kind of a

18   follow-up e-mail to a phone call?

19       A    Mm hmm.

20       Q    Does that look about right?

21       A    Yes.

22       Q    And the practice writes you back and says,

23   "I want to make sure that we will not be penalized by

24   Healthy Advice if we decide to switch.  Do you know?"

Patrick Cavanna    March 5, 2014

1    And you respond, "Hi, Valerie.  I switch about four

2    or five Healthy Advice screens a week."  Was that

3    true in November 2011?

4        A    It seemed like that was true at the time.

5        Q    "I assure you that you, your doctor or anyone

6    in that facility are in no way contractually

7    obligated to pay Healthy Advice a single penny for

8    switching out their television at all."  What was

9    your basis for making that statement?

10       A    I assumed that they weren't obligated based

11   on what other, you know, the other clinics that --

12   what they were telling me, essentially.

13       Q    So other clinics were telling you that they

14   were not liable to Healthy Advice at all?

15       A    They just said that they didn't have a

16   contract.

17       Q    And of course, you don't know if this clinic

18   has a contract with Healthy Advice?

19       A    No, I don't know if they -- I was under the

20   assumption that they didn't.

21       Q    You were under the assumption, but did you

22   ask?

23       A    I mean, I don't recall the specific

24   conversation.  Yes, I was under the assumption that

Patrick Cavanna    March 5, 2014

1   they didn't have a contract.

2       Q    You say, "I have personally switched out

3   approximately 97 facilities since I have started here

4   and not one of them has ever had to pay any penalties

5   whatsoever."  And when you say 97, that's a fairly

6   precise number.  How did you arrive at that number?

7       A    You know, I'd have to go look back at the

8   numbers, but it seemed like that's what we were

9   doing.

10      Q    And you say in the second paragraph, "It is

11  actually against the law to charge you for canceling

12  any type of educational content provided to you for

13  free by an organization, whether it's a TV, a

14  magazine or pamphlets."  What is your basis for

15  making that statement?

16      A    I heard this from another clinic.  They told

17  me that -- they told me that.

18      Q    Did you do anything to verify that it's

19  against the law to charge for canceling educational

20  content?

21      A    I don't know.

22      Q    You continue, "We adhere to those rules as

23  well and we are very transparent about it.  If you

24  decide you don't want us any more at any time, it's

Patrick Cavanna    March 5, 2014

1   as simple as an e-mail to me to say, hey, Patrick,

2   take it down, we don't want it any more and we will

3   do it with no questions asked and there is no

4   penalty."  Is it true that if a practice called -- if

5   you went back to the office today and a practice

6   called and said take down our screen, you would say

7   when can we schedule a tech to come out and do it?

8       A   Yes, if someone called me today and expressed

9   their frustration and we don't want it any more.

10      Q   Did you try to save the practice?

11      A   Sometimes.

12      Q   Not always?

13      A   It depends on how mad they were.  It depends

14  on if they were mad or if they absolutely didn't want

15  it.  I mean, you can tell on the phone if you don't

16  want to answer any questions, or you don't want to

17  ask any questions.

18      Q   So if someone called today and requested you

19  to take down their screen and you've done it or

20  you're going to schedule it?

21      A   I wouldn't personally schedule it.

22      Q   But no questions asked?

23      A   Like I said, I mean, it depends.  I mean, if

24  the conversation is going well, I'd ask questions.

Patrick Cavanna    March 5, 2014

```
 1    If it's not, I wouldn't.
 2        Q    All right, I show you one more e-mail.
 3             (Document marked as Plaintiff's Exhibit 25
 4              for identification.)
 5        Q    Just take a minute to look at this e-mail.
 6    So this is an e-mail dated May 16, 2012 concerning
 7    RHN to a, someone named Evelina in a practice.  And
 8    the second paragraph says, "Evelina, just as I had
 9    mentioned, we are switching out Healthy Advice TV's
10    at an astounding rate.  Just last week we did 23
11    switch outs in the L.A. area alone."  Is that
12    possible?
13        A    It's, I mean, like I said, I'd have to go
14    back and look at the numbers, but it's certainly
15    possible.
16        Q    Did you actually switch out 23 Healthy Advice
17    televisions in the L.A. area in early May 2012?
18        A    Did I?  I don't recall.
19        Q    Did the company?
20        A    I couldn't answer that, you know, without
21    having to look at the numbers.  If I wrote it down
22    here, I mean, it would seem that we were.
23        Q    And what would you do to look at the numbers
24    to confirm that?
```

