```
 1              UNITED STATES DISTRICT COURT
                 SOUTHERN DISTRICT OF OHIO
 2                   WESTERN DIVISION

 3

 4   HEALTHY ADVICE NETWORKS, LLC, )
                                   )
 5             Plaintiff,          )
                                   )
 6       -vs-                      ) No. 1:12 CV 00610
                                   )
 7   CONTEXTMEDIA, INC.,           )
                                   )
 8             Defendant.          )

 9

10       The deposition of JEANA LOEWE, taken before

11   Lydia B. Pinkawa, CSR and Notary Public, pursuant to

12   the Federal Rules of Civil Procedure for the United

13   States Courts pertaining to the taking of

14   depositions, at 25th Floor, 222 North LaSalle Street,

15   Chicago, Illinois, commencing at 9:13 a.m., on the

16   5th day of March, 2014.

17

18

19

20

21

22

23

24
```

Jeana Loewe   March 5, 2014

1   PRESENT:

2         FROST BROWN TODD, LLC
          By MR. AARON M. BERNAY
3         3300 Great American Tower
          301 East Fourth Street
4         Cincinnati, Ohio  45202
          (513) 651-6831
5         abernay@fbtlaw.com

6            appeared on behalf of plaintiff,

7         SIDLEY AUSTIN, LLC
          By MR. RICHARD J. O'BRIEN and
8            MS. JESSICA JOHNSON
          One South Dearborn Street
9         Chicago, Illinois  60603
          (312) 853-7283
10        robrien@sidley.com

11           appeared on behalf of defendant.

12

13  ALSO PRESENT:

14        Mr. Manuj Lal

15

16

17

18

19

20

21

22

23

24

Jeana Loewe    March 5, 2014

```
1                    I N D E X
2    WITNESS
3      Jeana Loewe
4    EXAMINED BY                           PAGE
5      Mr. Bernay                           4
6    EXHIBITS MARKED                       PAGE
7    Exhibit 1 (12-6-10 e-mail)            30
8    Exhibit 2 (12-2-10 e-mail to J. Attaway)   36
9    Exhibit 3 (12-20-10 e-mail to J. Attaway)  39
10   Exhibit 4 (e-mail from J. Attaway)    44
11   Exhibit 5 (members outreach manual)   47
12   Exhibits 6 and 7
13     (comparison pieces, Bates 4771 and 4778)  60
14   Exhibit 8 (e-mail to Kyle, Bates 4228)    62
15   Exhibit 9 (7-26-11 e-mail from S. Agarwal)  72
16   Exhibit 10 (e-mail to Vandersteen, Cavanna) 74
17   Exhibit 11 (e-mail from B. Vandersteen)   75
18   Exhibit 12 (3-28 e-mail from Vandersteen)  76
19   Exhibit 13 (7-13-12 e-mail from J. Demas)  77
20   Exhibit 14 (e-mail to senior management)  86
21   Exhibit 15 (e-mail re HAN video clip)    90
22   Exhibit 16 (May 2012 e-mail)          94
23   Exhibit 17 (9-29-11 e-mail to Cavanna/Garms)96
24
```

Jeana Loewe    March 5, 2014

```
 1                   JEANA LOEWE,
 2   having been first duly sworn, was examined and
 3   testified as follows:
 4                 DIRECT EXAMINATION
 5   BY MR. BERNAY:
 6      Q   Good morning.  I should have asked you for
 7   this off the record, but you pronounce your name
 8   Jeana Loewe?
 9      A   Loewe.
10      Q   We just met a few minutes before off the
11   record.  I want to start by asking, have you ever
12   been deposed before?
13      A   No.
14      Q   Have you ever given prior testimony in court?
15      A   No.
16      Q   So I want to go over some ground rules.  I'll
17   be asking you a lot of questions this morning.  I'm
18   going to assume that you understand the question I'm
19   asking and that your answer is responsive to my
20   question.  If at any time you don't understand the
21   question, please let me know.  Can we agree on that?
22      A   Mm hmm.
23      Q   It's important that we don't talk over each
24   other to assist the court reporter in keeping an
```

Jeana Loewe    March 5, 2014

1    accurate record, so I'll ask you to wait until I
2    finish asking a question to answer it.  No problem?
3        A    Okay.
4        Q    In addition, the court reporter can only
5    capture verbal responses, so no head shakes or
6    "mm hmm", "unh unh".  Yes or no.  That's fine?
7        A    Okay.
8        Q    And if you need a break at any time, just let
9    me know for any reason.  If you're getting tired of
10   the fluorescent lights, just say I need a break, no
11   issue at all.  All right?  Any questions about the
12   process?
13       A    No.
14       Q    Are you on any medications today that would
15   affect your ability to give full, complete and
16   accurate testimony?
17       A    No.
18       Q    Are you presently under a doctor's care for
19   any reason?
20       A    No.
21       Q    Can you state your full name for the record?
22       A    Jeana Rose Loewe.
23       Q    And what's your current address?
24       A    901 West Madison, Chicago, Illinois.

Jeana Loewe    March 5, 2014

1      Q    And let's talk about your education.  Did you
2    complete high school?
3      A    Yes.
4      Q    Which one?
5      A    Hackett Catholic Central.
6      Q    And where is that?
7      A    Kalamazoo, Michigan.
8          MR. O'BRIEN:  If you want to slow down a
9    little bit.  You're talking kind of fast.
10         THE WITNESS:  Oh, sorry.  I didn't realize I
11    was.
12   BY MR. BERNAY:
13     Q    I'm guilty of the same.  Did you attend
14    college?
15     A    Yes.
16     Q    Where?
17     A    Western Michigan University.
18     Q    And did you graduate?
19     A    Yes.
20     Q    And when?
21     A    2003.
22     Q    And what's your degree in?
23     A    Public relations.
24     Q    Do you have any advanced degrees?

Jeana Loewe    March 5, 2014

```
 1      A    Yes.

 2      Q    What are those?

 3      A    Master's of science in integrated marketing

 4   communications.

 5      Q    And where is that from?

 6      A    Loyola University.

 7      Q    And when did you receive that?

 8      A    2012.

 9      Q    So when were you at Loyola?

10      A    2010 to 2012.

11      Q    And that was during your time at Context, is

12   that correct?

13      A    Correct.

14      Q    Did Context pay for your Master's degree?

15      A    No.

16      Q    Ever been convicted of a crime?

17      A    No.

18      Q    Have you ever been sued anyone?

19      A    No.

20      Q    Everybody been sued by anyone?

21      A    No.

22      Q    Are you a member of any trade groups or

23   associations?

24      A    No.
```

Jeana Loewe    March 5, 2014

1     Q    What did you do to prepare for today's
2  deposition?
3     A    I met briefly with the Sidley Austin team.
4     Q    And you're represented by counsel here today,
5  is that right?
6     A    Correct.
7     Q    And that counsel is Mr. O'Brien and
8  Ms. Johnson?
9     A    Correct.
10    Q    Did you speak with anyone about your
11 deposition besides your counsel?
12    A    An individual at Context, Matt Garms.
13    Q    And what did you discuss with Mr. Garms?
14    A    The fact that I've been called in to give a
15 deposition.
16    Q    Anything else?
17    A    We kept it strictly to that.
18    Q    Did you review any documents ahead of your
19 deposition today?
20    A    Yes.
21    Q    What did you look at?
22    A    Former communications.
23    Q    E-mails?
24    A    Correct.

Jeana Loewe   March 5, 2014

```
 1      Q    Anything besides e-mails?
 2      A    A few marketing follow-up pieces I developed.
 3      Q    Anything else besides that?
 4      A    No.
 5      Q    And do you have any documents in your
 6   possession at home that you reviewed prior to this
 7   deposition?
 8      A    No.
 9      Q    When did you start at ContextMedia?
10      A    November 2010.
11      Q    Do you recall when in November it was?  Was
12   it early, late?
13      A    November 11th.
14      Q    How did you come to work at ContextMedia?
15      A    I was looking for a new opportunity, saw the
16   listing and applied.
17      Q    Where was the listing?
18      A    Craigslist, I believe.
19      Q    And what were you doing before you went to
20   Context?
21      A    Working for a marketing agency.
22      Q    Which one?
23      A    Legacy.
24      Q    And what were your responsibilities at
```

Jeana Loewe    March 5, 2014

1    Legacy?

2        A    Primary contact for a number of our key

3    accounts.

4        Q    Those were corporate accounts?

5        A    Correct.

6        Q    And were you doing messaging for them, copy,

7    anything like that?

8        A    Messaging, copy, marketing campaign

9    development and execution

10       Q    And how long were you there for?

11       A    Three and a half years.

12       Q    Have you held other positions in marketing

13   besides Legacy before you went to Context?

14       A    Yes.

15       Q    What were those positions?

16       A    Marketing project coordinator, Eaton

17   Corporation.

18       Q    Eaton Corporation?

19       A    Correct.

20       Q    Doing similar stuff?

21       A    Mm hmm.  Yes.

22       Q    Just in house?

23       A    Correct.

24       Q    Anything else?

Jeana Loewe    March 5, 2014

1      A    Marketing for Pfizer.

2      Q    Any other jobs we haven't covered?

3      A    American Medical Association for a short

4    time.

5      Q    Again on the marketing end?

6      A    Correct.

7      Q    So you came to Context in 2010.  What were

8    you hired to do?

9      A    Brand manager of the Rheumatoid Health

10   Network.

11     Q    And what is the Rheumatoid Health Network?

12     A    An office patient education system for

13   rheumatology offices.

14     Q    And as brand manager, what were your job

15   responsibilities?

16     A    To understand the space that we were in, to

17   help develop marketing materials and to help the

18   sales team develop messages.

19     Q    And who did you report to at Context?

20     A    Shradha Agarwal.

21     Q    And what was her position at the time?

22     A    Chief marketing officer.

23     Q    Were there other brand managers for RHN when

24   you started?

Jeana Loewe    March 5, 2014

```
 1        A    No.

 2        Q    Were you the first?

 3        A    In that role, yes.

 4        Q    In that role?

 5        A    Mm hmm.

 6        Q    Were there any other brand managers during

 7    your time at Context?

 8        A    Yes.

 9        Q    Who else?

10        A    Darcy Hatzold.

11        Q    And she was a brand manager for RHN?

12        A    No, for the Diabetes Health Network.

13        Q    Was she there when you began?

14        A    Yes.

15        Q    Did you have any involvement in the Diabetes

16    Health Network?

17        A    No.

18        Q    You were exclusively RHN?

19        A    Correct.

20        Q    And that was true for the -- well, let me ask

21    you this.  When did you leave Context?

22        A    September 2012.

23        Q    So for the nearly two years you were there,

24    you were strictly RHN?
```

Jeana Loewe    March 5, 2014

1     A    For the first year I was there and then

2   became brand manager over, we consolidated our

3   services into ContextMedia Health, which I became the

4   brand manager for.

5     Q    So when you consolidated, did you have

6   oversight or were you responsible for RHN and DHN at

7   that point?

8     A    Yes, but they weren't separate networks any

9   more.  It was more, the programming was tailored

10  based on the clinic that we were being installed

11  into.

12    Q    So you were, you had one product and you were

13  tailoring it to the clinic?

14    A    Correct.

15    Q    And after the consolidation, was Darcy still

16  there?

17    A    For a short period.

18    Q    When you joined in November 2010, how many

19  employees did Context have?

20    A    Ten.

21    Q    Are you number ten?

22    A    Nine.

23    Q    And when you joined, did you have any point

24  of care or out of home experience at that point?

Jeana Loewe    March 5, 2014

```
 1       A    No.
 2       Q    So what did you do to learn about the
 3   industry?
 4       A    For rheumatology, attended the ACR
 5   conference, read a lot about -- signed up for the
 6   different various newsletters, read a lot about
 7   rheumatologists, their pain point, what the different
 8   diseases that they saw, learned a lot about those
 9   different conditions, read as much as I could.
10       Q    You said pain points before.  What do you
11   mean by pain point?
12       A    Meaning for the doc's office, what are the
13   things that they struggle with, what are the things
14   that they deal with that hinders them from giving
15   best possible care to their patients, keeping their
16   office open, et cetera.
17       Q    When you joined on November 11, 2010, had
18   ContextMedia launched RHN at that point?
19       A    Very shortly prior.
20       Q    Do you know how soon prior?
21       A    I don't know the exact date.
22       Q    Was there a pilot program used to roll out
23   RHN?
24       A    In terms of --
```

Jeana Loewe    March 5, 2014

1     Q    Did you launch the network as a pilot, per

2  se?

3     A    I never heard them use the terminology that

4  it was launched as a pilot.

5     Q    When you started, what were you told about

6  the history of that network of RHN?  Do you know when

7  it was developed?

8     A    Again, I was told that it had been started a

9  couple months prior.  I don't know exactly how many

10  months.  Or I don't recall, I should say.

11     Q    Do you know how many practices were in the

12  network when you joined?

13     A    I don't recall.

14     Q    You were responsible for tracking the number

15  of practices in the network over time, is that right?

