Brok Vandersteen    March 6, 2014

```
          IN THE UNITED STATES DISTRICT COURT
1               SOUTHERN DISTRICT OF OHIO
2                    WESTERN DIVISION

3   HEALTHY ADVICE NETWORKS, LLC,    )
                                     )
4                    Plaintiff,      )
                                     )
5           vs.                      ) No. 1:12 CV 00610
                                     )
6   CONTEXTMEDIA, INC.,              )
                                     )
7                    Defendant.      )

8

9

10

11          The deposition of BROK VANDERSTEEN, called

12   by the plaintiff for examination, pursuant to

13   notice, and pursuant to the Rules of Civil Procedure

14   for the United States District Courts, taken before

15   Joanne Ryan, CSR and Notary Public in and for the

16   County of Cook and State of Illinois, on March 6,

17   2014, at 1:35 p.m., at 222 North LaSalle Street,

18   Suite 2400, Chicago, Illinois.

19

20

21

22

23

24
```

Brok Vandersteen     March 6, 2014

```
 1      PRESENT:

 2           VEDDER PRICE, P.C.
             BY MS. JEANAH PARK
 3           222 North LaSalle Street, Suite 2400
             Chicago, Illinois  60601
 4           (312) 609-7500
             jpark@vedderprice.com
 5

 6               appeared on behalf of the plaintiff;

 7

 8           SIDLEY AUSTIN, LLC
             BY MR. RICHARD J. O'BRIEN
 9           One South Dearborn Street
             Chicago, Illinois  60603
10           (312) 853-7283
             robrien@sidley.com
11

12               appeared on behalf of the defendant.

13

14

15

16

17

18

19

20

21

22

23

24
```

Brok Vandersteen    March 6, 2014

```
1                    I N D E X
                     – – – – –
2  WITNESS
   ———————
3     Brok Vandersteen

4

5  EXAMINED_BY                        PAGE
   ——————————— ——                     ————
6     Ms. Park                           4

7     Mr. O'Brien                      107

8

9                 EXHIBITS_MARKED
                  ———————— ——————
10

11    Exhibit 46  (Quickbase data base)    23

12    Exhibit 47 (Authorization form)      43

13    Exhibit 48  (Training manual)        51

14    Exhibit 49  (E-mail)                 55

15    Exhibit 50  (E-mails)                85

16    Exhibit 51  (E-mails)                87

17    Exhibit 52  (E-mails)                91

18    Exhibit 53  (E-mail)                 93

19    Exhibit 54  (E-mails)                94

20    Exhibit 55  (E-mail)                 96

21    Exhibit 56  (E-mails)                99

22    Exhibit 57  (E-mail)                 99

23    Exhibit 58  (E-mails)               102

24    Exhibit 59  (Fax)                   105
```

Brok Vandersteen     March 6, 2014

```
 1              BROK VANDERSTEEN,
 2   having been first duly sworn, was examined and
 3   testified as follows:
 4                   EXAMINATION
 5   BY MS. PARK:
 6      Q    Good afternoon, Mr. Vandersteen.  We were
 7   chatting a little bit before we were on the record,
 8   but for the record, my name is Jeanah Park, I
 9   represent the plaintiff Healthy Advice Networks, LLC
10   in this matter.  And this is the deposition of Brok
11   Vandersteen pursuant to notice.
12          Would you please state and spell your name
13   for the record.
14      A    Brok Vandersteen, B-R-O-K,
15   V-A-N-D-E-R-S-T-E-E-N.
16      Q    Thank you.  Have you ever been deposed
17   before?
18      A    Never.
19      Q    Okay.  I'm just going to go over a couple
20   ground rules, and I'm sure you went over them with
21   your attorney.
22          But this is going to be in a question and
23   answer format.  If I ask a question and you don't
24   understand the question, I just ask that you ask me
```

Brok Vandersteen     March 6, 2014

1  to repeat it or rephrase it.  If you answer, I'll
2  assume that you understood it and that you're
3  answering truthfully.  Is that fair?
4      A    Yes.
5      Q    And as you can see, we have a court
6  reporter here today, so I just ask that your answers
7  all be verbal so the court reporter can get down all
8  of your answers, and that we try not to talk over
9  one another.  So let me finish before you start
10 answering, I will let you finish before I start
11 asking my next question.  Is that fair?
12     A    Yes.
13     Q    If you need a break at any time, feel free
14 to ask for one, ask your attorney for one.  The only
15 thing that I ask is if there's a question pending,
16 that you answer the question before you ask for a
17 break.  Is that fair?
18     A    Yes.
19     Q    Okay.  Is there any reason why you can't
20 testify truthfully today?
21     A    No.
22     Q    And just so that we're clear, I'll probably
23 use the term HAN, and by that I mean Healthy Advice
24 Network, and Context I mean ContextMedia.  Does that

Brok Vandersteen    March 6, 2014

1    make sense?

2        A    Yes.

3        Q    Okay.  Did you prepare for your deposition

4    today?

5        A    Would you clarify?

6        Q    I'm sorry.  Did you prepare for your

7    deposition?

8        A    Yes.

9        Q    How did you prepare?

10       A    Meeting with Dick.

11       Q    Okay.  When did you meet with Dick?

12       A    Last Friday.

13       Q    How long did you meet with him?

14       A    Roughly two hours.

15       Q    Was anyone else present other than Dick?

16       A    His assistant, I believe.

17       Q    Jessica Johnson?

18       A    Yes.

19       Q    Okay.  Did you review any documents when

20   you met with Dick?

21       A    Yes.

22       Q    What documents?

23       A    Well, four e-mails.

24       Q    Four or forty?

Brok Vandersteen     March 6, 2014

1      A     Just e-mails.

2      Q     Four e-mails or forty e-mails?

3      A     Four.

4      Q     Okay.  There's a difference.  Did any of

5  the e-mails that you saw refresh your recollection

6  about the subject matter of this lawsuit?

7      A     Yes.

8      Q     Okay.  Did you meet with anyone else other

9  than Dick to prepare for your deposition?

10     A     No.

11     Q     Did you discuss your deposition with anyone

12  else other than Dick?

13     A     No.

14     Q     Did you review any documents that have been

15  filed with the court in this case?

16     A     Not that I'm aware of.

17     Q     Okay.  Anything else that you did to

18  prepare that we haven't covered?

19     A     No.

20     Q     Have you ever testified under oath before

21  today?

22     A     No.

23     Q     Have you ever been a party to a lawsuit?

24     A     No.

Brok Vandersteen    March 6, 2014

```
1       Q    What's your date of birth?
2       A    ███████████████████████████
3       Q    And what's your address?
4       A    939 West Belle Plaine, Apartment 1,
5  Chicago, Illinois, 60613.
6       Q    Can you describe generally your education
7  after high school?
8       A    Four-year degree.
9       Q    Where did you get your degree?
10      A    University of St. Thomas.
11      Q    What was your degree in?
12      A    Marketing.
13      Q    And when did you graduate?
14      A    May 2010.
15      Q    Did you receive any formal education other
16  than your degree from St. Thomas?
17      A    No.
18      Q    Do you have any professional
19  certifications?
20      A    No.
21      Q    And do you understand that you're here
22  today because of your position with ContextMedia?
23      A    Yes.
24      Q    And when were you hired by Context?
```

Brok Vandersteen     March 6, 2014

```
1        A    June of 2011.
2        Q    What position were you hired for?
3        A    Member outreach executive.
4        Q    Is that your current title today?
5        A    Yes.
6        Q    How many employees did Context have at the
7   time you were hired in June 2011?
8        A    Between 10 and 15.
9        Q    Were there any other member outreach
10  executives other than yourself when you were hired?
11       A    Yes.
12       Q    How many?
13       A    I believe four or five.
14       Q    Four or five?
15       A    Yes.
16       Q    Who were they, if you know?
17       A    There was Jordan Smick, Pat Garrety, Devon
18  Tatum, and Matt Garms.
19       Q    As between Jordan, Pat, Devon and Matt, are
20  any of them still with the company?
21       A    Devon and Matt.
22       Q    What job did you have before you came to
23  ContextMedia?
24       A    I was a sales representative for Thompson
```

Brok Vandersteen     March 6, 2014

1   Writers.

2       Q    How long were you with Thompson Writers?

3       A    Nine months.

4       Q    What were your general duties and

5   responsibilities at Thompson Writers?

6       A    I reached out to existing customers and

7   sold them new product.

8       Q    How did you reach out to the customers?

9       A    Telephone.

10      Q    Okay.  Why did you leave Thompson?

11      A    The opportunity with Context.

12      Q    How did you find out about the opportunity

13  with Context?

14      A    Through a friend.

15      Q    So you have been with Context for a little

16  under three years, is that right?

17      A    (Indicating.)

18      Q    Can you --

19      A    Correct.

20      Q    Thank you.  Can you describe your duties

21  and responsibilities as a member outreach executive?

22      A    Our duties are to bring on new members.

23      Q    And by new members, what do you mean?

24      A    Clinics using our equipment.

Brok Vandersteen     March 6, 2014

```
 1     Q     Physician practices, is that fair to say?
 2     A     That's fair.
 3     Q     And what equipment are you referring to?
 4     A     Our televisions.
 5     Q     What do the televisions do?
 6     A     Play content.
 7     Q     What kind of content?
 8     A     Educational.
 9     Q     About what?
10     A     Health.
11     Q     Any specific categories of health?
12     A     Eating, exercise, inspiration.
13     Q     Are there types of physicians practices --
14  Strike that.
15           Are there specific specialties that Context
16  focuses on?
17     A     Yes.
18     Q     And what are those specialties?
19     A     Diabetes, rheumatology, cardiology, primary
20  care,  neurology.
21     Q     Are you responsible for a particular kind
22  of specialty or do you call all types of physician
23  practices?
24     A     Currently a specific type.
```

Brok Vandersteen     March 6, 2014

```
 1       Q     And what is that kind?

 2       A     Rheumatology.

 3       Q     What kind of practice did you focus on --

 4   well, strike that.

 5             You said currently.  When did rheumatology

 6   become your focus?

 7       A     January of 2014.

 8       Q     And what was your focus before January of

 9   2014?

10       A     All specialties.

11       Q     How is it that you got assigned to focus on

12   rheumatology?

13       A     Could you clarify?

14       Q     What led to the change from you going from

15   all practice to just rheumatology?

16       A     They just divided the team.

17       Q     Who is they?

18       A     Management.

19       Q     And who do you report to?

20       A     Matt Garms.

21       Q     Have you always reported to Matt Garms?

22       A     Yes.

23       Q     Who is Matt Garms report -- Strike that.

24             Who does Matt Garms report to, if you know?
```

Brok Vandersteen     March 6, 2014

```
 1      A    It's a combination of the C Suite.  Jim
 2  Demas, Rishi Shah.
 3      Q    Do you consider Rishi Shah to be your boss?
 4      A    No.
 5      Q    Do you consider Jim Demas to be your boss?
 6      A    No.
 7      Q    Do you ever interact face to face -- I
 8  shouldn't say face to face -- Strike that.
 9           Do you ever been interact directly with
10  Rishi Shah?
11      A    Yes.
12      Q    In what circumstances?
13      A    Professionally and casually.
14      Q    Okay.  So let's talk about your
15  professional interactions with Rishi Shah.  On what
16  occasions do you interact with him?
17      A    End of the year review.  And that's about
18  it, honestly.
19      Q    Do you ever report directly to Rishi Shah?
20      A    No.
21      Q    You said you're -- and I'm talking about
22  the 20 -- you didn't come on until -- from the time
23  you were hired on June 2011 through I guess January
24  of 2014, you said that your job duties and
```

Brok Vandersteen     March 6, 2014

```
 1   responsibilities as an MOE were to bring on new

 2   members, right?

 3       A    Correct.

 4       Q    Can you give me a little bit more detail

 5   than that?

 6       A    Anything specifically?

 7       Q    Yes.  What do you do day to day?

 8       A    I call physician practices, tell them about

 9   our service, and try to bring them on as a member.

10       Q    How do you know who to call?

11       A    I have a list of leads.

12       Q    Where does the list come from?

13       A    Management.

14       Q    How is that list given to you?

15       A    It is preloaded into our data base.

16       Q    What kind of software is the data base?

17       A    Sales Force.

18       Q    Sales Force?

19       A    (Indicating.)

20       Q    Did Context ever use Quickbase?

21       A    Yes.

22       Q    When did Context switch from Quickbase to

23   Sales Force?

24       A    I can't remember specifically.  Toward the
```

