1              IN THE UNITED STATES DISTRICT COURT
2          FOR THE SOUTHERN DISTRICT OF ILLINOIS
                      WESTERN DIVISION
3

HEALTHY ADVICE NETWORKS, LLC.    )
4                                )
                   Plaintiff,    )
5                                )
          vs.                    )Case No.
6                                )1:12-cv-00610
   CONTEXTMEDIA, INC.,           )
7                                )
                   Defendant.    )
8

9          The deposition of JAMES DEMAS, called by

10   the Plaintiff for examination, taken pursuant to

11   notice, agreement, and by the provisions of the

12   Federal Rules of Civil Procedure for the United

13   States District Courts pertaining to the taking of

14   depositions, taken before Tina M. Alfaro, CSR

15   No. 084-004220, a Notary Public within and for the

16   County of Cook, State of Illinois, and a Certified

17   Shorthand Reporter of said State, at the offices of

18   Vedder Price, 222 North LaSalle Street, Chicago,

19   Illinois, on the 13th day of March, A.D., 2014 at

20   9:00 a.m.

21

22

23

24

James Demas   March 13, 2014

```
 1   APPEARANCES:

 2        FROST BROWN TODD, LLC
          BY: GRANT COWAN, ESQ.
 3             330 Great American Tower
               301 East Fourth Street
 4             Cincinnati, Ohio 45202
               (513) 651-6900
 5             gcowan@fbtlaw.com

 6                  On behalf of the Plaintiff;

 7        SIDLEY AUSTIN, LLP
          BY: RICHARD O'BRIEN, ESQ.
 8             One South Dearborn Street
               Chicago, Illinois 60603
 9             (312) 853-7000
               robrien@sidley.com
10
                    On behalf of the Defendant.
11

12

13

14

15

16

17

18

19

20

21

22

23

24   REPORTED BY: Tina Alfaro, CSR No. 084-004220
```

James Demas   March 13, 2014

```
1                    I N D E X

2
                    EXAMINATION
3
   WITNESS                              PAGE
4
   JAMES DEMAS
5
       By Mr. Cowan                     5
6

7                    EXHIBITS

8  PLAINTIFF'S EXHIBITS                 PAGE

9  Exhibit 137                         12
       Financial records
10
   Exhibit 138                         17
11     Quarterly income statements

12 Exhibit 139                         17
       Independent Contractor Agreement for
13     Direct Seller

14 Exhibit 140                         19
       Redacted offer letter
15
   Exhibit 141                         20
16     7/11/11 offer letter

17 Exhibit 142                         20
       1/2/12 offer letter
18
   Exhibit 143                         21
19     7/3/12 offer letter

20 Exhibit 144                         21
       2/6/14 offer letter
21
   Exhibit 145                         34
22     E-mail

23 Exhibit 146                         43
       2/9/11 e-mail string
24
```

James Demas   March 13, 2014

1                          EXHIBITS
                          (Cont'd)
2
    PLAINTIFF'S EXHIBITS                      PAGE
3
    Exhibit 147                              43
4       3/2/11 e-mail

5   Exhibit 148                              45
        3/4/11 e-mail
6
    Exhibit 149                              47
7       E-mail

8   Exhibit 150                              52
        E-mail
9
    Exhibit 151                              56
10      10/18/11 e-mail

11  Exhibit 152                              60
        Series of e-mail
12
    Exhibit 153                              62
13      10/23/12 e-mail

14  Exhibit 154                              63
        Quarterly billing
15

16

17

18

19

20

21

22

23

24

James Demas   March 13, 2014

```
 1                    (Witness sworn.)
 2    WHEREUPON:
 3                       JAMES DEMAS,
 4    called as a witness herein, having been first duly
 5    sworn, was examined and testified as follows:
 6                       EXAMINATION
 7    BY MR. COWAN:
 8         Q.  Good morning.  State your name.
 9         A.  James Demas.
10         Q.  Mr. Demas, my name's Grant Cowan.  We met
11    several times.  I'm here to take your deposition in
12    the case that PatientPoint has brought against
13    Contextmedia that's pending in the Federal Court in
14    Cincinnati.
15              Have you ever had a deposition taken
16    before?
17         A.  I have.
18         Q.  And how long was that?
19         A.  Approximately 15 years ago.
20         Q.  I suspect that the ground rules are
21    probably pretty similar to what they were back 15
22    years ago, but I'll go ahead and cover some basic
23    ground rules.
24              The first is if I ask you a question at any
```

James Demas   March 13, 2014

1    time that you don't understand or is any way

2    confusing to you, let me know and I'll rephrase the

3    question.  It's my job to put a question to you that

4    you understand.

5         Second is I'll ask you to answer the

6    questions orally, yes or no, explain your answer,

7    but I'm sort of distinguishing that between an

8    uh-huh or a nod of the head because Tina will have

9    difficulty reflecting that on the transcript.

10        Then the final rule is while I don't expect

11   this to be going all day, we'll probably go at least

12   several hours.  We've been pretty good about taking

13   breaks about every hour, but if at any time you need

14   a break, just let me know and what I'll do is I'll

15   kind of try to work myself quickly to a convenient

16   stopping point.  Okay?

17        A.  Okay.

18        Q.  You're currently the CFO for Contextmedia?

19        A.  I am.

20        Q.  Do you hold any other title?

21        A.  I do not.

22        Q.  And when did you join the company?

23        A.  I joined the company in August of 2009.

24        Q.  And when you joined the company in August

James Demas    March 13, 2014

1    of 2009, was it as the CFO?

2         A.  I was hired as controller.

3         Q.  Was there a CFO at the time?

4         A.  There was not.

5         Q.  When did you become CFO?

6         A.  I don't remember the exact date, but it was

7    sometime in 2010.

8         Q.  Do you know if it was in the first half of

9    2010?

10        A.  I don't recall.

11        Q.  What were your duties -- let me ask you

12   this.  Did you assume any additional duties as CFO

13   that you did not have as controller?

14        A.  Not necessarily as CFO, but during -- I

15   don't recall the time frame that I adopted more

16   responsibility, but certainly I picked up more

17   responsibility as I -- as my tenure increased at

18   Contextmedia.

19        Q.  As of year-end 2010, describe for me

20   generally as best you can your duties and

21   responsibilities as CFO.

22        A.  I was in charge of the accounting, finance

23   function in the company.  I also had the member

24   services or account services team reporting to me

James Demas    March 13, 2014

1    and, to my recollection, the logistics function as
2    well.
3        Q.  And did you report directly to Mr. Shah?
4        A.  I did.
5        Q.  And member services, your direct report or
6    the person that would have reported directly to you
7    at that time would have been Ms. Velazquez?
8        A.  Ms. Velazquez.  I believe at the end of
9    2010 we may have -- strike that.  We hired somebody
10   in 2011.  So yes, Ms. Velazquez.
11       Q.  And who was it that was hired for MSE in
12   2011?
13       A.  Chad Patterson.
14       Q.  And then logistics would have been Coppola?
15       A.  Correct.
16       Q.  Matt Coppola?
17       A.  Correct.
18       Q.  How would you describe the financial
19   condition of the company, Context, say in the second
20   half of 2010?
21       A.  What do you mean by "describe"?
22       Q.  Fair enough.  Was the company facing any
23   financial issues that you considered to be outside
24   the norm, any financial concerns or constraints in

James Demas   March 13, 2014



James Demas   March 13, 2014

1 ████████████████████

▮ ████████████████

▮ ██████████████████████

▮ ███████████████████████

▮ ██████████████████████

▮ ███████████████████████

▮ ████████████████████

▮ ████████████████████████

▮ ██████████████████

10     A.   I was.

11     Q.   And in what capacity?  How so?

12     A.   Primarily from a financial standpoint

13 assuring that we had the resources to roll out a new

14 network.

15     Q.   And what's your understanding of how it is

16 that RHN came about?  Why did the company decide to

17 roll out a new network?

