Case: 1:12-cv-00610-SJD Doc #: 80 Filed: 08/14/14 Page: 1 of 165  PAGEID #: 4497

LISA GRIPPO                                    March 26, 2014
HEALTHY ADVICE NETWORKS vs. CONTEXTMEDIA

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION
-------------------------------------X

HEALTHY ADVICE NETWORKS, LLC,

          Plaintiff,

     vs.                Case No.
                        1:12CV610

CONTEXTMEDIA, INC.,

          Defendant.

-------------------------------------X



     VIDEOTAPED DEPOSITION OF LISA GRIPPO

          New York, New York

       Wednesday, March 26, 2014








Reported by:
JOAN WARNOCK
JOB NO. 10453

LISA GRIPPO                                    March 26, 2014
HEALTHY ADVICE NETWORKS vs. CONTEXTMEDIA

Page 2

3                  March 26, 2014

4                  1:45 p.m.


6         Videotaped deposition of LISA

7    GRIPPO held at the offices of Sidley

8    Austin LLP, 787 Seventh Avenue,

9    New York, New York, before Joan Warnock,

10   a Notary Public of the State of

11   New York.

LISA GRIPPO                                           March 26, 2014
HEALTHY ADVICE NETWORKS vs. CONTEXTMEDIA

                                                            Page 3

1

2      A P P E A R A N C E S:

3

4          FROST BROWN TODD, LLC

5          Attorneys for Plaintiff

6                  3300 Great American Tower

7                  301 East Fourth Street

8                  Suite 3300

9                  Cincinnati, Ohio  45202

10         BY:   GRANT S. COWAN, ESQ.

11

12         SIDLEY AUSTIN, LLP

13         Attorneys for Defendant

14                 One South Dearborn Street

15                 Chicago, Illinois  60603

16         BY:   RICHARD J. O'BRIEN, ESQ.

17

18

19

20    ALSO PRESENT:

21         KRISTIN ZARNETSKE, VIDEOGRAPHER

22

23

24

25

LISA GRIPPO                                                  March 26, 2014
HEALTHY ADVICE NETWORKS vs. CONTEXTMEDIA

Page 4

1              L. Grippo

2              VIDEOGRAPHER:  This is tape number

3      one of the videotaped deposition of

4      Lisa M. Grippo, taken by defendant in

5      the matter of Healthy Advice Networks,

6      LLC, Plaintiff, versus ContextMedia,

7      Inc., in the United States District

8      Court, Southern District of Ohio,

9      Western Division, Case Number 1:12CV610.

10             This deposition is being held on

11     March 26, 2014, at approximately

12     1:44 p.m.  My name is Kristin Zarnetske.

13     I'm the legal videographer representing

14     Esquire Deposition Solutions.  The court

15     reporter, also in association with

16     Esquire, is Joan Warnock.  This

17     deposition is being held at the law firm

18     of Sidley Austin at 787 Seventh Avenue,

19     New York, New York.

20             Will counsel present please

21     introduce themselves for the record.

22             MR. COWAN:  Grant Cowan

23     representing the plaintiff and the

24     witness.

25             MR. O'BRIEN:  Dick O'Brien

LISA GRIPPO                                      March 26, 2014
HEALTHY ADVICE NETWORKS vs. CONTEXTMEDIA

Page 5

1            L. Grippo

2       representing the defendant.

3            VIDEOGRAPHER:  Thank you.  Will the

4       court reporter please swear in the

5       witness.

6  L I S A   G R I P P O, called as a witness,

7       having been duly sworn by a Notary

8       Public, was examined and testified

9       as follows:

10           COURT REPORTER:  Please state your

11      name and address for the record.

12           THE WITNESS:  Lisa Grippo,

13      12 Lincoln Avenue, Commack, New York

14      11725.

15  EXAMINATION BY

16  MR. O'BRIEN:

17      Q.   Good afternoon, Ms. Grippo.  We

18  just met.  I'm Dick O'Brien.  And, as you

19  know, I represent the defendant in a lawsuit

20  brought against it by your employer, Healthy

21  Advice Networks.  I'll sometimes refer to

22  Healthy Advice Networks as "HAN," if that's

23  okay with you.

24      A.   Okay.

25      Q.   And may slip into referring to it

LISA GRIPPO                                    March 26, 2014
HEALTHY ADVICE NETWORKS vs. CONTEXTMEDIA

Page 6

1            L. Grippo

2    as "PatientPoint," if that's also okay with

3    you.

4        A.    Absolutely.

5        Q.    I'll be asking you a series of

6    questions today.  If at any point in time you

7    don't understand any one of my questions,

8    please let me know that.  Okay?

9        A.    Okay.

10       Q.    If you go ahead and answer my

11   question, we're all going to leave the room

12   today with the assumption that you've

13   understood the question.  Is that fair?

14       A.    Yes.

15       Q.    What's your current position with

16   HAN?

17       A.    I am no longer employed by HAN.  I

18   am working with a different company now.

19       Q.    When did you cease employment with

20   HAN?

21       A.    In September.

22       Q.    And who are you working with now?

23       A.    Last year.  I am working with Teq,

24   Tequipment.  They're based in Huntington,

25   Long Island.

LISA GRIPPO                                    March 26, 2014
HEALTHY ADVICE NETWORKS vs. CONTEXTMEDIA

Page 7

1                    L. Grippo

2        Q.    What's the name of the company?

3        A.    It's Teq, T-e-q.

4        Q.    And I guess I've lost track of who

5    is a current employee and who's a former

6    employee.  What do you do for Tequipment?

7        A.    A sales role.

8        Q.    Same general field as HAN or a

9    completely different field?

10       A.    No.  We actually sell smartboards

11   and equipment to K through 12.  So

12   educational tools.

13       Q.    So a completely different field?

14       A.    Yeah.

15       Q.    Why did you leave HAN?

16       A.    I left in September of last year.

17   I had taken a few different roles within my

18   last year and a half with the company, was

19   traveling quite a bit, and there was a lot of

20   reorganization going on.  I had made

21   management aware of the fact that I wasn't

22   very happy with a lot of the changes in my

23   position.  I really didn't want to be

24   traveling anymore.  So I had been there for

25   nine years, and we decided to part ways.

Page 8

1            L. Grippo

2   They gave me a severance, and I left in

3   September.

4       Q.    Are you still receiving payments

5   under the severance?

6       A.    I'm not.

7       Q.    Was that a lump sum?

8       A.    Yes.

9       Q.    Do you have any agreement in place

10  with HAN right now regarding this litigation?

11      A.    Not that I'm aware of.

12      Q.    For example, your severance

13  agreement doesn't say that you'll provide

14  testimony when asked or things like that?

15      A.    I did not check my severance

16  agreement.  It may.  But it was not under --

17  I was not told by the company that I had to

18  appear here today if that was the question.

19      Q.    I've listened to testimony from

20  other witnesses, principally Tom Campbell,

21  about management at some point in time in

22  2013 basically deciding to -- I don't mean

23  this in a pejorative sense -- purge senior

24  management and bring in a new team.  Is that

25  your memory of what happened?

Page 9

1                L. Grippo

2        A.    Well, I left -- there was a lot of

3    changes in management over the past several

4    years when new management came in really in

5    2012, I think.  So it was a period of time

6    that there had been lots of different changes

7    going on in the organization.

8        Q.    Lisa Brewer left?

9        A.    Jill Brewer.

10       Q.    Jill Brewer.  You're Lisa.  Jill

11   Brewer left.  Debra Schnell left; right?

12       A.    Debbie retired.  She had been

13   planning on retiring, yes.

14       Q.    Mr. Campbell ultimately left?

15       A.    (Indicating).

16       Q.    You have to answer out loud.

17       A.    Oh.  Sorry.  Yes.

18       Q.    And Ms. Shattles?

19       A.    Sabrina.

20       Q.    Right.  She left; right?

21       A.    Yes.

22       Q.    And a new COO and new CFO came in;

23   right?

24       A.    Correct.

25       Q.    Who did you report to when you

LISA GRIPPO                                          March 26, 2014
HEALTHY ADVICE NETWORKS vs. CONTEXTMEDIA

Page 10

```
 1              L. Grippo

 2    left?

 3         A.    Chris Martini.

 4         Q.    He was the president; right?

 5         A.    I believe so.

 6         Q.    And at the time you left HAN, what

 7    was your last position?

 8         A.    What was my actual title.  I was

 9    essentially vice president of sales.  We had

10    a few different titles going on, but I was

11    the area vice president for this region.

12         Q.    This region being which states?

13         A.    It kept changing.  It kept

14    changing.  But I was covering essentially

15    from Maine to Virginia.

16         Q.    And when you say sales, that's

17    sales efforts with respect to recruiting

18    practices for HAN; right?

19         A.    Correct.

20         Q.    How many regions did HAN have when

21    you left in addition to yours?

22         A.    For about the year prior to me

23    leaving, they were going through several

24    iterations of what the sales force was going

25    to look like for the company.  We previously
```

LISA GRIPPO                                    March 26, 2014
HEALTHY ADVICE NETWORKS vs. CONTEXTMEDIA

Page 11

```
 1              L. Grippo
 2     had three separate sales entities.  And we
 3     were trying to combine those and figure out
 4     what the right mix is.  Geography was part of
 5     that as well, trying to figure out where we
 6     had resources, where we wanted to have
 7     resources, what made the most sense for the
 8     company.  I believe when I left there were
 9     four regions, but I don't recall exactly.
10          Q.   Is it your understanding these
11     changes in management were due to the equity
12     investor not being happy with the financial
13     performance of the company?
14          A.   I'm not exactly certain.
15          Q.   Have you been deposed before today?
16          A.   I have not.
17          Q.   When you left HAN, describe for us
18     what your general sort of day to day
19     responsibilities were?
20          A.   I had a team of sales reps that
21     were out talking to physicians, physician
22     groups, hospitals regarding all of our
23     services.  So we had, as you know, acquired
24     PatientPoint, which is the coordinated care
25     division.  And we had our hospital division,
```

LISA GRIPPO                                    March 26, 2014
HEALTHY ADVICE NETWORKS vs. CONTEXTMEDIA

Page 12

1              L. Grippo
2    which was selling hospital guides to and
3    other services to hospitals.  And then we had
4    our educational programs.  And those are
5    geared more towards physician offices.  And
6    so my team was actually out selling all of
7    those solutions in my geographic area.
8         Q.   Including trying to recruit
9    physicians for the PCN network?
10        A.   Correct.
11        Q.   And the ACN network; correct?
12        A.   Correct.
13        Q.   I take it your titles changed over
14   time while you were at HAN for nine years;
15   right?
16        A.   Yes.
17        Q.   At all times when you were there,
18   though, were your responsibilities in one
19   way, shape, or form focused on trying to
20   recruit physician practices?
21        A.   Yes.
22        Q.   So in that sense your job never
23   really changed?
24        A.   Correct.  That was -- well, that
25   was always part of my responsibility.  I

LISA GRIPPO                                    March 26, 2014
HEALTHY ADVICE NETWORKS vs. CONTEXTMEDIA

Page 13

1              L. Grippo

2     wasn't always responsible for the educational

3     programs.  For a period of time I was focused

4     solely on the technology solution that we had

5     acquired.  But that was a very short period

6     of time, for about a year out of the nine

7     that I was there.

8          Q.   And I'm really going to be focused

9     today on the PCN and can networks, if that's

10    okay with you.

11         A.   Yes.

12         Q.   And when you said you had a team

13    that worked for you, did this team make phone

14    calls into practices?  Did they show up in

15    person to practices or a mixture of those two

16    things?

17         A.   Mixture.

18         Q.   Were those communications with

19    practices both for the purpose of trying to

20    recruit new practices but also to maintain

21    relationships with existing practices?

22         A.   Yes.

23         Q.   What did you do, if anything, to

24    prepare for your deposition today?

25         A.   I had a conversation earlier today

Page 14

1           L. Grippo

2    with Grant.

3        Q.   And he's your lawyer here today;

4    right?

5        A.   Yes.

6        Q.   Do you agree with me in your

7    business conduct that it's important to be

8    truthful in your communications?

9        A.   Absolutely.

10        Q.   And to be accurate?

11        A.   Absolutely.

12        Q.   And not be misleading?

13        A.   Yes.

14        Q.   And that would be true whether it

15    was a conversation or an email or

16    presentation or any sort of communication?

17        A.   Yes.

18        Q.   And you endeavored to do that while

19    you were at HAN?

20        A.   Yes.

21        Q.   And you feel like you did a good

22    job at it?

23        A.   Yes.

24        Q.   And if someone working for you, to

25    your knowledge, was not being truthful or

LISA GRIPPO                                            March 26, 2014
HEALTHY ADVICE NETWORKS vs. CONTEXTMEDIA

Page 15

1              L. Grippo

2     accurate in their communications, I take it

3     you'd have something to say about it?

4          A.   Yes.

5          Q.   Have you ever spoken to anyone at

6     ContextMedia before?

7          A.   I believe that we -- I don't think

8     we actually spoke.  I ran into some of them

9     at conference, at a NORM conference a couple

10    of -- well, many years back now, so.

11         Q.   You don't look old enough for it to

12    be many years.

13         A.   Oh, thank you.

14         Q.   And that was just sort of

15    informal --

16              MR. COWAN:  He's still the bad guy.

17    Don't let him fool you.

18         Q.   That was very informal

19    communication, I take it?

20         A.   Yes.

21         Q.   To your knowledge, ContextMedia

22    didn't do anything untoward or behave

23    improperly in that conference setting?

24         A.   To my knowledge, there was -- there

25    was definitely an air about them, an

LISA GRIPPO                                    March 26, 2014
HEALTHY ADVICE NETWORKS vs. CONTEXTMEDIA

Page 16

1                    L. Grippo

2     arrogance about some of the sales reps.  And

3     it was interesting, it was the first time I

4     had ever encountered anything like that to

5     the point where it was noticeable to others

6     around me, and they were kind of wondering.

7     And I had to say, you know, they are a

8     competitor, we have a competing product, and

9     that's fine, so -- but did they say anything

10    directly to me, no.  It was more -- I guess

11    just that, just sort of an arrogance and

12    behavior that --

13          Q.    Young?

14          A.    -- I interpreted -- yeah, they were

15    --

16          Q.    Young?

17          A.    Young.

18          Q.    Energetic?

19          A.    Sure.

20          Q.    Enthusiastic?

21          A.    Yes.

22          Q.    Good qualities for a salesperson?

23          A.    Yes.

24          Q.    What's your understanding of why

25    we're here today, that is, why we have a

LISA GRIPPO                                    March 26, 2014
HEALTHY ADVICE NETWORKS vs. CONTEXTMEDIA

Page 17

1          L. Grippo

2    lawsuit?

3          A.   My understanding, and, actually,

4    the reason -- and I had shared with Grant, I

5    am no longer employed by PatientPoint.  I'm

6    under no obligation to come in today.  As a

7    manager within the company, I was aware of a

8    lot of what was going on with ContextMedia

9    and as we were losing physicians and

10   practices to them.  And I just really felt

11   that the way that they behaved was very

12   unethical.

13          And so when I was asked to come in,

14   of course, I didn't realize it was going to

15   be such a significant amount of my time, I

16   thought, you know, it was something that I

17   wanted to do, because it really was something

18   that was very troublesome to me at the time.

19   I just -- I'm sure things like this go on all

20   the time in business.  I just had -- it was

21   the first time I had been exposed to anything

22   to this extent.

23          Q.   Were you involved in the decision

24   made by HAN to sue ContextMedia?

25          A.   I was not.

LISA GRIPPO                                    March 26, 2014
HEALTHY ADVICE NETWORKS vs. CONTEXTMEDIA

Page 18

1              L. Grippo

2      Q.    But you were at the company when

3   the suit was brought; right?

4      A.    I was.

5      Q.    And you said a moment ago that it's

6   your belief that ContextMedia did things that

7   were unethical; is that right?

8      A.    Correct.

9      Q.    And can you tell us what things

10  you're referring to when you say that?

11     A.    I was informed by practices that

12  they were calling them and essentially

13  speaking ill of our product, misrepresenting

14  our program, misrepresenting the company.

15  They were in a couple of instances that I'm

16  aware of, they actually walked into the

17  practice -- and if you're going to ask me to

18  recall exactly which practice, I'm not going

19  to -- but told them that they were there,

20  they were upgrading their equipment.  And

21  they subsequently took down our equipment and

22  put theirs up in our place in -- yeah, in our

23  place.  So there was, you know, a variety of

24  communications over the years regarding this.

25  And we really had significant churn in our

LISA GRIPPO                                     March 26, 2014
HEALTHY ADVICE NETWORKS vs. CONTEXTMEDIA

Page 19

```
 1              L. Grippo
 2    physician practices.
 3         Q.   Anything else other than the list
 4    you've given me that leads you to testify
 5    that ContextMedia behaved unethically?
 6         A.   Nothing that's coming to mind right
 7    now.
 8         Q.   And one of the rules of this
 9    deposition is that you can jump in at any
10    point in time, an hour from now, an hour and
11    a half from now, thirty minutes from now, and
12    change, revise, or supplement an answer, no
13    questions asked.  You don't have to wait for
14    me to ask you a follow-up question.  You can
15    just jump in and do that.  Okay?
16         A.   Okay.
17         Q.   So something comes to mind, just
18    feel free to share it with us.
19         A.   Okay.
20         Q.   Now, you say that you were informed
21    by practices that ContextMedia was speaking
22    ill of HAN; right?
23         A.   Correct.
24         Q.   And you say that HAN was
25    misrepresenting the program; right?
```

LISA GRIPPO                                      March 26, 2014
HEALTHY ADVICE NETWORKS vs. CONTEXTMEDIA

Page 20

 1              L. Grippo

 2      A.    They were misrepresenting our

 3   program.

 4      Q.    Right.   And they were

 5   misrepresenting your company; right?

 6      A.    Correct.

 7      Q.    Those two misrepresentations,

 8   misrepresentation of the program and

 9   misrepresentation of the company, are those,

10   again, things that you know about only

11   because practices told you?

12      A.    Correct.

13      Q.    You're aware that, are you not, HAN

14   has throughout the time you were there

15   maintained a rather robust CMS database?

16      A.    Yes.

17      Q.    And one of the purposes of many of

18   that database is to capture all important

19   information that HAN learns about a practice;

20   right?

21      A.    Um-hmm.

22      Q.    You have to answer out loud.

23      A.    Oh, I'm so sorry.   Yes.

24      Q.    In fact, you know Ms. Finley;

25   right?

LISA GRIPPO                                   March 26, 2014
HEALTHY ADVICE NETWORKS vs. CONTEXTMEDIA

Page 21

1              L. Grippo

2         A.   Yes.

3         Q.   Ms. Finley has a whole team whose

4    responsibilities, among other things, include

5    getting with practices on a regular basis,

6    and particularly when they've been told

7    they're thinking about switching, to

8    understand why the practice is thinking about

9    switching; right?

10        A.   Yes.

11        Q.   And those folks are all trained to

12   dutifully put that information into the

13   database so that you can all see it; right?

14        A.   Correct.

15        Q.   Your team, do they receive similar

16   training when they're either making their

17   phone calls or out there on their visits, if

18   they learn something of significance to the

19   business about a practice, they're supposed

20   to put it in the CMS database?

21        A.   That should.  With salespeople it's

22   often hard to get them to actually log in and

23   put the data into CMS.  We would try, and

24   that was certainly a hope, but not everything

25   made it into -- I'm quite certain not

LISA GRIPPO                                     March 26, 2014
HEALTHY ADVICE NETWORKS vs. CONTEXTMEDIA

Page 22

1            L. Grippo

2   everything made it into CMS.

3        Q.   But they were trained to do that;

4   right?

5        A.   Trained to do that themselves or to

6   contact their, you know, inside person.

7        Q.   If it was really a problem that

8   ContextMedia was speaking ill to practices of

9   HAN, you would expect to find references to

10  that in the database; right?

