```
 1            IN THE UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT OF ILLINOIS
 2                    WESTERN DIVISION

 3
HEALTHY ADVICE NETWORKS, LLC.   )
 4                               )
                Plaintiff,       )
 5                               )
        vs.                      )Case No.
 6                               )1:12-cv-00610
CONTEXTMEDIA, INC.,              )
 7                               )
                Defendant.       )
 8
 9        The deposition of BRADFORD PURDY, called by

10   the Plaintiff for examination, taken pursuant to

11   notice, agreement, and by the provisions of the

12   Federal Rules of Civil Procedure for the United

13   States District Courts pertaining to the taking of

14   depositions, taken before Tina M. Alfaro, CSR

15   No. 084-004220, a Notary Public within and for the

16   County of Cook, State of Illinois, and a Certified

17   Shorthand Reporter of said State, at the offices of

18   Vedder Price, 222 North LaSalle Street, Chicago,

19   Illinois, on the 28th day of March, A.D., 2014 at

20   9:30 a.m.

21

22

23

24
```

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy    March 28, 2014

```
 1   APPEARANCES:

 2       FROST BROWN TODD, LLC
         BY: GRANT COWAN, ESQ.
 3           330 Great American Tower
             301 East Fourth Street
 4           Cincinnati, Ohio 45202
             (513) 651-6900
 5           gcowan@fbtlaw.com

 6               On behalf of the Plaintiff;

 7       SIDLEY AUSTIN, LLP
         BY: RICHARD O'BRIEN, ESQ.
 8           One South Dearborn Street
             Chicago, Illinois 60603
 9           (312) 853-7000
             robrien@sidley.com
10
                 On behalf of the Defendant.
11

12

13

14

15

16

17

18

19

20

21

22

23

24   REPORTED BY: Tina Alfaro, CSR No. 084-004220
```

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy    March 28, 2014

1                    I N D E X

2                  EXAMINATION

3    WITNESS                        PAGE

4    BRADFORD PURDY

5       By Mr. Cowan                4

6

7                   EXHIBITS

8    PLAINTIFF'S EXHIBITS           PAGE

9    Exhibit 205                    13
        Notice
10
     Exhibit 206                    17
11      Deposition preparation chart

12   Exhibit 207                    151
        Series of e-mails
13
     Exhibit 208                    153
14      Series of e-mails

15   Exhibit 209                    154
        (Not described)
16
     Exhibit 210                    155
17      Communication re practice in Alabaster,
        AL
18
     Exhibit 211                    155
19      Contracts

20   Exhibit 212                    156
        Contracts

21

22

23

24

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy    March 28, 2014

1   Whereupon:

2                    BRADFORD PURDY,

3   the witness at the time of recess, having been first

4   duly sworn, was further examined and testified as

5   follows:

6                    EXAMINATION

7   BY MR. COWAN:

8       Q.  State your name, please.

9       A.  Bradford Purdy.

10      Q.  Mr. Purdy, I'm Grant Cowan.  We just met.

11  We've had a chance to talk a little bit about travel

12  and things for a few minutes before the deposition.

13  You understand I represent PatientPoint in a lawsuit

14  that's pending in Cincinnati against Contextmedia?

15      A.  Yes.

16      Q.  I'm here today to take your deposition in

17  what's called a 30(b)(6) deposition where you've

18  been designated on certain topics by Contextmedia to

19  speak for it.  Do you understand that?

20      A.  Yes.

21      Q.  Have you ever had a deposition taken

22  before?

23      A.  No.

24      Q.  Let me give you some basic ground rules.

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy    March 28, 2014

1    They're pretty simple I think.  The first is it's my
2    job to put to you a question which you understand.
3    So if I ask you a question which is confusing to you
4    in any way, just let me know and I will do my best
5    to rephrase the question and put it to you in such a
6    way that you understand it.  Okay?
7        A.  Yep.
8        Q.  The second thing is to do as you've thus
9    far been doing a good job of and that is to answer
10   orally, preferably with a yes or no or at least
11   words as opposed to an uh-huh or nod of the head
12   because that's difficult for Tina to take down in
13   the transcript.  Okay?
14       A.  Understood.
15       Q.  Then, finally, if you need to take a break,
16   let me know and what I'll do is work myself to a
17   convenient stopping place so that we can all take a
18   break.  Fair enough?
19       A.  Yes.
20       Q.  What is your current position with Context?
21       A.  Chief operating officer.
22       Q.  And when did you join?
23       A.  July of 2012.
24       Q.  Tell me a little bit about your background.

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy     March 28, 2014

1   Did you go to college?

2       A.   I did.  I went to Northwestern University.

3       Q.   And when did you graduate?

4       A.   March of 2011.

5       Q.   And what did you take a degree in?

6       A.   Economics and political science.

7       Q.   My son graduated in 2011, I believe.  He's

8   25.  Is that about how old are you, 25, 26?

9       A.   I'm 24.

10      Q.   What did you do between graduation from

11  Northwestern and when you joined Context in July of

12  2012?

13      A.   I worked in a unit of Citadel Investment

14  Group called Surveyor Capital in New York.

15      Q.   And what did you do for them?

16      A.   It was a bit of a hybrid role, but I sat on

17  the trading desk and I worked on the investment

18  team.

19      Q.   So after you left Citadel did you then join

20  Context?

21      A.   Yes.

22      Q.   And how did that come about?

23      A.   Rishi and I have been close friends for a

24  number of years.  We met through an organization at

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy    March 28, 2014

1   Northwestern called the Institute for Student

2   Business Education, which is an experiential

3   learning platform.

4        Q.  It's a student experiential platform?

5        A.  Yeah.  It's a, at this point, 400-plus-

6   person organization that focuses on experiential

7   learning for undergraduates.

8        Q.  What's that mean, experiential learning?

9        A.  In undergraduate it's oftentimes that

10  you're getting more theoretical education.  This is

11  a group that really focuses on allowing people to do

12  things where they can learn through actually doing

13  them in practice.

14       Q.  When you joined Context in July of 2012,

15  did you join as the chief operating officer?

16       A.  No.  For, I believe, about three to four

17  weeks, I'm not exactly sure on the time it was, you

18  know, confirmed or, I guess, agreed upon, but I was

19  the vice president of business operations.

20       Q.  Vice president of business operations?

21       A.  Yes.

22       Q.  And what were your duties in that position?

23       A.  Rishi and I had been a little bit broad

24  because we wanted me to be functional across the

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy    March 28, 2014

1   organization.  It was more to help other people

2   within the organization do their jobs quicker,

3   easier, and make the organization move quicker in

4   its growth and development.

5        Q.  So during that time period where you were

6   vice president of business operations did you

7   interact directly with members of the MOE team?

8        A.  I interacted directly with them in learning

9   the business.  In my first month I certainly spent a

10  lot of time learning the business.

11       Q.  And the same would be true with members of

12  the MSE team?

13       A.  Yes.

14       Q.  Then after the first month when you were in

15  the process of learning the business, did you then

16  become chief operating officer?

17       A.  Yes.

18       Q.  And how did that come about?  Let me strike

19  that.

20           Was it anticipated when you joined that you

21  would be chief operating officer, there would just

22  be a period of time before that would happen?

23       A.  Not really.

24       Q.  So tell me, how did -- what happened to

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy     March 28, 2014

1  cause you to go from vice president of business
2  operations to chief operating officer?
3      A.  I believe Rishi thought I had a lot of
4  potential, and I think I showed a degree of, you
5  know additive value to the organization in a short
6  period of time.
7      Q.  And then what were your job duties and
8  responsibilities as chief operating officer when you
9  became -- took that position?  Let me strike that.
10         When did you formally become the chief
11 operating officer?
12     A.  I don't remember exactly, but I believe
13 August of 2012.
14     Q.  All right.  So what were your job duties
15 and responsibilities when you became COO in August
16 of 2012?
17     A.  In a large sense they were similar to the
18 objectives that Rishi and I had talked about when I
19 joined the organization, to really focus on, you
20 know, a broad range of activities, whether it's
21 hiring, expanding the organization, working on
22 different ways to develop teams, helping with
23 technology, infrastructure with things like our
24 database, and overall, you know, helping us grow.

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy     March 28, 2014

1     Q.   During the time that you've been COO, have

2  you had anybody that reports directly to you?

3     A.   Yes.

4     Q.   And who would that be?  Is it a long list

5  or a short list?

6     A.   It's a relatively long list.  Right now my

7  direct reports are Chirag Patel and my assistant

8  Julie Anne.  Since I started I've also had both

9  Jason and Sylvia, the leaders of our member services

10  team; Travis, who runs our network operations team;

11  Roberta, who runs or logistics team.  There were two

12  other assistants at periods of time when they were

13  at the organization.  I believe that's all that

14  reports to me.  Obviously subsequently through those

15  teams each one of those people is generally a

16  manager of a number of other people through those.

17     Q.   Mr. Patel, what's his role?

18     A.   He's director of software development.  At

19  this point he and I work very closely on software

20  development activities.

21     Q.   What kind of software development is

22  Context involved?

23     A.   In particular the development is related to

24  our tablet product.

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy    March 28, 2014

1       Q.  Anything other than the development of the

2   tablet product?

3       A.  The only other thing is related to

4   messaging that is directly integrated into

5   electronic medical records.

6       Q.  Messaging like text messaging?

7       A.  Both text messaging and a component of

8   e-mail messaging.

9       Q.  And how long has Context -- strike that.

10          Does Context currently market or sell an

11  electronic medical records product?

12      A.  No.

13      Q.  When did it begin developing that?

14      A.  I don't recall the exact date.

15      Q.  Did Context begin developing it after you

16  joined the company?

17      A.  Yes.  After Chirag developed -- after

18  Chirag joined the company as well, which was in, I

19  believe, late January 2013.  I don't believe any

20  development was done until several months after

21  that.

22      Q.  And same question with respect to the

23  tablet product.  Is Context currently marketing a

24  tablet product to practices?

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy    March 28, 2014

1       A.  Yes.

2       Q.  And how long has it been doing that?

3       A.  Practices have had the product since

4   October of 2013.

5       Q.  And, again, was Mr. Patel primarily

6   responsible for the development of that product from

7   a technology standpoint?

8       A.  Could you rephrase that?

9       Q.  Sure.

10          Who at Context was, in your mind, the point

11  person from a technology standpoint on the

12  development of the tablet product?

13      A.  It was both myself and Chirag.

14      Q.  Do you know Mike Williams?

15      A.  I do know Mike Williams.

16      Q.  Who does he report to?

17      A.  At the moment it's Travis.

18      Q.  Has he ever reported to Mr. Patel?

19      A.  No.

20      Q.  At any time since you've been the COO has

21  anyone -- has the MOE team reported directly to you?

22      A.  No.

23      Q.  And who do they report to?

24      A.  I believe technically it's Rishi.

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy    March 28, 2014

1                    (Plaintiff's Exhibit 205 was

2                       marked as requested.)

3  BY MR. COWAN:

4      Q.  Mr. Purdy, I've handed you what we've

5  marked as Plaintiff's Exhibit 205, and this should

6  be the Plaintiff's notice of 30(b)(6) deposition

7  that was directed to Context.  Have you seen this

8  before?

9      A.  Yes.

10      Q.  And, as I understand it, you've been

11  designated by the company to testify as to all of

12  the topics except No. 5?

13      A.  There are a number of topics that are no

14  longer, I believe, being discussed today.

15      Q.  Okay.

16      MR. O'BRIEN:  We objected --

17      MR. COWAN:  I was going to ask you --

18      MR. O'BRIEN:  -- on one topic.  Then on the

19  imaging we both have decided to punt until the

20  forensic exam comes back.

21      MR. COWAN:  Fair enough.

22      MR. O'BRIEN:  So I think he's not being

23  produced today on 7, 12, or 5, although I made an

24  offer on 5 which is memorialized in an e-mail.

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy    March 28, 2014

1      MR. COWAN:  I had asked you to just let me
2  know.  Are you offering him up on 5?
3      MR. O'BRIEN:  On that one question and answer
4  if you want to drill down.
5      THE WITNESS:  I believe 17 is not on there
6  either.
7      MR. O'BRIEN:  Right.  Right.  We've withdrawn
8  that.
9      MR. COWAN:  You've withdrawn the defense or not
10  going to do the topic?
11      MR. O'BRIEN:  We withdrew the defense.  That's
12  memorialized too.
13      MR. COWAN:  I'll take your word for it.  Is it
14  literally in a pleading?
15      MR. O'BRIEN:  It's in an e-mail or something
16  like that.
17      MR. COWAN:  Okay.  I try to read all my
18  e-mails, particularly when they come from you.
19  BY MR. COWAN:
20      Q.  Okay.  So let's start with topic No. 1,
21  supervision and training of employees in member
22  outreach marketing and member services.  What did
23  you do to prepare yourself to testify on that
24  subject?

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy    March 28, 2014

1      A.  So I spoke to a number of people involved

2  in the training of those teams to prepare myself

3  today.

4      Q.  Okay.

5      A.  I also reviewed all of the training manuals

6  and materials that I thought were relevant to

7  prepare myself.

8      Q.  And, to the best of your knowledge, have

9  all of those training manuals been produced in the

10  litigation?

11      A.  To the best of my knowledge, everything

12  that I've reviewed has been produced.

13      Q.  Do you recall seeing any documents that

14  didn't have a Context Bates number -- let me strike

15  that.

16         Are you familiar with what a Bates number

17  is on a document?  Let me show you real quickly.

18  This is a document that's been previously marked

19  Plaintiff's Exhibit 79.  Down in the become

20  right-hand column there's a tag that says Context

21  Production or Context Prod, P-R-O-D, and then some

22  numbers.  Do you see that?

23      A.  I do see that.

24      Q.  That's what some of us sometimes refer to

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy     March 28, 2014

1    as Bates numbering.  Do you recall that the

2    documents you looked at to prepare for your

3    deposition today all had that type of numbering on

4    it?

5         MR. O'BRIEN:  He may well have looked at

6    documents that were produced but didn't have Bates

7    numbers on them because they don't have documents

8    internal to the company that have Bates stamp

9    numbers on them.  Those that were produced to us

10   have been produced to you.  So, for example, he may

11   well have looked at a manual that wasn't the one

12   that's got the stamp on it.

13        MR. COWAN:  Okay.

14        MR. O'BRIEN:  Secondly, I can represent to you

15   that he didn't review any documents that weren't

16   produced in the litigation.  You can ask whatever

17   questions you want.

18        MR. COWAN:  No, that's fine.  I'll take that.

19   I mean, that will save us a lot of time.

20        MR. O'BRIEN:  I made sure of that.

21   BY MR. COWAN:

22        Q.  Can I have that document that's in front of

23   you.

24        A.  It's the same one as that one.

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy     March 28, 2014

1          Q.   It is.  I'll give it back to you.

2          MR. COWAN:   Let's mark this as the next exhibit

3                       (Plaintiff's Exhibit 206 was

4                       marked as requested.)

5     BY MR. COWAN:

6          Q.   I've handed you what we've marked as

7     Plaintiff's Exhibit 206, and it's entitled "30(b)(6)

8     Deposition Preparation Chart," is it not?

9          A.   Yes.

10         Q.   Is this a document you prepared?

11         A.   Yes.

12         Q.   And what -- go ahead.

13         A.   Well, there was a template that was given

14    to me, and then I prepared all the notes here.  At

15    one point there was a list of to-dos which helped in

16    my progression of doing research in preparing

17    myself.

18         Q.   Who provided the templates?

19         A.   Sidley Austin.

20         Q.   And who provided the to-dos?

21         A.   I did.

22         Q.   The template -- does the template just

23    have -- that Sidley provided, it essentially had

24    sort of the 30(b)(6) topics column and the notes

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy    March 28, 2014

1   column, but those were not filled in?

2       A.  Exactly.  If you basically take here, there

3   was this column which was prefilled in, there was a

4   to-do column which was empty, and a notes column

5   which was empty.

6       Q.  The column that was filled in was just the

7   column that had the topics, topic 1, topic 2, that

8   sort of thing?

9       A.  And the actual --

10      Q.  Language?

11      A.  -- language as far as what the topic was.

12      Q.  Exactly.  And then you created a sort of

13  to-do list, and ultimately after you did your to-dos

14  you completed the notes section?

15      A.  That is correct.

16      Q.  On topic 1, who were the individuals that

17  you talked to?

18      A.  I spoke with Matt Garms, Rishi, Shradha,

19  Sylvia, Jim, and I reviewed Jeana Loewe's deposition

20  to the degree it had any reference to her own

21  training.  I believe that's all.

22      Q.  The portions of the Loewe deposition that

23  you reviewed, how did you determine what portions to

24  review?

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy    March 28, 2014

1      A.  Here it's specifically talking about
2  supervision and training.  So in certain cases I did
3  a search looking for training or key words with
4  regards to supervision.
5      Q.  In terms of the individuals, I just want to
6  make sure for the purpose of the record the names
7  are complete.  You talked to Matt Garms, Rishi Shaw,
8  Shradha Agarwal, Sylvia Velazquez, and Jim Demas?
9      A.  That's correct.
10     Q.  And did you talk to them individually or
11  separately?  Did you talk to them individually or
12  collectively?
13     A.  Individually.
14     Q.  And can you give me any ballpark as to how
15  long you spent with each person?  I'm just focused
16  on topic 1 right now.
17     A.  I don't recall the exact time I spent on
18  topic 1.
19     Q.  And when you talked with, say as an
20  example, Mr. Shah, did you talk with him in one
21  sitting where you talked with him about the various
22  topics that you thought he might have information
23  on?  Does that make sense?
24     A.  I would phrase it differently.

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy     March 28, 2014

1      Q.   Okay.  How would you phrase it?

2      A.   So in certain cases I talked about multiple

3   topics; in certain cases I talked about individual

4   topics.

