**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | | |
|---|---|---|
| **HEALTHY ADVICE NETWORKS, LLC,** | : | Case No. 1:12-CV-00610 |
| | : | |
| Plaintiff, | : | **Chief Judge Susan J. Dlott** |
| | : | |
| v. | : | |
| | : | **PLAINTIFF'S STATEMENT OF** |
| **CONTEXTMEDIA, INC.** | : | **UNDISPUTED FACTS IN SUPPORT** |
| | : | **OF ITS MOTION FOR SUMMARY** |
| Defendant. | : | **JUDGMENT** |

Pursuant to the Court's Standing Order on Civil Procedures Section I(E)(3)(a), Plaintiff PatientPoint Networks, LLC (formerly Healthy Advice Networks, LLC) ("Healthy Advice" or "HAN") submits the following statement of proposed undisputed facts in support of its motion for summary judgment against Defendant ContextMedia, Inc. ("Context" or "CM").

## THE INDUSTRY

1.     This case concerns the point-of-care patient education industry, in which companies provide patient education materials and information to physician practices free of charge, and receive revenue from sponsors, such as pharmaceutical companies or other medical product suppliers, who pay to advertise within those materials.  (CM Statement of Facts, No. 1,[1] Doc. 54 at PageID 407).

2.     One way of delivering patient education information in a physician's practice is through digital waiting room networks, in which the patient education programming is displayed on television screens in the practice's waiting room.  (CM Statement of Facts, No. 2, Doc. 54 at PageID 407).

---

[1] HAN has admitted the truth of certain facts asserted by Context in support of its motion for summary judgment and HAN relies herein upon some of those unopposed facts.

## THE PARTIES

3.      Founded in 1987, HAN holds itself out as the nation's largest health education provider.  (CM Statement of Facts, No. 3, Doc. 54 at PageID 408).

4.      HAN's waiting-room programs are targeted toward five physician specialties: primary care; OB/GYN; rheumatology; cardiology; and dermatology.  (CM Statement of Facts, No. 4, Doc. 54 at PageID 408).

5.      HAN claims to serve more than 61,000 physicians in all of its programs, and to have approximately 14,000 to 15,000 physicians in its primary care waiting room network alone. (CM Statement of Facts, No. 5, Doc. 54 at PageID 408).

6.      HAN now goes by the name PatientPoint.  (CM Statement of Facts, No. 6, Doc. 54 at PageID 408).

7.      Context was founded in 2006.  It gained its first physician subscribers and its first advertisers in the 2007 to 2008 time period.  (CM Statement of Facts, No. 8, 9, Doc. 54 at PageID 408).

8.      HAN and Context are direct competitors in the health-related educational materials market throughout the United States, particularly in content related to rheumatology, diabetes, and cardiology.  (HAN Second Amended Complaint, ¶18; CM Answer to Second Amended Complaint, ¶18, Doc. 40 at PageID 310, Doc. 46 at PageID 348).

9.      The customers and prospective customers of Context are also customers and prospective customers of HAN.  (HAN Second Amended Complaint, ¶19; CM Answer to Second Amended Complaint, ¶19, Doc. 40 at PageID 310, Doc. 46 at PageID 348).  However, when practices agree to the placement of a Context health education television monitor, it is in general to the exclusion of other providers.  (CM Answer to Second Amended Complaint, ¶20, Doc. 45 at PageID 348).

10.     Context's advertising rates for its sponsors are calculated based on the number of practices that Context has running its system.  The more practices Context signs up, the more money it makes.  (Ex. 7, Agarwal Dep. at 48-49).

### SUFFERING FINANCIAL LOSSES EVERY YEAR SINCE ITS INCEPTION, CONTEXT DECIDES IN LATE 2010 TO TARGET HAN PRACTICES

11.     ████████████████████████████████████████████████
████████████

12.     In late 2010, Context expanded into rheumatology for the first time, under the program name Rheumatoid Health Network ("RHN").  (CM Statement of Facts, No. 11, Doc. 54 at PageID 409).

13.     As Context began trying to secure rheumatology practices to play Context educational content and ads in their waiting rooms, it discovered that a number of the practices had HAN content in their waiting rooms.  (Ex. 7, Agarwal Dep. at 76; Ex. 6, Demas Dep.at 25).

14.     Context's founder and CEO, Rishi Shah ("Shah") suggested that Context begin doing "competitor switch-outs."  Shah suggested that Context compete against competitor services by selling against them directly.  (Ex. 6, Demas Dep. at 22).

