IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| **HEALTHY ADVICE NETWORKS, LLC**, | : | |
| | : | Case No. 1:12CV610 |
| | : | |
| Plaintiff, | : | Chief Judge Susan J. Dlott |
| | : | |
| v. | : | ORDER DENYING DEFENDANT'S |
| | : | MOTION FOR SUMMARY |
| **CONTEXTMEDIA, INC.**, | : | JUDGMENT AND PLAINTIFF'S |
| | : | CROSS-MOTION FOR PARTIAL |
| Defendant. | : | SUMMARY JUDGMENT |
| | : | |

This matter comes before the Court on Defendant's motion for summary judgment (Doc. 53) and Plaintiff's cross-motion for partial summary judgment (Doc. 84). Each party contests the other's motion. For the following reasons, both Defendant's motion for summary judgment (Doc. 53) and Plaintiff's cross-motion for partial summary judgment (Doc. 84) will be DENIED.

## I. BACKGROUND[1]

The record in this case is voluminous; as such, the Court will provide an abbreviated statement of background facts in this section and expound upon material facts with respect to each claim below, as necessary.

### A. The Parties

Plaintiff Healthy Advice Networks, LLC[2] ("HAN") and Defendant Contextmedia, Inc. ("Context") are competitors in the point-of-care patient education industry. Both companies

---

[1] Except as otherwise indicated, background facts are drawn from Defendant's Proposed Statement of Undisputed Facts (Doc. 56-1 at PageID 1159–95) to the extent those facts are admitted in Plaintiff's response thereto (Doc. 90 at PageID 6494–6523) and Plaintiff's Proposed Statement of Undisputed Facts (Doc. 88 at PageID 5603–24) to the extent those facts are admitted in Defendant's response thereto (Doc. 103-1 at PageID 7227–52). Where the parties do not explicitly agree on any statement of fact, the Court cites to the portion of the record providing support for the statement.

provide patient education materials and information to physician practices free of charge, and in return, receive revenue from sponsors, such as pharmaceutical companies or other medical product suppliers, who pay to advertise within those materials.  Patient education materials are commonly displayed through digital waiting room networks, in which the patient education programming is displayed on television screens in a doctor's office or practice's waiting room.

HAN was founded in 1987 and holds itself out as the nation's largest health education provider, specializing in waiting room programs targeted toward five physician specialties: primary care, OB/GYN, rheumatology, cardiology, and dermatology.  HAN claims to serve more than 61,000 physicians in all of its programs and to have approximately 14,000 to 15,000 physicians in its primary care waiting room network.

Context, founded in 2006, is a newer competitor in the point-of-care patient education industry.  Context gained its first physician subscribers and advertisers in 2007–2008. Context initially offered only diabetes-related programming and practices under the program name Diabetes Health Network, but in 2010, expanded into rheumatology for the first time under the program name Rheumatoid Health Network.

At the time Context began emerging as a competitor in the patient point-of-care education industry, Context's waiting room network programming was primarily live-action video with sounds, and included a news ticker and streaming weather reports.  Although HAN's programming included video, it did not contain the other features.  (Merz Dep. 57–58, Doc. 65 at PageID 2113–14.)

---

[2]       HAN now goes by the name PatientPoint.

      **B.**      **Practices Switch from HAN's Program to Context's Program**

In late 2010, Context's founder and CEO, Rishi Shah, suggested that Context begin doing "competitor switch-outs." Shah suggested that Context compete against competitor services by selling against them directly. Context had a list of medical practices which included HAN practices to target through direct mail marketing. (Shah Dep. 75–76, Doc. 74 at PageID 3855–56.)

As early as December 2, 2010, Context became aware that practices that were using a competitor's program in their waiting rooms began asking questions about the process by which Context would remove the competitor's equipment and switch the practice to Context, prompting Context's senior management to develop a switch-out process. Context's senior management developed written materials to be provided to HAN practices when Context sought to switch the practice to Context, and Context began to advertise its Hassle-Free Switch package or process.

