UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF OHIO

- - -

HEALTHY ADVICE NETWORKS, :
LLC,                      :
     Plaintiff,          :
     vs.                 : CASE NO.1:12-cv-00610
                         :
CONTEXTMEDIA, INC.,       :
     Defendant.          :

- - -

Deposition of KEVIN ARST, a witness herein, taken by the plaintiff as upon cross-examination, pursuant to the Federal Rules of Civil Procedure and pursuant to agreement by counsel as to the time and place and stipulations hereinafter set forth, at the offices of Frost Brown Todd, 3300 Great American Tower, 301 East Fourth Street, Cincinnati, Ohio, at 9:20 a.m. on Friday, August 15, 2014, before M. Sue Lopreato, RMR, CRR and Notary Public within and for the State of Ohio.

- - -

```
 1   APPEARANCES:

 2           On behalf of the plaintiff:

 3               GRANT S. COWAN, ESQ.
                 Frost Brown Todd, LLC
 4               3300 Great American Tower
                 301 East Fourth Street
 5               Cincinnati, Ohio  45202

 6

 7           On behalf of the defendant:

 8               THOMAS F. HANKINSON, ESQ.
                 Keating Muething & Klekamp, PLL
 9               One East Fourth Street
                 Suite 1400
10               Cincinnati, Ohio  45202

11

12                       - - -

13

14

15

16

17

18

19

20

21

22

23

24
```

1            S T I P U L A T I O N S

2                    It is stipulated by counsel for the

3    respective parties that the deposition of

4    KEVIN ARST, a witness herein, may be taken at this

5    time by the plaintiff as upon cross-examination

6    and pursuant to the Federal Rules of Civil

7    Procedure, all other legal formalities

8    being waived by agreement; that the

9    deposition may be taken in stenotypy by the

10   Notary Public-Court Reporter and transcribed

11   by her out of the presence of the witness;

12   that the transcribed deposition was

13   submitted to the witness for examination

14   and signature and that signature may be

15   affixed out of the presence of the Notary

16   Public-Court Reporter.

17                    - - -

18

19

20

21

22

23

24

```
 1                    I N D E X

 2

 3  BY MR. COWAN:                      PAGE

 4      Cross                           5

 5

 6

 7                  EXHIBITS

 8

 9  Exhibit                          Marked

10  Plaintiff's 1                       6

11  Plaintiff's 2                      24

12  Plaintiff's 3                      25

13  Plaintiff's 4                      25

14  Plaintiff's 5                      72

15  Plaintiff's 6                     113

16  Plaintiff's 7                     133

17  Plaintiff's 8                     134

18  Plaintiff's 9                     135

19  Plaintiff's 10                    151

20  Plaintiff's 11                    190

21  Plaintiff's 12                    191

22  Plaintiff's 13                    202

23                  -   -   -

24
```

1                    KEVIN ARST

2    of lawful age, a witness herein, being first

3    duly sworn, as hereinafter certified, was

4    examined and deposed as follows:

5                    CROSS-EXAMINATION

6    BY MR. COWAN:

7         Q.    Good morning.  Could you state

8    your name.

9         A.    My name is Kevin Arst.

10        Q.    Mr. Arst, my name is Grant

11   Cowan.  We introduced a minute ago.  As you

12   know, I'm one of the attorneys representing

13   Healthy Advice in this lawsuit against

14   ContextMedia.  I'm here to take your

15   deposition today.  I assume you've been

16   deposed before?

17        A.    Yes.

18        Q.    On a number of occasions?

19        A.    Yes.

20        Q.    Do you have a pretty good

21   understanding of the basic rules?

22        A.    I do.

23        Q.    What were you engaged to do in

24   this case?

1          A.    I'll refer you to my expert

2    report on page 1, Section 3.  I detailed my

3    assignment as being 284 Partners has been

4    retained in order to provide opinions

5    regarding the issue of damages in this

6    lawsuit.

7               I was also asked to review and

8    assess the claims of HAN for monetary damages

9    as advanced by Dr. Wilner.

10         Q.    Let's go ahead.  You brought a

11   copy of your report?

12         A.    I did, along with some of the

13   other supporting materials.

14              MR. COWAN:  Okay.  Let's go

15   ahead and, for the record, I'm going to mark

16   a copy of your report.

17              (Plaintiff's Exhibit No. 1

18              was marked for identification.)

19         Q.    Feel free to refer to the one

20   you brought, if you prefer.  I just want to

21   make sure we have a copy for the record, a

22   copy of your report.

23         A.    That makes sense.

24         Q.    Just if you could, review

1    Exhibit 1 to see if it appears to be a true

2    and accurate copy of your report, and then

3    you can put it aside and refer to your own.

4           A.    It does appear to be a copy of

5    my report.  I do note my report, I believe,

6    was prepared in color and also on

7    single-sided, but otherwise, it looks to be

8    the same.

9           Q.    Okay.  So refer me again on

10   page 3 of your report to where your report

11   describes your engagement.

12          A.    I'm sorry.  Section 3 on page 1.

13          Q.    Okay.  That's what was confusing

14   to me.  Section 3, page 1?

15          A.    It's at the bottom of the page

16   there.

17          Q.    Right.  Were you engaged to do

18   anything else, other than what is reflected

19   in Section 3?

20          A.    That represents, I think, a fair

21   statement regarding my engagement.

22          Q.    What do you believe qualifies

23   you to be an expert on the issues involved in

24   this case, at least those upon which you are

1    going to provide expert testimony?

2              MR. HANKINSON:   Objection.

3    Form.

4         A.    I'll refer you to Appendix A of

5    my report.  It's part of Exhibit 1, which

6    provides a detail of my professional

7    experience, education, and certifications.

8              I've been engaged professionally

9    in valuation as a professional who assesses

10   commercial damages in the context of civil

11   disputes for roughly 15 years now.

12             I'm a certified public

13   accountant licensed in the State of

14   California.  I'm certified in financial

15   forensics by the AICPA.  I'm a certified

16   licensing professional by the LES, which is

17   an Intellectual Property Trade Association

18   that deals with intellectual property

19   licensing and valuation issues.

20             I've authored articles about

21   valuation and damages related issues.  I've

22   taught courses, or at least lectured as a

23   guest in a university setting about damages

24   related issues.

1        In all, I think I've likely

2   consulted on well over a hundred, probably

3   over 200 matters, including other cases with

4   similar fact patterns as this one.  Does that

5   provide a fair summary for you?

6        Q.    It does.  Have you ever been

7   engaged by either of the two law firms that

8   are representing ContextMedia in this case

9   prior to this engagement?

10       A.    Yes, with respect to Sidley

11  Austin.  I don't recall with respect to KMK.

12  I don't have a perfect recollection of all

13  the various law firms that have been involved

14  in the cases that I've worked on in the

15  course of my career.

16       Q.    What cases do you recall having

17  been engaged on by Sidley Austin?

18       A.    Our standard engagement letter,

19  and the engagement letters of firms that I've

20  worked for before, 284 Partners requires that

21  I keep in confidence matters that are not

22  publicly available.

23            I can recall certain

24  engagements, including some in which I've

1   provided testimony, and I can refer you to my

2   CV for those.

3           But there are other matters in

4   which I'm not going to be able to disclose

5   the parties, but perhaps I could provide a

6   general background about some of the issues

7   in those cases, if that would be of interest

8   to you.

9           Q.    It would be helpful.

10          A.    Okay.  Well, let's start with,

11  if it's all right with you, the cases on my

12  CV in which I've provided oral testimony.

13          Q.    Right.

14          A.    I'm on page 4 of my CD, fourth

15  page down, Prism Technologies, LLC, versus

16  United States Cellular Corporation.

17          Q.    You testified on behalf of

18  U.S. Cellular?

19          A.    That's correct.  Just so we're

20  on the same page, my last answer was

21  incomplete, though.  I was going to keep

22  working down the list.

23          Q.    Okay.  I assume that you were

24  starting here and going to keep working down.

 1          A.    Yes.

 2          Q.    Why don't we go through, and

 3    I'll just check off the cases that are on

 4    page 4 of your CV, where you were engaged by

 5    Sidley Austin.

 6          A.    Sure.  More of the companies

 7    that Sidley Austin represents, but the --

 8          Q.    Fair enough.

 9          A.    -- United States Cellular

10    Corporation matter, the Ibbotson Associates

11    and Morningstar matter, The Home Depot

12    matter, the Delta Airlines matter, and the

13    Competitive Edge matter, and the Ethicon

14    Endo-Surgery matter.

15               There are two Ethicon

16    Endo-Surgery matters, the Covidien case and

17    the Crescendo Technologies case.  I'm talking

18    about the Crescendo Technologies case.  In

19    fact, I believe your firm was local counsel

20    on the Ethicon Endo-Surgery versus Covidien

21    matter.

22               And that's a subset of my

23    experience.  Those are cases in which I

24    provided oral testimony.  There are other

 1   cases in which I was retained to provide

 2   consulting services, or perhaps where I was

 3   retained to potentially provide expert

 4   testimony, and the cases didn't evolve in

 5   that direction and/or I had served as a

 6   consulting expert.

 7        Q.    And again, those are -- we're

 8   focusing on cases where you were engaged by

 9   the Sidley Austin firm on behalf of their

10   client?

11        A.    Sometimes engagement letters are

12   structured as the law firm is engaging the

13   consultant on behalf of the corporate client.

14   Sometimes they're structured as the corporate

15   client is retaining.

16             I don't recall precisely, but in

17   substance, those were matters in which Sidley

18   Austin had some involvement.

19        Q.    Exactly.  Thanks.  And how many

20   of those matters are we talking about?

21        A.    I don't understand the question.

22        Q.    So I think we've identified, on

23   pages 4 and 5 of your CV, engagements

24   involving Sidley Austin where it actually

1    resulted in a lawsuit and you gave testimony.

2    Is that fair?

3          A.    That's all that's reflected on

4    my CV.

5          Q.    Right.   Then I thought -- and

6    maybe I just misunderstood you.   I thought

7    that in addition to what's reflected on your

8    CV, there had been other engagements

9    involving Sidley Austin where you served a

10   role either as a consultant, or a consultant

11   with the idea of possibly becoming an expert,

12   but you ended up not giving expert testimony;

13   is that correct?

14         A.    That's fair.

15         Q.    And with respect to that

16   category that we just described,

17   approximately how many of those engagements

18   were there?

19         A.    I don't know precisely.   I would

20   expect the number of matters in which I've

21   consulted that involved Sidley Austin is

22   roughly 15 matters or so.   I just don't

23   recall precisely.

24         Q.    Other than this case, "this

1    case" being the ContextMedia case, have you

2    been involved in any other cases where

3    Mr. O'Brien, Richard O'Brien, was the lead

4    counsel?

5          A.    It's not always clear to me what

6    roles different counsel play on the

7    engagement teams, so I don't know.

8          Q.    Had you had any prior engagement

9    where you interacted with Mr. O'Brien prior

10   to the ContextMedia case?

11         A.    I interacted with Mr. O'Brien on

12   several cases.  I don't recall what his role

13   might have been in those cases, in addition

14   to this case.

15         Q.    Do you recall if those cases

16   involved Lanham Act false advertising claims?

17         A.    Not to my recollection, meaning

18   I don't believe that they did.

19         Q.    Earlier you indicated, I think,

20   that you had been engaged or been involved in

21   some hundred, possibly 200 legal matters,

22   some involving similar fact patterns as this

23   case.  Give me a few examples.

24         A.    Sure.  I'm recalling a case

1    involving Bulk Containers, which was a Lanham

2    Act case involving alleged false advertising.

3                    I've worked on a series of other

4    false advertising cases, including the

5    Honeywell versus ICM Controls matter, which

6    is a false advertising case.

7                    I've also worked on other cases

8    involving other forms of intellectual

9    property where the measures of monetary

10   relief that are available are similar like

11   Lanham Act; for example, copyright cases.

12                    And so I think that those cases

13   do have some relevance with respect to my

14   opinions here.

15        Q.    The case involving the Bulk

16   Containers, who was your client?

17        A.    That's not a matter that is --

18   my involvement isn't a matter of public

19   record, so I don't believe I'm at liberty to

20   disclose that to you.

21        Q.    And when you say your

22   involvement is not a matter of public record,

23   does that mean that you were engaged to

24   consult but not necessarily render expert

1    testimony that would be publicly disclosed?

2         A.    That's fair.  I did not render

3    any public testimony.

4         Q.    Were you engaged by the

5    plaintiff or the defendant in the Bulk

6    Container case?

7         A.    If memory serves, there were

8    claims going both ways in that case.  So I

9    think there was a counterclaim.  I believe

10   they were the defendant in the original suit.

11        Q.    And are you permitted to give me

12   a general description of the facts in that

13   case, or would that be contrary to your

14   engagement limitations?

15        A.    My general understanding is that

16   I'm not permitted under our engagement

17   letters to disclose facts related to

18   engagements that are not a matter of public

19   record.

20             So I think I could -- are you

21   interested in understanding the facts about

22   that particular engagement, or are you

23   interested in understanding the nature of my

24   opinions about damages?

1          Q.     Probably both.  But I don't want

2     to get you edgewise with any contractual

3     obligations you have, or ethical obligations

4     you have.

5               Let me ask you this:  Can you

6     tell me whether or not the case involving

7     Bulk Containers involved allegations of

8     literally false statements made by one of the

9     parties?

10          A.     I don't recall that.

11          Q.     The Honeywell case, that's a

12     case that presumably is available online.

13     What can you tell me about your involvement

14     in the Honeywell case?

15          A.     I was retained by ICM Controls

16     and testified on issues related to damages.

17     That is a case that is pending right now in

18     the United States District Court, District of

19     Minnesota, scheduled for trial, I believe in

20     January of next year.

21          Q.     Did you give a deposition in

22     that case?

23          A.     I did.

24          Q.     And did any of your opinions in

1    that case involve issues relating to

2    literally false statements?

3         A.    I don't recall.

4         Q.    What do you recall being the

5    focus of your opinions in that case?

6         A.    Damages related issues.

7         Q.    And what types of claims?

8         A.    That case has three utility

9    patents at issue.  There were claims of false

10   advertising, false designation of origin,

11   copyright infringement.  And I provided

12   opinions on damages related to each of those

13   forms of intellectual property.

14        Q.    Do you recall the nature of the

15   false advertising claims?

16        A.    I do recall there were some

17   claims with respect to whether a product was

18   made in the USA.  I believe that's a matter

19   of public record.

20        Q.    Did any of your opinions go to

21   the issue of causation?

22        A.    Yes.

23        Q.    How so?

24        A.    All consistent with my opinions

1   in this matter.  I think it's important to

2   evaluate causation related issues when

3   determining damages and considering lost

4   profits, and also when considering profit

5   disgorgement remedies, including the portion

6   of profits that are attributable to the

7   alleged wrongful conjunct, vis-a-vis other

8   contributions that the defendant may have

9   made to the product of that issue.

10                  And as part of that, I typically

11  evaluate issues related to causation,

12  including drivers of demand alternatives,

13  capacity, and so forth.

14      Q.   Have you ever testified for a

15  plaintiff in a case involving claims of false

16  advertising?

17      A.   If we're limiting it to cases in

18  which I provided oral testimony, no.

19      Q.   Have you ever provided oral

20  testimony on behalf of a defendant in a case

21  where the defendant was accused of making

22  literally false statements to a customer?

23      A.   I don't recall all the matters

24  that I've consulted on over the course of my

1    career.  I do note that the ICM Controls,

2    Honeywell matter had an element of false

3    advertising.  I don't recall whether there

4    were allegations of literal falsehood.

5              So that's one potential that I

6    would have to investigate; otherwise, I don't

7    think I have provided oral testimony.

8         Q.   In the Honeywell case, do you

9    recall whether you considered, in formulating

10   any of your opinions, any database record of

11   customer comments?

12        A.   I don't recall.  I do recall

13   considering evidence related to the reasons

14   why folks were procuring the accused

15   products.  I don't recall whether that was

16   provided in a database or another form.

17        Q.   Have you ever provided oral

18   testimony as an expert in a case involving

19   claims of tortious interference with

20   contract?

21        A.   That's, in my experience,

22   frequently plead.  I would expect that I

23   have.  I listed on my CV here the primary

24   cause of action, not each cause of action, so

Page 21

1    I would need to investigate that further.

2    Would it be all right if I grabbed some more

3    coffee?

4              MR. COWAN:  Sure.  Absolutely.

5    You can stop me any time.

6              (Brief recess.)

7         Q.   On page 1 of your report,

8    Section 1, the last full paragraph under

9    Section 1, you say, "I have provided expert

10   testimony regarding IP infringement damages

11   and valuation issues in federal and state

12   court proceedings."  Do you see that?

13        A.   Yes.

14        Q.   Do you consider a Lanham Act

15   claim for damages to be included with what

16   you referred to as IP infringement damages?

17        A.   I was -- technically, I suppose,

18   IP infringement is not necessarily a Lanham

19   Act, but the limitation in that sentence of

20   IP infringement damages we could remove to

21   revise that sentence to say I provided expert

22   testimony regarding damages and valuation

23   issues, which I think then would include

24   Lanham Act matters.

1        Q.    Fair enough.  Because I think,

2   in the course of some of the preceding

3   questions, you indicated that you had been

4   involved in cases involving Lanham Act

5   claims?

6        A.    Yes.

7        Q.    At least in terms of how you use

8   the phrase IP infringement damages, at least

9   how you use it, would you agree that this

10  case does not involve our case contacts,

11  meaning this case does not involve claims of

12  IP infringement?

13            MR. HANKINSON:  Objection.

14       Q.    Let me strike that.  We may be

15  just playing semantics, but I just want to

16  make sure I understand when you use a phrase.

17            Is it fair to say that you do

18  not consider a Lanham Act false advertising

19  claim to be a claim for IP infringement

20  damages?

21            MR. HANKINSON:  Objection.

22       A.    My understanding is that the

23  Lanham Act broadly covers trademark matters,

24  and so we could include trademark

1    infringement.  The way I think about it is

2    damages, is really that there are two major

3    categories of damages that are available in

4    most IP disputes, including Lanham Act, which

5    are lost profits and profit disgorgement.

6              And on the profit disgorgement

7    side, you've got copyright, Lanham Act, trade

8    secret cases.  Those all, in my mind, fit

9    together.  And then on the lost profit side,

10   you got those, plus utility patent

11   infringement, design patent.  There's a

12   disgorgement remedy available.  So that's the

13   way I think about it.

14             In this case, I believe there's

15   also some trade secrets that are at issue.

16   So it's a case in which there's disgorgement

17   remedies potentially available, as well as

18   lost profits.

19        Q.    In terms of the -- flipping back

20   to your CV.  In terms of the publications

21   that you identify, are there any publications

22   listed on page 3 flowing over to page 4 that

23   you consider to be applicable or relevant to

24   the issues in this case?

1              Tell you what, you'd probably be

2    better off using your version because that

3    staple's going to come out.

4         A.    I regrettably did not bring my

5    CV.

6         Q.    Okay.

7         A.    "Bubbles and Squeaks:

8    'Irrational Exuberance' and Its Impact (or

9    lack thereof) on Damages Under the Lanham Act

10   in the Dot.Com Era" is an article that I

11   authored in the "Trademark Reporter" that

12   related to damages for Lanham Act under the

13   Lanham Act.  That's the one I think would be

14   most applicable.

15             (Plaintiff's Exhibit No. 2

16             was marked for identification.)

17        Q.    Handing you Plaintiff's

18   Exhibit 2.  Does that appear to be a copy of

19   the "Bubble and Squeaks" article?

20        A.    Yes.

21        Q.    I'm just going to mark a couple

22   of exhibits and have you identify them.  I'm

23   not going to spend a lot of time on them.

24

1            (Plaintiff's Exhibit No. 3

2            was marked for identification.)

3       Q.    Is Plaintiff's Exhibit 3 the

4   engagement letter between 284 Partners and

5   KMK on behalf of ContextMedia?

6       A.    Yes.

7       Q.    Were you initially involved in

8   this case to consult?

9       A.    That's my understanding, yes.

10      Q.    And that at some point in time,

11  it was determined that you would become a

12  testifying expert?

13      A.    That's generally consistent with

14  my understanding, yes.

15            (Plaintiff's Exhibit No. 4

16            was marked for identification.)

17      Q.    And Plaintiff's Exhibit 4, is

18  this just copies of some communications

19  between you and counsel, along with invoices?

20      A.    Could you please repeat the

21  question back, or have it read back?

22            MR. COWAN:  Sue, could you read

23  it, please.

24    (The record was read by the court reporter.)

1          A.     That's fair.

2          Q.     Put that one away.  On page 2 of

3    your report, you reference some production

4    documents that you, or at least your

5    colleagues at 284 Partners reviewed.  Do you

6    see that?

7          A.     Yes.

8          Q.     What financial and accounting

9    records were reviewed?

10         A.     There are profit and loss

11   statements that were relied upon by

12   Dr. Wilner and by me in order to determine

13   the costs associated with the services at

14   issue in this litigation.  I could find some

15   Bates numbers for you, if you'd like.

16         Q.     That's fine.  Is that a pretty

17   good summary of what those are or were that

18   you reviewed?

19         A.     That's -- it would include those

20   documents.  There may be others.

21         Q.     The customer databases, what

22   customer databases did you review?

23         A.     Well, there was a database

24   that's been termed the CMS database, and I

1  talked a little bit about that in footnote

2  one.  It relates to the practice enrollment

3  decisions and HAN's accounting of those

4  decisions.

5       Q.    Any other customer databases

6  that you reviewed in this case?

7       A.    That's the one that I relied

8  upon.  If memory serves, there was another

9  database that was characterized as a tracking

10  spreadsheet.  Those are the two that are

11  coming to mind.  There may be others, again,

12  and I could flip through my report if you'd

13  like me to try to identify others that would

14  fit under that category.

15       Q.    The two that you identified,

16  those were HAN produced documents, correct?

17       A.    Yes.

18       Q.    Did you review any ContextMedia

19  databases, customer databases?

20       A.    I don't recall reviewing any

21  ContextMedia databases.

22       Q.    Do you know if anybody else at

23  284 Partners did?

24       A.    Not to my knowledge.  I provided

Page 28

1  a complete listing of the Bates numbers of

2  documents that I reviewed in connection with

3  this report, and I believe it's in appendix

4  or exhibit -- I could find that for you.  And

5  to be sure, we could reference that.

6       Q.    Why don't we just pull it out,

7  because there's an Appendix B.

8       A.    That's what I had in mind.

9       Q.    What is Appendix B, at least as

10 you would describe it?

11      A.    This is a document index that

12 relates to -- I wanted to provide a

13 disclosure of the documents that I reviewed

14 and relied upon for the purposes of writing

15 my report.

16      Q.    In terms of marketing materials,

17 what marketing materials do you recall

18 reviewing?

19      A.    I'm recalling collateral related

20 to the products at issue.

21      Q.    Would that be Context

22 collateral?

