```
                                                    1
 1            UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OF OHIO
 2                 WESTERN DIVISION
 3     HEALTHY ADVICE        :
       NETWORKS, LLC,        :
 4                           :
           Plaintiff,        :
 5                           :
       vs.                   :   Case No. 1:12CV610
 6                           :
       CONTEXTMEDIA, INC.,   :
 7                           :
           Defendant.        :
 8
 9
10     Videotaped Deposition of JILL BREWER, a
11   witness herein, taken by the defendant as
12   upon cross-examination, pursuant to the
13   Federal Rules of Civil Procedure and pursuant
14   to notice of counsel as to the time and place
15   and stipulations hereinafter set forth, at
16   the offices of Keating Muething & Klekamp,
17   PLL, One East Fourth Street, Suite 1400,
18   Cincinnati, Ohio 45202, at 9:30 a.m.,
19   Tuesday, March 25, 2014, before Paul Jahn,
20   Videographer and ANN M. BELMONT, RPR, a
21   Registered Professional Reporter and Notary
22   Public within and for the State of Ohio.
23                      - - -
24
```

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Jill Brewer, 3/25/2014

2

```
 1    APPEARANCES:
 2
      On behalf of Plaintiff:
 3
      AARON M. BERNAY, ESQ.
 4    Frost Brown Todd, LLC
      301 East Fourth Street
 5    Suite 3300
      Cincinnati, Ohio 45202
 6
      On behalf of Defendant:
 7
      RICHARD J. O'BRIEN, ESQ.
 8    Sidley Austin, LLP
      One South Dearborn Street
 9    Chicago, Illinois 60603
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                    ea7650af-fe4a-42aa-8a27-29ee2ee30e7b

Jill Brewer, 3/25/2014

3

1            S T I P U L A T I O N S

2       It is stipulated by counsel for the

3    respective parties that the deposition of

4    JILL BREWER, a witness herein, may be taken

5    at this time by the defendant as upon

6    cross-examination and pursuant to the Federal

7    Rules of Civil Procedure and notice to take

8    deposition, all other legal formalities being

9    waived by agreement; that the deposition may

10   be taken in stenotype by the Notary Public

11   Reporter and transcribed by her out of the

12   presence of the witness; that availability of

13   the deposition to the witness for examination

14   and signature is expressly waived.

15

16

17

18

19

20

21

22

23

24

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Jill Brewer, 3/25/2014

```
                                                        4
  1                          INDEX
  2    WITNESS          DIRECT  CROSS  RE-      RE-
                                       DIRECT   CROSS
  3
       JILL BREWER
  4    BY MR. O'BRIEN:              6          142
       BY MR. BERNAY:     137
  5
       EXHIBIT IDENTIFIED                      PAGE
  6
       Exhibit 19 e-mail exchange               58
  7    Exhibit 24 e-mail exchange               72
       Exhibit 34 e-mail exchange               77
  8    Exhibit 35 e-mail exchange               81
       Exhibit 36 e-mail exchange               89
  9    Exhibit 40 e-mail exchange               90
       Exhibit 44 e-mail exchange               91
 10    Exhibit 47 e-mail exchange               92
       Exhibit 74 e-mail exchange               99
 11    Exhibit 80 e-mail exchange              110
       e-mail communication                    110
 12    Exhibit 81 e-mail exchange              115
       Exhibit 82 e-mail exchange              119
 13    Exhibit 83 e-mail exchange              124
       Exhibit 84 e-mail exchange              127
 14    Exhibit 85 e-mail exchange              130
       Exhibit 86 entry from the CMS           134
 15    database
 16    OBJECTIONS                     PAGE LINE
 17    MR. BERNAY:                    20     3
       MR. BERNAY:                    25    21
 18    MR. BERNAY:                    34    20
       MR. BERNAY:                    40     1
 19    MR. BERNAY:                    41    17
       MR. BERNAY:                    42    11
 20    MR. BERNAY:                    52    18
       MR. BERNAY:                    53     1
 21    MR. BERNAY:                    53    11
       MR. BERNAY:                    56    12
 22    MR. BERNAY:                    60    19
       MR. BERNAY:                    61    12
 23    MR. BERNAY:                    61    21
       MR. BERNAY:                    62     7
 24    MR. BERNAY:                    62    15
```

Jill Brewer, 3/25/2014

```
                                                                    5

 1     MR.  BERNAY:                              65      24
       MR.  BERNAY:                              75       5
 2     MR.  BERNAY:                              76       6
       MR.  BERNAY:                              77       4
 3     MR.  BERNAY:                              79       1
       MR.  BERNAY:                              80      13
 4     MR.  BERNAY:                              84       5
       MR.  BERNAY:                              97      21
 5     MR.  BERNAY:                              98      24
       MR.  BERNAY:                             102      13
 6     MR.  BERNAY:                             105       7
       MR.  BERNAY:                             108       5
 7     MR.  BERNAY:                             112       1
       MR.  BERNAY:                             112      21
 8     MR.  BERNAY:                             113      24
       MR.  BERNAY:                             117       8
 9     MR.  BERNAY:                             118      23
       MR.  BERNAY:                             127       5
10     MR.  BERNAY:                             132      13
       MR.  BERNAY:                             135      10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Electronically signed by Ann M. Belmont (201-234-827-3922)                    ea7650af-fe4a-42aa-8a27-29ee2ee30e7b

Jill Brewer, 3/25/2014

6

1        MR. JAHN: We're on the record.

2        THE WITNESS: I get a copy, okay.

3              JILL BREWER,

4      a witness herein, of lawful age, having

5    been first duly sworn as hereinafter

6    certified, was examined and testified as

7    follows:

8              CROSS-EXAMINATION

9    BY MR. O'BRIEN:

09:52  10        Q.    State your full name, Ms.

11    Brewer.

12        A.    Jill Marie Brewer.

13        Q.    We just had a discussion before

14    we went on the record.  We just met, my name

15    is Dick O'Brien, I represent ContextMedia in

16    a lawsuit that Healthy Advice Network has

17    brought against it.  I'll be asking you a

18    series of questions today.  If at any point

19    in time you don't understand any one of my

09:53  20    questions or you're confused by it, just let

21    me know, I'll try to fix it. Otherwise, if

22    you go ahead and answer the question, we're

23    all going to leave the room at the end of the

24    day with the understanding that you

Electronically signed by Ann M. Belmont (201-234-827-3922)                    ea7650af-fe4a-42aa-8a27-29ee2ee30e7b

Jill Brewer, 3/25/2014

7

1    understood the questions; is that fair?

2         A.    Yeah.

3         Q.    Also, as we just discussed

4    before we went on the record, whenever you

5    want to take a break, just let us know,

6    you're sort of the boss of this show.  When

7    you want to take a break, let us know, we'll

8    take a break.  The only thing I would ask of

9    you is that you not request a break while a

09:53  10    question is pending, go ahead and answer the

11    question, then we'll take the break, if

12    that's okay with you.

13         A.    Yes.

14         Q.    First of all, I want to thank

15    you for appearing here today.  I know that

16    you didn't have to, you weren't under

17    subpoena, and you're no longer with the

18    company, so I appreciate your showing up here

19    today.  Have you been deposed before?

09:53  20         A.    No.

21         Q.    And you're not represented by

22    counsel here today?

23         A.    I am not.

24         Q.    And did you do anything to

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                    ea7650af-fe4a-42aa-8a27-29ee2ee30e7b

Jill Brewer, 3/25/2014

8

1    prepare yourself for giving testimony here

2    today?

3              A.    I did not.

4              Q.    What is your educational

5    background?

6              A.    I have a bachelor of arts or

7    science degree from the University of

8    Tennessee in marketing communications.

9              Q.    When did you receive that

09:54  10    degree?

11             A.    In 1987.

12             Q.    You're much younger than me. And

13   what have you done by way of employment since

14   you graduated in 1987?

15             A.    I worked for a company in

16   Knoxville, Tennessee, called Whittle

17   Communications.  They -- Chris Whittle is the

18   founder and architect of Play Space Media and

19   why you guys are here. So I was an executive

09:54  20    there, vice president and partner, and I led

21   their field sales operations, much like what

22   I did when I was recruited to come to Healthy

23   Advice.

24             Q.    Why did you leave Whittle?

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                    ea7650af-fe4a-42aa-8a27-29ee2ee30e7b

Jill Brewer, 3/25/2014

9

1        A.    I didn't really leave. They -- I

2    left from there, I -- one of the projects

3    they started, I don't know if you recall

4    Channel One, but that led into what is called

5    the Edison Project and Edison Schools, so I

6    launched that.  And then I went to work for

7    them, specifically with Hamilton Jordan and

8    Benno Schmidt and all that whole clan and

9    started Edison Schools.

09:55   10        Q.    Tell us what Edison Schools was

11    or is.

12        A.    Edison Schools is a -- it's a

13    what you call an education management

14    organization.  So they would partner with

15    public schools and manage them for the school

16    for a fee.

17        Q.    What sort of services would they

18    provide to the school?  Just management of

19    schools?

09:55   20        A.    They took over the school.

21        Q.    I see. Are they still in

22    operation?

23        A.    Yeah, they are. They now run

24    charter schools across the country, and they

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                    ea7650af-fe4a-42aa-8a27-29ee2ee30e7b

Jill Brewer, 3/25/2014

10

1    work in partnership with public schools and

2    then they have this charter school movement

3    as well.

4         Q.    So when they were dealing with

5    public schools, the public school district

6    would come to Edison and they'd contract and

7    have Edison, basically, run its school

8    district?

9         A.    Well, it was my job to recruit

09:56    10    them to do so.  But, yes, basically, the job

11    was, let us -- basically, the job is, let us

12    run your school, because we can do it better

13    and make a profit.

14         Q.    I see.

15         A.    And you serve as sort of the

16    benchmark for the remainder of the school

17    district, so that they can use your learnings

18    for the remainder of their district and

19    capitalize.  So sort of like a springboard or

09:56    20    benchmark.

21         Q.    Can you give me one example of

22    where you guys did that?

23         A.    We're right now doing it for the

24    state of Hawaii.  We -- they are doing it for

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                                    ea7650af-fe4a-42aa-8a27-29ee2ee30e7b

Jill Brewer, 3/25/2014

11

1  the state of Hawaii.  They did it in

2  Philadelphia, we did it in -- I worked with

3  the Perry Township in Indianapolis.

4          Q.    So your job was to market the

5  company to schools and recruit schools into

6  the program?

7          A.    Em-hm.

8          Q.    Then why did you join Healthy

9  Advice Networks?

09:57  10         A.    I was working for Edison, and

11  all of my jobs I've been recruited.  I

12  haven't really looked for a job before, but

13  people who knew me before brought me over. So

14  I was recruited or asked to come to work

15  there because of my experience at Whittle

16  Communications.

17         Q.    And I think you made a comment

18  earlier that Whittle Communications is, in a

19  sense, why we're all here today. Were they

09:57  20  really the pioneer of this industry?

21         A.    Chris Whittle, founder.

22         Q.    When you first started for HAN,

23  what was your title and responsibilities?

24         A.    Vice president physician

Electronically signed by Ann M. Belmont (201-234-827-3922)                    ea7650af-fe4a-42aa-8a27-29ee2ee30e7b

Jill Brewer, 3/25/2014

12

1    recruitment or --

2         Q.    Did that change over time?

3         A.    I departed as executive vice

4    president in charge of field sales and

5    service. Over a period of seven, eight years.

6         Q.    When did you become an executive

7    VP?

8         A.    Maybe three years in.

9         Q.    So was it when you became an

09:58  10    executive VP that you became in charge of not

11    just the patient -- or physician recruitment

12    side of the business, but also the physician

13    service side of the business?

14         A.    Yeah, that happened over time.

15    It started -- I started, what happened was,

16    is that, just like in any organization when

17    you're selling something, and then your

18    services and delivery are different than what

19    you're selling, right?  So there's a mix.

09:58  20    And then you also had the install.  So when I

21    was selling, you would have -- we used

22    third-party vendors for install, and that

23    experience was very different than what I

24    sold, the experience that customers had.  And

Electronically signed by Ann M. Belmont (201-234-827-3922)                    ea7650af-fe4a-42aa-8a27-29ee2ee30e7b

Jill Brewer, 3/25/2014

13

1    then you had the install, then you had the

2    ongoing service.  So it was, like, very

3    siloed so that the vision was to bring it

4    together so it's a consistent or a consistent

5    customer experience. So over time, I went

6    from being in charge of the physician

7    recruitment to the onboarding of the

8    practices, because that was difficult.  And

9    so that at least got managed, and then --

09:59  10    consistently.  And then from there I

11    eventually took responsibility for the

12    installs and then eventually responsibility

13    for the ongoing service, working

14    communications, including the website.  So

15    basically, we created what's called the

16    customer experience team.  So if it touched

17    the customer in the physician practice, as

18    opposed to the climate, PhRMA, it was under

19    one area of management. And that turned out

09:59  20    to be a beautiful thing.

21          Q.    And how long did you have --

22          A.    That responsibility?

23          Q.    -- this combination of all of

24    the responsibilities you just described?

Electronically signed by Ann M. Belmont (201-234-827-3922)                    ea7650af-fe4a-42aa-8a27-29ee2ee30e7b

Jill Brewer, 3/25/2014

14

1          A.     Three to four years. I don't
2    have my resumé here, but I could look it up.
3          Q.     You're obviously, at that point
4    in time, if you weren't before, a member of
5    very senior management, right?
6          A.     Correct.
7          Q.     And during this three- or
8    four-year period when you're in charge of all
9    aspects of the physician recruitment,
10   installation service business, who are you
11   reporting to?
12         A.     I reported to Mike McAllister.
13         Q.     He was the CEO?
14         A.     COO.
15         Q.     And how many folks, round
16   numbers, I know you're not going to know
17   exactly, were reporting to you when you were
18   in charge of this whole operation?
19         A.     I do know that because it's on
20   my resumé.  That would be about 70 FTEs and
21   then we had probably ten-plus vendors, and
22   maybe 1000, 2000 contractors under their
23   service.
24         Q.     A lot of people?

10:00 (line 10)
10:00 (line 20)

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                    ea7650af-fe4a-42aa-8a27-29ee2ee30e7b

Jill Brewer, 3/25/2014

15

1     A.    Well, the contractors aren't

2  reporting to you, but you are directing and

3  leading and setting, you know, negotiating

4  and all that stuff.

5     Q.    Now, why did you leave Healthy

6  Advice?

7     A.    I left Healthy Advice because

8  new management was coming in, and -- and as

9  we were looking at the books, it was --

10:01  10  basically, my position was eliminated due to

11  cost cutting initiatives.

12     Q.    Mr. Campbell was here yesterday

13  and testified that, basically, a decision was

14  made at some point in time to change out

15  virtually all the senior management including

16  you and eventually him as well. Do you agree

17  with that view?

18     A.    Do I agree with that view? I

19  don't know, I'm not privy.  I wasn't a part

10:01  20  of the decisionmaking. I offered my own

21  departure.  I said if you do X, Y and Z, you

22  don't need me anymore, and so I was not asked

23  to leave, but creating the -- my field

24  operations, I guess, I built a really good

Electronically signed by Ann M. Belmont (201-234-827-3922)       ea7650af-fe4a-42aa-8a27-29ee2ee30e7b

Jill Brewer, 3/25/2014

16

1    business strategy and said, if you do this,

2    you don't need me and you can save all this

3    money, so they eliminated my position.

4            Q.     So if they --

5            A.     Through my initiation.

6            Q.     But they eliminated your

7    position, they didn't put anyone in place of

8    you to be in charge of all these aspects of

9    the customer experience?

10:02 10           A.     Nope.  They -- one person, the

11   person below me who did field -- who ran sort

12   of the ops, she just --

13           Q.     Who was that person?

14           A.     Kimberly Theiss.

15           Q.     Okay.

16           A.     So Kimberly continued doing what

17   she was doing, and then the sales, I don't

18   know what they did with that.

19           Q.     How about customer service, Amy

10:02 20   Finley?

21           A.     Yeah, em-hm.

22           Q.     These are all people that

23   reported to you before?

24           A.     Em-hm.

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                    ea7650af-fe4a-42aa-8a27-29ee2ee30e7b

Jill Brewer, 3/25/2014

17

1          Q.    You have to -- they prefer you

2    to say yes.

3          A.    Oh, I'm sorry, yes.  They all

4    reported to me before.

5          Q.    Did you get a package when you

6    left?

7          A.    Yeah, there was a standard

8    package that I received that's part of the

9    protocol that is in the handbook or the guide

10:03    10    lines or whatever.

11         Q.    Are you still receiving payments

12    under that package?

13         A.    No.  I wish.

14         Q.    Okay.

15         A.    It was a lump sum at departure.

16         Q.    Do you know whether or not this

17    lawsuit that brings us here together today

18    was pending at the time you left the company?

19         A.    It was not.

10:03    20         Q.    And I take it, then, you have no

21    agreements with Healthy Advice concerning

22    this lawsuit?

23         A.    I do not.

24         Q.    You were with Healthy Advice

Electronically signed by Ann M. Belmont (201-234-827-3922)                    ea7650af-fe4a-42aa-8a27-29ee2ee30e7b

Jill Brewer, 3/25/2014

18

1    nine years?

2          A.    I came in '04 and departed in

3    '13, so -- no, I departed in '12.

4          Q.    Eight years?

5          A.    I think I came in '04. '06.  I

6    came in '06 maybe.  I came in '06 and

7    departed '04.

8          Q.    Your Linkedin says July 2004 to

9    April 2012.

10:03   10          A.    Okay.  Then that's how long I

11   was there.

12          Q.    It says seven years, ten months?

13          A.    Yeah, thank you.

14          Q.    When you were at Healthy Advice,

15   did you believe it was important to make sure

16   that you were being truthful and honest in

17   your communications within the company?

18          A.    Oh, I was, and still am, yes.  I

19   was, yeah.

10:04   20          Q.    Okay.

21          A.    Yes.

22          Q.    And that would include e-mail

23   communications, right?

24          A.    Correct.

Electronically signed by Ann M. Belmont (201-234-827-3922)                    ea7650af-fe4a-42aa-8a27-29ee2ee30e7b

Jill Brewer, 3/25/2014

19

1        Q.    And if you -- it came to your

2    attention that one of these many people that

3    reported to you was not being truthful or

4    honest or accurate in their communications, I

5    assume that you would do something about it?

6        A.    If I was aware, yes.

7        Q.    You, or to your knowledge,

8    anyone reporting to you, would never

9    intentionally say something that was

10:04   10   misleading or not completely truthful?

11       A.    I would hope not. I do not know

12   what they would do, but I would hope not. It

13   wouldn't have been -- I would hope not.

14   That's not the way I led.  And it wasn't the

15   expectations I set.