Patrick Cavanna    March 5, 2014

1      A    You know, I didn't really look at numbers to
2   confirm that.
3      Q    I mean, today if you wanted to look at the
4   numbers to confirm that you had switched out 23
5   practices in Los Angeles alone in one week, what
6   would you do?
7      A    You know, that instance wouldn't come up
8   today.  I mean, there's no need for me to tell them
9   how many switch outs I did last week or anything like
10  that.
11     Q    Who at Context would know if there had been
12  23 switch outs in Los Angeles in early May 2012?
13     A    Anyone can go look back at the numbers.
14     Q    And where are the numbers kept?
15     A    I have no idea.
16     Q    But someone keeps the numbers?
17     A    You know, they're on the board.
18     Q    Are they in Quickbase or Sales Force?
19     A    I'm assuming there's a way in Sales Force
20  where you can find that.  I don't know how to do
21  that.
22     Q    Would Matt Garms know?
23     A    I don't know.
24     Q    Who would know?  Don't know?

Patrick Cavanna    March 5, 2014

```
 1      A    Don't know.  Who would know what?
 2      Q    Who would know if there had been 23 switch
 3   outs in Los Angeles in early May 2012?
 4      A    I wouldn't, I mean, I wouldn't know who would
 5   know that.
 6           MR. O'BRIEN:  Could we take a break?
 7           MR. BERNAY:  All right, we'll go for a break.
 8           (A recess was taken, after which the
 9        following proceedings were had:)
10      Q    So before the break we went through a number
11   of e-mails, as you recall.
12      A    Yes.
13      Q    And I've got a few more to show you.
14      A    Okay.
15           MR. BERNAY:  We'll mark this as Plaintiff's
16        Exhibit 26.
17           (Document marked as Plaintiff's Exhibit 26
18             for identification.)
19      Q    This is an e-mail from Silvia Velazquez to, I
20   guess it's MSE at ContextMedia, Inc. with the subject
21   quit snapshot of switchouts.  It's dated January 11,
22   2012.  Did you receive this e-mail?
23      A    No, I don't remember.  I mean, I wasn't
24   included on the e-mail.
```

Patrick Cavanna    March 5, 2014

1      Q    So you're not within the MSE distribution
2  list?
3      A    No.
4      Q    You'll note that she's telling the member
5  services team here we had 109 switch outs last year
6  in 2011.  Of those, and she goes through the numbers,
7  Accent Health, 26 cable TV's, 64 Healthy Advice.  Do
8  you have any reason to believe that those numbers are
9  incorrect?
10     A    No, I don't have a -- I mean, if she sent
11 this out to the team, I wouldn't think that it was
12 incorrect.
13     Q    And would Silvia be the one who kept this
14 information?
15     A    I don't know if she did or not.  Like I said,
16 I don't really have any insight into the member
17 services, what they do on a daily basis.
18     Q    So if there are 109 switch outs in 2011, then
19 it's fair to say you probably did not switch out 97
20 facilities in the first three months that you were at
21 Context?
22     A    Based on this e-mail, yes.
23     Q    So that statement is false?
24     A    Based on this e-mail, yes.