16     A    Not necessarily my responsibility.  I helped

17  to track offices against a target list provided to us

18  by Johnson & Johnson.

19     Q    And did you have that list at the outset?

20     A    I was not aware of the list at the outset.

21     Q    When did you become aware of that Johnson &

22  Johnson list?

23     A    I don't recall an exact date.  Possibly

24  spring.

Jeana Loewe    March 5, 2014

```
 1      Q    Spring of 2011?

 2      A    Correct.

 3      Q    Were you responsible for deciding which

 4  practices were called about RHN?

 5      A    No.

 6      Q    Who was responsible for that?

 7      A    I would say management.

 8      Q    And by management, do you mean anyone in

 9  particular?

10      A    Our senior staff, so Rishi, Shradha, Jim.

11      Q    Rishi Shah?

12      A    Correct.

13      Q    Shradha Agarwal?

14      A    Agarwal.

15      Q    And Jim Demas?

16      A    Correct.

17      Q    And who provided you with the Johnson &

18  Johnson list?

19      A    In terms of --

20      Q    Who presented it to you and told you you had

21  to track practices against it?

22      A    Within Context?

23      Q    Within Context, correct.

24      A    Rishi Shah.
```

Jeana Loewe   March 5, 2014

1     Q   And did he tell you why?
2     A   Yes, because we had to show the growth of the
3  network against the offices that Johnson & Johnson
4  was interested in having their Simponi ads played in.
5     Q   Was Johnson & Johnson a sponsor from the
6  outset --
7     A   Yes.
8     Q   -- of RHN?  And RHN played Simponi ads from
9  the beginning?
10     A   Yes.
11     Q   When you joined, were there other sponsors
12  besides Johnson & Johnson --
13     A   No.
14     Q   -- for RHN?  Just Johnson & Johnson.  Do you
15  recall how many practices were on that list?
16     A   I do not.
17     Q   I did ask you earlier how many practices were
18  within RHN when you joined.  It would be fair to say
19  it wasn't that many?
20     A   Define that many.
21     Q   Less than 50?
22     A   Yes.
23     Q   So RHN was just, really just starting out?
24     A   Yes.

Jeana Loewe    March 5, 2014

1        Q    But you had the loop, Context had the loop
2    prepared, correct?
3        A    From --
4        Q    Context had a content loop that it was
5    sending out to RHN practices and that was ready to
6    go?
7        A    Meaning had they developed one to use for
8    their current members?
9        Q    Yes.
10       A    Yes, they did.
11       Q    And how did Context go about signing up
12   practices for RHN when you started?
13       A    We had outside sales individuals at Acquirent
14   who were given the target list of practices from J&J
15   and they would cold call the offices, reaching out,
16   asking to speak with them about their patient
17   education needs and if they were interested in having
18   a patient education service in their office.
19       Q    Was it all cold calling?
20       A    Yes.  I'm sorry.  At the beginning, yes,
21   until we started attending conferences and doing
22   marketing activities.
23       Q    And you've mentioned conferences before.
24   Besides conference, what other marketing activities

Jeana Loewe    March 5, 2014

```
 1   did you do for the brand?
 2       A    We would do a fax blast and --
 3       Q    Fax blast?
 4       A    Correct.  Sorry, I have a cold, so I can't
 5   talk crisp.  E-mail campaigns and direct mail.
 6       Q    And did Acquirent have this J&J list from the
 7   beginning?
 8       A    The J&J list was inputted into our CRM
 9   system, Quickbase, and we assigned select accounts to
10   the two sales reps that acquired it.
11       Q    So ContextMedia used Quickbase as its
12   customer relationship management software?
13       A    Correct.
14       Q    And was that the case when you joined in
15   2010?
16       A    Yes.
17       Q    But Context had no in house sales team in
18   2010?
19       A    Not until December.
20       Q    And what happened in December?
21       A    They hired an in house sales individual.
22       Q    And who was that?
23       A    Matt Garms.
24       Q    And why was Matt Garms hired in
```

Jeana Loewe    March 5, 2014

1    December 2010?

2        A    Because they wanted to bring the sales team

3    in house.

4        Q    Instead of using Acquirent?

5        A    Correct.

6        Q    And had they used Acquirent for DHN before

7    RHN?

8        A    I don't know that answer.

9        Q    So Acquirent was using a J&J list from the

10   beginning to target RHN, potential RHN practices?

11       A    Yes.

12       Q    But you didn't become familiar with that list

13   until the spring?

14       A    I had not particularly seen the list myself

15   in terms of outside of Quickbase.

16       Q    Got you.  So you knew that the list everyone

17   was operating off of was the J&J list?

18       A    (Nodding.)

19       Q    Were there other lists besides J&J?

20       A    Not to my knowledge.

21       Q    Now, who were the main competitors in the

22   rheumatology, the point of care rheumatology space

23   when you joined?

24       A    Accent Health and Healthy Advice.

Jeana Loewe    March 5, 2014

```
 1      Q    And were there others?
 2      A    Health Monitor, Every Well for a short time.
        And I want to say there was an additional, but I
 3
 4      don't recall the name offhand.
 5      Q    And when you joined, was ContextMedia
 6      switching out those competitors in RHN offices?
 7      A    I was not aware if there was any switching
 8      when I joined.
 9      Q    You don't know if there had been, prior to
10      your arrival, if Context had switched out any
11      competitors in any office?
12      A    Correct.
13      Q    When you joined, did the company have a
14      policy about switch outs?
15      A    Not to my knowledge.
16      Q    So you said earlier that when you started,
17      you kind of read up on the space and educated
18      yourself about the field.  What were your impressions
19      of Healthy Advice when you started in 2010?
20           MR. O'BRIEN:  Object to the form.  You can
21           answer.  You can answer.
22           THE WITNESS:  Okay.
23      A    I thought Accent Health was a superior system
24      to Healthy Advice in terms of relating the two when I
```

Jeana Loewe    March 5, 2014

1    was looking at the space.

2    BY MR. BERNAY:

3        Q    And why was that?

4        A    Healthy Advice Systems at the time were

5    primarily, it wasn't video footage, it wasn't, you

6    know, segments where individuals are talking and

7    interacting.  It was more silent, slide like

8    information with light music in the background.

9        Q    Are you talking about Accent Health or are

10   you talking about Healthy Advice?

11       A    Healthy Advice.

12       Q    And what was Accent Health?

13       A    Video footage.  So there was segments

14   interacting, there's round tables with doctors and

15   patients talking, there was different segments about

16   either if there was an association giving tips on how

17   to exercise or healthy eating, things along those

18   lines.

19       Q    And how did you educate yourself about Accent

20   Health and Healthy Advice when you started?

21       A    Reading up on their web sites, going through

22   and just doing competitive searches online, seeing

23   what people were saying about them, seeing what they

24   had been -- what's been said on the news, press

Jeana Loewe    March 5, 2014

1    releases, things along those lines, mostly secondary

2    research.

3        Q    So the basis for your opinion was online

4    research that you did?

5        A    Correct.

6        Q    Anything else?

7        A    No.

8            MR. O'BRIEN:  You mean when she first

9        started?

10   BY MR. BERNAY:

11       Q    When you first started, to be clear.

12       A    Yes.

13           MR. BERNAY:  Thanks, Dick.  Yes.

14       Q    You said that Johnson & Johnson provided the

15   ads for RHN.  Do you know where ContextMedia acquired

16   its content for the network?

17       A    Yes.  When I first started or throughout

18   my --

19       Q    Let's do both.

20       A    Okay.  When I first started it was, I don't

21   remember the name of the exact company, but there was

22   patient education providers that we would lease the

23   content from.  Throughout my time there, I developed

24   relationships with various associations and worked to

Jeana Loewe    March 5, 2014

1   obtain, to utilize, I should say, their video content
2   in our network.
3       Q    And what were those associations?
4       A    American College of Rheumatology, American
5   Heart Association, Arthritis Foundation.
6       Q    And did those organizations pay to broadcast
7   their content on the network?
8       A    No.
9       Q    As brand manager, were you given goals to
10  meet?
11      A    In terms of --
12      Q    You reported to Shradha.  Did she give you
13  any goals in terms of the network, number of
14  practices, for example, within the network?
15      A    Not to me specifically.
16      Q    Those goals were not given to you
17  specifically?
18      A    They were company goals that we all worked to
19  achieve.
20      Q    And when you started, what were the company
21  goals for RHN?
22      A    We had to reach a certain growth number.  I
23  don't recall that number at this time.
24      Q    And why did you have to reach that growth

Jeana Loewe    March 5, 2014

1    number?

2        A    Contract terms with J&J.

3        Q    Did you ever see the contract with J&J?

4        A    No.

5        Q    But you were told that this is why we have to

6    meet this growth figure?

7        A    Yes.

8        Q    And who told you that?

9        A    Jim Demas.

10       Q    And do you remember any of those growth

11   targets over time?

12       A    Yes, we had a goal of reaching 300 screens at

13   a point in November, I'm sorry, in 2011.  However, I

14   don't remember the exact date.

15       Q    Did you meet that goal?

16       A    Yes.

17       Q    Any other goals that you can remember?

18       A    Not particular in terms of exact numbers.

19       Q    Was reaching a critical mass of practices the

20   only goal for RHN?

21       A    In terms of --

22       Q    Company goals.

23       A    I would say it was a primary.

24       Q    What were the secondary goals?

Jeana Loewe    March 5, 2014

1    A    Obtaining content so that we had a, we had

2   robust programming, we had various condition types

3   that, depending upon the basis of the office, that we

4   could provide for them.

5    Q    Anything else?

6    A    Not that I can recall.

7    Q    When you joined, was the company having

8   difficulty attracting practices to the network?

9    A    Difficulty in terms of --

10   Q    Cold calling and selling it.

11   A    I wouldn't say difficulty.

12   Q    Was it going slower than expected?

13   A    Slower, but more based on the number of

14  salespeople.  They had two salespeople.

15   Q    Before you started, to your knowledge, was

16  RHN placed in 200 physician offices as part of a test

17  run?

18   A    I don't know.

19   Q    Don't know?  Do you recall a point when RHN

20  would have hit a number of 200 physician practices,

21  when that would have happened?

22   A    Some point in 2011.

23   Q    When you started in November 2010, what were

24  the key components of the early marketing strategy

Jeana Loewe    March 5, 2014

1    for RHN?

2        A    Attending --

3            MR. O'BRIEN:  Object to the form.  You can

4        answer.

5        A    Attending conferences, primarily, fax blasts

6    and direct mail.

7    BY MR. BERNAY:

8        Q    And cold calling?

9        A    In terms of marketing activities?

10        Q    Right.

11        A    That's a sales activity.

12        Q    Did you provide copy for the salespeople to

13    market on?

14        A    I provided them talking points to use in

15    their sales activities.

16        Q    When you joined, did you have meetings to

17    discuss this marketing strategy?

18        A    With -- internally?

19        Q    Internally.

20        A    I had meetings with Shradha.

21        Q    And what did you discuss in those meetings?

22        A    We discussed what conferences we would want

23    to attend, we discussed what our direct mail schedule

24    would be, what type of direct mail campaigns that we

Jeana Loewe    March 5, 2014

1    would want to develop.

2        Q    Attending conferences, fax blasts, direct

3    mail, were these new marketing outlets for

4    ContextMedia?

5        A    No.

6        Q    They were doing the same thing with DHN?

7        A    Correct.

8        Q    Did the marketing strategy for RHN change

9    over the time that you were there?

10       A    In terms of --

11       Q    Any of the prongs we've discussed.

12       A    Change how?

13       Q    Did you put more emphasis into one channel

14   than another, did you find that things weren't

15   working, so you changed course?

16       A    We would course correct as needed.  We found

17   that fax blasts, because of the advent of technology,

18   was becoming less of an avenue.  We utilized trade

19   advertising and continued to utilize direct mail and

20   conferences.

21       Q    In order to meet its goals for Johnson &

22   Johnson, would RHN need to take market share from

23   competitors?

24       A    Not necessarily.

Jeana Loewe    March 5, 2014

1      Q    Why not?

2      A    Because the rheumatology space is large and

3   no one had a particular hold on a vast majority of

4   that space.

5      Q    When you started, did anyone provide you with

6   information about the space in terms of who the

7   players were and what percentage of the market they

8   had?

9      A    Shradha provided me with the list of who our

10  competitors were.  I was not given information in

11  terms of market share per competitor.  It was general

12  discussion regarding the fact that the rheumatology

13  space was large and that there was a lot of

14  opportunity.

15     Q    And why was there a lot of opportunity?

16     A    Because it was a relatively new space.

17     Q    And so you knew that RHN had competition in

18  the rheumatology space from the beginning of your

19  time at Context?

20     A    Yes.

21     Q    And did you and Shradha discuss the need to

22  take market share from competitors?

23     A    No.

24     Q    Do you recall a time in which ContextMedia

Jeana Loewe    March 5, 2014

1    switched out a competitor practice -- strike that.