Brok Vandersteen     March 6, 2014

```
 1    end of last year.
 2        Q    Do you know why Context switched from
 3    Quickbase to Sales Force?
 4        A    It didn't meet our need.
 5        Q    In what way?
 6        A    It was a bit of an outdated software.
 7        Q    What functionalities does Sales Force have
 8    that Quickbase did not?
 9        A    It allows all departments to share the same
10    view of a clinic account.
11        Q    What other departments are there other than
12    member outreach?
13        A    Member service executive, IT, and
14    marketing.
15        Q    And you said that management gets a list of
16    practices -- sorry.  Strike that.
17             Management gets a list of leads for the
18    member outreach team to use to call potential
19    members, right?
20        A    They provide us with a list.
21        Q    Okay.  Do you know where management gets
22    the list?
23        A    No.
24        Q    Does the term J & J mean anything to you?
```

Brok Vandersteen     March 6, 2014

```
1        A    I believe that's Johnson & Johnson.
2        Q    Do you know that from your employment with
3   Context or just generally speaking?
4        A    Generally speaking.
5        Q    Does the term J3 mean anything to you?
6        A    No.
7        Q    Do you know if Context receives a list of
8   practices to call from J & J?
9        A    No.
10       Q    Do you know if Context receives a list of
11  practices to call from J3?
12       A    No.
13       Q    Do you know who at Context would know this,
14  that is, where the list of practices comes from?
15       A    Senior management.
16       Q    When you say senior management, who do you
17  refer to specifically?
18       A    Rishi Shah, Shradha Agarwal, Jim Demas,
19  Brad Purdy.
20       Q    Who was the last person?
21       A    Brad Purdy.
22       Q    Okay.  What, if you know, is Shradha
23  responsible for?
24       A    Strategy.
```

Brok Vandersteen    March 6, 2014

```
 1      Q     And in what way?
 2      A     Business strategy.  I don't know the
 3  specifics.
 4      Q     Is she based in New York or in Chicago?
 5      A     Chicago.
 6      Q     Okay.  What is Brad Purdy's job?
 7      A     He's our chief operating officer.
 8      Q     And what does that mean, if you know?
 9      A     I don't know specifically.
10      Q     Do you know generally?
11      A     No, to be quite honest.
12      Q     Do you know if Context ever -- Strike that.
13            Do you know if Context has a list of
14  Healthy Advice practices?
15      A     No.
16      Q     When I say Healthy Advice, do you know what
17  I'm referring to?
18      A     Yes.
19      Q     And when I say Patient Point, do you know
20  that they're now the same company?
21      A     Yes.
22      Q     Other than management providing you with a
23  list of leads, do you know of any other method
24  through which Context identify the practices to
```

Brok Vandersteen    March 6, 2014

1   call?

2          Let me try to clarify on that.  Do you know

3   if Context engages outside firms or consultants to

4   get lists of potential members?

5          A    I don't know.

6          Q    Does Context target certain specific types

7   of practices?

8          A    Could you clarify?

9          Q    Yes.  Are there -- well, you mentioned that

10  Context shows content in diabetes, rheumatology,

11  cardiology, primary care and neurology I think you

12  said?

13         A    Correct.

14         Q    In those specialties are there types of

15  practices that Context focuses on?

16         A    Not that I'm aware of.

17         Q    Okay.  You don't know if they try to

18  recruit members who are parts of certain hospital

19  systems or certain geographical areas or any other

20  type of way to categorize the practices?

21         A    No.

22         Q    Has anyone in Context management talked to

23  you about obtaining more valuable practices?

24         A    No.

Brok Vandersteen     March 6, 2014

1    Q    So let's walk through kind of your day at

2  ContextMedia.  Strike that.

3         You said that when you were first hired you

4  were responsible for calling all types of practices,

5  not just rheumatology, right?

6    A    Correct.

7    Q    And that was consistent throughout your

8  time there until January 2014 when you were told to

9  focus on rheumatology?

10   A    Correct.

11   Q    Okay.  So let's kind of walk through your

12  day as an MOE.  How much of your day do you spend on

13  the phone?

14   A    All of it.

15   Q    All of it.  I guess you're sick of talking

16  to people.  Do you have a set number of calls that

17  you have to make per day?

18   A    No.

19   Q    Does management give you a target number,

20  like try to make 50 phone calls or try to make

21  contact with 50 live people, anything like that?

22   A    Yes.

23   Q    What's that number or what's that metric,

24  if you can tell me?

Brok Vandersteen    March 6, 2014

1        A        Roughly 80 a day.

2        Q        And is it make 80 calls or talk to 80

3   people?

4        A        Eighty calls.

5        Q        Do you have a set number of e-mails that

6   your target is to send?

7        A        No.

8        Q        Okay.  As between e-mail and phone --

9   Strike that.

10            Do you use e-mail to reach out to

11   practices?

12       A        Yes.

13       Q        What percentage would you say do you spend

14   calling versus e-mailing practices?

15       A        80/20.

16       Q        Eighty phone calls, twenty e-mails?

17       A        Yes.

18       Q        Do you use faxes at all to reach out to

19   practices?

20       A        Yes.

21       Q        How many faxes -- or is there a target goal

22   of taxes that you are to send to practices?

23       A        No.

24       Q        Where do faxes factor into the 80/20

Brok Vandersteen     March 6, 2014

1    equation?

2        A    I couldn't tell you.

3        Q    On average how many faxes do you send out a

4    day, and this is until January of 2014?

5        A    Anywhere from one to thirty.

6        Q    Do you have an opinion about what method is

7    most effective to make a sale?

8        A    No.

9        Q    What's your preferred method of contacts?

10       A    Phone.

11       Q    Why is that?

12       A    You can make more phone calls then you can

13    send e-mails.

14       Q    It's more efficient?

15       A    Yes.

16       Q    Do you think it's more effective?

17       A    I don't know.

18       Q    Do you have a script that you use when you

19    call practices?

20       A    No.

21       Q    Does Context use a script and you're just

22    like, I'm not going to use the script?

23       A    No.

24       Q    Okay.  Let's say you're just kind of

Brok Vandersteen      March 6, 2014

1    placing a cold call to a practice that no one has

2    ever reached out to before.  What information do you

3    have in your hand before you call?

4        A    None.

5        Q    Just the name of the practice and that's

6    it?

7        A    Phone, name, doctor, physician name.

8        Q    Who is it that you're trying to ultimately

9    reach when you place a call like that?

10       A    The decision maker.

11       Q    And who is the decision maker typically?

12       A    It depends.  Usually it's the practice

13   manager.

14       Q    But not the physician himself or herself?

15       A    It varies.

16       Q    Okay.  But usually it's either sort of the

17   office manager or the doctor, correct?

18       A    Yes.

19       Q    Okay.  Going back to lists.  Were you ever

20   in your time from the time you were hired until

21   January of 2014 provided with a call list that has a

22   particular purpose of any kind, like you have to hit

23   all 50 of these people or any kind of specific

24   purpose?

Brok Vandersteen      March 6, 2014

```
1     A     No.
2           MS. PARK:  Let's mark this as Exhibit 46.
3               (Plaintiff's Exhibit 46
4               marked for identification.)
5   BY MS. PARK:
6     Q     Mr. Vandersteen, I'm showing you an exhibit
7   that's marked Plaintiff's Exhibit 46.  Just take a
8   look at this.  And if it helps, it's actually
9   supposed to be like this, which is why I didn't
10  staple it.
11    A     Side by side here?
12    Q     Yes.  And I think all three, because they
13  coordinate together.
14    A     Okay.
15    Q     Do you recognize this document in its paper
16  form?
17    A     No.
18    Q     Let me ask you about -- there's little
19  numbers at the bottom of the document.  Do you see
20  that?
21    A     Yes.
22    Q     See Context prod 904?
23    A     Yes.
24    Q     And on that document do you see your name
```

Brok Vandersteen     March 6, 2014

1   under the Column P?

2       A    Yes.

3       Q    What does that signify?  I'm just trying to

4   figure out what this document is?

5       A    It signifies that I had touched base with

6   this clinic.

7       Q    Okay.  Is it possible that this is a

8   printout of a Quickbase data base that you were

9   using to keep track of phone calls that you made?

10      A    Yes.

11      Q    Okay.  And in the Column Q on that same

12  Context prod 904, do you see all the notes that were

13  in that column?

14      A    Yes.

15      Q    Are those notes that you fill out?  For

16  example, if it says Brok Vandersteen, does that mean

17  that the note that says calling Jill B-O-M is

18  something that you wrote?

19      A    Yes.

20      Q    Let's look at Context prod 903, under

21  Column H.  And you can see it's row three across all

22  three pages.  So this is still what appears to be a

23  Brok Vandersteen contact, do you see that?

24      A    Uh-huh.

25

Brok Vandersteen    March 6, 2014

```
 1      Q    So in Column H it says J & J priority room
 2  list.  Do you know what that means?  Does that mean
 3  anything to you?
 4      A    No.
 5      Q    It says lead source under the H.  Is it
 6  possible that that's where the lead came from?
 7          MR. O'BRIEN:  Object to the form, but you
 8      can answer.
 9      A    Yes.
10  BY MS. PARK:
11      Q    Okay.  But you don't know exactly what that
12  column means?
13      A    No.
14      Q    Okay.  One last thing, again back to 903.
15  In Column L do you see it says other competitor
16  installed other advertising on that?
17      A    Yes.
18      Q    Again, looking at that row three that had
19  the J & J priority room list, it says competitor
20  installed.  What does that mean?
21      A    It means one of our competitors installed
22  in the practice.
23      Q    So the practice was using a competitor
24  screen instead of Context?
```

26

Brok Vandersteen     March 6, 2014

```
 1       A    Correct.
 2       Q    And who are Context's competitors?
 3       A    Accent Health, Patient Point, Health Media
 4   Network, Health Focus Media.  There may be a couple
 5   others.
 6       Q    But those are the only ones you can think
 7   of right now?
 8       A    Yes.
 9       Q    Okay.  Would you say that Context has a
10   primary competitor?
11       A    No.
12       Q    Okay.  So going back to kind of -- you're
13   done with that one.  Going back to kind of a day in
14   the life of a member outreach executive.
15            So you make a call, and the practice tells
16   you we have a competitor and we're not interested.
17   What happens next?
18       A    I would ask who is the competitor.
19       Q    Okay.  And then what do you do?
20       A    Why are you not interested?
21       Q    So you try to convince them to switch from
22   their competitor to Context?
23       A    I may.
24       Q    On what occasions would you not try to
```

Brok Vandersteen    March 6, 2014

1    convince them to switch?

2        A    If they don't have a competitor.

3        Q    Right.  But if they do have a competitor,

4    you would as a matter of course try to get them to

5    switch to ContextMedia?

6        A    I'd try to promote our practice.

7        Q    Okay.  And that means convincing the

8    practice that ContextMedia's product is better than

9    whatever they're using?

10       A    Yes.

11       Q    Okay.  What happens if the practice says, I

12   am really not interested and wants to get off the

13   phone with you, what do you do next?

14       A    Explain our services to them.

15       Q    Okay.  If the practice ends the call, what

16   do you do after that?

17       A    Note it in our notes.

18       Q    Okay.  Do you call the practice again, keep

19   trying?

20       A    At some point.

21       Q    How long do you usually wait before you

22   call the practice again?