18     A.   Since my joining we had talked about moving

19 into additional verticals and we had always

20 identified 11 or 13 different verticals that were

21 attractive to us, and we just felt this was a good

22 time for us.  I believe there were some

23 conversations with agencies who were interested in

24 potentially looking for a new outlet for a

James Demas   March 13, 2014

```
 1   rheumatoid network.  I believe the impetus was more
 2   we were ready to move away from -- in addition to
 3   diabetes, move into another vertical.
 4       Q.  And the agencies you talked to, would one
 5   of them have been J3?
 6       A.  We talked to J3.  I don't know if it was
 7   prior to our discussions about launching the
 8   network.
 9       Q.  And the discussions with J3 would have been
10   relevant to Simponi?
11       A.  Correct.
12       Q.  Any other agencies that you talked to prior
13   to the formation of RHN about RHN?
14       A.  Not that I'm aware of, but I don't
15   frequently talk to agencies other than when I'm
16   trying to collect money.
17       Q.  Okay.
18           Who negotiates the contractual terms
19   between Context and an agency or Context and a
20   sponsor?
21       A.  Today?
22       Q.  Yes.
23       A.  Today it's our sponsorship team, the head
24   of our sponsorship team.
```

James Demas   March 13, 2014

```
1        Q.   And who's the head of the sponsorship team?
2    Is that Ms. Agarwal?
3        A.   Ashik,  A-S-H-I-K, Desai, D-E-S-A-I.
4        Q.   In 2010 and 2011 who negotiated the terms
5    of specific agreements?
6        A.   Rishi Shah.
7        Q.   Did you have any involvement in that
8    process?
9        A.   Not in the negotiations themselves other
10   than providing information to Mr. Shah.
11       Q.   Okay.
12            Were you personally involved in any
13   discussions with J3 relative to the formation of
14   RHN, specifically discussions about Simponi and the
15   development of a rheumatology network.
16       A.   No, I was not.
17                    (Plaintiff's Exhibit 137 was
18                     marked as requested.)
19   BY MR. COWAN:
20       Q.   Mr. Demas, I've handed you what we've
21   marked as Deposition Exhibit 137, and these are some
22   materials that were produced to us by Context.
23   You'll see that they have numbers down at the
24   bottom.  They appear to be some profit and loss
```

James Demas   March 13, 2014

```
1    and/or statement of operations.  They're a little
2    bit out of order in terms of Bates numbering.  I
3    just put them by year order.  Can you identify these
4    for me?
5         A.  Yes.  These are our internal financial
6    statements, and they are all statements of
7    operations for year-end starting 2006 through 2012.
8         Q.  And are you involved in the preparation of
9    these?
10        A.  I am.
11        Q.  At least as is reflected in these
12   documents, Exhibit 137, it appears as if
13   Contextmedia lost money every year from its
14   inception through 2010; is that fair?
15        A.  Excuse me.  Can I go back to your previous
16   question?
17        Q.  Sure.
18        A.  You asked if I was involved in the
19   preparation of these.  I was involved in the
20   preparation from 2009 on.  I was not there prior to
21   2009.
22        Q.  Fair enough.
23        A.  Just for clarification.
24        Q.  Yep.
```

James Demas   March 13, 2014



James Demas    March 13, 2014



James Demas    March 13, 2014

1    ████████████████████████████████

▮    ████████████████████████████████

▮    ██████████████████████████████████

▮        ██████████████████████████████

▮    ████████████████████████

▮        ████████████████

7        Q.   Does Context consider provider recruitment

8    to be marketing?

9        A.   Provider recruitment?

10       Q.   Yes.

11       A.   Office acquisition, is that what you're

12   asking?  Member recruitment?

13       Q.   I probably ought to ask my colleague here.

14   Yes.

15       A.   To be marketing?

16       Q.   Yes.

17       A.   Portions of what they do are marketing.

18       Q.   Okay.  What portions?

19       A.   So we have a direct marketing function

20   within that group that we call member outreach.

21       Q.   Is that what was Jeana Loewe's group?

22       A.   That's correct.

23       Q.   And that's a marketing -- that's a brand

24   mark- -- is that a brand marketing function?

James Demas   March 13, 2014

1      A.   Correct.

2      Q.   And that was within member outreach?

3      A.   It was categorized for financial statements

4  as a separate department.

5      Q.   Okay.

6      A.   But that function supported the member

7  outreach team.

8                    (Plaintiff's Exhibit 138 was

9                     marked as requested.)

10 BY MR. COWAN:

11     Q.   I've handed you what we've marked as

12 Exhibit 138.  Can you identify this, Mr. Demas?

13     A.   Yes.  This is our quarterly income

14 statements for the years ended 2009 through 2013.

15                    (Plaintiff's Exhibit 139 was

16                     marked as requested.)

17 BY MR. COWAN:

18     Q.   Handing you what we've marked as 139.  It's

19 labeled "Independent Contractor Agreement for Direct

20 Seller," and it looks as if the last page of this

21 has your name and signature; is that right?

22     A.   Yes, that is my signature and my name.

23     Q.   And this is the independent contractor

24 agreement between Context and Acquirent; is that

James Demas    March 13, 2014

```
1    correct?
2        A.   Correct.
3        Q.   According to the first page, the initial
4    term was from October 18, 2010 ending on or about
5    April 30, 2010; do you see that?
6        A.   Yes.
7        Q.   Do you know if this agreement was extended?
8        A.   I don't recall.
9        Q.   At least during the initial term of the
10   independent contractor agreement, was there a
11   particular individual within Context that was sort
12   of the primary liaison with Acquirent?
13       A.   Jeana Loewe.
14       Q.   The first page, again, it's about halfway
15   down, Mr. Demas, it says "Acquirent agrees to market
16   and sell Contextmedia, Inc.'s patient education
17   services to target customers and verticals agreed
18   upon with Contextmedia."
19            Did, at least during this time frame,
20   Context have targeted customers?
21       A.   I don't know specifics about targeted
22   customers.  That would have been Jeana Loewe's
23   category.
24       Q.   And at least as the term "customer" is used
```

James Demas    March 13, 2014

1    there, do you understand that to be members?

2        A.   I do, yes.

3        Q.   And members being, as we've used it in

4    other depositions, physician practices, correct?

5        A.   Correct.

6        Q.   Context has produced some what appear to be

7    offer letters between -- sample, template offer

8    letters between Context and member outreach

9    executives.  Are these documents you'd be familiar

10   with generally?

11       A.   Yes.

12                   (Plaintiff's Exhibit 140 was

13                    marked as requested.)

14   BY MR. COWAN:

15       Q.   Does this appear to be essentially a

16   sample -- why don't you tell me what this is,

17   Exhibit 140.

18       A.   It's a redacted offer letter to a member

19   outreach executive.

20       Q.   And under the compensation paragraph, items

21   1 and 2, is that, to the best of your knowledge,

22   part of the compensation structure, at least as of

23   August 27, 2010 for MOEs?

24       A.   Are you referring to 1 and 2?

James Demas   March 13, 2014

```
1        Q.  Yes.  Roman 1 and 2.
2        A.  It is.  It's part of the -- it's the earned
3    commission structure.
4                        (Plaintiff's Exhibit 141 was
5                         marked as requested.)
6    BY MR. COWAN:
7        Q.  I'm just going to go through a series of
8    these and sort of ask the same questions.  So 141
9    would be the same type of document, although this is
10   for at least as of July 11, 2011; is that right?
11       A.  Yes.
12                       (Plaintiff's Exhibit 142 was
13                        marked as requested.)
14   BY MR. COWAN:
15       Q.  Mr. Demas, Exhibit 142 appears to be a
16   similar document, this time for the period at least
17   as of January 2, 2012?
18       A.  This document is different.
19       Q.  Ah, okay.  What is this?  This appears to
20   be for an account director?
21       A.  That is correct.
22       Q.  And what's an account director?
23       A.  An account director is a salesperson on the
24   sponsorship side of our business.
```