11       A.   Potentially.  You know, CMS is not

12  extremely user friendly.  So in terms of it

13  being a great tool for the team, it really

14  wasn't.  So while we would have liked for

15  them to capture more data there, the reality

16  is that they didn't.  I believe that we

17  started trying to document more of this as a

18  result of what we were encountering.  We

19  really had never encountered, you know,

20  something to this extent with regard to a

21  competitor.  I mean there's obviously other

22  competitors, Accent Health or whatever, but

23  -- so over the years that I was there, we

24  started and I couldn't tell you exactly when

25  we began asking our team to really document,

LISA GRIPPO                                        March 26, 2014
HEALTHY ADVICE NETWORKS vs. CONTEXTMEDIA

Page 23

1             L. Grippo

2    or if we're losing a practice, please, you

3    know, understand why, make sure it's

4    documented who we're, you know, losing them

5    to, and document who the competitor is and

6    make sure that everything with regards to a

7    save is documented in CMS.  I know that that

8    ended up being a request that was made of

9    particularly Amy's team.  I can't tell you

10   when that went into place, though.

11        Q.   Can you tell me what year?

12        A.   I'm sorry.  I don't recall.

13        Q.   Can you identify for me a single

14   practice that told you the ContextMedia was

15   speaking ill of HAN?

16        A.   Off the top of my head, I cannot.

17        Q.   Can you think of a single practice

18   that told you ContextMedia was

19   misrepresenting the HAN program?

20        A.   Told me, no.  Me specifically, no.

21        Q.   Can you think of a single practice

22   that told you that ContextMedia was

23   misrepresenting HAN as a company?

24        A.   Again, directly to me, no, I

25   cannot.  I don't recall.

Page 24

1          L. Grippo

2      Q.   Well, for all these questions let

3  me go back.  Can you identify a practice as

4  to which any of your team told you these

5  things had been said?

6      A.   Yes.

7      Q.   What practice?

8      A.   There were a couple of them in

9  Queens in Diane's territory.

10      Q.   Can you name the practice other

11  than give me one of the boroughs?

12      A.   I mean nine years.  I think Forest

13  Hills potentially.  We had some in upstate.

14  We had some in -- I mean I -- well, you know

15  what, now that I'm thinking, there was a

16  large practice on Long Island that I met

17  with, one of the ones that we did end up

18  losing, which was very sad to hear, that we

19  had a very good relationship with.  And I

20  went and I was speaking with one of the

21  office managers.  And she was like, this

22  company is just badgering us, they're just

23  calling us all the time.  So yes, there was a

24  company I could think of, or a practice, and

25  I will -- I can get you the name.  It's not

LISA GRIPPO

March 26, 2014

HEALTHY ADVICE NETWORKS vs. CONTEXTMEDIA

Page 25

1              L. Grippo

2    coming to me right now.  It's Long Island

3    Rheumatology Associates perhaps.  And, you

4    know, I apologized for that.

5              It was getting very hard for any of

6    us.  There was basically three companies

7    targeting rheumatologists.  We had the

8    Rheumatoid Health Network.  There was Health

9    Monitor.  And there was Healthy Advice.  And

10   my reps were having a really hard time

11   getting in to talk to anyone to make sure

12   that the relationship was strong and that we

13   were doing what we needed to do, simply

14   because they were being inundated by calls

15   trying to get them to switch.  And, you know,

16   I think it was getting a little ugly from the

17   practice's perspective in terms of, you know,

18   the number of people that were reaching out

19   and what was going on.

20        Q.   Healthy Monitor and RHN were

21   relative newcomers relative to HAN to

22   rheumatology?

23        A.   To the rheumatology space, yes.

24        Q.   And so where HAN had enjoyed sort

25   of a monopoly for years, now it was facing

LISA GRIPPO                                    March 26, 2014
HEALTHY ADVICE NETWORKS vs. CONTEXTMEDIA

Page 26

1              L. Grippo

2    intense competition; right?

3         A.   Yes.

4         Q.   And the one practice that you were

5    able to identify for me in response to my

6    questions about unethical things you say were

7    told to you by practices about the behavior

8    of ContextMedia, what you told me was that

9    the practice told you that ContextMedia was

10   badgering it; right?

11             MR. COWAN:  Object to the form.  Go

12       ahead.

13        A.   I believe that's what I said, that

14   they were calling, they were relentless in

15   their calling.  I heard that from several

16   practices.  I'm not going to be able to give

17   you exact practice names.

18        Q.   And I don't want it, because

19   badgering is not unethical, is it?

20        A.   It is not.  That's not unethical.

21   It was once they reached this woman and what

22   they were saying with regard to -- that our

23   content wasn't updated, that it was a Power

24   Point presentation and nothing more, that,

25   you know, we were stuck in the 80's and -- I

LISA GRIPPO                                    March 26, 2014
HEALTHY ADVICE NETWORKS vs. CONTEXTMEDIA

Page 27

1            L. Grippo

2    don't even remember all of the things that,

3    you know, were said.  I just don't think that

4    it's right to be so disparaging, you know, to

5    a competitor.  I know that it happens.  Maybe

6    that's their sales tactic, but.

7         Q.   And the answer you just gave me,

8    you don't think that's in the CMS database?

9         A.   I'm sorry.  Which answer?

10         Q.   Well, you just seemed to give me an

11    answer explaining in some detail things that

12    a practice had told you that ContextMedia

13    did.  Did I understand your answer correctly?

14         A.   Yes.

15         Q.   Shouldn't that be in the database?

16         A.   Probably.

17         Q.   Let me come at it this way.  As you

18    sit here today in 2014, can you think of any

19    resource at all within HAN that is a better

20    source of information about why practices

21    switched from HAN to ContextMedia than the

22    CMS database?

23         A.   That should be the repository of

24    truth, but the reality is not all data got in

25    -- would get into CMS.  So I would say that

LISA GRIPPO                                      March 26, 2014
HEALTHY ADVICE NETWORKS vs. CONTEXTMEDIA

Page 28

1              L. Grippo

2    the better resource would be the team of

3    customer service representatives.  They were

4    fielding the calls.  They were speaking to

5    the customers.  They had the best sense of

6    exactly what was going on.

7         Q.   In terms of unethical comments

8    which HAN believes were made by ContextMedia,

9    could you think of a better resource within

10   the company than the CMS database?

11        A.   Again, I'm not certain how much

12   data was actually entered into CMS.

13        Q.   I understand that part.  But can

14   you think of a better resource in 2014 for

15   understanding supposed unethical comments

16   that were made by ContextMedia about HAN than

17   that database?

18        A.   Again, the only thing that's coming

19   to mind is the employees, the ones that were

20   hearing this.  So should they have documented

21   all of this?  I'm sure everyone would have

22   been more thorough in doing that had we have

23   known where we would be today.  But I think

24   other than actually documenting it, it was

25   the people who were hearing it and having

LISA GRIPPO                                    March 26, 2014
HEALTHY ADVICE NETWORKS vs. CONTEXTMEDIA

Page 29

1           L. Grippo
2    those conversations.
3           Q.   So are you telling me that the
4    memories of the likes of Lisa Grippo are a
5    better resource for exactly what was said to
6    practices by ContextMedia than the CMS
7    database?
8           A.   Not if there's someone who would
9    like data to support that.
10          Q.   How about facts?
11          A.   Right.  I mean it's -- but even if
12   it was typed in, it's subjective, right.
13   Everything is subjective.  What I'm saying is
14   subjective.
15          Q.   I understand.
16          A.   I understand that --
17          MR. COWAN:  Wait a second.  Go
18       ahead.
19          Q.   Sorry.
20          A.   No.  I understand that this is all
21   subjective, right.  This is what we were
22   relaying what we were told by a practice.
23   And, you know, who knows if the practice was
24   even telling us everything that was said,
25   right?

LISA GRIPPO                                        March 26, 2014
HEALTHY ADVICE NETWORKS vs. CONTEXTMEDIA

Page 30

1              L. Grippo

2        Q.    I didn't mean to cut you off.  So

3   sorry.  Are you finished?

4        A.    That's fine.

5        Q.    But would you think that your

6   subjective impressions contemporaneous with

7   the time the comment was made would be more

8   reliable than your recollection in 2014?

9        A.    Are you asking should I have

10  documented my thoughts at that time?

11       Q.    No.  I'm asking which would you

12  find more reliable, impressions put in the

13  CMS database at the time the comments were

14  made or near the time the comments were made,

15  would that data or facts be more reliable,

16  however subjective they might be, than

17  someone's unaided memory years later?

18       A.    I would say if everyone documented

19  what they had heard back then, that would

20  absolutely be more accurate.  I don't believe

21  that occurred.  We did start mandating that

22  people put everything in there, but I will

23  tell you I'm quite certain not everything is

24  documented in CMS.

25       Q.    I'm not fighting you on that.

LISA GRIPPO                                    March 26, 2014
HEALTHY ADVICE NETWORKS vs. CONTEXTMEDIA

Page 31

1                    L. Grippo

2          A.   No, no, I know.  I don't --

3          Q.   You've told me the shortcomings, in

4    your opinion, of the database.

5          A.   Right.

6          Q.   I get that.  But here we are in

7    2014 in a lawsuit.  Which is the most

8    reliable source, however imperfect you might

9    feel it is, the CMS database or the memories

10   of the likes of Lisa Grippo in 2014?

11         A.   You would have to say the CMS

12   database.

13         Q.   Can you identify a single practice

14   that switched from HAN to ContextMedia

15   because of something ContextMedia did that

16   was wrong?

17         A.   I know that we had conversations

18   with practices, yes.  I mean, I'm sorry, I

19   can't recall a particular one, but I know

20   that when we were actually able to reach

21   customers prior to our equipment being taken

22   down, and they now understood what was

23   occurring and that this was not us upgrading

24   their equipment, that this was, in fact, a

25   competitor and that they had an agreement

LISA GRIPPO                                    March 26, 2014
HEALTHY ADVICE NETWORKS vs. CONTEXTMEDIA

Page 32

1              L. Grippo

2    with us and we could talk to them about it,

3    I'm quite certain in many instances Amy's

4    team was either able to save them, or I know

5    for a fact that they were very apologetic

6    about what had happened.  They misunderstood

7    what was occurring, and once -- and that's

8    when we started reminding them, okay, well,

9    you know, we've had a relationship, we've

10   been supporting you for a number of years,

11   you know, please give us the respect of at

12   least giving us notice prior to canceling and

13   the program ends.  So they were sometimes

14   just very remorseful and would still decide

15   to go and change.  But other times they would

16   be sort of -- I don't know if "disgusted" is

17   too strong a word, but not necessarily liking

18   what was happening, and they would decide to

19   stay with us.

20        MR. O'BRIEN:  I move to strike the

21        answer as nonresponsive.

22        Q.   My question was, can you identify a

23   single practice that you believe switched

24   from HAN to ContextMedia because of something

25   wrong that ContextMedia did?

LISA GRIPPO                                    March 26, 2014
HEALTHY ADVICE NETWORKS vs. CONTEXTMEDIA

                                                    Page 33

 1              L. Grippo

 2              MR. COWAN:  Objection.  Asked and

 3         answered.  Go ahead.

 4         A.    A single practice, I cannot.

 5         Q.    A couple of times now you've

 6    suggested that you believe that ContextMedia

 7    posed as HAN or represented itself as HAN

 8    from time to time.  Did I understand that

 9    correctly?

10         A.    Yes.

11         Q.    Can you identify a single practice

12    where that ever happened?

13         A.    Not from memory, no.

14         Q.    In fact, isn't that sort of

15    nonsensical?

16              MR. COWAN:  Objection.

17         Q.    By that I mean don't you understand

18    that ContextMedia, whether it's its sales

19    tactics or something you approve of or

20    disapprove of, the thrust of the tactics were

21    we are different than HAN.

22         A.    Um-hmm.

23         Q.    We are different than the

24    competition.  Now you say they said things

25    they shouldn't have said in trying to make

Page 34

1           L. Grippo

2    the point they were different.  But wasn't

3    the thrust of their sales efforts that we are

4    different?

5           A.   I think there's a difference in how

6    you communicate the fact that you're

7    different.  If you are specifically

8    targeting, which it certainly appeared as

9    though they were specifically targeting our

10   customers, and they were aware that they had

11   our programming, and they were saying

12   disparaging things about the content and the

13   program, I don't know that that's a sales

14   tactic that I would ask my team to employ.

15          Q.   No, no.  But you make my point.

16   What you just said shows that it's

17   nonsensical for you to believe that

18   ContextMedia was posing as HAN.  If

19   ContextMedia is posing as HAN, why would it

20   be disparaging, then, its own product?

21          A.   There were -- and, again, I had

22   heard from Amy's team, and we had a couple of

23   practices -- so it started -- it was a

24   spectrum.  So early on we had heard, okay,

25   there's a competitor out there, they're going

LISA GRIPPO                                    March 26, 2014
HEALTHY ADVICE NETWORKS vs. CONTEXTMEDIA

Page 35

1              L. Grippo

2    into practices and they're taking our

3    equipment down, and they're putting their --

4    saying that it's an upgrade and they're

5    putting their equipment up.  Again, they

6    weren't speaking directly to me.  I was a

7    manager over the area.  In many instances it

8    was my employees that were going into these

9    practices.

10             So most cases it was not a

11   conversation directly to me.  I was aware of

12   them because I was trying to help put

13   together some strategies so that we could

14   retain our customer base.  And so I had heard

15   that this was happening.  I had heard

16   something similar happened up in Buffalo.

17   Amy made me aware.  She said make sure that,

18   you know -- so I shared with it with my

19   employee here on Long Island.  I said, Diane,

20   if you hear of anything like this happening,

21   please let me know.  And then we started to

22   -- I think it only happened a couple of times

23   where they were -- had claimed that it was an

24   upgrade.  And then it was more just going in

25   and -- they actually didn't go in.  I don't

LISA GRIPPO                                    March 26, 2014
HEALTHY ADVICE NETWORKS vs. CONTEXTMEDIA

Page 36

1              L. Grippo
2    believe they had outside salespeople.  I
3    believe they did most of their work on the
4    phone, because that's what I would hear from
5    practices when I did go out and speak to
6    them.  Again, like I said earlier, they were
7    calling repeatedly trying to get in.  And
8    then once they had them on the phone, they
9    were it seemed specifically targeting our
10   practices and saying very disparaging things
11   about it, about us, and how much better they
12   were, and, you know, again, we'll come in,
13   we'll take down the equipment, and we'll put
14   ours up, and, you know, no skin off your
15   back.  They didn't have to do anything, the
16   practices.
17          And then the next spectrum was,
18   okay, we at least got them and the practices
19   through a campaign to say, listen, if you're
20   looking to change, talk to us, help us
21   understand why, but at least give us the
22   notice.  You know, you are under contract,
23   and you can't just take our equipment down
24   and ship it back to us.  So it was, you know,
25   over a period of time there were a lot of

LISA GRIPPO
HEALTHY ADVICE NETWORKS vs. CONTEXTMEDIA

March 26, 2014

Page 37

1          L. Grippo

2  different things that occurred.  As far as

3  direct communication to me, not all of it was

4  directly to me.  It was through my colleagues

5  and through my direct reports.

6          Q.   It sounds like, based upon some

7  answers you've given recently, that you would

8  agree with me that Amy Finley would be far

9  more knowledgeable than you about why

10 practices switched from HAN to ContextMedia?

11         A.   Correct.

12         Q.   You mentioned a scenario a little

13 while ago where you said you were able to

14 save the practice.  Do you remember that?

15         A.   Me specifically -- I said we --

16         Q.   The company.

17         A.   We the company, correct.

18         Q.   And HAN maintains save statistics,

19 does it not?

20         A.   Yes.

21         Q.   And that's part of the CMS database

22 as well; right?

23         A.   Correct.

24         Q.   And part of HAN's problem with

25 ContextMedia was that it was thwarting HAN

LISA GRIPPO                                March 26, 2014
HEALTHY ADVICE NETWORKS vs. CONTEXTMEDIA

Page 38

 1              L. Grippo
 2    receiving the 30 or 60-day notice, whichever
 3    notice period was in play; right?
 4        A.    Um-hmm.
 5        Q.    You have to answer out loud.
 6        A.    I'm sorry.  Yes.
 7        Q.    And the purpose for that notice
 8    period is to try to save the practice; right?
 9        A.    Correct.
10        Q.    You have recommended internally to
11    HAN from time to time that HAN take down
12    ContextMedia's equipment; right?
13        A.    I have not.  I suggested that
14    perhaps we should consider it one time.  I
15    said I would never normally consider
16    something like that, because I don't think
17    it's ethical, but in this situation, and I
18    forget, it was one of the practices in
19    Queens, I think, we didn't end up doing that.
20        Q.    Did you see some emails on this
21    subject in the last couple of weeks?
22        A.    Yes.
23        Q.    And those were shown to you by
24    Mr. Cowan or someone at his firm?
25        A.    Yes.

Page 39

1               L. Grippo

2       Q.    What else was shown to you by

3  Mr. Cowan or someone at his firm besides that

4  email?

5            MR. COWAN:  I think that's going to

6       invade work product.

7            MR. O'BRIEN:  You take that

8       position?  Different lawyers do.  I

9       don't.  But that's fine.

10            MR. COWAN:  You know, here's --

11            MR. O'BRIEN:  I understand.

12            MR. COWAN:  Nothing that I've shown

13       her has not been produced in this case.

14       I've selected emails.  It doesn't bother

15       me if you want to try to spend time

16       asking her what we reviewed today.  I

17       just want to make sure I get time at the

18       end of this to ask a few questions.  But

19       do that if you want.  I won't object.

20       Q.    You reviewed some emails; right?

21       A.    Correct.

22       Q.    Can you recall anything else you

23  reviewed?

24       A.    No.  He just showed me some emails.

25       Q.    Do you have any files from your

LISA GRIPPO                                    March 26, 2014
HEALTHY ADVICE NETWORKS vs. CONTEXTMEDIA

                                                    Page 40

1              L. Grippo

2    days at HAN?

3         A.   I threw out most of -- most of my

4    stuff.

5         Q.   Upon your departure?

6         A.   Yeah.

7         Q.   Had you already been approached

8    before your departure about collecting and

9    preserving things for the lawsuit?

10        A.   No.

11        Q.   Did you basically throw out

12   everything you had with regard to the

13   business?

14        A.   Pretty much.

15        Q.   Were you kind of a pack rat with

16   your emails?

17        A.   Over the course of nine years, I

18   kept -- my memory was exploding, so.

19        Q.   Not the memory in your head, the

20   memory in --

21        A.   No.  The memory in my -- yes.  I

22   was always getting those error messages, so.

23        Q.   Did any competitor besides

24   ContextMedia ever take down HAN's equipment?

25        A.   Not that I'm aware of.

LISA GRIPPO                                    March 26, 2014
HEALTHY ADVICE NETWORKS vs. CONTEXTMEDIA

                                                    Page 41

 1              L. Grippo

 2      Q.    Did HAN ever take down any

 3   competitor's equipment?  You already talked

 4   about ContextMedia.  Now I asked you a

 5   broader question.

 6      A.    Not that I'm aware of.

 7      Q.    You left, again, in August of 2013?

 8      A.    September.

 9      Q.    September.  Are you aware that

10   practices were continuing to be switched out

11   from HAN to ContextMedia up until the time

12   you left?

13      A.    I believe so.  I couldn't swear to

14   the date.

15      Q.    Was there any ebb and flow to it,

16   as far as you were concerned, where it seemed

17   to be more switch-outs any point in time than

18   other points in time, or was it pretty much

19   steady?