5      Q.   All right.  Do you recall which topics you

6   talked with Mr. Shah about where you just talked

7   about one topic?

8      A.   No.

9      Q.   Do you recall that as to any particular

10  individual you talked to where you have a specific

11  memory of just talking to them about one subject?

12     A.   There's certainly times I made

13  clarifications on individual topics.

14     Q.   And do you recall specific examples of

15  that?

16     A.   I don't recall specifically.

17     Q.   So your notes say "First three to four mo

18  informal training."  Does that essentially mean the

19  first three to four months was essentially informal

20  training?

21     A.   No.  The first three to four people who

22  were hired as member outreach executives received

23  rather informal training from the people involved in

24  that process.

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy    March 28, 2014

1    Q.  And who were those first three to four
2  people?
3    A.  To the best of my knowledge, it was Matt
4  Garms, Patrick Cavanna, Devin Tatum, and there's a
5  handful of people that I believe are no longer
6  members of the organization.  Two names that I'm
7  remembering are potentially Lauren Kirby and Jordan
8  Zmick.
9    Q.  How do you spell Jordan's last name?
10  Z-M-I-C-K?
11    A.  Yes.
12    Q.  So in terms of these people that you've
13  identified, if, in fact, these were the people that
14  received -- let me strike that.
15        You've identified five people, Garms,
16  Cavanna, Tatum, Kirby and Zmick.  Of those five
17  people can you tell me for certain which of those
18  you know would be included in the first three to
19  four that received informal training?
20    A.  I know Matt Garms for sure.
21    Q.  Okay.  All right.
22        How did Matt receive -- let me strike that.
23        Was Matt the first inside salesperson that
24  was going to be dealing with trying to recruit

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy     March 28, 2014

```
 1   physician practices?
 2        A.  Not in the history of the company.
 3        Q.  Okay.
 4             At the time that he joined, did Context
 5   have any other inside salespeople recruiting
 6   practices?
 7        A.  From my understanding it was a contract
 8   firm, but it was inside sales.
 9        Q.  Acquirent?
10        A.  Yes.
11        Q.  Okay.
12             So when Mr. Garms came on board, who
13   provided training to him?
14        A.  It's my understanding that Rishi Shah made
15   calls with Matt explaining how to best position our
16   service, and that formulated the vast majority of
17   his training.  I know he was also given sales
18   collateral and certain information by Jeana Loewe
19   with regards to the information that she understood
20   about our products and our positioning in the
21   market.
22        Q.  And, to your knowledge, were any documents
23   created by Context when Mr. -- at or around the time
24   Mr. Shah provided his training to Mr. Garms?
```

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy     March 28, 2014

1          MR. O'BRIEN:  Object to the form.

2              You can answer.

3          MR. COWAN:  I'd like to get it right.  So...

4          MR. O'BRIEN:  It's so vague.  Any documents

5     related to any subject?

6          MR. COWAN:  I'm sorry.  That's a fair

7     objection.

8     BY MR. COWAN:

9          Q.  Do you know if Context created any

10    documents to assist Mr. Shah in providing his

11    training to Mr. Garms?

12         A.  I don't know.  I know that there was sales

13    collateral at the time.

14         Q.  And, to the best of your knowledge, the

15    sales collateral, though, was generated primarily by

16    Ms. Loewe?

17         A.  Yes.

18         Q.  Did you talk to Mr. Shah about what he

19    specifically told Mr. Garms to say on calls?

20         A.  I've spoken to Rishi about this topic

21    before.  In preparation for this there was some

22    conversation, but not directly related to what he

23    told Matt in the concert of his training.

24         Q.  As you sit here today, are you able to

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy     March 28, 2014

1    testify as the company representative as to the

2    specific training that Mr. Shah gave to Mr. Garms to

3    train him to make calls into physicians' offices?

4         A.   Absolutely.  I know exactly how he was

5    trained.  I don't know the specific language as

6    you're talking about.

7         Q.   So tell me what you know, you know,

8    absolutely to be the case with respect to that

9    subject.

10        A.   Yeah.  When we call in to practices the

11   number one thing that we focus on is building a

12   relationship and rapport with office managers so we

13   can then sell the merits of our service to that

14   office, and oftentimes the office manager directly

15   relates that to the physician.  It's my

16   understanding that he spoke about ways to build

17   rapport and relationships with office managers and

18   what the specific merits are with our service that

19   seem compelling to offices like that.

20        Q.   What did Mr. Shah tell Mr. Garms to say

21   relative to any competitors that a practice might

22   have?

23        A.   There was sales collateral that gave direct

24   comparisons as regards our service versus others.  I

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy    March 28, 2014

1    believe he pointed to those as great resources as

2    far as the ways in which you could position our

3    service versus theirs.  There's a couple topics that

4    are the main components, content, you know, some of

5    our customizations and our account management being

6    a couple of the topics that are certainly

7    highlighted.

8         Q.  Did Mr. Shah during his initial training of

9    Mr. Garms provide any training to Mr. Garms

10   specifically related to practices that had Healthy

11   Advice?

12        A.  No, I don't believe so.

13        Q.  Do you know when Mr. Shah provided this

14   training to Mr. Garms?

15        A.  When he was hired.

16        Q.  Do you know when Mr. Garms was hired?

17   Understand, some of these questions like the

18   question about when Mr. Garms was hired I don't

19   necessarily expect you to know.  So it's just a if

20   you know it let me know.

21        A.  In Q4 of 2010 he was hired as a contract

22   employee.  I'm not sure as to the exact time he was

23   brought on full time and what would actually

24   validate it as far as when he joined the

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy    March 28, 2014

1    organization.

2         Q.  To the best of your knowledge, did Mr. Shah

3    provide the training that we've been talking about

4    to Mr. Garms when Mr. Garms was a contract employee?

5         A.  I believe it was done when he first started

6    selling for the organization, which, to my

7    knowledge, is when he was a contract employee.

8         Q.  Would we be able to determine when

9    Mr. Garms -- strike that.

10        Do you believe that there are records that

11   would show when Mr. Garms was a contract employee

12   and when he became a full-time employee?

13        A.  I believe those records exist.

14        Q.  And then did -- to the best of your

15   knowledge, then, once Mr. Garms was trained by

16   Mr. Shah, did Mr. Garms then become responsible for

17   training the other people as they were on-boarded?

18        A.  That is mostly what I'm referring to with

19   regards to informal training.  It was certainly

20   training in the sense that I believe Mr. Garms was

21   mostly responsible.  I believe it was informal in

22   the fact that it didn't have a training manual and

23   an exact set of procedures that would keep it

24   consistent across people, which is how I would refer

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy    March 28, 2014

1    to it as informal.  That's where these other notes

2    come from.  So it's informal and Matt would do

3    things like listen to calls, show them materials on

4    comparisons and other things that were effective in

5    getting people to become salespeople.

6         Q.  And then you note that the HAN loop was not

7    used in training?

8         A.  Yes.

9         Q.  Who told you that?

10        A.  Matt.

11        Q.  Did Mr. Garms tell you that the HAN loop

12   was ever used for any purpose within Context?

13        A.  I don't recall discussing that with Matt

14   Garms.

15        Q.  In any of your preparation work for today's

16   deposition did anyone tell that you the HAN loop was

17   used for any purpose?

18        A.  Not for a business purpose.

19        Q.  For just entertainment, or what?

20        A.  I think general knowledge is what I would

21   closely compare it to.

22        Q.  What did you learn on that subject?

23   Specifically what I'm asking is you just said the

24   HAN loop was not used for a business purpose, but

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy    March 28, 2014

1   more general knowledge.  Just flesh that out for me

2   if you can.

3       A.  What would be your understanding of what

4   general knowledge is defined to be?

5       Q.  I could probably give it to you, but you're

6   the one that used it.  So I'd probably rather use

7   your definition.

8       A.  My definition of general knowledge would be

9   that people are curious, people want to understand

10  things about the industry that they work in and the

11  marketplace.  To the best of my knowledge, you know,

12  the HAN -- you said loop or content?

13      Q.  HAN loop is the term that you used.

14      A.  The HAN loop was certainly played on a TV

15  for a short period of time in the office.  More or

16  less it was out of curiosity.  There was very little

17  done with the content.

18      Q.  You've got a note that says "MG was selling

19  during most of the period, worked to correct team to

20  factual statements."  What does that mean?  I assume

21  "MG" means --

22      A.  Matt Garms.

23      Q.  So what did you mean there?  I get he was

24  selling during most of the people.

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy    March 28, 2014

1      A.  He was selling.  So he sat directly in the

2  middle -- and still does -- of all of the sales

3  team, and, to a degree, if he heard anything that

4  was factually incorrect, he would have a direct

5  conversation with them to correct it.

6      Q.  And did he give you any specific examples

7  that relates to HAN where he did that?

8      A.  Yes, we discussed a couple specific

9  examples.

10      Q.  Which ones did you discuss?

11      A.  So a specific example would be if there was

12  a statement made about the structure of their

13  content which was inaccurate, about the percentage

14  of their sponsorship or anything that he felt was

15  inconsistent with our public knowledge or things

16  that appeared on materials like the comparative

17  sheets that he thought was inconsistent with what

18  was our understanding of anything about their

19  system, he would have a direct conversation with

20  them and fix it.

21      Q.  I got that, but at least as I understand

22  your answer, the one specific that he mentioned to

23  you was if one of the MOEs was making a statement to

24  prospective practices that discussed the percentage

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy    March 28, 2014

1    of ads on a HAN loop that Mr. Garms felt was
2    inaccurate, he would attempt to correct that?
3         MR. O'BRIEN:  Object to the form.
4            You can answer.
5    BY THE WITNESS:
6         A.  He would directly speak to them about it
7    being inaccurate and absolutely work to correct it.
8         Q.  In any of the documents that you reviewed
9    in preparation for today's deposition did you see
10   anything in writing from Mr. Garms directed to any
11   MOE team member specifically relating to any
12   statements made by MOE team members to practices
13   about HAN?
14        A.  I don't recall.
15        Q.  Were there any other specifics that
16   Mr. Garms gave you about statements he may have
17   heard an MOE making about HAN that he attempted to
18   correct with whoever made the statement?
19        A.  Certainly there were other examples that he
20   gave me.  One that I remember right now is if
21   someone said something that he felt was inaccurate
22   about the number of practices that were switched or
23   anything of that nature, he would work to correct
24   them to what he believed was factual.

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy    March 28, 2014

1       Q.  And do you know why he would do that?

2       A.  Can you rephrase the question?

3       Q.  Sure.

4           Do you know why Mr. Garms attempted to

5   correct any statements made by MOEs about HAN that

6   he felt were inaccurate or not truthful?

7       A.  Absolutely.  I believe, you know, we are a

8   very truthful organization, Matt is a very truthful

9   person, our management team wants to do the right

10  thing in selling the merits of our service, and

11  that's what he was trying to make sure was happening

12  across his team.  He was responsible for that.

13      Q.  Then you've got a reference to "Jeana

14  worked with the team and attempted to correct

15  inaccurate statements."  Would that have been

16  gleaned from her deposition as opposed to talking

17  with her specifically?

18      A.  I overlapped with her as well while she

19  worked at Contextmedia.  I know she was very adamant

20  about people saying truthful things and being

21  correct in their positioning.  That was her

22  responsibility as well with regards to things like

23  marketing collateral, and she certainly wanted

24  people to stay consistent with that messaging.  I

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy     March 28, 2014

1    did review her deposition in the process of
2    preparing for today.
3        Q.  And then you say on your notes there "Team
4    would sometimes use information/feedback received
5    from clinics in the field."  Is that relating to
6    training as opposed to supervision?
7        A.  In preparation for my training I spoke to a
8    couple individuals --
9        Q.  You said in preparation for your training.
10       A.  In preparation for my deposition, I'm
11   sorry, I spoke to members of the member outreach
12   team about this topic, two examples being Brok and
13   Pat Cavanna.  Earlier I said -- I guess those are
14   added to the people I said I may have discussed this
15   topic with.
16           I think my goal there was to understand how
17   anything could come to be that was inconsistent with
18   their training or the materials they had been
19   provided, and one of the things they discussed with
20   me was that they would oftentimes get information or
21   feedback from practices in the field and sometimes
22   they would incorporate that into their sales pitch.
23   In cases obviously that proved to be inaccurate.
24       Q.  So did they give you specific examples of

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy     March 28, 2014

1   that?

2       A.  I don't recall what the specific examples

3   were.

4       Q.  But am I to understand what Mr. -- what

5   Brok and Patrick told you is that on occasion they

6   received information from a practice which they,

7   Patrick or Brok, then incorporated into their sales

8   materials and the information that had been provided

9   by the practice ultimately was inaccurate?

10      A.  We discussed them involving them in their

11  pitch, not their sales materials.  There was

12  certainly feedback it appears that they received

13  from the marketplace when they were speaking with

14  practices which was inaccurate.

15      Q.  Like what?  I'm trying to -- I'm not so

16  much testing your knowledge on it as trying to

17  understand what happened.  So you said there was

18  feedback that was given that was inaccurate.  I

19  don't understand that.  You seem confused by my

20  confusion.

21      A.  Yeah.

22      Q.  So I need to kind of slice this.  Patrick

23  and Brok said that occasionally they would receive

24  some information from a practice which they would

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy     March 28, 2014

1    then incorporate into their pitch.  Not necessarily

2    written sales material, into their pitch, correct?

3         A.  That's my understanding.

4         Q.  Okay.  And then at some point in time, if I

5    understand it, they came to learn that this

6    information that was incorporated into their pitch

7    was inaccurate?

8         A.  No.  I'm saying it's inaccurate.

9         Q.  Oh, you're saying it's inaccurate.  Okay.

10        A.  I'm sure at some point when they had a

11   verbal discussion with Matt Garms, for example, they

12   realized it was inaccurate as well, but I would be

13   speculating on their perception of that to actually

14   give an answer.  So I'm not going to give an answer

15   there.

16        Q.  But as to a specific example so that I can

17   try to get an idea as to the type of information

18   that a practice may have provided to Patrick or

19   Brok, that you don't know, you don't have a specific

20   example?

21        A.  I don't have a specific example.  If I may,

22   I can give you a theoretical example of how I would

23   perceive this to happen.

24        Q.  Okay.

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy    March 28, 2014

1        A.  In a theoretical example I would imagine a

2    practice would say their loop appears or feels like

3    it has 50 percent advertising, in which case they

4    could use that information or did use that

5    information in relaying that to other practices.

6    That would obviously in certain cases be inaccurate

7    and something they shouldn't have done.

8        Q.  But just to make sure I understand it, what

9    you're not saying, as I understand it, as the

10   corporate rep is that actually happened?  You're

11   using that as a theoretical example?  You don't know

12   that any practice ever told anyone at Context that a

13   HAN loop felt like it had 50 percent ads?

14       A.  To my understanding, there was a number of

15   things that were told from practices to the team

16   which were used in sales pitches.  To the degree

17   that there were things in the sales pitch that were

18   inaccurate, it's my understanding that some of that

19   could have come from feedback or information they

20   received from the field.

21       Q.  Of any of the stuff that's utilized in a

22   pitch or sales materials, you're not able to tell me

23   any specifics that came from the practice as opposed

24   came directly from Context?

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy    March 28, 2014

1        A.  I do not have specific examples as far as

2    the feedback they gave them that was then

3    incorporated into anything that seemed inaccurate,

4    no.

5        Q.  This is an exhibit, Mr. Purdy, that's been

6    previously marked as Plaintiff's Exhibit No. 10.

7    Take a minute and look at that, if you would.

8                    (Witness viewing document.)

9    BY THE WITNESS:

10       A.  Okay.  I've reviewed it.

11       Q.  Is Plaintiff's Exhibit 10 an example of a

12   situation where Ms. Loewe worked with the team and

13   was attempting to correct some inaccurate

14   statements?

15       A.  That certainly appears to be the case.

16       Q.  And specifically in this e-mail she says in

17   her paragraph No. 2 "Their" -- I believe that's

18   referring to HAN -- "stated advertisement time is 9

19   minutes and 30.  Please do not" -- she's capped "do

20   not" -- "say that they only have 17 minutes of

21   content and the rest is ads."  Do you see that?

22       A.  Yes.

23       Q.  She goes on to say "This isn't published

24   and we cannot guarantee this to be true"; do you see

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy    March 28, 2014

1    that?

2         A.  Yes.

3         Q.  And at least judging from the To line --

4    the From and To line, it looks as though this e-mail

5    went to Mr. Cavanna, Mr. Vandersteen, Mr. Garms,

6    Ms. Tatum, Mr. Stoll, and Lauren Kirby, correct?

7         A.  Yes.

8         Q.  And this is dated March 27th of 2012.  Do

9    you know -- is it your understanding that at least

10   up until that time, March 27, 2012, Contextmedia

11   MOEs were routinely telling prospective practices

12   that had HAN in their waiting room that HAN's

13   content was 40 percent, 50 percent ads?

14        A.  No.  It appears there's eight minutes

15   between the e-mail where that's said and when Jeana

16   responds.

17        Q.  Right.  I understand.  I'm saying prior to

18   March 27th of 2012 is it your understanding that

19   Context MOEs were routinely telling HAN practices

20   that the HAN loop consisted of 40 percent or

21   50 percent ads?

22        A.  No.  I believe we obviously had sales

23   materials where we showed that wasn't the case.

24   They were trained on the fact that 9 minutes and 30

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy    March 28, 2014

1    was what their published information was, and I

2    would imagine any time this previously had been

3    brought up it had been corrected to the knowledge of

4    anyone involved in that process and to the degree it

5    was heard by anyone.  I would imagine that this is

6    an example of something where they made an

7    inaccurate and poor, you know, statement and it was

8    immediately corrected.