15.     Context had a target list of practices and this included targeting HAN practices, including through the use of direct mail communications.  (Ex. 8, Shah Dep. at 75-76).

16.     Context paid its salespeople bonuses for switching out practices that had competitor content in their waiting rooms.  Context paid its salespeople the largest bonuses for switching out practices that had HAN content in their waiting rooms.  (Ex. 13, Vandersteen Dep. at 29-30).

17.     ████████████████████████████████████████████████
████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████

### CONTEXT INTENIONALLY INDUCES THE HAN PRACTICES TO BREACH THEIR CONTRACTS WITH HAN

18. ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████  ███████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████

19. ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████ Context chose the phrase "hassle-free" to try to communicate to the practices that it would not be a hassle for them to switch to Context.  (Ex. 8, Shah Dep. at 55-56).

20. ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

---

[2] "PX" refers to a Plaintiff Deposition Exhibit.

████████████████████████████████████████████████████████

█████████████████████████████████████████████

21.  ████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████████████████████████████

22.  ████████████████████████████████████████████████

███████████████████████████████████████████████████████ █

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

███████████

23.     The "Authorization Form" was developed by Context's CFO to alleviate concerns
Context had about removing HAN's equipment, knowing that HAN's agreement with its
practices prohibited the practice from removing HAN's equipment without HAN's written
consent.  The "Authorization Form," prepared by Context, purports to "authorize" Context to
remove HAN's equipment. (Ex. 6, Demas Dep. at 27-31).  ████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

---

[3] Bradford Purdy, Context's Chief Operating Officer, was designated as Context's 30(b)(6) representative on a
number of topics.

████████████████████████████████████████████████████████

███████████████████████████

24.  ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████    ██████████████

███████████████████████████████████████

25.     Context could have provided HAN written notice asking HAN to remove the HAN equipment, but Context was concerned if it did so, HAN would talk to the practice and try to keep or save the practice from switching to Context.  (Ex. 7, Agarwal Dep. at 112-113) ("That's something any company would do.").   Context was concerned that if HAN was provided notice that its practice was going to switch, HAN might try to save the account.  (Ex. 6, Demas Dep. at 51).

26.  ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████

27.     Context admits that if it was notified that a practice was thinking about switching from Context to a competitor, Context would want to fight to save the practice—to keep it from switching to a competitor.  (Ex. 6, Demas Dep. at 51; Ex. 7, Agarwal Dep. at 119-121; Ex. 9, Velazquez Dep., at 118).  Context had occasions when it was alerted that a practice was thinking of switching and Context was able to save the practice from switching.  (Ex. 6, Demas Dep. at 52)

28.     Context does not dispute that HAN has the right to have a term in its agreements with practices requesting that their property is not moved or handled by personnel they have not approved.  (Ex. 8, Shah Dep. at 178).

29.     I██████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████

30.     Mr. Shah has referred to these agreements, under oath in another lawsuit, as "contracts," and admits that the Context agreements with practices "could certainly be called contracts." (Ex. 8, Shah Dep. at, 43-44).

31.     It was important to Context to have its practices agree that they would not remove, relocate, modify, alter, or disrupt Context's system components without Context's prior written consent. (Ex. 6, Demas Dep. at 34).

32.     Context expects its practices to abide by that portion of its agreement. (Ex. 11, Purdy Dep. at 67; Ex. 6, Demas Dep. at 34 Ex. 7, Agarwal Dep. at 50-52).

33.     ████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████

34.     The basis for Shah's letter is his opinion that no outside party is authorized to legally repair, replace, or handle Context's equipment. (Ex. 8, Shah Dep. at 241-242).

35.     For every practice which Context switched from HAN to Context, Context obtained an executed Authorization Form from the HAN practice. (Ex. 11, Purdy Dep. at 54; (Ex. 9, Velazquez Dep., at 70; Ex. 13, Vandersteen Dep., at 45).

36.     At no point has HAN ever provided Context with any authority or permission to remove, relocate, modify or disrupt any of the HAN equipment located at HAN practices. (HAN Second Amended Complaint, ¶28, Doc. 40 at PageID 312; CM Answer to Second Amended Complaint, ¶28, Doc. 46 at PageID 349).