According to Context's training manual, the process for HAN switch-outs requires that Context first provide the practice with a sign-up sheet and an installation authorization form. (Training Manual, Doc. 88-20 at PageID 5893.) After receiving the completed authorization form, Context coordinated the switch-out. (*Id*.) On the day of the switch-out, a Context technician would remove the competitor's system, package all equipment, patch any markings, and install the Context system. (*Id*.) A Context member services representative would schedule a pick-up of the competitor's system via FedEx, and the equipment would be sent back to the competitor. (*Id*.) Context member service would contact the competitor and provide them with the tracking number of the package. (*Id*.)

When a practice canceled HAN's waiting room service, HAN required its Practice Relationship Management personnel to ask the reason that the practice decided to cancel and

3

document the information into a database called the "CMS."  Practice Relationship Managers are instructed to notate each account with every reason the practice gives for a switch of service. Employees could not always acquire all information for the report, because they must "read[] the customer, prob[e] when [they] can without making them mad or upset because you would like to think that these customers could potentially be a customer again in the future."  (April 21, 2014 Finley Dep. 47, Doc. 72 at PageID 3357.)  The CMS database is created and maintained in the ordinary course of HAN's business, and HAN uses and relies upon the information in the CMS database, including the reasons that practices identified for cancelling HAN's services and switching to a competitor's services.

Lori Smith, a member of the Practice Relationship Management team, was assigned to track practices that switched from HAN to Context and record the reasons for those switches in a separate tracking spreadsheet.  Smith received special instructions pertaining to practices that switched to Context from HAN, and was instructed to document any indication that Context misled the practice.

### C.    Procedural History

HAN filed this action on August 10, 2012, alleging unfair competition under § 43(a) of the Lanham Act, a violation of the Ohio Deceptive Trade Practices Act ("ODTPA"), tortious interference with contract, and conversion.  (Doc. 1.)  On October 24, 2012, Plaintiff filed an amended verified complaint.  (Doc. 21.)  On November 15, 2013, Plaintiff filed a second amended verified complaint, which included a new allegation of misappropriation of trade secrets.  (Doc. 40.)   On July 10, 2014, Context filed a motion for summary judgment (Doc. 53), arguing it is entitled to summary judgment as to all claims.  On August 14, 2014, Plaintiff filed a cross-motion for partial summary judgment (Doc. 84), arguing it is entitled to summary

judgment as to liability on its Lanham Act, ODTPA, and tortious interference claims, and that the issue of damages on each claim should be reserved for trial.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). All reasonable inferences from the record must be drawn in the light most favorable to the nonmoving party, and the court may grant summary judgment only "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986). The moving party may support the motion for summary judgment with affidavits or other proof or by exposing the lack of evidence on an issue for which the nonmoving party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). In responding to a summary judgment motion, the nonmoving party may not rest upon the pleadings but must go beyond the pleadings and "present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986). The task of the Court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249.

## IV. ANALYSIS

### A. Unfair Competition Under § 43(a) of the Lanham Act

In order to establish liability under § 43(a) of the Lanham Act for unfair competition, the plaintiff must establish:

> 1) the defendant has made false or misleading statements of fact concerning his own product or another's; 2) the statement actually deceives or tends to deceive a substantial portion of the intended audience; 3) the statement is material in that it

5

will likely influence a deceived consumer's purchasing decisions; 4) the advertisements were introduced into interstate commerce; 5) there is some causal link between the challenged statements and harm to the plaintiff.

*American Council of Certified Podiatric Physicians and Surgeons v. American Bd. of Podiatric Surgery, Inc.*, 185 F.3d 606, 613 (6th Cir. 1999).

HAN alleges that Context made the following wrongful statements to physicians' practices to cause the practices to switch from HAN's waiting room system to Context's waiting room system:

(1) Context told practices that they did not have a contract with HAN;
(2) Context told practices that there was no need to provide notice of cancellation to HAN and also that Context could remove HAN's equipment because HAN and Context had an agreement whereby Context would remove and return HAN's equipment at no charge to the practice;
(3) Context grossly exaggerated the number of HAN practices that had switched to Context, sometimes by as much as a factor of 5;
(4) Context told practices that advertising comprised 50% of HAN's broadcast content, knowing the actual figure was 30% advertising;
(5) Context characterized HAN's content as an outdated, PowerPoint slide show of general health information.

(Pl. MSJ, Doc. 89 at PageID 6489–90.)