23      A.    I reviewed information about

24 both products in order to try to understand

1    the nature of the products that were at issue

2    in the case.

3         Q.    And part of my confusion is I

4    want to make sure I understand Appendix B,

5    because Appendix B, as I read it, just

6    identifies HAN produced documents.

7         A.    If you'd look to the next page

8    there.  I've got a listing of Context

9    documents.

10        Q.    Got it.  All right.

11        A.    And then if you'd flip to the

12   last page beyond that, I've got deposition

13   transcripts, and the exhibits associated with

14   those depositions.

15        Q.    Exactly.  Thanks.

16        A.    And also I've got -- if you flip

17   to the next page, there's some other

18   references, some publicly available

19   information.

20        Q.    So if you'd look at the page

21   that has some ContextMedia documents, it

22   says, "ContextMedia database 2012-member DB."

23   Do you know what that is?

24        A.    If memory serves, that related

Page 30

1    to the nature of practices that were

2    converted from ContextMedia to HAN -- excuse

3    me.  From HAN to ContextMedia, and that there

4    was some differences between HAN's accounting

5    of those practices and its CMS database, and

6    ContextMedia's accounting of those.

7              And for purposes of my report, I

8    relied upon HAN's accounting of those because

9    that was the database that Dr. Wilner relied

10   upon, and I wanted to try to use a similar

11   framework for purposes of my analysis so that

12   we were on the same page.

13        Q.    Why do you say that Dr. Wilner

14   relied upon that database, the HAN database?

15        A.    Because if memory serves, his

16   report indicates that he did so, and that's

17   consistent with my understanding.

18        Q.    Do you have a copy of his

19   report?

20        A.    Yes.  And I have reference in

21   footnote one, page 7 of Dr. Wilner's report,

22   where he's referencing those same documents.

23        Q.    Could you go ahead and just

24   describe for me in his report where he

1  references that and how so?

2        A.    I refer you to page 7 of his

3  report, footnotes 13 and 14.

4        Q.    Go ahead.

5        A.    Do you want me to read them, or

6  do you just want to --

7        Q.    Yes, just read them.

8        A.    He says, "My understanding is

9  that PatientPoint uses the information it

10  collects to assign standard reason codes to

11  practices that left PatientPoint, and

12  includes those reason codes in preparing

13  periodic analyses of terms and practices.

14  For term metrics prepared by PatientPoint,

15  see HAN 004743 to 46, HAN 006135, HAN 005747,

16  HAN 006138.

17            "It's my understanding that

18  ContextMedia has a different list of

19  physician practices that converted from

20  PatientPoint to ContextMedia.

21            "I also understand the parties

22  to the suit could in the future stipulate to

23  the practices that convert it.  As a result,

24  I reserve my right to update the list of

1    practices in the future.  This update would

2    not alter my overall methodology, only the

3    imports."

4          Q.    Is it your understanding that

5    Dr. Wilner relied upon any of the customer

6    comments in the HAN database in formulating

7    any of his opinions?

8                MR. HANKINSON:  Objection.

9          A.    My understanding is that he did.

10         Q.    Go ahead.  What's the basis for

11   that?

12         A.    In order -- well, that's my

13   understanding of how he defined the universe,

14   so to speak, of practices that converted from

15   HAN to ContextMedia, and that forms the basis

16   of his calculation of lost profits and unjust

17   enrichment damages in part.

18         Q.    Do you draw any distinction

19   between trying to determine which practices

20   simply switched from HAN to Context, and

21   trying to determine why they did?

22         A.    I don't understand the question

23   that you're asking me.

24         Q.    Do you understand that the

1    parties have attempted to come up with a list

2    of practices that we all agree switched from

3    HAN to Context?

4         A.    I understand that the parties

5    have differing views about that.  I don't

6    know the degree to which the parties have

7    come together to try to reach an accord about

8    that.

9         Q.    Okay.  And so what I'm trying to

10   understand is in your mind, is there a

11   distinction between trying to determine just

12   the number of practices that switched, and

13   trying to determine the reasons why the

14   practices switched?

15        A.    For what purpose?

16        Q.    For any purpose.

17              MR. HANKINSON:  Objection to

18   form.

19        A.    I don't understand the question

20   that you're asking me.

21        Q.    So you don't understand there to

22   be a distinction between trying to come up

23   with a number of practices that switched and

24   worked on to try to determine why they may

1   have switched?

2        A.    I understand that there's

3   practices that switched, and then there are

4   reasons why those practices switched, and

5   that's part of the issue that we're

6   navigating in this case.

7        Q.    And do you know whether

8   Dr. Wilner relied upon any of the commentary

9   in the HAN database regarding reasons for --

10  reasons given by practices as to switching

11  and formulating any of his opinions?

12            MR. HANKINSON:  Objection.

13       A.    He has referenced those comments

14  in his reports, so I do think he's considered

15  those, yes.

16       Q.    Where did he reference those in

17  his report?

18       A.    Do you have his second report

19  here?

20       Q.    Oh, his secondary report?

21       A.    Yes.

22       Q.    Well, your report only

23  considered his initial report?

24       A.    My report was exchanged

1   subsequent to his first report but before his

2   second report.

3          Q.    Right.  So in terms of his first

4   report, did he reference considering any of

5   the comments in a database?

6          A.    I'd have to flip through his

7   reporting, and I haven't committed it to

8   memory.

9          Q.    Okay.  In terms of customer

10  correspondence, back on page 2 of your

11  report -- so you can put Dr. Wilner's report

12  away for a moment.

13             Going back to your report,

14  customer correspondence, what customer

15  correspondence was referred to?

16         A.    I recall, in the record of this

17  case, that there were -- there was evidence

18  related to communications with practices.

19         Q.    Did you review any

20  correspondence, e-mails or letters, between

21  Context and any HAN practices?

22         A.    My research, there were

23  deposition exhibits that related to that.

24         Q.    Do you recall any of those being

1  important to the formation of any of your

2  opinions?

3          MR. HANKINSON:  Objection.

4  Form.

5          A.    Importance is on a continuum.  I

6  think we would need to know relative to what.

7  I thought they were part of the record in the

8  case that I was interested in reviewing, and

9  I did so.

10          They didn't form an input from a

11  quantitative or arithmetic sense into a

12  calculation of profits, but they may be of

13  relevance to a determination of the portion

14  of profits that may be attributable to the

15  alleged wrongful conduct.

16          Q.    On page 3 of your report, you

17  reference discussions you had with Mr. Demas,

18  Mr. Garms, and Mr. Postel from Context.  Do

19  you see that?

20          A.    Yes.

21          Q.    Are all of your discussions with

22  those three gentlemen reflected in your

23  report?

24          A.    I provided footnote references

Page 37

1    for -- in sentences or areas of their report

2    where I relied in part on Mr. Demas,

3    Mr. Garms, and Mr. Postel.

4            So I did attempt to provide a

5    full disclosure of the substance of those

6    conversations insofar as my opinion and

7    report contained here in Exhibit 1.

8        Q.   Was there anything that they

9    told you that did not find its way into your

10   report?

11       A.   I can imagine that there was.  I

12   spoke with Mr. Demas perhaps three or four

13   times, and I'm not recalling anything in

14   particular, but part of what I wanted to do

15   is understand a little bit about the history

16   of the company, the products at issue, the

17   nature of the dispute, and there were other

18   sources of information that was consistent

19   with what Mr. Demas told me.

20           And it's my typical practice to,

21   if there are a couple sources of information,

22   to cite several of them, not necessarily all

23   of them.  I wasn't trying to provide here an

24   exhaustive list of every source for every

Page 38

1    sentence, so -- but I do think I could --

2    that Mr. Demas in particular, our

3    conversations extended beyond just what

4    footnotes may indicate in the report.

5        Q.    Did you take notes of your

6    communications with Mr. Demas?

7        A.    No.

8        Q.    In formulating your opinions in

9    this case, did you make any assumptions as to

10   whether Context made literally false

11   statements to any HAN practices?

12       A.    I made the assumption that

13   liability would be found in HAN's favor for

14   all of HAN's claims.

15       Q.    And why did you do that?

16       A.    That is the standard practice of

17   my peers who evaluate damages in the context

18   of commercial litigation.  One of the

19   predicate assumptions that ought to be made

20   in connection with the damages report is that

21   liability will be found.

22       Q.    In formulating your opinions in

23   this case, did you make any assumptions as to

24   whether Context willfully made any literally

1    false statements?

2              MR. HANKINSON:  Objection.

3         A.    I did not make the assumption

4    that -- related to willfulness.

5         Q.    Did you make any assumptions

6    relating to bad faith?

7              MR. HANKINSON:  Objection.

8         A.    I think I need to take a step

9    back on the willfulness response, as well as

10   bad faith, which is I'm not a legal scholar

11   or expert, and I don't know what are the

12   predicate proofs that need to be made in

13   order to prevail on the various claims that

14   have been asserted by HAN in this case, my --

15   sort of my analysis, with a top level

16   assumption of liability.  And that's really

17   what I assumed.

18              It may be that HAN is pursuing

19   exceptional damages or non-monetary damages.

20   That's really beyond the scope of the opinion

21   that I'm rendering.  Is that responsive to

22   your question?

23        Q.    It is.  But leaving aside any

24   claim for punitive damages, exemplary

1   damages, and leaving aside any claim for

2   non-monetary damages, conjunctive relief, did

3   you make any assumptions as to whether any

4   statements made by Context to HAN practices

5   were literally false and made willfully?

6           MR. HANKINSON:  Objection.

7       A.    Let me answer this in the same

8   way as I did before, which is I made the

9   assumption that liability would be found.  I

10  did not try to tread into willfulness related

11  issues as it relates to non-monetary damages.

12           If willfulness is part of one of

13  the proofs that needs to be made in order to

14  prevail on liability for the other causes of

15  action, then I did insofar as I assumed

16  liability.  But I didn't want to weigh in on

17  the equitable side or the non-monetary side

18  of the damages related questions or liability

19  issues.

20      Q.    On page 5 and 6 of your report,

21  you reference Johnson & Johnson's branding

22  agency J3.  Do you see that?

23      A.    I do.

24      Q.    Are you aware of any evidence

1   that Context, specifically Mr. Shah, misled

2   J3?

3         A.    I'm not aware one way or the

4   other.

5         Q.    If the evidence were to show

6   that Mr. Shah misled J3, specifically as it

7   relates to HAN, would that be something that

8   you would want to know in formulating your

9   opinions?

10            MR. HANKINSON:   Objection.

11        A.    To the extent that HAN seeks

12  damages related to additional elements,

13  that's something I would expect to review and

14  assess.  Your question isn't defined well

15  enough for me to know whether or not that's

16  something that's forthcoming, and so if it

17  is, I would expect to assess it if asked to

18  do so.

19        Q.    On page 6, the last full

20  paragraph prior to Section 5, you say, "In

21  instances where a practice using an existing

22  competitive offering preferred ContextMedia's

23  platform on its merits, I understand that

24  ContextMedia offered the practice the option

1    of a hassle-free switch-out."  Do you see

2    that?

3            A.    Yes.

4            Q.    Tell me, as best as you

5    understand, the hassle-free switch-out.  What

6    was that?

7            A.    Well, I would refer you to

8    Mr. Shah's testimony.  He testified about

9    that, and I included references in my report.

10   I brought that with me, if you'd like.  But

11   my understanding is that is contained in that

12   sentence that you just -- or the paragraph

13   that you just referred me to, which is that

14   ContextMedia made efforts to work with

15   practices to schedule switch-outs in ways

16   that would be convenient for the practice,

17   such as scheduling those switch-outs when

18   patients wouldn't be there, outside of the

19   normal bounds of office hours, and things of

20   that nature.

21           Q.    Was there anything about the

22   hassle-free switch-out, including any of the

23   documents that are part of the hassle-free

24   switch-out utilized by Context, that was

1    material to you in terms of rendering your

2    opinions regarding damages on the tortious

3    interference claim?

4              MR. HANKINSON:  Objection.

5         A.   I understand that HAN alleges

6    that certain of the practices related to

7    hassle-free switch-outs constituted alleged

8    wrongful conduct.  So I understand that, and

9    it has relevance in that way.

10             But there also was testimony

11   about hassle-free switch-outs related to

12   the -- trying to accommodate the practice as

13   I just discussed, and Mr. Shah's associated

14   testimony that I think also has problems.

15        Q.   Let me hand you what's

16   previously been marked in the case as

17   Plaintiff's Exhibit 79, and ask you if that's

18   a document that you recall having seen in

19   connection with your work in this case?

20        A.   I don't recall this specific

21   document, but I do see that it's listed as an

22   exhibit, I believe to Ms. Agarwal's

23   deposition, in which case I do believe I did

24   see this at some point.

1      Q.    In your report on page 6, the

2  next sentence, you say, "I understand that

3  the intent of this offering --" and I think

4  you were referring to the hassle-free

5  switch-out package -- "was to eliminate any

6  concerns such a practice may have had

7  regarding the time commitment to set up a new

8  product, and to accommodate that practice's

9  schedule so as not to disrupt the waiting

10  room area." Do you see that?

11      A.    Yes.

12      Q.    So I take it that, at least it

13  was important to you, in connection with

14  formulating your opinions, the intent behind

15  the hassle-free switch-out practice?

16           MR. HANKINSON:  Objection.

17      A.    Really, this is in the

18  background section of my report, and what I

19  was trying to do was provide some context for

20  my opinion, you know, which is the reason why

21  I included this element.  It does have

22  relevance to consider, I think, and I did so.

23      Q.    Would you agree with me that

24  Plaintiff's Exhibit 79 would indicate that

Page 45

1 there was a different intent on the part of

2 Context in formulating the hassle-free

3 switch-out?

4            MR. HANKINSON:  Objection.

5       A.    I would deter this question to

6 the fact witnesses in the case.  That's not

7 something that I'm -- I have personal

8 knowledge of.  I believe Mr. Shah and perhaps

9 Ms. Agarwal's testified about the hassle-free

10 switch-outs, and I included that, references

11 to that testimony in my report.

12       Q.    Well, let me ask you about that,

13 then.  Do you not consider other evidence?

14 Do you simply rely upon what your client

15 testified?

16       A.    I thought you were asking me a

17 question of fact, and no, I do consider

18 evidence.  Perhaps I misunderstood your

19 earlier question.

20       Q.    Right.  So you would consider

21 what your client testified to on a particular

22 fact, correct?

23       A.    I would consider testimony from

24 both parties, sure.

1        Q.    And you would consider as well

2    evidence from your client that contradicts

3    what they testified to; would you not?

4        A.    I would consider all the

5    evidence that was made available to me in

6    order to reach my opinions.

7        Q.    Well, you read Ms. Agarwal's

8    transcript, you've looked at the exhibits.

9    Exhibit 79 was an exhibit.  Did that cast any

10   doubt in your mind on the intent of

11   ContextMedia in formulating the hassle-free

12   switch-out practice?

13            MR. HANKINSON:  Objection.

14       A.    I didn't really render opinions

15   about the intent of the hassle-free

16   switch-out.  I just considered that in the

17   context of the overall case.

18       Q.    In this case, would the intent

19   behind the hassle-free switch-out package

20   have any relation to causation?

21       A.    Causation to damages?

22       Q.    Correct.

23       A.    I think there's other evidence

24   in the case that I put more weight on with

1    respect to causation than hassle-free

2    switch-outs.  I would characterize that as

3    something that potentially could have an

4    impact on causation of damages, but in light

5    of the balance of testimony and evidence

6    available in this case, I don't think it has

7    much weight.

8         Q.    If the evidence shows that

9    Context developed and utilized the

10   hassle-free switch-out package in order to

11   keep HAN practices from abiding by and

12   following their contracts with HAN, would

13   that be significant to you in formulating

14   your opinions?

15        A.    Could you please repeat that

16   question.

17             MR. COWAN:  Yes.  Sue, read it

18   back.

19    (The record was read by the court reporter.)

20             MR. HANKINSON:  Objection.

21        A.    I started my analysis with an

22   assumption that liability would be found.

23   And I understand that this is what is part of

24   HAN's claim in this case is that those

Page 48

1    practices that were converted constitute a

2    form of alleged unlawful conduct.

3                    And so I don't think the

4    evidence that you just suggested would have a

5    major impact on the framework or my

6    understanding of damages related issues in

7    this case.

8         Q.    Is it your understanding that

9    Context would not switch a HAN practice until

10   it had received a signed authorization form

11   which is part of the hassle-free switch-out

12   practice?

13                    MR. HANKINSON:  Objection.

14        A.    Can you please repeat that

15   question.

16                    MR. COWAN:  Sure.  Sue, read it

17   back.

18   (The record was read by the court reporter.)

19                    THE WITNESS:  One more time.

20   I'm sorry.

21   (The record was read by the court reporter.)

22        A.    I would defer to the fact

23   witnesses.  I don't have an understanding of

24   that.  I've made the assumption, for purposes

1    of my report, that each of the practices that

2    were converted from HAN to ContextMedia did

3    so a month before, at least, they otherwise

4    would have.

5              So I think there is an implicit

6    assumption within my report that gets to, in

7    some respect, that type of a liability

8    question, but I don't have an independent

9    opinion about whether or not that happened.

10   And I think that the fact witnesses would be

11   in a better position to answer that question.

12        Q.    Does that issue not go to

13   causation in your mind?

14              MR. HANKINSON:  Objection.

15   Form.

16        A.    Can you please help me

17   understand what you mean by "that issue," and

18   can you --

19        Q.    The fact that Context witnesses,

20   including its corporate rep, have stated that

21   each and every practice that switched from

22   Context to HAN had to sign an authorization

23   form before Context would move forward with

24   the switch.

1          A.    Just so we're speaking the same

2     language.  When I think about causation, I'm

3     thinking about causation to damages, not

4     causation from a liability perspective.  And

5     no, I don't think that would impact causation

6     to damages.

7          Q.    Why not?

8          A.    Well, I wrote a report that

9     contains the substance of my opinions with

10    respect to causation, and it's a multifaceted

11    and long answer.  Would you like me to

12    explain that in detail?

13         Q.    In the context of my question,

14    which goes to the authorization form.

15              MR. HANKINSON:  Objection.

16         A.    I'd refer you to page 17 in my

17    report, where I have a bulleted list here of

18    items that I think are relevant to causation.

19              And the evidence in this case

20    demonstrates that there are a myriad of

21    factors that practices weighed when making

22    enrollment decisions, or differences in the

23    product offerings between ContextMedia and

24    HAN.

1          I'm not aware of evidence that

2   would substantiate the claim that practice

3   conversion decisions were attributable to the

4   alleged wrongful conduct.  There's a lot of

5   evidence that other factors were driving

6   those enrollment decisions.

7          Q.    If the evidence shows that

8   Context would not have switched any HAN

9   practices but for the execution of an

10  authorization form that was included as part

11  of the hassle-free switch-out practice, does

12  that or would that impact your opinions and

13  conclusions?

14          MR. HANKINSON:  Objection.

15          A.    I want to understand this

16  hypothetical.  The hypothetical is if I

17  assumed that but for -- can you just repeat

18  the hypothetical for me, please?

19          Q.    Yes.  I don't believe it's a

20  hypothetical.  I'm just saying --

21          MR. COWAN:  Go ahead and read it

22  back, Sue.

23   (The record was read by the court reporter.)

24          THE WITNESS:  One more time,

```
 1   please.

 2   (The record was read by the court reporter.)

 3        A.    I'm not aware of evidence that

 4   corroborates the claim that but for the

 5   alleged wrongful conduct, HAN would have

 6   suffered lost profits in excess of those

 7   quantified in my report.  I think that's on

 8   the basis of the evidence that's available in

 9   this case.

10            There are a lot of reasons to

11   conclude that causation has not been

12   established, and if there is additional

13   evidence relevant to causation that

14   Dr. Wilner or HAN's experts identified, I

15   expect I would review that and assess it.

16        Q.    That's not my question.  My

17   question is, if the evidence demonstrates

18   that Context would not have switched any HAN

19   practices but for their receipt of an

20   executed authorization form, would that

21   impact your opinions and conclusions in the

22   case?

23            MR. HANKINSON:  Objection.

24        A.    I believe it's the same answer
```

1   as the one that I just gave you.  Could you

2   perhaps rephrase it, then?

3          Q.   It's fair to say that your

4   report talks considerably about but-for

5   causation; does it not?

6          A.   It does.

7          Q.   And my question is simply this:

8   If but for the execution of the authorization

9   form included in the hassle-free switch-out

10  practice, the HAN practices would not have

11  switched to Context, does that impact your

12  opinions and conclusions in the case?

13              MR. HANKINSON:  Objection.

14         A.   My opinion is that but-for

15  causation has not been established.  Your

16  question is hypothetical insofar as you're

17  asking to assume if but-for causation is

18  established, does that establish but-for

19  causation.

20              And I suppose under a

21  hypothetical that but-for causation is

22  established, then I would agree that it is.

23  But what I'm saying is I don't think that the

24  second part of your question changes the

1  balance of evidence in this case about the

2  reasons why practices made enrollment

3  decisions.  I think that ought to be properly

4  considered, along with the testimony and the

5  other evidence that I included in my report.

6         Q.    Did you consider, in the context

7  of your conclusions regarding but-for

8  causation, whether the practices would have

9  switched but for the execution of an

10 authorization form included in the

11 hassle-free package provided to them by

12 Context?

13         MR. HANKINSON:  Objection.

14         A.    My understanding of the alleged

15 wrongful conduct is as I indicated in pages 6

16 and 7 of my report.  Generally, HAN claims

17 ContextMedia adopted a strategy of making

18 false and/or misleading statements to HAN's

19 existing customers regarding those practices,

20 existing contracts with HAN and HAN's

21 business services.  And I included some

22 examples here.

23             I did not include that specific

24 provision that you asked me about in your

1  question, though it is, I think, not

2  inconsistent with my understanding of what

3  generally are the allegations in the case.

4        Q.    My question, then, is -- and

5  maybe it was a question to ask, but I'll ask

6  it, perhaps rephrase it.

7             Did you consider that issue in

8  formulating your opinions and conclusions, by

9  "that issue," the issue of whether but for

10  the execution of an authorization form by the

11  HAN practice, the practice would not have

12  switched to Context?

13        A.    Yes.

14             MR. HANKINSON:  Objection.

15        Q.    Where is that referenced?

16        A.    It's referenced in the section

17  related to but-for causation, beginning in

18  Section 7, and continuing through the balance

19  of the report.

20        Q.    Well, just point me, if you

21  would, sir, to where you specifically discuss

22  but-for causation and the authorization form

23  signed by each and every of the practices.

24        A.    I discuss but-for causation with

1  respect to the evidence that was advanced by

2  Dr. Wilner.  I didn't granularly get down to

3  that level of detail that you're asking me

4  about, but I considered but-for causation

5  with respect to the conversion of practices

6  generally, including the alleged wrongful

7  conduct, as well as the other factors that

8  drove customer purchase decisions.

9             If we reach a point where we

10  could take a break?

11       Q.   Sure.  Let me just ask one more

12  question and we will.