16       Q.    Thank you. Now, at some time it

17   came to your -- at some point in time it came

18   to your attention that ContextMedia was

19   competing with HAN as to certain of the

10:05   20   networks, right?

21       A.    What did you say?

22       Q.    At one point in time it came to

23   your attention that ContextMedia was

24   competing with HAN with respect to certain of

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Jill Brewer, 3/25/2014

20

1    the networks?

2          A.    Certain of the networks?

3          MR. BERNAY: Object to the form.

4    You can still answer the question.

5          Q.    If you don't understand it, I'll

6    try to do it differently.

7          A.    Certain, I don't know what

8    certain of the networks mean.

9          Q.    Okay.  I say certain of the

10:05   10    networks, HAN had a network it called ACN,

11    right?

12          A.    You mean Arthritic Care Network?

13          Q.    Exactly.

14          A.    Yeah.

15          Q.    And then it had a network it

16    called PCN, right?

17          A.    Oh, yeah.  We had our primary

18    care networks, yeah.

19          Q.    And then it had a network it

10:05   20    called DHN --

21          A.    Yeah, there's nine.  There were

22    nine of them.

23          Q.    That's what I was --

24          A.    That's what you were referring

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                    ea7650af-fe4a-42aa-8a27-29ee2ee30e7b

Jill Brewer, 3/25/2014

21

1    to.  So you're saying that ContextMedia had

2    products that would be competing with some of

3    those networks?

4           Q.    Correct.

5           A.    Yes.  I was -- I am aware, was

6    aware that, yeah, they were a competitor.

7           Q.    Were you aware in the 2010-2012

8    time frame, before you left, of other

9    competitors as to the ACN, DHN or PCN

10:06   10   networks beside ContextMedia?

11          A.    Yes.

12          Q.    Who were those other competitors

13   that you were aware of?

14          A.    I don't recall their name, but

15   one was based in North Carolina.  I don't

16   recall their names though.

17          Q.    Do you recall that it was a

18   competitive environment?

19          A.    We were pretty dominant, so the

10:06   20   only environment that I perceived to be

21   competitive was ACN.  The other environments,

22   you know, it was a big world out there.

23   There's enough for everybody.

24          Q.    Did you, when you were there,

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                    ea7650af-fe4a-42aa-8a27-29ee2ee30e7b

Jill Brewer, 3/25/2014

22

1   keep track of market share?

2          A.     Market share. That's all very

3   relative, so you can't, say, keep track of

4   market share, because it's how people look at

5   it. But we were, by far, had the largest

6   placement distribution.

7          Q.     And that's why I asked the

8   question.  You made a comment a moment ago

9   that Healthy Advice was dominant.

10:07   10          A.     Yeah, because we had the largest

11   distribution.

12          Q.     As to PCN, ACN and DHN, all

13   three?

14          A.     DHN?

15          Q.     The Diabetes Health Network.

16          A.     We don't have a Diabetes Health

17   Network.

18          Q.     Did HAN at one point have a

19   Diabetes Health Network that --

10:07   20          A.     Not while I was there.

21          Q.     Okay. Let's take it then with

22   respect to PCN and ACN. Was HAN dominant in

23   both of those networks?

24          A.     PCN?

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                    ea7650af-fe4a-42aa-8a27-29ee2ee30e7b

Jill Brewer, 3/25/2014

23

1      Q.     Right.

2      A.     Definitely PCN and ACN, I think

3  so, but it was so small, I don't know that

4  anybody was dominant.

5      Q.     When you say so small --

6      A.     Well, the opportunity.  I mean,

7  it's just a -- there's what?  How many

8  rheumatologists try to get in one?  There's

9  only, like, I don't know. There just aren't

10:08  10  that many of them, and they have four

11  offices.  I mean, there just aren't that

12  many, so I think it would be hard for anybody

13  to dominate that.

14      Q.     Do you recall how large the ACN

15  market was in terms of practices?

16      A.     I mean, our distrubution?

17      Q.     No, overall.  The whole market.

18  You said the market's so small.

19      A.     I'm going to -- I'd have to

10:08  20  guess, so under 10,000.

21      Q.     And just for relative

22  comparison, what was the rough size of the

23  PCN market?

24      A.     Again, it's how you view it.  So

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                                    ea7650af-fe4a-42aa-8a27-29ee2ee30e7b

Jill Brewer, 3/25/2014

24

1    it would be huge.  Meaning, I would say -- I

2    can't tell you, because this would be the

3    fact stuff, but I would say it's huge.

4    Meaning that, do you, like, look at it by --

5    I mean, you can look up how many primary care

6    physicians are out there.  Sometimes, you

7    know what you do, you have doctors who are

8    hospitalists that are considered primary

9    care, but they work in the hospital.  So are

10:09  10   they, you know, part of the market?  There

11   are primary care doctors who work in the

12   government, there are primary care doctors

13   who work in VA, there are primary care

14   doctors who work in -- who work for offices,

15   so are you looking at offices or looking at

16   doctors?  I mean --

17        Q.    Okay.

18        A.    -- there are marketing experts

19   who can do that.  But I'm just saying it's

10:09  20   how you slice and dice it.

21        Q.    Fair enough. Do you feel like,

22   based upon your experience at Healthy Advice,

23   that you got a sense of what factors are

24   important to a practice when considering

Electronically signed by Ann M. Belmont (201-234-827-3922)                                        ea7650af-fe4a-42aa-8a27-29ee2ee30e7b

Jill Brewer, 3/25/2014

25

1    whether or not to select a point of care

2    provider?

3           A.    I can tell you what we promoted.

4           Q.    Well --

5           A.    I think I can remember.

6           Q.    In your experience, was the

7    quality of the health-related programming

8    important to a practice in selecting a POC

9    provider?

10:10   10        A.    The most important, what that

11   would be one.

12          Q.    Okay. You were about to tell me

13   what you thought the most important was.

14          A.    No.   I was going to say what --

15   when you -- I guess, one of the most

16   important things, they need to trust you.

17          Q.    Is another one the quality of

18   the entertainment-related program?  Is that

19   an important factor in selecting a POC

10:10   20   provider?

21              MR. BERNAY: Object to the form.

22   You can still answer.

23          A.    We did not promote that.

24          Q.    I'm not really asking you what

Electronically signed by Ann M. Belmont (201-234-827-3922)                    ea7650af-fe4a-42aa-8a27-29ee2ee30e7b

Jill Brewer, 3/25/2014

26

1    you promoted. I'm asking you whether you have

2    an understanding, based upon your experience

3    working and promoting to practices, what

4    factors they find important in making that

5    decision.  And if you don't know, that's

6    fine.

7         A.    Yeah. I would -- and this is

8    going to sound like being a smartass, but if

9    we didn't promote it, I didn't think it was

10   important.

11        Q.    Okay. So then why don't you tell

12   me what you promoted.

13        A.    Do you have any copy of our

14   sales collateral materials? I'm sure you do.

15   I've got to believe you do.

16        Q.    I'm not sure I have it.

17        A.    Yeah, because Context would have

18   it.  So if you look at what we promoted, we

19   promoted quality, we promoted reliability, we

20   promoted truthfulness, we promoted service.

21   They wanted content they could trust. And we

22   promoted a partnership that we would work in

23   partnership together.

24        Q.    Those are the things?

Electronically signed by Ann M. Belmont (201-234-827-3922)                    ea7650af-fe4a-42aa-8a27-29ee2ee30e7b

Jill Brewer, 3/25/2014

27

1          A.     That's what I recall.

2          Q.     Okay.

3          A.     I mean, because you have to be

4    very earnest in this field because you're

5    using their office as your home. I mean,

6    you're basically walking in their office and

7    saying, can we be a part of it.  And so you

8    have to come in a very servant approach, in

9    my opinion, but that's my approach.

10:12  10          Q.     And when you -- the first factor

11   you listed you promoted because you thought

12   it was important was quality.  And when you

13   say quality, what do you mean by that?

14          A.      The quality of the content, the

15   quality of the materials, the quality of the

16   service, the quality of the support and the

17   customer service.  I mean, throughout.

18          Q.     Okay.  The second thing you told

19   me about or that you mentioned was

10:12  20   reliability.  What do you mean by

21   reliability?

22          A.      That the service works and it

23   works as -- as we intended and all that.

24          Q.     Okay.

Electronically signed by Ann M. Belmont (201-234-827-3922)                    ea7650af-fe4a-42aa-8a27-29ee2ee30e7b

Jill Brewer, 3/25/2014

28

1          A.     What reliability kind of means,

2     I'm sorry, that.

3          Q.     I apologize if some of my

4     questions seem dumb --

5          A.     I know, I apologize.  I'm just

6     saying reliability.  So, yes, I do, yeah,

7     that works.

8          Q.     Well, but reliability in this

9     context does not mean reliability in some

10:13  10     other context, and that's --

11          A.     So reliability that it works and

12     that you're responsive.

13          Q.     And the next thing you mentioned

14     was trustworthiness?

15          A.     Yeah, they want to know that the

16     content is -- they care very much about their

17     patients and we wanted to make sure that the

18     content was consistent with their -- with

19     what they believed, you know, was good.

10:13  20          Q.     And the next thing you mentioned

21     was service.  I take it that means service of

22     the equipment?

23          A.     It's allover service.  So it's,

24     again, you pick up the phones, somebody's

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                                        ea7650af-fe4a-42aa-8a27-29ee2ee30e7b

Jill Brewer, 3/25/2014

29

1    going to respond to you, you have a problem,

2    it gets repaired, it's, you know.

3              Q.    The last thing you mentioned was

4    partnership?

5              A.    Yeah, like I said -- mentioned,

6    consistent with what I said, that it was

7    their point of view that this was their -- we

8    talked, this was their -- this is their

9    office, this is their home, and they're

10:14  10  agreeing to allow us to come into their home,

11    so we talk about partnership and providing

12    them, as you know, these products are --

13    there's no fee associated.  So it has to be a

14    partnership, and that you're providing, you

15    know, programs and services, there's no --

16    there's not a fee exchanged, and because

17    there's no fee exchanged, we have to deliver

18    on services because they're allowing us to

19    use their space.  And that is a partnership.

10:14  20            Q.    And, obviously, you appreciate

21    and understand, during this process, that the

22    practice can have whatever they want in their

23    waiting room, right?

24            A.    Can -- they can have whatever

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                    ea7650af-fe4a-42aa-8a27-29ee2ee30e7b

Jill Brewer, 3/25/2014

30

1    they want?  It's their home, they can do

2    whatever.  Well, it's a system now, so it's

3    hospital administrators make those decisions.

4    But way back in the day, it was individual

5    practices, and so this is their home, they

6    can do --

7            Q.    They can have hanging on the

8    wall whatever they want?

9            A.    -- it's their choices. They --

10:15  10   in a partnership, within guidelines, because

11   there -- it was my belief that there were

12   other companies who wanted to create these

13   long-term contracts that, really, I don't

14   even think can be legal, but forgetting what

15   I think. But we create an environment that if

16   you give us a notice, I don't recall the

17   length of that notice, but if you give us

18   advanced notice, you can discontinue. And

19   that's one of the reasons we were able to

10:15  20   grow the network as we did, because we were

21   able to build with trust and partnership.

22           Q.    And why did Healthy Advice want

23   advanced notice if the practice was going to

24   discontinue service?

Electronically signed by Ann M. Belmont (201-234-827-3922)                    ea7650af-fe4a-42aa-8a27-29ee2ee30e7b

Jill Brewer, 3/25/2014

31

1        A.    Why -- everyone would.  You want

2   advanced notice because you need to be able

3   to plan to take the equipment off the wall,

4   because the practice doesn't own the

5   equipment.  And that was part of the

6   agreement, as far as the equipment, it

7   remains ours, it is not their equipment, it

8   is our equipment.  So we are putting it in

9   their office, they are allowing us to let it

10:16  10   be there, but they don't own it, they can't

11   take -- they couldn't take it off the wall,

12   they can't manipulate it, they couldn't turn

13   it on or off, they couldn't do anything with

14   it.  They -- the agreement is for the

15   content, for the rich educational content,

16   you allow us to place this in here and we do

17   our best effort to make it the quality of

18   product that you enjoy and that your patients

19   appreciate it, respect, and then, in turn,

10:16  20   you know, it's a win-win.  And if you choose

21   to discontinue the network, you need to give

22   us notification so that we can arrange to get

23   someone back out there, because it's

24   extensive, get somebody back out there, take

Electronically signed by Ann M. Belmont (201-234-827-3922)                    ea7650af-fe4a-42aa-8a27-29ee2ee30e7b

Jill Brewer, 3/25/2014

32

1      it off the wall, and get it back.

2            Q.     Okay.

3            A.     And that's reasonable.

4            Q.     And I think you told us a moment

5      ago that, at least in the last three or four

6      years of your position, in addition to sales

7      to practices and service of practices, the

8      folks who dealt with the installations and

9      the removal of the equipment all reported up

10:17  10     to you as well, right?

11           A.     Well, they worked for a vendor

12     that we -- we used third-party vendors.  Or

13     we used external vendors, but they

14     reported -- Kimberly oversaw those vendors

15     and she reported to me.

16           Q.     Right. That was under your

17     bailiwick --

18           A.     Yeah, yep, yep, yep.

19           Q.     To round out your resumé, what

10:17  20     have you done since you left Healthy Advice

21     by way of employment?

22           A.     I worked for a brief period for

23     a company in Maryland called Care Vision.

24           Q.     What were you doing?

Electronically signed by Ann M. Belmont (201-234-827-3922)                                    ea7650af-fe4a-42aa-8a27-29ee2ee30e7b

Jill Brewer, 3/25/2014

33

1          A.    For three months. I was -- took

2    a position as a chief operating officer, and

3    as it turned out, the funds weren't in place

4    as I had been led to believe, so I departed

5    there.

6          Q.    Did you actually move out to

7    Maryland?

8          A.    I did.

9          Q.    Your Linkedin page says that you

10:18  10   currently live in Denver?

11         A.    Because I'm moving there as fast

12   as I can.

13         Q.    Why is that?

14         A.    Because I like it.

15         Q.    Okay.

16         A.    My son's graduating high school,

17   so I'm unencumbered shortly.  I'm putting my

18   house on the market.

19         Q.    And have you been employed since

10:18  20   the employment you had with the company in

21   Maryland?

22         A.    I have not.

23         Q.    In HAN's efforts to sign up

24   physicians to its networks, it would try to

Electronically signed by Ann M. Belmont (201-234-827-3922)          ea7650af-fe4a-42aa-8a27-29ee2ee30e7b

Jill Brewer, 3/25/2014

34

1    convince physicians who already had a POC

2    provider to switch to HAN, correct?

3         A.   No.  We -- we were sort of --

4    no.  We didn't by and large target anybody

5    with current products, I mean --

6         Q.   I didn't mean it that way.  Let

7    me start over.  If in the course of a sales

8    effort HAN determined that the practice

9    already had a POC provider, HAN would --

10:19  10         A.   POC?

11         Q.   Point of care.

12         A.   So start over.

13         Q.   Okay. If in the course of a

14    sales effort to a practice HAN would learn

15    that the practice already had a competitor in

16    the waiting room, HAN wouldn't then cease all

17    sales efforts, it would instead try to

18    convince the practice of the merits of HAN's

19    product over the competitor's, right?

10:19  20         MR. BERNAY: Object to the form.

21    You can answer.

22         A.   Yeah, I would say if we walked

23    in and saw it on the wall, we would ask if

24    they were satisfied with their service, and

Electronically signed by Ann M. Belmont (201-234-827-3922)      ea7650af-fe4a-42aa-8a27-29ee2ee30e7b

Jill Brewer, 3/25/2014

35

1   if they were dissatisfied with their service,

2   we would ask them if they were interested in

3   a different product or service.  But my

4   recollection is that -- just like what

5   happened at Whittle Communications, the

6   original product -- and I will volunteer this

7   insight.  The original product that

8   Context -- I think it's Context sits under,

9   is actually a product that I built out

10:20  10  originally, it was called Special Reports. So

11  Special Reports was the first in office

12  program and it was with Joan Lunden, and it

13  had magazines, these huge, glossy magazines,

14  you can still go in offices in Chicago and

15  see big wooden oak cases. So when I say Chris

16  Whittle founded it, we built the first

17  network across the country.  Just like we did

18  in education, I did it originally at Whittle

19  Communications there. Over time, that was

10:20  20  sold to Time Warner and sold and sold, and I

21  think it was -- what is that channel in

22  Chicago, that channel, you know, whatever.

23  But, anyway, that was the original special

24  report platform. So Healthy Advice, by and

Electronically signed by Ann M. Belmont (201-234-827-3922)          ea7650af-fe4a-42aa-8a27-29ee2ee30e7b

Jill Brewer, 3/25/2014

36

1    large, it started dwindling because they

2    didn't replace it, because there's a natural

3    churn in these networks.  By default, the

4    practice, doctors die, they move, they close

5    up shop, you know, they merge, they unmerge,

6    so there's a natural churn due to, just like

7    the homeowner's market. So when I came here,

8    the network was tiny, so we built it out.  So

9    the bulk, 99 percent of this network, or

10:21  10   99.9 percent was virgin, there was nothing

11   there.

12          Q.    When you say 99.9 percent --

13          A.    I'm just saying there was --

14   there was not a competitor out there. We grew

15   the network without a competitor in place.

16          Q.    What time period are you talking

17   about when you say --

18          A.    From the time I came there, '04.

19          Q.    So from 1994 until --

10:21  20          A.    No, I don't know what you mean

21   by '94.  I'm just saying, when I came to

22   Healthy Advice, --

23          Q.    2004, oh, I'm sorry.

24          A.    -- by and large. By and large,

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                                    ea7650af-fe4a-42aa-8a27-29ee2ee30e7b

Jill Brewer, 3/25/2014

37

 1    when I came to Healthy Advice, there weren't
 2    competitors in the marketplace.  It was
 3    virgin territory, we just expanded.
 4            Q.    Did that ever change, that it
 5    was virgin territory and there were no
 6    competitors in the market?
 7            A.    Well, what happens, you get
 8    saturated, so you have salespeople, so if you
 9    saturate a market, then you just -- you
10:22  10    travel and you go to a market that's not --
11    that doesn't have distribution, I guess, is
12    one way to look at it.
13            Q.    You said a couple times the
14    market was saturated, that HAN had
15    99.9 percent, what --
16            A.    I don't mean 99, what I'm saying
17    is that -- the 99 percent.  I'm just saying
18    the bulk of everything we did, did not -- it
19    was -- there was not a product in place,
10:22  20    like -- more like a bulk.  So the majority of
21    the network was built on virgin space.
22            Q.    What I'm trying to find out is
23    what network are you talking about when you
24    keep saying --

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                                                              ea7650af-fe4a-42aa-8a27-29ee2ee30e7b

Jill Brewer, 3/25/2014

38

1          A.     Primary care.

2          Q.     Okay.

3          A.     All of them, every one of them.

4          Q.     Did there ever come a time where

5     HAN faced competition and would compete with

6     market share with other competitors?