Patrick Cavanna    March 5, 2014

1      Q    Do you have any other reason to believe that
2   you may have switched out 97 practices?
3      A    Other than it seemed like that's what I did,
4   no, based on these numbers, no.
5      Q    And likewise, you probably weren't switching
6   out four or five Healthy Advice screens a week?
7      A    Did I say I switched out four to five Healthy
8   Advice screens a week?
9      Q    Yes, in that same e-mail that we looked at
10  just before break, you told a practice that you
11  switched out four or five Healthy Advice screens a
12  week.  I'm sorry, the other.  24.
13     A    Yes, I mean, it seemed like that's what I was
14  doing at the time.
15     Q    But that's a false statement?
16     A    Based on these numbers, I mean, it seems like
17  it's a false statement.
18     Q    And looking at Plaintiff's Exhibit 23 where
19  you say that you personally removed over 50 screens
20  in the California area from Healthy Advice, and that
21  would have been the first four weeks that you were at
22  Context, and all of them were turned away by the
23  service, professionalism and overall customer
24  satisfaction from Healthy Advice, that's also a false

Patrick Cavanna    March 5, 2014

1    statement?

2        A    Yes, I mean if you do the math based on

3    Silvia's e-mail, then yes, that could have been true.

4        Q    And you have no independent basis to think

5    otherwise?

6        A    What do you mean by that?

7        Q    Do you have any basis to believe that this is

8    accurate?

9        A    Which e-mail?

10       Q    23, the statement we're looking at, the 50

11   screens.

12       A    Could you repeat the question again?  I don't

13   really understand what you're asking.

14       Q    Sure.  So you're saying based on Silvia's

15   e-mail, this is probably a false statement?

16       A    Yes, based on Silvia's e-mail, I mean, yes.

17       Q    I'm asking do you have any other basis for

18   believing that it is not a false statement?

19       A    Other than me assuming that that's what it

20   felt like I did at the time, yes.

21       Q    And do you know how many, to date how many

22   practices have switched from Healthy Advice, slash,

23   Patient Point to Context?

24       A    I don't know the exact number.

Patrick Cavanna    March 5, 2014

1       Q   Were you made aware by others at Context of
2    certain misrepresentations that were made to
3    practices?
4       A   What do you mean by that?
5       Q   Did anyone approach you about false or
6    misleading statements that were made by the member
7    outreach team to practices?
8       A   To me, you know, if I said something that was
9    incorrect, yes, absolutely.
10      Q   Do you recall what you said that may have
11   triggered a comment like that or a response?
12          MR. O'BRIEN:  It's been asked and answered,
13      but you can answer if you know.
14      A   Yes, I mean, things that were in fact not
15   true that I assumed were, you know, four to five, I'm
16   sorry, not four to five, but half ads, they don't
17   have a contract, I was told not to say that, you
18   know, numerous times.
19   BY MR. BERNAY:
20      Q   So I'm going to direct you to Plaintiff's
21   Exhibit No. 10, which is somewhere in that stack.
22   And take a look at this e-mail.  Is this one of those
23   times when you were corrected about a misstatement?
24      A   Hold on one second.  Can I read the e-mail

Patrick Cavanna    March 5, 2014

1    here?

2         Q    Sure.  I'll walk through it with you.

3         A    Okay.

4         Q    This is an e-mail string that initiates with

5    Brok Vandersteen on March 27 and then you reply a few

6    minutes later and say -- this is about, the e-mail is

7    about Healthy Advice upgrades -- that it is, you're

8    saying it is still mostly general health, so your

9    ammo against them is really the same.  17 minutes of

10   content, the rest are ads on a 30 minute loop, no

11   video, very basic customization.  It should still be

12   a lay-up.  So you still think this is an easy,

13   Healthy Advice is an easy sell.

14        And then Jeana Loewe responds a few minutes

15   later and among other things she writes in kind of

16   bullet point 2, "Their stated advertisement time is

17   nine minutes, 30.  Please do not say that they only

18   have 17 minutes of content and the rest is ads.  This

19   isn't published and we cannot guarantee this to be

20   true.  There are a number of different scenarios that

21   affect content time, including Advitos, inclusion of

22   their own practice messages, et cetera, et cetera."

23   And then you respond and say Jeana is right, nine

24   minutes of ads.  Do you recall this correspondence?