2    I'll ask that again.  What was the first time that

3    ContextMedia encountered a competitor and switched

4    out their equipment?

5        A    I don't know the date of when they first

6    encountered a competitor and switched them out.

7        Q    Do you remember that instance?

8        A    No, because I can't say if that was before or

9    after my time.

10       Q    I'm going to start here.  And I apologize if

11   this is in small font.  To be honest, it just comes

12   out of our software like that.

13       A    No worries.  I have good eyesight.

14            MR. BERNAY:  I'm sorry, I only have these.

15            MR. O'BRIEN:  That's fine.  We can share.

16       Are you going to mark it?

17            MR. BERNAY:  Yes, let's mark this as

18       Plaintiff's Exhibit 1.

19            (Documents marked as Plaintiff's Group

20             Exhibit 1 for identification.)

21       Q    So I've given you an e-mail.  The top string

22   is dated December 6, 2010 at 5:19 p.m.

23       A    Mm hmm.

24       Q    And the Bates number is Context 41720 and the

Jeana Loewe    March 5, 2014

```
 1    second page is 41721.  Take a minute to look at the
 2    e-mail.
 3         A    Mm hmm.
 4         Q    Do you recall this communication?
 5         A    I recall the form, yes.
 6         Q    And I may have asked you, but when you joined
 7    the company, was there a protocol in place to switch
 8    out competitors?
 9         A    Not to my knowledge.
10         Q    And does the practice name of a Dr. Margolis
11    or Margulies ring a bell?
12         A    Yes.
13         Q    To your knowledge, was he the first Healthy
14    Advice practice that switched to RHN?
15         A    I don't know if he was the first.
16         Q    You'll note the subject of this e-mail is
17    installation authorization, and I'll read the bottom
18    e-mail from Jim Demas.  "Silvia, attached is the
19    installation authorization form required for those
20    offices where we are removing a competitor's
21    system.  The information in italics will obviously
22    vary by office.  The attached is based on one of
23    Dr. Margolies' sign up sheets.  Please change
24    accordingly.  I would like to have these in our hands
```

Jeana Loewe    March 5, 2014

1  prior to the work order.  Let me know if you have any

2  questions."

3          Then you respond, "Jim, thanks so much for

4  putting this together.  If you don't mind, I made a

5  few updates so this looks a bit more formal and can

6  be used as a template moving forward."

7          Why was this document prepared?

8      A   It was prepared because Jim was trying to put

9  a process in place for switching competitive --

10  switching systems with installing our health

11  networks.

12     Q   And did Jim explain to you why there needed

13  to be a form?

14     A   I don't recall an exact conversation.

15     Q   And this switch out form that's on the second

16  page, this form or its eventual successor became a

17  requirement, is that right?

18     A   Yes.

19     Q   So every time you went in and switched out a

20  competitor, you would have them sign this form?

21     A   It was told to the sales team that each time

22  they spoke to an office who indicated they had a

23  competitive system that they wanted to remove and

24  install our system instead, that this form needed to

Jeana Loewe    March 5, 2014

```
 1   be completed by the office.
 2       Q    And why was that?
 3       A    I don't know all the details behind how this
 4   came to be.
 5       Q    But this was an important document?
 6       A    I was --
 7            MR. O'BRIEN:  Object to the form.  You can
 8       answer.
 9       A    Yes.
10   BY MR. BERNAY:
11       Q    Were you involved in the Margolies switch
12   out?
13       A    No.
14       Q    Do you recall what you did to this form to
15   make it more formal?
16       A    I put it on letterhead.
17       Q    Anything else?
18       A    Not that I can particularly recall.
19       Q    Do you know if the practice asked for this
20   form?
21       A    I don't know.
22       Q    Is it your understanding that this form gave
23   Context the legal right to remove competitor
24   equipment?
```

Jeana Loewe    March 5, 2014

1          MR. O'BRIEN:  Object to the form.  She can
2      answer.
3      A    Yes.
4  BY MR. BERNAY:
5      Q    And why is that?
6      A    Because from my understanding of the
7  agreements that were in place with the competitive,
8  or I'm sorry, with the practice, they had the ability
9  to remove the system after meeting the stipulation
10 set forth in an agreement.
11     Q    All right, let's put this aside for now.
12 Were there other parts of this switch out protocol
13 beyond the form itself?
14     A    Not that I was involved in.
15     Q    But there were other parts?
16     A    I don't know specifically what other pieces
17 occurred.
18     Q    Are you, just so I understand your response,
19 are you saying for this particular practice?
20     A    For this particular practice, I don't know
21 what other processes were set in place to switch out
22 the system.
23     Q    Did there come a point in time when
24 ContextMedia developed what it called a switch out

Jeana Loewe    March 5, 2014

1    package?

2        A    Yes.

3        Q    And what was that switch out package?

4        A    My understanding of it, of what they called a

5    package, a switch out package was that it contained

6    the form along with the sign -- this form on the

7    exhibit we just went through a moment ago along with

8    a sign up sheet and that the member services team

9    would work with the competitive company to de-install

10   the equipment and have it sent back to them.

11       Q    So the member services team would work with

12   the competition to return the equipment?

13       A    That was my understanding.

14       Q    When Context went into an office where a

15   competitor was installed, do you recall what, if

16   anything, practices were telling Context about their

17   willingness to deal with the competitor equipment

18   upon installation?

19       A    What do you mean?

20       Q    Was Context's ability to offer a hassle free

21   switch out process extremely important to the brand?

22       A    I wouldn't say it was extremely important.

23       Q    What would you say?

24       A    I would say that a practice isn't going to

Jeana Loewe    March 5, 2014

1   choose to switch out a competitive system just

2   because Context said they would make it hassle free.

3       Q    But it was an important prong?

4       A    No.

5       Q    Not important at all?  So if Context had, if

6   a practice -- if Context went to a practice and told

7   the practice they needed to coordinate with a

8   competitor to remove equipment, that would be okay?

9           MR. O'BRIEN:  Object to the form.  You can

10      answer.

11      A    It's dependent upon the practice.  You have

12  practices who switch out monthly because an incentive

13  is being offered to them.  You have practices who are

14  like okay, not a problem.  You have practices who are

15  like I just don't feel like dealing with it.

16  BY MR. BERNAY:

17      Q    In terms of Healthy Advice, did Context tell

18  current Healthy Advice practices that indicated a

19  willingness to switch that they had to deal with

20  Healthy Advice on removal issues?

21      A    I don't know that.

22          MR. BERNAY:  We'll mark this as No. 2.

23          (Documents marked as Plaintiff's Group

24           Exhibit 2 for identification.)

Jeana Loewe   March 5, 2014

1      Q   I'll give you a moment to review this e-mail
2   chain.  And take your time.  Just let me know when
3   you've had a chance to review.
4      A   Mm hmm.
5      Q   Ready?  I don't mean to rush you.
6      A   Yes.
7      Q   Let's start on page 2, which is the first
8   e-mail in this string.  It's from you to Jaime
9   Attaway on December 2, 2010.  Who is Jaime Attaway?
10     A   Jaime Attaway was an individual with
11  Acquirent.
12     Q   And it appears that you had a conversation
13  that morning with her and she wanted information
14  about competitors.
15     A   Mm hmm.
16     Q   So if you go to the third paragraph, you say
17  "Essentially there are two main competitors to the
18  RHN.  They're Arthritis Health Monitor by Health
19  Monitor Network and Rheumatology Health Network by
20  Health Media Network."
21     A   Mm hmm.
22     Q   Was that your impression in your first month
23  on the job?
24     A   Yes.

Jeana Loewe    March 5, 2014

1    Q    So Healthy Advice was not a main competitor?

2    A    Not according to this e-mail and not so much

3  as they were in the, more the hospital space and

4  slowly moving into physician waiting rooms.

5    Q    And again you would have -- how would you

6  have developed your knowledge of these competitors

7  three weeks into the job?

8    A    By visiting their web sites, as noted here.

9    Q    And was this the first inquiry that you can

10  recall from your sales reps about competitors?

11    A    I don't recall when the first inquiry would

12  have been.

13    Q    But they were beginning to encounter

14  competitive systems in the field.

15        MR. O'BRIEN:  Did you want her to answer the

16      question?

17  BY MR. BERNAY:

18    Q    Is that right?

19    A    I'm sorry.  Was there a question with that?

20    Q    Yes.  Was it your understanding that they

21  were beginning to encounter competitor networks in

22  the field?

23    A    Yes.

24    Q    Okay, you can put that aside.  Next document,

Jeana Loewe     March 5, 2014

1    we'll mark this as No. 3.

2         (Documents marked as Plaintiff's Group

3          Exhibit 3 for identification.)

4    Q    Again, take a minute to review this e-mail.

5    I'll ask you about specific parts.  Looking at the

6    top level e-mail, this is an e-mail from you to a

7    number of people at ContextMedia on December 20,

8    2010.  You were employee number nine, I think you

9    said before.  Is this everyone in the company,

10   essentially, at the time?

11   A    At that time it looks -- no.

12   Q    Who's missing?

13   A    Sean Alexander.

14   Q    And who is Sean?

15   A    In admin.

16   Q    But apart from Sean, this is everybody else?

17   A    Yes.

18   Q    And this is a competitive analysis of other

19   companies in the rheumatology space.  Did anyone ask

20   you to create this?

21   A    Yes.

22   Q    Who?

23   A    It came out of a meeting between myself and

24   the sales team based on the request to understand

Jeana Loewe    March 5, 2014

```
 1   more about the different competitors that were out
 2   there.
 3       Q    And who was the sales team at the time?
 4       A    Matt Garms, Jaime Attaway, Julia Heffernan
 5   and Matt Browner.
 6       Q    And Julia, Matt and Jaime are at Acquirent?
 7       A    Matt Browner was at Acquirent with Julia and
 8   Jaime, yes.
 9       Q    And this is the first time that you had
10   circulated a document like this?
11       A    Correct, yes.
12       Q    And if you'd turn to the third page, there's
13   a column E for Healthy Advice.  Third page, I'm
14   sorry, the third page of this --
15       A    Fourth page?
16           MR. O'BRIEN:  He's counting this as page 1
17       (indicating).
18   BY MR. BERNAY:
19       Q    Counting this as page 1.  You've got them as
20   separate documents.  There you go.  And this is
21   information that you had compiled about Healthy
22   Advice.  Again, where did you get this information
23   from?
24       A    From their web site and from marketing
```

Jeana Loewe    March 5, 2014

1    collateral.

2        Q    When you say marketing collateral, what do

3    you mean?

4        A    A copy of their -- marketing collateral in

5    terms of pieces that were garnered at trade shows or

6    a copy of the agreement, of the agreement that they

7    use.

8        Q    So did Context have a kind of archive of that

9    type of material?

10       A    Yes.

11       Q    And they had a copy of Healthy Advice's

12   agreement with its practices?

13       A    Yes.

14       Q    Do you know how they acquired that?

15       A    No.

16       Q    And do you know how they acquired their other

17   marketing collateral?

18       A    Some collateral was sent to us by offices

19   that we were speaking with.  Some collateral was

20   gained at trade shows.

21       Q    When you say gained at trade shows, what do

22   you mean?

23       A    People going around and picking up pieces

24   from various booths.

Jeana Loewe    March 5, 2014

1    Q   So here I'm reading off the rows on, I guess

2  the first page of that piece.  But you say that

3  there's no cost for the system -- that there's no

4  contract for the system.  But you had the contracts,

5  right?

6    A   We had a copy of what we viewed being

7  agreement.  I don't recall exactly the title of the

8  document.

9    Q   So you have an agreement, but what does

10  contract mean?

11    A   Contract to me meant that if there was

12  renewal terms, if there was a cost for service, if

13  there was a penalty if the -- if certain terms

14  weren't met.

15    Q   So there's a cancellation policy, is that

16  right, next row down?

17    A   Yes.

18    Q   And it's after six months' usage, you must

19  provide 30 days notice, written notice to Healthy

20  Advice?

21    A   Mm hmm.

22    Q   So those were -- that was a minimum term,

23  correct?

24    A   That's the stipulation, mm hmm.

Jeana Loewe    March 5, 2014

 1      Q    But that wasn't enough to make it a contract?

 2      A    When I say term, I am referring to renewal

 3   terms.  For instance, if you look at Accent Health,

 4   they talk about that the contract renews

 5   automatically after X number of days, they must

 6   provide us notice.  If notice is provided outside,

 7   all those different types of things.  If there's a

 8   fee charged if you choose to end the system

 9   beforehand, you're going to be charged X amount.

10      Q    And in the next row down you say 30 minute

11   slide format loop includes quizzes, facts and trivia,

12   no video, uses soft sounds.  Again, was there a piece

13   of marketing material that you recall in which you

14   learned there was a 30 minute slide loop?

15      A    Between reading their web site is where I

16   gained the majority of this information.

17      Q    And at the bottom you see that there's a

18   notation that 70 percent of programming loop is

19   content and 30 percent are sponsor messages, which

20   equals about nine minutes per 30.  And again you

21   would have received that, you would have learned that

22   from marketing materials?