23       A    It varies.

24       Q    On what?

Brok Vandersteen     March 6, 2014

```
 1      A    Nothing specifically.
 2      Q    Do you ever put them on a do not call ever
 3  again list?
 4      A    No.
 5      Q    Does Context have a do not call list?
 6      A    Not that I'm aware of.
 7      Q    If you get a call and the practice says,
 8  yeah, that sounds okay, I'm not really sure, what do
 9  you do?
10      A    Try to understand what they're not sure
11  about.
12      Q    Okay.  Does your strategy change depending
13  on whether the practice already is using a
14  competitor or the practice doesn't have any TV of
15  any kind in its office?
16      A    No.
17      Q    Are you incentivized in any way to try to
18  switch a competitor versus install a new system in a
19  practice?
20      A    Sometimes.
21      Q    Okay.  On what occasions are you
22  incentivized?
23      A    Monthly.  I mean, it just varies.
24      Q    Okay.  Do you get bonus if you sign up more
```

Brok Vandersteen    March 6, 2014

```
1   competitor switch-outs versus new installations?
2       A    Sometimes.
3       Q    Okay.  And on what occasions do you get a
4   bonus if you sign up more competitor switch-outs?
5       A    It truly depends.
6       Q    On what?
7       A    I don't know.
8       Q    You don't know how your bonus is paid?
9       A    Sometimes there's a bonus, sometimes there
10  is not.
11      Q    When is there a bonus?
12      A    When we removed a competitor.
13      Q    Okay.  What's the bonus?
14      A    Additional money.
15      Q    Okay.  Do you get more money if the
16  competitor is Healthy Advice versus Accent Health
17  versus Health Monitor?
18      A    At times, yes.
19      Q    Okay.  What's your bonus if you switch
20  out -- well, just tell me, how is the bonus
21  structured?
22           I'm trying to understand if you switch 100
23  practices in a month and 50 of them are Healthy
24  Advice, what would your bonus be?
```

Brok Vandersteen     March 6, 2014

```
 1        A    Are you asking for the specific number?
 2        Q    Yes.  I'm asking how it's calculated.
 3        A    It's per sale.  We receive an additional
 4   dollar amount of somewhere between $50 to $250.
 5        Q    Okay.  What's the bonus if you switch an
 6   Accent Health practice?
 7        A    Currently nothing.
 8        Q    What was it in the 2011 to 2014 time frame?
 9        A    Anywhere between $50 and $100.
10        Q    What was your bonus during that same time
11   frame if you switched out a Healthy Advice practice?
12        A    $50 to $100.
13        Q    And what about a Health Monitor practice,
14   same time frame?
15        A    Anywhere from zero to $100.
16        Q    So Accent Health and Healthy Advice you
17   would receive more of a bonus than Health Monitor?
18        A    Yes.
19        Q    Okay.  Was there ever a time when you would
20   receive the biggest bonus if you switched out a
21   Healthy Advice practice?
22        A    Yes.
23        Q    What was that time?
24        A    I don't remember specifically.
```

Brok Vandersteen     March 6, 2014

```
 1      Q    Can you generally remember?
 2      A    You mean beginning of last year to
 3 currently?
 4      Q    Beginning of 2013?
 5      A    Yes.
 6      Q    Do you remember what your bonus was if you
 7 switched a Healthy Advice practice at the time you
 8 were hired?
 9      A    No.
10      Q    But something between $50 and $100?
11      A    I don't remember.
12      Q    Did it ever get more than $100 to switch
13 out a Healthy Advice TV?
14      A    Yes.
15      Q    What was the highest bonus you received for
16 switching out a Healthy Advice practice?
17      A    $250.
18      Q    Per practice?
19      A    Yes.
20      Q    When was that?
21      A    I don't remember.
22      Q    Do you recall generally when that was?
23      A    Sometime in the last year.
24      Q    Was that in effect in 2011?
```

Brok Vandersteen     March 6, 2014

```
 1        A    I don't remember.
 2        Q    Do you know who set the bonus structure?
 3        A    Management.
 4        Q    Anyone specific in management as between
 5   Jim Demas, Rishi Shah, Shradha Agarwal and Brad
 6   Purdy?
 7        A    I don't know who would have made the call.
 8        Q    Did anyone come to you directly and say,
 9   Brok, this is our bonus structure, here it is?
10        A    Matt Garms.
11        Q    Anyone else convey ContextMedia's bonus
12   structure to you other than Matt Garms?
13        A    I can't remember.
14        Q    Do you know why you received the highest
15   bonus for practices that were switched from Healthy
16   Advice screens?
17        A    Say that again?
18        Q    Do you know why you received the highest
19   bonus for practices that were switched from Healthy
20   Advice screens?
21        A    No.
22        Q    Did you ever ask why?
23        A    No.
24        Q    You didn't really care, right?  What was
```

Brok Vandersteen     March 6, 2014

```
 1    your salary when you were hired in June of 2011?
 2         A    $42,500, I believe.
 3         Q    And what's your salary currently?
 4         A    $60,000.
 5         Q    When you were hired in June 2011, your
 6    salary was $42,500.  Do you know approximately how
 7    much you earned in bonus?
 8         A    When?
 9         Q    Between June of 2011 and let's say January
10    of 2012, I guess the year of 2011.
11         A    I don't remember.
12         Q    Was it more than $42,500?
13         A    No.
14         Q    So your primary compensation was through
15    your salary, not your bonus?
16         A    Correct.
17         Q    Is that the same for 2012?
18         A    Yes.
19         Q    And for 2013?
20         A    Yes.
21         Q    What was your salary in 2012?
22         A    $50,000.
23         Q    How is your bonus paid?
24         A    I'm sorry.  2012?
```

Brok Vandersteen    March 6, 2014

```
 1      Q     2012.
 2      A     It stayed the same.  Actually, 2012 it
 3   stayed the same as 2011.
 4      Q     So 2013 it was $50,000?
 5      A     Correct.
 6      Q     How often was your bonus paid?
 7      A     At each paycheck.
 8      Q     And how often are you paid?
 9      A     Twice a month.
10      Q     How would you keep track of the number of
11   practices that you switched?
12      A     I didn't.
13      Q     Did you just trust management's
14   calculations that your bonus was correct?
15      A     Yes.
16      Q     If you wanted to, could you find out how
17   many practices you switched or signed up or anything
18   about your personal sales achievements?
19      A     Yes.
20      Q     Where would you go to look?
21      A     I might ask Jim Demas.
22      Q     But for the most part, you agreed that
23   whatever your bonus was was -- accurately reflected
24   the amount of practices that you switched?
```

Brok Vandersteen     March 6, 2014

1      A     Yes.
2      Q     Did you get a bonus for signing up just
3   brand new practices who didn't have any TV
4   whatsoever?
5      A     On top of a regular bonus?
6      Q     I guess my understanding is that you got a
7   bonus for switching or for signing up a practice
8   that switched from a competitor.
9            Did you receive a bonus for signing up a
10  brand new practice that wasn't using anything?
11     A     Yes.
12     Q     What was that bonus?
13     A     Between $75 and $150.
14     Q     Do you know what factors went into whether
15  you would get $50 or $75 or $100 or $150?
16     A     No.
17     Q     Did management tell you ahead of time what
18  the bonus would be?
19     A     Yes.
20     Q     So you always knew -- I guess I'm trying to
21  understand.  You always knew March 1st that your
22  bonus for signing up a switch versus a new
23  installation versus a Healthy Advice would be --
24  there would be a set number before the month

Brok Vandersteen     March 6, 2014

```
 1   actually started?
 2       A    Yes.
 3       Q    Okay.  How did Matt convey the bonus
 4   structure to you?
 5       A    Verbally.
 6       Q    Okay.  And how often was the bonus
 7   structure set?
 8       A    Annually.
 9       Q    So for a whole year you would get $80 for a
10   Healthy Advice or $100 for Accent Health or $75 for
11   a new sign up?
12       A    No.
13       Q    When would it change then?
14       A    Annually.  The base commission is annually
15   changed.
16       Q    Okay.  So you would receive a base
17   commission, and then you would receive a bonus on
18   top of that based on what kind of practice you
19   switched?
20       A    Correct.
21       Q    Okay.  How often was that extra bonus
22   determined?
23       A    Say that again.
24       Q    The extra bonus that you would receive on
```

Brok Vandersteen     March 6, 2014

1   top of the base commission, how often was that
2   determined?
3       A    I'm not sure.
4       Q    So there was no set timetable for the extra
5   bonus for switching specific types of competitors or
6   signing up the new practice or signing up the
7   specific specialty?
8       A    No.
9       Q    They would just kind of tell you at any
10  given time?
11      A    Yes.
12      Q    You talked about there being goals for you
13  to place a certain number of calls per practice.
14  Did you have sales goals as well?
15      A    Yes.
16      Q    How often were those goals set?
17      A    Monthly.
18      Q    Okay.  Were those goals broken down --
19  Strike that.
20          Was it just sign up 100 new practices or
21  were they broken down by sign up 100 new Healthy
22  Advice practices or 50 Accent Health practices?
23      A    Just general practices.
24      Q    Sign up new members, we don't care where

Brok Vandersteen    March 6, 2014

1    they come from?

2        A    Correct.

3        Q    Okay.  Going back to kind of your sales

4    practice.  Let's say that you call a practice and

5    they're like, great, we want to go with Context.

6    What do you do next?

7        A    If they're ready to sign up?

8        Q    Yes.

9        A    Direct them to our sign-up form.

10       Q    What is the sign-up form?

11       A    What is the sign-up form?

12       Q    Yes.

13       A    It's a form with a series of questions

14   verifying their address and practice information.

15       Q    Are there any other forms that you give to

16   the practice, and I'm talking in again the 2011 to

17   2014 time frame?

18       A    No.

19       Q    And then once they fill out the forms, do

20   they send them back to you?

21       A    Yes.

22       Q    And then what do you do at that point?

23       A    I submit it.

24       Q    Who do you submit it to?

Brok Vandersteen     March 6, 2014

```
1        A     My management, Matt Garms.
2        Q     If you know, what does Matt do with them?
3        A     He then forwards it on to our on-boarding
4    department.
5        Q     Is that member services?
6        A     Yes.
7        Q     Okay.  Once you sign up a new practice, is
8    that when your interaction with the practice ends?
9        A     Yes.
10       Q     Do you ever have occasion to get back in
11   touch with the practice?
12       A     No.
13       Q     What if you have confirmation of a sale and
14   the practice is with Patient Point or Healthy
15   Advice?
16       A     What are you asking specifically?
17       Q     I guess, have you had a practice say, yeah,
18   I would like to join Context, but I'm currently with
19   Healthy Advice, what do you do?
20       A     I direct them to notify their provider to
21   cancel.
22       Q     Do you give them any kind of form to
23   effectuate the cancellation?
24       A     No.
```

Brok Vandersteen     March 6, 2014

```
 1            MR. O'BRIEN:  You're talking about now or
 2        at any time?
 3            MS. PARK:  No, I'm talking about -- I guess
 4        just so I don't have to keep saying it.
 5        Q    Whenever I'm asking you a question, just
 6    assume that it's from June 2011 to December of 2013.
 7        A    Okay.
 8        Q    So during that time frame, did you ever
 9    give the practice an additional form to effectuate
10    the cancellation?
11        A    Specifically for --
12        Q    A Healthy Advice, Patient Point, yes.
13        A    Yes.
14        Q    What was that form?
15        A    An authorization form.
16        Q    Where did you get the authorization form
17    from?
18        A    Management.
19        Q    Do you know who drafted the authorization
20    form?
21        A    No.
22        Q    Do you know if the authorization form was
23    reviewed by an attorney?
24        A    No.
```

Brok Vandersteen     March 6, 2014

```
 1      Q     But you don't know specifically?
 2      A     I don't know.
 3      Q     Okay.  Thank you.  Do you know specifically
 4  who in management drafted the authorization form?
 5      A     I don't know.
 6      Q     What did you understand the authorization
 7  form to mean?
 8      A     I took it to mean that the patient or the
 9  practice would like to switch.
10      Q     Okay.  Did you have any understanding of
11  whether the form gave the practice the right to
12  terminate its relationship with the competitor?
13      A     I don't know.
14      Q     Do you have any understanding as to whether
15  the form gave the practice the right to terminate
16  its contract with the competitor?
17      A     I don't know.
18      Q     You don't know or you don't have any
19  understanding?
20      A     I don't -- I didn't know that side of their
21  business between them and HAN.
22      Q     Okay.  Did you ever talk about what the
23  form meant with Jim Demas?
24      A     No.
```

Brok Vandersteen    March 6, 2014

1      Q    Did you ever talk about what the form meant
2   with Rishi Shah?
3      A    No.
4      Q    Did you ever talk about what the form meant
5   with Shradha Agarwal?
6      A    No.
7      Q    And how about Brad Purdy?
8      A    No.
9      Q    Did you ever talk to anybody about what the
10  authorization form meant?
11     A    Matt Garms.
12     Q    And what was the substance of that
13  communication?
14     A    That gave us authorization to replace their
15  equipment.
16     Q    It gave Context authorization to replace
17  Healthy Advice's equipment?
18     A    Yes.
19     Q    Okay.  Other than Matt, did you speak with
20  anybody else at Context about what that
21  authorization form meant?
22     A    No.
23     Q    When you would send -- well, you know,
24  let's just mark this.

Brok Vandersteen     March 6, 2014

```
 1                (Plaintiff's Exhibit 47
 2                 marked for identification.)
 3    BY MS. PARK:
 4        Q    I'm showing you what's been marked
 5    Plaintiff's Exhibit 47.  Do you recognize this
 6    document?
 7        A    Yes.
 8        Q    Is this the authorization form that we were
 9    just discussing?
10        A    Yes.
11        Q    And do you see that it looks -- it's blank.
12    It looks to be sort of a standard form, and there's
13    brackets and italics where it says office name and
14    office address.  Do you see that?
15        A    Uh-huh.  Yes.
16        Q    Would you once you signed up a potential
17    member, who would fill out those blanks?
18        A    The practice.
19        Q    Okay.  So you would send this form to the
20    practice in like word form and say fill out this
21    form?
22        A    Correct.
23        Q    And then what did you instruct the practice
24    to do after they filled out the form?
```

Brok Vandersteen     March 6, 2014

1      A     To sign it and return it.

2      Q     Return it to you?

3      A     Yes.

4      Q     And then what did you do with the form once

5   you got it back?