James Demas   March 13, 2014

```
 1        Q.  So would that be like a Matt Crandall or a
 2   Steve Svec?
 3        A.  Yes.
 4                     (Plaintiff's Exhibit 143 was
 5                      marked as requested.)
 6   BY MR. COWAN:
 7        Q.  143 appears to be an offer letter for a
 8   member outreach executive position as of July 3,
 9   2012?
10        A.  It is.
11                     (Plaintiff's Exhibit 144 was
12                      marked as requested.)
13   BY MR. COWAN:
14        Q.  144 appears to be an offer letter for a
15   member outreach executive position as of February 6,
16   2014?
17        A.  It is.
18        Q.  Let me talk about the latter part of 2010.
19   Do you know if prior to, say, December 2010 Context
20   had switched out any practices that were at the time
21   using a competitor service?
22        A.  Prior to the last half of 2010?
23        Q.  Exactly.
24        A.  I don't know of any.
```

James Demas   March 13, 2014

```
 1        Q.  You were involved in some internal
 2   discussions at Context about the idea of doing
 3   competitor switch-outs?
 4        A.  Yes.
 5        Q.  And how did that come about?
 6        A.  Mr. Shah suggested it.
 7        Q.  Tell me as best you can recall -- my first
 8   question is do you recall about when that occurred?
 9        A.  The latter half 2010.
10        Q.  And tell me as best you can recall what
11   Mr. Shah suggested.
12        A.  He suggested that we compete against
13   competitor services by selling against them
14   directly.
15        Q.  And was there -- did he indicate to you if
16   there was some sort of a precipitating factor for
17   that decision?
18        A.  No.
19        Q.  Prior to that time with respect to the DHN,
20   the Diabetes Health Network, if Context encountered
21   a member that had a competitor, did it not attempt
22   to switch the practice?
23        A.  I don't know the answer.
24        Q.  Who was involved in the initial discussions
```

James Demas   March 13, 2014

1    within Context about the idea of developing a

2    competitor switch-out practice?

3        A.   The members of the senior management team.

4        Q.   Which would be you, Mr. Shah, and

5    Ms. Agarwal?

6        A.   Correct.

7        Q.   Anyone else?

8        A.   Not that I recall.

9        Q.   As of the latter half of 2010, to your

10   knowledge, was Context able to identify practices

11   that had competitor systems in them at the time?

12       A.   Identify in what way?

13       Q.   Well, let me -- I'll ask you some specific

14   questions.  Do you know if Context ever was either

15   provided or developed a list of potential member

16   sites which list would indicate whether the member

17   currently had a point-of-care service?

18       A.   No, we do not have such a list.

19       Q.   To your knowledge, how did Context go about

20   marketing its services to members in the

21   rheumatology field?  Specifically what I'm trying to

22   get at is was there some sort of a list of practices

23   that the member outreach team had?

24       A.   To the best of my knowledge, there were

James Demas     March 13, 2014

1   lists that were purchased, and they worked off those

2   lists to target physicians.

3        Q.  Do you recall discussions in the second

4   half of 2010 in connection with the development or

5   the formation of RHN that Healthy Advice had a

6   presence in that market, a pre-existing presence in

7   that market?

8        A.  I'm sorry.  Can you repeat the question?

9        Q.  Sure.

10          Do you recall discussions internal to

11   Context in, say, the second half of 2010 relative to

12   the formation of the RHN about the fact that Healthy

13   Advice had sort of a pre-existing presence in the

14   network or those offices?

15       A.  Yes.

16       Q.  Tell me what -- tell me what you learned

17   and who from.

18       A.  Just in normal discussions of competitors

19   in our space, I think we knew that even before the

20   latter half of 2010.  There's not many players in

21   this field.  So we often monitor our competitors.

22       Q.  In terms of Mr. Shah approaching the senior

23   management team and talking about the idea of

24   competing, going against competitors in point-of-

James Demas    March 13, 2014

```
 1    care, I'm trying to understand how Context would
 2    know that they were going to be competing if they
 3    didn't have some idea of which practices had which
 4    competitors?
 5        A.  As we called into offices we encountered
 6    competitors, and it was as we were building out the
 7    RHN and encountering competitors that we learned
 8    that there were offices that had Healthy Advice and
 9    AccentHealth.
10        Q.  And as that began to occur, as Context
11    began to call into offices and learn that some of
12    the offices at least had competitors in there
13    including Healthy Advice, do you know if any of the
14    members raised any concerns or issues about how
15    there would be a switch if they already had a system
16    in place?
17        A.  I don't know if they raised concerns.
18        Q.  Are you familiar with the term as used by
19    Context called a competitor switch-out package or a
20    hassle-free switch-out package?
21        A.  Yes.
22        Q.  And how did you become aware of that?
23        A.  I was involved in drafting up the document.
24        Q.  That's the authorization form?
```

James Demas    March 13, 2014

1        A.   The authorization form, yes.

2        Q.   In terms of some of the ancillary materials

3    relative to the switch-out package, did you have any

4    involvement in drafting any ancillary materials?

5        A.   What are the ancillary materials you're

6    referring to?

7        Q.   Well, I showed them to Mr. Shah yesterday

8    and I can pull them out, but there's some documents

9    that were used by some of the MOEs, a one-page

10   switch that says "Switching is easy" and it talks

11   about how to go about switching.

12       A.   No, I wasn't involved in preparing any of

13   those.

14       Q.   Other than the written authorization form,

15   do you recall having any involvement in the

16   preparation of any other written documents relative

17   to the switch-out package?

18       A.   No.

19       Q.   How does the development of the

20   authorization form come about?  Why was that done?

21       A.   It was my suggestion.  I wanted to make

22   sure that we had the authorization of the office

23   before we took something down that was on their

24   property.

James Demas    March 13, 2014

1      Q.  Was that -- did that come about because

2  someone had -- someone within Context had raised the

3  issue with you?

4      A.  Raised the issue that --

5      Q.  Of taking down a competitor's equipment.

6      A.  Rishi Shah raised the issue of wanting to

7  go in and switch out, and my part in it was to

8  develop the authorization form.  It was my idea to

9  do that.  Does that answer your question?

10     Q.  Yeah, it does.

11         So when Mr. Shah talked about wanting to go

12  in and switch out competitors, did switch-out, as

13  you use that term, include removing the competitor

14  equipment that was existing in the member office?

15     A.  Yes.

16     Q.  And why was it necessary for -- at least as

17  you understood it, why was it necessary for Context

18  to do that?

19     A.  To remove the equipment?

20     Q.  Yes.

21     A.  I don't recall why it was necessary.

22     Q.  All right.

23         We've got some binders here of some

24  previously marked exhibits, and I'm going to ask you

James Demas    March 13, 2014

1    to look at a series of them that start at 71.  Take

2    a minute and look at Exhibit 71.  Just review it to

3    yourself as much as you need to to familiarize

4    yourself with it.

5                    (Witness viewing document.)

6    BY THE WITNESS:

7        A.  Okay.

8        Q.  Does this e-mail string sort of generally

9    describe, at least as of December 2, 2010, sort of

10   the genesis of the idea to create a written

11   authorization form?

12       A.  Yes.

13       Q.  I'm going to ask a question, but don't

14   answer it right away.  I want to give Dick the

15   opportunity to tell you not to.

16           The written authorization form that you

17   prepared, did you provide that to legal counsel

18   before it was actually provided to potential

19   members?

20       MR. O'BRIEN:  You can answer that with a yes or

21   no.

22   BY THE WITNESS:

23       A.  No.

24       Q.  Okay.  Exhibit 72 is an e-mail from you to

James Demas    March 13, 2014

1    Mr. Shah and Ms. Agarwal.  The subject is "Install

2    authorization" and there's an attachment.  Is this

3    at least the draft installation authorization

4    document?

5        A.  It is.

6        Q.  And in your e-mail you say "Hey guys.  I've

7    written this to appear as an installation/

8    de-installation authorization."  What did you mean

9    by "appear"?