20      A.    I'm not certain.

21      Q.    It's not something you tracked?

22      A.    Well, again, I stepped away from

23   that side of the business for a little over a

24   year, and in terms of recruiting the

25   physician practices, I was more focused on

LISA GRIPPO                                    March 26, 2014
HEALTHY ADVICE NETWORKS vs. CONTEXTMEDIA

Page 42

1                    L. Grippo
2    the technology side.  And then when I came
3    back in, I was surprised, so the beginning of
4    2014 -- 2012.  2013.
5         Q.   2013.
6         A.   Surprised to hear that this was
7    still, you know, an issue that we were
8    facing.
9         Q.   Okay.  You continued to face that
10   up until the time you left; right?
11        A.   I believe so, yes.
12        Q.   And you say technology side.  Maybe
13   you already told me and I just missed it.
14   What do you mean by that?
15        A.   We acquired PatientPoint, the
16   coordinated care division.
17        Q.   I see.  I understand that one of
18   the responsibilities Amy Finley's team had
19   was to monitor and follow and track the
20   return of the HAN equipment after a practice
21   switched.  Does that square with your
22   understanding?
23        A.   I'm not certain that fell on Amy's
24   team.
25        Q.   Who do you think had that

LISA GRIPPO                                                    March 26, 2014
HEALTHY ADVICE NETWORKS vs. CONTEXTMEDIA

Page 43

```
 1              L. Grippo
 2    responsibility?
 3         A.   Monitoring of equipment?
 4         Q.   Yeah.  Practices switched, now
 5    who's going to -- I'm from southern Illinois,
 6    so.  Do you know what bird dog mean?
 7         A.   No.
 8         Q.   To follow and stay on top of --
 9         A.   Oh, okay.
10         Q.   -- what's happening to the
11    equipment.
12         A.   I would think that would be a
13    combination of Amy's team and Kimberly's
14    team.
15         Q.   Do you know Vida Albert?
16         A.   I do.
17         Q.   Do you know if that was her
18    responsibility?
19         A.   It could have been.  I'm not
20    exactly sure who was responsible.
21         Q.   But in any event, it was not your
22    responsibility?
23         A.   No.
24         Q.   Or anybody on your team?
25         A.   Correct.
```

LISA GRIPPO                                    March 26, 2014
HEALTHY ADVICE NETWORKS vs. CONTEXTMEDIA

Page 44

                        L. Grippo

1

2         Q.    So while you couldn't name a

3    practice that you felt had switched from HAN

4    to ContextMedia due to wrongful conduct by

5    ContextMedia, would you agree that some

6    practices switched from HAN to ContextMedia

7    simply due to fair competition?

8              MR. COWAN:  I'm going to object to

9         form.  I think she did identify a

10        practice or two.  But go ahead.

11        A.    Could you repeat the question.

12        Q.    Yes.  I said that while, by my ear,

13   you did not identify a single practice that

14   you felt had switched from HAN to

15   ContextMedia due to wrongful conduct by

16   ContextMedia, would you agree with me that

17   you know that certain practices, not specific

18   ones, but some practices switched from HAN to

19   ContextMedia simply due to fair competition?

20             MR. COWAN:  Object to the form.  Go

21        ahead.

22        A.    So you're asking me if I believe

23   that some practices who switched from Healthy

24   Advice programming to ContextMedia, if they

25   did that due to fair competition and --

LISA GRIPPO                                    March 26, 2014
HEALTHY ADVICE NETWORKS vs. CONTEXTMEDIA

Page 45

1              L. Grippo

2      Q.    Right.

3      A.    I'm sure there are, yes.

4      Q.    Do you have any way as you sit here

5  today to make a judgment about how many

6  practices switched due to what you feel was

7  wrongful conduct and how many practices

8  switched due to fair competition?

9      A.    I do not.

10      Q.    Do you know if any analysis was

11  undertaken like that within the company while

12  you were there?

13      A.    I do not.  I will say it was always

14  challenging, whether it was ContextMedia or

15  any other perceived competitor, to, you know,

16  with practices in terms of the reasons that

17  they actually told you why they were leaving,

18  you know, no one likes confrontation, right.

19  So we tried the best that we could to get

20  accurate data with regard to the reasons.

21      Q.    And that's all you could do --

22            MR. COWAN:  Go ahead.  Wait.

23      Q.    I didn't mean to interrupt.

24            MR. COWAN:  Go ahead.

25      A.    But, you know, that was not always

LISA GRIPPO                                    March 26, 2014
HEALTHY ADVICE NETWORKS vs. CONTEXTMEDIA

                                                   Page 46

 1              L. Grippo
 2    a possibility.  They may have just been
 3    telling us something because they thought
 4    that's what we would want to hear or to, you
 5    know, let us down easy kind of thing.
 6         Q.   And what you just said is your
 7    sheer speculation; right?
 8         A.   From talking to practices, yeah.  I
 9    mean yes.
10         Q.   I mean you're speculating that they
11    didn't tell you the whole truth?
12         A.   The whole story?
13         Q.   Right.
14         A.   Right, because when you try --
15    Amy's team would get one answer, and then I
16    would call or one of my team would call if
17    they weren't being responsive.  And likely we
18    would then get a different story.  So, again,
19    you know, the data is only as good as,
20    unfortunately, what was in the people's --
21         Q.   Can you identify for me a single
22    practice where that happened, that is, one
23    person from HAN called and got one reason,
24    and then another person from HAN called and
25    got a different reason?

LISA GRIPPO                                              March 26, 2014
HEALTHY ADVICE NETWORKS vs. CONTEXTMEDIA

Page 47

```
 1                L. Grippo
 2        A.    I can't give you a specific, but
 3   I'm sure there are many.
 4        Q.    I'm sorry?
 5        A.    I'm sure there are many, but I
 6   cannot give you a specific.
 7        Q.    And if you wanted to try to get
 8   your arms around that as best you could right
 9   now, the only thing you could do is look at
10   the CMS database; right?
11        A.    Correct.
12        Q.    Do you feel like in nine years of
13   doing that, that being what you were doing at
14   HAN, selling to practices, that you have a
15   pretty good feel for what factors practices
16   think are important in deciding which point
17   of care provider to choose?
18        A.    Yes.
19        Q.    I mean that's kind of the nuts and
20   bolts of what you were doing, you need to
21   know those things in order to be effective;
22   right?
23        A.    Correct.
24        Q.    And you endeavored to do your best
25   to know those things; right?
```

LISA GRIPPO                                                    March 26, 2014
HEALTHY ADVICE NETWORKS vs. CONTEXTMEDIA

Page 48

1              L. Grippo

2        A.    Yes.

3        Q.    And what things, based upon your

4    nine years of experience, were important

5    considerations or factors to a practice in

6    making a -- if I say POC, would you

7    understand that to be point of care?

8        A.    (Indicating).

9        Q.    -- in making a POC provider

10   decision?

11       A.    Specific to the educational

12   programming in the waiting room you're

13   referring to.

14       Q.    Specific to PCN and DHN, yeah.

15       A.    Okay.

16             MR. COWAN:  ACN.

17       Q.    ACN.

18       A.    One -- what we spoke to is the

19   quality of our programming, the fact that all

20   of -- I think that it's important for the

21   providers to know that we had a team of

22   medical writers that was creating all of our

23   content that was reviewed by a board of

24   physicians, so that they know that it's

25   credible content in their waiting room, the

LISA GRIPPO                                    March 26, 2014
HEALTHY ADVICE NETWORKS vs. CONTEXTMEDIA

Page 49

1              L. Grippo

2    fact that they the ability to review it and

3    to pull any content if it was not, you know,

4    something that they would endorse.

5              They appreciated the fact that it

6    was silent programming, because, you know, we

7    would often hear that it was extremely

8    disruptive to the staff and to the patients

9    to hear the same program repetitively.  So

10   that was something that we always spoke

11   about, the fact that we were a guest in their

12   waiting room, that we wanted to give them the

13   educational option, but we're not going to

14   be, you know, in their face about it.  And

15   that resonated very well with the physician

16   practices and administrators.

17             And the fact that they were able to

18   personalize it.  They had eighteen messages

19   that would speak specifically to their

20   patient population.  And that was really the

21   only time that we had sound is there would be

22   some music playing behind those messages to

23   draw the patients', you know, attention to

24   what the practice felt was relevant.

25        Q.   The three things that you just gave

LISA GRIPPO                                          March 26, 2014
HEALTHY ADVICE NETWORKS vs. CONTEXTMEDIA

Page 50

1                  L. Grippo

2     me, quality of programming, silent, and the

3     ability to personalize, those are factors

4     that you thought were important selling

5     points for HAN's product; right?

6          A.   And I thought that's what you asked

7     me.  I'm sorry.

8          Q.   No.  My question was broader than

9     that, and that is, what factors did practices

10    consider to be important in making a POC

11    provider decision?  That was my question.

12         A.   And from my experience in talking

13    with hundreds of practices throughout the

14    country, the number one concern for the

15    larger practices, not always the smaller

16    ones, was making sure that they had quality

17    content.

18         Q.   And a practice could be very

19    concerned with quality content and

20    nonetheless choose a competitor of HAN's if

21    they thought the competitor had a higher

22    quality content; right?

23         A.   Absolutely.  We had many

24    competitors.

25         Q.   But that's an important factor;

LISA GRIPPO
HEALTHY ADVICE NETWORKS vs. CONTEXTMEDIA

March 26, 2014

Page 51

```
 1              L. Grippo
 2    right?
 3         A.   Um-hmm.
 4         Q.   And you said silence is an
 5    important factor.
 6         A.   Sorry.  Yes.
 7         Q.   Right?  You said silence was an
 8    important factor; right?
 9         A.   That was an advantage to our
10    programming.  That was also something that
11    was asked about us from many companies.
12    Accent Health was really our largest
13    competitor always, and that has sound.  So in
14    speaking with physician practices, what I
15    would hear is, oh, we had something in the
16    past, it was a lot of noise in the waiting
17    room, we don't want that, and so I found that
18    that was something that they really enjoyed,
19    the fact that ours was silent, so.
20         Q.   But didn't you find that a lot of
21    practices preferred sound, and for that
22    reason they preferred ContextMedia over HAN's
23    product?
24         A.   That was not my experience.
25         Q.   Well, didn't you know that in
```

Page 52

1              L. Grippo

2    reaction to that competitive pressure, HAN

3    significantly increased the amount of sound

4    in its product?

5         A.   In our rheumatoid program?

6         Q.   Yes.

7         A.   I did not.

8         Q.   Did you know video was an important

9    factor to many practices?

10        A.   The ability to upload their own

11   video regarding the practice, yes.

12        Q.   No. The ability to have video that

13   involved real-life characters, real action

14   video.

15        A.   No.  I was only asked if they would

16   be able to upload their own videos that they

17   had created.

18        Q.   So you're not aware that in

19   response to many practices telling HAN that

20   they wanted more video, that HAN has

21   significantly increased the amount of its

22   video content?

23        A.   I was not aware that they had

24   increased sound or video content into the

25   program, no.

1           L. Grippo

2      Q.    Were you aware that some practices

3  thought it was important for their patients

4  to also see weather and news tickers?

5      A.    Yes.

6      Q.    And didn't HAN react by providing

7  more of that kind of content as well?

8      A.    Correct, to most of our programs.

9      Q.    Is customer service an important

10  factor?

11      A.    Yes.

12      Q.    And the experience with the sales

13  representatives is an important factor;

14  right?

15      A.    Yes.

16      Q.    Did you learn in your years of

17  doing this that a lot of practices preferred

18  a much longer loop of content than HAN was

19  able to offer?

20      A.    We had heard that from -- we had

21  received some feedback from practices with

22  regards to the loop and the length of the

23  loop, not specific to ContextMedia, just in

24  general.  And so we had changed the format so

25  -- I'm not going to explain it properly, but

LISA GRIPPO                                        March 26, 2014
HEALTHY ADVICE NETWORKS vs. CONTEXTMEDIA

Page 54

1           L. Grippo

2    essentially if there was a 30-minute loop,

3    there was content for longer than 30 minutes,

4    and it was interchangeable, so that if a

5    patient was sitting there for more than

6    30 minutes, it wouldn't look exactly the

7    same.  So that was something that we had

8    heard from a mix of practices, not just

9    rheumatology.

10          Q.   Right.  And that's a change that

11   HAN made to make its content more attractive

12   to practices; right?

13          A.   Correct, realizing that wait times

14   were a little longer, so we were trying to be

15   responsive to that.

16          Q.   Did practices also tell you that

17   they liked the fact that ContextMedia's

18   content had sort of three partitions on the

19   screen providing different information?  Did

20   you ever hear that?

21          A.   Specific to me, I remember speaking

22   to a customer in I think it was the

23   Carolinas, and they had said the staff -- and

24   the receptionist, I was just asking her about

25   the programming, and she had said something

ESQUIRE SOLUTIONS                        800.211.DEPO (3376)
                                         EsquireSolutions.com

Page 55

```
 1              L. Grippo
 2    about the, you know, she really liked the
 3    recipes and the cooking segments and that.
 4    And so I did hear that comment.
 5         Q.   And those were things that HAN was
 6    not able to offer at the time; right?
 7         A.   We were not.
 8         Q.   And did you also hear that
 9    practices preferred ContextMedia's content
10    because the practice had the freedom and
11    flexibility to change the educational
12    content, not the other content, but the
13    educational content where HAN did not permit
14    that?
15         A.   I did not.
16         Q.   Did you hear that
17    condition-specific practices treating
18    diabetes and condition-specific practices
19    treating rheumatoid arthritis preferred
20    ContextMedia's content over HAN's because
21    they thought the content was more specific to
22    those conditions?
23         A.   No.  I think if I heard anything,
24    it was that more of an entertainment value to
25    ContextMedia's programming.  With regard to
```

Page 56

1                    L. Grippo

2    the educational content, we definitely had

3    more educational content in our program.  It

4    was all education other than the sponsor

5    messages and the individualized -- the

6    personalized messages for the practice.

7         Q.   Do you consider recipes and

8    exercise tips and advice to be entertainment

9    or education?

10        A.   More entertainment.

11        Q.   More entertainment.  Okay.

12        A.   And more entertainment in many ways

13   for the staff is what I would hear when I was

14   talking, because the patients, you know, may

15   or may not actually be able to sit there

16   through an entire cooking segment.

17        Q.   Would you agree with me that

18   practices are free to choose whatever they

19   want to have in their waiting room?

20        A.   Absolutely.

21        Q.   They can choose your product;

22   right?

23        A.   Um-hmm.

24        Q.   Or ContextMedia's?

25        A.   Yes.

LISA GRIPPO                                          March 26, 2014
HEALTHY ADVICE NETWORKS vs. CONTEXTMEDIA

Page 57

1              L. Grippo

2      Q.   Or cable television?

3      A.   Yes.

4      Q.   Or nothing?

5      A.   Yes.

6      Q.   That's their choice; right?

7      A.   Correct.  And that -- like I said,

8   we had many competitors over the years, and

9   we would, you know, lose practices.  It's not

10  as though we just started losing practices

11  when, you know, RHN came along.  We certainly

12  had lost -- it was more what we were hearing

13  from practices, again, not coming directly to

14  me, with regard to some of the tactics that

15  they were utilizing.  So that was -- we've

16  lost many practices to Accent Health because

17  of the sound, because they have a pediatric

18  program.  So it was just more, again, it

19  seemed targeted, and it just seemed very

20  unethical, in my opinion.

21     Q.   The ACN network is relatively

22  small; right?

23     A.   Correct.

24     Q.   It's a small market; right?

25     A.   Yeah.  It's a --

LISA GRIPPO                                        March 26, 2014
HEALTHY ADVICE NETWORKS vs. CONTEXTMEDIA

Page 58

1              L. Grippo

2       Q.    Extremely small compared to the PCN

3    network; right?

4       A.    Yes.

5       Q.    Let me hand you and your counsel

6    what was previously marked as Deposition

7    Exhibit 25.  Take whatever time you want to

8    look at this document, and let me know when

9    you're ready for me to ask you a question or

10   two.

11      A.    Okay.

12      Q.    Do you remember this situation

13   involving the Lakeside practices?

14      A.    I do now.

15      Q.    Well, this Lakeside practice or

16   network of practices, was it in your

17   territory in February 2013?

18      A.    No.  It was in California.

19      Q.    So why does this get kicked up to

20   you?

21      A.    I believe it was -- February of

22   2013.  I believe they asked me to get

23   involved, again, most likely simply because

24   of all the changes going on, and given my

25   familiarity with the programs, that I could

Page 59

1            L. Grippo

2    speak to her and try to assist with saving

3    the practice.  But, again, that's all

4    speculation.  I don't quite -- I'm not quite

5    certain why it was sent to me.

6        Q.   I would like to ask you a question

7    about what's written on Page 4.

8        A.   Okay.

9        Q.   And this is in the middle of a long

10   email that Laurie Smith is writing to folks,

11   including you.  As I read this, she's

12   detailing all the efforts that she has

13   exerted to try to save this very important

14   practice; right?

15       A.   Yes.

16       Q.   And in the last paragraph on Page 4

17   about the middle of that paragraph it's

18   written that Pam -- and Pam is the

19   representative of the practice; right?

20       A.   Yes.

21       Q.   Said that the decision has already

22   been made and contracts were signed.  That's

23   contracts with ContextMedia; right?

24       A.   I'm sorry.  I'm not seeing that.

25       Q.   You're on Page 4?

LISA GRIPPO                                    March 26, 2014
HEALTHY ADVICE NETWORKS vs. CONTEXTMEDIA

Page 60

 1              L. Grippo

 2         A.   Yes, I am.

 3         Q.   In the middle of that last

 4    paragraph, roughly halfway in there is a

 5    sentence that begins "Pam said that the

 6    decision."

 7         A.   Okay.  "Pam said the decision has

 8    already been made and contracts were signed."

 9         Q.   And that's the practice telling HAN

10    that the practice has already signed

11    contracts with ContextMedia; right?

12         A.   It seems that's the case, yes.

13         Q.   And then Ms. Smith explains she

14    told the practice that "often in our business

15    the contracts are not always binding, and I

16    just want to make sure the decision makers

17    know about our suite of products before we

18    begin removing the monitors."  Do you see

19    that?

20         A.   Yes.

21         Q.   So this is a situation where

22    ContextMedia has not taken down the

23    equipment; right?

24         A.   Correct.

25         Q.   And HAN is getting notice from the

LISA GRIPPO                                     March 26, 2014
HEALTHY ADVICE NETWORKS vs. CONTEXTMEDIA

Page 61

 1              L. Grippo

 2    practice; right?

 3         A.    Yes.

 4         Q.    And HAN is doing its level best to

 5    try to save the practice; right?

 6         A.    Yes.

 7         Q.    And one of the things it does to

 8    try to do that is tell the practice that the

 9    contracts that the practice has signed with

10    ContextMedia aren't any good; right?

11              MR. COWAN:   Objection.   That's not

12         what it says.   Go ahead.

13         Q.    It tells the practice that the

14    contracts that ContextMedia has signed with

15    the practice are not always binding.

16              MR. COWAN:   Objection.   That's not

17         what it says.   Go ahead.

18         A.    It says the contracts are not

19    always binding.   I'm not quite certain what

20    Laurie meant by that.

21         Q.    Well, did you have a problem with

22    her making that statement?

23         A.    I don't know that I even read it

24    that closely when I saw it the first time.

25         Q.    Well, since the email is directed

LISA GRIPPO                                    March 26, 2014
HEALTHY ADVICE NETWORKS vs. CONTEXTMEDIA

Page 62

```
 1            L. Grippo

 2   to you, among other people, do you recall

 3   saying wait a minute, Laurie, you can't say

 4   that, that's not kosher?

 5        A.   Laurie reported to Amy, not to me.

 6   And I put some of my thoughts here with

 7   regard to the situation.  So I never said

 8   that to her, no.  I never took exception with

 9   that comment.

10        Q.   And should I understand your answer

11   at least in part to be that if someone was

12   going to take exception to that, it should

13   have been Amy; right?

14        A.   If someone were to take exception

15   with that, then I would say yes, it should be

16   Amy.  My understanding, though, was that

17   this, and one of the points that I made, is

18   that Pam was obviously not the decision

19   maker.  So, therefore, how could she be

20   certain that contracts were already executed.

21   And I do not today know that any contracts

22   were executed.  I know -- I believe we ended

23   up maintaining this customer, but I was not

24   involved with that.  Chris Martini ended up

25   needing to be in California anyway, so he
```

LISA GRIPPO                                        March 26, 2014
HEALTHY ADVICE NETWORKS vs. CONTEXTMEDIA

Page 63

1              L. Grippo

2    took over.  So all I did was sort of give my

3    two cents, like let's get our heads together

4    and figure out how we can keep this from

5    happening.

6              There was a larger issue here, that

7    they were considering leaving us because we

8    weren't accommodating their cardiology

9    practice.  And we had a cardiology program.