9        Q.  This is what's been marked previously as

10   Plaintiff's Exhibit No. 27, and this is an e-mail

11   from Mr. Cavanna on April 4, 2012.  So this comes

12   after the instruction, the directive by Ms. Loewe

13   regarding what to say about HAN loops and ads,

14   right?

15       A.  Yes.

16       Q.  And we know from Plaintiff's Exhibit No. 10

17   that Mr. Cavanna got the message from Jeana because

18   he wrote back "Jeana's right, nine minutes of ads";

19   do you see that?

20       A.  I do.

21       Q.  And then about a week later Mr. Cavanna is

22   writing to a practice and he says in his e-mail

23   "what you're getting now with Healthy Advice is a

24   30-minute slide show that doesn't have any video and

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy    March 28, 2014

```
 1   half of the 30 minutes consists of ads"; do you see
 2   that?
 3        A.  I do.
 4        Q.  So despite the instruction, despite the
 5   directive from Ms. Loewe, Mr. Cavanna appears to
 6   have paid absolutely no attention to that?
 7        MR. O'BRIEN:  Object to the form.  I also note
 8   that we're off topic 1 and into topic 5, on which
 9   this witness was not tendered.
10        MR. COWAN:  No.  I'm on supervision.
11        MR. O'BRIEN:  It looks like it's more squarely
12   on topic 5.
13        MR. COWAN:  Dick, the specific thing is Jeana
14   worked with the team and attempted to correct
15   inaccurate statements.
16        MR. O'BRIEN:  I'm not instructing him not to
17   answer.
18   BY MR. COWAN:
19        Q.  Go ahead.
20        A.  Could you repeat the question?
21        MR. COWAN:  Read it back.
22                  (Record read as requested.)
23        MR. O'BRIEN:  Same objections.
24            You can answer.
```

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy     March 28, 2014

1    BY THE WITNESS:

2        A.  I don't think that's accurate.  He appeared

3    to have confirmed that he knows that there should be

4    only nine minutes of ads.  So he obviously paid

5    attention to it.

6        Q.  Fair enough.

7            Do you have any explanation as to why,

8    then, after having paid attention to what Ms. Loewe

9    said he was advising a HAN practice that their loop

10   had -- consisted of half ads?

11       A.  I believe he made a very poor personal

12   decision.

13       Q.  And why do you believe that?

14       A.  I'm not sure.

15       Q.  No.  I mean, why do you believe that's a

16   poor personal decision?

17       A.  Because he was instructed to say factual

18   statements, he was told what the factual statements

19   were, he confirmed what he believed and knew to be

20   the factual statements, and then he said something

21   that was, to the best of our knowledge, not

22   factually correct in his process that I believe in

23   how I would define a poor personal decision

24   certainly seems like a poor personal decision.

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy    March 28, 2014

1        Q.  In terms of the communications that an MOE

2   has with practices, do you have any sense of how

3   much of the communication is oral, meaning on the

4   phone, as opposed to in writing, primarily e-mail?

5   This is MOEs.  I'm not talking about MSEs.

6        A.  Well, member outreach generally makes

7   between 60 and a hundred calls a day.  A lot of

8   that's on the phone obviously.  So they have a lot

9   of oral communication.  They do send quite a few

10  e-mails.  I don't know exactly what the breakdown

11  would be.

12       Q.  But it would be fair to say that -- strike

13  that.

14           Before you had mentioned something where

15  you used the term "pitch," and I think you were

16  distinguishing it from sales collateral or sales

17  materials; is that right?

18       A.  By "pitch" I would generally be referring

19  to a verbal conversation with an office manager.

20       Q.  Okay.

21           Is a lot of what MOEs do, at least during

22  this time frame -- and by this time frame -- strike

23  that.

24           I think for purposes, Mr. Purdy, of the

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy     March 28, 2014

1    rest of the deposition I'm going to confine my

2    questions to the time period of December 2010

3    through March of 2013.

4         A.  I understand that to be the relevant time

5    period.

6         Q.  Fair enough.  Unless I've got a question

7    for you that goes beyond or outside the parameters

8    of that, just assume that's the time period I'm

9    covering.

10            During this time period, do MOEs -- is the

11   first step in terms of an MOE trying to obtain a

12   practice a cold call in terms of communications with

13   a practice?

14        A.  I think the question's kind of ambiguous

15   and not really a fair representation of how the

16   business is run.

17        Q.  I'm not trying to misrepresent it.  I'm

18   trying to understand it.  I'll get into it later

19   when we talk about the practice procedure.

20        A.  Do I need these?

21        Q.  Just keep the Jeana one out.  No, you're

22   done with it.  Can you put them all to the side.

23            Plaintiff's Exhibits 11 is an e-mail from

24   Mr. Vandersteen to Ms. Loewe and it's in response to

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy    March 28, 2014

1    that e-mail that we've just been talking about where

2    she pointed out the HAN stated advertising time in

3    their loop; is that right?

4        A.  Let me review it.

5        Q.  Sure.

6                    (Witness viewing document.)

7    BY THE WITNESS:

8        A.  This is the same chain with the last

9    response just being Brok saying thanks for

10   clarifying.

11       Q.  Yes.  So it appears as though

12   Mr. Vandersteen also got the message?

13       A.  He's on the e-mail and he replies, yes.

14       Q.  This is an e-mail from Mr. Vandersteen one

15   day later after he got the message from Ms. Loewe to

16   a practice.  The attachment says "HA switch."  You

17   understand that to be a HAN switch?

18       A.  Yes.

19       Q.  And he says "Hi Debbie.  I can't stress

20   enough how much better our network is than the

21   Healthy Advice TV you have.  You have a 30-minute

22   PowerPoint slide of general information right now

23   and half of it is advertising."  Do you see that?

24       A.  Yes.

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy     March 28, 2014

1      Q.  And do you know why it is that

2  Mr. Vandersteen one day after being directed and

3  instructed by Ms. Loewe about what should and should

4  not be said about the amount of advertising in a HAN

5  loop is continuing to say that the HAN loop consists

6  of half advertising?

7      A.  Do I know why he did it?  No.

8      Q.  Would you categorize this as a, as with

9  Mr. Cavanna, another poor personal decision?

10     A.  It certainly appears to be a poor personal

11 decision.  It appears they have exaggerated or

12 certainly not been consistent with what they've been

13 told and certainly been supervised to say to people

14 in the field.

15     Q.  Here's an e-mail from Mr. Stoll.  We know

16 from the original e-mail from Ms. -- the one we

17 looked at with Mr. Cavanna that Mr. Stoll was a

18 recipient of the directive from Ms. Loewe?

19     A.  Yes.

20     Q.  You see this is an e-mail from him June 8

21 of 2012, so a couple months after being instructed

22 and directed as talked about by Ms. Loewe.  About

23 halfway down in his e-mail, "Healthy Advice is a

24 30-minute PowerPoint slide of general health

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy    March 28, 2014

1    information, and that's not what patients come to

2    your office for.  Less ads.  Healthy Advice is close

3    to 40 percent advertising."  Do you see that?

4        A.  I do see that.

5        Q.  Again, would you characterize that, as you

6    have for Mr. Cavanna and Mr. Vandersteen, as a poor

7    personal decision?

8        A.  Yes, I believe that to be the case.  These

9    sales representatives obviously make thousands of

10   phone calls and conversations and e-mails with the

11   marketplace, and it certainly appears that they've

12   in a number of cases made poor personal decisions

13   which are not accurate or representative of how

14   we've trained them, what our policies are, or

15   certainly what they've been directed to do by

16   managers and supervision.

17       Q.  Let me show you one more, and if you want

18   we can take a break.

19           This is Plaintiff's Exhibit 50.  You'll see

20   now we're into late August of 2012.  Take a minute.

21   The first e-mail is late August of 2012, and then

22   the second e-mail is early September 2012.

23       A.  Are these all the same e-mail template,

24   just sent to different practices?

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy    March 28, 2014

1      Q.  They're sent to different practices.  It's
2  sort of a compendium exhibit.  I'm only going to ask
3  you about the first and third page.  You'll see
4  these are from Mr. Vandersteen.  The first page is
5  an e-mail dated August 31 to a practice, the second
6  one is September 6, both of them referring to
7  Healthy Advice.  In one he says roughly 40 percent
8  of the Healthy Advice loop is advertising.  The next
9  one he says roughly 50 percent of the Healthy Advice
10  loop is advertising.  Do you see that?
11      A.  Yes.
12      Q.  Let me just ask you about that.  Do you
13  have any understanding as to why in one e-mail it
14  would be 40 percent and in one e-mail it's
15  50 percent?
16      A.  So I spoke to Brok yesterday about the
17  reason for which he was taking information that he
18  had received from our organization and changing
19  things to make it appear as facts in the sales
20  process.  As I've previously mentioned, he even
21  personally told me it was a poor personal decision,
22  it was something that he was not directed by anyone
23  to do, and that as soon as someone else,
24  particularly Matt Garms, realized this was the case,

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy    March 28, 2014

1    he was immediately reprimanded and it was stopped.

2         Q.   When did that happen?

3         A.   I don't recall.

4         Q.   Did he give you a specific -- was there a

5    specific reason why he was reprimanded?  By that I

6    mean was there a specific statement for which he was

7    reprimanded?

8         A.   No.  It was for making inaccurate

9    statements to offices.  He was reprimanded as soon

10   as he was made aware.  As you can see in a lot of

11   correspondence, as soon as we're made aware of it we

12   act upon it.  In the case of an earlier example, it

13   was within eight minutes.  I believe we're always

14   trying to make sure we properly prepare ourselves in

15   selling the merits of our service which we believe

16   to be very competitive, in certain cases a better

17   choice for offices.

18        Q.   To your knowledge, was Mr. Garms

19   supervising, reviewing the written communications

20   that were being provided by the sales team, by the

21   MOEs to prospective practices during the relevant

22   time?

23        A.   No.  We trust our sales representatives to,

24   you know, represent our company to the best of their

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy    March 28, 2014

1   ability.  Matt Garms did not individually monitor or

2   check each correspondence that was sent out into the

3   marketplace.

4       MR. COWAN:  I'm going to switch to topic 2.  Do

5   you want to take a break?

6       MR. O'BRIEN:  Sure.

7                   (A short break was had.)

8   BY MR. COWAN:

9       Q.  Let's go to topic 2.  So who did you talk

10  to with respect to topic 2?

11      A.  I believe just Jim.

12      Q.  Demas?

13      A.  Yes.

14      Q.  Did you review any documents?

15      A.  I looked at our authorization form, and I

16  reviewed all of the correspondence in early January

17  2011 between HAN and Contextmedia.  Then I saw an

18  exhibit with regards to the conversation between

19  AccentHealth and Contextmedia in early 2011 as well.

20      Q.  So your first note says "When Context

21  became aware of competitors, Rishi originally wanted

22  to compete in the market on the merits of service

23  offering.  Jim made recommendation of an

24  authorization form for competitor switch-outs."  Do

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy    March 28, 2014

1    you see that?

2        A.  Yes.

3        Q.  In some of the materials I've seen there's

4    reference to a competitor switch-out package.  Have

5    you seen that?

6        A.  Could you rephrase the question?

7        Q.  Yeah.  Let me ask a different one.  I'm not

8    going to rephrase that one.  I'll ask a different

9    one.

10           Have you ever heard the term as it's used

11    by Context "hassle-free switch-out"?

12        A.  Only in the course of this proceeding.

13        Q.  And only in the course of your involvement

14    to become prepared to be the 30(b)(6) or --

15        A.  Yes.

16        Q.  Do you know -- when you talked with

17    Mr. Demas, did you get a sense of who it was that

18    came up with the idea of developing a competitor

19    switch-out practice or procedure?

20        A.  Competitor switch-out practice?

21        Q.  The practice of -- strike that.  I can tell

22    easily with you when I've asked a question which is

23    confusing.  So that's helpful.

24           During the relevant time did Context have a

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy    March 28, 2014

1    procedure for dealing with competitor switch-outs?

2        A.  Not during the entirety of the relevant

3    time period.

4        Q.  Okay.  What period of time do you believe

5    Context had a procedure for dealing with competitor

6    switch-outs?

7        A.  My next note says that, you know, after the

8    first three to five switch-outs there was a process

9    by which they would ship the equipment directly from

10   the office where a switch-out had happened directly

11   back to Healthy Advice.  I believe once that

12   procedure was in place as well as the authorization

13   form, which I believe happened at the first

14   switch-out of any kind, I would call that probably

15   the period by which there was actually a procedure

16   in place.  From my understanding, it's indeterminate

17   when that exact date was.

18       Q.  Fair enough.

19           Did Mr. Demas -- strike that.

20           Do you know why Context developed the

21   authorization form?

22       A.  So we believed it to be the office's choice

23   to choose whichever service they wanted with regards

24   to, you know, something like a competitor versus

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy     March 28, 2014

1  something that Contextmedia was offering.  In cases

2  where they were switching from one service to

3  another, we believe we needed to have written

4  authority from the office if and when they chose to

5  switch to be able to move forward with any change of

6  service.

7      Q.  And did change of service include Context

8  removing a competitor's equipment?

9      A.  No, not always.  I suppose the word

10  "always" is incorrect.  I don't believe that Context

11  removing any equipment would be necessary for a

12  change in service.

13      Q.  Why not?

14      A.  To give an example, we have an agreement

15  with AccentHealth whereby there's notice given to

16  each respective organization if an office chooses a

17  different service.  In the vast majority and

18  everything that I'm really privy to each respective

19  organization has generally handled their own

20  equipment in any change of service, there's been

21  quite a few, but I don't believe it's necessary for

22  any change of service whatsoever.

23      Q.  Context has sort of a similar agreement

24  with PatientPoint or at least has since about the

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy    March 28, 2014

1    end of March 2013?

2        A.  Yeah.

3        Q.  And how has that worked from your

4    standpoint?

5        A.  My understanding is that it has been far

6    more effective and certainly mitigated any concerns

7    that are main contentions being brought in this

8    lawsuit.  I also believe there are certain cases

9    where it has been, you know, not as responsive as we

10   would potentially like, but I certainly believe it

11   has been far more effective.

12       Q.  Did the authorization form that Context

13   prepared purport to have the practice authorize

14   Context to remove a competitor's piece of equipment?

15       A.  Could you rephrase that question?

16       Q.  The authorization form that was used by

17   Context -- and let's focus specifically on Healthy

18   Advice practices.  Did the authorization form

19   purport to have the practice authorize Context to

20   remove the Healthy Advice equipment?

21       A.  I don't believe that is what is being

22   authorized in the authorization form.  If you have

23   an example, I'm happy to look at it.

24       Q.  We marked one.  I'll see if I can get it.

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy     March 28, 2014

1    Well, wait a second.
2            This is Plaintiff's Exhibit 38.  Take a
3    minute and look at that, if you would.
4                    (Witness viewing document.)
5    BY THE WITNESS:
6        A.  So in this case, you know, I believe my
7    answer was incomplete in the sense that I said I
8    don't believe that's what it's authorizing because I
9    believe there's a holistic sense of what it is
10   authorizing.  In this case the example I'm looking
11   at says that "The technician is responsible for
12   installing the Rheumatoid Health Network system and
13   to also uninstall and remove the existing name of
14   competition system and to arrange to have all
15   equipment returned to name of competition."
16           In this case one of the components of the
17   installation authorization appears to be the
18   authority to remove and uninstall that equipment
19   which the office is giving us the authority to do.
20   So that was sort of the way in which I was actually
21   answering the previous question where I believe
22   there's a holistic sense to which this authorization
23   form is being completed.
24       Q.  Just so you understand, this is not

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy     March 28, 2014

1   intended to be a test.  So if there's a document
2   that you need to look at to make your answer
3   complete, don't hesitate to tell me that.  I'm not
4   trying to, you know, expect that you know every word
5   in every document.
6        A.  Absolutely.  I'm trying to make sure that
7   words are not being taken out of context.
8        Q.  I appreciate that.  Neither of us want
9   that.
10          Did you discuss with Mr. Demas why
11  Context -- strike that.
12          Did Context believe that it needed the
13  authorization form in order to proceed with a
14  competitor switch-out?  And I should say a signed, a
15  completed, an executed authorization form.
16       A.  I can't speculate as to what Contextmedia
17  and the management team believed.  You know, we
18  certainly wanted to make sure we had written
19  authorization to be able to proceed with a
20  switch-out.
21       Q.  And, to the best of your knowledge, for all
22  of the switch-outs that involved Healthy Advice, did
23  Context obtain an executed authorization form?
24       A.  To the best of my knowledge, we did obtain

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy    March 28, 2014

1    an authorization form in every switch-out.

2        Q.   Did Mr. Demas indicate to you at any time,

3    and certainly in connection with your preparation

4    for your testimony today, why he felt Context should

5    utilize an authorization form for Healthy Advice

6    switch-outs?

7        A.   We did not specifically talk about why he

8    believed that should be used.

9        Q.   Let me hand you what we previously marked

10    as Plaintiff's Exhibit 79.  Take a minute and look

11    at that.  My first question is going to be with

12    respect to if you recall having reviewed that

13    document?

14                    (Witness viewing document.)

15    BY THE WITNESS:

16        A.   No, I haven't reviewed this document.

17        Q.   Have you had a chance to just now?

18        A.   Yeah.

19        Q.   I'm going to just ask you about the top

20    part, the e-mail from Mr. Shah dated January 24,

21    2011.  You understand that this is a series of

22    e-mails relating to the issue of switching out a

23    Healthy Advice practice?

24        A.   Yes, that's my understanding.

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy    March 28, 2014

1        Q.  And Mr. Shah in his e-mail says "We do have

2    a set plan in place to deal with it whereby we

3    communicate with HAN on behalf of the office to pick

4    up the equipment once we take it down so it's hassle

5    free for the site"; do you see that?