## NOT CONTENT WITH SIMPLY INDUCING HAN PRACTICES TO BREACH THEIR CONTRACTS WITH HAN, CONTEXT LIES TO THE PRACTICES ABOUT HAN'S CONTRACT'S WITH ITS PRACTICES

37.     Context admits that in past instances, certain Context employees have told certain practices that the practice may not have a contractual obligation to HAN.   (HAN Second Amended Complaint, ¶25, Doc. 40 at PageID 311; CM Answer to Second Amended Complaint, ¶25, Doc. 46 at PageID 349).

38.     ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

39.     ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

40.     ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

41.  ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████

### NOT CONTENT WITH SIMPLY INDUCING HAN PRACTICES TO BREACH THEIR CONTRACTS WITH HAN, CONTEXT LIES TO THE PRACTICES ABOUT CONTEXT'S RELATIONSHIP WITH HAN

42.  Context's lead sales person was Matt Garms ("Garms").  When Garms joined Context, he was trained by Shah.  Shah placed calls to practices with Garms, explaining how to best position Context's service, and those calls formulated the vast majority of Garms' training. (Ex. 11, Purdy Dep. at 22, 25).

43.  After Garms was trained by Shah, Garms became responsible for training other Context sales personnel.  (Ex. 11, Purdy Dep. at 26).

44.  ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████

45.     Context and its executive officers (Shah; Agarwal; Demas) all admit that what Garms told the HAN practice was false and misleading.  (Ex. 11, Purdy Dep. at 81; Ex. 7, Agarwal Dep. at 148; Ex. 6, Demas Dep. at 44).

46.     However, none of the Context officers recalls actually telling Garms that his messaging was false and misleading or that he should not say what he was caught saying.  (Ex. 7, Agarwal Dep. at 148-149; Ex. 6, Demas Dep. at 44; Ex. 8, Shah Dep. at 108).

47.     According to Agarwal, she would have expected Shah, who managed sales at the time, to have followed up with Garms to make sure Context stopped using that statement.  (Ex. 7, Agarwal Dep. at 149).  However, Shah testified that while he "certainly would have been supportive of taking action and clarifying it" he does not recall if he personally addressed it with Garms.  (Ex. 8, Shah Dep. at 108-109).

48.     ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

49.     Context does not know if its sales personnel were making this statement during every communication with practices.  (Ex. 7, Agarwal Dep. at 154).

50.     Context does not know how many HAN practices were told the false and misleading statement.  (Ex. 7, Agarwal Dep. at 157).

51.     ███████████████████████████████████████████████████████████████████████████████████████████████████

11

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████

52.     ██████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████

53.     ██████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████

54.     Context employees made similar statements over the phone to HAN practices. For example, a Context sales person told a Cincinnati, Ohio practice, during a phone conversation, that Context would be able to remove and replace the Healthy Advice system because Context had an agreement with Healthy Advice that allowed Context to remove Healthy Advice equipment.  (Affidavit of Jane Root, attached as Exhibit 2, ¶ 5).

55.     Context believes that these types of statements by Context sales personnel are "one of the worst forms of hyperbole and embellishment" resulting in "very inaccurate statements to a clinic in the marketplace."  (Ex. 11, Purdy Dep. at 88).

56.     Nevertheless, Context did not terminate or even dock the pay of any Context employee who made false or misleading statements about HAN.  (Ex. 7, Agarwal Dep. at 167-168).  Context company policy does not include the docking of pay as a disciplinary action. (Ex. 8, Shah Dep. at 98).  In fact, Context gave raises to at least one employee--Brok Vandersteen--who repeatedly made false and misleading statements to HAN practices.  (Ex. 13 , Vandersteen Dep., at 33).  (Vandersteen testified that his starting salary when he was hired in June 2011 was $42,500; it increased to $50,000 in 2012, and as of deposition in March 2014 it was $60,000).

57.     ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████      ████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████

58. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

**NOT CONTENT WITH LYING ABOUT CONTEXT'S ALLEGED RELATIONSHIP WITH CONTEXT, CONTEXT LIES TO HAN PRACTICES ABOUT THE AMOUNT OF ADVERTISEMENTS THAT ARE RUN BY HAN AND THE NATURE OF HAN'S CONTENT**

59. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████

60. ████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████

61. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████     █████████████

████████████████████████████████████████████

████████████████████████████████████████████



62.     Context admits that the statements that half of HAN's content was advertising were not true.  (Ex. 13, Vandersteen Dep., at 101).