To briefly summarize the parties' positions, Context argues it is entitled to summary judgment on HAN's unfair competition claim, because HAN cannot prove that any practice switched to Context because of the alleged wrongful statements. HAN, on the other hand, argues it is entitled to summary judgment as to liability on its unfair competition claim, because Context admits that it specifically targeted HAN's practices with comparative advertisements, that the statements were literally false, and that in many instances, the statements were made despite having been told they were false. As a result, Defendant argues it is entitled to a presumption of damages. There are several disputes of material fact which preclude summary judgment for the

Plaintiff or the Defendant on this claim. While the Court does not intend to narrow the issues for trial, it will highlight a few of these disputes.

A dispute of fact exists as to whether HAN had contracts with each of the medical practices it alleged switched to Context's services. The existence of a contract is an issue for the trier of fact to resolve. *Magnum Steel & Trading, L.L.C. v. Mink,* Nos. 26127/26231, 2013 WL 2713268, at *6 (Ohio App. 2013). It is undisputed that Context received a copy of the first page of a HAN enrollment agreement on January 6, 2011, shortly after implementing its Hassle-Free Switch package. (Velazquez Email, Doc. 88-18 at PageID 5855–56.) The enrollment agreement includes the following relevant terms:

> The initial term of this Agreement is 24 months from the last date set forth below and will automatically renew for 12 month periods after the initial term. Either party may cancel the Agreement at any time after 6 months with a 30-day written notice to the other, though HAN may remove the System at [sic] anytime if it is not being used consistent with this Agreement. By signing below, the Practice further agrees it will:
> [ . . . ]
> b.      Not remove, relocate, modify, alter or disrupt the System (e.g., maintain agreed to volume and video settings, not turn off or unplug the System etc.) without HAN's prior written agreement.

(*Id.*)

HAN proffers its first amended verified complaint as evidence that before placing HAN property in a practice, it enters into a contractual agreement with that practice outlining the parties' relationship and respective responsibilities, including that the practice must give 30 days' notice when cancelling service.[3] (First Amended Verified Complaint, Doc. No. 21 at

---

[3]      It is unclear why Plaintiff relies upon its first amended verified complaint (Doc. 21), as that complaint has been superseded by its second amended verified complaint (Doc. 40). The verification of both pleadings appears to be the same, as does the language related to the existence of HAN's contracts (*Compare* Doc. 21 at PageID 207–08, ¶¶ 11–13 *with* Doc. 40 at PageID309–10, ¶¶ 11–13). The only substantive difference appears to be that there is no contract attached to Plaintiff's second amended verified complaint as Exhibit A as referenced in the pleading.

PageID 207.)  While a verified complaint based on personal knowledge serves as the equivalent

of an opposing affidavit for the purposes of summary judgment, the verified complaint must

meet the requirements of Federal Rule of Civil Procedure 56(c)(4), which states that "an affidavit

or declaration used to support or oppose a motion must be made on personal knowledge, set out

the facts that would be admissible in evidence, and show that the affiant or declarant is

competent to testify on the matters stated."  Gregory Robinson's verification of Plaintiff's first

amended complaint does not comport with these requirements.[4]  While there is other record

evidence that contracts between HAN and its medical practices may exist (*see, e.g.*, Lawrence

Dep. 80–82, Doc. 66 at PageID 2237–39), there remains a question of fact as to whether HAN

entered into contracts with all of its practices and whether Context was aware of those contracts.

A question of fact also exists as to how frequently the alleged wrongful statements were

made and how significant their impact was.  For example, in an email from Chris Stoll, a Context

sales representative, to a representative of a HAN practice, Stoll stated:  "Since you do not have

a contract with [HAN], we would simply fill out a sheet and come in and replace it for free."