13       A.   Sure.

14       Q.    If a practice would not have

15  switched to Context, but for its execution of

16  the authorization form, would that fact

17  impact your opinions and conclusions in this

18  case?

19             MR. HANKINSON:  Objection.

20       A.    The way that I think about this

21  case is that if there are -- if there's

22  evidence that's available that would lead one

23  to conclude that a particular practice would

24  not have switched but for the alleged

Page 57

1    wrongful conduct, and that's something that

2    ought to be considered, I'm not aware of

3    evidence that would substantiate Dr. Wilner's

4    claim.

5              In fact, as I understand it,

6    Dr. Wilner has relied on industry experts, or

7    so-called industry experts that -- whose

8    opinions have not been disclosed to me, at

9    least the analyses that they performed have

10   not been disclosed to me.

11             But if there's additional

12   evidence that's relevant to the determination

13   of practice enrollment decisions, then I

14   would want to consider that, sure.

15             MR. COWAN:  All right.  That's a

16   good time for a break.

17             (Brief recess.)

18        Q.   Are you aware of any presumption

19   in this case that Context statements to HAN

20   practices caused damage to HAN?

21        A.   Could you please repeat that?

22        Q.   Sure.  Just repeat it or

23   rephrase it?

24        A.   I was just not quite with us.

1          Q.    Got it.  Are you aware of any

2     presumption in this case that Context

3     statements to HAN practices caused damage to

4     HAN?

5          A.    The word presumption is a little

6     bit confusing to me.  Could you please

7     re-characterize or rephrase that sentence?

8          Q.    I don't know that I can.  If --

9          A.    I'll answer as best I can.

10         Q.    Sure.

11         A.    Dr. Wilner has presumed that the

12    alleged wrongful conduct caused damages, and

13    he's projected those damages through 2018.  I

14    disagree that the profits generated by

15    ContextMedia or HAN, or those profits lost by

16    HAN are attributable to the alleged wrongful

17    conduct, with the possible exception of

18    revenue and profits that were lost by HAN

19    associated with practices that converted

20    before they otherwise would have.  And so

21    that's -- is that responsive to your

22    question?

23         Q.    It's your answer, so I'll take

24    that.  And my question, let me ask it maybe

1    in a slightly different way.  Are you aware

2    of any legal presumption in this case that

3    Context statements to the HAN practices

4    caused HAN damages?

5         A.    I did not make the assumption

6    that HAN would be entitled to damages upon a

7    finding of liability.  I evaluated the

8    evidence in this case in order to provide an

9    opinion about whether and to what extent HAN

10   should be entitled to damages upon the

11   finding of liability.  And I offered opinions

12   about those damages in this report.

13        Q.    The cases in your binder, the

14   law cases, the legal cases, where did you get

15   those?

16        A.    They were -- some of the cases I

17   was aware of based on my work and experience

18   in this field; some of the cases were

19   provided by counsel.

20        Q.    Which were you aware of, which

21   were provided by counsel?

22        A.    I think the way that I would

23   answer this question most clearly for you is

24   that there was a quote related to post hoc

1    ergo propter hoc on page 10 of my report that

2    references a case, TNS Media Research, LLC.

3              That was an opinion about an

4    expert that was working in another case that

5    I was working on.  So I was aware of that,

6    and some of the cases cited by that case.

7              I asked Mr. Hankinson whether

8    there were other cases relevant to this issue

9    in the venue that this litigation is in, and

10   those types of cases were provided.

11        Q.   So, for example, the Balance

12   Dynamics case and the Iams cases that were

13   referenced in your report, were those

14   provided to you by counsel?

15        A.   Do you have a reference point?

16        Q.   Sure.  Page 8 of your report,

17   the footnotes cite those cases.

18        A.   If memory serves, yes, those

19   were provided by counsel.

20        Q.   Is there anything about any of

21   those cases that were provided to you by

22   counsel that, in your mind, as you sit here

23   today, was important to your overall

24   opinions?

1          MR. HANKINSON:  Objection.

2      A.    Generally, I wanted to make sure

3  that my opinions were consistent with the

4  law.  I have a lot of experience working in

5  matters involving these measures of monetary

6  relief, and I have a general understanding

7  based on that experience.

8              And I wanted to confirm my

9  understanding by reference to these cases,

10  and that's what I did, so it was important in

11  that respect.

12      Q.    On page 9 of your report, right

13  above Section 7, you talk about a couple of

14  the other claims.  Do you see that?

15      A.    I'm not sure which part you're

16  referencing.

17      Q.    Right above where you say "I

18  also understand that several forms of

19  relief --" that paragraph.

20      A.    Yes.

21      Q.    I didn't see any reference in

22  there to the tortious interference with

23  contract claim.  Is that fair?

24      A.    I don't know whether that's

1    fair.  I've identified some of the actions

2    that I understand may be related to alleged

3    tortious interference on page 6 of my report,

4    and I don't know whether that alleged

5    tortious interference relates to the

6    deceptive trade practices, or if that's

7    something different.

8              Generally, my understanding is

9    that there were two forms of relief that were

10   sought by HAN, lost profits and profits

11   disgorgement.  I have a general understanding

12   that under the various claims that HAN has

13   made, that those are measures that are

14   potentially available.

15             And then sorting out as to

16   between which claim relates to which

17   methodology is something that I didn't really

18   attempt to do in this report.

19        Q.   On page 10, right above the

20   footnote, the sentence in the last full

21   paragraph on that page, you say, "In my

22   experience, plaintiffs often attempt to

23   satisfy the test for but-for causation by

24   demonstrating a nexus between the alleged

1    wrongful conduct and demand for the alleged

2    lost sales; causation of the alleged lost

3    sales by showing the absence of acceptable

4    alternatives, or by showing the plaintiffs

5    but-for market share; plaintiffs capacity to

6    exploit the demand; and the amount of profit

7    that would have been made."  Do you see that?

8           A.    Yes.

9           Q.    Is that your experience in

10   Lanham Act cases involving claims of false

11   advertising?

12          A.    That's my experience generally

13   related to lost profits, whether it's a

14   breach of contract, a claim of lost profits

15   under Lanham Act, a claim of lost profits

16   under 35 USC 284.

17                Generally, what I'm talking

18   about here is elements associated with

19   establishing causation to actual lost

20   profits.

21          Q.    Turn to page 16 of your report,

22   if you would.

23          A.    (Complies with request.)

24          Q.    Up at the top, you have a quote

1    from the "Litigation Services Handbook:  The

2    Role of the Financial Expert."  Do you see

3    that?

4         A.    Yes.

5         Q.    And you indicate from the

6    chapter about patent infringement damages.

7    Do you see that?

8         A.    Yes.

9         Q.    Was there anything in that book

10   concerning Lanham Act false advertising

11   damages?

12              MR. HANKINSON:  Objection.

13        A.    I expect there would be, yes.

14        Q.    Is there a reason why you chose

15   to quote something about patent infringement

16   damages, as opposed to Lanham Act damages?

17        A.    Yeah.  In my experience, there's

18   just a lot more opinions related to patent

19   infringement litigation than Lanham Act

20   damages related opinions.

21              What I was focused on here was

22   causation element, which I think, as I just

23   indicated a moment ago, in my opinion, was

24   relevant to lost profits claims generally, so

Page 65

1     that's why I selected that passage.

2          Q.    Have you ever been involved in a

3     matter, either as a consultant or as a

4     testifying expert, involving Lanham Act false

5     advertising claims, involving literally false

6     statements where there was a legal

7     presumption that the statements caused

8     damages?

9          A.    I don't recall any such

10    instance.

11         Q.    If you could turn to page 18 of

12    your report?

13         A.    Yes.

14         Q.    Under Section A, you've

15    identified a number of factors that impact

16    the point of care health media enrollment

17    decisions of HAN's former and current

18    practices.  Do you see those?

19         A.    Yes.

20         Q.    First question is, are those

21    listed in any sort of rank order, order of

22    priority?

23         A.    There were some rankings that

24    were -- that some of the witnesses in the

Page 66

1    case provided.  I don't recall -- I didn't

2    attempt to line this up precisely with that

3    ranking.  Some of the rankings were made

4    available by just the nature of the questions

5    and answers that were asked in the

6    depositions.

7              And so I wasn't intending this

8    to be from top to bottom most important to

9    least important, but there is some evidence

10   in the record that we could begin to navigate

11   that if we so choose.

12        Q.    As you sit here today, when you

13   look at the factors that you bulleted on

14   pages 18 and 19, can you give me an idea of

15   what you'd consider to be the three or four

16   most important factors?

17        A.    The evidence in this case

18   indicates that that varied to some degree on

19   a practice by practice basis.  There appears

20   to be a consensus between the parties that

21   the quality of the health related programming

22   and the entertainment related programming in

23   terms of its ability to engage the patient

24   was important, as well as the length of the

1   program.

2                I recall seeing testimony about

3   technical service issues, and some of the

4   trouble that HAN was experiencing.  Those are

5   some that, along with media format, the

6   testimony indicates were relatively

7   important.

8        Q.    If HAN practices were told by

9   Context that a significant number of HAN

10  practices were switching to Context, would

11  that relate to the quality of health related

12  programming?

13       A.    I'm sorry.  You lost me on that

14  question.  Can you please restate?

15       Q.    Sure.  If HAN practices were

16  told by Context that a significant number of

17  HAN practices had switched to Context, would

18  that relate to the quality of health related

19  programming?

20       A.    No.  I was really thinking about

21  statements made to practices, and the

22  relationships for sales representatives

23  bullets, which is on the next page.  When I

24  was thinking about the quality related

1    programming, and the entertainment related

2    programming, and the media format, for

3    example, I was just talking more about the

4    product.

5         Q.    And would a statement that a

6    significant number of practices had switched

7    their product from HAN to Context relate to

8    the quality of the product?

9              MR. HANKINSON:  Objection.

10        A.    That may be a byproduct of the

11   quality of the product.  I think it would

12   just depend on -- I think it would depend.

13        Q.    Is the HAN product that was in

14   HAN practice waiting rooms during the

15   relevant time period, 2011 to March of 2013,

16   or April of 2013, was that product a

17   PowerPoint slideshow?

18             MR. HANKINSON:  Objection.

19        A.    I understand that there's

20   allegations that are made that that -- claims

21   of it being a PowerPoint slideshow constitute

22   alleged wrongful conduct.  I'm not trying to

23   weigh in and offer an opinion about whether

24   that was or was not.

Page 69

```
 1              I did notice that there was some
 2    deposition testimony from some of the
 3    witnesses, and also there were some comments
 4    in the CMS database that some of the
 5    customers characterized it that way perhaps
 6    in some instances, but I'm not trying to wade
 7    in to the liability side of this case.
 8         Q.    And you have listed, down at the
 9    last bullet on page 18, the ratio of health
10    related content to advertising.  Do you see
11    that?
12         A.    Yes.
13         Q.    So that's an important factor to
14    practices?
15         A.    I understand that the -- from
16    the testimony of witnesses is that that was a
17    factor that had some importance, yes.
18         Q.    Turn to page 29, if you would.
19         A.    I'm with you.
20         Q.    The bullet points that are
21    listed there, do you see those?
22         A.    Yes.
23         Q.    Are you able to testify that any
24    HAN practice left because of any of those
```

Page 70

1    reasons?

2         A.    The evidence in this case

3    supports that conclusion, yes.

4         Q.    And "the evidence in this case"

5    being what is referred to in the CMS

6    database?

7         A.    The CMS database, the deposition

8    testimony of the witnesses in this case, and

9    some of the documents that were also made

10   available, yes.

11        Q.    But do you know for a fact

12   whether any HAN practice left for any of

13   these reasons?

14        A.    On the basis of the evidence

15   that's been made available that's contained

16   in my report, that's the conclusion that I

17   think is supportable.  I don't have personal

18   knowledge of it.  My knowledge is based on

19   the evidence that's articulated in this

20   report.

21        Q.    Do you have an opinion as to

22   whether any Context employee lied to a HAN

23   practice?

24        A.    I don't have opinions one way or

1    the other about that.

2          Q.    And that's not important to any

3    of your opinions or conclusions in the case?

4          A.    Well, I understand, again, that

5    there are allegations that have been made by

6    HAN that ContextMedia lied and/or made false

7    statements, and that's part of the predicate

8    assumption that I made in order to evaluate

9    damages is that there will be a finding of

10   liability for the wrongful conduct that's

11   been alleged by HAN.

12         Q.    As you looked through all of the

13   exhibits, deposition exhibits in this case,

14   and read the testimony, did you formulate,

15   did you come to any conclusion in your own

16   mind whether or not Context lied to the

17   practices?

18         A.    That's not something I spent

19   much time focusing on.

20         Q.    Do you have an opinion as to

21   whether any of the provisions in HAN's

22   enrollment agreement of its practices are

23   enforceable?

24         A.    No opinions about that.

 1              (Plaintiff's Exhibit No. 5

 2              was marked for identification.)

 3        Q.    Handing you what's been marked

 4   as Plaintiff's Exhibit 5.  Take a minute and

 5   look at that.  I don't know that this is a

 6   document that you reviewed, a document that

 7   was produced by Context.

 8        A.    (After reviewing document) Okay.

 9        Q.    On the first page, there's an

10   e-mail from a practice to Deven Tatum,

11   January 3, 2012, where the practice person says,

12   "I am not at my desk; however, I will need to

13   pull my enrollment agreement with Healthy

14   Advice.  Are you aware of what is necessary

15   on my end with regards to notifying HA --"

16   who we assume to be Healthy Advice -- "of any

17   decision to discontinue their services."  Do

18   you see that?

19        A.    Yes.

20        Q.    And Deven responds, "Yes, ma'am.

21   No --" no is in all caps -- "action is required

22   by you.  Simply fill out the attached forms

23   and we do the rest."  Do you see that?

24        A.    Yes.

1          Q.    Does a statement like this, made

2    by Context to a practice, specifically

3    referencing the practice's obligation under

4    HAN's contract, have any relevance to

5    causation issues in your mind?

6               MR. HANKINSON:  Objection.

7          A.    In my mind, the right question

8    to ask is but for the alleged wrongful

9    conduct, what would have happened to this

10   practice.

11              And in order to evaluate that, I

12   do think we can consider this document, along

13   with the other evidence I reference in my

14   report, and -- in order to make a

15   determination.

16         Q.    So if a practice asks a Context

17   representative what do I need to do under my

18   agreement with HAN before cancelling, and the

19   practice is told something by the Context

20   person that is not true, is that impactful

21   with respect to any causation issues?

22              MR. HANKINSON:  Objection.

23         A.    It depends on whether or not HAN

24   would have realized incremental sales and

1    profits but for the alleged wrongful conduct.

2          Q.    And you don't know whether, in

3    this particular case, that would or would not

4    have happened?

5          A.    Well, I've assumed in my report

6    that this type of exchange would constitute

7    alleged wrongful conduct.  I've quantified

8    profits associated with that that were

9    allegedly lost by HAN, and so I have

10   considered this with respect to causation.

11         Q.    And do you know what would have

12   happened in this particular case if

13   Ms. Tatum had responded yes, you need to give

14   HAN advanced written notice of your intent to

15   cancel under the agreement?

16              MR. HANKINSON:  Objection.

17   Form.

18         A.    There is evidence available in

19   this case from which we can form conclusions

20   about what would have happened absent the

21   alleged wrongful conduct.  And I wrote an

22   opinion about that, and it's contained in

23   Exhibit 1, yes.

24         Q.    Exhibit 1 of your report?

1          A.     Right.

2          Q.     And my question is, with respect

3    to this practice, do you know what would have

4    happened had the practice been told you need

5    to give HAN advanced written notice of your

6    intent to cancel?

7               MR. HANKINSON:  Objection.

8          A.     Based on the evidence available

9    in this case, it's my conclusion that it's

10   reasonable to conclude that HAN may have

11   realized incremental sales and profits to the

12   extent that the practice, from Exhibit 5,

13   converted to ContextMedia before it otherwise

14   should have.

15               On the basis of the evidence in

16   my report, I also think it's unreasonable to

17   conclude that the practice would have stayed

18   with ContextMedia through 2018.  And I

19   provide evidence associated with, or the

20   bases of those opinions in my report.

21               MR. HANKINSON:  For clarity, do

22   you mind if I make a comment?

23               MR. COWAN:  I'm sorry?

24               MR. HANKINSON:  Do you mind if I

Page 76

 1    make a comment, for clarity?

 2                    MR. COWAN:  Yes.  Go ahead.

 3                    MR. HANKINSON:  I think he used

 4    the word ContextMedia in that answer instead

 5    of HAN at one point.

 6                    MR. COWAN:  Fair enough.

 7         A.    I may have misstated.

 8         Q.    Do you have an opinion as to

 9    whether HAN would have been able to retain

10    this practice that's referenced in

11    Plaintiff's Exhibit 5 had the practice

12    provided advance written notice of its intent

13    to cancel to HAN in accord with the

14    enrollment agreement?

15                    MR. HANKINSON:  Objection.

16         A.    There were some hypotheticals, I

17    think, baked into your question, but

18    generally, I have an opinion that the

19    evidence does not support the conclusion that

20    HAN would have retained the practices that

21    elected to convert to ContextMedia.

22                    And I talk about that in my

23    report.  I also talk about some of the

24    alternatives that were available to both the

1    practices and to ContextMedia that I think

2    ought to also be considered as part of this

3    in this question.

4         Q.    And what's the basis for that?

5         A.    The basis of that is the

6    evidence and testimony that's available in

7    the case, and my understanding of the factors

8    that were important to practices and their

9    enrollment decisions.

10        Q.    Do you know what factors were

11   important to this practice, practices

12   referenced in Exhibit 5?

13        A.    I would need to cross-reference

14   this practice against CMS database and see if

15   this practice was discussed by some of the

16   witnesses.

17              I provided examples of testimony

18   and evidence in my report.  Without

19   cross-referencing, I don't know if that

20   testimony and evidence related to this

21   practice or to other practices, but I do have

22   an understanding generally of the factors

23   that were important.

24        Q.    Did you have an understanding,

1    from any of the evidence reviewed, that

2    Context wanted to have the opportunity to try

3    and save its practices if they were notified

4    of possible movement to a competitor?

5           A.    Ms. Lawrence testified about

6    that, yes.

7           Q.    Context, I'm saying.

8           A.    Oh, excuse me.  I'm sorry.  I

9    misunderstood your question.  Can you please

10   repeat?

11          Q.    Right.  Did you have an

12   understanding that Context wants to have an

13   opportunity to try to save practices, its

14   practices from switching?

15          A.    That sounds like a logical

16   inference.  I believe Mr. Shah may have

17   testified about this.  I'd have to refresh my

18   recollection by reviewing his testimony.

19               I also recall him testifying

20   that perhaps Context hasn't lost many

21   practices.  That's my memory.

22          Q.    Do you think that may be because

23   its competitors play right?

24               MR. HANKINSON:  Objection.

1          A.     I don't have opinions about

2    that.

3          Q.     So let me try to understand.

4    Are you going to be rendering opinions in

5    this case on the issue of causation?

6          A.     I'm going to be offering

7    opinions, as I understand it, on damages

8    related to questions, which I think does

9    include an assessment of, again, whether and

10   to what extent HAN would have realized

11   incremental sales and profits but for the

12   alleged wrongful conduct.

13              And as part of that, I expect to

14   consider issues related to demand for the

15   products, issues related to whether that

16   demand is attributable to the alleged

17   wrongful conduct, versus other factors,

18   alternatives available to ContextMedia and to

19   practices, HAN's capacity to retain those

20   practices.

21              And then on the unjust

22   enrichment side, there's a question of

23   apportionment.  ContextMedia generated sales

24   and profits as a result of converting

Page 80

1    practices to -- from HAN, and the question,

2    then, is what's a portion of those sales and

3    profits that's attributable to the alleged

4    wrongful conduct, vis-a-vis the other

5    contributions that ContextMedia made to the

6    commercial success of its own products.

7              And in order to answer that

8    question, I think one ought to consider

9    issues related to the same demand driver and

10   alternatives that I just discussed.

11             So there are a couple of areas

12   where causation becomes important to an

13   assessment of damages, and if asked, I expect

14   to testify about those damages related

15   issues.

16        Q.    At the end of the day, is the

17   causation issue as it relates to damages a

18   question of why the practice decided to

19   switch?

20             MR. HANKINSON:  Objection.

21        A.    That's not the way that I think

22   about it in my mind.  That could be a

23   question to -- for one to ask and consider in

24   connection with the damages analysis, but

Page 81

1   there's also the question of what's the

2   portion of the available profit that should

3   be attributed to the alleged wrongful conduct

4   versus the other contributions that

5   ContextMedia made.

6       Q.    Let's leave that aside.  Let's

7   just talk about your but-for causation.

8       A.    That's part of the same

9   consideration, so I don't know what you mean

10  by let's keep that to the side.

11      Q.    Well, what do you believe that

12  HAN needs to show for but-for causation?

13          MR. HANKINSON:  Objection.

14      A.    From a damages perspective, in

15  order to demonstrate its entitlement to lost

16  profits, in my opinion, HAN needs to show

17  that but for the alleged wrongful conduct, it

18  would have generated incremental sales and

19  profits.

20          And in order to establish that,

21  my opinion, HAN ought to establish that the

22  demand for the products and services was

23  driven by the alleged wrongful conduct, that

24  there weren't acceptable alternatives

 1    available to the practices nor to

 2    ContextMedia, and that HAN had the capacity

 3    to make those sales, and that HAN could have

 4    made those sales profitably.

 5                So there are some considerations

 6    that one ought to consider in order to

 7    establish but-for causation from a lost

 8    profits perspective.

 9                On the profit disgorgement side,

10    it's my understanding that the law has said

11    that's an equitable measure of relief subject

12    to the principles of equity.

13                And that's something that the

14    Court or the trier of fact is going to

15    determine, assuming liability is found, and

16    there could be causation in the way issues

17    that might weigh on that determination as

18    well.

19        Q.    Is it your opinion that the HAN

20    practices that switched to Context switched

21    for reasons other than the alleged wrongful

22    conduct?

23        A.    I think that's a reasonable

24    conclusion that could be made on the basis of

Page 83

1     the evidence that's available in this case.

2     That said, is my opinion that Dr. Wilner had

3     not established but-for causation to lost

4     profits with the exception of the

5     acceleration of conversions.  So it's a

6     little bit of a nuance answer to your

7     question.

8            Q.     But in terms of your conclusion

9     that it's reasonable, based on the evidence,

10    to conclude that the HAN practices switched

11    to Context for reasons other than the alleged

12    wrongful conduct, are you relying primarily

13    on the evidence relating to what the

14    practices communicated to HAN?

15           A.     There were documents and

16    corporate testimony, and there's a lot of

17    evidence I considered.  And I included that

18    in my report.  And we can go through it, but

19    generally, it includes documents and

20    testimony.

21           Q.     I understand that.  Really all

22    evidence in this case is either documents or

23    testimony.  You understand that?