7          A.     I would say that ACN is the only

8     one that rings a bell.

9          Q.     You know that ContextMedia took

10:23  10     market share from HAN, right?

11          A.     Took market share.  I know that

12     ContextMedia displaced HAN's placement.

13          Q.     And did HAN ever switch a

14     practice from ContextMedia service to HAN's

15     service?

16          A.     I don't recall winning that over

17     in ACN. I mean, we had, what, 160 offices?

18          Q.     How about in PCN?

19          A.     I didn't even know they had a

10:24  20     PCN product.

21          Q.     So it's your recollection that

22     the space where ContextMedia competed against

23     HAN was in ACN?

24          A.     That is my recollection.

Electronically signed by Ann M. Belmont (201-234-827-3922)                                    ea7650af-fe4a-42aa-8a27-29ee2ee30e7b

Jill Brewer, 3/25/2014

39

1        Q.    And you threw out a number of

2    160 a moment ago, is that because, when you

3    left, the size of HAN's ACN market was about

4    160 doctors?

5        A.    I'm guessing. Somewhere around

6    there.  It was tiny.

7        Q.    Did you ever see projections

8    within the company whereby the size of HAN's

9    market in ACN would grow by 500 physicians in

10:24  10    a single calendar year?

11       A.    I ran that, so, no, I never saw

12    that.  I mean, that would be really hard to

13    do.

14       Q.    I mean, that's -- would be

15    unrealistic, right?

16       A.    Be unrealistic? It would be --

17    500 doctors in one year?

18       Q.    Right, in ACN.

19       A.    In ACN, that would be hard to

10:25  20    do. I'm sharing my opinion, I guess I'll shut

21    up about that.

22       Q.    What about the proposition that

23    HAN would grow its ACN market by 500 doctors

24    in 2012 and another 500 doctors in 2013?

Electronically signed by Ann M. Belmont (201-234-827-3922)                    ea7650af-fe4a-42aa-8a27-29ee2ee30e7b

Jill Brewer, 3/25/2014

40

1          MR. BERNAY: Object to the form.

2     You can answer.

3          A.    I don't need to answer.  I have

4     no idea what happened.  I mean, I don't know

5     how the market's changed, it's been a long

6     time.  I would just say, at the time, I think

7     we had about 160.  I do know -- I will share

8     that the market, the rheumatology market is

9     going exponentially.  Obviously, there's tons

10:25  10    of money there and PhRMA is willing to pay a

11    lot for it, and that's why so many people

12    entered that field, I'm guessing, and so

13    there were a lot of people interested, a lot

14    of people charging a lot of money per doctor

15    based on their product, and it's -- and also

16    they -- I think I recall there was an influx

17    of a lot of NPs and PAs who were going in

18    that field that would allow a larger space,

19    if I recall, because that's the problem.  You

10:26  20    can't get into these guys and everybody seems

21    to need it.  So with NPs and PAs expanding, I

22    recall that that was growing exponentially,

23    and so if they're going in that field, that

24    would increase the market huge.

Electronically signed by Ann M. Belmont (201-234-827-3922)                    ea7650af-fe4a-42aa-8a27-29ee2ee30e7b

Jill Brewer, 3/25/2014

41

1          So, again, that is what I recall

2     that was trending.  Because what they do,

3     they charge -- there's a patient value, and a

4     patient value on a drug in a rheumatology

5     product is 20 -- I want to say is 20 times

6     that or 100 times that.  It's so much more

7     than the patient value of an antibiotic or

8     something. The patient value of those drugs

9     are huge, and that's what drives this market.

10:26   10     So that I would say for -- and then, with all

11     the growth and the high trends and NPs and

12     PAs, with new government guidelines and

13     ObamaCare, you know, it's very likely or

14     possible that that market could be exploding.

15          Q.    But that's your speculation

16     right now, right?

17               MR. BERNAY: Object to the form.

18     You can answer.

19          A.    No, I'm not saying that's my

10:27   20     speculation.  I'm saying, just like before,

21     based on my experience and what I recall from

22     knowledge and trends from the -- from the

23     time I was there, the trends are what I just

24     described, and that's what I recall. So I

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                                    ea7650af-fe4a-42aa-8a27-29ee2ee30e7b

Jill Brewer, 3/25/2014

42

1    wouldn't call it speculation.  I would say my

2    recollection of the trends and the growth in

3    those networks and how that growth could be

4    allowed for or accommodated for.

5         Q.    Well, let's talk about trends

6    while you were there. From the time you

7    started in 2004 to the time you left in 2012,

8    didn't the size of HAN's ACN market hover

9    around that 160 number you gave me a moment

10   ago?

11             MR. BERNAY: Object to the form.

12   You can answer.

13        A.    No. It grew, we grew it. We grew

14   our last year, and when I say that 160, that

15   would have been before.  Because my last

16   year, it was -- they were looking to grow,

17   because -- and you probably know Linda

18   Ruschau, who's the client that was behind the

19   product, she -- because there was so much

20   interest and because of the patient value,

21   everybody was interested in the growth of

22   this network. So I'm not saying that hovered,

23   but I'm saying it was a focus of the company

24   for growth.  That's what I recall when I

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Jill Brewer, 3/25/2014

43

1      left.

2             Q.      I guess what I was trying to ask

3      you, from 2004 to 2012, didn't the size of

4      HAN's ACN market consistently stay around

5      160?

6             A.      Yes, during that time that --

7      I'm not sure how ContextMedia is funded,

8      Healthy Advice is funded by the number of

9      doctors in the network, and so you managed to

10:29  10     that. So -- meaning that if -- if you're

11     selling the space, and let's say you're

12     selling 100, and if I sell 101 doctors, I

13     don't get paid for that extra doctor, I only

14     get paid for the hundred.  So the objective

15     is to stay what your target is. That is the

16     objective.  And so I did a good job of

17     keeping it on track.  As I say, arrived on

18     time and on budget.

19            Q.      Okay. When a practice notified

10:29  20     HAN that it was leaving HAN --

21            A.      Em-hm.

22            Q.      -- your team were to contact the

23     practice and try to understand the reasons

24     the practice was leaving HAN, right?

Electronically signed by Ann M. Belmont (201-234-827-3922)                                    ea7650af-fe4a-42aa-8a27-29ee2ee30e7b

Jill Brewer, 3/25/2014

44

1          A.    No.   If they called us, we asked

2     them.   We didn't have to contact them, they

3     called us.   So we would ask them on the phone

4     why they called, because they do -- they call

5     you.   We would go why, we document it in the

6     files and stuff, like why are you leaving and

7     anything we can do.

8          Q.    Right.   Well, I wasn't focused

9     on who called who.   Whether you called them

10:30   10    or they called you --

11          A.    Okay.

12          Q.    -- you had folks on your team

13    whose job responsibilities included trying to

14    understand why the practice had made the

15    decision to leave HAN, right?

16          A.    Any time a practice contacted

17    us, we have reason codes as to why they were

18    departing, and we would ask, why you're

19    departing, just like if you're cancelling a

10:30   20    credit card or anything else, they ask you

21    why you want to leave, and you tell them. We

22    did the same thing, and we would document why

23    they were departing.   So, yes, if they called

24    us and wanted to cancel, we said why are you

Electronically signed by Ann M. Belmont (201-234-827-3922)                    ea7650af-fe4a-42aa-8a27-29ee2ee30e7b

Jill Brewer, 3/25/2014

45

1    cancelling, and we would document the reason

2    code.

3         Q.    And when you say reason code,

4    can you tell me what you're talking about?

5         A.    Well, are you leaving because

6    your practice is closing, are you leaving due

7    to a competitor, are you leaving due to

8    you're moving, are you -- you know, why are

9    you leaving our network so that we can better

10:31  10    understand and better serve you.

11        Q.    Were each of those reasons under

12    this reason code system assigned a number or

13    a letter from the alphabet or something

14    else --

15        A.    I don't remember.

16        Q.    -- associated a particular code?

17        A.    I don't remember.  Maybe it just

18    went into comments, I really don't recall.

19        Q.    When you say it went into

10:31  20    comments, you're talking about the CMS

21    database, right?

22        A.    Yeah.  But I don't recall, I

23    just know that there was a documentation that

24    would say why are you departing and why you

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                                    ea7650af-fe4a-42aa-8a27-29ee2ee30e7b

Jill Brewer, 3/25/2014

46

1    were departing, it would document why you are

2    departing so we would know the reason of --

3    just like any company would do.  So I'm sure

4    there was like a code or something.  It would

5    be silly not to have one.

6            Q.    Why was it important to HAN to

7    know the reasons a practice was leaving?

8            A.    Same reason it's important for

9    American Express to know why you don't want

10:32   10   their card anymore.  It's to understand the

11   marketplace so you can improve your product

12   or service.  If they're dissatisfied with

13   your content and you want to understand it so

14   you can improve the content.  If they're

15   dissatisfied somebody was rude on the phone

16   or somebody didn't return a call or, you

17   know, it's elementary business.

18           Q.    And I apologize, again, if my

19   questions seem --

10:32   20           A.    I know, I'm just thinking it's

21   so common, but that's why. So you can provide

22   better service.  I'll try not to be so windy.

23           Q.    At one point in time, do you

24   recall -- well, let me back up. These folks

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                    ea7650af-fe4a-42aa-8a27-29ee2ee30e7b

Jill Brewer, 3/25/2014

47

1    who would try to understand and document a

2    reasons -- the reasons a practice was leaving

3    HAN, they reported up to Ms. Finley, who in

4    turn reported up to you, right?

5           A.    Correct.

6           Q.    Do you recall all of the fields

7    that were in the CMS database with respect to

8    keeping track of information regarding

9    practices?

10:33
10          A.    I don't recall all of them, and

11   they didn't always report to Amy.  For a long

12   time, the majority of this time, Amy just had

13   responsibility for the -- for the -- Amy only

14   had this responsibility for the last couple

15   of years, I don't even know how long, but

16   maybe two years.  Before that, other people

17   had this responsibility.  So Amy only was

18   just responsible, she was my assistant in the

19   sales recruitment and then she saw -- she

10:33
20   oversaw the people who did the onboarding,

21   and then for a while there's a woman by the

22   name of Kelly Nugent who led that team.  And

23   Kelly Nugent is the one who established all

24   the protocols and all that stuff.  So I

Electronically signed by Ann M. Belmont (201-234-827-3922)                    ea7650af-fe4a-42aa-8a27-29ee2ee30e7b

Jill Brewer, 3/25/2014

48

1    don't -- I know we had a lot.  We had

2    probably -- because we wanted to understand

3    it, so we -- I'd be guessing, but a lot of

4    reason codes.

5         Q.    Okay. And how would someone who

6    was trying to assign the reason a practice

7    had left or was leaving HAN to a reason code,

8    how would they know what the available reason

9    codes were?  Was there a sheet of paper that

10:34   10    said here's the reason --

11         A.    It's embedded in CMS, so they

12    would -- so I'm talking to you on the phone,

13    I have my computer in front of me and I click

14    a box, so it's not manual, it's electronic.

15         Q.    I see. And do you recall what

16    other fields were in the CMS database?  And

17    let me give you an example.  Was there a

18    field in there for noting whether or not you

19    were able to save a practice?  Do you know

10:34   20    what I mean by save a practice? There's two

21    questions --

22         A.    I'm not aware of that at all.

23         Q.    Okay.

24         A.    Because these people aren't paid

Electronically signed by Ann M. Belmont (201-234-827-3922)                    ea7650af-fe4a-42aa-8a27-29ee2ee30e7b

Jill Brewer, 3/25/2014

49

1    for -- at the time.  I do not recall these

2    people, that they were paid in any capacity

3    for "saving".  I don't recall that.

4         Q.    Let me start over. Do you

5    know -- do you understand what I'm talking

6    about when I say save a --

7         A.    Yeah, and I'm saying --

8              (Interruption by Reporter.)

9         Q.    You have to let me, just talk

10:35 10  one at a time, otherwise she'll never be able

11   to get it down. So let me start over.

12              Do you know what I mean by save

13   a practice?

14        A.    No.  Why don't you explain that.

15        Q.    A practice has notified HAN that

16   it's going to a competitor. One of the folks

17   that report up to you is on the phone trying

18   to understand the reasons why. Does that

19   person also then try to save the practice and

10:35 20  convince the practice of the merits of HAN's

21   content, for example, so that the practice

22   will consider staying with HAN?

23        A.    I apologize, but I thought I

24   answered that already. Previously we said,

Electronically signed by Ann M. Belmont (201-234-827-3922)                    ea7650af-fe4a-42aa-8a27-29ee2ee30e7b

Jill Brewer, 3/25/2014

50

1    when a practice calls in to cancel, because

2    they always call, that I recall, then we

3    would say, why -- we would try to convince

4    them not to leave.

5         Q.    Okay.

6         A.    Because it's very expensive when

7    they leave.

8         Q.    I'm sorry if I didn't catch

9    that --

10:36  10         A.    No, it's okay, but, yeah, that

11   would be, yeah.

12         Q.    So if the person then was

13   successful in what I'm calling saving the

14   practice, and they say okay, all right, I'll

15   stay with you.  Is that noted in the CMS

16   database?

17         A.    Not -- I have no idea.  I don't

18   recall that it was, but I cannot say.

19         Q.    Okay. How about the status of

10:36  20   the equipment with respect to a practice who

21   leaves HAN, is that a field in the database?

22         A.    They have tremendous tracking.

23   Yeah, tremendous.

24         Q.    So the database would note

Electronically signed by Ann M. Belmont (201-234-827-3922)                                        ea7650af-fe4a-42aa-8a27-29ee2ee30e7b

Jill Brewer, 3/25/2014

51

1     whether or not the equipment had come back or

2     not, right?

3          A.    Oh, yeah.  And those -- it knows

4     where it is in transports, it knows

5     everything.  It knows every device on it,

6     yeah, that's pretty sophisticated.

7          Q.    Were you aware of instances from

8     time to time where someone on your team

9     advised a practice that they didn't need to

10:37  10    return the equipment, they could just keep

11    it?

12         A.    I'm not aware.

13         Q.    Do you know if that ever

14    happened?

15         A.    I'm sure -- like what kind of

16    equipment?

17         Q.    The player and the screen.

18         A.    No, I'm not aware of that ever.

19         Q.    Okay.

10:37  20    A.    What I'm aware of is if we spent

21    the money which turned out not to be

22    effective at all to run cable, the only thing

23    we left at the practice, you running cable

24    like through the walls and all this, which is

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)          ea7650af-fe4a-42aa-8a27-29ee2ee30e7b

Jill Brewer, 3/25/2014

52

1  extremity expensive, we have left that, I'm

2  aware of that. I'm aware of the products that

3  were in exam rooms, like they -- Healthy

4  Advice bought some company that I don't --

5  some company that had stuff in exam rooms,

6  that stuff we didn't want back, and we tried,

7  oh, take it home, and because it was -- but

8  that was in exam rooms, it wasn't being used

9  for the network, it was just in there, so we

10:38   10  were hoping we didn't have to go pick it up.

11  That's the exam room.  But never, I do not

12  recall ever in the waiting room saying, keep

13  it.  It's too expensive.

14       Q.    And that's the reason you

15  believe it didn't happen, because the

16  equipment is expensive?

17       A.    No. I just --

18            MR. BERNAY: Object to the form

19  of that question.  You can answer.

10:38   20       A.    Yeah, so say that again.

21       Q.    Is that the reason you're saying

22  you don't believe a practice was ever allowed

23  to keep, for example, the player, because

24  it's too expensive?

Electronically signed by Ann M. Belmont (201-234-827-3922)                    ea7650af-fe4a-42aa-8a27-29ee2ee30e7b

Jill Brewer, 3/25/2014

53

1          MR. BERNAY: Objection.

2          A.    No, it's a -- it's against the

3    rules, it's against the law, like, that's not

4    our agreement.  The agreement is, you can't.

5    You can't because PhRMA pays us, and if we

6    did that, it would be a gift to the practice,

7    so you can't. There's a lot of reasons you

8    can't, but you can't.

9          Q.    What if the equipment was

10:39  10   antiquated?

11          MR. BERNAY: Object to the form.

12          A.    I just mentioned in the -- I

13   don't know the details of this, but that

14   stuff in the exam room, I did.  I even looked

15   at trying to buy remotes to give to them,

16   because it wasn't being used in an

17   advertising format.  So as long as it's not

18   being used as a medium.  Meaning, I think

19   what I'm trying to say, if it's been written

10:39  20   off because it's so old.  But, no, I'm not

21   aware of that ever.

22          Q.    Okay. At what point in time do

23   you recall -- let me back up. I asked you a

24   question a moment ago about whether the folks

Electronically signed by Ann M. Belmont (201-234-827-3922)                                    ea7650af-fe4a-42aa-8a27-29ee2ee30e7b

Jill Brewer, 3/25/2014

54

1   who were responsible for trying to understand

2   the reasons a practice left HAN reported up

3   to Ms. Finley. And you said she only had that

4   role the last couple of years you were there,

5   and before that, others had that role, right?

6          A.    Yeah.

7          Q.    And so the years that Ms. Finley

8   would have had that role would have been the

9   2010-2012 time frame?

10:40  10          A.    Yeah, and, again, I don't

11   remember exactly.  But Kelly -- maybe even

12   before that, but Kelly Nugent is the person

13   who -- and she only worked there a year, so

14   not very long.  But she's the one who did the

15   original manuals.  But then -- and then

16   before that, it was in another department, so

17   it's kind of -- but for the reason codes, I

18   would say the current reason codes, and the

19   reason codes upon my departure, Amy would

10:40  20   have had set those up.

21          Q.    Yeah.

22          A.    And she had all of that.

23          Q.    And I'm really only interested,

24   today, for the most part, unless I tell you

Electronically signed by Ann M. Belmont (201-234-827-3922)                    ea7650af-fe4a-42aa-8a27-29ee2ee30e7b

Jill Brewer, 3/25/2014

55

1    otherwise, in the 2010-2012 time frame.

2         A.    Okay. So, yes, Amy would have

3    established all those reason codes.

4         Q.    Do you recall at one point in

5    time going to the same -- I was going to say

6    Amy, let me start over.  Do you recall at one

7    point in time going to Ms. Finley and saying

8    that you wanted her team to create a separate

9    spreadsheet to track switches away from HAN

10:41  10    to ContextMedia?