Patrick Cavanna    March 5, 2014

```
 1       A    Looking at it now, I recall e-mail.  I mean,
 2   I don't recall the exact mind frame that I was at
 3   when I wrote this e-mail.  But yes, looking at it, it
 4   looks familiar.
 5            MR. BERNAY:  And I'll mark this as 27.
 6            (Document marked as Plaintiff's Exhibit 27 for
 7             identification.)
 8       Q    Take a minute to look at this e-mail.  And
 9   I'll just direct your attention to the beginning of
10   the e-mail.  Again this is an e-mail I assume to a
11   practice dated April 4, 2012.  You write, "Hi,
12   Laurie.  Please show this information to Dr. Metyas.
13   We can customize the loop to specifically include
14   autoimmune conditions that Dr. Metyas treats.  What
15   you are getting now with Healthy Advice is a 30
16   minute slide show that doesn't have any video, and
17   half of the 30 minutes consists of ads."
18            So a week earlier you had been told that
19   there are only nine minutes of ads, which is about
20   30 percent of the loop in Healthy Advice, and here
21   you're back to half.  How did that happen?
22       A    I must have made a mistake, you know, in
23   writing that.
24       Q    And after this date, did anyone else comment
```

Patrick Cavanna    March 5, 2014

```
 1   to you about the amount of advertising in the loop
 2   and your comments about the same?
 3        A    My comments are about the same.
 4        Q    I mean your statements.
 5        A    I mean, I don't recall specifically.
 6        Q    All right, you can put that aside.  I'm going
 7   to mark Plaintiff's Exhibit 28.
 8             (Document marked as Plaintiff's Exhibit 28
 9              for identification.)
10        Q    It's the same practice, about a week later.
11   Take a look.  This is an e-mail from you to Matt
12   Garms about the same practice we spoke about a minute
13   ago.  And you write.  "Notes from member services.
14   Silvia, this is kind of urgent.  They have Healthy
15   Advice right now and they are scheduled to upgrade
16   the TV on Monday.  We, of course, swooped in and told
17   her not to do it and to go with us.  As I was talking
18   to her today, Healthy Advice called her and told her
19   that no one is allowed to touch the television except
20   for Healthy Advice, which obviously is a boldface
21   lie.  I told her the Healthy Advice rep told her that
22   probably because she wants Laurie to keep the TV in
23   there for as long as she can."
24             So how do you know that the fact that no one
```

Patrick Cavanna    March 5, 2014

1    can touch Healthy Advice's equipment but Healthy

2    Advice is a boldfaced lie?

3         A    Because I was under the impression that that

4    wasn't true.

5         Q    That anyone could remove Healthy Advice

6    equipment?

7         A    The question again?

8         Q    You were under the impression that anyone

9    could remove Healthy Advice equipment?

10        A    No, I was under -- that's not what I said.

11   I was under the impression that what the rep told

12   Healthy Advice was not true.

13        Q    And the rep told Healthy Advice that --

14        A    The rep told the clinic.

15        Q    Sorry.  The rep told the clinic that no one

16   but Healthy Advice is allowed to remove their

17   equipment?

18        A    Yes, I thought that was untrue.

19        Q    And you never saw Healthy Advice's agreement

20   with its practices?

21        A    No, I did not.

22        Q    And you knew that ContextMedia had a

23   provision in its sign up form that said only

24   ContextMedia could remove ContextMedia's equipment?

Patrick Cavanna    March 5, 2014

1      A   I don't believe those are the specific words

2   on the agreement, but yes, there's something in

3   there, I believe in the contract, I think it was the

4   last bullet point that, you know, I don't exactly

5   recall the exact words.

6      Q   I'll just, I'll tell you, "I agree not to

7   remove, relocate, modify, alter or disrupt any of the

8   RHN system components without prior consent from the

9   Rheumatoid Health Network."  So you need our,

10  essentially you need ContextMedia's permission before

11  anything is touched?

12     A   Yes, I mean what I get from that is they are

13  not allowed to, you know, whoever signs that is not

14  allowed to, without consent, touch their -- move

15  their equipment or take it down.

16     Q   But you believe that's not the case for

17  Healthy Advice?

18     A   Yes, I was under the assumption that, you

19  know, they didn't have a contract, so yes, I thought

20  the rep at the time was not being honest.