23      A    Correct.

24      Q    And you knew no differently at the time?

Jeana Loewe    March 5, 2014

1      A    No.

2      Q    All right, put that aside.  I'll mark this as

3   Exhibit 4.

4           (Documents marked as Plaintiff's Group

5            Exhibit 4 for identification.)

6      Q    Have a look at this e-mail.  As you're having

7   a look, I'm going to ask if you recall this physician

8   Veena Nayak.

9      A    I recall the name.

10     Q    Do you recall the circumstances in which she

11  came to RHN?

12     A    No.

13     Q    At this point in January 2011, is there a

14  switch out package in place at ContextMedia?

15     A    I don't recall if there was a formal process

16  developed at that point.

17     Q    If you look at the top e-mail on the first

18  page, this is from Jaime Attaway.  She writes,

19  "Thanks for your message.  I've responded to

20  Dr. Nayak and will call her later today per her

21  request.  Is there a written agreement regarding

22  switching from another network to RHN?  Some offices

23  want details on what the process entails before they

24  make the decision to switch."  Then she asks, "Can

Jeana Loewe    March 5, 2014

1   you send some information?"  Do you recall what you
2   would have sent her?
3       A    I would have sent her the installation
4   agreement form that we referenced in Exhibit 1.
5       Q    And do you recall fielding inquiries from
6   offices about how this was going to work, how they
7   were going to remove the previous competitor's
8   equipment?
9       A    Fielding in terms of --
10      Q    Fielding -- Jaime is reporting that some
11  offices want details.  Do you recall other instances
12  where you had to send information about the switch
13  out process?
14      A    I'm sorry, I want to make sure I'm clear.  So
15  in terms of me directly handling or in terms of
16  Context fielding?
17      Q    Both.
18      A    My involvement with member services was
19  minimal.  Most of that was handled by Silvia at the
20  time.  I do recall that offices would have questions
21  and the sales team and the member services team would
22  work with them to answer those questions.
23      Q    But you would agree that offices were
24  concerned about how this would be handled?

Jeana Loewe    March 5, 2014

1      A    I would say that they have questions.

2          MR. O'BRIEN:  We've been going about an hour.

3      Whenever is convenient, if you want to take a

4      short break.

5          MR. BERNAY:  If you want to take a break now,

6      that's fine, or we can keep going.  I'll let the

7      witness decide.

8          MR. O'BRIEN:  Are you okay?

9          THE WITNESS:  I'm fine for now.  Maybe

10     another like 20 minutes or so and then a break

11     would be lovely.

12   BY MR. BERNAY:

13     Q    If you need more water, we can take a minute,

14   too.  I asked you earlier about that form, the

15   authorization form.  To your knowledge, and I don't

16   want to know what was said, but to your knowledge was

17   that form run by an attorney before it was sent to

18   the field?

19     A    It was my understanding that it was.

20     Q    And we've talked earlier about a switch out

21   package.  Do you know who was responsible for

22   creating that switch out package?

23     A    I believe senior management was responsible

24   for confirming those terms and that process.

Jeana Loewe    March 5, 2014

1      Q    The terms and process -- so you're saying the
2   terms of the form and the switch out process?
3      A    Correct.
4      Q    And again by senior management you mean
5   Rishi, Shradha and Jim?
6      A    Correct.
7      Q    All right, I'm going to mark the following
8   as 5.
9           (Documents marked as Plaintiff's Group
10            Exhibit 5 for identification.)
11     Q    So I've given you -- and you don't have to
12   read the entire members outreach manual.
13     A    I remember it.
14          MR. O'BRIEN:  In fairness, you can read
15      whatever you want.
16   BY MR. BERNAY:
17     Q    Right.  But this is not a reading test.  What
18   I've handed you, there's a cover e-mail from June 10,
19   2011 from you.  And I'll ask you, are you responsible
20   for drafting this manual?
21     A    Yes.
22     Q    For all the content inside?
23     A    I worked with various members of the
24   organization to gather the content and print and then

Jeana Loewe    March 5, 2014

1    I put it into one place.

2       Q    And who did you work with?

3       A    I worked with Matt Garms on the member

4    outreach side, Silvia Velazquez on member services

5    and Travis Kemp in the operations team.

6       Q    And that was just to gather material for

7    each -- from each of their different departments?

8       A    Correct, to make sure that processes were

9    outlined in here, the information was accurate.  I

10   covered off on everything or anything that they would

11   want the individual sales individuals to know.

12      Q    And why was this document drafted?

13      A    The sales team was growing.  We were hiring

14   SEC's, we had two individuals coming in and I was

15   trying to put together a formal on boarding

16   processing for new sales team members.

17      Q    And who were these individuals that were

18   coming in?

19      A    I don't remember exactly who.  We had a

20   number of people starting within a short period and I

21   don't exactly remember who was when.

22      Q    These were all internal folks?

23      A    Correct, yes.

24      Q    Do you recall when ContextMedia ended its

Jeana Loewe    March 5, 2014

1    relationship with Acquirent?

2        A    I don't recall an exact date.

3        Q    All right, if we turn to what's -- it's

4    page 14 of this manual.  It's got a production number

5    of 6471.  I want to ask you just a couple questions

6    about this page.  So this is kind of a one pager

7    about RHN.  And it says at the top, "Launched in

8    2010, RHN is ContextMedia's third waiting room TV

9    network."  Was there another one besides DHN and RHN?

10       A    There was the Heart Health Network that was a

11   pilot program that they put on hold for the RHN.

12       Q    So it was shelved.  Do you know why it was

13   shelved?

14       A    Sponsorship opportunity.

15       Q    What do you mean by that?

16       A    Meaning Simponi had come to ContextMedia

17   wanting to develop a rheumatology network, and so

18   that became a priority.

19       Q    Do you know when Simponi came to

20   ContextMedia?

21       A    I do not know that answer.

22       Q    And I want to just ask a particular question

23   on -- well, I guess two.  If you look under, it's the

24   last sentence under the focus heading.  For those

Jeana Loewe    March 5, 2014

1    offices that -- it says, "For those offices concerned

2    about sound, a silent RHN loop is also available."

3    Was that true from the beginning when you started?

4        A    No.

5        Q    When did that silent loop come into being?

6        A    I don't recall an exact date.

7        Q    And do you know why it came into being?

8        A    Primarily because you have the office

9    managers where the TV was sitting near and didn't

10   want to listen to the same thing all day long.

11       Q    So you received feedback that certain

12   practice managers wanted the silent loop?

13       A    Correct.

14       Q    And then under sponsors, the last sentence,

15   "Our doctor's choice guarantee allows the doctor to

16   remove any specific message from his or her loop at

17   any time."  Are you aware if practices communicated

18   that they did not want certain content in the loop?

19       A    Yes.

20       Q    And who handled those requests?

21       A    I don't recall exactly.

22       Q    Would that have been someone from the member

23   services side?

24       A    Member services would field it.

Jeana Loewe    March 5, 2014

1      Q    And do you know if those requests were
2  honored?
3      A    I don't know.
4      Q    And turning to 15 and 16, this is essentially
5  the, looks like an update to a competitor information
6  chart that we looked at earlier.
7      A    Mm hmm.
8      Q    And again this is June 2011.  Are you using
9  the same sources here that you would have used in
10  December of 2010?
11      A    Yes, same type of sources.  Obviously web
12  sites and marketing collateral is updated.
13      Q    And every member outreach executive from
14  June 2011 on would have received this manual?
15      A    Yes.
16      Q    And told to review this manual as part of
17  their on boarding?
18      A    Told to review and it was reviewed with them.
19      Q    I want to look at page 22.  And this is the
20  sign up form for RHN, right?
21      A    Mm hmm.
22      Q    Did you draft this?
23      A    I did.
24      Q    And before you came on board, do you know

Jeana Loewe    March 5, 2014

1    what they used as a sign up form?

2        A    Something similar.

3        Q    But you drafted this particular version?

4        A    Yes.

5        Q    And there's an agreement at bottom.  It's

6    kind of bracketed as D.  Every practice that signed

7    up would have completed this form, is that right?

8        A    Yes.

9        Q    Looking at the agreement side of it, are

10   these meant to be check boxes on the left margin here

11   next to each sentence?

12       A    Yes.

13       Q    Okay.  So the practice was to check off each

14   of these, I guess clauses as part of the agreement,

15   as part of filling in the agreement?

16       A    As part of filling in the sign up form, yes.

17       Q    And did practices do that?

18       A    Yes.

19       Q    Were the sign up forms handled by member

20   services or member outreach?

21       A    Member outreach provided the sign up form to

22   a prospective practice.  The practice then sent it

23   back in to member outreach.  The sale was approved in

24   terms of making sure they met the demographics to be

Jeana Loewe    March 5, 2014

1  an RHN member as shown in B and then it was provided

2  to member services to follow up with and then begin

3  the installation process.

4      Q    Got you.  And did Context require that the

5  practice agree to every provision under the agreement

6  section?

7      A    For the most part, yes.  There was certain,

8  for instance, electronic media in the waiting room,

9  there were certain instances if there was a cable

10 television, that was -- they would agree to it.

11     Q    Were there any other exceptions made?

12     A    I don't know.

13     Q    And when you drafted this, did anyone approve

14 it at ContextMedia?

15     A    Yes.

16     Q    And who did that?

17     A    Shradha Agarwal.

18     Q    And did you use -- you said this is a

19 different version.  Did you use any other documents

20 in drafting this document as reference?

21     A    Yes.

22     Q    What were those documents?

23     A    The Diabetes Health Network sign up form.

24     Q    So the same form for a sister network?

Jeana Loewe    March 5, 2014

1    A    Correct.

2    Q    Anything else?

3    A    Not that I recall.

4    Q    What were the demographics that qualified a

5   practice for RHN?

6    A    They had to see a certain percentage of

7   rheumatology patients.

8    Q    Per week what the measurement is?

9    A    I don't recall if it was exactly per week.

10    Q    And if you look, again going back to the

11   agreement section, if you look at the last sentence,

12   "I agree to not remove, relocate, modify, alter or

13   disrupt any of the RHN system components without

14   prior consent from the Rheumatoid Health Network."

15   Did you put that clause in there?

16    A    I did.

17    Q    And why did you put that clause in there?

18    A    It was a clause that was included on the

19   Diabetes Health Network form.

20    Q    And so you wanted the same to apply to RHN

21   and the RHN practices?

22    A    Correct.  We wanted the forms to mirror each

23   other.

24    Q    When a practice signed up, did you receive a

Jeana Loewe    March 5, 2014

1    copy of the contract?

2        A    Yes.  In the beginning, yes.

3        Q    In the beginning.  And that stopped at a

4    certain point?

5        A    For awhile I would receive the form, make

6    sure the doctor -- I would receive the form from the

7    sales team, make sure that everything was completed,

8    make sure that they met the percentage, patient

9    percentage piece.  And if those things were correct,

10   I'd pass it on to member services team.  Once my role

11   started changing, that went over to Matt Garms.

12       Q    And when did your role start changing?

13       A    When we started to transition to ContextMedia

14   Health.

15       Q    So about a year in?

16       A    Correct.  A little more than a year.

17       Q    And who provided you the required

18   demographics?

19       A    Rishi Shah and Shradha Agarwal.

20       Q    And were those, do you know if those

21   demographics came from J&J?

22       A    I don't know that.

23       Q    If you'd turn to 27 and 28, and I know it's

24   hard to read, but this is essentially another version

Jeana Loewe    March 5, 2014

1    of the installation authorization that we looked at

2    earlier.

3        A    Mm hmm.

4        Q    And this is a section entitled competitor

5    switch out process.  If you turn to page 28, you'll

6    notice that there's a division for Accent Health

7    switch outs and non Accent Health switch outs.  Why

8    is there that dichotomy?

9        A    It's my understanding that Rishi and the head

10   of Accent Health developed a process between the two

11   companies for switch out systems.

12       Q    And that was in place in June 2011?

13       A    I don't know the exact day it started.

14       Q    And so if I'm reading this right, the

15   practice was required to work through Accent Health

16   to schedule removal, but that wasn't required if the

17   company was a competitor apart from Accent?

18       A    That is what Rishi and Accent Health agreed

19   to.

20       Q    And was there a point when that changed?

21       A    I don't know.

22       Q    Did anyone ever tell you why Accent Health

23   was treated differently?