6      A     I included it with their sign-in form.

7      Q     And then -- you mean that form, that

8   enrollment form?

9      A     Yes.

10      Q     And then you would give that package to

11   Matt Garms?

12      A     Correct.

13      Q     Did you ever send this form to Healthy

14   Advice?

15      A     No.

16      Q     Did you ever have -- well, strike that.

17            Was there ever a time when you would give

18   this form to the practice, tell them to fill it out

19   and return it to you, and the practice seemed to be

20   uncomfortable with that?

21      A     Not that I remember.

22      Q     Did the practice ever question you about

23   this form or what it meant?

24      A     No.

Brok Vandersteen    March 6, 2014

```
 1       Q    Did you ever have -- was there ever a time
 2  when the practice simply didn't return the form to
 3  you?
 4       A    Not that I remember.
 5       Q    Did ContextMedia get an authorization form
 6  from every practice that had switched from Healthy
 7  Advice?
 8       A    I believe so.
 9       Q    Did you get an installation authorization
10  form from every practice that you personally
11  switched from Healthy Advice?
12       A    Yes.
13       Q    Okay.  Other than the enrollment form and
14  the authorization form, were there any other forms
15  that you would get from the practice to complete the
16  sale?
17       A    No.
18       Q    Have you ever sold a practice just by
19  e-mail alone without talking to them on the phone?
20       A    No.
21       Q    Were your calls to practices at any time
22  recorded, to your knowledge?
23       A    No.
24       Q    There was never a time where any of your
```

Brok Vandersteen      March 6, 2014

1    calls were played back to you?

2        A    No.

3        Q    Or used for educational or instructional

4    purposes?

5        A    No.

6        Q    Do you know if any other member outreach

7    executive's phone calls to practices were recorded?

8        A    No.

9        Q    Meaning you don't know or you know for sure

10   that they were never recorded?

11       A    They were never recorded.

12       Q    How do you know that?

13       A    We have never used that capability on our

14   phones.

15       Q    So to the best of your knowledge, your

16   phone calls were not recorded?

17       A    Correct.

18       Q    Is it possible that Context recorded sales

19   people's phone calls and just didn't tell you?

20       A    Maybe.

21       Q    Was your productivity monitored in any way?

22       A    Yes.

23       Q    How so?

24       A    Our software tracks how many calls are

Brok Vandersteen     March 6, 2014

1   made.

2       Q    Was your productivity monitored in any

3   other way?

4       A    No.

5       Q    Did Context keep track of the number of

6   e-mails you sent?

7       A    No.

8       Q    Did Context keep track of the number of

9   faxes you sent?

10      A    No.

11      Q    So it was all phone calls?

12      A    Correct.

13      Q    I'm sorry.  The only thing that they kept

14  track of was the phone calls?

15      A    Correct.

16      Q    Did they keep track of how many times you

17  actually made contact with a person?

18      A    No.

19      Q    So as long as you placed, I think you said

20  80 phone calls, it doesn't matter if you left

21  voicemail or talked to somebody, as long as you just

22  placed the calls, right?

23      A    Correct.

24      Q    But is it fair to say that you were bonused

Brok Vandersteen     March 6, 2014

1   based on the numbers of sales you made, so from your

2   perspective it would be best to actually talk to

3   somebody so you could make a sale, right?

4       A    Yes.

5       Q    What kind of training did you receive when

6   you joined Context?

7       A    Anything specific?

8       Q    Yes.

9       A    An explanation of the product, and general

10  idea of who we would be reaching out to.

11      Q    Was it a formal training?

12      A    It was -- how so?

13      Q    Were you, I guess, put in a conference room

14  with some other people and sat there all day and

15  listened to lectures and things like that, or did

16  you just shadow somebody and they just kind of told

17  you what to do?

18      A    There was a period of sit down, and then

19  there was a time when we would also listen to other

20  people make phone calls.

21      Q    Okay.  Who led the training?

22      A    Matt Garms.

23      Q    Who else was in the training besides

24  yourself?

Brok Vandersteen     March 6, 2014

```
1       A     No one.
2       Q     Okay.  Did anyone other than Matt train you
3    or talk to you about the product or any other aspect
4    of Context's business?
5       A     The department heads would explain sort of
6    their general role in the company.
7       Q     Who spoke to you as between all the
8    department heads?
9       A     For MS it would have been Silvia Velazquez.
10   For logistics it would have been Matt Coppola, and
11   for network operations it would have been Travis
12   Kemp.
13      Q     Did Rishi or Jim Demas speak to you during
14   the training?
15      A     No.
16      Q     Did Shradha speak to you during the
17   training?
18      A     No.
19      Q     How many phone calls did you listen in on?
20      A     I can't remember.
21      Q     Was it more than 10?
22      A     Yes.
23      Q     More than 50?
24      A     I don't know.
```

Brok Vandersteen     March 6, 2014

1     Q     Probably somewhere between 10 and 50?

2     A     Sure, yes.

3     Q     Were you told anything about Context's

4  competitors?

5           MR. O'BRIEN:  During the training?

6           MS. PARK:  Yes.  Thank you.

7     A     Yes.

8  BY MS. PARK:

9     Q     What were you told?

10    A     Their names and general differences.

11    Q     Do you know why Context informed you about

12 its competitors?

13    A     To be aware of what's in the market.

14    Q     Did they talk to you specifically about

15 what to say if a practice tells you that they're

16 already using a competitor's display?

17    A     No.

18    Q     Did you watch a video loop of any -- I'm

19 sorry.

20          Did you watch a video loop of any of

21 Context's competitors?

22    A     No.

23    Q     Did you review any documents related to

24 Healthy Advice or any of Context's competitors?

Brok Vandersteen    March 6, 2014

```
 1      A    Could you clarify that?
 2      Q    Yes.  Was there a side-by-side comparison
 3  sheet or any sort of one pager about Healthy
 4  Advice's product versus Context's product?
 5      A    Yes.
 6      Q    Do you know who authored that?
 7      A    No.
 8      Q    What was the purpose of the side-by-side
 9  comparison one pager?
10      A    To highlight comparisons.
11      Q    Did you feel that it was important for you
12  to know the differences between Healthy Advice and
13  Context?
14      A    Somewhat.
15      Q    In what way was it helpful?
16      A    To know what their members may have playing
17  in their waiting room.
18      Q    When you were trained, was there a formal
19  training manual that you were given?
20      A    Yes.
21          MS. PARK:  Mark this as Exhibit 48.
22              (Plaintiff's Exhibit 48
23               marked for identification.)
24
```

Brok Vandersteen     March 6, 2014

```
 1   BY MS. PARK:
 2       Q    Mr. Vandersteen, I'm showing you what's
 3   been marked Plaintiff's Exhibit 48.  Do you
 4   recognize this document?
 5       A    Yes.
 6       Q    Is this the training manual that you were
 7   given?
 8       A    Yes.
 9       Q    And in your job as a member outreach
10   executive, did you ever refer to this training
11   manual?
12       A    Never.
13       Q    Did you ever read this training manual?
14       A    I can't remember.
15       Q    But you never rely on this in connection
16   with your job with Context?
17       A    Not once.
18       Q    Okay.  Other than the base commission and
19   then the extra bonus that you would receive for
20   switching certain types of practices and your
21   salary, were you compensated in any other way by
22   Context?
23       A    No.
24       Q    Did you receive any gift cards or any other
```

Brok Vandersteen     March 6, 2014

```
1    sorts of incentives or anything like that?
2        A    Yes, occasionally.
3        Q    What would you receive a gift card for?
4        A    It depends.  Most sales in a month or week.
5    That's really it.
6        Q    What amount were the gift cards in?
7        A    Ten to fifty.
8        Q    Were they like cash gift cards or Starbucks
9    or what kind of gift cards were they?
10       A    Either.
11       Q    But is it fair to say that they were always
12   tied to the amount of sales you made or the amount
13   of switches you made or anything like that?
14       A    Tied to the amount of sales we made.
15       Q    Okay.  What was the biggest gift card that
16   you received?
17       A    $100.
18       Q    Okay.  So other than the gift card, the
19   bonuses, the commissions and your salary, were you
20   compensated in any other way?
21       A    No.
22       Q    Vacations to Aruba, anything like that?
23       A    No.
24       Q    Okay.  We talked about the comparison sheet
```

Brok Vandersteen     March 6, 2014

1    that you were given when you were first trained at

2    Context.  Do you recall that?

3        A    I recall you mentioning it.

4        Q    But do you recall actually seeing kind of a

5    side-by-side comparison sheet between Healthy Advice

6    and Context?

7        A    I do.

8        Q    Were you given new or updated comparison

9    sheets from time to time during your time at

10   Context?

11       A    I can't remember.

12       Q    Did you ever review any of those comparison

13   sheets in detail?

14       A    No.

15       Q    Do you know why management gave you

16   comparison sheets between -- that compared Healthy

17   Advice and Context?

18       A    For our general understanding.

19       Q    Your general understanding of what?

20       A    Comparisons between the two companies.

21       Q    Do you know why management got the

22   information that they put in the comparison sheets?

23       A    I believe from their website?

24       Q    From Patient Point's website?

Brok Vandersteen     March 6, 2014

```
 1        A     That's what I understand.
 2        Q     Do you have any reason to believe they got
 3   the information anywhere else other than Patient
 4   Point's website?
 5        A     No.
 6              MS. PARK:  Mark that Exhibit 49, please.
 7                   (Plaintiff's Exhibit 49
 8                    marked for identification.)
 9   BY MS. PARK:
10        Q     Showing you what's been marked Plaintiff's
11   Exhibit 49, Mr. Vandersteen.  If you could take a
12   look at that, and let me know when you're finished.
13        A     Okay.
14        Q     Okay.  This is an e-mail from you to Jeana
15   Loewe that was sent on March 12th, 2012.  Do you
16   remember sending this e-mail?
17        A     No.
18        Q     Do you have any reason to think that you
19   didn't send this e-mail?
20        A     No.
21        Q     Who is Jeana Loewe?
22        A     Jeana Loewe is a former employee at
23   Context.
24        Q     Why was she -- well, I should say.  This is
```

Brok Vandersteen      March 6, 2014

1    an e-mail from you, but you're responding to an
2    e-mail she sent to you.
3              Why did she send this e-mail to you, if you
4    know?
5         A    To gather our feedback.
6         Q    What was her job at Context?
7         A    She was marketing.
8         Q    What did she want your feedback about?
9         A    What we're hearing from our members.
10        Q    From whose members?
11        A    Our competitors.
12        Q    Okay.  Did she ask you for information
13   about Context competitors on a regular basis?
14        A    No.
15        Q    Do you know why specifically she was asking
16   you at this time for information about your
17   competitors, Context's competitors?
18        A    I don't know.
19        Q    Okay.  And you write, Hi, Jeana, Accent
20   Health, very general health, I believe the member is
21   liable for equipment.  Healthy Advice starting to
22   include RA info.  I believe the member is liable for
23   equipment, still lame as always.
24             What was the basis for you saying that the

Brok Vandersteen     March 6, 2014

1    member is liable for equipment?

2        A    Feedback from the members.

3        Q    And what did you mean by the member is

4    liable for equipment?

5        A    They're in charge of their equipment.

6        Q    They're in charge of the competitor's

7    equipment?

8        A    I think so.

9        Q    So they're responsible for taking down the

10   competitor's equipment?

11       A    I can't remember.

12       Q    Do you know what you meant by the member is

13   liable for equipment?

14       A    I can't remember.

15       Q    Okay.  Looking at Jeana's e-mail to you and

16   to the rest of the sales team, the third line from

17   the bottom that starts with as you know.  Do you see

18   that?

19       A    Yes.

20       Q    She says, as you know that we are in great

21   need of RHN sales.  Do you see that?

22       A    Yes.

23       Q    Did you know at the time that Context was

24   in great need of RHN sales?