10       A.  I don't know what I meant at the time.

11       Q.  At the time that you prepared the written

12   authorization form, had you seen a copy of any of

13   Healthy Advice's contracts or agreements with member

14   practices?

15       A.  Not that I recall.

16       Q.  Take a look at Exhibit 74, and this is an

17   e-mail from Ms. Velazquez to you and a bunch of

18   others dated January 6, 2011 and the subject is

19   "Copy of a Healthy Advice agreement."  She says "Hi

20   team.  Attached is a copy of the Healthy Advice

21   agreement for everyone's review," and then there's

22   an agreement attached.  Do you see that?

23       A.  Yes.

24       Q.  Do you recall at some point in time on or

James Demas    March 13, 2014

1  around this date seeing a copy of the Healthy Advice

2  agreement?

3      A.  I don't recall it at the time.

4      Q.  The e-mail would indicate as much?

5      A.  Yes.

6      Q.  Then if you'd look at the actual -- stay

7  with 74, the actual enrollment agreement, the

8  Healthy Advice agreement.  Mr. Demas, I've had

9  trouble directing witnesses to the language, but

10  about a third of the way up from the bottom there's

11  some language that says "HAN offers the practice the

12  system under the terms set forth in this agreement";

13  do you see that?

14      A.  Yes.

15      Q.  It says "All system equipment and content

16  shall remain the property of HAN or its licensors";

17  do you see that?

18      A.  Yes.

19      Q.  And it says "The initial term in this

20  agreement is 24 months from the last date set forth

21  below and will automatically renew for 12-month

22  periods after the initial term"; do you see that?

23      A.  Yes.

24      Q.  It goes on to say "Either party may cancel

James Demas    March 13, 2014

1    the agreement at any time after six months with a

2    30-day written notice to the other"; do you see

3    that?

4        A.  Yes.

5        Q.  And a little bit further on it says "By

6    signing below the practice further agrees it will"

7    and item B says "Not remove, relocate, modify,

8    alter, or disrupt the system, e.g., maintain agreed

9    to volume and video settings, not turn off or unplug

10   the system, et cetera, without HAN prior written

11   agreement"; do you see that?

12       A.  Yes.

13       Q.  After seeing the HAN agreement, did you

14   have any concerns about, going forward, Context

15   providing a document to member practices which

16   purported to have the member practice authorize

17   Context, a competitor of HAN, remove HAN equipment?

18       A.  The form was designed to alleviate those

19   concerns.  To receive the authorization is precisely

20   why we did a form and have the office authorize us

21   to do so.

22       Q.  What basis did you have for believing that

23   Context could essentially have a practice authorize

24   it to -- authorize ConContext to remove a

James Demas    March 13, 2014

1   competitor's equipment, particularly given the

2   language in the HAN agreement?

3       A.  The authorization form was instructing us

4   to remove the equipment on behalf of the member.

5   It's their office.  We believe they can choose the

6   service that they want.  As part of that we

7   facilitated the process by obtaining an

8   authorization form and removing the equipment.

9       Q.  Do you know of any member practices ever

10  raising any questions about the authorization form?

11      A.  I don't recall any specifically.

12      Q.  Take a look, if you would, at Exhibit 76.

13  I think this has been previously identified, but

14  does this appear to be a Contextmedia RHN sign-up

15  sheet and agreement?

16      A.  This is.

17      Q.  And it's dated -- it appears as if it's

18  dated February 14 of 2011.  Does that look right to

19  you?

20      A.  I'm not seeing the date.

21      Q.  Down at the very bottom.

22      A.  There we go.  Yes.

23      Q.  And you'll see the last sort of item under

24  the agreement is a provision that's checked that

James Demas   March 13, 2014

1   says "I will insure that the RHN will be the only

2   electronic media in this waiting room, and I commit

3   to playing the RHN during all office hours."  Do you

4   see that?

5       A.  Yes.

6       Q.  And then if you turn to the next exhibit,

7   Exhibit 77, this is an e-mail from Jeana Loewe to

8   Mr. Vandersteen with some RHN materials?

9       A.  Yes.

10      Q.  And if you look at the form -- RHN sign-up

11  form and agreement, you'll see that right above the

12  signature line now there's a space added to the

13  Context form that says "I agree to not remove,

14  relocate, modify, alter, disrupt any of the RHN

15  system components without prior consent from the

16  Rheumatoid Health Network"; do you see that?

17      A.  Yes.

18      Q.  Do you know how it came to be that Context

19  apparently revised its agreement to include that

20  language?

21      A.  I don't know how it came to be.

22      Q.  Were you aware that Context had added that

23  language?

24      A.  I was aware.

James Demas    March 13, 2014

1       Q.   How did you become aware of that?

2       A.   Reading this sign-up form.

3       Q.   And did you believe that it was important

4    to have Context members agree that they would not

5    remove, relocate, modify, alter, or disrupt any of

6    the RHN system components without prior written

7    consent?

8       A.   Yes.

9       Q.   And was it your expectation that members

10   would, if they signed that, abide by that provision?

11      A.   Yes.

12      Q.   Do you know who it is within Context that

13   prepares the member agreements?

14      A.   Today?

15      Q.   No.   Back in, say, 2010, 2011.

16      A.   Jeana Loewe.

17                    (Plaintiff's Exhibit 145 was

18                     marked as requested.)

19   BY MR. COWAN:

20      Q.   Handing you what we've marked, Mr. Demas,

21   as Exhibit 145.   It's an e-mail from you to

22   Ms. Velazquez.   The subject is "Back side of HAN

23   contract."  You can read it to yourself, but

24   essentially you were asking for the back side of one

James Demas    March 13, 2014

```
 1  of the HAN agreements?

 2       A.  Yes.

 3       Q.  Do you recall if you ever got it?

 4       A.  I don't recall.

 5       Q.  Why was it that -- if you can recall, why

 6  was it that you wanted to see the back side of the

 7  agreement?

 8       A.  I don't recall.

 9       MR. COWAN:  I'm going to shift topics.  Do you

10  want to keep going or are you guys good?

11       COURT REPORTER:  Can we take a quick bathroom

12  break?

13       MR. COWAN:  You can sure.  Let's take about

14  five.

15                    (A short break was had.)

16  BY MR. COWAN:

17       Q.  Mr. Demas, were you aware that in

18  connection with either the first HAN de-install or

19  one of the first HAN de-installs in the December

20  2010 time frame that a HAN player was shipped from

21  the practice to Context offices?

22       A.  Yes.

23       Q.  When did you learn that that had happened?

24  Let me try to frame it.  Did you know before the HAN
```

James Demas    March 13, 2014

1    player arrived that it was going to be coming back

2    to Context offices?

3        A.   Yes.

4        Q.   And how is that?  How did you know that?

5        A.   I knew because we instructed the office to

6    ship it back to us as we were having -- as I recall,

7    we were having some difficulty figuring out where to

8    ship the equipment.  So we brought it back to our

9    office.

10       Q.   What was the difficulty figuring out where

11   to ship the equipment?

12       A.   I don't recall the details around it.

13       Q.   Do you know who within Context made the

14   decision to have the equipment shipped from the

15   practice back to Context?

16       A.   I don't recall.

17       Q.   Were you involved in any discussions with

18   Mr. Shah about copying any information on the HAN

19   player?