10   So the fact that ContextMedia with the

11   diabetes and a rheumatology program could

12   better accommodate them did not seem to make

13   sense.  So that was the larger issue, that we

14   as an organization would lose a customer of

15   this size because we weren't willing to

16   enroll one of their cardiology programs in

17   that program, because that was on a wait

18   list, so -- I'm talking, but I don't know if

19   I'm answering your question.

20        Q.   You're actually not, but.

21        A.   Let me just keep talking?

22        Q.   No, not really.  We've got a

23   limited amount of time here.

24        A.   Okay.

25        Q.   But in any event, you took no

LISA GRIPPO                                    March 26, 2014
HEALTHY ADVICE NETWORKS vs. CONTEXTMEDIA

Page 64

1              L. Grippo

2    issue, as far as you know, with her telling a

3    practice that had signed a contract with

4    ContextMedia that it could go ahead and

5    basically continue to do business with HAN;

6    right?

7         A.   If I thought that that's what she

8    was saying, to just completely ignore a

9    signed contract, then I don't -- I would take

10   exception with that.  I would want to better

11   understand who signed the contract, when they

12   were executed, and what that contract was.

13   But I'm not taking this to be ignore

14   ContextMedia's contract.  She was simply

15   pointing out that it may not be binding.

16        Q.   And the reason she's saying that is

17   to try to save the practice; right?

18        A.   It looks like that's -- she's just

19   asking her to look to see if it's a binding

20   contract.  Yes.

21             MR. O'BRIEN:  Can we take a short

22        break.  We've been going about an hour.

23             MR. COWAN:  Sure.

24             VIDEOGRAPHER:  The time is

25        2:46 p.m. on March 26, 2014.  This is

LISA GRIPPO                                    March 26, 2014
HEALTHY ADVICE NETWORKS vs. CONTEXTMEDIA

Page 65

1            L. Grippo

2      the end of tape number one.

3            (Recess taken from 2:46 p.m. to

4      2:56 p.m.)

5            VIDEOGRAPHER:  The time is

6      2:56 p.m. on March 26, 2014.  This is

7      tape number two.  We're back on the

8      record.

9      Q.   The exhibit we just talked about

10   that's still in front of you, Exhibit 25,

11   it's dated February 19th, 2013, at least the

12   last email in the chain; right?

13     A.   Yes.

14     Q.   I would now like to show you what

15   has previously been marked as Defendant's

16   Exhibit 33.  It looks like a 53 to some, but

17   it's a 33.

18            I don't see you on this email, but

19   I'm going to ask you a question about it

20   anyway.  Take whatever time you want to look

21   at it.

22     A.   I should have gone the other way.

23   It would have made more sense, right.

24     Q.   Usually.

25     A.   Sorry about that.  I don't even

LISA GRIPPO                                          March 26, 2014
HEALTHY ADVICE NETWORKS vs. CONTEXTMEDIA

Page 66

1              L. Grippo

2      know if I understand what this is, so.  I'll

3      try.

4          Q.   Well, the email that is

5      Ms. Finley's at the bottom of Page 1 says

6      from Amy Finley, Wednesday, 20, 2013, 7:52

7      a.m.  Do you see that?

8          A.   Um-hmm.

9          Q.   And that's the next day after

10     Ms. Smith is telling a practice that their

11     contract with ContextMedia may not be

12     binding; right?

13         A.   Laurie sent that on -- are you

14     asking me to confirm the date?

15         Q.   Yeah.  It's a day later; right?

16         A.   I don't think so.

17         Q.   I'm sorry.  Hers is the 15th, the

18     last email on the chain.  So it's five days

19     later.

20         A.   Yes.

21         Q.   And you said that if someone was

22     going to correct Ms. Smith about what she was

23     saying about binding contracts, it would be

24     Ms. Finley's job; right?

25         A.   Yeah.  Amy reported to -- I mean

Page 67

1          L. Grippo

2    she reported to Amy.

3          Q.   And here Amy is writing to Chris

4    Martini; right?

5          A.   Correct.

6          Q.   And he's the president of the

7    business at the time; right?

8          A.   Correct.

9          Q.   And Amy says, "I guess this

10   happened when we called.  It shouldn't be a

11   clause.  This program is in the exam room,

12   not the waiting room.  Their agreement, like

13   ours, states no one else can be in the

14   waiting room.  But, again, these are not

15   binding contracts."  Do you see that?

16         A.   I do.

17         Q.   Had you heard Ms. Finley say that

18   from time to time, that HAN's contracts with

19   the practices weren't binding contracts?

20         A.   Whether or not -- I would guess

21   that I've probably heard Amy say that.  I

22   have heard with just regards to our

23   agreements in general that they were not

24   necessarily binding, that if a company were,

25   you know, if we were to try or we were to sue

LISA GRIPPO

March 26, 2014

HEALTHY ADVICE NETWORKS vs. CONTEXTMEDIA

Page 68

1              L. Grippo

2  or whatever, but that they may not hold up.

3  So I guess that's what it means by binding.

4        Q.    It does.

5        A.    But when that would typically come

6  up was with regard to -- with regard to

7  Accent Health, because we didn't have a

8  clause, we did not demand exclusivity in the

9  waiting room initially, so we could coexist

10  with them.  And so we would sort of indemnify

11  the practice to say that if Accent Health

12  took, you know, exception with the fact that

13  we were there, if that was a clause, and that

14  was a term, again, not being a lawyer, that

15  was often used, that typically the agreements

16  are not legally binding.

17        Q.    Did Lisa Grippo ever say these

18  agreements are not legally binding?

19        A.    I don't -- I mean I couldn't swear

20  for certain, but it's not a term that I would

21  use, that I recall using frequently.

22        Q.    But you may have said it on

23  occasion?

24        A.    Of course.  I may have, yes.

25        Q.    And Mr. Martini, the president of

LISA GRIPPO                                    March 26, 2014
HEALTHY ADVICE NETWORKS vs. CONTEXTMEDIA

 1              L. Grippo

 2   the company, did you ever hear him say that

 3   HAN's contracts with the practices were not

 4   legally binding?

 5          MR. COWAN:  Objection.  Go ahead.

 6       A.   I have not.

 7       Q.   How about Mr. Campbell?

 8          MR. COWAN:  How about what?

 9       Q.   Did you ever hear Mr. Campbell

10   comment that the contracts that HAN had with

11   the practices are not legally binding?

12       A.   No.  I did not interact with Tom

13   regularly really, or Chris until the few

14   months prior to -- until 2013.

15       Q.   And that's when this is; right?

16       A.   Correct.  But he was the president

17   of the hospital division.  So with regard to

18   physician practices, we didn't have a lot of

19   -- he was trying to -- he was still learning

20   what was going on on the physician side.

21       Q.   Let me hand you and your counsel

22   what was previously marked as Defendant's

23   Deposition Exhibit 26.

24          MR. COWAN:  Thank you.

25       Q.   This is a reproduction from HAN's

LISA GRIPPO                                    March 26, 2014
HEALTHY ADVICE NETWORKS vs. CONTEXTMEDIA

Page 70

```
 1              L. Grippo
 2   files, I'll represent to you, with the file
 3   label "Competitor Info."  Do you recall while
 4   you were at HAN seeing a Competitor Info file
 5   on ContextMedia?
 6        A.   Do I recall seeing a -- I know that
 7   we started a collection of emails.  I had
 8   referred to that earlier.  We were trying to
 9   get everything documented into CMS.  I want
10   to say yes, but I'm trying to recall where we
11   would have -- where it would have been
12   housed.  I believe we may have started
13   collecting -- we had to have had competitor
14   information.  I just, umm...
15        Q.   It's a natural thing to do to try
16   to collect information --
17        A.   Absolutely.
18        Q.   -- about your competitors.
19        A.   About the competitors.  I just
20   don't know...
21        Q.   Well, the file you're flipping
22   through now, do you recall seeing this
23   particular file before?
24        A.   I recall seeing all of this
25   information.  I honestly don't recall it
```

LISA GRIPPO                                    March 26, 2014
HEALTHY ADVICE NETWORKS vs. CONTEXTMEDIA

1              L. Grippo

2    being in a particular file.

3         Q.   And in fairness to you, there's

4    some emails in here that you're on.  So there

5    are numbers in the bottom right-hand corner

6    of each of these pages that begin HAN.  And

7    I'll use those to guide you to the pages I

8    want to ask you questions about.

9         A.   Okay.

10        Q.   So if you look at HAN 3192 for

11   starters.  And this is an email from Amanda

12   Devlin to you and others; right?

13        A.   Yes.

14        Q.   And it looks like she's reporting

15   on viewing ContextMedia's loop in a physician

16   practice.  Is that how you read this?

17        A.   Yes.

18        Q.   And you were okay with that; right?

19        A.   Yes.

20        Q.   You don't think HAN's content loop,

21   for example, is confidential or trade secret,

22   do you?

23        A.   That our loop -- I'm sorry.

24        Q.   Your loop that plays in the

25   practice waiting room, do you think that's a

LISA GRIPPO                                      March 26, 2014
HEALTHY ADVICE NETWORKS vs. CONTEXTMEDIA

Page 72

1            L. Grippo

2    trade secret?

3        A.   No.

4        Q.   You don't require physicians to

5    have patients sign NDAs to enter the waiting

6    room; right?

7        A.   No.

8        Q.   Now, were you aware at this time

9    frame -- first of all, you know Amanda

10   Devlin; right?

11       A.   Yes.

12       Q.   And were you aware in this time

13   frame that one of her responsibilities was

14   gathering intelligence on ContextMedia?

15       A.   I was aware, yes.  We actually --

16   we had asked the field, because we were

17   interested in putting together something like

18   this.  So I knew that we were compiling

19   competitor information as they were out in

20   the field to -- if they could take a picture

21   of the screen so we knew what it looked like,

22   and if they had a chance, to let us know a

23   little bit about the content.

24       Q.   And here she sat and looked at the

25   content and then gives you a summary of

LISA GRIPPO                                           March 26, 2014
HEALTHY ADVICE NETWORKS vs. CONTEXTMEDIA

Page 73

1            L. Grippo

2    what's in it; right?

3        A.   Correct.

4        Q.   Do you know if she ever took a

5    video of the content?

6        A.   I do not.

7        Q.   But there wouldn't have been a

8    problem with that either; right?

9        A.   If they had taken -- if she had

10   taken a video of their content to show us

11   what it was like?

12       Q.   Right.

13       A.   No.

14       Q.   And then if you turn to page HAN

15   3180, there's another email from Ms. Devlin.

16   It runs on for a couple of pages.  And here

17   she's reporting on a conversation she had

18   with a salesperson from ContextMedia; right?

19       A.   Yes.

20       Q.   And she's sending this information

21   to you, Ms. Finley, Ms. Brewer, and then who

22   are all those other people who are cc'd?

23       A.   They are sales reps.

24       Q.   And so she's providing information

25   about ContextMedia to sales reps to help the

Page 74

1              L. Grippo

2      sales reps sell against ContextMedia; right?

3          A.   To help -- I don't know that this

4      is necessarily a sales document.  This was

5      more just documenting what we found out about

6      their program.

7          Q.   Well, what would be the conceivable

8      reason for giving it to sales people if not

9      to use it as ammunition to sell against

10     ContextMedia?

11         A.   Well, I mean yeah, absolutely.  At

12     the time we were trying to figure out who

13     they were and what they were doing and more

14     information about their loop.

15         Q.   But it wasn't idle prurient

16     curiosity; right?

17         A.   No.  It was because we were hearing

18     all of this from our practices about them,

19     yes.

20         Q.   And she indicates that she spoke to

21     the sales rep for 30 minutes; right?

22         A.   Yes.

23         Q.   And she got detail on their

24     program; right?

25         A.   Yes.

LISA GRIPPO                                      March 26, 2014
HEALTHY ADVICE NETWORKS vs. CONTEXTMEDIA

Page 75

```
 1                 L. Grippo
 2        Q.    And she got all this information by
 3   lying; right?
 4        A.    She misrepresented who she was,
 5   yes.
 6        Q.    You don't think she lied?
 7        A.    Do I think -- yes, she did.  She
 8   misrepresented something.
 9        Q.    And is that something you approved
10   of?
11        A.    I do not approve of lying, no.  I
12   do not approve of -- as I told you earlier,
13   the only reason I'm here is because of --
14   that I truly believe, based on my time there
15   and what I heard from practices, that they
16   were engaging in unethical behavior.  Would
17   this, could this be construed as unethical
18   behavior, yes.  I'm quite certain that I
19   received calls from competitors over the
20   years asking me to provide information to
21   them and they were misrepresenting
22   themselves.  I'm not saying that it's
23   something that I have ever asked anyone that
24   works for me to do.  But we certainly, when
25   we were in a practice, we would always probe
```

LISA GRIPPO                                    March 26, 2014
HEALTHY ADVICE NETWORKS vs. CONTEXTMEDIA

Page 76

1           L. Grippo

2    to get additional information with regards to

3    the competitor.

4        Q.   But this is different, though.

5    This is not being at a practice like the

6    earlier email.  This is lying to a competitor

7    in order to get details about their program;

8    right?

9        A.   Yes.  She misrepresented who she

10   was.

11       Q.   And she got quite a bit of detail

12   from him; right?

13       A.   Yes.

14       Q.   And can you tell me anything in

15   here that Mr. Zmick of ContextMedia told

16   Ms. Devlin when she was telling that she's a

17   practice interested in the program, anything

18   in here that was misleading or unethical or

19   not truthful that he said to Ms. Devlin?

20       A.   Well, RHN is the only company that

21   has a robust program specific to the

22   specialty on the market today.  That would be

23   incorrect.

24       Q.   You think that's incorrect?

25       A.   Yes.  He told me that he switches

LISA GRIPPO                                    March 26, 2014
HEALTHY ADVICE NETWORKS vs. CONTEXTMEDIA

Page 77

1              L. Grippo

2    out Accent Health at least two to five times

3    a week and it would be no problem to make the

4    switch.  Sorry.  I'm just reading it.  I

5    honestly do not know their programming well

6    enough to know whether or not it does all

7    that he's saying it does here.

8         Q.   In fairness to you, it says some

9    things later on about Healthy Advice, which

10   you would probably take issue with.  But it

11   looks like the gist of this is he's selling

12   on the strength of the ContextMedia content;

13   right?

14        A.   Correct.

15        Q.   Now, if you turn a little farther

16   into this -- actually, I'm not going to ask

17   you about that.  That's fine.  Let's move on.

18             Let me show you and your counsel

19   what was previously marked as Defendant's

20   Exhibit 42.  It looks like this is an email

21   where a comment from the CMS database is

22   being forwarded.  It's unclear who it was

23   forwarded to, but in any event, you end up

24   responding; right?

25        A.   Um-hmm.

Page 78

1            L. Grippo

2            MR. COWAN:  Yes?

3       A.   Yes.  I'm so sorry.

4       Q.   And it was reported to you that a

5  practice was going to go with HAN, and then

6  the doctor went to a conference and decided

7  to go with ContextMedia.  Do you see that?

8       A.   Yes.

9       Q.   And the doctor came away from the

10  conference thinking that ContextMedia's

11  content was bilingual and more

12  specialty-specific; right?

13       A.   Correct.

14       Q.   Now, this is a situation, is it

15  not, the way I read this, not of a switch-out

16  but a head to head competition it looks like.

17  Is that how you read it?

18       A.   I'm not certain that -- but it

19  appears to be that way, yes.

20       Q.   And it looks like maybe you had

21  already delivered the equipment even though

22  -- it's a little hard to parse this, so I'm

23  not sure if it was a head to head competition

24  or they had already signed up with you and

25  the equipment hadn't been installed.  But in

LISA GRIPPO                                      March 26, 2014
HEALTHY ADVICE NETWORKS vs. CONTEXTMEDIA

Page 79

1              L. Grippo

2    any event, the comment reflects that after

3    the conference, the doctor's decision was

4    final because he felt like he liked

5    ContextMedia's content hands down better;

6    right?

7         A.   He says that it was bilingual and

8    he thought it was more specialty-specific.

9         Q.   And then she goes on to report that

10   his decision was final to go with

11   ContextMedia?

12        A.   Yes.

13        Q.   And that the doctor liked their

14   content hands down better; right?

15        A.   Yes.

16        Q.   And then you write, "RHN is in

17   Spanish, too.  I was not aware."  And you go

18   on to say, "I have sent out a ton of

19   supporting info for choosing us over them";

20   right?

21        A.   Yes.

22        Q.   And when you say sent out a ton of

23   supporting information, you're referring to

24   the marketing collateral and material that

25   you had extolling the merits of HAN's

LISA GRIPPO                                          March 26, 2014
HEALTHY ADVICE NETWORKS vs. CONTEXTMEDIA

Page 80

```
 1              L. Grippo

 2    product; right?

 3         A.   Correct.

 4         Q.   Would you agree with me that this

 5    is a situation where ContextMedia just won

 6    over HAN due to fair competition?

 7              MR. COWAN:  Objection.  Calls for

 8         speculation.  Go ahead.

 9         A.   It would appear so.

10         Q.   Let me show you what was previously

11    marked as --

12         A.   Do they have it in Spanish, though?

13    I still don't know.

14         Q.   You should have gotten Ms. Devlin

15    on it.  She would have found out.  I've

16    handed to you and your counsel what has been

17    marked as Defendant's Exhibit 52.  This is

18    another email chain that begins with someone

19    forwarding a comment about a practice

20    deciding to go with ContextMedia over HAN.

21    Is that how you read it?

22         A.   It looks like they weren't able to

23    get in contact with the practice.  What was

24    happening is we would not hear from a

25    practice for a period of time, and then we
```

LISA GRIPPO                                    March 26, 2014
HEALTHY ADVICE NETWORKS vs. CONTEXTMEDIA

Page 81

 1              L. Grippo

 2    would receive the equipment back.  So anytime

 3    that someone on Amy's team sort of wasn't

 4    able to connect with the practice, they were

 5    concerned that, you know, a competitor, most

 6    likely RHN, was in there.

 7         Q.   But in the first --

 8         A.   But I don't think that they had

 9    decided, unless I'm missing something.

10         Q.   All right.  Fair enough.  I stand

11    corrected.  It looks like they've told you

12    that they're inclined to go with

13    ContextMedia; right?

14         A.   I don't think it said that.  Am I

15    missing it?  They asked me to follow up

16    because the practice had gone to radio silent

17    and that was, we had realized, a telltale

18    sign that something was wrong and that

19    perhaps they were talking to a competitor.

20         Q.   Right.  If you look at the first

21    comment, though, doesn't it say, "Doctor went

22    to some conference and saw program he thought

23    would be better"; right?

24         A.   I'm sorry.  I did not see that.

25    Yes.

ESQUIRE SOLUTIONS                    800.211.DEPO (3376)
                                     EsquireSolutions.com

LISA GRIPPO                                    March 26, 2014
HEALTHY ADVICE NETWORKS vs. CONTEXTMEDIA

Page 82

1                L. Grippo

2        Q.   Do you see it now?

3        A.   I do.

4        Q.   And you understand that now to mean

5    that the doctor -- and here's another doctor

6    that went to a conference and saw

7    ContextMedia and now preferred it; right?

8        A.   It looks like Laurie was making an

9    assumption that they were switching to RHN,

10   but I don't know -- I don't see that they --

11   they just said a competitor, so it could have

12   been RHN, it could have been Health Monitor.

13   I'm not sure which one it was.

14       Q.   All right.  Fair enough.  Do you

15   recall that it was reported to you that a

16   number of physicians who had gone to a

17   conference and seen ContextMedia's content

18   came back from the conference and decided to

19   switch to ContextMedia?

20       A.   I do.

21       Q.   And HAN reacted to that by deciding

22   that it was going to start participating in

23   these conferences; right?