6        A.  Yes.

7        Q.  And is that consistent with your

8    understanding as the 30(b)(6) witness for the

9    company as to the practice or procedure for

10   switching out HAN practices, that being that Context

11   will communicate with HAN on behalf of the practice

12   to pick up the equipment once it's been taken down?

13       A.  No.  I don't believe this is a holistic

14   view into what our policies are.  I believe this was

15   at the time where it was very early in us developing

16   the policies.  At some point it was far more clear

17   as far as how this was done.

18       Q.  And when was that?

19       A.  I believe I discussed earlier it was a

20   little bit ambiguous as to when those procedures

21   were formed.  It was certainly in the earlier, you

22   know, maybe Q1 of 2011, maybe potentially into Q2,

23   but I'm not a hundred percent sure.

24       Q.  But was it your understanding in the

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy    March 28, 2014

1    relevant time period the Context practice for doing

2    a HAN switch-out was to, A, get a signed

3    authorization form for the practice and then, B,

4    remove the HAN equipment and then provide HAN notice

5    that its equipment had been removed and would be

6    shipped back to them?

7        A.  Do you mean by 1, 2, 3 for it to be

8    chronological?

9        Q.  Right.

10       A.  Then what you just said I don't believe is

11   the policy.

12       Q.  All right.  What do you believe the policy

13   is?

14       MR. O'BRIEN:  Can we get a time frame here?

15       MR. COWAN:  That's fair.

16       MR. O'BRIEN:  He's already testified it sort of

17   changed.

18       MR. COWAN:  It did change.

19   BY MR. COWAN:

20       Q.  I thought you had said it's a little bit

21   ambiguous as to sort of the time line.  Tell me as

22   best you can what the practice was from when the

23   first switch-out was done up through to March of

24   2013.

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy     March 28, 2014

1      A.  Isn't your question a little bit
2  inconsistent with what you just said where it's
3  changed over time?  How could there be a policy
4  across the entire period?
5      MR. O'BRIEN:  I think he's asking you what it
6  was at various points in time.  Is that fair?
7      MR. COWAN:  Yeah.
8  BY THE WITNESS:
9      A.  So in a general sense I think, you know, at
10  first we found that there were offices with
11  competitor services.  The office after going through
12  a sales process, you know, chose or asked to use our
13  service, and they signed a written authorization
14  form to allow us to install our service and in
15  certain cases remove the service that was in
16  existence.  I believe there was, certainly at the
17  beginning, a number of attempts to try and reach
18  Healthy Advice.  Here's an example whereby the
19  practice was directly trying to reach Healthy
20  Advice.
21      Q.  And you're referring to?
22      A.  The exhibit you just gave me.
23      MR. O'BRIEN:  What's the number?
24  BY THE WITNESS:

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy    March 28, 2014

1        A.   I think it's 79.  There's a thing that says
2   "An office manager at one of my offices has informed
3   me that Healthy Advice has told them that their
4   equipment is not to be touched or removed by anyone
5   other than Healthy Advice technicians.  The Healthy
6   Advice contract or the addendum states that the
7   account must keep the equipment for six months and
8   give written notice 30 days prior to the end of the
9   period to have that monitor removed."
10        So in that case the offices were, we
11   believed, giving authority to switch.  We don't
12   comment on their contract or the agreement, if such
13   exists.  You know, they're made aware of the
14   authorization that the clinic gives us.  In the case
15   where we'd remove the equipment, we'd remove their
16   equipment, install our service, and, you know, I
17   think at first there was a little bit of a hazy
18   period where it wasn't exactly clear where to send
19   the equipment back to.
20        I think in a couple cases -- I certainly
21   know that Dr. Margules, the first switch-out case,
22   the equipment was sent to our office and then sent
23   from our office to Healthy Advice.  In certainly
24   subsequent switch-outs after a protocol was put in

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy    March 28, 2014

1   place it was shipped directly from the office to

2   Healthy Advice.

3       Q.  In terms of just your best estimate of

4   timing as to when that protocol was instituted --

5   I'm not going to hold you to it -- are we talking,

6   you know, March of '11?  Are we talking April?

7   June?

8       A.  I think it's rather unknowable.  If I were

9   to make a best guess, it was Q1 of 2011, but I will

10  say I just discussed two different policies

11  obviously and a time line of how policies

12  progressed.

13      Q.  So the second --

14      A.  Our latest policy and certainly what I

15  think has been used for the vast majority of the

16  relevant time period was developed in Q1 of 2011.

17      Q.  It was developed in Q1 of 2011?

18      A.  To the best of my knowledge.

19      Q.  And what is that -- what's that policy?

20      A.  It's what I just described where an office

21  would be sold into the merits of our service by our

22  inside sales team.  At some point when they agree to

23  sign up with our service, the member services

24  executive would work directly with the office to get

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy    March 28, 2014

1    a written authorization form.  If in a case they

2    could not reach HAN or HAN would not come and

3    uninstall the equipment, there certainly has been

4    cases where authority was given to remove that

5    equipment and send it directly back to HAN from the

6    office.  During that process we would install our

7    equipment.

8        Q.  We need to kind of give a name for that

9    practice or procedure because it's the one that was

10   in place for the bulk of the relevant period, right?

11       A.  Uh-huh.

12       Q.  Yes?

13       A.  Yes.

14       Q.  So let's call it the operative practice.

15       A.  The operative HAN switch-out practice.

16       Q.  The operative HAN switch-out practice.  Is

17   the operative HAN switch-out practice documented?

18       A.  I'm not sure if the entirety is documented.

19   There are certainly pieces that are documented.

20       Q.  Where would that be?

21       A.  I'm not sure exactly where they would be

22   documented.  For example, the authorization form is

23   clearly documented.

24       Q.  I think I handed you -- do you still have

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy    March 28, 2014

1    Exhibit 38?  Yeah, that's it.

2              So take a look at this.  This is an e-mail

3    from Sylvia Velazquez to Chad Peterson Friday,

4    February 18, 2011.  The subject is "Templates for

5    switch package"; do you see that?

6        A.  Yes.

7        Q.  Just take a minute and review the documents

8    in here, and my question's simply going to be are

9    these documents documents that were used as part of

10   the operative HAN switch-out practice?

11                    (Witness viewing document.)

12   BY THE WITNESS:

13       A.  These certainly seem like documents like

14   those that would be in the operative HAN switch-out

15   process.  I'm not necessarily sure if these are part

16   of that.

17       Q.  All right.  So I take it that what you're

18   saying is the documents that are in Plaintiff's

19   Exhibit 38 are consistent with what you would

20   understand or expect to be as part of the operative

21   HAN switch-out practice?

22       A.  These are examples of things that I would

23   imagine would be a part of a switch-out process.

24   It's not necessarily -- I don't know exactly what's

63

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy    March 28, 2014

1    part of that process.  So I'm not necessarily sure

2    what I would expect.  Your question seems like

3    there's some opinion in there.

4         Q.  This is Plaintiff's Exhibit 5.  It should

5    be at least a version of the MOE training manual.  I

6    think you had indicated that you did review certain

7    versions of training manuals in preparing for

8    today's deposition, correct?

9         A.  Yes.

10         Q.  This version, at least as of June 10, 2011,

11    has a section that talks about competitor

12    switch-outs.

13         A.  What page is that?

14         Q.  I'll get to it.  It is -- it's page 27 of

15    the document.  The Bates number is 6484.  You'll see

16    there's a section that says "Competitor switch-out

17    process."

18         A.  Yep.

19         Q.  If you could just review that section at

20    least until -- it carries over, Mr. Purdy, to the

21    next page, and then there's a section that deals

22    with AccentHealth switch-outs.  I don't need you to

23    read the AccentHealth part.  My question is going to

24    be, so you understand why I'm asking you to read it,

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy    March 28, 2014

1    is what's described here on pages 27 and 28

2    consistent with your understanding of the operative

3    HAN switch-out practice?

4                    (Witness viewing document.)

5    BY THE WITNESS:

6        A.   So this certainly seems to be part of what

7    would be an operative switch-out process.  Since I'm

8    not necessarily sure of all the components of it, I

9    can't necessarily say if this is, you know, a

10   hundred percent consistent with all of it.

11       Q.   There's nothing -- let me try to get at it

12   a different way, then, at least take your answer as

13   best I can.  I take it, Mr. Purdy, there's nothing

14   in what you've reviewed on pages 27 and 28 of the

15   exhibit, Plaintiff's Exhibit 5, that's inconsistent

16   with your understanding of the operative HAN

17   switch-out practice?

18       A.   Nothing to my current knowledge seems

19   inconsistent.

20       Q.   And in connection with the -- strike that.

21           On page 22 of the document you'll see a

22   document that is referred to as the "RHN Sign-up

23   Form."

24       A.   I see that.

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy    March 28, 2014

1       Q.  Are you familiar with that document
2   generally?
3       A.  Yes.
4       Q.  And is the RHN sign-up form part of the
5   operative HAN switch-out practice?
6       A.  Sign-up forms change quite a bit over time,
7   but we certainly do have a sign-up form for every
8   office and that would be consistent with anything in
9   a switch-out process.
10      Q.  The bottom part says "Agreement"; do you
11  see that?
12      A.  Yes.
13      Q.  And then the last part says "I agree to not
14  remove, relocate, modify, alter, or disrupt any of
15  the RHN system components without prior consent from
16  the Rheumatoid Health Network"; do you see that?
17      A.  Yes.
18      Q.  Were you aware that that language was in
19  the RHN sign-up form that was part of the operative
20  HAN switch-out package?
21      A.  This I believe is dated June 10, 2011.  I
22  certainly see that this is a sign-up form that we
23  used at this period of time.  I see this language is
24  in here.  So it certainly would overlap with a

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy    March 28, 2014

1    period that would be -- during which we probably had

2    a operative switch-out process.  You know, there

3    certainly could be a period of time where that isn't

4    the case.

5        Q.  Do you know that or or just saying -- are

6    you saying that to be careful, or do you know that

7    there was a period of time during when the operative

8    HAN switch-out practice was used that Context did

9    not use this form?

10        A.  We've always used the sign-up form.  I

11    suppose there's a lot of variables we're talking

12    about here, and I'm not necessarily sure to be

13    careful whether or not that's the case.

14        Q.  Does Context believe that the agreement

15    portion of its RHN sign-up form when it's part of

16    the HAN operative switch-out practice is a contract?

17        A.  No.  We look at our agreement as something

18    by which we prefer the office to follow.  We don't

19    believe we have a contract.

20        Q.  And why is it, then, that you have the

21    practice sign something that's entitled "Agreement"

22    and actually ask for their signature?

23        A.  Because we certainly want to affirm what

24    they're doing is truthful and that we've

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy    March 28, 2014

1    communicated it as our preference.  They're also

2    obviously affirming to a number of other things

3    here, and I think we really want to make sure that

4    we have the correct information.  So there's a lot

5    of things with regards to the accuracy of their

6    suite, their specialty, their data, and, you know, I

7    think they're affirming to all of that.

8         Q.  The provision at the bottom of the

9    agreement that says "I agree to not remove,

10   relocate, modify, alter, disrupt any of the RHN

11   system components without prior consent from the

12   Rheumatoid Health Network," does Context expect its

13   practices to abide by that portion of the agreement?

14        A.  We certainly prefer that they do.

15        Q.  To your knowledge, was any practice ever

16   advised before it signed the agreement that this is

17   really just Context's preference, it's not really a

18   contract?

19        A.  I don't really recall.

20        Q.  I think I'm done with that one.

21        A.  Are you done with all of these?

22        Q.  I am, yeah.

23             I'm handing what you we've marked

24   previously as Plaintiff's Exhibit 110.  This is,

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy     March 28, 2014

1    Mr. Purdy, another one of these compendium exhibits.

2    Take a minute and just review it briefly to

3    yourself.

4         A.  All of it?

5         Q.  Yeah, all of it.  I'm trying to figure out

6    if there's a way for me to streamline it.

7         A.  I know what all of these are.  I've

8    reviewed these.

9         Q.  Okay.  What do you understand these to be,

10   then, since you've reviewed them?

11        A.  This is very similar to a topic we've

12   already discussed.  In fact, I believe there's an

13   e-mail here that has the exact language that we've

14   already discussed on this page that just happened to

15   be in an e-mail before.  I think this is considered

16   rogue or kind of independently created collateral.

17   I believe this here has the exact language that was

18   previously in an e-mail.

19        MR. O'BRIEN:  He's looking at Context

20   production 1160.

21   BY MR. COWAN:

22        Q.  Right.  So 1160, we looked at a similar

23   version or a somewhat similar version before, and

24   this was described as sort of rogue collateral

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy    March 28, 2014

1   material; is that right?

2        A.  Exactly.

3        Q.  And let's just stick with that page.  What

4   is it that you consider to be the rogue part of it?

5   Just read the entire -- everything that's said in

6   here.

7        MR. O'BRIEN:  This page or the whole exhibit?

8        MR. COWAN:  No, just this page.

9   BY THE WITNESS:

10       A.  This page in my understanding is rogue in

11  that it wasn't produced by our marketing team and

12  was independently created by a member of the sales

13  team and, from what I see here, has inaccurate

14  information on it.

15       Q.  And what is the inaccurate information?

16  Which specific sentence in this document is

17  inaccurate?

18       A.  So obviously there's a lot of variation in

19  product perception and the way something can be

20  described.  I would say that, to the best of my

21  knowledge, Healthy Advice doesn't use PowerPoint in

22  the development of their content.  And albeit the

23  words "Healthy Advice is close to 50 percent" can be

24  about as wide ranging as it gets, but it certainly

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy    March 28, 2014

1    infers it's within a close proxy of 50 percent

2    advertising, which neither of those two, at least as

3    I'm sort of looking down here, I would say are

4    exactly consistent with how we tell the team to

5    message it.

6         Q.  Do you understand that the documents that

7    are -- that comprise Plaintiff's Exhibit 110 are

8    materials that were utilized by MOEs as part of the

9    operative HAN switch-out practice?

10        MR. O'BRIEN:  Take your time and look at it

11   given that question.  There's a lot of pages in

12   here.

13        MR. COWAN:  Do not disobey your lawyer.

14                   (Witness viewing document.)

15   BY THE WITNESS:

16        A.  Okay.  There appears to be an installation

17   authorization form and a sign-up form as the last

18   two components of this exhibit.  I believe those two

19   documents are used in the operative switch-out

20   process.  Everything else I see here, to the best of

21   my knowledge, was something that was independently

22   created by the sales team and is certainly not part

23   of the operative switch-out process.

24        Q.  When you say "not part of the operative

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy    March 28, 2014

1    switch-out practice," do you mean by that it is --

2    those documents are materials that should not have

3    been used by Context?

4        A.   So I spoke to Brok yesterday about this.

5    Brok confirmed to me he created the "Switching Is

6    Easy" document, so 4515, and he also created 1160 at

7    his own volition, both of which in my estimation do

8    not contain a hundred percent accurate or correct

9    portrayals of how our organization would

10   characterize the service and are inconsistent with

11   how they've been trained.  And as soon as it was

12   brought to light and Matt Garms was made aware of

13   this, he immediately told them to stop using it and

14   they were discarded.

15       Q.   When did that happen?

16       A.   Within a very short time period.

17       Q.   Within a very short time period of what?

18       A.   Of when they started being used.

19       Q.   When did they start being used?  When did

20   they stop being used?

21       A.   I'm not sure exactly when they started

22   being used, but as soon as we were made aware of it,

23   they stopped using it.

24       Q.   Right.  I understand that.  When did that

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy    March 28, 2014

1    happen?
2        A.  I don't think anyone really has direct
3    knowledge as far as the date.
4        Q.  So the company is not aware of when these
5    materials started -- were first used and when they
6    stopped being used, correct?
7        A.  To my knowledge, I don't believe we
8    understand the exact dates that they were started or
9    stopped being used.
10       Q.  Do you know whether or not the materials
11   that were created by Mr. Vandersteen were used by
12   any of the other MOEs other than Mr. Wiser,
13   Mr. Cavanna, and Mr. Vandersteen?
14       A.  I don't have any reason to believe so.
15       Q.  Why do you say that?  Did you talk to
16   Ms. Tatum?
17       A.  I didn't speak with Devin directly about
18   this, no.
19       Q.  Did you speak with any of the other -- did
20   you speak with any of the MOEs other than Mr. Wiser,
21   Mr. Cavanna, and Mr. Vandersteen specifically as to
22   whether or not they used any of the materials that
23   we're talking about that Mr. Cavanna created -- I'm
24   sorry -- Mr. Vandersteen created?

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy    March 28, 2014

1      A.  I spoke with Matt Garms.

2      Q.  And what did he say?  Did he use any of

3   them?

4      A.  No.  As I just discussed with you, these

5   were things he affirmed were independently created

6   by the team and that, as soon as he was made aware

7   of it, were immediately stopped being used by the

8   team.  That's what I heard from every single person

9   I spoke to.

10      Q.  Did Mr. Garms indicate how it was he put an

11   end to use of these materials, how he actually did

12   that?

13      A.  To my understanding, they have regular

14   meetings, oftentimes on Monday mornings.  I believe

15   this collateral or the use of this collateral was

16   raised in an individual meeting.  I think Matt asked

17   to see it, and I believe as soon as he saw it he had

18   a verbal confirmation with Brok, who obviously

19   created and showed him the documents, as well as

20   everyone on the team that this was inconsistent with

21   our policies and should never be used again.

22      Q.  And is the company certain that after that

23   conversation was had that these materials were never

24   utilized again?