63.     According to Context, the only explanation for Context employees continuing to say that HAN's content was one-half ads, after having been specifically told that HAN's content was about one-third ads, was due to "poor personal decisions."  Context considers these poor personal decisions because the employee "was instructed to say factual statements, he was told what the factual statements were, he confirmed what he believed and knew to be the factual statements, and then he said something that was, to the best of our knowledge, not factually correct" which "certainly seems like a poor personal decision."  (Ex. 11, Purdy Dep. at 40).

64.     According to Context, Context's "sales representatives obviously make thousands of phone calls and conversations and e-mails with the marketplace, and it certainly appears that they've in a number of cases made poor personal decisions which are not accurate or representative of how we've trained them, what our policies are, or certainly what they've been directed to do by managers and supervision."  (Ex. 11, Purdy Dep. at 45).  A substantial amount of communication by Context sales personnel with prospective practices is done by phone.  (Ex. 8, Shah Dep. at 90-91).

65.

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████

66.      The Context sales materials are not true because HAN "doesn't use PowerPoint in the development of their content" and the reference to close to 50% advertising is not "exactly consistent with how we tell the team to message it."  (Ex. 11, Purdy Dep. at 69-70).

67.      Context does not know when the sales personnel began using the sales materials or when they stopped using the sales materials.  (Ex. 11, Purdy Dep. at 72).

## CONTEXT EMPLOYEES LIE ABOUT THE NUMBER OF HAN PRACTICES THAT CONTEXT SWITCHED TO CONTEXT

68.      ███████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████

69.      Context admits that the fact that a significant percentage of the rheumatology market, which is fairly small, has switched away from Healthy Advice to other competitors, including Context, may bear some significance to some practices.  (Ex. 8, Shah Dep. at 66).

70.      ███████████████████████████████████████████████

█████████████████████████████████████     ██████████████

██████████████████████████████

71.      ███████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████

72.     Context admits that there is not "any firm base in fact" for these statements, which involve "quite a bit of embellishment and a poor personal decision in constructing these statements." (Ex. 11, Purdy Dep. at 98). Vandersteen further admits that these statements (that 150 to 350 health care facilities were switching from Healthy Advice to Context) were exaggerations and that they did not "appear" to be true. (Ex. 13, Vandersteen Dep., at 103).

73.     Context is unable to say when these false statements stopped, if at all, because there have been examples of Context employees being told that their statements were inaccurate and the employees continued to make inaccurate statements even after a "direct confrontation" by the company. (Ex. 11, Purdy Dep. at 99).

74.     Beginning in potentially 2011, and certainly in 2012 and 2013, Context's sales manager, marketing personnel and CFO became aware of the "hyperbole" being used regarding the number of switch-outs. (Ex. 8, Shah Dep.at 67-68).

75.     Context finally put in place policies around March 2013 to try to "have a degree of accuracy in these sorts of descriptions," and while Shah is "comfortable" with these policies, he admits that "there are thousands of phone calls and e-mails from this team," and he "certainly" does not review all of them or overhear all of them." (Ex. 8, Shah Dep. at 67-68).

## CONTEXT MAKES A COPY OF HAN'S VIDEO LOOP AND THE HARD DRIVE OF ITS COMPUTER

76.     For the first switch-out of a HAN practice, the HAN equipment was shipped to Context. (Ex. 11, Purdy Dep. at 59). Context knew that the HAN equipment was going to be shipped to Context. (Ex. 6, Demas Dep. at 35-36). According to Shah, "this was exactly the decision that was made, to have it shipped back to our office on the first few occasions." (Ex. 8, Shah Dep. at 122).

77. When the HAN equipment arrived at Context's offices, Shah instructed that the HAN player be plugged in and thereafter Context made a video recording of the HAN content. (Ex. 6, Demas Dep. at 37).

78. In addition, a Context employee made a copy of the HAN hard drive, which was then put on a backup server.  (Ex. 8, Shah Dep. at 123; Ex. 6, Demas Dep. at 39).  Specifically, Context employee Mike Williams connected a portable hard-drive containing the software "Image for Linux" to the HAN equipment.  (CM Supplemental Response to Interrogatory No. 17, Ex. 51 ).

79. Shah was aware of the decision to copy the HAN hard drive, although he testified: "I don't know if I would call it my decision or somebody else's decision, but it's something I was aware of."  (Ex. 8, Shah Dep. at 129).