(Stoll Email, Doc. 88-26 at PageID 5962.)  In an email from Patrick Cavanna, a Context sales

representative, to a HAN practice, Cavanna stated: "Remember legally you are not actually tied

into a contract with Healthy Advice."  (Cavanna Email, Doc. 88-27 at PageID 5964.)  Context

also admits that certain individual Context employees developed their own attachments to sales

---

[4]       Specifically, Robinson does not clarify the facts for which he has personal knowledge, and his verification
is not made under penalty of perjury.  *Collaborative Sys. Grp., Inc. v. Grove*, 1:10CV543, 2011 WL 4502019, at *3
(S.D. Ohio Sept. 28, 2011) ("The Sixth Circuit has indicated that a plaintiff must sign a verified complaint under
penalty of perjury to defeat summary judgment.  It follows that a verified complaint used to support a summary
judgment motion must include the same language." (internal citation removed)); *Rodgers v. Hawley*, 14 F. App'x
403, 409 n.2 (6th Cir. 2001) (*"Executed under the penalty of perjury,* a verified complaint has the same force and
effect as an affidavit for evidentiary purposes." (quotation marks omitted and emphasis added) (citing *Williams v.
Browman*, 981 F.2d 901, 905 (6th Cir. 1992).)

emails that stated Context would remove HAN equipment, and there was "[n]o need to notify Healthy Advice." (Wesier Email, Doc. 88-28 at PageID 5967; Purdy Dep. 67–68, Doc. 88-11 at PageID 5812–13.) While Context does not dispute these statements were made, it offers testimony that these and other admitted-to statements were isolated incidents, not made at the instruction of management, and corrective action was taken. (Shah Dep. 67, 89–98, Doc. 74 at PageID 3847, 3869–78.) HAN counters that Shah's testimony may not be credible in light of inconsistent testimony evidenced by his two affidavits submitted to this Court, creating yet another issue of fact and credibility for a jury to resolve. (*Compare* Doc. 15-1 *with* Doc 88-47.)

Defendant argues that even assuming Plaintiff could prove literal falsity and willfulness, Plaintiff has no evidence that customers switched from HAN's system to Context's due to the alleged wrongful statements. To support this argument, Defendant relies heavily upon the admission of reports generated by Plaintiff in the regular course of business, in which HAN employees summarized former customers' statements as to their given reasoning for switching services.[5] (Doc. 56-4, 56-8, 56-9.) Defendant also offers statements made by HAN's employees stating that the primary reason customers leave HAN is because of content. (*See, e.g.*, Robinson Email, Doc. 56-6 at PageID 1232–33.)

This evidence is countered by testimony from HAN's witnesses. Lisa Grippo, former Vice President of Sales for HAN, testified that in her experience, cancelling practices did not always give all the reasons they switched services. (Grippo Dep. 10, 136–37, Doc. 80 at PageID

---

[5] The Court need not rule on the admissibility of these documents for purposes of the parties' motions for summary judgment. While the documents appear to meet the standard of the Federal Rule of Evidence 803(6) business records exception, the statements of customers contained within the document are likely inadmissible hearsay and do not meet any exception to the extent such customer statements are being offered for the truth of the matter asserted (e.g., the reason the practice switched from Context to HAN). However, given that these documents are voluminous and contain many hearsay statements, it is impossible for the Court to make a generalized ruling as to the admissibility of these documents in their entirety at this point in the litigation. The Court expects this issue will be more fully addressed at trial and in pre-trial briefing.

4506, 4632–33.)  For example, practices would give one HAN team one reason, and her team another reason for their switch.  (*Id*. at 136, PageID 4632.)  Sometimes, the practice representative would say he or she did not want confrontation and would give the answer he or she thought would be easiest for HAN to hear.  (*Id*. at 136–137, PageID 4632–33.)   Smith testified that it is her understanding that the reasons listed in comments of HAN's spreadsheet may just be one of many reasons a practice switches, and that the practice may give an incomplete answer or omit information that could be responsive.  (Smith Dep. 185–186, Doc. 69 at PageID 2808–09.)  Thus, even if the disputed records were entered into evidence, Plaintiff has provided enough evidence to demonstrate a material dispute of fact exists.

Given the numerous disputes of material fact, only some of which have been highlighted by the Court, neither Defendant nor Plaintiff is entitled to summary judgment on HAN's unfair competition claim.

### B.     ODTPA

Because summary judgment is inappropriate for either party on HAN's unfair competition claim, summary judgment is also inappropriate for either party on HAN's ODTPA claim.  *See HER, Inc. v. RE/MAX First Choice, LLC,* 468 F. Supp. 2d 964, 979 (S.D. Ohio 2007) ("[A]n analysis appropriate for a determination of liability under section 43(a) of the Lanham Act is also appropriate for determining liability under the Ohio Deceptive Trade Practices Act." (citing *Worthington Foods, Inc. v. Kellogg Co.,* 732 F. Supp. 1417, 1431 (S.D. Ohio 1990)).