24           A.     I'm just trying to answer your

1    questions as best as I can.

2         Q.    No, I understand.  So I

3    understand that the evidence in this case

4    consists of documents and testimony.  My

5    question is that those documents and the

6    testimony, as it relates to the issue of a

7    HAN practice leaving for reasons other than

8    the alleged wrongful conduct, that is based

9    on comments made or statements made by a HAN

10   practice as to its reasons for leaving?

11        A.    In part.  There's other evidence

12   that corroborates that, including documents

13   that were prepared in the normal course of

14   business by HAN, corporate testimony related

15   to those reasons, and my understanding based

16   on my discussions with ContextMedia

17   personnel, in particular Mr. Demas.

18        Q.    But in terms of determining why

19   a practice, a HAN practice left HAN and went

20   to Context, one would have to know why the

21   practice decided to do that?

22             MR. HANKINSON:  Objection.

23        A.    Could you please repeat that

24   question?

Page 85

1        Q.    Right.  I'm not trying to make

2   this difficult.  But in terms of trying to

3   determine, form an opinion as to whether a

4   HAN practice left for reasons other than the

5   alleged wrongful conduct, one would need to

6   know from the practice?

7              MR. HANKINSON:  Objection.

8        A.    That is, I think, a source that

9   one could consider.  Indeed, there was some

10  of that evidence available in this case from

11  the CMS database.

12             I also considered the corporate

13  testimony of some of the witnesses that were

14  involved who had opinions about that topic

15  based on their experience and training.

16             There's one other caveat that

17  I'd like to make, which is that in Dr. Wilner's

18  second report, he referenced an industry

19  analysis, or an analysis that HAN employees

20  prepared.

21             That's not something that's been

22  made available to me, and so it may be that

23  that would be another source of information

24  to consider if it's produced, and if the --

1    if it's a methodology, if I had an

2    understanding of what methodology was

3    employed.

4            And so generally, I think yeah,

5    you'd want to consider all the available

6    information that you have in order to ensure

7    that you have a reasonable opinion.

8        Q.    I understand that.  But in order

9    to determine why a practice left, you're

10   going to have to know the reasons for the

11   practice's decision, correct?

12           MR. HANKINSON:  Objection.

13       A.    Generally, I agree that in order

14   to understand why a practice left, you or one

15   could consider the evidence from that

16   practice about why they left.

17       Q.    And the testimony, the corporate

18   testimony that you have referenced, the HAN

19   employee testimony and corporate testimony,

20   their testimony about why practices left is

21   based on what practices tell them?

22           MR. HANKINSON:  Objection.

23       A.    They did testify that they -- I

24   included a section in my report about this,

1    that they were -- they used databases in the

2    normal course of their business, and they

3    viewed that as the best source of company

4    information about why practices left; and

5    that they were trained to determine customers

6    reasons for leaving.

7              And they also testified that

8    they believed that those practices were, by

9    and large, truthful, but they also may have

10   opinions based on their positions and

11   understanding of the market and the products.

12   And I think that that's something that one

13   could probably consider as well, seeing -- on

14   the ContextMedia side.

15        Q.    Do you believe that you have any

16   scientific knowledge that will help the jury

17   understand why a HAN practice decided to

18   leave?

19              MR. HANKINSON:  Objection.

20        A.    I think I have expert opinions

21   about the application of the evidence

22   associated with why practices decided to

23   leave, to a profit disgorgement calculation,

24   that I think I could help the trier of fact

1    understand.

2              That said, my opinions are based

3    on the evidence that's been made available in

4    this case, including the documents in the

5    associated deposition testimony.  That's not

6    something that I have personal knowledge

7    about, rather I have reviewed that evidence

8    in order to determine or provide opinions

9    about the portion of the profits that are

10   attributable to the various factors that

11   drive sales.

12        Q.    And so I'm going to stick with

13   my question.  I'm going to be very specific

14   on it.  And I'm going to go through sort of

15   several that are going to be like it.

16              Do you believe that you have

17   scientific knowledge that will assist the

18   jury in determining why a particular practice

19   decided to leave HAN and go --

20              MR. HANKINSON:  Objection.

21        Q.    -- to Context?

22        A.    Same answer as the one I just

23   gave.

24        Q.    You didn't answer it.  My

1    question is, yes or no, do you believe that

2    you have scientific knowledge that you

3    believe will assist the jury in determining

4    why a HAN practice decided to leave HAN and

5    go to Context?

6                 MR. HANKINSON:  Objection.

7          A.    My answer is the same, which is

8    that I'm -- it's the application of that to

9    the determination of damages is where my

10   expertise comes in.

11                I'm not offering opinions about

12   why a particular practice left on a

13   scientific basis or a personal knowledge

14   basis.  What I'm offering opinions about is

15   the profit related and damages related

16   issues.

17         Q.    Do you believe that a jury of

18   lay people is capable of determining, without

19   expert testimony, why a HAN practice decided

20   to leave HAN and join Context?

21                MR. HANKINSON:  Objection.

22         A.    I don't have an opinion about

23   that.  A couple things that are coming to

24   mind, for example, is that Dr. Wilner

Page 90

1    referenced industry experts or employee

2    experts from HAN that he needed to rely upon

3    in order to make that determination.

4              Of course, there's other

5    evidence and testimony in this case that I

6    think gets to the essence of that issue.  I

7    do think I could assist the trier of fact in

8    providing the nexus between some of those

9    demand drivers and the determination of

10   damages or profits.

11        Q.    But on the core fundamental

12   issue of why a practice decided to leave HAN

13   and join Context, you believe that the jury

14   can determine that issue without expert

15   testimony, don't you?

16             MR. HANKINSON:  Objection.

17        A.    I don't have an opinion about

18   that.  I don't have an opinion about that.

19        Q.    But it's not your intent to

20   provide expert testimony on that issue, why a

21   practice left -- simply this issue -- why a

22   practice left HAN and joined Context?

23        A.    I think that that question has

24   relevance to the determination of damages,

1    including lost profits damages and profit

2    disgorgement damages, and I think it ought to

3    be properly considered in order to quantify

4    damages.

5              So that's really an input into a

6    damages analysis, as opposed to that I'm

7    providing, in the de novo source of providing

8    an industry expert opinion and/or something

9    like that, that I would characterize as where

10   I'm the de novo source of that information.

11   Does that clarify?

12        Q.    It doesn't.  So do you believe

13   that you have any technical expertise that

14   would assist a jury in understanding simply

15   why a practice decided to switch from HAN to

16   Context?

17              MR. HANKINSON:  Objection.

18        A.    And I'm giving the same answer

19   that I've been providing you, which is that

20   it's the nexus between that decision and the

21   determination of damages is where I can

22   assist the trier of fact.

23              It's understanding measures of

24   monetary relief, and how that evidence

Page 92

1    impacts the type of relief that may be

2    available to HAN upon a finding of liability.

3            Q.    But my question is -- I'm

4    leaving aside the nexus.  I'm talking simply

5    on the issue of why a practice decided to

6    leave HAN and join Context.  Do you believe

7    you have any technical expertise that would

8    aid the jury in determining that specific

9    issue?

10           MR. HANKINSON:   Objection.

11       A.    Potentially.

12       Q.    How so?

13       A.    Dr. Wilner has referenced an

14   analysis that was conducted by employee

15   experts.  That analysis has not been made

16   available to me.

17           If made available, I would want

18   to try to understand the facts and data that

19   was relied upon, the methodology that was

20   employed, and I may be able to offer opinions

21   about whether that methodology supports the

22   conclusions that Dr. Wilner purports.

23           It hasn't been made available to

24   me, and so I don't know whether or not I

Page 93

1    would have opinions to offer about that.

2              Generally, though, my opinions

3    relate to the nexus issues related to

4    damages, and the calculation of damages, as

5    opposed to having independent technical

6    opinions about the reasons why practices

7    switched.

8              I calculate damages based on my

9    understanding of some of those factors, and I

10   think that they ought to be considered in the

11   determination of damages.

12        Q.    Have you ever been engaged as an

13   expert to opine on whether a literally false

14   statement caused a customer to stop doing

15   business with someone?

16        A.    We talked a little bit about

17   this this morning.  I have provided opinions

18   on damages and causation related issues in

19   Lanham Act matters; and, in my mind, there's

20   not a difference between a literally false

21   statement and other false advertising or

22   false designation of origin.

23              When I think about damages, I

24   think about whether lost profits are

1    appropriate and/or the portion of profits

2    that is attributable to the alleged wrongful

3    conduct.  It may be that I have.  It would

4    depend on whether or not there were

5    allegations of literally false statements in

6    some of the cases that I've worked on.

7           Q.    But you don't recall, as you sit

8    here?

9           A.    Well, for example, we talked

10   this morning about the ICM Controls,

11   Honeywell matter.  And if memory serves,

12   there were allegations there of "Made in the

13   USA."  And I don't recall whether that was

14   literal falsehood or not, but I did opine as

15   to issues related to causation and damages,

16   profit disgorgement, and lost profits.

17          Q.    And in that case, did you render

18   an opinion as to whether the statement "Made

19   in the USA" caused or did not cause the

20   plaintiffs to suffer damages?

21          A.    If memory serves, I did, yes.

22          Q.    And what were your opinions?

23          A.    I don't recall precisely.  I had

24   opinions about damages.

Page 95

 1        Q.    Do you recall how you went about

 2   trying to determine whether or not the

 3   statement "Made in the USA" did or did not

 4   cause damages?

 5        A.    Well, the framework that I use

 6   in this case is the same framework that I

 7   would use in any case, which is to first

 8   start by asking the question would the

 9   plaintiff have realized incremental sales and

10   profits but for the alleged wrongful conduct.

11             And in the case of a Lanham Act,

12   or false designation of origin case, I would

13   also ask the question what are the profits

14   that were realized by the defendant on a sale

15   of the accused products, and then what's the

16   portion of those profits, if any, that is

17   attributable to the alleged wrongful conduct,

18   vis-a-vis other contributions that the

19   defendant made for the commercial success of

20   those products.

21        Q.    And how did you do it

22   specifically in that case?  Did you talk to

23   any customers?

24             MR. HANKINSON:  Objection to

1    form.   Compound.

2              MR. COWAN:   Fair objection.

3         Q.    In that case, did you talk to

4    any customers?

5         A.    If memory serves, there was an

6    industry expert that I did talk to, who I

7    believe had experience as a customer.   It was

8    more of a consumer product type of a product.

9         Q.    Do you have an opinion as to

10   what would be the best way to determine

11   whether a literally false statement made by a

12   competitor caused the customer to switch to

13   the competitor?

14        A.    I mean, I have opinions about

15   the factors that ought to be considered in

16   making that determination, sure.

17        Q.    And I'm talking about what would

18   be the best way to try to make that

19   determination?

20        A.    I have opinions about -- that I

21   think are appropriate and reasonable.

22        Q.    Sure.   What are those?

23        A.    Well, one ought to consider

24   whether or not, but for the alleged wrongful

1    statements, there would have been any

2    difference in the sales and profits realized

3    by the plaintiff after considering the

4    factors that we've talked about.  And I can

5    run through them again if you'd like, or not?

6          Q.    No, that's okay, but what's the

7    best way to go about making that

8    determination?

9          A.    The same process that I just

10   explained.  Would you like me to try to

11   provide more --

12         Q.    So do you believe it would be

13   important to talk directly with a customer to

14   make that determination?

15         A.    That's not always something

16   that's available.

17         Q.    I understand it's not always

18   available.  These are customers.  The

19   practices we're talking about are practices

20   of Context, correct?

21         A.    My last answer was incomplete.

22         Q.    Go ahead.

23         A.    I lost my train of thought.

24         Q.    You said it's not something

1    that's always available.

2         A.    Well, in my experience, parties

3    in litigation typically do not like to

4    involve their customers in the litigation

5    process, so that's not something that's

6    always available to me.

7              I didn't speak with any

8    practices in this case, but I had a lot of

9    evidence to consider, including deposition

10   testimony and the records that we talked

11   about this morning, in order to reach a

12   reasonable conclusion.

13        Q.    Would it have been helpful to

14   talk to any of the HAN practices that

15   switched to Context?

16        A.    I had sufficient information to

17   render my opinions, so if they were made

18   available to me, sure, I'd talk to them.

19        Q.    That wasn't my question.  My

20   question was, would it have been helpful to

21   have talked to the HAN practices that

22   switched to Context?

23              MR. HANKINSON:  Objection.

24        A.    Helpful in the sense of

1    furthering my understanding?

2         Q.    Sure.  Rendering your opinions.

3         A.    I had sufficient information to

4    render my opinions.  If they were made

5    available, I would expect to talk to them.  I

6    don't know.

7         Q.    My question, sir, is very

8    straightforward.  Would it have been helpful

9    to you, in rendering your opinions and

10   formulating your conclusions, to have talked

11   to any of the HAN practices that switched?

12             MR. HANKINSON:  Objection.

13   That's not straightforward, and it calls for

14   speculation, and it's been asked and

15   answered.

16        A.    Same answer as the one I've been

17   giving.

18        Q.    So you would have done it if it

19   was made available, but it's not something

20   you felt necessary to do?

21        A.    That's a fair characterization.

22   I had a lot of evidence in this case to

23   consider.

24        Q.    Did you ask?

```
 1        A.    No.

 2        Q.    Was it offered to you?

 3        A.    I don't recall that, no.  Sir?

 4        Q.    Go ahead.

 5             MR. HANKINSON:  Did we mark this

 6   e-mail from Deven Tatum dated January 3rd?

 7             MR. COWAN:  I thought we did.

 8             MR. HANKINSON:  Is it 5?

 9             MR. COWAN:  Yes.

10             MR. HANKINSON:  Thanks.

11             THE WITNESS:  Okay.  Thank you.

12   BY MR. COWAN:

13        Q.    Do you believe it would be

14   important to tell the customer what the

15   literally false statements were in order to

16   determine whether the statements caused the

17   customer to switch?

18        A.    I don't understand that

19   question.

20        Q.    If you're trying to determine,

21   as I think you are in this case, whether a

22   false statement made to a practice caused

23   them to switch, do you believe that it would

24   be important to tell the customer what the
```

1   false statement was in order to reach that

2   determination?

3           A.    No, not necessarily.

4           Q.    Why not?

5           A.    Well, I think one ought to

6   consider the available evidence about what

7   caused that practice to switch.  I don't

8   think that requires the provision that you

9   asked me about.

10          Q.    So if the practice does not know

11  its lied to, how can you tell whether or not

12  that was a factor in its decision to switch?

13          A.    I think one can make the

14  determination based on the individual

15  practices, and what they said and what was

16  important to them, along with the testimony

17  and the documents that were prepared in the

18  normal course of business by the party too.

19                So if there was additional

20  information that a practice provided about

21  what drove its decision, then sure, I'd want

22  to consider that.

23          Q.    Have you ever been involved in

24  Lanham Act cases involving false advertising

1    where customers were actually provided what

2    the alleged false statement was, and asked to

3    provide their commentary on it in terms of

4    whether or not it influenced their decision?

5          A.    I think so.  I don't know about

6    the literally false aspect, if that was a

7    predicate of your question, but I think

8    that -- I think so.

9          Q.    Why is that done --

10         MR. HANKINSON:  Objection.

11         Q.    -- to your knowledge?

12         A.    To further an understanding of

13   the portion of profits that may be

14   attributable to the alleged wrongful conduct,

15   vis-a-vis the other contributions that the

16   defendant makes to the commercial success of

17   the accused product.

18         Q.    And that was not done by you or

19   Context in this case, correct?

20         A.    Can you tell me what the "that"

21   is?

22         Q.    Providing to the customer,

23   telling the customer the actual false

24   statement, and asking them to comment on it

1  in terms of their decision to switch, or its

2  impact on them.

3      A.    Right.  I mean, there was not a

4  survey that was conducted that I'm aware of

5  in this case.  In some cases there are

6  surveys that may be available.

7      Q.    And when it's done, why is that

8  done?

9          MR. HANKINSON:  Objection.

10     A.    Well, there could be surveys

11  done for all sorts of reasons; for example,

12  sometimes in the normal course of business,

13  companies survey their customers in order to

14  help understand how to modify their products

15  to respond to competitive advantages or

16  competitive situations in the marketplace.

17          And in the context of

18  litigation, sometimes surveys are performed

19  to establish liability reasons, or for

20  liability reasons, and sometimes surveys are

21  performed in order to assist in the

22  determination of damages.  So that happens

23  from time to time for a myriad of reasons.

24     Q.    The comments from customers that

1    are reflected in the CMS database concerning

2    their reasons for leaving HAN and going to

3    Context, were those comments all made after

4    the practice had decided to switch to

5    Context?

6           A.    I think we'd have to go look at

7    that CMS database, and I'd need to take

8    another look at that in order to answer the

9    question.  I think that should be

10   determinable.

11              If memory serves, there were

12   some practices that -- for which entries were

13   made that subsequently didn't switch, or

14   there have been some instances of that, and I

15   just don't know from a factual standpoint

16   without looking at the underlying document.

17          Q.    Well, would you agree with me

18   that if HAN contacted a practice to ask them

19   why they had cancelled, that would have been

20   done after, at least after HAN received

21   notice that they had cancelled?

22              MR. HANKINSON:  Objection.

23          A.    That sounds intuitive to me;

24   but, again, I just would need to go look at

1    that document.  And I don't recall precisely

2    whether there may be instances of entries

3    that were made outside of the context of a

4    particular practice switching, or a practice

5    that was retained.  I just am not a hundred

6    percent sure without looking at that

7    document.

8         Q.    Is that something that would be

9    important to you to know?

10        A.    Can you help me with the "that"

11   again?

12        Q.    Would it be important, in the

13   context of the opinions that you're rendering

14   in this case, to know whether the comments

15   that you're relying upon, where the practice

16   is commenting on its reasons for switching,

17   were made after it had decided to cancel with

18   HAN?

19        A.    I think I would consider

20   available information if it was prospective

21   or retrospective.  Again, it sounds intuitive

22   to me that most of the comments in the CMS

23   database were retrospective comments, but I

24   would also consider, if available,

1  prospective comments.

2      Q.    Do you know whether or not

3  Context coached any HAN practices about what

4  to tell HAN when HAN called about the

5  cancellation?

6      A.    I'm aware of those allegations

7  that have been made, and I read that in

8  Dr. Wilner's report, and I also recall, I

9  believe, Ms. Lawrence testifying about that.

10  I'm not aware of that.

11      Q.    Did you ask anyone at Context if

12  they did so?

13      A.    No.

14      Q.    That would be important,

15  wouldn't it?

16      A.    I'm not aware of evidence about

17  that.  If there was evidence that, again, for

18  any particular practice, that there was

19  alleged wrongful conduct that resulted in the

20  conversion of a practice, that's something

21  that I would want to understand and consider,

22  but I'm not aware of that.

23      Q.    I'm not talking about alleged

24  wrongful conduct in connection with

1    conversion of a practice.

2              What I'm saying is it would be

3    important to you to know whether a comment

4    that was made by a practice that's reflected

5    in the CMS database was based on coaching

6    from Context?

7              MR. HANKINSON:  Objection.

8         A.   Depends.

9         Q.   Can you imagine a situation in

10   the world where that would not be important

11   to you?

12        A.   Yeah.  Depends on why that

13   practice made the determination to switch.

14   And the question, then, is was it due to the

15   alleged wrongful conduct, or was it due to

16   other factors.

17             If it was due to the alleged

18   wrongful conduct, then that's something that

19   would, I think, give rise to damages; if it

20   was not, then I think it would not.

21        Q.   And maybe we may be

22   misconnecting here.

23        A.   Okay.

24        Q.   My question, first of all, it is

1   true that you considered and relied upon

2   comments made by practices to HAN, as

3   reflected in the documents, about their

4   reasons for cancelling and switching to

5   Context?

6          A.    Yes, along with the testimony

7   and other evidence.

8          Q.    And if those comments that you

9   relied upon by the practice were based on

10  coaching from Context, that would be

11  important to know, correct?

12              MR. HANKINSON:  Objection.

13         A.    Again, it depends on --

14  potentially, it depends on whether or not the

15  practice was converted as a result of the

16  alleged wrongful conduct.

17         Q.    You're assuming they were?

18         A.    No.  I'm assuming that they

19  converted from HAN to Context.  I'm not

20  assuming that they were converted because of

21  the alleged wrongful conduct.  That's a

22  question that needs to be answered in order

23  to determine damages.

24         Q.    I'm sorry.  I missed it.  I

1 thought we began this whole discussion by you

2 saying everything you're doing is based on

3 the assumption that there's proven liability

4 that it was alleged wrongful conduct?

5    A. I did make that assumption, yes.

6    Q. We agree that you have relied

7 upon comments made by practices to HAN

8 personnel, when they were contacted by HAN

9 personnel to ask them about why they were

10 cancelling?

11    A. In part.  I reviewed that, along

12 with other testimony and documents, yes.

13    Q. Would you concede to me that

14 that is a large part of your but-for

15 analysis?

16    A. That's a -- large is on a

17 continuum.  I'm trying to navigate this with

18 you.  It's something that I considered, along

19 with the balance of analyses I performed in

20 my report.

21    Q. And if the comments that you

22 relied upon were based on coaching by

23 Context, that would be important to you?

24     MR. HANKINSON:  Objection.

1    A.    I'm saying -- the question that

2  I'm trying to answer is whether the alleged

3  wrongful conduct caused damages, and the role

4  that the alleged wrongful conduct played in,

5  or the portion of the profits that

6  ContextMedia realized that's attributable to

7  the alleged wrongful conduct.

8              The alleged coaching may be a

9  factor that would have an impact on whether a

10  particular practice was converted as a result

11  of the alleged wrongful conduct, but it may

12  not, even assuming the alleged coaching was

13  what transpired.

14              It would really depend on

15  whether or not that practice would have

16  converted from HAN to ContextMedia but for

17  the alleged wrongful conduct.  And that's a

18  determination that needs to be made.

19    Q.    Right.  But you have concluded

20  that practices switched not for the alleged

21  wrongful conduct, but for other reasons?

22              MR. HANKINSON:  Objection.

23    A.    I think that's a reasonable

24  conclusion that one could make based on the

 1    evidence that's available in this case.

 2              Q.    And much of that conclusion is

 3    based on comments that the practices gave to

 4    HAN as to why they switched?

 5              A.    Some of that conclusion is based

 6    on that evidence.

 7              Q.    For example, you've got in your

 8    report, do you not, reference to practices

 9    saying we thought that the HAN content was

10    boring?

11              A.    That's generally consistent with

12    what I recall some of the practices have

13    said.  Now, that's also consistent with what

14    some of the witnesses have said.

15              Q.    And if it turns out that Context

16    employees had coached the practice to tell

17    HAN when they were contacted, tell them that

18    you thought the reason you're leaving is

19    because you thought it was boring, that would

20    be important to you?