11              MR. BERNAY: And let me advise

12   you just at this moment not to, again, as we

13   discussed off the record, not to disclose the

14   contents of your conversations with counsel

15   during the time you were at Healthy Advice.

16         Q.    The question I asked was a yes

17   or no question. I'll ask it again.  Do you

18   recall at one point in time going to Ms.

19   Finley and instructing her to create a

10:41  20    separate spreadsheet that would track

21   switches from HAN to ContextMedia only?

22         A.    I do not. All of this

23   information is stored in CMS so it would have

24   been stored in CMS.  There would be no reason

Electronically signed by Ann M. Belmont (201-234-827-3922)                    ea7650af-fe4a-42aa-8a27-29ee2ee30e7b

Jill Brewer, 3/25/2014

56

1    to have it separate. I mean, I'm just saying,

2    I think, to me, CMS was quite elaborate and

3    I -- it is my belief that, if it was in CMS,

4    that we could track all of that.

5        Q.    I'll represent to you Ms. Finley

6    testified that you did do that.

7        A.    Okay.  Then I did, but I just

8    don't recall that.

9        Q.    So I take it you have no

10   recollection of the reasons you asked her to

11   do that?

12            MR. BERNAY: Objection.

13       A.    I have no -- if I don't recall

14   specifically doing that, other than being

15   able to track and understand what's going on

16   specifically, what's going on, I would've

17   think that, instead of having that in a

18   separate spreadsheet, I would think, not that

19   I didn't, but I would think it would be in

20   CMS and you can extract anything out of CMS.

21       Q.    It's a pretty robust database,

22   isn't it?

23       A.    It's hand grown.  It's got a lot

24   of stuff, it doesn't function great, sorry,

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                    ea7650af-fe4a-42aa-8a27-29ee2ee30e7b

Jill Brewer, 3/25/2014

57

1    Cathy, but it's got a lot of stuff.  I mean,

2    we tracked everything.  Everything was

3    tracked, everything.  So I can't imagine you

4    would need -- not that you couldn't because

5    you could run it out of CMS and you would

6    have it.  So I don't know why it would be

7    separate.  There would be no special reason

8    for that.

9          Q.    So I take it you also don't

10:43 10   recall any lawyer for HAN instructing you to

11   have your team create such a separate

12   database --

13         A.    I definitely do not remember

14   that.

15         Q.    Okay.

16         A.    I wanted to be aggressive and

17   they didn't.

18         Q.    Okay.

19         A.    And I can assure you, not only

10:43 20   do I not remember, I know for certain that

21   never occurred.  I don't recall.

22         Q.    That is, it never occurred that

23   a lawyer instructed you --

24         A.    No --

Electronically signed by Ann M. Belmont (201-234-827-3922)          ea7650af-fe4a-42aa-8a27-29ee2ee30e7b

Jill Brewer, 3/25/2014

58

1          (Interruption by Reporter.)

2          Q.    Let me finish my question,

3     please.

4          A.    Oh, sorry.

5          Q.    It never occurred that a lawyer

6     instructed you to create such a separate

7     spreadsheet?

8          A.    No.

9          Q.    Now I'm going to show you some

10:43  10     documents.

11          A.    Okay.

12          Q.    That's part of this process,

13     too.

14          A.    That's okay.

15          Q.    I'm now going to show you what

16     was previously marked as Defendant's

17     Exhibit 19. And with all of these, Ms.

18     Brewer, you take whatever time you want to

19     look at this before you answer any questions

10:44  20     I have for you.  When you are ready to answer

21     a question, though, the first one I'll have

22     for you is if you recall this e-mail chain.

23      (Exhibit 19 identified.)

24          A.    Okay, so.  Okay, so.

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                    ea7650af-fe4a-42aa-8a27-29ee2ee30e7b

Jill Brewer, 3/25/2014

59

1          Q.    The first question was, do you

2     recall this e-mail chain?

3          A.    Do I recall it? Is it -- this is

4     a chain, so this is October 14, 2011, 4:49.

5     So FYI, so Cathy Goold, Cathy Goold sent this

6     to Scott Landon, and Scott sent it to Lance

7     and Todd -- who's Todd Glass? Who's Todd

8     Glass?

9          Q.    I have no idea. The way I read

10:45 10    this, Ms. Brewer, it starts off with an

11    e-mail from Amanda Devlin to you, Ms.

12    Grippo --

13         A.    I'm back there --

14         (Reading to herself out loud.)

15              Says he switches out Accent

16    Health -- Accent Health. Accent Health was

17    the former thing that I did. Well, it's here,

18    so I guess so, but.

19         Q.    Well, let me ask you some

10:46 20    questions --

21         A.    Okay. Ask me about it, go ahead.

22         Q.    First of all, do you recall

23    that -- do you recall Amanda Devlin?

24         A.    Pardon?

Electronically signed by Ann M. Belmont (201-234-827-3922)                    ea7650af-fe4a-42aa-8a27-29ee2ee30e7b

Jill Brewer, 3/25/2014

60

1          Q.     Do you recall Amanda Devlin?

2          A.     Oh, yes, I did.

3          Q.     Did she report up to you?

4          A.     She did.  She reported to me.

5          Q.     And do you recall that, during

6     this time period, that she was gathering

7     competitive intelligence about ContextMedia?

8          A.     That she -- well, clearly I was.

9          Q.     Okay. So, for example, she was

10:47   10   speaking to people from ContextMedia, right?

11         A.     She spoke -- I guess she

12    communicated through this e-mail.  I guess

13    she called them.

14         Q.     Right. And did you know when she

15    did that she lied to the fellow from

16    ContextMedia and said that she was from a

17    practice interested in ContextMedia's

18    service?

19               MR. BERNAY:  Objection.  You can

10:47   20   answer.

21         A.     Well, she -- I clearly learned

22    after the fact.

23         Q.     Is that something you approved

24    of before the fact?

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                                    ea7650af-fe4a-42aa-8a27-29ee2ee30e7b

Jill Brewer, 3/25/2014

61

1     A.    No.  I didn't know she was -- to
2    the best of my knowledge, no, I did not know
3    she was doing it.
4          Q.    Do you know who did approve that
5    before the fact?
6          A.    I don't know that anyone did.  I
7    think she probably just did it.
8          Q.    And had she come to you before
9    the fact and asked your permission to do
10:47  10   that, what would you have told her?
11         A.    I'm not sure.
12               MR. BERNAY: Objection. Object to
13   the form.  You can answer.
14         Q.    Once you did find out, did you
15   or anybody else in management reprimand or
16   admonish her for that?
17         A.    No, I did not.
18         Q.    As you sit here today, do you
19   think that what she did was unethical?
10:48  20        A.    To call --
21               MR. BERNAY: Objection.  You can
22   answer.
23         A.    -- a competitor. You know,
24   it's -- that's a moral question, so what I

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                    ea7650af-fe4a-42aa-8a27-29ee2ee30e7b

Jill Brewer, 3/25/2014

62

1    think, I don't know.

2         Q.    Okay. Did you feel like you

3    understood what appropriate business ethics

4    were when you were working at Healthy Advice?

5         A.    Did I feel like I understood?

6         Q.    Right.

7              MR. BERNAY:  Object to the form.

8         A.    I understand business practice.

9    So you said appropriate?

10:49   10         Q.    Did you have an understanding of

11    that -- a framework that you worked under

12    when you were at Healthy Advice as to what

13    would be an ethical business practice and

14    what would be an unethical business practice?

15              MR. BERNAY: Object to the form.

16         A.    I tried my best to create an

17    ethical business practice.

18         Q.    And would part of that effort be

19    to approve or disapprove of someone on your

10:49   20    team misrepresenting themselves to a

21    competitor as someone from a practice in

22    order to gain information about the

23    competitor?

24         A.    I -- repeat that.

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                                    ea7650af-fe4a-42aa-8a27-29ee2ee30e7b

Jill Brewer, 3/25/2014

63

1           MR. O'BRIEN: Could you read it

2      back, please.

3         (Record read by Reporter.)

4           MR. BERNAY: Object to the form.

5      You can answer it.

6           A.    So repeat my understanding of

7      the question. Is that, basically, do I think

8      what Amanda did was okay and ethical?  And

9      so, specifically, do I find it inappropriate

10:50  10     or poor business practice to call a

11     competitor and ask questions regarding a

12     product in order to gain information. I would

13     say that's probably standard business

14     practice across the country. I'd say it's

15     standard.  It happened to us. So I'd say

16     standard.

17           Q.    The part you left out, though,

18     when you rephrased my question was, Ms.

19     Devlin didn't simply call a competitor and

10:50  20     asked for information.  She called the

21     competitor and falsely represented herself as

22     being from a practice who was interested --

23           A.    I understand.  That's standard

24     business practice.

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                                    ea7650af-fe4a-42aa-8a27-29ee2ee30e7b

Jill Brewer, 3/25/2014

64

1       Q.    Okay. Now, if you look at the

2  first page of this e-mail chain, you've got

3  an e-mail dated October 14th to Mr. Campbell,

4  Ms. Shattles --

5       A.    Em-hm.

6       Q.    -- Mr. McAllister, Ms. Goold,

7  Ms. Phillips and you cc'd Ms. Theiss, right?

8       A.    Yeah.

9       Q.    At the time, Mr. Campbell, what

10:51  10  position did he hold?

11       A.    The only really he ever held

12  there, the same one he held when he departed,

13  in charge of programming.

14       Q.    Well, no, at the time he

15  departed, he was the COO. That happened after

16  you left?

17       A.    Okay.  So he was -- he did the

18  same job.

19       Q.    And Ms. Shattles, what was her

10:51  20  position?

21       A.    She led the editorial team.

22       Q.    Content or something?

23       A.    Yeah.

24       Q.    And then Ms. -- Mr. McAllister.

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                    ea7650af-fe4a-42aa-8a27-29ee2ee30e7b

Jill Brewer, 3/25/2014

65

1        A.    He was COO.

2        Q.    Ms. Goold?

3        A.    She's head of IT.

4        Q.    IT?

5        A.    IT.

6        Q.    Oh, information technology?

7        A.    Yes.

8        Q.    And then Ms. Phillips?

9        A.    She worked for Tom.

10:52    10        Q.    Okay. And then in the second

11    sentence of your e-mail, you said, "With that

12    said, they were clearly capitalizing on our

13    practice's service concerns, specifically our

14    connectivity issues," do you see that?

15        A.    Em-hm.

16        Q.    And then you go on to say,

17    "almost all the offices they've been able to

18    convert have a record of one or more service

19    issues," do you see that?

10:52    20        A.    Em-hm.

21        Q.    And you wouldn't have said that

22    at the time unless you believed it to be

23    true, right?

24              MR. BERNAY: Objection.

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                    ea7650af-fe4a-42aa-8a27-29ee2ee30e7b

Jill Brewer, 3/25/2014

66

1        A.    No, that's not true. I wanted

2    them, if you read the remainder, I wanted

3    them, "By the end of 2011, we have around --"

4             (Interruption by Reporter.)

5        A.    So the point is, I was trying to

6    sell a different install.  I was trying to

7    sell -- I was trying to sell my cause, that I

8    wanted to do a different type of install.

9        Q.    So because you were making a

10   sales pitch, it was, in your judgment,

11   appropriate to exaggerate or engage in

12   hyperbole; is that fair?

13       A.    It's -- it was, in my view --

14   no, that's not fair. I wanted to promote --

15   there's nothing I said here that isn't true.

16   When I say almost all, that probably is an

17   exaggeration, but I would say that I'm

18   highlighting what's most important.  What's

19   most important as the person responsible for

20   the servicing of these practices. So if you

21   move over, how much it's going to cost,

22   800,000 just to manage the phone charges, I

23   was trying to say that, let's do it by

24   sharing, because we used faxes, let's do it

10:53

10:53

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                    ea7650af-fe4a-42aa-8a27-29ee2ee30e7b

Jill Brewer, 3/25/2014

67

1    by sharing their network. That was the

2    objective of this right here.

3        Q.    Sharing their network, what do

4    you mean by that?

5        A.    The Internet connection of a

6    practice.

7        Q.    So --

8        A.    As opposed to putting in a

9    phone/fax and running all that cable that's

10:54   10   costing $1 million a year.

11       Q.    So you're trying to make the

12   point to senior management that we should be

13   moving toward a delivery model that shared an

14   Internet connection versus these fax

15   connections, right?

16       A.    Correct.

17       Q.    And is part of your point that

18   with the fax connection, there are

19   connectivity and then resulting service

10:54   20   issues?

21       A.    Correct.

22       Q.    And you understood at the time

23   that there were a lot of service issues with

24   practices around connectivity due to the fax

Electronically signed by Ann M. Belmont (201-234-827-3922)                    ea7650af-fe4a-42aa-8a27-29ee2ee30e7b

Jill Brewer, 3/25/2014

68

1    line, right?

2              A.    Yes.

3              Q.    Okay.

4              A.    You know, I'm going to back that

5    up. Our number one, and it probably says it

6    in here, so we've lost all of our sales, when

7    I started investigating, was due to service

8    issues.  When you talked earlier about do we

9    track codes, yes, we do, and this is why you

10:55  10   track codes, right?  Because it costs you a

11   lot of money to acquire the practice, and

12   then when you -- just like in any business,

13   it's -- when you have to recruit another

14   practice, there's costs involved there.  So

15   that's understanding your service,

16   understanding your business, this is very

17   important. So, "This is classic, you wait

18   until your competitor trips up," e.g., we

19   tripped up and then someone else steps in,

10:55  20   and that's what happens in every business.

21   And I am saying we must explore more modern

22   options, it's increasing our competitive

23   risk. And also in the beginning, the reason

24   they did it the other way is because

Electronically signed by Ann M. Belmont (201-234-827-3922)                    ea7650af-fe4a-42aa-8a27-29ee2ee30e7b

Jill Brewer, 3/25/2014

69

1    practices didn't understand the Internet and

2    they weren't comfortable sharing, and I'm

3    saying they are now comfortable sharing.  So

4    the objective of this was to say too, we need

5    to move forward.

6           Q.    This e-mail is about

7    ContextMedia, right?

8           A.    No.  This -- my purpose here is

9    about the -- my content here is specifically

10:56  10    about changing our delivery model.

11           Q.    Right.  But go to the first page

12    again, the paragraph ahead, you focus on --

13           A.    I understand.  People passed it

14    around, but I'm saying, my particular

15    content, what I wrote right here, is about a

16    different delivery model.

17           Q.    Let me finish my question.

18           A.    Okay.

19           Q.    You write, "That said, they are

10:56  20    clearly capitalizing," isn't the they in your

21    sentence ContextMedia?

22           A.    It's only because it was in the

23    context of this e-mail, because it initiated

24    here.  So only because of that. This is an

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                    ea7650af-fe4a-42aa-8a27-29ee2ee30e7b

Jill Brewer, 3/25/2014

70

1    example of, if you think about it, what,

2    Healthy Advice has, what, 25,000 primary care

3    offices, we had 160 of these. The impact,

4    like I'm not going to save $1 million a year

5    on ACN, I'm talking about this savings from

6    the entire network.  So this is just an

7    example of how this impacts the entire

8    company as opposed to this tiny network.

9              Q.    I understand. But the they in

10   that sentence was ContextMedia, right?

11             A.    They in that sentence is

12   ContextMedia, but this is an example --

13             Q.    I understand.

14             A.    -- of the whole impact. So they

15   are just really an aside.

16             Q.    I understand.  And in the next

17   sentence when you say, "Almost all the

18   offices they've been able to convert have a

19   record of one or more service issues," the

20   they there is also ContextMedia, right?

21             A.    Yeah, because attachments and

22   cc, it says RHN.  So, specifically, it would

23   be sort of confusing to talk about anything

24   other than what the e-mail context is.

10:57

10:57

Electronically signed by Ann M. Belmont (201-234-827-3922)                    ea7650af-fe4a-42aa-8a27-29ee2ee30e7b

Jill Brewer, 3/25/2014

71

1        Q.    I understand. And it's your

2    testimony, though, when you say, "Almost all

3    the offices," that was a bit of an

4    exaggeration or was that your belief at the

5    time?

6        A.    I'm -- that's -- I'm sure I

7    probably exaggerated.

8        Q.    Okay.

9        A.    I'm guessing, because it sounds

10   like a sales pitch to me.

11       Q.    And it's not uncommon when

12   making a sales pitch to engage, salespeople

13   do it all the time, a little bit of

14   exaggeration or hyperbole, right?

15       A.    Well, yeah, I guess, I hear

16   when -- well, this is internal, that's

17   different.  When you're talking to a

18   practice, an external customer, I feel it's

19   very, very important to be earnest.  So I'm

20   selling this to my executive team, Mike

21   McAllister, and I'm trying to get these

22   people on page, and get IT to believe in

23   this.  So internal practices, I think, are

24   very different than external customers.

10:58

10:58

Electronically signed by Ann M. Belmont (201-234-827-3922)                    ea7650af-fe4a-42aa-8a27-29ee2ee30e7b

Jill Brewer, 3/25/2014

72

1          Q.    Okay.

2                MR. BERNAY: We've been going for

3     a while.  You want to take a break?

4                MR. O'BRIEN: Sure.

5                MR. JAHN: We're off the record.

6                (Break taken.)

7                MR. JAHN: We're on the record.

8          Q.    Ms. Brewer, I'm now going to

9     hand to you what was previously marked as

11:05  10   Defendant's Exhibit 24. Now, there's no

11    indication that you received this. But I

12    would like you to look at it, and I've got a

13    question or two for you.

14       (Exhibit 24 identified.)

15          A.    Okay.

16          Q.    Do you know from your experience

17    at HAN that this e-mail is repeating a

18    comment from the CMS database?

19          A.    What did you say?

11:06  20          Q.    Does this appear, this e-mail,

21    to include a comment from the CMS database?

22          A.    It says comment, so.

23          Q.    But you don't recognize from the

24    format of this as being a comment that was

Electronically signed by Ann M. Belmont (201-234-827-3922)                    ea7650af-fe4a-42aa-8a27-29ee2ee30e7b

Jill Brewer, 3/25/2014

73

1    pulled from the CMS database?

2           A.    It says comment type, so that

3    would tell you it came from CMS.

4           Q.    Okay.  That's what I'm asking.

5           A.    Yeah, I mean. That's what I

6    tried to explain earlier.  Comment type,

7    comment.  So I would assume it came from CMS,

8    which is why I -- yeah.

9           Q.    Do you recall -- well, as I

11:07  10  said, you're not on this, but do you recall

11   in this time frame, September 2011, it being

12   reported up to you that practices were

13   switching from HAN to ContextMedia because

14   the practice found the program more engaging?