21     Q   Did you ask anyone to confirm if that was the

22  case or not?

23     A   Anyone --

24     Q   Anyone within ContextMedia?

Patrick Cavanna     March 5, 2014

1      A    No, I was just under the assumption that, you

2  know, that wasn't the case.

3      Q    I'm showing you, this is Exhibit 29.  Take a

4  minute to look at that.

5           (Documents marked as Plaintiff's Group

6            Exhibit 29 for identification.)

7      Q    This is an e-mail correspondence with someone

8  named Reneta or Renata Hawks at a practice.  And she

9  asks you in the middle of the first page, sends you

10  an e-mail on May 8, 2012 asking, "Legal has a few

11  questions that it received yesterday I have to get

12  clarified by Healthy Advice.  One is that it is

13  believed that I have to give a 60 day notice to

14  Healthy Advice.  The second is that legal believes

15  that we should allow Healthy Advice to remove their

16  own equipment.  Will try to get to call today."

17           And you respond saying, "That sounds great,

18  Renata.  I think we are moving in the right

19  direction.  I will warn you if you try to have

20  Healthy Advice remove their own equipment, they will

21  stall until the cows come home.  That's why we just

22  ship it back to them ourselves.  You definitely do

23  not need 60 days' notification as we replace these

24  all the time."  Why were you concerned about the

Patrick Cavanna    March 5, 2014

1    practice removing or having Healthy Advice remove its

2    own equipment?

3        A    Based on my experience up until this point,

4    Healthy Advice was unresponsive, you know, when

5    somebody would call.  At least that's what I was told

6    from other clinics.

7        Q    You learned that from other clinics?

8        A    Yes.

9        Q    But you were concerned that if you let this

10   practice's legal department allow Healthy Advice or

11   at least consult Healthy Advice, that you might lose

12   the sale?

13       A    I don't think I said anything to that regard,

14   you know.  It doesn't say that I was thinking that or

15   said that.

16       Q    But I'm asking you as you reflect back on it,

17   were you concerned about losing the sale?

18       A    I don't believe I was, no.

19       Q    And you're telling the practice that they

20   don't need 60 days' notification because Context

21   replaces these all the time?  And is that right, the

22   practice is telling you that they may need to give 60

23   days' notification?

24       A    Well, she's not telling -- it doesn't say

Patrick Cavanna    March 5, 2014

1  here that she's telling me that.  It says that she
2  believes that you have to give 60 days' notice and,
3  you know.
4      Q    But your response is, well, we do this all
5  the time?
6      A    Yes, that's what it says in the e-mail.
7      Q    And just generally, was it a concern that
8  if -- this is before the process switch.  Was it the
9  concern that if Healthy Advice was allowed to remove
10  its own equipment, that it could result in a lost
11  sale?
12      A    No, that wasn't ever a concern of mine, you
13  know.  The content speaks for itself, in my opinion.
14      Q    Since you switched to this new procedure
15  about a year ago, have you lost sales, have you
16  personally lost a sale because of the requirement
17  that Healthy Advice perform the switch out?  Or it's
18  now Patient Point.
19      A    Very -- you know what?  I can't recall that
20  ever being an issue.  Typically, you know, if I tell
21  them they have to call them, they don't really have a
22  problem with that.
23      Q    And I think I may have asked you earlier, but
24  was there a -- just to confirm, you don't know why

Patrick Cavanna    March 5, 2014

```
1    there was a different protocol at one time for Accent
2    Health switch outs, is that right?
3        A    I can't recall the reason, you know, the
4    exact specific reason.
5        Q    But there was a different procedure, right?
6        A    Yes.
7        Q    I think what I'm about to show you now has
8    already been entered into --
9            MR. O'BRIEN:  You want some help?
10           MR. BERNAY:  Yes, I'm looking for, it would
11       have been around the last --
12           MS. JOHNSON:  The last one was 17.
13   BY MR. BERNAY:
14       Q    I'm going to show you what was marked
15   previously as Plaintiff's Exhibit 14.  Have you had a
16   look at the e-mail?
17       A    Yes, I remember this.
18       Q    Do you recall this incident that's described
19   in the e-mail from Jeana Loewe at the bottom?
20       A    Yes, I do recall this incident.
21       Q    And what happened?
22       A    You know, I basically asked -- what happened
23   in this specific e-mail that she's describing?
24       Q    Mm hmm.
```

Patrick Cavanna    March 5, 2014

1     A    Basically I borrowed a badge from Eli Lilly,

2  I went up to the Accent Health booth, asked her, the

3  rep there what everything is about and she kind of,

4  you know, told me everything, handed me some material

5  and that's kind of what happened.