24       A    No.

Jeana Loewe    March 5, 2014

1              MR. BERNAY:  Well, we have been going for
2        about almost an hour 20 minutes, so let's take a
3        break.
4              THE WITNESS:  Okay.
5              (A recess was taken, after which the
6                following proceedings were had:)
7    BY MR. BERNAY:
8        Q    Before we broke, we were talking about
9    drafting the RHN form.  And I meant to ask you, did
10   you draft the DHN form as well?
11       A    No.
12       Q    Who did that?
13       A    I don't know.
14       Q    You spoke about taking market share from
15   competitors of Shradha.  Did you discuss that with
16   anyone else at ContextMedia?
17             MR. O'BRIEN:  I'll object to the form.  You
18        can answer.
19       A    Actually, I didn't say that we talked about
20   taking market share from competitors.  We talked
21   about the space, that there was opportunity in the
22   space.
23   BY MR. BERNAY:
24       Q    Did you talk about there being opportunity in

Jeana Loewe    March 5, 2014

1    the space with anyone else at ContextMedia besides

2    Shradha?

3        A    Yes.

4        Q    Who was that?

5        A    Rishi Shah, Matt Garms.

6        Q    What did you discuss with Rishi?

7        A    We -- more group meetings with all four of us

8    involved that we just mentioned and discussing where

9    we were at in terms of sales in the pipeline and the

10   fact that it was a new, a relatively young space that

11   these systems were in.

12       Q    So Rishi, Shradha, Matt Garms never discussed

13   the need to take some of that space from competitors?

14       A    I don't know that answer.

15       Q    You don't know or you don't remember?

16       A    I don't know if they discussed it separately

17   from me.

18       Q    But you don't recall any conversations to

19   that end?

20       A    There was no specific conversation stating

21   that in order for us to gain -- to hit our numbers,

22   we had to go after specific competitors.

23       Q    Beyond Simponi, were there other brands that

24   came onto the RHN network during your time there?

Jeana Loewe    March 5, 2014

```
 1      A    Not that I recall.
 2      Q    It was just Simponi for those two years?
 3      A    For the RHN, yes, I believe.
 4      Q    During your time there, did you use any other
 5   lists besides the J&J list?
 6      A    I don't know.  I wasn't involved in the
 7   importing of lists into the CRF.
 8      Q    Who would have done that?
 9      A    That would have been handled by Rishi Shah
10   and Matt Coppola.
11      Q    And you did see this J&J list at one point.
12   Did that list indicate if a practice had a competitor
13   system in their office?
14      A    No.
15      Q    Are you aware if, when these sales calls were
16   made, if the member outreach executives knew there to
17   be a competitor system in an office?
18      A    Only if the practice told them that they had
19   a system.
20      Q    So prior to a cold call, there was no
21   knowledge?
22      A    Correct.
23      Q    So you created -- and before I go on, how
24   were these lists used from J&J?
```

Jeana Loewe    March 5, 2014

```
 1      A    In terms of --
 2      Q    The sales team called exclusively off the J&J
 3   list during this entire time?
 4      A    I don't know.  Going back to your question a
 5   few moments ago, I don't know how the lists were
 6   imported into Quickbase.
 7      Q    Did you create competitive analysis sheets
 8   contrasting Context and Healthy Advice?
 9      A    Yes.
10      Q    And I'm going to give you, I'm going to mark
11   as exhibit, we'll do this as Exhibit 6 and 7.
12           (Documents marked as Plaintiff's Exhibits 6
13            and 7 for identification.)
14           MR. BERNAY:  Dick, what's the Bates number on
15      that page I just gave you?
16           MR. O'BRIEN:  This one (indicating)?
17           MR. BERNAY:  Yes.
18           MR. O'BRIEN:  4778.
19           MR. BERNAY:  Sorry, I've got two different
20      4778.
21      Q    Did I give you 4771?  Jeana, what's that
22   number there?
23      A    4778 and 4771.
24      Q    Okay.  So is this an example of the
```

Jeana Loewe    March 5, 2014

```
 1   comparison pieces that you would send out from time

 2   to time?

 3        A    This is an example of what I would provide to

 4   the sales team, yes.

 5        Q    And what was the purpose of this document?

 6        A    The purpose of the document was to provide

 7   the sales team with some background information

 8   regarding the ContextMedia health system versus

 9   competitive systems for offices who wanted to know,

10   to contrast and compare the two.

11        Q    And these were updated frequently, is that

12   right?

13        A    Not necessarily frequently.

14        Q    And were these mailed to offices, e-mailed to

15   offices?

16        A    This would have been provided by the sales

17   team via e-mail.

18        Q    And do you recall when you first started

19   circulating something like this?

20        A    I don't.

21        Q    But it was a shorthand for the sales team to

22   sell on, basically?

23        A    Yes.

24        Q    And you did these for other competitors
```

Jeana Loewe    March 5, 2014

1   besides Healthy Advice, is that right?

2       A    Yes.

3       Q    I'm going to show you a similar document.

4   We'll mark this as 8.

5           (Documents marked as Plaintiff's Group

6            Exhibit 8 for identification.)

7       Q    Take a look at this e-mail.

8       A    Mm hmm.

9       Q    Do you recall circulating these documents and

10  this chain?

11      A    I recall the document.  I don't recall the

12  particular chain without reading this e-mail.

13      Q    Take a quick look.

14      A    Okay.

15      Q    If you see in the middle e-mail, this is page

16  number 4228, you say, "Kyle, please hold on using the

17  revised Healthy Advice.  As I'm continuing to

18  research other competitors, there were a few other

19  differentiators I would like to include in this one.

20  I'll follow up with revise shortly."  Do you recall

21  what revision that would have been and what

22  occasioned that revision?

23      A    I do not.

24      Q    Again, what sources are you using to

Jeana Loewe    March 5, 2014

1    construct this document?

2        A    The web site and marketing materials, same

3    sources.

4        Q    So you monitored Healthy Advice's web site

5    fairly frequently?

6        A    Mm hmm.  Yes.

7        Q    Would you say once a week?

8        A    Less frequently than that.

9        Q    Once a month?

10       A    I don't recall how frequently.

11       Q    What else did you do to monitor Healthy

12   Advice online?  Did you have any Google alert set for

13   Healthy Advice or similar mechanisms?

14       A    I had Google alerts set for Healthy Advice as

15   well as a dashboard for any social media.

16       Q    So when you say dashboard, you mean like for

17   Twitter, for Facebook?

18       A    Correct.

19       Q    So you could aggregate all that material?

20   And was that for Healthy Advice and other competitors

21   as well?

22       A    Yes, for our competitors as well as for

23   Context.

24       Q    Were you responsible for Context's social

Jeana Loewe     March 5, 2014

1    media output?

2        A    No, we were not using social media at the

3    time.

4        Q    Through 2012?

5        A    Through my time in 2012.

6        Q    And you say that on a company-wide basis?

7        A    No, for the Rheumatoid Health Network.

8        Q    Was it different for DHN?

9        A    Yes.

10        Q    Was there a point in time when you became

11    aware that some of the member outreach executives

12    were making misrepresentations to practices?

13        A    Yes.

14        Q    And when do you recall, when was that?

15        A    I don't recall a date.

16        Q    And do you recall what the misrepresentations

17    were?

18        A    Not in particular.  I just know there were

19    instances.

20        Q    There were instances.  And how did you learn

21    of those instances?

22        A    Either through over hearing a sales call,

23    through being told by Matt Garms or through receiving

24    a note from the sales team them self, the sales

Jeana Loewe    March 5, 2014

1    individuals.

2        Q    So what did you overhear on sales calls?

3        A    I don't recall particular verbiage.

4        Q    But it was something that struck you as

5    incorrect?

6        A    It would be something worded not in the way

7    that I would want them to say it.

8        Q    Did you work frequently with the outreach

9    executives on messaging?

10        A    Yes.

11        Q    And what did you do to make sure that they

12    were staying on message?

13        A    I left that -- the responsibility of making

14    sure they were on message was Matt Garms.  I provided

15    the sales team with e-mail templates and talking

16    points.  We would do lunch and learns to talk through

17    concerns that they had and we would have a weekly

18    meeting to talk about updates to marketing

19    activities, updates to sales goals, hurdles that they

20    encountered that they wanted to talk through, success

21    stories, et cetera.

22        Q    Would you ever listen in on phone calls?

23        A    I did not.

24        Q    And how did you overhear phone conversations?

Jeana Loewe    March 5, 2014

```
1        A    We are a small office.

2        Q    You were a ten person office.  Were you

3   always in the same space from 2010 through 2012?

4        A    Yes.

5        Q    I can imagine.  Were the sales folks in

6   cubicles?

7        A    Yes.

8        Q    And were you in a cubicle as well?

9        A    Yes.

10       Q    And were you located near the salespeople?

11       A    Yes.

12       Q    Did you hear them every day?

13       A    Yes.

14       Q    Could you concentrate?

15       A    I could.

16       Q    So when you heard something that, you know,

17  raised an alarm, did you say something to anyone?

18       A    Yes.

19       Q    Who did you talk to?

20       A    I would speak immediately to the individual,

21  I would make sure that Matt Garms was involved and,

22  if necessary, I would ladder up to Jim and Rishi.

23       Q    And again, you don't remember what was said

24  that kind of set you off?
```

Jeana Loewe    March 5, 2014

1      A    Not in exact words.

2      Q    And do you recall who you spoke to about

3   misrepresentations?

4           MR. O'BRIEN:  I think she's answered that,

5      but go ahead.

6      A    In terms of who --

7   BY MR. BERNAY:

8      Q    Specific individuals.

9      A    On the sales team or within --

10     Q    On the sales team, sorry.  Let's be clear.

11  Thanks.

12     A    Pat Cavanna, Brok Vandersteen, Jordan Zmick

13  are three that I know for sure that I've spoken to,

14  and Deven Tatum.

15     Q    And did you report any of those individuals

16  up the ladder?

17     A    I did.

18     Q    Who?

19     A    Pat Cavanna.

20     Q    And why did you report --

21     A    And Jordan Zmick, actually.

22     Q    And why did you do that?

23     A    Because I wanted more help from Matt to make

24  sure that the team is utilizing the talking points

Jeana Loewe   March 5, 2014

```
 1    that are provided to them and the materials provided
 2    to them.
 3        Q   And do you recall, when you -- so when you
 4    say reported up, would you talk to Matt?
 5        A   Yes.
 6        Q   Did you ever go to Rishi or Jim over concerns
 7    about what was being said?
 8        A   I don't recall an exact time.
 9        Q   But you did?
10        A   Yes.
11        Q   And what did -- well, let's start with Rishi.
12    What did Rishi say in response?
13        A   He would -- actually, I think I can give an
14    example of him.  There were times in terms of using
15    an incentive, in terms of we would -- there was a
16    point where we would offer a gift card.  We had X
17    number of gift cards available to close a sale.  Pat
18    was definitely an individual who would lean on it
19    more and I would speak to Rishi and Matt that his
20    sales skills need to be honed better versus relying
21    on a gift card.
22        Q   Do you recall when that was?
23        A   I don't.
24        Q   Any others in terms of talking to Rishi about
```

Jeana Loewe    March 5, 2014

1    particular individuals?

2        A    In terms of overhearing like their sales

3    calls?

4        Q    Mm hmm.

5        A    Not that I remember exactly.

6        Q    And you said you spoke to Jim as well?

7        A    Jim would be involved in the conversation.

8        Q    Did you ever go to Jim without Rishi in the

9    room to discuss concerns you had?

10       A    Yes.

11       Q    And do you recall what the reason was?

12       A    To be honest, more that the sales team was

13   driving me nuts, not regarding a particular --

14       Q    Why was the sales team driving you nuts?

15       A    Just their, mostly in terms of calls they

16   were making, screwing around in the office.  Number

17   of calls, I should say.

18       Q    Number of calls?

19       A    Yes.

20       Q    Meaning like they weren't making as many

21   calls?

22       A    They could have been more productive.

23       Q    Would you say maturity issues?

24       A    Yes.  It is a young sales team.

Jeana Loewe    March 5, 2014

1      Q    And what did Jim say he would do?

2      A    He would reiterate the need for hitting a

3    certain number of calls and to act in a professional

4    manner within the office.

5      Q    And he'd say that directly to the sales team

6    or --

7      A    Yes.

8      Q    Or through Matt?

9      A    He would say it directly to them.

10     Q    And what did Rishi say about the concerns you

11    raised?

12     A    He would speak with the particular individual

13    as well.

14     Q    And you said you would get notes from the

15    sales team as well about misrepresentations that were

16    being made?

17     A    No, in terms of when the sales team would

18    send me, for instance, the sale, like for instance,

19    if they had a sign up form that came in, not that

20    misrepresentations were being made but that they were

21    using a gift card when there wasn't one for them to

22    use.

23     Q    Not every practice merited a gift card?

24     A    Correct.

Jeana Loewe    March 5, 2014

1      Q    What practices merited a gift card?  What was
2  the criteria?
3      A    It depended on if a marketing campaign was
4  being run.
5      Q    So there were periods where gift cards were
6  offered and there were periods where no gift cards
7  were offered --
8      A    Yes.
9      Q    -- during your time?  And the purpose of
10 offering the gift cart was what?
11     A    An incentive if it was an office who wasn't
12 quite sure, they're like, oh, we have a lot going on,
13 we'll deal, you know, come back in a month, we'll
14 deal with it.  They would use it to close the sale.
15 And the gift card was meant to, for instance, buy
16 lunch for the office.
17     Q    And you also said that Matt Garms came to you
18 with concerns over things that were being said?
19     A    He would notify me if he overheard something
20 being said not in the right way, just to give me a
21 heads up.
22     Q    And again, do you recall what those were?
23     A    I don't recall.
24          MR. BERNAY:  I'm going to mark this as 9.