Brok Vandersteen     March 6, 2014

```
 1      A    Yes.
 2      Q    What was that based on?
 3      A    I don't know.
 4      Q    Who told you that Context was in great need
 5  of RHN sales?
 6      A    I can't recall.
 7      Q    Did someone other than Jeana tell you that
 8  Context was in great need of RHN sales?
 9      A    I can't remember.
10      Q    Do you know why Context was in need of,
11  great need of RHN sales?
12      A    We were starting a new network.
13      Q    What was that network?
14      A    Rheumatoid Health Network.
15      Q    Do you know when Rheumatoid Health Network
16  started?
17      A    I can't remember.
18      Q    Sometime before March of 2012?
19      A    Yes.
20      Q    What did the fact that Context was starting
21  a new RHN network have to do with it needing a great
22  deal of RHN sales?
23      A    It's important to grow a network, so to
24  grow a network, you need to get new members.
```

Brok Vandersteen     March 6, 2014

```
 1      Q    Why was it important to grow your network?
 2  Why was it important for Context to grow its RHN
 3  network?
 4      A    To reach more patients.
 5      Q    Why did Context need to reach more
 6  patients?
 7      A    To educate them.
 8      Q    Do you know how Context is paid?
 9      A    Yes.
10      Q    How?
11      A    Sponsors.
12      Q    Do sponsors, if you know, do sponsors pay
13  Context more if Context has more members in its
14  networks?
15      A    Yes.
16      Q    Did you ever see -- I might have asked this
17  earlier.  But at any time between the time you
18  started and now, have you ever seen Healthy Advice's
19  loop?
20      A    Yes.
21      Q    When?
22      A    I can't recall specifically.
23      Q    Do you know generally when, approximately
24  when?
```

Brok Vandersteen    March 6, 2014

```
 1      A    It would have been in the latter part of
 2    2013.
 3      Q    How many times did you see it?
 4      A    Once.
 5      Q    Where did you see it?
 6      A    In a clinic office in Indiana.
 7      Q    How is it that you came to see Healthy
 8    Advice's loop in an Indiana clinic office?
 9      A    I was sitting there waiting.
10      Q    Were you there to see your own doctor or
11    were you there on behalf of Context?
12      A    I was there on behalf of Context.
13      Q    Were you asked to go in to the clinic
14    office specifically to watch the Healthy Advice
15    loop?
16      A    No.
17      Q    Why were you there?
18      A    To meet the practice manager.
19      Q    Okay.  Were you there to make a sale?
20      A    I was there to promote our product.
21      Q    To what?
22      A    To promote our services.
23      Q    How often would you go make house calls, if
24    you will, to practices?
```

Brok Vandersteen     March 6, 2014

```
 1       A    I can't remember a specific number, a
 2   frequency.
 3       Q    Had you always made in-person visits to
 4   potential practices, potential members?
 5       A    Sometimes.
 6       Q    When did you begin making in-person visits
 7   to practices?
 8       A    I can't remember specifically.
 9       Q    Had you always made in-person visits since
10   the time you started working at Context?
11       A    No.
12       Q    So you started doing that sometime after
13   you were hired?
14       A    Yes.
15       Q    And do you know again approximately when?
16       A    Sometime in 2012 maybe.
17       Q    Okay.  Do you know why Context began
18   sending MOEs to make in-person house calls?
19       A    Just a different way to reach them.
20       Q    Who told you to start making in-person
21   visits?
22       A    No one.
23       Q    Oh, you just volunteered to do it on your
24   own?
```

Brok Vandersteen     March 6, 2014

1      A     Yeah.
2      Q     Why did you think that that would be an
3  effective way to make sales?
4      A     Because offices are busy, and sometimes you
5  need to get in front of them.
6      Q     Did you feel that it was -- making direct
7  phone calls wasn't enough?
8      A     No.  Just another way to reach a potential
9  member.
10     Q     Other than the time in Indiana when you
11 were making the personal visit, did you see Healthy
12 Advice's loop at any time?
13     A     No.
14     Q     Are you familiar with the term switch-out
15 package or hassle-free switch-out package?
16     A     Am I familiar with the term?
17     Q     Yes.
18     A     Vaguely.
19     Q     What does that mean to you?
20     A     A package of switch-out materials.
21     Q     Is the switch-out package a policy that
22 Context uses to encourage practices to switch from a
23 competitor to Context?
24     A     No.

Brok Vandersteen     March 6, 2014

1      Q     In what circumstances would the term
2   switch-out package come up?
3      A     I don't recall.
4      Q     Did you ever try to sell a hassle-free
5   switch-out package to a practice?
6      A     I don't recall.
7      Q     Does anyone at Context -- Strike that.
8            Did anyone in Context management talk to
9   you about a switch-out package?
10     A     I don't recall.
11     Q     What if anything did Rishi Shah tell you
12  about switching HAN practices to Context?
13     A     He told me nothing.
14     Q     What if anything did Jim Demas tell you
15  about switching HAN practices to Context?
16     A     Nothing.
17     Q     What did Jeana Loewe tell you about
18  switching HAN practices to Context?
19     A     I don't believe she told me anything.
20     Q     What if anything did Matt Garms tells you
21  about switching HAN to Context?
22     A     I don't remember.
23     Q     Do you remember having any conversations
24  with anyone at Context about switching HAN practices

Brok Vandersteen     March 6, 2014

1    to Context?

2        A    I can't remember any specifics.

3        Q    Generally did you have any conversations

4    with anyone about switching HAN practices to

5    Context?

6        A    Yes.

7        Q    What was the general nature of those

8    conversations?

9        A    I can't remember specifically.

10       Q    Just generally?

11       A    Well, I'm assuming we must have discussed

12   the form.

13       Q    The authorization form that we talked

14   about?

15       A    Yes.

16       Q    Anything else?

17       A    No.

18       Q    Did you discuss anything about taking down

19   HAN, getting rid of Patient Point, crushing Patient

20   point, anything like that?

21       A    Not that I remember.

22       Q    Is it possible that you might have said

23   something about taking down HAN or crushing Patient

24   Point?

Brok Vandersteen     March 6, 2014

```
 1      A    Anything is possible.
 2      Q    Did Context treat switch-outs from Active
 3  Health differently from switch-outs from HAN?
 4      A    I believe the member of Accent Health would
 5  call Accent Health and cancel.
 6      Q    Okay.  So would the member call Healthy
 7  Advice to cancel?
 8      A    That's really up to them.
 9      Q    Did you on behalf of Context ever call
10  Healthy Advice to cancel a practice on behalf of the
11  practice?
12      A    No.
13      Q    Did you ever send a form to cancel the
14  practice's relationship -- Strike that.
15           Did you ever send a form directly to
16  Healthy Advice to cancel the practice's relationship
17  with Healthy Advice?
18      A    No.
19      Q    Do you know if anyone in member outreach
20  ever sent a form to cancel the practice's contract
21  with Healthy Advice?
22      A    No.
23           MS. PARK:  Are there certain things --
24      well, actually, why don't we take a quick break.
```

Brok Vandersteen     March 6, 2014

```
 1                (A recess was taken, after which the
 2                 following proceedings were had:)
 3          MS. PARK:  Back on the record.
 4      Q    Just before the break we were talking
 5  about, I think we were talking about the way Context
 6  treats Accent's switch-out differently from Healthy
 7  Advice.
 8           How did you know to treat Accent Health
 9  switch-outs differently from Healthy Advice
10  switch-outs?
11      A    Just through instruction.
12      Q    Who gave you the instruction?
13      A    I believe Matt Garms.
14      Q    Did anyone else at Context give you that
15  instruction?
16      A    No.
17      Q    Did that difference in treatment continue
18  throughout the time that you have been at
19  ContextMedia?
20      A    I believe so.
21      Q    Are there certain things that you as a
22  member outreach executive cannot say about
23  competitors when talking to practices?
24      A    Not specifically.
```

Brok Vandersteen    March 6, 2014

1        Q    Generally speaking are there things that
2    you aren't supposed to say about competitors?
3        A    We don't address their contracts of any
4    kind.  We don't speak to -- nothing else I can
5    remember.  No specific things.
6        Q    Was it always the case that you weren't to
7    talk to practices about their contracts with
8    competitors?
9        A    Not that I really remember.
10        Q    Okay.  So when were you told that you
11    should not be talking to practices about their
12    contracts with competitors?
13        A    Some time late 2013.
14        Q    Who told you that?
15        A    I believe it was Jim Demas and Matt Garms.
16        Q    How did Jim and Matt convey that to you?
17        A    I believe they explained that it's not
18    our -- that we should not be telling members what
19    they -- what their contract is, that they should
20    seek that from their provider.
21        Q    How did they, Jim and Matt, convey that to
22    you, is it in a meeting, was it by e-mails?
23        A    In a meeting.
24        Q    In a meeting.  Who else attended the

Brok Vandersteen     March 6, 2014

1   meeting?

2       A    The MOE team.

3       Q    Was anyone else in management present at

4   that meeting?

5       A    No.

6       Q    Was Rishi present at that meeting?

7       A    No.

8       Q    Do you know why management conveyed the

9   message that you were not to talk to practices about

10  their contracts with competitors?

11      A    I believe to -- well, say that again.

12  Would you repeat that?

13      Q    Yes.  Do you know why Context management

14  told the member outreach team that it's not to talk

15  to practices about their contracts with competitors?

16      A    I don't know why specifically.

17      Q    Do you know why generally?  Do you know why

18  generally?

19      A    Maybe they -- well, I don't know what

20  exactly why, to be quite honest.  They may have

21  heard someone mention something, and he wanted to

22  nip it in the bud.

23      Q    What do you base that on?

24      A    I don't know.

Brok Vandersteen      March 6, 2014

```
1      Q    Okay.  You said this was late 2013?

2      A    Yes.

3      Q    Approximately?

4      A    Yes.

5      Q    Before that time had you said anything to

6   practices about their contracts with competitors?

7      A    Not that I recall.

8      Q    Did you tell practices that they didn't

9   need to give notice to Healthy Advice to cancel?

10     A    Not that I recall specifically.

11     Q    Did you tell any practices that you,

12  Context, had a relationship with Healthy Advice, and

13  that Healthy Advice said it would be okay for

14  Context to take down Healthy Advice's TVs?

15     A    I believe it was mentioned in an e-mail.

16     Q    What was your basis for saying that?

17     A    I don't quite remember.

18     Q    Is it possible that you just made that up?

19     A    Possibly.

20     Q    Did you ever tell a practice that -- well,

21  before I go there.  Other than telling you that

22  you're not to talk to practices about their

23  contracts with competitors, is there anything else

24  that you were told that you were not to talk to
```

Brok Vandersteen     March 6, 2014

1    practices about?

2        A    Not that I remember.

3        Q    Did you ever tell a practice that if it

4    signed the authorization form, that Context would be

5    authorized to remove the Healthy Advice screen?

6        A    I don't know if that wording was used

7    exactly.  I believe I said we would handle the

8    equipment.

9        Q    Okay.  And is it a true statement, to your

10   knowledge, that as long as the practice filled out

11   the authorization form, that that would give Context

12   the right to take down Healthy Advice's equipment?

13       A    That's what I believed.

14       Q    Okay.  And what was your belief based on?

15       A    Just not to tell them it was done.

16       Q    Is that what somebody at Context told you?

17       A    I don't remember an instance where that was

18   conveyed to me.

19       Q    But you got the idea somewhere that it

20   would be okay for Context to take Healthy Advice's

21   screens down as long as the practice filled out the

22   authorization form?

23       A    I believe so.

24       Q    Do you know, does Context still use that

Brok Vandersteen     March 6, 2014

1    authorization form?

2        A    Not for Healthy Advice.

3        Q    Who does it use it for?

4        A    I believe for Health Monitor and Health

5    Focus Media.

6        Q    When did Context stop using the

7    authorization form for Healthy Advice?

8        A    I can't remember exactly.  It would have

9    been sometime in the last year or so.

10       Q    Okay.  And who conveyed the message to you

11   that Context doesn't use the authorization forms

12   with Healthy Advice anymore?

13       A    Management.

14       Q    Was this in a meeting similar to the one

15   with Jim Demas or was it in an e-mail, or how was

16   that communicated to you?

17       A    I believe it was in a meeting.

18       Q    Again, with the whole member outreach team?

19       A    With the member outreach team, and I

20   believe Matt Garms.

21       Q    Did management tell you anything else about

22   the authorization forms during that meeting?

23       A    No.

24       Q    Did management tell you anything else about

Brok Vandersteen      March 6, 2014

1    Healthy Advice during that meeting?

2        A    Not that I remember.

3        Q    Has management ever talked to you -- yes,

4    has management ever talked to you about the lawsuit

5    between Healthy Advice and ContextMedia?

6        A    I was -- we were made aware that there was

7    a lawsuit.

8        Q    Do you know when that was?

9        A    I don't remember exactly.

10       Q    Do you know why Context management made you

11   aware of the lawsuit?

12       A    I don't know why.

13       Q    After you began working at Context, did you

14   ever tell a practice that you switch out Healthy

15   Advice screens every day?

16       A    Maybe.

17       Q    It's possible that you have told practices

18   that you switch out Healthy Advice screens every

19   day?