20       A.   I was not.

21       Q.   Did you learn that that happened?

22       A.   The copying of the information I didn't

23   recall happening until I saw the discovery.  The

24   copying of the image --

James Demas    March 13, 2014

```
 1        Q.  The image of the hard drive.
 2        A.  -- that's what you're referring to, right?
 3        Q.  We were speaking over each other.  So the
 4   HAN player arrived back at Context offices, correct?
 5        A.  Correct.
 6        Q.  And then were you aware that a video was
 7   made of the HAN content, if you will, that
 8   essentially the HAN player was hooked up to a
 9   Context monitor, the video loop was played, the HAN
10   loop was played, and somebody videoed it?
11        A.  Yes, that I was aware of.
12        Q.  Were you aware of that at or around the
13   time that that occurred?
14        A.  Yes.
15        Q.  And how did that come about?
16        A.  The actual videotaping?
17        Q.  Exactly.  Were you involved in any
18   discussions about doing that, you know, is that a
19   good idea, bad idea, anything like that?
20        A.  I know Mr. Shah instructed the -- I don't
21   remember who the individual was at the time, to plug
22   in the player.  The videotaping of the HAN content
23   that Mr. Berning did, I don't know what the
24   discussions were around that or who made that
```

James Demas    March 13, 2014

1    decision.

2        Q.  How do you know that Mr. Shah instructed

3    somebody to plug in the HAN player?

4        A.  I believe I saw an e-mail to that effect.

5        Q.  Do you understand now that, in addition to

6    making a video of the HAN content, literally like a

7    boot leg-type video of the HAN content, that in

8    addition Context actually made a copy, an image of

9    the entire hard drive of the HAN player?

10       A.  I am aware of that.

11       Q.  And I take it, though, from a prior answer

12   that you didn't become aware of that, the image of

13   the hard drive, until after this litigation was

14   instituted?

15       A.  That's correct.  Or I didn't recall.

16       Q.  I don't want you to discuss anything that

17   you've discussed with counsel, but after you became

18   aware of it in the context of the litigation, did

19   you have any discussions with anybody at Context

20   about it, the "it" being the imaging of the hard

21   drive?

22       A.  Not outside of the discussions of the

23   lawsuit.

24       Q.  And I do want to explore those discussions.

James Demas   March 13, 2014

```
 1   I just want to make sure that counsel was not
 2   involved in those discussions.
 3        A.  There were a couple discussions that
 4   counsel was involved in.
 5        Q.  Tell me about those discussions.
 6        A.  Basically just asked Mike Williams --
 7   you're familiar with the name Mike Williams?
 8        Q.  I am.
 9        A.  After I learned that he imaged it, what he
10   did and where it resides, and that's consistent with
11   what is in the interrogatory responses.  That was
12   the extent of my discussion outside of having
13   discussions with counsel.
14        Q.  So did Mr. Williams tell you that he had
15   taken a thumb drive, a flash drive that had a
16   program on it called Image For Linux on the thumb
17   drive and put it into the HAN player and made an
18   image of the entire hard drive?
19        A.  He didn't tell me the details, he didn't go
20   into as much detail as you are or as in the
21   interrogatories.  Basically he told me that he
22   imaged it and then put it on a backup server.  I was
23   more concerned with where it was so we could produce
24   it for the forensics.
```

James Demas    March 13, 2014

1        Q.  Did you ask him if anyone had instructed
2    him or directed him to make the image?
3        A.  That question was asked during a meeting
4    with counsel.
5        MR. COWAN:  Let's go off the record.
6                    (Whereupon a discussion was had
7                    off the record.)
8    BY MR. COWAN:
9        Q.  Outside the presence of counsel, did you
10   ever learn whether anyone in Context management had
11   directed Mr. Williams to make an image of the hard
12   drive?
13       A.  I think there were some e-mails in
14   discovery, but outside of that, no.
15       Q.  Take a look at Exhibit 82, and this is an
16   e-mail -- it's really an e-mail string involving
17   Mr. Berning, Mr. Shah, and Mr. Williams.  Is this
18   the e-mail that you're talking about?
19       A.  Yes.
20       Q.  Have you seen any other e-mails that --
21   other than this one, Exhibit 82, that discuss,
22   reference, or relate to the imaging of the hard
23   drive?
24       A.  I don't recall seeing any other e-mails.

James Demas    March 13, 2014

1      Q.  What were you able to determine, if
2  anything, about -- let me strike that.
3           Did you talk to Mr. Williams about what, if
4  anything, he had done with the hard drive image
5  since the time that he made the copy?
6      A.  I did.
7      Q.  And what did he say?
8      A.  He said he did nothing with it.
9      Q.  Do you know if anyone else at Context
10  accessed, viewed, looked at the image of the hard
11  drive at any time?
12      A.  I don't know.
13      Q.  Outside the presence of counsel, did you
14  have any discussions with Mr. Shah about this hard
15  drive image?
16      A.  The only discussions we had were about the
17  forensics exam and the logistics around it.
18      Q.  But you never -- Strike that.
19           You know now that Mr. Shah was aware that
20  the image was being made back in time when it was
21  done?
22      A.  Yes.
23      Q.  Did you ever say to Mr. Shah anything to
24  the effect of, you know, that really was not

James Demas    March 13, 2014

1    something we should do?

2        A.  Well, we discussed it --

3        Q.  Outside the presence of counsel.

4        A.  No.

5        Q.  Do you recall having some communications

6    with what I'll call technicians, firms that Context

7    might engage to install and de-install equipment

8    relative to the issue of de-installing HAN

9    equipment?

10        A.  Yes.

11        Q.  And we've got some e-mails.  I'll put one

12    or two in front of you in a minute, but generally

13    what do you recall about those communications and

14    discussions?

15        A.  It was the firm Sarcom who, from my

16    understanding, basically was a service provider for

17    both Healthy Advice and Contextmedia, and they at

18    one point decided they were not going to be involved

19    in any work orders that involved removing the HAN

20    equipment and putting up the Contextmedia equipment.

21        Q.  Did they explain to you what their issues

22    were or why they didn't want to do that?

23        A.  No.  The only thing that I recall from

24    phone conversations was that it was a legal issue on

James Demas   March 13, 2014

```
 1  their part or a legal matter.
 2                    (Plaintiff's Exhibit 146 was
 3                    marked as requested.)
 4  BY MR. COWAN:
 5      Q.  I don't think I'm going to ask you any
 6  questions perhaps substantively about this document,
 7  but does this appear to be an e-mail string
 8  February 9, 2011 relative to the Sarcom de-install
 9  issues?
10      A.  Yes.
11                    (Plaintiff's Exhibit 147 was
12                    marked as requested.)
13  BY MR. COWAN:
14      Q.  147 is an e-mail from Ms. Velazquez to you
15  dated March 2, 2011, and the subject is "Switch
16  package HAN report."  She says "Jim, here's the
17  report you asked for," and It looks like it
18  identifies what appear to be HAN practices that had
19  been switched as of March 2, 2011; is that correct?
20      A.  That's what it appears to be.
21      Q.  Do you recall why you had asked for this
22  report?
23      A.  I don't recall why I would have asked for
24  it.
```

James Demas   March 13, 2014

1        Q.   Take a look in the book at Exhibit 84.
2   This is an e-mail from you to Mr. Shah and
3   Ms. Agarwal dated December 20, 2010, and the subject
4   is "Sales claims."  In your e-mail to Mr. Shah and
5   Ms. Agarwal you said that you heard Matt Garms --
6   Garms at this time was sort of a new member outreach
7   guy?
8        A.   He was.  At this time he was brand new.
9        Q.   It says "I heard Matt Garms on the phone
10  telling an office that we have an agreement with
11  Healthy Advice whereby we remove their screens and
12  ship them back to Healthy Advice.  The messaging is
13  false and misleading."
14           You agree that that message was indeed
15  false and misleading?
16        A.   I do.
17        Q.   Then you say "We probably should make it
18  clear to him and the Acquirent sales team that, upon
19  the office request, we'll remove the HA system and
20  ship it back."
21           Did you have any direct discussions with
22  Mr. Garms after this instance about that subject?
23        A.   I don't recall if I had a direct
24  conversation with him.