24       A.   Correct.

25       Q.   And it really upped its

LISA GRIPPO                                        March 26, 2014
HEALTHY ADVICE NETWORKS vs. CONTEXTMEDIA

Page 83

```
 1              L. Grippo
 2   participation in the conferences in reaction
 3   to this; right?
 4        A.   Correct.  RHN as well as Health
 5   Monitor.  They actually formed a relationship
 6   with one rheumatology association and...
 7        Q.   And then on the first page it looks
 8   like you're being enlisted to try to keep the
 9   practice; right?
10        A.   Yes.
11        Q.   And you say, "I'm happy to call.
12   What is the desired outcome?"  Right?
13        A.   Correct.
14        Q.   And you say, "I just read through
15   all the notes."  And that's CMS notes; right?
16        A.   Correct.
17        Q.   "And it looks like they've had one
18   service issue after another."  Do you see
19   that?
20        A.   Yes.
21        Q.   And so you were skeptical that you
22   were going to be able to save them because of
23   the service issue problems; right?
24        A.   Correct.
25        Q.   And that was a recurring problem at
```

LISA GRIPPO                                    March 26, 2014
HEALTHY ADVICE NETWORKS vs. CONTEXTMEDIA

Page 84

1              L. Grippo
2    HAN as well, was it not, practices being
3    dissatisfied with service, in particular
4    connectivity issues?
5         A.   A recurring?
6         Q.   Yes.
7         A.   Well, it was certainly an issue of
8    some practice, particularly older equipment,
9    which it looks like this was, which is why
10   Kelly was saying that I could upgrade them.
11   So we had been selling the program for a
12   number of years, so there was a lot of
13   different equipment out there.  So some of
14   the older equipment had service issues.
15        Q.   Well, isn't it a fact that you know
16   that you lost practices to ContextMedia due
17   to service and connectivity issues?
18        A.   Yes.
19        Q.   And it also became a competitive
20   issue for HAN that it was continuing to be
21   fax-based delivery versus internet-based
22   delivery; right?
23        A.   Analog versus internet, yes.
24        Q.   And HAN has reacted by gradually
25   migrating its practices to internet-based

Page 85

1              L. Grippo

2    delivery; right?

3         A.   Yes.

4         Q.   It hasn't finished yet, but that's

5    the goal; right?  It hadn't finished by the

6    time you left, but that's the goal?

7         A.   Yes.

8         Q.   And ContextMedia was internet-based

9    delivery all along; right?

10        A.   I'm not sure.  We actually shied

11   away from internet delivery for a number of

12   years because practices were concerned that

13   we would be tapping into their internet, and

14   they wanted to make sure there were the right

15   firewalls and all of that, but it ended up

16   being a much more cost effective solution.

17        Q.   And once people got used to the

18   internet, thanks to Al Gore, practices didn't

19   have those concerns any longer; right?

20        A.   I don't know who Alcor is.

21             MR. O'BRIEN:  You didn't prepare

22        her properly.

23             MR. COWAN:  Al Gore, G-o-r-e.

24        A.   Oh, Al Gore.  I do know who Al Gore

25   is.  Yes.  Thanks to him we have the

LISA GRIPPO                                    March 26, 2014
HEALTHY ADVICE NETWORKS vs. CONTEXTMEDIA

Page 86

1            L. Grippo

2    internet.  I thought you said Alcor.  I

3    thought that was a company.

4       Q.   Again, that's my southern Illinois

5    accent.  Let me hand you and your counsel

6    what has been marked as Deposition Exhibit

7    Number 59.  This one found its way up to you

8    as well; right?  It actually starts at the

9    back page of what you're holding.

10      A.   Yes.

11      Q.   Do I at least have this one correct

12   that it appears to be a situation of head to

13   head competition?

14      A.   I guess so, yes.

15      Q.   And the reason I say that it says,

16   the notes say that the practice "declined our

17   program."  Do you see that?

18      A.   Yes.

19      Q.   That suggests that --

20      A.   Instead of canceled.

21      Q.   Exactly.

22      A.   Correct.

23      Q.   Does the CMS database capture

24   practices that are the subject of a head to

25   head competition with HAN whether HAN wins or

LISA GRIPPO                                         March 26, 2014
HEALTHY ADVICE NETWORKS vs. CONTEXTMEDIA

Page 87

1                    L. Grippo

2    loses?

3        A.    Practices are marked either --

4    there's always a reason for either

5    cancellation or being declined.  I think the

6    designation is declined.  And then the

7    reasons would be competition.  The

8    interesting thing is I think they classified

9    television potentially at times as under

10   that.  So it was a little -- there was a lot

11   in that.  But I believe for a variety of

12   reasons there were -- they had to give

13   details as to why they were canceling or

14   declining us, yes.

15       Q.    Actually, I've seen documents that

16   suggest cable TV was one of your biggest

17   competitors.

18       A.    Practices going to television,

19   yeah.

20       Q.    Maybe sad but true, but some people

21   prefer soap operas to educational --

22       A.    It is very sad.

23       Q.    Anyway, that's a different

24   conversation.

25       A.    And Judge Judy.

Page 88

1          L. Grippo

2     Q.   It indicates here that HAN lost out

3  to ContextMedia because the practice wanted a

4  system that had sound.  Do you see that?

5     A.   Yes.

6     Q.   Because their patients could listen

7  to the program.  And it also says another

8  reason the practice went with ContextMedia

9  over HAN was the loop was longer; right?

10     A.   Correct.

11     Q.   And did you also hear that one of

12  the reasons that certain practices preferred

13  sound was that they had a lot of elderly

14  patients who had trouble reading the messages

15  on the HAN content?

16     A.   I personally did not hear that

17  feedback, to which I would say how loud do

18  you need to have it and wouldn't that be

19  incredibly distracting.  But that's what I

20  would say to a practice, but I don't recall

21  ever having that conversation with a

22  practice.

23     Q.   And after you lose in this head to

24  head competition to ContextMedia, you write

25  Ms. Finley at the very top of the first page

LISA GRIPPO                                March 26, 2014
HEALTHY ADVICE NETWORKS vs. CONTEXTMEDIA

Page 89

1              L. Grippo

2    and say, "Sorry to be spreading bad news on a

3    yucky Monday morning, thought I would share

4    the feedback.  This is a six-doc practice

5    that we desperately needed to win!"  Looks

6    like that's probably a frown that didn't get

7    translated.  "So frustrating."

8         A.   "So frustrating."  Yes.

9         Q.   And a six-doc practice is a

10   particularly valuable practice; right?

11        A.   Absolutely.

12        Q.   Because at least at HAN, you don't

13   count your offices by practice but by docs;

14   right?

15        A.   We sell doctors, yes.  We don't.

16   The other side of the business does.

17        Q.   Right.  You get paid --

18        A.   So we needed to keep a certain

19   number of doctors within our network.

20        Q.   The business depends upon revenue;

21   right?

22        A.   Correct.

23        Q.   And that revenue comes from the

24   advertisers; right?

25        A.   Correct.

LISA GRIPPO                                March 26, 2014
HEALTHY ADVICE NETWORKS vs. CONTEXTMEDIA

Page 90

1              L. Grippo

2      Q.   And they pay based upon the number

3  of doctors; right?

4      A.   Correct.

5      Q.   And you say "This was a six-doc

6  practice that we desperately needed to win."

7  Do you know why you wrote that in December of

8  2011?

9      A.   Because we were losing a

10  significant number of doctors, and we needed

11  at the end -- the way that the business runs

12  is if you need to have an average of 100

13  doctors over the course of the year, if you

14  get all those doctors in January and you

15  maintain them for the year, beautiful.  If

16  you -- so it's average docs per month.  So

17  think about if you don't recruit those

18  doctors until July, what happens, it goes up

19  exponentially.  So in December --

20      Q.   Gotcha.

21      A.   -- it's really critical that we

22  make up those doctors so that we can average

23  out the docs per month for our contract with

24  our sponsors.  And that was another issue,

25  too, with regards to the sponsors, because,

LISA GRIPPO                                    March 26, 2014
HEALTHY ADVICE NETWORKS vs. CONTEXTMEDIA

Page 91

1           L. Grippo

2     you know, there were competing sponsors, and

3     they were taking money away, you know,

4     funding both programs and taking doctors away

5     from us, but.  Again, I'm going on.

6          Q.   Let me show you what we've marked

7     as Defendant's Deposition Exhibit 67.  This

8     appears to be another set of comments from

9     the CMS database that get forward up to you;

10    right?

11         A.   Yes.

12         Q.   And the comments say that the

13    practice has actually been turning HAN off;

14    right?

15         A.   Yes.

16         Q.   And that's because patients are

17    telling the practice that HAN's content is

18    boring, repetitive; right?

19         A.   Yes.

20         Q.   It's also noted that, "Looking at

21    past comments, we haven't reached out since

22    November except for sending cookies"; right?

23         A.   Yes.

24         Q.   And she notes, "I think we are in

25    jeopardy of losing them"; right?

Page 92

1          L. Grippo

2      A.   Yes.

3      Q.   She's writing this apparently in

4   February of 2013.  In the normal course of

5   things, would you reach out to a practice

6   just as a matter of maintenance of the

7   relationship more frequently than every two

8   months?

9      A.   There would certainly -- I'm sorry.

10  Can you ask repeat the question.

11     Q.   Let me ask a different question.

12  You told me earlier today that part of the

13  job of your folks was not simply to reach out

14  to practices you were trying to sell, but

15  practices that you had already sold, to make

16  sure that the relationship was good; right?

17     A.   Yes.  That was a goal, but you

18  still -- they still had to make their quotas.

19  So it was more important for them to -- they

20  needed to get to the practices and enroll new

21  practices, and when they were in the area and

22  could stop by existing practices, they would,

23  but that primarily fell on Amy's team in

24  terms of customer retention.  I don't

25  necessarily agree with it, but that's the way

Page 93

1          L. Grippo

2    that the compensation was set up.  They

3    weren't compensated to stop by to just

4    nurture the relationship.  And in many cases

5    they may or may not have enrolled that

6    practice, so.

7          Q.    So when you say you didn't

8    necessarily agree with that, do I understand

9    you to be saying that the compensation system

10   was structured in such a way that there were

11   no real financial incentives for salespeople

12   to stop by for the maintenance visits, if you

13   will?

14         A.    I think a good salesperson would do

15   that regardless, because ultimately if you're

16   maintaining that, it's less doctors that

17   you're going to have to replace because we're

18   not going to lose them.  What I had tried,

19   you know, we had talked about, not just me,

20   but we had talked about, well, you know,

21   could there be something where, you know, a

22   rep would be compensated somehow for stopping

23   in and having a conversation with regard to

24   the program, making sure that everything was

25   working correctly, because we were the feet

LISA GRIPPO                                     March 26, 2014
HEALTHY ADVICE NETWORKS vs. CONTEXTMEDIA

Page 94

1            L. Grippo

2    on the street.  It's very hard to do things

3    remotely.  But we did manage it remotely,

4    and, you know, for the most part we had very

5    good, very high customer ratings.  So it

6    really wasn't something that was deemed

7    necessary at the time.

8        Q.   What I was really trying to get at

9    was if you guys had some sort of schedule,

10   whether it was rigidly filed or just an

11   aspirational target, as to the frequency with

12   which you would be in touch with a practice

13   to see how things were going.

14       A.   Once we enrolled them, once it went

15   on the wall, it was Amy's team --

16       Q.   Gotcha.

17       A.   -- to maintain the contact with

18   them.  I would advocate for my reps if

19   they're in the area to stop by, because I

20   think it's just good business practice, but

21   they weren't compensated to do that.

22       Q.   And then Amy reaches out to you and

23   says, "Can we get someone from your team to

24   visit this office to try to save them."  Do

25   you see that?

LISA GRIPPO                                          March 26, 2014
HEALTHY ADVICE NETWORKS vs. CONTEXTMEDIA

Page 95

1              L. Grippo

2      A.   Yes.

3      Q.   Do you know whether you were able

4  to save this practice?

5      A.   I don't.  I believe I sent Sonya

6  there, but I don't -- I'm not sure.

7      Q.   This needs to be marked.  No.  It

8  has been marked.  Excuse me.  It's 68.  This

9  appears to be another email string with

10  respect to a practice who is moving from HAN

11  to ContextMedia that ends up at your doorstep

12  as well; right?

13     A.   Yes.  Jonathan.  I remember

14  Jonathan.  There were a lot of people who

15  were asked to go there, but I ended up going

16  there myself.

17     Q.   Johns Hopkins?

18     A.   Yes.

19     Q.   It's not a great neighborhood.

20     A.   No.  It really isn't.  And I am

21  honestly not certain when I went there --

22  this is in March.  Oh, I'm sorry.  Go ahead.

23  Ask the question.

24     Q.   Look at Page 9 when you're ready.

25  But spend whatever time you want with the

LISA GRIPPO                                    March 26, 2014
HEALTHY ADVICE NETWORKS vs. CONTEXTMEDIA

Page 96

 1                L. Grippo

 2    document.

 3         A.   Okay.

 4         Q.   It sounds like you have some memory

 5    of this situation.

 6         A.   Yes.

 7         Q.   And isn't it true this is a

 8    situation where Johns Hopkins already had

 9    ContextMedia installed in some of its offices

10    and had HAN installed in other offices;

11    right?

12         A.   I believe so, yes.

13         Q.   In fact, if you look at the email,

14    he's telling you that, he's saying he's

15    comparing the ContextMedia and the HAN

16    content.

17         A.   It says that he signed the waiver

18    provided by them to remove our -- gives them

19    permission to remove our equipment.  Yes.

20         Q.   So he's got a couple of screens

21    showing ContextMedia content; right?

22         A.   I guess so.

23         Q.   He's got a couple of screens

24    showing HAN content; right?

25         A.   Correct.

LISA GRIPPO                                    March 26, 2014
HEALTHY ADVICE NETWORKS vs. CONTEXTMEDIA

Page 97

1              L. Grippo

2        Q.    And he's telling you what his

3   judgments are as to the relative merits of

4   each; right?

5        A.    It would appear so.

6        Q.    He's not being lied to by

7   ContextMedia; right?  He's actually looking

8   at the actual product; right?

9              MR. COWAN:  Object to the form.

10       A.    I would guess that he's watched

11   them.  I mean I know very few -- and Jonathan

12   wasn't the final decision maker on this.

13       Q.    No, but he says that the other

14   rheumatology offices are using RHN and like

15   it because there is much more information,

16   not repetitive, with interviews, news wires,

17   and streaming weather; right?

18       A.    Yes.

19       Q.    And the HAN person says that she

20   explained that we have streaming weather, and

21   he said no, you really don't; right?

22       A.    Correct.

23       Q.    "He described our system as

24   repetitive and a very basic slide show";

25   right?

LISA GRIPPO                                        March 26, 2014
HEALTHY ADVICE NETWORKS vs. CONTEXTMEDIA

Page 98

1                    L. Grippo

2        A.    Correct.

3        Q.    Would you agree with me that this

4    is a situation where HAN lost out to

5    ContextMedia due to fair competition?

6              MR. COWAN:  Objection.  Go ahead.

7        A.    Yes.

8        Q.    I mean there's no better way to

9    evaluate the relative products than actually

10   examining both of them; right?

11       A.    Correct.

12       Q.    Let me show you what was previously

13   marked as Defendant's Exhibit 34.  Now, here

14   we have Amanda Devlin again reporting to you

15   and Ms. Finley and Ms. Brewer some additional

16   information she's received from Mr. Zmick at

17   ContextMedia; right?

18       A.    Yes.

19       Q.    And now she has gotten Mr. Zmick to

20   send some examples of ContextMedia's content;

21   right?

22       A.    Yes.

23       Q.    Or some links to physical activity,

24   recipe example, and personal story example.

25   Do you see that?

Page 99

1                    L. Grippo

2          A.    Yes.

3          Q.    And on the back page he writes, "We

4    will then coordinate the installation with

5    you upon the removal of Accent Health";

6    right?

7          A.    Yes.

8          Q.    At this point in time Ms. Devlin is

9    telling Mr. Zmick at ContextMedia that she's

10   from Dr. Corbett's office and they have

11   Accent Health; right?

12         A.    Apparently.

13         Q.    And he's not saying we'll take the

14   equipment down, he's saying that the practice

15   has to have Accent Health do it; right?

16         A.    Yes.

17         Q.    Do you know for how long a period

18   of time Ms. Devlin kept up this charade with

19   Mr. Zmick in order to gain information about

20   ContextMedia?

21         A.    I do not know exactly.  I believe

22   it was just a couple of email exchanges and

23   then that was -- she had indicated that she

24   was not interested or something along those

25   lines.

Page 100

1              L. Grippo

2        Q.    Did personnel at HAN besides

3    Ms. Devlin misrepresent themselves to Context

4    in order to find out information about

5    Context, to your knowledge?

6        A.    No.

7        Q.    Did HAN do that with other

8    competitors besides ContextMedia, to your

9    knowledge?

10       A.    No.

11       Q.    Let me show you what was previously

12   marked as Exhibit 35.  This is more

13   information from Ms. Devlin to you and

14   Ms. Brewer that Ms. Devlin has been able to

15   get from Mr. Zmick; is that right?

16       A.    Yes.

17       Q.    And now what Ms. Devlin is telling

18   Mr. Zmick, if you look at Page 2, is the

19   doctor preferred a silent program; right?

20       A.    Yes.

21       Q.    And Mr. Zmick then makes the

22   assumption that what Ms. Devlin is talking

23   about is HAN's product; right?

24       A.    Yes.

25       Q.    Because you were the only

LISA GRIPPO                                          March 26, 2014
HEALTHY ADVICE NETWORKS vs. CONTEXTMEDIA

                                                    Page 101

1              L. Grippo

2    competitor out there that had a silent

3    program; right?

4         A.    Correct.

5         Q.    So that was a fair assumption on

6    his part; right?

7         A.    Correct.

8         Q.    And he says "We also have a silent

9    loop program.  It is longer and much more

10   thorough than the Healthy Advice that you are

11   interested in"; right?

12        A.    That's what he says.

13        Q.    And then she gets him now to send

14   ContextMedia's silent content; right?

15             MR. COWAN:  Objection.

16        A.    Yes.  He asked if she would like to

17   see it.  She said she could show it to him,

18   but he's already made his decision.  And then

19   he sends those two examples here.

20        Q.    Of a silent loop?

21        A.    Of a silent loop.

22        Q.    This was previously marked as

23   Defendant's Exhibit 47.  Now, you're not on

24   this email, but do you know as of

25   February 28th, 2011, what position Mike

LISA GRIPPO                                    March 26, 2014
HEALTHY ADVICE NETWORKS vs. CONTEXTMEDIA

Page 102

1            L. Grippo

2    McAllister was in?

3        A.   I believe he was the chief

4    operating officer.

5        Q.   And he's asking Ms. Finley why

6    practices are saying they like ContextMedia

7    content over HAN's; right?

8        A.   Yes.

9        Q.   And Ms. Finley is the person to ask

10   that question; right?

11       A.   Her and her team would get the

12   feedback, yes.

13       Q.   And she says, "We're hearing sound,

14   cooking segments, and recipes.  Some have

15   just said the doctors like the overall

16   content better than ours"; right?

17       A.   Yes.

18       Q.   She doesn't say anything about

19   unethical conduct or misleading practices,

20   does she?

21       A.   She does not.

22       Q.   Let me hand you what was previously

23   marked as Defendant's Deposition Exhibit 74.

24   Now, this is a relatively long email chain.

25   It starts from what appears to be a comment

Page 103

1              L. Grippo

2    from the CMS database where a practice is

3    saying they're switching to ContextMedia

4    because ContextMedia offered them a gift

5    card.

6         A.   Okay.

7         Q.   And that the practice would

8    consider HAN if HAN would offer the same

9    deal.  Do you see that?

10        A.   Where are you?  Oh, here.

11   ContextMedia offered an American Express

12   card.  They said if we would offer, they

13   would feel free to stay.  Okay.

14        Q.   And then there's a discussion in

15   the email chain about bringing this to the

16   attention of J3.  Do you know who J3 is?

17        A.   I don't.

18        Q.   Were you involved in efforts at HAN

19   to try to cast ContextMedia in a negative

20   light with the advertising sponsor side of

21   the business?

22        A.   I was not.  I did always advocate

23   for exclusivity with the sponsors,

24   particularly in a program as small as

25   rheumatology, because if the same sponsor was

LISA GRIPPO                                March 26, 2014
HEALTHY ADVICE NETWORKS vs. CONTEXTMEDIA

Page 104

1              L. Grippo

2     sponsoring both programs, they were

3     essentially funding the removal of our

4     doctors.

5          Q.   Then if I could direct your

6     attention, since you weren't involved in the

7     J3 activity, to Page 4.  It looks like here's

8     where you come into the loop when Jill Brewer

9     writes to Mr. McAllister and Mr. Campbell, a

10    bunch of other folks, and you; right?