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy    March 28, 2014

1        A.  I don't believe the company is certain that
2    they were never used again.
3        Q.  Is Mr. Garms still with the company?
4        A.  Yes.  He still leads the member outreach
5    team.
6        Q.  And Mr. Vandersteen is still with the
7    company?
8        A.  Yes.
9        Q.  Mr. Cavanna is?
10       A.  Yes.
11       Q.  What happened to Mr. Wiser?  Is he still
12   with the company?
13       A.  Yes.
14       Q.  Take a look at Plaintiff's Exhibit 28, if
15   you would.
16                   (Witness viewing document.)
17   BY THE WITNESS:
18       A.  I've read it.
19       Q.  Have you seen this one before?
20       A.  No.
21       Q.  This is an e-mail from Mr. Cavanna to
22   Mr. Garms dated April 12 of 2012, is it not?
23       A.  Yes.
24       Q.  And this apparently refers to a Healthy

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy     March 28, 2014

1     Advice switch-out?

2         A.  That's what it looks to be referring to,

3     yes.

4         Q.  The "Notes for MS," that would be -- let me

5     just step back.  I think I've seen so many of these,

6     but I just want to understand kind of generally what

7     this is.  Is this information that's put into some

8     sort of database?

9         A.  I'm not sure actually.

10        Q.  Okay.

11            In any event, it says "Notes for MS."  I

12    assume that's the member services?  Do you take that

13    to be referring to member services?

14        A.  Yes.

15        Q.  It says "Sylvia, this is kind of urgent.

16    They have Healthy Advice right now and they are

17    scheduled to upgrade the TV on Monday.  We, of

18    course, swooped in and told her not to do it, to go

19    with us.  As I was talking to her today, Healthy

20    Advice called her and told her that no one is

21    allowed to touch the television except Healthy

22    Advice, which obviously is a bold-faced lie."  Do

23    you see that?

24        A.  I do see that.

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy    March 28, 2014

1      Q.  Do you believe that -- does the company
2  believe that Healthy Advice advising a practice, one
3  of its practices that no one is allowed to touch the
4  television except for Healthy Advice is a bold-faced
5  lie?
6      A.  How would you characterize "bold-faced
7  lie"?
8      Q.  You know --
9      A.  I think there's a number of ways you can
10  actually look at this statement.  So I'm just
11  wondering.
12      Q.  Yeah.  So I'd respectfully say that you're
13  probably in a better position since this is the
14  company's employee that's making this statement, but
15  if you can't answer it because you don't understand
16  what is meant by "bold-faced lie," then I'll move
17  on.
18      A.  I think I understand what he means by
19  "bold-faced lie."  I think what is the part that I
20  may have a different opinion on is that, depending
21  on how this is read, it's said that, you know,
22  Healthy Advice is the only one that's allowed to
23  touch the equipment.  I do believe it's the
24  company's position that, given authorization, a

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy    March 28, 2014

1    third party can remove the equipment if that is the

2    office's choice.  So if that's a binary statement

3    where they are the only person to touch it and

4    Patrick is thus saying that it is a bold-faced lie

5    in the sense of that is not a hundred percent being

6    truthful, then I think there are different ways of

7    interpreting this.

8        Q.  During your investigation in preparation

9    for being the corporate representative on the topics

10   so designated, did you learn that there was a

11   desire, an interest on the part of the company to

12   try to remove Healthy Advice equipment before

13   Healthy Advice was notified that the equipment was

14   going to be removed or their agreement with the

15   practice was going to be canceled?

16       A.  Could you repeat the first part of that

17   question?  Did you say the word was it a tactic?

18       Q.  I don't think I did, but she knows better.

19                  (Record read as requested.)

20   BY THE WITNESS:

21       A.  No, I don't believe it was a desire because

22   I believe it was our desire to have a written

23   authorization form signed and directly faxed back to

24   Healthy Advice.

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy    March 28, 2014

1     Q.  Do you know typically how long it took
2  between the time that the authorization form --
3  strike that.
4         Who was the authorization form faxed to?
5     A.  Which authorization form?
6     MR. COWAN:  Can you read back his answer.
7              (Record read as requested.)
8  BY MR. COWAN:
9     Q.  Is it --
10     A.  So you're talking about the installation
11  authorization form?
12     Q.  I'm talking about whatever you were talking
13  about.
14     A.  Yeah.  I think during a switch-out
15  proceeding it is our desire to have an authorization
16  form signed by a practice and for the notice -- I've
17  seen in other documents as far as a notice that an
18  office can send to Healthy Advice with regard to
19  this procedure executed prior to anything happening
20  as far as anything with their equipment or our
21  installation.
22     Q.  And do you know typically how long after
23  the authorization form was faxed to Healthy Advice
24  it would take for the Healthy Advice equipment to be

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy    March 28, 2014

1    removed?
2         A.  No, I don't know.
3         Q.  Was it hours?  Was it days?  Do you have
4    any idea?
5         A.  I don't have any specific information that
6    I could make a guess on, no.
7         Q.  I'll hand you what's been marked as
8    Plaintiff's Exhibit 29.  My first question is going
9    to be -- take a minute and look at it, but is this a
10   document you're familiar with?
11                   (Witness viewing document.)
12   BY THE WITNESS:
13        A.  Yeah, I've reviewed it.
14        Q.  Have you seen that one before?
15        A.  No.
16        Q.  You'll see there Mr. Cavanna is talking
17   with what appears to be a Healthy Advice practice;
18   is that right?
19        A.  It's my understanding, based on this
20   communication, this practice does have Healthy
21   Advice, yes.
22        Q.  Does the company know how often any of its
23   MOEs advised Healthy Advice practices that the
24   practice did not need to give notification or a

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy    March 28, 2014

1    specific period of notification to Healthy Advice?

2        A.  I don't believe Contextmedia has a count or

3    a confirmation as far as the number of times a

4    statement such as you just described has been made?

5        MR. COWAN:  Let's go off the record.

6                    (A short break was had.)

7    BY MR. COWAN:

8        Q.  Mr. Purdy, we talked a little bit earlier

9    about Mr. Garms and when he went from a contract

10   employee to a full-time employee of Context.  Do you

11   recall that?

12       A.  I do recall our conversation.

13       Q.  Do you believe that by December 20th of

14   2010 he, Mr. Garms, was a full-time employee?

15       A.  I don't have any way to affirm that.

16       Q.  Do you believe that by December 20th of

17   2010 he had been trained by Mr. Shah with respect to

18   how to make calls to recruit practices?

19       A.  I believe he was trained at the initiation

20   of his overall work with Contextmedia as a contract

21   employee.  So I believe so if he was at the

22   organization, which I do believe he was at

23   December 20th.

24       Q.  Let me hand you what we've marked

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy    March 28, 2014

1    previously as Plaintiff's Exhibit 84.  Take a minute

2    and look at this, if you would.

3                    (Witness viewing document.)

4    BY MR. COWAN:

5        Q.  Have you seen this one before?

6        A.  No.

7        Q.  This is an e-mail from Mr. Demas to

8    Mr. Shah and Ms. Agarwal dated December 20, 2010.

9    The subject is "Sales claims," and Mr. Demas reports

10   to them "I heard Matt Garms on the phone telling an

11   office we have an agreement with Healthy Advice

12   whereby we remove their screens and ship them back

13   to Healthy Advice"; do you see that?

14       A.  I do see that.

15       Q.  And Mr. Demas goes on to say "The messaging

16   is false and misleading."  Do you agree with that?

17       A.  If Matt is saying that we have an agreement

18   with Healthy Advice to remove their screens and ship

19   them back, I believe that is false and misleading

20   because, to my understanding, there was no such

21   agreement.

22       Q.  Does the company know how Mr. Garms, who

23   had been trained by Mr. Shah to make calls, came up

24   with the idea of telling offices what's reflected in

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy    March 28, 2014

1    this e-mail?

2        A.   I believe there was some degree of

3    hyperbole used in the sales process, and I believe

4    Matt during his early period of time with the

5    organization said some things that were inconsistent

6    with the training and messaging that were delivered

7    by Rishi.  I think after it was directly confronted,

8    there was a conversation on this topic, his policies

9    and his own behavior changed, and I believe that

10   there's been very little problems after those

11   conversations took place.

12       Q.   And then I think you said earlier that

13   Mr. Zmick would have been somebody that Mr. Garms

14   would have trained when Mr. Zmick joined the

15   company?

16       A.   Yes.  There would have been a degree of

17   certainly at least informal training between Garms

18   and Mr. Zmick.

19       Q.   Let me hand you what we've marked as

20   Plaintiff's Exhibit 86.  Take a minute and review

21   that, if you would.  Just the first page.

22       MR. O'BRIEN:  Well, you can review whatever you

23   want.

24   BY MR. COWAN:

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy    March 28, 2014

1    Q.  You can review whatever you want.  I'm only
2  going to ask you about the first page.
3                  (Witness viewing document.)
4  BY THE WITNESS:
5    A.  Yes.  This appears to be an e-mail between
6  Jordan and an office where he's discussing a
7  potential switch-out between their service and ours,
8  and he has attached to the documents that during
9  that time that are part of the operative switch-out
10  process.
11    Q.  This is dated July 19th of 2011, is it not?
12    A.  Yes.
13    Q.  It appears to involve a Healthy Advice
14  practice?
15    A.  Yes.
16    Q.  And the last sentence of the first full
17  paragraph says "You do not need to contact them" --
18  referring to Healthy Advice -- "as we have a
19  relationship with them which allows us to ship their
20  product back to them"; do you see that?
21    A.  I do see that.
22    Q.  That statement is not true, correct?
23    A.  This certainly seems to be an embellishment
24  and a poor personal statement by Jordan with respect

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy    March 28, 2014

1   to our own policies and procedures, yes.

2       Q.  And do you know how it is that Mr. Zmick

3   would have come up with the idea to tell a HAN

4   practice that they do not need to contact HAN as

5   Context has a relationship with HAN which allows

6   Context to ship HAN's product back to them?  Do you

7   know where he would have come up with that?

8       A.  As I just mentioned, there's thousands of

9   these, you know, communications, and in a couple

10  isolated incidents we've certainly seen, you know,

11  examples of very poor communication and personal

12  decisions being made, this being one of those

13  statements.

14      Q.  Well, the company has no idea of knowing

15  whether or not this statement by Mr. Zmick was an

16  isolated statement, does it?

17      A.  In the course of, you know, our operating

18  we've done a lot of different communication with

19  practices, the vast majority of which has been

20  truthful and accurate.  To the degree that there has

21  been something inaccurate, it is the vast minority

22  and what I would consider an isolated incident.

23      Q.  But my question is how do you know that?

24  There are thousands of calls made during any given

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy     March 28, 2014

1    week by MOEs for Contextmedia, none of which, as I

2    understand, we have recordings of.  Is that

3    consistent with your knowledge?  Let me strike that.

4           My understanding is that there are no

5    recorded calls where we have the actual recording of

6    calls between Context MOEs and a Healthy Advice

7    practice?

8        A.  I don't have an ability to confirm that

9    right now.  I'm not sure.

10       Q.  I don't know that you were noticed up on

11   that.

12       A.  I certainly know that there are calls

13   between Healthy Advice practices and our member

14   outreach team that certainly have been listened to

15   by Matt Garms and are certainly of the vast majority

16   of all of our communication with them accurate and

17   don't contain things like this which are obviously

18   inaccurate and misleading.

19       Q.  So is it the company's testimony that

20   Mr. Garms listens to the vast majority of calls that

21   are made by members of his sales team to prospective

22   practices?

23       A.  It's not the company's testimony that we

24   listen to the vast majority of calls.  They do sit

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy     March 28, 2014

1    in a very close area, the farthest are about 25 feet
2    away from Mr. Garms, and most of the communication
3    can be overheard.  In any case, I would say a lot of
4    the communication can be heard, and if there's ever
5    an inaccurate statement, that is I think immediately
6    resolved.  I do believe that if you listen to that
7    communication, anything inaccurate over the course
8    of several years and the relevant time period is the
9    vast minority and certainly isolated relative to the
10   rest of the communications.
11        Q.  So did you specifically talk with Mr. Garms
12   about what percentage of calls placed by members of
13   his team to HAN practices he heard or overheard?
14        A.  We did not discuss conversations with
15   regards to percentages.  We did talk about the
16   communication with our member outreach team and HAN
17   practices.  The way that it was described was that
18   in any case where there is inaccurate information
19   either overheard or seen, it's immediately
20   corrected.  And he obviously works very, very
21   closely with these people, a matter of feet, and the
22   vast majority of what he interacts with is anything
23   similar to this that is inaccurate, and obviously
24   he's worked over a number of different years to have

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy    March 28, 2014

1  very, very high quality and consistently honest and

2  truthful communication with practices.

3      Q.  This has been marked as Plaintiff's

4  Exhibit 113.  This is an e-mail from Mr. Stoll dated

5  June 8, 2012.  Take a minute and review that to

6  yourself.

7                    (Witness viewing document.)

8  BY THE WITNESS:

9      A.  I've reviewed it.

10     Q.  Do you understand this appears to be a

11 communication between Mr. Stoll and a Healthy Advice

12 practice?

13     A.  That is the way I read it.

14     Q.  And in his e-mail he says "I will call

15 Healthy Advice for you, so don't worry about that.

16 We have an agreement with them that we are much more

17 suited for rheumatoid clinics."  Do you see that?

18     A.  I do see that statement, yes.

19     Q.  That clearly is an inaccurate statement,

20 that is not a truthful statement, correct?

21     A.  We certainly don't have an agreement with

22 them that we are much more suited for rheumatoid

23 clinics, yes.

24     Q.  And do you know how it is that Mr. Stoll

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy     March 28, 2014

1    came up with the idea to advise potential practices,
2    HAN practices of that?
3        A.  I don't have any idea how he came up with
4    that.  I do believe this was one of the worst forms
5    of hyperbole and embellishment that he's gotten to
6    and a point where he's obviously making very
7    inaccurate statements to a clinic in the
8    marketplace.  It's very inconsistent with the way
9    that he's been trained, and certainly if anyone saw
10   this it would be immediately corrected.
11       Q.  Let's cover topic 3.  I think some of these
12   I'm going to kind of cover with you based on
13   Exhibit 206.  So pull that out.
14           So topic 3, who did you talk with relative
15   to topic 3?
16       A.  So I spoke with Matt Garms, I reviewed the
17   marketing materials, I reviewed Jeana's transcript
18   with regards to the marketing materials, and that's
19   what I did to prepare for this.  Oh, and I spoke to
20   Shradha.
21       Q.  What did Ms. Agarwal tell you relative to
22   topic 3?  What information did you obtain from her
23   relative to topic 3?
24       A.  So Shradha managed Jeana Loewe, who is

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy    March 28, 2014

1    responsible for the development of any materials and

2    marketing collateral.  I spoke with her as far as

3    how that came to be developed as well as how we

4    actually look for information to develop our

5    comparison sheets.  To do that we went to public Web

6    sites, press releases, and general availability of

7    information in the public domain and then created

8    comparison sheets between our service and other

9    people who had a similar product.

10        Q.  And then was it your understanding -- is it

11    your understanding that those marketing materials,

12    particularly the comparison pieces, were provided to

13    MOEs for them to utilize either in their pitch or

14    actual written material submitted to HAN practices?

15        A.  I certainly believe that was supposed to be

16    a guiding format for their communication, whether it

17    be their verbal pitches or anything they put in

18    writing to practices.

19        Q.  The last kind of bullet on the first page

20    of 206 says "Targeting universe of offices and does

21    not look for competitors."  What does that mean?

22        A.  So when we actually developed the offices

23    that we believe are a good fit for our service we

24    look at a number of different things, whether

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy    March 28, 2014

1    someone is a practicing physician within the

2    specialty, sometimes prescription volume data,

3    sometimes information provided by a sponsor,

4    sometimes it's our own data that we've collected

5    through market research, and that's how we look at

6    the target universe and create our own essentially

7    prequalification list for how we actually go and

8    look for practices in the market that would be a

9    good fit for our service.

10       Q.  Then the next page, page 2, that carries

11   over on topic 3 says "There are processes of sales

12   initiatives used to focus on a subset of offices

13   within the sales universe."  What's that mean?

14       A.  So the comparison sheet would be a great

15   example where if they run into an office that has

16   competitor equipment, there are a number of

17   different points by which you can compare our

18   service to theirs so that an office may make a

19   relative comparison on the merits of the offering.

20       Q.  To your knowledge, did marketing ever

21   provide information to MOEs about the number of

22   competitor practices switched during a given period

23   of time by Context?

24       A.  Do you mean by "provide" as an example

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy    March 28, 2014

1   would be at any point in the relevant time period

2   did Jeana Loewe send any information to anyone on

3   the team that said this is the number of practices

4   that we've switched from one to another?

5       Q.  Right.

6       A.  I believe at some period of time that would

7   have probably been the case.

8       Q.  And do you know why that was done?

9       A.  I have seen an example of some inaccurate

10  information.  I'm sure that at some point and I have

11  certainly heard examples of when something was

12  inaccurate, obviously them leading with information

13  that was accurate.  And by "them" I mean the

14  marketing team.  So Jeana, for example, would follow

15  up with information that was accurate and try to

16  correct any misstatements.

17      Q.  Did you, either in the course of your

18  duties for the company or in preparation for today's

19  deposition, come to learn that some MOEs told

20  practices that certain numbers of Healthy Advice

21  practices had switched during a given period of

22  time?

23      A.  I don't recall specific documents.  I

24  certainly in my conversations with Brok, for

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy    March 28, 2014

1    example, and Pat heard statements that they said

2    into the marketplace which they in their own

3    perception believed to be close to the truth but

4    were certainly not truthful when compared with

5    factual evidence.

6        Q.  That's what Mr. Vandersteen and Mr. Cavanna

7    told you recently?

8        A.  Yes.

9        Q.  As recently as yesterday?

10       A.  I spoke with Brok on a number of topics

11   yesterday.  I don't know if this is the exact one

12   that we spoke about.

13       Q.  Let me show you what's been previously

14   marked as Exhibit 52.  Take a minute and look at

15   that, if you would.  It's a compendium exhibit that

16   has some e-mails from Mr. Vandersteen to practices

17   between December 1 and December 7 of 2011.