80. No one at CM asked HAN for permission to image the HAN hard drive.  (Ex. 8, Shah Dep. at 144).

81. Shah testified that he does not believe the copy of the hard drive was "subsequently used much."  (Ex. 8, Shah Dep. at 130).

82. Shah admits that the decision to copy the HAN hard drive "was in poor judgment."  (Ex. 8, Shah Dep. at 129).

**CONTEXT'S CEO SUBMITS A FALSE AND MISLEADING DECLARATION TO THE COURT IN THIS CASE**

83. Context's CEO, Shah, executed a Declaration in this case, signed on October 3, 2012.  (Doc. 15-1, PageID 1-38, Ex. 50, PX105, Declaration of Rishi Shah; Ex. 8, Shah Dep. at 59).

84. Paragraph 34(a) of the Shah Declaration states that Context does not represent that the practices have no contract with Healthy Advice as is alleged in paragraph 24 of Healthy

Advice's complaint.  (Doc. 15-1, PageID 1-38, PX105).  Shah now admits, however, that there "were certain incidents where this did happen with certain salespeople."  (Ex. 8, Shah Dep. at 100, 102)

85. ██████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████

86.    Paragraph 34(b) of the Shah Declaration states:  "For practices that had been using Healthy Advice equipment and services, ContextMedia does not represent that ContextMedia is 'authorized' to remove the Healthy Advice property as alleged in paragraph 25 of Healthy Advice's complaint."  (Doc 15-1, PageID 1-38, PX 105; Ex. 8, Shah Dep. at 106).

87.    Shah now admits that he was told by Demas, in a December 20, 2010 e-mail, that Context's lead sales person, Garms, was overheard telling HAN practices that Context has an agreement with HAN whereby CM removes their equipment and ships it back to them, and that the messaging was "false and misleading."  (Ex. 8, Shah Dep. at 107).

88. ██████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████

89. ██████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████

90.     As a result of the false statements in the Shah Declaration, Shah was forced to execute a Supplemental Declaration, "to correct a few things in my original declaration."  (Ex. 47, PX115 at CONTEXT_PROD_Supplemental Declaration of Rishi Shah; Ex. 8, Shah Dep. at 116).

## CONTEXT TAKES AT LEAST 168 PRACTICES FROM HAN

91.     Context's most recent list of practices that switched from HAN to Context totals approximately 168 practices through March 2013.  (CM Statement of Facts in Support Of Its Motion For Summary Judgment, Doc. 54, Exh. 43).

92.     HAN counts 173 practices that switched from HAN to Context during the same period. (CM Statement of Facts in Support Of Its Motion For Summary Judgment, Doc. 54, Exh. 41).

## EACH PRACTICE IS WORTH $20,000 TO CONTEXT

93.     ████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████

94.     Although Shah now characterizes the $20,000 figure as "an arbitrary number" that was designed "to press an alarm on the fact that significant value is walking away when an office leaves the network and it needs to be treated with priority," he admits that the valuation figure is not a lie.  (Ex. 8, Shah Dep. at 245-247; 250-251).


Respectfully submitted,

*/s/  Grant S. Cowan*
Grant S. Cowan (0066326)
Aaron Bernay (0086495)
FROST BROWN TODD LLC
3300 Great American Tower
301 East Fourth Street
Cincinnati, Ohio 45202
(513) 651-6800
(513) 651-6981 (fax)
E-mails:  gcowan@fbtlaw.com
                 abernay@fbtlaw.com

Attorneys for Plaintiff Healthy Advice
Networks, LLC

21

## CERTIFICATE OF SERVICE

I hereby certify that on August 14, 2014, a copy of the foregoing was served to the following via the Court's electronic filing system:

James E. Burke, Esq.
Thomas F. Hankinson, Esq.
KEATING MUETHING & KLEKAMP PLL
One East Fourth St.
Suite 1400
Cincinnati, Ohio 45202
jburke@kmklaw.com
thankinson@kmklaw.com

Richard J. O'Brien, Esq.
Jessica Johnson, Esq.
SIDLEY AUSTIN LLP
One South Dearborn St.
Chicago, IL 60603
(312) 853-7000
robrien@sidley.com
smukherjee@sidley.com
*Attorneys for Defendant ContextMedia, Inc.*

*/s/ Grant S. Cowan*
Grant S. Cowan

0065527.0597739   4849-8141-0845v1