### C.     Tortious Interference with Contract

The five elements of a claim for tortious interference with contract are (1) the existence of a contract, (2) the wrongdoer's knowledge of the contract, (3) the wrongdoer's intentional procurement of the contract's breach, (4) lack of justification, and (5) resulting damages.  *Reali,*

*Giampetro & Scott v. Soc. Nat'l Bank*, 729 N.E.2d 1259, 1263 (Ohio App. 1999) (citing *Kenty v.*

*Transamerica Premium Ins. Co*., 650 N.E.2d 863, 866–67 (Ohio 1995)).  To reiterate, the Court

does not intend to narrow the disputes of fact relevant to this claim.  However, as highlighted

*supra*, there are genuine issues of material fact as to whether HAN entered into contracts with

the practices it alleges switched to Context's services and whether Context had knowledge of

those contracts.  Summary judgment for either Defendant or Plaintiff is therefore inappropriate.

### D. Misappropriation of Trade Secrets

Plaintiff alleges its computer processing unit and hard drive ("CPU"), which it installs for

its practices to deliver its health-related educational content to display at physician waiting

rooms, contains trade secret information, including:

> an archive of broadcast content drawn from all of HAN's networks, modified
> executable files, a customized version of Windows XP, and source code refined
> over several years by HAN engineers to optimize playback and execution of the
> company's content using various models of CPUs and monitors[,] [. . .] HAN's
> Kiosk Change Management System, a proprietary method for deploying
> installers, scripts, and other downloadable content to HAN's CPUs in the field.

(Second Amended Complaint, Doc. 40 at PageID 321, ¶ 91.)  HAN claims the "scripts, software

modifications, methods and other HAN Confidential Information are proprietary and confidential

to HAN and constitute protectable trade secrets."[6]  (*Id*. at PageID 321, ¶ 92.)

In order to prevail on a misappropriation of trade secret claim, the plaintiff must show by

a preponderance of the evidence: (1) the existence of a trade secret, (2) the acquisition of a trade

secret as a result of a confidential relationship, and (3) the unauthorized use of a trade secret.

*Hoover Transp. Serv., Inc. v. Frye,* 77 F. App'x 776, 782 (6th Cir. 2003) (citing *GTI Corp. v.*

---

[6]     It is not clear to the Court whether the archive of broadcast content drawn from HAN's networks is part of
the "scripts, software, modifications, and methods" HAN claims are trade secrets.

*Calhoon*, 309 F. Supp. 762, 767 (S.D. Ohio 1969)).  A "trade secret" under Ohio law is defined as:

> information, including the whole or any portion or phase of any scientific or technical information, design, process, procedure, formula, pattern, compilation, program, device, method, technique, or improvement, or any business information or plans, financial information, or listing of names, addresses, or telephone numbers, that satisfies both of the following: (1) It derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use. (2) It is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

*Id.* (citing Ohio Rev. Code § 1333.61(D)).[7]  "The question of whether something is a trade secret is a question of fact to be determined by the trier of fact upon the greater weight of the evidence."  *Id.* (citing *Valco Cincinnati, Inc. v. N & D Machining Serv., Inc.*, 492 N.E.2d 814, 819 (1986)).

The Sixth Circuit has held that "except where the evidentiary showing of reasonable efforts could not conceivably support a judgment in favor of the plaintiff, the reasonableness of the efforts [to maintain secrecy] is a question for the trier of fact."  *Niemi v. NHK Spring Co., Ltd.*, 543 F.3d 294, 303 (6th Cir. 2008).  There are several questions of fact, some of which the Court highlights below, regarding whether the steps Plaintiff took to protect its alleged trade secrets were reasonable.

---

[7]    The Ohio Supreme Court has adopted a six-factor test to determine the existence of a trade secret, the factors of which are: "(1) [t]he extent to which the information is known outside the business; (2) the extent to which it is known to those inside the business, *i.e.*, by the employees; (3) the precautions taken by the holder of the trade secret to guard the secrecy of the information; (4) the savings effected and the value to the holder in having the information as against competitors; (5) the amount of effort or money expended in obtaining and developing the information; and (6) the amount of time and expense it would take for others to acquire and duplicate the information."  *State ex rel. The Plain Dealer v. Ohio Dep't of Ins.,* 687 N.E.2d 661, 672 (Ohio 1997) (citing *Pyromatics, Inc. v. Petruziello*, 454 N.E.2d 588, 592 (Ohio App. 1983)).