21                    MR. HANKINSON:  Objection.

22              A.    Again, it's the same answer as

23    I've been saying it.  It would -- in order

24    for that to have an impact on damages, you

1   need to determine whether or not that changes

2   the practices that were converted by

3   ContextMedia from HAN but for the alleged

4   wrongful conduct.  And it may or may not.  It

5   would depend on that particular practice.  So

6   that's the answer.

7           Q.    And how would you determine

8   that?

9           A.    You would determine it by

10  considering whether or not that practice,

11  that particular practice would have not been

12  converted by ContextMedia but for the alleged

13  wrongful conduct.

14          Q.    How would you do that?

15          A.    By considering the available

16  evidence.

17          Q.    If the available evidence

18  consisted of comments that were made by the

19  practice based on coaching from Context, how

20  would you make that determination?

21              MR. HANKINSON:  Objection.

22          A.    You would want to consider the

23  evidence I considered in my report in order

24  to make that determination.  And if there's a

1   particular practice for which it wouldn't

2   have been converted but for the alleged

3   wrongful conduct, then I think the next

4   question is would that practice have been

5   retained by HAN, what alternatives would that

6   practice have considered, what alternatives

7   were available to ContextMedia, and you need

8   to keep considering the balance of the

9   causation factors.

10          Q.    But it is true that your

11  opinions and conclusions in this case are

12  based, at least in part, on what the HAN

13  practice told HAN after it had cancelled with

14  HAN?

15          A.    That is part of the evidence

16  that I considered, along with the other

17  evidence.

18                (Plaintiff's Exhibit No. 6

19                was marked for identification.)

20          Q.    Let me hand you what's been

21  marked as Plaintiff's Exhibit 6.  Take a

22  minute and read this, and see if you are

23  familiar with this document.

24          A.    (After reviewing document) I've

1    reviewed this document.

2         Q.    Who is Sylvia Velazquez?

3         A.    I don't have a title for Sylvia

4    Velazquez.

5         Q.    Do you know what her role is at

6    Context?

7         A.    No.

8         Q.    In her e-mail, which is at the

9    top of the first page of Exhibit 6, the last

10   full paragraph, she says, "From my end, I

11   think issues arise when the clinic thinks the

12   competitor is going to be in good spirits

13   that they're cancelling their contract.

14            "Similar to when any of us

15   cancel cable TV, a credit card, a gym

16   membership, the company will be a bit annoyed

17   and push to retain.

18            "The clinics should be ready to

19   expect this, and I try to prep them for this

20   as best I can during my confirmation call

21   with the new member."  Do you see that?

22        A.    Yes.

23        Q.    Do you know what it is that

24   Ms. Velazquez does when she tries to prep the

1    practice in advance of the call from the

2    competitor who is losing the practice?

3              MR. HANKINSON:  Objection to

4    form.

5         A.    No.  I would defer to the folks

6    at ContextMedia.  No.

7         Q.    Would it be important to you to

8    know what prepping was done by ContextMedia

9    in advance of a call from HAN to the practice

10   concerning cancellation?

11             MR. HANKINSON:  Objection.

12        A.    I don't think so.  Only to the

13   extent that it would -- if there was an

14   influence on the practice enrollment

15   decision, then it may.

16             But in this type of an example

17   was what I was trying to explain before.

18   We've got, it appears, an office that wanted

19   to go with ContextMedia, and that decision is

20   what drives the revenue to some degree from

21   ContextMedia side.

22             And the question then is would

23   this revenue have been realized by

24   ContextMedia absent the alleged wrongful

 1    conduct.  That's the question that we need to

 2    answer.

 3         Q.    So let's use this as an example,

 4    as you said.

 5         A.    Sure.

 6         Q.    If the reason that the practice

 7    decided to switch was because they were told

 8    that the HAN loop consisted of 50 percent

 9    ads, and that's the reason they decided to

10    leave, that would be a decision based on an

11    improper or an unlawful conduct, correct?

12              MR. HANKINSON:  Objection.

13         A.    Under the assumption that that's

14    my understanding of what the allegations are

15    of some of the alleged wrongful conduct.

16              And so if that practice made the

17    decision to leave as a result of that alleged

18    wrongful conduct, and that does have

19    implications as to lost profits, and it also

20    has implications as to profit disgorgement,

21    and they're separate considerations.  So do

22    you want me to keep talking about that,

23    or --

24         Q.    No.

1        A.    Okay.

2        Q.    And if that same practice was

3   coached or prepped by Context to tell HAN

4   that the reason they left was because they

5   found the program boring or repetitive, that

6   would be important to know?

7              MR. HANKINSON:  Objection.

8   Speculation.

9        A.    What I'm trying to say is in

10  order to determine damages, a determination

11  needs to be made of whether and to what

12  extent the revenues and profits of HAN and

13  ContextMedia would have been changed or have

14  been implicated by the alleged wrongful

15  conduct.

16             And that's not -- in my mind,

17  there's a question as to whether there's any

18  linkage with respect to the alleged coaching.

19  I did consider evidence about practice

20  enrollment decisions, along with the

21  testimony, so it just depends, is my answer.

22       Q.    And I'm not suggesting that the

23  coaching was the reason for the switch.  I'm

24  suggesting that the coaching impacts the

1    evidence that you've relied upon to make a

2    determination that the practice switched for

3    legitimate reasons.

4            MR. HANKINSON:  Objection.

5    Calls for speculation.

6           A.    Same answer as the one I've been

7    giving, which is the focus is on the -- my

8    focus is on what would have happened but for

9    the alleged wrongful conduct in terms of

10   sales and profits.

11          And there's a lot of evidence,

12   including the CMS database, and the

13   deposition testimony of fact witnesses, and

14   documents that were prepared in the normal

15   course of business, so it is something that I

16   would consider.

17          And to the extent that I learn

18   of alleged coaching with respect to a

19   particular practice, that's something that I

20   think I would consider.

21          I'm not prepared to say that

22   that's going to have an impact on my

23   conclusions.  I would just need to understand

24   the nature of the allegation.

1               MR. COWAN:  Fair enough.  It's

2     12:12.  Do you want to take a break for

3     lunch?

4               THE WITNESS:  That sounds good.

5     I'm getting hungry.

6               MR. HANKINSON:  That would be

7     fine.

8               (Lunch recess.)

9               MR. COWAN:  Let's go back on.

10         Q.    Turn to page 48 of your report

11     if you would.

12         A.    (Complies with request.)

13         Q.    In the section here, you say,

14     "Based on my review, while certain comments

15     within the CMS database indicate that HAN

16     personnel were querying practices as to the

17     reasons underlying their switch, and

18     ContextMedia's alleged wrongful conduct and

19     recording their responses, the recorded

20     comments indicate that the practice

21     enrollment decisions were ultimately based on

22     factors unrelated to the alleged wrongful

23     conduct."  Do you see that?

24         A.    Yes.

1         Q.    And then you go through and you

2   have some citations to various locations

3   there; is that right?

4         A.    Right.

5         Q.    What were you trying to convey

6   here?  What was the point you were trying to

7   make in this section?

8         A.    Trying to assess two things.

9   One, I was trying to assess Dr. Wilner's

10  assumption of causation for lost profits.

11              And then second, I was

12  interested in assessing the portion of ethics

13  media profits that may be reasonably

14  attributed to the alleged wrongful conduct.

15  So these are some qualitative factors that I

16  think are -- have some bearing on those

17  issues.

18        Q.    And what are the qualitative

19  factors?

20        A.    What are those qualitative

21  factors?

22        Q.    Right.

23        A.    I would refer you again to

24  page 17 of my report, where I have a bullet

1    listing of some of the qualitative factors,

2    including some of the factors that drive

3    customer enrollment decisions, and the

4    relative importance of those factors;

5    differences between the products of HAN on

6    the one hand and ContextMedia on the other

7    hand; evidence associated with whether the

8    practices were converted that's attributable

9    to the alleged wrongful conduct, as well as

10   my consideration of alternatives.

11        Q.    Let's go back to page 48, the

12   reference to the Okolocha Medical Corp.

13   What were you trying to convey here?

14        A.    I was trying to convey the

15   evidence associated with the reasons for the

16   switch from HAN to ContextMedia.

17        Q.    And as I understand it, you

18   believe that this evidence, as it's reflected

19   relating to Okolocha Medical Corp.,

20   demonstrates to you that the practice

21   enrollment decision was ultimately based on

22   factors unrelated to the alleged wrongful

23   conduct?

24        A.    I think it's unreasonable to

1   conclude that the alleged wrongful conduct

2   was the primary determinant with respect to

3   this practice and other practices, and for

4   the reasons that are included in the section

5   there for Okolocha Medical Corp., as well as

6   some of the other evidence and testimony in

7   my report.

8        Q.    You used the qualifier primary.

9   Why?

10       A.    Could we please have your

11  question and my answer read back?

12       Q.    Sure.

13       A.    Because I wasn't thinking of it

14  that way.

15            MR. COWAN:  Go ahead and read

16  that back, Sue.

17   (The record was read by the court reporter.)

18       A.    I think you could remove the

19  word primary from that answer, and the

20  substance of my opinion would be the same.

21       Q.    And how is it that, reading the

22  reported comments here on page 48 relating to

23  Okolocha, you arrive at the conclusion that

24  the alleged wrongful conduct had no impact on

1    the decision of this practice to switch?

2         A.    I'm not aware of evidence that

3    would suggest that the alleged wrongful

4    conduct was attributable, or the -- I could

5    state it another way.

6              I'm not aware of evidence that

7    would corroborate that the practice decision

8    was driven by the alleged wrongful conduct,

9    vis-a-vis the other factors that are outlined

10   here.

11        Q.    Right.  But what you say is the

12   recorded comments, referring to what you have

13   here on page 48, indicate that the practice

14   enrollment decisions were ultimately based on

15   factors unrelated to the alleged wrongful

16   conduct.  What in this comment leads you to

17   that conclusion?

18        A.    This comment is an example of

19   practices indicating that the program was

20   less desirable than -- well, at least the HAN

21   program, the comment is that the program did

22   not have a lot on it.  It was boring.

23             And that's generally consistent

24   with some of the other comments that I've

1    seen with respect to other practice

2    enrollment decisions.

3            And so what I was trying to do

4    was understand, again, what were the factors

5    that were considered by the practices, and

6    how important was the alleged wrongful

7    conduct by way of comparison with some of the

8    other factors.  And ultimately, I think that

9    gets to the issue of apportionment.

10        Q.    Do you know whether or not any

11   false statements were made to Okolocha

12   Medical Corp. by Context?

13        A.    I have assumed that liability

14   will be found.  And that said, I do not know

15   or have an opinion that there was an alleged

16   false statement made to that particular

17   facility.

18        Q.    And are you drawing the

19   conclusion that this practice was not

20   influenced by any false statement made to it

21   by Context because there's no reference to

22   the false statement in here?

23        A.    Well, there is no reference to

24   the false statement in here that I can see,

1    but my conclusion that HAN has not

2    established causation includes considerations

3    associated with drivers of demand and

4    enrollment decisions, but also includes

5    considerations associated with alternatives

6    and some of the other factors referenced in

7    my report.  So I think it's a bit broader

8    than as is implied by your question.

9          Q.    And I'm just trying to

10   understand.  You have cited this as evidence

11   that the practice enrollment decision of this

12   practice was ultimately based on factors

13   unrelated to the alleged wrongful conduct.

14          How can you say, based on this

15   statement here, that the practice made its

16   decision not based on unlawful conduct?

17          A.    I don't see evidence that would

18   tend to corroborate that the decision was

19   made on the basis of the alleged wrongful

20   conduct, and I also considered other factors

21   beyond the factors contained in the CMS

22   database in order to reach my conclusion that

23   but-for causation has not been established by

24   HAN.

1        Q.    What other factors, other than

2   what's here, did you believe influenced

3   Okolocha Medical Corp.'s decision?

4        A.    Well, there's evidence in the

5   CMS database that indicates that the Okolocha

6   Medical Corp. noted that the HAN program did

7   not have a lot on it, and that was boring.

8              I've also considered that the

9   HAN witnesses and Dr. Wilner have not

10  identified evidence that would suggest that

11  the alleged wrongful conduct was the reason

12  that the practices switched.

13             I also considered, again, the

14  other bullets contained on page 17 of my

15  report that I think are important to consider

16  as well.

17       Q.    Do you believe that the fact

18  that Sheila at Okolocha was, at least

19  according to the comment that you've

20  referenced, told by the HAN representative

21  that Context's removal of HAN's equipment put

22  her in jeopardy of being liable for

23  equipment, may have had any impact on the

24  statement made by Sheila later that the

1    program did not have a lot on it and it was

2    boring?

3              MR. HANKINSON:  Objection.

4         A.    I'm sorry.  I've become somewhat

5    distracted by the pen.  Could we please

6    re-ask that question?

7         Q.    Sure.

8         A.    Thank you.

9         Q.    I'll just ask it again.  Do you

10   believe that the fact, as evidenced by the

11   recorded comment that you've referred to

12   here, that Sheila was told by the HAN

13   representative that Context's removal of

14   HAN's equipment put her in jeopardy of being

15   liable for the equipment, may have had any

16   impact on any of her later statements?

17        A.    I'm not aware of evidence that

18   would suggest that.  The testimony in the

19   case was that the -- for the most part, the

20   HAN witnesses believed that the folks that

21   they were engaging with on the practice side

22   were being truthful.  And so I am aware of

23   that evidence.  I'm not aware of anything to

24   suggest otherwise.

Page 128

1        Q.    And I'm not asking you for

2   evidence that suggests that.  You have

3   rendered, or are going to be rendering

4   opinions based on this statement here,

5   correct?

6        A.    Well --

7        Q.    You're drawing conclusions from

8   the words that are in the recorded comments,

9   correct?

10       A.    In combination with the

11  testimony about those comments and the other

12  documents, sure.

13       Q.    But just focusing on the

14  comments, which is what's set forth on

15  page 48, do you have any belief, any view

16  whatsoever as to whether when the office

17  person at Okolocha was told by the HAN

18  representative that Context's removal of the

19  HAN equipment could put them in jeopardy of

20  being liable for the equipment, may have had

21  any impact on her later comments?

22       A.    I'm not aware of any evidence

23  that suggests that I did.  And so I'm taking

24  it at face value, along with the testimony

1    and other evidence associated with these

2    practice enrollments.

3            Q.    And I'm not asking you for

4    evidence.  I'm just saying human nature,

5    you're commenting about -- you're using this

6    as evidence to support your views.  Would

7    human nature suggest that that's possible?

8            MR. HANKINSON:  Objection.

9            A.    I took the evidence at face

10   value.  I did not try to inject my own

11   opinions about human nature.  And so if

12   there's evidence that would suggest, that

13   comes out that this ought not be considered,

14   then I can assess that at the time.

15            For this statement, and the

16   balance of the other statements in my report,

17   I used diligence in reviewing those, and in

18   reviewing the associated deposition testimony

19   in order to try to reach a reasonable

20   conclusion.

21            And so I think, on the basis of

22   the testimony that the HAN employees are

23   trained in order to identify the reasons that

24   practices left, and that they made notes in

1    the normal course of their business into the

2    database, and that they believe that those

3    people were being truthful, you know, that

4    led me to believe that my reliance on this

5    information, in part, was appropriate.

6              Q.    So you have no opinion one way

7    or the other as to whether or not a practice

8    personnel's response or statements might be

9    influenced if they were told that they might

10   be in jeopardy of being held liable for

11   Context's removal of the HAN equipment?

12             MR. HANKINSON:  Objection.

13             A.    Same answer that I just gave.  I

14   took these at face value, and I did not --

15   that's the answer.

16             Q.    So I still don't know if I got

17   an answer.  Do you or do you not have an

18   opinion?

19             MR. HANKINSON:  Objection.

20             A.    Can I please hear the question

21   one more time?

22             Q.    Right.  Do you have an opinion

23   as to whether or not the practice

24   representative's statements to HAN that are

1   reflected here may have been influenced by

2   having been told, before she made her

3   statement, that Context's removal of HAN's

4   equipment could put the practice in jeopardy

5   of being liable for the equipment?

6              MR. HANKINSON:   Objection.

7         A.    I don't have an opinion about

8   that.

9         Q.    Look at page 49, the North

10  Dayton.  Read the comment as reflected or as

11  recorded on page 49 to yourself.

12             My question is going to be, can

13  you tell who was the decision maker for North

14  Dayton Rheumatology with respect to the

15  decision to switch from HAN to Context?

16        A.    (After reviewing document) I'm

17  sorry about the pen.  Do you mind?

18        Q.    I'm sorry.

19        A.    That's okay.  Your question was

20  do I know who specifically at the practice

21  made the decision?

22        Q.    Correct.

23        A.    On the basis of the passage

24  here, that's not indicated in this particular

1    section.  It may be that one of the witnesses

2    testified about this, and I'd have to take

3    another look at the deposition testimony to

4    confirm that.

5         Q.   Take a look at the next one from

6    Dr. Ferrari.  Just read that one to yourself,

7    and then I'll have some questions about it.

8         A.   (After reviewing document) Yes,

9    I read it.

10        Q.   Now, this is a situation where,

11   at least according to the recorded comment,

12   Context told the practice that Context had

13   permission to remove HAN's equipment?

14        A.   That's what this comment

15   indicates.

16        Q.   And do you know whether or not

17   that comment made by Context had any impact

18   on the decision by this practice to switch?

19        A.   Based on my reading of this

20   comment, just a practical reading of it, it

21   appears that the programming was the factor

22   that drove the decision.

23        Q.   Let me ask you a few questions

24   about the Ferrari practice.  Did you look at

Page 133

1    any of Context's communications with the

2    Ferrari practice?

3            A.    Insofar as those were deposition

4    exhibits or included in my documents.  I'm

5    not recalling specifically.

6                  (Plaintiff's Exhibit No. 7

7                  was marked for identification.)

8            Q.    Let me hand you what has been

9    marked as Plaintiff's Exhibit 7.  Take a

10   minute and see if you recall having seen this

11   before.

12           A.    After having reviewed the

13   document, I don't recall having reviewed this

14   document before.

15           Q.    Would you agree with me that it

16   appears to be an e-mail from Brok Vandersteen

17   at ContextMedia to the Ferrari office?

18           A.    I haven't really spent time to

19   review the document.  Would you like me to do

20   so?

21           Q.    Sure.

22           A.    (After reviewing document) I've

23   reviewed this document.

24           Q.    And your page 49, when you

1    reference the comments about Dr. Ferrari's

2    presence, references a Veronica.  Do you see

3    that?

4         A.    Yes.  I see that on page 49 in

5    my report.

6         Q.    And Exhibit 7 is an e-mail from

7    Brok to doctor.ferrari@yahoo.com.  It says

8    "Hi, Veronica"?

9         A.    I see that, yes.

10        Q.    Now, in his e-mail, October 25,

11   2011, he's referencing both Healthy Advice

12   and Accent Health.  Do you see that?

13        A.    I do see that, yes.

14        Q.    And with respect to Healthy

15   Advice, what he says is, "We also have less

16   ads and more customization features."  Do you

17   see that?

18        A.    He said, "We also have less ads

19   and more customization features."  I see

20   those words.

21               (Plaintiff's Exhibit No. 8

22               was marked for identification.)

23        Q.    Let me hand you Plaintiff's

24   Exhibit 8.  This is another e-mail from

1    Mr. Vandersteen to Veronica at Dr. Ferrari's

2    office a few weeks later.  Do you see that?

3           A.    Yes.  Would you like me to take

4    the time to read this?

5           Q.    Sure.  Please.

6           A.    I've reviewed this document.

7           Q.    You'll see, in the second full

8    paragraph now, Mr. Vandersteen is saying,

9    referring to Healthy Advice, "We also have

10   far less ads than Healthy Advice in each

11   loop."  Do you see that?

12          A.    I see that sentence.

13                (Plaintiff's Exhibit No. 9

14                was marked for identification.)

15          Q.    This is Plaintiff's Exhibit 9,

16   which is now a January 9, 2012 e-mail from

17   Mr. Vandersteen to Veronica at Dr. Ferrari's

18   office.  Do you see that?

19          A.    Yes.  Would you like me to take

20   a moment to read this?

21          Q.    Take a moment and read it, if

22   you would.

23          A.    (After reviewing document) I've

24   reviewed this.

1          Q.     So at least it appears, based on

2     the documents that have been produced by

3     Context in this case, that at least as of

4     Monday, January 9, 2012, Mr. Vandersteen had

5     not been successful in persuading Veronica or

6     Dr. Ferrari's office to switch.  Is that

7     fair?

8          A.     That sounds like a reasonable

9     conclusion, based on these documents.

10         Q.     And now Mr. Vandersteen is

11    saying to Veronica, he says in that first

12    paragraph, "The Rheumatoid Health Network --"

13    and you understand that's Context, RHN, their

14    network?

15         A.     I do.

16         Q.     "The Rheumatoid Health Network

17    is significantly better, and that's why over

18    350 healthcare facilities had us replace

19    Healthy Advice last year."  Do you see that?

20         A.     I do.

21         Q.     And is it your understanding

22    that that statement is just flatly false?

23              MR. HANKINSON:  Objection.

24         A.     I don't know.

1          Q.    Based on the evidence you've

2    seen in the case, and your analysis of the

3    practices that switched, can you tell me

4    whether or not there's evidence to support a

5    statement that Context had switched

6    350 healthcare facilities from Healthy Advice

7    to Context in 2011?

8          A.    I have some practice switching

9    documents according to Healthy Advice

10   Network's records that I brought with me

11   today related to the RHN and diabetes

12   networks in 2011.  I can go look at those if

13   you'd like me to.

14         Q.    No.  If you can't tell me

15   offhand whether or not you think it's true

16   that RHN switched 350 practices from Healthy

17   Advice in 2011, I'll take that.

18         A.    I don't recall the number of

19   practices in particular.  And another caveat

20   is I don't recall if there's other networks

21   beyond the diabetes network or the RHN.

22         Q.    Are you able to say to what

23   extent Veronica was influenced or impacted by

24   that statement?

1              MR. HANKINSON:  Objection.

2         A.    I, again, take at face value the

3    comments that were recorded in the CMS

4    database, and the associated testimony about

5    those comments.  So that's the same answer as

6    the one that I was giving earlier today.

7    This hasn't changed my opinion on that.

8         Q.    Right.  It's not an answer to my

9    question.  My question is, can you tell me to

10   what extent Veronica was influenced or

11   impacted by the statement by Mr. Vandersteen

12   that over 350 healthcare facilities had

13   Context replace Healthy Advice last year?

14        A.    I don't have personal knowledge

15   of that.  I would, in order to answer that,

16   would need to look at the CMS database, and

17   see what reasons that the HAN personnel

18   recorded for the transition, and review the

19   deposition transcripts to see if there's any

20   other evidence.  I don't know otherwise.

21        Q.    Is it your testimony that if a

22   statement like this, 350 practices switched

23   from Healthy Advice to Context, doesn't show

24   up in the CMS database, then it was not

1    significant or material to the practice?