15          A.    No. We debated and discussed

16   that a million times. You're going to have --

17   like, in this case, what this says, is that

18   this was installed before the manager was

19   there. So in this case, the person we sold

11:07  20  the product in to felt that the way we sold

21   it in -- is that the content was educational

22   in scope, so, yes.  So the new manager wanted

23   a different product, the new manager.  But

24   the old manager was happy with the focus on

Electronically signed by Ann M. Belmont (201-234-827-3922)                    ea7650af-fe4a-42aa-8a27-29ee2ee30e7b

Jill Brewer, 3/25/2014

74

1    educational content.  And we debated this a

2    lot, and just like in any product, there are

3    oranges and apples, why are there X-number of

4    phones with different widgets and we elected,

5    even though -- if you would look through,

6    you'd see this debated, as to the reasons

7    codes were lost, but you can see that it's

8    really this reason code is tiny compared to

9    moving, died, or any other reason.

11:08    10         Q.    So --

11         A.    So there's always going to be

12    somebody who wants something different.  In

13    this case, it was a new manager who didn't.

14         Q.    So a change in office personnel

15    could be -- was one of the reasons HAN would

16    lose a practice from time to time, right?

17         A.    Change in personnel or -- well,

18    that's what this e-mail says, yes.

19         Q.    And you said that you debated it

11:09    20    a lot. When you say you debated it a lot, was

21    that internal discussions within HAN upon

22    hearing that some practices were switching to

23    ContextMedia for reasons like sound and news

24    ticker, things like that?  With that

Electronically signed by Ann M. Belmont (201-234-827-3922)                    ea7650af-fe4a-42aa-8a27-29ee2ee30e7b

Jill Brewer, 3/25/2014

75

1    information in hand, was the debate whether

2    or not HAN should move away from its model,

3    the apples, if you will, towards something

4    more like the oranges?

5              MR. BERNAY: Object to the form.

6         A.    I would say if -- with Amy, when

7    I showed her the statistics of -- of the

8    percent this really represented, which is

9    nominal, correct? And then what was debated

11:10  10   is that, if I recall, is that the

11   pharmaceutical salespeople wanted to promote,

12   so it's really to promote the drug, they

13   wanted to be able to put sound to make it

14   easy for them to sell it to PhRMA, it wasn't

15   necessarily something, it's my belief at the

16   time, and the study showed that the practices

17   preferred a silent network.  But the

18   pharmaceutical salesperson, because they

19   would get asked for it from the

11:10  20   pharmaceutical side to get their product

21   sold.

22              In other words, I'm going to

23   watch educational content, but I'm not going

24   to watch an ad necessarily.  So they were

Electronically signed by Ann M. Belmont (201-234-827-3922)                    ea7650af-fe4a-42aa-8a27-29ee2ee30e7b

Jill Brewer, 3/25/2014

76

1    trying to make their ad more valuable.  Does

2    that make sense?

3         Q.    Yeah.  It sounds like there was

4    pressure from the side of the business that

5    sold PhRMA to add sound?

6                 MR. BERNAY: Objection.

7         A.    I wouldn't say there was

8    pressure, I disagree.  I would say that they

9    would think that would make their job easier.

11:11  10        Q.    Whose job easier?

11        A.    The pharmaceutical salesperson.

12        Q.    At the advertiser or at Healthy

13    Advice?

14        A.    The advertiser.

15        Q.    And didn't HAN ultimately

16    include sound?

17        A.    I do not recall.  We had sound

18    while I was there.

19        Q.    And I think you said that what

11:11  20    you told Amy was, and you showed her

21    statistics, that the percentage of practices

22    that HAN would lose to someone like

23    ContextMedia because the practice liked the

24    content that was different from HAN was small

Electronically signed by Ann M. Belmont (201-234-827-3922)                    ea7650af-fe4a-42aa-8a27-29ee2ee30e7b

Jill Brewer, 3/25/2014

77

1    compared to the reason -- the other reasons

2    HAN experienced churn, such as a practice

3    retiring or doctor dying, that kind of thing?

4              MR. BERNAY: Object to the form.

5         A.     Correct. No.  What you just

6    said, I will say that what I showed Amy was

7    the number of practices who chose to

8    discontinue service with us because they

9    wanted entertainment, which is what I'm

10   reading here, sound, or news ticker or that

11   entertainment is nominal, tiny relative to

12   the other -- any other reason code. That

13   would be what I recall.

14      (Exhibit 34 identified.)

15         Q.     Okay. Let me show you what was

16   previously marked as Defendant's Exhibit 34.

17   This is another e-mail chain with respect to

18   Ms. Devlin's activities, interacting with

19   ContextMedia to obtain competitive

20   information about ContextMedia, right?

21              MR. BERNAY: Take your time to

22   review the document.

23         Q.     Absolutely.

24         A.     It appears to be one and the

11:12 (line 10)

11:13 (line 20)

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                    ea7650af-fe4a-42aa-8a27-29ee2ee30e7b

Jill Brewer, 3/25/2014

78

1    same event.

2         Q.    Em-hm.

3         A.    It appears to be one and the

4    same event.

5         Q.    Well, there's -- there's loops

6    now attached regarding recipes and physical

7    activities and personal story examples,

8    right?

9         A.    Pardon?

11:13  10      Q.    You don't understand those http

11   links to be links to ContextMedia content?

12        A.    I never went there. Was this

13   sent to me?

14        Q.    Yes, it was.

15        A.    Yeah, I never went and looked at

16   it.

17        Q.    What did you --

18        A.    But, you know, it really

19   wouldn't matter because we see it -- we would

11:14  20   have -- we saw it in the office.  I mean,

21   we'd sit there and watch it.

22        Q.    There's nothing proprietary

23   about ContextMedia's content, right?

24        A.    There's nothing --

Electronically signed by Ann M. Belmont (201-234-827-3922)                    ea7650af-fe4a-42aa-8a27-29ee2ee30e7b

Jill Brewer, 3/25/2014

                                                                79

1              MR. BERNAY: Object to the form.

2         A.    No, I'm not saying that.  I'm

3    saying that, if you're in a public space, if

4    you're in a public -- if I'm in an office,

5    just like people did with us, they would come

6    in, sit down and watch our program. And so if

7    it's -- if the content is playing in a public

8    space, then anyone can be watching it.

9         Q.    But this content is not playing

11:14  10   in a public space when management at HAN is

11   looking at it.  It's a link that Ms. Devlin

12   got from --

13        A.    Is it the content that was

14   played in a public space?

15        Q.    It may have been, but.

16        A.    I have no idea.  I never clicked

17   on it, so because I never clicked on it. So I

18   don't know, but I'm assuming that this is

19   personal -- that they took clips or excerpts

11:15  20   from their content and sent this to people

21   who inquire as examples of what they do. So I

22   would assume that this is played on their

23   networks in the offices is what I assume.  I

24   never clicked on them.

Electronically signed by Ann M. Belmont (201-234-827-3922)                    ea7650af-fe4a-42aa-8a27-29ee2ee30e7b

Jill Brewer, 3/25/2014

80

1          Q.    Did you know Ms. Devlin and Mr.

2    Zmick of ContextMedia communicated back and

3    forth over a several week period exchanging

4    information?

5          A.    I guess you can tell me if I

6    knew because I don't remember that, but I got

7    an e-mail that says I did, so I guess I did.

8    I don't recall it. I don't recall it.

9          Q.    So you don't recall e-mails at

11:15   10    Ms. Devlin's urging where ContextMedia kept

11    giving her more information about their

12    product and content, you don't remember that?

13               MR. BERNAY: Objection.

14          A.    I do not, and I don't -- I don't

15    recall that.

16          Q.    Do you recall reading these

17    e-mails and noting that ContextMedia was

18    trying hard to sell Ms. Devlin on the merits

19    of the ContextMedia product and content?

11:16   20          A.    I don't recall the exchange

21    you're talking about, so if you've got one,

22    show it to me and I can help you more.

23          Q.    Well, do you recall --

24          A.    Do you have a copy of something?

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                    ea7650af-fe4a-42aa-8a27-29ee2ee30e7b

Jill Brewer, 3/25/2014

81

1          Q.    I'm showing you two, and I'm

2     going to show you another.  They're all the

3     same thing.

4          A.    Okay.

5          Q.    Do you recall Mr. Zmick of

6     ContextMedia ever being deceptive or saying

7     anything false and misleading on Ms. Devlin

8     in trying to sell the ContextMedia product?

9          A.    I don't recall the whole

11:16  10     experience, I wouldn't recall those

11     specifics.  But if you have something to

12     jog -- I mean, this is 2011, '12, '13, three

13     years now, so I don't recall much of

14     anything.

15          Q.    Well, I'm trying to do the best

16     I can.

17          A.    Thank you so much.

18        (Exhibit 35 identified.)

19          Q.    I'm now showing you Defendant's

11:17  20     Exhibit 35. There's another e-mail exchange,

21     and now we're a couple weeks later now.

22          A.    Yeah, let me -- since this is

23     important for you. "We will coordinate the

24     installation with you upon it's removal,

Electronically signed by Ann M. Belmont (201-234-827-3922)          ea7650af-fe4a-42aa-8a27-29ee2ee30e7b

Jill Brewer, 3/25/2014

82

1    Accent Health," that's that one. So now is

2    this a continuation of this?

3         Q.    It is not.  It seems to be

4    separate, and now Ms. Devlin has told Mr.

5    Zmick that the doctor preferred a silent

6    program and has gone with someone else and

7    Mr. Zmick assumes, since HAN was the --

8    apparently the only player out there that had

9    silent content, that she was talking about

11:18  10  HAN, so Mr. Zmick tries to sell Ms. Devlin

11   ContextMedia over HAN.  And now, because

12   she's told him she's interested in silent

13   content, he sends her different content.  Now

14   she's getting ContextMedia's silent content.

15   That's what I read of this.

16         A.    Does ContextMedia have silent

17   content?

18         Q.    It did.

19         A.    It did?

11:18  20        Q.    There's two links to it right

21   there in the front page.

22         A.    I've never seen it. I mean, you

23   know, being in the field, I don't recall they

24   ever had silent content. That would be --

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                    ea7650af-fe4a-42aa-8a27-29ee2ee30e7b

Jill Brewer, 3/25/2014

83

1    I -- well, you don't want to know what I

2    think, but I find that -- I don't know how

3    they could do that, but that would not be

4    what they have sold their advertisers.  So

5    that would be --

6         Q.   Do you see, can you read the

7    words silent loop?

8         A.   I see it, but what I'm sharing

9    with you is that, how they could really

10   distribute that because their advertisers

11   didn't have content designed for silent.

12   They only had content designed for sound, so

13   I guess they would put -- I would think they

14   would be in conflict, or whatever the word

15   would be, with their contract with their

16   advertisers.

17        Q.   I can assure you they were not.

18        A.   I know, but it seems to me,

19   because that's how they pay for it, right?

20        Q.   Are you aware that some

21   practices actually prefer a silent program?

22        A.   Am I aware?

23        Q.   Right.

24        A.   I think the majority of

11:19 (line 10)

11:19 (line 20)

Electronically signed by Ann M. Belmont (201-234-827-3922)        ea7650af-fe4a-42aa-8a27-29ee2ee30e7b

Jill Brewer, 3/25/2014

84

1    practices prefer silent.

2          Q.    So it would be reasonable for

3    ContextMedia to have the capability to offer

4    both?

5                MR. BERNAY: Objection.

6          A.    I don't know what would be.

7    You -- creating content for sound is -- it

8    would be dramatically different than creating

9    content for silent. They are not one and the

11:20   10    same.

11          Q.    Have you ever spoken to anybody

12    at ContextMedia?

13          A.    Have I ever spoken to anyone at

14    ContextMedia? On the phone, in person?

15          Q.    In the phone, in person, let me

16    include written communications, e-mail, any

17    form of communication, pigeon?

18          A.    I saw them at a conference and I

19    saw a couple reps there because they took

11:20   20    some of our stuff, and I spoke to them.  And

21    I told them that I knew they took our stuff.

22          Q.    When you say took their stuff,

23    marketing brochures and materials from your

24    booth?

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                    ea7650af-fe4a-42aa-8a27-29ee2ee30e7b

Jill Brewer, 3/25/2014

85

1        A.    Actually, I think -- I don't

2    recall exactly, but I remember, I think they

3    took something more than that.  I think they

4    took like maybe a display or a poster board

5    or something.

6        Q.    And you told them you didn't

7    like that?

8        A.    Yes.

9        Q.    Told them to give it back?

11:21  10        A.    I'm sure.

11        Q.    Okay.

12        A.    There were a couple guys at this

13    conference. That would be, as I recall,

14    again, it's been a long time, my only verbal

15    communication with them.

16        Q.    Why didn't you like them taking

17    HAN marketing materials from your booth?

18        A.    No, they didn't take HAN

19    marketing materials from our booth.  They

11:21  20    took, I think, actually like a presentation

21    board. I mean, they had -- they're at the

22    conference, they can walk up and take a

23    pamphlet, that's -- I mean, that's -- that's

24    what every competitor does at every

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                    ea7650af-fe4a-42aa-8a27-29ee2ee30e7b

Jill Brewer, 3/25/2014

86

1   conference everywhere, right?  You walk by,

2   you say thank you very much.  I mean, it's

3   laid out there for public take, and you're at

4   the conference, you're part of that.  But if

5   I recall, they didn't take those materials,

6   they took a display board.

7         Q.    What's a display board in this

8   context?

9         A.    I don't remember details, but

11:22  10   I'm thinking it was like a large -- like

11   maybe a large board, like a -- like a poster

12   board kind of thing.

13         Q.    Displaying information about

14   HAN?

15         A.    I don't remember any other

16   details.

17         Q.    It was forward facing to the

18   public though, right?

19         A.    It was forward facing to the

11:22  20   public, but it was a presentation board.  So

21   it's probably a couple hundred dollars or

22   something.  So it wasn't to be taken, right?

23   You know what?  Actually, I think it was one

24   of our display cases.  That's that it was.  I

Electronically signed by Ann M. Belmont (201-234-827-3922)        ea7650af-fe4a-42aa-8a27-29ee2ee30e7b

Jill Brewer, 3/25/2014

87

1    think it was one of our display cases from

2    our -- over the from there.  That's what it

3    was, that's all we would have up there is a

4    display case.

5         Q.    What's a display case?

6         A.    It's what goes in the exam room,

7    like hack, half those kind of things.

8         Q.    I don't understand.

9         A.    It would be like a -- it's a

11:23  10  board that can mount on the wall, go over the

11   door that has advertising at the bottom and

12   educational brochure and pamphlets for

13   patients to take.

14        Q.    So it's written materials, it

15   holds -- does the display case hold written

16   materials?

17        A.    It holds written materials and

18   advertising, and then the case itself. Again,

19   if you look at the -- if you look at their

11:23  20  sales collateral, it'll be in there.

21        Q.    When you say advertising, what

22   do you mean?

23        A.    Like pharmaceutical advertising

24   at the bottom.

Electronically signed by Ann M. Belmont (201-234-827-3922)                                    ea7650af-fe4a-42aa-8a27-29ee2ee30e7b

Jill Brewer, 3/25/2014

88

1       Q.    Print?

2       A.    Em-hm.

3       Q.    And so they picked up this big

4  board and walked away with it?

5       A.    I don't remember the details. I

6  don't remember the details around it.  I was

7  just told they -- I was just told they took

8  it.

9       Q.    I see.  So you didn't see them

11:24  10  do it, someone else told you that?

11       A.    Correct.

12       Q.    Who told you that?

13       A.    The -- the people who managed

14  the convention.

15       Q.    Were you there? Were you there

16  at the convention when this happened?

17       A.    Yeah, I was there.

18       Q.    So then what did you do?  You

19  went over to ContextMedia --

11:24  20       A.    And said, do you -- you took

21  that, and they just -- I don't remember the

22  conversation.  They just -- I don't -- they

23  just looked at me or something.

24       Q.    Did you see your display booth

Electronically signed by Ann M. Belmont (201-234-827-3922)                                    ea7650af-fe4a-42aa-8a27-29ee2ee30e7b

Jill Brewer, 3/25/2014

89

1    in their booth?

2         A.    No, that would be sort of silly

3    to have a Healthy Advice product in a

4    ContextMedia booth, but.

5         Q.    So you never saw anybody --

6         A.    No, I was just told.

7      (Exhibit 36 identified.)

8         Q.    Okay.  Now, let me show you

9    what's been marked as Defendant's Exhibit 36.

11:24  10    This is another e-mail concerning the

11    activities of Ms. Devlin. It doesn't look

12    like you're on this. But --

13         A.    Because I wasn't employed at

14    that time.

15         Q.    April 2012, you're no longer

16    there?

17         A.    Nope.

18         Q.    Okay.

19         A.    So I can't really speak to that

11:25  20    because I'm not employed.

21         Q.    Okay.  I'll just ask you one

22    question.  In April 2012, do you know what

23    position Mike Collette held with the company?

24         A.    I wasn't there, I have no idea.

Electronically signed by Ann M. Belmont (201-234-827-3922)                                   ea7650af-fe4a-42aa-8a27-29ee2ee30e7b

Jill Brewer, 3/25/2014

90

1        Q.    No idea, okay. Now, I'll show

2   you what's previously marked as Defendant's

3   Exhibit 40.

4      (Exhibit 40 identified.)

5        A.    So we're back to this.  For me

6   to keep them in order, because it sort of

7   seems to go together.  Here we go, it goes

8   back to '11, October 12, '11; October 13,

9   '11.

11:26   10        Q.    Do you recall this e-mail

11   exchange?

12        A.    Yes, I do.

13        Q.    And this has to do with HAN

14   learning that, as part of its sales efforts,

15   ContextMedia was sometimes offering a

16   practice a gift card, right?

17        A.    I mean, I remember.  What I

18   remember more is that the content was being

19   shown on -- let's see.  Humira was shown on

11:26   20   RHN network, because we had exclusive

21   agreements with Humira.  So I believe this is

22   critical --

23                (Reading out loud to herself.)

24                I'm reading, I'm just reading

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                                              ea7650af-fe4a-42aa-8a27-29ee2ee30e7b

Jill Brewer, 3/25/2014

91

1    what's on here, sorry. I'll be quiet. I

2    forgot, I forgot.  I'll read to myself.

3         Q.    So what do you recall about this

4    incident?

5         A.    I'm reading. I remember thinking

6    this was big stuff, that if this is a black

7    box of drug that requires 90 minutes, it was

8    a 30-second spot.  How did the Humira content

9    get on that network.

11:27  10         Q.    And what -- did you ever get to

11    the bottom of it?

12         A.    We did not.

13      (Exhibit 44 identified.)

14         Q.    All right. Let me show you what

15    was previously marked as Defendant's

16    Exhibit 44. It doesn't appear you're on this

17    one either. The e-mail on the front page from

18    Colette Brady, dated November 29, 2010, to

19    Amanda Devlin states in the third sentence,

11:28  20    "After all the ACNs that Cassie has stolen

21    from Rheumatoid Health Network, and it now

22    looks like someone has now swiped one of

23    mine," do you see that?