6     Q    And Jeana's sending you this e-mail as an

7  FYI, is that right, about a day after it happened?

8     A    I don't know if it was the exact day after it

9  happened.

10     Q    A few hours?

11     A    Yes.

12     Q    Did anything come of this?  Were you

13  reprimanded in any way?

14     A    Yes, I was told very sternly not to do, you

15  know, not to do this again, it's not a testament to

16  our character as ContextMedia Health.

17     Q    Who told that to you?

18     A    Everyone that I talked to, upper management,

19  Jim, Shradha, Rishi, my boss Matt.

20     Q    So multiple people came and spoke with you

21  about what happened?

22     A    Oh, yeah.

23     Q    And did you go back to that conference?

24     A    This particular conference that was going on

Patrick Cavanna    March 5, 2014

1   Monday?

2       Q    Yes.

3       A    No, no.

4       Q    Besides kind of being talked to, anything

5   else come of it?

6       A    I just remember having really serious

7   conversations with them to not ever do this again,

8   this was, you know, very serious and it wasn't a

9   matter to take, you know, lightly.  And that, you

10  know, that was good enough for me.

11      Q    Besides this incident, have you been

12  reprimanded or disciplined by the company for other

13  reasons?

14      A    Yes, I have.

15      Q    For what?

16      A    Let's see.  I mean, my boss Matt has, you

17  know, heard me say stuff over the phone that I

18  shouldn't be saying.  If any of the senior

19  management, I recall, you know, if any of the senior

20  management walked by my desk and they heard me say

21  something, I recall having a conversation with them

22  about not saying that particular thing.

23      Q    And I'll just pause you there.  Who was them

24  and --

Patrick Cavanna    March 5, 2014

1     A    Senior management.

2     Q    Meaning Rishi?

3     A    Rishi, Jim, Shradha.

4     Q    They all spoke to you at the same time?

5     A    I mean, I'm giving kind of a generality.  No,

6  they didn't speak with me -- depending on who heard

7  me at the time, that's who would speak with me.

8     Q    So this happened multiple times?

9     A    I mean, it's definitely happened more than,

10  you know, five or six times.

11     Q    And apart from being told not to say whatever

12  you were saying at the time -- and do you recall what

13  that might have been?

14     A    I mean, it could be really anything.  I mean,

15  if we were saying stuff that was, you know, wrong

16  about our competitor, if we were saying stuff that

17  was wrong about our content, they would correct me on

18  that.  You know, if it was a training session with a

19  new employee, if I was being too hard on them or

20  saying, you know, something that I shouldn't say to

21  them, they would correct me, reprimand me on that.

22  I mean, two and a half years, yes, senior management,

23  Matt came down on me numerous times.

24     Q    And were you also reprimanded at one point

Patrick Cavanna    March 5, 2014

1    for handing out, I think you referenced it to a $200

2    gift card?

3        A    Yes.

4        Q    Or other denominations of gift cards?

5        A    Yes, $200 specifically.

6        Q    And were you reprimanded for offering gift

7    cards when there was no gift card promotion?

8        A    I mean, yes, that would come out of my

9    pocket, yes.

10       MR. BERNAY:  All right, I think that's what I've

11   got.  Anything else?

12       MR. O'BRIEN:  Signature reserved, no questions.

13                   (WITNESS EXCUSED.)