Jeana Loewe    March 5, 2014

```
 1          (Document marked as Plaintiff's Exhibit 9 for
 2            identification.)
 3      Q    Just take a minute to familiarize yourself
 4   with this e-mail.  And you'll see that this is an
 5   e-mail from Shradha to the, I guess sales and
 6   marketing team on July 26, 2011 in which she writes,
 7   "I just want to clarify some of the phrasing.  We do
 8   not have an agreement from Healthy Advice to remove
 9   them but do have a hassle free switch package to
10   offer which several facilities have taken advantage
11   of."  Do you recall outreach executives telling
12   practices that they had, there was an agreement
13   between ContextMedia and Healthy Advice?
14      A    I don't know a specific incident.
15      Q    Were you aware that that was being said?
16      A    I had heard that the word agreement was used.
17   I don't recall if it was used in regards to Healthy
18   Advice.
19      Q    But that someone had said there was an
20   agreement between ContextMedia and a competitor?
21      A    Yes.
22      Q    And she concludes the e-mail by saying,
23   "Let's continue to take them down fast."  Was there a
24   particular marketing campaign directed to Healthy
```

Jeana Loewe    March 5, 2014

1    Advice at that time?

2        A    There was a competitive campaign that was

3    done in the first half of 2011 that was geared at

4    three competitors, not particularly Healthy Advice.

5        Q    Who were those competitors?

6        A    I don't recall offhand without seeing the

7    piece.

8        Q    So this was a marketing, you're saying this

9    was a marketing piece that you put together?

10       A    Myself and Shradha, yes.

11       Q    And that was part of a campaign?

12       A    Yes.

13       Q    And the aim of that campaign was to switch

14   out those practices from their competitors into

15   ContextMedia?

16       A    The aim of the campaign was to, because it

17   wasn't to just competitive practices, or practices

18   with competitors in them.  The aim of the campaign

19   was to educate the prospective members on the various

20   systems that were in the space.

21       Q    But there were three competitors in

22   particular that were identified?

23       A    I believe so.

24       Q    And I'm going to give you what I'll mark as

Jeana Loewe    March 5, 2014

1    10.
2            (Document marked as Plaintiff's Exhibit 10
3             for identification.)
4        Q    Take a minute to look at this e-mail.  Were
5    there other times when you became aware via the sales
6    staff of misunderstandings or misrepresentations that
7    were being made?
8        A    I'm sorry?
9        Q    Were there other times when you became aware
10   of misrepresentations being made?
11       A    In terms of beyond this e-mail?  I'm not sure
12   what you're asking.
13       Q    Including that e-mail.
14       A    I'm sorry, I --
15       Q    I'll ask the question a different way.  Don't
16   worry about it.  Well, let's look at the e-mail
17   itself.  Do you recall this communication?
18       A    Seeing it in front of me, yes.
19       Q    And it looks like this is a string that
20   starts with Brok Vandersteen and goes through Pat
21   Cavanna.  And he states to the group that Healthy
22   Advice has 17 minutes of content, the rest are ads in
23   a 30 minute loop.  And then you write back and
24   correct him, is that right?

Jeana Loewe    March 5, 2014

```
 1        A    Yes.
 2        Q    And why did you write back and correct him?
 3        A    Because the information that he had provided
 4    in his response was not accurate, to my knowledge.
 5        Q    And then he writes back and says, "Jeana is
 6    right, nine minutes of ads."  And did you do anything
 7    to make sure that he was -- that the sales team was
 8    sticking to the information that had been in your --
 9             (Whereupon a brief interruption occurred.)
10        A    I'm sorry.  Can you repeat the question?
11             (Question read.)
12        Q    -- that had been in your comparison sheets?
13        A    Yes, I would continue, any time I got wind of
14    anything like this, I would get up and go over to
15    their desk, talk to them, reiterate why it's
16    important that we use only information that we can
17    support, and again something we would talk about in
18    our weekly meetings as well, too.
19        Q    And if we look at -- we'll mark this as
20    No. 11.
21             (Documents marked as Plaintiff's Group
22              Exhibit 11 for identification.)
23        Q    And this is an e-mail from Brok Vandersteen
24    saying just thanks for clarifying, is that right?
```

Jeana Loewe    March 5, 2014

1      A    (Nodding.)

2      Q    So the sales team got the message?

3      A    I would say so from their responses.

4           MR. BERNAY:  I'm going to mark the following

5      as Exhibit 12.

6           (Document marked as Plaintiff's Exhibit 12

7            for identification.)

8      Q    Take a minute to look at this e-mail.  And if

9      you look at this, I'll just start at the beginning,

10     this is an e-mail from Brok Vandersteen a day later,

11     March 28th in which he says to, I guess a practice

12     contact, "Hi, Debbie.  I can't stress enough how much

13     better our network is than the Healthy Advice TV you

14     have.  You have a 30 minute PowerPoint slide with

15     general information right now and half of it is

16     advertising."  So is that statement incorrect?

17     A    To my knowledge, yes.

18     Q    And reading on it says, if you read at the

19     bottom, "I'll send you a $50 American Express gift

20     card that you can use for anything you want.  All I

21     need is two forms, not contractual in any way."

22     Again, do you understand what he means by not

23     contractual in any way?

24     A    I do not understand what he means with that.

Jeana Loewe    March 5, 2014

1      Q    And is it concerning to you that
2   Mr. Vandersteen is basically repeating misinformation
3   a day after you had sent that e-mail?
4      A    Yes.
5      Q    And were you aware that these
6   misrepresentations were continuing?
7      A    No, not a day later.
8      Q    And besides -- I think you said earlier that
9   you went and you talked to the sales team to make
10  sure they got the message.  Beyond that, in terms of
11  this particular e-mail, can you recall doing anything
12  else to make sure that these statements were not
13  being made?
14     A    Beyond reiterating and, you know, talking
15  about the importance of making sure we use the right
16  information, hearing senior management talk to them
17  about how it's so important to use the right
18  information, Matt talking to them, I don't recall
19  beside -- beyond that.
20     Q    All right, I'm going to show you now what
21  I've marked as Exhibit 13.
22          (Documents marked as Plaintiff's Group
23           Exhibit 13 for identification.)
24     Q    This is an e-mail from Jim Demas to you on

Jeana Loewe    March 5, 2014

1    July 13, 2012.  Just take a minute to look at the

2    e-mail.  And do you recall, if you read in the middle

3    of this first page, this is an e-mail from you, I

4    guess, to the member outreach team and it says,

5    "Hello, team.  I just spoke to" -- I guess RS is

6    Rishi Shah?

7        A    Yes.

8        Q    -- "about this.  And to reinforce with each

9    of you, we should by no way indicate that we have an

10   arrangement with or permission from Healthy Advice to

11   remove their equipment.  What we do, however, is

12   offer the practice an opportunity to decide if they

13   want to switch to a different and albeit better

14   patient education system."  So do you remember what

15   precipitated this e-mail?

16       A    Reading through the chain, it appears as

17   though one of the member outreach executives, Brok

18   forwarded a letter that was sent to him from one of

19   his clinics.

20       Q    Do you recall this being a letter that

21   Healthy Advice sent to its practices?

22       A    I don't recall the circumstances beyond

23   reading what is written right here.

24       Q    And again it was your understanding that

Jeana Loewe    March 5, 2014

1    these represations -- representations to the effect

2    that there was some kind of permission or

3    relationship between Context and Healthy Advice were

4    being made at the time?

5        MR. O'BRIEN:  Object to the form.  You can

6        answer.

7        A    I'm sorry, can you -- that stutter threw me

8    off a little.

9    BY MR. BERNAY:

10       Q    You say you want to reinforce with the

11   members that there's -- that Context should in no way

12   indicate that they have an arrangement or permission

13   from Healthy Advice to remove equipment.

14       A    Mm hmm.

15       Q    And I take reinforce to mean that this

16   warning had been made before.  My question is, if you

17   recall, were you aware of those misstatements

18   happening around that time?

19       A    I do not recall offhand if there was -- if

20   there were statements continuing to happen around

21   this time period.

22       Q    Are you aware if anyone faced reprimand or

23   discipline because of statements like this?

24       A    I'm sorry?

Jeana Loewe    March 5, 2014

1      Q    Did anyone --

2      A    Oh, face reprimands, got it.

3      Q    Face reprimand or discipline because of

4   statements like this or the others we discussed this

5   morning?

6      A    Reprimand in terms of --

7      Q    Could be, I don't know, could be any one of a

8   number of things.  Would they receive a letter, was

9   there, you know, a note made to the file?

10     A    Got you.  I know that if an instance

11  occurred, Rishi spoke to the team as individuals.

12  However, I do not know if additional measures such as

13  notes in files, et cetera, were taken.

14     Q    And were you concerned at the amount of, I

15  guess this type of language from the sales team since

16  you could overhear them and you were getting these

17  reports about things that were being said to

18  practices?

19     A    Concern that this would be said, yes.

20  Concern in terms of amount, I would not say that it

21  was a frequent basis, at least in my knowledge.

22     Q    Were you concerned that what you were hearing

23  would damage the brand with practices?

24     A    Yes.

Jeana Loewe     March 5, 2014

```
1       Q    You mentioned earlier that one of the things
2   that you did was these lunch and learns.  What was
3   the purpose of a lunch and learn?
4       A    Purpose would be to get everyone together
5   away from their desk during the lunch period and go
6   over, educate them on a particular topic.  The
7   Portable Care Act was one of the topics, specific
8   rheumatology commissions were topics, consolidating
9   the two services into ContextMedia Health was a
10  topic.
11      Q    How often were these held?
12      A    I don't recall the frequency.  Not very
13  frequent.
14      Q    Were there ones held, would they be held on
15  single topics or would they cover multiple issues?
16      A    Typically a single topic.  It was only during
17  that lunch time period.
18      Q    Were there lunch and learns held about
19  competitors?
20      A    No.
21      Q    Were there lunch and learns held about
22  representations that were made to practices?
23      A    There were lunch and learns held about how we
24  message ourselves.
```

Jeana Loewe   March 5, 2014

1      Q   And I guess the converse of that would be how
2    you would not message yourself.  Were things
3    discussed that a practice, that a sales executive
4    should not say?
5      A   Yes.
6      Q   And do you recall what some of those things
7    were?
8      A   I do not.
9      Q   When you held these lunch and learns, did you
10   lead them?
11     A   It would depend on the topic.
12     Q   In terms of messaging and what to and to not
13   say, would you lead those?
14     A   Again, that would depend.  There was a number
15   of us that led them, myself, Matt, Rishi, Shradha,
16   Jim.
17     Q   Are documents prepared and handed out at
18   these lunch and learns?
19     A   It depended on the topic.
20     Q   Do you recall for the messaging lunch and
21   learns, were there documents handed out?
22     A   I don't recall.
23     Q   Were there agendas or notes prepared?
24     A   No.

Jeana Loewe   March 5, 2014

1    Q   Can you think of any other documents that
2 would be related to these lunch and learns?
3    A   If it was a lunch and learn about, you know,
4 network marketing campaign, we'd bring a copy of the
5 campaign.  Again it just depended on what the topic
6 being covered was.
7    Q   Did you ever conduct an audit of, I guess the
8 effectiveness of the sales team for RHN?
9    A   In terms of --
10   Q   I would ask just generally to begin.
11   A   An audit in terms of their activities or an
12 audit of where they are on the pipeline?
13   Q   Both.
14   A   I would look at overall where a number of
15 accounts in the different stages of the pipeline.
16 Matt primarily looked at, was developing into that
17 manager role and was looking more along the lines in
18 terms of the different individuals that we would work
19 together to provide information.
20   Q   So you were concerned with each individual's,
21 I guess sell rate?
22   A   Mm hmm.
23   Q   And their call rate and other kinds of
24 metrics?

Jeana Loewe    March 5, 2014

```
 1        A    Yes.
 2        Q    And did you look at what they were actually
 3   telling practices?
 4        A    I wasn't in particular.  I can't speak to if
 5   Matt was.
 6        Q    Do you know if anyone else was besides you
 7   and Matt?
 8        A    I don't know that answer.
 9        Q    And did you review any of the e-mails that
10   went out by the practice relations team?  I'm sorry,
11   by the member outreach team?
12        A    Like spot check?
13        Q    Yes.
14        A    No, that wasn't -- my dealings with the sales
15   team was a little bit higher level than that.
16        Q    Who would have had that kind of granular --
17        A    Responsibility?
18        Q    -- check, yes.
19        A    Matt Garms, Rishi Shah.
20        Q    You mentioned earlier that these
21   representations would hurt the value or the integrity
22   of the brand.  Why was that?
23            MR. O'BRIEN:  I'll object to the form.  She
24        can answer.
```

Jeana Loewe    March 5, 2014

1       A    They had the potential to hurt the brand

2   because for me, I wanted to make sure that everything

3   that we said and presented was accurate.