20       A    I believe I said on a daily basis.

21       Q    Is that a true statement that Context

22   switches out Healthy Advice screens on a daily

23   basis?

24       A    I know it was a lot.  I don't know exactly

Brok Vandersteen     March 6, 2014

1  how often.

2      Q     What was your basis for saying that Context

3  switches out Healthy Advice screens on a daily

4  basis?

5      A     Just believe it was quite a bit.

6      Q     Did you do any independent research or look

7  up anything on Quickbase to confirm that?

8      A     No.

9      Q     Did you do anything to verify that Context

10  switches out Healthy Advice screens on a daily

11  basis?

12      A     No.

13      Q     Do you know if others made that same

14  statement?

15      A     I'm not sure what other people were saying.

16      Q     But saying that Healthy -- so you never

17  heard anybody say that statement?

18      A     Not that I remember.

19      Q     But you told practices that Context

20  switches out Healthy Advice screens on a daily basis

21  as part of your sales pitch to the practices, right?

22      A     Yes.

23      Q     You tried to do that to convince them to

24  switch to ContextMedia?

Brok Vandersteen     March 6, 2014

1      A    I just said what I believed.

2      Q    But you don't know if it was a true

3  statement that Context switches out Healthy Advice

4  screens every day?

5      A    I didn't confirm that exact number.

6      Q    Did you tell practices that you switched

7  out hundreds of Healthy Advice screens?

8      A    I believe so.

9      Q    Was that a true statement?

10      A    I believe so.

11      Q    How do you know that to be a true

12  statement?

13      A    Just seems we have done it hundreds of

14  times.

15      Q    It seems that you have done it hundreds of

16  times now or at the time it seems like you have done

17  it hundreds of times?

18      A    It's always seemed to be quite a bit.

19      Q    Did you do any independent research to

20  confirm that you switched out hundreds of Healthy

21  Advice screens?

22      A    No, I did not.

23      Q    Do you know how many Healthy Advice screens

24  Context has switched from the beginning of time

Brok Vandersteen    March 6, 2014

1    until now?

2        A    I'm not sure of the specific number.

3        Q    But you said that ContextMedia switches out

4    hundreds of Healthy Advice screens as part of your

5    sales pitch, right, to practices?

6        A    I have said that to practices.

7        Q    What do you mean that it seemed like

8    Context switched out hundreds of Healthy Advice

9    screens?

10        A    It seemed at the time we were getting a lot

11    of HAN members who were very interested in

12    switching.

13        Q    Who were interested in switching, but they

14    didn't actually switch?

15        A    No, who had been switching.

16        Q    And it seemed like there were hundreds of

17    HAN practices?

18        A    Yes, it did.

19        Q    Have you told practices that 50 percent of

20    HAN's loop is advertising?

21        A    I have said that.

22        Q    Is that a true statement?

23        A    I know now it's -- I believe it's not.

24        Q    How do you know it's not?

Brok Vandersteen     March 6, 2014

```
 1        A    I was told that it was inaccurate, I
 2   shouldn't say that.
 3        Q    Who told you that?
 4        A    I was approached by Matt Garms, and Jeana
 5   had mentioned that as well.
 6        Q    When did Matt Garms approach you about
 7   that?
 8        A    I don't remember specifically.
 9        Q    Was it in the last year or before that?
10        A    I really don't remember when specifically
11   that conversation occurred.
12        Q    When did Jeana Loewe tell you that it was
13   not true that 50 percent of HAN's loop is
14   advertising?
15        A    I really don't remember specifically when
16   that would have been.
17        Q    When did Jeana Loewe leave Context?
18        A    Maybe I believe early 2013.
19        Q    Okay.  So the conversation with Jeana had
20   to have happened sometime before late 2013, right?
21        A    I suppose.
22        Q    Did you continue saying that 50 percent of
23   HAN's loop is advertising after you were told by
24   Matt and Jeana that that's not true?
```

Brok Vandersteen     March 6, 2014

```
 1       A     No.
 2       Q     At the time that you made that statement,
 3   did you do any independent research to confirm
 4   whether 50 percent of HAN's loop is advertising?
 5       A     I did not.
 6       Q     So you didn't know if that was true or not?
 7       A     It was a little exaggeration, I believe, so
 8   I don't know specifically.
 9       Q     So it wasn't true that 50 percent of HAN's
10   loop is advertising?
11       A     Say that again.
12       Q     It wasn't true that 50 percent of HAN's
13   loop is advertising?
14       A     No.
15       Q     And you said it any way?
16       A     Well, it was said -- would you mind
17   repeating that?
18       Q     What's that?
19       A     Would you mind repeating that?
20       Q     You knew that 50 percent of HAN's loop was
21   not advertising -- I'm sorry.  Strike that.
22             When you said 50 percent of HAN's loop is
23   advertising to practices, you knew that that was not
24   a true statement?
```

Brok Vandersteen    March 6, 2014

```
 1      A    It was an exaggeration.
 2      Q    Which means that it was not true?
 3      A    I suppose.
 4      Q    Did you ever tell a practice that -- Strike
 5   that.
 6           Did Jeana ever come to talk to you about
 7   how she felt uncomfortable about the way the sales
 8   team handled itself?
 9      A    No.
10      Q    Did she ever complain to you about feeling
11   uncomfortable with how the sales team handled
12   itself?
13      A    Not that I remember.
14      Q    Were you ever reprimanded by anyone in
15   Context management for saying statements that were
16   not true to practices?
17      A    Yes.
18      Q    When was that?
19      A    I can't remember specifically, but it would
20   have been sometime last year.
21      Q    Who reprimanded you?
22      A    Matt Garms individually, as well as senior
23   management.
24      Q    Who in senior management?
```

Brok Vandersteen     March 6, 2014

```
1        A    Jim Demas, Rishi Shah, Shradha Agarwal.
2        Q    Was this -- when Jim, Rishi and Shradha
3   talked to you, were they talking to you all at once
4   or did each of them come talk to you one on one?
5        A    It was all at once.
6        Q    Did they talk to just you or were they
7   talking to you and other members of the member
8   outreach team?
9        A    I believe -- well, I know that, let's see,
10  Jim Demas had pulled the sales team in to have a
11  meeting and said that it had come to his attention
12  that we were saying things that weren't true, and
13  told us that it needed to stop.
14       Q    So this was more than just you, this was
15  the whole sales team?
16       A    The sales team.
17       Q    And this was just Jim or were Rishi and --
18       A    So this is with Jim, and then later we were
19  pulled aside again by Jim, Rishi and Shradha to
20  stress the fact that these things cannot be said.
21       Q    During that meeting, the second meeting
22  that is, was Jim the only person who was talking or
23  did Rishi and Shradha say something too?
24       A    I believe they each said something.
```

Brok Vandersteen     March 6, 2014

1      Q    How much time passed between the first
2  meeting with just Jim and the second one with Jim,
3  Rishi and Shradha?
4      A    I don't remember specifically, but it would
5  have been shortly after.
6      Q    Why did Jim, Rishi and Shradha have to have
7  a second meeting with you after Jim had already
8  spoken to the member outreach team, if you know?
9      A    Because I think it came to light that I had
10  said specifically certain things that weren't true,
11  and that I needed to stop.
12      Q    That you had?
13      A    (Indicating.)
14      Q    Yes?
15      A    Yes.
16      Q    How did that come to light?
17      A    I don't recall if it was overheard or if
18  they were just reviewing how we were running our
19  practice or running our day.
20      Q    And what is it that you said that wasn't
21  true that caused them to have the second meeting?
22      A    I had exaggerated the amount of advertising
23  in the loop.  And that also I believe -- that's it.
24  Yeah, that's it.

Brok Vandersteen     March 6, 2014

1    Q    So even after Matt and Jeana had told you

2  not to say that 50 percent of HAN's loop is

3  advertising, you still continued to say it?

4    A    I really don't remember when that was.

5    Q    Okay.  But you said that sometime before

6  Jeana left in early '13, or early 2013 she told you

7  not to say that 50 percent of HAN's loop is

8  advertising?

9    A    I don't know if she was addressing that

10 specifically.  I really can't remember what it was

11 she was addressing.

12   Q    Did Jim, Rishi or anyone else in senior

13 management threaten to terminate your employment if

14 you continued saying misrepresentations?

15   A    No.  I had heard that people may have been

16 in the past, but I wasn't threatened with

17 termination.

18   Q    You were not nervous about losing your job

19 at Context?

20   A    I haven't really thought about it.

21   Q    Did you ever tell a practice that you had

22 just upgraded somebody from down the street from

23 Healthy Advice to Context?

24   A    I don't remember specifically.

Brok Vandersteen      March 6, 2014

```
 1      Q    Is it possible that you said -- does that
 2  sound like something that you would say that you
 3  just upgraded somebody down the street?
 4      A    Maybe.  I don't know.
 5      Q    It is possible that you could have said
 6  that you just upgraded somebody down the street?
 7           MR. O'BRIEN:  Asked and answered.  You can
 8      answer again.
 9           THE WITNESS:  I can answer?
10           MR. O'BRIEN:  Yes.
11      A    Yeah, I guess it's possible.
12  BY MS. PARK:
13      Q    Did you ever tell a practice that they're
14  not legally obligated to stay with Healthy Advice?
15      A    Not that I remember.
16      Q    Have you ever told a practice that you
17  wanted to upgrade their system without identifying
18  yourself as being with ContextMedia?
19      A    Not that I remember.
20      Q    Looking at Exhibit 44 from the last
21  deposition.  Mr. Vandersteen, have you had a chance
22  to look at Exhibit 44?
23      A    Yes.
24      Q    And this is an e-mail exchange between you
```

Brok Vandersteen    March 6, 2014

```
 1   and Silvia Velazquez in approximately November of
 2   2011.  Do you see that?
 3        A    Yes.
 4        Q    She's talking about an instance in which
 5   she asked you to call a practice back tomorrow
 6   because she -- a practice that thought Context was
 7   HAN taking down the current HAN TV, and she thought
 8   Silvia was from Humera.  Do you see that?
 9        A    Yes, I see what you're talking about.
10        Q    Do you recall this incident?
11        A    I don't.
12        Q    Do you know why a practice would get the
13   impression that you, Brok, were calling from Healthy
14   Advice?
15        A    No.  I think they just lose track, can't
16   keep things straight.
17        Q    Did you ever have a conversation with a
18   practice where the practice thought you were with
19   Healthy Advice?
20             MR. O'BRIEN:  I'll object to the form.  You
21        can answer.
22        A    No.
23   BY MS. PARK:
24        Q    Did you ever intentionally try to lead a
```

Brok Vandersteen     March 6, 2014

1   practice to believe that you were with Healthy
2   Advice?
3        A    No.
4        Q    Do you know what happened, did you in fact
5   call this lady back at the practice like Silvia
6   asked you to?
7        A    I don't remember specifically.
8        Q    In all likelihood, would you have called
9   back this person to try to effectuate the sale?
10       A    Yeah, I would have tried to call her back.
11       Q    Did you talk at all with Silvia about the
12  incident that's being described in Plaintiff's
13  Exhibit 44?
14       A    When?
15       Q    After she told you about this incident.
16       A    I don't recall this incident.
17       Q    Do you remember Silvia being upset or
18  yelling at you or telling you that you shouldn't
19  make practices think that you're with Healthy
20  Advice?
21       A    I don't remember.
22       Q    Do you remember any conversations with
23  Silvia where she reprimanded you or talked to you or
24  told you that you shouldn't make misrepresentations

Brok Vandersteen    March 6, 2014

1    to practices?

2       A    I don't remember.  We were always

3    instructed to be clear about it.

4       Q    Who instructed you to be clear about it?

5       A    Management is always instructing us to be

6    clear about who we're calling from.

7       Q    Who in management instructs you?

8       A    Matt Garms and the senior team.

9       Q    Anyone specific on the senior team?

10      A    No.  I don't remember.

11           MS. PARK:  This is Group Exhibit 50.

12               (Plaintiff's Group Exhibit 50

13                marked for identification.)

14   BY MS. PARK:

15      Q    Mr. Vandersteen, I'm showing you a series

16   of three e-mails, well, four e-mails.  And just to

17   save time, they're very similar.  But don't feel

18   like you -- read them as long as you need to to get

19   an understanding of what I'm going to ask you about.