James Demas    March 13, 2014

```
1          Q.  Do you know -- as you sit here today, do
2     you know whether either Mr. Shah or Ms. Agarwal did?
3          A.  I don't.
4          Q.  Did you have any direct contact or
5     communications with Acquirent, anybody at Acquirent
6     about the issue that's referenced in Exhibit 84?
7          A.  I don't recall a conversation with them.
8          Q.  And same question.  Do you know, do you
9     have firsthand knowledge whether or not Mr. Shah or
10    Ms. Agarwal did?
11         A.  I don't recall.
12                        (Plaintiff's Exhibit 148 was
13                         marked as requested.)
14    BY MR. COWAN:
15         Q.  Exhibit 148 is an e-mail from you to
16    Mr. Shah dated March 4, 2011, and the subject is
17    "HAN shipment."  Just take a minute and read this to
18    yourself.  My question is going to simply be do you
19    have a recollection of what the issue was that's
20    referenced in here?
21                        (Witness viewing document.)
22    BY THE WITNESS:
23         A.  No, I don't have a recollection of this.
24         Q.  For the purpose of the rest of the
```

James Demas   March 13, 2014

1   deposition, I'm going to sort of kind of define a
2   time period that my questions are going to relate
3   to, and it's essentially December 2010 through March
4   of 2013.  And the reason I've got that is sometime
5   after March of 2013 it appears as if PatientPoint
6   and Context reached an understanding relative to how
7   the switch-outs would be handled thereafter.  So
8   unless I tell you otherwise, my questions now are
9   going to focus on this time period.
10          During this time period, were there a
11  number of occasions when Context removed equipment,
12  whether it's HAN's or otherwise, and mistakes were
13  made involving the equipment, the equipment was sent
14  to the wrong company, FedEx lost or damaged the
15  equipment, anything of that nature?
16      A.   There were some.
17      Q.   And isn't that sort of an inherent problem
18  associated with a competitor taking charge of the
19  removal of another company's equipment?
20      A.   I don't know if that's an inherent problem.
21  Shipping problems happen even when we ship our own
22  equipment back from clinics.
23      Q.   Have you ever had a situation where Context
24  shipped some of its own equipment to another

James Demas    March 13, 2014

1    competitor in error?

2        A.  Our own equipment to another competitor?

3        Q.  Yeah.

4        A.  I don't recall that happening.

5        Q.  Would you be irritated, would you be angry

6    if one of your competitors, one of Context's

7    competitors removed Context equipment and shipped it

8    to another competitor?

9        A.  I'd be angry if we didn't get our equipment

10   back.

11       Q.  But just the mere fact that it was done and

12   it ended up in a competitor's office, that wouldn't

13   bother you?

14       MR. O'BRIEN:  Asked and answered.

15           You can answer it again.

16       MR. COWAN:  That's fair.  That was asked and

17   answered.  You don't need to answer it.

18                       (Plaintiff's Exhibit 149 was

19                        marked as requested.)

20   BY MR. COWAN:

21       Q.  Take a minute and just review 149 to

22   yourself.  I'll probably ask you about the

23   Ms. Velazquez e-mail to you and yours to her.

24                       (Witness viewing document.)

James Demas   March 13, 2014

```
 1    BY MR. COWAN:
 2        Q.  Ms. Velazquez's e-mail to you of April 27,
 3    2011 describes at least a situation, if not
 4    situations, where Healthy Advice apparently became
 5    aware of an attempted switch of a practice to
 6    Context and was able to persuade the client not to
 7    switch; is that fair?
 8        A.  Yes.
 9        Q.  In terms of Ms. Velazquez and your
10    discussions, was there a desire on the part of
11    Context to try to make sure that the equipment was
12    removed, the de-install process was done quickly
13    enough so that HAN would not receive notice from a
14    member practice with sufficient time to try to
15    counteract the switch?
16        A.  My understanding is we're trying to make it
17    as easy as possible for the office by boxing up and
18    taping and having the equipment ready to ship and
19    get our equipment installed.  I don't know what
20    Ms. Velazquez's intentions were.
21        Q.  But did you understand that there were at
22    least concerns expressed within Context about the
23    need for speed in terms of de-installs so that the
24    HAN equipment was essentially down and Context
```

James Demas    March 13, 2014

1    equipment up quickly to avoid giving HAN the

2    opportunity to try to counteract the switch?

3        A.   I view it as us wanting to get the service

4    up and have the member office satisfied with our

5    service as quickly as possible and not necessarily

6    to box out our competitor.

7        Q.   Well, in paragraph 2 she's talking about --

8    it appears to be dealing with the brochure racks; is

9    that right?

10       A.   Yes.

11       Q.   And she says a couple sentences in

12   "Basically by the time the install happens the

13   brochure holder should be on site so we can take out

14   HAN's and quickly replace it with ours on the same

15   day our TV is going up.  This would avoid any holes

16   left on the wall for any period of time and the site

17   being upset because of an ugly wall - - - which

18   leaves the door open for a call from HAN."

19            What did you understand to be the concern

20   on Context's part, at least Ms. Velazquez's part,

21   about leaving the door open for a call from HAN?

22       A.   I believe that she wants to make the member

23   as happy as possible and avoid a competitor coming

24   back in and getting their system up.  This is all

James Demas    March 13, 2014

1    about, in my opinion, her wanting the member not to

2    have to deal with holes in the wall and give them

3    any reason to remove our service.

4        Q.  Were you aware of any internal discussions

5    in Context about -- where the issue was discussed

6    about trying to avoid a situation where a HAN

7    practice communicated with HAN about a potential

8    switch to Context?

9        A.  A HAN practice communicated --

10       Q.  With HAN.

11       A.  -- with HAN about a switch?

12       Q.  Right.  Yeah.

13       A.  To try to avoid that?

14       Q.  Where Context wanted to try to do

15   everything they could to avoid a situation where a

16   HAN practice would actually alert HAN or contact HAN

17   and say, you know, we're thinking of switching.

18       A.  My recollection around early conversations

19   about that when we initially started doing

20   switch-outs we encouraged the office to call HAN.

21   My recollection from the first five or ten or so

22   that we did was that HAN was calling the offices --

23   and I believe there's some e-mails -- and

24   essentially yelling at office managers, being rude

James Demas    March 13, 2014

```
 1   to office managers, and we basically thought that
 2   was just something that we didn't want to have
 3   people who wanted our service to deal with.  So that
 4   was the only -- my only recollection of those types
 5   of conversations.
 6        Q.  You don't recall any conversation within
 7   Context where there was any concern or any
 8   discussion within Context about wanting -- being
 9   concerned that HAN might try to save the account if
10   they were notified of a potential switch?
11        A.  We had conversations like that.  I don't
12   recall specifics of them.
13        Q.  Tell me what you can recall generally.
14        A.  Much like we would if we were notified, we
15   would have -- we would want to fight to save our
16   office, and I suspect that HAN would want to do the
17   same and AccentHealth would want to do the same.
18   Those were general conversations.
19        Q.  And would it be your expectation that
20   Context salespeople, whether it's MSEs or MOEs, if
21   they were alerted by a Context practice that the
22   practice was thinking of switching to a competitor,
23   would it be your expectation that whoever received
24   that call, the appropriate person would do whatever
```

James Demas    March 13, 2014

1    they could to try to persuade the Context practice

2    to stay with Context?

3        A.   I think -- I'm not sure "whatever they

4    could" means, but yes, they would work hard to save

5    the member office.

6        Q.   And do you know if that ever happened?  And

7    by that I mean where Context was alerted that a

8    Context practice was thinking of doing a switch and

9    Context was able to save the practice from

10   switching?

11       A.   Sure, we've had incidences of that.

12                   (Plaintiff's Exhibit 150 was

13                    marked as requested.)

14   BY MR. COWAN:

15       Q.   Mr. Demas, let me explain 150.  It's a

16   multi-page document.  What I did is I took several

17   e-mails and tried to put them in chronological order

18   that I think at least appear to me to be all dealing

19   with the same issue, that issue relating to either

20   some damaged or missing HAN equipment.

21       A.   Okay.

22       Q.   If you could just look at the second-to-

23   last page, which should be Context production 44350.