11         A.   Yes.

12         Q.   And the folks on this email

13    comprise all of HAN's senior management plus;

14    right?

15         A.   Correct.

16         Q.   So Mr. --

17         A.   Senior and mid-level, yes.

18         Q.   So Ms. Brewer was senior

19    management; right?

20         A.   Correct.

21         Q.   And so was Mr. McAllister and

22    Mr. Campbell; right?

23         A.   Yes.

24         Q.   Ms. Schnell was as well; right?

25         A.   Yes.  And as well as Sabrina and

Page 105

1          L. Grippo

2    Scott.

3          Q.    How about Ms. Ruschau?

4          A.    Based on her title, I would think

5    that she was, but I'm not sure if she was

6    part of senior management at that point.

7          Q.    But this is all of senior

8    management and some of middle management;

9    right?

10         A.    Correct.

11         Q.    And she writes, "At some point we

12   need to get together to discuss a plan to

13   sustain this universe into 2012 as it doesn't

14   look like these guys are going away."  Do you

15   see that?

16         A.    Yes.

17         Q.    And then she also writes that

18   "Attached are two emails" -- and I don't have

19   those -- "one where it shows that RHN is

20   buying, yes, buying ads on Google and we all

21   know this ain't cheap"; right?

22         A.    Yes.

23         Q.    See that?

24         A.    Yes.

25         Q.    And that's fair competition, isn't

Page 106

1          L. Grippo

2     it, buying an ad on Google?

3          A.   Yes.

4          Q.   "And they developed a silent

5     version of their network to compete directly

6     with us."  That's fair competition; right?

7          A.   Yes.

8          Q.   And then she says in parens, "Keep

9     in mind that Bernie is the alias that Amanda

10    Devlin used to dialogue with RHN to get the

11    information attached."  Do you see that?

12         A.   Yes.

13         Q.   That's not fair competition, is it?

14         A.   She definitely misrepresented

15    herself.  We obviously couldn't call to find

16    out about their programming, but -- so is

17    that fair?  I would say no.  I don't know

18    that we would have -- would not have been

19    able to get this information off of their web

20    site, but Amanda misrepresenting herself was

21    not being forthcoming.

22         Q.   Right.  And when you believe

23    ContextMedia behaves unethically in the

24    marketplace, you think that's unfair

25    competition; right?

LISA GRIPPO                                  March 26, 2014
HEALTHY ADVICE NETWORKS vs. CONTEXTMEDIA

Page 107

1                    L. Grippo

2          A.    We were not disparaging

3    ContextMedia to customers.  We were calling

4    them trying to understand their program so

5    that we understood what we were up against

6    and, you know, why we were hearing all of

7    this negative stuff from our -- from

8    customers that have been with us for so many

9    years.  So is it unethical, yes, in looking

10   at it in hindsight, okay.  But, again, she

11   wasn't disparaging the company.  She was

12   sharing information internally with us so

13   that we knew what the competition was and

14   what they were doing and what they were

15   saying about us.

16         Q.    No, I understand the distinction

17   you're drawing.  I guess where I was headed

18   with this was if ContextMedia behaves

19   unethically, you think it's unfair

20   competition.  And I was wondering if what's

21   good for the goose is good for the gander and

22   you also believe that when you behave

23   unethically, that's unfair competition.

24              MR. COWAN:  Object to the form.

25         There's a lot in there, but go ahead.

LISA GRIPPO                                    March 26, 2014
HEALTHY ADVICE NETWORKS vs. CONTEXTMEDIA

Page 108

1              L. Grippo

2       A.    No.

3       Q.    I'll withdraw the question.

4       A.    That's okay.

5       Q.    I'll withdraw it.

6       A.    That's fine.  Well, I don't mind

7    answering it.

8       Q.    Okay.

9       A.    As I think I said earlier, I'm

10   quite certain, and I don't know for sure

11   whether it was ContextMedia or Accent Health

12   or whoever, but over the course of my nine

13   years, I'm quite certain that competitors

14   called in claiming to be a doctor's office

15   wanting information regarding our programming

16   and how they went about enrolling, whether

17   they ended up starting a competitor or they

18   were from a competitor, I'm quite certain

19   that type of activity goes on.  I'm not going

20   to disagree with you that it could be

21   perceived as unethical.  But, again, this

22   wasn't client, customer facing.  This was

23   internal.  This was our own due diligence, if

24   you will, with regards to who the competitors

25   were, because we never really had competitors

LISA GRIPPO
HEALTHY ADVICE NETWORKS vs. CONTEXTMEDIA

March 26, 2014

Page 109

1          L. Grippo

2     in the space.

3          Q.   Yeah, it wasn't like telling a

4     practice when they had a contract with a

5     competitor that it wasn't really binding.  It

6     wasn't that kind of thing; right?

7               MR. COWAN:  Objection.

8          A.   No, it is not.

9          Q.   Okay.  And above that Ms. Ruschau

10    writes to the group, and you're still there,

11    and she says, "Thanks for sharing the

12    information, Jill.  And great detective work,

13    Amanda!"  Do you see that?

14         A.   Yes.

15         Q.   That's hardly a reprimand for

16    unethical conduct, is it?

17         A.   No.

18         Q.   And then she says, "Speaking of

19    ContextMedia, they're obviously being VERY,"

20    in all caps, "aggressive and smart."  Do you

21    see that?

22         A.   Yes.

23         Q.   Being smart is not unfair

24    competition, is it?

25         A.   No.

LISA GRIPPO                                    March 26, 2014
HEALTHY ADVICE NETWORKS vs. CONTEXTMEDIA

Page 110

 1              L. Grippo

 2        Q.    And then she concludes by saying,

 3   "It is obvious that we have to put a larger

 4   emphasis on retention and truly partnering

 5   with our practices if we are going to win or

 6   compete."  Do you see that?

 7        A.    Yes.

 8        Q.    And she's suggesting there that

 9   perhaps HAN wasn't doing as good a job as it

10   should have been on retention and truly

11   partnering with our practices; correct?

12        A.    "It is obvious we have to put a

13   larger emphasis on retention and truly

14   partnering with our practices if we are going

15   to win or compete," yes.

16        Q.    She's suggesting that HAN needs

17   some improvement in that area; right?

18        A.    More emphasis.  Could be

19   improvement, but she just says more emphasis.

20        Q.    In the second to last email in this

21   chain which begins on Page 1 is from Jill

22   Brewer to the group.  She starts by

23   commenting on the ContextMedia silent content

24   after she's looked at the loops; right?  Is

25   that correct?

ESQUIRE SOLUTIONS                    800.211.DEPO (3376)
                                     EsquireSolutions.com

LISA GRIPPO                                    March 26, 2014
HEALTHY ADVICE NETWORKS vs. CONTEXTMEDIA

Page 111

 1              L. Grippo

 2       A.    I'm sorry.  What did you ask me?

 3       Q.    Doesn't Ms. Brewer start off by

 4   commenting on the ContextMedia silent content

 5   there at the bottom of Page 1?

 6              MR. COWAN:  Page 4?  What did you

 7       say?

 8              MR. O'BRIEN:  No.  Page 1.

 9              MR. COWAN:  Page 1.

10       A.    It says -- it looks like she's

11   answering a question.  I just don't know what

12   the question is.  I won't read out loud.  The

13   one before that just says, "Lips still

14   moving.  Amazing."  I don't understand what

15   she's answering.  But yes, she's commenting

16   on their -- what she -- the segments that she

17   viewed and her thoughts on those.

18       Q.    The segment that she viewed of

19   ContextMedia's silent content; right?

20       A.    Yes.

21       Q.    And she says that "Some segments

22   have video with closed caption and some are

23   flash animation or Power Point slides."  Do

24   you see that?

25       A.    Yes.

LISA GRIPPO                                    March 26, 2014
HEALTHY ADVICE NETWORKS vs. CONTEXTMEDIA

Page 112

1              L. Grippo

2       Q.    She goes on to say, "which is how

3    they describe our programming prospects";

4    right?

5       A.    Yes.

6       Q.    And in the third paragraph on

7    Page 2 she writes, "With regard to churn,

8    what we've heard is that many offices are

9    just trying something new or that there is a

10   new manager, so they don't know us or the

11   product well."  Do you see that?

12      A.    Yes.

13      Q.    And at this time Ms. Finley reports

14   to Ms. Brewer; right?

15      A.    Yes.

16      Q.    So you would expect Ms. Brewer to

17   also be knowledgeable about why practices

18   were switching from HAN to ContextMedia;

19   right?

20           MR. COWAN:  Objection.  Go ahead.

21      A.    I don't know when this is.  I mean

22   we certainly learned as we heard about them.

23   But yes, Amy would report to Jill what we

24   were hearing with regard to competitor

25   information.

LISA GRIPPO                                    March 26, 2014
HEALTHY ADVICE NETWORKS vs. CONTEXTMEDIA

Page 113

1            L. Grippo

2       Q.   Right.  Let's look at what we've

3   previously marked as Defendant's Exhibit 82.

4   Is this one of the emails you saw the other

5   day with your lawyer?

6            MR. COWAN:  Today.

7       A.   Today.

8       Q.   Today.

9       A.   Yes.

10      Q.   And at the end of this chain you

11  write, "Let's see what she says."  "She" is

12  Jill Brewer; right?

13      A.   Yes.

14      Q.   "I think we are opposed in

15  principle but we may need to do this

16  occasionally.  I think Jill would be in

17  favor, but Kimberly is opposed."  Do you see

18  that?

19      A.   Yes.

20      Q.   And this is a reference to taking

21  down ContextMedia's equipment; right?

22      A.   Correct.

23      Q.   And do you know if Ms. Brewer ever

24  approved of that?

25      A.   She did not.

LISA GRIPPO                                    March 26, 2014
HEALTHY ADVICE NETWORKS vs. CONTEXTMEDIA

Page 114

 1              L. Grippo

 2       Q.    You presented it to her and she

 3   declined to approve that?

 4       A.    Correct.

 5              MR. O'BRIEN:  We'll break.

 6              VIDEOGRAPHER:  The time is

 7       3:53 p.m. on March 26, 2014.  This is

 8       the end of tape number two.

 9              (Recess taken from 3:53 p.m. to

10       4:11 p.m.)

11              VIDEOGRAPHER:  The time is

12       4:11 p.m. on March 26, 2014.  This is

13       tape number three.  Back on the record.

14       Q.    Let me show you and your counsel

15   what has previously been marked as

16   Defendant's Exhibit 83.

17       A.    Yes.

18       Q.    This appears to be another email

19   chain where you're proposing the possibility

20   of taking down ContextMedia's equipment;

21   right?

22       A.    I think this is the same practice.

23       Q.    You think it's the same practice?

24       A.    (Indicating).

25       Q.    Okay.  So --

Page 115

1              L. Grippo

2        A.    I only recall proposing it one

3    time, against my better judgment, and we

4    never did.

5        Q.    And so when you say on Page 2 "I am

6    sure Jill will approve of taking down the RHN

7    equipment," I take it it turns out you were

8    wrong?

9        A.    Correct.  All fired up at the time,

10   apparently.

11       Q.    Did I miss something?  Let me show

12   you what was previously marked as Defendant's

13   Exhibit 84.  This is an email exchange

14   involving a practice switching out from HAN

15   to ContextMedia; right?

16       A.    Yes.

17       Q.    Was there any rhyme or reason as to

18   when comments from the CMS database regarding

19   a practice leaving HAN would find its way to

20   your side of the business?  Was it done all

21   the time, just when it was in your region,

22   just when they thought you could contribute

23   something to the save effort?

24       A.    Typically, if they believed that we

25   could do something to help save, but also

LISA GRIPPO                                    March 26, 2014
HEALTHY ADVICE NETWORKS vs. CONTEXTMEDIA

Page 116

1              L. Grippo

2    just to share something that may have been

3    learned that we learned that they did at a

4    practice.

5         Q.   So somewhat ad hoc?

6         A.   If I was going to be involved in

7    the save, that would always come to me.  I

8    would occasionally see -- be forwarded

9    comments from Amy's team regarding what we

10   had learned that had happened at a particular

11   practice.  So I can't say that I saw every

12   email with regards to RHN.

13        Q.   Well, if you had, we would have

14   been here a lot longer.

15        A.   I'm sure.

16        Q.   You mentioned earlier today that

17   the company maintains save statistics.  In

18   what format did you see those?  Was it a

19   report devoted to saves?  Was it a column in

20   the CMS database?

21        A.   Statistics on churn, so on

22   practices that we had lost, but particularly

23   with regard to saves, I don't know that I

24   ever saw -- Amy would compute that.  I

25   honestly -- I'm not sure if she would keep it

LISA GRIPPO                                     March 26, 2014
HEALTHY ADVICE NETWORKS vs. CONTEXTMEDIA

                                                  Page 117

 1                    L. Grippo

 2    in Excel or -- I'm sure she created some sort

 3    of Excel document or something.

 4          Q.   You saw churn reports from time to

 5    time; right?

 6          A.   Yes.

 7          Q.    And do you recall that those churn

 8    reports had information in them about saves

 9    as well?

10          A.    I don't recall.  They would be

11    linked, because if we were saving it, the

12    churn would be less.  But I really don't

13    recall what those reports look like.

14          Q.    Do you recall statistics on

15    percentages of saves once a practice had

16    notified HAN that it wanted to leave?

17          A.    Yes.

18          Q.    And where did you see those?

19          A.    In Amy's churn report.

20          Q.    And were those reflected as a

21    percentage of save -- are you a baseball fan?

22          A.    Yes.

23          Q.    Were they recorded as a percentage

24    of save opportunities?

25          A.    Percent of save -- I don't recall

LISA GRIPPO                                    March 26, 2014
HEALTHY ADVICE NETWORKS vs. CONTEXTMEDIA

Page 118

1              L. Grippo

2    ever seeing that number, no.

3         Q.   How did you see the statistics

4    presented, then?  Just gross number of saves?

5         A.   Well, I would see historical churn

6    rate by program year over year.  And I never

7    actually saw it until this became an issue

8    with rheumatology.  But it was a number that

9    we always tracked, because we needed to know

10   our historical churn rate so that we could

11   factor that into the numbers we needed to

12   acquire in the following year in order to

13   maintain that average doc per month.  Does

14   that make sense?

15        Q.   Yeah.  But my question was when you

16   saw the save numbers, were they presented as

17   a gross number, eight number of saves, or are

18   they presented as eight number of saves

19   reflecting the percentage of five percent of

20   save opportunities?

21        A.   I never saw a percentage of save

22   opportunities number.  I would simply see the

23   percent churn.

24        Q.   Okay.

25             MR. COWAN:  That's what -- because

LISA GRIPPO                                    March 26, 2014
HEALTHY ADVICE NETWORKS vs. CONTEXTMEDIA

Page 119

1              L. Grippo

2         it was unclear to me if you had really

3         established that there were save

4         numbers.  I just want to make sure I

5         understand that.

6              MR. O'BRIEN:  Well, you'll get a

7         chance to ask her questions.  I mean I

8         think she said a couple times today

9         that --

10             MR. COWAN:  Yeah, it was a little

11        -- it was gray, but go ahead.  You're

12        right.  I've got my own time.

13        Q.   Were the save numbers you saw

14   specific as with the churn numbers you saw to

15   programs?

16        A.   The reports that came out regularly

17   were churn reports, but we were discussing --

18   we were trying to save practices.  So I'm

19   quite certain that I saw something at a point

20   in time that, you know, had number of

21   practices, number saved, number lost.

22   Whether that was in the same -- I don't

23   believe it was the same report.  I think it

24   was something that we started creating, and I

25   think it was Excel.

Page 120

```
 1              L. Grippo
 2        Q.    And was it by program?
 3        A.    Yes.
 4        Q.    So there would be some numbers for
 5   PCN, there would be some numbers for ACN?
 6        A.    Correct.
 7        Q.    What's your educational background?
 8        A.    I have an undergraduate degree in
 9   psychology and a master's in human resource
10   management.
11        Q.    And from which institutions and
12   what years?
13        A.    I graduated in '91 from SUNY
14   Oneonta, and I graduated in I think '96 from
15   Mercy College.
16        Q.    I gave you 84; right?
17        A.    Yes.
18        Q.    Now, the beginning of this involves
19   a practice notifying HAN that it's switching
20   to ContextMedia.  You stated "They offered
21   him such a great incentive that he has to go
22   with them, probed, but he would not reveal
23   the incentive.  Began to schedule the removal
24   and he said, oh, no, RHN will take the
25   equipment down and ship it to you.  I
```

Page 121

1           L. Grippo

2    explained that if anything happened to the

3    equipment, his office would be responsible."

4    Do you see that?

5           A.    Yes.

6           Q.    And then he says in response to

7    that, "He said that we took the equipment

8    down," we being HAN, "when we," being HAN,

9    "enrolled them, and he just thought it was an

10   industry standard."  Did you see that?

11          A.    Who is speaking on behalf of HAN?

12          Q.    Well --

13          A.    This is Michael Chung had decided

14   to go with RHN because of an incentive that

15   they offered him.  We couldn't find out what

16   that was.  He said he began to schedule --

17   no.  Who is it.  Liz began to schedule the

18   removal, and he said, "No, don't worry about

19   scheduling it, RHN will take down the

20   equipment and ship it to you."  And then Liz

21   explains that if anything happened to the

22   equipment, that his office would be

23   responsible.  And he said, and I'm guessing

24   this is Michael Chung, that we, the practice,

25   took the equipment down when we enrolled

Page 122

1          L. Grippo

2     them, and he just thought it was industry

3     standard.

4          Q.   So when Liz Billman writes "we,"

5     you think she's referring to the practice and

6     not HAN?

7          A.   He said we took the equipment down,

8     meaning the practice.

9          Q.   That part is not in quotes like the

10    other stuff, is it?

11         A.   No.  But he said we took the

12    equipment down when we enrolled them.  So I'm

13    guessing that she meant when they enrolled

14    with RHN, because if they were enrolling with

15    us, why would we take equipment down.  We

16    would be putting it up.

17         Q.   Not if you were switching something

18    out, like a cable TV or a competitor's

19    equipment.

20         A.   But we didn't do such things.

21         Q.   That was my next question.  As far

22    as you know, HAN never took down the

23    equipment of some other party?

24         A.   No, as far as I know.  And now

25    you're going to get me on my bad sense of

LISA GRIPPO                                          March 26, 2014
HEALTHY ADVICE NETWORKS vs. CONTEXTMEDIA

Page 123

 1              L. Grippo

 2    humor.

 3         Q.   I'm sorry.

 4         A.   And now you're going to get me on

 5    my bad sense of humor.

 6         Q.   I don't know what to say to that.

 7    Then you write, "Can we steal their sponsors

 8    so they run out of money."

 9         A.   Yes.

10         Q.   What did you mean by that?

11         A.   As I had said earlier, one of the

12    issues that I had as a manager in the field

13    -- I'm sorry, my eyes are watering -- was the

14    fact from the client side that they would

15    sell to our sponsors.  Maintaining -- you

16    know, it was really important to make sure

17    that our sponsors were only funding our

18    educational programs regardless of whether it

19    was primary care, cardiology, rheumatology,

20    because the reality is if we don't have

21    exclusivity, then they're essentially funding

22    our competitors to take our doctors away from

23    us, which is what we found out to be the case

24    with Humera.  And that was a huge issue for

25    me.  And so essentially they took our sponsor

LISA GRIPPO                                    March 26, 2014
HEALTHY ADVICE NETWORKS vs. CONTEXTMEDIA

Page 124

1              L. Grippo

2    away so that we -- and we were in a lot of

3    trouble, so I was jokingly, obviously not

4    good taste, saying, well, let's steal their

5    sponsor so that they run out of money.

6         Q.   That wasn't a real action item, you

7    were just being humorous?

8         A.   Facetious, yes.

9              MR. COWAN:  Dick didn't think that.

10             MR. O'BRIEN:  I'm sorry?

11             MR. COWAN:  You knew that.

12             MR. O'BRIEN:  I get surprised every

13        day.  You know, I forgot what the last

14        number was.  It was somewhere between 80

15        and 85.  So why don't we just guess and

16        mark this as 85.

17             (Defendant's Exhibit 85, Email

18        exchange, marked for identification, as

19        of this date.)