18                   (Witness viewing document.)

19   BY THE WITNESS:

20       A.  Okay.

21       Q.  Have you seen those?

22       A.  Yes.  Or I've seen an example of this.  I

23   don't know if I've seen all of these documents.

24       Q.  Fair enough.

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy    March 28, 2014

1              So on December 1, 2011 Mr. Vandersteen

2      writes to a woman by the name of Violetta or

3      Violetta, and he says "I'd like to talk to you

4      briefly about why 350 healthcare facilities have

5      switched from Healthy Advice to our Rheumatoid

6      Health Network in the last 12 months."  Do you see

7      that?

8          A.  Yes.

9          Q.  The 350 figure there that's used by him,

10     would it be fair to say that that is not remotely

11     close to the truth as of this time?

12         A.  I don't have the trailing 12-month

13     switch-out data, but if I were to make a guess based

14     on my understanding of the number of practices that

15     we've switched and what the annual run rate would

16     look like, I don't believe 350 switch-outs in the 12

17     months preceding December 1, 2011 would be 350

18     facilities.  That would then subsequently make this

19     an inaccurate statement.

20         Q.  Do you believe that it is possible that a

21     HAN practice would find it concerning to learn that

22     350 Healthy Advice practices had switched to Context

23     in the prior 12-month period?

24         A.  I don't have any ability to speculate on

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy    March 28, 2014

1    that perception.

2         Q.   Do you know -- does the company know why

3    Mr. Vandersteen believed from a sales perspective

4    providing that type of information, meaning the

5    number of Healthy Advice practices that it switched

6    to Contextmedia, was something worth sharing or

7    providing to a practice?

8         A.   I believe this is sales hyperbole and

9    certainly an exaggeration.  I believe that the point

10   he may be trying to make is that we have a

11   competitive product, but I can't in any way

12   speculate as to why he was doing this at this time

13   as I don't have an understanding of the full

14   circumstances.

15        Q.   The next one is Plaintiff's Exhibit 53.

16   You'll see this is an e-mail from Mr. Garms to what

17   appear to be the MOE team, is that right, as of

18   January 12, 2012?

19        A.   The people on this e-mail are on the member

20   outreach team.  I'm not sure as of this time if

21   there were other members there.

22        Q.   And have you seen this before?

23        A.   No.

24        Q.   He's reporting that in 2011 Context had 109

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy    March 28, 2014

1    switch-outs; do you see that?

2         A.   I do see that.

3         Q.   And of those 64 were Healthy Advice?

4         A.   I do see that.

5         Q.   Do you have any reason to doubt the

6    accuracy of this information at this time?

7         A.   I don't have any reason to doubt the

8    accuracy, no.

9         Q.   If, in fact, in 2011 Context had switched

10   out 64 Healthy Advice practices, you would agree

11   with me that Mr. Vandersteen referencing 350

12   healthcare facilities having switched is nowhere

13   close to the truth?

14        A.   I wouldn't be able to speculate as far as

15   the numbers between December 1 and December 31st in

16   2010, but based on what I would make from an

17   educated guess, I don't think that's accurate, no.

18        Q.   But in any event, Mr. Garms was able to by

19   January 12 of 2012 share with the MOE team what

20   Context believed to be accurate data?

21        A.   Right.  This is documented in 2011, but if

22   you look at his statement, on December 1st he's

23   talking about the previous 12 months.  So the

24   previous 12 months would include some date within

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy    March 28, 2014

1    2010.
2         Q.  I understand.  I got that answer.  I
3    appreciate your answer.  I'm saying that at least by
4    January 12th of 2012 Mr. Garms had provided the MOEs
5    with data believed to be accurate with respect to
6    the total number of switches in 2011 and
7    specifically with respect to Healthy Advice?
8         A.  Right.  I see that here.
9         Q.  And then I'll hand you what's been
10   previously marked as Plaintiff's Exhibit 54.  So
11   this is an e-mail from Mr. Vandersteen about five
12   days after he got the e-mail from Mr. Garms with the
13   accurate data regarding switches.  This is a
14   compendium exhibit, but you'll see that within a
15   period of a couple weeks Mr. Vandersteen is telling
16   practices that last year Context switched anywhere
17   from 200 -- excuse me -- anywhere from 150 to 350
18   practices; do you see that?
19        A.  I do see that.
20        Q.  From Healthy Advice?
21        A.  Well, not related to Healthy Advice.
22        Q.  Fair enough.  So the first e-mail says
23   "Last year over 200 healthcare facilities switched
24   from Healthy Advice to our network for many

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy     March 28, 2014

1    reasons"; do you see that?

2        A.  Yes.

3        Q.  And then the next page says "Last year over

4    350 clinics upgraded from Healthy Advice to the

5    Diabetes Health Network"; do you see that?

6        A.  Yes.

7        Q.  And then the final one says "Last year over

8    150 rheumatologists switched from Healthy Advice to

9    the Rheumatoid Health Network"; do you see that?

10       A.  Yeah.  I'd like to make note of the fact

11   that that says rheumatologists, which obviously

12   there's a difference between practices and

13   rheumatologists.  So it's very indeterminate and

14   sort of impossible to know the difference because in

15   a single clinic you can have a varying number of

16   rheumatologists.

17       Q.  Mr. Purdy, let me just ask you this.  On

18   behalf of the company, how does the company explain

19   that one of its salespeople is provided specific

20   information by Mr. Garms about the number of

21   switches and continues to provide Healthy Advice

22   practices false information?

23       A.  I think it's very clear that Brok is not

24   using any specific information or anything he's

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy    March 28, 2014

1    really been told by a third party to actually come

2    up with these statements.  Notice he's going from

3    200 healthcare facilities to 350 healthcare

4    facilities within a matter of, you know, 28 hours.

5    I don't believe there's any firm base in fact and

6    he's using quite a bit of embellishment and a poor

7    personal decision in constructing these statements,

8    and I don't believe there's any way that you could,

9    you know, obviously connect this to what's actually

10   been told by him via the company or his training as

11   far as why he's doing this.

12        I do believe that as soon as something like

13   this was discovered by the organization it was

14   immediately corrected and it was something that was

15   stopped because it was inconsistent with our

16   policies and the way that we sell our service, which

17   is to focus on the merits of the product that we do

18   offer.

19        Q.  When did that happen?  When did the company

20   discover what Mr. Vandersteen was saying and put a

21   stop to it?

22        A.  I'm not sure it's possible to know that.

23        Q.  Let me hand you what's been previously

24   marked as Plaintiff's Exhibit 58.  Take a minute and

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy     March 28, 2014

1   review that to yourself, if you would.  I know your

2   counsel -- and he's exactly right -- will want you

3   to review as much as you feel is necessary.  I was

4   just going to focus you on the last two pages and

5   ask does it appear, at least as of June 13, 2012,

6   the company had not discovered that Mr. Vandersteen

7   was providing HAN practices with false information

8   regarding the number of Healthy Advice practices

9   that had been switched?

10       A.  I don't believe I could characterize that

11  as accurate because in previous examples there is a

12  situation that has arisen that is inaccurate and

13  there's a direct confrontation between the

14  organization and sales individuals as far as

15  correcting the information and there's a subsequent

16  activity which is also inaccurate.  So it certainly

17  could have been addressed prior to this.

18       Q.  Well then, what would be the company's

19  explanation for why the practice would continue?

20       A.  As I've previously noted, I believe there

21  are times in which there were isolated incidents of

22  poor personal communication that is inconsistent

23  with the company's policies, and I believe this is

24  an example of that.

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy     March 28, 2014

1      Q.  All right.  So let's move on, if you don't

2   mind.  You can hand those back over to Mr. O'Brien

3   if you want.  Just keep out Exhibit 206.

4           Topic 4, Contextmedia's business plan

5   during the relevant time period to the extent such

6   business plans involve switching out practices

7   and/or targeting HAN practices, and your notes say

8   there's no such business plan?

9      A.  There is no business plan during that time

10  period.

11     Q.  Topic 6 is Contextmedia's practice and

12  procedure for compensating, whether through salary

13  or bonus or other benefit or reward, any

14  Contextmedia employee or independent contractor for

15  switching any PP practice; do you see that?

16     A.  I do.

17     Q.  And your notes say "Commission schedule and

18  offer letters"; do you see that?

19     A.  Yes.

20     Q.  And Context has produced samples or copies

21  of commission letters; you're aware of that?

22     A.  Yes.

23     Q.  I covered those with Mr. Demas.  Is that

24  what you're referring to when you're talking about

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy    March 28, 2014

1   the offer letters?

2       A.   Correct.  The member outreach executive --

3   I can't speak to Acquirent -- for example, has a

4   base salary and a commission schedule based on their

5   sales activity.

6       Q.   Do you know if at any time any Context

7   employees received a bonus or commission or any type

8   of remuneration specifically for switching out a HAN

9   practice as opposed to any other practice?

10       A.   To the best of my and the company's

11   knowledge, it never happened during the relevant

12   time period.  I have heard statements referencing

13   that, but the only thing I've seen documented and

14   that I'm aware of happened in the fourth quarter of

15   2013.  What I'm specifically referring to is there

16   seems to be some ambiguous language in some of the

17   depositions I've seen, particularly from Patrick

18   Cavanna and Brok, about specific incentives with

19   regards to PatientPoint.  I don't believe anything

20   specific to PatientPoint has ever existed outside of

21   Q4 of 2013 or was never initiated before Q4 of 2013.

22       Q.   And what was initiated for Q4 of 2013

23   relative to PatientPoint?

24       THE WITNESS:  Do I have to answer that?

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy    March 28, 2014

1      MR. O'BRIEN:  It's outside the relevant time

2   period.  What's the relevance?  If we're going to

3   take discovery beyond that time period, it's going

4   to be a two-way street.

5      MR. COWAN:  Yeah.

6      MR. O'BRIEN:  I know you're curious, but...

7      MR. COWAN:  I'm not so much worried about the

8   sort of tit for tat, but I want to be respectful of

9   the fact that we've sort of benchmarked a position

10   there.

11      MR. O'BRIEN:  It applies to a lot of stuff.  I

12   think we ought to stick with it unless we're just

13   going to abandon it.

14      MR. COWAN:  Let's go off the record.

15                     (Whereupon a discussion was had

16                      off the record.)

17   BY MR. COWAN:

18      Q.  We just had a discussion off the record

19   where your -- well, I'm not going to speak for

20   Mr. O'Brien.  There was a discussion about the

21   relevance of topics beyond March of 2013.  So I'm

22   going to move on.

23          Topic No. 8, who did you speak to regarding

24   topic No. 8?

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy     March 28, 2014

```
 1        A.  So I spoke to Shradha, Ryan Postel, who was
 2   our media manager, and I read components of Mike
 3   Berning's deposition.
 4        Q.  When did Mr. Postel start with the company?
 5        A.  It would have been sometime in the fall of
 6   2012.  I can't say with a hundred percent certainty,
 7   but that's my best guess.
 8        Q.  And what did Mr. Postel tell you on this
 9   topic?
10        A.  That we've never used any HAN content to
11   influence or create any of our own content, which is
12   a very, very small piece of our media library.  The
13   vast majority of our media comes from third parties.
14        Q.  And what did Ms. Agarwal tell you?
15        A.  She told me the same thing, that no HAN
16   content was ever used in building or making content
17   decisions in any way to influence or content.
18        Q.  Did Mr. Postel replace Mr. Berning?  Did he
19   essentially take over the duties and
20   responsibilities that Mr. Berning had, or did they
21   work together for a period of time?
22        A.  They never worked together.  Their roles,
23   in my own opinion, are different.  There were a
24   number of changes made to media and the processing
```

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy     March 28, 2014

1    when Mike Berning left the organization.

2         Q.  And forgive me because this is not

3    something I necessarily expect you to know.  You

4    just may know it.  Do you know when Mr. Berning

5    left?

6         A.  I believe it was September of 2012.

7         Q.  Prior to the time that -- for that portion

8    of the relevant time period when Mr. Berning was

9    with the company, was he the person primarily

10   responsible for developing the content for Context

11   waiting room and/or exam room programs?

12        A.  I suppose it depends on how you would

13   define primarily.  I believe he did that alongside

14   Shradha.

15        Q.  And then after Mr. Berning left, sort of

16   the same question, would it be Mr. Postel and

17   Ms. Agarwal that were primarily involved in the

18   development of the content for the waiting room

19   and/or exam room programs through the end of the

20   relevant time period?

21        A.  There's no exam room media during the

22   relevant time period.

23        Q.  Okay.

24             Were there efforts undertaken during the

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy    March 28, 2014

1   relevant time period to develop an exam room

2   program?

3       A.   It's a bit of an indeterminate question.

4   The beginning of 2013 obviously Chirag Patel was

5   hired in January of 2013.  I can't say with any

6   certainty whether or not the exam room product was

7   under any sort of development.  I know there wasn't

8   a single line of code written until at least July of

9   2013.

10      Q.   For the exam room product?

11      A.   Exactly.

12      Q.   Let me try to finish out topic 9 and 10 and

13  then we'll break.  I think these will be pretty

14  quick.

15          Topic 9, who did you speak with regarding

16  topic 9?

17      A.   I spoke with Mike Williams and Travis, and

18  then I spoke with Jim with regards to the actual

19  dates as far as our contract agreements there.

20      Q.   So I've heard BroadSign's name several

21  times throughout the course of depositions I've been

22  involved in.  What is BroadSign and how does Context

23  use it?  I have almost no understanding.  So just

24  the basics.

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy    March 28, 2014

1        A.  BroadSign is a content management platform.

2   It's in the most general sense a technology license

3   by which you can run a digital signage or media

4   network using it.  The way that we utilize it is

5   most consistent with how SAS software as service

6   technology is done where you pay someone a monthly

7   fee.  In our case it's on a per-player per-month

8   basis, and we utilize that software to run our media

9   network.

10       Q.  It's BroadSign's software that's utilized?

11       A.  Yes.

12       Q.  So --

13       A.  Well BroadSign in conjunction with

14  Landscape.  So they're two sort of complimentary

15  systems.  Landscape is a Linux-based device

16  management system that in concert with BroadSign

17  allows us to run our media network the way that we

18  do.  These are both third-party technologies that we

19  pay for.  BroadSign we've been using since at least

20  January 21st of 2008 when we initiated our contract.

21  Landscape, if I were to guess, was initiated around

22  the same time, but Jim knows that it was at least

23  being used starting in the beginning of 2009.  And

24  those are the technologies we continue to use today.

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy    March 28, 2014

1      Q.  And at least during the relevant time

2   period, if you know, how is the content loaded onto

3   the player?  Is it done through the cloud or some

4   Web-based system?

5      A.  So there's an initial loop of content.

6   Albeit now we don't use a loop concept, we use a

7   play list.  I suppose it's not relevant because it's

8   not during the relevant time period.  It may be in a

9   short period of that.  But there's an initial piece

10  of content that's loaded onto the software alongside

11  BroadSign/Landscape at our offices so that when the

12  player is initially hooked up it has content and can

13  play.

14          On generally a monthly basis we update what

15  is in BroadSign.  BroadSign is then hosted on a

16  Linode server, L-I-N-O-D-E, and then that content is

17  pushed to all the devices we have in the field

18  through our network connectivity and updates the

19  content.

20     Q.  And the Linode, do I read into that name

21  that it has some connection to Linux?

22     A.  Are you familiar with Amazon Web services?

23     Q.  You'll probably get beyond me pretty

24  quickly.  The short answer is probably not really.

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy    March 28, 2014

1    I mean, is it like a Netflix type thing?

2         A.   No.   It's a server that is owned and

3    operated by a third party that, as you say, is a

4    cloud piece of software infrastructure.   That's what

5    Linode is.   It allows us to use our BroadSign

6    instance.

7         COURT REPORTER:   Our BroadSign instance?

8         THE WITNESS:   I'm saying instance as in our

9    company version of BroadSign.

10        MR. COWAN:   We're at 12:30.   Why don't we

11   break.   Tell me how long you guys want.

12        MR. O'BRIEN:   40 minutes.

13        MR. COWAN:   Let's do 45.

14        MR. O'BRIEN:   Let's resume at 1:15.

15        MR. COWAN:   I'm thinking that -- you know, the

16   bulk of what I wanted to do is done.   So I suspect,

17   without holding me to it, this will go quicker in

18   the afternoon.

19                        (Whereupon, at 12:33 p.m., the

20                         deposition was recessed, to

21                         reconvene at 1:15 p.m., this

22                         same day.)

23

24

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy     March 28, 2014

1                    AFTERNOON SESSION

2                               (1:15 p.m.)

3                    BRADFORD PURDY,

4      the witness at the time of recess, having been

5      previously duly sworn, was further examined and

6      testified as follows:

7                    EXAMINATION

8                    (Resumed)

9    BY MR. COWAN:

10         Q.  Topic No. 10, who did you talk with about

11     topic No. 10?

12         MR. O'BRIEN:  Actually, he wants to modify an

13     answer based upon a phone call he had.

14     BY MR. COWAN:

15         Q.  Based upon what?

16         A.  A phone call.

17         Q.  First tell me about the phone call.

18         A.  So about 15 minutes ago I spoke with Jim

19     Demas with regards to the switch-out procedures.

20     One of the things I may have made an incomplete --

21     what I now want to modify is the statement with

22     regards to authorization forms and the exact

23     operating procedure with regards to notifying, you

24     know, Healthy Advice.