The language of HAN's enrollment agreement[8] states:

> HAN offers the Practice use of the System under the terms set forth in this Agreement. All System equipment and content shall remain the property of HAN or its licensors.
> [ . . . ]
> Practice will use reasonable care to protect System from vandalism, tampering, theft or other hazards.
> [ . . . ]
> (2) System Access. HAN shall permit Practice registered contacts online access to the System to order new materials, manage Practice Content, access educational information and other purposes. All such individuals accessing the System must register by providing an e-mail address and password. The Practice shall be responsible for the activities of all such individuals accessing the System including, without limitation, those related to Practice Content. The Practice shall promptly inform HAN when access by any doctor or employee should be restricted or terminated (e.g., terminating access for former employees, change of administrator, etc.). The Practice agrees to notify HAN immediately of any breach of security or unauthorized access to the System.

(Ex. A to Complaint, Doc. 1-1 at PageID 15–16.) HAN's "System" is defined as "our award-winning patient-education program." (*Id*.) The language of the enrollment agreement raises questions of fact as to whether the "System" includes Plaintiff's alleged trade secrets and whether this provision adequately protects the confidentiality of those alleged trade secrets.[9]

HAN has also offered other evidence of steps it has taken to protect its alleged trade secrets, including requiring that nearly all employees sign agreements containing confidentiality clauses and restrictive covenants and that departing employees return all proprietary information to HAN upon termination of employment. (HAN Response to Third Set of Interrogatories, Doc. 88-15 at PageID 6337.) HAN maintains its servers and home office technology in secure facilities, with limited access to others. (*Id.*) It also maintains its scripts, codes, and other

---

[8] As discussed *supra*, there is a question of fact as to whether HAN required each of its practices to enter into a contract.

[9] It is unclear to the Court whether the CPU software contains the "system," or if it simply facilitates access to the "system" over the internet via a password protected login.

13

technical information in electronic format and in proprietary databases which are username and password protected. (*Id.*) In addition, it has confidentiality agreements with its third party vendors. (Vendor Agreements, Doc. 88-58 at PageID 6464–72.)

On the other hand, HAN admits patients at physician offices were not subject to non-disclosure agreements before viewing its broadcast content. (Context SOF, Doc. 56-1 at PageID 1188, ¶ 153.) In addition, HAN witnesses testified that some hardware of certain models of its CPUs have been determined to be "obsolete," and if a cancelling practice was okay with keeping an obsolete CPU and using it however they would like, HAN sometimes leaves the CPU with the practice. (Lawrence Dep. 53, Doc. 66 at PageID 2210.) HAN employees testified that CPUs are left at practices after they cancelled service for a variety of reasons and purposes, including to salvage, to play the HAN loop over and over again without receiving updated content despite severing its relationship with HAN, or to donate to schools or elsewhere. (CM SOF, Doc. 56-1 at PageID 1186, ¶¶ 140, 141, 144.)

This evidence demonstrates there is a question of fact as to whether Plaintiff's steps to protect its trade secrets were reasonable, including whether Plaintiff's abandonment of certain CPUs was without any obligation to protect the confidentiality of that information. While Plaintiff's evidentiary showing is not particularly strong, Plaintiff has demonstrated enough evidence that could conceivably support a judgment in its favor. Accordingly, Context is not entitled to summary judgment on this claim.

### E. Conversion

Defendant argues the Court should decline exercising supplemental jurisdiction over HAN's conversion claim if its motion for summary judgment on the other claims is granted.

This argument is moot. Accordingly, Defendant is not entitled to summary judgment on HAN's conversion claim.

**IV.    CONCLUSION**

The Court, having reviewed the parties' pleadings and in accordance with the reasons stated herein, **DENIES** Defendant's motion for summary judgment (Doc. 53) and Plaintiff's cross-motion for partial summary judgment (Doc. 84).

IT IS SO ORDERED.

S/Susan J. Dlott
Chief Judge Susan J. Dlott
United States District Court

15