2           A.    My testimony is that -- my

3    understanding is that the CMS database

4    contains information that the practices

5    relayed to HAN, and that the HAN witnesses or

6    personnel were trained to try to solicit the

7    reasons as to why practices were switching,

8    and that they recorded those, and they

9    believed that those statements were truthful.

10              That's what is contained in the

11   CMS database that I considered and reviewed

12   in connection with my opinions here, along

13   with the deposition testimony.

14              If there were other factors that

15   also influenced that practice and enrollment

16   decision, beyond what's included in the CMS

17   database, that's not something that I have

18   personal knowledge about.

19              I would defer to the folks who

20   were involved in that, and if there's

21   information that's available that would allow

22   me to advance my understanding with respect

23   to any particular practice, I would be happy

24   to do so.

1          MR. COWAN:  Okay.  Could you

2    read him back my question.  I'm going to have

3    her read you back my question.  I want you to

4    try answering my question.

5     (The record was read by the court reporter.)

6          MR. HANKINSON:  Objection.

7          A.    That's not really the way that I

8    characterized my opinion.

9          Q.    I'm sorry, sir.  I'm not

10   interested in how you characterized your

11   opinion.  I want an answer to my question.

12   It's a very specific question.  Can you

13   answer my question?

14         A.    I was trying to answer your

15   question, but now I'm -- can you please read

16   it back?

17         MR. COWAN:  I'll have Sue read

18   it again.

19   (The record was read by the court reporter.)

20         MR. HANKINSON:  Objection.

21         A.    That's not my testimony.

22         Q.    So it would be your testimony,

23   or it would be your belief that a statement

24   such as 350 healthcare facilities had Context

1   replace Healthy Advice last year could be

2   material to a practice, even though it

3   doesn't show up in the CMS database?

4           MR. HANKINSON:  Objection.  It

5   doesn't follow.

6       A.   Could you please ask that be

7   reread?

8       Q.   Sure.

9       A.   Thank you.

10   (The record was read by the court reporter.)

11      A.    I mean, hypothetically, it could

12   arrange -- there are a myriad of

13   considerations that the practices made, and

14   that hypothetically could be something that

15   would be important to a practice.

16           The question in my mind is

17   whether that changes, from a damages

18   perspective, HAN's entitlement to lost

19   profits damages and/or a portion of profits

20   that should be attributable to the alleged

21   wrongful conduct.

22      Q.    In the second full paragraph,

23   now Mr. Vandersteen is saying, as of

24   January 9, 2012, third or fourth sentence in,

Page 142

1    "Instead of a 30-minute PowerPoint slide that

2    consists of nearly 50 percent commercials, we

3    have award winning cooking shows, exercise

4    videos, and inspirational stories."  Do you

5    see that?

6              A.    I see that sentence.

7              Q.    And you have told me before that

8    one of the factors that you believe

9    influences a practice's decision on which

10   provider to use is the percentage of ads on

11   the loop or content?

12             A.    There was some testimony that

13   the advertising to content ratio was one of

14   the factors that practices considered, yes.

15             Q.    That's one of the -- not only

16   testimony, you have it in your report as

17   being one of the factors that's considered?

18             A.    It's on the bullet list of

19   factors that I am aware of, yes.

20             Q.    So are you able to tell me

21   whether Veronica was influenced or impacted

22   by Mr. Vandersteen's statement that the HAN

23   30-minute PowerPoint slide consists of nearly

24   50 percent commercials?

1          A.     My answer to this is consistent

2    with my answers to the other questions that

3    you asked me about the conversion of

4    practices, which is that my understanding is

5    based on the testimony and the comments that

6    were recorded in the CMS database.  I don't

7    have personal knowledge about the influence

8    that the other alleged wrongful statements

9    had on the enrollment decision.

10         Q.     So is your answer no, you are

11   unable to say to what extent, if any, this

12   statement that HAN's program consisted of a

13   30-minute PowerPoint slide that was nearly

14   50 percent commercials had on Veronica?

15              MR. HANKINSON:  Objection.

16         A.     It's a little bit more nuance

17   than that, because there are a lot of factors

18   that I understand drove the enrollment

19   decisions.  And I considered the evidence

20   about those factors across the scope of

21   practices that were allegedly wrongfully

22   converted.

23              And it is true that I don't

24   know, with respect to the recipient of the

1    e-mail here marked as Exhibit 9, what impact

2    that particular statement had on her

3    enrollment decision.  I'm not aware of

4    evidence that would tend to corroborate or

5    suggest that the damages quantified by

6    Dr. Wilner would flow from that for the

7    reasons I've articulated in my report.

8          Q.    Well, if the Ferrari practice

9    decided to switch from HAN to Context because

10   it was told and believed that the HAN loop

11   consisted of nearly 50 percent commercials,

12   that would indicate that the wrongful conduct

13   caused that practice to switch?

14               MR. HANKINSON:  Objection.

15         A.    That's where I'm not necessarily

16   agreeing with you.  I think there are other

17   considerations that one need to properly

18   consider in order to reach that conclusion.

19         Q.    What are those?

20         A.    You need to consider what would

21   have happened in the absence of the alleged

22   wrongful conduct.

23         Q.    How would you make that

24   decision?  How would you make that

Page 145

1    determination?

2         A.    By assessing the relative points

3    of the alleged wrongful conduct by way of

4    comparison with the other factors that

5    perhaps contributed to the decision of the

6    practice to convert from HAN to ContextMedia,

7    and then also by considering the alternatives

8    that were available to both the practice and

9    to ContextMedia in order to convert that

10   practice, and also consider whether or not

11   HAN had the capacity to make that sale from a

12   marketing standpoint, or to retain that

13   practice from a marketing standpoint.

14        Q.    Well, does it not depend

15   entirely on the specific practice as to what

16   information influenced their decision?

17        A.    It does depend on the practice

18   and what information influenced that

19   decision, and it also depends on what

20   alternatives were available at that practice

21   and to ContextMedia.

22        Q.    Are you able to tell me that the

23   Ferrari practice did not switch because of

24   either the statement involving 350 practices,

1    or the statement involving the amount of

2    commercials on HAN's product?

3            A.    The available evidence in this

4    case does not support the conclusion that the

5    practice switched because of the alleged

6    wrongful statements.

7            Q.    And what is that evidence?

8    We're focusing on Dr. Ferrari.  What is the

9    evidence that you say does not support the

10   conclusion that Dr. Ferrari switched either

11   because of the 350 practices statement, or

12   the 50 percent ad statement?

13           A.    I'm not aware of evidence to

14   support the notion that it did.  HAN

15   witnesses were asked to identify practices

16   that switched that were attributable solely

17   to the alleged wrongful conduct, and they

18   were unable to do so.

19                 They also testified that they

20   were unable to -- that there were some

21   practices that were converted because of fair

22   competition.  That was a word that the HAN

23   witnesses used, if memory serves, and that

24   there were others that they believed were

Page 147

1    allegedly converted by unlawful means.

2                I'm not aware of identification

3    by the HAN witnesses that Dr. Ferrari's

4    practice was converted on the basis of the

5    alleged wrongful statements.

6                And there are a lot of factors

7    that these practices consider when they're

8    making their enrollment decisions.

9                I've considered those factors,

10   their relative importance, and in the case of

11   Dr. Ferrari's practice, what the HAN

12   witnesses identified as being important to

13   their enrollment decision.

14       Q.   You would agree with me that the

15   HAN witnesses who were questioned by counsel

16   for ContextMedia do not know what Context

17   told the HAN practices?

18                MR. HANKINSON:  Objection.

19       A.   I don't know what -- whether

20   that's right or not.

21       Q.   Well, let me ask you this:  You

22   read Mr. Shah's testimony, right?

23       A.   Yes.

24       Q.   You read Mr. Purdy's testimony?

 1    You did.  It's in there.

 2          A.    Yes.

 3          Q.    They are Context's executives,

 4    correct?

 5          A.    Yes.

 6          Q.    Sit in the same office with the

 7    Context employees?

 8          A.    I presume.

 9          Q.    And you saw from their testimony

10    that they were unable to say what the Context

11    employees told each and every HAN practice?

12          A.    I need to take a look at their

13    testimony in order to corroborate that.  I'm

14    not recalling precisely, as I sit here now.

15          Q.    Let me just ask you, as an

16    expert witness who is here to testify today

17    truthfully and honestly, can you tell me that

18    you believe that the HAN employees know what

19    each and every Context employee told each and

20    every HAN practice?

21                MR. HANKINSON:  Objection.

22          A.    Can you please repeat that?

23                MR. COWAN:  Go ahead, Sue.

24    (The record was read by the court reporter.)

Page 149

1        A.    I don't know the answer to that.

2   That wouldn't be my suspicion, but I don't

3   know what the HAN employees know.

4        Q.    Do you believe it's possible

5   that the HAN employees know what each and

6   every Context employee told each and every

7   HAN practice?

8        A.    I don't think so, but I don't --

9   I think we were talking past each other a

10  little bit, because at first I thought you

11  were talking about a particular practice, and

12  now I think it's expanding to what every

13  Context person talked about, and so I don't

14  think it's likely that the -- or probable

15  that they so know what all -- all the various

16  communications.

17            With respect to what a

18  particular witness knew about a particular

19  practice, I don't know whether they had

20  knowledge of that or not.

21       Q.    Right.  And so when Context

22  attorneys ask a HAN employee, do you think

23  that maybe some of the practices left because

24  of fair competition, that answer that's given

1    is only as good as what they know was told by

2    Context to the practices, right?

3                MR. HANKINSON:  Objection.

4        A.    I don't think I could

5    necessarily agree with that.  I mean, I

6    understand that these were corporate

7    witnesses that were designated to testify

8    about the subject matters, and they did so,

9    and so I took the testimony at face value;

10   and, again, it was generally consistent with

11   the documents that I saw, and that's what I

12   based my opinion on.

13       Q.    Do you know whether there was

14   any HAN practice that was switched to Context

15   that was not lied to by Context?

16       A.    I've made the assumption that

17   liability would be established as a predicate

18   assumption to my damages analysis.  I don't

19   know the scope of the alleged wrongful

20   conduct as it relates to each and every

21   practice.

22                For instance, I understand that

23   I'm not aware of evidence that each of these

24   statements were made to each of these

1    practices, but I'm not -- you know, I am

2    assuming liability, though.

3              (Plaintiff's Exhibit No. 10

4              was marked for identification.)

5         Q.   Plaintiff's Exhibit 10, the

6    final one on the Dr. Ferrari practice.  Just

7    take a minute and read the top statement to

8    yourself, if you would.

9         A.   (After reviewing document) I

10   read the top part, and a little bit of the

11   bottom part.

12        Q.   You'll see here, where Brok now

13   is saying, as of March 26, 2012, "I just

14   wanted to let you know that we've finalized a

15   partnership with The Arthritis Foundation in

16   order to provide more programming for your

17   patients.  We're the only network investing

18   in programming that actually helps patients

19   with rheumatic conditions."  Do you see that?

20        A.   Yes.

21        Q.   That statement there, "We're the

22   only network investing in programming that

23   actually helps patients with rheumatic

24   conditions," do you believe that's a truthful

Page 152

1    statement?

2                    MR. HANKINSON:   Objection.

3        A.    I don't know.

4        Q.    Do you believe that

5    Mr. Vandersteen is suggesting that Context is

6    the only provider that has a relationship

7    with The Arthritis Foundation?

8                    MR. HANKINSON:   Objection.

9        A.    I don't see that in these words.

10       Q.    You do see, though, in the

11   comments on 49 referenced by Veronica to The

12   Arthritis Foundation?

13       A.    I see that, yes, on page 49.

14       Q.    Take a look on your report at

15   the North Fulton Health Care Association, the

16   recorded comments.  What is the specific

17   comment that she made that leads you to

18   believe that the practice enrollment decision

19   for that practice was ultimately based on

20   factors unrelated to the alleged wrongful

21   conduct?

22       A.    You can see I provided a bold

23   statement there, in the paragraph on page 50

24   of my report, that the office explained that

Page 153

1    they switched because the office had not been

2    offered an upgrade unlike all the other

3    related offices.

4         Q.    Okay.  And you see that that

5    statement, at least according to the comment,

6    came after Shannon at North Fulton said she

7    did not have a contract with PatientPoint.

8    HAN explained to her that she did have an

9    enrollment agreement signed in 2005; after

10   Shannon said that Context told her they were

11   authorized to remove the equipment, after HAN

12   explained to her that she was misled and the

13   other company does not have permission, and

14   they may have made her liable for return of

15   the equipment since they broke the enrollment

16   agreement, and after it's reported that

17   Shannon got really defensive at that time and

18   said follow up about what.  Do you see that?

19        A.    Well, I see that -- the sentence

20   that I explained comes after those other

21   statements in this paragraph.

22              I don't know that that

23   necessarily means that this paragraph was

24   recorded sequentially in order of the

1    conversation, but if that was the case, then

2    that would be right.  I just don't know if

3    that's right.

4         Q.    You assume that, though, don't

5    you?

6         A.    I don't assume that.

7         Q.    You don't?

8         A.    No.

9         Q.    So you've indicated that you

10   believe that, I think in your report you said

11   that the HAN employees meticulously record

12   the comments?

13        A.    I think there was testimony

14   consistent with that.

15        Q.    Yeah.  If they meticulously

16   recorded the comment, would you expect them

17   to get them recorded in the order they

18   occurred?

19        A.    I didn't make an assumption that

20   it was.

21        Q.    Well, apparently, based on your

22   testimony, the order in which comments are

23   made is important to you?

24             MR. HANKINSON:  Objection.

1        A.    That's not what I said.  I was

2    just trying to answer your question.

3        Q.    What you said was, I'm not sure

4    that the testimony, that the statement came

5    in that order.

6        A.    You asked me to corroborate that

7    it did come in that order, and I said I don't

8    know if it did.

9        Q.    If it did come in that order, if

10   it came in the order that it's written in, do

11   you believe that all that proceeds it may

12   have impacted that which you are relying

13   upon, i.e., "She explained that she switched

14   because the office has never been offered an

15   upgrade unlike all of the related offices"?

16       A.    My response is consistent with

17   my response on other similar questions, which

18   is I'm taking this at face value, and so

19   that's what I considered in my report.

20       Q.    So you --

21       A.    I don't have an opinion about

22   the -- to answer your question.

23       Q.    So it's fair to say, then, that

24   you just pick the words out and don't try to

1    put them into context?

2              MR. HANKINSON:  Objection.

3         A.    I don't think I agree with that,

4    no.

5         Q.    Well, the words that you're

6    relying upon are in context, correct?

7    They're in the context of an overall

8    conversation.  You would agree with that?

9         A.    There's other information here,

10   sure, yes.

11        Q.    And the context in which they're

12   given has an impact on whether or not they

13   are truthful?

14        A.    I don't know that I can agree

15   with that.  I mean, my understanding is that

16   the HAN witnesses believe that the statements

17   that they received were truthful.

18              That's what the testimony is,

19   and I took it at face value.  I provided the

20   whole passage here so as not to lose context,

21   but that is my -- the substance of my

22   testimony on that entry.

23        Q.    You saw testimony, did you

24   not -- well, maybe you didn't read all the

1    HAN transcripts.

2              Did you see testimony from any

3    HAN witnesses that said that they felt like

4    practices often just gave them the reasons

5    that HAN wanted to hear so they could get off

6    the phone?

7         A.    I'm not recalling that.  I think

8    we should be able to confirm that by looking

9    at the transcript.

10        Q.    Did you read Ms. Grippo's

11   transcript?

12        A.    No.

13        Q.    All right.  If you could look at

14   the next entry for Rheumatology Associates of

15   South Florida.

16        A.    (Complies with request.)

17        Q.    Just read it over to yourself,

18   and I'll ask you a couple questions about it.

19        A.    Sure.  (After reviewing

20   document) Okay.

21        Q.    In the middle, the recorded

22   comment says, "I asked if she --" and "I" is,

23   we would agree, is referring to the HAN

24   employee, "she" referring to Annette?

Page 158

1       A.    I'm not seeing that, but --

2       Q.    Take a minute.

3       A.    Oh, I see.  I found it.  And the

4  question is does the "I" refer to Annette?

5       Q.    No.  The "I" refers to the HAN

6  employee.  Do you understand that?

7       A.    That's my presumption, yes.

8       Q.    And "she" would be Annette?

9       A.    That sounds right.

10      Q.    "I asked if she was told that

11  Context was authorized or that they had our

12  permission to remove our equipment.  She

13  explained that was the reason she signed

14  papers giving them permission to remove."  Do

15  you see that?

16      A.    Yes.

17      Q.    What papers do you understand

18  she's referring to?

19      A.    It appears, based on that

20  statement, it was papers related to

21  permission to remove the HAN equipment from

22  the practice.

23      Q.    Do you know whether Annette

24  and/or Rheumatology Associates would have

Page 159

1    switched from HAN to Context if they were not

2    told by Context that Context had permission

3    to remove HAN's equipment?

4         A.    The available evidence is that

5    they switched because the doctors were ready

6    for a change, and that they liked audio on

7    the program.  I think it would be

8    unreasonable to conclude that they wouldn't

9    have switched and would have remained with

10   HAN for the duration of the period, as

11   forecasted by Dr. Wilner.

12        Q.    What's the basis for that?

13        A.    Well, I don't want to get us off

14   track, but I've provided and we talked about

15   before a bullet list of factors related to

16   demand drivers.  There's also alternatives

17   that were available to the practice, to the

18   degree that they wanted to switch from HAN,

19   and also alternatives available to

20   ContextMedia that ContextMedia could employ

21   to entice practices to switch.

22        Q.    And those are general comments.

23   They're not applicable to any specific

24   practice?

1          A.    I think they're applicable to

2    all the practices.

3          Q.    Do you know which of those were

4    applicable to Annette in Rheumatology

5    Associates?

6                MR. HANKINSON:  Objection.

7          A.    The alternatives are applicable

8    to Annette in Rheumatology Associates, and

9    factors related to the differences of the

10   products were attributable to that practice

11   as well.

12         Q.    But here we have a specific

13   statement by a specific practice that she

14   explained that the reason she signed the

15   practices was because she was told by Context

16   that they had permission to remove the

17   equipment.  That's how you read that,

18   correct?

19         A.    Could I please hear that again?

20               MR. COWAN:  Sue.

21    (The record was read by the court reporter.)

22         A.    I read that as she signed the

23   papers to give them permission to remove the

24   equipment.  That's the reason that she signed

1    it, according to the sentence.

2         Q.    The sentence says, "I asked if

3    she was told that Context was authorized or

4    that they had our permission to remove our

5    equipment.  She explained that was the reason

6    she signed papers giving them permission to

7    remove."  How do you interpret that?

8         A.    That she signed the papers to

9    give them permission to remove the equipment.

10        Q.    Do you not read that as that she

11   was told by Context that they had permission

12   to remove?

13        A.    I read that that she was told by

14   Context that she had permission to remove.

15        Q.    And my question is specifically

16   related to Annette in Rheumatology Associates

17   of South Florida.  Can you tell me that that

18   practice would have switched to Context if

19   Context had not told her that they had

20   permission to remove the equipment?

21             MR. HANKINSON:  Objection.

22        A.    I can tell you I do not believe

23   that that has been established by Dr. Wilner

24   or by HAN for the reasons that are

1   articulated in my report.

2           I think the conclusion that that

3   practice would have converted to ContextMedia

4   is a more reasonable conclusion on the basis

5   of the evidence available in this case.

6           Counsel, would it be okay if I

7   grabbed a coffee?

8           MR. COWAN:  Yes.  Let's take two

9   minutes, three minutes.

10          THE WITNESS:  Great.  Thank you.

11          (Brief recess.)

12      Q.   I skipped over one that I should

13   not have.  If you would go to page 49, the

14   John Hopkins entry.

15      A.   Yes.

16      Q.   Read that one to yourself, if

17   you would.

18      A.   (After reviewing document) I

19   looked at it.

20      Q.   So in this recorded comment,

21   Jonathan, who is with John Hopkins, told the

22   HAN employee that he signed a waiver provided

23   by Context that gave them permission to

24   remove our equipment.  Do you see that?

1          A.    Yes.

2          Q.    And the HAN employee asked him

3    to fax him a carbon copy of the waiver, and

4    he said he would have his customer service

5    rep at Context fax it to us, to me.  Do you

6    see that?

7          A.    Yes.

8          Q.    And then the HAN employee

9    apparently told Jonathan, or explained to

10   Jonathan that the enrollment form with HAN

11   said that only PatientPoint can service or

12   remove PatientPoint equipment.  Do you see

13   that?

14         A.    Yes.

15         Q.    And his reply, and it's in

16   quotes, is, "I don't know who is lying to

17   me."  Do you see that?

18         A.    Yes.

19         Q.    How did you interpret that

20   statement by Jonathan in this recorded

21   comment that you relied upon?

22         A.    Can you be more specific?  What

23   do you mean, how did I interpret that?

24         Q.    Well, let me just -- maybe I

Page 164

1     need to step back.  When you see a customer

2     comment that you're relying upon that says "I

3     don't know who is lying to me," did you not

4     pay particular attention to that?

5          A.    No.  I was focused more on the

6     reason underlying the decision to switch to

7     ContextMedia.

8          Q.    But you understand that this

9     case is about Context lying to practices?

10         A.    I understand there's alleged

11    wrongful conduct.  I understand that there

12    are allegations of that, yes.

13         Q.    Would you agree with me that at

14    a bare minimum, this comment by Jonathan

15    evidences actual confusion on the part of the

16    practice?

17              MR. HANKINSON:  Objection.

18         A.    I don't know, from a legal

19    standpoint, if the word confusion has a legal

20    meaning or implication.  I do --

21         Q.    Assume it doesn't.

22         A.    Okay.  I'm under -- the plain

23    practical read of this paragraph indicates to

24    me that Jonathan at Johns Hopkins was advised

1    that ContextMedia gave -- that ContextMedia

2    received a waiver from Jonathan to remove the

3    equipment; that HAN explained that the

4    enrollment form said that only PatientPoint

5    could service or remove the equipment, and

6    that Jon didn't know what was right.

7         Q.    He goes on to say, or the

8    comment goes on to say, "Jonathan said that

9    the Johns Hopkins' other rheumatology offices

10   are using RHN and like it because there is

11   much more information not repetitive with

12   interviews, newswires, and streaming

13   weather."  Do you see that?

14        A.    Yes.

15        Q.    So that's information that was

16   provided by the other offices to Jonathan?

17             MR. HANKINSON:  Objection.

18        A.    Was your question did Jonathan

19   observe that by himself, or was he told that?

20   Is that the nature of your question?

21        Q.    My question is, this would

22   indicate that that information was provided

23   to Jonathan by the other offices?

24        A.    I don't know that you could make

1    that determination based on this sentence.

2         Q.    How would Jonathan know that the

3    other offices liked RHN better?

4         A.    Based on observing that and

5    discussing it with other folks.

6         Q.    Let me ask you about the entry

7    on page 50 for C.A.R.E. Center.  Do you see

8    that?

9         A.    Yes.

10        Q.    Take a minute and just read that

11   to yourself.