24         A.    Em-hm.

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                    ea7650af-fe4a-42aa-8a27-29ee2ee30e7b

Jill Brewer, 3/25/2014

92

1          Q.    Does this refresh your
2    recollection at all as to whether or not HAN
3    had been switching practices from
4    ContextMedia to HAN during this time frame?
5          A.    No different, it's just -- I
6    mean, these people were really -- I mean, our
7    objective was to get the physicians. So I did
8    not manage -- I mean, I managed the people
9    that managed the people, so this would not be
11:29  10   any more important than -- I mean, I just
11   looked at the total numbers, so.
12          Q.    Okay.
13          A.    Yeah.
14          Q.    This is not -- you wouldn't be
15   this deep in the weeds?
16          A.    No.  I mean, it's just a
17   practice I think.
18          Q.    Okay.
19          A.    Let me finish reading to make
11:29  20   sure.
21          Q.    Sure.
22          A.    Yeah, sorry, I can't help you
23   there.
24          (Exhibit 47 identified.)

Electronically signed by Ann M. Belmont (201-234-827-3922)                    ea7650af-fe4a-42aa-8a27-29ee2ee30e7b

Jill Brewer, 3/25/2014

1          Q.    Okay.  Moving right along, let

2      me show you what's been marked as Defendant's

3      Exhibit 47. This is an e-mail from --

4      exchange, excuse me, between Mike McAllister

5      and Amy Finley in February 2011. Mr.

6      McAllister was the CEO at the time?

7          A.    No.  COO.

8          Q.    COO, thank you. Who was the CEO

9      in 2011?

11:31  10          A.    Mike Collette.

11          Q.    Do you know why Ms. Finley, who

12      reports to you, would be communicating

13      directly through Mr. McAllister?  Or was that

14      something that just happened?  You weren't

15      that rigid in terms of your reporting?

16          A.    He was the -- when I had

17      spent -- when it was clear that the

18      executive, that Collette, McAllister,

19      whomever made a decision not to pursue legal

11:31  20      action against ContextMedia for whatever

21      reason, I didn't want to waste any more of my

22      time on it, and so I told Mike to.

23          Q.    Okay.

24          A.    I mean, if you'll see, I'm not

Electronically signed by Ann M. Belmont (201-234-827-3922)                                    ea7650af-fe4a-42aa-8a27-29ee2ee30e7b

Jill Brewer, 3/25/2014

94

1    in a lot of exchanges because I'm out of them

2    because it's -- once they decided not to

3    pursue legal, which I felt we should have at

4    the time, or take this graver steps, and so

5    this specific response is probably the -- is

6    probably specifically, because it looks like

7    there's a lot of stuff deleted here.

8         Q.    No, not to my knowledge.

9         A.    Okay. Anyway, it looks like that

11:32  10  this is -- the only reason I say that,

11   there's, like, lines and stuff up here, so it

12   looks like there was stuff attached to this,

13   but that's fine.

14        Q.    This is how I got it.

15        A.    Okay.  But I'm just saying it

16   looks to me like there's more here, but I

17   would say that this is specific and to --

18   regarding RHN, and not to the network as a

19   whole, because I was no longer managing it

11:32  20  and Mike McAllister was, managing the -- the

21   conflict, I guess, whatever you call it.

22        Q.    So as of February -- sometime

23   prior to February 2011, in your view, HAN

24   should have initiated litigation against

Electronically signed by Ann M. Belmont (201-234-827-3922)                    ea7650af-fe4a-42aa-8a27-29ee2ee30e7b

Jill Brewer, 3/25/2014

95

1    ContextMedia; is that right?

2          A.    I'm saying that we should have

3    done something.  I don't -- I'm not a lawyer

4    so I don't know what we should have done, but

5    I'm saying I felt like we should have done

6    something, that we should have taken some

7    kind of action.  I don't know what that -- I

8    just felt like we should have done something.

9          Q.    Why?

11:33   10       A.    Because this comes back to the

11   feel. Because, specifically, I recall that we

12   had evidence that one of the units that was

13   taken, that ContextMedia took out of the

14   practice, that it actually had been tampered

15   with before we received it. So we -- by the

16   time, because we check all that, so the time

17   it came down, someone looked in to -- opened

18   it up, I don't remember the details, before

19   they shipped it, so it went to a third-party,

11:34   20   so the products weren't shipped straight, the

21   product was not shipped from the office, it

22   was shipped to an office in Chicago and then

23   from that office to here, and then our

24   diagnostics showed that content had been

Electronically signed by Ann M. Belmont (201-234-827-3922)                    ea7650af-fe4a-42aa-8a27-29ee2ee30e7b

Jill Brewer, 3/25/2014

96

1    touched, opened, I don't remember, but.

2         Q.    Copied?

3         A.    I don't know.  I just know that

4    there had been access to the content, which I

5    felt, if -- if someone took possession of our

6    property.  So in other words, it didn't leave

7    the office and was shipped directly to us, it

8    was shipped to an office an office, and from

9    that office it was accessed and then from

11:35  10   there it was shipped to us. That's when I --

11   that's why I felt like we should have taken

12   some kind of action.

13             I do not -- and -- so the

14   debate, I guess, financials or whatever they

15   decided, and I said I'm exhausted, I've spent

16   too much time with it and you guys deal with

17   it, I'm gonna -- I've got bigger fish -- not

18   bigger fish, I've got a lot to do.  And so

19   that's why their communications began.

11:35  20        Q.    Okay. Was it your understanding

21   that ContextMedia had received this device

22   and then, as you said, touched or looked at

23   the content?

24             A.    Pardon?

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                                                ea7650af-fe4a-42aa-8a27-29ee2ee30e7b

Jill Brewer, 3/25/2014

97

1        Q.    Were you upset because

2   ContextMedia had looked at your content?

3        A.    I wasn't upset.  I felt like

4   that was illegal.

5        Q.    Okay. But you were --

6        A.    They didn't, it wasn't content.

7   The physical device, our property, was

8   transported to a third -- to a site, so

9   someone illegally took possession of the

11:36   10   property and illegally looked at the content

11   and how we -- whatever is inside all that

12   stuff, and then it was shipped. So it was the

13   illegal possession of the property, in my

14   mind.

15        Q.    And then without -- consistent

16   with Mr. Bernay's admonition earlier, without

17   disclosing to me anything that was said to

18   you by a lawyer, what's your understanding of

19   why your recommendation wasn't acted on and

11:36   20   something was not done about this?

21             MR. BERNAY: Objection.  And,

22   again, my admonition stands, do not reveal

23   conversations --

24        A.    I don't recall.  It wasn't with

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                                    ea7650af-fe4a-42aa-8a27-29ee2ee30e7b

Jill Brewer, 3/25/2014

98

1    counsel.  It was the decisions internally.

2           Q.    Okay.  Who was involved in that

3    process?

4           A.    The same people I told you

5    earlier, the CEO and the COO. It was their

6    decision not to.

7           Q.    McAllister and Collette?

8           A.    Correct.  Mike and Mike.

9           Q.    Did they tell you why they made

10   the decision they did?

11          A.    Nope.

12          Q.    Now, here Mr. McAllister is

13   asking Ms. Finley if offices are telling HAN

14   why they are switching to ContextMedia,

15   right?

16          A.    I guess, so Mike obviously sent

17   her a question. There we go. What -- I mean,

18   I can only tell you what it says.  This isn't

19   to me.

20          Q.    Okay.  Never mind. Do you recall

21   being involved in efforts by HAN to complain

22   to J3 about ContextMedia?

23          A.    Who is J --

24                MR. BERNAY: Object to the form.

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

11:37 (line 10)

11:37 (line 20)

Electronically signed by Ann M. Belmont (201-234-827-3922)                    ea7650af-fe4a-42aa-8a27-29ee2ee30e7b

Jill Brewer, 3/25/2014

99

1        A.    What is J3?

2        Q.    You're not familiar with the

3   name J3?

4        A.    (Witness shakes head

5   negatively.)

6        Q.    You didn't work the advertiser

7   side of the business, right?

8        A.    (Witness shakes head

9   negatively.)

11:38   10        Q.    You have to answer out loud.

11        A.    No, I did not.

12        Q.    And you weren't aware that J3

13   was the captive advertising agency for

14   Johnson & Johnson?

15        A.    No.

16        Q.    Let me show you what we have

17   marked as Defendant's Deposition Exhibit 74.

18   This is a long one so take whatever time you

19   want to look at it.

11:39   20      (Exhibit 74 identified.)

21        A.    Yes.  Some segments. So I'm

22   assuming that R3 response would be that

23   somebody asked me -- I'm assuming R3 had

24   questions.

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Jill Brewer, 3/25/2014

100

1      Q.    You mean J3?

2      A.    Whatever, yeah.  Those people. I

3   wasn't -- I was like the righteous one, so

4   that pharmaceutical advertising.

5      Q.    Well, if you look at page 5.

6      A.    I'm getting there.

7      Q.    Oh, I'm sorry. Let me know when

8   you're done reviewing it.

9      A.    Okay.  I'm on page 5.

11:44   10      Q.    All right.  It looks like page 5

11   indicates when you get added to this e-mail

12   discussion when Mike McAllister forwards the

13   chain to you, right?

14      A.    That's what it looks like.

15      Q.    Okay.  And then you have, on

16   page 4, an e-mail that you write, correct?

17      A.    2:29.

18      Q.    Do you see that?

19      A.    I'm backing up to go October 28,

11:45   20   2011. These are just out of order.  It would

21   be more helpful if they were in order.  So,

22   for example, October 20, 2011, 3:58, then I

23   go to 2:29, but then now I'm back at 2:44.

24   But that's okay.  So I'm just trying to make

Electronically signed by Ann M. Belmont (201-234-827-3922)                    ea7650af-fe4a-42aa-8a27-29ee2ee30e7b

Jill Brewer, 3/25/2014

101

1    sure that's in sequence.

2           Q.    It could be due to different

3    time zones, I don't know.  But this is the

4    way it was produced to me, Ms. Brewer.

5           A.    Okay.  So let me see.  I'm

6    looking at 4:03, 3:58.  So, Linda responded,

7    Sabrina responded.

8           Q.    You realize you have to read

9    these from the back to front, right?

11:45  10           A.    Yes.  But I'm saying that

11    responded to my stuff.

12           Q.    Well, when you're ready, I'd

13    like to ask you some questions about your

14    e-mail on page 4.

15           A.    Okay, go ahead.

16           Q.    You start off by saying, "At

17    some point we need to get together to discuss

18    a plan to sustain this universe into 2012 as

19    it doesn't look like these guys are going

11:46  20    away," do you see that?

21           A.    Em-hm.

22           Q.    What you did mean by that, if

23    you recall?

24           A.    That all I meant by that is that

Electronically signed by Ann M. Belmont (201-234-827-3922)                    ea7650af-fe4a-42aa-8a27-29ee2ee30e7b

Jill Brewer, 3/25/2014

102

1    there were a lot of competitors. One of

2    which, and I don't even know that they still

3    don't have a product if you go back here,

4    Health Monitor, I suspect that they're not in

5    business anymore. So a lot of competitors

6    come and go. I could list you tons.  So it

7    was my takeaway here is that this competitor

8    was not leaving.

9           Q.    And when you say, "sustain this

11:46  10   universe into 2012," that sounds sort of

11   apocalyptic.  I mean, what do you mean by

12   that?

13               MR. BERNAY: Object to the form.

14          A.    Apocalyptic, sustain.  If you

15   look at my other communication, I used that

16   word a lot.  I spoke earlier to the fact that

17   if I sell $100 -- doctors, I had to deliver

18   100 doctors.  So sustain would be sustain the

19   bucket.

11:47  20          Q.    The universe is the bucket?

21          A.    The universe, ACN bucket.  The

22   universe is ACN bucket.

23          Q.    And later on in your e-mail you

24   have a parenthetical reminding folks that

Electronically signed by Ann M. Belmont (201-234-827-3922)                    ea7650af-fe4a-42aa-8a27-29ee2ee30e7b

Jill Brewer, 3/25/2014

103

1    Berne is the alias that Amanda Devlin used to

2    dialogue with RHN to get the information

3    attached, right?

4          A.    I'm assuming that what I

5    forwarded had that e-mail attached to it so

6    that I would want people to know that, I

7    guess.

8          Q.    Why were you forwarding that to

9    other members of senior management?

11:47   10          A.    Why wouldn't I?

11          Q.    And then you write, "Regarding

12    R3's response, see my comments below," and

13    then if you go to the long e-mail from Mr.

14    Casma, which begins on page 5 and goes over

15    to page 7.

16          A.    Em-hm.

17          Q.    There's inserted in there in a

18    number of places, in brackets, JB.

19          A.    Em-hm.

11:48   20          Q.    And that's you, right?

21          A.    Yes.

22          Q.    And you inserted some comments

23    in there, right?

24          A.    Yes.

Electronically signed by Ann M. Belmont (201-234-827-3922)                    ea7650af-fe4a-42aa-8a27-29ee2ee30e7b

Jill Brewer, 3/25/2014

104

1          Q.     Okay.

2          A.     That was to Kim. Those comments

3    would be to Kim.

4          Q.     Okay.

5          A.     So my, Hi, Kim.  So my

6    comment -- this -- my comments are in this

7    context, wouldn't it have it to Kim?  Because

8    my comments are only inserted as a response,

9    so it should be from me to Kim.

11:48  10        Q.     No, it's not.  It's from you to

11   Mike McAllister, Tom Campbell, Debbie

12   Schnell, Sabrina Shattles, Scott Nesbitt, Kim

13   Coar, Linda Ruschau, Liz Phillips, Amanda

14   Devlin, Liz Greppo -- Grippo and Amy Finley,

15   that's who your e-mail's to.

16        A.     With the comments?

17        Q.     Right.

18        A.     Then I am stupid.

19        Q.     Then go up on page 4 at the top,

11:49  20   Ms. Ruschau then responds to your e-mail and

21   she says, "Thanks for sharing the

22   information, Jill.  And great detective work,

23   Amanda," do you see that?

24        A.     I see.

Electronically signed by Ann M. Belmont (201-234-827-3922)                    ea7650af-fe4a-42aa-8a27-29ee2ee30e7b

Jill Brewer, 3/25/2014

105

1       Q.      Okay.

2       A.      And then --

3       Q.      And the great detective work on

4    Amanda's part that she's talking about is her

5    impersonating a practice to gain information

6    regarding ContextMedia, right?

7               MR. BERNAY: Object to the form.

8       A.      So I -- again, call me stupid,

9    but I am looking -- it says Jill Brewer,

11:50  10    rheumatology, and all the people you said,

11    and, "regarding our future response, see my

12    comments below," right?

13      Q.      Right.

14      A.      And then there's an e-mail from

15    Mike McAllister, so I'm not sure -- I just am

16    not sure of that flow, but it doesn't matter.

17    Do you see my point?

18      Q.      No.

19      A.      I guess it doesn't matter, but,

11:50  20    yes, the JB are my comments.

21      Q.      Okay. But back on page 4 I was

22    asking you a question about Ms. Ruschau's

23    e-mail, the question that was pending was

24    when Ms. Ruschau says, "Great detective work,

Electronically signed by Ann M. Belmont (201-234-827-3922)                                    ea7650af-fe4a-42aa-8a27-29ee2ee30e7b

Jill Brewer, 3/25/2014

106

1    Amanda!" What she's talking about is Amanda

2    impersonating a practice to gain information

3    from ContextMedia, right?

4           A.    I can't say that. But is that

5    e-mail attached?

6           Q.    If you don't know, you can just

7    say so, Ms. Brewer.

8           A.    Yeah, I can't.  I don't know

9    exactly.  I'd have to put it together.

11:51  10           Q.    In the same e-mail, Ms. Ruschau

11    writes to you and others, "I would like to be

12    involved in the discussions.  It is obvious

13    we have to put a larger emphasis on retention

14    and truly partnering with our practices if we

15    are going to win or compete," do you see

16    that?

17           A.    Yeah.

18           Q.    Did you agree with that

19    statement at the time?

11:51  20           A.    I don't know what she means by

21    truly partner with our practices if we are

22    going to win.  I don't know what she means by

23    that.

24           Q.    So did you ask her at the time

Electronically signed by Ann M. Belmont (201-234-827-3922)                    ea7650af-fe4a-42aa-8a27-29ee2ee30e7b

Jill Brewer, 3/25/2014

107

1    what she meant by that?

2         A.    No. Because Linda is a

3    salesperson and this is her client and she is

4    just trying to champion for her client and

5    her personal profits.

6         Q.    And back on to the first page,

7    there's another e-mail from you dated

8    October 28, 2011. And you write, "Yes, some

9    segments have video with closed caption and

11:52 10    some are Flash animation or PowerPoint

11    slides, which is how they describe our

12    programming to prospects," do you see that?

13         A.    I see that.

14         Q.    Does this refresh your

15    recollection as to whether you clicked on any

16    of the loops and actually looked at them?

17         A.    No, because I could have been

18    told that.

19         Q.    Okay. And if you go over to the

11:52 20    next page --

21         A.    I mean, I could.  I'm saying I

22    do not recall that, that I couldn't tell you

23    what it looked like.

24         Q.    Okay.

Electronically signed by Ann M. Belmont (201-234-827-3922)                    ea7650af-fe4a-42aa-8a27-29ee2ee30e7b

Jill Brewer, 3/25/2014

108

1          A.    But clearly Sabrina did because

2     she looked at it.

3          Q.    This e-mail suggests you did as

4     well, does it not?

5               MR. BERNAY: Object to the form.

6          Q.    Never mind, I'll withdraw the

7     question.

8               Go to the next page, page 2,

9     please, and the second paragraph that appears

11:53 10   on that page. You begin by saying, "With

11     regard to churn, what we've heard is that

12     many offices are just trying something new or

13     there is a new manager, so they don't know us

14     or the product well," do you see that?

15          A.    Em-hm.

16          Q.    Would that have been a true

17     statement at the time you wrote it?

18          A.    That would be -- this would be

19     consistent with the Amy Finley comment that

11:54 20   they want something entertaining with sound,

21     and I'm saying, yes, that's one reason, but

22     it's also just because it's something new or

23     a new manager and they don't know us or the

24     product very well.

Electronically signed by Ann M. Belmont (201-234-827-3922)                                    ea7650af-fe4a-42aa-8a27-29ee2ee30e7b

Jill Brewer, 3/25/2014

1        Q.    Okay.

2        A.    So all of these are around the

3    same time, I think.

4        Q.    And when you made that

5    statement, you felt you were being truthful,

6    right?  That was my question.