14

15

16

17

18

19

20

21

22

23

24

Patrick Cavanna    March 5, 2014

```
 1                 UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF OHIO
 2                       WESTERN DIVISION

 3

 4    HEALTHY ADVICE NETWORKS, LLC, )
                                    )
 5               Plaintiff,         )
                                    )
 6        -vs-                      ) No. 1:12 CV 00610
                                    )
 7    CONTEXTMEDIA, INC.,           )
                                    )
 8               Defendant.         )

 9

10        I, PATRICK CAVANNA, being first duly sworn, on

11    oath say that I am the deponent in the aforesaid

12    deposition taken on March 5, 2014; that I have read

13    the foregoing transcript of my deposition, consisting

14    of pages 1 through 92 inclusive, and affix my

15    signature to same.

16

17                        _____

18                                   Patrick Cavanna

19

20    Subscribed and sworn to
      before me this _____ day
21    of _____, 2014.

22    _____
23    Notary Public

24
```

Patrick Cavanna   March 5, 2014

```
 1    STATE OF ILLINOIS)
                       ) SS.
 2    COUNTY OF C O O K)

 3         I, LYDIA B. PINKAWA, CSR and Notary Public in

 4    and for the County of Cook and State of Illinois, do

 5    hereby certify that on March 5, 2014, at 1:22 p.m.,

 6    at 222 North LaSalle Street, Chicago, Illinois, the

 7    deponent PATRICK CAVANNA personally appeared before

 8    me.

 9         I further certify that the said Patrick Cavanna

10    was by me first duly sworn to testify and that the

11    foregoing is a true record of the testimony given by

12    the witness.

13         I further certify that the deposition

14    terminated at 4:07 p.m.

15         I further certify that I am not counsel for nor

16    related to any of the parties herein, nor am I

17    interested in the outcome hereof.

18         In witness whereof, I have hereunto set my hand

19    and seal of office this 12th day of March, 2014.

20

21

22                                      Notary Public
```

Patrick Cavanna     March 5, 2014

```
                    MERRILL LEGAL SOLUTIONS
                311 South Wacker Drive - Suite 300
                    Chicago, Illinois 60606
                (312) 386-2000    (800) 868-0061

                        March 12, 2014

        Mr. Patrick Cavanna
        c/o Sidley Austin, LLC
        One South Dearborn Street
        Chicago, Illinois  60603
        Attn: Mr. Richard O'Brien

                    Re: Healthy Advice vs. ContextMedia
                    No. 1:12 CV 00610
                    Deponent: Patrick Cavanna

        Dear Mr. Cavanna:

        The above referenced deposition has been transcribed
        and is ready for review, pursuant to the Rules of
        Court.

        Please contact our office at your earliest
        convenience for an appointment to review the
        deposition transcript or you may contact counsel for
        a copy of the transcript for your review.

        Upon failure to comply within 30 days, we shall
        forward an appropriate affidavit of noncompliance to
        counsel without further notice.

                    Very truly yours,


                    _____
                    Merrill Legal Solutions

        cc:  Counsel of record              lp219292




                    MERRILL LEGAL SOLUTIONS
                (800) 868-0061    (312) 386-2000
```

Patrick Cavanna   March 5, 2014

CASE: HAN v. Context  DATE TAKEN: March 5, 2014

DEPONENT: Patrick Cavanna

PAGE   LINE                        ERRATA SHEET

_____  _____        CHANGE:  _____

_____  _____        REASON:  _____

_____  _____        CHANGE:  _____

_____  _____        REASON:  _____

_____  _____        CHANGE:  _____

_____  _____        REASON:  _____

_____  _____        CHANGE:  _____

_____  _____        REASON:  _____

_____  _____        CHANGE:  _____

_____  _____        REASON:  _____

_____  _____        CHANGE:  _____

_____  _____        REASON:  _____

_____  _____        CHANGE:  _____

_____  _____        REASON:  _____

_____  _____        CHANGE:  _____

_____  _____        REASON:  _____

_____  _____        CHANGE:  _____

_____  _____        REASON:  _____


(signed)  _____  DATE _____

Reporter: Lydia B. Pinkawa


                    MERRILL LEGAL SOLUTIONS
              (800) 868-0061    (312) 386-2000