4   BY MR. BERNAY:

5       Q    And sometimes it wasn't?

6       A    Yes.

7       Q    We've talked about this, different facets of

8   it, but did you have specific conversations with, for

9   example, Rishi Shah about the protocol to switch out

10  HAN, the HAN equipment?

11      A    I recall conversations regarding competitor

12  switch out and what that process -- what is the

13  process.

14      Q    And was Rishi essentially just telling you

15  what the process was, was going to be?  Or was it a

16  discussion of what it should be?

17      A    He did not speak to me regarding what that

18  process should be.  It was laddered down to me after

19  it was discussed between him, Jim and other

20  individuals.

21      Q    And did you have direct discussions with Jim

22  about it?

23      A    I don't recall.

24      Q    You mentioned earlier that you gathered a lot

Jeana Loewe    March 5, 2014

1    of competitive material at conferences.

2        A    Mm hmm.

3            MR. BERNAY:  So I'm going to mark this as 14.

4            (Documents marked as Plaintiff's Group

5             Exhibit 14 for identification.)

6        Q    Take a minute and have a look at this e-mail.

7    Do you recall this correspondence?

8        A    Unfortunately, yes.

9        Q    Why unfortunately?

10       A    This is not something that was sanctioned by

11   the company at all and is not how we do things.

12       Q    And I'll represent to you we don't have the

13   original, a stand alone original e-mail in this

14   string.  Do you recall sending this e-mail to the

15   individuals kind of in the middle here, Rishi, Jim

16   Demas, Matt Garms?

17       A    Yes.

18       Q    And why did you send the e-mail?

19       A    Matt made me aware of something that had

20   occurred at the conference after I had left.  And it

21   was something that I wasn't sure what was going to

22   happen from it and I wanted to make senior management

23   aware of a potential situation.

24       Q    And you describe Mr. Cavanna as an

Jeana Loewe    March 5, 2014

1    enterprising individual who borrowed a badge from one

2    of the reps.  You were at this conference?

3        A    I was, but I had left prior to this

4    happening.

5        Q    And if you turn to the second page you write,

6    "Matt is currently in possession of the materials.

7    My initial thought is to come into the office

8    tomorrow before the show and make copies and burn the

9    programming disk."  Why was that?

10       A    Matt and I had a conversation.  We were like,

11   well, if we have the materials, might as well make a

12   copy of it before returning.

13       Q    And in fact is that -- and Rishi essentially

14   tells you to do the same, is that right, on the first

15   page?

16       A    Yes.

17       Q    And is that what happened?

18       A    Yes.

19       Q    And did you make the copies?

20       A    I did.

21       Q    And what did you do with the copies of the

22   materials?

23       A    I made copies of the hand held materials, the

24   hard copies, and scanned them in and placed them in a

Jeana Loewe    March 5, 2014

1    competitive intelligence folder on our server.

2        Q    And then you say at the end of that

3    paragraph, first paragraph on the second page, "When

4    I get on site", meaning, I assume, back to the

5    conference?

6        A    Mm hmm.

7        Q    "I'm going to go to Accent Health and return

8    the materials to the individual and apologize that I

9    was unaware that this had taken place.  I want them

10   to know that this is not how we play the game."  So

11   what do you mean by that, this is not how we play the

12   game?

13       A    With trade shows, it's fairly common practice

14   across any industry that if your competitor leaves

15   materials out on their booth, there is an opportunity

16   to come by and take a copy of them.  What is not

17   acceptable in my eyes is, or anyone at Context, when

18   we have these, when we had the follow-up

19   conversations is that you cannot go and pose as

20   someone else, particularly a potential sponsor, to

21   gain copies of materials.

22       Q    But nonetheless, Context made sure that it

23   had a copy of what was received?

24       A    Yes.

Jeana Loewe    March 5, 2014

1    Q    And did you believe that Patrick Cavanna
2  showed initiative and was enterprising by borrowing
3  that badge?
4    A    No, I was being cheeky, which he and I had
5  had a conversation that evening via phone where I
6  essentially yelled at him.  And he was very
7  remorseful for his -- he came across as very
8  remorseful for his actions.
9    Q    Do you know if he was reprimand in any way?
10    A    That I do not know.
11    Q    And once you had this material, what did
12  you -- I know you made copies of it, but what did you
13  do with it after that?
14    A    I read through it.  Much of it was the same
15  as everything that we had already had in hand.
16    Q    And the programming disk?
17    A    Gave that to the media operations team.
18    Q    And were these materials uploaded to a
19  competitor information folder?
20    A    Yes.
21    Q    And so what -- can you tell me about that
22  folder?  What is it?
23    A    Just an archive of marketing materials that
24  are either used at a trade show or a practice would

Jeana Loewe    March 5, 2014

1    send to us.

2        Q    And what did you use it for?

3        A    Background knowledge about competitors,

4    seeing what -- a lot of it was used to put together

5    an analysis so we knew how we compared.

6        Q    And where was that folder located?

7        A    On Context's server.

8        Q    The Context server which, did everyone have

9    access to that server in the office?

10       A    Yes.

11       Q    And were the outreach executives encouraged

12   to review those folders?

13       A    They were made aware of them.  I don't recall

14   if they were told to specifically go in and review

15   them.

16       Q    And did you have a folder for each competitor

17   within the RHN universe?

18       A    That we were aware of.

19       Q    That you were aware of, yes.

20       A    Yes.

21           MR. BERNAY:  I'm going to mark Exhibit 15.

22           (Document marked as Plaintiff's Exhibit 15

23            for identification.)

24       Q    Take a minute to review this e-mail.  Do you

Jeana Loewe    March 5, 2014

1   recall viewing the HAN video clip discussed in this
2   e-mail?
3       A    I don't recall reviewing the full video, no.
4       Q    Reviewing the full video.  Do you remember
5   watching some of the video?
6       A    I can't recall whether I did or not.
7       Q    And this is, we spoke before about the
8   competitor intelligence folder.
9       A    Mm hmm.
10      Q    And this is the, I guess the file path to
11  that folder, CM server one, marketing competitor
12  intelligence?
13      A    Yes.
14      Q    And were you responsible for managing that
15  folder?
16      A    No, it was a community folder that if you
17  had, you know, Mike put items into it, Silvia would
18  put items into it, people who came across things.
19      Q    Besides this loop -- so do you recall
20  anything about this loop at all?
21      A    No.
22      Q    During your time at Context, did you see
23  other HAN loops?
24      A    I don't recall.

Jeana Loewe    March 5, 2014

1      Q    There is a note on the third paragraph that
2  says do not try and play it, meaning the loop, off
3  the server.  Beyond that, if you delete or mess
4  anything up, the marketing team will ruin you.  Why
5  is that?
6      A    Because all of our marketing materials were
7  saved in these folders and the team had a habit of,
8  if they went into a file and were customizing it for
9  their own, they would accidentally save over our
10  materials.
11     Q    So there's other material in there including,
12  I assume, work documents that could be overridden?
13     A    Yes.
14     Q    And during your time at Context, did this
15  competitor intelligence folder remain in the same
16  place or did it move somewhere else within the
17  server?
18     A    I don't know.
19     Q    As far as you know, it was always in the same
20  place?
21     A    I think so.
22     Q    We talked earlier about growth and revenue
23  targets.  And there were monthly goals in terms of
24  the number of practices that needed to be on boarded,

Jeana Loewe    March 5, 2014

1    is that right?

2        A    Yes.

3        Q    And who set those goals?

4        A    Rishi.

5        Q    And do you know -- and those goals varied

6    month to month, is that right?

7        A    Yes.

8        Q    And do you know why those goals varied?

9        A    Varied based off of previous months' sales as

10   well as his conversations with J&J regarding growth.

11       Q    So would you say that the goals were more or

12   less fluid over time, so one month the sponsor would

13   want -- would need this and another month a sponsor

14   would need a higher number of practices?

15           MR. O'BRIEN:  Object to the form.

16       A    No.

17   BY MR. BERNAY:

18       Q    So there was always one or two targets you

19   were driving for in terms of growth over time?  So

20   for example, I'll give you an example, was the idea

21   to have a certain number of practices on board by the

22   end of 2011?

23       A    The number of practices were based on an

24   annual contract signed by sponsors.

Jeana Loewe    March 5, 2014

1      Q    Which included minimum number, included a
2    requirement in terms of minimum numbers of practices
3    in the network?
4      A    For, yes, for the course of that time period.
5      Q    I'm going to show you what I'll mark as
6    Exhibit 16.
7           (Documents marked as Plaintiff's Group
8            Exhibit 16 for identification.)
9      Q    So let me ask you, top line e-mail is one
10   from you to, it looks like various individuals but
11   not the member outreach team in mid May 2012.  It
12   concerns hitting a certain number of practices.  You
13   say, "All right, so following up with the e-mail from
14   last Tuesday, we now have ten new installs scheduled
15   between now and May 31.  This is going to bring us up
16   to 401."  When you count practices for, I guess for
17   sponsorship purposes, you can't fully count a
18   practice until it's installed, is that correct?
19     A    In terms of what we put, like if a sponsor
20   asks how many screens do you have up, are you asking
21   that we can't count a screen until it has
22   programming -- unless it has programming playing,
23   correct?
24     Q    I guess so, yes.

Jeana Loewe   March 5, 2014

1      A    Then yes, a screen has to be playing
2  programming within the office to be counted as --
3  towards these numbers.
4      Q    Okay.  And if you look in the second
5  paragraph towards the end you're talking about, I'll
6  just read it, "This still puts us short of our goal
7  for June to see if there were any we could push into
8  May.  I note that as of right now, we only have two
9  RHN installations scheduled for the entire month.
10  This very much concerns me as we need to be hitting
11  450 by June 30."  So your sales targets are set a few
12  months in advance?

Jeana Loewe   March 5, 2014



20       MR. BERNAY:  I'm going to mark this as
21    Exhibit 17.
22       (Document marked as Plaintiff's Exhibit 17
23        for identification.)
24    Q   And here I'm going to ask you if -- this is

Jeana Loewe    March 5, 2014

1   an e-mail from you to Pat Cavanna and Matt Garms on

2   September 29, 2011.  And you're asking Pat and Matt

3   at the beginning, "As you are both aware, Healthy

4   Advice is essentially the easiest competitor for us

5   to sell against and switch out."  Why is that?  Why

6   are they the easiest competitor?

7       A    The feedback that we had been receiving from

8   practices is that they preferred the content and the

9   length of the ContextMedia loop versus the Healthy

10  Advice programming.

11      Q    Any other reason?

12      A    Not that I can recall at this time.

13      Q    So here you are, in the e-mail it says,

14  "Attached you will find a list of Context accounts

15  that have been marked in Quickbase as unqualified due

16  to having Healthy Advice installed.  As they have

17  been marked unqualified, they are not being followed

18  up on."  And then you go on to assign the accounts

19  for followup.  I assume that this is a list, direct

20  mail list for Healthy Advice.  So you were

21  specifically targeting Healthy Advice practices?

22      A    At this point in September, yes.

23      Q    And why was that?

24      A    If I recall correctly, the directive was

Jeana Loewe    March 5, 2014

1    given from Shradha and Rishi that this is one of the

2    marketing campaigns that they wanted to do.

3        Q    And do you know why that was?

4        A    I don't know.

5        Q    And so do you recall following up to make

6    sure that they had been calling these practices?

7        A    I don't recall.

8        Q    And similarly, let me just kind of ask you,

9    take a step back and ask why would these practices

10   be, quote, "unqualified" because of Healthy Advice?

11       A    The approach that the sales team was taking

12   for the most part is that they had so many accounts

13   assigned to them that we want to make sure that they

14   were touching each of the accounts.  So as more sales

15   team members came on board and the accounts, that

16   limited universe, how they would be divided up

17   amongst more people, we were then encouraging them to

18   go back and revisit accounts that they had previously

19   touched to see if they could gain any traction.

20       Q    But why would -- I'm curious about the

21   terminology.  Why would these be unqualified

22   practices?

23       A    Limitation of the fields that were available

24   in Quickbase.

Jeana Loewe    March 5, 2014

1      Q    That's all?

2      A    Mm hmm.  So essentially it was either open --

3  there was like five fields.  And so they didn't have

4  the functionality to be able to break it and divide

5  it further, at least to my knowledge, using

6  Quickbase.

7      Q    So what does unqualified represent, then?

8      A    Don't spend your time on it right now.

9      Q    So it's not a good lead?

10     A    Correct.

11     Q    And that's because the practices communicated

12  that they're not interested?

13     A    They communicated they weren't interested or

14  the sales team wasn't getting any traction.

15     Q    When a practice tells the sales team that

16  they want to be taken off the list and not called,

17  does the sales team do that?

18     A    To my knowledge, yes.

19     Q    I'm going to turn back to the previous

20  exhibit as well, just something else.  If you look,

21  so this is Exhibit 16.  And again I think I'm kind of

22  picking up on your point here about unqualified

23  accounts.  If you look, there's a paragraph that

24  starts "separately" in the middle of the page.