20      A    Okay.

21      Q    Do you recognize the e-mails that were in

22   Group Exhibit 50?  For the record, they're e-mails

23   that are authored by you on July 12th, 2011,

24   September 26th, 2011, September 6th, 2012, and

Brok Vandersteen     March 6, 2014

```
 1   August 31st, 2012.
 2       A    They look familiar.
 3       Q    These are e-mails that you would send to
 4   potential members, is that right?
 5       A    Correct.
 6       Q    And do you see, I guess the common theme of
 7   these e-mails is that in each of them you make the
 8   representation to the practice that in the last year
 9   we've replaced hundreds of Healthy Advice
10   televisions across the country.  Do you see that?
11       A    I see that.
12       Q    And again, what was your basis for saying
13   Context has replaced hundreds of Healthy Advice
14   televisions across the country?
15       A    I believe it was a lot.  It was quite a
16   bit.
17       Q    You believed it was a lot, but you did not
18   know whether Context in fact replaced hundreds of
19   Healthy Advice televisions across the country,
20   right?
21       A    I didn't know specifically.
22       Q    The fact -- Strike that.
23            You are making the representation that
24   Context replaced hundreds of Healthy Advice
```

Brok Vandersteen     March 6, 2014

1   televisions though, right?

2       A     Yes, I am saying that we replaced hundreds

3   of their screens.

4       Q     But you did not know if that was a true

5   statement?

6       A     I didn't know how many specifically we

7   replaced.

8       Q     You didn't verify whether Context replaced

9   hundreds of Healthy Advice televisions across the

10  country?

11      A     No, I never did.

12            MS. PARK:  This will be Group Exhibit 51.

13                  (Plaintiff's Group Exhibit 51

14                   marked for identification.)

15  BY MS. PARK:

16      Q     Mr. Vandersteen, I'm showing you another

17  set of e-mails.  Take your time to look at them.

18            But I'll say they're all authored by you,

19  and sent to it appears to be potential member

20  practices.  Feel free take a look, and tell me when

21  you're finished.

22      A     Okay.

23      Q     As I said, these are either a series of

24  e-mails or like blank sort of letters that you sent

Brok Vandersteen    March 6, 2014

1   to practices.
2        Do you recall sending the e-mails that are
3   in Group Exhibit 51?
4        A    They look familiar.
5        Q    Okay.  Any reason to think that you did not
6   send them?
7        A    No.
8        Q    And the common denominator, just I'll save
9   us some time.  Each of the e-mails you make the
10  representation to the practices that you replace
11  HAN -- Context replaces HAN on a daily basis or
12  Context replaces Healthy Advice every day all over
13  the country.  Do you see those statements?
14       A    I do.
15       Q    Did you know for a fact whether Context
16  replaced Patient Point or Healthy Advice on a daily
17  basis?
18       A    I believe we were.
19       Q    What was that belief based on?
20       A    Based off of just the number of sales we
21  were getting at the time.
22       Q    And you believe that every single day
23  Context was switching a practice from Healthy
24  Advice?

Brok Vandersteen     March 6, 2014

1      A    I thought so.
2      Q    You had access to the number of practices
3  that were sold and the number of practices of those
4  that were switched from Healthy Advice, didn't you,
5  in Quickbase?
6      A    I believe I had access to that.
7      Q    You could have verified how many exactly
8  Context had sold or had switched from Healthy
9  Advice, right?
10      A    I could have.
11      Q    But you just chose not to?
12      A    Didn't have time.  Busy.
13      Q    Okay.  Could you look at this.  Again,
14  looking at these little numbers on the lower
15  right-hand corner.  The one marked Context prod
16  23723.  And they're actually not in numerical order.
17           MR. O'BRIEN:  What was the number again?
18           MS. PARK:  23723.
19  BY MS. PARK:
20      Q    Do you see it?
21      A    I do, yes.
22      Q    Okay.  In the third line you're writing to
23  Sharon, February 11th, 2013.  It says last
24  Wednesday, do you see that?

Brok Vandersteen      March 6, 2014

1      A      Yes.

2      Q      Okay.  It says last Wednesday we replaced

3  29 Patient Point screens in one health system alone.

4  What was that statement based on?

5      A      A co-worker of mine had gotten a clinic

6  signed up to replace, I believe, 29 screens in a

7  health system.

8      Q      Which co-worker was that?

9      A      I believe it was Patrick Avana (phonetic).

10      Q      Do you remember what health system that

11  was?

12      A      No, I don't remember.

13      Q      Did you see it in Quickbase or did Patrick

14  tell you that?

15      A      I kind of like overheard it, seen it

16  happen.

17      Q      Where did you see it happen?

18      A      We sat near each other, so I was able to

19  see that he had gotten them signed up, and he talked

20  about it.

21      Q      Do you know if those 29 screens were

22  actually installed?

23      A      I believe they were not.

24          MS. PARK:  We're done with that.  Mark this

Brok Vandersteen     March 6, 2014

1      as Group Exhibit 52.

2                 (Plaintiff's Group Exhibit 52

3                 marked for identification.)

4  BY MS. PARK:

5      Q    I'm showing you what's been marked Group

6  Exhibit 52.  Just take a look at it, and let me know

7  when you're finished.

8      A    Okay.

9      Q    This is a series of four e-mails that were

10 sent from you to it appears to be various practices

11 in the month of December of 2011.  Do you recall

12 sending these e-mails?

13     A    They look familiar.

14     Q    Okay.  Any reason to think that you didn't

15 send them?

16     A    No.

17     Q    Okay.  And the common denominator with this

18 group exhibit is that it looks like in each of them

19 you make the representation that in the last year

20 over 350 health care facilities have switched from

21 Healthy Advice to RHN or to Context.  Do you see

22 that?

23     A    I do.

24     Q    What was your basis for saying that 350 in

Brok Vandersteen    March 6, 2014

1    particular health care facilities switched from

2    Healthy Advice to Context?

3        A    I just believe we had really been replacing

4    a lot of their screens.

5        Q    Did you know how many screens Context had

6    switched from Healthy Advice in the year 2011?

7        A    Not specifically.

8        Q    Did you have any basis to pick the number

9    350 when you sent these e-mails?

10           MR. O'BRIEN:  Actually, for the record,

11       some of them say half to 350.

12           MS. PARK:  That's true.  Okay.

13       Q    Well, for the ones that say 350 new health

14   care facilities, did you have any basis to come up

15   with that number 350?

16       A    No, I believed it was a lot at the time.

17       Q    And what was that belief based on?

18       A    The fact that it seemed to be happening

19   quite a bit.

20       Q    Okay.  Did anyone in Context management or

21   anyone at Context at any time give you the actual

22   number of Healthy Advice screens that switched to

23   Context in any given year?

24       A    No.

Brok Vandersteen     March 6, 2014

```
 1              MS. PARK:  Mark this as Exhibit 53.
 2                   (Plaintiff's Exhibit 53
 3                    marked for identification.)
 4    BY MS. PARK:
 5       Q    Showing you what's been marked Plaintiff's
 6    Exhibit 53.  If you could take a look at that, and
 7    let me know when you're finished.
 8       A    Okay.
 9       Q    This appears to be an e-mail from Matt
10    Garms dated January 12th, 2012 addressed to you and
11    a number of other people.  The subject is right way
12    to start the day.  Do you see that?
13       A    Yes.
14       Q    Do you recall receiving this e-mail?
15       A    I really don't.
16       Q    In the e-mail Matt says, hey, guys and
17    girls, take a look at everything below.  These
18    numbers kick ass.  Everyone should be very proud.
19    Well done.  Do you see that?
20       A    I do see that.
21       Q    And the e-mail he's referring to is an
22    e-mail from Silvia Velazquez to the MS team saying
23    we had 109 switch-outs last year in 2011.  Of those
24    15 Accent Health, 26 cable TV, 2 Health Focus, 64
```

Brok Vandersteen     March 6, 2014

1    Healthy Advice.  Do you see that?

2       A    I see that.

3       Q    So as of January 12th, you knew that the

4    actual number of switch-outs in 2011 was 64, of

5    Healthy Advice screens was 64.  Do you see that?

6       A    I see that on the paper.  I really don't

7    remember seeing this, though.

8       Q    Do you have any reason to doubt that these

9    numbers are correct?

10      A    No.

11           MS. PARK:   Mark this as Group Exhibit 54.

12               (Plaintiff's Group Exhibit 54

13               marked for identification.)

14   BY MS. PARK:

15      Q    Mr. Vandersteen, I'm showing you an exhibit

16   that's been marked Group Exhibit 54.  Take a look at

17   it, and let me know when you're finished.

18      A    Okay.

19      Q    So these are e-mails dated January 16th,

20   17th, and 30th of 2012 that were sent by you to a

21   few different practices.  Do you see that?

22      A    I do.

23      Q    Do you remember sending these e-mails?

24      A    I don't remember sending these

Brok Vandersteen     March 6, 2014

1   specifically.

2       Q    Any reason to think that you did not send

3   them?

4       A    No.

5       Q    And in the e-mails you say that 350, 200

6   and 150 facilities for rheumatologists switched from

7   Healthy Advice to ContextMedia.  Do you see that?

8       A    I do.

9       Q    And looking at Exhibit 53 that we just

10  looked at, you knew as of January 12th that only 64

11  Healthy Advice TVs switched from Healthy Advice to

12  Context.  Do you recall that?

13      A    Well, I don't recall seeing that e-mail.

14      Q    But you have no reason to think that you

15  didn't receive the e-mail on the 12th?

16      A    No.

17      Q    But the next day or, you know, five days

18  later or six days later at the end of the month you

19  continued to say that 350, 200 and 150 practices

20  switched from Healthy Advice to Context.  What was

21  your basis for saying that?

22      A    I think I assumed it.  Exaggerated.

23      Q    It wasn't true, was it, that 350, 200 and

24  150 facilities switched from Healthy Advice to

Brok Vandersteen     March 6, 2014

1    Context?

2       A    After seeing Silvia's e-mail previously

3    here, I can see now that that's not true.

4       Q    Why did you change the number from 350 to

5    200 to 150?

6       A    I don't know.

7       Q    Were you just kind of picking numbers out

8    of the air?

9       A    I suppose so.  It was an exaggeration.

10           MS. PARK:  Mark this as Group Exhibit 55.

11              (Plaintiff's Exhibit 55

12              marked for identification.)

13   BY MS. PARK:

14      Q    Showing you what has been marked

15   Plaintiff's Exhibit 55.  If you could just take a

16   look at that, and let me know when you're finished.

17      A    Okay.

18      Q    Do you remember -- this is an e-mail from

19   you to a prospective member, Friday, November 4th,

20   2011.  Do you remember sending this e-mail?

21      A    I don't remember sending it.

22      Q    Do you have any reason to think that you

23   didn't send it?

24      A    No.

Brok Vandersteen     March 6, 2014

1      Q    Just directing your attention to the second

2   sentence in the e-mail.  You say, I wanted to follow

3   up with you to stress the fact that the Healthy

4   Advice system you have in your waiting room is far

5   below industry standard.  Do you see that?

6      A    I do.

7      Q    What did you mean by far below industry

8   standard?

9      A    Based on feedback from their members, I

10  understood that it wasn't a very satisfactory

11  service.

12     Q    What was the industry you were referring

13  to?

14     A    The point of care industry.

15     Q    Did you do any independent research to

16  verify whether Healthy Advice's system was far below

17  industry standard?

18     A    Based on their members' feedback, they

19  seemed pretty clear.

20     Q    How many members told you that Healthy

21  Advice's system was far below industry standard?

22     A    I couldn't say specifically.  I talked to

23  hundreds of people a day.

24     Q    Did you have any reason to believe that --

Brok Vandersteen     March 6, 2014

```
1    Strike that.
2            You had actually no basis for the
3    conclusion that Healthy Advice's system is far below
4    industry standard, did you?
5        A    My basis was feedback from HAN's members.
6            MR. O'BRIEN:  I'm going to need a break
7        when it's convenient.
8            MS. PARK:  I just have one more, then we
9        can stop.  I think we're almost done.
10       Q    You had mentioned that at some point you
11   said that 50 percent of HAN's loop is advertising.
12   Do you recall that?
13       A    I recall reading it in an e-mail.
14       Q    An e-mail that you sent to practices?
15       A    Yes.
16       Q    Is it possible that you said that over the
17   phone too?
18       A    I suppose it's possible.
19       Q    Okay.  Most of your -- you had said most of
20   communications with practices were over the phone,
21   right?
22       A    Yeah.
23       Q    Is it possible that the statements about
24   replacing HAN's screens on a daily basis, replacing
```

Brok Vandersteen    March 6, 2014

```
 1   hundreds of HAN's screens might have been something
 2   that you did say over the phone too?
 3        A    It might have been.
 4        Q    And at some point you said that Jeana told
 5   you that you shouldn't say that 50 percent of HAN's
 6   loop is advertising, right?
 7        A    I think she had at some point.
 8             MS. PARK:  Mark this as 56.
 9                  (Plaintiff's Exhibit 56
10                   marked for identification.)
11   BY MS. PARK:
12        Q    I'm showing you what's been marked
13   Plaintiff's Exhibit 56.  If you could just take a
14   look at that, and let me know when you're finished.
15        A    Okay.
16             MS. PARK:  This will be 57 if you want
17        to mark that.
18                  (Plaintiff's Exhibit 57
19                   marked for identification.)
20   BY MS. PARK:
21        Q    Do you recall -- this is an e-mail -- well,
22   it's an e-mail from you to Jeana that you're
23   responding to an e-mail that she sent to you.  Do
24   you see that?
```

Brok Vandersteen     March 6, 2014

1      A    Yes, I see that.

2      Q    And do you remember receiving and sending

3   these e-mails?