24       MR. O'BRIEN:  You can look at whatever you

James Demas   March 13, 2014

```
 1   want.
 2   BY MR. COWAN:
 3       Q.  That's a good instruction.  Why don't you
 4   review the entire document and familiarize yourself
 5   with it and see if my description of it is accurate.
 6                    (Witness viewing document.)
 7   BY THE WITNESS:
 8       A.  It's reverse chronological order?
 9       Q.  Exactly, yeah.
10       A.  Okay.
11       Q.  Well, I'm not sure.  It starts August 4 and
12   goes to August 15.  So I don't know if that's
13   reverse or chronological, but whatever.
14       A.  I was reading it from the back.  Sorry.
15       Q.  Okay.
16                    (Witness viewing document.)
17   BY MR. COWAN:
18       Q.  So does this appear to be sort of a string
19   of different e-mails that relate to an issue
20   involving some missing HAN equipment?
21       A.  Yes.
22       Q.  And the second-to-last page, so this would
23   be Context Bates No. 44350 down at the bottom.
24       A.  Yes.
```

James Demas    March 13, 2014

1        Q.  There's an e-mail from Chad Patterson.  Is

2    he a logistics guy?

3        A.  Member services executive.

4        Q.  To you August 11, 2011.  He says "Jim, we

5    did an HA" -- Healthy Advice -- "switch-out last

6    week in Georgia."  I'm assuming "GA" is Georgia.

7    "Our site contact called me and said Healthy Advice

8    reached out to her and told her that the TV was

9    damaged that they received and that some equipment

10   was missing."  Do you see that?

11       A.  Yes.

12       Q.  Then he goes on to sort of describe what

13   he's learned from the tech, and at the end he says

14   "I was going to have the site contact call Healthy

15   Advice back and tell them that everything was fine

16   when they packaged it up and when FedEx picked it

17   up.  So Healthy Advice needs to file a claim with

18   FedEx to cover the damages, that the site is not

19   responsible once FedEx has the equipment."  Do you

20   see that?

21       A.  Yes.

22       Q.  So as I understand it, Context goes and

23   removes equipment -- let me strike that.

24           You're aware that Context lawyers got

James Demas    March 13, 2014

1    involved as soon as they learned early in 2011 about

2    the switch-out process and wrote some letters to

3    Context about that?

4        MR. O'BRIEN:  Object to the form.

5            You can answer.

6        MR. COWAN:  Let me rephrase it.  I'm not sure

7    what was objectionable.

8    BY MR. COWAN:

9        Q.  Are you aware that Healthy Advice's lawyers

10   got involved early in 2011 and there was some letter

11   writing between counsel for Context and Healthy

12   Advice relative to Context switching out Healthy

13   Advice equipment?

14       MR. O'BRIEN:  You can answer.

15   BY THE WITNESS:

16       A.  Yes.

17       Q.  And were you aware that Healthy Advice had

18   through counsel communicated to Context through

19   counsel that no one other than Healthy Advice was

20   permitted or authorized to touch or handle its

21   equipment?

22       A.  Yes.

23       Q.  So going back to -- and after that time

24   Context continued its practice of removing Healthy

James Demas    March 13, 2014

1    Advice equipment and returning it to Healthy Advice?

2        A.  Yes.

3        Q.  Or at least trying to return it to Healthy

4    Advice?

5        A.  Yes.

6        Q.  And so this situation that's being

7    referenced by Mr. Patterson was a situation where

8    Context removed some Healthy Advice equipment and

9    the equipment was shipped back, the TV was damaged,

10   at least according to the information provided to

11   Context, and some equipment was missing, and

12   Context's response was to have the practice call

13   Healthy Advice and tell them it was essentially

14   their problem, they needed to file a claim with

15   FedEx?

16       A.  That was Chad Patterson's recommendation,

17   not Context's response.

18       Q.  How was this resolved, this issue resolved?

19       A.  I don't recall the specifics of this issue.

20                      (Plaintiff's Exhibit 151 was

21                      marked as requested.)

22   BY MR. COWAN:

23       Q.  Take a minute and look at 151, Exhibit 151.

24   It's an e-mail from Mr. Coppola to you dated

James Demas    March 13, 2014

```
1    October 18, 2011.
2                    (Witness viewing document.)
3    BY MR. COWAN:
4        Q.  Do you have any recollection of this
5    particular issue?
6        A.  I don't.
7        Q.  Do you recall around this time, October of
8    2011, that J3 was asking some questions of Context
9    about Context switch-outs of HAN equipment?
10       A.  I do.
11       Q.  Tell me what you recall about that.
12       A.  I recall Mr. Shah sharing some information
13   with us, and I believe it was initiated because J3
14   had heard from somebody at Healthy Advice that
15   Contextmedia was taking down equipment and
16   essentially doing things that they weren't supposed
17   to be doing.
18       Q.  Was anybody at Context, to your knowledge,
19   concerned about the questions being posed by J3?
20       A.  Concerned in what way?
21       Q.  Just worried that this was an issue that
22   was being raised by an important agency.
23       A.  Certainly.  We wanted to address it, and we
24   did.
```

James Demas    March 13, 2014

1        Q.   In this e-mail what I wanted to kind of
2    question you about is -- it kind of starts on the
3    first page.  You're asking I think Matt Coppola "Why
4    do notes for 6112 mention HAN equipment?"  And he
5    says "Jim, this was a HAN switch-out.  The tech
6    wasn't able to fit everything in the boxes to be
7    sent back to CM.  So he took the Delta with him and
8    then Matt sent him a label.  We wanted
9    everything" -- he capitalized "everything" -- "to
10   come back here first so we could guarantee what is
11   what.  Matt says it should arrive back here
12   tomorrow."
13          You write back "Travis, what is a Delta?
14   Are you saying that we are bringing HAN equipment to
15   our office?"
16          This is his response.  "Jim, because we
17   have extra equipment that is ours plus HA
18   equipment" -- Healthy Advice equipment -- "I want to
19   insure that we receive our equipment and it's not
20   sent to HA.  I have everything picked up today to be
21   delivered here and will repackage the HA equipment
22   and send to Ohio."
23          Were you aware that Healthy Advice
24   equipment as late as October of 2011 was being sent

James Demas    March 13, 2014

1   to Context?

2       A.  The direction that -- so the answer is no,

3   aside from this e-mail.

4       Q.  Got it.

5           And so did you understand this to be sort

6   of an isolated instance, or was there a practice at

7   the time of actually having HAN equipment returned

8   to Context and then packaged up and sent to HAN?

9       A.  No, quite the contrary.  I didn't want any

10  HAN equipment coming back to Contextmedia.  The

11  equipment was to be boxed up and sent directly to

12  HAN to avoid, one, too many people handling the

13  equipment, and then, two, the optics of us touching

14  HAN equipment and bringing them on to our site.  We

15  just didn't want to do that.

16      Q.  But after you received this e-mail here,

17  did you come to learn -- what I'm trying to figure

18  out is is what's being described here a single sort

19  of isolated instance, or did you come to learn there

20  was more of a widespread practice of the equipment

21  coming back?

22      A.  No.  This would be isolated.  This would be

23  an isolated incident.

24      Q.  In terms of your involvement in these

James Demas    March 13, 2014

1   issues dealing with HAN equipment issues, for lack
2   of a better term, why was it that you were involved
3   in those discussions and issues as the CFO?
4        A.   Most of the time during this period the
5   logistics department reported directly to me, and
6   for some period of time so did the network
7   operations department.
8        Q.   Okay.
9             Did you have -- during this time did you
10  have what you considered to be some operational
11  duties and responsibilities?
12       A.   Yes.
13       Q.   Anything in addition to aspects dealing
14  with logistics in terms of operational duties and
15  responsibilities?
16       A.   Member services at one point reported in to
17  me.
18       Q.   At what period of time did member services
19  report in to you?
20       A.   Between 2010 up until early 2012.  Forgive
21  me if my back-end dates might be a little bit off,
22  though.
23                      (Plaintiff's Exhibit 152 was
24                       marked as requested.)