20        Q.   I've handed to you what has now

21   been marked as Defendant's Exhibit 85.  This

22   starts off with an exchange, which doesn't

23   look like you're involved again, where HAN is

24   trying to get J3's attention about things

25   that ContextMedia is doing.  And then on

Page 125

1                L. Grippo

2    Page 2 there's an email that you've already

3    seen from Jill Brewer about sustaining the

4    universe.

5         A.    Yes.

6         Q.    And then there's an email that you

7    add to the chain that appears on Page 1.

8         A.    Yes.

9         Q.    And you're writing to --

10        A.    My team.

11        Q.    That's your team.  Okay.  Thank

12   you.  And then sort of as a PS at the bottom

13   you write, "Also, they are obviously sharing

14   information with Amanda, a/k/a Bernie, even

15   though she does not really represent any

16   doctors."  And the "they" there is

17   ContextMedia; right?

18        A.    Yes.

19        Q.    And you say, "Be carful who you

20   send disclosed information to.  They should

21   be verified."

22        A.    Correct.

23        Q.    So drawing on your experience of

24   Ms. Devlin being so successful at getting

25   information from ContextMedia, you're telling

Page 126

1              L. Grippo

2    your team don't fall for a similar ruse;

3    right?

4         A.   Correct.

5              MR. O'BRIEN:  So this will be 86.

6              (Defendant's Exhibit 87, Email

7         exchange involving Ms. Grippo,

8         Mr. Ferrara, and Mr. Hartfield, marked

9         for identification, as of this date.)

10             MR. O'BRIEN:  You know what, can we

11        remark that.  It looks like our last

12        exhibit was 86.  And I'll correct the

13        others at some other point in time, but

14        can we remark this one as 87.

15             MR. COWAN:  Yeah, that's fine.

16             MR. O'BRIEN:  At least we'll have

17        one less mistake.

18        Q.   This is an email exchange involving

19   you and Mr. Ferrara and Mr. Hartfield; right?

20        A.   Yes.  Ms. Hartfield.

21        Q.   And it doesn't tell us what site is

22   involved here.  But this is an example where

23   a practice is switching to ContextMedia

24   because the practice felt its content was

25   more geared towards rheumatoid arthritis;

LISA GRIPPO                                    March 26, 2014
HEALTHY ADVICE NETWORKS vs. CONTEXTMEDIA

Page 127

1              L. Grippo

2    right?

3              MR. COWAN:  Objection.  Go ahead.

4         A.   So my comment is, "Looks like the

5    site switched to CM," ContextMedia.  "They

6    felt it was geared more towards rheumatoid

7    arthritis rather than a more general

8    rheumatology program."  Yes.

9         Q.   And you're reporting that --

10   Ms. Hartfield is reporting that to you.  I'm

11   sorry.  I got that wrong, didn't I?

12        A.   Yes.

13        Q.   And she tells you that the patient

14   felt they would get more value from that;

15   right?

16        A.   Yes.  I was copied on this.  None

17   of this was my words.

18        Q.   Now let me show you what was

19   previously marked as 86.  You're not shown on

20   this, but the only question I have for you is

21   you see -- did Ms. Hartfield report to you?

22        A.   No.  She reported to Kelly.

23        Q.   I see.  And Kelly reported to who?

24        A.   Amy.

25        Q.   And she writes here, "Hey, I

LISA GRIPPO                                          March 26, 2014
HEALTHY ADVICE NETWORKS vs. CONTEXTMEDIA

Page 128

1              L. Grippo

2    REALLY," all caps, "need you to delete this

3    comment."  Do you see that?

4         A.   Yes.

5         Q.   Were you aware of circumstances

6    where it was HAN's practice to require that

7    comments received from practices as to why

8    they switched were to be deleted?

9         A.   No.

10        Q.   Can you shed any light on why

11   Ms. Hartfield wrote this?

12        A.   Let me read it.  I can't imagine

13   why she would request that, and I can't

14   imagine that Kelly would honor it.  But I'll

15   read it.  Unless it was inaccurate, I don't

16   know.  I don't know why she would make such a

17   request.

18             MR. O'BRIEN:  I think the only

19        exhibit we're going to need to fix,

20        we've got two 85s now.

21             MR. COWAN:  That's fine.

22             MR. O'BRIEN:  But we can work that

23        out.

24             MR. COWAN:  Sure.

25             MR. O'BRIEN:  And I've got no

LISA GRIPPO                                          March 26, 2014
HEALTHY ADVICE NETWORKS vs. CONTEXTMEDIA

Page 129

1              L. Grippo
2       further questions.  Thank you for your
3       time.
4              THE WITNESS:  Okay.
5              MR. COWAN:  I have a --
6              THE WITNESS:  Well, I have just a
7       couple things.  The other thing I will
8       say to this is with regards to honesty,
9       that was sort of a sticking point with
10      Jill.  And I can't imagine that she
11      would have reacted favorably to this
12      request.  So I don't know why this was
13      done.
14             And I just wanted to say, in case
15      it wasn't clear, and I know a lot of
16      what I know about the situation was not
17      directly reported to me.  It was
18      reported to my peers.  It was reported
19      to me by my reps and not directly to me.
20      The only reason I came here today, and
21      not that I'm here to advocate for
22      PatientPoint, and we certainly over the
23      years had more than our fair share of
24      competitors, primarily Accent Health.  I
25      don't think that we would have been --

LISA GRIPPO                                            March 26, 2014
HEALTHY ADVICE NETWORKS vs. CONTEXTMEDIA

Page 130

 1              L. Grippo
 2       we would be here today if there weren't
 3       tactics employed early on by
 4       ContextMedia, whether they are smart or
 5       aggressive, that were, you know,
 6       obviously they were deemed unethical.
 7       And I've never -- and maybe it is, maybe
 8       other companies act this way, but the
 9       only reason I wanted to come in here
10       today is because it was very frustrating
11       for us when we're trying to operate in a
12       certain way, and Health Monitor, too.
13       And at conferences I would talk to the
14       people from Health Monitor.  They're
15       like we can't believe some of the things
16       that they're doing and that we're
17       hearing from practices.  So that's the
18       only reason that I'm here today.
19            And, you know, fair competition, is
20       their program superior in some regards,
21       maybe.  Is it more engaging, perhaps.
22       You know, if a practice fairly evaluated
23       both of them and chose to go with
24       theirs, then yeah.  Then if we didn't
25       clearly articulate the value of ours

LISA GRIPPO                                          March 26, 2014
HEALTHY ADVICE NETWORKS vs. CONTEXTMEDIA

Page 131

1            L. Grippo

2        over theirs, then we deserve to lose

3        them.  But I don't think it's fair that

4        our practices were continually barraged

5        with calls, that they were showing up

6        and taking down equipment.  And whether

7        it happened once or whether it happened

8        a hundred times, it's just -- that was

9        really the reason that I wanted to come

10       today, because it was just very -- like

11       I can't believe these guys are getting

12       away with it.  And I just said we should

13       be suing them.  And apparently we are.

14       Or they did.  They are.  So I just

15       wanted that being stated for the record,

16       as I'm not going to be at any trial if

17       there is one, so.

18            MR. O'BRIEN:  And I move to strike

19       all that as not being responsive to any

20       question.

21            THE WITNESS:  Okay.

22   EXAMINATION BY

23   MR. COWAN:

24       Q.   You do recall when Mr. O'Brien told

25   you that if you had anything to offer at any

LISA GRIPPO                                    March 26, 2014
HEALTHY ADVICE NETWORKS vs. CONTEXTMEDIA

                                                    Page 132

 1              L. Grippo

 2      point during the course of the deposition, to

 3      do that?

 4          A.   Yes.

 5              MR. O'BRIEN:  If it was in response

 6          to a question.

 7              MR. COWAN:  Can we go off the

 8          record.

 9              VIDEOGRAPHER:  The time is 4:33.

10          We're going off the record.

11              (Discussion off the record.)

12              VIDEOGRAPHER:  The time is

13          4:34 p.m.  We're back on the record.

14          Q.   Ms. Grippo, Grant Cowan.  Because

15      you're not going to be present for trial, I

16      would like to ask you just a few follow-up

17      questions following on some of what

18      Mr. O'Brien asked you.

19              At one point I think you said that

20      it's your understanding that a lot of what

21      Context did in terms of trying to penetrate

22      the practices was done remotely either by

23      phone or by email?

24          A.    Correct.

25          Q.    Were you privy to any of the calls

LISA GRIPPO                                    March 26, 2014
HEALTHY ADVICE NETWORKS vs. CONTEXTMEDIA

Page 133

1              L. Grippo

2    that took place between Context and any of

3    the HAN practices that switched?  Were you a

4    party to those calls?

5         A.   No.

6         Q.   Do you have any idea what was said

7    on any of these calls?

8         A.   Only what was relayed to me, but

9    nothing specific.  You know, I was never part

10   of any -- I never listened in on any of those

11   calls.

12        Q.   And you have not seen any of the

13   ContextMedia emails or any emails that were

14   sent to HAN practices, have you, where they

15   were articulating whatever it was that they

16   were trying to articulate in terms of the

17   sale?

18        A.   Just the one to Amanda.  Just the

19   ones, I guess the emails to Amanda.

20        Q.   So as you sit here today, you don't

21   know what specifically the HAN practices were

22   told by ContextMedia employees?

23        A.   With absolute certainty?

24        Q.   Right.

25        A.   No.

ESQUIRE SOLUTIONS                    800.211.DEPO (3376)
                                     EsquireSolutions.com

Page 134

1            L. Grippo

2       Q.    And you don't know what things that

3   were told by Context to the practices the

4   practices relied upon in making their

5   decision to switch, do you?

6       A.    No.

7       Q.    For instance, if a practice was

8   told by ContextMedia that they had in the

9   last year switched out 350 HAN practices, you

10  don't know whether the practice was

11  influenced by that statement, do you?

12      A.    No.

13      Q.    You don't know if a practice was

14  told by ContextMedia that the HAN loop was

15  simply a Power Point loop, you don't know

16  whether or not the practice was influenced by

17  that statement, do you?

18      A.    Whether or not the practice was

19  influenced or --

20      Q.    Yes.

21      A.    -- whether or not they said it?

22  Yes, I do not know whether or not they would

23  be influenced for certain.

24      Q.    And you don't know if ContextMedia

25  told a practice that the HAN loop consisted

LISA GRIPPO                                                    March 26, 2014
HEALTHY ADVICE NETWORKS vs. CONTEXTMEDIA

Page 135

1              L. Grippo

2      of approximately 50 percent ads, you don't

3      know if the practice was influenced by that

4      statement, do you?

5          A.   I would venture to say that they

6      would be.  That was always a sticking point

7      with practices, the percentage of ads.  But

8      could I say with certainty, no.  Sorry.

9          Q.   Mr. O'Brien asked you about your

10     experience or knowledge of the types of

11     things that are important to practices.  As

12     you sit here today, do you believe that it is

13     possible that a practice might be influenced

14     by being told that some 350 other HAN

15     practices had switched to Context in the last

16     year?

17         A.   Absolutely.

18         Q.   And do you think that a practice

19     might be influenced by being told that the

20     HAN loop consists of upwards of 50 percent

21     ads?

22         A.   Without a doubt.

23         Q.   Now, in response to every question

24     that Mr. O'Brien asked you about why a HAN

25     practice switched to Context, every bit of

LISA GRIPPO                                    March 26, 2014
HEALTHY ADVICE NETWORKS vs. CONTEXTMEDIA

Page 136

1              L. Grippo

2    information that you have on that subject is

3    information that was told by a practice to

4    somebody at HAN; is that correct?

5         A.   Correct.

6         Q.   So every bit of information as to

7    what led a practice -- that you testified to

8    why a practice might have left is based on

9    something somebody other than HAN told HAN;

10   is that correct?

11        A.   Correct.

12        Q.   You had said in one of your

13   responses to a question by Mr. O'Brien that

14   at least in your experience, practices don't

15   always tell you all the reasons why they're

16   leaving; is that right?

17        A.   Yes.

18        Q.   And expand on that.  What did you

19   mean by that?

20        A.   I would hear, you know, repeatedly

21   and I think I had indicated that the practice

22   would give Amy's team one reason, but when

23   we, you know, would call them, we would end

24   up getting a different reason.  And sometimes

25   they would be like, listen, I just didn't

LISA GRIPPO                                    March 26, 2014
HEALTHY ADVICE NETWORKS vs. CONTEXTMEDIA

Page 137

1            L. Grippo

2    want confrontation, I was just, you know,

3    giving an answer because I just wanted to

4    give the answer that they thought would be

5    easiest for us to hear or whatever.

6        Q.   So as an example, and this is just

7    one example, but in an answer you gave to

8    Mr. O'Brien, you said that you understood

9    that HAN lost practices to Context due to

10   connectivity issues.  Do you recall that?

11       A.   Yes.

12       Q.   And your answer was based entirely

13   on information that somebody outside of HAN

14   told to HAN; correct?

15       A.   Yes.

16       Q.   Now, there was some testimony

17   regarding HAN's contracts with practices.  Do

18   you recall that?

19       A.   Yes.

20       Q.   And you were asked a question by

21   Mr. O'Brien about whether or not you may have

22   ever said or thought, questioned whether or

23   not a HAN contract with a practice was

24   binding.  Do you recall that?

25       A.   Yes.

LISA GRIPPO                                      March 26, 2014
HEALTHY ADVICE NETWORKS vs. CONTEXTMEDIA

Page 138

1            L. Grippo

2       Q.   And in response you were talking

3   about -- there was a specific reference to an

4   exclusivity clause.

5       A.   Right.  We for a long time did not

6   include a clause in our contracts or

7   agreements that there be -- that we would be

8   the exclusive education provider in a

9   practice's waiting room simply because we

10  were told that that was not a binding

11  contract, because we could not dictate -- we

12  didn't own the practice.  So we legally cold

13  not dictate what they could or could not put

14  in their waiting room.

15      Q.   So any time that you ever heard

16  anyone question whether or not HAN had a

17  binding contract with a practice, did it

18  always relate to the issue of whether or not

19  a practice could be bound to exclusivity?

20      A.   I mean that's when it would always

21  -- the contracts would come up.  It was

22  really with regards to Accent Health and

23  whether or not we could coexist, which is

24  what I had said.  And so I would think yes.

25      Q.   Did you ever hear anybody at HAN

Page 139

1                    L. Grippo

2    question whether or not it had a binding --

3    whether the provision in its contracts with

4    practices that required 30 or 60 days'

5    written notice to cancel, did anybody ever

6    raise a question as to whether or not that

7    provision was binding, to your knowledge?

8        A.   We wanted to partner, you know, we

9    were partnering with our practices.  So it

10   was more out of -- you know, we would say,

11   you know, we want -- we obviously wanted to

12   retain them.  And whenever we were asked

13   about that clause, it was, you know,

14   ultimately we wanted to do what's right by

15   you, but we expect that you would honor our

16   agreement, which is the 60 -- I mean 30, and

17   then we ended up increasing it to 60 days'

18   notice.  So I don't know if I'm answering

19   your question directly, but it was an

20   expectation that they would honor that

21   clause, yes.

22       Q.   And are you aware that HAN's

23   contracts with practices have a provision

24   that essentially says that no one other than

25   HAN is permitted to touch or remove the

LISA GRIPPO                                      March 26, 2014
HEALTHY ADVICE NETWORKS vs. CONTEXTMEDIA

Page 140

```
 1              L. Grippo
 2    equipment?
 3         A.    Yes.
 4         Q.    And did you always understand that
 5    that was a requirement, a binding obligation
 6    of the practice that they only let HAN --
 7         A.    Well, we own the equipment.  We
 8    don't own the practice.
 9         Q.    Right.
10         A.    So yes.  We were responsible for
11    it.  I mean our technicians would walk them
12    through some basic things if there was
13    something wrong, but more often than not,
14    even for minor things, we would send someone
15    out to fix the equipment, because we really
16    didn't want people messing with it.
17         Q.    I've just got a few -- this looks
18    worse than it is.
19         A.    Thank goodness.
20         Q.    Exhibits that I wanted to just
21    mark.  And I'm probably not going to ask you
22    a lot of questions about them.  I just want
23    to get them marked.
24              (Plaintiff's Exhibit 200, Email
25         from Lisa Grippo to Susan Kelly within
```

LISA GRIPPO                                    March 26, 2014
HEALTHY ADVICE NETWORKS vs. CONTEXTMEDIA

Page 141

 1          L. Grippo
 2      HAN, marked for identification, as of
 3      this date.)
 4      Q.   Plaintiff's Exhibit 200.  Could you
 5   just identify this.  Is this an email from
 6   you to Susan Kelly within HAN?
 7      A.   Yes.
 8      Q.   And it's relating to an ACN
 9   location that is for Dr. Unopit?
10      A.   Yes.
11          (Defendant's Exhibit 201, Email
12      from Lisa Grippo to Diane Fier regarding
13      an can practice, Carolina Specialty
14      Care, marked for identification, as of
15      this date.)
16      Q.   Exhibit 201, is this an email from
17   you to Diane -- how do you pronounce her last
18   name?
19      A.   Fier.
20      Q.   Within HAN?
21      A.   Yes.
22      Q.   And this is regarding an ACN
23   practice, Carolina Specialty Care?
24      A.   Yes.
25          (Defendant's Exhibit 202, Email

LISA GRIPPO                                          March 26, 2014
HEALTHY ADVICE NETWORKS vs. CONTEXTMEDIA

Page 142

```
 1            L. Grippo

 2       from Lisa Grippo to people within HAN

 3       dated March 21, 2001, marked for

 4       identification, as of this date.)

 5       Q.   Exhibit 202 I've handed you, is

 6  this an email from you to some folks within

 7  HAN dated March 21, 2001?

 8       A.   Yes.

 9            (Defendant's Exhibit 203, Email

10       from Amanda Devlin to Amy Finley and

11       Lisa Grippo dated March 8th, 2012,

12       marked for identification, as of this

13       date.)

14       Q.   Is Exhibit 203 an email from Amanda

15  Devlin to Amy Finley and you dated March 8th,

16  2012?

17       A.   Yes.

18       Q.   The last couple of questions are

19  just about trying it save practices.  In your

20  experience, do you believe it would be more

21  difficult for HAN to try to save one of its

22  practices after its equipment had already

23  been removed from the premises?

24       A.   Absolutely.

25       Q.   Why?
```

Page 143

1              L. Grippo

2        A.   The fact that it's already down,

3   you know, that's half of -- you know, why put

4   it back.  I don't know.  It's just to

5   reinstall -- we found that once equipment was

6   down, it was very tough for us to save.  Once

7   it was up, and not even for competitors, just

8   once it was down, they just didn't want the

9   hassle for whatever reason of dealing with an

10  installation again.  They're busy practices,

11  and, you know, it's tough to schedule

12  installations to begin with.  And we just

13  found that even if they wanted the program,

14  it was challenging just to get the reinstall

15  scheduled and get the equipment back up.

16              MR. COWAN:  That's all I have for

17      you.

18              MR. O'BRIEN:  I've got a couple.

19              MR. COWAN:  Can we go off the

20      record for just one second?

21              MR. O'BRIEN:  Sure.

22              VIDEOGRAPHER:  The time is

23      44:49 p.m.  We're going off the record.

24              (Discussion off the record.)

25              VIDEOGRAPHER:  The time is 4:50

LISA GRIPPO                                          March 26, 2014
HEALTHY ADVICE NETWORKS vs. CONTEXTMEDIA

                                                    Page 144

 1              L. Grippo

 2         p.m.  We're back on the record.

 3   BY MR. O'BRIEN:

 4         Q.   Your lawyer showed you what he

 5   marked as Plaintiff's Deposition Exhibit 200.

 6   Do you still have that handy?

 7         A.   Yes.

 8         Q.   And if you turn to the back page,

 9   there's the CMS comments about why the

10   practice is switching; right?

11         A.   Yes.

12         Q.   And it's written, "They really need

13   sound in the waiting room."  Do you see that

14   down toward the bottom?

15         A.   Yes.

16         Q.   "Tina said they contacted HAN to

17   inquire about additional sound in the program

18   and was told that the sound that is provided

19   is all that is available at this time."  Do

20   you see that?