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy    March 28, 2014

1              I think before I had seen a document that
2    was a letter or kind of a template letter that I
3    think an office could use to notify Healthy Advice
4    which I believe to be part of the operating
5    procedure.  I believe that was in certain cases
6    used, but I don't think it was part of the standard
7    operative switch-out process.  It mainly was the
8    authorization form that we received and then
9    obviously the sign-up agreement.  I don't believe
10   that in the vast majority of cases there was a
11   template or notification where the authorization
12   form was sent directly to Healthy Advice.
13        Q.  Okay.  I'm actually glad you clarified
14   that.  That was inconsistent with what I had
15   understood.  So I think you had said earlier
16   something about the authorization form being faxed
17   to Healthy Advice?
18        A.  Yes.
19        Q.  What you confirmed with Mr. Demas is that
20   was --
21        A.  Was faxed to our office.
22        Q.  Right, but the authorization form was not
23   faxed to Healthy Advice?
24        A.  I misconstrued a conversation I had about

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy    March 28, 2014

1    authorization forms being faxed to our office and

2    having seen a letter with regards to notification

3    that could be sent to Healthy Advice, which I know

4    in at least some cases it was, that that was part of

5    standard operating procedure in it being faxed to

6    Healthy Advice.

7        Q.  That's good.  Just so the record is clear,

8    the document we've been referring to is the

9    authorization form?

10       A.  Yes.

11       Q.  Which I think we understand what that is.

12   That document was provided in the first instance by

13   Contextmedia to the practice?

14       A.  Yes.

15       Q.  It was essentially completed accept for the

16   signature line for the practice to sign?

17       A.  I can't comment on exactly when and when it

18   wasn't completed, but it was provided to the office

19   and the office did at some point sign it and return

20   it to us.

21       Q.  Returned it to Context, but then Context

22   didn't send the authorization form to Healthy

23   Advice?

24       A.  No, that authorization form wasn't sent to

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy    March 28, 2014

1    Healthy Advice.  There has been, you know, certainly

2    processes by which we notify competitors of

3    switch-outs, but in the standard operating procedure

4    that authorization form and I believe notification

5    was not sent as part of the operative switch-out

6    process.

7        Q.  Let me just make sure.  The authorization

8    form was not sent to --

9        A.  To Healthy Advice.

10       Q.  -- to Healthy Advice, but there may have

11   been some other written document that communicated

12   to Healthy Advice that their equipment had been

13   removed that was provided to them?

14       A.  No, that's not what I said.  I said in some

15   competitor switch-outs, for example, if we were

16   working with AccentHealth, there is definitely

17   communication sometimes sent to them as

18   notification.

19       Q.  Okay.

20       A.  I'm not referring to notification sent to

21   Healthy Advice specifically when I'm talking about

22   that.

23       Q.  As part of the operative switch-out -- as

24   part of the operative HAN switch-out practice, did

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy    March 28, 2014

1    Context provide notice to HAN that a practice was

2    switching or had switched?

3        A.  As part of the operative procedure I don't

4    think it was required.  I think there are certainly

5    cases where it happens.

6        Q.  Okay.  And when that happened, was the

7    communication to HAN done after the HAN equipment

8    was removed?

9        A.  I've seen examples where that clearly isn't

10   the case.

11       Q.  Is or is not?

12       A.  Is not the case.  I've seen an example

13   where there's obviously communication between the

14   practice and Healthy Advice regarding the desire to

15   remove equipment and the equipment is still there.

16   We've certainly discussed some of those today.

17       Q.  Right.  Did you just say there was

18   communication between Healthy Advice and the

19   practice?

20       A.  The practice and Healthy Advice.

21       Q.  But when --

22       A.  Or at least that's what I understand.  I've

23   seen e-mails today where there is -- certainly

24   communication where there is description of an

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy     March 28, 2014

1    office manager speaking with Healthy Advice about

2    the desire to switch and the equipment is obviously

3    still there based on what I understand through the

4    communication.

5         Q.   Okay.

6              We had looked at Plaintiff's Exhibit 5,

7    which is the MOE training manual, and if you would

8    look at page 28 of that -- I think I've put it in

9    front of you -- that describes the process for

10   non-AccentHealth switch-outs; do you see that?

11        A.   Yes.

12        Q.   And if I look at No. 2 and No. 3, it looks

13   like under -- do you understand these steps to be

14   essentially --

15        A.   Sequential.

16        Q.   -- sequential?

17        A.   Yes.

18        Q.   So No. 2 says "The following business day

19   the member service representative schedules a pickup

20   of the competitor's via" -- presumably a pickup of

21   the competitor's equipment?

22        A.   Yeah, I understand that to mean the pickup

23   of the competitor's equipment.

24        Q.   (continuing) -- "via FedEx and the

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy    March 28, 2014

 1  equipment is sent back to the competitor"; do you

 2  see that?

 3      A.  Yes.

 4      Q.  And after that member services contacts the

 5  competitor and provides them with a tracking number;

 6  do you see that?

 7      A.  Uh-huh.

 8      Q.  Yes?

 9      A.  Yes.

10      Q.  Is that typically how you understood the

11  practice -- strike that.

12          Is it your understanding that Context

13  generally or typically followed the practice that is

14  set forth in this document?

15                    (Witness viewing document.)

16  BY THE WITNESS:

17      A.  That seems to be generally accurate with

18  regards to our operative procedure during this

19  period of time.

20      Q.  All right, then.  Thank you for the

21  clarification on the authorization form.

22          So on topic 10 who did you speak to?

23      A.  I spoke to Jim Demas and Rishi Shah.

24      Q.  And the topic there is "Context revenues

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy    March 28, 2014

1    and profits to date associated with or in any way

2    attributable to the PP practices," and your note

3    says "Only case was done through the exercise Jim

4    did for the March 2003 settlement conference"; do

5    you see that?

6        A.  Yes.

7        Q.  What was the exercise Jim did, to your

8    knowledge?  Let me strike that.

9        MR. COWAN:  Let's go off the record for a

10   second.

11                        (Whereupon a discussion was had

12                         off the record.)

13   BY MR. COWAN:

14       Q.  What do you understand to have been the

15   exercise that Mr. Demas went through for the

16   settlement conference?

17       A.  So I believe he tried to make a general

18   approximation of the revenues associated with the

19   offices which had been switched from Healthy Advice

20   to Contextmedia service.  I believe that was -- to

21   my knowledge, that is the most that was done, and I

22   would characterize it as a rather loose

23   interpretation or even revenue and certainly not a

24   way of discerning revenues and profits in any way

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy    March 28, 2014

1  attributable to the PatientPoint practices in a

2  fully defined or complete manner.

3     Q.  Do you understand the methodology that he

4  utilized?

5     A.  We had a general discussion around it.  I

6  wouldn't understand -- I wouldn't say I understand

7  the full methodology.

8     Q.  To the extent that you understand the

9  methodology, can you at least tell me what you

10  understand it to be?

11     A.  So I think he took a general approximation

12  of revenue that would have been associated with the

13  clinics that were switched and then averaged it and

14  divided that revenue generally equally across all of

15  the offices, and that was about it.

16     Q.  Did it come up with a value on a per-

17  practice basis?

18     A.  No.  I think it was a loose approximation

19  of revenue on a per-practice basis.

20     Q.  And what was that?

21     A.  I don't know.

22     Q.  To your knowledge, does Context --

23     A.  It wasn't revenue on a per-practice basis.

24  It was revenue that on an average had been

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy    March 28, 2014

1    attributable to programs run in these offices.

2        Q.  But what the actual amount was right now

3    you don't recall?

4        A.  No.

5        Q.  Or don't know?

6        A.  I don't know.

7        Q.  I interpreted something that you said, and

8    I may be making assumptions that I should not.  My

9    interpretation is that you thought his methodology

10   was flawed?

11       A.  I think it's incomplete.

12       Q.  What do you believe would be necessary to

13   complete it?

14       A.  I think I would have to spend a little

15   while actually digging into this, but I believe

16   there's a pretty large number of variables that

17   could be -- that go into what are revenues and

18   profits associated with it.  The question you had

19   raised is around value, and I think that that's an

20   even more difficult and has a broader number of

21   variables associated with actually discerning that

22   value.

23       Q.  Does Context track at all what it believes

24   to be the revenue associated with a particular

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy    March 28, 2014

1   practice?

2       A.  During the relevant time period there's

3   never been any document other than the one made for

4   the settlement conference to our knowledge.

5       Q.  Does Context today -- or has Context

6   sometime outside the relevant time period tracked

7   revenues associated with a practice?

8       A.  Contextmedia has not done so during this

9   period.  I don't --

10      THE WITNESS:  Do I have to answer that?

11      MR. O'BRIEN:  You can answer.

12  BY THE WITNESS:

13      A.  I think the most close approximation is,

14  you know, being done on a similar, you know, manner

15  associated with some of the damages claims.  I think

16  there are other approximations that have been made,

17  but I don't think --

18      MR. O'BRIEN:  These are all litigation driven.

19  Some of this -- not some of it -- is work product

20  material.

21      MR. COWAN:  Okay.

22      MR. O'BRIEN:  I know what he's referring to

23  now.  It's not being done in the ordinary course of

24  the business.

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy    March 28, 2014

1        MR. COWAN:  But just so I understand before I
2    move off of it, there's some work being done
3    relative to this litigation that you would consider
4    to be work product to try to come up with sort of
5    damages?
6        MR. O'BRIEN:  People are looking at whether or
7    not this is doable.
8        THE WITNESS:  Associating revenue to a
9    practice.
10       MR. O'BRIEN:  He said it's incomplete.  People
11   are trying to see if it can be more complete.  The
12   jury's out.
13       MR. COWAN:  You're trying to help us out?  What
14   are you doing?  I mean, I'm trying to understand why
15   it's being done.
16       MR. O'BRIEN:  To perhaps address what we're
17   going to see on April 15th.
18       MR. COWAN:  Off the record.
19                   (Whereupon a discussion was had
20                    off the record.)
21   BY MR. COWAN:
22       Q.  Okay.  So just to kind of close the loop at
23   least on the subject matter we're specifically
24   talking about right now, to the best of your

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy     March 28, 2014

1    knowledge, Context did not create during the

2    relevant time period any documentation by which they

3    attempted to associate revenue with a practice?

4         A.   During the relevant time period there was

5    no documents, to my knowledge, created to try to

6    associate revenue to individual practices.

7         Q.   Let me stray away a bit from sort of the

8    focus on documents.  Do you know if during the

9    relevant time period Context -- if there were any

10   internal discussions about what Context believed

11   were the revenues associated with a practice?

12        A.   Not to my knowledge.

13        Q.   I don't know if in the course of your

14   preparation for this you reviewed any e-mails that

15   have been marked as exhibits where Mr. Shah made

16   reference to each de-install cost is a loss of

17   20,000.  Is that familiar to you?

18        A.   I've seen some documents where those --

19   where there are numbers referenced in e-mails.  I

20   understand them I think quite differently than

21   they've been portrayed and our organization

22   understands them quite differently than they can

23   sometimes be viewed by a third party.

24        Q.   And how is it that the company understands

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy    March 28, 2014

1    them?
2        A.   I think Rishi in our organization sometimes
3    tries to really focus people around, you know,
4    providing an extraordinary level of diligence, you
5    know, effort, concentration around given topics and
6    an amount of hyperbole and exaggeration is used to
7    do that, and I think Rishi in particular finds it
8    quite effective and our organization finds it
9    effective to really push people to provide a sort of
10   unreasonably high level of service and action
11   corresponding to our customer service and sales
12   process.
13       Q.   So sticking with topic 10 and perhaps topic
14   13, why did Context try to switch out HAN -- switch
15   HAN practices to Context?
16       A.   I don't really understand the question.
17       MR. O'BRIEN:  I think because it doesn't seem
18   to be on topic.
19   BY MR. COWAN:
20       Q.   Well, what was the -- was there a benefit,
21   a financial benefit to Context by switching a
22   practice from HAN to Context?
23       A.   What topic are you referring to?
24       Q.   Topic 10 and topic 13.

123

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy    March 28, 2014

1      A.  So I think, as we've discussed, we sell

2    into a marketplace with offices that we've

3    predetermined as a good fit for our service based on

4    a number of different variables.  I think some of

5    those practices have competitor services, and we

6    offer our service and try to explain the merits of

7    it to prospective members even if they potentially

8    have another service because we think it's a free

9    marketplace and it's something that can certainly be

10   done in accordance with our normal procedures in

11   business.

12      Q.  I'm not trying to be sort of opaque about

13   this.  I understand that at least during the

14   relevant time period Context did not try to track

15   revenues associated with a practice.  We've covered

16   that, correct?

17      A.  Uh-huh.

18      Q.  Yes?

19      A.  Yes.

20      Q.  So I'm trying to kind of take it maybe a

21   level lower and simply trying to understand is there

22   some financial benefit to Context when it switches a

23   practice from HAN to Context?

24      A.  Are you saying that relative to the

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy    March 28, 2014

1   acquisition of another office?

2       Q.  No.  Just when it -- no.  So I'm not trying

3   to compare it to, say, an AccentHealth office or an

4   office that has just TV or an office that has

5   nothing.  I'm just saying when you -- when Context

6   is able to switch a HAN practice to Context, does it

7   receive any sort of a financial benefit at some

8   point in time associated with that switch?

9       A.  I think part of our business model is to

10  grow our network and distribution, and certainly in

11  the practice of doing that we do acquire offices

12  that have a competing service.  I think that's the

13  degree to which I sort of understand or am able to

14  answer the question.

15      Q.  Well, there's got to be a reason why

16  Context tries to switch a competitor to its service,

17  right?

18      A.  We're trying to build our network and I

19  think grow our distribution.

20      Q.  All right.  So why are you trying to grow

21  your network?  Is there a financial remuneration

22  associated with that?  Is there a financial benefit

23  of growing the network?

24      A.  Certainly not directly from the practice.

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy    March 28, 2014



Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy    March 28, 2014



Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy    March 28, 2014



Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy    March 28, 2014



Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy    March 28, 2014



Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy    March 28, 2014



Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy    March 28, 2014



Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy    March 28, 2014



Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy    March 28, 2014



Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy    March 28, 2014



Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy    March 28, 2014



Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy    March 28, 2014



Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy    March 28, 2014



Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy    March 28, 2014



Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy    March 28, 2014



Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy    March 28, 2014

1   ████████████████████████████

    ██████████████████████████████████

    ███████████████████████████████

    ███████████████████████████████

    ████████████████

         ██████████████████████████████

         ███████

         ██████████████████████████████

    ████████████████████████

         █████████████

11        Let me ask you to talk about topic 15 that

12   deals with Health Monitor.  My first question is did

13   you have any independent firsthand knowledge of any

14   of the issues relating to Health Monitor when you

15   joined the company or at any time when you were with

16   the company?  By that I mean independent of

17   preparing to be a witness today.

18        A.  I was certainly aware of the situation and

19   I've reviewed a document that showed that I was, in

20   my opinion, superficially involved in the process

21   where I collected some feedback and showed it to the

22   senior management team.

23        Q.  And who did you collect the feedback from?

24        A.  I'd have to see the document to actually

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy    March 28, 2014

1    show you.  I believe it would have been people who

2    interacted with Health Monitor or had been involved

3    in these situations.  I know that, for example, one

4    in particular was Sylvia.

5        MR. COWAN:  Let's go off the record for a few

6    minutes.

7                    (Whereupon a discussion was had

8                     off the record.)

9    BY MR. COWAN:

10       Q.  Let me hand you Exhibit 95.  Is Exhibit 95

11   the document you were referring to before we broke?

12       A.  Yes, it is.  So the last two pages are some

13   feedback or questions I rolled up.

14       Q.  Just explain to me the creation of the last

15   two documents because when I read it I sort of read

16   it as picturing in my mind that there was some sort

17   of a meeting with all these people and this is what

18   was discussed.  I take it that's not really what

19   happened?

20       A.  No, not at all.  So this was right after I

21   joined the organization.  So in certain areas I was

22   brought up to speed.  It was oftentimes, as I said,

23   going in and speaking to different people about

24   different topics.  I believe -- I'm not sure if it's

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy     March 28, 2014

1    in this communication.

2           Rishi asked me a couple questions.  It says

3    "What's HAN's messaging?  Why are members

4    switching - taking of physicians.  What are we doing

5    to prevent -- a message to prevent this.  Mike

6    seemed to have some ideas below.  Please follow up

7    with SV."

8           I believe I took his information and then

9    went and asked a number of people as far as, you

10   know, what was some of the relevant information that

11   potentially would answer those questions.

12       Q.  I got it.  So it started with Rishi posing

13   some questions that you've referenced, and then you

14   went and followed up with individuals to try and get

15   information that might help answer his questions or

16   fill out the story?

17       A.  Exactly.

18       Q.  And "SV" would be Ms. Velazquez?

19       A.  Yes.

20       Q.  "SA" would be Ms. Agarwal?

21       A.  Yes.

22       Q.  And "JL" would be Ms. Loewe?

23       A.  Yes.

24       Q.  Then did you participate in any meetings

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy    March 28, 2014

1    internal to Context about what to do about what I'll

2    call the Health Monitor issue?

3        A.  I don't believe so.  If so, I don't recall.

4        Q.  So it looks like in preparing for topic 15

5    you talked to Mr. Demas?

6        A.  I spoke to Jim and Rishi and then reviewed

7    some of the exhibits and documentation around this,

8    yes.

9        Q.  Okay.  And what -- it says "Jim was able to

10   reach them."  I assume that's referring to Health

11   Monitor?

12       A.  Yes.

13       Q.  "And find a resolution by speaking to

14   someone at HM."  What did Mr. Demas tell you about

15   his discussions with Health Monitor?

16       A.  I believe there was some initial concern

17   because we had equipment removed and never returned

18   and it later turned out to be lost, and we wanted to

19   understand what happened in those instances.  I

20   believe Jim got the contact information of someone

21   at Health Monitor, reached out to them and spoke to

22   them on the phone, in which case they were able to

23   resolve the issue and I know that Health Monitor

24   paid us for the equipment that they said that they

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy    March 28, 2014

1    had lost.