12        A.    (After reviewing document) Sure.

13   I've reviewed it.

14        Q.    Who do you understand, in the

15   part of this that you've bolded, it says "the

16   other company."  Who is "the other company"

17   referring to?

18        A.    If memory serves, this is --

19   these comments are all related to

20   ContextMedia.

21        Q.    So, "The other company --"

22   referring to ContextMedia -- "provides a

23   three-hour loop each of rheumatology info and

24   allergy info."  Do you see that?

Page 167

1        A.    I do see that.

2        Q.    And if you'd look at page 29 of

3   your report, the second bullet point on page 29

4   says, "ContextMedia's content during the

5   period at issue ran on a 90-minute loop."  Do

6   you see that?

7        A.    I see that.

8        Q.    So if the C.A.R.E. Center

9   practice was told by Context that it provides

10  a three-hour loop each of rheumatology info

11  and allergy info, that would be a lie; would

12  it not?

13            MR. HANKINSON:   Objection.

14        A.    This is a hypothetical question

15  because it says that the other company

16  provides a three-hour loop each of

17  rheumatology info and allergy info.  That

18  doesn't say that that's what she was told.

19            I also note, in footnote 107 on

20  page 29 of my report, that ContextMedia

21  transitioned from the 90-minute loop to a

22  smart playlist that was more of a dynamic

23  media library.  And so those are some of my

24  reactions to your question.

1          Q.     Turn if you would to page 54.

2     You say in sort of the middle of your

3     paragraph that's after the quoted testimony

4     from Greg Robinson, "I am not aware of any

5     contention from HAN or Dr. Wilner that

6     practices that switched from HAN to

7     ContextMedia in the period following the

8     accord have done so as a result of any

9     alleged wrongful conduct."  Do you see that?

10         A.     Yes.

11         Q.     Do you know whether Context

12    employees have continued to make false

13    statements to HAN practices after March 2013?

14         A.     I'm not aware of that one way or

15    the other.  And also as part of your question

16    that it was false statements, I mean, I'm

17    presuming liability here.  That's not a

18    determination that I made.  And so I think

19    that I'm having a little bit of trouble

20    navigating your question.

21         Q.     Let me ask it a different way.

22         A.     Okay.

23         Q.     Do you know if Context employees

24    made false statements to HAN practices after

Page 169

1    March 2013?

2         A.    Same -- that's the same question

3    as the one that you asked me.  I'm not

4    appreciating the difference.

5              Part of my challenge here is I

6    am not offering an opinion as to whether a

7    statement is false or not false.  I'm just

8    presuming that there was alleged wrongful

9    conduct that constitutes false statements,

10   but I am not offering an opinion that it was

11   or wasn't.

12             And I understand that the

13   parties reached an accord that the witnesses

14   in the case have testified was the end of the

15   period of alleged wrongful conduct, and if

16   that's responsive to your question, then we

17   can --

18        Q.    I can rephrase it, I think, to

19   ask it a better way.

20        A.    Okay.

21        Q.    Do you know whether Context has

22   engaged in any unlawful conduct relative to

23   HAN practices after March 2013?

24        A.    That clarification didn't help

1    me navigate your question because, again,

2    it's presuming that I'm -- has a presumption

3    element of liability.

4          Q.    It's not.  It's not.

5          A.    Yeah, I'm just not

6    understanding.

7          Q.    It's just a simple question.  Do

8    you know if Context employees engaged in any

9    unlawful or wrongful conduct with HAN

10   practices after March 2013?

11         A.    I'm not aware of that.

12         Q.    You don't know one way or the

13   other?

14         A.    Well, I have an understanding,

15   based on the testimony in this case, that the

16   parties reached an accord, and that HAN

17   witnesses have testified that the alleged

18   wrongful conduct stopped at that period in

19   time, and that's the period in which

20   Dr. Willard truncated his damaged analysis,

21   save alleged lost growth, on the basis of the

22   historical period, and so that's something

23   that's part of the record of this case.

24               But I don't know whether HAN is

Page 171

1    making allegations beyond that, and I also

2    don't know whether those are -- will be

3    ultimately found to be wrongful.

4         Q.   Is it material to any of your

5    opinions whether Context continued to switch

6    out practices after March 2013?

7         A.   I understand that they did

8    continue to switch out practices, and I have

9    considered that, yes.

10        Q.   And you don't know, as you sit

11   here today, whether they did so based on

12   unlawful or improper conduct?

13             MR. HANKINSON:  Objection.

14   Already asked and answered.

15        A.   Yeah, I don't agree with that.

16   I considered that Context continually

17   transitioned practices before and after the

18   period in which there was an accord that was

19   reached.

20             And my understanding of the case

21   is that that serves as the end of

22   Dr. Wilner's damages period, save alleged

23   lost future growth.  And I considered that,

24   along with the other evidence in the case, in

1    order to advance my thinking about damages

2    related issues.

3           Q.    Do you understand this accord

4    that you've referred to as essentially

5    Context agreeing that it would no longer

6    commit bad acts?

7                 MR. HANKINSON:  Objection.

8           A.    That's not consistent with my

9    understanding.

10          Q.    Tell me what your understanding

11   of the accord is.

12          A.    My understanding is that the

13   parties reached an agreement about the

14   process by which they would engage in

15   switching practices from one company to the

16   other.

17                I wouldn't want that to be

18   misconstrued as an agreement by ContextMedia

19   that it's -- the alleged wrongful conduct was

20   indeed unlawful.  I'm just not offering

21   opinions about that.

22          Q.    Do you know whether Context

23   employees made any untruthful statements to

24   any HAN practices after March 2013?

Page 173

1              MR. HANKINSON:  Objection.

2         A.    Same answer as the one that I

3    gave before, which is I'm not aware.  My

4    understanding is that the parties reached an

5    accord, and that the end of the period of the

6    alleged wrongful conduct was March of 2013.

7                   And it's further complicated

8    by -- I'm assuming that the alleged wrongful

9    conduct was indeed wrongful.  And your

10   question is asking me to assume, then, that

11   there's future alleged wrongful conduct.

12        Q.    I didn't, but let me just make

13   it clear for the record.  I'm not going to

14   try to trip you up, or use anything that you

15   say as a suggestion that you believe, because

16   you've assumed liability, that, in fact,

17   Context did anything wrong.  You've made that

18   clear 20 times in this deposition and

19   throughout your report.  Would you agree?

20              MR. HANKINSON:  Objection.

21   Compound.

22        A.    I think we understand each other

23   on that point.

24        Q.    Right.  So all I'm trying to

1    understand is you clearly place some

2    importance on the fact that Context continued

3    to switch out practices from HAN after March

4    2013?

5          A.    I considered that, yes.

6          Q.    And my only point is, you do not

7    know whether or not Context employees made

8    any untruthful statements to those practices

9    that switched after March 2013, do you?

10          MR. HANKINSON:  Objection.

11          A.    My understanding is that that

12   March 2013 marks the period in which the

13   alleged wrongful conduct stopped.

14          I included an excerpt of my --

15   in this report on page 54.  Mr. Robinson

16   testified that save a handful of instances

17   which he would not constitute as a trend, to

18   his knowledge, ContextMedia did not continue

19   to engage in acts of alleged false

20   advertising and misleading statements.  And

21   that's what I took as at face value.

22          Q.    So to the best --

23          MR. HANKINSON:  Excuse me.  I'm

24   sorry.

1           MR. COWAN:  Go ahead.

2           MR. HANKINSON:  I have an

3    objection to this line of questioning.  I've

4    just been stating objection.  I would like to

5    make a comment, but if you would like to

6    excuse the witness first, that would be fine.

7           MR. COWAN:  No.  Go ahead.

8           MR. HANKINSON:  I just want to

9    make the further statement that in addition

10   to Mr. Robinson's testimony, and the

11   testimony about the accord, Healthy Advice

12   has used the March 2013 date, and the

13   understanding between the parties that

14   alleged wrongful conduct stopped as of that

15   date for purposes of not producing documents

16   regarding things that occurred after that

17   date.

18           And so the extent that this line

19   of questioning wants to inquire into what

20   Mr. Arst knows and doesn't know about

21   evidence about what happened after that date,

22   and for them perhaps then imply that his

23   analysis is reasonable or unreasonable, I

24   think that that would be inappropriate, not

Page 176

1    just based on the testimony that he had

2    access to, but also the discovery positions

3    of Healthy Advice.

4                MR. COWAN:  And I appreciate the

5    comments, Tom.  My understanding is that the

6    parties mutually agreed that there would not

7    be production of discovery or documents for

8    events after March 2013.  It wasn't just

9    Healthy Advice took that position.  It was a

10   negotiation and agreement on that point.  Is

11   that fair?

12               MR. HANKINSON:  That is fair,

13   except to the extent that the parties intend

14   to rely on documents that are coming from

15   after that date; and, you know, we can defer

16   to the e-mails.  It was mutual.

17               The point being, though, that

18   Mr. Arst is not really responsible for that

19   accord, or the availability of information

20   after March 2013.

21               MR. COWAN:  Right.

22   BY MR. COWAN:

23      Q.    And my point simply is that you

24   are assuming, Mr. Arst, for purposes of your

1    opinions, that there was no wrongful activity

2    after March 2013.  Is that fair?

3           A.    I included the deposition

4    testimony of Mr. Robinson on the subject,

5    including the part in which he indicated that

6    there were a handful of instances that

7    perhaps constituted some alleged wrongful

8    conduct from his perspective.

9                 But he also testified that he

10   did not constitute -- that that did not

11   constitute a trend, which is why I felt

12   comfortable looking at conversions before and

13   after 2013 as one element in the context of a

14   broader damages analysis.

15          Q.    Do you know if Context in 2013,

16   the latter part of 2013, offered any special

17   incentives to its employees to switch out HAN

18   practices?

19          A.    I'm not recalling that, as I sit

20   here now.

21          Q.    Let me shift gears a bit and

22   fast forward to page 65, and talk about

23   unjust enrichment, if you don't mind.

24          A.    Yes, sir.

1      Q.    Did HAN suffer any harm or

2    damage as a result of losing practices to

3    Context?

4      A.    HAN lost practices to Context.

5    Whether that caused damages, and about four

6    cents relates to the issues that we were

7    talking about before, but whether or not

8    but-for causation can be established.

9      Q.    Yeah.  I'm leaving aside the

10   but-for.  My question was, specifically did

11   not suggest that HAN suffered harm or damage

12   as a result of Context's actions.  I'm simply

13   asking did HAN suffer any harm or damage as a

14   result of losing practices to Context?

15     A.    And that's what I want to be

16   careful about, the word "harm" or "damage,"

17   because in my mind, that has a linkage with

18   the alleged wrongful conduct.

19          I can agree with you to this

20   extent.  HAN lost practices to ContextMedia,

21   and those practices were gained by

22   ContextMedia.  Then there is a question as to

23   what impact does the alleged wrongful conduct

24   have on that.

1        Q.    Fair enough.  Did the loss of

2   the HAN practices to Context cause any

3   financial loss to HAN?

4        A.    I have assumed that there could

5   have been some losses.  I don't think that's

6   been established by HAN.

7        Q.    You saw testimony from Mr. Shah

8   where he indicated that the loss of a

9   practice to Context was significant from a

10  financial standpoint.  Page 73, the last

11  answer.

12       A.    I see Mr. Shah's testimony on

13  page 73.

14       Q.    And so you understood that he

15  believed that when Context loses a practice,

16  that constitutes significant value walking

17  out the door?

18       A.    I understand that the company's

19  monetize practices through the sale of

20  sponsorship, and that they generate revenue

21  on the basis of practices.

22       Q.    And is it your understanding

23  that the same is true for HAN?

24       A.    I do understand that the same is

Page 180

1    true for HAN.  There are some differences in

2    the models that those companies employ, but

3    generally, they monetize practices through

4    the sale of advertising to sponsors.

5            Q.    And so when HAN loses a practice

6    to Context, that has a financial implication?

7            A.    Potentially.

8            Q.    You used the term, on page 65 of

9    your report, "marketplace damages,"

10   Section 11.  Do you see the term "marketplace

11   damages"?

12           A.    Yes.

13           Q.    What are marketplace damages?

14           A.    We would need to look at the

15   cases there to see if those are defined.  My

16   general understanding is actual damages is

17   the notion here.

18           Q.    What types of actual damages?

19           A.    Again, we need to take a look at

20   the particular cases, but --

21           Q.    Well, let me just interrupt you

22   there.  Why do I need to look to some legal

23   case to understand your term "marketplace

24   damages"?

Page 181

1          A.    Well, that's because that's

2     referencing principles that are identified in

3     those cases, which I haven't committed to

4     memory.

5               But generally, what I'm saying

6     is that my understanding is that profit

7     scores and remedies are equitable measures of

8     relief, and that actual damages, marketplace

9     damages, whether they were suffered, have

10    some bearing on -- from disgorgement damages

11    under the Lanham Act.

12         Q.    So what are the types of

13    marketplace damages that a plaintiff in a

14    case like this might suffer?

15         A.    Lost profits.

16         Q.    Lost profits resulting from lost

17    practices?

18         A.    Lost profits resulting from lost

19    sales.  And I'm thinking about incremental

20    profits, which would be calculated as

21    incremental revenues less incremental costs.

22         Q.    Leaving aside but-for causation,

23    the financial loss associated with HAN losing

24    a practice to Context, would that constitute

1    marketplace damages?

2              MR. HANKINSON:  Objection.

3        A.    I didn't understand the

4    question.

5        Q.    Leaving aside the issue of

6    but-for causation, so leaving aside the issue

7    of whether or not any act of Context caused

8    the harm or damages, does the financial loss

9    associated with losing a practice from HAN to

10   Context, would that be considered a

11   marketplace damage?

12             MR. HANKINSON:  Objection.

13       A.    Sounds like you're asking me for

14   a legal conclusion, and that's not what I'm

15   trying to offer.

16             My understanding is that profit

17   disgorgement damages under the Lanham Act are

18   subject to the principles of equity.

19             And what I was simply trying to

20   say here is that I understand that the --

21   whether there were actual damages may impact

22   those from a -- is my understanding, and that

23   you're not automatically entitled to a

24   disgorgement of -- to disgorge profits, the

Page 183

1    defendant, under the Lanham Act, that there's

2    other considerations there.

3           Q.    You understand that, according

4    to Context's analysis as reflected in the

5    declaration offered by Mr. Demas, Context

6    believes 168 HAN practices switched to

7    Context?

8           A.    I'd need to look at that.  I'm

9    not recalling them as I'm sitting here now.

10          Q.    Let me represent to you that

11   Mr. Demas has issued a declaration which

12   authenticates some documents produced by

13   Context which reflect 168 practices switched

14   from HAN to Context.

15          A.    Okay.

16          Q.    Assuming that to be the case, do

17   you believe that HAN experienced lost profits

18   associated with losing those practices?

19               MR. HANKINSON:  Objection.

20          A.    It's a complicated question, and

21   the answer is likewise nuanced.  The question

22   in my mind is whether lost profits flowed

23   from the alleged wrongful conduct.

24          Q.    Mr. Arst, that's not my

Page 184

1    question.

2         A.    I'm trying to get to your

3    question.  And as I indicated, it's a nuance

4    question, in part, because the parties in

5    this case have adopted a framework for

6    measuring alleged damages that deviates to

7    some degree from the actual accounting

8    realities of the products in this

9    marketplace.

10                And so in order to answer that

11   question as to whether the loss of a practice

12   caused the loss of a dollar, even setting

13   aside the issues related to whether that loss

14   is attributable to the alleged wrongful

15   conduct, we would need to look at the

16   practices that were at hand at HAN, the

17   contracted minimums with the sponsors, the --

18   grace period is the wrong word, but there was

19   an allowment, generally, within the contracts

20   that if the enrollments fell below a certain

21   level, the -- there would be -- there's a

22   grace period.

23                And then we'd need to look at

24   whether or not the transition of particular

1  practices at a particular point in time would

2  have pushed HAN, so to speak, over that

3  threshold.

4            And then we'd need to look at

5  what the economic consequence of that would

6  be, in terms of make good payments or

7  otherwise, which, based on my understanding,

8  are sometimes made and sometimes forgiven.

9  And so I think it would really just depend.

10            The framework that the parties

11  have adopted, I think, as a matter of

12  convenience, is looking at a revenue per

13  practice per month, or revenue per physician

14  per month, which I think is a reasonable way

15  to think about damages in this case.

16            But your question, I think, was

17  asking me something a little bit different

18  that I'm having a hard time agreeing with

19  because of the complicated nature of the way

20  that the contracts work with respect to the

21  practices.

22       Q.    And I can probably get to it

23  this way.  I'll just ask you this question.

24            Do you have an opinion as to

Page 186

1    whether HAN suffered any lost profits as a

2    result of the loss of the 168 practices to

3    Context?

4           A.    I have assumed that they

5    suffered a loss.  I don't know that that's

6    been -- I don't think that's been established

7    by HAN.

8           Q.    I'm not interested in your

9    assumptions.  I'm interested in your

10   opinions.  Do you have an opinion -- I'm only

11   as good as what you're going to tell me

12   today.  At some point in time, you're going

13   to get on the stand, and I want to be able to

14   know your answer to this question.

15              Do you have an opinion as to

16   whether HAN suffered any lost profits as a

17   result of the loss of the 168 practices to

18   Context?

19          A.    Same answer as the one I gave.

20   I have assumed that that's true.  I don't --

21   I have an opinion that HAN hasn't established

22   that.  I've assumed that it's true.  I don't

23   have an opinion that it is true, but I've

24   assumed that it's true.

1      Q.    Are there any other types of

2   marketplace damages that might be suffered by

3   someone like HAN in this type of a case?  And

4   again, leave aside whether or not they were

5   caused by anybody other than HAN.

6            MR. HANKINSON:  Objection.

7      A.    Lost profits, I think, could

8   probably encompass a range of adverse

9   economic consequences.  Ultimately, though, I

10   think it would manifest itself in the form of

11   the profits.

12      Q.    Is goodwill, loss of goodwill, a

13   marketplace damage?

14            MR. HANKINSON:  Objection.

15      A.    Sounds like a legal conclusion,

16   and I'm not trying to offer a legal

17   conclusion.  But I would note that

18   ultimately, I would expect the manifestation

19   of damages to take the form of profits.

20      Q.    Do you have an opinion as to

21   whether Context gained any sales as a result

22   of gaining the 168 HAN practices?

23      A.    I want to separate sales from

24   revenue in this response.  I understand that

Page 188

1    ContextMedia generated revenue on the basis

2    of its practices by securing sponsorship

3    sales, and that revenue was generated on

4    ContextMedia's practices, including those

5    that were converted from HAN.

6         Q.    And that's a fair qualification.

7    I probably shouldn't have used the term

8    revenue.  So let me just ask it this way so

9    that the record is clear.

10             Do you have an opinion as to

11   whether Context generated any or gained any

12   revenues as a result of gaining the

13   168 practices from HAN?

14             MR. HANKINSON:  Objection.

15        A.    I have an understanding that

16   ContextMedia generated revenue by making

17   sales to sponsors that compensated

18   ContextMedia on the basis of practices, and

19   that included practices that were converted

20   from HAN.

21        Q.    Do you have an opinion as to the

22   amount of revenues that were generated by

23   Context as a result of gaining the 168 practices

24   from HAN?

1      A.     I performed calculations of

2 revenue and apportionment in the appendices

3 of my report.  I think that I could find for

4 you, from an accounting perspective, the

5 results of that analysis with the caveat that

6 it was, again, a framework that was employed

7 by the parties in suit, I think as a

8 convenience, as a way of calculating revenues

9 and profits.

10             And there are some differences

11 between that framework that HAN and

12 ContextMedia have adopted for purposes of

13 this litigation, with the revenues and

14 profits that might be calculated under a

15 different framework.

16      Q.     And would that be Exhibits 5.1

17 and their brethren?  Well, actually, I

18 probably started at 5.  I should have started

19 earlier.

20      A.     Exhibit 5 represents my

21 corrections to Dr. Wilner's calculation of

22 revenue.  I calculated revenue on Exhibit 2.1.

23      Q.     Right.  I'm just going to try to

24 stay in order of how your report flows.

1    Page 66, there's some reference to some

2    Context contracts.

3              The last sentence on that page

4    says, "Mr. Demas explained that contract

5    2013-9 is, in fact, the base contract for

6    325 screens, and that contract 2013-5 was an

7    amendment to that base contract, allowing the

8    same sponsor to buy additional screens above

9    the initial 325."  Do you see that?

10         A.    Yes.

11         Q.    Were you ever provided with

12    unredacted copies of those contracts?

13         A.    No, I don't believe so.

14              MR. COWAN:  I'm just going to

15    mark them so I make sure we're talking about

16    the same documents.

17              (Plaintiff's Exhibit No. 11

18              was marked for identification.)

19         Q.    I'm handing you what we've

20    marked as Plaintiff's Exhibit 11.  Does that

21    appear to be a copy of the contract that's

22    referenced in your report as 2013-5?

23         A.    From memory, it looks like it.

24    If I could take a moment here to corroborate

1    that, if you'd like me to?

2          Q.    I mean, it's not really a test.

3    I pulled up what I understood to be the

4    copies.  It probably would make sense just to

5    have you check just to make sure we're, at

6    least for the record, working off the same

7    documents.

8          A.    (After reviewing document) This

9    is one of the contracts that was relevant to

10   that, yes.

11               (Plaintiff's Exhibit No. 12

12               was marked for identification.)

13         Q.    I'm going to ask you if Exhibit 12,

14   which appears to be 2013-9.  Exhibit 12

15   appears to be a copy of 2013-9.  Does

16   Exhibit 12 appear to be a copy of the

17   contract you reference in your report?

18         A.    I'll just note for the record

19   here that I'm referencing a binder that I

20   produced in connection with this case that

21   has the documents that I relied upon, and I'm

22   looking for that particular page.

23         Q.    Gotcha.

24         A.    Yes.

Page 192

1          Q.     Okay.  As I understand it, what

2    Mr. Demas said was that Exhibit 12 is the

3    base contract; is that right?

4          A.     That's my understanding.  And

5    generally, the way that I think about this is

6    that the contract provided for $174 per

7    screen per month, which is what's reflected

8    on Exhibit 3.7 of my report.

9          Q.     And you understood from

10   Mr. Demas that Exhibit 11 was an amendment to

11   Exhibit 12?

12         A.     My understanding is that the

13   Exhibit 11 sponsor entered into the contract

14   marked as Exhibit 11 to purchase additional

15   screens in line with ContextMedia's growth

16   forecast.  And under both contracts,

17   Exhibit 12 and Exhibit 11, the monthly cost

18   of a sponsor for any given screen was $174.

19   And I'm looking at footnote three on

20   Exhibit 3.7 of my report.

21         Q.     And what's the basis of that,

22   your understanding, if both of them are 174

23   bucks per screen?  Is that something that

24   Demas told you, or is that based on something

1    in the contract?