7        A.    If you look at the reason codes

8    for transition, or, you know, for loss, if

9    you look at the reason codes, it would spell

11:54   10    it out expressly. So I'm saying here,

11    frankly, it could be a little exaggeration

12    because I didn't want sound.

13        Q.    So you don't know if it's

14    truthful or not?

15        A.    I'm saying mini is objective. So

16    what does mini mean?

17        Q.    You don't have an understanding

18    of the --

19        A.    No.  I can tell you that the

11:55   20    intent here was a little bit -- is that I did

21    not want sound.

22        Q.    Okay.

23        MR. JAHN: Pardon me, Counsel,

24    we're off the record.

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Jill Brewer, 3/25/2014

110

1          (Break taken.)

2          MR. JAHN: We're on the record

3    with DVD No. 2.

4      (Exhibit 80 identified.)

5          Q.   I've now handed to you and

6    counsel for HAN what's been marked as

7    Defendant's Exhibit 80.  Again, this is

8    another e-mail communication you're not on.

9    Do you know who Vida Albert was in December

12:01  10   2011?

11         A.   Vida?  Yes, I know Vida.

12         Q.   What was Vida's job in

13   December 2011?

14         A.   I don't remember. She had a lot

15   of different jobs.

16         Q.   Was one of them responsibility

17   for figuring out what happened to equipment

18   when a practice left?

19         A.   I don't think there was a job

12:01  20   that that was -- nobody had just that job.

21   That was sort of like tracking.  I can't tell

22   you that.  I don't recall that being an

23   explicit job.  I mean, it wouldn't be a

24   full-time job.

Electronically signed by Ann M. Belmont (201-234-827-3922)                    ea7650af-fe4a-42aa-8a27-29ee2ee30e7b

Jill Brewer, 3/25/2014

111

1          Q.    I didn't suggest it was full
2    time, but that she was the person that had
3    that responsibility.  It sounds like you
4    don't remember --
5          A.    No.
6          Q.    That's fine.
7          A.    No, it's like, yeah.
8          Q.    It's written here that Lori
9    writes -- you know who Lori Smith is, right?

12:02 10          A.    Em-hm.
11          Q.    Lori writes, "Vida, will you
12    please write off the CPU for this location.
13    Their equipment was removed by DHN and their
14    CPU was not returned. Since we don't have an
15    EA on file and the CPU was old, Heather
16    approved that I stop --" it says perusing,
17    but I bet she meant "pursuing the return of
18    the equipment," do you see that?
19          A.    Em-hm.

12:02 20          Q.    Does this refresh your
21    recollection of instances where HAN allowed
22    equipment to stay with the practice after the
23    practice had left --
24          A.    No.

Electronically signed by Ann M. Belmont (201-234-827-3922)                    ea7650af-fe4a-42aa-8a27-29ee2ee30e7b

Jill Brewer, 3/25/2014

112

1          MR. BERNAY: Object to the form.

2          A.    No, I don't.  If I read the rest

3    of it. What this is saying is that it was

4    removed by the Diabetes Health Network and

5    the CPU was not returned with the monitor,

6    and the CPU is old, so it would have already

7    been written off the books anyway.  So even

8    though we don't have it in our possession, we

9    have to -- through our accounting purposes,

12:03  10    because old equipment we dispose of anyway.

11    And our accounting policies were, when it

12    became off the books or we disposed of

13    equipment that was broken, or I guess broken

14    would be that -- that you couldn't use any

15    more, you had to dispose of it or write it

16    off, and that is what this is referencing.

17          Q.    Well, that's not true.  It also

18    says, "Heather approved that I stop pursuing

19    the return of the equipment," do you see

12:03  20    that?

21          MR. BERNAY: Objection.

22          A.    Yeah, because we track all their

23    equipment.  But once there was an

24    investigation -- I'm just telling you what

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                                         ea7650af-fe4a-42aa-8a27-29ee2ee30e7b

Jill Brewer, 3/25/2014

113

1    I -- once they looked into it, and it's not

2    here, they're like, well, you know, I guess

3    let it go, because of its age and it's not

4    there.  Because if you go down to the

5    practice, if you read the rest of this, it

6    says -- explains she, "Mrs. Trager called and

7    explained she spoke with Diabetes Health

8    Network and they told her that our CPU is the

9    only size of a book, and was in the same box

12:04    10    as the monitor."  So she called Diabetes

11    Health Network, who obviously packed up the

12    equipment.  It had a Lenovo -- we knew it had

13    a Lenovo, which I told you we track.  "Since

14    we write off the equipment, I let it go. She

15    wondered why we are just now calling since

16    the system was removed in November and it is

17    now December.  I explained that I was on

18    leave." So that is what that's about.

19         Q.    Isn't it an instance where HAN

12:04    20    decided not to pursue the return of the

21    equipment because it felt the equipment was

22    antiquated?

23         A.    No.

24              MR. BERNAY: Object to the form.

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                                    ea7650af-fe4a-42aa-8a27-29ee2ee30e7b

Jill Brewer, 3/25/2014

114

1         A.    No.   This an example of the

2    computer is gone, it wasn't in the box.   And

3    even if we got it back, we would have

4    disposed of it, and we couldn't -- there was

5    no way to find it, it was gone.   And the

6    practice says, I called Diabetes Health

7    Network, they said they put it in the box.

8    It was gone, so we either had to -- I mean,

9    it was gone. There was nothing to do. That

12:05 10   happened -- if you read other e-mails,

11   there's often, in the e-mails that I had, it

12   said that when it came back it's -- I believe

13   I read here that I said, half the time, or

14   whatever I said, that parts of what got

15   returned wasn't.   I say, "Currently, we are

16   still missing seven systems and in almost

17   every instance, 49, we are missing one or

18   more components." So when they -- when RHN

19   would pack it up, we never got all of our

12:06 20   stuff back.   That's what that says, and

21   that's what that's talking about.

22         Q.    So when it's written, "Heather

23   approved that I stopped pursuing the return

24   of the equipment."

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Jill Brewer, 3/25/2014

115

1          A.    Em-hm.

2          Q.    It means something other than

3     the plain English there?

4          A.    Yeah, it means something other

5     than the plain English.

6       (Exhibit 81 identified.)

7          Q.    Do you recognize what I've

8     marked as Exhibit 81?

9          A.    I -- this is a rheumatology,

12:06 10   yeah, a fact sheet. Okay.

11          Q.    My question is, do you recognize

12    it?

13          A.    Em-hm.

14          Q.    And this is an example of

15    marketing collateral that HAN used to sell

16    against ContextMedia?

17          A.    I would have to study it to say

18    it's exactly what was there when I was there.

19    But, yes, there was something like this. This

12:07 20   would have been put together by Morgan Moore

21    and Amanda and Lisa.  I did not put this

22    together, the three of them did.

23          Q.    All of them report up to you,

24    though, right?

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Jill Brewer, 3/25/2014

116

1        A.    Yep, they sure do.

2        Q.    And then one of the selling

3   points that you include here is "Accountable

4   for content," do you see that in the middle?

5        A.    Yes.

6        Q.    What does it mean in the context

7   of this document to say "accountable for

8   content"?

9        A.    Well, if you wrote that --

12:07  10   Rheumatoid Health, if I recall, if I recall,

11   three years.  I recall that they actually

12   have an exclusion in their contract or in

13   their advertising, or whatever, their

14   website, I think it may be the website, where

15   they say they are not accountable for the

16   content.

17        Q.    And what do you mean to say --

18   what does HAN mean to say when it says it is

19   accountable for content?

12:08  20        A.    Well, we are accountable, we

21   were accountable.

22        Q.    And then at the bottom there's a

23   selling point "Dedicated account managers,"

24   do you see that?

Electronically signed by Ann M. Belmont (201-234-827-3922)                    ea7650af-fe4a-42aa-8a27-29ee2ee30e7b

Jill Brewer, 3/25/2014

117

1     A.     Em-hm.

2     Q.     And this says that HAN has them

3  and ContextMedia does not, right?

4     A.     Correct.

5     Q.     How did you know that

6  ContextMedia didn't have dedicated account

7  managers?

8         MR. BERNAY: Object to the form.

9     A.     The only way we would know, I

12:08  10  would guess, is that, when you talk to

11  practices and they said they -- again, I

12  don't know.  I don't know if it was something

13  on their website that said a service

14  representative will help you, you know, just

15  a generic service.  My guess is it says a

16  generic service representative, whereas, when

17  a practice enrolls with Healthy Advice, at

18  the time they were actually given a business

19  card of a name of their service

12:09  20  representatives.  So you had the recruitment

21  person, and then they were given the business

22  card of their dedicated person.  So in other

23  words, when you go to install that person,

24  that sales rep, which is part of my customer

Electronically signed by Ann M. Belmont (201-234-827-3922)                    ea7650af-fe4a-42aa-8a27-29ee2ee30e7b

Jill Brewer, 3/25/2014

118

1    experience was tied to the onboarding person

2    who was tied to the person who would manage

3    their account ongoing.  And I believe here,

4    my guess is, is that from their website, that

5    when you called in, someone would answer your

6    call, but you're not -- that's what -- that's

7    what that is.

8         Q.    You don't know where that

9    information came from, right?  That permitted

10   HAN to say, no, ContextMedia doesn't have

11   dedicated account managers?

12        A.    I don't recall. My thoughts

13   would be that probably is taken from their

14   website.

15        Q.    Is it possible this is something

16   that a practice told a member of HAN and

17   therefore HAN felt comfortable --

18        A.    No, no, no. My guess is that we

19   extracted it from their website.

20        Q.    You think there's something in

21   their website that says we don't have

22   dedicated account managers?

23             MR. BERNAY: Object to the form.

24        A.    No, I didn't say that. I said I

12:09

12:10

Electronically signed by Ann M. Belmont (201-234-827-3922)                    ea7650af-fe4a-42aa-8a27-29ee2ee30e7b

Jill Brewer, 3/25/2014

119

1    believe the information was extracted from

2    their website.

3            Q.    Did you ever learn that that

4    statement was false?

5            A.    No.  That I recall, no.

6        (Exhibit 82 identified.)

7            Q.    I've now handed to you what's

8    been marked as Defendant's Deposition Exhibit

9    82. This is an e-mail dated November 16,

12:11  10   2011, from Lisa Grippo to Diane Feyrer. Lisa

11   Grippo did not report to you, right?

12           A.    Yes, she did.

13           Q.    Oh, she did?  I thought she was

14   on the advertiser side.

15           A.    Nope.

16           Q.    Okay. That's right, that's

17   right. I'm mistaken.  She works in the

18   northeast region selling to practices, right?

19           A.    She was a regional vice

12:11  20   president.

21           Q.    Okay. Who is Diane Feyrer?

22           A.    One of her employees.

23           Q.    Do you need time to look for

24   something?

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                    ea7650af-fe4a-42aa-8a27-29ee2ee30e7b

Jill Brewer, 3/25/2014

120

1          A.    I'm listening.  Go ahead.

2          Q.    Okay. Well, the e-mail that I

3    just marked as Exhibit 82 reads, "Let's see

4    what she says. I know we are opposed in

5    principle, but we may need to do this

6    occasionally. I think Jill would be in favor

7    but Kimberly is opposed. I would not do it

8    regularly but... keep me posted," do you see

9    that?

12:12   10          A.    Okay.

11          Q.    And if you look at the back or

12   the second page in your example, there's a

13   discussion about someone from HAN, it looks

14   like, maybe -- I can't tell.  Maybe you can

15   tell me.  Someone from HAN telling a practice

16   that HAN could take down the ContextMedia

17   equipment and install the HAN equipment,

18   right?

19          A.    Let me read it.

12:12   20          Q.    Sure.

21          A.    Who did Lisa send this to?

22          Q.    I can't tell. But ultimately

23   there's --

24          A.    No, I mean, we need for this to

Electronically signed by Ann M. Belmont (201-234-827-3922)                    ea7650af-fe4a-42aa-8a27-29ee2ee30e7b

Jill Brewer, 3/25/2014

121

1    be -- you need to know who she sent this to.

2           Q.    Well --

3           A.    I need to know. So let me read

4    it though. But it doesn't --

5           Q.    Well, why don't you read it.

6           A.    -- say who she sent to, which

7    seems not correct.

8           Q.    I'll represent to you this is a

9    document produced --

12:13    10       A.    I know, but then I'm just saying

11   it doesn't say who she sent it to. Unless

12   Diane sent it to her previously. So Diane is

13   a salesperson, so Diane did this. Yes, it is,

14   okay. So this looks to me like Diane said

15   that to a practice.

16          Q.    Said what to a practice?

17          A.    "Hi.  See below."  It's what I'm

18   saying together.  "I may have stepped out of

19   bounds, but I offered for our technicians to

12:14    20   take down RHN when they install ours and to

21   box up RHN neatly for them to pick up.  The

22   POC didn't sound like they would say yes to

23   this, but in case they say yes, I am OK or

24   should I retract my offer?  Just thinking

Electronically signed by Ann M. Belmont (201-234-827-3922)                    ea7650af-fe4a-42aa-8a27-29ee2ee30e7b

Jill Brewer, 3/25/2014

122

1    'outside the box'...  pun intended." I do not

2    believe this here is correct. I would never

3    have authorized that. I'm just saying. I was

4    incredibly ethical, I would never. So Lisa is

5    responding to Diane, "Let's see what she

6    says. I know we are opposed in principle, but

7    we may do this occasionally, I think Jill

8    would be in favor but Kimberly opposed."

9    That --

12:15   10           Q.    You don't agree with that

11   statement?

12           A.    No, I do not.

13           Q.    You understand that Jill is you,

14   right?

15           A.    I understand Jill is you.  I'm

16   just saying that that's not right.

17           Q.    You disagree with her assessment

18   that you would be in favor of --

19           A.    Absolutely, I would never do

12:15   20   that. "I would not do it regularly, but keep

21   me posted. Let's see what she says."  So they

22   are going to ask me, and if you read here,

23   you can see that I said no, because this is

24   what happened.

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                    ea7650af-fe4a-42aa-8a27-29ee2ee30e7b

Jill Brewer, 3/25/2014

123

1          Q.    Do you recall anybody coming to

2    you asking you permission to remove

3    ContextMedia equipment?

4          A.    I can recall the salespeople

5    saying that's crazy, that's what they're

6    doing to us, why can't we do it?  I said

7    absolutely not.  That's what I recall.

8          Q.    Okay. And you surmised that the

9    comment on page 2 reflects a decision not to

12:16 10   remove the RHN equipment, right?

11         A.    Yes.

12         Q.    Isn't the timing wrong for that,

13   ma'am?  I mean, the timing of that comment is

14   November 15th --

15         A.    This is the 16th.

16         Q.    -- 2011.

17         A.    Yeah.

18         Q.    And on the 16th they're thinking

19   you'll approve, so if you rejected the idea,

12:16 20   it had to be on the 16th or later, right?

21         A.    It says, "I convinced her to

22   keep it up for now since we will be

23   installing." The other thing I would say is,

24   that all of our comments, every time a

Electronically signed by Ann M. Belmont (201-234-827-3922)                    ea7650af-fe4a-42aa-8a27-29ee2ee30e7b

Jill Brewer, 3/25/2014

124

1    comment is added, a date and time stamp is

2    stamped to it. So this looks like multiple

3    comments without date and time stamps.  And

4    maybe we didn't do -- we didn't always have

5    date and time stamps in every comment, but I

6    don't know that. I'm just saying that it

7    doesn't look like that. So I see that this is

8    on the 11th, so if this is on the 11th at

9    3:17, so it says, "Came to pick up, the only

12:17    10    two boxes and a third box monitor was still

11    there."

12        (Exhibit 83 identified.)

13        Q.    Let's mark this as Defendant's

14    Exhibit 83.

15        A.    And Lisa could never approve

16    this.

17        Q.    I've now handed to you, Ms.

18    Brewer, what's been marked Defendant's

19    Exhibit 83. This has multiple pages, take

12:18    20    whatever time you want to look at it and let

21    me know when you're ready to answer some

22    questions.

23        A.    So I'm asking him to take a

24    picture of where he saw the Humira ad on our

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                    ea7650af-fe4a-42aa-8a27-29ee2ee30e7b

Jill Brewer, 3/25/2014

125

1    content.

2          Q.    I haven't asked a question yet,

3    but go on.

4          A.    But I'm playing -- I'm saying

5    what this is.

6          Q.    Okay.

7          A.    That's what that is. I said,

8    yes, take a picture. This is just confusing

9    to me, so -- so go ask your questions.

12:21  10        Q.    Okay. On page 2, Ms. Grippo

11    again writes -- strike that, I'll start over.

12          On page 2, Ms. Grippo writes,

13    "Can we force their hand and get it installed

14    tomorrow?  I am sure Jill will approve taking

15    down the RHN equipment. Not the game I want

16    to play, but we may have to. Thoughts?" Do

17    you have any idea why Ms. Grippo, at least,

18    on two occasions now, was sure that you would

19    approve taking down ContextMedia's equipment?

12:21  20        A.    No. It's two occasions regarding

21    the same event. This is the same reference to

22    the same event, these aren't different.

23          Q.    Same practice?

24          A.    Yes.

Electronically signed by Ann M. Belmont (201-234-827-3922)                    ea7650af-fe4a-42aa-8a27-29ee2ee30e7b

Jill Brewer, 3/25/2014

126

1          Q.    Okay.

2          A.    I'm guessing.  Humira, New York,

3    New York.  Diane is New York, Lisa is in New

4    York, this is the same. So I have no idea why

5    she says that. She never says Jill did

6    approve it, she says I'm sure Jill will. I

7    never -- I just wouldn't to that.  I can't

8    imagine I would do that.

9          Q.    And you don't know for a fact

12:22  10   these two occasions are the same practice, do

11    you?

12          A.    It would be easy enough to find

13    out, but my take away is that they are one

14    and the same.

15          Q.    Okay. And as you pointed out a

16    moment ago, you had approved the taking of a

17    picture of the ContextMedia content, right?

18          A.    I wanted to get a picture of the

19    Humira ad that was playing on our product --

12:23  20   or no, I mean, the Humira ad that was playing

21    on RHN.

22          Q.    And you had no problem with

23    that?

24          A.    Taking a picture of an ad?  No.

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                                    ea7650af-fe4a-42aa-8a27-29ee2ee30e7b

Jill Brewer, 3/25/2014

127

1          Q.    Would you have any problem if

2    one of your employees had taken a picture of

3    the -- taken a video of the educational

4    content?

5               MR. BERNAY: Object to the form.

6          A.    I don't know.

7          Q.    And to be clear, would you have

8    any problem if someone was in a practice when

9    a content was running in a patient waiting

12:23  10   room with someone taking a video of the

11   content under those circumstances?