Jeana Loewe    March 5, 2014

1    "Separately, I'm going through the RHN unqualified to

2    reopen accounts to the team.  For the majority of

3    last year, accounts of the competitor have been quick

4    to unqualify and as the team inherited accounts, we

5    changed our ability to sell against competitors.

6    These have not been revisited for the most part.  I

7    believe that there are a number of accounts here we

8    can easily flip, especially if they are Healthy

9    Advice."

10           So again -- and this e-mail is dated 2012.

11   So again there was another push or emphasis on

12   Healthy Advice practices in mid 2012?

13           MR. O'BRIEN:  Object to the form.  You can

14       answer.

15       A   What is the question?

16   BY MR. BERNAY:

17       Q   There was never -- does this indicate that

18   there was another push or emphasis to gain Healthy

19   Advice practices in mid 2012?

20       A   This is indicating that there's opportunities

21   within accounts that had not been touched in a while,

22   not -- they happen to be Healthy Advice.  It isn't a

23   specific against one competitor only.

24       Q   Was there a point at which Healthy Advice

Jeana Loewe    March 5, 2014

```
 1   began developing a product for the exam room?
 2       A    I don't know that answer.
 3       Q    Sorry, Context.  I'm confusing my parties.
 4       A    There had been opportunities to install the
 5   systems into the exam room and there had been talk of
 6   developing an iPad product.
 7       Q    Did that happen before you left?
 8       A    Which piece?
 9       Q    Let's take the iPad piece first.
10       A    No.
11       Q    And what about the installing on screens in
12   exam rooms?
13       A    On a limited basis based on certain
14   specifications.
15       Q    And were those screens installed in RHN
16   practices?
17       A    Yes.
18       Q    And DHN as well?
19       A    I can't speak to that.
20       Q    And we've mentioned some of these people
21   today.  Who is Jordan Zmick?
22       A    Jordan Zmick is a former member outreach
23   executive.
24       Q    He's former?
```

Jeana Loewe    March 5, 2014

```
 1      A    Mm hmm.

 2      Q    Why did he leave?

 3      A    Accepted an opportunity, a different

 4  opportunity.

 5      Q    And another name I've seen on the e-mails is

 6  Patrick, I think it's Gerrity?

 7      A    Mm hmm.

 8      Q    Who is he?

 9      A    A member outreach executive.

10      Q    Is he former?

11      A    Yes.

12      Q    And why did he leave?

13      A    Wasn't a good fit, doesn't like cold calling.

14           MR. BERNAY:  All right, let's take a break.

15      I'm pretty close to done.

16           MR. O'BRIEN:  Okay.

17           MR. BERNAY:  I probably have another three or

18      four minutes of questions and that's it.  So

19      we'll just take a quick break.  We're at a little

20      past noon.

21           (A recess was taken, after which the

22      following proceedings were had:)

23  BY MR. BERNAY:

24      Q    Just to pick up on a thread from earlier, a
```

Jeana Loewe    March 5, 2014

1  couple threads, the exam room products we discussed,
2  where did the idea for an exam room product come
3  from?
4      A    That I don't know.
5      Q    And we talked earlier about why, in relation
6  to the e-mail I showed you, why it was easier to sell
7  a HAN practice or switch out a HAN practice.  Why are
8  HAN practices easier to sell and switch out than
9  Accent Health?
10     A    A lot of it is the format of the programming.
11 Accent Health programming was video footage again, as
12 I mentioned earlier, round table doctor discussions,
13 things of that nature.
14     Q    So your testimony is that the programming
15 made it more difficult to sell, that Accent Health's
16 programming made a practice less likely to switch
17 out?
18     A    That's my understanding.
19     Q    And that understanding is based on --
20     A    Feedback that had been relayed to me from a
21 number of practices, through the sales team, through
22 member services.
23     Q    We talked earlier about lists.  Were there
24 lists for DHN as well?

Jeana Loewe    March 5, 2014

1      A    Yes.

2      Q    And were there multiple lists?

3      A    Yes.

4      Q    And who provided those lists?

5      A    Similar to the Johnson & Johnson list,

6   sponsors would provide particular physician target

7   lists.  And that was based off scripts being written.

8      Q    And who were those sponsors that were

9   providing the lists?

10     A    The only one that comes to mind is Levemir.

11  That's the one that I recall.

12     Q    Anyone else?  Any other brand?

13     A     Not that I can remember the specific name

14  for.

15     Q    And Levemir provided a list and that list

16  served as a guide to selling DHN?

17     A    Yes.

18     Q    You've discussed previously some issues you

19  had with the sales team today.  Have you seen those

20  types of issues at other marketing positions you've

21  had?

22     A    This is the first position where I worked so

23  closely with a sales team.

24     Q    So you haven't seen that pattern elsewhere?

Jeana Loewe    March 5, 2014

1      A    I have not worked close enough to sales teams
2    elsewhere to be able to speak to that.
3      Q    Finally, where did you go after you left CM?
4      A    I went to Baldwin Richardson Foods.
5      Q    And are you still in that job?
6      A    No, I was recently recruited for a new job.
7      Q    And where do you work now?
8      A    Follett.
9      Q    The publisher Follett?
10     A    They're not a publisher, but yes, education.
11     Q    And again, did you do similar things in both
12   those jobs?
13     A    In terms of marketing.
14     Q    And why did you leave ContextMedia?
15     A    I was laid off.
16     Q    You were laid off?  Do you know why you were
17   laid off?
18     A    I do not.
19     Q    And when did that happen?
20     A    September 2012.
21     Q    And when you were laid off, were you given a
22   severance?
23     A    Yes.
24     Q    Do you know any of the -- were other people

Jeana Loewe     March 5, 2014

1    laid off besides you?

2        A    Yes.

3        Q    Who else?

4        A    Two additional individuals in the marketing

5    team, Michael Gauthier and Terry Lind Jones.

6        Q    And how long had both of those individuals

7    been with the company?

8        A    Approximately six months.

9        Q    Both of them?

10       A    Yes.

11       Q    And what were they doing?

12       A    Terry was on the sponsorship marketing side,

13   Michael, marketing, but I wasn't sure, exactly sure

14   to what regard.

15       Q    Michael was marketing but not clear what --

16       A    Not a particular brand or product.

17       Q    And you were all laid off at the same time?

18       A    Approximately, within a few months, about two

19   months.

20       Q    Was anyone else?

21       A    No, just the marketing team.

22       Q    And are you aware what happened to the

23   marketing function after you left?

24       A    The activities were reduced, focus was

Jeana Loewe    March 5, 2014

1  primarily on selling.  And I know Matt Garms picked

2  up some of, more of the marketing activities like,

3  I'm sorry, conference planning.

4      Q   Were you aware if the company was having any

5  financial difficulties at the time you were laid off?

6      A   I do not know.

7      Q   What about RHN as a network?  Was it meeting

8  goals?

9      A   I don't know because everything had been

10 wrapped into ContextMedia Health.

11     Q   So when you say that ContextMedia -- you were

12 the brand manager for ContextMedia Health, though,

13 right?

14     A   Mm hmm.

15     Q   So you were aware of, you would have been

16 aware of how they were, I guess what was previously

17 DHN and RHN were meeting targets, is that right?

18     A   When it became ContextMedia Health, when the

19 systems were merged and it became ContextMedia

20 Health, it was -- we were given one sales number to

21 go towards.  It wasn't broken down by network at that

22 point any more.

23     Q   So it was just a whole list, a number that

24 blended the previous networks?

Jeana Loewe    March 5, 2014

```
 1       A    Yes.
 2       Q    And after that kind of merger happened, was
 3   the company hitting those numbers?
 4       A    I don't recall.
 5       Q    And again, when did that transition to
 6   ContextMedia Health take place?
 7       A    Summer 2012.
 8       Q    Do you still keep in touch with the Context
 9   people?
10       A    I do.
11       Q    Who do you keep in touch with?
12       A    Numerous individuals that are there.  Are you
13   looking for specific names or --
14       Q    Sure.  Do you keep in touch with Matt Garms?
15       A    Yes.
16       Q    With Mr. Cavanna?
17       A    Yes.
18       Q    Mr. Vandersteen?
19       A    Yes.
20       Q    Anyone else I'm missing?  Just the whole
21   crew?
22       A    I mean, pretty much the whole sales team.
23       Q    When you were employed by ContextMedia, did
24   you receive any stock in the company?
```

Jeana Loewe    March 5, 2014

```
 1      A    We were given stock options.
 2      Q    And did you take them?
 3      A    I wasn't provided with the paperwork during
 4   the time period.  We were just given a letter saying
 5   you've been given X number of stock options, but then
 6   no other paperwork or anything besides that.
 7      Q    So as of today, do you own stock in
 8   ContextMedia?
 9      A    No.
10      MR. BERNAY:  That's what I've got.  Dick,
11   anything?
12      MR. O'BRIEN:  No questions.  Signature reserved.
13                    (WITNESS EXCUSED.)
14
15
16
17
18
19
20
21
22
23
24
```

Jeana Loewe    March 5, 2014

```
 1              UNITED STATES DISTRICT COURT
                 SOUTHERN DISTRICT OF OHIO
 2                   WESTERN DIVISION

 3

 4    HEALTHY ADVICE NETWORKS, LLC, )
                                    )
 5              Plaintiff,          )
                                    )
 6         -vs-                     ) No. 1:12 CV 00610
                                    )
 7    CONTEXTMEDIA, INC.,           )
                                    )
 8              Defendant.          )

 9

10        I, JEANA LOEWE, being first duly sworn, on oath

11    say that I am the deponent in the aforesaid

12    deposition taken on March 5, 2014; that I have read

13    the foregoing transcript of my deposition, consisting

14    of pages 1 through 109 inclusive, and affix my

15    signature to same.

16

17                    _____

18                         Jeana Loewe

19

20    Subscribed and sworn to
      before me this _____ day
21    of _____, 2014.

22    _____
      Notary Public
23

24
```

Jeana Loewe    March 5, 2014

1   STATE OF ILLINOIS)
                    ) SS.
2   COUNTY OF C O O K)

3        I, LYDIA B. PINKAWA, CSR and Notary Public in

4   and for the County of Cook and State of Illinois, do

5   hereby certify that on March 5, 2014, at 9:13 a.m.,

6   at 222 North LaSalle Street, Chicago, Illinois, the

7   deponent JEANA LOEWE personally appeared before me.

8        I further certify that the said Jeana Loewe was

9   by me first duly sworn to testify and that the

10  foregoing is a true record of the testimony given by

11  the witness.

12       I further certify that the deposition

13  terminated at 12:27 p.m.

14       I further certify that I am not counsel for nor

15  related to any of the parties herein, nor am I

16  interested in the outcome hereof.

17       In witness whereof, I have hereunto set my hand

18  and seal of office this 12th day of March, 2014.

19

20

21                              Notary Public

Jeana Loewe   March 5, 2014

MERRILL LEGAL SOLUTIONS
311 South Wacker Drive - Suite 300
Chicago, Illinois 60606
(312) 386-2000   (800) 868-0061

March 12, 2014

Ms. Jeana Loewe
c/o Sidley Austin, LLC
One South Dearborn Street
Chicago, Illinois  60603
Attn: Mr. Richard O'Brien

Re: Healthy Advice vs. ContextMedia
No. 1:12 CV 00610
Deponent: Jeana Loewe

Dear Ms. Loewe:

The above referenced deposition has been transcribed
and is ready for review, pursuant to the Rules of
Court.

Please contact our office at your earliest
convenience for an appointment to review the
deposition transcript or you may contact counsel for
a copy of the transcript for your review.

Upon failure to comply within 30 days, we shall
forward an appropriate affidavit of noncompliance to
counsel without further notice.

Very truly yours,

_____
Merrill Legal Solutions

cc:  Counsel of record              lp219292

MERRILL LEGAL SOLUTIONS
(800) 868-0061   (312) 386-2000

Jeana Loewe   March 5, 2014

CASE: HAN v. Context  DATE TAKEN: March 5, 2014

DEPONENT: Jeana Loewe

PAGE   LINE                     ERRATA SHEET

_____  _____     CHANGE: _____

_____  _____     REASON: _____

_____  _____     CHANGE: _____

_____  _____     REASON: _____

_____  _____     CHANGE: _____

_____  _____     REASON: _____

_____  _____     CHANGE: _____

_____  _____     REASON: _____

_____  _____     CHANGE: _____

_____  _____     REASON: _____

_____  _____     CHANGE: _____

_____  _____     REASON: _____

_____  _____     CHANGE: _____

_____  _____     REASON: _____

_____  _____     CHANGE: _____

_____  _____     REASON: _____

_____  _____     CHANGE: _____

_____  _____     REASON: _____

(signed) _____  DATE _____

Reporter: Lydia B. Pinkawa


MERRILL LEGAL SOLUTIONS
(800) 868-0061    (312) 386-2000