4      A    Not specifically.

5      Q    Okay.  Looking at in the middle of page

6   next to two, Jeana's writing to you, and she's

7   saying, their stated advertisement time is 9 minutes

8   and 30, please do not say that they only have 17

9   minutes of the content and the rest is ads.  This

10  isn't published, and we cannot guarantee this to be

11  true.  Do you see that?

12     A    I do see that.

13     Q    The 9 minutes and 30 is approximately 30

14  percent, would you agree with that?

15     A    Yes.

16     Q    And you responded to Jeana saying, thanks

17  for clarifying, acknowledging that you received this

18  e-mail.  Do you see that on the top of the page?

19     A    I see that, yes.

20     Q    All right.  Keep 56 in front of you.

21  Showing you Plaintiff's Exhibit 57.  If you could

22  take a look at that, and let me know when you're

23  finished.

24     A    Okay.

Brok Vandersteen    March 6, 2014

1      Q    This e-mail is dated March 28th, Exhibit
2  57, that is from you to a practice.  Do you see
3  that?
4      A    Uh-huh.
5      Q    And the day before you got the e-mail from
6  Jeana saying that 9 minutes of Healthy Advice's loop
7  out of 30 is advertising.  Do you see that?
8      A    I see that, yes.
9      Q    And on the next day you told the practice
10  you have a 30-minute power point slide of general
11  information right now, and half of it is
12  advertising.  Do you see that?
13      A    Yes, I do.
14      Q    Why did you say that half of it is
15  advertising when you knew that only 30 percent of it
16  was advertising the day before?
17      A    I must have made a mistake.
18      Q    It wasn't a true statement, was it, that
19  half of Healthy Advice's slide or loop was
20  advertising?
21      A    I don't suppose it was.
22          MS. PARK:  We can take a break now.
23              (A recess was taken, after which the
24                following proceedings were had:)

Brok Vandersteen     March 6, 2014

```
 1           MS. PARK:  Back on the record.
 2                (Plaintiff's Group Exhibit 58
 3                marked for identification.)
 4    BY MS. PARK:
 5      Q    Same as before, Mr. Vandersteen, this is a
 6    series of e-mails that were sent by you to different
 7    practices.
 8           But take your time and look at it if you
 9    would like.  I don't want to make you feel rushed.
10      A    Okay.
11      Q    This is a series, like I said, a series of
12    e-mails that you sent from approximately February
13    1st through June of 2012.
14           Any reason -- I know you probably don't
15    recall sending each and every e-mail.  But is there
16    any reason for you to think you didn't send these
17    e-mails?
18      A    No.
19      Q    And the common denominator is that in each
20    of the e-mails you make a representation to the
21    practices that 350, 300 -- 350, in other words a
22    number of practices switched from Healthy Advice to
23    Context.  Do you see that?
24      A    I see that.
```

Brok Vandersteen    March 6, 2014

1      Q     And if you look at 53 in front of you, you
2  see that you found out as of January 12th, 2012 that
3  only 64 Healthy Advice practices switched from
4  Healthy Advice to Context.  Do you see that?
5      A     I see that.
6      Q     Why did you keep on making the
7  representation that somewhere between 150 and 350
8  Healthy Advice practices switched to Context?
9      A     I was just exaggerating.
10     Q     Was there any basis for you to make the
11 statement between 150 to 350 health care facilities
12 were switching from Healthy Advice to Context?
13     A     Still seemed like quite a bit.  It's just
14 me exaggerating.
15     Q     Those were not true statements when you
16 made them, were they?
17     A     Doesn't appear to be so.
18     Q     If you look at the first one stamped 826 in
19 the lower right-hand corner, I think it's the first
20 one.
21     A     Yes.
22     Q     Second to last line you say, if you sign
23 up, I'll give you a $100 American Express gift card
24 to use as you please.  Do you see that?

Brok Vandersteen    March 6, 2014

1      A    Yes.

2      Q    Was it a common practice for you to give a

3  gift card to potential practices to encourage them

4  to switch to Context?

5      A    It was common practice to offer a gift card

6  to just about anybody to become a member.

7      Q    Okay.  Context frequently offered

8  incentives, gift card incentives to encourage

9  practices to switch?

10      A    To simply sign up, whether they had a

11  competitor or not.

12      Q    Okay.  How often would you say you offered

13  a gift card on behalf of Context to get a member to

14  join?

15      A    I'm really not sure.

16      Q    About 50 percent of the time?

17      A    I really don't know.  I wouldn't feel right

18  throwing out a percentage.

19      Q    Does Context still offer gift cards to

20  practices to encourage them to sign up?

21      A    Yes.

22          MS. PARK:  Mark this as Exhibit 59.

23          THE WITNESS:  I would like to say that we

24      have the option --

Brok Vandersteen     March 6, 2014

1              (Plaintiff's Exhibit 59

2               marked for identification.)

3    BY MS. PARK:

4        Q    Showing you what's been marked as

5    Plaintiff's Exhibit 59 --

6        A    Did we catch my previous statement?

7        Q    What were you saying?

8        A    I was just saying that we as MOE's had the

9    option.  It wasn't required, it was simply we had

10   the ability to use that as we please.

11       Q    Okay.  Who gave you the ability -- who at

12   Context gave you the ability to use the gift cards?

13       A    Matt Garms.

14       Q    Okay.  Were you given a set number of gift

15   cards per month or were you just given an unlimited

16   number?

17       A    There was no set number.

18       Q    Okay.  Was there a limit like you can only

19   use up to 5 or 10?

20       A    No.

21       Q    In your experience did you find that the

22   gift card was helpful in encouraging a practice to

23   sign up?

24       A    I found that people like receiving gifts.

Brok Vandersteen     March 6, 2014

1     Q     So it was helpful in sealing the deal?

2     A     I mean, I think that maybe -- yeah.

3     Q     Okay.  So take a look at Exhibit 59 if you

4     would.

5     A     Okay.

6     Q     It appears to be a fax that was sent from

7     Heidi at Joint and Muscle Medical Care Services to

8     you on July 13th, 2012.

9           Do you see that?  And the date is on the

10    fax line on the bottom, which is upside down.

11    A     Okay.

12    Q     Do you recognize the letter that's attached

13    to the fax?

14    A     Looks familiar.

15    Q     What do you understand this letter to be?

16    A     I take it as a scare tactic.

17    Q     Okay.  Do you remember receiving this

18    letter from Heidi?

19    A     I don't remember the date.  It looks

20    familiar.

21    Q     Do you remember talking to Heidi about this

22    letter?

23    A     No.

24    Q     So do you know if you asked her to send it

Brok Vandersteen    March 6, 2014

1   or if she volunteered to send it?

2       A    I don't believe I would have asked her to

3   send this.

4       Q    But you don't know if you did or you

5   didn't?

6       A    I don't remember.

7       Q    What did you do with this once after you

8   received it?

9       A    I really don't remember.

10          MS. PARK:  Okay.  I have no further

11      questions.

12          MR. O'BRIEN:  I have one.

13                      EXAMINATION

14   BY MR. O'BRIEN:

15      Q    Mr. Vandersteen, I may have misheard you,

16   but I thought I heard you answer a question with

17   counsel, something like this, to the effect that

18   there is to this day a difference in how

19   ContextMedia treats switch-outs with HAN versus

20   other competitors.  Is that in fact the case?

21      A     No, no, we require that the HAN member,

22   just like any other competitor member, actually

23   reaches out to their provider and cancel.

24          MR. O'BRIEN:  That's all the questions I

108

Brok Vandersteen     March 6, 2014

1    have.

2         MS. PARK:  Okay.  I have no further

3    questions.

4         MR. O'BRIEN:  Signature reserved.

5         MS. PARK:  Okay.  Thank you.

6              (The witness was excused.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Brok Vandersteen     March 6, 2014

```
1   STATE OF ILLINOIS)
                     ) SS.
2   COUNTY OF C O O K)

3        I, JOANNE RYAN, CSR and Notary Public in

4   and for the County of Cook and State of Illinois, do

5   hereby certify that on the 6th of March, 2014, at

6   1:35 p.m., at 222 North LaSalle Street, Chicago,

7   Illinois, the deponent BROK VANDERSTEEN personally

8   appeared before me.

9        I further certify that the said BROK

10  VANDERSTEEN was by me first duly sworn to testify

11  and that the foregoing is a true record of the

12  testimony given by the witness.

13       I further certify that the deposition

14  terminated at 3:55 p.m.

15       I further certify that I am not counsel for

16  nor related to any of the parties herein, nor am I

17  interested in the outcome hereof.

18       In witness whereof, I have hereunto set my

19  hand and seal of office this 10th of March, 2014.

20

21                     _____

22                                Notary Public

23

24  CSR No. 084-003334 - Expiration Date: May 31, 2015.
```

Brok Vandersteen    March 6, 2014

```
 1            IN THE UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF ILLINOIS
 2                       EASTERN DIVISION

 3   HEALTHY ADVICE NETWORKS, LLC,    )
                                      )
 4                   Plaintiff,       )
                                      )
 5           vs.                      ) No. 1:12 CV 00610
                                      )
 6   CONTEXTMEDIA, INC.,              )
                                      )
 7                   Defendant.       )

 8

 9           I, BROK VANDERSTEEN, being first duly

10   sworn, on oath say that I am the deponent in the

11   aforesaid deposition taken on March 6, 2014; that I

12   have read the foregoing transcript of my deposition,

13   consisting of pages 1 through 110 inclusive, and

14   affix my signature to same.

15

16                         _____

17                              BROK VANDERSTEEN

18   Subscribed and sworn to
     before me this_____day of
19   _____, 20__
     _____
20   Notary Public

21

22

23

24
```

Brok Vandersteen     March 6, 2014

```
 1                MERRILL LEGAL SOLUTIONS
              311 South Wacker Drive, Suite 300
 2                  Chicago, Illinois 60606
                       (312) 386-2000
 3
                                    March 10, 2014
 4
     Mr. Brok Vandersteen
 5   C/O Mr. Richard J. O'Brien
     Sidley Austin, LLC
 6   One South Dearborn Street
     Chicago, Illinois  60603
 7
 8       Case:  Healthy Advice vs. ContextMedia
         No: 1:12 CV 00610
 9       Deponent: Brok Vandersteen
         Date taken:  March 6, 2014
10
     Dear Mr. Vandersteen:
11
     The above-referenced deposition has been transcribed,
12   and is ready for review, pursuant to the Rules of
     Court.
13
     Please contact our office at your earliest convenience
14   for an appointment to review the deposition transcript,
     or you may contact counsel for a copy of the transcript
15   for your review.

16   Upon failure to comply within 30 days, we shall forward
     an appropriate affidavit of noncompliance to counsel
17   without further notice.

18                          Very truly yours,
                            MERRILL LEGAL SOLUTIONS
19                          (Job#219293)(JR)

20   cc:  Ms. Jeanah Park
          Mr. Richard O'Brien
21

22

23

24
```

Brok Vandersteen     March 6, 2014

```
 1   CASE: Healthy Advice vs. ContextMedia

 2   DATE TAKEN: March 6, 2014

 3   DEPONENT:  Brok Vandersteen

 4   PAGE LINE                 ERRATA_SHEET
     ____ ____                 _____ _____
 5   ____  ____ CHANGE:_____

 6   ____  ____ REASON:_____

 7   ____  ____ CHANGE:_____

 8   ____  ____ REASON:_____

 9   ____  ____ CHANGE:_____

10   ____  ____ REASON:_____

11   ____  ____ CHANGE:_____

12   ____  ____ REASON:_____

13   ____  ____ CHANGE:_____

14   ____  ____ REASON:_____

15   ____  ____ CHANGE:_____

16   ____  ____ REASON:_____

17   ____  ____ CHANGE:_____

18   ____  ____ REASON:_____

19   ____  ____ CHANGE:_____

20   ____  ____ REASON:_____

21   (SIGNED) _____ DATE _____

22

23

24
```

Merrill Corporation - Chicago
(312) 386-2000                    www.merrillcorp.com/law