James Demas    March 13, 2014

1    BY MR. COWAN:

2        Q.  Exhibit 152 is a series of e-mails that I

3    put together that I have put in chronological order

4    that appear to me to be relating to -- well, that's

5    not right.  Why don't we just go through each one at

6    a time.

7            The first e-mail is an e-mail from you to

8    Mr. Coppola October 17, 2011.  Just take a minute

9    and look at that.  I think all I'm going to ask you

10   about on this is is the request that you're making

11   of Mr. Coppola related to the J3 inquiry?

12       A.  It is.

13       Q.  And the second page is your e-mail to

14   Ms. Velazquez and Mr. Coppola, the subject is "HAN

15   info," dated October 18, 2011.  Same question.  Is

16   this e-mail related to the J3 inquiry?

17       A.  Yes.

18       Q.  And then the next one is an e-mail from you

19   to Mr. Kemp October 18, 2011.  It just says "Did we

20   go to 6110 just to box HAN equipment?"  Do you have

21   any recollection of what that's about?  I don't want

22   you to necessarily tie it to anything else here.

23       A.  I don't.

24       Q.  And then the last page is an e-mail from

James Demas   March 13, 2014

1   Ms. Velazquez to you.  The subject is "Elaina," but

2   take a minute and review it to yourself.  I'm just

3   trying to figure out what the issue was here, if

4   this relates to the J3 inquiry or something

5   different.

6                    (Witness viewing document.)

7   BY THE WITNESS:

8       A.  It appears that we're trying to track down

9   a form.

10      MR. COWAN:  Can we take a couple minutes.  I

11  don't have a considerable amount more, maybe half an

12  hour or less.  I'd like to talk to Greg because I

13  actually may be able to eliminate some stuff.

14      MR. O'BRIEN:  Okay.  Great.

15                    (A short break was had.)

16                    (Plaintiff's Exhibit 153 was

17                     marked as requested.)

18  BY MR. COWAN:

19      Q.  153 appears to be an e-mail from you to

20  everyone dated October 23, 2012 with a copy of the

21  Context noncompetition agreement?

22      A.  Yes.

23      Q.  Is this, to the best of your knowledge, the

24  agreement that Context has its employees sign?

James Demas   March 13, 2014

1      A.  This appears to be the most up to date.

2      Q.  My only question is on -- it doesn't have

3  page numbers on it, but on 44578, so the second page

4  of the noncompete agreement, there's a provision

5  that defines proprietary information; do you see

6  that?

7      A.  F, yes.

8      Q.  F, yeah.  Is that -- the information that's

9  listed there, is that the information or at least

10  the type of information that Context considers to be

11  proprietary to Context?

12      A.  Yes.  Yes.

13                    (Plaintiff's Exhibit 154 was

14                     marked as requested.)

15  BY MR. COWAN:

16  ███████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████████

███████████████

██████████████

████████████████████████████████

██████████████

████████████████████████████████████

███████████████████

James Demas    March 13, 2014



James Demas    March 13, 2014



James Demas    March 13, 2014



James Demas    March 13, 2014



James Demas   March 13, 2014



15       (Whereupon, at 11:17 a.m., the
16        signature of the witness having
17        been reserved, the witness being
18        present and consenting thereto,
19        the taking of the instant
20        deposition ceased.)
21
22
23
24

James Demas    March 13, 2014

```
 1   STATE OF ILLINOIS      )
                            )     SS:
 2   COUNTY OF C O O K      )

 3

 4         The within and foregoing deposition of the

 5   aforementioned witness was taken before Tina M.

 6   Alfaro, C.S.R. and Notary Public, at the place,

 7   date, and time aforementioned.

 8         There were present during the taking of the

 9   deposition the previously named counsel.

10         The said witness was first duly sworn and

11   was then examined upon oral interrogatories; the

12   questions and answers were taken down in shorthand

13   by the undersigned, acting as stenographer and

14   Notary Public; and the within and foregoing is a

15   true, accurate, and complete record of all the

16   questions asked of and answers made by the

17   aforementioned witness at the time and place

18   hereinabove referred to.

19         The signature of the witness was not

20   waived, and the deposition was submitted, pursuant

21   to Rules 30(e) and 32(d) of the Rules of Civil

22   Procedure for the United States District Court, to

23   the deponent per copy of the attached letter.

24
```

James Demas    March 13, 2014

1          The undersigned is not interested in the

2     within case, nor of kin our counsel to any of the

3     parties.

4          Witness my official signature and seal as

5     Notary Public, in and for Cook County, Illinois on

6     this _____ day of _____, A.D., 2014.

7

8

9

10                    _____
                      Tina M. Alfaro, CSR, CRR, CLR
                      C.S.R. No. 084-004220
11                    311 South Wacker Drive
                      Suite 300
12                    Chicago, Illinois 60606
                      (312) 386-2000
13

14

15

16

17

18

19

20

21

22

23

24

James Demas    March 13, 2014

```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF ILLINOIS
 2                    WESTERN DIVISION

 3
    HEALTHY ADVICE NETWORKS, LLC.  )
 4                                 )
                    Plaintiff,     )
 5                                 )
            vs.                    )Case No.
 6                                 )1:12-cv-00610
    CONTEXTMEDIA, INC.,            )
 7                                 )
                    Defendant.     )
 8

 9         I, JAMES DEMAS, being first duly sworn, on

10    oath say that I am the deponent in the aforesaid

11    deposition taken on February 13, 2014; that I have

12    read the foregoing transcript of my deposition

13    consisting of pages 1 through 73 inclusive, and

14    affix my signature to same.

15

16                            JAMES DEMAS

17

18    SUBSCRIBED AND SWORN TO

19    before me this _____ day

20    of _____, 2014.

21

22    _____

23    NOTARY PUBLIC

24
```

James Demas    March 13, 2014

```
 1

 2

 3
                                        March 17, 2014
 4
    Sidley Austin, LLP
 5  Richard O'brien, Esq.
    One South Dearborn Street
 6  Chicago, Illinois 60603

 7  Re:      HEALTHY ADVICE v. CONTEXTMEDIA
                 1:12-cv-00610
 8  Dep: JAMES DEMAS

 9  Dear Mr. O'brien:

10  Enclosed is your copy of the deposition transcript
    along with the original signature page and errata
11  sheet.

12  Pursuant to the rules of court in this matter,
    please have the deponent read the transcript and
13  sign the signature page before a notary public.

14  If any corrections/changes are to be made, please
    TYPE or PRINT them on the attached errata sheet,
15  giving the page and line number, desired
    correction/change, and reason.
16
    Please arrange for accomplishment of same and
17  transmittal of the signature page and errata sheet
    back to our office within 30 days from the date of
18  this letter.

19  Upon failure to comply, we shall forward an
    appropriate affidavit of noncompliance to all
20  counsel of record.

21                       Sincerely Yours,

22
                      _____
23                    Merrill Legal Solutions

24  cc:   Grant Cowan           (TMA - 1401-219296)
```

```
 1                      ERRATA SHEET

 2    CASE NAME:    HEALTHY ADVICE v. CONTEXTMEDIA

 3    CASE NUMBER:  1:12-cv-00610

 4    WITNESS:      JAMES DEMAS

 5    PAGE LINE

 6    _____    _____ CHANGE:_____

 7    _____    _____ REASON:_____

 8    _____    _____ CHANGE:_____

 9    _____    _____ REASON:_____

10    _____    _____ CHANGE:_____

11    _____    _____ REASON:_____

12    _____    _____ CHANGE:_____

13    _____    _____ REASON:_____

14    _____    _____ CHANGE:_____

15    _____    _____ REASON:_____

16    _____    _____ CHANGE:_____

17    _____    _____ REASON:_____

18    _____    _____ CHANGE:_____

19    _____    _____ REASON:_____

20    _____    _____ CHANGE:_____

21    _____    _____ REASON:_____

22
      Signed: _____ Date: _____
23

24    REPORTER:  Tina M. Alfaro
```