21         A.   Yes.

22         Q.   So in this instance there was

23   nothing HAN could do to save the practice,

24   right, because HAN couldn't give the practice

25   what it wanted?

LISA GRIPPO                                    March 26, 2014
HEALTHY ADVICE NETWORKS vs. CONTEXTMEDIA

Page 145

1              L. Grippo

2       A.   Sound was absolutely one of the

3  components that we could -- we really could

4  not combat unless we were speaking to the

5  decision maker and explaining to them why --

6  why we -- we deliberately decided not to have

7  sound for many years.

8       Q.   But if the decision maker says I

9  want more sound than you can provide, there's

10  nothing HAN could do to save the practice;

11  right?

12      A.   I don't believe -- I don't know.  I

13  don't think so.  If that's their only reason

14  for leaving us, yeah, we don't offer sound.

15      Q.   And then it concludes by saying,

16  "There are no notes in the CMS about a sound

17  inquiry."  Do you see that?

18      A.   Yes.

19      Q.   Now, what HAN did for certain

20  factors that were important to POC decisions,

21  POC provider decisions, was they sort of

22  separately tracked those, and sound was one

23  of those; right?

24      A.   I'm not sure I'm understanding your

25  question.

LISA GRIPPO                                      March 26, 2014
HEALTHY ADVICE NETWORKS vs. CONTEXTMEDIA

                                                    Page 146

 1              L. Grippo

 2      Q.    Do you know what it means in HAN

 3   parlance to say sound inquiry?

 4      A.    "There are no notes in CMS about a

 5   sound inquiry."  I am guessing that that

 6   meant that they were, like I said, if they

 7   were tracking reasons for losing, but I've

 8   never seen a drop-down anywhere that said

 9   "Sound."

10      Q.    Okay.  So you're not familiar with

11   that?

12      A.    Correct.

13      Q.    Let's look at 201.  And in the

14   middle there it's written, "The reason she

15   went with us was because we were silent,

16   which allowed them to also have a TV"; right?

17      A.    Yes.

18      Q.    And when certain practices

19   preferred the fact that your content was

20   silent, that was based upon the fact that

21   they could simultaneously display your silent

22   content and have a TV available for the

23   waiting room; right?

24      A.    It wasn't preferable, but if a

25   practice wanted us to coexist with the

LISA GRIPPO                                    March 26, 2014
HEALTHY ADVICE NETWORKS vs. CONTEXTMEDIA

Page 147

1              L. Grippo

2      television, we would.

3          Q.    Well, you guys were willing to

4      coexist with competitors; right?

5          A.    Not in the same waiting room.  Not

6      in the same waiting area, no.

7          Q.    Isn't it a fact that one of HAN's

8      tactics for trying to save a practice was

9      when HAN was being told that the practice was

10     going to a competitor, in particular

11     ContextMedia, we can be there, too, we can

12     coexist with ContextMedia, that's just fine

13     with HAN?  You weren't aware of that?

14         A.    We wouldn't -- we could coexist.

15     Typically in a rheumatology office they would

16     have a waiting room as well as an infusion

17     room.  So depending upon where they were

18     putting RHN, we could coexist within the

19     practice.  I'm not aware that we ever made a

20     recommendation that we could be in the same

21     waiting area with them.

22         Q.    Did you understand that it would be

23     inconsistent with the practice's agreement

24     with ContextMedia to have HAN coexist in the

25     practice?

LISA GRIPPO                                    March 26, 2014
HEALTHY ADVICE NETWORKS vs. CONTEXTMEDIA

Page 148

```
 1               L. Grippo
 2       A.    Again, I guess that goes to
 3   exclusivity, right, and I'm not -- I don't
 4   recall what their agreement stated with
 5   regards to exclusivity.  I'm assuming that
 6   they did not want to coexist, so.
 7       Q.    Right.  And after it's reported
 8   here that the reason they went with you in
 9   the first place was so that they could play
10   you and play TV, it's reported that now it
11   was the doctor's decision to make the switch,
12   they were looking for a program with sound.
13   Do you see that?
14       A.    No.  I'm sorry.
15       Q.    After the sentence we focused on,
16   "The reason she went with us" --
17       A.    The reason -- right.
18       Q.    The very next sentence says, "It
19   was the doctor's decision to make the switch.
20   They were looking for a program with sound";
21   right?
22       A.    Yes.
23       Q.    And you've mentioned several times
24   today the decision maker.  In your
25   experience, the physician is the ultimate
```

LISA GRIPPO                                    March 26, 2014
HEALTHY ADVICE NETWORKS vs. CONTEXTMEDIA

                                                  Page 149

 1              L. Grippo

 2    decision maker in a practice; right?

 3        A.    The what?

 4              MR. COWAN:  The doctor you mean.

 5        A.    The doctor is the --

 6        Q.    Right.

 7        A.    Honestly, quite often it was the

 8    office manager, and they would overrule the

 9    practice manager.  They would at times

10    overrule the doctor.  But one of the two,

11    doctor or -- I would think that a doctor

12    could be a decision maker in his own office,

13    yes.

14        Q.    It's a fair --

15        A.    His or her I should say.

16        Q.    -- assumption; right?

17        A.    Yes.

18        Q.    And then it goes on to note that

19    the practice mentioned that the monitor had

20    been black for two weeks.  Do you see that?

21        A.    Yes.

22        Q.    And then the HAN representative

23    accurately concludes that it's their decision

24    to have whatever program they want out in the

25    waiting room; right?

LISA GRIPPO
HEALTHY ADVICE NETWORKS vs. CONTEXTMEDIA

March 26, 2014

Page 150

1          L. Grippo

2       A.   Yes.

3       Q.   Now, in response to some of

4  Mr. Cowan's questions, I believe he asked you

5  one about whether the connectivity problems

6  that HAN was experiencing was something you

7  knew because practices told you that.  Do you

8  recall that question and answer along those

9  lines?

10      A.   Yes.

11      Q.   But that's not completely true, is

12  it?  I mean HAN had documented connectivity

13  problems; right?

14      A.   From customers, yes.

15      Q.   But you had technicians go out and

16  see that those complaints weren't made up;

17  right?

18      A.   Correct.

19      Q.   I mean you weren't just relying on

20  the practices.  You knew for a fact based

21  upon your own vendor's inspection that there

22  were connectivity issues from time to time;

23  right?

24      A.   Yes.  And what the cause was, a lot

25  of times it wasn't even a connectivity issue.

LISA GRIPPO                                    March 26, 2014
HEALTHY ADVICE NETWORKS vs. CONTEXTMEDIA

                                              Page 151

 1              L. Grippo
 2    Someone mistakenly turned the monitor off.
 3        Q.   But sometimes it was a connectivity
 4    issue; right?
 5        A.   Correct.
 6        Q.   The practices weren't making that
 7    up; right?
 8        A.   Not to my knowledge.
 9        Q.   And you knew for a fact that some
10    practices switched because of documented
11    connectivity and service issues; right?
12        A.   Correct.
13        Q.   And we showed you an email earlier
14    to that effect, remember?
15        A.   Yes.
16        Q.   You said how am I going to save
17    them when the facts are they've had all these
18    issues; right?
19        A.   Correct.
20        Q.   Mr. Cowan tried to get you to say
21    that -- that's a poor question.  Mr. Cowan
22    asked you some questions suggesting that the
23    discussion about a binding HAN contract was
24    limited to exclusivity issues.  Do you
25    remember those questions?

Page 152

1              L. Grippo

2         A.    Yes.

3         Q.    And, in fact, you recall, do you

4    not, discussions about the binding nature of

5    HAN's contract in the context of the 30-day

6    notice; right?

7         A.    I recall?

8         Q.    Right.

9         A.    You're asking me if I recall?

10        Q.    Right.

11        A.    I mean yeah.  I guess that could

12   come into question whether or not that's

13   binding, yes.

14        Q.    Right.  And you recall discussions

15   around that and whether or not HAN could do

16   anything to enforce it; right?

17        A.    Yes.

18        Q.    And HAN never sued a practice, did

19   it?

20        A.    No.

21        Q.    It never sought to legally enforce

22   the 30-day provision; right?

23        A.    Not that I'm aware of.  Most

24   practices respected that.

25        Q.    Or the 60-day provision; right?

LISA GRIPPO                                    March 26, 2014
HEALTHY ADVICE NETWORKS vs. CONTEXTMEDIA

Page 153

```
 1            L. Grippo
 2       A.   Correct.  But, again, and as I said
 3   earlier, it wouldn't have been an issue if
 4   these practices -- if everyone was being
 5   ethical and following the rules.  It's only
 6   because things were not being done ethically
 7   that we had to now start enforcing this and
 8   questioning what was binding or not.  If all
 9   was fair and we were losing for legitimate
10   reasons, it wouldn't have been an issue.
11       Q.   I didn't ask what your opinion was
12   as to why it was an issue.  I was just asking
13   whether you had discussions around that
14   issue.
15       A.   We had to start having discussions
16   around that issue, yes.
17       Q.   The CMS database, that's a document
18   that's maintained in the ordinary course of
19   HAN's business; right?
20       A.   Correct.
21       Q.   And HAN relies upon that database
22   to make certain business decisions; right?
23       A.   Yes.
24       Q.   And those business decisions
25   include sales strategies and tactics; right?
```

LISA GRIPPO                                    March 26, 2014
HEALTHY ADVICE NETWORKS vs. CONTEXTMEDIA

Page 154

1              L. Grippo

2      A.    In what way?

3      Q.    Well, a practice seems to think

4   this is important, maybe we could emphasize

5   something to counter that.  I mean it's

6   intelligence that you could use to try to

7   better effectuate your sales performance?

8      A.    Correct.

9      Q.    And it's valuable information to

10  HAN to evaluate and assess its content and

11  whether changes should be made to content;

12  right?

13     A.    Absolutely.

14     Q.    In fact, they did that; right?

15     A.    Yes.

16     Q.    And there's probably other reasons

17  that I can't think of that HAN finds that

18  information valuable; right?

19     A.    Yes.

20     Q.    You said there were instances where

21  you felt practices didn't always tell you the

22  reasons that they were leaving.  Remember

23  that?

24     A.    Yes.

25     Q.    But, again, the best source we have

LISA GRIPPO                                        March 26, 2014
HEALTHY ADVICE NETWORKS vs. CONTEXTMEDIA

Page 155

1             L. Grippo

2    for why they were leaving here in 2014 is the

3    CMS database; right?

4         A.   Yes.

5             MR. O'BRIEN:  I have nothing

6         further.

7             MR. COWAN:  I just have a couple of

8         follow-ups and then you're done.

9             MR. O'BRIEN:  He can't promise

10        that.

11            MR. COWAN:  That's true.

12   BY MR. COWAN:

13        Q.   I think you were asked a couple of

14   questions about 201.

15        A.   Yes.

16        Q.   And specifically Mr. O'Brien asked

17   you about this.  So as I understand it, is

18   this information that's in the CMS system?

19        A.   The comment on the bottom is a

20   comment from CMS.

21        Q.   So just to better understand it, so

22   this is somebody at HAN talking to somebody

23   at the practice named Savannah?

24        A.   Correct.

25        Q.   So, first, everything that's here

LISA GRIPPO                                    March 26, 2014
HEALTHY ADVICE NETWORKS vs. CONTEXTMEDIA

Page 156

1                    L. Grippo

2        is something that's being reported by some

3        woman named Savannah?

4            A.    Correct.  Well, being reported

5        by --

6            Q.    Well, being reported --

7            A.    Heather as -- yeah.

8            Q.    And Heather is saying what somebody

9        named Savannah said?

10           A.    What Savannah said, yes.

11           Q.    And then when Mr. O'Brien asked you

12       about it was the doctor's decision to make

13       the switch, they were looking for a program

14       with sound, that's actually Savannah, some

15       woman named Savannah, saying what the doctor

16       apparently told her?

17           A.    Correct.

18           Q.    Is that right?

19           A.    Correct.

20           Q.    So on Exhibit 68, which should be

21       in the stack over there, it's the Johns

22       Hopkins Jonathan email.

23           A.    Yes.  What is it 68?

24           Q.    68, yeah, previously marked.

25           A.    Okay.

Page 157

1                    L. Grippo

2          Q.   Do you have that one?

3          A.   Yes.

4          Q.   So go to the last page.

5          A.   Yes.

6          Q.   So just a couple of things on this.

7     First, in the second sentence it says,

8     "Jonathan said that he signed a waiver

9     provided by ContextMed," ContextMedia, "that

10    gave them permission to remove our equipment.

11    I asked him to fax me a cc of the waiver, and

12    he said that he would have his customer

13    service rep at CM (Megan) fax it to me.  I

14    explained that their enrollment form with us

15    said that only PPT can service or remove PPT

16    equipment.  His reply, 'I don't know who is

17    lying to me.'"  See that?

18         A.   Yes.

19         Q.   And then he goes on to say,

20    "Jonathan said that the Johns Hopkins other

21    rheumatology offices are using RHN and like

22    it because there is much more information and

23    not repetitive with interviews, news wires,

24    and streaming weather."  Do you see that?

25         A.   Yes.

LISA GRIPPO                                        March 26, 2014
HEALTHY ADVICE NETWORKS vs. CONTEXTMEDIA

Page 158

```
 1              L. Grippo

 2      Q.    I think Mr. O'Brien asked you about

 3  that.  So that's a situation where Jonathan

 4  is reporting to somebody at HAN what somebody

 5  at the practice told Jonathan?

 6      A.    Correct.

 7            MR. COWAN:  That's all I have.

 8  Thanks.

 9            THE WITNESS:  Okay.

10  BY MR. O'BRIEN:

11      Q.    Back to 68, the last page.  Where

12  do you see an indication that Jonathan is

13  reporting something someone told him as

14  opposed to Jonathan reporting on his personal

15  observations?

16      A.    Are you asking me or are you --

17      Q.    Yeah, I'm asking you.

18      A.    -- asking Grant?

19      Q.    Well, I'd like to ask Grant, but I

20  know what the answer would be.

21      A.    Well, because Jonathan is referring

22  to what other rheumatology -- what the other

23  rheumatology offices are saying that are

24  using RHN, not his.  He still had our program

25  at the time.
```

LISA GRIPPO                                      March 26, 2014
HEALTHY ADVICE NETWORKS vs. CONTEXTMEDIA

Page 159

1          L. Grippo

2          MR. O'BRIEN:  All right.  That's

3     fine.  I have no further questions.

4          MR. COWAN:  Thank you, Ms. Grippo.

5          VIDEOGRAPHER:  The time is 5:05

6     p.m. on March 26, 2014.  This is the end

7     of tape number three.  And this

8     completes the videotaped deposition of

9     Lisa Grippo.

10          (Time noted:  5:05 p.m.)

11

12

13

14          _____

15          LISA GRIPPO

16

17  Subscribed and sworn to before me

18  this ____ day of _____, 2014.

19

20  _____

21

22

23

24

25

LISA GRIPPO                                    March 26, 2014
HEALTHY ADVICE NETWORKS vs. CONTEXTMEDIA

Page 160

 1
 2                    C E R T I F I C A T E
 3      STATE OF NEW YORK            )
 4                             : ss.
 5      COUNTY OF WESTCHESTER        )
 6
 7           I, JOAN WARNOCK, a Notary Public
 8      within and for the State of New York, do
 9      hereby certify:
10           That LISA GRIPPO, the witness whose
11      deposition is hereinbefore set forth,
12      was duly sworn by me and that such
13      deposition is a true record of the
14      testimony given by the witness.
15           I further certify that I am not
16      related to any of the parties to this
17      action by blood or marriage, and that I
18      am in no way interested in the outcome
19      of this matter.
20           IN WITNESS WHEREOF, I have hereunto
21      set my hand this 2nd day of April, 2014.
22
23           _____
24                JOAN WARNOCK
25

LISA GRIPPO                                          March 26, 2014
HEALTHY ADVICE NETWORKS vs. CONTEXTMEDIA

Page 161

1

2      ----------------- I N D E X ----------------

3      WITNESS            EXAMINATION BY        PAGE

4      L. Grippo         Mr. O'Brien              5

5                        Mr. Cowan              131

6                        Mr. O'Brien            144

7                        Mr. Cowan              155

8                        Mr. O'Brien            158

9

10     ------------ INFORMATION REQUESTS -----------

11     DIRECTIONS:

12     RULINGS:

13     TO BE FURNISHED:

14     REQUESTS:

15     MOTIONS:

16

17     ------------------ EXHIBITS ----------------

18     DEFENDANT'S                     FOR ID.

19      EXHIBIT 85                      124

20      Email exchange

21      EXHIBIT 87                      126

22      Email exchange involving

23      Ms. Grippo, Mr. Ferrara, and

24      Mr. Hartfield

25

LISA GRIPPO                                          March 26, 2014
HEALTHY ADVICE NETWORKS vs. CONTEXTMEDIA

Page 162

```
 1

 2     PLAINTIFF'S                       FOR ID.

 3      EXHIBIT 200                      140

 4      Email from Lisa Grippo to Susan

 5      Kelly within HAN

 6      EXHIBIT 201                      141

 7      Email from Lisa Grippo to Diane

 8      Fier regarding an can practice,

 9      Carolina Specialty Care

10      EXHIBIT 202                      141

11      Email from Lisa Grippo to people

12      within HAN dated March 21, 2001

13      EXHIBIT 203                      142

14      Email from Amanda Devlin to Amy

15      Finley and Lisa Grippo dated

16      March 8th, 2012

17

18

19

20

21

22

23

24

25
```

LISA GRIPPO                                          March 26, 2014
HEALTHY ADVICE NETWORKS vs. CONTEXTMEDIA

                                                        Page 163

1          DEPOSITION ERRATA SHEET

2

3     Our Assignment No.:  104543

4     Case Caption:  Healthy Advice Networks v.

5     ContextMedia, Inc.

6

7        DECLARATION UNDER PENALTY OF PERJURY

8

9           I declare under penalty of perjury

10    that I have read the entire transcript of my

11    Deposition taken in the captioned matter or

12    the same has been read to me, and the same is

13    true and accurate, save and except for

14    changes and/or corrections, if any, as

15    indicated by me on the DEPOSITION ERRATA

16    SHEET hereof, with the understanding that I

17    offer these changes as if still under oath.

18                    _____

19                    Lisa Grippo

20    Subscribed and sworn to on the _____ day of

21    _____, 20 _____ before me.

22    _____

23    Notary Public,

24    in and for the State of

25    _____.

ESQUIRE SOLUTIONS                      800.211.DEPO (3376)
                                       EsquireSolutions.com

LISA GRIPPO                                    March 26, 2014
HEALTHY ADVICE NETWORKS vs. CONTEXTMEDIA

Page 164

1            DEPOSITION ERRATA SHEET

2     Page No._____Line No._____Change to:_____

3     _____

4     Reason for change:_____

5     Page No._____Line No._____Change to:_____

6     _____

7     Reason for change:_____

8     Page No._____Line No._____Change to:_____

9     _____

10    Reason for change:_____

11    Page No._____Line No._____Change to:_____

12    _____

13    Reason for change:_____

14    Page No._____Line No._____Change to:_____

15    _____

16    Reason for change:_____

17    Page No._____Line No._____Change to:_____

18    _____

19    Reason for change:_____

20    Page No._____Line No._____Change to:_____

21    _____

22    Reason for change:_____

23

24    SIGNATURE:_____DATE:_____

25            Lisa Grippo

LISA GRIPPO                                    March 26, 2014
HEALTHY ADVICE NETWORKS vs. CONTEXTMEDIA

Page 165

1        DEPOSITION ERRATA SHEET

2    Page No._____Line No._____Change to:_____

3    _____

4    Reason for change:_____

5    Page No._____Line No._____Change to:_____

6    _____

7    Reason for change:_____

8    Page No._____Line No._____Change to:_____

9    _____

10   Reason for change:_____

11   Page No._____Line No._____Change to:_____

12   _____

13   Reason for change:_____

14   Page No._____Line No._____Change to:_____

15   _____

16   Reason for change:_____

17   Page No._____Line No._____Change to:_____

18   _____

19   Reason for change:_____

20   Page No._____Line No._____Change to:_____

21   _____

22   Reason for change:_____

23

24   SIGNATURE:_____DATE:_____

25        Lisa Grippo