2        Q.  Do you know how much it was?

3        A.  I don't.

4        Q.  What was the resolution -- was there a

5    resolution on sort of a going-forward basis?

6        A.  Not to my knowledge.

7        Q.  Did Mr. Demas indicate that he had any

8    discussions with anyone at Health Monitor about

9    Health Monitor's practice of removing Context

10   equipment without Context's authorization?

11       A.  No.  My understanding is that the

12   resolution mainly was around the cost of the lost

13   equipment.

14       Q.  So it is the company's position that there

15   was no -- there was no resolution with Health

16   Monitor dealing with what Health Monitor would do

17   going forward relative to Context equipment?

18       A.  Based on my conversation, there was no

19   resolution on forward-going switch-outs.  It was

20   focused on the payment and resolution around lost

21   equipment.

22       Q.  Okay.

23           Do you know if after Mr. Demas had the

24   communication with the person at Health Monitor if

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy    March 28, 2014

1    Health Monitor removed any of Context's equipment

2    after that time?  By that I mean just take the

3    equipment down.

4         A.  I don't know.

5         Q.  Do you know who it is that he spoke with at

6    Health Monitor?

7         A.  No.  Jim didn't have the specific name.

8         MR. COWAN:  Dick, on these remaining topics,

9    are there any on the remaining topics, 16 -- well,

10   17 isn't in there.  Let me see what 17 was.  Okay.

11   17 you withdrew.  All right.  Thank you.

12         So the remaining ones, are any of these --

13   should we wait until after we get the forensics?

14         MR. O'BRIEN:  No.

15         MR. COWAN:  No.  Okay.

16   BY MR. COWAN:

17         Q.  So topic 16, what did you -- who did you

18   talk to relative to topic 16?

19         A.  Yes.  I spoke with Jim and Rishi, and I

20   reviewed some of the documentation I've seen related

21   to this.

22         Q.  And what did they tell you?

23         A.  There was a series of letters and

24   correspondence in early 2011 between Healthy Advice

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy    March 28, 2014

1    and Contextmedia, at which point there was an

2    attempt by Contextmedia to come to an agreement with

3    regards to, you know, mutual procedures with regards

4    to switch-outs.  Following that communication there

5    was an inability to reach or find resolution with

6    Healthy Advice, and due to that they then continued

7    with the operative switch-out procedures.

8        Q.  Is it -- strike that.

9            It is not the company's position that

10   Healthy Advice ever said anything to Context that

11   led Context to believe that Healthy Advice approved

12   of the continued use of the operative HAN switch-out

13   practices; is that correct?

14       A.  It is the company's position that we didn't

15   come to an agreement on the operative switch-out

16   procedures until March 2013.

17       Q.  Topic 18, for topic 18 did you essentially

18   talk to the same people that you would have talked

19   to with respect to topic 9?

20       A.  With your definition of trade secrets --

21       Q.  I probably made this more difficult than I

22   should have.

23       A.  Yeah.  So I spoke to Shradha, Ryan, read

24   parts of Mike Berning's deposition, spoke with

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy    March 28, 2014

1    Travis, Mike Williams, and then obviously my own

2    personal knowledge.

3        Q.  Topic 19, who did you talk to with respect

4    to topic 19?

5        A.  The same group I just talked about and Jim.

6        Q.  Demas?

7        A.  Yes.

8        Q.  Okay.

9            Going back to topic 18, did Context, to

10   your knowledge, undertake any efforts to do any sort

11   of a forensic analysis of any of its computer

12   systems or networks to determine whether or not

13   anyone had accessed the image of the hard drive?

14       A.  Prior to what's currently being done?

15       Q.  Well, prior to -- what do you mean "prior

16   to what's currently being done"?  What's currently

17   being done?

18       A.  My understanding is there's a forensic

19   procedure being done in accordance with this legal

20   proceeding.

21       MR. COWAN:  Do you think he's referring to D4?

22       MR. O'BRIEN:  I know he is.

23   BY MR. COWAN:

24       Q.  Regarding topic 20, who did you speak to?

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy    March 28, 2014

1    Same group as 19 and 18?

2        A.   I didn't speak with Ryan or Shradha or Jim

3    here because this is regarding the play-back

4    technology.

5        Q.   Well, let me ask you this.

6        A.   I spoke to Travis and Mike Williams.

7        Q.   What did they tell you?  Anything more than

8    what's described there in your notes?

9        A.   So we have used BroadSign and Landscape,

10   since early 2008 in the case of BroadSign, at least

11   early 2009 in the case of Landscape.  Both of those

12   are from my understanding what I've read in the

13   trade secrets representation inconsistent with the

14   software that HAN uses as well as obviously the

15   perspective that I got from Travis and Mike

16   Williams, in particular the HAN software uses

17   Windows, we used a Linux-based operating system and

18   we've used third-party technologies since prior to

19   this instance and continue to do so.  And my

20   understanding of what their appropriated

21   technologies are and what we use is that there are

22   fundamental incompatibilities that would make it --

23   it would be unuseable as it's described here.

24       Q.   Topic 21, who did you speak with?

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy    March 28, 2014

1        A.  So Travis, Mike Williams, Jim.  That's it.

2        Q.  Your notes say "Context does not have any

3   technology it considers to be trade secrets."

4        A.  We don't have anything that we consider to

5   be trade secrets.

6        Q.  Does Context have any information that it

7   considers to be confidential as opposed to a trade

8   secret?

9        A.  I believe there's confidential information

10  in the organization.

11       Q.  Such as?  I'm not asking for the specifics.

12  Just give me some general descriptions.

13       A.  I think one example of confidential

14  information is our internal revenues.

15       Q.  But I take it from your answer -- because

16  you said you don't have anything that's trade

17  secret.  Do you draw a distinction between something

18  that's a trade secret and something that's

19  confidential?

20       A.  Can you define confidential?

21       Q.  I guess my definition, at least for

22  purposes of my question, would be information that

23  Context expects to be kept within Context, not

24  disseminated to any outside parties.

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy    March 28, 2014

1      A.  Okay.  Can you define trade secrets?

2      Q.  Trade secrets would be, under my

3  definition, something that is same or similar type

4  information which the company has taken reasonable

5  steps to try to maintain the secrecy of that

6  information.

7      MR. O'BRIEN:  And semi-unique and provides a

8  competitive advantage.

9  BY THE WITNESS:

10      A.  That's my understanding of trade secrets.

11      Q.  Okay.  Why don't we use Dick's and yours.

12  My question is are you drawing a distinction between

13  confidential and trade secrets, then?

14      A.  I certainly believe there's a distinction.

15      Q.  Okay.

16          And, as I understand your testimony,

17  there's no information that Context has that they

18  consider to be a trade secret; is that correct?

19      A.  Correct.  We don't have any information we

20  consider to be trade secrets based on our

21  understanding of the definition.

22      Q.  I've just got a couple additional documents

23  I'd like to ask you just to identify, and I'm going

24  to mark them as exhibits because I don't think

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy    March 28, 2014

1   they've been previously marked and deal with

2   communications with practices largely.

3        A.  Okay.

4                      (Plaintiff's Exhibit 207 was

5                      marked as requested.)

6   BY MR. COWAN:

7        Q.  Take a minute and look at Exhibit 207.  My

8   first question will be to ask if it's a document

9   you've seen before today?

10                     (Witness viewing document.)

11  BY THE WITNESS:

12       A.  I haven't seen this before.

13       Q.  Okay.

14           Does it appear to be a series of e-mail

15  exchanges between Mr. Cavanna and someone at Reston

16  Rheumatology relative to a potential switch of the

17  practice?

18       A.  I don't understand it to be about a

19  potential switch.

20       Q.  What do you understand it to be about?

21       A.  Could you rephrase that?

22       Q.  Yeah.  You said you don't understand it to

23  be about a potential switch.  I'm just asking what

24  do you understand it to be about?  Does it appear to

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy    March 28, 2014

1    be a series of communications --

2        A.  I mean, there's a reference to the fact he

3    would guarantee its presence regardless of a

4    competitor's counteroffer.  I don't see anything

5    with regards to a switch.  So I don't have any

6    information that would lead me to believe that this

7    office was switched from another competitor to our

8    service.

9        Q.  Well, the first e-mail, so the last page,

10   from Mr. Cavanna to this fellow, to Mr. Chung, the

11   last sentence says "Don't forget about the incentive

12   for switching out, exclamation point, $200 gift card

13   with your name on it, smiley face."  Do you see

14   that?

15       A.  I see that now.

16       Q.  Relative to the HAN practices that were

17   switched, do you know what -- how many of those

18   practices were offered an incentive such as a gift

19   card, free lunch, some sort of what you would refer

20   to as an incentive to switch?

21       A.  We offer a broad range of incentives

22   oftentimes around campaigns or trying to mitigate

23   any degree of time or effort that any, you know,

24   component of our service requires from an office,

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy     March 28, 2014

1    but I don't have any quantitative value as far as

2    the number of times that was done or that relative

3    to the ones offered to Healthy Advice practices.

4         Q.  Are there any -- I'm going to ask two

5    questions.  The first is are there any written --

6    during the relevant time period were there any

7    written materials that discussed under what

8    circumstances a practice could be offered an

9    incentive?

10        A.  I'm not aware of any.

11        Q.  And the second is do you know if there was

12   any sort of unwritten guidelines during the relevant

13   time period about when to offer an incentive or what

14   type of incentive to offer?

15        A.  In very general terms I've heard a

16   structure by which an incentive can be offered from

17   anything ranging from you can do this up to X number

18   of times per month versus it can happen in this type

19   of situation.  I'm not necessarily sure if there was

20   any written or unwritten procedure.

21                    (Plaintiff's Exhibit 208 was

22                     marked as requested.)

23   BY MR. COWAN:

24        Q.  Take a minute and just look at 208.  The

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy    March 28, 2014

1   first question will be like the others, and that is

2   have you seen this before?

3                   (Witness viewing document.)

4   BY THE WITNESS:

5        A.  I've reviewed it.

6        Q.  Have you seen that before?

7        A.  No.

8        Q.  The information -- I'm looking at the

9   e-mail from Brok to Jeana.  The subject is "RHN

10  Carolina Specialty Care, Statesville, North

11  Carolina."  The information that's in there,

12  network, account number, do you know where that

13  information is generated?  Does that come from a

14  database or some sort of a system?

15       A.  I'm not sure if he's putting that in

16  himself or he's copying and pasting from a database.

17       Q.  Okay.

18       A.  It seems similar to something I've seen

19  earlier today.  So based on that structure, I'm led

20  to assume that it may be being copied and pasted

21  from a database.

22                  (Plaintiff's Exhibit 209 was

23                   marked as requested.)

24  BY MR. COWAN:

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy    March 28, 2014

1      Q.  To the best of your knowledge, 209, does it

2  appear to be related to the same practice?

3                    (Witness viewing document.)

4  BY THE WITNESS:

5      A.  Yes, it appears to be the same practice.

6                    (Plaintiff's Exhibit 210 was

7                     marked as requested.)

8  BY MR. COWAN:

9      Q.  Last question.  Take a look at 210.  I'm

10  just going to ask you can you identify this as what

11  appears to be an internal communication, by that I

12  mean an internal Context communication relating to a

13  practice in Alabaster, Alabama, Shelby

14  Endocrinology?

15      A.  Yes, it appears to be related to an account

16  in Alabaster, Alabama.

17      MR. COWAN:  Let's go off the record for just a

18  second.

19                    (Whereupon a discussion was had

20                     off the record.)

21                    (Plaintiff's Exhibit 211 was

22                     marked as requested.)

23  BY MR. COWAN:

24      Q.  Are you able to -- take a look, if you

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy     March 28, 2014

1    would.  These are some documents recently produced

2    by Context.  I'm just trying to see if you're able

3    to identify these documents?

4         MR. O'BRIEN:  211 is a bunch of contracts,

5    right?

6         MR. COWAN:  I haven't spent a lot of time with

7    it.  That sounds like that could be the case.

8         MR. O'BRIEN:  Okay.  In fact, it does look like

9    that's the case.

10   BY MR. COWAN:

11        Q.  Does this exhibit include a number of what

12   we would be referring to as sponsor contracts?

13                     (Witness viewing document.)

14   BY THE WITNESS:

15        A.  Yes, this appears to be a group of sponsor

16   contracts.

17                     (Plaintiff's Exhibit 212 was

18                      marked as requested.)

19   BY MR. COWAN:

20        Q.  212, does this also appear to be another

21   group of sponsor contracts?

22                     (Witness viewing document.)

23   BY THE WITNESS:

24        A.  Yes, it appears to be a group of sponsor

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy    March 28, 2014

1   contracts.
2       Q.  And the final -- I've got a document that
3   was produced.  It's an updated list of what I
4   understand to be practices that switched from HAN to
5   Context.  Did you have any involvement in preparing
6   that?
7       A.  No.
8       Q.  So if I showed you, you wouldn't be able to
9   authenticate it or identify it because you haven't
10  seen it before, I take it?
11      A.  No.
12      MR. COWAN:  That's all I have for you.  Thank
13  you.
14      MR. O'BRIEN:  No questions.  We'll reserve.
15                    (Whereupon, at 2:45 p.m., the
16                     signature of the witness having
17                     been reserved, the witness being
18                     present and consenting thereto,
19                     the taking of the instant
20                     deposition ceased.)
21
22
23
24

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy    March 28, 2014

1  STATE OF ILLINOIS      )
                          )     SS:
2  COUNTY OF C O O K      )

3

4          The within and foregoing deposition of the

5  aforementioned witness was taken before Tina M.

6  Alfaro, C.S.R. and Notary Public, at the place,

7  date, and time aforementioned.

8          There were present during the taking of the

9  deposition the previously named counsel.

10         The said witness was first duly sworn and

11 was then examined upon oral interrogatories; the

12 questions and answers were taken down in shorthand

13 by the undersigned, acting as stenographer and

14 Notary Public; and the within and foregoing is a

15 true, accurate, and complete record of all the

16 questions asked of and answers made by the

17 aforementioned witness at the time and place

18 hereinabove referred to.

19         The signature of the witness was not

20 waived, and the deposition was submitted, pursuant

21 to Rules 30(e) and 32(d) of the Rules of Civil

22 Procedure for the United States District Court, to

23 the deponent per copy of the attached letter.

24

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy    March 28, 2014

1          The undersigned is not interested in the

2     within case, nor of kin our counsel to any of the

3     parties.

4          Witness my official signature and seal as

5     Notary Public, in and for Cook County, Illinois on

6     this _____ day of _____, A.D., 2014.

7

8

9

       _____
10     Tina M. Alfaro, CSR, CRR, CLR
       C.S.R. No. 084-004220
11     311 South Wacker Drive
       Suite 300
12     Chicago, Illinois 60606
       (312) 386-2000

13

14

15

16

17

18

19

20

21

22

23

24

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy     March 28, 2014

1                IN THE UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF ILLINOIS
2                     WESTERN DIVISION

3

HEALTHY ADVICE NETWORKS, LLC.   )
4                               )
               Plaintiff,       )
5                               )
        vs.                     )Case No.
6                               )1:12-cv-00610
CONTEXTMEDIA, INC.,             )
7                               )
               Defendant.       )
8

9          I, BRADFORD PURDY, being first duly sworn,

10  on oath say that I am the deponent in the aforesaid

11  deposition taken on March 28, 2014; that I have read

12  the foregoing transcript of my deposition consisting

13  of pages 1 through 162 inclusive, and affix my

14  signature to same.

15

16
                         BRADFORD PURDY
17

18  SUBSCRIBED AND SWORN TO

19  before me this _____ day

20  of _____, 2014.

21

22  _____
NOTARY PUBLIC
23

24

161

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy    March 28, 2014

```
 1

 2

 3                                      April 9, 2014

 4    Sidley Austin, LLP
 5    Richard O'brien, Esq.
      One South Dearborn Street
 6    Chicago, Illinois 60603

 7    Re:     HEALTHY ADVICE V. CONTEXTMEDIA
              1:12-cv-00610
 8    Dep: BRADFORD PURDY

 9    Dear Mr. O'Brien:

10    Enclosed is your copy of the deposition transcript
      along with the original signature page and errata
11    sheet.

12    Pursuant to the rules of court in this matter,
      please have the deponent read the transcript and
13    sign the signature page before a notary public.

14    If any corrections/changes are to be made, please
      TYPE or PRINT them on the attached errata sheet,
15    giving the page and line number, desired
      correction/change, and reason.
16
      Please arrange for accomplishment of same and
17    transmittal of the signature page and errata sheet
      back to our office within 30 days from the date of
18    this letter.

19    Upon failure to comply, we shall forward an
      appropriate affidavit of noncompliance to all
20    counsel of record.

21                      Sincerely Yours,

22

23    _____
                      Merrill Legal Solutions

24    cc:   Grant Cowan
```

Healthy Advice Network vs. ContextMedia Inc.
Bradford Prudy    March 28, 2014

```
1              ERRATA SHEET

2   CASE NAME:    HEALTHY ADVICE V.  CONTEXTMEDIA

3   CASE NUMBER:  1:12-cv-00610

4   WITNESS:      BRADFORD PURDY

5   PAGE LINE

6   _____   _____ CHANGE:_____

7   _____   _____ REASON:_____

8   _____   _____ CHANGE:_____

9   _____   _____ REASON:_____

10  _____   _____ CHANGE:_____

11  _____   _____ REASON:_____

12  _____   _____ CHANGE:_____

13  _____   _____ REASON:_____

14  _____   _____ CHANGE:_____

15  _____   _____ REASON:_____

16  _____   _____ CHANGE:_____

17  _____   _____ REASON:_____

18  _____   _____ CHANGE:_____

19  _____   _____ REASON:_____

20  _____   _____ CHANGE:_____

21  _____   _____ REASON:_____

22
    Signed: _____ Date: _____
23

24  REPORTER:  Tina M. Alfaro
```