2         A.    You can calculate that based on

3    the contract, but he also corroborated my

4    understanding of that.

5         Q.    How do you calculate it?

6         A.    I refer you to Exhibit 3.7 of my

7    report.

8         Q.    Okay.

9         A.    If you could just bear with me

10   for a moment, I'm going to check the math.

11   Okay.

12        Q.    Walk me through it.  Let me just

13   start by asking you, on Exhibit 11, the

14   amendment?

15        A.    Yes.

16        Q.    Which of these cells, if you

17   will, relate to the contract that is

18   Exhibit 12?

19        A.    They all do.

20        Q.    Okay.

21        A.    So if I could just take a moment

22   to explain, or I can answer your questions,

23   however you like.

24        Q.    Let me ask one more question,

1   and then I'll let you do what you should be

2   doing, which is explaining to me.

3        A.    Sure.

4        Q.    If I look at Exhibit 11, the far

5   left has something called com number.  Do you

6   see that?  What does that say?

7        A.    I'm not sure where you're

8   referencing.

9        Q.    You see the numbers 1, 2, 3, 4

10  in the far left, those cells?

11       A.    Right here?

12       Q.    Yep.  What are those?  There's

13  something that those are identifying as up

14  above.

15       A.    It's hard for me to read that.

16       Q.    Okay.

17       A.    I think it might say contract,

18  but I'd need to see a cleaner printout of

19  this.

20       Q.    Let's just assume it says

21  contract, just so we have a placeholder.

22       A.    Sure.

23       Q.    If you look at contract number

24  one, what's the start date?  Would you agree

1    with me that the start date at least looks

2    like it starts in year 2012?

3            A.    I think that's 2013.

4            Q.    You do?  Okay.  For the start

5    date?

6            A.    Well, I think I could explain to

7    you how to interpret these documents based on

8    what Mr. Demas told me.

9            Q.    Okay.  But I just -- and I want

10   to get there.  I want to hear what Mr. Demas

11   told you, but when I read start date, and I

12   look at the number -- we can probably get a

13   better copy from Context, if necessary, but

14   when I look at start date and compare it to

15   the end date on Exhibit 11, it definitely

16   looks like a '12 and then '13.  Do you just

17   disagree with that?  If you want to, you can

18   compare contract number two, which also looks

19   like a 2012 and a 2013.

20           A.    I'm having a hard time reading

21   those fields.

22           Q.    Okay.  If it's a 2012 -- and

23   let's just say I'm going to agree with Grant

24   for the purposes of this one question.  If

1    the start date is 2012, would that make it

2    unlikely that this is an amendment to Exhibit

3    Number 12, which has a start date of 2013?

4         A.    I'm -- no.  I tried to

5    understand these contracts by speaking with

6    Mr. Demas, and when he explained it to me --

7    and I understand that these are amendments to

8    the contract.

9         Q.    All right.

10        A.    So I'm relying on Mr. Demas to

11   help me interpret these documents.

12        Q.    Okay.  Well, why don't you walk

13   me through how we get to $174 doing your

14   analysis?

15        A.    Sure.  Let's start with

16   Exhibit 12.  Now I've lost a little bit of my

17   train of thought, so if you could bear with

18   me.

19        Q.    I will.

20        A.    Thank you.  We have a period

21   cost of $56,550 on Exhibit 12.

22        Q.    Right.

23        A.    325 screens yields $174 per

24   screen.

1          Q.     And is that $174 per screen per

2    month?

3          A.     Yes.

4          Q.     Okay.

5          A.     Now, when we get to April of

6    2013, and we look at this contract on

7    Exhibit 11, and you flip to the second page,

8    I think it's the second column here, which is

9    April 1, 2013 to April 30, 2013, it's in the

10   second row.

11         Q.     Okay.

12         A.     We've got $8,700.

13         Q.     Yes.

14         A.     And we've got 50 screens.

15   $8,700 divided by 50 screens is $174 per

16   screen.  And so you can see now, by reference

17   to Exhibit 3.7 of my report, the screen

18   guarantee went up in April from 325 screens

19   to 375 screens.  That's the 50 screens that

20   we see in row two.  And the extra cost was

21   $8,700.

22         Q.     Okay.

23         A.     And that's how I -- my

24   understanding is how these documents work

1    together.  Does that make sense to you?

2         Q.    It does.

3         A.    I'm sorry to interrupt.  But if

4    we could take a quick break, I'd appreciate

5    that.

6         Q.    Sure.  That's fine.

7         A.    Thank you.

8              (Brief recess.)

9         Q.    All right.  I think I'm done

10   with 11 and 12.  Let me ask you a general

11   question, which I'm not sure if I'll either

12   ask it the right way, or if you can give me

13   an answer.

14              Is it fair to say that with

15   respect to Dr. Wilner's calculation of lost

16   profits, you agree with the methodology as it

17   applies to his deduction of expenses,

18   allocation of expenses?

19        A.    So setting aside issues related

20   to the periods and the revenue streams, and

21   focusing just on the incremental cost

22   determinations I made, I think that those

23   were reasonable.  I don't want that to be

24   misconstrued as an endorsement of other

Page 199

1    aspects of this methodology.

2         Q.    And I wasn't trying to imply

3    that.  I'm truthfully just trying to

4    eliminate that area where we have

5    disagreement, and figure out where we agree

6    so we can focus on where we disagree.

7              And in terms of the expense

8    allocation of the adjustment for expenses,

9    that's an area that you don't have

10   disagreement with?

11        A.    Same answer as the one I just

12   gave.

13        Q.    On page 68, that first full

14   paragraph, you say, "Notwithstanding my

15   agreement with Dr. Wilner regarding the

16   deduction of incremental costs, I disagree

17   with Dr. Wilner's assumption that the

18   totality of the resultant incremental profits

19   is attributable to the alleged wrongful

20   conduct."  Do you see that?

21        A.    Yes.

22        Q.    The last sort of couple

23   sentences later, you say, "Most importantly,

24   there is no evidence that the revenue

```
 1    stemming from conversion of any physician

 2    practice from HAN's ACN to ContextMedia's RHN

 3    was attributable to the alleged wrongful

 4    conduct."  Do you see that?

 5         A.    Yes.

 6         Q.    Is that the primary disagreement

 7    that you have with Dr. Wilner's conclusions?

 8         A.    That is one area of significant

 9    disagreement, but there are others.

10         Q.    What are the others?  What are

11    the others, if you could just list them for

12    me?

13         A.    Well, I've identified here, for

14    example, on page 68, other bullets that I

15    think one ought to consider when determining

16    the portion of the profits that were

17    generated by ContextMedia that is

18    attributable to the alleged wrongful conduct

19    by way of comparison with the other

20    contributions that ContextMedia made to its

21    products.

22         Q.    Okay.  So let me ask you about

23    Mr. Shah's testimony and e-mails, where he

24    uses a $20,000 figure per practice.  And I
```

1    think that begins, your commentary on that,

2    on page 72.

3         A.    Yes.

4         Q.    I'm going to hand you what has

5    been previously marked as Plaintiff's

6    Exhibit 95.  Does that have yellow?  Okay.

7                And then also I'm going to give

8    you what has been previously marked as

9    Plaintiff's Exhibit 136.  And take a minute

10   and look at those.

11               My first question's going to be

12   whether those are the two e-mails that you

13   understand Mr. Shah was questioned about that

14   are the subject of your testimony?  The

15   citations to his testimony in your report, I

16   should say.

17        A.    These are looking familiar to

18   me, in particular Exhibit 95.  If you'd like

19   me to spend the time, I think I could provide

20   the linkage.  But if you can help me along,

21   that might expedite this.

22               I brought a copy of Mr. Shah's

23   deposition, and I see, for example,

24   Exhibit 135, of which I'm looking at --

1      Q.    135 or 136?

2      A.    The transcript says Exhibit 135,

3  but it may be that it's the same.  And I'm

4  happy to accept your --

5      Q.    No, don't, because I'm not --

6      A.    Okay.

7            MR. COWAN:  Let's mark this,

8  Sue.

9            (Plaintiff's Exhibit No. 13

10            was marked for identification.)

11      Q.    I'm handing you what we've

12  marked as Plaintiff's Exhibit 13.  And it's

13  some pages from Mr. Shah's testimony.  It's

14  pages 244 to 252.

15            And on page 244, I start by

16  asking him about Exhibit 95, which is one of

17  the exhibits I've given you.  And you'll see,

18  referring to that exhibit, Mr. Shah talks

19  about "it's not based on a financial model,"

20  which is the testimony you've cited in your

21  report?

22      A.    Yes, I see that.  I've brought a

23  copy of his deposition and the references to

24  that.

1          Q.    Okay.  And then on page 247 of

2    Exhibit 13, his deposition, I marked

3    Exhibit 136, which is the other e-mail that

4    I've given to you, and then asked him

5    questions about that document, which I think

6    some of the testimony also found its way into

7    your report.

8          A.    From pages 250 to 251 of

9    Mr. Shah's transcript?

10          Q.    Right.

11          A.    That appears to be so, yes.

12          Q.    So let's just focus right now,

13    before we get into his testimony, with the

14    exhibits.  The 136 comes first in time.  And

15    this is a July 24, 2012 e-mail from Mr. Shah

16    to Mr. Garms, correct?

17          A.    Exhibit 136?

18          Q.    Correct.

19          A.    Is from July 24th from Mr. Shah

20    to Mr. Garms, at least the top --

21          Q.    The top portion?

22          A.    -- portion.

23          Q.    So the portion that I was

24    focused on in my questioning, and it's the

1   subject, I think, of your report is actually

2   the e-mail from Mr. Shah the day before,

3   July 23rd, 2012, to Mr. Demas, Mr. Purdy, and

4   the senior management team.  Do you see that?

5           A.    I do.

6           Q.    Now, other than Mr. Demas and

7   Mr. Purdy, do you know who was included in

8   the ContextMedia senior management team?

9           A.    Not without refreshing my

10  recollection perhaps by referencing

11  Mr. Shah's testimony.

12          Q.    Mr. Demas, who is the direct

13  recipient of the e-mail, is the CFO of the

14  company?

15          A.    Yes.

16          Q.    And Mr. Purdy is the chief

17  operating officer?

18          A.    Right.

19          Q.    So at least the two people that

20  are named are senior executives within the

21  company?

22          A.    That's my understanding.

23          Q.    And down towards the bottom of

24  Mr. Shah's e-mail, he says, "Our 4-year value

1   to a site is at least $16,000."  Do you see

2   that?

3           A.    Yes.

4           Q.    And do you believe that's an

5   accurate value of the 4-year value for sites

6   to ContextMedia?

7           A.    I don't have an opinion about

8   that.  I did not attempt to perform a

9   valuation.

10          Q.    Why not?

11          A.    Because I don't think that that

12  is a measure of relief that's available upon

13  a finding of liability in this case.  And we

14  talked a little bit before about the measures

15  of relief that are available.

16               My understanding, that it's an

17  accounting of profits and/or a lost profits,

18  and so this is not something that I viewed as

19  being a reasonable way to calculate either of

20  those measures.

21          Q.    Well, the $16,000 figure,

22  whether it's accurate or not accurate, do you

23  know what that figure represents?  Is it

24  profit?

1          A.    I didn't dig too deeply into

2     this, so no, I would need to defer these

3     questions to the folks who wrote these

4     e-mails in order to answer those questions.

5          Q.    Well, you talked specifically

6     about this with Mr. Demas; did you not?

7          A.    That's true, I did talk about

8     that with Mr. Demas, but I didn't ask the

9     question that you just asked me.

10         Q.    So you actually talked to

11    Mr. Demas about this e-mail, about this

12    subject matter, and you didn't ask him if the

13    $16,000 figure represents profits?

14         A.    I did not ask him that question.

15         Q.    Go down to the next paragraph,

16    where Mr. Shah says, "We have a very finite,

17    scarce amount of offices.  We can't keep

18    finding them, so each one that slips out of

19    our hands is awfully valuable."  Do you see

20    that?

21         A.    I do.

22         Q.    Do you have any reason to

23    dispute that?

24         A.    I don't dispute that the

1   business that ContextMedia is in is to

2   monetize practices through sales to sponsors,

3   and that's part of what I think the essence

4   of what they're talking about here.

5           Q.    Well, I'm being more specific.

6   Do you have any reason to dispute that each

7   practice that slips out of Context's hands is

8   awfully valuable?

9           A.    The word "awfully" is not

10  well-defined here beyond the figures that are

11  contained in the e-mail, but I don't dispute

12  that the practices are of value to

13  ContextMedia, and I think that's the essence

14  of what they're talking about here.

15          Q.    Then the next exhibit is

16  Exhibit 95.  And the pertinent portion of it

17  is on the second page of the exhibit, which

18  is the e-mail on Monday, July 30, 2012, from

19  Mr. Shah, where he says, "Jim, Brad, this is

20  a top priority."  Do you see that?

21          A.    I'm not with you.

22          Q.    You're not with me?  Make sure

23  you have Exhibit 95.

24          A.    95?

1         Q.    Turn to the second page, about

2    the middle of the page, you'll see where it

3    says "on Monday, July 30, 2012, at 11:16

4    p.m., Rishi Shah wrote"?

5         A.    Yes, I see it.

6         Q.    Are you there?

7         A.    I see it.

8         Q.    "Jim, Brad, this is a top

9    priority."  Do you see that?

10        A.    Yes.

11              MR. HANKINSON:  2012?

12              MR. COWAN:  What did I say?

13              MR. HANKINSON:  I think 2011.  I

14   didn't mean to interrupt.

15              MR. COWAN:  Not at all.  If I

16   transpose my dates, correct me.

17        Q.    "Jim, Brad, this is a top

18   priority."  Do you see that?

19        A.    Yes.

20        Q.    Do you understand Jim and Brad

21   to be Mr. Demas and Mr. Purdy?

22        A.    That's the way I understand

23   this.

24        Q.    And at the end of his e-mail, he

1    says, "Each member lost is a $20K loss,"

2    $20,000 loss.  Do you see that?

3          A.    Yes.

4          Q.    "Let's treat it with adequate

5    priority and get on this tomorrow."  Do you

6    see that?

7          A.    Yes.

8          Q.    Did you talk to Mr. Demas about

9    this?

10         A.    Yes.

11         Q.    And did you ask him whether or

12   not the $20,000 figure there represented lost

13   profits?

14         A.    It doesn't -- my understanding

15   is it does not represent lost profits.  This

16   is not a financial muddle that was performed.

17              So they're talking about

18   principles that I think are separate and

19   distinct from the damages calculations that

20   are at issue in this case.

21         Q.    What did Mr. Demas tell you the

22   $20,000 figure represented?

23         A.    Oh, maybe I misunderstood your

24   last question.  I mean, I understand that

1    this, based on the testimony, is -- they're

2    talking about the relative value of a

3    practice.

4                And my questions with Mr. Demas

5    were related to whether there's a financial

6    model from which one could calculate those

7    numbers, and his answer was no, there's not,

8    which is consistent with Mr. Shah's

9    testimony.

10        Q.   Well, did you ask him how he

11   thought Mr. Shah came up with the $20,000

12   figure?

13        A.   No.

14        Q.   In your report, you cite

15   testimony from Mr. Shah, where he tries to

16   put the $20,000 figure in context?

17        A.   That's a reasonable way to

18   characterize it, I think.

19        Q.   And your citation ends at

20   page 251, I believe; is that right?

21        A.   You know, I am sorry.  It's

22   getting a little bit late in the day for me.

23   I'm trying to follow.

24        Q.   Sure.  And we're getting close

Page 211

1    to being done.  Page 74?

2         A.    I'm on page 74.

3         Q.    Right.  So the citation that you

4    have from Mr. Shah's testimony that is

5    footnote 244 ends at page 251.  Do you see

6    that?

7         A.    I see footnote 244, I referenced

8    pages 250 and 251 of Mr. Shah's deposition.

9         Q.    So in my Exhibit 13, your

10   citation to Mr. Shah's testimony ends at

11   Line 23 on 251; is that correct?

12        A.    That's the part that I quoted

13   there.

14        Q.    Yeah.  So but the very next

15   question on 251 says, at Line 24, "When you

16   said in your e-mail to your colleagues at

17   Context that each de-install was like losing

18   $20,000, was that a lie?"  Mr. Shah answered,

19   "No, I don't believe it was a lie."  Do you

20   see that?

21        A.    Yes.

22        Q.    Is there a reason why you didn't

23   include that in your report?

24        A.    No.  You could include that.

1    That wouldn't change the substance of my

2    opinions.

3              Q.    And so you would agree that the

4    evidence that you reviewed is that Mr. Shah

5    has testified under oath that the $20,000

6    figure is not a lie?

7              MR. HANKINSON:   Objection.

8              A.    I mean, his testimony on the

9    subject continues on through page 252,

10   including that testimony, so I understand

11   that.

12             Q.    Given that Mr. Shah, in an

13   e-mail to the CFO and the COO, said that the

14   value of a practice is $20,000, and given

15   that he testified under oath that that is not

16   a lie, do you fault Dr. Wilner for relying

17   upon that number in any of his work?

18             A.    Yes.

19             Q.    Why?

20             A.    Because it's clear, based on the

21   testimony of Mr. Shah and my conversations

22   with Mr. Demas, that that valuation was not

23   the product of commonly accepted valuation

24   methodologies.

1           And further, it's my opinion

2    that damages ought to be measured by

3    consideration of whether and to what extent

4    time lost profits is attributable to the

5    alleged wrongful conduct, and by

6    consideration of the profits that were

7    generated by ContextMedia that's attributable

8    to the alleged wrongful conduct.

9           And looking at ContextMedia's

10   testimony related to the ten or $20,000

11   figure doesn't answer either of those

12   questions.

13      Q.    Now, you understand that the

14   Court, Judge Dlott in this case, will have

15   significant discretion with determining

16   whether and how much profit disgorgement to

17   allow?

18           MR. HANKINSON:  Objection.

19      A.    My understanding is that profit

20   disgorgement is subject to the principles of

21   equity.  Some of the cases that I've been

22   involved in the trier of fact has been the

23   Court, and other instances where juries have

24   made those determinations, and -- but I do

Page 214

1    recognize that the Court has discretion in

2    assisting in that determination, if not

3    making that determination.  I think it just

4    depends on the particular case and what the

5    Court prefers to do.

6         Q.    On page 65 of your report, in

7    Section 11, you say, "As previously

8    discussed, I understand that profit

9    disgorgement damages under the Lanham Act

10   are equitable measures of monetary relief

11   over which the Court has substantial

12   discretion."  Do you see that?

13        A.    Yes.

14        Q.    Now, was that something you

15   were -- was that a concept you were aware of

16   and understood before becoming involved in

17   this case?

18        A.    Yes.

19        Q.    And have you ever been involved

20   in a case where profit disgorgement was

21   ultimately awarded?

22        A.    I'm thinking of one case in

23   particular, yes, and I would expect there are

24   others, and I could refresh my recollection

Page 215

1    by looking at my CV.

2            Q.    Why don't you look at your CV.

3            A.    I'm thinking of a couple cases

4    that may fit in the category of what you're

5    talking about.

6                  I worked on a case involving pet

7    feed for alpacas, and there was a profit

8    disgorgement that was awarded.  I was not a

9    testifying expert in that case.

10           Q.    Were you on the plaintiff's side

11   or defendant?

12           A.    If memory serves, the

13   defendant's side.

14           Q.    Do you recall the law firm you

15   worked with?

16           A.    That I don't recall.  I recall

17   they were out of Colorado.

18           Q.    Do you recall the name of the

19   defendant, at least the party on whose behalf

20   you were offering assistance?

21           A.    I'm not recalling that.  I

22   remember -- I can exhaust my recollection of

23   the case with you, if you'd like me to?

24           Q.    Sure.

Page 216

1          A.    I remember that it was a case

2    involving, if memory serves, false

3    advertising under the Lanham Act involving

4    animal feed for alpacas.

5               There was a determination by the

6    jury that some portion of profits was

7    attributable to the alleged wrongful conduct,

8    and then I recall that the judge subsequently

9    modified that determination.

10         Q.    You don't recall if that was in

11   state court or federal court?

12         A.    I don't recall.  I would expect

13   it would be in federal court under the Lanham

14   Act.

15         Q.    Right.

16         A.    I had another case that came to

17   mind, which was the Ethicon Endo-Surgery

18   versus Crescendo Technologies.  And that was

19   a case that involved the alleged

20   misappropriation of trade secrets and breach

21   of contract that I valued.  The jury awarded

22   damages, and I quantified damages in that

23   case.

24               Now, whether that was -- should

1    be characterized as a disgorgement of

2    profits, I think it could be, or it also

3    could be conceptualized as actual damages

4    because I was thinking about it in terms of a

5    reasonable royalty of what's the value of

6    what was allegedly mis -- or found to have

7    been misappropriated.  There may be others.

8            Q.    My understanding is that you

9    were not asked or engaged to try to place a

10   value on any of HAN's intellectual property?

11           A.    That's reasonable.

12           Q.    In any of your discussions with

13   anyone at Context, did you come to learn

14   whether Context has increased the amount of

15   its incentives that it is offering to

16   practices since the relevant time period in

17   question?

18           A.    I don't recall discussing that

19   particular issue with ContextMedia, but I do

20   recall that there were some documents that I

21   reviewed and relied upon that contained an

22   accounting of the incentives that were used.

23                 And I think I can find that

24   document for you, if you'd like, and we may

Page 218

1    be able to look and see over time whether

2    there was a change.

3              MR. COWAN:  That's okay.  I

4    think that's all the questions I have for

5    you.  Thanks.

6              MR. HANKINSON:  I don't have any

7    questions.

8

9

10                   _ _ _ _ _ _ _ _ _
                     KEVIN ARST

11

12        (DEPOSITION CONCLUDED AT 3:30 P.M.)

13                    - - -

14

15

16

17

18

19

20

21

22

23

24

Page 219

1              C E R T I F I C A T E
    STATE OF OHIO      :
2                      : SS.
    COUNTY OF HAMILTON :
3          I, M. Sue Lopreato, the undersigned, a duly

4    qualified notary public within and for the State

5    of Ohio, do hereby certify that KEVIN ARST was by

6    me first duly sworn to depose the truth and

7    nothing but the truth; foregoing is the

8    deposition given at said time and place by said

9    witness; deposition was taken pursuant to

10   stipulations hereinbefore set forth; deposition

11   was taken by me in stenotypy and transcribed

12   by me by means of computer; deposition was

13   submitted to the witness for examination and

14   signature; I am neither a relative of any

15   of the parties or any of their counsel; I am

16   not, nor is the court reporting firm with

17   which I am affiliated, under a contract as

18   defined in Civil Rule 28(D) and have no

19   financial interest in the result of this action.
                    IN WITNESS WHEREOF, I have
20   hereunto set my hand and official seal of office
     at Cincinnati, Ohio, this 9th day of September
21   2014.
                    _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
22                    M. Sue Lopreato
                    Notary Public - State of Ohio
23
     My Commission expires:
24   May 10, 2015.