12          A.    Would I have a problem with

13   that?

14          Q.    Right.

15          A.    No, probably not.

16          Q.    Let me show you what we'll mark

17   as Exhibit 84.

18          A.    Is that illegal?

19          Q.    I'm not here dispensing legal

12:24  20   advice.

21               MR. BERNAY: We're not here to

22   answer questions.

23          A.    I don't think it's illegal.

24       (Exhibit 84 identified.)

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Jill Brewer, 3/25/2014

128

1        Q.    Exhibit 84, which I've just

2    handed to you, appears to be an e-mail

3    exchange that starts involving Ms. Billmann,

4    Liz Billmann, to be precise, Amy Finley, Lisa

5    Grippo, Heather McGauvran, and then it

6    involves you, and Lisa Grippo sends you an

7    e-mail. Do you see that?

8        A.    Em-hm.

9        Q.    And on the back there's a

12:25   10    comment in CMS concerning a practice who is

11    switching from HAN to ContextMedia, right?

12        A.    Okay.

13        Q.    And Ms. Billmann reports that,

14    when she tried to schedule the removal of the

15    HAN equipment, the person at the practice

16    said that ContextMedia will take down the

17    equipment and ship it to HAN, right?

18        A.    Em-hm.

19        Q.    And then Ms. Billmann tells the

12:25   20    practice, if anything happened to the

21    equipment, his office would be responsible,

22    right?

23        A.    Em-hm.

24        Q.    And his responses to that was,

Electronically signed by Ann M. Belmont (201-234-827-3922)                    ea7650af-fe4a-42aa-8a27-29ee2ee30e7b

Jill Brewer, 3/25/2014

129

1    "He said that we took the equipment down when

2    we enrolled them, and he just thought it was

3    an industry standard," do you see that?

4           A.    Em-hm.

5           Q.    And the we there is HAN, right?

6           A.    Em-hm.

7           Q.    Do you recall instances where

8    HAN took down the equipment of a competitor?

9           A.    Never. This is -- and I bet, if

12:26  10    you look this up, you could see if they were

11    ever installed there. Often a practice would

12    have a -- Reston, Virginia Town Center, they

13    would have had their own TV or their own old

14    special report, or old -- their old stuff,

15    and we, as a courtesy, would do that. Then we

16    stopped doing it because of liability. So

17    they would ask us sometimes to take down

18    their product.  I mean, their own personal

19    equipment.

12:26  20           Q.    But as you sit here today, you

21    have no idea what this person at the practice

22    is referring to here, do you?

23           A.    I would bet $1,000 or more what

24    I just said is what that refers to.

Electronically signed by Ann M. Belmont (201-234-827-3922)                    ea7650af-fe4a-42aa-8a27-29ee2ee30e7b

Jill Brewer, 3/25/2014

130

1          Q.     Do you gamble a lot?

2          A.     Nope.  I only bet when I know

3    I'm right.

4          Q.     On the --

5          A.     It would be easy enough to find

6    out.

7          Q.     On the front here, Ms. Grippo

8    writes to you, "They must be increasing their

9    incentives to switch.  Doubt that anyone

12:27  10   would consider a $100 gift card such a great

11   incentive.  Ugghh!!  Can we steal their

12   sponsors so they run out of $$?" Do you see

13   that?

14         A.     Em-hm.

15         Q.     Did you ever have a discussion

16   with Mr. -- Ms. -- let me start over.

17              Did you have a discussion with

18   Ms. Grippo about trying to steal ContextMedia

19   sponsors?

12:27  20         A.     We aren't in the advertising

21   side, that was a joke.

22         Q.     Okay.

23         A.     We're on the physician side.

24      (Exhibit 85 identified.)

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                                    ea7650af-fe4a-42aa-8a27-29ee2ee30e7b

Jill Brewer, 3/25/2014

131

1          Q.    I have now handed to you

2     Defendant's Deposition Exhibit 85. Let me

3     know when you're done reviewing it.

4          A.    Okay.

5          Q.    In the middle there, Ms. Devlin

6     writes to Thaleen Varian. Do you know who

7     Thaleen Varian is?

8          A.    She was a former sales rep in

9     the field.

12:30   10        Q.    She reported up to you?

11        A.    She reported to Amanda, who

12    reported to me.

13        Q.    And is Ms. Devlin still with the

14    company as far as you know?

15        A.    Yes.

16        Q.    And it's written there, "If we

17    were installing in the same spot we need the

18    uninstall date. I don't know of any offices

19    that have switched. From our experience with

12:30   20   Accent Health, we need a firm date and the

21    practice needs to tell them they will remove

22    it if the system is not removed by the

23    promised date of removal," do you see that?

24        A.    Em-hm.

Electronically signed by Ann M. Belmont (201-234-827-3922)                    ea7650af-fe4a-42aa-8a27-29ee2ee30e7b

Jill Brewer, 3/25/2014

132

1          Q.    Accent Health is a competitor,

2     right?

3          A.    Yes.

4          Q.    And a practice is switching from

5     Accent Health to Healthy Advice, right?

6          A.    It looks that way.

7          Q.    And were you aware of instances

8     where HAN representatives told the practice

9     to tell a competitor in a switch out

12:31  10     situation that, if the competitor didn't get

11     the equipment down by the promised date, that

12     the practice could take it to down?

13               MR. BERNAY: Object to the form.

14          A.    No, I recall our thought is

15     because -- is that we -- what this does, it

16     says that we're not going to do it. And if

17     they want the install date, then they

18     would -- we're not going to do it for them.

19     So what they choose to do is what they choose

12:31  20     to do, but we're not going to do it, that's

21     what this says.

22               And if you read down here, it

23     says we need the uninstall date, meaning

24     we're not going to show up until it's

Electronically signed by Ann M. Belmont (201-234-827-3922)                                    ea7650af-fe4a-42aa-8a27-29ee2ee30e7b

Jill Brewer, 3/25/2014

133

1    uninstalled.

2          Q.    Right.  But aren't you also

3    advising the practice that they should tell

4    the competitor, if the competitor doesn't get

5    it down by the date, the practice is going to

6    go ahead and take it down?

7          A.    No. We are trying to let the

8    practice -- we need a firm date and the

9    practice needs to tell them, the vendor, that

12:32  10  they -- because they were competitors, I'm

11    thinking Context, I don't know this. That

12    wouldn't show up and take the equipment.

13    They'd just leave it there, even after they

14    tried to cancel. So this is saying the

15    practice needs to tell them, the vendor, they

16    will remove it if the system is not removed

17    by the promised date of removal.  That is a

18    way to help give the vendor incentive to

19    actually remove it if they choose to switch.

12:32  20        Q.    Are you aware of instances where

21    a practice told HAN that it was switching to

22    ContextMedia and HAN gave the practice an

23    uninstall date and HAN didn't show up?

24          A.    No, not aware of that.

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Jill Brewer, 3/25/2014

134

1        Q.    Are you aware of instances where
2    HAN was unresponsive to a practice that was
3    trying to get HAN to remove the equipment so
4    that a competitor's equipment could be
5    installed?

6        A.    We had guidelines of the time
7    that we give to uninstall.  So if a practice
8    wanted us to uninstall in a shorter time
9    frame than what's outlined in the agreement,
12:33  10    then that's fine. Our agreement says we will
11    uninstall by these dates and times.  And to
12    the best of my knowledge, we obliged by our
13    agreement with the practice.

14      (Exhibit 86 identified.)

15        Q.    I've now handed to you what's
16    been marked as Defendant's Exhibit 86. Excuse
17    me. And this appears, does it not, to be an
18    entry from the CMS database that's being
19    forwarded by Ms. Hartfiel to Kelly Schulkers?
12:34  20        A.    This is after my departure.  I
21    can't speak to it.

22        Q.    Okay. In the middle of the
23    comment it's written, "Keisha stated that she
24    tried multiple times to contact PatientPoint

Electronically signed by Ann M. Belmont (201-234-827-3922)                    ea7650af-fe4a-42aa-8a27-29ee2ee30e7b

Jill Brewer, 3/25/2014

135

1    to have equipment removed and picked up prior

2    to RHN installing it but no one came to get

3    it." Now, I appreciate you have no knowledge

4    of this particular instance because you were

5    gone, but looking at that, does it refresh

6    your recollection that, while you were still

7    there, there were instances where HAN was not

8    responsive to a practice on deinstalling

9    HAN's equipment?

12:35   10              MR. BERNAY: Object to the form.

11           A.    To my knowledge, during my

12    employment, I would have given direction to

13    stay within the agreement guidelines. If our

14    agreement says we will -- we want X-written

15    notice, and we need X-days to uninstall it,

16    it is my belief that I would have worked

17    within the guidelines or the agreement that

18    we had with the practice.

19           Q.    Did -- while you were employed,

12:35   20    did Jennifer Hartfiel report to you directly

21    or indirectly?

22           A.    Indirect.

23           Q.    And how about Kelly Schulkers?

24           A.    Indirectly.

Electronically signed by Ann M. Belmont (201-234-827-3922)                                    ea7650af-fe4a-42aa-8a27-29ee2ee30e7b

Jill Brewer, 3/25/2014

136

1        Q.    And Jennifer writes to Kelly,

2    "Hey, I REALLY," and really is in all caps,

3    "need you to delete this comment," do you see

4    that?

5        A.    I looked at it, yeah. I'm not

6    even really reading it because I wasn't

7    employed, so I don't think it's relevant to

8    me.

9        Q.    Actually, you don't get to make

12:36  10    that judgment.

11        A.    Oh, so I have to read it?

12        Q.    Well, if you're going to refuse,

13    the record will reflect --

14        A.    I'm just saying, I'm not

15    employed at this time, so I can read it, but

16    it just -- I'm not employed, so I can't speak

17    to anything in here.

18        Q.    Yeah, but there's something

19    called -- there's a phenomenon called

12:36  20    "recollection refresh," and I could show you

21    a Coke bottle and it might refresh your

22    recollection.

23        A.    To an event when I wasn't

24    employed?

Electronically signed by Ann M. Belmont (201-234-827-3922)                    ea7650af-fe4a-42aa-8a27-29ee2ee30e7b

Jill Brewer, 3/25/2014

137

1        Q.    No, to an event when you were
2    employed.

3        A.    Okay.  So, I'll read it. Okay.
4    I've read it.

5        Q.    And my question for you is, do
6    you recall, while you were employed,
7    instances where folks on your team were
8    instructing others to delete comments?

9        A.    No.

12:37  10        Q.    So you can offer me no insight
11    into why she wrote this here?

12        A.    No, I cannot.

13            MR. O'BRIEN: I have no further
14    questions.  Thank you.

15            MR. BERNAY: Okay.  Let's just
16    take a break for one minute so I can get my
17    notes together.

18            MR. JAHN: We're off the record.

19            (Break taken.)

12:41  20            MR. JAHN: We're on the record.

21            DIRECT EXAMINATION

22    BY MR. BERNAY:

23        Q.    All right.  Ms. Brewer, I have
24    just a few more questions for you.  As you

Electronically signed by Ann M. Belmont (201-234-827-3922)                    ea7650af-fe4a-42aa-8a27-29ee2ee30e7b

Jill Brewer, 3/25/2014

138

1    know, I'm Aaron Bernay, I'm counsel to

2    PatientPoint, formerly known as Healthy

3    Advice Networks, in its lawsuit against

4    ContextMedia, and I just want to follow up on

5    a few things you said this afternoon and then

6    we'll be done.

7             You stated that you left prior

8    to the filing of the lawsuit in this case.

9    Are you aware of the allegations contained in

10   that lawsuit?

11        A.    I said I left in March, and to

12   my knowledge, there wasn't a lawsuit in place

13   at that time, just to be clear.

14             MR. O'BRIEN: And you're correct.

15        Q.    Have you seen the lawsuit that

16   was filed in this case?

17        A.    I have not.

18        Q.    And you're not privy to anything

19   that PatientPoint has learned about

20   ContextMedia as a result of this litigation,

21   are you?

22        A.    No.

23        Q.    You testified earlier that

24   enrollment agreements are important. Did

12:41 (line 10)
12:42 (line 20)

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                    ea7650af-fe4a-42aa-8a27-29ee2ee30e7b

Jill Brewer, 3/25/2014

139

1    every practice that signed up with Healthy

2    Advice have an enrollment agreement?

3         A.    Yes.

4         Q.    And HAN expected its practices

5    to honor that agreement; is that right?

6         A.    Yes.

7         Q.    You testified earlier that the

8    ACN network was around 160 offices and may

9    have increased during the end of your time

12:42  10  there, but do you know how many doctors were

11   in the network?

12        A.    I don't recall.

13        Q.    You testified earlier -- strike

14   that.

15             Again, I want to caution you not

16   to reveal the contents of your conversations

17   with attorneys.  I just simply want you to

18   confirm if you recall or not whether you met

19   with counsel in early 2011 concerning the

12:43  20  behavior of ContextMedia?

21        A.    We -- yes.

22        Q.    And do you recall that cease and

23   desist letters were issued around that time?

24        A.    Yes.

Electronically signed by Ann M. Belmont (201-234-827-3922)                    ea7650af-fe4a-42aa-8a27-29ee2ee30e7b

Jill Brewer, 3/25/2014

140

1          Q.     Mr. O'Brien showed you a lot of

2     exhibits today.

3                    MR. O'BRIEN: It wasn't a lot.

4                    MR. BERNAY: It's all relative.

5          A.     It's easy for you.

6          Q.     It felt like a lot of exhibits,

7     right?  If you look -- if you turn back to

8     Exhibit 80 in your pile. If you recall this

9     exhibit.

12:44   10          A.     I'm getting there. 80.

11          Q.     There you go.

12          A.     I'm fine.

13          Q.     Okay.

14          A.     I'm just looking.

15          Q.     Gotcha.  So in Exhibit 80 he

16     asked you several questions about this

17     database comment and Lori's e-mail to Vida

18     after that. Is there anything in this comment

19     that suggests the equipment remained with the

12:44   20     practice?

21          A.     It did not stay with the

22     practice.

23          Q.     And sitting here today, did

24     that -- it may have been lost on its way back

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                                          ea7650af-fe4a-42aa-8a27-29ee2ee30e7b

Jill Brewer, 3/25/2014

141

1    to Healthy Advice?

2          A.    All we know is that it was

3    removed and it was shipped, and upon receipt,

4    the CPU wasn't in the box with the monitor.

5    That's what this says.

6          Q.    If you turn to the exhibit that

7    just preceded that -- followed that, sorry,

8    81. You were asked about dedicated account

9    managers.

12:46  10          A.    Em-hm.

11          Q.    How many practice relation

12    managers did Healthy Advice have in 2011, if

13    you recall?

14          A.    I don't recall.

15          Q.    That's fine. During your time at

16    Healthy Advice, up until the time you left,

17    are you aware of any practices that switched

18    from ContextMedia to Healthy Advice?

19          A.    I'm trying to look at all the

12:47  20    e-mails you showed me. To say, I guess, I

21    don't remember, but looking through the

22    e-mails it would tell you.  I mean, that's

23    easy to do.  You don't need me to tell you,

24    but sorry.

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                    ea7650af-fe4a-42aa-8a27-29ee2ee30e7b

Jill Brewer, 3/25/2014

142

1      Q.    But you don't recall any one?

2      A.    No, I would hope we were good

3   enough to win, but it's easy enough to track

4   and see.

5            MR. BERNAY: All right. That's

6   all I have.

7            THE WITNESS: Super.

8            RECROSS-EXAMINATION

9   BY MR. O'BRIEN:

12:47   10      Q.    I just have a couple. In

11   response to a question from Mr. Bernay, I

12   believe I heard you say that you met with HAN

13   counsel in early 2011?

14      A.    I don't remember the time. I

15   remember we had -- and frankly I don't know

16   if I actually met with them or if it was just

17   all over the phone, telephone conferencing.

18      Q.    Okay.

19      A.    That's why I hesitated because I

12:48   20   couldn't remember if I actually met them or

21   if it was just via phone.  I know there were

22   several phone.

23      Q.    Whether it was a meeting or

24   meetings or phone calls, do you recall the

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                    ea7650af-fe4a-42aa-8a27-29ee2ee30e7b

Jill Brewer, 3/25/2014

143

1    names of any of the counsel that you

2    interacted with?

3           A.    Patil, I think. I think.

4           Q.    Is that the only name you can

5    recall?

6           A.    If you listed them I could tell.

7           Q.    I'm sorry?

8           A.    If you could list some names, I

9    could tell you.

12:48  10         Q.    Well, let's put it this way,

11   that's the only name you recall as you sit

12   here today, right?

13          A.    Yes, off the top of my head.

14                MR. O'BRIEN: I have nothing

15   further.

16                MR. BERNAY: I have nothing

17   further.

18                THE WITNESS: Yeah.

19                MR. BERNAY: Thank you.

12:48  20         MR. JAHN: We're off the record

21   at 12:47:34.

22

23

24

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                    ea7650af-fe4a-42aa-8a27-29ee2ee30e7b

Jill Brewer, 3/25/2014

```
                                                              144

   1

   2

   3                          SIGNATURE WAIVED

   4                      _____

                             JILL BREWER

   5

   6

   7

   8                     *   *   *

   9          (DEPOSITION CONCLUDED AT 12:47 p.m.)

  10                     *   *   *

  11

  12

  13

  14

  15

  16

  17

  18

  19

  20

  21

  22

  23

  24
```

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Jill Brewer, 3/25/2014

145

```
1              C E R T I F I C A T E
2
     STATE  OF  OHIO
3            :  SS
     COUNTY OF CLERMONT
4
5         I, ANN M. BELMONT, RPR, the
     undersigned, a duly qualified notary public
6    within and for the State of Ohio, do hereby
     certify that JILL BREWER was by me first duly
7    sworn to depose the truth and nothing but the
     truth; foregoing is the deposition given at
8    said time and place by said witness;
     deposition was taken pursuant to stipulations
9    hereinbefore set forth; deposition was taken
     by me in stenotype and transcribed by me by
10   means of computer; that availability of the
     deposition to the witness for examination and
11   signature is expressly waived. I am neither a
     relative of any of the parties or any of
12   their counsel; I am not, nor is the court
     reporting firm with which I am affiliated,
13   under a contract as defined in Civil Rule
     28(D) and have no financial interest in the
14   result of this action.
15        IN WITNESS WHEREOF, I have hereunto set
     my hand and official seal of office at
16   Cincinnati, Ohio this 13th day of April,
     2014.
17
18
                    _____
19   My commission expires:  ANN M. BELMONT, RPR
     December 4, 2015  Notary Public - State of Ohio
20
21
22
23
24
```

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

Electronically signed by Ann M. Belmont (201-234-827-3922)                    ea7650af-fe4a-42aa-8a27-29ee2ee30e7b